USDC SCAN INDEX SHEET

















MNA    6/4/03    8:45
3:03-CV-01108   LUCENT TECHNOLOGIES V. DELL COMPUTER CORP
*1*
*TRANCS.*

140

**ORIGINAL** IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

**FILED**

JUN - 2 2003

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

03 CV 1108 - BTM (LAB)

| | |
|---|---|
| LUCENT TECHNOLOGIES INC. and | : |
| LUCENT TECHNOLOGIES GUARDIAN I LLC, | : |
| | : |
| Plaintiffs, | : |
| | : |
| v. | : |
| | : |
| DELL COMPUTER CORPORATION, | : |
| | : |
| Defendant. | : |

Civil Action No. 03-205-KAJ

## STIPULATED ORDER TO TRANSFER

WHEREAS, on February 20, 2003, Plaintiffs Lucent Technologies Inc. and Lucent

Technologies Guardian I LLC (collectively, "Lucent") filed this action against Defendant Dell

Computer Corporation ("Dell") in this Court for infringement of United States Patent Nos.

4,439,759 ("the '759 patent"); 4,910,781 ("the '781 patent"); 4,958,226 ("the '226 patent");

5,227,878 ("the '878 patent"); 5,347,295 ("the '295 patent"); and 5,649,131 ("the '131 patent")

(collectively, "the Patents-in-Suit");

WHEREAS, on April 8, 2003, Microsoft Corporation ("Microsoft") filed Civil Action

No. 03-CV-0699 (RMB) (LAB) against Lucent in the United States District Court for the

Southern District of California ("the Microsoft Action") seeking declaratory judgments regarding

thirteen Lucent patents, including five of the Patents-in-Suit, namely the '781 patent, the '226

patent, the '878 patent, the '295 patent, and the '131 patent;

WHEREAS, in Civil Action No. 03-CV-0699 (RMB) (LAB) the United States District

Court for the Southern District of California has scheduled a technology tutorial for August 18-

1

21, 2003, and a *Markman* hearing for September 22-25, 2003, pertaining to all patents involved in that action;

WHEREAS, on May 6, 2003, Dell filed a Motion to Sever and Transfer Counts II-VI of Lucent's Complaint in this action to the United States District Court for the Southern District of California (relating to the five Patents-in-Suit also involved in the Microsoft Action:  the '781 patent, the '226 patent, the '878 patent, the '295 patent, and the '131 patent);

WHEREAS, Dell agrees, in return for Lucent's consent to transfer of this case and subject to the approval of the United States District Court for the Southern District of California, to abide by, and not seek to alter, the existing schedule for the technology tutorial and *Markman* hearing that has been set by the United States District Court for the Southern District of California; and

WHEREAS, Lucent, in return for Dell's agreement to abide by, and not seek to alter, the existing schedule for the technology tutorial and *Markman* hearing that has been set by the United States District Court for the Southern District of California, does not oppose, and hereby consents to, transfer of this case to the Southern District of California.

THEREFORE, in the interest of efficiency and judicial economy, the parties, by their attorneys, hereby stipulate, subject to the approval of the Court, as follows:

1.      Dell's Motion to Sever and Transfer is hereby GRANTED; and

2.      This case in its entirety is TRANSFERRED to the United States District Court for the Southern District of California for all further proceedings.

**SO ORDERED:**

Dated: 5/22/03

_____
United States District Judge

We hereby request, agree, and consent to entry of the foregoing Order.

By: _____
Josy W. Ingersoll (#1088)
John W. Shaw (#3362)
Christian Douglas Wright (#3554)
YOUNG CONAWAY STARGATT
    & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE  18991
(302) 571-6600

John M. Desmarais
Robert A. Appleby
Maxine Y. Graham
KIRKLAND & ELLIS
153 East 53rd Street
New York, New York 10022-4675
(212) 446-4800

Attorneys for Lucent Technologies Inc.
 and Lucent Technologies Guardian I LLC

By: _____
R. Eric Hutz (#2702)
CONNOLLY BOVE LODGE &
    HUTZ, LLP
1220 Market Street, P.O. Box 2207
Wilmington, DE  19899
(302) 658-9141

Joel M. Freed
Joseph A. Micallef
Ali R. Sharifahmadian
ARNOLD & PORTER
555 12th Street NW
Washington, DC  20004
(202) 942-5000

Attorneys for Dell Computer Corporation

- 3 -

OFFICE OF THE CLERK
# UNITED STATES DISTRICT COURT
### DISTRICT OF DELAWARE

Peter T. Dalleo
CLERK

LOCKBOX 18
844 KING STREET
U.S. COURTHOUSE
WILMINGTON, DELAWARE 19801
(302) 573-6170

May 23, 2003

Clerk of the Court
United States District Court
Southern District of California
880 Front Street, Room 4290
San Diego, CA 92101-8900

**'03 CV 1108 BTM LAB**

Re: **_Delaware_** Case No. CA 03-205 KAJ
**_Lucent Technolgies, et al., v. Dell Computer Corp._**

Dear Sir/Madam:

   In accordance with the Stipulated Order by the Honorable Kent A. Jordan dated May 23, 2003, I am transferring the above captioned case to the Southern District of California. Please find enclosed the original docket items: 1 - 39 (inclusive) and a certified copy of the docket sheet.

   Please acknowledge receipt of the above by signing and dating the enclosed copy of this letter. Please return the same to me in the enclosed, self-addressed, envelope.

        Sincerely,

        Peter T. Dalleo, Clerk

       By: _Bob Cruikshank_
         Deputy Clerk

PTD:rc
encl.

cc: The Honorable Kent A. Jordan
  Josy W. Ingersoll, Esq.
  R. Eric Hutz, Esq.

CLOSED

U.S. District Court
U. S. District Court of Delaware (Wilmington)

CIVIL DOCKET FOR CASE #: 03-CV-205

Lucent Technologies, et al v. Dell Computer Corp          Filed: 02/20/03
Assigned to: Judge Kent A. Jordan          Jury demand: Both
Demand: $0,000          Nature of Suit:  830
Lead Docket: None          Jurisdiction: Federal Question
Dkt# in other court: None

Cause: 35:271 Patent Infringement          '03 CV  1108 BTM LAB

LUCENT TECHNOLOGIES, INC.          Josy W. Ingersoll
     plaintiff                    [COR LD NTC]
                                  Young, Conaway, Stargatt &
                                  Taylor
                                  The Brandywine Building
                                  1000 West Street, 17th Floor
                                  P.O. Box 391
                                  Wilmington, DE 19899-0391
                                  (302) 571-6600


LUCENT TECHNOLOGIES GUARDIAN I    Josy W. Ingersoll
LLC                               (See above)
     plaintiff                    [COR LD NTC]


     v.


DELL COMPUTER CORP                R. Eric Hutz
     defendant                    [COR LD NTC]
                                  Connolly, Bove, Lodge & Hutz
                                  1220 Market Bldg.
                                  P.O. Box 2207
                                  Wilmington, DE 19899
                                  (302) 658-9141


========================

DELL COMPUTER CORP                R. Eric Hutz
     counter-claimant             [COR LD NTC]
                                  Connolly, Bove, Lodge & Hutz
                                  1220 Market Bldg.
                                  P.O. Box 2207
                                  Wilmington, DE 19899
                                  (302) 658-9141


Docket as of May 22, 2003 2:54 pm          Page 1

Proceedings include all events.
1:03cv205 Lucent Technologies, et al v. Dell Computer Corp        CLOSED

    v.


LUCENT TECHNOLOGIES, INC.          Josy W. Ingersoll
    counter-defendant             [COR LD NTC]
                                   Young, Conaway, Stargatt &
                                   Taylor
                                   The Brandywine Building
                                   1000 West Street, 17th Floor
                                   P.O. Box 391
                                   Wilmington, DE 19899-0391
                                   (302) 571-6600


LUCENT TECHNOLOGIES GUARDIAN I      Josy W. Ingersoll
LLC                                 (See above)
    counter-defendant             [COR LD NTC]

Proceedings include all events.
1:03cv205 Lucent Technologies, et al v. Dell Computer Corp          CLOSED

| 2/20/03 | 1 | COMPLAINT filed. Magistrate Consent Notice to Pltf. FILING FEE $ 150.00   RECEIPT # 133698 (es) |
| 2/20/03 | -- | DEMAND for jury trial by Lucent Technologies, Lucent Technologies (es) |
| 2/20/03 | -- | SUMMONS(ES) issued for Dell Computer Corp (es) |
| 2/20/03 | 2 | Report to Commissioner of Patents and Trademarks. Exit original. RE: 4,439,759, 4,910,781, 4,958,226, 5,227,878, 5,347,295 and 5,649,131. (es) |
| 2/20/03 | 3 | Lucent's Rule 7.1(a) Disclosure Statement (es) |
| 2/21/03 | 4 | RETURN OF SERVICE executed as to Dell Computer Corp 2/20/03 (c/o The Corporation Service Company) Answer due on 3/12/03 for Dell Computer Corp (bkb) |
| 2/26/03 | 5 | CASE assigned  to Judge Kent A. Jordan . Notice to all parties. (rb) |
| 3/11/03 | 6 | ANSWER to complaint with jury demand; filed by Dell Computer Corp (Attorney R. Eric Hutz); and COUNTERCLAIM against Lucent Technologies, Lucent Technologies Guardian (rc) [Entry date 03/12/03] |
| 3/12/03 | 7 | Letter dated 3/12/03 by Judge Jordan to parties enclosing a scheduling order form and requesting parties contact the Court w/in 10-days to schedule a teleconference. (rc) [Entry date 03/13/03] |
| 3/25/03 | 8 | ORDER,  set Tele-Scheduling Conference for 4:00 4/3/03 ( signed by Judge Kent A. Jordan )  copies to: cnsl. (nl) |
| 3/31/03 | 9 | Letter dated 3/31/03 to Judge Jordan by John W. Shaw, Esq., enclosing proposed joint discovery plan. (rc) [Entry date 04/01/03] |
| 3/31/03 | 10 | MOTION by Dell Computer Corp with Proposed Order for Ali R. Sharifahmadian to Appear Pro Hac Vice  re: [10-1] motion (rc) [Entry date 04/01/03] |
| 3/31/03 | 11 | MOTION by Dell Computer Corp with Proposed Order for Joel M. Freed to Appear Pro Hac Vice  re: [11-1] motion (rc) [Entry date 04/01/03] |
| 3/31/03 | 12 | MOTION by Dell Computer Corp with Proposed Order for Robert Jones Worrall to Appear Pro Hac Vice  re: [12-1] motion (rc) [Entry date 04/01/03] |
| 3/31/03 | 13 | MOTION by Dell Computer Corp with Proposed Order for Leslie L. Jacobs, Jr., to Appear Pro Hac Vice  re: [13-1] motion (rc) [Entry date 04/01/03] |

Proceedings include all events.
1:03cv205 Lucent Technologies, et al v. Dell Computer Corp          CLOSED

3/31/03   14     ANSWER by Lucent Technologies, Lucent Technologies to [6-2]
                 counter claim (rc) [Entry date 04/01/03]

3/31/03   15     MOTION by Lucent Technologies, Lucent Technologies with
                 Proposed Order to Strike [6-1] Dell's Affirmative Defense
                 of Unenforceability , and to Dismiss Dell's Counterclaim
                 to the Extent it is based on that Affirmative Defense
                 Answer Brief due 4/14/03 re: [15-1, 15-2] motion (rc)
                 [Entry date 04/01/03]

3/31/03   16     Opening Brief Filed by Lucent Technologies, Lucent
                 Technologies, in support  [15-1] motion to Strike [6-1]
                 Dell's Affirmative Defense of Unenforceability and [15-2]
                 motion to Dismiss Dell's Counterclaim to Extent it is based
                 on that Affirmative Defense - Answer Brief due 4/14/03 (rc)
                 [Entry date 04/01/03]

4/1/03    --     So Ordered granting [10-1] motion for Ali R. Sharifahmadian
                 to Appear Pro Hac Vice ( signed by Judge Kent A. Jordan )
                 Notice to all parties. (rc) [Entry date 04/02/03]

4/1/03    --     So Ordered granting [11-1] motion for Joel M. Freed to
                 Appear Pro Hac Vice ( signed by Judge Kent A. Jordan )
                 Notice to all parties. (rc) [Entry date 04/02/03]

4/1/03    --     So Ordered granting [12-1] motion for Robert Jones Worrall
                 to Appear Pro Hac Vice ( signed by Judge Kent A. Jordan )
                 Notice to all parties. (rc) [Entry date 04/02/03]

4/1/03    --     So Ordered granting [13-1] motion for Leslie L. Jacobs,
                 Jr., to Appear Pro Hac Vice ( signed by Judge Kent A.
                 Jordan ) Notice to all parties. (rc) [Entry date 04/02/03]

4/2/03    17     MOTION by Dell Computer Corp., with Proposed Order for
                 Joseph A. Micallef to Appear Pro Hac Vice re: [17-1]
                 motion (rc)

4/2/03    --     So Ordered granting [17-1] motion for Joseph A. Micallef to
                 Appear Pro Hac Vice ( signed by Judge Kent A. Jordan )
                 Notice to all parties. (rc)

4/3/03    18     STIPULATED PROTECTIVE ORDER - filed by the parties. (rc)

4/3/03    --     Scheduling conference held before Judge Jordan.  (Ct Rptr
                 V. Gunning). (rc) [Entry date 04/04/03]

4/4/03    --     So Ordered granting [18-1] stipulated protective order (
                 signed by Judge Kent A. Jordan ) Notice to all parties. (rc)

4/7/03    19     CERTIFICATE OF SERVICE by Dell Computer Corp, Re: Dell's
                 1st set of Interrog., & 1st set of Doc. Requests were
                 served. (rc)

Proceedings include all events.
1:03cv205 Lucent Technologies, et al v. Dell Computer Corp          CLOSED

4/8/03    20      MOTION by Lucent Technologies, Lucent Technologies with
                  Proposed Order for Robert A. Appleby and Maxine Y. Graham
                  to Appear Pro Hac Vice re: [20-1] motion (rc)

4/8/03    --      So Ordered granting [20-1] motion for Robert A. Appleby and
                  Maxine Y. Graham to Appear Pro Hac Vice ( signed by Judge
                  Kent A. Jordan ) Notice to all parties. (rc)

4/10/03   21      TRANSCRIPT filed by Ct Rptr V. Gunning, Re: Scheduling
                  teleconference held on 4/3/03. (rc)

4/14/03   22      Reply/Answer Brief Filed by Dell Computer Corp., Re: [15-1]
                  motion to Strike [6-1] Dell's Affirmative Defense of
                  Unenforceability & [15-2] motion to Dismiss Dell's
                  Counterclaim to the Extent it is based on that Affirmative
                  Defense  - Reply Brief due 4/21/03 (rc)
                  [Entry date 04/15/03]

4/15/03   23      Letter dated 4/15/03 to Judge Jordan by John W. Shaw, Esq.,
                  enclosing joint proposed scheduling order for approval. (rc)
                  [Entry date 04/16/03]

4/16/03   24      SCHEDULING ORDER:  setting Discovery cutoff to 5/14/04 ;
                  Status Report is due 10/31/03 ; set Status Conference for
                  4:30 on 11/6/03 ; set Deadline for filing dispositive
                  motions to 9/2/04 ; Joint Claim Construction is due on
                  7/23/04 ; set Markman Hearing for 11/15/04 at 9:30 ;
                  Pretrial conference set for 4:30 on 2/28/05 ; Proposed
                  Pretrial Order is due on 2/21/05 ; set Jury Trial (3-weeks)
                  for 10:00 on 3/7/05 ; Case is referred to the U.S.
                  Magistrate Judge for ADR.( signed by Judge Kent A. Jordan )
                  copies to: cnsl. (rc)

4/16/03   --      Deadline updated per DI#24;  set Markman Hearing for 9:30
                  on 11/15/04 (rc)

4/16/03   25      TRIAL MANAGEMENT ORDER - (see Order for details). ( signed
                  by Judge Kent A. Jordan ) copies to: cnsl. (rc)

4/21/03   26      Reply Brief Filed by Lucent Technologies, in support of
                  [15-1] motion to Strike [6-1] Dell's Affirmative Defense of
                  Unenforceability, and in support of [15-2] motion to
                  Dismiss Dell's Counterclaim to the Extent it is based on
                  that Affirmative Defense (rc) [Entry date 04/22/03]

4/23/03   27      CERTIFICATE OF SERVICE by Lucent Technologies, Lucent
                  Technologies, Re: Pltf's Initial Disclosure Statement was
                  served. (rc)

4/24/03   28      CERTIFICATE OF SERVICE by Dell Computer Corp, Re: Deft's
                  Initial Disclosures were served. (rc) [Entry date 04/25/03]

Proceedings include all events.
1:03cv205 Lucent Technologies, et al v. Dell Computer Corp          CLOSED

4/28/03  29      MOTION by Lucent Technologies, Lucent Technologies with
                 Proposed Order for John M. Desmarais to Appear Pro Hac
                 Vice re: [29-1] motion (rc)

4/28/03  --      So Ordered granting [29-1] motion for John M. Desmarais to
                 Appear Pro Hac Vice ( signed by Judge Kent A. Jordan )
                 Notice to all parties. (rc) [Entry date 04/29/03]

5/1/03   30      CERTIFICATE OF SERVICE by Dell Computer Corp, Re: Deft's
                 2nd set of Doc Requests were served. (rc)

5/6/03   31      MOTION by Lucent Technologies, Lucent Technologies with
                 Proposed Order for Todd M. Friedman, Jon T. Hohenthaner,
                 Steven J. Lever, Michael E. Stimson & Brian P. Verminski to
                 Appear Pro Hac Vice re: [31-1] motion (rc)

5/6/03   32      MOTION by Dell Computer Corp., with Proposed Order to
                 Sever, and to Transfer Case Answer Brief due 5/20/03
                 re: [32-1, 32-2] motion (rc) [Entry date 05/07/03]

5/6/03   33      Opening Brief Filed by Dell Computer Corp., in support of
                 [32-1] motion to Sever & [32-2] motion to Transfer Case  -
                 Answer Brief due 5/20/03 (rc) [Entry date 05/07/03]

5/6/03   34      Declaration of Henry N. Garrana filed by Dell Computer
                 Corp., in support of [32-1] motion to Sever, [32-2] motion
                 to Transfer Case (rc) [Entry date 05/07/03]

5/7/03   35      ORDER,  set Telephone Conference for 1:00 on 5/20/03 to
                 discuss the scheduling of mediation. ( signed by Judge
                 Mary P. Thynge ) copies to: cnsl. (rc)

5/7/03   --      So Ordered granting [31-1] motion for Todd M. Friedman, Jon
                 T. Hohenthaner, Steven J. Lever, Michael E. Stimson & Brian
                 P. Verminski to Appear Pro Hac Vice ( signed by Judge Kent
                 A. Jordan ) Notice to all parties. (rc)
                 [Entry date 05/08/03]

5/8/03   36      CERTIFICATE OF SERVICE by Lucent Technologies, Re: Pltf's
                 Objections/Responses to Deft's 1st set of Doc. Req., 1st
                 set of Interrog., and Pltf's 1st set of Interrog., & Req.
                 for Prod., to Deft, were served (rc)

5/16/03  37      Letter dated 5/16/03 to Judge Jordan by R. Eric Hutz, Esq.,
                 enclosing letter by Christopher S. Marchese, Esq., counsel
                 for Microsoft, Re: Dell's pending Motion [DI# 32] to Sever
                 & Transfer. (rc) [Entry date 05/19/03]

5/20/03  38      STIPULATION with proposed order extending time to 5/23/03
                 for Pltf to file Answer Brief Re: Motion [DI# 32] to Sever
                 and Transfer. (rc)

Docket as of May 22, 2003 2:54 pm                    Page 6

Proceedings include all events.
1:03cv205 Lucent Technologies, et al v. Dell Computer Corp          CLOSED

5/20/03   --      So Ordered granting [38-1] stipulation  reset Answer Brief
                  Deadline to 5/23/03  re: [32-1] motion to Sever, & [32-2]
                  motion to Transfer Case ( signed by Judge Kent A. Jordan )
                  Notice to all parties. (rc) [Entry date 05/21/03]

5/21/03   39      STIPULATION with proposed order granting Dell's Motion
                  [DI#32] to Sever and Transfer Case to the United States
                  District Court for the Southern District of California. (rc)
                  [Entry date 05/22/03]

5/22/03   --      So Ordered granting [39-1] stipulation ( signed by Judge
                  Kent A. Jordan ) Notice to all parties. (rc)

5/22/03   --      Interdistrict transfer to District of Southern District of
                  California, (DI#'s 1-39 included). (rc)

CERTIFIED: 5/22/03
AS A TRUE COPY:
ATTEST:
PETER T. DALLEO, CLERK
BY
Deputy Clerk

Docket as of May 22, 2003 2:54 pm                          Page



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LUCENT TECHNOLOGIES INC. and
LUCENT TECHNOLOGIES GUARDIAN I LLC,   :

      Plaintiffs,   :

      v.   :    Civil Action No.  03-205-KAJ

DELL COMPUTER CORPORATION,   :

      Defendant.   :

## STIPULATED ORDER TO TRANSFER

WHEREAS, on February 20, 2003, Plaintiffs Lucent Technologies Inc. and Lucent

Technologies Guardian I LLC (collectively, "Lucent") filed this action against Defendant Dell

Computer Corporation ("Dell") in this Court for infringement of United States Patent Nos.

4,439,759 ("the '759 patent"); 4,910,781 ("the '781 patent"); 4,958,226 ("the '226 patent");

5,227,878 ("the '878 patent"); 5,347,295 ("the '295 patent"); and 5,649,131 ("the '131 patent")

(collectively, "the Patents-in-Suit");

WHEREAS, on April 8, 2003, Microsoft Corporation ("Microsoft") filed Civil Action

No. 03-CV-0699 (RMB) (LAB) against Lucent in the United States District Court for the

Southern District of California ("the Microsoft Action") seeking declaratory judgments regarding

thirteen Lucent patents, including five of the Patents-in-Suit, namely the '781 patent, the '226

patent, the '878 patent, the '295 patent, and the '131 patent;

WHEREAS, in Civil Action No. 03-CV-0699 (RMB) (LAB) the United States District

Court for the Southern District of California has scheduled a technology tutorial for August 18-

21, 2003, and a *Markman* hearing for September 22-25, 2003, pertaining to all patents involved in that action;

WHEREAS, on May 6, 2003, Dell filed a Motion to Sever and Transfer Counts II-VI of Lucent's Complaint in this action to the United States District Court for the Southern District of California (relating to the five Patents-in-Suit also involved in the Microsoft Action: the '781 patent, the '226 patent, the '878 patent, the '295 patent, and the '131 patent);

WHEREAS, Dell agrees, in return for Lucent's consent to transfer of this case and subject to the approval of the United States District Court for the Southern District of California, to abide by, and not seek to alter, the existing schedule for the technology tutorial and *Markman* hearing that has been set by the United States District Court for the Southern District of California; and

WHEREAS, Lucent, in return for Dell's agreement to abide by, and not seek to alter, the existing schedule for the technology tutorial and *Markman* hearing that has been set by the United States District Court for the Southern District of California, does not oppose, and hereby consents to, transfer of this case to the Southern District of California.

THEREFORE, in the interest of efficiency and judicial economy, the parties, by their attorneys, hereby stipulate, subject to the approval of the Court, as follows:

1.      Dell's Motion to Sever and Transfer is hereby GRANTED; and

2.      This case in its entirety is TRANSFERRED to the United States District Court for the Southern District of California for all further proceedings.

- 2 -

**SO ORDERED:**

Dated: _5/22/03_

_____
United States District Judge

We hereby request, agree, and consent to entry of the foregoing Order.

By: _____
Josy W. Ingersoll (#1088)
John W. Shaw (#3362)
Christian Douglas Wright (#3554)
YOUNG CONAWAY STARGATT
& TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE  18991
(302) 571-6600

John M. Desmarais
Robert A. Appleby
Maxine Y. Graham
KIRKLAND & ELLIS
153 East 53rd Street
New York, New York 10022-4675
(212) 446-4800

Attorneys for Lucent Technologies Inc.
and Lucent Technologies Guardian I LLC

By: _____
R. Eric Hutz (#2702)
CONNOLLY BOVE LODGE &
HUTZ, LLP
1220 Market Street, P.O. Box 2207
Wilmington, DE  19899
(302) 658-9141

Joel M. Freed
Joseph A. Micallef
Ali R. Sharifahmadian
ARNOLD & PORTER
555 12th Street NW
Washington, DC  20004
(202) 942-5000

Attorneys for Dell Computer Corporation

- 3 -

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

LUCENT TECHNOLOGIES INC. and
LUCENT TECHNOLOGIES GUARDIAN I LLC,

      Plaintiffs,

      v.

DELL COMPUTER CORPORATION,

      Defendant.

Civil Action No.: 03-205-KAJ

### STIPULATION AND ORDER

The parties hereby stipulate and agree, subject to the approval of the Court, that

the time for plaintiffs to file and serve their answering brief in opposition to defendant's motion

to sever and transfer (D.I. 32) is extended through and including May 23, 2003.

YOUNG CONAWAY STARGATT &
  TAYLOR LLP

CONNOLLY BOVE LODGE & HUTZ LLP

Josy W. Ingersoll (#1088)
John W. Shaw (#3362)
1000 West Street, 17th Floor
Wilmington, Delaware  19899-0391
(302) 571-6600
Attorneys for Plaintiffs

R. Eric Hutz (No. 2702)
1220 Market Street
Wilmington, DE  19899
(302) 658-9141
Attorneys for Defendant

SO ORDERED this 20th day of ___May___, 2003,

_____
United States District Judge

WP3:890286.1

57224.1002

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LUCENT TECHNOLOGIES INC. and
LUCENT TECHNOLOGIES GUARDIAN I LLC,

        Plaintiffs,

          v.

DELL COMPUTER CORPORATION,

        Defendant.

:
:
:
:
:
:
:   Civil Action No.: 03-205-KAJ
:
:
:
:

## STIPULATION AND ORDER

        The parties hereby stipulate and agree, subject to the approval of the Court, that

the time for plaintiffs to file and serve their answering brief in opposition to defendant's motion

to sever and transfer (D.I. 32) is extended through and including May 23, 2003.

YOUNG CONAWAY STARGATT &
   TAYLOR LLP



_____
Josy W. Ingersoll (#1088)
John W. Shaw (#3362)
1000 West Street, 17th Floor
Wilmington, Delaware  19899-0391
(302) 571-6600
Attorneys for Plaintiffs

CONNOLLY BOVE LODGE & HUTZ LLP



_____
R. Eric Hutz (No. 2702)
1220 Market Street
Wilmington, DE  19899
(302) 658-9141
Attorneys for Defendant

SO ORDERED this _____ day of _____, 2003,



_____
United States District Judge

ORIGINAL

LAW OFFICES

JAMES M. MULLIGAN, JR.
ARTHUR G. CONNOLLY, JR.
RUDOLF E. HUTZ
HAROLD PEZZNER
RICHARD M. BECK (DC BAR)
PAUL E. CRAWFORD
STANLEY C. MACEL, III
HENRY E. GALLAGHER, JR.
GEORGE PAZUNIAK
N. RICHARD POWERS
BURTON A. AMERNICK (DC BAR)*
MORRIS LISS (DC BAR)*
STANLEY B. GREEN (DC BAR)*
RICHARD DAVID LEVIN
JOHN A. CLARK, III
JEFFREY B. BOVE
JAMES J. WOODS, JR.
COLLINS J. SEITZ, JR.
GEORGE R. PETTIT (DC BAR)*
EDWARD F. EATON
CHARLES J. DURANTE
MICHAEL K. NEWELL
PATRICIA SMINK ROGOWSKI
MARY W. BOURKE
ROBERT G. McMORROW, JR. (PA BAR)
R. ERIC HUTZ
ARTHUR G. CONNOLLY, III
WILLIAM E. McSHANE (PA BAR)
JAMES D. HEISMAN
JEFFREY C. WISLER
ASHLEY I. PEZZNER
KAREN C. BIFFERATO
GERARD M. O'ROURKE
FRANCIS DiGIOVANNI
SAMUEL D. BRICKLEY II
MATTHEW F. BOYER
CHRISTINE M. HANSEN

# CONNOLLY BOVE LODGE & HUTZ LLP

1220 MARKET STREET
P.O. BOX 2207
WILMINGTON, DELAWARE 19899

TELEPHONE   (302) 658-9141
FACSIMILE   (302) 658-5614
DIRECT DIAL (302) 888-6230

www.eh@cblhlaw.com

WASHINGTON OFFICE
SUITE 800
1990 M STREET NW
WASHINGTON, DC 20036-3425
TELEPHONE: (202) 331-7111
FACSIMILE: (202) 293-6229

May 16, 2003

ARTHUR G. CONNOLLY
PARTNER EMERITUS

WERNER H. HUTZ
1944-1970
JANUAR D. BOVE, JR.
1949-1991

COUNSEL
CRAIG B. YOUNG (DC & VA BAR)*
WILLIAM E. LAMBERT III (PA BAR)
M. EDWARD DANBERG
WAYNE C. JAESCHKE (NY BAR)
WILLIAM C. BERGMANN (PA BAR)*
SUSAN E. SHAW McBEE (DC BAR)*

THOMAS F. POCHÉ (DC BAR)*
MICHAEL L. LOVITZ (PA BAR)
OLEH V. BILYNSKY
JUDITH M. JONES
JAMES M. OLSEN
ERIC J. EVAIN
GREGORY J. WEINIG
DANIEL C. MULVENY
MICHELLE McMAHON
CHRISTOS T. ADAMOPOULOS
MAX B. WALTON
DANIEL J. HARBISON
ELLIOT C. MENDELSON
GARY A. BRIDGE (MA BAR)
HELENA C. RYCHLICKI
LARRY J. HUME (DC BAR)*
JOSEPH BARRERA (DC BAR)*
REDMOND L. CLEVENGER, JR
LIZA D. HOHENSCHUTZ (PA BAR)
MARK E. FREEMAN
GWENDOLYN M. LACY
BRIAN J. HAIRSTON (VA BAR)*
C. KEITH MONTGOMERY (VA BAR)*
ZHUN LU (NJ BAR)
C. TODD MARKS (DC & VA BAR)*

* RESIDENT WASHINGTON OFFICE

DELAWARE BAR UNLESS OTHERWISE
DESIGNATED

**HAND DELIVERED**

Honorable Kent A. Jordan
United States District Court
844 North King Street, Room 6325, Lockbox 10
Wilmington, DE  19801

Re:    **Lucent Technologies, Inc., et al. v. Dell Computer Corporation**
       **(C. A. No. 03-205-KAJ)**

Dear Judge Jordan:

Enclosed please find a letter from counsel for Microsoft regarding Dell's pending motion to sever and transfer, which the undersigned has been asked to forward to the Court.

Respectfully submitted,

R. Eric Hutz

REH\evs
Enclosure
cc:    Clerk of the Court (by hand w/enclosure)
       Counsel of Record (See attached Certificate of Service)

# FISH & RICHARDSON P.C.

4350 La Jolla Village Drive
Suite 500
San Diego, California
92122

Telephone
858 678-5070

Facsimile
858 678-5099

Web Site
www.fr.com

Frederick P. Fish
1855-1930

W.K. Richardson
1859-1951

**VIA FACSIMILE**

May 16, 2003

Joel M. Freed, Esq.
Arnold & Porter
555 12th Street NW
Washington, D.C. 20004

Re:   Microsoft v. Lucent
      USDC-S.D. Cal. - Case No. 03 CV 0699 B (LAB)
      Lucent v. Gateway
      USDC-S.D. Cal. – Case No. 02 CV 2060 B (LAB)

BOSTON

DALLAS

DELAWARE

NEW YORK

SAN DIEGO

SILICON VALLEY

TWIN CITIES

WASHINGTON, DC

Dear Mr. Freed:

I understand that Dell has filed a motion to sever Counts II-VI of Lucent's complaint in the *Lucent v. Dell* litigation ("the *Dell* case"), and to transfer those counts to the S.D. Cal., where they could be consolidated with the pending actions between Lucent, Microsoft, and Gateway relating to the same patents and accused products. Those related actions are *Lucent Techs. Inc. v. Gateway, Inc.*, Case No. 02 CV 2060 B LAB (S.D. Cal.) ("the *Gateway* case"), and *Microsoft Corp. v. Lucent Techs. Inc.*, Case No. 03 CV 0699 B (LAB) (S.D. Cal.) ("the *Microsoft* case").

In response to your request for information regarding the status of the related pending litigation in the S.D. Cal., I write to advise you of the following facts:

1.   The Six Patents Lucent Has Asserted Against Dell Fully Overlap Those at Issue in the *Microsoft* and *Gateway* Cases.

As shown in the chart below, every one of the six patents at issue in the *Dell* litigation is also at issue in the *Microsoft* case, the *Gateway* case, or both. Five of those six patents are addressed in the *Microsoft* case, in which Microsoft has sought a declaration that the patents are invalid and not infringed by the very same Microsoft products that Lucent has accused of infringement in the *Dell* litigation. Accordingly, transferring the *Dell* case to the Southern District of California would promote efficiency and avoid the possibility of inconsistent rulings on the same patents, products, and prior art.

FISH & RICHARDSON P.C.

Joel M. Freed, Esq.
May 16, 2003
Page 2

| Patents at Issue | Lucent v. Dell (*Dell* case) | Microsoft v. Lucent (*Microsoft* case) | Lucent v. Gateway (*Gateway* Case) |
|---|---|---|---|
| 4,958,226 | √ | √ | √ |
| 4,910,781 | √ | √ | |
| 5,227,878 | √ | √ | |
| 5,347,295 | √ | √ | |
| 5,649,131 | √ | √ | |
| 4,439,759 | √ | | √ |
| 4,317,956 | | √ | √ |
| 4,383,272 | | √ | √ |
| 4,617,676 | | √ | √ |
| 4,701,954 | | √ | |
| 4,763,356 | | √ | √ |
| 5,341,457 | | √ | |
| 5,627,938 | | √ | |
| Re 36,714 | | √ | |

2.   The *Gateway* and *Microsoft* Actions Are Pending Before the Same Judge, Who Is Treating the Cases as One.

Not only are the *Gateway* and *Microsoft* cases pending in the same Court, but they are also before the same Judge: Judge Rudi M. Brewster. Judge Brewster has not yet officially consolidated the actions, but he is handling them together for purposes of discovery and claim construction. In addition, both cases are assigned to the same Magistrate—Magistrate Judge Larry A. Burns—who has scheduled the Case Management/Settlement Conference in the *Gateway* case to be held concurrently with the Early Neutral Evaluation Conference in the *Microsoft* case.

3.   Discovery Is Well Underway in the *Gateway* Case, Which Was Filed Much Earlier Than Lucent's Action Against Dell.

Lucent originally sued Gateway in the Eastern District of Virginia in June 2002, long before it filed its action against Dell. Almost immediately thereafter, Gateway and Lucent began discovery, propounding and responding to a total of 363 document requests, 17 interrogatories, and 213 requests for admission. The case was transferred to the Southern District of California in late 2002. In February 2003, Microsoft intervened in the *Gateway* action in response to indemnity demands from Gateway

FISH & RICHARDSON P.C.

Joel M. Freed, Esq.
May 16, 2003
Page 3

based on Lucent's accusations that Gateway's alleged infringement of five of the
seven patents at issue resulted from Gateway's use of Microsoft products. Since
joining the action as an intervenor, Microsoft also has been actively pursuing
discovery, serving and responding to a total of 320 document requests and 26
interrogatories, and serving 11 third party subpoenas. The subpoenas, which were
served on the inventors of the asserted patents, are being handled in large part by
Lucent, which has begun producing responsive documents. In addition, Lucent,
Gateway, and Microsoft are far along in negotiating a protective order. Accordingly,
discovery related to the asserted patents and accused products is already well
underway in the *Gateway* case.

4.   The *Markman* Hearing Is Already Scheduled for Both the *Microsoft* and
     *Gateway* Cases.

In April 2003, Judge Brewster set a schedule for *Markman*, under which the Court
will construe the asserted claims of all fifteen patents at issue in the *Microsoft* and
*Gateway* actions. Under that schedule, the Court will hold a four-day technology
tutorial on all fifteen patents from August 18 through August 21, 2003. Following the
tutorial, the Court will hold a four-day *Markman* hearing, again addressing all fifteen
patents, from September 22 through September 25, 2003. Judge Brewster has
indicated that, by the end of the *Markman* hearing, the parties will know the Court's
construction of all of the disputed terms. Accordingly, it appears that Judge
Brewster's *Markman* ruling will issue by September 25, 2003, on all fifteen patents,
including the six patents at issue in the *Dell* litigation.

Very truly yours,

Christopher S. Marchese

CSM/reb

10274020.doc

## CERTIFICATE OF SERVICE

I certify that today on May 16, 2003, a copy of the foregoing LETTER TO THE

HONORABLE KENT A. JORDON DATED MAY 16, 2003 was served upon counsel for

defendants as follows:

### BY HAND
John W. Shaw
Christian Douglas Wright
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Post Office Box 391
Wilmington, Delaware  19899-0391

### FEDERAL EXPRESS
Robert A. Appleby
Michael E. Stimson
Kirkland & Ellis
153 East 53rd Street
New York, New York 10022-4675

R. Eric Hutz  (I.D. 2702)

256468v1



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LUCENT TECHNOLOGIES INC. and
LUCENT TECHNOLOGIES GUARDIAN I LLC,

       Plaintiffs,

       v.

DELL COMPUTER CORPORATION,

       Defendant.

Civil Action No.: 03-205-KAJ

## NOTICE OF SERVICE

The undersigned hereby certifies that Maxine Y. Graham, of Kirkland & Ellis, served copies of (1) Lucent's Objections and Responses to Dell's First Set of Document Requests; (2) Lucents Objections and Responses to Dell's First Set of Interrogatories; (3) Lucent's First Set of Interrogatories; and (4) Lucent's First Set of Requests for Documents and Things; were caused to be served on May 6, 2003 upon the following counsel of record:

**BY U.S. MAIL**

    R. Eric Hutz, Esquire
    Connolly, Bove, Lodge & Hutz, LLP
    1220 Market Street, P.O. Box 2207
    Wilmington, DE  19899

**BY FEDERAL EXPRESS**

    Joel M. Freed
    Joseph A. Micallef
    Ali R. Sharifahmadian
    Arnold & Porter
    555 12th Street, NW
    Washington, DC  20004

In addition, the undersigned hereby certifies that this Notice of Service was served upon the foregoing counsel of record in the manner indicated above on May 8, 2003.

YOUNG CONAWAY STARGATT & TAYLOR LLP

Josy W. Ingersoll (#1088)
John W. Shaw (#3362)
Christian Douglas Wright (#3554)
The Brandywine Building
1000 West Street, 17<sup>th</sup> Floor
P.O. Box 391
Wilmington, Delaware  19899-0391
(302) 571-6672
Attorneys for Lucent Technologies Inc. and Lucent
  Technologies Guardian 1 LLC

OF COUNSEL:

John M. Desmarais
Robert A. Appleby
Maxine Y. Graham
Michael E. Stimson
KIRKLAND & ELLIS
153 East 53<sup>rd</sup> Street
New York, NY  10022-4675
(212) 446-4800

Dated:  May 8, 2003

WP3:881294.1                                                     57224.1002

ORIGINAL

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

LUCENT TECHNOLOGIES, INC. and     :
LUCENT TECHNOLOGIES GUARDIAN     :
I LLC,     :
    :
               Plaintiffs,     :
    :
      v.     :    Civil Action No. 03-205-KAJ
    :
DELL COMPUTER CORPORATION,     :
    :
               Defendant.     :

## ORDER

At Wilmington this 7th day of **May, 2003**.

Pursuant to Judge Jordan's Scheduling Order of April 16, 2003, this matter has been referred to the Magistrate Judge for the purpose of exploring possible settlement or resolution of this matter.  Therefore,

IT IS ORDERED that a teleconference has been scheduled for **Tuesday, May 20, 2003 at 1:00 p.m.** with Magistrate Judge Thynge to discuss the scheduling of, the procedures involved and the types of alternative dispute resolutions available, including mediation conferences.  **Plaintiff's counsel shall initiate the teleconference call**.

Local counsel are reminded of their obligations to inform out-of-state counsel of this Order.  To avoid the imposition of sanctions, counsel shall advise the Court immediately of any problems regarding compliance with this Order.

Counsel and the parties are required to review and be prepared to discuss the attachment to this Order during the teleconference.

UNITED STATES MAGISTRATE JUDGE

## TELECONFERENCE PREPARATION REQUIREMENTS

The following are some areas that the Court will focus upon during the teleconference, if applicable. Counsel are required to be prepared to discuss these areas and shall advise the Court of other issues that may affect ADR.

1.      The parties' interest in ADR and the type of ADR (e.g., mediation; arbitration, binding or non-binding, with or without high/low; neutral evaluation; summary or mini bench or jury proceeding).

2.      The timing of any ADR process.  <u>Note:</u>  Generally, the Court's availability is approximately 100+ days from the teleconference date.

3.      The availability of counsel, the parties and/or their decision makers.

4.      The length of time needed for the scheduled ADR process (e.g., more than one day).

5.      The identities of any non-parties who have an interest or influence on the outcome of the litigation, and whether they were notified by counsel or the parties of the teleconference.  For example, such non-parties would include health care or workers' compensation lienholders, excess carriers, or unsecured creditors in bankruptcy adversary proceedings.  **Note:** If any non-party's interest would likely prevent a resolution if not a participant in the selected ADR process, or whom counsel or a party feels may be necessary for an effective ADR process to occur, then counsel or the party **shall advise** the non-party or its representative of the date and time of the teleconference and their required participation.

6.      Any ancillary litigation pending/planned which could affect the ADR process in this case, including companion cases filed in this Court or other courts, and

arbitration proceedings.

7.    Previous efforts, if any, by the parties or their counsel to resolve this matter.

8.    The identification of any outstanding liens, the amounts verified, and whether the liens are negotiable or limited by governmental regulations or statutes (federal, state or local).

9.    The identification of other information required to appropriately and reasonably value this matter prior to the ADR process selected.  If the information will not be available or completed by the time of the teleconference, counsel shall have an understanding of the type of information, reports, data and necessary discovery before ADR should occur.

(35)

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

LUCENT TECHNOLOGIES, INC. and       :
LUCENT TECHNOLOGIES GUARDIAN         :
I LLC,                               :
                                     :
                 Plaintiffs,         :
                                     :
       v.                            :    Civil Action No. 03-205-KAJ
                                     :
DELL COMPUTER CORPORATION,           :
                                     :
                 Defendant.          :

## ORDER

At Wilmington this 7th day of **May, 2003**.

Pursuant to Judge Jordan's Scheduling Order of April 16, 2003, this matter has been referred to the Magistrate Judge for the purpose of exploring possible settlement or resolution of this matter.  Therefore,

IT IS ORDERED that a teleconference has been scheduled for **Tuesday, May 20, 2003 at 1:00 p.m.** with Magistrate Judge Thynge to discuss the scheduling of, the procedures involved and the types of alternative dispute resolutions available, including mediation conferences.  **Plaintiff's counsel shall initiate the teleconference call**.

Local counsel are reminded of their obligations to inform out-of-state counsel of this Order.  To avoid the imposition of sanctions, counsel shall advise the Court immediately of any problems regarding compliance with this Order.

Counsel and the parties are required to review and be prepared to discuss the attachment to this Order during the teleconference.

UNITED STATES MAGISTRATE JUDGE

## TELECONFERENCE PREPARATION REQUIREMENTS

The following are some areas that the Court will focus upon during the teleconference, if applicable. Counsel are required to be prepared to discuss these areas and shall advise the Court of other issues that may affect ADR.

1.    The parties' interest in ADR and the type of ADR (e.g., mediation; arbitration, binding or non-binding, with or without high/low; neutral evaluation; summary or mini bench or jury proceeding).

2.    The timing of any ADR process. Note: Generally, the Court's availability is approximately 100+ days from the teleconference date.

3.    The availability of counsel, the parties and/or their decision makers.

4.    The length of time needed for the scheduled ADR process (e.g., more than one day).

5.    The identities of any non-parties who have an interest or influence on the outcome of the litigation, and whether they were notified by counsel or the parties of the teleconference. For example, such non-parties would include health care or workers' compensation lienholders, excess carriers, or unsecured creditors in bankruptcy adversary proceedings. **Note:** If any non-party's interest would likely prevent a resolution if not a participant in the selected ADR process, or whom counsel or a party feels may be necessary for an effective ADR process to occur, then counsel or the party **shall advise** the non-party or its representative of the date and time of the teleconference and their required participation.

6.    Any ancillary litigation pending/planned which could affect the ADR process in this case, including companion cases filed in this Court or other courts, and

arbitration proceedings.

7.     Previous efforts, if any, by the parties or their counsel to resolve this matter.

8.     The identification of any outstanding liens, the amounts verified, and whether the liens are negotiable or limited by governmental regulations or statutes (federal, state or local).

9.     The identification of other information required to appropriately and reasonably value this matter prior to the ADR process selected.  If the information will not be available or completed by the time of the teleconference, counsel shall have an understanding of the type of information, reports, data and necessary discovery before ADR should occur.

(34)

ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LUCENT TECHNOLOGIES INC. and<br>LUCENT TECHNOLOGIES GUARDIAN I LLC, | ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 03-CV-205-KAJ |
| vs. | ) ) ) | |
| DELL COMPUTER CORPORATION, | ) ) ) | |
| Defendants, | ) ) ) | |

---

## DECLARATION OF HENRY N. GARRANA IN SUPPORT OF DELL'S MOTION TO SEVER AND TRANSFER

R. Eric Hutz (#2702)
James D. Heisman (#2746)
**CONNOLLY BOVE LODGE & HUTZ, LLP**
1220 Market Street, P. O. Box 2207
Wilmington, DE 19899
(302) 658-9141
*Attorneys for Defendants*
*Dell Computer Corp.*

**OF COUNSEL**
Joel M. Freed
Joseph A. Micallef
**ARNOLD & PORTER**
555 Twelfth Street, N.W.
Washington, D.C. 20004-1202
(202) 942-5000

**DATED:** May **6**, 2003

1

## DECLARATION OF HENRY GARRANA

I, Henry N. Garrana, declare as follows:

1.      I am Vice President, Intellectual Property for Dell Computer Corporation ("Dell"). If called to testify as a witness, I could competently testify to the truth of each statement set forth below.

2.      Dell sells computer systems. For over fifteen years Dell has pioneered efficient outsourcing and manufacturing techniques to produce and sell high quality systems that employ up to date technology at low cost.

3.      Dell is a customer of Microsoft Corporation ("Microsoft"). Computer systems sold by Dell are customarily installed with operating systems and application software supplied by Microsoft and in which Dell plays no design or development role.

4.      Representatives of Lucent first contacted Dell in 1998. On several occasions over an almost five year period representatives of Dell and Lucent met and corresponded about the purported applicability of Lucent patents to Dell products. In those communications numerous infringement and validity issues raised by Lucent's allegations were discussed.

5.      Lucent representatives maintained that several of its patents apply to any device that practices certain MPEG standards. Those patents were U.S. Patent Nos. 4,958,226, 5,227,878 and 4,910,781. The products we purchase from Microsoft are said to practice those standards. With respect to another patent, U.S. Patent No. 5,649,131, Lucent identified functionality of Dell's website as allegedly infringing. That functionality is provided by Microsoft's Commerce Server product. Finally, one patent asserted in the complaint but not mentioned in pre-suit correspondence, U.S. Patent No. 5,347,295, appears

to be directed to Microsoft's PocketPC software included in some of Dell's handheld products.

6.      Dell has requested indemnification from Microsoft for each of the aforementioned patents based on Lucent's allegations.

7.      According to Lucent's initial disclosures in this case, the individuals which it believes may have relevant information all reside outside of this Judicial District, in Illinois, Pennsylvania, New Jersey, California, Connecticut and Sweden.  Dell's witnesses also reside outside of this District, in Texas, where Dell is based, or in California.

I declare under penalty of perjury under the laws of the United States of America that the foregoing are true and correct statements and that this Declaration was executed this 5Th day of May at Austin, Texas.

Henry N. Garrana

3

ORIGINAL **IN THE UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE**

| | |
|---|---|
| LUCENT TECHNOLOGIES, INC., and<br>LUCENT TECHNOLOGIES GUARDIAN I LLC, | )<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | )<br>) |
| DELL COMPUTER CORPORATION, | )<br>) |
| Defendant. | )<br>) |

**Case No. 03-CV-205-KAJ**

## DELL COMPUTER CORPORATION'S
## BRIEF IN SUPPORT OF ITS
## <u>MOTION TO SEVER AND TRANSFER</u>

R. Eric Hutz (ID # 2702)
James D. Heisman (#2746)
**CONNOLLY BOVE LODGE & HUTZ, LLP**
1220 Market Street, Post Office Box 2207
Wilmington, DE 19899
(302) 658-9141
*Attorneys for Defendant*
*Dell Computer Corporation*

**OF COUNSEL**
Joel M. Freed
Joseph A. Micallef
**ARNOLD & PORTER**
555 12th Street NW
Washington, DC 20004
(202) 942-5000

**DATE:** May 6, 2003

## TABLE OF CONTENTS

**PAGE**

INTRODUCTION..................................................................................................1

NATURE AND STAGE OF PROCEEDINGS AND STATEMENT OF FACTS ................1

ARGUMENT......................................................................................................3

    A.      Legal Standards ................................................................................3

    B.      Efficient Administration Of Justice Supports Severance And
           Transfer Of Counts II-VI.................................................................4

CONCLUSION ..................................................................................................7

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES

*Air Products and Chemicals, Inc. v. MG Nitrogen Services, Inc.,*
   133 F.Supp.2d 354 (D. Del. 2001) ........................................................................ 4

*Chrysler Credit Corp. v. Country Chrysler, Inc.,*
   928 F.2d 1509 (10th Cir. 1991) ............................................................................. 4

*Codex Corp. v. Milgo Electronic Corp.,*
   553 F.2d 735 (1st Cir. 1977) ................................................................................. 3

*Corixa Corp. v. IDEC Pharmaceuticals Corp.,*
   2002 WL 265094 (D. Del. 2002) .......................................................................... 4

*Crosley Corp. v. Hazeltine Corp.,*
   122 F.2d 925 (3d Cir. 1941) ................................................................................. 4

*In re Innotron Diagnostics,*
   800 F.2d 1077 (Fed. Cir. 1986) ............................................................................ 4

*Kahn v. General Motors Corp.,*
   889 F.2d 1078 (Fed. Cir. 1989) ............................................................................ 4

*Kerotest Mfg. Co. v. C-O-Two Fire Equipment Co.,*
   342 U.S. 180 (S. Ct. 1952) ................................................................................... 3

*Miteq, Inc. v. Comtech Telecommunications Corp.,*
   2003 WL 179991 (D. Del. 2003) .......................................................................... 4

## STATUTES

*Fed. R. Civ. P. 21* ...................................................................................................... 4

*Fed. R. Civ. P. 42(b)* ................................................................................................. 4

## INTRODUCTION

This is a patent infringement case in which plaintiffs (collectively "Lucent") have alleged that Defendant Dell Computer Corporation ("Dell") has infringed six patents.  Infringement allegations relating to five out of those six patents implicate software which Dell purchases from Microsoft Corporation ("Microsoft") and then installs in Dell's products.  Dell played no role in the design and development of that software.  Dell is a customer of Microsoft for that software and has sought indemnification from Microsoft.

Based on Lucent's patent assertions against Dell and other Microsoft customers, Microsoft has brought suit against Lucent in the United States District Court for the Southern District of California ("the Declaratory Judgment Microsoft case").  The Declaratory Judgment Microsoft case asks for declarations of noninfringement and invalidity of a number of patents that Lucent has threatened Microsoft's customers with -- including each of the five patents in this case that implicate software purchased by Dell from Microsoft.

It would be wasteful to litigate identical issues in two different courts.  Accordingly, Dell hereby moves for an order severing the claims for infringement of those five patents set out in Counts II through VI of the complaint (along with Dell's counterclaim as it relates thereto) and transferring them to the Southern District of California where the Declaratory Judgment Microsoft case is pending.

## NATURE AND STAGE OF PROCEEDINGS AND STATEMENT OF FACTS

Dell sells computer systems, and for over fifteen years has pioneered outsourcing and manufacturing techniques for high quality computer systems which employ the latest technology at the lowest cost. (*See,* Declaration of Henry N. Garrana – "Garrana Decl." – filed concurrently herewith, at ¶2.)  These computer systems are sold with Microsoft operating systems and

1

application software installed. Dell's relationship with Microsoft is one of customer to manufacturer, *i.e.,* Dell plays no part in the design or development of Microsoft software. (Garrana Decl. ¶3.)

In 1998, representatives of Lucent contacted Dell concerning several Lucent patents. Thereafter, representatives of the two companies met and corresponded from time to time over a 5-year period to discuss the professed applicability of Lucent's patents to Dell products. (Garrana Decl. ¶4.) Lucent's representatives contended that several of its patents apply to any device that practices certain MPEG standards, which contentions implicated the software from Microsoft that is installed in Dell's products. (Garrana Decl. ¶5.) With respect to another patent, they identified a functionality of Dell's website, provided by Microsoft's Commerce Server software products. (*Id.*) Finally, one patent asserted in the complaint but not mentioned in pre-suit correspondence appears to be directed to Microsoft's PocketPC software included in some of Dell's products. (*Id.*) Accordingly, Dell requested indemnification from Microsoft. (Garrana Decl. ¶6.)

Based on Lucent's patent assertions against Dell and other Microsoft customers, Microsoft brought the Declaratory Judgment Microsoft case against Lucent in the United States District Court for the Southern District of California. The complaint in that case is attached as Exhibit A. It seeks declarations of noninfringement and invalidity of a number of patents with which Lucent has threatened Microsoft's customers -- including the five patents in this case that implicate the software purchased by Dell from Microsoft Corporation. (*See* Counts V-IX of

2

Exhibit A.)[1]  The application of those five patents to Dell products is therefore at issue in that case.

Accordingly, in this case the Court is faced with a classic "customer infringement suit" where a suit involving the supplier with the real interest in the infringement allegations is in litigation elsewhere with the patentee over the same patents and the same products.

<div align="center">

**ARGUMENT**

</div>

**A.      Legal Standards**

Where two cases directed to the same issues are pending the general rule is that the first filed should proceed. *Kerotest Mfg. Co. v. C-O-Two Fire Equipment Co.*, 342 U.S. 180, 185-186 (S. Ct. 1952).  But a long recognized exception to this rule is where a manufacturer files a second suit seeking a declaratory judgment concerning the allegations of infringement against the customer. *Id.*  In such a situation, the courts favor the manufacturer's suit as the one involving

---

[1] The sole patent in this case which is not included in the Declaratory Judgment Microsoft case against Lucent in the United States District Court for the Southern District of California (namely, U.S. Patent No. 4,439,759) is also before that same California Court in a related case.  Lucent sued Gateway, Inc. ("Gateway"), another seller of computer systems, on June 6, 2002 in the United States District Court for the Eastern District of Virginia for infringement of that and six other patents ("the Gateway case").  A copy of the complaint in the Gateway case is attached as Exhibit B.  On motion by Gateway, the Gateway case was transferred to the United States District Court for the Southern District of California.  The transfer order is attached as Exhibit C.  Microsoft intervened in the Gateway case in California and counterclaimed against Lucent for a declaratory judgment that five of the seven patents at issue there were invalid and not infringed.  A copy of that pleading is attached as Exhibit D.

Dell does not specifically here move for transfer with regard to U.S. Patent No. 4,439,759. In the future, however, should Lucent identify a Microsoft product as the basis for its allegations against Dell of infringement of that patent, Dell would move the Court for transfer with regard to that patent as well.  And given that the patent is already before the California Court in the Gateway case, this Court may determine that such a transfer is warranted even at this stage.

<div align="center">

3

</div>

the real parties in interest. *Codex Corp. v. Milgo Electronic Corp.,* 553 F.2d 735 (1st Cir. 1977); *Kahn v. General Motors Corp.,* 889 F.2d 1078 (Fed. Cir. 1989). This rule has long been recognized in the Federal Circuit, the Third Circuit and has been applied in this District. *Kahn v. General Motors Corp.,* 889 F.2d 1078 (Fed. Cir. 1989); *Crosley Corp. v. Hazeltine Corp.,* 122 F.2d 925 (3d Cir. 1941); *Miteq, Inc. v. Comtech Telecommunications Corp.,* 2003 WL 179991, *1 (D. Del. 2003) (attached as Exhibit E).

A district court has ample discretion to apply this rule, *see, Air Products and Chemicals, Inc. v. MG Nitrogen Services, Inc.,* 133 F.Supp.2d 354, 356 (D. Del. 2001), even where the customer suit includes allegations beyond what is included in the manufacturer's suit, *Corixa Corp. v. IDEC Pharmaceuticals Corp.,* 2002 WL 265094, *3 (D. Del. 2002) (attached as Exhibit F). Furthermore, the court has ample authority to sever different causes of action where the issues warrant doing so. *Fed. R. Civ. P. 21; Corixa Corp,,* 2002 WL 265094, *3 (D. Del. 2002). And the court also may stay or transfer severed counts where the efficient administration of justice requires it. *Fed. R. Civ. P. 42(b); In re Innotron Diagnostics,* 800 F.2d 1077, 1084 (Fed. Cir. 1986); *Chrysler Credit Corp. v. Country Chrysler, Inc.,* 928 F.2d 1509, 1518-19 (10th Cir. 1991).

## B.    Efficient Administration Of Justice Supports Severance And Transfer Of Counts II-VI

While the Declaratory Judgment Microsoft case was filed after the present action, the manufacturer's suit exception is applicable here. Counts II through VI of the complaint implicate software which Dell purchases from Microsoft Corporation. The same patents and the same products are at issue in the Microsoft case (and some of the same are at issue in the Gateway case) before the California court.

4

Microsoft and Lucent will take part in the same discovery in the California cases that will be required in this one. The same documents will be produced, the same inventors, individuals involved in patent procurement, developers, business people, and experts will be deposed. The same patents and file histories will be analyzed, the same interpretation arguments briefed and the same claims construed. The same prior art will be discovered, asserted and argued over. The same summary judgment motions made and the same evidence presented.

Moreover, in this case Microsoft is a third party. And while the Federal Rules provide for third party discovery, the interests of judicial administration are served best by proceeding in the California court where disputes over confidentiality, burden, scope and timing of discovery can all be addressed in context by the Judge before whom Microsoft also is appearing as a party.

Furthermore, the efficiencies that can be achieved by the severance and transfer here requested cannot be achieved in reverse. The Declaratory Judgment Microsoft case in California includes Lucent patents not at issue in this Court, including some that are at issue in the Gateway case but not here. Also, the Gateway case includes two Lucent patents asserted in the complaint here. Even if Microsoft's allegations relating to the patents at issue here were dismissed or transferred from California, Microsoft and Lucent would still be litigating in California. Indeed, they would still be litigating two of the patents asserted here. At this point, the only court that can efficiently resolve all of these disputes is the California court.

Permitting that Court to do so prejudices no party. Lucent is a national corporation, having sales last year of $12.3 billion dollars (Lucent SEC-10K, 12/12/02 attached as Exhibit G) and maintaining offices in eight states (2002 Corporate Affiliations Vol. III, attached as Exhibit H), including California. And, although based in New Jersey, Lucent is already litigating these issues in California, so it can hardly complain of being dragged into a distant forum.

5

In any event, according to Lucent's initial disclosures in this case, the individuals that it believes may have relevant information reside outside of this Judicial District, in Illinois, Pennsylvania, New Jersey, California, Connecticut and Sweden. (Garrana Decl. ¶ 7.) Dell's witnesses also reside outside of this District, in Texas, where Dell is based, or in California. (*Id.*) While Dell cannot speak for where Microsoft witnesses or documents may be, it should be noted that Microsoft is based in Redmond, Washington. The court in California is therefore a substantially more convenient forum for this dispute.

Given this balance of convenience, the fact that the real parties in interest are already litigating common issues in California and that the other California issues cannot practically be transferred here, Dell submits that the efficient administration of justice strongly supports the severance and transfer of those counts relating to the five patents in common with the Microsoft case (along with Dell's counterclaim relating thereto) to the United States District Court for the Southern District of California.[2]

---

[2] The Court may consider the interests of justice further served by also transferring Count I of the complaint (the count directed to U.S. Patent No. 4,439,759). *See* note 1, *supra.*

## CONCLUSION

Accordingly, Dell Computer Corporation moves the Court to sever Counts II through VI of the complaint and transfer those counts, along with the Counterclaim I (Declaratory Judgment) of the answer and counterclaim to the extent it relates to Counts II through VI, to the United States District Court for the Southern District of California.

Respectfully submitted,

**CONNOLLY BOVE LODGE & HUTZ, LLP**

By: _____

R. Eric Hutz (#2702)
James D. Heisman (#2746)
1220 Market Street
Post Office Box 2207
Wilmington, DE 19899
(302) 658-9141
*Attorneys for Plaintiff*
   *Dell Computer Corporation*

**OF COUNSEL**
Joel M. Freed
Joseph A. Micallef
**ARNOLD & PORTER**
555 12th Street NW
Washington, DC 20004
(202) 942-5000

**DATE:** May 6, 2003

263736v1

7

1 | John E. Gartman (SBN 152300)
Christopher S. Marchese (SBN 170239)
2 | Gary H. Savitt (SBN 220129)
Fish & Richardson P.C.
3 | 4350 La Jolla Village Drive, Suite 500
San Diego, California 92122
4 | Telephone: (858) 678-5070
Facsimile:  (858) 678-5099
5 |
Katherine Ford Horvath (SBN 213098)
6 | Fish & Richardson P.C.
500 Arguello Street, Suite 500
7 | Redwood City, California 94063
Telephone: (650) 839-5070
8 | Facsimile:  (650) 839-5071

9 | *Additional counsel listed on last page*

10 | Attorneys for Plaintiff
MICROSOFT CORPORATION

11 |

```
FILED

APR – 8 2003

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                         DEPUTY
```

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

**'03 CV  0699 K   LAB**

| | |
|---|---|
| MICROSOFT CORPORATION, | Case No._____ |
| Plaintiff, | **DECLARATORY JUDGMENT COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| LUCENT TECHNOLOGIES INC. and LUCENT TECHNOLOGIES GUARDIAN I LLC, | |
| Defendants | |

## COMPLAINT

Plaintiff, Microsoft Corporation ("Microsoft"), as and for its complaint against defendants,

Lucent Technologies Inc. and Lucent Technologies Guardian I LLC (collectively "Lucent"), alleges

as follows:

1.      This is an action for a declaratory judgment that Microsoft does not infringe any

claim of United States Patent Nos. 4,317,956; 4,383,272; 4,617,676; 4,763,356; 4,958,226;

4,910,781; 5,227,878; 5,347,295; 5,649,131; 4,701,954; 5,341,457; 5,627,938; and Re. 36,714 ("the

Patents-in-Suit"), attached hereto as Exhibits A-M, respectively. This action is filed pursuant to 28

1                    Case No._____

1  U.S.C. §§ 2201 and 2202 for the purpose of resolving an actual and justiciable controversy between

2  Microsoft and Lucent.

### Parties

3

4      2.     Microsoft Corporation is a Washington corporation with its principal place of

5  business at One Microsoft Way, Redmond, WA 98052-6399.

6      3.     On information and belief, Lucent Technologies Inc. is a corporation organized

7  under the laws of the state of Delaware with its principal place of business at 600 Mountain

8  Avenue, Murray Hill, NJ 07974.

9      4.     On information and belief, Lucent Guardian I LLC is a limited liability company

10 organized under the laws of the state of Delaware with its principal place of business at 600

11 Mountain Avenue, Murray Hill, NJ 07974.

### Jurisdiction and Venue

12

13     5.     Microsoft brings this action under the Declaratory Judgment Act, 28 U.S.C. §§ 2201

14 and 2202, to obtain a judicial declaration that the Patents-in-Suit, purportedly owned by Lucent, are

15 invalid, unenforceable, and have not been infringed by Microsoft or its customers.  This action

16 arises under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq.*, and is based upon an actual

17 and justiciable controversy between the parties with respect to the infringement, validity, and

18 enforceability of the Patents-in-Suit.  This Court has jurisdiction under 28 U.S.C. §§ 1331, 1338(a),

19 2201 and 2202.  Diversity of citizenship also exists under 28 U.S.C. § 1332, and the amount in

20 controversy exceeds $75,000, exclusive of costs and interest.

21     6.     Venue is proper before this court pursuant to 28 U.S.C. §§ 1391(b), (c), and 1400(b)

22 because the claims involve federal questions of patent law and Lucent is subject to personal

23 jurisdiction in this district.

### Lucent's Claims Against Users of Microsoft's Products

24

25     7.     Lucent has asserted the Patents-in-Suit against Microsoft customers.  The Patents-in-

26 Suit are:

27

28

           Case No. _____

1        a.     United States Patent No. 4,317,956 ("the Torok '956 Patent"), which issued

2 on March 2, 1982, and is entitled "Remote Chalkboard Automatic Cursor." A copy of the Torok

3 '956 Patent is attached as Exhibit A.

4        b.     United States Patent No. 4,383,272 ("the Netravali '272 Patent"), which

5 issued on March 10, 1983, and is entitled "Video Signal Interpolation Using Motion Estimation." A

6 copy of the Netravali '272 Patent is attached as Exhibit B.

7        c.     United States Patent No. 4,617,676 ("the Jayant '676 Patent"), which issued

8 on October 14, 1986, and is entitled "Predictive Communication System Filtering Arrangement." A

9 copy of the Jayant '676 Patent is attached as Exhibit C.

10        d.     United States Patent No. 4,763,356 ("the Day '356 Patent"), which issued on

11 August 9, 1988, and is entitled "Touch Screen Form Entry System." A copy of the Day '356 Patent

12 is attached as Exhibit D.

13        e.     United States Patent No. 4,958,226 ("the Haskell '226 Patent"), which issued

14 on September 18, 1990, and is entitled "Conditional Motion Compensated Interpolation of Digital

15 Motion Video." A copy of the Haskell '226 Patent is attached as Exhibit E.

16        f.     United States Patent No. 4,910,781 ("the Ketchum '781 Patent"), which

17 issued on March 20, 1990, and is entitled "Code Excited Linear Predictive Vocoder Using Virtual

18 Searching." A copy of the Ketchum '781 Patent is attached as Exhibit F.

19        g.     United States Patent No. 5,227,878 ("the Puri '878 Patent"), which issued on

20 July 13, 1993, and is entitled "Adaptive Coding and Decoding of Frames and Fields of Video." A

21 copy of the Puri '878 Patent is attached as Exhibit G.

22        h.     United States Patent No. 5,347,295 ("the Agulnick '295 Patent"), which

23 issued on September 13, 1994, and is entitled "Control of a Computer Through a Position-Sensed

24 Stylus." A copy of the Agulnick '295 Patent is attached as Exhibit H.

25        i.     United States Patent No. 5,649,131 ("the Ackerman '131 Patent"), which

26 issued on July 15, 1997, and is entitled "Communications Protocol." A copy of the Ackerman '131

27 Patent is attached as Exhibit I.

28

1         j.      United States Patent No. 4,701,954 ("the Atal '954 Patent"), which issued on

2 October 20, 1987, and is entitled "Multipulse LPC Speech Processing Arrangement." A copy of the

3 Atal '954 Patent is attached as Exhibit J.

4         k.      United States Patent No. 5,341,457 ("the Hall '457 Patent"), which issued on

5 August 23, 1994, and is entitled "Perceptual Coding of Audio Signals." A copy of the Hall '457

6 Patent is attached as Exhibit K.

7         l.      United States Patent No. 5,627,938 ("the Johnston '938 Patent"), which

8 issued on May 6, 1997, and is entitled "Rate Loop Processor for Perceptual Encoder/Decoder." A

9 copy of the Johnston '938 Patent is attached as Exhibit L.

10         m.      United States Patent No. Re. 36,714 ("the Brandenburg '714 Reissue

11 Patent"), which reissued on May 23, 2000, and is entitled "Perceptual Coding of Audio Signals." A

12 copy of the Brandenburg '714 Reissue Patent is attached as Exhibit M.

13      8.      Lucent has sued Microsoft's customers Gateway, Inc. and Gateway Country Stores

14 L.L.C. (collectively, "Gateway") in this Court, alleging, *inter alia*, that Gateway infringes the Torok

15 '956 Patent, the Netravali '272 Patent, the Jayant '676 Patent, the Day '356 Patent, and the Haskell

16 '226 Patent ("the Gateway Litigation Patents"), as well as two other patents not named in this

17 action. A copy of the complaint is attached as Exhibit N. Microsoft has intervened in the action

18 between Lucent and Gateway as to the Gateway Litigation Patents. On information and belief,

19 Lucent's infringement allegations as to the Gateway Litigation Patents are based, at least in part, on

20 Gateway's use of Microsoft products and sale of Gateway computers containing Microsoft

21 products. Accordingly, a legal action is ongoing in a court of competent jurisdiction concerning the

22 Gateway Litigation Patents, and there exists an actual and justiciable controversy between

23 Microsoft and Lucent concerning the Gateway Litigation Patents.

24      9.      Lucent has initiated suit against another of Microsoft's customers, Dell Computer

25 Corporation ("Dell"), in the United States District Court for the District of Delaware alleging, *inter*

26 *alia*, that Dell infringes the Haskell '226 Patent, the Ketchum '781 Patent, the Puri '878 Patent, the

27 Agulnick '295 Patent, and the Ackerman '131 Patent ("the Dell Litigation Patents"). A copy of the

28 complaint is attached as Exhibit O. Accordingly, Lucent has sued both Dell and Gateway on one of

1   the Patents-in-Suit in this action, namely, the Haskell '226 Patent. On information and belief,

2   Lucent's infringement allegations as to the Dell Litigation Patents are based, at least in part, on

3   Dell's use of Microsoft products and sale of Dell computers containing Microsoft products.

4   Accordingly, a legal action is ongoing in a court of competent jurisdiction concerning the Dell

5   Litigation Patents, and there exists an actual and justiciable controversy between Microsoft and

6   Lucent concerning the Dell Litigation Patents.

7           10.     On information and belief, Lucent has threatened to commence an infringement

8   action against Dell for infringement of the Atal '954 Patent. On information and belief, Lucent's

9   infringement allegations against Dell on the Atal '954 Patent are based, at least in part, on Dell's

10  use of Microsoft products and sale of Dell computers containing Microsoft products. Accordingly,

11  there exists an actual and justiciable controversy between Microsoft and Lucent concerning the Atal

12  '954 Patent.

13          11.     On information and belief, Lucent has threatened at least one other Microsoft

14  customer claiming infringement of the Day '356 Patent, the Haskell '226 Patent, the Puri '878

15  Patent, the Hall '457 Patent, the Agulnick '295 Patent, the Johnston '938 Patent, and the

16  Brandenburg '714 Reissue Patent based, at least in part, on that customer's use of Microsoft

17  products and sale of computers made by that customer that contain Microsoft products.

18  Accordingly, there exists an actual and justiciable controversy between Microsoft and Lucent

19  concerning those additional accused patents.

20          12.     Gateway has demanded contractual defense and indemnification from Microsoft

21  against Lucent's infringement charges on the Gateway Litigation Patents under a contract between

22  Microsoft and Gateway. By this paragraph, however, Microsoft does not admit that it must

23  indemnify Gateway on the Gateway Litigation Patents.

24          13.     Dell has demanded contractual defense and indemnification from Microsoft against

25  Lucent's infringement charges on the Dell Litigation Patents and the Atal '954 Patent under a

26  contract between Microsoft and Dell. By this paragraph, however, Microsoft does not admit that it

27  must indemnify Dell on the Dell Litigation Patents or the Atal '954 Patent.

28

1    14.    Consequently, as a result of Lucent's actions, Microsoft has received defense and

2  indemnification demands from Gateway and Dell against Lucent's infringement charges on the

3  Torok '956 Patent, the Netravali '272 Patent, the Jayant '676 Patent, the Day '356 Patent, the

4  Haskell '226 Patent, the Ketchum '781 Patent, the Puri '878 Patent, the Agulnick '295 Patent, the

5  Ackerman '131 Patent, and the Atal '954 Patent. In addition, at least one other Microsoft customer

6  has been threatened with the the the remaining Patents-in-Suit (the Hall '457 Patent, the Johnston '938

7  Patent, and the Brandenburg '714 Reissue Patent).

8    15.    On January 13, 2003, an entity known as "ThinkFire," which claims to represent

9  Lucent as its licensing agent, sent a letter to Microsoft stating: "We believe that specific Lucent

10  Technologies patents are crucial to the current and planned product offerings of Microsoft." A copy

11  of the January 13 letter is attached as Exhibit P to this Complaint. The January 13 ThinkFire letter

12  included a list of 16 patents that ThinkFire alleged "includes patents that Microsoft already knows

13  about through discussions that Lucent has had with various computer manufacturers who sell

14  products incorporating Microsoft products." Of the 16 listed patents, eight are involved in this

15  Complaint: the Jayant '676 Patent, the Haskell '226 Patent, the Puri '878 Patent, the Hall '457

16  Patent, the Brandenburg '714 Reissue Patent, the Ackerman '131 Patent, the Day '356 Patent, and

17  the Agulnick '295 Patent.

18    16.    On March 12, 2003, representatives of Microsoft met in person with representatives

19  of ThinkFire to discuss the allegations in the January 13 letter. During that meeting, ThinkFire

20  representatives discussed seven patents purportedly owned by Lucent, including the Day '356

21  Patent, the Ackerman '131 Patent, and the Agulnick '295 Patent.

22    17.    In sum, Lucent's conduct has caused Microsoft reasonably and legitimately to fear

23  that Lucent will bring infringement actions under the Patents-in-Suit against Microsoft and/or

24  against Microsoft's customers for use of Microsoft Products.

25                                **Count I**

26              **(Declaratory Judgment Regarding the Torok '956 Patent)**

27    18.    Microsoft incorporates by reference and realleges Paragraphs 1 through 17 of this

28  Complaint.

                                  6                    Case No. _____

19.     The manufacture, use, sale, offer to sell, and/or importation of Microsoft products do not infringe and have not infringed any claim of the Torok '956 Patent. In addition, the manufacture, use, sale, offer to sell, and/or importation of Microsoft products do not contribute to or induce the infringement of any claim of the Torok '956 Patent; nor has Microsoft ever contributed to or induced the infringement of any such claim. Microsoft, its customers, and all others have the right to manufacture, have made, use, sell, offer to sell, and import all of Microsoft's products accused of infringement, unhampered and unmolested by Lucent.

20.     The claims of the Torok '956 Patent are invalid for failure to comply with one or more provisions of the Patent Laws of the United States of America, Title 35, United States Code, Sections 101 *et seq.*, including without limitation Sections 102, 103 and/or 112.

21.     There is an actual and justiciable controversy between Microsoft Corporation and Lucent over the validity, enforceability and infringement of the Torok '956 Patent.

## Count II

### (Declaratory Judgment Regarding the Netravali '272 Patent)

22.     Microsoft incorporates by reference and realleges Paragraphs 1 through 17 of this Complaint.

23.     The manufacture, use, sale, offer to sell, and/or importation of Microsoft products do not infringe and have not infringed any claim of the Netravali '272 Patent. In addition, the manufacture, use, sale, offer to sell, and/or importation of Microsoft products do not contribute to or induce the infringement of any claim of the Netravali '272 Patent; nor has Microsoft ever contributed to or induced the infringement of any such claim. Microsoft, its customers, and all others have the right to manufacture, have made, use, sell, offer to sell, and import all of Microsoft's products accused of infringement, unhampered and unmolested by Lucent.

24.     The claims of the Netravali '272 Patent are invalid for failure to comply with one or more provisions of the Patent Laws of the United States of America, Title 35, United States Code, Sections 101 *et seq.*, including without limitation Sections 101, 102, 103 and/or 112.

25.     The Netravali '272 Patent is unenforceable by virtue of inequitable conduct. The claims of the Netravali '272 Patent are unenforceable as a result of the inequitable conduct of the

7                    Case No. _____

1  applicants, their attorneys and/or agents in the prosecution of the Netravali '272 Patent. Microsoft

2  alleges that said inequitable conduct comprised intentional misrepresentations and omissions

3  including, without limitation, the following:

4           a)       The sworn statement signed by the applicants on or about April 2 and April 3,

5  1981, stated in pertinent part that: "I am the original, first and sole inventor ... or a joint inventor

6  ... of the invention entitled Video Signal Interpolation Using Motion Estimation described and

7  claimed in the attached specification; I do not know and do not believe the same was ever known or

8  used in the United States of America before my or our invention thereof or more than one year prior

9  to this application; to the best of my knowledge and belief the same was not in public use or on sale

10  in the United States of America more than one year prior to this application; ... I acknowledge my

11  duty to disclose information of which I am aware which is material to the examination of this

12  application ...."

13           b)       On May 11, 1979, Arun N. Netravali, one of the named inventors on the

14  Netravali '272 Patent, submitted an article entitled "Picture Coding: A Review" for publication in

15  the PROCEEDINGS OF THE IEEE, Vol. 68, No. 3, p. 366. The article was published in March

16  1980. The article was highly material to the examination of the Netravali '272 Patent and thus was

17  required to be cited during the prosecution under 37 C.F.R. 1.56. Nonetheless, the article was not

18  cited during the prosecution of the Netravali '272 Patent, in spite of the fact that Netravali authored

19  the article.

20       26.      There is an actual and justiciable controversy between Microsoft and Lucent over the

21  validity, enforceability and infringement of the Netravali '272 Patent.

22  <u>**Count III**</u>

23  **(Declaratory Judgment Regarding the Jayant '676 Patent)**

24       27.      Microsoft incorporates by reference and realleges Paragraphs 1 through 17 of this

25  Complaint.

26       28.      The manufacture, use, sale, offer to sell, and/or importation of Microsoft products do

27  not infringe and have not infringed any claim of the Jayant '676 Patent. In addition, the

28  manufacture, sale, offer to sell, and/or importation of Microsoft products do not contribute to or

Case No. _____

1  induce the infringement of any claim of the Jayant '676 Patent; nor has Microsoft ever contributed

2  to or induced the infringement of any such claim. Microsoft, its customers, and all others have the

3  right to manufacture, have made, use, sell, offer to sell, and import all of Microsoft's products

4  accused of infringement, unhampered and unmolested by Lucent.

5       29.    The claims of the Jayant '676 Patent are invalid for failure to comply with one or

6  more provisions of the Patent Laws of the United States of America, Title 35, United States Code,

7  Sections 101 *et seq.*, including without limitation Sections 102, 103 and/or 112.

8       30.    The Jayant '676 Patent is unenforceable by virtue of inequitable conduct.

9  The claims of the Jayant '676 Patent are unenforceable as a result of the inequitable conduct of the

10 applicants, their attorneys, and/or agents in the prosecution of the Jayant '676 Patent. Microsoft

11 alleges that said inequitable conduct comprised intentional misrepresentations and omissions

12 including, without limitation, the following:

13          a)    The sworn statement signed by the applicants on or about November 20,

14 1984 and January 11, 1995, stated in pertinent part: "I believe I am an original, first and joint

15 inventor of the subject matter which is claimed and for which a patent is sought on the invention,

16 entitled Predictive Communication System Filtering Arrangement, the specification of which was

17 filed on September 4, 1984, as application Serial No. 646,971. ... I acknowledge the duty to

18 disclose information which is material to the examination of this application in accordance with

19 Title 37, Code of Federal Regulations, 1.56(a)."

20          b)    In March 1984, a textbook co-authored by N.S. Jayant, one of the named

21 inventors of the Jayant '676 Patent, entitled DIGITAL CODING OF WAVEFORMS was published

22 by Prentice Hall. The textbook was highly material to the examination of the Jayant '676 Patent

23 and thus was required to be cited during the prosecution under 37 C.F.R. 1.56. Nonetheless, the

24 textbook was not cited during the prosecution of the Jayant '676 Patent, despite that Jayant co-

25 authored the textbook.

26          c)    On March 26, 1986, prior to the issuance of the Jayant '676 Patent, inventor

27 Jayant filed a second patent application with the same title, "Predictive Communication System

28 Filtering Arrangement," having subject matter related to the Jayant '676 Patent. On June 10, 1986,

9                    Case No. _____

1    prior to the issuance of the Jayant '676 Patent and during the prosecution of the second application,

2    Jayant cited a material prior art reference in an Information Disclosure Statement, the reference

3    being an article that he co-authored entitled, "Adaptive Quantization in Differential PCM Coding of

4    Speech," and published by The American Telephone and Telegraph Company in September, 1973.

5    As Jayant acknowledged in his second application, the article was highly material to the

6    examination of the Jayant '676 Patent and thus was required to be cited during the prosecution of

7    the Jayant Patent under 37 C.F.R. 1.56.  Nonetheless, the article was not cited during the

8    prosecution of the Jayant '676 Patent.

9        31.     There is an actual and justiciable controversy between Microsoft and Lucent over the

10    validity, enforceability and infringement of the Jayant '676 Patent.

11                    **Count IV**

12         **(Declaratory Judgment Regarding the Day '356 Patent)**

13        32.     Microsoft incorporates by reference and realleges Paragraphs 1 through 17 of this

14    Complaint.

15        33.     The manufacture, use, sale, offer to sell, and/or importation of Microsoft products do

16    not infringe and have not infringed any claim of the Day '356 Patent.  In addition, the manufacture,

17    sale, offer to sell, and/or importation of Microsoft products do not contribute to or induce the

18    infringement of any claim of the Day '356 Patent; nor has Microsoft ever contributed to or induced

19    the infringement of any such claim.  Microsoft, its customers, and all others have the right to

20    manufacture, have made, use, sell, offer to sell, and import all of Microsoft's products accused of

21    infringement, unhampered and unmolested by Lucent.

22        34.     The claims of the Day '356 Patent are invalid for failure to comply with one or more

23    provisions of the Patent Laws of the United States of America, Title 35, United States Code,

24    Sections 101 *et seq.*, including without limitation Sections 102, 103 and/or 112.

25        35.     There is an actual and justiciable controversy between Microsoft and Lucent over the

26    validity, enforceability and infringement of the Day '356 Patent.

27

28

Case No. _____

## Count V

### (Declaratory Judgment Regarding the Haskell '226 Patent)

36.    Microsoft incorporates by reference and realleges Paragraphs 1 through 17 of this Complaint.

37.    The manufacture, use, sale, offer to sell, and/or importation of Microsoft products do not infringe and have not infringed any claim of the Haskell '226 Patent.  In addition, the manufacture, sale, offer to sell, and/or importation of Microsoft products do not contribute to or induce the infringement of any claim of the Haskell '226 Patent; nor has Microsoft ever contributed to or induced the infringement of any such claim.  Microsoft, its customers, and all others have the right to manufacture, have made, use, sell, offer to sell, and import all of Microsoft's products accused of infringement, unhampered and unmolested by Lucent.

38.    The claims of the Haskell '226 Patent are invalid for failure to comply with one or more provisions of the Patent Laws of the United States of America, Title 35, United States Code, Sections 101 et seq., including without limitation Sections 101, 102, 103 and/or 112.

39.    The Haskell '226 Patent is unenforceable by virtue of inequitable conduct.  The claims of the Haskell '226 Patent are unenforceable as a result of the inequitable conduct of the applicants, their attorneys and/or agents in the prosecution of the Haskell '226 Patent. Microsoft alleges that said inequitable conduct comprised intentional misrepresentations and omissions including, without limitation, the following:

a)    The sworn statement signed by the applicants on or about September 25, 1989, stated in pertinent part:  "I believe I am an original, first and joint inventor of the subject matter which is claimed and for which a patent is sought on the invention entitled Conditional Motion Compensated Interpolation of Digital Motion Video the specification of which is attached hereto .... I acknowledge the duty to disclose information which is material to the examination of this application in accordance with Title 37, Code of Federal Regulations, 1.56(a)."

b)    Barry G. Haskell, one of the named inventors on the Haskell '226 Patent, and Arun N. Netravali are the co-authors of a book entitled DIGITAL PICTURES: REPRESENTATION AND COMPRESSION, which was published more than one year prior to the

11                          Case No. _____

1  date of the application for the Haskell '226 Patent. DIGITAL PICTURES: REPRESENTATION

2  AND COMPRESSION was highly material to the prosecution of the Haskell '226 Patent.

3  Nevertheless, the inventors failed to cite this material reference during the examination of the

4  Haskell '226 Patent, as required under 37 C.F.R. 1.56.

5      40.    There is an actual and justiciable controversy between Microsoft and Lucent over the

6  validity, enforceability and infringement of the Haskell '226 Patent.

### Count VI

### (Declaratory Judgment Regarding the Ketchum '781 Patent)

9      41.    Microsoft incorporates by reference and realleges Paragraphs 1 through 17 of this

10  Complaint.

11      42.    The manufacture, use, sale, offer to sell, and/or importation of Microsoft products do

12  not infringe and have not infringed any claim of the Ketchum '781 Patent. In addition, the

13  manufacture, use, sale, offer to sell, and/or importation of Microsoft products do not contribute to or

14  induce the infringement of any claim of the Ketchum '781 Patent; nor has Microsoft ever

15  contributed to or induced the infringement of any such claim. Microsoft, its customers, and all

16  others have the right to manufacture, have made, use, sell, offer to sell, and import all of

17  Microsoft's products accused of infringement, unhampered and unmolested by Lucent.

18      43.    The claims of the Ketchum '781 Patent are invalid for failure to comply with one or

19  more provisions of the Patent Laws of the United States of America, 35 U.S.C. §§ 101 *et seq.*,

20  including without limitation Sections 102, 103, and/or 112.

21      44.    There is an actual and justiciable controversy between Microsoft and Lucent over the

22  validity and infringement of the Ketchum '781 Patent.

### Count VII

### (Declaratory Judgment Regarding the Puri '878 Patent)

25      45.    Microsoft incorporates by reference and realleges Paragraphs 1 through 17 of this

26  Complaint.

27      46.    The manufacture, use, sale, offer to sell, and/or importation of Microsoft products do

28  not infringe and have not infringed any claim of the Puri '878 Patent. In addition, the manufacture,

1    use, sale, offer to sell, and/or importation of Microsoft products do not contribute to or induce the

2    infringement of any claim of the Puri '878 Patent; nor has Microsoft ever contributed to or induced

3    the infringement of any such claim.  Microsoft, its customers, and all others have the right to

4    manufacture, have made, use, sell, offer to sell, and import all of Microsoft's products accused of

5    infringement, unhampered and unmolested by Lucent.

6        47.    The claims of the Puri '878 Patent are invalid for failure to comply with one or more

7    provisions of the Patent Laws of the United States of America, 35 U.S.C. §§ 101 *et seq.*, including

8    without limitation Sections 102, 103, and/or 112.

9        48.    There is an actual and justiciable controversy between Microsoft and Lucent over the

10   validity and infringement of the Puri '878 Patent.

11                                      **Count VIII**

12              **(Declaratory Judgment Regarding the Agulnick '295 Patent)**

13       49.    Microsoft incorporates by reference and realleges Paragraphs 1 through 17 of this

14   Complaint.

15       50.    The manufacture, use, sale, offer to sell, and/or importation of Microsoft products do

16   not infringe any claim of the Agulnick '295 Patent.  In addition, the manufacture, use, sale, offer to

17   sell, and/or importation of Microsoft products do not contribute to or induce the infringement of any

18   claim of the Agulnick '295 Patent; nor has Microsoft ever contributed to or induced the

19   infringement of any such claim.  Microsoft, its customers, and all others have the right to

20   manufacture, have made, use, sell, offer to sell, and import all of Microsoft's products accused of

21   infringement, unhampered and unmolested by Lucent.

22       51.    The claims of the Agulnick '295 Patent are invalid for failure to comply with one or

23   more provisions of the Patent Laws of the United States of America, 35 U.S.C. §§ 101 *et seq.*,

24   including without limitation Sections 102, 103, and/or 112.

25       52.    There is an actual and justiciable controversy between Microsoft and Lucent over the

26   validity and infringement of the Agulnick '295 Patent.

27

28

## Count IX

### (Declaratory Judgment Regarding the Ackerman '131 Patent)

53.    Microsoft incorporates by reference and realleges Paragraphs 1 through 17 of this Complaint.

54.    The manufacture, use, sale, offer to sell, and/or importation of Microsoft products do not infringe and have not infringed any claim of the Ackerman '131 Patent.  In addition, the manufacture, use, sale, offer to sell, and/or importation of Microsoft products do not contribute to or induce the infringement of any claim of the Ackerman '131 Patent; nor has Microsoft ever contributed to or induced the infringement of any such claim.  Microsoft, its customers, and all others have the right to manufacture, have made, use, sell, offer to sell, and import all of Microsoft's products accused of infringement, unhampered and unmolested by Lucent.

55.    The claims of the Ackerman '131 Patent are invalid for failure to comply with one or more provisions of the Patent Laws of the United States of America, 35 U.S.C. §§ 101 *et seq.*, including without limitation Sections 102, 103, and/or 112.

56.    There is an actual and justiciable controversy between Microsoft and Lucent over the validity and infringement of the Ackerman '131 Patent.

## Count X

### (Declaratory Judgment Regarding the Atal '954 Patent)

57.    Microsoft incorporates by reference and realleges Paragraphs 1 through 17 of this Complaint.

58.    The manufacture, use, sale, offer to sell, and/or importation of Microsoft products do not infringe and have not infringed any claim of the Atal '954 Patent.  In addition, the manufacture, use, sale, offer to sell, and/or importation of Microsoft products do not contribute to or induce the infringement of any claim of the Atal '954 Patent; nor has Microsoft ever contributed to or induced the infringement of any such claim.  Microsoft, its customers, and all others have the right to manufacture, have made, use, sell, offer to sell, and import all of Microsoft's products accused of infringement, unhampered and unmolested by Lucent.

14                     Case No. _____

1       59.    The claims of the Atal '954 Patent are invalid for failure to comply with one or more

2   provisions of the Patent Laws of the United States of America, 35 U.S.C. §§ 101 *et seq.*, including

3   without limitation Sections 102, 103, and/or 112.

4       60.    There is an actual and justiciable controversy between Microsoft and Lucent over the

5   validity and infringement of the Atal '954 Patent.

6   <div align="center">**Count XI**</div>

7   <div align="center">**(Declaratory Judgment Regarding the Hall '457 Patent)**</div>

8       61.    Microsoft incorporates by reference and realleges Paragraphs 1 through 17 of this

9   Complaint.

10      62.    The manufacture, use, sale, offer to sell, and/or importation of Microsoft products do

11  not infringe and have not infringed any claim of the Hall '457 Patent.  In addition, the manufacture,

12  use, sale, offer to sell, and/or importation of Microsoft products do not contribute to or induce the

13  infringement of any claim of the Hall '457 Patent; nor has Microsoft ever contributed to or induced

14  the infringement of any such claim.  Microsoft, its customers, and all others have the right to

15  manufacture, have made, use, sell, offer to sell, and import all of Microsoft's products accused of

16  infringement, unhampered and unmolested by Lucent.

17      63.    The claims of the Hall '457 Patent are invalid for failure to comply with one or more

18  provisions of the Patent Laws of the United States of America, 35 U.S.C. §§ 101 *et seq.*, including

19  without limitation Sections 102, 103, and/or 112.

20      64.    There is an actual and justiciable controversy between Microsoft and Lucent over the

21  validity and infringement of the Hall '457 Patent.

22  <div align="center">**Count XII**</div>

23  <div align="center">**(Declaratory Judgment Regarding the Johnston '938 Patent)**</div>

24      65.    Microsoft incorporates by reference and realleges Paragraphs 1 through 17 of this

25  Complaint.

26      66.    The manufacture, use, sale, offer to sell, and/or importation of Microsoft products do

27  not infringe and have not infringed any claim of the Johnston '938 Patent.  In addition, the

28  manufacture, use, sale, offer to sell, and/or importation of Microsoft products do not contribute to or

<div align="center">15</div>

Case No. _____

1    induce the infringement of any claim of the Johnston '938 Patent; nor has Microsoft ever

2    contributed to or induced the infringement of any such claim.  Microsoft, its customers, and all

3    others have the right to manufacture, have made, use, sell, offer to sell, and import all of

4    Microsoft's products accused of infringement, unhampered and unmolested by Lucent.

5        67.    The claims of the Johnston '938 Patent are invalid for failure to comply with one or

6    more provisions of the Patent Laws of the United States of America, 35 U.S.C. §§ 101 *et seq.*,

7    including without limitation Sections 102, 103, and/or 112.

8        68.    There is an actual and justiciable controversy between Microsoft and Lucent over the

9    validity and infringement of the Johnston '938 Patent.

<div align="center">

## Count XIII

**(Declaratory Judgment Regarding the Brandenburg '714 Reissue Patent)**

</div>

12       69.    Microsoft incorporates by reference and realleges Paragraphs 1 through 17 of this

13   Complaint.

14       70.    The manufacture, use, sale, offer to sell, and/or importation of Microsoft products do

15   not infringe and have not infringed any claim of the Brandenburg '714 Reissue Patent.  In addition,

16   the manufacture, use, sale, offer to sell, and/or importation of Microsoft products do not contribute

17   to or induce the infringement of any claim of the Brandenburg '714 Reissue Patent; nor has

18   Microsoft ever contributed to or induced the infringement of any such claim.  Microsoft, its

19   customers, and all others have the right to manufacture, have made, use, sell, offer to sell, and

20   import all of Microsoft's products accused of infringement, unhampered and unmolested by Lucent.

21       71.    The claims of the Brandenburg '714 Reissue Patent are invalid for failure to comply

22   with one or more provisions of the Patent Laws of the United States of America, 35 U.S.C. §§ 101

23   *et seq.*, including without limitation Sections 102, 103, and/or 112.

24       72.    The Brandenburg '714 Reissue Patent is unenforceable by virtue of inequitable

25   conduct.  The claims of the Brandenburg Patent are unenforceable as a result of the inequitable

26   conduct of the applicants, their attorneys and/or agents in the prosecution of the Brandenburg

27   Patent.  Microsoft alleges that said inequitable conduct comprised intentional misrepresentations

28   and omissions including, without limitation, the following:

1    a)  The sworn statement signed by the applicants on or about August 12, 1993

2 and during the earlier prosecution of U.S. Patent No. 5,040,217 (which became the RE 36,714

3 patent), stated in pertinent part: "We verily believe ourselves to be the original, first and joint

4 inventors of the invention described in and claimed in Letters Patent No. 5,040,217. ... We

5 acknowledge the duty to disclose information which is material to the examination of this

6 application in accordance with Title 37, Code of Federal Regulations, 1.56(a)."

7    b)  In spring 1988, an article co-authored by K.H. Brandenburg, one of the

8 named inventors of the Brandenburg '714 Reissue Patent, which article was entitled "Fast Signal

9 Processor Encodes 48 kHz/16 Bit Audio Into 3 Bit In Real Time," was published by the IEEE. This

10 article was highly material to the examination of the Brandenburg '714 Reissue Patent and thus was

11 required to be cited during the prosecution under 37 C.F.R. 1.56. Nonetheless, the article was not

12 cited during the prosecution of the Brandenburg '714 Reissue Patent, despite that Brandenburg co-

13 authored the article.

14   73.  There is an actual and justiciable controversy between Microsoft and Lucent over the

15 validity and infringement of the Brandenburg '714 Reissue Patent.

16           **PRAYER FOR RELIEF**

17   WHEREFORE, Microsoft asks this Court to enter judgment in Microsoft's favor against

18 Lucent granting the following relief:

19   A.  Declaration that neither Microsoft nor its products infringes or has infringed any of

20 the claims of the Patents-in-Suit under any subsection of 35 U.S.C. § 271;

21   B.  Declaration that the claims of the Patents-in-Suit are invalid under 35 U.S.C. §§ 102,

22 103, and/or 112;

23   C.  Declaration that some or all of the Patents-in-Suit are unenforceable;

24   D.  Order enjoining the Lucent entities and their respective officers, partners, employees,

25 agents, parents, subsidiaries, and affiliates from suing or threatening to sue for infringement of any

26 of the Patents-in-Suit on the basis of the making, using, selling, offering for sale or importing of any

27 Microsoft products;

28

           17     Case No. _____

1     E.     Any such other and further relief, including an award of Microsoft's costs of suit and

2 attorneys' fees to the extent permitted by law, that this Court deems just and proper.

3 <div align="center">**JURY DEMAND**</div>

4     Microsoft hereby demands a trial by jury for all issues so triable.

5 Dated: April 8, 2003                 FISH & RICHARDSON P.C.

6

7                     By: _____

8                         Christopher S. Marchese (SBN 170239)
                        Fish & Richardson P.C.

9                         4350 La Jolla Village Drive, Suite 500
                        San Diego, California 92122

10

11                     Additional Counsel:
                        Stephen P. McGrath (SBN 202696)

12                         MICROSOFT CORPORATION
                        One Microsoft Way

13                         Redmond, WA 98052
                        Telephone: (425) 882-8080

14                         Facsimile: (425) 936-7329

15

16                   Attorneys for Plaintiff
                  MICROSOFT CORPORATION

17

18

19

20

21

22

23

24

25

26

27

28

1

## PROOF OF SERVICE

2   I am employed in the County of San Diego. My business address is Fish & Richardson P.C.,

3 4350 La Jolla Village Drive, Suite 500, San Diego, California 92122.  I am over the age of 18 and

4 not a party to the foregoing action.

5   I am readily familiar with the business practice at my place of business for collection and

6 processing of correspondence for personal delivery, for mailing with United States Postal Service,

7 for facsimile, and for overnight delivery by Federal Express, Express Mail, or other overnight

8 service.

9   On April 8, 2003, I caused a copy of the following document(s):

10

## DECLARATORY JUDGMENT COMPLAINT

11

12 to be served on the interested parties in this action by placing a true and correct copy thereof, enclosed in a sealed envelope, and addressed as follows:

13  Jane Hahn       Attorneys for Defendants,

14  Hahn & Adema      LUCENT TECHNOLOGIES INC. and
   501 West Broadway, Suite 1730  LUCENT TECHNOLOGIES

15  San Diego, CA  92101     GUARDIAN I LLC
   Telephone:  (619) 235-2100

16  Facsimile:  (619) 235-2101

17  ☐  **MAIL:**   Such correspondence was deposited, postage fully paid, with the United States Postal Service on the same day in the ordinary course of business.

18

19  ☒ XX  **PERSONAL:** Such envelope was delivered by hand to the offices of the addressee.

20

21  ☐  **FACSIMILE:** Such document was faxed to the facsimile transmission machine with the facsimile machine number stated above.  Upon completion of the transmission, the transmitting machine issued a transmission report showing the transmission was complete and without error.

22

23  ☐  **FEDERAL EXPRESS:** Such correspondence was deposited on the same day in the ordinary course of business with a facility regularly maintained by Federal Express.

24

25  ☐  **EXPRESS MAIL:** Such correspondence was deposited on the same day in the ordinary course of business with a facility regularly maintained by the United States Postal Service.

26

27  ☐  **OVERNIGHT DELIVERY:** Such correspondence was given on the same day in the ordinary course of business to an authorized courier or a driver authorized by that courier to receive documents.

28

<center>1     Case No. _____</center>

1        I declare that I am employed in the office of a member of the bar of this Court at whose
direction the service was made.

2        I declare under penalty of perjury that the above is true and correct. Executed on April 8,
2003, at San Diego, California.

3

_____

4                           Veronica Whalen

5    10267545.doc

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

          Case No. _____

1  John E. Gartman (SBN 152300)
   Christopher S. Marchese (SBN 170239)
2  Gary H. Savitt (SBN 220129)
   Fish & Richardson P.C.
3  4350 La Jolla Village Drive, Suite 500
   San Diego, California 92122
4  Telephone:  (858) 678-5070
   Facsimile:  (858) 678-5099
5
   Katherine Ford Horvath (SBN 213098)
6  Fish & Richardson P.C.
   500 Arguello Street, Suite 500
7  Redwood City, California 94063
   Telephone:  (650) 839-5070
8  Facsimile:  (650) 839-5071

9  Attorneys for Plaintiff
   MICROSOFT CORPORATION
10

11                     UNITED STATES DISTRICT COURT

12                   SOUTHERN DISTRICT OF CALIFORNIA

13

|  |  |
|---|---|
| MICROSOFT CORPORATION, | Case No. _____ |
| Plaintiff, | **Table of Contents For Exhibits** |
| v. | |
| LUCENT TECHNOLOGIES INC. and LUCENT TECHNOLOGIES GUARDIAN I LLC, | |
| Defendants. | |

20                        **Table of Contents**

21                                                                        **Page**

22  Exhibit A ........................................................................................... 1-12

23  Exhibit B ........................................................................................... 13-23

24  Exhibit C ........................................................................................... 24-36

25  Exhibit D ........................................................................................... 37-64

26  Exhibit E ........................................................................................... 65-70

27  Exhibit F ........................................................................................... 71-84

28  Exhibit G ........................................................................................... 85-151

                                1                    Case No. _____

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit H ............................................................................................................ 152-236

Exhibit I............................................................................................................. 237-260

Exhibit J ............................................................................................................ 261-280

Exhibit K ........................................................................................................... 281-297

Exhibit L ............................................................................................................ 298-320

Exhibit M ........................................................................................................... 321-333

Exhibit N............................................................................................................ 334-344

Exhibit O ........................................................................................................... 345-358

Exhibit P............................................................................................................. 359-362

Case No. _____

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

JUN - 6 2002

Spencer

|                                             |   |                               |
|---------------------------------------------|---|-------------------------------|
| LUCENT TECHNOLOGIES INC. and                | : |                               |
| LUCENT TECHNOLOGIES GUARDIAN I LLC,         | : |                               |
|                                             | : |                               |
| Plaintiffs,                                 | : |                               |
|                                             | : | Civil Action No.: 3:02~389-R  |
| v.                                          | : |                               |
|                                             | : | DEMAND FOR JURY TRIAL         |
| GATEWAY, INC. and                           | : |                               |
| GATEWAY COUNTRY STORES LLC,                 | : |                               |
|                                             | : |                               |
| Defendants.                                 | : |                               |

## COMPLAINT

Plaintiffs Lucent Technologies Inc. and Lucent Technologies Guardian I LLC

(collectively, "Lucent") for their Complaint against Gateway, Inc. and Gateway Country Stores

LLC (collectively, "Gateway") hereby demand a jury trial and allege as follows:

### Parties

1.     Plaintiff Lucent Technologies Inc. is a corporation organized under the

laws of the state of Delaware with its principal place of business at 600 Mountain Avenue,

Murray Hill, NJ 07974.

2.     Plaintiff Lucent Technologies Guardian I LLC is a limited liability

company organized under the laws of the state of Delaware with its principal place of business at

600 Mountain Avenue, Murray Hill, New Jersey 07974.

3.     Lucent is a leading global supplier of computer and communications equipment, including data, software, voice, and wireless-networking technologies. Researchers at Lucent's Bell Laboratories have developed a wide variety of key innovations that have greatly enhanced the capabilities and utility of personal computers. Common features such as video display, audio encoding, telephony, networking, and user interfaces have all benefited from Lucent's research and development efforts.

4.     On information and belief, Defendant Gateway, Inc. is a company organized under the laws of the state of Delaware with its principal place of business at 14303 Gateway Place, Poway, CA 92064.

5.     On information and belief, Defendant Gateway Country Stores LLC is a company organized under the laws of the state of Delaware with its principal place of business at 610 Gateway Drive, North Sioux City, SD 57049.

6.     Gateway makes, uses, sells, and offers for sale in the United States, and imports into the United States, computer systems, components, and accessories.

### Nature of the Action

7.     This is a civil action for infringement of seven United States Patents. This action is based upon the Patent Laws of the United States, 35 U.S.C. § 1 *et seq.*

### Jurisdiction and Venue

8.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1338(a).

9.     Venue is proper in this district under 28 U.S.C. §§ 1391(b) and (c) and

1400(b) because Gateway has committed acts of infringement in this district and because

Gateway is subject to personal jurisdiction in this district.  Venue is proper in this division under

Rule 3 of the Local Rules of Practice because Gateway has committed acts of infringement in

this division and because Gateway is subject to personal jurisdiction in this division.

## The Patents

10.     United States Patent No. 4,317,956 ("the Torok '956 Patent"), entitled

"Remote Chalkboard Automatic Cursor," was duly and legally issued on March 2, 1982, to

Torok et al.  A copy of the Torok '956 Patent is attached hereto as Exhibit A.

11.     United States Patent No. 4,383,272 ("the Netravali '272 Patent"), entitled

"Video Signal Interpolation Using Motion Estimation," was duly and legally issued on May 10,

1983, to Netravali et al.  A copy of the Netravali '272 Patent is attached hereto as Exhibit B.

12.     United States Patent No. 4,439,759 ("the Fleming '759 Patent"), entitled

"Terminal Independent Color Memory For A Digital Image Display System," was duly and

legally issued on March 27, 1984, to Fleming et al.  A copy of the Fleming '759 Patent is

attached hereto as Exhibit C.

13.     United States Patent No. B1 4,582,956 ("the Doughty '956 Patent"),

entitled "Method And Apparatus For Displaying At A Selected Station Special Service

Information During A Silent Interval Between Ringing," was duly and legally issued on April

15, 1986, to Carolyn A. Doughty.  A reexamination certificate confirming the patentability of the

invention of the Doughty '956 Patent was duly and legally issued on September 20, 1994.  A

copy of the Doughty '956 Patent is attached hereto as Exhibit D.

-3-

14.    United States Patent No. 4,617,676 ("the Jayant '676 Patent"), entitled "Predictive Communication System Filtering Arrangement," was duly and legally issued on October 14, 1986, to Jayant et al. A copy of the Jayant '676 Patent is attached hereto as Exhibit E.

15.    U.S. Patent No. 4,763,356 ("the Day '356 Patent"), entitled "Touch Screen Form Entry System," was duly and legally issued on August 9, 1988, to Day, Jr. et al. A copy of the Day '356 Patent is attached hereto as Exhibit F.

16.    United States Patent No. 4,958,226 ("the Haskell '226 Patent"), entitled "Conditional Motion Compensated Interpolation Of Digital Motion Video," was duly and legally issued on September 18, 1990, to Haskell et al. A copy of the Haskell '226 Patent is attached hereto as Exhibit G.

17.    The Torok '956, Netravali '272, Fleming '759, Doughty '956, Jayant '676, Day '356, and Haskell '226 patents are collectively referred to herein as the "Patents-in-Suit."

18.    Lucent owns each of the Patents-in-Suit, with the right to sue for past infringement.

## Count I
### (Patent Infringement of United States Patent No. 4,317,956)

19.    Paragraphs 1 through 18 are incorporated by reference as if stated fully herein.

20.    The Torok '956 Patent is valid and enforceable.

-4-

21.    Before the expiration of the Torok '956 Patent, Gateway made, used, sold, and offered to sell products that infringed at least one claim of the Torok '956 Patent.

22.    Before the expiration of the Torok '956 Patent, Gateway also contributed to and/or induced the infringement of at least one claim of the Torok '956 Patent.

23.    Although Lucent notified Gateway of its infringement of the Torok '956 Patent, Gateway continued its infringement after receiving this actual notice.

24.    Gateway's infringement of the Torok '956 Patent was willful.

25.    Lucent has been damaged by Gateway's infringement of the Torok '956 Patent.

### Count II
#### (Patent Infringement of United States Patent No. 4,383,272)

26.    Paragraphs 1 through 18 are incorporated by reference as if stated fully herein.

27.    The Netravali '272 Patent is valid and enforceable.

28.    Before the expiration of the Netravali '272 Patent, Gateway made, used, sold, and offered to sell products that infringed at least one claim of the Netravali '272 Patent.

29.    Before the expiration of the Netravali '272 Patent, Gateway also contributed to and/or induced the infringement of at least one claim of the Netravali '272 Patent.

30.    Although Lucent notified Gateway of its infringement of the Netravali '272 Patent, Gateway continued its infringement after receiving this actual notice.

-5-

31.    Gateway's infringement of the Netravali '272 Patent was willful.

32.    Lucent has been damaged by Gateway's infringement of the Netravali '272 Patent.

### Count III
#### (Patent Infringement of United States Patent No. 4,439,759)

33.    Paragraphs 1 through 18 are incorporated by reference as if stated fully herein.

34.    The Fleming '759 Patent is valid and enforceable.

35.    Before the expiration of the Fleming '759 Patent, Gateway made, used, sold, and offered to sell products that infringed at least one claim of the Fleming '759 Patent.

36.    Before the expiration of the Fleming '759 Patent, Gateway also contributed to and/or induced the infringement of at least one claim of the Fleming '759 Patent.

37.    Although Lucent notified Gateway of its infringement of the Fleming '759 Patent, Gateway continued its infringement after receiving this actual notice.

38.    Gateway's infringement of the Fleming '759 Patent was willful.

39.    Lucent has been damaged by Gateway's infringement of the Fleming '759 Patent.

### Count IV
#### (Patent Infringement of United States Patent No. B1 4,582,956)

40.    Paragraphs 1 through 18 are incorporated by reference as if stated fully herein.

-6-

41.   The Doughty '956 Patent is valid and enforceable.

42.   Gateway makes, uses, sells, and offers to sell products that infringe at least one claim of the Doughty '956 Patent.

43.   Gateway also contributes to and/or induces the infringement of at least one claim of the Doughty '956 Patent.

44.   Although Lucent notified Gateway of its infringement of the Doughty '956 Patent, Gateway continued its infringement after receiving this actual notice.

45.   Gateway's infringement of the Doughty '956 Patent was, and continues to be, willful.

46.   Lucent has been damaged by Gateway's infringement of the Doughty '956 Patent and will suffer irreparable injury unless the infringement is enjoined by this Court.

### Count V
#### (Patent Infringement of United States Patent No. 4,617,676)

47.   Paragraphs 1 through 18 are incorporated by reference as if stated fully herein.

48.   The Jayant '676 patent is valid and enforceable.

49.   Gateway makes, uses, sells, and offers to sell products that infringe at least one claim of the Jayant '676 Patent.

50.   Gateway also contributes to and/or induces the infringement of at least one claim of the Jayant '676 Patent.

-7-

51.     Although Lucent notified Gateway of its infringement of the Jayant '676 Patent, Gateway continued its infringement after receiving this actual notice.

52.     Gateway's infringement of the Jayant '676 Patent was, and continues to be, willful.

53.     Lucent has been damaged by Gateway's infringement of the Jayant '676 Patent and will suffer irreparable injury unless the infringement is enjoined by this Court.

<u>Count VI</u>
(Patent Infringement of United States Patent No. 4,763,356)

54.     Paragraphs 1 through 18 are incorporated by reference as if stated fully herein.

55.     The Day '356 Patent is valid and enforceable.

56.     Gateway makes, uses, sells, and offers to sell products that infringe at least one claim of the Day '356 Patent.

57.     Gateway also contributes to and/or induces the infringement of at least one claim of the Day '356 Patent.

58.     Although Lucent notified Gateway of its infringement of the Day '356 Patent, Gateway continued its infringement after receiving this actual notice.

59.     Gateway's infringement of the Day '356 Patent was, and continues to be, willful.

-8-

60.    Lucent has been damaged by Gateway's infringement of the Day '356

Patent and will suffer irreparable injury unless the infringement is enjoined by this Court.

## Count VII
### (Patent Infringement of United States Patent No. 4,958,226)

61.    Paragraphs 1 through 18 are incorporated by reference as if stated fully

herein.

62.    The Haskell '226 Patent is valid and enforceable.

63.    Gateway makes, uses, sells, and offers to sell products that infringe at least

one claim of the Haskell '226 Patent.

64.    Gateway also contributes to and/or induces the infringement of at least one

claim of the Haskell '226 Patent.

65.    Although Lucent notified Gateway of its infringement of the Haskell '226

Patent, Gateway continued its infringement after receiving this actual notice.

66.    Gateway's infringement of the Haskell '226 Patent was, and continues to

be, willful.

67.    · Lucent has been damaged by Gateway's infringement of the Haskell '226

Patent and will suffer irreparable injury unless the infringement is enjoined by this Court.

## Prayer for Relief

WHEREFORE, Lucent prays for judgment as follows:

A.    That Gateway has willfully infringed the Patents-in-Suit;

-9-

B.   That Gateway, its officers, agents, servants and employees, and those

persons in active concert or participation with any of them, and their

successors and assigns be permanently enjoined from infringement,

inducement of infringement, and contributory infringement of each of the

Patents-in-Suit not yet expired, including but not limited to making,

importing, using, offering for sale, or selling any devices or systems that

infringe, or using processes that infringe, the Patents-in-Suit before the

expiration dates of those patents;

C.   That Lucent be awarded all damages adequate to compensate it for

Gateway's infringement of the Patents-in-Suit, such damages to be

determined by a jury and, if necessary to adequately compensate Lucent

for the infringement, an accounting, and that such damages be trebled and

awarded to Lucent with prejudgment interest;

D.   That this case be declared an exceptional case within the meaning of 35

U.S.C. § 285 and that Lucent be awarded the attorney fees, costs, and

expenses that it incurs prosecuting this action; and

E.   That Lucent be awarded such other and further relief as this Court deems

just and proper.

## JURY DEMAND

Lucent demands a trial by jury on all issues triable of right by a jury.

LUCENT TECHNOLOGIES INC. and
LUCENT TECHNOLOGIES GUARDIAN I LLC

By Counsel

**RICHARDS McGETTIGAN REILLY
& WEST, P.C.**
225 Reinekers Lane, Suite 700
Alexandria, Virginia 22314-2822
(703) 549-5353

By: _____
     John F. Anderson
     Va. Bar No. 20710
     Craig C. Reilly
     Va. Bar No. 20942

OF COUNSEL:

John M. Desmarais
Robert A. Appleby
**KIRKLAND & ELLIS**
153 East 53rd Street
New York, New York 10022-4675
(212) 446-4800

-11-

FILED

OCT 17 2002

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

F I L E D

OCT - 4 2002

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

LUCENT TECHNOLOGIES, INC., et al.,

               Plaintiffs.

v.

GATEWAY, INC., et al.,

               Defendants.

Civil Action Number 3:02CV389

02cv 2060 BTM(JAH)

### ORDER

THIS MATTER comes before the Court on Defendants Gateway, Inc., et al.'s Motion to Transfer Venue, filed on August 19, 2002. For the reasons discussed in the accompanying memorandum, the Defendant's Motion is GRANTED. This case is TRANSFERRED to the Southern District of California for all further proceedings.

The Clerk is DIRECTED to forward the entire case file to the Southern District of California.

Let the Clerk send a copy of this Order to all parties of record.

It is SO ORDERED.

_James R. Spencer_
UNITED STATES DISTRICT JUDGE

OCT - 4 2002
_____
DATE

A TRUE COPY, TESTE:
CLERK, U.S. DISTRICT COURT

BY _Jennifer L. Thompson_
        DEPUTY CLERK

FILED
03 FEB 27 AM 7:55
DISTRICT COURT
OF CALIFORNIA
DEPUTY

RECEIVED
FEB 2 6 2003
CLERK U.S DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY
DEPUTY

1  John E. Gartman (SBN 152300)
   Christopher S. Marchese (SBN 170239)
2  Katherine Ford Horvath (SBN 213698)
   Gary H. Savitt (SBN 220129)
3  Fish & Richardson P.C.
   4350 La Jolla Village Drive, Suite 500
4  San Diego, California 92122
   Telephone: (858) 678-5070
5  Facsimile: (858) 678-5099

6  Attorneys for
   MICROSOFT CORPORATION
7

8            UNITED STATES DISTRICT COURT

9           SOUTHERN DISTRICT OF CALIFORNIA

10

11 LUCENT TECHNOLOGIES INC. and       Case No. 02-CV-2060 BTM (JAH)
   LUCENT TECHNOLOGIES GUARDIAN I
12 LLC,                               STIPULATION AND [PROPOSED]
                                      ORDER FOR MICROSOFT
13       Plaintiffs and Counter-defendants  CORPORATION TO INTERVENE IN
                                      THIS ACTION AND FOR AN
14       v.                           EXTENSION OF TIME TO PRESENT
                                      CLAIM CONSTRUCTION POSITIONS
15 GATEWAY, INC. and GATEWAY
   COUNTRY STORES LLC,
16                                    Honorable Barry Ted Moskowitz
         Defendants and Counter-claimants,
17                                    Courtroom 15, 5th Floor
         and                          FILE BY FAX
18
   MICROSOFT CORPORATION.
19
         Applicant for Intervention
20

21

22       WHEREAS, Plaintiffs Lucent Technologies Inc. and Lucent Technologies Guardian I LLC

23 (collectively, "Lucent") filed their Complaint on June 6, 2002 in the United States District Court for

24 the Eastern District of Virginia;

25       WHEREAS, in that Complaint, Lucent asserted seven patents (the "Lucent Patents"):

26 United States Patent No. B1 4,582,956 (the "Doughty Patent"); United States Patent No. 4,439,759

27

28                        STIP. & [PROPOSED] ORDER FOR MICROSOFT TO INTERVENE
                          IN THIS ACTION AND FOR AN EXT. OF TIME TO PRESENT
                          CLAIM CONSTRUCTION POSITIONS
                          Lucent et al. v Gateway et al.
                          Microsoft Corp.
                          Intervenor



1  (the "Fleming Patent"); United States Patent No. 4,958,226 (the "Haskell Patent"); United States

2  Patent No. 4,383,272 (the "Netravali Patent"); United States Patent No. 4,617,676 (the "Jayant

3  Patent");United States Patent No. 4,317,956 (the "Torok Patent"); and United States Patent No.

4  4,763,356 (the "Day Patent");

5      WHEREAS, on October 4, 2002, the United States District Court for the Eastern District of

6  Virginia ordered the instant case transferred to this Court;

7      WHEREAS, on November 19, 2002, this Court held a Case Management Conference where

8  it set various dates including a claim construction hearing on October 27, 2003;

9      WHEREAS, in an order dated November 22, 2002, this Court vacated these dates;

10     WHEREAS, on December 11, 2002, this Court held a Status Conference where it set a date

11  of February 28, 2003 for Lucent to file its claim construction positions and a date of April 4, 2003

12  for Gateway, Inc. and Gateway Country Stores LLC (collectively, "Gateway") to file their claim

13  construction positions;

14     WHEREAS, Applicant for Intervention Microsoft Corporation ("Microsoft") desires to

15  intervene in the instant action as a defendant and counterclaimant with respect to five of the seven

16  Lucent Patents, namely, the Haskell Patent, the Netravali Patent, the Jayant Patent, the Torok

17  Patent, and the Day Patent (collectively, the "Intervention Patents");

18     WHEREAS, given the proximity of the current claim construction dates, given that

19  Microsoft has not yet become a party to the instant action, and given the status and nature of this

20  action, Microsoft desires an extension of time to prepare its claim construction positions;

21     WHEREAS, in signing the instant stipulation, neither Microsoft nor Gateway waive the

22  right to seek an additional extension of time relating to presenting claim construction positions,

23  including on the bases that discovery relevant to claim construction has not been provided, or has

24  been provided at a time too late to permit responsive claim construction positions to be provided by

25  the time currently scheduled. Lucent reserves the right to oppose such a request, including on the

26

27

28

STIP. & [PROPOSED] ORDER FOR MICROSOFT TO INTERVENE
IN THIS ACTION AND FOR AN EXT. OF TIME TO PRESENT
CLAIM CONSTRUCTION POSITIONS
Lucent et al. v Gateway et al.
Microsoft Corp.
Intervenor

2

1    bases that the discovery sought is not in fact relevant to claim construction or was not timely

2    sought.

3         WHEREAS, by intervening only as to the five Intervention Patents, Microsoft does not

4    waive any right to defend any charge of infringement by Lucent against Microsoft or any Microsoft

5    product relating to the Doughty Patent and/or Fleming Patent;

6         NOW, THEREFORE, Lucent, Gateway, and Microsoft, by and through their undersigned

7    counsel, stipulate to the following:

8         1.  Microsoft shall be permitted to intervene as a defendant and counterclaimant with

9             respect to the Intervention Patents.

10        2.  A complete statement of Lucent's proposed construction of all the asserted claims of

11            each of the seven patents at issue in this case that Lucent contends Gateway and/or

12            Microsoft infringed (and/or infringe) is no longer due on or before February 28,

13            2003, but is now due on or before April 11, 2003.

14        3.  Gateway's response to Lucent's statement of claim construction, which in turn sets

15            forth a complete statement of Gateway's proposed construction of the asserted

16            claims of each of the seven patents at issue in this case, is no longer due on or before

17            April 4, 2003, but is now due on or before May 16, 2003.

18        4.  Microsoft's response to Lucent's statement of claim construction, which in turn sets

19            forth a complete statement of Microsoft's proposed construction of the asserted

20            claims of each of the Intervention Patents at issue in this case, is due on or before

21            May 16, 2003.

22

23

24

25

26

27

28

STIP. & [PROPOSED] ORDER FOR MICROSOFT TO INTERVENE
IN THIS ACTION AND FOR AN EXT. OF TIME TO PRESENT
CLAIM CONSTRUCTION POSITIONS
Lucent et al. v Gateway et al.
Microsoft Corp.
Intervenor

3

1  IT IS SO STIPULATED.

2  Dated: 2/25/03                    FISH & RICHARDSON P.C.

3

4                                    By: _____
                                          Christopher S. Marchese
5

6                                    Attorneys for
                                     MICROSOFT CORPORATION
7

8  Dated: _____           HAHN & ADEMA

9

10                                   By: _____
                                          Alison Adema
11

12                                   Attorneys for
                                     LUCENT TECHNOLOGIES INC. and
13                                   LUCENT TECHNOLOGIES GUARDIAN I
                                     LLC
14

15

16  Dated: _____          SELTZER, CAPLAN, MCMAHON & VITEK

17

18                                   By: _____
                                          David J. Zubkoff
19

20                                   Attorneys for
                                     GATEWAY, INC. and GATEWAY
21                                   COUNTRY STORES LLC

22

23

24

25

26

27

28                          STIP. & [PROPOSED] ORDER FOR MICROSOFT TO INTERVENE;
                            IN THIS ACTION AND FOR AN EXT. OF TIME TO PRESENT
                            CLAIM CONSTRUCTION POSITIONS
                       4    Lucent et al. v Gateway et al.
                            Microsoft Corp.
                            Intervener

1    IT IS SO STIPULATED.

2    Dated: _____              FISH & RICHARDSON P.C.

3

4                                       By: _____

5                                          Christopher S. Marchese

6                                       Attorneys for

7                                       MICROSOFT CORPORATION

8    Dated: **2/26/03**                 HAHN & ADEMA

9

10                                      By: _Alison Adema_____

11                                         Alison Adema

12                                      Attorneys for

13                                      LUCENT TECHNOLOGIES INC. and
                                        LUCENT TECHNOLOGIES GUARDIAN I

14                                      LLC

15

16   Dated: _____              SELTZER, CAPLAN, MCMAHON & VITEK

17

18                                      By: _____

19                                         David J. Zubkoff

20                                      Attorneys for

21                                      GATEWAY, INC. and GATEWAY
                                        COUNTRY STORES LLC

22

23

24

25

26

27                                      STIP. & [PROPOSED] ORDER FOR MICROSOFT TO INTERVENE
                                        IN THIS ACTION AND FOR AN EXT. OF TIME TO PRESENT
28                                          CLAIM CONSTRUCTION POSITIONS
                                               Lucent et al. v Gateway et al.
                               4                      Microsoft Corp.
                                                         Intervenor

FEB.26.2003  10:01AM  SCMV                                    NO.634   P.5/6

1      IT IS SO STIPULATED.

2    Dated: _____            FISH & RICHARDSON P.C.

3

4

5                                     By: _____
                                          Christopher S. Marchese
6
                                      Attorneys for
7                                     MICROSOFT CORPORATION

8    Dated: _____            HAHN & ADEMA

9

10                                    By: _____
                                          Alison Adema
11

12                                    Attorneys for
                                      LUCENT TECHNOLOGIES INC. and
13                                    LUCENT TECHNOLOGIES GUARDIAN I
                                      LLC
14

15

16   Dated: _____           SELTZER, CAPLAN, MCMAHON & VITEK

17

18                                    By: _____
                                          David J. Zubkoff
19
                                      Attorneys for
20                                    GATEWAY, INC. and GATEWAY
                                      COUNTRY STORES LLC
21

22

23

24

25

26

27

28                   STIP. A [PROPOSED] ORDER FOR MICROSOFT TO INTERVENE
                       IN THIS ACTION AND FOR AN EXT. OF TIME TO PRESENT
                                            CLAIM CONSTRUCTION POSITIONS
                          4                    Lucent et al. v Gateway et al.
                                                          Microsoft Corp.
                                                              Intervenor

## ORDER

1. Microsoft can intervene as a defendant and counterclaimant with respect to the Intervention Patents. *Microsoft shall file its counterclaim in intervention within 20 days.*

2. Microsoft shall file an answer (including any counterclaims) within 20 days *for* of entry of this order.

3. A complete statement of Lucent's proposed construction of all the asserted claims of each of the seven patents at issue in this case that Lucent contends Gateway and/or Microsoft infringed (and/or infringe) is no longer due on or before February 28, 2003, but is now due on or before April 11, 2003.

4. Gateway's response to Lucent's statement of claim construction, which in turn sets forth a complete statement of Gateway's proposed construction of the asserted claims of each of the seven patents at issue in this case, is no longer due on or before April 4, 2003, but is now due on or before May 16, 2003.

5. Microsoft's response to Lucent's statement of claim construction, which in turn sets forth a complete statement of Microsoft's proposed construction of the asserted claims of each of the Intervention Patents at issue in this case, is due on or before May 16, 2003.

Dated: **2-26**, 2003

BARRY T. MOSKOWITZ
Judge of the District Court

10255176.doc

STIP. & [PROPOSED] ORDER FOR MICROSOFT TO INTERVENE
IN THIS ACTION AND FOR AN EXT. OF TIME TO PRESENT
CLAIM CONSTRUCTION POSITIONS
Lucent et al. v Gateway et al.
Microsoft Corp.
Intervener

5

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.

MITEQ, INC., Plaintiff,
v.
COMTECH TELECOMMUNICATIONS CORP.,
Defendant.

No. Civ.A. 02-1336-SLR.

Jan. 23, 2003.

MEMORANDUM ORDER

ROBINSON, J.

I. INTRODUCTION

*1 On July 29, 2002, plaintiff Miteq, Inc. filed this
action against defendant Comtech
Telecommunications, Corp. seeking a declaratory
judgment that it does not infringe U.S. Patent No.
5,666,646 ("the '646 patent") owned by a subsidiary
of defendant, or that the '646 patent is invalid. (D.I.1)
Presently before the court is defendant's motion to
dismiss, stay, or transfer this action. (D.I.6) This
court has jurisdiction pursuant to 28 U.S.C. § § 1331
and 1338. For the reasons that follow, the motion
shall be granted.

II. BACKGROUND

Plaintiff is a Delaware corporation with its principal
place of business in Hauppauge, New York. (D.I. 14
at 5) Plaintiff designs and manufactures satellite
communications equipment, including the accused
infringing products. (Id. at 7) Defendant is a
Delaware corporation with its principal place of
business in Melville, New York. (D.I.8) Comtech EF
Data ("EF Data") is a wholly owned subsidiary of
defendant with its principal place of business in
Tempe, Arizona. (Id.) EF Data is the assignee of the
'646 patent entitled "Radio Frequency (RF) Converter
System with Distributed Protection Switching and
Method Transfer." (Id.) Defendant and EF Data
design and manufacture satellite communications
equipment utilizing the technology of the '646 patent.

On April 10, 2002, defendant filed a complaint
against plaintiff in the United States District Court
for the District of Arizona alleging infringement of
the '646 patent. (D.I. 7 at 3) However, defendant
asserts that it did not serve plaintiff in the Arizona
case until August 1, 2002, in order to "permit a
dialogue between the parties." (Id.) Prior to being
served in the Arizona case, plaintiff filed this action
and served defendant on July 29, 2002, seeking
declaratory judgment of non-infringement and
invalidity of the '646 patent. (D.I.1) Defendant now
seeks to either dismiss this action, stay this case until
resolution of the Arizona litigation, or transfer this
case to the District of Arizona. (D.I.7)

III. DISCUSSION

More than fifty years ago, the Third Circuit Court of
Appeals adopted the "first-filed rule" where "in all
cases of federal concurrent jurisdiction the court
which first had possession of the subject must decide
it." Crosley Corp. v. Hazeltine Corp., 122 F.2d 925,
929 (3d Cir.1941) (quoting Smith v. M'Iver, 22 U.S.
(9 Wheat.) 532, 6 L.Ed. 152 (1824)). Consequently,
the second filed action should be stayed or
transferred to the court where the first filed action is
pending. Peregrine Corp. v. Peregrine Indus., Inc.,
769 F.Supp. 169, 171 (E.D.Pa.1991); Dippold-
Harmon Enterprises, Inc. v. Lowe's Companies, Inc.,
2001 U.S. Dist. LEXIS 18547, Civil Action No. 01-
532-GMS, 2001 WL 1414868 (D.Del.2001). The rule
"encourages sound judicial administration and
promotes comity among federal courts of equal
rank." E.E.O.C. v. University of Pennsylvania, 850
F.2d 969, 971 (3d Cir.1988). The decision to transfer
or stay the second action is within the discretion of
the trial court. Id. at 972, 977. However, invocation
of the rule will usually be the norm, not the
exception. Courts must be presented with exceptional
circumstances before exercising their discretion to
depart from the first-filed rule. Id. at 979.

*2 In this case, it is undisputed that the first-filed
case in Arizona and the present case involve the same
patent and the same issues. Therefore, the burden is
on plaintiff to present some exceptional
circumstances why the court should depart from the
first-filed rule. In support of its argument opposing
transfer, plaintiff states that all of its relevant
witnesses reside in New York, all the documents and
records related to the accused product are in New
York, and the "center of gravity" of the case is New
York. (D.I. 14 at 6-7) None of these arguments show
that there are any exceptional circumstances
requiring the court to depart from the first-filed rule.

Furthermore, defendant makes the same arguments
in favor of transferring the case to Arizona. It argues
that all of its relevant witness, documents, and

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

products are either in or near Arizona. Therefore, by not allowing a transfer, the court would simply be transferring the inconvenience of traveling from plaintiff to defendant. Mere inconvenience to one party does not rise to the level of exceptional circumstances that would require the court to depart from the well-established principles of the first-filed rule. Since the patent litigation action in Arizona was filed first, transfer of the subsequently filed Delaware action will promote judicial administration and consistency of results.

IV. CONCLUSION

For the reasons stated, at Wilmington, this 23rd day of January, 2003, IT IS ORDERED that:

1. Defendant's motion to transfer (D.I.6) is granted.

2. Defendant's motions to dismiss and stay (D.I.6) are denied as moot.

3. The above-captioned action shall be transferred to the United States District Court for the District of Arizona.

2003 WL 179991 (D.Del.)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

**C**
Only the Westlaw citation is currently available.

United States District Court, D. Delaware.

CORIXA CORPORATION, a Delaware corporation, et al., Plaintiffs,
v.
IDEC PHARMACEUTICALS CORPORATION, a Delaware corporation, Defendant.

No. CIV.A.01-615-GMS.

Feb. 25, 2002.

MEMORANDUM AND ORDER

SLEET, District J.

I. INTRODUCTION

*1 On September 10, 2001, IDEC Pharmaceutical Corporation ("IDEC") filed a complaint in the Southern District of California against Coulter Pharmaceutical Inc. ("Coulter"), Corixa Corporation ("Corixa"), and the Regents of the University of Michigan ("Michigan"). In its complaint, IDEC seeks a declaratory judgment of non-infringement and/or invalidity of five patents. On September 11, 2001, the Oncologic Drugs Advisory Committee ("ODAC") indicated that it would recommend a limited FDA approval of IDEC's drug Zevalin. On September 12, 2001, at approximately 8:33 A.M. PST, IDEC filed a first amended complaint which included a sixth patent.

On September 12, 2001, at 12:07 P.M. EST, Corixa, Coulter, and GlaxoSmithKline (GSK) (collectively "Corixa") filed the above-captioned action against IDEC. [FN1] Corixa alleges that IDEC is infringing U.S. Patent Nos. 6,015,542, ("the '542 patent"), 6,090,365 ("the '365 patent"), and 5,595,721 ("the '721 patent"). These patents are three of the patents involved in the California declaratory judgment action.

> FN1. On September 28, 2001, Michigan was added as a plaintiff in this action.

Presently before the court is IDEC's motion to stay the proceedings, or alternatively, to dismiss or transfer this action to the Southern District of California. [FN2] For the reasons that follow, the court will grant IDEC's motion to transfer.

> FN2. IDEC sought to stay the proceedings pending a ruling from the California court on a motion to dismiss. On January 30, 2002, the California court denied the motion to dismiss. IDEC's current motion to stay is therefore moot.

II. BACKGROUND

IDEC is a Delaware corporation with its sole place of business in the San Diego area. Coulter is a Delaware corporation with its principle place of business in the San Francisco Bay area. Corixa is a Delaware corporation based in Seattle, Washington. GSK is a Pennsylvania corporation with its principle place of business in Philadelphia, Pennsylvania. The University of Michigan is a constitutional corporation of the State of Michigan, located in Ann Arbor, Michigan.

The patents at issue involve technology for the treatment of lymphoma using targeted radioimmunotherapy. Coulter and Michigan are co-owners of the '542, ' 365, and '721 patents. Corixa and GSK are the licensees of these patents. Both IDEC and Corixa are currently seeking FDA approval for a commercial embodiment of their respective inventions for the treatment of lymphoma using radioimmunotherapy.

With these facts in mind, the court will now turn to the motion presently before it.

III. DISCUSSION

A. The "First-Filed" Rule

Where two patent lawsuits involving the same claims are filed in different jurisdictions, the Federal Circuit requires that the first-filed action be given preference absent special circumstances. *See Genentech v. Eli Lilly & Co.,* 998 F.2d 931, 937 (Fed.Cir.1993). The first-filed doctrine also serves to prevent a multiplicity of actions and to achieve resolution in a single lawsuit of all disputes arising from common matters. *See id.* at 937. This doctrine applies equally well where the first-filed action is one for a declaratory judgment. *See id.* at 938 (noting that, where the declaratory action can resolve the various issues, a first-filed declaratory action is

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

entitled to precedence as against a later-filed patent infringement action.)

*2 Applying the first-filed rule, IDEC argues that the present case should be transferred to the Southern District of California. Notwithstanding that the cases at issue are "mirror image" cases where the court is asked to construe the same patents, Corixa argues that the first-filed rule is inapplicable to the present situation.

Corixa first argues that GSK has not been joined in the California litigation. The record before the court indicates that GSK is Coulter's licensee. It is unclear whether GSK is an exclusive licensee. However, even were the court to accept Corixa's argument that GSK is an exclusive licensee, that alone does not indicate that GSK is a necessary party to this litigation. Corixa concedes that GSK is a licensee with fewer than all substantial rights. As such, GSK, while likely a proper party to the California lawsuit, is not a necessary party. See *Intellectual Property Development, Inc. v. TCI Cablevision of California, Inc.*, 248 F.3d 1333, 1348 (Fed.Cir.2001) (holding that an exclusive licensee possessing fewer than all substantial rights may not sue in its own name without joinder of the patent owner.) Finally, to the extent that the parties believe that GSK is a necessary party, GSK may request permission to join the California litigation. [FN3]

> FN3. Corixa expresses concern over whether the California court has subject-matter jurisdiction over an action between IDEC and GSK. As it is not the court's province to determine another court's subject matter jurisdiction, the court expresses no opinion on this.

Corixa next argues that the first-filed rule is inapplicable to the present situation because IDEC improperly "raced to the courthouse" in order to file its motion in California. In support of this contention, Corixa points out that its right to file an infringement suit against IDEC did not ripen until after ODAC recommended that the FDA approve Zevalin. However, before ODAC publicly recommended approval, but after IDEC had reason to believe they would do so, IDEC "raced" to file its declaratory judgment action.

The court acknowledges that IDEC's filing seems providential since ODAC's recommendation became public the day after IDEC filed its suit. In its

November 6, 2001 Order, however, the California court specifically found that IDEC possessed a reasonable apprehension of suit when it filed its declaratory judgment action. The California court continued by stating that, "an actual controversy existed when IDEC filed the complaint under consideration. Consequently the [c]ourt finds that IDEC's filing suit was not motivated by "forum shopping alone," but rather was a legitimate exercise of its opportunity under the Declaratory Judgment Act ...." This court sees no reason to disagree with the California court's findings.

Given the information presently before it, the court concludes that having two separate trials in mirror image cases would defeat the purposes of the first-filed rule, namely, sound judicial administration and comity among federal courts of equal rank. See *EEOC v. University of Pennsylvania*, 850 F.2d 969, 971 (3d Cir.1988). Accordingly, the court finds that the application of the rule weighs heavily in favor of transferring this case to the Southern District of California.

B. Section 1404(a)

*3 Transfer to the Southern District of California is also mandated under a section 1404(a) analysis. Section 1404(a) provides that "[f]or the convenience of [the] parties and [the] witnesses, in the interest of justice," the court may transfer this action to "any other district where it might have been brought." 28 U.S.C. § 1404(a). There is no dispute that this action could have been filed in the Southern District of California. The court will, therefore, move on with inquiry as directed by the Third Circuit. See *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir.1995).

In *Jumara*, the Third Circuit provided a list of factors to assist the district courts in determining "whether, on balance, the litigation would more conveniently proceed and the interests of justice [would] be better served by a transfer to a different forum." *Id.* These factors include six private and five public interests which the court may consider. *See id.*

1. The Private Interests

The private interests most relevant to this case include: (1) the convenience of the parties as indicated by their relative physical and financial position; (2) the convenience of the witnesses, but only to the extent that they may be unavailable for trial in one of the fora; and (3) the location of records and other documents, again, only to the extent that

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Case 1:03-cv-01108-B-CAB   Document 1   Filed 06/02/03   Page 91 of 976

these files cannot be produced in the alternate forum. [FN4]

> FN4. For the reasons the court discussed in a previous opinion, it will not afford any weight to the first three *Jumara* factors, specifically, the plaintiff's initial choice of forum, the defendant's preferred venue, and whether the claim arose elsewhere. *See Affymetrix, Inc. v. Synteni, Inc., 28 F.Supp.2d 192, 197-201 (D.Del.1998).* In not affording weight to these factors, the court avoids the risk of double- counting these interests and thereby throwing off the transfer analysis. *See id.* Instead, the court will consider whether the Southern District of California is a more convenient forum for the parties and the witnesses, while also serving the interests of justice. *See 28 U.S.C. § 1404(a).*

**a. The Convenience of the Parties**

Geographically, California is not more inconvenient for the parties than Delaware. Michigan must travel whether the suit is in California or Delaware. GSK is one of the world's largest pharmaceutical companies, and cannot complain about location. The remainder of the parties are based on · the West Coast. Furthermore, transfer to California would reduce the overall inconvenience to all parties involved. The parties must already be prepared to litigate the related case currently pending in the Southern District of California. Bringing witnesses and relevant documents to only one location, here California, minimizes the level of disruption caused to all parties by the litigation. This is certainly a more economical and efficient result than having each party moving witnesses and documents between two states, depending on which of these related actions is being litigated at that time. Thus, this factor weighs in favor of transfer.

**b. The Convenience of Witnesses**

Party witnesses or witnesses who are employed by a party carry no weight in the "balance of convenience" analysis since each party is able, indeed obligated, to procure the attendance of its own employees for trial. *See Affymeytrix, 28 F.Supp.2d at 203.* Expert witnesses or witnesses who are retained by a party to testify carry little weight in determining where the "balance of convenience" lies because they are "usually selected [on the basis] of their reputation and

special knowledge without regard to their residences and are presumably well compensated for their attendance, labor and inconvenience, if any." *See id.* (internalcitations omitted). Fact witnesses who possess first-hand knowledge of the events giving rise to the lawsuit, however, have traditionally weighed quite heavily in the "balance of convenience" analysis. *See id.*

*4 There is no evidence on the record that would indicate that Delaware would be an inconvenient forum for potential non-party witnesses. However, the court notes that all the material witnesses in this dispute, party or otherwise, will be in California already to litigate the related matter now pending in the Southern District of California. Requiring that they come to Delaware to litigate this action separately cannot be considered convenient and in the interest of justice. However, as there is no clear evidence that a non- party witness will be unable to attend trial in Delaware, this factor must weigh against transfer.

**c. The Location of Records and Other Documents**

The technological advances of recent years have significantly reduced the weight of this factor in the "balance of convenience" analysis. *See id.* at 205. There is no indication that either party would be unable to produce the relevant records and documents in Delaware. Thus, because this factor is relevant only insofar as the documents would be unavailable in one forum, the court finds that this factor must weigh against transfer.

From a practical standpoint, however, the court notes that any relevant documents will already be in California for the litigation of that case. The court sees no need to require that the parties move the same documents across the country. Rather, it would be much more efficient to litigate these related actions in one location. However, these considerations are more relevant to the first factor discussed *supra.*

**2. The Public Factors**

As other courts have noted, depending on the circumstances of the case, some of the "public interest" factors listed in *Jumara* may play no role in the "balance of convenience." *See id.* at 205. The court thus elects to discuss only the factors most relevant to the pending case.

**a. Practical Considerations Making Trial Easy, Expeditious or Inexpensive**

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

This factor appears to substantially repeat the "first-filed" analysis advanced by IDEC, and accepted by the court, in Section III .A, *supra.* As such, the court declines to further address this issue here, since it has already taken this argument into consideration.

b. Delaware's Interest in this Controversy

Three of the parties in this action are Delaware corporations. However, while the court is mindful of Delaware's interest, that alone will not tip the "balance of convenience" in its favor. This is so because the court can hardly describe the patents as a local controversy unique to Delaware. *See Affymetrix, 28 F.Supp.2d at 207.* Instead, the patents deal with the treatment of lymphoma. This clearly has far-reaching implications. Accordingly, this factor does not weigh against transferring this case to California.

c. Collective Travel Time and Cost

A mirror image action is currently pending in California. Thus, to require the parties to simultaneously litigate virtually the same case on different coasts would certainly increase the collective travel time and cost. Thus, this factor weighs in favor of transfer.

IV. CONCLUSION

**\*5** The court concludes that the "balance of convenience" tips strongly in favor of transferring this action to the Southern District of California.

For these reasons, IT IS HEREBY ORDERED that:
   1. IDEC's alternative motion to transfer this action to the Southern District of California (D.I.8) is GRANTED.
   2. The above-captioned matter is hereby TRANSFERRED to the United States District Court for the Southern District of California.

2002 WL 265094 (D.Del.)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

WASHINGTON, D.C. 20549

# FORM 10–K

[X]  ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF
THE SECURITIES EXCHANGE ACT OF 1934

FOR THE FISCAL YEAR ENDED SEPTEMBER 30, 2002

OR

[ ]  TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF
THE SECURITIES EXCHANGE ACT OF 1934

FOR THE TRANSITION PERIOD FROM _____ TO _____

COMMISSION FILE NO.: 001–11639

## LUCENT TECHNOLOGIES INC.
(EXACT NAME OF REGISTRANT AS SPECIFIED IN ITS CHARTER)

| | |
|---|---|
| DELAWARE | 22–3408857 |
| (STATE OR OTHER JURISDICTION OF INCORPORATION OR ORGANIZATION) | (I.R.S. EMPLOYER IDENTIFICATION NO.) |

| | |
|---|---|
| 600 MOUNTAIN AVENUE, MURRAY HILL, NEW JERSEY | 07974 |
| (ADDRESS OF PRINCIPAL EXECUTIVE OFFICES) | (ZIP CODE) |

REGISTRANT'S TELEPHONE NUMBER, INCLUDING AREA CODE: (908) 582–8500

SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:
See attached Schedule A.

SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT:
None

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes [X] No [ ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S–K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in the definitive proxy or information statements incorporated by reference in Part III of this Form 10–K or any amendment to this Form 10–K. [ ]

At November 30, 2002, the aggregate market value of the voting and non–voting common stock held by non–affiliates of the registrant was approximately $6,300,000,000.

At November 30, 2002, 3,607,381,493 shares of the registrant's common stock were outstanding.

DOCUMENTS INCORPORATED BY REFERENCE

(1) Portions of the registrant's annual report to shareowners for the fiscal year ended September 30, 2002 (Part II).

(2) Portions of the registrant's definitive proxy statement for its 2003 annual meeting of shareowners (Part II and III).

SCHEDULE A

Securities registered pursuant to Section 12(b) of the Securities Exchange Act of 1934:

| Title Of Each Class | Name Of Each Exchange On Which Registered |
|---|---|
| | |

| | |
|---|---|
| Common Stock (par value $.01 per share) | New York Stock Exchange |
| 7.25% Notes due July 15, 2006 | New York Stock Exchange |
| 6.50% Debentures due January 15, 2028 | New York Stock Exchange |
| 5.50% Notes due November 15, 2008 | New York Stock Exchange |
| 6.45% Debentures due March 15, 2029 | New York Stock Exchange |

---

## TABLE OF CONTENTS

| Item | Description | Page |
|---|---|---|
| | **PART I** | |
| Item 1. | Business | 1 |
| Item 2. | Properties | 30 |
| Item 3. | Legal Proceedings | 31 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 36 |
| | **PART II** | |
| Item 5. | Market for Registrant's Common Equity and Related Stockholder Matters | 37 |
| Item 6. | Selected Financial Data | 38 |
| Item 7. | Management's Discussion and Analysis of Results of Operations and Financial Condition | 38 |
| Item 8. | Financial Statements and Supplementary Data | 38 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 38 |
| | **PART III** | |
| Item 10. | Directors and Executive Officers of the Registrant | 39 |
| Item 11. | Executive Compensation | 39 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management | 39 |
| Item 13. | Certain Relationships and Related Transactions | 39 |
| Item 14. | Controls and Procedures | 39 |
| Item 15. | Exhibits, Financial Statement Schedule, and Reports on Form 8–K | 39 |

This report contains trademarks, service marks and registered marks of us and our subsidiaries, and other companies, as indicated.

## PART I

### Item 1.  Business

### COMPANY OVERVIEW

Lucent Technologies Inc. (referred to in this report as the "Company," "we," "us" or "Lucent") is a leading provider of communications networks for the world's largest communications service providers. We design our systems, services and software to help our customers quickly deploy and better manage their networks and create new, revenue–generating services that help businesses and consumers. We have a strategic focus on and strong relationships with the top 50 global service providers.

We were incorporated in Delaware in November 1995. We were formed from the systems and technology units that were formerly a part of AT&T Corp. ("AT&T"), including the research and development capabilities of Bell Laboratories ("Bell Labs"), and were spun off by AT&T on September 30, 1996. Our principal executive offices are located at 600 Mountain Avenue, Murray Hill, New Jersey 07974 (telephone number 908–582–8500). Our fiscal year begins October 1 and ends September 30.

### MARKET ENVIRONMENT

The global telecommunications networking industry is experiencing a very difficult period, which began in calendar 2001 and intensified in 2002. Our service provider customers, especially in North America, are facing slowing revenue growth due to competitive and market pressures and a decline in near–term demand for their services. The following are the primary factors that have contributed to the lower revenue growth for service providers:

- Growth in demand for traditional telecommunications services in developed markets has been slowing. Subscriber penetration for various services has started to reach saturation levels and subscriber growth has started to taper off.

- Demand for corporate data services has weakened due to the economic slowdown in general and reductions in business spending for information technology.

- Prices for traditional telecommunications services have declined significantly due to increased competition across customer segments and technologies.

  - In many regions, established wireline players are entering each other's markets.

  - Some local service providers are providing long distance service, and long distance operators are offering local telephone service.

  - Cable operators are providing basic telephone services in addition to their traditional broadcast video operations.

  - Wireless service providers are competing with wireline service providers, as customers are canceling landline service and using only mobile service.

  - Wireless service providers continue to compete aggressively, leading to further price declines.

- Demand for new telecom services, especially "application services," remains subdued.

Many service providers also accumulated significant amounts of debt in recent years to expand their network capacity, enter new markets and acquire other businesses. Access to capital for long–term investment in telecommunications networks has become scarce and the industry is going through a period of rationalization after a period of heavy investment. The regulatory environment, especially in North America, has also discouraged local service providers from investing in network expansion and upgrades.

In response to these challenges, service providers have a renewed focus on reducing debt levels, cutting costs and conserving cash. They are significantly reducing capital expenditures and rethinking their plans to expand their networks. Capital spending by service providers declined by more than 25% from the end of 2001. Service providers are refocusing their capital investment on projects that can provide an immediate return either through profitable revenue growth or clear operating cost savings. In addition, many service providers are delaying their deployment of new technologies or scaling back these plans significantly. Many large service providers in the U.S., including SBC Communications and Verizon Communications, intend to reduce their capital spending in calendar year 2003 even further from 2002 levels. We expect that capital spending by service providers will continue to decline through 2003 and will begin to stabilize or possibly increase in 2004 and 2005.

## OUR STRATEGY

Our strategy continues to center upon meeting the needs of the world's top service providers. We estimate that the top 50 service providers will account for about 70% of the total capital spending in the industry in 2002 and that this will grow to almost 80% of service provider capital spending by 2005. In addition, the top 20 countries still account for over 90% of all capital spending by service providers. We are organized to address service providers' needs globally through two distinct operations: Mobility Solutions ("Mobility"), which is focused on wireless service providers, and Integrated Network Solutions ("INS"), which is focused on wireline service providers.

In the Mobility segment, we plan to lead the migration to next or third generation wireless networks, often referred to as 3G, across both CDMA2000 and UMTS industry standards. We intend to build upon our leadership position in CDMA spread spectrum technology – the underpinning of both global standards – and our detailed understanding of wireless operators' business challenges. We believe that the key to widespread deployment of 3G networks centers upon meeting the enterprise demand for high–speed mobile data services. These new service offerings offer the promise of profitable new revenue streams for service providers and provide financial justification for the significant investment in network upgrades to 3G systems.

In the INS segment, we remain committed to providing end–to–end solutions for wireline service providers. However, in response to this extended market downturn, we have taken action to further refocus our product portfolio. We are exiting or paring back investment in product lines that have been slow to develop and are unlikely to become profitable in the next 12 to 18 months. For example, we are reducing our investment in broadband access by focusing on revenue opportunities involving carriers' metropolitan area networks (which we refer to as our

2

metro optical products) and scaling back efforts in next generation voice segments, including Class 5 circuit switch replacement.

While refocusing our product portfolio in this manner, we are working on expanding the role of third party vendors with whom we have relationships. We will continue to offer end–to–end solutions to both wireline and wireless service providers, but will design these solutions to use both internally developed and externally sourced products. Consistent with this approach, we intend to increase our support of third party products by both our Network Operations Software and our Worldwide Services organization. We expect to integrate third party products under our iNavis network and service management platform and expand our capability to engineer, install, integrate and maintain third party networking products.

We believe that we have an opportunity to increase our participation in both the services and software portions of the market. We plan to expand our approach to selling services and software from the more traditional bundling of these with Lucent product sales to selling services and software to support third party vendors' products. We are also seeking opportunities to provide professional and managed services. Our professional services portfolio includes network design, integration and optimization. Managed services include outsourcing all or portions of network monitoring and maintenance.

We strive to be our customers' partner of choice for providing communications and networking products and services. We believe we have the following strengths that differentiate us from our competitors:

- The deepest experience building and supporting large service providers' wireline and wireless networks.

- Our service intelligence network architecture that provides a platform to drive new revenues, reduce costs and simplify operations for our service provider customers.

- One of the largest in-house research and development programs focused on service providers.

- The industry's most extensive services capability to design, build, integrate and manage networks.

- Network management and software tools to help our customers simplify operations and deliver services faster.

Our customer strategy is to focus our sales and marketing, product development, services and supply chain resources on the world's largest service providers in both the INS and Mobility segments. We have moved from a geographically organized sales force across INS and Mobility segments to two smaller sales forces, one primarily dedicated to the needs of wireline customers and the other primarily dedicated to the needs of wireless customers. We believe this alignment will improve our ability to address our customers' requirements. We follow the geographic footprints of the world's largest service providers around the world to the approximately 20 core countries in which they do business. We also pursue business with other service providers in these 20 countries when opportunities arise. We expect to serve customers selectively in countries that are within close proximity to these 20 core countries by drawing upon the infrastructure from the core countries. For countries that do not fit those criteria, we have or are

3

developing strategic relationships with third party agents, so that we can continue to service customers without utilizing our direct resources.

We began to implement this new business structure in the beginning of fiscal 2002. Our goals are to eliminate costs from our business, speed-up our decision making by reducing the number of people involved in the decisions and shift to the most profitable near-term opportunities.

## OUR RESTRUCTURING PROGRAM

Beginning in 2001, we embarked on a series of restructuring efforts because of the dramatic downturn in the telecommunications market and the significant reduction in our revenues. These programs were designed to eliminate duplication in functions and activities, centralize other functions and restructure the business to match our strategy. During 2002, we committed to additional steps in response to the continued downturn in the market.

Our restructuring included the following actions: (1) evaluating our manufacturing operations and eliminating some of our manufacturing facilities, (2) making greater use of contract manufacturers, (3) assessing virtually every aspect of our product portfolio and associated research and development ("R&D"), (4) streamlining the rest of our operations to support those reassessments, (5) eliminating some marginally profitable or non-strategic lines, (6) merging technology platforms, (7) consolidating development activities and (8) eliminating positions to reduce personnel costs where appropriate. In making these decisions, we have taken and continue to take into account the needs of our largest service provider customers. We have sold assets relating to product lines whose products did not support our large service provider customers or our strategy.

## DISPOSITIONS

During 2002 and 2001, we sold various assets and businesses as part of our strategy to focus our business on large service providers and to streamline our operations and reduce our costs. Some of the more significant actions we have taken are as follows:

*Power Systems*

On December 29, 2000, we sold our power systems business to Tyco International Ltd.

*Manufacturing*

We sold our manufacturing operations in Oklahoma City, Oklahoma and Columbus, Ohio to Celestica Corporation on August 31, 2001. Upon closing of the sale, we entered into a five-year supply agreement with Celestica to be the primary manufacturer of our switching and access and wireless networking products. In July 2002, we reacquired the Columbus, Ohio facility and we are currently planning to sell it.

We sold a substantial portion of our optical networking manufacturing operation to Solectron on May 31, 2002, and entered into a three-year supply contract with Solectron to be the primary

4

manufacturer of our optical networking products. Due to continuing market uncertainties, we have agreed with Solectron to unwind this relationship. We expect that the contract manufacturing work for our optical networking products will be transitioned to our other suppliers.

*Optical Fiber Solutions*

On November 16, 2001, we sold a significant portion of our optical fiber business to The Furukawa Electric Co., Ltd. and on September 30, 2002, we sold our interests in two Chinese joint ventures in the optical fiber business to Corning Incorporated.

*Customer Care*

On February 28, 2002, we sold our billing and customer care business to CSG Systems International, Inc.

*Agere*

On June 1, 2002, we completed our spin-off of Agere Systems Inc. by distributing to our common shareholders of record on May 3, 2002 all of the shares of Agere held by us.

**OUR ORGANIZATION**

We are organized around two distinct customer segments: Integrated Network Solutions, focusing on the needs of wireline service providers, and Mobility Solutions, focusing on the needs of wireless service providers. We have consolidated sales, product development, product management and general profit and loss responsibilities within each of these two segment organizations. In fiscal 2002, we began to report the INS and Mobility segment financial performance separately. Financial information about each of these segments is set forth in Note 13 to our September 30, 2002 financial statements and our Management's Discussion and Analysis of Results of Operations and Financial Condition.

Our segments are supported by a number of central organizations, including Lucent Worldwide Services (or "LWS"), Supply Chain Networks ("SCN"), Bell Labs and the Corporate Centers (e.g. finance, human resources, information systems, etc.). LWS provides the services that are sold to customers through the two segment organizations. Manufacturing and supply chain functions have been consolidated into the SCN organization. SCN manages the materials and activities necessary to produce and deliver products and services to our customers. Our Corporate Centers provide administrative support to both segments.

**INTEGRATED NETWORK SOLUTIONS**

INS focuses on global, wireline service providers and offers a broad range of circuit switching, packet switching, access and optical networking products, as well as network management software. Our offerings include services provided by LWS and may include products, software and services provided through original equipment manufacturers and our co-marketing and

5

strategic alliances with other businesses. Our switching, access and optical products are an integral part of our customer's networks that support voice, data and video applications.

INS's revenues during fiscal 2002 were approximately $6.4 billion, of which 54% were from customers in the U.S. Our revenues come primarily from large established service providers. Sales to our five largest customers accounted for approximately 40% of our total revenues during fiscal 2002. We sell most of our products and services through our direct sales force with individual teams that support all significant customers. We also sell our products and services through third party distributors, although to a much lesser extent. We are actively working to enhance our relationships with third party distributors and increase our indirect sales capabilities. As of September 30, 2002, INS had approximately 10,000 employees that are primarily engaged in product development and sales and marketing activities.

We believe that over time, voice traffic will migrate from existing circuit switched infrastructure to a packet infrastructure primarily driven by new packet based end-user devices. These devices, when connected to the packet switching infrastructure, will offer new kinds of multi-media and voice services. However, we do not believe that wireline service providers will undertake a massive replacement of circuit switches in the near term. As a result, our SoftSwitch product, a key component providing the switching intelligence in voice-over-packet applications, will be focused in the near term to support the 3G wireless market, where our customers see a near-term market opportunity for this technology.

*INS Strategy*

Our primary focus is addressing opportunities with our service provider customers who have massive investments in their existing networks. We believe that one of the key priorities for service providers is leveraging their investment in these networks.

In voice switching, we are working closely with our customers to help them evolve their 5ESS ® circuit switch platforms to increase capacity, lower cost of operations and accelerate new feature introductions. We have launched an IP Centrex solution that adds interfaces on the 5ESS to connect packet based end-user devices for voice traffic. This allows service providers to serve new types of terminals and offer new services with a small additional investment, while significantly reducing operational expenses.

In the packet switched network core, we are committed to help our customers migrate to MPLS. MPLS is a protocol or procedure for regulating the transmission of data through a network using multiple types of traffic, such as frame relay, asynchronous transfer mode (or ATM) and Internet protocol. Given our customers' stated intent to focus on leveraging their embedded networks, we will enhance our GX550 Multi-Service Core Switch feature set with MPLS and other features, as requested by our customers. At the network edge, we will continue to invest in products such as CBX Multi-Service Switch and the PSAX Concentrator.

We believe we have an industry leading optical networking portfolio. Our primary focus and near term investment planning is on metro optical products which support local metropolitan area networks and for which there is a strong market demand. Our Metropolis optical products

6

are in more than 45 trials and deployments. The LambdaUnite™ MultiService Switch, introduced in January 2002, was successfully launched in over 50 customer trials and deployments.

In the core optical market, we have what we believe is an industry leading long-haul optical transport system, LambdaXtreme™ that was launched in March 2002, and is going through trials with half a dozen customers. The market for core optical long-haul equipment has slowed because of a significant overbuild in the past 3 years. With a continued rise in demand for telecommunication services, this market is expected to grow again, with Lucent positioned with a strong portfolio.

In our access line of products, such as Stinger, Anymedia Access Systems, and Universal Gateway products, we invest to meet customer commitments with a clear focus on continuous reduction of the manufacturing costs of these platforms.

One area where we will continue to make significant investments is network management software. Our new Navis iOperations software portfolio is focused on simplifying network management for our customers, reducing costs, improving reliability, and helping them accelerate the time to market for voice and data services. These areas are critical to the business success of our customers and we believe there will be an increasingly strong demand for these types of management solutions. Many service providers have deployed Lucent software products.

Our product offerings include:

### Circuit Switching Products

Primarily used for voice communications, circuit switching is a networking technology that uses switches to transmit or "switch" communications from one location to another within the network. Circuit switching has been used in telephone networks for decades. In a traditional "circuit-switched" telephone call, the telephone network creates dedicated connections so that the person placing the call can communicate with the person receiving the call. When the call is placed, the network determines a path for the call and all communications during that call are transmitted over that path. The telephone line and other network resources are then dedicated to that particular call and cannot be used for any other purpose or any other call.

### Packet Switching Products

Packet switching is a more recent technology that has historically been used for data communications. The Internet uses Internet Protocol (called "IP") switching, a specific type of packet switching, to connect the end-user to the servers where the web pages reside. In packet switched networks, information is divided up into small segments (called packets) of information. Packets are then sent independently, possibly over different paths, through the network from the originating end of the call to the destination. At each step along the way, the network can determine the 'next step' that a particular packet should take. As all the packets arrive at the destination, they are re-assembled into the original information.

7

Packet switching has an advantage over circuit switching in that it allows information streams to more efficiently share network resources because a "path" is not dedicated to each information stream as in circuit switching. However, packet switching can have lower transmission quality than circuit switching because some packets may get delayed or lost in transit. New protocols between packet switches allow the network to maintain quality transmission of information by tagging each information packet with a description of the type and importance of its content. Multi-Protocol Label Switching, or MPLS, is such a protocol (or procedure) for regulating the transmission of data through a packet network. MPLS allows multiple types of traffic (data, voice and video) to cross a packet switched network without loss of quality.

### Access Products

Access products provide a means of connecting the end user to the rest of the network. The INS access product line is focused on access through twisted copper wires, which is the wiring commonly used in local telephone networks. Traditionally, voice traffic has been, and continues to be, connected to circuit switches through circuit-switched access products. This allows one voice call per pair of copper wires. More recent access technologies, such as Digital Subscriber Line, or DSL, allow faster transmission of data, multiple voice connections and even video streams over one pair of copper wires to the end-user. INS has two families of products, one fully specialized at providing DSL service with the highest speeds at low cost, and the other aimed at providing a flexible mix between traditional voice access and DSL access. Other access technologies allow packet and circuit switched networks to communicate with each other. An example is our Universal Gateway products, which allow end-users to dial over a circuit switched connection (traditional phone call) and then interface with a packet switched network, such as the Internet.

### Optical Networking Products

Optical networking products include laser-based transmission systems that transport information between and among switches and other network components by release of light particles. Optical networking is made possible by photonics, a technology that uses light particles, or photons, to transport information over glass fibers in optical fiber cables. These systems include core backbone high capacity systems (the central portion of network equipment) as well as lower capacity metropolitan systems (local networks).

Core optical networking systems expand and speed optical signals over fiber cable for the "core" or central portion of the network of a service provider and allow these customers to increase the amount of traffic transmitted over their fiber optic networks. The core network equipment is responsible for moving voice, data and video traffic from origin to destination and connecting radio base stations to the public voice and data networks.

Metro optical networking systems, another group of optical networking products, are designed to aggregate and increase the use of fiber optic systems for both voice and data traffic for local carriers or networks located in metropolitan areas. This family of optical networking products provides service providers with fast, efficient information transport over fiber optic lines.

8

## MOBILITY SOLUTIONS

Mobility focuses on global, wireless service providers with end-to-end solutions and products that support their needs for radio access, core networks, network management and application and service delivery systems. We also tap strengths across INS's optical networking, switching and access product lines and LWS services and, to a lesser extent, products, software and services provided by third parties.

Mobility's revenues during fiscal 2002 were approximately $5.4 billion. Although products and services are provided to wireless service providers on a worldwide basis, approximately 80% of Mobility's fiscal 2002 revenues were related to U.S. customers, of which 84% were concentrated with four large U.S. service providers. We primarily sell to customers through our direct sales force. As of September 30, 2002, Mobility had approximately 7,000 full time employees that are engaged primarily in product development and sales and marketing activities.

Our products and services encompass all of the major wireless mobile network standards. Our primary focus is on two technologies – Code Division Multiple Access ("CDMA") and Universal Mobile Telecommunication System ("UMTS")*. We continue to meet ongoing customer commitments to the Advanced Mobile Phone Service ("AMPS"), an analog technology that uses FM radio channels, Time Division Multiple Access ("TDMA"), and Global Systems for Mobile Communications ("GSM"). We provide these mobile systems throughout the world and in a variety of frequency bands assigned to mobile communications. Our offerings are scalable (i.e., can be made larger or smaller without undue cost increases) and are therefore compatible with the established providers and start–ups. We believe our strength and track–record in spread spectrum technologies, have us uniquely positioned for the global migration to 3G and the support for high speed packet data communications.

Our emphasis is providing the equipment and services necessary for our customers to evolve from their current second generation ("2G") technology to 3G spread spectrum technologies of CDMA2000 and UMTS. Spread spectrum technologies will allow service providers to offer enhanced voice capacity and improved Internet/Intranet access. These spread spectrum technologies distribute radio signals over a wide range of frequencies and then collect them into their original frequencies at the receiver. Wireless service providers must be able to provide voice capacity in terms of numbers of subscribers and minutes of use at extremely low cost in a spectrum–efficient manner. At the same time they must be able to penetrate the high–speed wireless data market for enterprise customers.

The 2G technologies utilized by service providers currently include cdmaOne, GSM, and TDMA. CdmaOne is the 2G version of spread spectrum. GSM and TDMA are both time division multiplexed technologies. Systems based on these 2G technologies provide digital voice and transaction data communications, but generally cannot offer the high–speed services in a spectrum–efficient manner that 3G spread spectrum technology is expected to provide. We have significantly reduced our investments in 2G but are continuing support of our existing customers.

---

*       UMTS is a trademark of the European Telecommunications Standards Institute.

The International Telecommunications Union, an international standards body that operates as part of the United Nations, has been instrumental in promulgating a vision of 3G that embraces a wide variety of spread spectrum technologies, a technology we have helped to develop. We are the global leader in CDMA spread–spectrum networks, with more than 70,000 base stations providing commercial service around the world, and more than 35,000 of those base stations are providing 3G services for our customers today. We have built more CDMA networks than anyone else, and we are leveraging that expertise to establish a strong position in the very early stages of UMTS deployment.

We have brought to market spread spectrum CDMA2000 networks in North America, South America, China, Asia, Eastern Europe, and Russia, and expect to supply UMTS networks in Europe in the future.

Based on the existent 3G migration plans from leading service providers around the world, it is expected that the great majority of future 3G mobile users will be accessing voice and high speed data services through a CDMA2000 or UMTS network. However, we cannot assure you that the spread spectrum technologies on which we have chosen to focus (CDMA2000 and UMTS) will become the dominant standards for 3G wireless networks in the future. Some of our competitors invested heavily in GSM and the future evolution of time division multiplex based technology to 2.5G (GPRS) and 3G (EDGE), a technology path in which we have decided not to invest. These competitors have developed products to help their GSM service provider customers migrate to 3G through technology upgrades, rather than deploy new 3G networks. Two of the major service providers in the U.S. have chosen this path. However, they are also continuing to evaluate and plan for UMTS. We believe spread spectrum will provide superior performance both technically and economically.

The planned customer investment in 3G networks has been reduced in the last two years. In early 2000, many service providers, particularly in Europe, had plans to aggressively upgrade their networks to 3G, or to enter new markets by building 3G networks. Auctions for UMTS 3G spectrum in Europe started off with staggering bids for the licenses, but since then, financial and market conditions have driven some service providers to delay their 3G deployments or abandon their plans to deploy 3G. We expect new high–speed data services will trigger increased capital expenditures, but this investment by service providers is being delayed.

## Mobility Strategy

One of our primary strategies is to capitalize on the evolving market need for wireless data services. Our existing and targeted customers' embedded base of network technology was primarily designed to support voice services. While this market continues to represent a large revenue opportunity, in many countries this is a mature market with limited growth potential for our customers. Furthermore, the average revenue per subscriber that our customers can realize for voice services has been steadily declining over the past several years, resulting in a negative impact on profit margins. Accordingly, we are committed to supporting our customers' objective to identify new high growth revenue opportunities. We believe that the availability of wireless high–speed data, driven by spread spectrum technologies, represents a significant

evolution of the wireless industry and can satisfy this customer objective. As a result, we expect to focus our investment on a portfolio of products that enables wireless high–speed data in both the CDMA and UMTS markets.

We have performed market research to identify the user segment most likely to adopt wireless high–speed data. This research has concluded that enterprises are planning (and have a need) to provide mobile communication capabilities for an increasing percentage of their workforce in the coming years. A mobile professional is defined as an employee that plans to spend at least 20% of their working time away from the office. The mobile professional, however, faces tremendous challenges in accessing critical business information while away from the office. We have worked closely with several information technology organizations across multiple industries to understand why enterprises have not utilized 2G or other wireless technology to address this need. In each case, the barriers to adoption are consistently focused on the lack of speed and security of access, limited availability of coverage, and high cost of service. Our research has included business case analysis that indicates significant gains in productivity and reductions in operating costs are realizable for enterprises if technology is made available that can overcome these barriers. Furthermore, the mobile professional is characterized by a strong willingness to pay for technology that can accomplish this.

Mobility and its product portfolio have been structured to meet this market need. We are actively working with our customers on 3G network deployments that are providing enterprises with the ability to mobilize their workforces. Our CDMA 2000 deployments have proven to provide the services that mobile professionals need to do their work. Similar results are expected with our UMTS networks. We are working with our customers to ensure optimal network performance in the secure environment that enterprises demand. This includes integrating VPN (Virtual Private Network) technology into our 3G offers, as well as providing tools that enable enterprises to quickly provision users for service. We are working on the development of leading edge technology that will enable subscribers to roam seamlessly from 3G networks to local area networks, or LANs, which service office complexes. We are also continuing to partner with our customers in educating their customers about the capabilities and benefits of wireless high–speed data.

Following acceptance and widespread use of high–speed wireless data by the mobile professional, we believe that the mobile consumer will quickly follow. This model has exhibited itself many times throughout the evolution of wireless technology as well as other high technology industries such as computing. We will therefore continue to work to create solutions that enable consumer based services as the second phase of our strategy.

Our product offerings include:

### Base Station Products

Base stations provide the radio link that transmits and receives wireless subscriber calls and manages handoffs as customers move from cell (the area in which calls are handled by a particular base station) to cell. Each radio base station covers a specific geographic area with a

11

capacity to handle a certain amount of subscriber traffic. Typically, base station equipment represents a significant portion of the capital equipment cost of a mobile operator.

The Flexent OneBTS Base Station is the newest member of our base station family, supporting CDMA and UMTS technologies, and will be the primary platform that we offer for UMTS network deployments. The Flexent OneBTS base station addresses the form, fit and function of future assemblies in a modular fashion so that current investment is not likely to be lost as the cell evolves to include expanded capacity in wireless voice and/or data transmissions. Our family of Flexent™ Base Station products supports virtually all major radio access technologies (AMPS, TDMA, CDMA, GSM and UMTS).

While we will continue to sell AMPS, TDMA and GSM radio equipment to existing customers, Mobility has made a strategic decision to focus on CDMA and UMTS 3G spread spectrum technologies in the future.

### Core Network Equipment

Core network equipment is responsible for connecting radio base stations to the public voice and data networks. The primary element of the core network for voice traffic is the mobile switching center ("MSC"). MSCs provide the transfer of calls within the wireless network and interface to the public switched telephone networks. The majority of these voice and packet data core network products are provided by the INS segment.

Our 5ESS–2000 switch has advanced switching, signaling and administrative capabilities to deliver cost–effectively the standard mobile switching center functionality. It is a multipurpose, flexible modular platform capable of supporting both wireline and wireless telecommunications applications. For our existing wireless customers, we expect to continue to support the 5ESS–based mobile switching center and provide a graceful transition to the new Softswitch based technology.

Our Softswitch based 3G MSC provides integrated voice and data services that use open application programming interfaces (applications for which the code is published), enabling providers to create new innovative services for the mobile Internet.

### Network Management Products

Operations and maintenance centers, which are essentially software systems, allow for the service provider's provisioning, diagnostics and administration of its wireless networks. Our Mobility segment will be utilizing our Navis™ network operations platforms to provide these products as well as third party systems depending on the customer environment.

### Applications And Service Delivery Products

The MiLife™ Applications Platforms allow a wireless service provider to easily introduce personalized mobile services. These platforms are used to support mobile applications and services developed by us and by third parties.

12

## LUCENT WORLDWIDE SERVICES (LWS)

Even with the telecommunications market as challenging as it is, services remain a clear opportunity for near–term revenue potential. We believe our customers spend $30 billion or more annually on services performed by third parties. LWS is looking to expand into new areas like network integration, multi–vendor networking and managed services such as outsourcing.

LWS's revenues during fiscal 2002 were approximately $2.7 billion, of which 71% was generated in support of INS customers and 29% in support of Mobility customers. LWS personnel are organized and deployed on a regional basis. Our U.S. service revenues represented about 63% of our total service revenues during fiscal 2002. At September 30, 2002, we had approximately 16,000 employees dedicated to professional services, deployment services and operational and maintenance services.

We believe services will differentiate us in the marketplace. We have one of the largest groups of skilled technicians, consultants, engineers, and installers serving all of Lucent's top customers. We offer multi–technology and multi–vendor services solutions in the following three areas:

–  Professional Services, which accounted for approximately 15% of fiscal 2002 revenues for LWS. These services help our customers identify network areas where they can capitalize on high–margin opportunities, apply proven tools and techniques to optimize performance and reduce expenses, and plan evolution to protect their network investment and increase profits. Our enhanced engineering services help our customers determine the best configuration for maximizing traffic capacity and other operational efficiencies. These services also provide our customers with "in service" upgrades to help them migrate to new technologies. Our enhanced technical services help carriers maintain a high performing network by identifying and correcting network performance issues, balancing traffic loads and integrating new equipment into a live system. We often help our customers improve their network quality by troubleshooting, reporting and resolving problems or by providing on–the–job training to their staff.

–  Deployment Services, which accounted for approximately 60% of fiscal 2002 revenues for LWS. These services help our customers bring their equipment online in an efficient manner and allow them to begin generating revenues more quickly. Our equipment and field engineering services provide analysis, identification and documentation of detailed hardware and software specifications for new networking equipment to help ensure smooth deployments. We build and expand wireline and wireless networks globally and provide on–site configuration, testing and network connectivity of the equipment following installation. We can also perform a complete inventory, inspection, assembly, configuration and testing of network equipment at one of our staging facilities prior to deployment in order to deliver a complete ready–for–installation system at a customer site.

13

–  Operations and Maintenance Services, which accounted for approximately 25% of fiscal 2002 revenues for LWS. These services help our customers maximize the performance of their networks and maintain network reliability and availability to ensure quality of service. We have the capabilities to provide technical support either remotely via phone or modem for rapid response, diagnosis and resolution or through on–site technical specialists supplementing the service provider's staff.

We are focused on the areas that customers tell us matter most to them in today's industry downturn, including revenue recovery, network performance, inventory management, network security, and technology migration. We also perform work for our customers on multi–vendor networks. A key to helping our customers in these areas is the expertise of our research and development arm, Bell Labs, which develops tools our engineers use to deliver our services.

**COMPETITION**

The global communications networking industry is highly competitive. Our current principal competitors include Alcatel, Ciena Corporation, Cisco Systems, Inc., LM Ericsson Telephone Company, Fujitsu Limited, Huawei Technologies, Motorola Inc., NEC Corporation, Nokia Corporation, Nortel Networks Corporation, Samsung Networks Inc. and Siemens AG. Some of our competitors, such as Alcatel and Nortel, compete across many of our product lines, while others compete in a smaller subset of our products.

We expect that the level of competition will intensify for several reasons. First, most industry participants will seek to strengthen their relationships with large service providers, as they represent over 70% of global carrier spending. The collapse of competitive local exchange carriers and other competitors of incumbent carriers has resulted in fewer customers. In addition, the large service providers have been consolidating, thus giving the remaining service providers additional buying power. Furthermore, as service providers continue to reduce their capital spending, fewer sales opportunities will exist.

Many factors influence our ability to compete successfully in our industry, some of these being:

–  the quality, performance, reliability, price and market acceptance of our products;

–  market acceptance of our competitors' products;

–  efficiency and quality of the production and implementation of our products;

–  our ability to develop appropriate technologies and introduce new products and services and value added features on a timely basis;

–  our willingness and ability to provide or arrange customer financing in certain emerging U.S. and non–U.S. markets; and

–  our customer support and reputation.

14

We believe we are currently among the top suppliers of products and services to global wireline and wireless service providers. However, a number of our existing competitors are very large companies with substantial technical, engineering and financial resources, brand recognition and established relationships with global service providers. In addition, we may from time to time face new competitors, including entrants from the telecommunications, computer software, data networking and semiconductor industries. These competitors may be able to offer lower prices, additional products or services or other incentives that we cannot or will not match or do not offer. They may also be in a stronger position to respond quickly to new or emerging technologies and to undertake more extensive marketing campaigns, adopt more aggressive pricing policies and make more attractive offers to our potential customers, employees and third party agents.

## NON-U.S. OPERATIONS

We have operations in foreign countries, including manufacturing and system integration center facilities, sales personnel and customer support operations. For fiscal 2002, we derived approximately 34% of our revenues from sales outside the United States and are dependent on international suppliers for many of our components and subassemblies used worldwide and for the manufacturing of some of our products. We intend to continue to pursue focused opportunities in carefully delineated markets outside the United States. Therefore, we continue to be subject to the risks inherent in doing business in foreign countries. In many non-U.S. markets, long-standing relationships between our potential customers and our competitors and protective regulations, including local content requirements, create barriers to our entry and can adversely affect our ability to capitalize on the opportunities in these markets. Also, pursuit of non-U.S. opportunities may require us to make significant investments for an extended period before returns on such investments, if any, are realized. Our ability to compete and our investments in some countries can be adversely affected by difficulties in protecting intellectual property, exchange controls, currency fluctuations, investment policies, repatriation of cash, nationalization, social and political risks, taxation, and other factors, depending on the country in which such opportunity arises.

## BELL LABS

Our INS and Mobility segments are supported by the technological expertise provided by Bell Labs, one of the world's largest research and development organizations focused on the needs of large service providers. Bell Labs provides basic and applied research and development support for our business. Bell Labs' mission is to develop technically advanced products and services that will keep us at the forefront of communications, to conduct fundamental research in scientific fields important to communications and to create innovations that can be put to use in our new communications products and services. Bell Labs' R&D activities continue to focus on the technologies we view as central to our business strategy: software, network design and engineering, network services, photonics, data networking and wireless communications.

Bell Labs has become smaller as we reorganized or divested various businesses, such as Agere, Avaya, the optical fiber business and the power systems business. Bell Labs' researchers and developers associated with those businesses were relocated to work with the new companies. At

15

the same time, certain areas of R&D work grew. For example, Bell Labs has increased its work on technologies to further the development of our service intelligent architecture. We plan to continue to invest in the R&D efforts of Bell Labs because we believe it gives us a competitive advantage in developing innovative technologies. There are approximately 1,400 employees supporting R&D efforts within Bell Labs core research group.

## SUPPLY CHAIN NETWORKS

Supply Chain Networks, or SCN, manages our end-to-end global supply chain needed to produce and deliver our products and services to our worldwide customers. The organization designs, implements and optimizes the supply chain for our products, with the goal of establishing product cost, product cycle and interval, and quality that meets our objectives and those of our customers.

The key functions of SCN include: identifying the sources of raw materials, sub-assemblies, and finished goods that are needed to support our product lines; establishing and managing relationships with component vendors and our electronic manufacturing service providers to ensure continuity of supply at the required price and quality; managing the operational execution in our systems integration centers and the distribution network required to deliver product and services to our customers; and driving the engineering effort across the product life cycle by working closely with our product management and development teams to ensure lowest cost designs through low cost and standardized component selection, optimizing sourcing strategies, aiding new product introductions, and maximizing post-development cost reduction opportunities.

## SOURCES AND AVAILABILITY OF COMPONENTS AND MANUFACTURING

We make significant purchases of components and other materials from many U.S. and non-U.S. sources. While there have been some shortages in components and some other materials, we have generally been able to obtain sufficient materials and components from sources around the world to meet our needs, although there may be temporary delays. We also develop and maintain alternative sources for essential materials and components. We do not have a concentration of sources of supply of materials, labor or services that, if suddenly eliminated, could severely impact our operations.

We currently have contracts with contract manufacturers, who we also refer to as electronic manufacturing services providers (or EMS providers), around the world. These providers manufacture a significant amount of our product lines. These providers include Celestica, Solectron, Jabil, Sanmina, Flextronics and other local providers in various regions. SCN controls source selection on all components. On non-strategic components, our manufacturing providers use their leverage and global buying power to negotiate best price on components from vendors we approve.

## CORPORATE HEADQUARTERS

16

INS, Mobility, LWS, SCN and Bell Labs draw upon centrally managed but locally deployed corporate support groups that include cash management, legal, accounting, tax, public relations, insurance, advertising, human resources and data services.

## BACKLOG

Our backlog, calculated as the aggregate of the sales price of orders received from customers less revenue recognized, was approximately $1.9 billion and $4.3 billion on September 30, 2002 and 2001, respectively. Approximately $600 million of the September 30, 2001 backlog was attributable to Agere, which was reported as a discontinued operation. Approximately $1.8 billion of the orders included in the September 30, 2002 backlog are scheduled for delivery during fiscal 2003. However, all orders are subject to possible rescheduling by customers. Although we believe that the orders included in the backlog are firm, customers may be able to cancel some orders without penalty, and we may elect to permit cancellation of orders without penalty where management believes that it is in our best interest to do so. In addition, some customers may become unable to pay for or finance their purchases as a result of deterioration in their financial positions.

## SEASONALITY

Our revenues and earnings have not followed a consistent pattern and have not been seasonal.

## PATENTS, TRADEMARKS AND OTHER INTELLECTUAL PROPERTY RIGHTS

We have patents to protect some of our innovations and proprietary products and technology. We market our products and services primarily under our own names and marks. We consider our patents and trademarks to be valuable assets. Many of our trademarks are registered throughout the world. We currently own approximately 6,300 patents in the U.S. and 9,500 patents in foreign countries. The foreign patents are, for the most part, counterparts of our U.S. patents.

The number of current patents reflects the reduction of our patent portfolio for U.S. and foreign patents we assigned to Avaya or Agere in connection with our spin-offs of these two companies as well as patents that we transferred in connection with dispositions, such as the sale of the optical fiber business. Our intellectual property licensing division licenses, protects and maintains our intellectual property and enforces our intellectual property rights. This responsibility includes the licensing of our patents and technology to third parties and negotiating agreements regarding our licensing of intellectual property from others. Many of the patents owned by us are licensed to other companies with large patent portfolios, and we are licensed to use patents owned by these other companies. We also have cross-licensing arrangements with our former affiliates, Agere, AT&T, Avaya and NCR.

We rely on patent, trademark, trade secret and copyright laws both to protect our intellectual property, including our proprietary technology, and to protect us against claims from others. We believe that we have direct intellectual property rights or rights under cross-licensing arrangements covering substantially all of our material technologies. However, third parties may

17

assert infringement claims against us or against our customers in connection with their use of our systems and products. When infringement claims are made against us or our customers, the outcome of these claims are difficult to predict because of the technological complexity of our systems and products.

## FORWARD-LOOKING STATEMENTS

This annual report on Form 10-K and other documents we file with the Securities and Exchange Commission contain forward-looking statements that are based on current expectations, estimates, forecasts and projections about us, our future performance, the industries in which we operate, our beliefs and our management's assumptions. In addition, other written or oral statements that constitute forward-looking statements may be made by or on behalf of us. Words such as "expects," "anticipates," "targets," "goals," "projects," "intends," "plans," "believes," "seeks," "estimates," variations of such words and similar expressions are intended to identify such forward-looking statements. These statements are not guarantees of future performance and involve certain risks, uncertainties and assumptions that are difficult to predict. Therefore, actual outcomes and results may differ materially from what is expressed or forecasted in such forward-looking statements. Except as required under the federal securities laws and the rules and regulations of the SEC, we do not have any intention or obligation to update publicly any forward-looking statements after the distribution of this Form 10-K, whether as a result of new information, future events, changes in assumptions, or otherwise.

## RISKS RELATED TO OUR BUSINESS AND INVESTING IN OUR SECURITIES

Our business and our prospects are subject to many risks. The following items are representative of the risks, uncertainties and assumptions that could affect our business, our future performance and the outcome of the forward-looking statements we make. In addition, our business, our future performance and forward-looking statements could be affected by general industry and market conditions and growth rates, general U.S. and non-U.S. economic and political conditions, including the global economy, interest rate and currency exchange rate fluctuations and other future events.

*If The Telecommunications Market Does Not Improve, Or Improves At A Slower Pace Than The Company Anticipates, The Company's Results Of Operations Will Continue To Suffer.*

During fiscal 2002 and 2001, the global telecommunications market has significantly deteriorated, reflecting a significant decrease in the competitive local exchange carrier market, failures of many other start-up telecommunications service providers and a significant reduction in capital spending by established service providers. The Company's sales and results of operations have been adversely affected by this market deterioration.

If capital investment levels by service providers continue to decline, or if the telecommunications market does not improve or improves at a slower pace than we anticipate, our revenues and profitability will continue to be adversely affected. In addition, if our sales volume and product mix do not improve, our gross margin percentage may not improve as much as we expect, resulting in lower than expected results of operations.

18

The significant slowdown in capital spending in our target markets has created uncertainty as to the level of demand in those markets. In addition, the level of demand can change quickly and can vary over short periods of time, including from month to month. As a result of the uncertainty and variations in our markets, accurately forecasting revenues, results and cash flow is increasingly difficult.

*The Company Incurred Significant Net Losses In Fiscal 2002 And 2001 And The Company Expects To Incur A Net Loss In Fiscal 2003. If The Company Continues To Incur Net Losses, The Company's Ability To Satisfy Its Cash Requirements May Be More Difficult And The Company's Legally Available Surplus May Be Significantly Reduced Or Impaired.*

We incurred net losses of approximately $12 billion and $16 billion in fiscal 2002 and 2001, and in fiscal 2002 we recorded a $2.9 billion charge to equity on account of our employee benefit plans. We expect to have a net loss in fiscal 2003 as well. There can be no assurance that we can return to profitability in the future. If we fail to generate operating income and net income, we could have difficulty meeting our cash requirements.

Our losses and charges to equity have contributed to a significant reduction in our legally available surplus. Under Delaware law we generally can pay dividends on or acquire shares of our capital stock (including our 8.00% redeemable convertible preferred stock) only from our legally available surplus, as defined by Delaware law. The significant reductions of our surplus we have experienced, as well as potential future losses and charges to equity, could adversely affect our ability to pay dividends or to redeem or otherwise acquire our capital stock.

***The Company's Strategic Direction And Restructuring Programs May Not Yield The Benefits The Company Expects And Could Even Harm The Company's Financial Condition, Reputation And Prospects.***

In connection with our strategic direction and restructuring programs, we have or are in the process of exiting certain product lines, outsourcing the manufacturing of most of our products, selectively disposing of certain of our businesses and facilities, reducing the number of countries in which we operate, and significantly reducing our workforce. These activities may not yield the benefits we expect, and may raise product costs, delay product production and service delivery, result in or exacerbate labor disruptions and labor−related legal actions against us, and create inefficiencies in our business.

Our strategic direction and restructuring program also may give rise to unforeseen costs, which could wholly or partially offset any expense reductions or other financial benefits we attain as a result of the changes to our business. In addition, if the markets for our products do not improve, we may need to take additional restructuring actions to address these market conditions. Any such additional actions could result in additional restructuring charges.

Our restructuring programs and our current business plan are designed to get us back to profitability and positive cash flow, but we cannot be certain that this will occur or that we will return to profitability and positive cash flow within the time period we are targeting. Our current

19

plan to return to profitability is predicated upon achieving gross profit margins in the mid 30% range or higher. If we cannot achieve these levels, we may not be able to obtain the cash flow and profitability levels we expect.

***The Company Has Substantial Cash Requirements And May Require Additional Sources Of Funds. Additional Sources Of Funds May Not Be Available Or Available On Reasonable Terms.***

We have substantial cash requirements in connection with our operations, capital expenditures, restructuring programs, debt service obligations, pension and postretirement benefit plans and, if we elect and have sufficient surplus to pay such dividends or redemptions in cash, preferred stock dividend requirements and redemptions. In addition, new product development, which is key to the success of our business, is cash intensive. If the cash we generate from our operations or from our other sources is not available when needed or is insufficient to satisfy our requirements, we may require additional sources of funds.

We cancelled our credit facility in October 2002 to avoid an anticipated default under our financial covenants. While we intend to replace that credit facility with a smaller credit facility, we cannot assure you that we will be able to do so on acceptable terms or at all. We also cannot assure you that any other required additional sources of funds would be available or available on reasonable terms. If we do not generate sufficient amounts of capital to meet our cash requirements at the times and on the terms required by us, our business will be adversely affected.

In addition, any new credit facility could severely limit our ability to plan for or react to market conditions or meet capital needs or could otherwise restrict our intended activities or business plans and adversely affect our ability to finance operations, strategic acquisitions, investments or alliances or to engage in other business activities that would be in our interest. Any new credit facility may also include financial covenants similar in scope to the financial covenants in our prior credit facility.

***The Company's Credit Ratings May Be Reviewed For Downgrade, Put On Credit Watch Or Downgraded, Which Could Adversely Affect The Company's Results Of Operations.***

Declines in our credit ratings have resulted in increased costs on certain of our financing arrangements. In addition, we have experienced reduced access to credit markets and declines in the price of our common stock, convertible preferred stock, trust preferred securities and debt securities. There can be no assurance that our credit ratings will not be reduced in the future by Moody's, S&P, or any other ratings agency. In addition, our current credit ratings may cause some customers to be unwilling to do business with us on normal terms and conditions, or at all.

***The Company Operates In A Highly Competitive Industry. The Company's Failure To Compete Effectively Would Harm Its Business.***

The industry in which we operate is highly competitive and we expect that the level of competition on pricing and product offerings will continue to be intensive. Factors that could

20

affect our ability to compete successfully in the industry include: the quality, performance, price, reliability, mix and market acceptance of our products; market acceptance of our competitors' products; efficiency and quality of the production and implementation of our products; and our customer support and reputation.

We have a number of existing competitors, some of which are very large with substantial technological and financial resources, brand recognition and established relationships with global service providers. In addition, new competitors may enter the industry as a result of shifts in technology. These new competitors, as well as existing competitors, may include entrants from the telecommunications, computer software, computer services, data networking, and semiconductor industries. We cannot assure that we will be able to compete successfully against existing or future competitors. Competitors may be able to offer lower prices, additional or a more attractive mix of products or services, or services or other incentives that we cannot or will not match or do not offer. These competitors may be in a stronger position to respond quickly to new or emerging technologies and may be able to undertake more extensive marketing campaigns, adopt more aggressive pricing policies, and make more attractive offers to potential customers, employees, and strategic partners. Because we have a unionized workforce at some locations and many of our main competitors are not unionized to the same extent, or at all, unless our labor contracts are improved, our costs will be higher and our profitability may be lower than those competitors. Our collective agreements with the unions expire on May 31, 2003, and no assurance can be given that we will complete new agreements with the unions prior to that time, or that we will not be competitively disadvantaged if we are not able to reach agreement with the unions by May 31, 2003.

In addition, we may have less liquidity and a more limited access to the capital markets as a result of our credit ratings than some of our competitors. Therefore, these competitors may be better positioned to withstand a prolonged downturn in the industry or in the economy as a whole.

***A Small Number Of The Company's Customers Account For A Substantial Portion Of Its Revenues, And The Loss Of One Or More Key Customers Could Significantly Reduce The Company's Revenues, Profitability And Cash Flow.***

We rely on a few large customers to provide a substantial portion of our revenues. These customers include: AT&T, AT&T Wireless, BellSouth, Cingular, SBC, Sprint, Verizon and Verizon Wireless. Our strategy is to target our products and services to the world's largest service providers. In addition, the telecommunications industry has recently experienced a consolidation of both U.S. and non-U.S. companies. As a result of these factors, it is likely that in fiscal 2003 and subsequent years an even greater percentage of our revenues will be attributable to a limited number of large service providers than in years past.

Reductions, delays or cancellations of orders from one or more of our significant customers or the loss of one or more significant customers in any period could continue to have an adverse effect on our revenues, profitability and cash flow.

<div align="center">21</div>

*The Company Is Exposed To The Credit Risk Of Its Customers As A Result Of The Company's Customer Financing Arrangements And Accounts Receivables.*

Our customer financing arrangements and accounts receivable make us vulnerable to downturns in the economy and the industry in general, and to adverse changes in our customers' businesses in particular. Many of the customers to whom we provide financing or with whom we have contracts have been negatively affected by the continued softening in the telecommunications market, and some have filed for bankruptcy or been declared insolvent. As a result, we wrote off some of our accounts receivables and many of our customer financings and sold others at significant discounts. We also recorded reserves or write-offs in our financial statements and may have to record additional reserves or write-offs in the future. Deterioration in the credit quality of our customers may increase our capital needs if we are unable to sell the notes representing existing customer financings or to transfer future funding commitments to financial institutions and investors on acceptable terms and in the expected timeframes.

*The Company Relies On Third Parties To Manufacture Most Of Its Products And To Provide Substantially All Of Its Components. If These Third Parties Fail To Deliver Quality Products And Components At Reasonable Prices On A Timely Basis, The Company May Alienate Some Of Its Customers, And Its Revenues, Profitability And Cash Flow May Decline.*

We are increasing our use of contract manufacturers as an alternative to our own manufacturing of products. If these contract manufacturers do not fulfill their obligations to us, or if we do not properly manage these relationships, our existing customer relationships may suffer. In addition, by undertaking these activities, we run the risk that the reputation and competitiveness of our products and services may deteriorate as a result of the reduction of our control over quality and delivery schedules. We also may experience supply interruptions, cost escalations and competitive disadvantages if our contract manufacturers fail to develop, implement or maintain manufacturing methods appropriate for our products and customers.

Our supply chain and manufacturing process relies on accurate forecasting to provide us with optimal margins and profitability. Because of market uncertainties, forecasting is becoming much more difficult. In addition, as we come to rely more heavily on contract manufacturers, we may have fewer personnel resources with expertise to manage these third-party arrangements.

*The Company Has Long-Term Sales Agreements With A Number Of Its Large Customers. Some Of These Agreements May Prove Unprofitable As The Company's Costs And Product Mix Shift Over The Lives Of The Agreements.*

We have entered into long-term sales agreements with a number of our large customers. Some of these sales agreements require us to sell products and services at fixed prices over the lives of the agreements, and some require us to sell products and services that we would otherwise discontinue, thereby diverting our resources from developing more profitable or strategically important products. The costs we incur in fulfilling some of our sales agreements may vary substantially from our initial cost estimates. Any cost overruns that we cannot pass on to our customers could adversely affect our results of operations by reducing or eliminating our profit margins.

<div align="center">22</div>

*If The Company Fails To Maintain A Product Portfolio That Is Attractive To Its Customers, Enhance Its Existing Products And Keep Pace With Technological Advances In Its Industry Or If The Company Pursues Technologies That Do Not Become Commercially Accepted, Customers May Not Buy Our Products, And The Company's Revenues, Profitability And Cash Flow May Be Adversely Affected.*

The demand for our products can change quickly and in ways that we may not anticipate because markets for our principal products are characterized by: rapid, and sometimes disruptive, technological developments; evolving industry and certification standards; frequent new product introductions and enhancements; changes in customer requirements and a limited ability to accurately forecast future customer orders; evolving methods of building and operating communications systems for our customers; and short product life cycles with declining prices over the life cycle of a product. For example, some of our U.S.-based Mobility customers are pursuing alternatives to our Time Division Multiple Access technology, and we do not have products for all of the alternative technologies. If one or more of the customers select an alternative technology we do not provide, we would expect to have a significant reduction of business from those customers.

Our operating results depend, to a significant extent, on our ability to maintain a product portfolio that is attractive to our customers, enhance our existing products and continue to successfully introduce new products on a timely basis. New technological innovations generally require a substantial investment before any assurance is available as to their commercial viability, including, in some cases, certification by U.S. and non-U.S. standards-setting bodies.

If we fail to make sufficient investments or we focus on technologies that do not become widely adopted, other technologies could render our current and planned products obsolete, resulting in the need to change the focus of our research and development and our product strategies. This will disrupt our business significantly. Being one of the first to make products available is important to the success of a new product, and any delays in bringing a new product to market could have a negative effect on our results of operations. Accordingly, when we do develop appropriate technology, this technology may not be successful if we fail to bring it to market in a timely and commercially feasible manner.

*Many Of The Company's Current And Planned Products Are Highly Complex And May Contain Defects Or Errors That Are Detected Only After Deployment In Communications Networks. If That Occurs, The Company's Reputation May Be Harmed.*

Our products are highly complex and some of them can only be fully tested when deployed in communications networks or with other equipment. From time to time, our products have contained undetected defects, errors or failures. The occurrence of any defects, errors or failures could result in cancellation of orders, product returns, diversion of our resources, legal actions by our customers or our customers' end-users and other losses to us or to our customers or end-users.

Any of these occurrences could also result in the loss of or delay in market acceptance of our products and loss of sales, which would harm our business and adversely affect our revenue and profitability.

*The Company's Success Depends On Its Ability To Retain And Recruit Key Personnel.*

Our success depends in large part on our ability to recruit and retain highly skilled technical, managerial, sales and marketing personnel. In spite of the economic slowdown, competition for these personnel remains intense. In addition, our recent workforce reductions have increased our dependence on our remaining workforce, as we are relying on our current personnel to assume additional responsibilities. The loss of services of any of our key personnel or our failure to retain and attract qualified personnel in the future could make it difficult for us to meet our key objectives, such as timely product introductions.

*The Company Is A Party To Lawsuits, Which, If Determined Adversely To It, Could Result In The Imposition Of Damages Against It And Could Harm The Company's Business And Financial Condition.*

We and certain of our former officers and current and former members of our board of directors are subject to various lawsuits brought by shareowners and classes of shareowners, customers and participants in some of our employee benefit plans, alleging, among other things, violations of federal and state securities laws, ERISA and breaches of various fiduciary obligations. The deterioration in the overall telecommunications market, the decline of our results of operations in fiscal 2002 and 2001, and the consequent impact on our common stock price, have increased the number and nature of the actions being brought and the damages claimed against us. In addition, our substantial workforce reductions appear to have been the catalyst for a number of employment related actions against us. The actions and allegations made against us may increase in the future as we continue to implement our restructuring efforts, which may involve asset dispositions and workforce reductions. There can be no assurance that actions that have been or will be brought against us will be resolved in our favor, or if a significant monetary judgment is rendered against us, we will have the ability to pay such a judgment. Any losses resulting from these claims could adversely affect our profitability and cash flow.

*If The Company Fails To Protect Its Intellectual Property Rights, The Company's Business And Prospects May Be Harmed.*

Intellectual property, such as patents, are vital to our business and developing new products and technology that are unique to our success. We have numerous United States and foreign patents and numerous pending patents, but we cannot predict whether any patents, issued or pending, will provide us with any competitive advantage, or will be challenged by third parties. Moreover, our competitors may already have applied for patents that, once issued, could prevail over our patent rights or otherwise limit our ability to sell our products. Our competitors also may attempt to design around our patents or copy or otherwise obtain and use our proprietary technology. In addition, patent applications that we have currently pending may not be granted. If we do not receive the patents we seek, or if other problems arise with our intellectual property, our competitiveness could be significantly impaired, which would limit our future revenues and harm our prospects.

*The Company Is Subject To Intellectual Property Litigation And Infringement Claims, Which Could Cause It To Incur Significant Expenses Or Prevent The Company From Selling Its Products.*

From time to time, we receive notices from third parties of potential infringement and receive claims of potential infringement when we attempt to license our intellectual property to others. Intellectual property litigation can be costly and time consuming and divert the attention of management and key personnel from other business issues. The complexity of the technology involved and the uncertainty of intellectual property litigation increase these risks. A successful claim by a third party of patent or other intellectual property infringement by us could compel us to enter into costly royalty or license agreements or force us to pay significant damages and may even require us to stop the sale of certain of our products.

*The Company Is Subject To Environmental, Health And Safety Laws, Which Could Be Costly And Restrict The Company's Future Operations.*

Our operations are subject to a wide range of environmental, health and safety laws, including laws relating to the use, disposal, clean up of, and human exposure to, hazardous substances. In the United States, these laws often require parties to fund remedial action regardless of fault. Although we believe our reserves are adequate to cover our environmental liabilities, factors such as the discovery of additional contaminants, the extent of remediation and compliance expenses, and the imposition of additional cleanup obligations at Superfund and other sites could cause our capital expenditures and other expenses relating to remediation activities to exceed the amount reflected in our environmental reserve and adversely affect our results of operations or cash flows. Compliance with existing or future environmental, health and safety laws could subject us to future liabilities, cause the suspension of production, restrict our ability to expand facilities, require us to acquire costly pollution control equipment or incur other significant expenses or modify manufacturing processes.

*Rapid Changes To Existing Regulations Or Technical Standards Or The Implementation Of New Regulations Or Technical Standards Upon Products And Services Not Previously Regulated Could Be Disruptive, Time Consuming And Costly To The Company.*

Many of our products and services are developed in reliance upon existing regulations and technical standards, our interpretation of unfinished technical standards or the lack of such regulations and standards. Rapid changes to existing regulations and technical standards or the implementation of new regulations and technical standards upon products and services not previously regulated could adversely affect development, demand, sale and warranty of our products and services, thus increasing our costs and decreasing the demand for our products and services.

*The Company Conducts A Significant Amount Of Its Operations Outside The United States, Which Subjects It To Social, Political And Economic Risks Of Doing Business In Foreign Countries And May Cause The Company's Profitability To Decline Due To Increased Costs.*

We have significant operations in foreign countries, including manufacturing facilities, sales personnel and customer support operations. For fiscal 2002, we derived approximately 34% of our revenues from sales outside the United States, with the foreign markets including China, Germany, India and Saudi Arabia.

We manufacture a portion of our products outside the United States. We are also dependent on international suppliers for many of our components and subassemblies and assembly of some of our products. We are concentrating sales and marketing, product development, services and supply chain resources to meet the global needs of the world's largest service providers and to follow the geographic footprint of our large service provider customers around the world to the approximately 20 core countries in which these customers do business. We are, therefore, subject to the risks inherent in doing business in foreign countries. These risks include: tariffs and duties, price controls, restrictions on foreign currencies and trade barriers imposed by foreign countries; exchange controls and fluctuations in currency exchange rates; difficulties in staffing and managing international operations; political or social unrest or economic instability; the risk of nationalization of private enterprises by foreign governments; and adverse tax consequences, including imposition of withholding or other taxes on payments by subsidiaries.

Difficulties in some foreign financial markets and economies could also inhibit demand from our customers in the affected countries. Any or all of these factors could have a material adverse impact on our global business operations. Although we attempt to manage our exposure to risks from fluctuations in foreign currency exchange rates, through our regular operating and financing activities and, when deemed appropriate, derivative financial instruments, our attempts may not always be successful. A significant change in the value of the United States dollar against the currency of one or more countries where we sell products to local customers or make purchases from local suppliers may materially adversely affect our operating results.

***The Company's Common Stock Has Traded At Prices Below $1.00, And Could Be Subject To Delisting By The New York Stock Exchange.***

Our common stock currently trades on the New York Stock Exchange ("NYSE"). Under the NYSE requirements, a stock is required to maintain a minimum trading price, and can be delisted and not allowed to trade on the NYSE if the average closing price of the stock over a 30 trading–day period is less than $1.00. At the close of trading on October 17, 2002, our common stock failed to meet this NYSE minimum trading price requirement because the average closing price for 30 trading days was below $1.00. The NYSE gave us notice of this fact and we have six months to cure this problem or our common stock could be delisted. We intend to ask our shareowners to authorize a reverse stock split at our next annual meeting in February 2003. This action is being taken because our Board of Directors believes a reverse stock split is in the best interest of shareholders as it may maintain our common stock price over the $1.00 threshold and prevent possible delisting by the NYSE. However, shareholders may not approve the reverse stock split, or if the reverse stock split is approved and completed, it may not result in a sustained trading price for our common stock sufficient to prevent delisting.

If our common stock is delisted, trading our stock may become more difficult and our stock price could decrease even further. If our common stock is not listed on a national securities exchange or NASDAQ, many potential investors will not purchase our common stock,

26

limiting the trading market for our stock even further. If delisting by the NYSE does occur, our common stock would likely be removed from the Standard & Poor's 500 index (S&P 500), which would also limit the trading market for our common stock.

***The Company Has Risks Related to Its Pension and Postretirement Benefit Plans***

The Company currently maintains U.S. pension plans under the Employee Retirement Income Security Act of 1974, or ERISA, that cover various categories of employees and retirees. Liabilities related to 32,000 active employees and 127,000 retired employees make up approximately 95% of the total obligations under these pension plans. The remaining 5% of the liabilities are attributable to approximately 90,000 beneficiaries and former employees with deferred vested pension rights. Separate trusts are maintained for management participants and for represented participants to fund these pension obligations. The Company's obligations to make contributions to fund benefit obligations under the pension plans are based on the performance of the financial markets, particularly the equity markets, and interest rates. Funding obligations are determined under ERISA and are measured as of December 31 of each year utilizing the value of assets and liabilities on that date. If the financial markets do not provide the long–term returns that are expected under the ERISA funding calculation, the likelihood of Company contributions increases. The equity markets can be, and recently have been, very volatile, and therefore the Company's estimate of future contribution requirements can change dramatically in relatively short periods of time. Similarly, changes in interest rates can impact our contribution requirements. In a low interest rate environment, the likelihood of required contributions in the future increases.

With respect to the management pension plan, we do not expect to be required to make a contribution for fiscal 2003. However, because of the volatility of the financial markets and fluctuations in interest rates, the Company could be required to make contributions as early as fiscal 2004. With respect to the represented pension plan, the Company does not currently foresee a need to make any contributions, but this could change if the equity markets decline substantially.

Approximately 127,000 of the Company's current retirees are also covered by postretirement healthcare benefit plans. With respect to management retirees, the Company expects it will only need to make minimal, if any, cash payments in fiscal 2003 for these healthcare benefits. However, the Company does expect to make benefit payments from its operating cash flow in fiscal 2004 and beyond. Although it is difficult to estimate these expected future payments, the Company's current view of the funding requirement is approximately $350 million annually. With respect to represented retirees, the Company does not expect to have to make cash payments before fiscal 2006 or 2007 due to assets currently held in a separate trust to fund these payments.

The cost of providing postretirement healthcare benefits continues to rise. The Company expects to take steps designed to reduce the overall cost of providing postretirement healthcare benefits and to reduce the share of these costs borne by the Company, consistent with legal requirements and our collective bargaining obligations. There can be no assurance that the Company will be successful in reducing these costs.

27

If the Company is required to make significant contributions to fund the pension plans or make significant cash payments for retiree healthcare benefits, the Company's cash flow available for other uses may be significantly reduced. In addition, if the Company is unable at any time to meet any required funding obligations for the pension plans, or if the Pension Benefit Guaranty Corporation (PBGC) concludes that, as insurer of certain plan benefits, its risk may increase unreasonably if the plans continue, under ERISA the PBGC could terminate the plans and place liens on material amounts of the Company's assets.

**EMPLOYEE RELATIONS**

On September 30, 2002, we had approximately 47,000 employees. Of these 47,000 employees, approximately 32,000, or 68%, were located in the United States. Of these U.S. employees, approximately 6,800, or 21%, were represented by unions, primarily the Communications Workers of America ("CWA") and the International Brotherhood of Electrical Workers ("IBEW"). Our current five–year collective agreements with the CWA and IBEW expire on May 31, 2003. We cannot give any assurance that new agreements with the unions will be reached by the time the current ones expire. If we do not enter into new agreements before

our current agreements expire, our operations could be disrupted, which could adversely impact our business.

## EXECUTIVE OFFICERS OF THE REGISTRANT

The following information about our executive officers is included herein in accordance with Part III, Item 10 and is as of November 30, 2002.

| Name | Age | Title | Date Became Executive Officer |
|---|---|---|---|
| Henry B. Schacht | 68 | Chairman of the Board | 10/00 |
| Patricia F. Russo | 50 | President and Chief Executive Officer | 01/02 |
| Robert C. Holder | 56 | Chief Operating Officer | 11/00 |
| William T. O'Shea | 55 | President, Bell Labs and Executive Vice President, Strategy and Marketing | 10/99 |
| Frank A. D'Amelio | 44 | Executive Vice President and Chief Financial Officer | 05/01 |
| Richard J. Rawson | 50 | Senior Vice President, General Counsel and Secretary | 02/96 |
| John A. Kritzmacher | 42 | Senior Vice President and Controller | 09/01 |
| James K. Brewington | 59 | President, Mobility Solutions | 10/02 |

| | | | |
|---|---|---|---|
| Janet G. Davidson | 46 | President, Integrated Network Solutions | 10/02 |

All of the executive officers have held high–level managerial positions and/or directorships with us for more than the past five years, except for Ms. Russo. Ms. Russo held executive officer positions with us from our formation in 1996 until August 2000. Prior to becoming our President and Chief Executive Officer in January 2002, Ms. Russo was Chairman of Avaya Inc. from December 2000 to January 2002 and President and Chief Operating Officer of Eastman Kodak Company from April 2001 to January 2002.

Officers are not elected for a fixed term of office but hold office until their successors have been elected.

## ENVIRONMENTAL MATTERS

Our current and historical operations are subject to a wide range of environmental protection laws. In the United States, these laws often require parties to fund remedial action regardless of fault. We have remedial and investigatory activities under way at numerous current and former facilities. In addition, we were named a successor to AT&T as a potentially responsible party at numerous "Superfund" sites pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA") or comparable state statutes. Under our Separation and Distribution Agreement with AT&T, we are responsible for all liabilities primarily resulting from or relating to our assets and the operation of our business as conducted at any time prior to or after the separation from AT&T, including related businesses discontinued or disposed of prior to our separation from AT&T. Furthermore, under the AT&T Separation and Distribution Agreement, we are required to pay a portion of contingent liabilities paid out in excess of certain amounts by AT&T and NCR, including environmental liabilities. In our separation agreements with Agere and Avaya, Agere and Avaya have agreed, subject to certain exceptions, to assume all environmental liabilities related to their respective businesses.

The future impact of environmental matters, including potential liabilities, is often difficult to estimate. We record an environmental reserve when it is probable that a liability has been incurred and the amount of the liability is reasonably estimable. This practice is followed whether the claims are asserted or unasserted. Management expects that the amounts reserved will be paid out over the periods of remediation for the applicable sites, which typically range from five to 30 years. Reserves for estimated losses from environmental remediation are, depending on the site, based primarily upon internal or third–party environmental studies and estimates as to the number, participation level and financial viability of any other potentially responsible parties, the extent of the contamination and the nature of required remedial actions. Accruals are adjusted as further information develops or as circumstances change. The amounts provided for in our consolidated financial statements for environmental reserves are the gross undiscounted amounts of such reserves, without deductions for insurance or third–party indemnity claims. In those cases where insurance carriers or third–party indemnitors have agreed to pay any amounts, and management believes that collectibility of such amounts is probable, the amounts are reflected as receivables in the consolidated financial statements. Although we believe that our reserves are adequate, we can not be certain that the amount of capital

expenditures and other expenses required for remedial actions and compliance with applicable environmental laws will not exceed the amounts reflected in our reserves or will not have a material adverse effect on our financial condition, results of operations or cash flows. Any possible loss or range of possible loss that may be incurred in excess of that provided for at September 30, 2002 cannot be determined.

## SEPARATION AGREEMENTS

In connection with our separation from AT&T in 1996, we, AT&T and NCR Corp. entered into a Separation and Distribution Agreement and related ancillary agreements, including an employee benefits agreement, technology–related agreements, a tax sharing agreement and other tax–related agreements. We entered into similar agreements with Avaya and Agere in connection with our spin–offs of each of these companies.

Pursuant to these various agreements, we and our former affiliates have separately agreed to assume all liabilities, including contingent liabilities, related to our and their respective businesses and operations. In some instances, these agreements also provide for the sharing of certain contingent liabilities, specifically: (1) any contingent liabilities that are not primarily our contingent liabilities or contingent liabilities associated with the businesses attributed to our former affiliate; (2) certain specifically identified liabilities, including liabilities relating to terminated, divested or discontinued businesses or operations; and (3) shared contingent liabilities and excess liabilities as specified in the agreements with AT&T and Avaya.

## Item 2.  Properties

As discussed in more detail below, we currently have approximately 470 owned and leased sites comprising 34.8 million square feet (including 5.7 million square feet which have been vacated under our restructuring actions). As part of our fiscal 2001 and 2002 restructuring actions, we have plans to reduce a significant number of our facilities, which will result in reducing our total owned and leased real estate by approximately 16.6 million square feet. As of September 30, 2002, we exited approximately 12.0 million square feet and expect to exit the remaining sites during fiscal 2003. Although we have not yet committed to any specific plans, we are currently considering strategies to exit the three largest manufacturing and systems integration sites we own, which are located in North Andover, Massachusetts, Columbus, Ohio and Oklahoma City, Oklahoma. These three sites comprise approximately 5.8 million square feet in total.

On September 30, 2002, we owned or leased 13 manufacturing and systems integration sites, consisting of approximately 7.6 million square feet. Four locations are in the United States, substantially all of which are owned. The remaining nine sites are located in seven other countries.

On September 30, 2002, we owned or leased 65 warehouse sites, consisting of approximately 2.4 million square feet. Fifty–six locations are in the United States, substantially all of which are leased. The remaining nine sites are located in seven other countries.

On September 30, 2002, we owned or leased 377 office sites (administration, sales, field service), consisting of approximately 15.4 million square feet of which 13.3 million square feet

are leased. Two hundred thirty of these office sites are located in the United States. The remaining 147 sites are located in 52 other countries.

On September 30, 2002, we owned or leased additional sites with significant research and development activities in four countries, including the U.S., consisting of approximately 9.3 million square feet, of which approximately 0.6 million square feet are leased.

On September 30, 2002, three New Jersey properties located in Whippany, Murray Hill and Holmdel were pledged to secure financing from GMAC Commercial Mortgage Corporation.

Most of the properties we are retaining listed above are used jointly by our reporting segments. We believe our facilities are suitable and adequate to meet our current needs.

## Item 3.  Legal Proceedings

We are subject to legal proceedings, lawsuits, and other claims, including proceedings by government authorities. In addition, we may be subject to liabilities to some of our former affiliates under separation agreements with them (see Item 1, "Business — Separation Agreements"). Legal proceedings are subject to uncertainties and the outcomes are difficult to predict. Consequently, we are unable to ascertain the ultimate aggregate amount of monetary liability or financial impact with respect to these matters at September 30, 2002. We are subject to several purported class action lawsuits and other lawsuits for alleged violations of federal securities laws, ERISA and related claims described below, which could have a material financial impact on us. Other than those matters, we believe that the remainder of the cases will not have a material financial impact on us after final disposition. However, because of the uncertainties of legal proceedings, one or more of these proceedings could ultimately result in material monetary payments by us. The damage claims in some of these proceedings, particularly the securities and related cases, are significant and if an adverse judgment were to be rendered against us in one or more of these proceedings for the amount of damages claimed, we may be unable to pay the amount of such judgments.

Legal proceedings involving the company include the following types of matters:

- Securities cases, including federal securities laws and related ERISA claims

- Consumer fraud and similar claims

- Commercial disputes involving breach of contract, products disputes or similar claims

- Intellectual property actions, usually involving patent infringement claims

  Employment matters

- Regulatory or government investigations

- Environmental, health and safety claims, including asbestos related claims

*Securities and Related Cases*

We and certain of our former officers are defendants in numerous purported shareholder class action lawsuits for alleged violations of federal securities laws. These cases have been consolidated into a single action pending in the United States District Court for the District of New Jersey, captioned *In re Lucent Technologies Inc. Securities Litigation.* The consolidated

31

complaint alleges, among other things, that beginning in late October 1999, we and certain of our officers misrepresented our financial condition and failed to disclose material facts that had an adverse impact on our future earnings and prospects for growth. The action seeks monetary damages and costs and expenses associated with the litigation. We have filed a motion to dismiss the complaint which was denied in June 2002. The case is in the discovery phase, however all proceedings are currently stayed pending court ordered mediation efforts. Should those efforts fail to result in a settlement of the action, Lucent intends to defend the action vigorously.

We have been served with derivative complaints filed by individual shareowners in Delaware Chancery Court against certain current and former members of our Board of Directors and a former officer. These complaints have been consolidated in a single action. The consolidated complaint asserts that certain current and former directors and officer allegedly breached their fiduciary duties to us by acquiescing in or approving allegedly fraudulent conduct and seek damages against the defendants and in favor of us, as well as costs and expenses associated with litigation. We have also been served with other derivative actions in Delaware Chancery Court and United States District Court for the District of New Jersey that have not been consolidated with the other derivative cases. These non–consolidated actions allege that certain of our current and former directors breached fiduciary duties to supervise our company and seeks an accounting of the damages sustained as a result of these alleged acts, as well as costs and expenses associated with litigation. The actions are in the early stages and we intend to defend the actions vigorously. The non–consolidated derivative action pending in Federal Court in New Jersey is currently stayed pending the same mediation efforts described in the preceding paragraph.

An additional derivative complaint was filed in September 2001 by an individual shareholder in the Delaware Court of Chancery against certain current and former members of our Board of Directors and a former officer asserting claims of corporate waste and breach of fiduciary duties arising out of the award of performance–based compensation to our directors and an officer and seeks the return of all such performance–based compensation, compensation to us for resulting losses, the imposition of a constructive trust upon the proceeds of any sale of our shares by the defendants, as well as costs and expenses associated with litigation. We are defending the action vigorously.

In July 2001, a purported class action complaint was filed in the United States District Court for the District of New Jersey alleging, among other things, that we and certain unnamed officers breached our and their fiduciary duties under ERISA with respect to Lucent's employee savings plans. The case claims that the defendants were aware that our stock was inappropriate for retirement investment and continued to offer Lucent stock as a plan investment option. The complaint seeks damages, injunctive and equitable relief, interest and fees and expenses associated with the litigation. The action is in the discovery stage, however the action is currently stayed pending the mediation efforts described above. Should these efforts fail to result in a settlement of the case, we intend to defend the action vigorously. The case is captioned *Reinhart et al. v. Lucent Technologies.*

In March 2002, we were named as a defendant in a case captioned *In re Winstar*

32

*Communications Securities Litigation*, pending in U.S. District Court for the Southern District of New York. The case is a putative class action on behalf of purchasers of common stock of Winstar Communications, Inc. ("Winstar"), which filed for bankruptcy in April 2001, against several former officers and directors of Winstar, Winstar's outside auditors and us. In addition, in April 2002, a case captioned *Preferred Life Insurance Co. of New York, et al. v. Lucent Technologies Inc.* was filed in New Jersey state court against us. The plaintiffs in the New Jersey case are institutional investors, many of which are affiliated with each other, that purchased the common stock of Winstar. In both actions, the plaintiffs claim that we caused or contributed to money lost by the plaintiffs in connection with their investments in Winstar stock. In the New York action, the plaintiffs claim that we violated federal securities laws in connection with plaintiffs' purchases of Winstar stock. In the New Jersey action, the plaintiffs claim that we committed common law fraud, negligent misrepresentation, conspiracy to commit fraud and aiding and abetting fraud in connection with plaintiffs' purchases of Winstar stock. Lucent has filed a motion to dismiss the claims asserted against it in the New York action, and the New Jersey action is in the discovery stage. Lucent is defending both actions vigorously.

We and certain of our current and former officers and directors are defendants in an action in Texas state court captioned *Obtek, et al. v. Lucent Technologies Inc., et al.* This case was filed in April 2001 and alleges violation of federal securities laws, the Texas Securities Act and common law fraud in connection with Lucent's acquisition of a company called Agere Inc. in April 2000. The court has set a trial date for February 2003. We are defending this action vigorously.

In November 2001, a purported class action complaint was filed in the United States District Court for the District of New Jersey against us and current and former officers captioned *Laufer v. Lucent Technologies Inc., et al.* The plaintiffs allege that we and our officers concealed material adverse information about Agere's financial condition prior to Agere's IPO and about our vendor financing portfolio. The action is currently stayed pending the mediation efforts described above. If the mediation does not result in settlement of the case, we intend to defend the action vigorously.

In October 2002, a purported class action lawsuit captioned *Balaban v. Schacht, et al.,* was filed in United States District Court for the District of New Jersey against the Company, certain current and former members of the Board of Directors and two former officers. The action was brought on behalf of holders of the Company's notes, the Company's convertible preferred stock and trust convertible preferred stock and asserts claims for breach of fiduciary duty by the defendants during the period from April 1999 to September 2002. The action seeks compensatory and other damages and costs and expenses associated with the

litigation. The action is in the early stages.

### Consumer Products Cases

*Sparks, et al. v. AT&T and Lucent Technologies Inc. et al.*, is a class action lawsuit filed in 1996 in Illinois state court under the name of *Crain v. Lucent Technologies*. The plaintiffs requested damages on behalf of present and former customers based on a claim that the AT&T Consumer Products business (which became part of Lucent in 1996) and Lucent had defrauded and misled customers who leased telephones, resulting in payments in excess of the cost to purchase the

33

telephones. Similar consumer class actions pending in various state courts were stayed pending the outcome of the Sparks case and, in July 2001, the Illinois court certified a nationwide class of plaintiffs.

A settlement was agreed to by the parties in August 2002, to settle the litigation for up to $300 million in cash plus pre–paid calling cards redeemable for minutes of long distance service. The court approved the settlement in November 2002. Lucent and AT&T deny they have defrauded or misled their customers, but have decided to settle this matter to avoid the uncertainty of litigation and the diversion of resources and personnel that the continuation of pursuing this matter would require. The class claimants will apply for reimbursement from the settlement fund, and will be required to demonstrate their entitlement through a claims form to be provided to a claims administrator. Depending upon the number of claims submitted and accepted, the actual cost of the settlement to the defendants may be less than the stated amount, but it is not possible to estimate the amount at this time. We have deposited approximately $200 million in escrow accounts in connection with the settlement.

Lucent is a party to various separation and distribution agreements, which provide for contribution from third parties formerly affiliated with Lucent for a portion of any liability (including any settlement) in this case. However, we are responsible for a majority of any such liability or settlement. As a result, we recognized a $162 million charge recorded in other income (expense), net in 2002, which is net of expected third party contributions.

### Commercial Matters

Lucent is the defendant in an adversary proceeding filed in April 2001 in United States Bankruptcy Court for the District of Delaware by Winstar Communications, Inc. and Winstar Wireless, Inc. (collectively "Winstar") in connection with the Chapter 11 bankruptcy petition of Winstar and various related entities. The Winstar bankruptcy was subsequently converted to Chapter 7 and the Winstar bankruptcy trustee replaced Winstar as plaintiff in the action. The complaint asserts claims for breach of contract and other claims against Lucent and seeks compensatory damages, as well as costs and expenses associated with litigation. The complaint also seeks recovery of a payment of approximately $190 million made by Winstar to Lucent in December 2000. Lucent has filed a motion to dismiss certain of the claims asserted by the plaintiff. Lucent intends to defend the case vigorously.

In the normal course of business, we are involved in commercial disputes with customers, suppliers, subcontractors and others. These matters generally involve claims for breach of contract, breach of warranty of similar claims. While many of these disputes are settled amicably without litigation, some of these matters will result in lawsuits being filed against us. The recent downturn in the telecommunications market and the insolvency and failures of numerous service providers has resulted in more claims and disputes resulting in litigation.

One such matter is *PF.Net Supply Corp. v. Lucent Technologies Inc.*, pending in U.S. Bankruptcy Court in New Jersey. The plaintiffs are claiming damages for breach of a purported $100 million purchase commitment of the Company. We are defending this action vigorously.

34

### Intellectual Property

We are defendants in various cases in which third parties have claimed we are infringing their patents. In addition, we have assumed defenses of some cases where infringement claims have been made against our customers in connection with products we have provided to them. We also occasionally institute actions against third parties which we believe are infringing our intellectual property rights, and these actions sometimes lead to counterclaims by the opposing party.

### Employee Matters

One of our former sales executives filed a lawsuit against us in New Jersey Superior Court in December 2000, captioned *Aversano v. Lucent Technologies Inc.* The allegations relate to the former sales executive's departure from us in October 2000. The complaint asserts claims for violation of New Jersey's Conscientious Employee Protection Act, breach of contract and promissory estoppel. The complaint seeks compensatory and punitive damages, as well as attorneys' fees. This action is set for trial in January 2003 and we are defending the action vigorously.

We are also subject to various other employment related claims regarding employee dismissals, benefits, compensation and other matters. As a result of our recent restructuring actions and plans for the future, we have reduced our work force significantly, and may have further reductions in the future. These work force reductions have increased the number of employment claims, and this trend may continue in the future.

### Regulatory

On November 21, 2000, we announced that we had identified an issue impacting our revenue in the fourth fiscal quarter of 2000. We informed the SEC and initiated a review by our outside counsel and independent accountants. In late December 2000, we announced the results of the review, which resulted in certain adjustments to our fourth fiscal quarter of 2000 results from the preliminary, unaudited results that we had announced in an October 2000 press release. We are cooperating fully with the SEC's investigation of these matters.

In August 2002, the U.S. Attorney's Office in New Jersey informed us that the office was conducting an investigation into certain of the matters described in the previous paragraph. The U.S. Attorney's Office has informed us that we are not a target of this investigation. We are cooperating fully with the U.S. Attorney's investigation.

*Environmental, Health and Safety*

Information about environmental proceedings is included under "Environmental Matters" in Item 1.

The Company is a defendant in various lawsuits involving exposure to asbestos. These cases primarily involve exposure to asbestos in premises owned or operated by the Company or the

35

predecessors of its business, such as AT&T or Western Electric, and, to a lesser extent, exposure from handling products manufactured or sold by the Company or its predecessors that contained asbestos. Historically, the Company has not paid any material amounts related to asbestos claims, and currently does not expect these cases to have a significant impact on the Company in the future. However, asbestos claims are on the rise generally in the U.S. and an increasing number of claims are being made against owners or operators of premises where asbestos is or was located and companies that manufactured or sold products containing asbestos. Accordingly, the Company cannot give assurance that asbestos related claims will not have a material adverse impact on the Company in the future.

**Item 4.  Submission Of Matters To A Vote Of Security Holders.**

During the fourth quarter of fiscal year 2002, no matter was submitted to a vote of our security holders.

36

**PART II**

**Item 5.  Market For Registrant's Common Equity And Related Stockholder Matters.**

**(a)  Market Price And Dividend Information**

Our common stock is traded on the New York Stock Exchange ("NYSE") under the symbol LU. The following table presents the reported high and low sales prices of our common stock as reported on the NYSE:

|  | High | Low | Dividend Per Share |
|---|---|---|---|
| YEAR ENDED SEPTEMBER 30, 2002 | | | |
| Quarter ended December 31, 2001 | $ 8.75 | $ 5.37 | $ 0.00 |
| Quarter ended March 31, 2002 | 7.50 | 4.10 | 0.00 |
| Quarter ended June 30, 2002 | 5.03 | 1.48 | 0.00 |
| Quarter ended September 30, 2002 | 2.94 | 0.71 | 0.00 |
| YEAR ENDED SEPTEMBER 30, 2001 | | | |
| Quarter ended December 31, 2000 | $ 34.50 | $ 12.19 | $ 0.02 |
| Quarter ended March 31, 2001 | 21.13 | 9.15 | 0.02 |
| Quarter ended June 30, 2001 | 11.50 | 5.16 | 0.02 |
| Quarter ended September 30, 2001 | 7.90 | 5.25 | 0.00 |

**(b)  Approximate Number Of Holders Of Common Stock**

On November 30, 2002, there were approximately 1,476,691 shareowners of record of our common stock.

**(c)  Dividends**

On July 24, 2001, we announced that our Board of Directors had discontinued payments of cash dividends on our common stock. We currently have no plans to reinstate a dividend for our common stock.

**(d)  Sale of Unregistered Securities**

During the fiscal quarter ended September 30, 2002, we issued a total of 58,113,000 shares of our common stock that were not registered under the Securities Act of 1933 in reliance on an exemption pursuant to Section 3(a)(9) of that Act. These shares of common stock were issued in two privately negotiated transactions occurring on September 20 and 26, 2002, solely in exchange for 174,500 shares of our 8% redeemable convertible preferred stock with a liquidation value of $174.5 million. No underwriters were used for these transactions.

**(e)  Equity Compensation Plans**

37

Information about our equity compensation plans required by this item is set forth in our definitive proxy statement for our 2003 annual meeting of shareowners to be held on February 19, 2003 and is incorporated herein by reference.

**Item 6.  Selected Financial Data.**

The information required by this item is included in page 20 of our annual report to shareowners for the fiscal year ended September 30, 2002. This page of the annual report to shareowners is included in Exhibit 13 to this report.

**Item 7.  Management's Discussion and Analysis of Financial Condition and Results of Operations.**

The information required by this item is included in pages 6 to 19 of our annual report to shareowners for the fiscal year ended September 30, 2002. These pages of the annual report to shareowners are included in Exhibit 13 to this report.

**Item 7A.  Qualitative and Quantitative Disclosures About Market Risk.**

The information required by this item is included in pages 18 to 19 of our annual report to shareowners for the fiscal year ended September 30, 2002. These pages of the annual report to shareowners are included in Exhibit 13 to this report.

**Item 8.  Financial Statements and Supplementary Data.**

The information required by this item is included in pages 21 to 51 of our annual report to shareowners for the fiscal year ended September 30, 2002. These pages of the annual report to shareowners are included in Exhibit 13 to this report.

**Item 9.  Changes in and Disagreements with Accountants on Accounting and Financial Disclosure.**

None.

38

**PART III**

**Item 10.  Directors And Executive Officers Of The Registrant.**

Information required by Item 10 for executive officers is set forth under the caption "Executive Officers of the Registrant" in Part I, Item 1 of this report. The other information required by Item 10 is included in our definitive proxy statement for our 2003 annual meeting of shareowners to be held on February 19, 2003 and is incorporated herein by reference.

**Item 11.  Executive Compensation.**

The information required by this Item 11 is included in our definitive proxy statement for our 2003 annual meeting of shareowners to be held on February 19, 2003 and is incorporated herein by reference.

**Item 12.  Security Ownership Of Certain Beneficial Owners And Management.**

The information required by this Item 12 is included in our definitive proxy statement for our 2003 annual meeting of shareowners to be held on February 19, 2003 and is incorporated herein by reference.

**Item 13.  Certain Relationships And Related Transactions.**

The information required by this Item 13 is included in our definitive proxy statement for our 2003 annual meeting of shareowners to be held on February 19, 2003 and is incorporated herein by reference.

**Item 14.  Controls And Procedures.**

Within the 90–day period prior to the filing of this report, an evaluation was carried out under the supervision and with the participation of our management, including the Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), of the effectiveness of our disclosure controls and procedures. Based on that evaluation, the CEO and CFO have concluded that our disclosure controls and procedures are effective to ensure that information required to be disclosed by us in reports that we file or submit under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms. Subsequent to the date of our management's evaluation, there were no significant changes in our internal controls or in other factors that could significantly affect these controls, including any corrective actions with regard to significant deficiencies and material weaknesses.

**Item 15.  Exhibits, Financial Statement Schedule, And Reports On Form 8–K.**

(a) The following documents are filed as part of this Report:

39

Pages

(1) Management's Discussion and Analysis of Results of Operations and Financial Condition ... *
(2) Five–Year Summary of Selected Financial Data ... *
(3) Report of Independent Accountants ... *
(4) Financial Statements:
   (i) Consolidated Statements of Operations ... *
   (ii) Consolidated Balance Sheets ... *
   (iii) Consolidated Statements of Changes in Shareowners' (Deficit) Equity ... *
   (iv) Consolidated Statements of Cash Flows ... *
   (v) Notes to Consolidated Financial Statements ... *
(5) Financial Statement Schedule:
   (i) Report of Independent Accountants ... 42
   (ii) Schedule II —Valuation and Qualifying Accounts ... 43

Separate financial statements of subsidiaries not consolidated and 50 percent or less owned persons are omitted since no such entity constitutes a 'significant subsidiary' pursuant to the provisions of Regulation S–X, Article 3–09.

\*     Incorporated by reference to the appropriate portions in pages 6 through 51 of the Company's annual report to shareowners for the fiscal year ended September 30, 2002 (see Part II and Exhibit 13)

(6) Exhibits:

See Exhibit Index on page 49 for a description of the documents that are filed as Exhibits to this report on Form 10–K or incorporated by reference herein. Any document incorporated by reference is identified by a parenthetical referencing the SEC filing which included the document.

We will furnish, without charge, to a security holder upon request a copy of our definitive proxy statement for our 2003 annual meeting of shareowners, portions of which are incorporated herein by reference thereto. We will furnish any other exhibit at cost.

(b) Reports On Form 8–K During The Last Quarter Of The Fiscal Year Covered By This Report:

The company filed the following four reports on Form 8–K during the fiscal quarter ended September 30, 2002:

| Date Filed | Item Reported Upon |
| --- | --- |
| July 23, 2002 | The Company issued a press release containing the results of its third fiscal quarter ended June 30, 2002, and slides made available at a webcast for its quarterly results conference call held on July 23, 2002. |

| | |
| --- | --- |
| August 12, 2002 | The Company announced the settlement of a class action lawsuit in Illinois state court entitled *Sparks, et al. v. AT&T and Lucent Technologies Inc. et al.* |
| August 13, 2002 | The Company announced that its chief executive officer and chief financial officer had submitted to the Securities and Exchange Commission sworn statements pursuant to Securities and Exchange Commission Order No. 4–460. |
| September 13, 2002 | The Company issued a press release regarding its expectations for revenues and profits for the quarter ended September 30, 2002. |

## REPORT OF INDEPENDENT ACCOUNTANTS ON FINANCIAL STATEMENT SCHEDULE

**To the Board of Directors and Shareowners of Lucent Technologies Inc.:**

Our audits of the consolidated financial statements referred to in our report dated October 23, 2002, except for the second paragraph of Note 4, the third paragraph of Note 10 and the first paragraph of Note 12, as to which the date is December 4, 2002, appearing in the 2002 Annual Report to the Shareowners of Lucent Technologies Inc. (which report and consolidated financial statements are incorporated by reference in this Annual Report on Form 10–K) also included an audit of the consolidated financial statement schedule hereto included in this Form 10–K. In our opinion, this consolidated financial statement schedule presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements.

PricewaterhouseCoopers LLP
New York, New York
October 23, 2002,
except for the second paragraph of Note 4, the third paragraph of Note 10 and the first paragraph of Note 12, as to which the date is December 4, 2002

42

**Lucent Technologies Inc.**
**Schedule II — Valuation and Qualifying Accounts**
**(Dollars in millions)**

| Column A | Column B | Column C Additions | | Column D | Column E |
|---|---|---|---|---|---|
| Description | Balance at beginning of period | Charged to Costs & expenses | Charged to other accounts, net | Deductions | Balance at end of period |
| **Year 2002** | | | | | |
| Allowance for doubtful accounts | $ 634 | $ 488 | $ — | $ 797(a) | $ 325 |
| Customer financing reserves | 2,109 | 765 | — | 1,923(a) | 951 |
| Deferred tax asset valuation allowance | 742 | 7,868 | 1,472(b) | 93(a) | 9,989 |
| Inventory valuation reserves | $ 1,814 | $ 621 | $ 334 | $ 1,279(d) | $ 1,490 |
| **Year 2001** | | | | | |
| Allowance for doubtful accounts | $ 479 | $ 462 | $ — | $ 307(a) | $ 634 |
| Customer financing reserves | 604 | 1,787 | 257 | 539(a) | 2,109 |
| Deferred tax asset valuation allowance | 197 | 545 | — | — | 742 |
| Inventory valuation reserves | $ 805 | $ 2,400(c) | — | $ 1,391(d) | $ 1,814 |
| **Year 2000** | | | | | |
| Allowance for doubtful accounts | $ 303 | $ 245 | $ — | $ 69(a) | $ 479 |
| Customer financing reserves | 34 | 260 | 432 | 122(a) | 604 |
| Deferred tax asset valuation allowance | 146 | 45 | 6 | — | 197 |
| Inventory valuation reserves | $ 624 | $ 360 | $ 8 | $ 187(d) | $ 805 |

(a)  Primarily represents amounts written off, net of recoveries.

(b)  Primarily charged to shareowners' (deficit) equity for minimum pension liability and other charges to other comprehensive income.

(c)  Charged to costs and expenses include $1,259 of inventory related to Lucent's business restructuring program, of which $570 was written off and included in deductions.

(d)  Primarily represents amounts of obsolete and scrapped inventory written off.

Amounts above reflect continuing operations. All amounts have been reclassified to exclude Avaya, Agere and the power systems business.

43

# SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, hereunto duly authorized on December 12, 2002.

LUCENT TECHNOLOGIES INC.

By:  /s/ JOHN A. KRITZMACHER
John A. Kritzmacher
Principal Accounting Officer

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities indicated on December 12, 2002.

_/s/ PATRICIA F. RUSSO_
PRINCIPAL EXECUTIVE OFFICER
    Patricia F. Russo
        President and Chief Executive Officer

_/s/ FRANK A. D'AMELIO_
PRINCIPAL FINANCIAL OFFICER
    Frank A. D'Amelio
        Executive Vice President and
        Chief Financial Officer

_/s/ JOHN A. KRITZMACHER_
PRINCIPAL ACCOUNTING OFFICER
    John A. Kritzmacher
        Senior Vice President and
        Corporate Controller

DIRECTORS
Paul A. Allaire
Robert E. Denham
Daniel S. Goldin
Carla A. Hills                           By:    _/s/ JOHN A. KRITZMACHER_
Patricia F. Russo                           Attorney–in–Fact
Henry B. Schacht
Franklin A. Thomas
John A. Young

44

## CHIEF EXECUTIVE OFFICER CERTIFICATION

I, Patricia F. Russo, President and Chief Executive Officer of Lucent Technologies Inc., certify that:

1.    I have reviewed this annual report on Form 10–K of Lucent Technologies Inc. (the "registrant");

2.    Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3.    Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4.    The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–14 and 15d–14) for the registrant and have:

a)    designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

b)    evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

c)    presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5.    The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a)    all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

b)    any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6.    The registrant's other certifying officers and I have indicated in this annual report whether there were significant changes in internal controls or in other factors that could significantly

45

affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

Date: December 12, 2002

/s/ Patricia F. Russo
President and Chief Executive Officer
(Principal Executive Officer)

46

## CHIEF FINANCIAL OFFICER CERTIFICATION

I, Frank A. D'Amelio, Executive Vice President and Chief Financial Officer of Lucent Technologies Inc., certify that:

1.    I have reviewed this annual report on Form 10-K of Lucent Technologies Inc. (the "registrant");

2.    Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3.    Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4.    The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and have:

a)    designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

b)    evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

c)    presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5.    The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a)    all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

b)    any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6.    The registrant's other certifying officers and I have indicated in this annual report whether there were significant changes in internal controls or in other factors that could significantly

affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

Date: December 12, 2002

/s/ Frank A. D'Amelio
Executive Vice President and
    Chief Financial Officer
(Principal Financial Officer)

48

## EXHIBIT INDEX

The following documents are filed as Exhibits to this report on Form 10–K or incorporated by reference herein. Any document incorporated by reference is identified by a parenthetical reference to the SEC filing which included such document.

| Exhibit Number | Description |
| --- | --- |
| 3(i) 1 | Certificate of Incorporation of the Registrant, as amended effective February 16, 2000 (Exhibit 3.1 to Registration Statement on Form S–4, No. 333–31400). |
| 3(i) 2 | Certificate of Designations of 8.00% Redeemable Convertible Preferred Stock Setting Forth the Powers, Preferences and Rights, and the Qualifications, Limitations and Restrictions thereof, of such Preferred Stock of Lucent Technologies Inc. (Exhibit 3 to Quarterly Report on Form 10–Q for the quarter ended June 30, 2001). |
| 3(ii) | By–Laws of the Registrant as amended through January 6, 2002 (Exhibit 3(ii) to the Quarterly Report on Form 10–Q for the quarter ended December 31, 2001). |
| 4(ii) 1 | Indenture dated as of April 1, 1996 between Lucent Technologies Inc. and The Bank of New York, as Trustee (Exhibit 4A to Registration Statement on Form S–3, No. 333–01223). |
| 4(ii) 2 | First Supplemental Indenture dated as of April 17, 2000 to Indenture dated April 1, 1996 (Exhibit 4 to Report on Form 8–K filed May 5, 2000). |
| 4(ii) 3 | Form of the Registrant's common stock certificate (Exhibit 4(iv) to Quarterly Report on Form 10–Q for the quarter ended December 31, 2001). |
| 4(ii) 4 | Amended and Restated Trust Agreement, dated as of March 19, 2002, among the registrant, as depositor, The Bank of New York, as property trustee, The Bank of New York (Delaware), as Delaware trustee, and the individuals named therein, as administrative trustees, relating to Lucent Technologies Capital Trust I. (Exhibit 4(v) 1 to Quarterly Report on Form 10–Q for the quarter ended March 31, 2002). |
| 4(ii) 5 | Form of certificate for preferred securities of Lucent Technologies Capital Trust I, designated as 7.75% Cumulative Convertible Trust Preferred Securities (liquidation preference $1,000 per preferred security) (Exhibit 4(v) 2 to Quarterly Report on Form 10–Q for the quarter ended March 31, 2002). |

49

| 4(ii) 6 | Indenture, dated as of March 19, 2002, between the registrant and The Bank of New York, as indenture trustee (Exhibit 4(v) 3 to Quarterly Report on Form 10–Q for the quarter ended March 31, 2002). |
| 4(ii) 7 | Form of the registrant's 7.75% convertible subordinated debentures due 2017 (Exhibit 4(v) 4 to Quarterly Report on Form 10–Q for the quarter ended March 31, 2002). |
| 4(ii) 8 | Guarantee Agreement, dated as of March 19, 2002, between the registrant, as guarantor, and The Bank of New York, as guarantee trustee (Exhibit 4(v) 5 to Quarterly Report on Form 10–Q for the quarter ended March 31, 2002). |
| 4(iii) | Other instruments in addition to Exhibits under 4(ii) which define the rights of holders of long–term debt of the Registrant and all of its consolidated subsidiaries are not filed herewith pursuant to Regulation S–K, Item 601(b)(4)(iii)(A). Pursuant to this regulation, the Registrant agrees to furnish a copy of any such instrument to the SEC upon request. |

| 10(i) 1 | Separation and Distribution Agreement by and among Lucent Technologies Inc., AT&T Corp. and NCR Corporation, dated as of February 1, 1996 and amended and restated as of March 29, 1996 (Exhibit 10.1 to Registration Statement on Form S−1 No. 333−00703). |
| --- | --- |
| 10(i) 2 | Tax Sharing Agreement by and among Lucent Technologies Inc., AT&T Corp. and NCR Corporation, dated as of February 1, 1996 and amended and restated as of March 29, 1996 (Exhibit 10.6 to Registration Statement on Form S−1 No. 333−00703). |
| 10(i) 3 | Employee Benefits Agreement by and between AT&T Corp. and Lucent Technologies Inc., dated as of February 1, 1996 and amended and restated as of March 29, 1996 (Exhibit 10.2 to Registration Statement on Form S−1 No. 333−00703). |
| 10(i) 4 | Rights Agreement between Lucent Technologies Inc. and The Bank of New York (successor to First Chicago Trust Company of New York), as Rights Agent, dated as of April 4, 1996 (Exhibit 4.2 to Registration Statement on Form S−1 No. 333−00703). |
| 10(i) 5 | Amendment to Rights Agreement between Lucent Technologies Inc. and The Bank of New York (successor to First Chicago Trust Company of New York), dated as of February 18, 1998 (Exhibit (10)(i) 5 to the Annual Report on Form 10−K for the year ended September 30, 1998). |

50

| 10(i) 6 | 364−Day Revolving Credit Facility Agreement, dated as of February 22, 2001 among Lucent Technologies Inc., several banks and other financial institutions or entities from time to time parties thereto, Salomon Smith Barney Inc., as Syndication Agent, and The Chase Manhattan Bank, as Administrative Agent (Exhibits 99.1 to the Current Report on Form 8−K filed February 27, 2001). |
| --- | --- |
| 10(i) 7 | 5−Year Amended and Restated Revolving Credit Facility Agreement, dated as of February 26, 1998, as Amended and Restated as of February 22, 2001 among Lucent Technologies Inc., the lenders party thereto, Salomon Smith Barney Inc., as Syndication Agent, and The Chase Manhattan Bank, as Administrative Agent (Exhibit 99.3 to the Current Report on Form 8−K filed February 27, 2001). |
| 10(i) 8 | Guarantee and Collateral Agreement made by Lucent Technologies Inc. and certain of its subsidiaries in favor of The Chase Manhattan Bank, as Collateral Agent, dated as of February 22, 2001 (Exhibit 99.4 to the Current Report on Form 8−K filed February 27, 2001). |
| 10(i) 9 | Collateral Sharing Agreement among Lucent Technologies Inc., various Grantors and The Chase Manhattan Bank, as Collateral Agent, dated as of February 22, 2001 (Exhibit 99.5 to the Current Report on Form 8−K filed February 27, 2001). |
| 10(i) 10 | First Amendment to 364−Day Revolving Credit Facility Agreement and First Amendment to Guarantee and Collateral Agreement, dated as of June 11, 2001 (Exhibit 99.1 to the Current Report on Form 8−K filed August 16, 2001). |
| 10(i) 11 | First Amendment to Five−Year Revolving Credit Facility Agreement and First Amendment to Guarantee and Collateral Agreement, dated as of June 11, 2001 (Exhibit 99.2 to the Current Report on Form 8−K filed August 16, 2001). |
| 10(i) 12 | Second Amendment to 364−Day Revolving Credit Facility, dated as of August 16, 2001 (Exhibit 99.3 to the Current Report on Form 8−K filed August 16, 2001). |
| 10(i) 13 | Second Amendment to Five−Year Amended and Restated Revolving Credit Facility Agreement, dated as of August 16, 2001 (Exhibit 99.4 to the Current Report on Form 8−K filed August 16, 2001). |
| 10(i) 14 | Third Amendment To Five−Year Revolving Credit Facility Agreement And Second Amendment To Guarantee And Collateral Agreement, dated as of June 7, 2002 (Exhibit 99.1 to Current Report on Form 8−K filed June 13, 2002). |

51

| 10(i) 15 | Letter Agreement, dated as of October 16, 2002, among Lucent Technologies Inc. and certain of its subsidiaries, and JPMorgan Chase Bank, as Collateral Agent (Exhibit 99.1 to Current Report on Form 8−K filed on October 23, 2002). |
| --- | --- |
| 10(ii)(B) 1 | Brand License Agreement by and between Lucent Technologies Inc. and AT&T, dated as of February 1, 1996 (Exhibit 10.5 to Registration Statement on Form S−1 No. 333−00703). |
| 10(ii)(B) 2 | Patent License Agreement among AT&T Corp., NCR Corporation and Lucent Technologies Inc., effective as of March 29, 1996 (Exhibit 10.7 to Registration Statement on Form S−1 No. 333−00703). |
| 10(ii)(B) 3 | Amended and Restated Technology License Agreement among AT&T Corp., NCR Corporation and Lucent Technologies Inc., effective as of March 29, 1996 (Exhibit 10.8 to Registration Statement on Form S−1 No. 333−00703). |
| 10(iii)(A) 1 | Lucent Technologies Inc. Short Term Incentive Program (Exhibit (10)(iii)(A) 2 to the Quarterly Report on Form 10−Q for the quarter ended March 31, 1998).* |
| 10(iii)(A) 2 | Lucent Technologies Inc. 1996 Long Term Incentive Program, as amended through April 21, 2002 (Exhibit 10(iii)(A) to the Quarterly Report on Form 10−Q for the quarter ended March 31, 2002). * |

10(iii)(A) 3    Lucent Technologies Inc. 1996 Long Term Incentive Program (Plan) Restricted Stock Unit Award Agreement (Exhibit (10)(iii)(A) 3 to the Annual Report on Form 10–K for the year ended September 30, 2000).*

10(iii)(A) 4    Lucent Technologies Inc. 1996 Long Term Incentive Program (Plan) Nonstatutory Stock Option Agreement (Exhibit (10)(iii)(A) 4 to the Annual Report on Form 10–K for the year ended September 30, 2000).*

10(iii)(A) 5    Lucent Technologies Inc. Deferred Compensation Plan (Exhibit (10)(iii)(A) 5 to the Annual Report on Form 10–K for the year ended September 30, 2000).*

10(iii)(A) 6    Lucent Technologies Inc. Stock Retainer Plan for Non–Employee Directors (Exhibit (10)(iii)(A) 5 to the Annual Report on Form 10–K for the year ended September 30, 1998).*

10(iii)(A) 7    Lucent Technologies Inc. Officer Long–Term Disability and Survivor Protection Plan (Exhibit (10)(iii)(A) 8 to the Annual Report on Form 10–K for the Transition Period ended September 30, 1996).*

10(iii)(A) 8    Description of the Lucent Technologies Inc. Supplemental Pension Plan (Exhibit (10)(iii)(A) 13 to the Annual Report on Form 10–K for the year ended September 30, 1998).*

10(iii)(A) 9    Lucent Technologies Inc. 1999 Stock Compensation Plan for Non–Employee Directors (Exhibit (10)(iii)(A) 14 to the Annual Report on Form 10–K for the year ended September 30, 1998).*

10(iii)(A) 10    Lucent Technologies Inc. Voluntary Life Insurance Plan (Exhibit (10)(iii)(A) 15 to the Annual Report on Form 10–K for the year ended September 30, 1998).

10(iii)(A) 11    Employment Agreement dated January 6, 2002, between Patricia F. Russo and Lucent Technologies Inc. (Exhibit (10)(iii)(A)(1) to Quarterly Report on Form 10–Q for the quarter ended December 31, 2001).*

10(iii)(A) 12    Officer Severance Policy for Robert Holder, dated February 14, 2001 (Exhibit (10)(iii)(A) 15 to the Annual Report on Form 10–K for the year ended September 30, 2001).*

10(iii)(A) 13    Officer Severance Policy for William O'Shea, dated February 14, 2001 (Exhibit (10)(iii)(A) 16 to the Annual Report on Form 10–K for the year ended September 30, 2001).*

10(iii)(A) 14    Officer Severance Policy for Richard J. Rawson, dated February 14, 2001.*

10(iii)(A) 15    Henry Schacht letter to Robert Holder, dated December 3, 2001 (Exhibit (10)(iii)(A) 19 to the Annual Report on Form 10–K for the year ended September 30, 2001).*

10(iii)(A) 16    Henry Schacht letter to William O'Shea, dated December 3, 2001 (Exhibit (10)(iii)(A) 20 to the Annual Report on Form 10–K for the year ended September 30, 2001).*

10(iii)(A) 17    Henry Schacht letter to Richard J. Rawson, dated December 3, 2001.*

10(iii)(A) 18    Henry Schacht letter to Frank A. D'Amelio, dated March 13, 2001.*

10(iii)(A) 19    Pam Kimmet letter to Frank A. D'Amelio, dated September 12, 2001.*

10(iii)(B) 1    Lucent Technologies Inc. 1997 Long Term Incentive Plan, as amended through April 21, 2002 (Exhibit 10(iii)(B) to the Quarterly Report on Form 10–Q for the quarter ended March 31, 2002).

12    Computation of Deficiency of Earnings to Cover Combined Fixed Charges and Preferred Stock Dividend Requirements and Ratio of Earnings to Combined Fixed Charges and Preferred Stock Dividend Requirements.

13    Selected portions (pages 5 to 51) of the company's Annual Report to Shareowners for the year ended September 30, 2002.

21    List of subsidiaries of Lucent Technologies Inc.

23    Consent of PricewaterhouseCoopers LLP.

24    Powers of Attorney executed by directors who signed this report.

99.1    Description of capital stock (Exhibit 99(i) to Quarterly Report on Form 10–Q for the quarter ended December 31, 2001).

99.2          Certification of Patricia F. Russo, Chief Executive Officer, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes–Oxley Act of 2002.

99.3          Certification of Frank A. D'Amelio, Chief Financial Officer, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes–Oxley Act of 2002.

* Management contract or compensatory plan or arrangement.

54

**EXHIBIT 10(iii)(A) 14**

To:     Rich Rawson

From:   Henry Schacht

Date:   February 14, 2001

Re:     Officer Severance Policy

This is a challenging time for our company. While I am confident in our ability to successfully work through the issues we are facing, I am also aware that our current business climate creates an uncertainty and raises concerns that could distract you from the turnaround work at hand. To address such concerns, I'm pleased to inform you that the Board of Directors has approved your eligibility for enhanced severance coverage in the event;

1       your employment is terminated by Lucent for reasons other than 'cause'; or

2.      you choose to terminate your employment with Lucent within six months of the hire date of the next CEO; or

3.      you choose to terminate your employment with Lucent because your reporting relationship to me has changed; or

4.      you choose to terminate your employment with Lucent on or after April 22, 2002 for any reason.

If you choose to invoke the severance policy as described in items 2, 3, or 4, you must give at least three months notice. Upon such notice, the Company will reserve the right to request an additional three months of employment from you.

The severance coverage, that you would receive in the event your employment ends under any of the conditions noted above, is described in Attachment I. This benefit provides for continuation of salary and target bonus for 24 months. During this 24–month paid leave of absence, your stock options and restricted stock units will continue to vest. In addition, your coverage under many of Lucent's benefit plans, including the medical, dental, stock purchase and savings plans, will continue as normal.

The 24–month paid leave of absence can be used to accrue age and service towards achieving service pension eligibility. Given you current age and years of service, you would be service pension eligible at the end of a 24–month paid leave of absence. And, at the conclusion of a 24–month paid leave of absence, the retirement and termination provisions set forth in each grant's (stock option and restricted stock units) respective agreement will apply. The vesting and retirement provisions for all your outstanding grants are described in Attachment II.

Also, if you choose to invoke the severance policy as described in items 2, 3, or 4, then the stock options and restricted stock units granted on December 26, 2000 will accelerate, with full vesting occurring on the first day your severance coverage begins. Further communication on these grants and the agreements will be sent to you later this week.

The special severance provisions described in items 2, 3, and 4 do not apply to all officers, so I ask that you keep the terms of this arrangement confidential.

Challenging times can be the most satisfying and rewarding times of our professional lives. With your help we can take our company to new levels of success.

Attachments

To: Rich Rawson

From: Henry Schacht

Date: December 3, 2001

Re: Special Compensation Actions

As we continue with our turnaround, it is critical for us to remain focused and committed to successfully meet our business challenges. I am confident that we can take our company to new levels of success, and I am counting on your continued commitment as a key player in making this happen. To reward you for your efforts and dedication, the Board has approved several compensation actions, which are contingent upon your waiving the enhanced severance coverage described in my February 14, 2001 letter to you:

1) You will be eligible for a special retention bonus; the amount and the payment terms are outlined on Attachment I.

2) All the unvested stock option and restricted stock unit grants you have received will become fully vested and exercisable on April 22, 2002, or earlier upon the appointment and commencement of employment of a new CEO, except for any future grants that you may be awarded.

3) In the event that any future payments you receive are deemed to be 'excess parachute payments' under Internal Revenue Code Section 280G, the company will provide a tax gross–up to indemnify you against the 20% federal excise tax. A summary of 280G considerations is shown on Attachment II.

Please note that due to these special compensation actions, the terms of the enhanced severance coverage described in my February 14, 2001 letter will be modified. Specifically, your acceptance of the special retention bonus will commit you to continuing your employment past April 22, 2002, or the appointment and commencement of employment of a new CEO if that should occur prior to April 22, 2002. Further, by accepting this award you acknowledge that you will no longer have the ability to invoke your severance coverage under the terms of items 2, 3, or 4 of the February 14, 2001 letter. You may, however, voluntarily resign prior to November 22, 2002 (the date at which you become retirement eligible) and be treated as retirement eligible for pension, medical insurance, and equity vesting. Instead, you will be eligible for ongoing severance coverage under the standard terms of the Officer Severance Policy. A summary of this policy is included on Attachment III.

I truly appreciate your efforts and look forward to working together through the challenges ahead.

**SPECIAL RETENTION BONUS**
**RICH RAWSON**

| | |
|---|---|
| AMOUNT | You are eligible to receive a retention bonus equal to two times your base salary and target bonus in effect on the payment date (see below). |
| | For illustrative purposes, if the bonus were based on your base salary and target bonus as of November 27, 2001, the amount of the retention bonus would be **$2,310,000.** |
| | This award is subject to any applicable tax and is benefit bearing for purposes of Lucent's benefit plans. Please note that this award is in addition to any other incentive awards for which you may be eligible. |
| PAYMENT DATE | Assuming your continued employment, the payments will be made on April 22, 2002, or upon the appointment and commencement of employment of a new CEO, whichever comes first. |
| TERMINATION PROVISIONS | – In the event you voluntarily resign or retire or are terminated by Lucent for 'Cause' prior to the payout date this award will be canceled. |
| | – In the event of your death or long–term disability prior to the payout date, this award will be paid to you or your estate. |
| | – If you are placed on a Company approved leave of absence under the Officer Severance Policy and you are on this leave on the scheduled payout date, then this award will continue to be paid on the originally scheduled date. Please note that the Officer Severance Policy remains in effect in the event of a Change in Control (as defined by the 1996 Long Term Incentive Program). |
| | – In the event of a Change in Control prior to the payout date (as defined by the 1996 Long Term Incentive Program), this award would continue to be paid on the originally scheduled date. |

## GOLDEN PARACHUTE RULES

IRC Section 280G was enacted to discourage the practice of giving "disqualified individuals" large benefits (such as the accelerated vesting of options, severance payments, etc.) that are triggered upon a change in control of their employer company. The employer company is denied a tax deduction for the "excess golden parachute," and the individual recipient must pay a 20% excise tax on this same amount. A "gross–up" payment made by the company to make the recipient whole for this excise tax (generally three times the amount of the excise tax) is also an "excess golden parachute" payment.

- Disqualified individuals include officers, the highest paid 1% of the employees and holders of stock or options having a fair market value in excess of $1 million.

- A benefit received that is in excess of three times the recipient's average annual compensation is considered a "golden parachute."

- The amount by which the golden parachute exceeds the recipient's average annual compensation is the "excess golden parachute" and is therefore disallowed as a tax deduction for the company and the participant receiving the benefit is subject to the excise tax.

- The value of the accelerated vesting of options is determined as follows:

  - The aggregate value of the options is determined over their normal vesting period then discounted to the present under present value analysis. This amount is then compared to aggregate value of the options upon the acceleration date. The excess is the value of the acceleration.

  - In addition to the value of acceleration, a value reflecting the lapse of the recipient's obligation to continue to perform services throughout the vesting period must also be included. This is equal to 1% of the amount of the accelerated payment multiplied by the number of full months that the right is no longer subject to a substantial risk of forfeiture.

## EXAMPLE OF TAX GROSS–UP CALCULATION

*Assumptions*

| | |
|---|---|
| Average Annual Compensation | $ 2,000,000 |
| 300% of Average Annual Compensation | $ 6,000,000 |
| Value of Change in Control Payments | $ 8,000,000 |

*Rules*

Since the value of Change in Control payments is greater than 300% of the Average Annual Compensation, the $8,000,000 is considered a "parachute payment." The "excess parachute payment" is the total parachute payment, less the Average Annual Compensation ($8,000,000 − $2,000,000) = $6,000,000

*Gross–Up Payments*

| | |
|---|---|
| Cost of Excise Tax to Participant: | $1,200,000 |
| ($6,000,000 x 20%) | |

*Gross–Up*

Additional payment from company needed to offset the effect of the excise tax on employee at 66% tax rate (46% regular tax rate + 20% excise tax):

    $ 3,500,000 gross
    $ 1,200,000 net after tax

Note that payments in excess of average annual compensation ($6,000,000) and gross–up payments ($3,500,000) are not deductible by the company.

## OFFICER SEVERANCE POLICY

**Eligibility**
- Lucent or Agere Officer status
- Participation for new officers is contingent upon Board/CEO approval
- Company initiated termination, other than for 'Cause' as defined on page 2
- Contingent upon signing the standard, Lucent Release Agreement (including non-compete, non-solicitation provisions)
- All payments and benefits listed below will be offset by any individually negotiated or legally required arrangement

**Leave of Absence Payment**
- 24 months of base salary and target bonus
- Base salary will be paid monthly. Target bonus will be paid annually in December. Both payments are benefits bearing.

**Equity**

STOCK OPTIONS
- Options continue vesting as scheduled during the 24 month period.
- At end of the 24 month period, your employment will end and options will follow normal termination provisions:
  - Pension eligible — Keep vested remainder of term; unvested options cancel
  - Not Pension eligible — 90 days to exercise vested; unvested options cancel

RESTRICTED STOCK
- Restricted stock continues vesting as scheduled during the 24 month period.

ESPP
- Your participation will continue through payroll deductions.

**Retirement Benefits**

SERVICE PENSION
Retirement eligible: Your severance pay will count towards your pension. Pension payments begin after termination of this arrangement.

Not retirement eligible: Deferred vested employees can elect to begin payment at the termination of this arrangement. The severance period can be used to accrue service/age toward achieving pension eligibility.

CASH BALANCE PENSION
- Severance pay will count towards the cash balance plan. The cash balance is payable at the end of the 24 month period or later at employee election.

401(K)
- Payroll deductions continue

**Health and Welfare Benefits**
- Medical, Dental, Disability, Life Insurance, Car Allowance, Financial Counseling benefits continue the same as actively employed Officers.
- Company credit cards, home office equipment, voice mail and e-mail will be cancelled at the beginning of the 24 month period.

## OFFICER SEVERANCE POLICY

| | |
|---|---|
| Termination Provisions | – In the event you need to terminate this arrangement during the 24 month leave period for any reason (including conflict with another employer), the Company may approve the payment of the remaining amount of base salary and target bonus in a lump sum. The normal 'voluntary' termination provisions for the stock and benefit plans will apply. |
| Outplacement Services | – At your request, outplacement services will be provided through a vendor selected by the Company, during the 24 month leave period or within six months following termination of employment, up to a limit of $50,000. |
| Change in control Provisions | – Upon or after a Change in Control (as defined in the 1996 Long Term Incentive Program or its successor plan as in effect immediately before the Change in Control) this policy will remain in effect. |
| | – Upon or after a Change in Control (as defined in the 1996 Long Term Incentive Program or its successor plan as in effect immediately before the Change in Control), you will also be entitled to the benefits of this policy if you terminate your employment within three months of an event constituting Good Reason. Good Reason is defined as follows: |

    (i)  the assignment to you by the Board of Directors or another representative of the Company of duties which represent a material decrease in responsibility and are materially inconsistent with the duties associated with your position, any reduction in your job title, or a material negative change in the level of Officer to whom you report, or

    (ii)  a material negative change in the terms and conditions of your employment, including a reduction by the Company of your annual base salary or a material decrease in your target opportunity for a Short Term Incentive Award, or

    (iii)  the requirement to change your work location to one in a different country, even for a comparable or superior position.

'Cause' is defined as:

(i)     violation of Lucent's code of conduct, Business Guideposts;

(ii)    conviction of (including a plea of guilty or nolo contendere) a felony or any crime of theft, dishonesty or moral turpitude; or

(iii)   gross omission or gross dereliction of any statutory or common law duty of loyalty to Lucent.

**EXHIBIT 10(iii)(A) 18**

To:        Frank D'Amelio

From:      Henry Schacht

Date:      March 13, 2001

Re:        Special Retention Bonus

As we continue with our turnaround, it is critical for us to remain focused and committed to successfully meet our business challenges. I am confident that we can take our company to new levels of success, and I am counting on your continued commitment as a key player in making this happen. To reward you for your efforts and dedication, the Board has approved a special retention bonus for you. The amount of the bonus and the payment terms are outlined in the attachment.

This special retention bonus has only been offered to select Officers, so I ask that you keep the details of this award confidential.

I truly appreciate your efforts and look forward to working together through the challenges ahead.

<div align="center">Attachment</div>

**Special Retention Bonus**
**Frank D'Amelio**

| | |
|---|---|
| **Amount** | You are eligible to receive a retention bonus in the amount of **$1,500,000**. |
| | This award is subject to any applicable tax and is non-benefit bearing for purposes of Lucent's benefits plans. Please note that this award is in addition to any other incentive awards for which you may be eligible. |
| **Payment Dates** | Assuming your continued employment, the following payments will be made: |

- 50% is payable on **February 1, 2002**

- 50 % is payable on **December 1, 2002**

**Termination Provisions**

– In the event you voluntarily resign or are terminated by Lucent for "Cause" prior to the payout date(s), this award will be cancelled.

– In the event of your death or disability prior to the payout date(s), a prorated portion of this award will be paid to your or your estate.

– If you are placed on a Company approved leave of absence under the Officer Severance Policy and you are on this leave on the scheduled payout date(s), then this award will be paid. Please note that the Officer Severance Policy remains in effect in the event of a Change in Control (as defined by the 1996 Long Term Incentive Program).

– In the event of a Change in Control (as defined by the 1996 Long Term Incentive Program), this award would continue to be paid on the originally scheduled dates assuming your continued employment.

**EXHIBIT 10(iii)(A) 19**

To:    Frank D'Amelio

From:  Pam Kimmet

Date:   September 12, 2001

Re:    Enhanced Retention Bonus

This memo is to confirm the change to your special cash retention bonus approved earlier this year. In recognition of your new role as Chief Financial Officer, the Board has approved an increase in the amount of this award as of May 24, 2001. The scheduled payout dates and terms will remain the same. As formal confirmation of this increase, the new amount is shown on the attachment, which replaces the attachment your received in February.

Please let me know if you have any questions.

Attachment

**Special Retention Bonus**
**Frank D'Amello**

| | |
|---|---|
| **Amount** | You are eligible to receive a retention bonus in the amount of **$3,000,000.** |
| | This award is subject to any applicable tax and is non–benefit bearing for purposes of Lucent's benefits plans. Please note that this award is in addition to any other incentive awards for which you may be eligible. |
| **Payment Dates** | Assuming your continued employment, the following payments will be made: |

- 50% is payable on **February 1, 2002**

- 50 % is payable on **December 1, 2002**

**Termination Provisions**

- In the event you voluntarily resign or are terminated by Lucent for "Cause" prior to the payout date(s), this award will be cancelled.

- In the event of your death or disability prior to the payout date(s), a prorated portion of this award will be paid to your or your estate.

- If you are placed on a Company approved leave of absence under the Officer Severance Policy and you are on this leave on the scheduled payout date(s), then this award will be paid. Please note that the Officer Severance Policy remains in effect in the event of a Change in Control (as defined by the 1996 Long Term Incentive Program).

- In the event of a Change in Control (as defined by the 1996 Long Term Incentive Program), this award would continue to be paid on the originally scheduled dates assuming your continued employment.

LUCENT TECHNOLOGIES INC. AND SUBSIDIARIES
COMPUTATION OF DEFICIENCY OF EARNINGS TO COVER COMBINED FIXED CHARGES
AND PREFERRED STOCK DIVIDEND REQUIREMENTS
AND RATIO OF EARNINGS TO COMBINED FIXED CHARGES
AND PREFERRED STOCK DIVIDEND REQUIREMENTS
(DOLLARS IN MILLIONS)
(UNAUDITED)

| | FOR THE YEAR ENDED SEPTEMBER 30, | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2002 | 2001 | 2000 | 1999 | 1998 |
| Income (loss) from continuing operations before income taxes and losses from equity investments | $ (7,083) | $ (19,844) | $ 2,388 | $ 3,828 | $ 1,466 |
| Less: interest capitalized during the period | 4 | 16 | 20 | 20 | 17 |
| Add: Fixed charges | 644 | 869 | 667 | 612 | 441 |
| Total earnings (loss) to cover fixed charges | $ (6,443) | $ (18,991) | $ 3,035 | $ 4,420 | $ 1,890 |
| Fixed charges: | | | | | |
| Total interest expense including capitalized interest | $ 469 | $ 659 | $ 434 | $ 428 | $ 298 |
| Interest portion of rental expenses | 175 | 210 | 233 | 184 | 143 |
| Total fixed charges | $ 644 | $ 869 | $ 667 | $ 612 | $ 441 |
| Preferred stock dividends and accretion | 167 | 28 | — | — | — |
| Ratio of earnings to combined fixed charges and preferred stock dividend requirements | — | — | 4.6 | 7.2 | 4.3 |
| Deficiency of earnings to cover combined fixed charges and preferred stock dividend requirements | $ 7,254 | $ 19,888 | — | — | — |

Fixed charges consist of interest expense on all indebtedness and that portion of operating lease rental expense that is representative of the interest factor.
Preferred stock dividend requirements consist of the amount of pre-tax earnings that is required to pay the dividends on outstanding preferred stock.

align=center>SELECTED PAGES OF
LUCENT TECHNOLOGIES
ANNUAL REPORT 2002

**LUCENT TECHNOLOGIES FINANCIAL REVIEW 2002**

**Management's Discussion and Analysis of Results of Operations and Financial Condition**
- Forward–Looking Statements — 6
- Overview — 6
- Application of Critical Accounting Policies — 7
- Results of Operations — 9
- Liquidity and Capital Resources — 15
- Risk Management — 18

**Five–Year Summary of Selected Financial Data** — 20

**Report of Management and Report of Independent Accountants** — 21

**Consolidated Financial Statements**
- Consolidated Statements of Operations — 22
- Consolidated Balance Sheets — 23
- Consolidated Statements of Changes in Shareowners' (Deficit) Equity — 24
- Consolidated Statements of Cash Flows — 25

**Notes to Consolidated Financial Statements**
- Summary of Significant Accounting Policies — 26
- Business Restructuring Charges and Asset Impairments, Net — 28
- Discontinued Operations — 30
- Business Dispositions and Combinations — 31
- Supplementary Financial Information — 33
- Earnings (Loss) Per Common Share — 34
- Comprehensive Income (Loss) — 34
- Income Taxes — 35
- Debt Obligations — 36
- Redeemable Convertible Preferred Stock — 37
- Employee Benefit Plans — 37
- Stock Compensation Plans — 40
- Operating Segments — 42
- Financial Instruments — 44
- Securitizations and Transfers of Financial Instruments — 46
- Accounting Changes — 47
- Commitments and Contingencies — 47
- Recent Pronouncements — 50
- Quarterly Information (Unaudited) — 51

**MANAGEMENT'S DISCUSSION AND ANALYSIS**
of Results of Operations and Financial Condition

## FORWARD-LOOKING STATEMENTS

This Management's Discussion and Analysis of Results of Operations and Financial Condition ("MD&A") contains forward-looking statements that are based on current expectations, estimates, forecasts and projections about us, our future performance, the industries in which we operate, our beliefs and our management's assumptions. In addition, other written or oral statements that constitute forward-looking statements may be made by or on behalf of us. Words such as "expects," "anticipates," "targets," "goals," "projects," "intends," "plans," "believes," "seeks," "estimates," variations of such words and similar expressions are intended to identify such forward-looking statements. These statements are not guarantees of future performance and involve certain risks, uncertainties and assumptions that are difficult to predict. Therefore, actual outcomes and results may differ materially from what is expressed or forecasted in such forward-looking statements. These risks and uncertainties include: the failure of the telecommunications market to improve or improve at the pace we anticipate; continued net losses may reduce or impair our legally available surplus; our ability to realize the benefits we expect from our strategic direction and restructuring program; our ability to secure additional sources of funds on reasonable terms; our credit ratings; our ability to compete effectively; our reliance on a limited number of key customers; our exposure to the credit risk of our customers as a result of our vendor financing arrangements and accounts receivable; our reliance on third parties to manufacture most of our products; the cost and other risks inherent in our long-term sales agreements; our product portfolio and ability to keep pace with technological advances in our industry; the complexity of our products; our ability to retain and recruit key personnel; existing and future litigation; our ability to protect our intellectual property rights and the expenses we may incur in defending such rights; changes in environmental health and safety law; changes to existing regulations or technical standards; the social, political and economic risks of our foreign operations; the impact if our common stock is de-listed from the New York Stock Exchange; and the costs and risks associated with our pension and postretirement benefit obligations. For a further list and description of such risks and uncertainties, see the reports filed by us with the Securities and Exchange Commission. Except as required under the federal securities laws and the rules and regulations of the SEC, we do not have any intention or obligation to update publicly any forward-looking statements after the distribution of this MD&A, whether as a result of new information, future events, changes in assumptions, or otherwise.

## OVERVIEW

We design and deliver networks for the world's largest communications service providers. Backed by Bell Labs research and development, we rely on our strengths in mobility, optical, data and voice networking technologies, as well as software and services, to develop next-generation networks. Our systems, services and software are designed to help customers quickly deploy and better manage their networks and create new, revenue-generating services that help businesses and consumers.

Beginning in fiscal 2001, the global telecommunications market deteriorated, reflecting a significant decrease in the competitive local exchange carrier market and a significant reduction in capital spending by established service providers. This trend intensified during fiscal 2002. We believe that large service providers, primarily in the wireline market, have reduced their capital spending by more than 25% since the end of 2001. The U.S. wireline service provider capital spending declined by about 40%. Additional capital spending reductions may occur during 2003. Reasons for this reduction include the general economic slowdown, network overcapacity, customer bankruptcies, network build-out delays and limited capital availability. As a result, our sales and results of operations have been and may continue to be adversely affected. The significant slowdown in capital spending has created uncertainty as to the level of demand in our target markets. In addition, the level of demand can change quickly and can vary over short periods of time, including from month to month. As a result of the uncertainty and variations in our markets, accurately forecasting future results, earnings and cash flow is increasingly difficult.

As discussed in more detail throughout our MD&A:

- our results of operations during the past two years were adversely affected by the rapid and sustained deterioration of the telecommunications market. After several years of significant growth, our revenues declined during fiscal 2002 and 2001 by 42% and 26%, respectively, as compared to the respective prior year. The significant reduction in capital spending by service providers, among other factors, contributed to this decline;

- our gross margin rates, which historically had been at least 40%, declined to 12.6% and 9.7% during fiscal 2002 and 2001, respectively. The significant and rapid decline in revenue from decreased market demand and product line discontinuances led to significant inventory charges and high-unabsorbed fixed costs, which, among other factors, adversely affected our gross margin rates;

- we were able to reduce our operating expenses as a result of cost reductions under our restructuring actions; however, these actions resulted in net business restructuring and asset impairment charges of $2.3 billion and $10.2 billion during fiscal 2002 and 2001, respectively;

- we recorded significant provisions for bad debts and customer financings of $1.3 billion and $2.2 billion during fiscal 2002 and 2001, respectively, as a result of the significant deterioration of the financial health of certain customers. Most of these provisions were related to commitments made and loans drawn under our customer-financing program during prior years; and

- we recorded a full valuation allowance on our net deferred tax assets during fiscal 2002, which resulted in a tax provision of $4.8 billion despite a pre-tax loss from continuing operations of $7.1 billion.

6

MANAGEMENT'S DISCUSSION AND ANALYSIS

All of these factors contributed significantly to our loss from continuing operations of $11.8 billion and $14.2 billion during fiscal 2002 and 2001, respectively. The fiscal 2001 results were also adversely affected by $3.2 billion of net losses from discontinued operations, which primarily related to our share of Agere's estimated losses through the June 1, 2002 spinoff date. We also completed several dispositions during the past two years, the most significant being the sale of our optical fiber business ( "OFS" ), resulting in a $664 million gain during fiscal 2002. Our dispositions did not have a significant effect on our results from continuing operations, except for the sale of OFS, which had revenues of $2.0 billion and pretax income of $541 million during fiscal 2001.

In fiscal 2002, we restructured our operations into distinct wireline and wireless units, and targeted the large service providers in each segment. We believe structuring our business along customer lines – wireline and wireless – enables us to better serve the needs of our large service provider customers.

Our wireline segment, Integrated Network Solutions ( "INS" ), focuses on global wireline service providers, including long distance carriers, traditional local telephone companies and Internet service providers. INS primarily sells and services core switching and access and optical networking products. Our wireless segment, Mobility Solutions ( "Mobility" ), offers products to support the needs of its customers for radio access and core networks and primarily sells and services wireless products to wireless service providers. Both segments offer network management and application and service delivery products. We support these two new segments through a number of central organizations, including our services organization and corporate headquarters. Manufacturing and supply chain functions are part of a single global supply chain network organization that manages the materials and activities necessary to produce and deliver products to our customers.

During this prolonged market downturn, we have worked closely with our customers to position the full breadth of our products and services, significantly reducing our cost structure and reducing our quarterly earnings per share ( "EPS" ) breakeven revenue figure. If capital investment levels continue to decline, or if the telecommunications market does not improve or improves at a slower pace than we anticipate, our revenues and profitability will continue to be adversely affected. We are financially planning for our revenues to decline by about 20% during fiscal 2003. However, our results are expected to improve by realizing higher gross margin rates and lower operating expenses resulting from improved product mix, cost reductions related to our restructuring actions, lower inventory–related charges, and lower provisions for bad debts and customer financings.

## APPLICATION OF CRITICAL ACCOUNTING POLICIES

Our consolidated financial statements are based on the selection and application of significant accounting policies, which require management to make significant estimates and assumptions. We believe that the following are some of the more critical judgment areas in the application of our accounting policies that affect our financial condition and results of operations.

The impact of changes in the estimates and judgments pertaining to revenue recognition, receivables and inventories is directly reflected in our segments' operating loss. Although any charges related to our net deferred tax assets and goodwill and other acquired intangibles are not reflected in the segment results, the long–term forecasts supporting the realization of those assets and changes in them are significantly affected by the actual and expected results of each segment. Generally, the changes in estimates related to pension and postretirement benefits, our restructuring program and litigation will not affect our segment results, although execution of the restructuring plans by each segment may cause related changes in the estimates.

We have discussed the application of these critical accounting policies with our board of directors and Audit and Finance Committee. There was no initial adoption of any accounting policies during fiscal 2002. See Note 18 to the consolidated financial statements for recent accounting pronouncements.

### Revenue recognition

Most of our sales are generated from complex contractual arrangements, which require significant revenue recognition judgments, particularly in the areas of multiple element arrangements and collectibility. Revenues from contracts with multiple element arrangements, such as those including installation and integration services, are recognized as each element is earned based on objective evidence of the relative fair value of each element and when there are no undelivered elements that are essential to the functionality of the delivered elements. We have determined that the customer or a third party can install most of our equipment, and as a result, revenue may be recognized upon delivery of the equipment, provided all other revenue recognition criteria are met. The assessment of collectibility is particularly critical in determining whether revenues should be recognized in the current market environment. As part of the revenue recognition process, we determine whether trade and notes receivable are reasonably assured of collection based on various factors, including our ability to sell those receivables and whether there has been deterioration in the credit quality of our customers that could result in our being unable to collect or sell the receivables. In situations where we have the ability to sell the receivable, revenue is recognized to the extent of the value we could reasonably expect to realize from the sale. We will defer revenue and related costs if we are uncertain as to whether we will be able to sell or collect the receivable. We will defer revenue but recognize costs when we determine that the collection or sale of the receivable is unlikely. For sales generated from long–term contracts, primarily those related to customized network solutions and network build–outs, we generally use the percentage of completion method of accounting. In doing so, we make important judgments in estimating revenue and cost and in measuring progress towards completion. These judgments underlie our determinations regarding overall contract value, contract profitability and timing of revenue recognition. Revenue and cost estimates are revised periodically based on changes in circumstances; any losses on contracts are recognized immediately. We also sell products through multiple distribution channels, including resellers and distributors. For products sold through these channels, revenue is generally recognized when the reseller or distributor sells the product to the end user. The total amount of deferred revenue, including deferrals relating to collectibility concerns, undelivered elements and multiple distribution channels was approximately $228 million and $550 million at September 30, 2002 and 2001, respectively.

7

MANAGEMENT'S DISCUSSION AND ANALYSIS

**Receivables and customer financing**

We are required to estimate the collectibility of our trade receivables and notes receivable. A considerable amount of judgment is required in assessing the realization of these receivables, including the current creditworthiness of each customer and related aging of the past due balances. Our provisions for bad debts and customer financings during fiscal 2002, 2001, and 2000 amounted to approximately $1.3 billion, $2.2 billion, and $500 million, respectively. At September 30, 2002 and 2001, our receivables of $1.6 billion and $4.6 billion, respectively, included reserves of $325 million and $634 million, respectively. Under our customer financing program, there were approximately $950 million and $2.1 billion of reserves on the $1.1 billion and $3.0 billion of drawn commitments at September 30, 2002 and 2001, respectively. We evaluate specific accounts when we become aware of a situation where a customer may not be able to meet its financial obligations due to a deterioration of its financial condition, credit ratings or bankruptcy. The reserve requirements are based on the best facts available to us and re-evaluated and adjusted as additional information is received. Our reserves also are determined by using percentages applied to certain aged receivable categories. Significant increases in reserves have been recorded during fiscal 2002 and 2001, and may occur in the future due to the market environment. In addition, at September 30, 2002, we had approximately $500 million of net assets from long-term projects that have been winding down in Saudi Arabia (primarily long-term receivables included in other assets). We have concluded that these net assets are realizable based on our contractual rights and past collection history.

**Inventories**

We are required to state our inventories at the lower of cost or market. In assessing the ultimate realization of inventories, we are required to make judgments as to future demand requirements and compare these with the current or committed inventory levels. Our reserve requirements generally increase as our projected demand requirements decrease due to market conditions, technological and product life cycle changes, and longer than previously expected usage periods. We have experienced significant changes in required reserves in recent periods due to changes in strategic direction, such as discontinuances of product lines, as well as declining market conditions. As a result, we incurred net inventory charges of approximately $620 million, $2.4 billion and $360 million during fiscal 2002, 2001 and 2000, respectively. At September 30, 2002 and 2001, inventories of $1.4 billion and $3.6 billion respectively, are net of reserves of approximately $1.4 billion and $1.1 billion, respectively. It is possible that significant changes in required inventory reserves may continue to occur in the future if there is a further decline in market conditions and if additional restructuring actions are taken.

**Income taxes**

We currently have significant deferred tax assets resulting from tax credit carryforwards, net operating loss carryforwards and deductible temporary differences, which will reduce taxable income in future periods. At September 30, 2001 and continuing through March 31, 2002 we provided valuation allowances on future tax benefits with relatively short carryforward periods such as foreign tax credits, foreign net operating losses, capital losses and most state net operating losses. At that time, we believed it was more likely than not that the remaining net deferred tax assets of $5.2 billion at both September 30, 2001 and March 31, 2002 would be realized principally based upon forecasted taxable income, generally within the twenty-year research and development ("R&D") credit and net operating loss carryforward periods, giving consideration to substantial benefits realized to date through our restructuring program. A valuation allowance is required when it is more likely than not that all or a portion of a deferred tax asset will not be realized. Forming a conclusion that a valuation allowance is not needed is difficult when there is negative evidence such as cumulative losses in recent years. Cumulative losses weigh heavily in the overall assessment. During the fiscal 2002 third quarter-end review, several significant developments were considered in determining the need for a full valuation allowance, including the continuing and recently more severe market decline, uncertainty and lack of visibility in the telecommunications market as a whole, a significant decrease in sequential quarterly revenue levels, a decrease in sequential earnings after several quarters of sequential improvement and the necessity for further restructuring and cost reduction actions to attain profitability. As a result of our assessment, we established a full valuation allowance for our remaining net deferred tax assets at June 30, 2002. During the fourth quarter of fiscal 2002, we maintained a full valuation allowance on our net deferred tax assets. Until we reach an appropriate level of profitability we do not expect to recognize any significant tax benefits in our future results of operations. Our income tax provision (benefit) included charges related to changes in valuation allowances of approximately $7.9 billion, $540 million and $40 million during fiscal 2002, 2001, and 2000, respectively. As of September 30, 2002 and 2001, our total valuation allowance on net deferred tax assets was approximately $10.0 billion and $740 million, respectively.

**Intangible assets**

We currently have intangible assets, including goodwill and other acquired intangibles of $224 million and capitalized software development costs of $570 million. The determination of related estimated useful lives and whether these assets are impaired involves significant judgments based upon short and long-term projections of future performance. Certain of these forecasts reflect assumptions regarding our ability to successfully develop and ultimately commercialize acquired technology. Changes in strategy and/or market conditions may result in adjustments to recorded asset balances. For example, we had taken significant impairment charges, including $4.1 billion related to goodwill and other acquired intangibles and $362 million related to capitalized software under our restructuring program during fiscal 2001. During fiscal 2002, the continued and recently sharper decline in the telecommunications market prompted a re-assessment of all key assumptions underlying our goodwill valuation judgments, including those relating to short and longer-term growth rates. As a result of our analysis, during fiscal 2002 we determined that impairment charges of $975 million were required because the forecasted undiscounted cash flows were less than the book values of certain businesses. The charges were measured on the basis of comparison of estimated fair values with corresponding book values and relate primarily to goodwill recorded in connection with our September 2000 acquisition of Spring Tide Networks. Fair values were determined on the basis of discounted cash flows. In addition, in the fourth quarter of fiscal 2002, we recorded

8

MANAGEMENT'S DISCUSSION AND ANALYSIS

approximately $200 million of capitalized software impairments and $50 million in property, plant and equipment impairments, primarily as a result of delays and increasing uncertainties in the development of the universal mobile telecommunications systems ("UMTS") market. Goodwill and other acquired intangibles at September 30, 2002, is primarily related to our acquisition of Yurie Systems, Inc., which provides asynchronous transfer mode access equipment. We have concluded that this amount is realizable based upon projected undiscounted cash flows through 2006. Due to uncertain market conditions and potential changes in our strategy and product portfolio, it is possible that forecasts used to support our intangible assets may change in the future, which could result in additional non–cash charges that would adversely affect our results of operations and financial condition.

**Pension and postretirement benefits**

We have significant pension and postretirement benefit costs and credits, which are developed from actuarial valuations. Inherent in these valuations are key assumptions, including discount rates and expected return on plan assets, which are usually updated on an annual basis at the beginning of each fiscal year. We are required to consider current market conditions, including changes in interest rates, in making these assumptions. Changes in the related pension and postretirement benefit costs or credits may occur in the future due to changes in the assumptions. The key assumptions used in developing our fiscal 2002 net pension and postretirement benefit credit were a 7% discount rate, a 9% expected return on plan assets and a 4.5% rate of compensation increase. These were consistent with the prior year assumptions except that the discount rate was reduced by one–half of a percent due to current market conditions. Compared with the prior year, our net pension and postretirement benefit credit in fiscal 2002 was reduced by $111 million to $972 million, excluding the impact of restructuring actions. Our net pension and postretirement benefit credit is expected to be reduced to approximately $500 million during fiscal 2003, primarily as a result of lower plan assets, a reduction in the discount rate from 7% to 6.5%, a reduction in the expected return on plan assets from 9% to 8.5% for pensions and from 9% to 7.93% for postretirement benefits. Holding all other assumptions constant, a one–half percent increase or decrease in the discount rate would have increased or decreased annual fiscal 2002 pre–tax loss by approximately $125 million. Likewise, a one–half percent increase or decrease in the expected return on plan assets would have increased or decreased annual fiscal 2002 pre–tax loss by $200 million.

In addition, the estimated accumulated benefit obligation ("ABO") related to the U.S. management employees pension plan, as well as several other smaller pension plans, exceeded the fair value of the plan assets at September 30, 2002. This was due primarily to negative returns on the pension funds as a result of the overall decline in the equity markets and a decline in the discount rate used to estimate the pension liability as a result of declining interest rates in the U.S. Therefore, we were required to establish a minimum liability and record a $2.9 billion direct charge to equity for the difference to the extent the minimum liability exceeded the unrecognized prior service cost. Market conditions and interest rates significantly impact future assets and liabilities of our pension plans, and similar charges might be required in the future upon measurement of plan obligations which are usually completed by us at the end of a fiscal year.

We expect to have minimal, if any, cash requirements related to our pension and postretirement benefit plans during fiscal 2003. However during fiscal 2004, it is likely that we will be required to fund some portion of retiree health benefits and, depending on market conditions, we may be required to make a contribution to the pension plan of our U.S. management employees. Although it is difficult to estimate these potential fiscal 2004 cash requirements due to uncertain market conditions, we currently expect that the cash requirements for the retiree health benefits would be approximately $350 million. For more information, see the detailed risk factor included in our Form 10–K for the year ended September 30, 2002.

**Business restructuring**

During fiscal 2002 and 2001, we recorded significant charges in connection with our restructuring program. The related reserves reflect many estimates, including those pertaining to separation costs, inventory, settlements of contractual obligations and proceeds from asset sales. We reassess the reserve requirements to complete each individual plan under our restructuring program at the end of each reporting period. Actual experience has been and may continue to be different from these estimates. For example, we revised our estimates for certain fiscal 2001 restructuring plans during fiscal 2002 which resulted in a net credit of $333 million. As of September 30, 2002 and 2001, liabilities associated with our restructuring program were $1.1 billion and $1.6 billion, respectively. For more information, see Note 2 to the consolidated financial statements.

**Legal contingencies**

We are subject to proceedings, lawsuits and other claims, including proceedings under laws and government regulations related to securities, environmental, labor, product and other matters. We are required to assess the likelihood of any adverse judgments or outcomes to these matters, as well as potential ranges of probable losses. A determination of the amount of reserves required, if any, for these contingencies is based on a careful analysis of each individual issue with the assistance of outside legal counsel. The required reserves may change in the future due to new developments in each matter or changes in approach such as a change in settlement strategy in dealing with these matters. For more information, see Note 17 to the consolidated financial statements.

**RESULTS OF OPERATIONS**

**Revenues**

The following table presents our U.S. and non–U.S. revenues and the approximate percentage of total revenues (dollars in millions):

| | Years ended September 30, | | |
| --- | --- | --- | --- |
| | 2002 | 2001 | 2000 |
| U.S. revenues | $ 8,148 | $ 13,776 | $ 19,829 |
| Non–U.S. revenues | 4,173 | 7,518 | 9,075 |
| Total revenues | $ 12,321 | $ 21,294 | $ 28,904 |

| | As a percentage of total revenues | | |
| --- | --- | --- | --- |
| U.S. revenues | 66.1% | 64.7% | 68.6% |

| | | | |
|---|---|---|---|
| Non–U.S. revenues | 33.9% | 35.3% | 31.4% |
| Total revenues | 100.0% | 100.0% | 100.0% |

9

MANAGEMENT'S DISCUSSION AND ANALYSIS

*Fiscal 2002 vs. 2001*

Continued reductions in capital spending in fiscal 2002 by service providers, primarily affecting our INS segment, and business dispositions were the primary reasons for the lower revenues in fiscal 2002 than in fiscal 2001. The revenue decline resulting from business dispositions was $2.3 billion for fiscal 2002, of which approximately 84% was a result of the sale of the OFS business in the first quarter of fiscal 2002. The impact of product rationalizations and discontinuances under our restructuring program has not had a significant effect on our overall trend of revenues.

*Fiscal 2001 vs. 2000*

A significant decrease in the competitive local exchange carrier ("CLEC") market and a significant reduction in capital spending by service providers were the primary reasons for the decline in revenues. In addition, we implemented a more selective customer-financing program, which also had a negative impact on revenues. In December 1999, the Securities and Exchange Commission issued Staff Accounting Bulletin 101, "Revenue Recognition in Financial Statements" ("SAB 101"). SAB 101 provides guidance on the recognition, presentation and disclosure of revenues in financial statements. The adoption of SAB 101 in fiscal 2001 did not have a significant impact on revenues or the comparability of results of operations for the periods presented (see Note 16 to the consolidated financial statements).

**Gross Margin**

The following table presents our gross margin and the percentage to total revenues (dollars in millions):

|  | Years ended September 30, | | |
| --- | --- | --- | --- |
|  | 2002 | 2001 | 2000 |
| Gross margin | $ 1,552 | $ 2,058 | $ 11,714 |
| Gross margin rate | 12.6% | 9.7% | 40.5% |

Inventory and other charges negatively affected the gross margin rate in fiscal 2002 and 2001 by approximately 13 percentage points and 11 percentage points, respectively. The total dollar amount of charges was lower in fiscal 2002, primarily due to lower inventory levels resulting from our strategy of focusing on large service providers, our restructuring program and improved inventory management. However, due to the significant revenue decline in fiscal 2002, the charges had a greater impact on the gross margin rate. These charges were primarily related to items or events associated with customers experiencing financial difficulties and in some cases declaring bankruptcy or becoming insolvent, costs associated with supplier and customer contract settlements, higher provisions for slow-moving and obsolete inventory, adjustments to certain long-term projects and higher than expected costs due to certain customer obligations and product performance issues.

During fiscal 2002 and 2001, we recorded $64 million and $1.2 billion, respectively, of inventory charges associated with product line rationalizations and product line discontinuances under our restructuring program. These inventory charges negatively affected the gross margin rate for fiscal 2002 and 2001 by 1 percentage point and 6 percentage points, respectively. Our product mix in fiscal 2002 was adversely affected by the sale of OFS.

Also, significant reductions in capital spending by service providers reduced sales volumes across all product lines and services more quickly than the reduction in our fixed costs, which resulted in less absorption of fixed costs. The net change in unabsorbed fixed costs as well as all other factors affecting gross margin, including changes in geographic and product mix, negatively affected the gross margin rate for fiscal 2002 and 2001.

**Operating Expenses**

The following table presents our operating expenses (dollars in millions):

|  | Years ended September 30, | | |
| --- | --- | --- | --- |
|  | 2002 | 2001 | 2000 |
| Selling, general and administrative ("SG&A") expenses, excluding the following two items | $ 2,466 | $ 4,240 | $ 4,743 |
| Provision for bad debts and customer financings | 1,253 | 2,249 | 505 |
| Amortization of goodwill and other acquired intangibles | 250 | 921 | 362 |
| Total SG&A | 3,969 | 7,410 | 5,610 |
| Research and development ("R&D") | 2,310 | 3,520 | 3,179 |
| Purchased in-process research and development ("IPRD") | — | — | 559 |
| Business restructuring charges and asset impairments, net | 2,252 | 10,157 | — |
| Operating expenses | $ 8,531 | $ 21,087 | $ 9,348 |

*SG&A expenses*

Excluding provisions for bad debts and customer financings and amortization of goodwill and other acquired intangibles, SG&A expenses decreased by 41.8% during fiscal 2002 as compared with fiscal 2001 and decreased by 10.6% in fiscal 2001 as compared with fiscal 2000. The decreases in fiscal 2002 and 2001 were primarily a result of headcount reductions under our restructuring program and other cost savings initiatives that limited discretionary spending. Approximately 80% of the fiscal 2002 reductions were in the INS segment due to the greater degree of product rationalization efforts in INS as well as the required cost reductions due to the significant INS revenue decline.

### *Provision for bad debts and customer financings*

Many of our customers have been negatively affected by the continued decline in telecommunications market conditions. As a result, the creditworthiness of certain customers has declined, resulting in some having to file for bankruptcy protection or having been declared insolvent. As a result, we have provided reserves for certain trade and notes receivable and sold others at significant discounts in the periods presented. We may have to record additional reserves or write-offs in the future.

### *Fiscal 2002 vs. 2001*

During fiscal 2002, $765 million of provisions related to customer financings with the balance relating to trade receivables. Approximately one-third of the provision for customer financings was related to one customer that defaulted under the terms and conditions of its customer financing agreement. Approximately 55% of the total provisions

10

MANAGEMENT'S DISCUSSION AND ANALYSIS

were related to INS customers and 39% were related to Mobility customers. The remaining provisions were not related to reportable segments.

### *Fiscal 2001 vs. 2000*

The deterioration of the creditworthiness of certain customers resulted in higher provisions for bad debts and customer financings in fiscal 2001 as compared with fiscal 2000. Provisions for three customer financings, including provisions for amounts due from One.Tel and Winstar, accounted for approximately 60% of fiscal 2001 expense. On April 18, 2001, Winstar filed for Chapter 11 bankruptcy protection, and in late May 2001, One.Tel filed for voluntary administration (bankruptcy). Approximately 63% of the total provisions were related to INS customers and 34% were related to Mobility customers. The remaining provisions were not related to reportable segments.

### *Amortization of goodwill and other acquired intangibles*

### *Fiscal 2002 vs. 2001*

Amortization of goodwill and other acquired intangibles was significantly lower in fiscal 2002 as compared with fiscal 2001 as a result of restructuring actions committed to in fiscal 2001 that reduced total goodwill and other acquired intangibles by $4.1 billion, primarily related to the discontinuance of the Chromatis Networks, Inc. product portfolio. In addition, as a result of the continued downturn in the telecommunications market during fiscal 2002, impairment charges of $975 million were recognized in fiscal 2002, primarily related to goodwill associated with Spring Tide.

### *Fiscal 2001 vs. 2000*

The full-year effect of the acquisitions of Chromatis in June 2000 and Spring Tide in September 2000 were the primary reasons for the increase in the amortization of goodwill and other acquired intangibles in fiscal 2001 as compared with fiscal 2000.

### *R&D*

### *Fiscal 2002 vs. 2001*

The decrease in R&D expenses in fiscal 2002 as compared with fiscal 2001 was primarily due to headcount reductions and product rationalizations under our restructuring program. Approximately 75% of the fiscal 2002 reductions were in the INS segment due to the greater degree of product rationalizations in INS.

During fiscal 2002, 53% of our R&D was attributable to our INS segment, and most of the remaining amounts were attributable to our Mobility segment. The INS spending was primarily related to next-generation products, including optical products for both long haul and metro networks, multi-service switches that can handle both Internet protocol services and multiple network traffic protocols, network operations software solutions, and digital subscriber line products. The Mobility spending was primarily related to code division multiple access ("CDMA") and UMTS next-generation technologies.

### *Fiscal 2001 vs. 2000*

The increase in R&D expenses for fiscal 2001 as compared with fiscal 2000 was primarily due to acquisitions made late in fiscal 2000 and new product development, particularly in next-generation optical networking and wireless products, partially offset by headcount reductions and product rationalizations under our restructuring program.

During fiscal 2001, 60% of our R&D was attributable to our INS segment and most of the remaining amounts were attributable to our Mobility segment.

### *IPRD*

In connection with the acquisitions in fiscal 2000 of Chromatis and Spring Tide, we allocated non-tax impacting charges of $428 million and $131 million, respectively, of the total purchase price to IPRD. As part of the process of analyzing each of these acquisitions, we made a decision to buy technology that had not yet been commercialized rather than develop the technology internally. We based this decision on a number of factors, including the amount of time it would take to bring the technology to market. We also considered Bell Labs' resource allocation and its progress on comparable technology, if any. We expect to use the same decision process in the future.

On June 28, 2000, we completed the purchase of Chromatis. Chromatis was involved in the development of next-generation optical transport solutions that provide telecommunications carriers with improvements in the cost, efficiency, scale and management of multi-service metropolitan networks. At the acquisition date, costs to complete the research and development efforts related to the product were expected to be $7.8 million. A risk-adjusted discount rate of 25% was used to discount projected cash flows. As part of our restructuring program in fiscal 2001, the Chromatis product portfolio was discontinued and all of the remaining assets, primarily goodwill and other acquired intangibles, were written off (see Note 2 to the consolidated financial statements).

On September 19, 2000, we completed the purchase of Spring Tide. Spring Tide was involved in the development of carrier-class network equipment that enables service providers to offer new, value-added Internet protocol ("IP") services and virtual private networks with low cost and complexity. At the acquisition date, costs to complete the research and development efforts related to the product were expected to be $0.5 million and $4.3 million in fiscal 2000 and 2001, respectively. A risk-adjusted discount rate of 25% was used to discount projected cash flows. In fiscal 2002, our remaining goodwill from the acquisition of Spring Tide was written off.

We estimated the fair value of IPRD for each of the above acquisitions using an income approach. This involved estimating the fair value of the IPRD using the present value of the estimated after-tax cash flows expected to be generated by the IPRD, using risk-adjusted discount rates and revenue forecasts as appropriate. The selection of the discount rate was based on consideration of our weighted average cost of capital, as well as other factors, including the expected useful life of each technology, estimated profitability levels of each technology, the uncertainty of technology advances that were known at the time, and the stage of completion of each technology. We believe that the estimated IPRD amounts so determined represented fair value and did not exceed the amount a third party would pay for the projects.

11

MANAGEMENT'S DISCUSSION AND ANALYSIS

Where appropriate, we deducted an amount reflecting the contribution of the core technology from the anticipated cash flows from an IPRD project. At the date of acquisition, the IPRD projects had not yet reached technological feasibility and had no alternative future uses. Accordingly, the value allocated to these projects was capitalized and immediately expensed at acquisition.

*Business restructuring charges and asset impairments, net*

Since beginning our restructuring program during the second quarter of fiscal 2001, we have realigned our resources to focus on the opportunities that we currently believe to be the most profitable for us – the large service provider market. We evaluated our manufacturing operations and decided to sell or otherwise lease certain of our manufacturing facilities and make greater use of contract manufacturers. We assessed our product portfolio and associated R&D, made decisions based on the needs of our largest service provider customers, deployed our resources to meet those needs and then streamlined the rest of our operations to support those reassessments. We eliminated some marginally profitable or non–strategic product lines, merged certain technology platforms, consolidated development activities, eliminated management positions and eliminated many duplications in marketing functions and programs, and centralized our sales support functions, which resulted in reduced associated product development costs. We sold the assets relating to a number of product lines whose products did not support our large service provider customers or our strategy. We closed facilities and reduced the workforces in many of the countries that we operated in at the end of fiscal 2000. As a result we incurred net business restructuring charges and asset impairments in fiscal 2001 of $11.4 billion. Due to continuing market declines in fiscal 2002, we committed to additional restructuring actions that resulted in net business restructuring charges and asset impairments of $1.3 billion. These actions are designed to enable us to achieve a cost structure that will result in EPS breakeven at a quarterly revenue level in late fiscal 2003 of $2.5 billion with a targeted gross margin rate of 35%. We generally expect to complete each restructuring plan within 12 months of committing to it.

During fiscal 2002, we recorded in operating expenses net business restructuring charges and related asset impairments of $1.3 billion and other impairment charges of $975 million, primarily related to Spring Tide's goodwill. This compares to $10.2 billion of net business restructuring charges and asset impairments recorded during fiscal 2001.We believe the restructuring actions committed to in fiscal 2001 will yield annual cost savings of approximately $5.0 billion, $4.0 billion of which will be reflected in operating expenses. We began to realize the full effect of these cost savings during the second quarter of fiscal 2002. In fiscal 2002, we committed to additional restructuring actions, primarily in the third and fourth quarters. These actions are expected to yield additional cost savings of approximately $2.0 billion, $1.4 billion of which is expected from reduced operating expenses. See Note 2 to the consolidated financial statements for more information.

**Other Income (Expense), Net**

Other income (expense), net consisted of the following items (dollars in millions):

| | *Years ended September 30,* | | |
| | --- | --- | --- |
| | 2002 | 2001 | 2000 |
| Interest income | $ 114 | $ 255 | $ 118 |
| Minority interests in earnings of consolidated subsidiaries | (12) | (81) | (50) |
| Net income (loss) from equity method investments | 14 | (60) | (31) |
| Other–than–temporary write–downs of investments | (209) | (266) | (14) |
| Loss on foreign currency transactions | (46) | (58) | (18) |
| Net gains on sales of businesses | 725 | 56 | 30 |
| Legal settlements | (212) | — | — |
| Net gains (losses) on sales and settlements of financial instruments | (22) | 18 | 347 |
| Write–off of embedded derivative assets | — | (42) | — |
| Miscellaneous, net | (60) | (179) | (49) |
| **Other income (expense), net** | $ 292 | $ (357) | $ 333 |

*Fiscal 2002*

Other income (expense), net included $725 million of gains from business dispositions, $664 million of which was from the sale of the OFS business and China joint ventures, and interest income of $114 million related to our cash and cash equivalents. This was partially offset by a legal settlement of $162 million related to our former consumer products telephone leasing business and a $50 million purchase price adjustment to settle a claim with VTech Holdings Limited and VTech Electronics Netherlands B.V., and other–than–temporary investment write–downs of $209 million, primarily related to our investment in Commscope.

*Fiscal 2001*

Other income (expense), net primarily included other–than–temporary write–downs on several of our investments due to adverse market conditions and net losses from minority interests and equity method investments, offset in part by interest income. The write–off of the embedded derivative assets was primarily related to One.Tel.

*Fiscal 2000*

In fiscal 2000, other income (expense), net primarily included interest income and net gains on sales and settlements of financial instruments, including equity investments.

**Interest Expense**

*Fiscal 2002 vs. 2001*

Interest expense for fiscal 2002 decreased to $382 million as compared with $518 million for fiscal 2001. The decrease resulted from a significant reduction in short‑term debt, partially offset by interest expense related to our trust preferred securities, which were issued in March 2002.

12

MANAGEMENT'S DISCUSSION AND ANALYSIS

### *Fiscal 2001 vs. 2000*

Despite lowering debt levels by approximately $2.1 billion in the latter half of fiscal 2001, interest expense increased to $518 million as compared with $342 million for fiscal 2000. The increase in interest expense was due to higher weighted average short–term debt levels, primarily related to borrowings under our credit facilities. In addition, interest expense in fiscal 2001 included the amortization of fees associated with entering into our credit facility arrangements.

### Provision (Benefit) for Income Taxes

The following table presents our provision (benefit) for income taxes and the related effective tax (benefit) rates (dollars in millions):

|  | Years ended September 30, | | |
|  | 2002 | 2001 | 2000 |
|---|---|---|---|
| Provision (benefit) for income taxes | $ 4,757 | $ (5,734) | $ 924 |
| Effective tax (benefit) rate | 67.3% | (28.8)% | 39.2% |

As discussed in more detail under "APPLICATION OF CRITICAL ACCOUNTING POLICIES,", "the effective tax rate for fiscal 2002 was significantly more than the U.S. statutory rate primarily due to providing for a full valuation allowance on our net deferred tax assets and not reflecting any significant tax benefits for the current fiscal year's losses.

The effective tax benefit rate for fiscal 2001 was lower than the U.S. statutory rate, primarily from the impact of non–tax deductible goodwill amortization, certain non–tax deductible business restructuring charges and asset impairments, as well as an increase in our deferred tax valuation allowances, all of which decreased the effective tax benefit rate. Such decrease was offset in part by research and development tax credits, which increased the effective tax benefit rate on the pre–tax loss.

The effective tax rate exceeded the U.S. statutory rate for fiscal 2000, primarily due to the write-offs of IPRD costs that were not deductible for tax purposes.

### Income (Loss) from Continuing Operations

As a result of the above, income (loss) from continuing operations and related per share amounts are as follows (amounts in millions, except per share amounts):

|  | Years ended September 30, | | |
|  | 2002 | 2001 | 2000 |
|---|---|---|---|
| Income (loss) from continuing operations | $ (11,826) | $ (14,170) | $ 1,433 |
| Basic earnings (loss) per share from continuing operations | $ (3.51) | $ (4.18) | $ 0.44 |
| Diluted earnings (loss) per share from continuing operations | $ (3.51) | $ (4.18) | $ 0.43 |
| Weighted average number of common shares outstanding – basic | 3,426.7 | 3,400.7 | 3,232.3 |
| Weighted average number of common shares outstanding – diluted | 3,426.7 | 3,400.7 | 3,325.9 |

### Income (Loss) from Discontinued Operations, Net

Income (loss) from discontinued operations, net for fiscal 2002, 2001 and 2000 was $73 million or $0.02 per basic and diluted share, ($3.2) billion or ($0.93) per basic and diluted share and ($214) million or ($0.06) per basic and diluted share, respectively (see Note 3 to the consolidated financial statements).

### Extraordinary Gain, Net

During fiscal 2001, we recorded a gain of $1.2 billion, net of a $780 million tax provision, or $0.35 per basic and diluted share, from the sale of our power systems business.

### Cumulative Effect of Accounting Changes, Net

Effective October 1, 2000, we recorded a net $38 million charge for the cumulative effect of certain accounting changes. This was comprised of a $30 million earnings credit ($0.01 per basic and diluted share) from the adoption of Statement of Financial Accounting Standards No.133, "Accounting for Derivative Instruments and Hedging Activities," and a $68 million charge to earnings ($0.02 per basic and diluted share) from the adoption of SAB 101.

### Results of Operations by Segment

### *INS*

The following table presents external revenues, U.S. and non–U.S., and operating income (loss) (dollars in millions):

*Years ended September 30,*

| | 2002 | | 2001 | | 2000 | |
|---|---|---|---|---|---|---|
| U.S. revenues | $ | 3,490 | $ | 7,065 | $ | 12,548 |
| Non–U.S. revenues | | 2,925 | | 5,198 | | 6,106 |
| Total revenues | $ | 6,415 | $ | 12,263 | $ | 18,654 |
| Operating income (loss) | $ | (2,769) | $ | (4,724) | $ | 1,685 |
| Return on sales | | (43.2%) | | (38.5%) | | 9.0% |

### *Fiscal 2002 vs. 2001*

During fiscal 2002, INS revenues declined by 47.7% as a result of continuing reductions and delays in capital spending by service providers. The decline was reflected in all product lines and geographic regions, except for China. The deterioration of creditworthiness or financial condition of certain service providers also adversely affected revenues, although to a much lesser degree. Approximately, 60% of the decline was in the United States, and about 40% was non–U.S., primarily in EMEA (Europe, Middle East, and Africa). The five largest INS customers represented about 40% of INS revenues during fiscal 2002, and accounted for about 45% of the revenue decline as compared with fiscal 2001.

During fiscal 2002, the operating loss declined by $2.0 billion to an operating loss of approximately $2.8 billion. The $2.8 billion operating loss was driven by a 2.2% gross margin rate and $2.9 billion of operating expenses, which included $683 million of provisions for bad debts. The INS gross margin rate continues to be under significant pressure

13

MANAGEMENT'S DISCUSSION AND ANALYSIS

and declined from 10.3% in fiscal 2001 to 2.2% in fiscal 2002. The low gross margin rates were primarily a result of unabsorbed fixed costs as a result of significantly lower revenue levels, as well as significant inventory charges. The decline from fiscal 2001 was primarily due to the continued decrease in sales volume, partially offset by lower inventory charges and cost reductions. Operating expenses declined $3.1 billion, of which $2.3 billion resulted from headcount reductions and less discretionary spending. The remaining decrease was from a decrease in provisions for bad debts and customer financings of $742 million, primarily due to the significant charges incurred for amounts due from Winstar in the prior year.

*Fiscal 2001 vs. 2000*

During fiscal 2001, INS revenues declined by 34%. The decline primarily resulted from reductions and delays in capital spending by large service providers and was reflected in all product lines. The most significant declines were in the U.S., especially associated with large service providers. Our five largest customers represented about 45% of INS revenues during fiscal 2001, and about 40% of the revenue decline as compared with revenues realized from those customers in fiscal 2000. The deterioration of creditworthiness or financial condition of certain service providers and CLECs also adversely affected revenues, although to a lesser degree. The decrease in non–U.S. revenues for fiscal 2001 was also attributable to the continued wind–down of a project with Saudi Telecommunications Company ("STC").

During fiscal 2001, the operating income (loss) declined by approximately $6.4 billion to a loss of $4.7 billion. Lower gross margin of $6.0 billion and higher operating expenses of $412 million drove this decline. The gross margin decrease resulted from a significant decline in the gross margin rate from 38.9% to 10.3%, primarily due to lower sales volume and significant inventory–related charges. The $412 million increase in operating expenses resulted from $993 million of higher provisions for bad debts and customer financings, partially offset by $581 million of lower expenses, primarily due to headcount reductions and less discretionary spending. The higher provisions for bad debts and customer financings primarily related to significant charges incurred for amounts due from Winstar.

*Mobility*

The following table presents external revenues, U.S. and non–U.S., and operating income (loss) (dollars in millions):

| | Years ended September 30, | | |
| --- | --- | --- | --- |
| | 2002 | 2001 | 2000 |
| U.S. revenues | $ 4,315 | $ 4,929 | $ 4,913 |
| Non–U.S. revenues | 1,065 | 1,225 | 1,924 |
| Total revenues | $ 5,380 | $ 6,154 | $ 6,837 |
| Operating income (loss) | $ (655) | $ (1,517) | $ 939 |
| Return on sales | (12.2%) | (24.7%) | 13.7% |

*Fiscal 2002 vs. 2001*

During fiscal 2002, Mobility revenues decreased by 12.6%. The decrease in the U.S. resulted primarily from reductions in capital spending by certain service providers. The decrease in non–U.S. revenues for fiscal 2002 resulted from reductions in the CALA (Caribbean and Latin America) and Asia Pacific regions primarily due to a loss of fiscal 2002 revenues from One.Tel, which went into receivership during 2001, partially offset by higher revenues in the China and EMEA regions. The five largest customers represented approximately 75% of Mobility revenues during fiscal 2002, and approximately 35% of the revenue decline compared with fiscal 2001. In addition, approximately 20% of the decline was related to lower revenues from a U.S. customer that defaulted on its customer financing commitment.

During fiscal 2002, the operating loss declined by $862 million to $655 million. Increases in gross margin of $188 million and decreases in operating expenses of $674 million drove the improvement. The gross margin rate increased from 21.0% to 27.5% due to lower inventory and warranty–related charges and cost reductions. However, the gross margin rate in fiscal 2002 was still affected by these charges. The reduction in operating expenses resulted from a reduction in provisions for bad debts and customer financings of $278 million, as well as a reduction in other operating expenses of $396 million, primarily related to headcount reductions and less discretionary spending. In fiscal 2002, approximately 50% of Mobility's provisions for bad debts and customer financings was due to the one customer that defaulted on its customer financing commitment. In fiscal 2001, Mobility incurred significant provisions for bad debts and customer financings for amounts due from One.Tel and another customer that experienced financial difficulties.

*Fiscal 2001 vs. 2000*

During fiscal 2001, Mobility revenues decreased by 10%. The decrease primarily resulted from lower non–U.S. revenues due to the wind–down of various projects and certain customers that experienced financial difficulties, including a loss of revenues from One.Tel, which went into receivership during the third fiscal quarter of 2001. Revenues from our five largest customers represented about 70% of Mobility revenues during fiscal 2001 and were slightly higher as compared with the revenues realized from those customers in fiscal 2000.

During fiscal 2001, operating income (loss) declined by $2.5 billion to a loss of $1.5 billion. Lower gross margin of $1.5 billion and higher operating expenses of $960 million drove this decline. The gross margin rate decreased from 40.7% to 21.0% primarily due to lower sales volume and higher inventory and warranty–related charges. The $960 million increase in operating expenses primarily resulted from higher provisions for bad debts and customer financings of $696 million. Substantially all of the increase in provisions for bad debts and customer financings was related to One.Tel and one other customer with specific credit concerns for which financing was provided. Most of the remaining increases in operating expenses were primarily related to higher R&D expenses for next–generation CDMA and UMTS technology.

MANAGEMENT'S DISCUSSION AND ANALYSIS

LIQUIDITY AND CAPITAL RESOURCES

Cash Flow for the Years Ended September 30, 2002, 2001 and 2000

*Operating activities*

Net cash used in operating activities was $756 million for fiscal 2002. This primarily resulted from the loss from continuing operations of $2.9 billion (adjusted for non–cash items) and changes in other operating assets and liabilities of $2.4 billion, offset in part by a reduction in working capital requirements (accounts receivable, inventories and contracts in process and accounts payable) of $4.5 billion. The reduction in working capital primarily resulted from the significant decrease in sales volume during fiscal 2002 as compared with fiscal 2001. Consistent with the decrease in receivables of $2.5 billion, the average receivable days sales outstanding decreased from 80 days at September 30, 2001 to 77 days at September 30, 2002. In addition to reduced sales volume, the decline in inventory and contracts in process was also a result of our continued efforts to streamline inventory supply chain operations and higher billings for our long–term contracts. The changes in other operating assets and liabilities include cash outlays under our restructuring program of $1.0 billion and a reduction in other operating assets and liabilities due to the decrease in sales volume and lower headcount. Federal and state income tax refunds in fiscal 2002 amounted to approximately $1.0 billion including $616 million received in connection with changes to tax legislation.

Net cash used in operating activities was $3.4 billion for fiscal 2001. This primarily resulted from the loss from continuing operations (adjusted for non–cash items) of $6.6 billion, a decrease in accounts payable of $759 million and changes in other operating assets and liabilities of $602 million. Changes in other operating assets and liabilities primarily include a net increase in notes receivable and higher software development assets, offset in part by business restructuring liabilities. The increases in net cash used in operating activities were partially offset by decreases in receivables of $3.6 billion and in inventories and contracts in process of $881 million. Receivable improvement was largely due to improved collections and lower sales volumes in fiscal 2001 as compared with fiscal 2000. Average receivable days outstanding improved by 34 days from 114 days at September 30, 2000 to 80 days at September 30, 2001. Improvements in inventory and contracts in process resulted from streamlining inventory supply chain operations, as well as lower amounts in net contracts in process due to the wind–down of the STC project in Saudi Arabia.

Net cash used in operating activities was $703 million for fiscal 2000. This primarily resulted from increases in receivables of $1.6 billion and inventories and contracts in process of $2.2 billion and changes in other operating assets and liabilities of $1.8 billion. Changes in other operating assets and liabilities primarily include higher software development assets and decreases in accrued income tax and payroll. Net cash used in operating activities was partially offset by income from continuing operations (adjusted for non–cash items) of $3.6 billion and tax benefits from stock options of $1.1 billion and an increase in accounts payable of $263 million. The receivable deterioration in fiscal 2000 resulted from slower collections, partially offset by smaller revenue growth in the fourth fiscal quarter of 2000 as compared with the same period in fiscal 1999. Average receivable days outstanding increased by 19 days to 114 days at September 30, 2000. The increase in inventories and contracts in process resulted from our increased production to meet current and anticipated sales commitments to customers and the start–up of several long–term projects.

*Investing activities*

The net cash provided by investing activities of $757 million for fiscal 2002 was primarily from the $2.6 billion of net cash proceeds received from the disposition of businesses and the sale of certain manufacturing operations, partially offset by $1.5 billion of purchases of short–term investments and capital expenditures of $449 million. Cash proceeds from dispositions primarily included the $2.1 billion received from the sale of our OFS businesses, $60 million from the sale of our voice enhancement and echo cancellation business, $93 million from the sale of New Venture Partners II LP, approximately $250 million from the sale of our billing and customer care business and $96 million from the sale of certain manufacturing operations to Solectron. The short–term investments primarily consisted of U.S. treasury bills and government agency notes, bank instruments and top tier corporate debt securities.

Net cash provided by investing activities was $2.0 billion for fiscal 2001 and was primarily from $2.5 billion in proceeds from the sale of the power systems business, $572 million from the sale of two of our manufacturing operations to Celestica and sales or disposals of property, plant and equipment of $177 million. These proceeds were partially offset by capital expenditures of $1.4 billion.

Net cash used in investing activities was $1.6 billion for fiscal 2000, primarily from capital expenditures of $1.9 billion and purchases of investments of $680 million, offset in part by proceeds from the sales or maturity of investments of $820 million and from the disposition of businesses of $250 million, largely related to the sale of the remaining consumer products business.

We currently expect about $400 million of capital expenditures during fiscal 2003, $100 million of which relates to the repurchase of certain real estate, under synthetic lease agreements we had in place as of September 30, 2002, which were designed to fund certain real estate construction costs. We expect to sell the property that we repurchased under the synthetic lease agreements during fiscal 2003, which may result in additional charges. We do not expect significant proceeds from business or asset dispositions.

*Financing activities*

Net cash provided by financing activities of $468 million for fiscal 2002 included $1.75 billion of proceeds from the sale of 7.75% convertible trust preferred securities in March 2002. Fees paid in connection with this transaction were approximately $46 million. Partially offsetting these proceeds were repayments under our credit facilities and other short–term borrowings of $1.1 billion and preferred stock dividend payments related to our 8% convertible redeemable preferred stock of $149 million.

MANAGEMENT'S DISCUSSION AND ANALYSIS

During September 2002, we repurchased approximately 175 thousand shares of 8% redeemable convertible preferred stock for approximately 58 million shares of our common stock. Since September 30, 2002, we have repurchased an additional 380 thousand shares of preferred stock for approximately 143 million shares of common stock. No gain or loss was recognized on these exchanges. The total carrying value of the preferred stock repurchased was approximately $555 million ($175 million was reflected as of September 30, 2002) and resulted in a corresponding increase to our common stock and additional paid-in capital. The fair value of the additional common shares issued to the preferred shareowners to prompt the exchange over the shares obligated for exchange pursuant to the original conversion terms amounted to $125 million ($29 million of which was recognized in fiscal 2002 and was included in the net loss applicable to the common shareowners). We may issue more common stock for similiar transactions in the future.

Net cash provided by financing activities for fiscal 2001 was $2.6 billion and was primarily due to net proceeds received from the issuance of 8% redeemable convertible preferred stock in August 2001 of $1.8 billion (a portion of the proceeds received were used to reduce borrowings under our credit facilities), net borrowings under our credit facilities of $3.5 billion ($2.5 billion of the debt associated with borrowings was assumed by Agere), and proceeds from a real estate debt financing of $302 million under which certain real estate was transferred to a separate, consolidated wholly–owned subsidiary. Borrowings under our credit facilities were used to fund our operations and to pay down $2.1 billion of short–term borrowings, which primarily represented commercial paper. We had no commercial paper outstanding as of September 30, 2001. In addition, we repaid the current portion of long–term debt that matured in July 2001 of $750 million. Dividends paid on our common stock in fiscal 2001 were $204 million.

Net cash provided by financing activities for fiscal 2000 of $2.2 billion resulted primarily from issuances of common stock related to the exercise of stock options of $1.4 billion and a net increase in short–term borrowings of $1.4 billion, partially offset by repayments of long–term debt of $387 million and common stock dividend payments of $255 million.

**Cash Requirements**

Our cash requirements over the next 12 months are primarily to fund operations, including spending on R&D, our restructuring program, capital expenditures, capital requirements in connection with our existing customer financing commitments, and debt service and preferred stock dividend requirements. We expect to use cash to fund our operations in fiscal 2003. Although we believe we will realize additional cash savings upon completion of our restructuring actions, including a full year impact of those actions completed during fiscal 2002, these savings will be offset by less working capital reductions and income tax refunds that were realized in fiscal 2002. We expect to have minimal, if any, cash requirements related to our pension and postretirement benefit plans during fiscal 2003. For more information on these obligations, see the detailed risk factor included in our Form 10–K for the year ended September 30, 2002.

*Restructuring*

Total cash requirements under the restructuring program since its inception are expected to be approximately $2.6 billion. Approximately $530 million was paid during fiscal 2001 and $1.0 billion was paid during fiscal 2002. The majority of the remaining $1.1 billion is expected to be paid in fiscal 2003, except for lease obligations of approximately $300 million, of which approximately $200 million would be paid in fiscal 2004 and 2005. Upon completion of the actions during fiscal 2003, we expect to realize annual cash savings of approximately $1.8 billion. These anticipated savings result primarily from reduced headcount. Our restructuring program may not achieve all of the cost and expense reductions and other benefits we anticipate and may not be completed on the timetable contemplated.

If we do not complete our restructuring program and achieve our anticipated expense reductions in the time frame we contemplate, our cash requirements to fund our operations are likely to be significantly higher than we currently anticipate. In addition, because market demand continues to be uncertain and because we are currently implementing our restructuring program and business strategy, it is difficult to estimate our ongoing cash requirements. Our restructuring program may also have other unanticipated adverse effects on our business.

*Customer financing commitments*

The following table presents our customer financing commitments at September 30, 2002 and September 30, 2001 (dollars in billions):

|  | September 30, 2002 | | |
|  | Total loans and guarantees | Loans | Guarantees |
|---|---|---|---|
| Drawn commitments | $    1.1 | $    0.9 | $    0.2 |
| Available but not drawn | 0.1 | 0.1 | — |
| Not available | 0.1 | 0.1 | — |
| Total commitments | $    1.3 | $    1.1 | $    0.2 |
| Reserves | $    1.0 | | |

|  | September 30, 2001 | | |
|  | Total loans and guarantees | Loans | Guarantees |
|---|---|---|---|
| Drawn commitments | $    3.0 | $    2.6 | $    0.4 |
| Available but not drawn | 1.4 | 1.4 | — |

| | | | | | |
|---|---:|---|---:|---|---:|
| Not available | | 0.9 | | 0.6 | 0.3 |
| Total commitments | $ | 5.3 | $ | 4.6 | $ 0.7 |
| Reserves | $ | 2.1 | | | |

We have provided substantial long−term financing to some of our customers worldwide as a condition of obtaining or bidding on infrastructure projects, in the form of both commitments to extend credit and providing third party financial guarantees. These commitments were extended to established companies as well as start up companies and ranged from modest amounts to more than a billion dollars. As a result, customer financing commitments increased to $8.1 billion at September 30, 2000. Our overall customer financing exposure, coupled with the rapid and sustained decline in telecommunications market conditions, negatively affected our results of operations and cash flows in fiscal 2001 and 2002. These market conditions led to the deteriora−

16

MANAGEMENT'S DISCUSSION AND ANALYSIS

tion of certain customer's creditworthiness or bankruptcy filings and corresponding defaults. We were also unable to sell or transfer significant amounts of the drawn and undrawn commitments to financial institutions or other investors on reasonable terms or at all. These adverse conditions resulted in significant charges for customer financings of approximately $1.8 billion and $765 million during fiscal 2001 and 2002, respectively, and additional charges may be required in the future.

We expect to continue to provide or commit to financing on a much more limited basis. We are focusing on the largest service providers who typically have less demand for such financing. We currently have the ability to offer limited customer financing due to our capital structure, credit rating, level of available credit and liquidity. As a result of significant customer defaults that led to significant charges and the cancellation or restructuring of several financing arrangements, our customer financing commitments were reduced to $1.3 billion at September 30, 2002. We expect that approximately $50 million of the undrawn commitments will be drawn during the next twelve months and the rest will likely expire undrawn.

Although on a very limited basis, we consider requests for customer financing on a case–by–case basis and may consider offering financing only after a careful review that considers the credit quality of the individual borrowers, their respective business plans and market conditions. We also consider the likelihood of our ability to sell or transfer the undrawn commitments and drawn borrowings to unrelated third parties. We continue to monitor the drawn borrowings and undrawn commitments by assessing, among other things, the customer's short–term and long–term liquidity position, current operating performance versus plan, execution challenges facing the company, changes in the competitive landscape, and management experience and depth. We undertake certain mitigating actions, including cancellation of commitments if corrective measures are not taken, depending upon the extent of any deterioration of a customer's credit profile or non–compliance with our loan conditions. Although these actions can limit the extent of our losses, substantial exposure remains to the extent of drawn amounts, which may not be recoverable.

### Debt service and preferred dividend requirements

Debt service primarily represents interest payments on our short– and long–term debt and trust preferred securities. Preferred dividend requirements represent payments on our 8% redeemable convertible preferred stock. We expect debt service and preferred dividend requirements for fiscal 2003 to be approximately $500 million.

## Sources of Cash

We expect to fund our cash requirements during fiscal 2003 through a combination of cash and cash equivalents of $2.9 billion and short–term investments of $1.5 billion, both as of September 30, 2002.

### Credit facility and accounts receivable securitization facility

On October 17, 2002, we cancelled our $1.5 billion credit facility and our $500 million accounts receivable securitization facility to avoid an anticipated default on the financial covenants contained in these agreements. We had no outstanding balance on the credit facility, which was scheduled to expire in February 2003, and nothing drawn against the accounts receivable securitization facility. We are currently in negotiations with our bankers concerning a new and smaller credit facility, however we can not provide assurance that one will be obtained.

Although the credit facility was cancelled, substantially all of our domestic U.S. assets remained collateralized as a result of extending through December 18, 2002, the Guarantee and Collateral Agreement with our banks. This agreement provides security for commercial bankers in extending, among other things, credit facilities to non–U.S. subsidiaries, letters of credit and foreign exchange hedging. If this agreement is not renewed or replaced with a similar agreement, we may be required to collateralize certain new or existing obligations or financial instruments, such as letters of credit with cash. Any cash collateral requirements would be expected to occur over time.

### Future capital requirements

We believe our cash and cash equivalents and short–term investments are currently sufficient to meet our requirements in fiscal 2003. However, we cannot assure that these sources will be available when needed or that our actual cash requirements will not be greater than we currently expect. If our sources of liquidity are not available or if we cannot generate sufficient cash flow from operations, we might be required to obtain additional sources of funds through additional operating improvements, asset sales and financing from third parties, or a combination thereof. We cannot provide assurance that these additional sources of funds will be available, or if available, would have reasonable terms.

### Credit ratings

Our credit ratings as of November 30, 2002, are as follows:

| Rating Agency | Long–term debt | Convertible preferred stock | Trust preferred securities | Last update |
|---|---|---|---|---|
| Standard & Poor's | B–[a] | CCC– | CCC– | October 11, 2002 |
| Moody's | Caa1[a] | Ca | Caa3 | November 1, 2002 |

[a] Ratings outlook is negative.

Our credit ratings are below investment grade. As a result of past downgrades, we no longer have the ability to participate in the commercial paper market and are unable to sell trade and notes receivables to the Trust (see "Customer financing commitments"). In addition, a credit downgrade affects our ability to

enter into and maintain certain contracts on favorable terms, and increases our cost of borrowing.

**Special Purpose Entities**

We have used special purpose entities for the sales and securitizations of receivables and in real estate financing arrangements. The Financial Accounting Standards Board is currently proposing amendments to existing accounting standards that will require the consolidation of certain special purpose entities. If these proposed amendments are approved in their existing form, we may be required to consolidate the Trust described below, that we have used to sell certain customer financing loans and receivables to, and this will result in the addition

17

**MANAGEMENT'S DISCUSSION AND ANALYSIS**

of approximately $350 million of long-term notes receivable and debt obligations to our balance sheet. We are currently analyzing these proposed amendments to existing accounting standards; we believe that if they are adopted in their existing form, we will be required to consolidate the aforementioned special purpose entity beginning July 1, 2003.

In September 2000, we and a third party created a non-consolidated Special Purpose Trust ("Trust") for the purpose of allowing us from time to time to sell on a limited-recourse basis customer finance loans and receivables ("Loans") at any given point in time to the Trust. Due to our credit downgrade in February 2001, we are unable to sell additional Loans to the Trust. As of September 30, 2002, the Trust held approximately $350 million in Loans relating to five obligors, all of which are in default. Because we and the Trust collectively hold significant portions of the total outstanding debt of each of the five obligors, we and the Trust currently are reviewing alternatives related to recovery of defaulted Loans currently held in the Trust. Our wholly-owned captive insurance company assumed the credit risk of the loans that are held in the Trust. It also reinsured the exposure to an unaffiliated insurer for amounts in excess of an initial loss of $90 million. The self-insured loss reserve related to these loans (including accrued interest) was $379 million and the corresponding receivable due from the unaffiliated insurer was $298 million. We also indemnify the Trust for any actions that we may take that impairs the Trust's ability to obtain payment.

### Contractual Cash Obligations and Other Commercial Commitments and Contingencies

The following tables quantify our future contractual obligations and commercial commitments as of September 30, 2002 (dollars in millions):

*Contractual Obligations*

| | | | | | Payments due in fiscal | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Total | 2003 | 2004 | 2005 | 2006 | 2007 | Thereafter |
| Long-term debt (including company-obligated trust preferred securities) | $ | 5,025 | $ 31 | $ 37 | $ 42 | $ 948 | $ 2 | $ 3,965 |
| 8% redeemable convertible preferred stock[a] | | 1,680 | — | — | — | — | — | 1,680 |
| Operating leases [b] | | 1,590 | 253 | 208 | 169 | 129 | 106 | 725 |
| Unconditional purchase obligations | | 775 | 350 | 425 | — | — | — | — |
| **Total** | $ | 9,070 | $ 634 | $ 670 | $ 211 | $ 1,077 | $ 108 | $ 6,370 |

(a)  Subsequent to September 30, 2002, $380 of convertible preferred stock was exchanged for our common stock (see "Financing activities"). The convertible preferred stock is redeemable, at our option after August 15, 2006 and at the option of the holders on August 2 of 2004, 2007, 2010 and 2016.

(b)  The contractual obligations under operating leases exclude approximately $250 of potential lease obligations that were assigned to Avaya, Agere and other dispositions for which Lucent remained secondarily liable.

*Other Commercial Commitments[a]*

| | | | | | Amounts expiring in fiscal | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Total | 2003 | 2004 | 2005 | 2006 | 2007 | Thereafter |
| Standby letters of credit | $ | 668 | $ 374 | $ 98 | $ 22 | $ 130 | $ 4 | $ 40 |
| Undrawn customer commitments | | 244 | 209 | 33 | — | — | 2 | — |
| **Total** | $ | 912 | $ 583 | $ 131 | $ 22 | $ 130 | $ 6 | $ 40 |

(a)  At September 30, 2002, we had $90 of surety bonds that remain outstanding until specific events or projects are completed and claims are settled.

### RISK MANAGEMENT

We are exposed to market risk from changes in foreign currency exchange rates, interest rates and equity prices. We manage our exposure to these market risks through the use of derivative financial instruments coupled with other strategies. Our risk management objective is to minimize the effects of volatility on our cash flows by identifying the assets, liabilities or forecasted transactions exposed to these risks and hedging them with either forward or option contracts or swap derivatives or by embedding terms into certain contracts that affect the ultimate amount of cash flows under the contract. Since there is a high correlation between the hedging instruments and the underlying exposures, the gains and losses on these exposures are generally offset by reciprocal changes in value of the hedging instruments when used. We use derivative financial instruments as risk management tools and not for trading or speculative purposes.

### Foreign Currency Risk

As a multinational company, we conduct our business in a wide variety of currencies and are therefore subject to market risk for changes in foreign exchange rates. We use foreign exchange forward and option contracts to minimize exposure to the risk to the eventual net cash inflows and outflows resulting from foreign currency denominated transactions with customers, suppliers and non-U.S. subsidiaries. Our objective is to hedge all types of foreign currency risk

to preserve our economic cash flows, but we generally do not expect to designate these derivative instruments as hedges under current accounting standards unless the benefits of doing so are material. Cash inflows and outflows denominated in the same foreign currency are netted on a legal entity basis, and the corresponding net cash flow exposure is appropriately hedged. To the extent that the forecasted cash flow exposures are overstated or understated or if there is a shift in the timing of the anticipated cash flows during periods of currency volatility, we may experience unanticipated currency gains or losses. We do not hedge our net investment in non–U.S. entities because we view those investments as long–term in nature.

Our primary net foreign currency exposures as of September 30, 2002 include the euro, the Chinese renminbi and the Indian rupee and at September 30, 2001, include the euro, Brazilian real, Australian dollar and Danish kroner. We use a sensitivity analysis to determine the effects that market risk exposures may have on the fair value of the foreign currency forwards and options and results of operations. To perform the sensitivity analysis, we assess the risk of loss in fair values from the effect of a hypothetical 10% change in the value of foreign

18

MANAGEMENT'S DISCUSSION AND ANALYSIS

currencies, assuming no change in interest rates. For contracts outstanding as of September 30, 2002 and 2001, a 10% adverse movement in the value of foreign currencies against the U.S. dollar from the prevailing market rates, including the primary foreign currency exposures noted above, would result in an incremental pretax net unrealized loss of $21 million and $63 million, respectively. Consistent with the nature of the economic hedge, any unrealized gains or losses on these forwards and options would be offset by corresponding decreases or increases, respectively, of the underlying instrument or transaction being hedged. The model to determine sensitivity assumes a parallel shift in all foreign currency exchange spot rates, although exchange rates rarely move in the same direction. We have not changed our foreign exchange risk management strategy from the prior year.

**Interest Rate Risk**

The fair values of our fixed–rate long–term debt, interest rate swaps, company–obligated 7.75% mandatorily redeemable convertible preferred securities of subsidiary trust and short–term investments are sensitive to changes in interest rates. Our portfolio of customer finance notes receivable is predominantly comprised of variable–rate notes at LIBOR plus a stated percentage and subjects us to variability in cash flows and earnings due to the effect of changes in LIBOR. Prior to May 2002, our debt obligations primarily consisted of fixed–rate debt instruments while our interest rate sensitive assets were primarily variable–rate instruments. In the latter half 2002, we began to mitigate this interest rate sensitivity by adding short–term fixed–rate assets to our investment portfolio and simultaneously entering into interest rate swaps on a portion of our debt obligations to make them variable–rate debt instruments. Under these swaps, we receive a fixed interest rate of 7.25% and pay an average floating rate of LIBOR plus 2.91% on the notional amounts of the swaps. As of September 30, 2002, LIBOR was approximately 1.79%. The objective of maintaining the mix of fixed and floating–rate debt and investments is to reduce the variability of cash inflows and outflows resulting from interest rate fluctuations, as well as reduce the overall cost of borrowing. We do not enter into derivative transactions on our cash equivalents since their relatively short maturities do not create significant risk. We do not foresee any significant changes in our risk management strategy or in our exposure to interest rate fluctuations.

The impacts of a sensitivity analysis we performed under a model that assumes a hypothetical 150 basis point parallel shift in interest rates is as follows (dollars in millions):

|  | Fair value as of September 30, 2002 | Hypothetical increase or decrease in fair value as of September 30, 2002 | Fair value as of September 30, 2001 | Hypothetical increase or decrease in fair value as of September 30, 2001 |
|---|---|---|---|---|
| **Assets:** |  |  |  |  |
| Short–term investments | $    1,515 | $        14 | $        — | $        — |
| Interest rate swaps | 28 | 27 | — | — |
| **Liabilities:** |  |  |  |  |
| Long–term debt obligations | 998 | 60 | 2,009 | 210 |
| Company–obligated 7.75% mandatorily redeemable convertible preferred securities of subsidiary trust | 400 | 19 | — | — |

The changes in fair values of our fixed–rate liabilities are not necessarily indicative of actual changes that may occur as a result of changes in interest rates alone when also considered with the result of potential future changes in our credit ratings. Our sensitivity analysis on debt obligations excludes variable–rate debt instruments, secured borrowings and bank loans because the changes in interest rates would not significantly affect the fair value of such instruments. In addition, our variable–rate customer finance notes have been excluded since a significant portion of the principle balances and related receivables for accrued interest are fully reserved.

**Equity Price Risk**

Our investment portfolio includes equity investments in publicly held companies that are classified as available–for–sale and other strategic equity holdings in privately held companies. These securities are exposed to price fluctuations and are generally concentrated in the high–technology and telecommunications industries. At September 30, 2002, the fair value of two available–for–sale securities (Commscope and Corning) that were obtained in connection with the sale of our optical fiber businesses totaled $101 million out of a total available–for–sale portfolio valued at $117 million. The process of determining the fair values of our privately held equity investments inherently requires subjective judgments. These valuation assumptions and judgments include consideration of the investee's earnings and cash flow position, cash flow projections and rate of cash consumption, recent rounds of equity infusions by us and other investors, strength of investee's management and valuation data provided by the investee that may be compared with peers. Due to a sustained weakness in the economic environment in both public and private equity markets, we have and may continue to record impairment losses and write down the carrying value of certain equity investments when the declines in fair value are other–than–temporary. Impairment charges recorded in 2002 and 2001 were $209 million and $266 million, respectively.

We generally do not hedge our equity price risk due to hedging restrictions imposed by the issuers, illiquid capital markets or inability to hedge non–marketable equity securities in privately held companies. As of September 30, 2002 and 2001, a 20% adverse change in equity prices would result in an approximate $23 million and $12 million decrease, respectively, in the fair value of our available–for–sale equity securities. The model to determine sensitivity assumes a corresponding shift in all equity prices. This analysis excludes stock purchase warrants as we do not believe that the value of such warrants is significant. An adverse movement in the equity prices of our holdings in privately held companies can not be easily quantified as our ability to realize returns on investments depends on the investees' ability to raise additional capital or derive sales from continuing operations or through liquidity events such as initial public offerings, mergers or private sales. As of September 30, 2002 and 2001, we had no outstanding hedging instruments for our equity price risk. However, during December 2002, we entered into a prepaid forward sales agreement for 50% of the Corning stock we own, under which we received approximately $60 million and locked in approximately $35 million of unrealized appreciation.

19

**FIVE-YEAR SUMMARY OF SELECTED FINANCIAL DATA**

*(Amounts in Millions, Except Per Share Amounts)* — *Years ended September 30,*

| RESULTS OF OPERATIONS | | 2002 | | 2001 | | 2000 | | 1999 | | 1998 |
|---|---|---|---|---|---|---|---|---|---|---|
| Revenues | $ | 12,321 | $ | 21,294 | $ | 28,904 | $ | 26,993 | $ | 21,307 |
| Gross margin [a] | | 1,552 | | 2,058 | | 11,714 | | 12,969 | | 9,817 |
| Operating income (loss) [a] | | (6,979) | | (19,029) | | 2,366 | | 3,786 | | 1,384 |
| Income (loss) from continuing operations [a] | | (11,826)[b] | | (14,170) | | 1,433 | | 2,369 | | 360 |
| Earnings (loss) per common share from continuing operations [c] [d]: | | | | | | | | | | |
| Basic | | (3.51) | | (4.18) | | 0.44 | | 0.76 | | 0.12 |
| Diluted | | (3.51) | | (4.18) | | 0.43 | | 0.74 | | 0.12 |
| Dividends per common share [e] | | 0.00 | | 0.06 | | 0.08 | | 0.08 | | 0.0775 |
| **FINANCIAL POSITION** | | | | | | | | | | |
| Cash, cash equivalents and short-term investments | $ | 4,420 | $ | 2,390 | $ | 1,467 | $ | 1,686 | $ | 1,144 |
| Total assets | | 17,791 | | 33,664 | | 47,512 | | 34,246 | | 24,289 |
| Total debt | | 5,106[e] | | 4,409 | | 6,498 | | 5,788 | | 2,861 |
| 8.00% redeemable convertible preferred stock | | 1,680 | | 1,834 | | — | | — | | — |
| Shareowners' (deficit) equity | | (4,734)[f] | | 11,023 | | 26,172 | | 13,936 | | 7,960 |

(a)  Operating income (loss) and Income (loss) from continuing operations includes net business restructuring charges and asset impairments of $2,316 and $11,416 in fiscal 2002 and 2001, respectively, of which $64 and $1,259 of inventory write-downs affected gross margin, in fiscal 2002 and 2001, respectively.

(b)  Includes a full valuation allowance on the net deferred tax assets as of September 30, 2002.

(c)  All per share data have been restated to reflect the two-for-one splits of our common stock that became effective on April 1, 1998 and April 1, 1999.

(d)  Includes the impact of preferred dividends and accretion of $167 and $28 in fiscal 2002 and 2001, respectively. In addition, fiscal 2002 includes the effect of conversion cost of $29 associated with the exchange of 8% redeemable convertible preferred stock for Lucent common stock.

(e)  Includes company-obligated 7.75% mandatorily redeemable convertible preferred securities of subsidiary trust of $1,750.

(f)  Includes a non-cash charge of $2,927 related to the minimum liability adjustment for the management pension plan.

## REPORT OF MANAGEMENT

Management is responsible for the preparation of Lucent Technologies Inc.'s consolidated financial statements and all related information appearing in this Annual Report. The consolidated financial statements and notes have been prepared in conformity with accounting principles generally accepted in the United States of America and include certain amounts that are estimates based upon currently available information and management's judgment of current conditions and circumstances.

To provide reasonable assurance that assets are safeguarded against loss from unauthorized use or disposition and that accounting records are reliable for preparing financial statements, management maintains a system of accounting and other controls, including an internal audit function. Even an effective internal control system, no matter how well designed, has inherent limitations -- including the possibility of circumvention or overriding of controls -- and therefore can provide only reasonable assurance with respect to financial statement presentation. The system of accounting and other controls is improved and modified in response to changes in business conditions and operations and recommendations made by the independent accountants and the internal auditors.

The Audit and Finance Committee of the board of directors, which is composed of independent directors, meets periodically with management, the internal auditors and the independent accountants to review the manner in which these groups are performing their responsibilities and to carry out the Audit and Finance Committee's oversight role with respect to auditing, internal controls and financial reporting matters. Both the internal auditors and the independent accountants periodically meet privately with the Audit and Finance Committee and have access to its individual members.

Lucent engaged PricewaterhouseCoopers LLP, independent accountants, to audit the consolidated financial statements in accordance with auditing standards generally accepted in the United States of America, which include consideration of the internal control structure.

Patricia F. Russo
President and
Chief Executive Officer

Frank A. D'Amelio
Chief Financial Officer


## REPORT OF INDEPENDENT ACCOUNTANTS

To the Board of Directors and
Shareowners of LUCENT TECHNOLOGIES INC.:

In our opinion, the accompanying consolidated balance sheets and the related consolidated statements of operations, changes in shareowners' (deficit) equity and cash flows present fairly, in all material respects, the financial position of Lucent Technologies Inc. and its subsidiaries at September 30, 2002 and 2001, and the results of their operations and their cash flows for each of the three years in the period ended September 30, 2002, in conformity with accounting principles generally accepted in the United States of America. These financial statements are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

As discussed in Note 16 to the consolidated financial statements, in 2001 the Company changed its accounting methods for revenue recognition and for derivative financial instruments.

PricewaterhouseCoopers LLP

**PRICEWATERHOUSECOOPERS LLP**
New York, New York
October 23, 2002,
except for the second paragraph of Note 4, the third paragraph of Note 10
and the first paragraph of Note 12, as to which the date is December 4, 2002

LUCENT TECHNOLOGIES INC. AND SUBSIDIARIES
## CONSOLIDATED STATEMENTS OF OPERATIONS

*(Amounts in Millions, Except Per Share Amounts)*

| | Years ended September 30, | | |
|---|---|---|---|
| | 2002 | 2001 | 2000 |
| Revenues: | | | |
| Products | $  9,632 | $  17,132 | $  23,978 |
| Services | 2,689 | 4,162 | 4,926 |
| Total revenues | 12,321 | 21,294 | 28,904 |
| Costs: | | | |
| Products | 8,452 | 15,596 | 13,265 |
| Services | 2,317 | 3,640 | 3,925 |
| Total costs | 10,769 | 19,236 | 17,190 |
| Gross margin | 1,552 | 2,058 | 11,714 |
| Operating expenses: | | | |
| Selling, general and administrative | 3,969 | 7,410 | 5,610 |
| Research and development | 2,310 | 3,520 | 3,179 |
| Purchased in-process research and development | — | — | 559 |
| Business restructuring charges and asset impairments, net | 2,252 | 10,157 | — |
| Total operating expenses | 8,531 | 21,087 | 9,348 |
| Operating income (loss) | (6,979) | (19,029) | 2,366 |
| Other income (expense), net | 292 | (357) | 333 |
| Interest expense | 382 | 518 | 342 |
| Income (loss) from continuing operations before income taxes | (7,069) | (19,904) | 2,357 |
| Provision (benefit) for income taxes | 4,757 | (5,734) | 924 |
| **Income (loss) from continuing operations** | **(11,826)** | **(14,170)** | **1,433** |
| Income (loss) from discontinued operations, net | 73 | (3,172) | (214) |
| Income (loss) before extraordinary item and cumulative effect of accounting changes | (11,753) | (17,342) | 1,219 |
| Extraordinary gain, net | — | 1,182 | — |
| Cumulative effect of accounting changes, net | — | (38) | — |
| Net income (loss) | (11,753) | (16,198) | 1,219 |
| Conversion cost – 8% redeemable convertible preferred stock | (29) | — | — |
| Preferred stock dividends and accretion | (167) | (28) | — |
| **Net income (loss) applicable to common shareowners** | **$  (11,949)** | **$  (16,226)** | **$  1,219** |
| **EARNINGS (LOSS) PER COMMON SHARE – BASIC** | | | |
| Income (loss) from continuing operations | $  (3.51) | $  (4.18) | $  0.44 |
| Net income (loss) applicable to common shareowners | $  (3.49) | $  (4.77) | $  0.38 |
| **EARNINGS (LOSS) PER COMMON SHARE – DILUTED** | | | |
| Income (loss) from continuing operations | $  (3.51) | $  (4.18) | $  0.43 |
| Net income (loss) applicable to common shareowners | $  (3.49) | $  (4.77) | $  0.37 |
| Weighted average number of common shares outstanding – basic | 3,426.7 | 3,400.7 | 3,232.3 |
| Weighted average number of common shares outstanding – diluted | 3,426.7 | 3,400.7 | 3,325.9 |

See Notes to Consolidated Financial Statements.

LUCENT TECHNOLOGIES INC. AND SUBSIDIARIES
## CONSOLIDATED BALANCE SHEETS

*(Dollars in Millions, Except Per Share Amounts)*

|  |  | September 30, | |
| --- | --- | ---: | ---: |
|  |  | 2002 | 2001 |
| **ASSETS** |  |  |  |
| Cash and cash equivalents | $ | 2,894 | $ 2,390 |
| Short-term investments |  | 1,526 | — |
| Receivables, less allowance of $325 in 2002 and $634 in 2001 |  | 1,647 | 4,594 |
| Inventories |  | 1,363 | 3,646 |
| Contracts in process, net |  | 10 | 1,027 |
| Deferred income taxes, net |  | — | 2,658 |
| Other current assets |  | 1,715 | 1,788 |
| **Total current assets** |  | 9,155 | 16,103 |
| Property, plant and equipment, net |  | 1,977 | 4,416 |
| Prepaid pension costs |  | 4,355 | 4,958 |
| Deferred income taxes, net |  | — | 2,695 |
| Goodwill and other acquired intangibles, net of accumulated amortization of $910 in 2002 and $832 in 2001 |  | 224 | 1,466 |
| Other assets |  | 2,080 | 2,724 |
| Net long-term assets of discontinued operations |  | — | 1,302 |
| **Total assets** | $ | 17,791 | $ 33,664 |
| **LIABILITIES** |  |  |  |
| Accounts payable | $ | 1,298 | $ 1,844 |
| Payroll and benefit-related liabilities |  | 1,094 | 1,500 |
| Debt maturing within one year |  | 120 | 1,135 |
| Other current liabilities |  | 3,814 | 5,285 |
| Net current liabilities of discontinued operations |  | — | 405 |
| **Total current liabilities** |  | 6,326 | 10,169 |
| Postretirement and postemployment benefit liabilities |  | 5,230 | 5,481 |
| Pension liability |  | 2,752 | 80 |
| Long-term debt |  | 3,236 | 3,274 |
| Company-obligated 7.75% mandatorily redeemable convertible preferred securities of subsidiary trust |  | 1,750 | — |
| Deferred income taxes, net |  | — | 152 |
| Other liabilities |  | 1,551 | 1,651 |
| **Total liabilities** |  | 20,845 | 20,807 |
| **Commitments and contingencies** |  |  |  |
| **8.00% redeemable convertible preferred stock** |  | 1,680 | 1,834 |
| **SHAREOWNERS' (DEFICIT) EQUITY** |  |  |  |
| Preferred Stock – par value $1.00 per share; authorized shares: 250,000,000; issued and outstanding none |  | — | — |
| Common stock – par value $.01 per share; Authorized shares: 10,000,000,000; 3,491,585,126 issued and 3,490,310,034 outstanding shares at September 30, 2002 and 3,414,815,908 issued and 3,414,167,155 outstanding shares at September 30, 2001 |  | 35 | 34 |
| Additional paid-in capital |  | 20,606 | 21,702 |
| Accumulated deficit |  | (22,025) | (10,272) |
| Accumulated other comprehensive loss |  | (3,350) | (441) |
| **Total shareowners' (deficit) equity** |  | (4,734) | 11,023 |
| **Total liabilities, redeemable convertible preferred stock and shareowners' (deficit) equity** | $ | 17,791 | $ 33,664 |

See Notes to Consolidated Financial Statements.

LUCENT TECHNOLOGIES INC. AND SUBSIDIARIES
**CONSOLIDATED STATEMENTS OF CHANGES IN SHAREOWNERS' (DEFICIT) EQUITY**

| (Dollars in Millions) | Common Stock | Additional Paid-In Capital | Retained Earnings (Accumulated Deficit) | Accumulated Other Comprehensive Loss | Total Shareowners' (Deficit) Equity | Total Comprehensive Income (Loss) |
|---|---|---|---|---|---|---|
| Balance at September 30, 1999 | $ 31 | $ 7,961 | $ 6,188 | $ (244) | $ 13,936 | |
| Net income | | | 1,219 | | | $ 1,219 |
| Foreign currency translation adjustment | | | | (185) | | (185) |
| Reclassification of foreign currency translation losses realized upon spin-off of Avaya | | | | 64 | | 64 |
| Unrealized holding gains on certain investments (net of tax of $124) | | | | 190 | | 190 |
| Reclassification adjustment for realized holding gains on certain investments (net of tax benefit of $126) | | | | (194) | | (194) |
| Common stock dividends declared | | | (255) | | | |
| Issuance of common stock | | 1,397 | | | | |
| Tax benefit from employee stock options | | 1,064 | | | | |
| Issuance of common stock and conversion of stock options for acquisitions | 3 | 9,901 | | | | |
| Other | | 45 | (14) | 2 | | 2 |
| Spin off of Avaya | | 6 | (1,009) | 2 | | |
| Total comprehensive income | | | | | | $ 1,096 |
| Balance at September 30, 2000 | 34 | 20,374 | 6,129 | (365) | 26,172 | |
| Net loss | | | (16,198) | | | $ (16,198) |
| Foreign currency translation adjustment (net of tax benefit of $16) | | | | (30) | | (30) |
| Reclassification of foreign currency translation losses realized upon the sale of foreign entities (net of tax of $2) | | | | (3) | | (3) |
| Unrealized holding losses on certain investments (net of tax benefit of $72) | | | | (95) | | (95) |
| Reclassification adjustment for realized holding gains and impairment losses on certain investments (net of tax of $32) | | | | 50 | | 50 |
| Common stock dividends declared | | | (204) | | | |
| Issuance of common stock | | 234 | | | | |
| Tax benefit from employee stock options | | 18 | | | | |
| Preferred stock dividends and accretion | | (28) | | | | |
| Cumulative effect of accounting change (SFAS 133) | | | | 11 | | 11 |
| Agere initial public offering | | 922 | | | | |
| Compensation on equity-based awards | | 87 | | | | |
| Other | | 95 | 1 | (9) | | (9) |
| Total comprehensive loss | | | | | | $ (16,274) |
| Balance at September 30, 2001 | 34 | 21,702 | (10,272) | (441) | 11,023 | |
| Net loss | | | (11,753) | | | $ (11,753) |
| Minimum pension liability adjustment | | | | (2,927) | | (2,927) |
| Foreign currency translation adjustment | | | | 40 | | 40 |
| Reclassification of foreign currency translation gain realized upon the sale of foreign entities | | | | 20 | | 20 |
| Unrealized holding losses on certain investments | | | | (27) | | (27) |
| Reclassification adjustment for realized holding losses and impairment losses on certain investments | | | | (8) | | (8) |
| Issuance of common stock in connection with exchange of 8% convertible redeemable preferred stock | 1 | 174 | | | | |
| Other issuance of common stock | | 55 | | | | |
| Preferred stock dividends and accretion | | (167) | | | | |
| Spin off of Agere | | (1,191) | | (6) | | (6) |
| Other | | 33 | | (1) | | (1) |
| Total comprehensive loss | | | | | | $ (14,662) |
| Balance at September 30, 2002 | $ 35 | $ 20,606 | $ (22,025) | $ (3,350) | $ (4,734) | |

See Notes to Consolidated Financial Statements.

24

LUCENT TECHNOLOGIES INC. AND SUBSIDIARIES
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

_(Dollars in Millions)_

| | | Years ended September 30, | |
|---|---|---|---|
| | **2002** | **2001** | **2000** |
| **OPERATING ACTIVITIES** | | | |
| Net income (loss) | $ (11,753) | $ (16,198) | $ 1,219 |
| Less: Income (loss) from discontinued operations | 73 | (3,172) | (214) |
| Extraordinary gain | — | 1,182 | — |
| Cumulative effect of accounting changes | — | (38) | — |
| Income (loss) from continuing operations | (11,826) | (14,170) | 1,433 |
| Adjustments to reconcile income (loss) from continuing operations to net cash used in operating activities, net of effects of acquisitions and dispositions of businesses and manufacturing operations: | | | |
| Non–cash portion of business restructuring charges, net | 827 | 9,322 | — |
| Asset impairment charges | 975 | — | — |
| Depreciation and amortization | 1,470 | 2,536 | 1,667 |
| Provision for bad debts and customer financings | 1,253 | 2,249 | 505 |
| Tax benefit from employee stock options | — | 18 | 1,064 |
| Deferred income taxes | 5,268 | (5,935) | 491 |
| Purchased in–process research and development | — | — | 559 |
| Net pension and postretirement benefit credit | (972) | (1,083) | (802) |
| Gains on sales of businesses | (725) | (56) | (30) |
| Other adjustments for non–cash items | 843 | 551 | (222) |
| Changes in operating assets and liabilities: | | | |
| Decrease (increase) in receivables | 2,493 | 3,627 | (1,626) |
| Decrease (increase) in inventories and contracts in process | 2,552 | 881 | (2,242) |
| (Decrease) increase in accounts payable | (539) | (759) | 263 |
| Changes in other operating assets and liabilities | (2,375) | (602) | (1,763) |
| **Net cash used in operating activities from continuing operations** | **(756)** | **(3,421)** | **(703)** |
| **INVESTING ACTIVITIES** | | | |
| Capital expenditures | (449) | (1,390) | (1,915) |
| Dispositions of businesses and manufacturing operations, net of cash disposed | 2,576 | 3,187 | 250 |
| Sales or maturity of investments | 31 | 57 | 820 |
| Purchases of non–consolidated investments | (30) | (101) | (680) |
| Purchases of short–term investments | (1,518) | — | — |
| Proceeds from the sale or disposal of property, plant and equipment | 194 | 177 | 26 |
| Other investing activities | (47) | 21 | (60) |
| **Net cash provided by (used in) investing activities from continuing operations** | **757** | **1,951** | **(1,559)** |
| **FINANCING ACTIVITIES** | | | |
| Issuance of company–obligated 7.75% mandatorily redeemable convertible preferred securities of subsidiary trust | 1,750 | — | — |
| (Repayments of) proceeds from credit facilities | (1,000) | 3,500 | — |
| Net (repayments of) proceeds from other short–term borrowings | (104) | (2,147) | 1,355 |
| Issuance of long–term debt | — | 302 | 72 |
| Repayments of long–term debt | (47) | (754) | (387) |
| Issuance of 8% redeemable convertible preferred stock | — | 1,831 | — |
| Issuance of common stock | 64 | 222 | 1,444 |
| Dividends paid on preferred and common stock | (149) | (204) | (255) |
| Other financing activities | (46) | (125) | — |
| **Net cash provided by financing activities from continuing operations** | **468** | **2,625** | **2,229** |
| Effect of exchange rate changes on cash and cash equivalents | 35 | 4 | 10 |
| Net cash provided by (used in) continuing operations | 504 | 1,159 | (23) |
| Net cash used in discontinued operations | — | (236) | (196) |

| | | | | | |
|---|---|---|---|---|---|
| Net increase (decrease) in cash and cash equivalents | | 504 | | 923 | (219) |
| Cash and cash equivalents at beginning of year | | 2,390 | | 1,467 | 1,686 |
| **Cash and cash equivalents at end of year** | **$** | **2,894** | **$** | **2,390** | **$ 1,467** |

See Notes to Consolidated Financial Statements.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
(Dollars in Millions, Except Per Share Amounts)

## 1. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

**Basis of Consolidation**

The consolidated financial statements include all majority–owned subsidiaries in which Lucent Technologies Inc. ("Lucent" or "the Company") exercises control. Investments in which Lucent exercises significant influence, but which it does not control (generally a 20% to 50% ownership interest), are accounted for under the equity method of accounting. All material intercompany transactions and balances have been eliminated. Except as otherwise noted, all amounts and disclosures reflect only Lucent's continuing operations.

**Use of Estimates**

The consolidated financial statements are prepared in conformity with generally accepted accounting principles. Management is required to make estimates and assumptions that affect the amounts reported in the consolidated financial statements and accompanying disclosures. Actual results could differ from those estimates. Among other things, estimates are used in accounting for long–term contracts, allowances for bad debts and customer financings, inventory obsolescence, restructuring reserves, product warranty, amortization and impairment of intangibles, goodwill, and capitalized software, depreciation and impairment of property, plant and equipment, employee benefits, income taxes, contingencies, and loss reserves for discontinued operations. Estimates and assumptions are periodically reviewed and the effects of any material revisions are reflected in the consolidated financial statements in the period that they are determined to be necessary.

**Foreign Currency Translation**

For operations outside the U.S. that prepare financial statements in currencies other than the U.S. dollar, results of operations and cash flows are translated at average exchange rates during the period, and assets and liabilities are translated at end–of–period exchange rates. Translation adjustments are included as a separate component of accumulated other comprehensive loss in shareowners' (deficit) equity.

**Revenue Recognition**

Revenue is recognized when persuasive evidence of an agreement exists, delivery has occurred, the fee is fixed and determinable, and collection of the resulting receivable, including receivables of customers to which Lucent has provided customer financing, is probable. For sales generated from long–term contracts, primarily those related to customized network solutions and network build–outs, Lucent generally uses the percentage of completion method of accounting. In doing so, Lucent makes important judgments in estimating revenue and costs and in measuring progress toward completion. These judgments underlie the determinations regarding overall contract value, contract profitability and timing of revenue recognition. Revenue and cost estimates are revised periodically based on changes in circumstances; any losses on contracts are recognized immediately. Lucent also sells products through multiple distribution channels, including resellers and distributors. For products sold through these channels, revenue is generally recognized when the reseller or distributor sells the product to the end user.

Most sales are generated from complex contractual arrangements that require significant revenue recognition judgments, particularly in the areas of multiple element arrangements and collectibility. Revenues from contracts with multiple element arrangements, such as those including installation and integration services, are recognized as each element is earned based on the relative fair value of each element and when there are no undelivered elements that are essential to the functionality of the delivered elements. Lucent has determined that most equipment is generally installed by Lucent within 90 days, but can be installed by the customer or a third party, and as a result, revenue is recognized when title passes to the customer, which usually is upon delivery of the equipment, provided all other revenue recognition criteria are met. Services revenues are generally recognized at time of performance. The assessment of collectibility is particularly critical in determining whether revenue should be recognized in the current market environment. As part of the revenue recognition process, Lucent determines whether trade and notes receivables are reasonably assured of collection based on various factors, including the ability to sell those receivables and whether there has been deterioration in the credit quality of customers that could result in the inability to collect or sell the receivables. In situations where Lucent has the ability to sell the receivables, revenue is recognized to the extent of the value Lucent could reasonably expect to realize from the sale. Lucent defers revenue and related costs when it is uncertain as to whether it will be able to collect or sell the receivable. Lucent defers revenue but recognizes costs when it determines that the collection or sale of the receivables is unlikely.

**Research and Development and Software Development Costs**

Research and development costs are charged to expense as incurred. However, the costs incurred for the development of computer software that will be sold, leased or otherwise marketed are capitalized when technological feasibility has been established, generally when all of the planning, designing, coding and testing activities that are necessary in order to establish that the product can be produced to meet its design specifications including functions, features and technical performance requirements are completed. These capitalized costs are subject to an ongoing assessment of recoverability based on anticipated future revenues and changes in hardware and software technologies. Costs that are capitalized include direct labor and related overhead.

Amortization of capitalized software development costs begins when the product is available for general release. Amortization is provided on a product–by–product basis on the straight–line method over periods not exceeding 18 months. Unamortized capitalized software development costs determined to be in excess of the net realizable value of the product are expensed immediately.

26

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**Cash and Cash Equivalents**

All highly liquid investments with original maturities of three months or less are considered cash equivalents. These primarily consist of money market funds and to a lesser extent certificates of deposit and commercial paper.

At September 30, 2002 and 2001, approximately $324 and $138, respectively, of cash was held as collateral or escrowed for contingent liabilities and was classified in other current assets on the consolidated balance sheets.

**Short–Term Investments**

All investments with original maturities greater than three months and with maturities less than one year are considered short–term investments. They are of investment grade quality and are not subject to significant market risk. These investments are designated as available–for–sale, and are recorded at fair value, which approximates their cost. Any unrealized holding gains or losses are excluded from net loss and are reported as a component of accumulated other comprehensive loss.

**Inventories**

Inventories are stated at the lower of cost (determined principally on a first–in, first–out basis) or market.

**Contracts in Process**

Net contracts in process are stated at cost plus accrued profits less progress billings. Gross contracts in process, before progress billings were $10,324 and $8,868, at September 30, 2002 and 2001, respectively. Contract progress billings were $10,314 and $7,841 at September 30, 2002 and 2001, respectively. Net contracts in process also includes unbilled receivables of $286 and $1,128 at September 30, 2002 and 2001, respectively; unbilled receivables are generally billable and collectible within one year.

Long–term contract receivables include amounts billed but unpaid due to contractual retainage provisions of $356 and $464 at September 30, 2002 and 2001, respectively, and are included in other assets.

**Property, Plant and Equipment**

Property, plant and equipment are stated at cost less accumulated depreciation. Depreciation is determined using accelerated and straight–line methods over the estimated useful lives of the various asset classes. Useful lives for buildings and building improvements, furniture and fixtures and machinery and equipment principally range from five to 40 years, five to 10 years and two to 10 years, respectively.

**Financial Instruments**

Various financial instruments, including foreign exchange forward and option contracts and interest rate swap agreements are used to manage risk by generating cash flows that offset the cash flows of certain transactions in foreign currencies or underlying financial instruments in relation to their amount and timing. Lucent's derivative financial instruments are for purposes other than trading. Non–derivative financial instruments include letters of credit, commitments to extend credit and guarantees of debt.

Lucent's investment portfolio includes securities accounted for under the cost and equity methods as well as equity investments in publicly held companies that are generally concentrated in the high–technology and telecommunications industries. These investments are included in other assets. Marketable equity securities with readily determinable fair values are classified as available–for–sale securities and reported at fair value. Unrealized gains and losses on the changes in fair value of these securities are reported as a component of accumulated other comprehensive loss until sold or considered to be other than temporarily impaired. At the time of sale, any such gains or losses are recognized in other income (expense), net. All equity investments are periodically reviewed to determine if declines in fair value below cost basis are other–than–temporary. Significant and sustained decreases in quoted market prices, a series of historic and projected operating losses by the investee or other factors are considered as part of the review. If the decline in fair value has been determined to be other–than–temporary, an impairment loss is recorded in other income (expense), net and the individual security is written down to a new cost basis.

**Securitizations and Transfers of Financial Instruments**

Lucent may sell trade and notes receivables with or without recourse and/or discounts in the normal course of business. The receivables are removed from the consolidated balance sheet at the time they are sold. Sales and transfers that do not meet the criteria for surrender of control are accounted for as secured borrowings.

The value assigned to undivided interests retained in securitized trade receivables is based on the relative fair values of the interests retained and sold in the securitization. Fair values are measured by the present value of estimated future cash flows of the securitization facility. See Note 15 for further discussions on securitizations and transfers of financial instruments.

**Goodwill and Other Acquired Intangibles**

Goodwill and other acquired intangibles are amortized on a straight–line basis over the periods benefited, principally in the range of five to seven years. Goodwill is the excess of the purchase price over the fair value of identifiable net assets acquired in business combinations accounted for as purchases.

**Impairment of Goodwill and Other Long–Lived Assets**

Goodwill and other long–lived assets are reviewed for impairment whenever events such as product discontinuances, plant closures, product dispositions or other changes in circumstances indicate that the carrying amount may not be recoverable. When such events occur, Lucent compares the carrying amount of the assets with undiscounted expected future cash flows. If this comparison indicates that there is an impairment, the amount of the impairment is typically calculated using discounted expected future cash flows. The discount rate applied to these cash flows is based on Lucent's weighted average cost of capital, which represents the blended after–tax costs of debt and equity.

**Reclassifications**

Certain prior-year amounts have been reclassified to conform to the fiscal 2002 presentation.

27

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**2. BUSINESS RESTRUCTURING CHARGES AND ASSET IMPAIRMENTS, NET**

*Fiscal 2002*

In fiscal 2002, due to the continuing decline and uncertainty in the telecommunications market, Lucent committed to additional restructuring actions to align the business with market conditions that resulted in net business restructuring charges and asset impairments of $1,341. Since Lucent's restructuring program is an aggregation of many individual plans that are currently being executed, actual costs have differed from estimated amounts. The fiscal 2002 charges were primarily comprised of headcount reductions, facility consolidations and property, plant and equipment write–downs. Business restructuring charges and asset impairments, net for fiscal 2002 and 2001, are recorded as a separate line item in the consolidated statements of operations, except for inventory charges which are included in costs.

Lucent continues to evaluate the current restructuring reserve as plans are being executed. As a result, there may be additional charges or reversals. This table displays the activity of the restructuring reserve for fiscal 2002, the balance at September 30, 2002, and the components of the net charges for fiscal 2002:

| | Sept. 30, 2001 reserve | Fiscal 2002 charge | Revisions to fiscal 2001 plans | | Net charge/ (reversal) | Deductions | Sept. 30, 2002 reserve |
| | | | charge | reversal | | | |
|---|---|---|---|---|---|---|---|
| Employee separations | $ 588 | $ 944 | $ 5 | $ (150) | $ 799(a) | $ (1,020)(a) | $ 367 |
| Contract settlements | 610 | 90 | 18 | (201) | (93) | (367) | 150 |
| Facility closings | 296 | 210 | 123 | (32) | 301 | (114) | 483 |
| Other | 125 | 34 | 2 | (20) | 16 | (72) | 69 |
| Total restructuring costs | $ 1,619 | $ 1,278 | $ 148 | $ (403) | $ 1,023 | $ (1,573)(b) | $ 1,069 |
| Total asset write–downs | | $ 536 | $ 148 | $ (226) | $ 458(c) | | |
| Net gains on sales | | (140) | — | — | (140) | | |
| Total net charges on business restructuring | | $ 1,674 | $ 296 | $ (629) | $ 1,341 | | |
| Impairment of goodwill and other assets | | $ 975 | — | — | $ 975 | | |
| Total | | $ 2,649 | $ 296 | $ (629) | $ 2,316(d) | | |

(a) Includes charges for pension termination benefits of $241, of which $205 are non–cash charges for certain U.S. employees expected to be funded through Lucent's pension assets; pension and postretirement benefit curtailment charges of $337 and postemployment benefit curtailment credits of $34.

(b) Includes cash payments of $1,022 and other non–cash settlements.

(c) At September 30, 2002, the remaining restructuring reserve for inventory was $129.

(d) Net inventory charges of $64 was included in costs.

The components of the fiscal 2002 net charge included:

- employee separation charges were associated with approximately 15,100 employees. Revisions for fiscal 2001 employee separation reserves were due to higher than expected attrition rates that resulted in a reduction in expected terminations by 2,200 employees. Also, the actual severance cost per person was lower than the original estimates after execution of the various plans in many countries. Including the 15,100 headcount reductions, the total voluntary and involuntary employee separations associated with the employee separations net charges recorded in fiscal 2001 and 2002 were 54,300. As of September 30, 2002, approximately 42,200 separations were completed. The completed and future employee separations affect all business groups and geographic regions. Approximately 70% of these separations were related to management employees and were involuntary. The majority of the remaining separations are expected to be completed by the end of the second quarter of fiscal 2003. In addition, since December 31, 2000, 16,600 employee separations have occurred through attrition and divestitures of businesses;

- contract settlement charges were for settlements of purchase commitments with suppliers and contract renegotiations or cancellations of contracts with customers, all of which resulted from the discontinuance of various product lines. Revisions to fiscal 2001 plans were primarily for settling certain purchase commitments for amounts lower than originally planned;

- fiscal 2002 charges for facility closings represented the expected remaining future cash outlays associated with trailing lease liabilities, lease termination payments and expected restoration costs, net of expected sublease income of $136. Revisions to fiscal 2001 plans were primarily due to additional space consolidation as well as changes in estimates for the amount and timing of expected sublease rental income of $63 as a result of changes in the current commercial real estate market. As part of the fiscal 2001 and 2002 restructuring actions, charges were recognized in connection with plans to reduce a significant number of owned and leased facilities, totaling approximately 16.6 million square feet. As of September 30, 2002, owned and leased sites aggregating 12.0 million square feet have been exited and the remaining sites are expected to be exited during fiscal 2003;

28

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

- net asset write–downs for fiscal 2002 included property, plant and equipment write–downs of $304 primarily related to facility closings and product rationalizations, capitalized software of $72, inventory charges of $129, that were associated with product exits in certain switching and access and optical networking products in the Integrated Network Solutions ("INS") segment, goodwill and other acquired intangibles write–down of $22 and other charges of $9. Net revisions to fiscal 2001 plans were primarily related to adjustments to estimated inventory charges. In establishing the initial charge for inventory, Lucent included an estimate of amounts relating to products rationalized or discontinued that were not required to fulfill existing customer obligations. To the extent the fulfillment of those customer obligations differed from amounts estimated, additional inventory charges or reserve reductions were required; and

- net gains on sales included $193 of gains primarily related to the sale of the billing and customer care business and losses of $53 which were primarily related to the sale of the enterprise professional services business. Net gains on sales are included in business restructuring if the disposition of these businesses was contemplated as part of Lucent's overall restructuring program.

**Impairment of goodwill and other assets**

The continued and recently sharper decline in the telecommunications market prompted an assessment of all key assumptions underlying goodwill valuation judgments, including those relating to short– and long–term growth rates. As a result of the analysis, Lucent determined that impairment charges of $975 were required because the forecasted undiscounted cash flows were less than the book values of the goodwill and other intangible assets of certain businesses. The charges were measured on the basis of comparison of estimated fair values with corresponding book values and related primarily to goodwill recorded in connection with the September 2000 acquisition of Spring Tide. Fair values were determined on the basis of discounted cash flows.

*Fiscal 2001*

In fiscal 2001, Lucent committed to various restructuring actions in which it exited certain non–strategic wireless, optical networking and switching and access product lines and streamlined its cost structure in various businesses and corporate operations. This resulted in a pre–tax charge to earnings totaling $11,416 for fiscal 2001.

This table displays the components of the fiscal 2001 charge, the activity of the restructuring reserve for fiscal 2001, and the balance at September 30, 2001:

| | Fiscal 2001 charge | | Deductions | | September 30, 2001 reserve |
|---|---|---|---|---|---|
| Employee separations | $ 3,440 | $ | (2,852)(a) | $ | 588 |
| Contract settlements | 944 | | (334) | | 610 |
| Facility closings | 304 | | (8) | | 296 |
| Other | 79 | | 46(b) | | 125 |
| Total restructuring costs | $ 4,767 | $ | (3,148)(c) | $ | 1,619 |
| Total asset write–downs | $ 6,649(d) | | | | |
| Total | $ 11,416(e) | | | | |

(a) Includes non–cash charges of $2,113 for net pension and postretirement termination benefits to certain U.S.employees expected to be funded through Lucent's pension assets, $632 for pension and postretirement benefit curtailment charges and $72 for postemployment benefit curtailment credits.

   (b) Includes proceeds from the sale of a product line.

   (c) Includes cash payments of $531 at September 30, 2001.

   (d) At September 30, 2001, the remaining restructuring reserve for inventory was $689.

   (e) Net inventory charges of $1,259 was included in costs.

The components of the fiscal 2001 charge included:

- employee separation charges for approximately 39,200 employees, including 8,500 related to a voluntary early–retirement offer to qualified U.S. paid management employees. During fiscal 2001, approximately 23,700 separations were completed;

- contract settlement charges consisted of settlements of purchase commitments with suppliers of $508 and contract renegotiations or cancellations of contracts with customers of $436. Approximately 50% of total purchase commitments related to the rationalization of certain optical networking products, including charges relating to the discontinuance of the Chromatis product portfolio. Customer settlements included charges associated with switching and access product rationalizations and Lucent's strategic decision to limit its investment in research and development in certain wireless technologies;

- facility closings charges represented the expected remaining future cash outlays associated with trailing lease liabilities, lease termination payments and expected restoration costs, net of expected sublease income of $241; and

29

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

- asset write–downs primarily related to the write–down of goodwill and other acquired intangibles of $4,081 and inventory charges of $1,259. Impairment losses related to the write–down of goodwill and other acquired intangibles were estimated by discounting the expected future cash flows. These impairment charges largely relate to the write–off of $3,707 of goodwill relating to the discontinuance of the Chromatis product portfolio, the write–off of acquired intangibles related to the impairment of Lucent's TeraBeam investment and rationalizations of products associated with the DeltaKabel, Stratus and Ignitus acquisitions. Inventory write–downs resulted primarily from optical networking, switching, access and wireless product rationalizations and discontinuances. The remainder of the asset write–downs consisted of property, plant and equipment of $425, capitalized software of $362 and other assets of $522 associated with Lucent's product and system rationalizations resulting in sales of assets, closures and consolidation of offices, research and development facilities and factories.

## 3. DISCONTINUED OPERATIONS

On June 1, 2002, Lucent completed the spinoff of Agere Systems Inc. ("Agere"), Lucent's microelectronics business, by distributing its remaining 37.0 million shares of Agere Class A common stock and 908.1 million shares of Agere Class B common stock to Lucent common shareowners of record on May 3, 2002. Each Lucent shareowner received one share of Agere Class A common stock for every 92.768991 shares of Lucent's common stock held and one share of Agere Class B common stock for every 3.779818 shares of Lucent's common stock held. The historical carrying amount of the net assets transferred to Agere of $1,191 was recorded as a reduction to shareowners' (deficit) equity.

On April 2, 2001, Agere, completed an initial public offering ("IPO") of 600 million shares of Class A common stock, resulting in net proceeds of $3,440 to Agere.As a result of the IPO and the planned spinoff of Agere, Lucent recorded an increase to shareowners' equity of $922 in fiscal 2001. In addition, on April 2, 2001, Morgan Stanley exercised its overallotment option to purchase an additional 90 million shares of Agere Class A common stock from Lucent. Morgan Stanley exchanged $519 of Lucent commercial paper for the Agere common shares. This transaction resulted in a gain of $141, which was included in the loss on disposal of Agere in fiscal 2001. After the exercise of the overallotment option by Morgan Stanley and before the spinoff, Lucent owned 57.8% of Agere common stock.

On December 29, 2000, Lucent completed the sale of its power systems business (see Note 4).

On September 30, 2000, Lucent completed the spinoff of Avaya Inc., Lucent's former enterprise networks business, in a tax–free distribution to its shareowners. The historical carrying amount of the net assets transferred to Avaya was recorded as a reduction to shareowners' equity of $1,009. As a result of the final transfer of assets and liabilities to Avaya, the stock dividend was adjusted by $47 and reflected as a reduction to additional paid–in capital during fiscal 2001. Summarized results of operations for discontinued operations are as follows:

|  | Years ended September 30, | | |
|  | 2002 | 2001 | 2000 |
| --- | --- | --- | --- |
| **REVENUES** | | | |
| Agere and power systems | $ 1,247 | $ 3,838 | $ 4,909 |
| Avaya | — | — | 7,607 |
| **Total revenues** | $ 1,247 | $ 3,838 | $ 12,516 |
| **INCOME (LOSS) FROM** | | | |
| **DISCONTINUED OPERATIONS, NET OF TAXES** | | | |
| Agere and power systems | $ — | $ (151) | $ 248 |
| Avaya | — | — | 303 |
| Income (loss) on disposal of Agere | 73 | (3,021) | — |
| Loss on disposal of Avaya | — | — | (765) |
| **Income (loss) from discontinued operations** | $ 73 | $ (3,172) | $ (214) |

The income (loss) from discontinued operations for Agere and power systems includes the results of operations for Lucent's former power systems business through the date of sale of December 29, 2000, and Agere through the initial measurement date of March 31, 2001. Agere's and power systems' income (loss) from discontinued operations included income tax provisions of $107 and $398 for the years ended September 30, 2001 and 2000, respectively.

Avaya's income from discontinued operations for fiscal 2000 was net of applicable income taxes of $160. Income from discontinued operations includes an allocation of Lucent's interest expense totaling $64 for fiscal 2000 and was based upon the amount of debt assumed by Avaya. Approximately $780 of commercial paper borrowings was assumed by Avaya as part of the spinoff transaction.

The income (loss) on disposal of Agere for fiscal 2002, net of a tax provision of $34, includes Lucent's share of Agere's net losses from the initial measurement date through the spinoff date. Also included in the income (loss) on disposal for fiscal 2002 are subsequent adjustments to the related loss reserve, including pension termination benefit charges of $102, relating to business restructuring actions taken by Agere prior to the spinoff. The income (loss) on disposal of Agere for fiscal 2001, net of a tax provision of $39, was composed of Lucent's 57.8% share of the estimated net losses and separation costs of the microelectronics business from the measurement date through the spinoff date, partially offset by a gain of $141 associated with Lucent's debt exchange on April 2, 2001. The fiscal 2001 loss on disposal of Agere includes Lucent's share of a $2,762 impairment charge for goodwill and other acquired intangibles primarily associated with the product portfolios of the Ortel Corporation, Herrmann Technology, Inc., and Agere, Inc.; acquisitions and costs associated with Agere's restructuring initiatives; separation expenses related to the IPO; and expected spinoff and inventory provisions of $563, $99 and $409, respectively. Major components of the restructuring charge include $386 for the rationalization of

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

underutilized manufacturing facilities and other restructuring–related activities, and $177 for work force reductions. In addition, Agere recorded a $538 tax valuation allowance for its deferred tax assets.

The loss on disposal of Avaya, net of a tax benefit of $238, reflects the costs directly associated with the spinoff and the net loss of Avaya between the measurement date and the spinoff date of September 30, 2000. The loss includes those components of the Avaya reorganization plan, including a business restructuring charge and directly–related asset write–downs of $545, recorded during the year, along with transaction costs of $56 for the spinoff. Major components of this restructuring charge include $365 for employee separation and $101 for real estate consolidation.

Agere's net current liabilities at September 30, 2001 consisted of current assets of $4,022 and current liabilities of $4,427. Current liabilities included $2,500 of short–term debt assumed by Agere on April 2, 2001, of which $1,000 was repaid on October 4, 2001, and $565 of reserves for Lucent's share of Agere's estimated future losses through the spinoff date. Agere's net long–term assets at September 30, 2001 consisted of long–term assets of $2,625 and long–term liabilities of $1,323, including a minority interest in the net assets of Agere of $1,026.

The following table represents changes in Lucent's cash balance in support of discontinued operations. During fiscal 2001, Agere was funded through Lucent's consolidated cash balances until its IPO on April 2, 2001.

|  | Years ended September 30, | |
|  | 2001 | 2000 |
| --- | --- | --- |
| Net cash provided by operating activities of discontinued operations | $     517 | $    1,640 |
| Net cash used in investing activities of discontinued operations | (744) | (1,366) |
| Net cash used in financing activities of discontinued operations | (9) | (470) |
| **Net cash used in discontinued operations** | $     (236) | $     (196) |

After April 2, 2001, Agere's operations were no longer funded through Lucent's consolidated cash balances. The following table represents the changes in Agere's cash balance due to their operations during fiscal 2002 through the spinoff date:

| | |
| --- | --- |
| Net cash used by operating activities of Agere | $     (521) |
| Net cash provided by investing activities of Agere | $      279 |
| Net cash used by financing activities of Agere | $   (1,744) |

## 4. BUSINESS DISPOSITIONS AND COMBINATIONS

### Dispositions

On September 30, 2002, Lucent completed the sale of two China–based joint ventures to Corning Incorporated, which were part of the optical fiber solutions ("OFS") business. Under the agreement originally announced on July 24, 2001, the total purchase price was $225, which included a cash payment of $123, Corning common stock valued at $50, a note receivable of $27 and a future cash payment of $25 should the ventures achieve certain business milestones. The transaction resulted in a gain of $100, which was included in other income (expense), net for the year ended September 30, 2002.

On May 31, 2002, Lucent completed its agreement with Solectron Corporation to sell certain manufacturing equipment and inventory for $96, subject to post–closing adjustments, and commenced a three–year supply agreement with Solectron for certain optical networking products. Due to continuing market uncertainties, Lucent and Solectron agreed to unwind the agreements which resulted in Lucent purchasing certain assets back from Solectron and paying $50 to Solectron in November 2002. It is expected that the contract manufacturing work for the optical networking products will be transitioned to other suppliers during the first half of fiscal 2003. The impact of these events are not expected to significantly impact the results of operations.

On February 28, 2002, Lucent completed the sale of its billing and customer care business to CSG Systems International, Inc. for approximately $250, after settling certain post closing purchase price adjust–ments. All post closing purchase price adjustments were settled as of September 30, 2002 and the transaction resulted in a net gain of $188 that has been included in business restructuring charges and asset impairments, net in fiscal 2002.

On November 16, 2001, Lucent completed the sale of OFS to The Furukawa Electric Co., Ltd. for approximately $2,300, of which $173 was in CommScope, Inc. common stock. The transaction resulted in a gain of $564, which was included in other income (expense) net in fiscal 2002.

On August 31, 2001, Lucent received $572 from the closing of its transaction with Celestica Corporation to transition Lucent's manufacturing operations in Oklahoma City, Oklahoma and Columbus, Ohio. At closing, Lucent entered into a five–year supply agreement for Celestica to be the primary manufacturer of its switching and access and wireless networking systems products. As a result of expected workforce reductions and/or transfers to Celestica, Lucent recorded non–cash termination and curtailment charges of approximately $378, which were included as a component of Lucent's employee separation restructuring costs in fiscal 2001.

On December 29, 2000, Lucent completed the sale of its power systems business to Tyco International Ltd. for approximately $2,538 in cash. In connection with the sale, Lucent recorded an extraordinary gain of $1,182 (net of tax expense of $780).

31

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### Acquisitions

The following table presents information about acquisitions by Lucent during fiscal 2000. All of these acquisitions were accounted for under the purchase method of accounting, and the acquired technology valuation included existing technology, purchased in–process research and development ("IPRD") and other intangibles. All IPRD charges were recorded in the quarter in which the transaction was completed. On a pro forma basis, if the fiscal 2000 acquisitions had occurred on October 1, 1999, the amortization of goodwill and other acquired intangibles would have increased by approximately $675.

| | | | | | | | Amortization Period (in years) | | |
| | Acquisition date | Purchase price | Goodwill | Existing technology | Other intangibles | (IPRD after–tax) | Goodwill | Existing technology | Other intangibles |
|---|---|---|---|---|---|---|---|---|---|
| Spring Tide | 9/00 | $ 1,315 Stock & options | $ 1,075 | $ 143 | $ 14 | $ 131 | 7 | 7 | 7 |
| Chromatis | 6/00 | 4,756 Stock & options | 4,223 | n/a | 186 | 428 | 7 | n/a | 2–7 |
| DeltaKabel | 4/00 | 52 Cash | 56 | n/a | n/a | n/a | 6 | n/a | n/a |

n/a   Not applicable.

Spring Tide Networks was a provider of network switching equipment, Chromatis Networks Inc. was a supplier of metropolitan optical networking systems and DeltaKabel Telecom cv was a developer of cable modem and Internet protocol (IP) telephony products and services for the European market. Due to declining telecommunications market conditions in fiscal 2002 and 2001, impairment charges for goodwill and other acquired technology were recorded for Spring Tide, Chromatis and DeltaKabel (see Note 2).

Included in the purchase price for the acquisitions was IPRD, which was a non–cash charge to earnings as this technology had not reached technological feasibility and had no future alternative use. The remaining purchase price was allocated to tangible assets and intangible assets, including goodwill and other acquired intangibles, less liabilities assumed.

The value allocated to IPRD was determined using an income approach that included an excess earnings analysis reflecting the appropriate cost of capital for the investment. Estimates of future cash flows related to the IPRD were made for each project based on estimates of revenue, operating expenses and income taxes from the project. These estimates were consistent with historical pricing, margins and expense levels for similar products.

Revenues were estimated based on relevant market size and growth factors, expected industry trends, individual product sales cycles and the estimated life of each product's underlying technology. Estimated operating expenses, income taxes and charges for the use of contributory assets were deducted from estimated revenues to determine estimated after–tax cash flows for each project. Estimated operating expenses include cost of goods sold; selling, general and administrative expenses; and research and development expenses. The research and development expenses include estimated costs to maintain the products once they have been introduced into the market and generate revenues and costs to complete the in–process research and development.

The discount rates utilized to discount the projected cash flows were based on consideration of Lucent's weighted average cost of capital, as well as other factors including the estimated useful life of each project, the anticipated profitability of each project, the uncertainty of technology advances that were known at the time and the stage of completion of each project.

### TeraBeam Corporation

On April 9, 2000, Lucent and TeraBeam Corporation entered into an agreement to develop TeraBeam's fiberless optical networking system that provides high–speed data networking between local and wide area networks. Under the agreement, Lucent paid cash and contributed research and development assets, intellectual property and free–space optical products, valued in the aggregate at $450. On September 26, 2001, Lucent and TeraBeam agreed to terminate most of the existing arrangements between the parties. Pursuant to the agreement, the 30% interest held by Lucent in the venture that develops the fiberless optical networking system was exchanged for a 15% interest in TeraBeam Corporation in the second quarter of fiscal 2002. As a result of exiting the original arrangement and an evaluation of the restructured investment as of September 30, 2001, the remaining investment and goodwill and other acquired intangibles of $328 were written–off and included in the fiscal 2001 business restructuring charge. In the fourth quarter of fiscal 2002, the remaining 15% interest was sold for $5 and included as part of the fiscal 2002 business restructuring charge.

### Ignitus Communications LLC

On April 4, 2000, Lucent acquired the remaining 44% of Ignitus Communications LLC, a start–up company that focuses on high–speed optical communications at the network edge, for approximately $33. Lucent previously owned 56% of the company. An impairment charge for goodwill and other acquired intangibles was recorded in fiscal 2001's business restructuring charge related to the product rationalization of the technology acquired from Ignitus.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**Pooling–of–Interests Mergers**

On November 3, 1999, Lucent merged with Excel Switching Corporation ("Excel"), a developer of programmable switches, through the issuance of approximately 22 million shares of Lucent common stock in exchange for all the outstanding shares of Excel common stock. On October 15, 1999, Lucent merged with International Network Services, a provider of network consulting, design and integration services, through the issuance of approximately 49 million shares of Lucent common stock in exchange for all the outstanding shares of their common stock.

Lucent merged with Xedia in fiscal 2000. The historical operating results of this entity were not material to Lucent's consolidated results of operations, therefore prior periods were not restated for this merger.

**5. SUPPLEMENTARY FINANCIAL INFORMATION**

**Supplementary Statements of Operations Information:**

| | Years ended September 30, | | |
| --- | --- | --- | --- |
| | 2002 | 2001 | 2000 |
| **DEPRECIATION AND AMORTIZATION** | | | |
| Depreciation of property, plant and equipment | $    718 | $  1,065 | $    908 |
| Amortization of goodwill | 207 | 790 | 281 |
| Amortization of other acquired intangibles | 43 | 131 | 81 |
| Amortization of software development costs | 469 | 501 | 395 |
| Other amortization | 33 | 49 | 2 |
| **Total depreciation and amortization** | $  1,470 | $  2,536 | $  1,667 |
| | | | |
| **OTHER INCOME (EXPENSE), NET** | | | |
| Interest income | $    114 | $    255 | $    118 |
| Minority interests in earnings of consolidated subsidiaries | (12) | (81) | (50) |
| Net income (loss) from equity method investments | 14 | (60) | (31) |
| Other–than–temporary write–downs of investments | (209) | (266) | (14) |
| Loss on foreign currency transactions | (46) | (58) | (18) |
| Net gains on sales of businesses | 725 | 56 | 30 |
| Legal settlements | (212) | — | — |
| Net gains (losses) on sales and settlements of financial instruments | (22) | 18 | 347 |
| Write–off of embedded derivative assets | — | (42) | — |
| Miscellaneous, net | (60) | (179) | (49) |
| **Total other income (expense), net** | $    292 | $   (357) | $    333 |

**Supplementary Balance Sheet Information:**

| | September 30, | |
| --- | --- | --- |
| | 2002 | 2001 |
| **INVENTORIES** | | |
| Completed goods | $    711 | $  2,023 |
| Work in process | 35 | 432 |
| Raw materials | 617 | 1,191 |
| **Total inventories** | $  1,363 | $  3,646 |
| | | |
| **PROPERTY, PLANT AND EQUIPMENT, NET** | | |
| Land and improvements | $    175 | $    320 |
| Buildings and improvements | 1,796 | 3,088 |
| Machinery, electronic and other equipment | 2,648 | 5,636 |
| Total property, plant and equipment | 4,619 | 9,044 |
| Less: accumulated depreciation | 2,642 | 4,628 |
| **Total property, plant and equipment, net** | $  1,977 | $  4,416 |

**GOODWILL AND OTHER**
**ACQUIRED INTANGIBLES, NET**

| | | | | |
|---|---|---|---|---|
| Goodwill | $ | 209 | $ | 1,262 |
| Other acquired intangibles | | 15 | | 204 |
| **Total goodwill and other acquired intangibles, net** | $ | 224 | $ | 1,466 |

**INCLUDED IN OTHER ASSETS**

| | | | | |
|---|---|---|---|---|
| Capitalized software | $ | 366 | $ | 583 |
| Internal use software | $ | 204 | $ | 261 |

**INCLUDED IN OTHER CURRENT LIABILITIES**

| | | | | |
|---|---|---|---|---|
| Deferred revenue | $ | 210 | $ | 452 |
| Advance billings, progress payments and customer deposits | $ | 403 | $ | 998 |
| Warranty reserve | $ | 440 | $ | 456 |
| Consumer Products leasing legal settlement (Note 17) | $ | 312 | $ | — |
| Self-insured loss reserves (Note 15) | $ | 428 | $ | 62 |

**Supplementary Cash Flow Information:**

| | | *Years ended September 30,* | | | | | |
|---|---|---|---|---|---|---|---|
| | | **2002** | | **2001** | | **2000** | |
| Interest payments, net of amounts capitalized | $ | (349) | $ | (490) | $ | (356) | |
| Income tax refunds (payments), net | $ | 804 | $ | (161) | $ | (34) | |
| Acquisitions of businesses: | | | | | | | |
| Fair value of assets acquired, net of cash acquired | $ | — | $ | — | $ | 59 | |
| Less: Fair value of liabilities assumed | | — | | — | | 7 | |
| **Acquisitions of businesses, net of cash acquired** | $ | — | $ | — | $ | 52 | |

33

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## 6. EARNINGS (LOSS) PER COMMON SHARE

Basic earnings (loss) per common share is calculated by dividing net income (loss) applicable to common shareowners by the weighted average number of common shares outstanding during the period. Net income (loss) applicable to common shareowners includes preferred stock dividends and accretion for fiscal 2002 and 2001 and the conversion cost related to the exchange of 8% redeemable convertible preferred stock for Lucent common stock in fiscal 2002 (see Note 10).

Diluted earnings (loss) per share is calculated by dividing net income (loss) applicable to common shareowners, adjusted for preferred stock dividends and accretion for fiscal 2002 and 2001, interest expense for the 7.75% mandatorily redeemable convertible preferred securities of subsidiary trust for fiscal 2002 and conversion cost related to the exchange of the 8% redeemable convertible preferred stock for fiscal 2002. Diluted earnings (loss) per common share further reflects all potential issuances of common stock. However, since Lucent recorded a loss from continuing operations for fiscal 2002 and 2001, the diluted earnings (loss) per share is the same as basic, as any potentially dilutive securities would reduce the loss per share from continuing operations.

|  | *Years ended September 30,* | | |
|---|---|---|---|
|  | **2002** | **2001** | **2000** |
| **EARNINGS (LOSS)** | | | |
| **PER COMMON SHARE – BASIC** | | | |
| Income (loss) from continuing operations | $ (3.51) | $ (4.18) | $ 0.44 |
| Income (loss) from discontinued operations | 0.02 | (0.93) | (0.06) |
| Extraordinary gain | — | 0.35 | — |
| Cumulative effect of accounting changes | — | (0.01) | — |
| **Net income (loss) applicable to common shareowners** | $ (3.49) | $ (4.77) | $ 0.38 |
| | | | |
| **EARNINGS (LOSS)** | | | |
| **PER COMMON SHARE – DILUTED** | | | |
| Income (loss) from continuing operations | $ (3.51) | $ (4.18) | $ 0.43 |
| Income (loss) from discontinued operations | 0.02 | (0.93) | (0.06) |
| Extraordinary gain | — | 0.35 | — |
| Cumulative effect of accounting changes | — | (0.01) | — |
| **Net income (loss) applicable to common shareowners** | $ (3.49) | $ (4.77) | $ 0.37 |
| | | | |
| **WEIGHTED AVERAGE NUMBER** | | | |
| **OF COMMON SHARES (IN MILLIONS)** | | | |
| Common shares – basic | 3,426.7 | 3,400.7 | 3,232.3 |
| Effect of dilutive securities: | | | |
| Stock options | — | — | 88.5 |
| Other | — | — | 5.1 |
| **Weighted average number of common shares – diluted** | 3,426.7 | 3,400.7 | 3,325.9 |

Most stock options are excluded from the calculation because their exercise price was greater than the average market price of the common shares. Diluted earnings (loss) per share for fiscal 2002 and 2001 does not include the effect of the following potential shares:

|  | *Years ended September 30,* | |
|---|---|---|
| *Potential common shares excluded from the calculation of diluted loss per share (in millions):* [a] | **2002** | **2001** |
| 8% redeemable convertible preferred stock | 519 | 47 [b] |
| Company–obligated 7.75% mandatorily redeemable convertible preferred securities of subsidiary trust | 193 [c] | — |
| Stock options | 4 | 24 |
| Other | 2 | 6 |
| **Total** | 718 | 77 |

(a)   Adjusted to reflect the spinoff of Agere.

(b)   Had these securities been outstanding for the entire fiscal year, the amount of shares excluded from the calculation would have been 309 million for the year ended September 30, 2001.

(c)   Had these securities been outstanding for the entire fiscal year, the amount of shares excluded from the calculation would have been 362 million for the year ended September 30, 2002.

In addition, stock options where the exercise price was greater than the average market price of the common shares of 471 million, 407 million and 41 million, calculated on a weighted average basis, for the years ended September 30, 2002, 2001 and 2000, respectively, were excluded from the computation of diluted earnings (loss) per share.

## 7. COMPREHENSIVE INCOME (LOSS)

Comprehensive income (loss) represents net income (loss) plus the results of certain shareowners' (deficit) equity changes not reflected in the consolidated statements of operations.

The components of accumulated other comprehensive loss are as follows:

| | Foreign currency translation adjustment | | Net unrealized holding gains/(losses) on investments | | Minimum pension liability adjustments | | Net unrealized holding gains/(losses) on derivative instruments | | Total accumulated other comprehensive loss |
|---|---|---|---|---|---|---|---|---|---|
| Beginning balance, October 1, 1999 | $ | (313) | $ | 79 | $ | (10) | $ | — | $ | (244) |
| Current-period change | | (185) | | (4) | | 2 | | — | | (187) |
| Amounts transferred to Avaya | | 64 | | — | | 2 | | — | | 66 |
| Ending balance, September 30, 2000 | | (434) | | 75 | | (6) | | — | | (365) |
| Cumulative effect of accounting change – SFAS 133 | | — | | 9 | | — | | 2 | | 11 |
| Current-period change | | (33) | | (45) | | (8) | | (1) | | (87) |
| Ending balance, September 30, 2001 | | (467) | | 39 | | (14) | | 1 | | (441) |
| Current-period change | | 60 | | (35) | | (2,927) | | (1) | | (2,903) |
| Amounts transferred to Agere | | (6) | | — | | — | | — | | (6) |
| Ending balance, September 30, 2002 | $ | (413) | $ | 4 | $ | (2,941) | $ | — | $ | (3,350) |

Foreign currency translation adjustments are not generally adjusted for income taxes as they relate to indefinite investments in non–U.S. subsidiaries.

34

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**8. INCOME TAXES**

The following table presents the U.S. and non-U.S. components of income (loss) from continuing operations before income taxes and the provision (benefit) for income taxes:

| | Years ended September 30, | | |
| | 2002 | 2001 | 2000 |
|---|---|---|---|
| **INCOME (LOSS) FROM CONTINUING OPERATIONS BEFORE INCOME TAXES:** | | | |
| U.S. | $ (7,076) | $ (19,089) | $ 2,055 |
| Non–U.S. | 7 | (815) | 302 |
| Income (loss) from continuing operations before income taxes | $ (7,069) | $ (19,904) | $ 2,357 |
| **PROVISION (BENEFIT) FOR INCOME TAXES:** | | | |
| Current: | | | |
| Federal | $ (611) | $ 21 | $ 159 |
| State and local | — | — | 9 |
| Non–U.S. | 100 | 180 | 265 |
| Subtotal | (511) | 201 | 433 |
| Deferred: | | | |
| Federal | 4,242 | (4,983) | 405 |
| State and local | 837 | (879) | 85 |
| Non–U.S. | 189 | (73) | 1 |
| Subtotal | 5,268 | (5,935) | 491 |
| Provision (benefit) for income taxes | $ 4,757 | $ (5,734) | $ 924 |

The following table presents the principal reasons for the difference between the effective tax (benefit) rate on continuing operations and the U.S. federal statutory income tax (benefit) rate:

| | Years ended September 30, | | |
| | 2002 | 2001 | 2000 |
|---|---|---|---|
| U.S. federal statutory income tax (benefit) rate | (35.0)% | (35.0)% | 35.0% |
| State and local income tax (benefit) rate, net of federal income tax effect | (3.3)% | (4.1)% | 1.2% |
| Foreign earnings and dividends taxed at different rates | 0.2% | 0.4% | (1.3)% |
| Research credits | (1.9)% | (0.8)% | (6.0)% |
| Acquisition–related costs (a) | 5.0% | 8.3% | 12.6% |
| Disposition of OFS business | (7.3)% | n/a | n/a |
| Other differences, net | (1.7)% | (0.3)% | (4.2)% |
| Change in valuation allowance | 111.3% | 2.7% | 1.9% |
| Effective income tax (benefit) rate | 67.3% | (28.8)% | 39.2% |

(a) Includes non–tax deductible IPRD, goodwill amortization and impairments (including goodwill write–offs recognized under the restructuring program), and merger–related costs.

n/a   Not applicable

The components of deferred income tax assets and liabilities are as follows:

*Years ended September 30,*

| | 2002 | 2001 |
|---|---|---|
| **DEFERRED INCOME TAX ASSETS:** | | |
| Bad debt and customer financing reserves | $    490 | $   1,004 |
| Inventory reserves | 585 | 685 |
| Business restructuring reserves | 421 | 632 |
| Other operating reserves | 843 | 536 |
| Postretirement and other benefits | 2,207 | 2,386 |
| Net operating loss/credit carryforwards | 5,826 | 2,538 |
| Other | 364 | 636 |
| Valuation allowance | (9,989) | (742) |
| | | |
| **Total deferred tax assets** | $    747 | $   7,675 |
| | | |
| **DEFERRED INCOME TAX LIABILITIES:** | | |
| Pension | $    632 | $   1,971 |
| Other | 115 | 526 |
| | | |
| **Total deferred tax liabilities** | $    747 | $   2,497 |

    Statement of Financial Accounting Standards ("SFAS") No.109, "Accounting for Income Taxes" ("SFAS 109") requires that a valuation allowance be established when it is more likely than not that all or a portion of a deferred tax asset will not be realized. A review of all available positive and negative evidence needs to be considered, including a company's current and past performance, the market environment in which the company operates, the utilization of past tax credits, length of carryback and carryforward periods, existing contracts or sales backlog that will result in future profits, etc.

    Forming a conclusion that a valuation allowance is not needed is difficult when there is negative evidence such as cumulative losses in recent years. Cumulative losses weigh heavily in the overall assessment. During the first and second quarters of fiscal 2002 Lucent established valuation allowances for future tax benefits with relatively short carryforward periods related to foreign tax credits, state and foreign net operating losses and capital losses. As a result of the review undertaken at June 30, 2002, Lucent concluded that it was appropriate to establish a full valuation allowance for its net deferred tax assets. During the fourth quarter of fiscal 2002 Lucent continued to maintain a full valuation allowance on the tax benefits generated by operating losses and credit carryforwards. Lucent expects to continue to record a full valuation allowance on future tax benefits until an appropriate level of profitability is sustained. Until an appropriate level of profitability is reached, Lucent does not expect to recognize any significant tax benefits in future results of operations. Valuation allowances of $1,149 were also established for net deferred tax assets resulting from minimum pension liabilities and other direct charges to equity.

35

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The following table presents carryforwards for losses (tax effected) and tax credits:

| Description | Amount | Expiration |
|---|---|---|
| Federal net operating losses | $ 3,008 | 2022 |
| State net operating losses | 627 | 2007 to 2022 |
| Capital losses | 296 | 2007 |
| Foreign net operating losses/credits | 192 | 2007 to indefinite |
| Foreign tax credits | 489 | 2003 to 2005 |
| Research credits | 969 | 2017 to 2022 |
| State credits (various) | 223 | 2007 to 2017 |
| Alternative minimum tax credits | 22 | Indefinite |
| **Total** | **$ 5,826** | |

As of September 30, 2002, Lucent had provided for $71 of U.S. deferred income taxes on $203 of undistributed earnings of a non–U.S. subsidiary. The Company has not provided for U.S. deferred income taxes or foreign withholding taxes on its remaining undistributed earnings of $3,374 of its non–U.S. subsidiaries since these earnings are intended to be reinvested indefinitely. It is not practical to estimate the amount of additional taxes that might be payable on such undistributed earnings.

The Internal Revenue Service is currently examining Lucent's federal tax returns for 1997 and 1998 and has proposed certain adjustments. In addition, Lucent is a party to a tax sharing agreement with AT&T and is liable for tax adjustments that are attributable to Lucent's lines of businesses as well as a portion of certain shared non–line of business tax adjustments during the years prior to separation from AT&T. Certain tax adjustments have been proposed or assessed subject to this tax sharing agreement. Lucent does not believe that the outcome of these matters will have a material adverse effect on the consolidated results of operations, consolidated financial position, or near–term liquidity.

## 9. DEBT OBLIGATIONS

| | September 30, | |
|---|---|---|
| | 2002 | 2001 |
| **DEBT MATURING WITHIN ONE YEAR** | | |
| Revolving credit facilities, 5.7% weighted average interest rate at September 30, 2001 | $ — | $ 1,000 |
| Other | 120 | 135 |
| **Total debt maturing within one year** | **$ 120** | **$ 1,135** |

Weighted average interest rate for revolving credit facilities was 5.2% and 6.0% for fiscal 2002 and 2001, respectively.

Although the credit facility was cancelled, substantially all of Lucent's domestic assets remained collateralized as a result of extending the Guarantee and Collateral Agreement with our banks through December 18, 2002. This agreement provides security for commercial bankers in extending, among other things, credit facilities to non–U.S. subsidiaries, letters of credit and foreign exchange hedging.

| | September 30, | |
|---|---|---|
| | 2002 | 2001 |
| **LONG–TERM DEBT** | | |
| 7.25% notes due July 15, 2006 | $ 750 | $ 750 |
| 11.755% notes due July 1, 2006 | 302 | 330 |
| 5.50% notes due November 15, 2008 | 500 | 500 |
| 6.50% debentures due January 15, 2028 | 300 | 300 |
| 6.45% debentures due March 15, 2029 | 1,360 | 1,360 |
| Other (7.0% and 8.0% weighted average interest rates, in 2002 and 2001, respectively) | 63 | 101 |
| Total long–term debt | 3,275 | 3,341 |
| Unamortized discount | (36) | (38) |
| Fair value basis adjustment attributable to hedged debt obligations | 28 | — |
| Amounts maturing within one year | (31) | (29) |
| Long–term debt | $ 3,236 | $ 3,274 |

| | | | |
|---|---|---|---|
| Company–obligated 7.75% mandatorily redeemable convertible preferred securities of subsidiary trust | $ | 1,750 | $ — |

Aggregate maturities of the $3,275 in total long–term debt obligations at September 30, 2002 for fiscal 2003 through fiscal 2007 and thereafter were $31, $37, $42, $948, $2 and $2,215, respectively.

On March 19, 2002, Lucent Technologies Capital Trust I ("the Trust") completed the sale of 7.75% cumulative convertible trust preferred securities for an initial price of $1,000 per share for an aggregate amount of $1,750. Lucent owns all of the common securities of the Trust. The Trust used the proceeds to purchase 7.75% convertible subordinated debentures issued by Lucent due March 15, 2017, which represent all of the Trust's assets. The terms of the trust preferred securities are substantially the same as the terms of the debentures. Lucent may redeem the debentures, in whole or in part, for cash at premiums ranging from 103.88% beginning March 20, 2007, to 100.00% on March 20, 2012, and thereafter. To the extent Lucent redeems debentures, the Trust is required to redeem a corresponding amount of trust preferred securities. Lucent has irrevocably and unconditionally guaranteed, on a subordinated basis, the payments due on the trust preferred securities to the extent Lucent makes payments on the debentures to the Trust. In connection with this transaction, Lucent incurred approximately $46 of expenses that are deferred and are being amortized over the life of the debentures.

Holders of trust preferred securities are entitled to receive quarterly cash distributions commencing June 15, 2002. The ability of the Trust to pay dividends depends on the receipt of interest payments on the debentures. Lucent has the right to defer payments of interest on the debentures for up to 20 consecutive quarters. If Lucent defers the payment of interest on the debentures, the Trust will defer the quarterly distributions on the trust preferred securities for a corresponding period. Deferred interest accrues at an annual rate of 9.25%. Each trust preferred security is convertible at the option of the holder into 206.6116 shares of Lucent common stock, subject to additional adjustment under certain circumstances.

36

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## 10. REDEEMABLE CONVERTIBLE PREFERRED STOCK

Lucent has 250,000,000 shares of preferred stock authorized. On August 6, 2001, Lucent designated and sold 1,885,000 shares of non-cumulative 8% redeemable convertible preferred stock having an initial liquidation preference of $1,000 per share, subject to accretion as described below, in a private placement, resulting in net proceeds of $1,831. Annual dividends are payable semiannually in cash or common stock at Lucent's option, subject to Lucent's having a legally available surplus as defined by Delaware law. Any unpaid dividends will increase the liquidation preference at an accretion rate of 10% per year, calculated on a semiannual basis. At the holder's option, each share of convertible preferred stock is convertible into 168.3502 shares of Lucent common stock, subject to adjustment under certain circumstances. Lucent can, at its option, require all holders to exchange their shares of redeemable convertible preferred stock for convertible subordinated debentures having terms substantially similar to the preferred stock. The redeemable convertible preferred stock is redeemable, at Lucent's option after August 15, 2006 and at the option of the holders on August 2 of 2004, 2007, 2010 and 2016. Provided certain criteria are met, Lucent has the option to redeem the convertible preferred stock for cash or its common stock (the common stock to be valued at a 5% discount from the then current market price) or a combination of cash and shares of its common stock. Lucent is obligated to redeem all outstanding preferred shares on August 1, 2031. The ability to redeem the preferred stock is subject to having legally available surplus as defined by Delaware law. The initial carrying value is being accreted to liquidation value as a charge to shareowners' (deficit) equity over the earliest redemption period of three years. Holders of the preferred stock have no voting rights, except as required by law, and rank junior to Lucent's debt obligations. In addition, upon dissolution or liquidation of Lucent, holders are entitled to the liquidation preference plus any accrued and unpaid dividends prior to any distribution of net assets to common shareowners.

During September 2002, Lucent repurchased 174,500 shares of 8% redeemable convertible preferred stock for 58,113,000 shares of Lucent common stock. No gain or loss was recognized on the exchange. The carrying value of the preferred stock repurchased was $175, and the exchange resulted in a corresponding increase to common stock and additional paid-in capital. The fair value of the additional common shares issued to the preferred stockholders to prompt the exchange over the shares obligated to be exchanged pursuant to the original conversion terms amounted to $29 and has been included in the loss applicable to the common shareowners.

Since September 30, 2002 and through December 4, 2002, Lucent repurchased an additional 380,024 shares of 8% redeemable convertible preferred stock for 143,340,962 shares of Lucent common stock. No gain or loss was recognized on the exchange. The carrying value of the preferred stock repurchased was approximately $380 and the exchange resulted in a corresponding increase to common stock and additional paid-in capital. The fair value of the additional common shares issued to the preferred stockholders to prompt the exchange over the shares obligated for exchange pursuant to the original conversion terms amounted to $96.

## 11. EMPLOYEE BENEFIT PLANS

### Pension and Postretirement Benefits

Lucent maintains defined benefit pension plans covering the majority of its employees and retirees, and postretirement benefit plans for retirees that include health care, dental benefits and life insurance coverage. On June 1, 2002, certain pension and postretirement asset and obligation amounts were transferred to Agere and are subject to final adjustment. The final amounts to be transferred to Agere are not expected to be materially different from the estimated amounts. In fiscal 2001, Lucent recorded final adjustments to the pension and postretirement asset and obligation amounts that were transferred to Avaya on September 30, 2000.

37

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The following information summarizes activity in the pension and postretirement benefit plans:

| | Pension benefits September 30, | | Postretirement benefits September 30, | |
|---|---|---|---|---|
| | 2002 | 2001 | 2002 | 2001 |
| **CHANGE IN BENEFIT OBLIGATION** | | | | |
| Benefit obligation at October 1 | $ 30,515 | $ 26,677 | $ 9,399 | $ 8,242 |
| Service cost | 238 | 345 | 18 | 35 |
| Interest cost | 1,981 | 1,956 | 622 | 604 |
| Actuarial losses | 1,708 | 1,466 | 1,004 | 761 |
| Amendments | — | 9 | — | (58) |
| Benefits paid | (3,403) | (2,800) | (914) | (709) |
| Settlements | (3) | (3) | — | (10) |
| Plan participant contributions | 5 | 5 | — | — |
| Termination benefits – Lucent | 237 | 1,954 | (1) | 197 |
| Termination benefits – Agere | 102 | — | — | — |
| Impact of curtailments | (14) | 715 | (29) | 288 |
| Exchange rate changes | 54 | 17 | — | — |
| Benefit obligation assumed by OFS | (95) | — | (37) | — |
| Benefit obligation assumed by Agere | (1,013) | — | (217) | — |
| Benefit obligation assumed by Avaya | — | 174 | — | 48 |
| **Benefit obligation at September 30** | $ 30,312 | $ 30,515 | $ 9,845 | $ 9,398 |
| **CHANGE IN PLAN ASSETS** | | | | |
| Fair value of plan assets at October 1 | $ 36,010 | $ 45,719 | $ 3,441 | $ 4,557 |
| Actual loss on plan assets | (2,473) | (6,848) | (515) | (827) |
| Company contributions | 98 | 57 | 10 | 17 |
| Benefits paid | (3,403) | (2,800) | (914) | (709) |
| Assets transferred to OFS | (115) | — | — | — |
| Assets transferred to Agere | (1,253) | — | (79) | — |
| Assets transferred from Avaya | — | 259 | — | 36 |
| Exchange rate changes | 35 | 12 | — | — |
| Other (including transfer of assets from pension to postretirement plans) | (301) | (389) | 502 | 366 |
| **Fair value of plan assets at September 30** | $ 28,598 | $ 36,010 | $ 2,445 | $ 3,440 |
| (Unfunded) funded status of the plan | $ (1,714) | $ 5,495 | $ (7,401) | $ (5,958) |
| Unrecognized prior service cost (credit) | 699 | 1,250 | (173) | (135) |
| Unrecognized transition asset | (7) | (100) | — | — |
| Unrecognized net (gain) loss | 5,948 | (1,642) | 2,851 | 1,035 |
| **Net amount recognized** | $ 4,926 | $ 5,003 | $ (4,723) | $ (5,058) |
| Amounts recognized in the consolidated balance sheets consist of: | | | | |
| Prepaid pension costs | $ 4,355 | $ 4,958 | $ — | $ — |
| Prepaid pension costs allocated to discontinued operations | — | 122 | — | — |
| Accrued benefit liability | (2,760) | (99) | (4,723) | (4,972) |
| Accrued benefit liability allocated to discontinued operations | — | (2) | — | (86) |
| Intangible asset | 390 | 5 | — | — |
| Accumulated other comprehensive loss | 2,941 | 19 | — | — |
| **Net amount recognized** | $ 4,926 | $ 5,003 | $ (4,723) | $ (5,058) |
| Under–funded or non–funded plans: | | | | |
| Aggregate benefit obligation | $ 18,238 | $ 95 | $ 9,845 | $ 8,094 |
| Aggregate fair value of plan assets | 14,940 | — | 2,444 | 1,674 |
| Plans with under–funded or non–funded accumulated benefit obligations: | | | | |
| Aggregate accumulated benefit obligation | $ 17,275 | $ 89 | n/a | n/a |
| Aggregate fair value of plan assets | 14,507 | — | n/a | n/a |

n/a     Not applicable.

38

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

In fiscal 2002, global capital market developments resulted in negative returns on Lucent's pension funds and a decline in the discount rate used to estimate the pension liability. As a result, the accumulated benefit obligation exceeded the fair value of plan assets and Lucent was required to adjust the minimum pension liability recorded in the consolidated balance sheet. The effect of this adjustment was to decrease prepaid pension costs by $684, increase pension liabilities by $2,623, increase intangible assets by $385 and increase accumulated other comprehensive loss by $2,922. Because these adjustments were non-cash, their effect has been excluded from the accompanying consolidated statement of cash flows.

Pension plan assets include $2 and $17 of Lucent common stock at September 30, 2002 and 2001, respectively. Postretirement plan assets include $0 and $1 of Lucent common stock at September 30, 2002 and 2001, respectively.

**Components of Net Periodic Benefit Cost:**

| | Years ended September 30, | | |
|---|---|---|---|
| | 2002 | 2001 | 2000 |
| **PENSION COST (CREDIT):** | | | |
| Service cost | $ 238 | $ 345 | $ 497 |
| Interest cost on projected benefit obligation | 1,981 | 1,956 | 1,940 |
| Expected return on plan assets | (3,384) | (3,401) | (3,256) |
| Amortization of unrecognized prior service costs | 236 | 327 | 363 |
| Amortization of transition asset | (92) | (220) | (298) |
| Amortization of net (gain) loss | (189) | (387) | (197) |
| Subtotal | (1,210) | (1,380) | (951) |
| Termination benefits | 340 | 1,954 | — |
| Curtailments | 305 | 562 | — |
| Settlements | (10) | (12) | — |
| Net pension cost (credit) | $ (575) | $ 1,124 | $ (951) |
| | | | |
| **DISTRIBUTION OF NET PENSION COST (CREDIT):** | | | |
| Continuing operations: | | | |
| Business restructuring | $ 543 | $ 2,485 | $ — |
| Other costs and expenses | (1,220) | (1,387) | (1,093) |
| Subtotal | (677) | 1,098 | (1,093) |
| Discontinued operations | 102 | 26 | 142 |
| Net pension cost (credit) | $ (575) | $ 1,124 | $ (951) |
| | | | |
| **POSTRETIREMENT COST:** | | | |
| Service cost | $ 18 | $ 35 | $ 67 |
| Interest cost on accumulated benefit obligation | 622 | 604 | 601 |
| Expected return on plan assets | (361) | (352) | (338) |
| Amortization of unrecognized prior service costs | — | 22 | 37 |
| Amortization of net gain | (24) | (25) | (12) |
| Subtotal | 255 | 284 | 355 |
| Termination benefits | — | 197 | — |
| Curtailments | 35 | 98 | — |
| Settlements | — | (5) | — |
| Net postretirement benefit cost | $ 290 | $ 574 | $ 355 |

| | Years ended September 30, | | |
|---|---|---|---|
| | 2002 | 2001 | 2000 |
| **DISTRIBUTION OF NET POSTRETIREMENT BENEFIT COST:** | | | |
| Continuing operations: | | | |
| Business restructuring | $ 35 | $ 260 | $ — |
| Other costs and expenses | 248 | 304 | 291 |

| | | | |
|---|---|---|---|
| Subtotal | 283 | 564 | 291 |
| Discontinued operations | 7 | 10 | 64 |
| **Net postretirement benefit cost** | **$ 290** | **$ 574** | **$ 355** |

**PENSION AND POSTRETIREMENT BENEFITS
WEIGHTED AVERAGE ASSUMPTIONS:**

| | | | |
|---|---|---|---|
| Discount rate | 6.5% | 7.0% | 7.5% |
| Expected return on plan assets | 9.0% | 9.0% | 9.0% |
| Rate of compensation increase | 3.5% | 4.5% | 4.5% |

The expected rate of return on plan assets that will be used to determine fiscal 2003 net periodic benefit cost is 8.75% for pensions and a weighted average of 7.93% for postretirement benefits.

Lucent has several non–pension postretirement benefit plans. For postretirement health care benefit plans, Lucent assumed a 9.8% weighted average annual health care cost trend rate for 2003, gradually declining to 4.9% (excluding postretirement dental benefits, the annual medical cost trend rate would be 10.2% in 2003 gradually declining to 5.0%). The assumed health care cost trend rate has a significant effect on the amounts reported. A one–percentage–point change in the assumed health care cost trend rate would have the following effects:

| | 1 Percentage Point | |
|---|---|---|
| | *Increase* | *Decrease* |
| Effect on total of service and interest cost components | $    24 | $    20 |
| Effect on postretirement benefit obligation | $    339 | $    294 |

**Savings Plans**

Lucent's savings plans allow employees to contribute a portion of their compensation on a pre–tax and/or after–tax basis in accordance with specified guidelines. Lucent matches a percentage of the employee contributions up to certain limits, in cash, in accordance with participants' investment elections. Savings plan expense charged to continuing operations was $71, $125 and $161 for fiscal 2002, 2001 and 2000, respectively.

39

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## 12. STOCK COMPENSATION PLANS

On April 22, 2002, Lucent commenced a voluntary offer to eligible employees to exchange certain outstanding stock options to purchase shares of common stock, including all stock options issued during the six–month period ended April 22, 2002, for Lucent's promise to grant a new stock option on or about November 25, 2002. Employees who participated in the offer tendered stock options to purchase an aggregate of 213.2 million shares of Lucent common stock, which have been cancelled, in exchange for Lucent's promises to grant new stock options to purchase up to an aggregate of 123.3 million shares of Lucent common stock. On November 25, 2002, Lucent granted approximately 110.6 million new stock options in connection with the exchange having an exercise price of $1.78 per share, which was the fair market value of Lucent common stock on the date of the grant.

Lucent has stock–based compensation plans under which outside directors and certain employees receive stock options and other equity–based awards. The plans provide for the grant of stock options, stock appreciation rights, performance awards, restricted stock awards and other stock unit awards.

Stock options generally are granted with an exercise price equal to 100% of the market value of a share of common stock on the date of grant, have two–to–10–year terms and vest within four years from the date of grant. Subject to customary antidilution adjustments and certain exceptions, the total number of shares of common stock authorized for option grants under the plans was 729 million shares at September 30, 2002.

In connection with certain acquisitions, outstanding stock options held by employees of acquired companies became exercisable, according to their terms, for Lucent common stock effective at the acquisition date. These options did not reduce the shares available for grant under any of Lucent's other option plans. For acquisitions accounted for as purchases, the fair value of these options was generally included as part of the purchase price. As of July 1, 2000, Lucent began recording deferred compensation related to unvested options held by employees of companies acquired in a purchase acquisition. Unamortized deferred compensation expense was $0, $5 and $34 at September 30, 2002, 2001 and 2000, respectively. The deferred expense calculation and amortization are based on the graded vesting schedule of the awards.

Lucent established an Employee Stock Purchase Plan ("ESPP") effective October 1, 1996. Under the terms of this ESPP, eligible employees could have up to 10% of eligible compensation deducted from their pay to purchase common stock. The per share purchase price was 85% of the average high and low per share trading price of common stock on the New York Stock Exchange ("NYSE") on the last trading day of each month. In fiscal 2001 and 2000, 17.6 million and 7.8 million shares, respectively, were purchased under this ESPP and the employer stock purchase plans of acquired companies, at weighted average per share prices of $10.04 and $46.75, respectively. This ESPP expired on June 30, 2001.

Effective July 1, 2001, Lucent established the current ESPP ("2001 ESPP"). Under the terms of the 2001 ESPP, eligible employees may have up to 10% of eligible compensation deducted from their pay to purchase common stock during an offering period, consisting of four purchase periods, generally six months long. An employee may purchase up to 567 shares on the last trading date of each purchase period. The per share purchase price is 85% of the average high and low per share trading price of common stock on the NYSE on either the employee's entry date for the relevant offering period, or on the last trading day of the relevant purchase period, whichever is lower. The amount that may be offered pursuant to this new plan is 250 million shares. During fiscal 2002, 9.9 million shares of common stock were purchased.

Lucent has adopted the disclosure requirements of SFAS No.123, "Accounting for Stock–Based Compensation" ("SFAS 123"), and, as permitted under SFAS 123, applies Accounting Principles Board Opinion No.25 ("APB 25") and related interpretations in accounting for its plans. Compensation expense recorded under APB 25 was $37, $147 and $49 for the years ended September 30, 2002, 2001 and 2000, respectively. If Lucent had elected to adopt the optional recognition provisions of SFAS 123 for its stock option and purchase plans, net income (loss) and earnings (loss) per share applicable to common shareowners would have been changed to the pro forma amounts indicated below. The fiscal 2002 pro forma amounts include $1,395 related to an increase in valuation allowances for net deferred tax assets.

|  | Years ended September 30, | | |
|  | 2002 | 2001 | 2000 |
| --- | --- | --- | --- |
| **NET INCOME (LOSS)** | | | |
| As reported | $  (11,753) | $  (16,198) | $  1,219 |
| Pro forma[a] | $  (14,265) | $  (17,172) | $  452 |
| | | | |
| **EARNINGS (LOSS) PER SHARE – BASIC** | | | |
| As reported | $  (3.49) | $  (4.77) | $  0.38 |
| Pro forma[a] | $  (4.22) | $  (5.05) | $  0.14 |
| | | | |
| **EARNINGS (LOSS) PER SHARE – DILUTED** | | | |
| As reported | $  (3.49) | $  (4.77) | $  0.37 |
| Pro forma[a] | $  (4.22) | $  (5.05) | $  0.13 |

(a)  Includes Lucent's pro rata share of Agere's SFAS 123 compensation expense.

The fair value of stock options used to compute pro forma net income (loss) and earnings (loss) per share disclosures is the estimated fair value at grant date using the Black–Scholes option–pricing model with the following assumptions:

| | Years ended September 30, | | |
| | 2002 | 2001 | 2000 |
|---|---|---|---|
| Dividend yield | 0.0% | 0.49% | 0.23% |
| Expected volatility – Lucent | 78.9% | 60.2% | 39.2% |
| – Acquisitions[a] | n/a | n/a | 55.3% |
| Risk–free interest rate | 3.6% | 4.9% | 6.5% |
| Expected holding period (in years) | 2.5 | 2.4 | 2.9 |

(a)   Pre–merger assumptions for companies acquired in a pooling–of–interests.

n/a   Not applicable.

40

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The fair value of the employee's purchase rights under the 2001 ESPP is calculated using the Black–Scholes model, with the following weighted average assumptions for fiscal 2002: dividend yield of 0%; expected life of 12.6 months; expected volatility of 81.7%; and a risk–free interest rate of 2.1%. The weighted average fair value of those purchase rights granted in fiscal 2002 was $3.18 per share.

The fair value of the employee's purchase rights under the 2001 ESPP was calculated using the Black–Scholes model, with the following weighted average assumptions for fiscal 2001: dividend yield of 0%; expected life of 15.3 months; expected volatility of 97.4%; and a risk–free interest rate of 3.7%. The weighted average fair value of those purchase rights granted in fiscal 2001 was $3.53 per share.

The weighted average fair value of stock options, calculated using the Black–Scholes option–pricing model, granted during the years ended September 30, 2002, 2001 and 2000 is $2.11, $4.59 and $16.15 per share, respectively.

Presented below is a summary of the status of Lucent stock options and the related activity for the years ended September 30, 2002, 2001 and 2000:

| | Shares (in thousands) | | Weighted average exercise price per share |
|---|---|---|---|
| Options outstanding at October 1, 1999 | 286,292 | $ | 26.15 |
| Granted/assumed[a] | 285,798 | | 47.95 |
| Exercised | (74,963) | | 15.38 |
| Forfeited/expired | (38,815) | | 41.56 |
| Options outstanding at September 30, 2000 | 458,312 | $ | 40.20 |
| Options outstanding at September 30, 2000, after spinoff adjustments[b] | 431,509 | $ | 39.34 |
| Granted | 347,557 | | 12.56 |
| Exercised | (10,496) | | 4.73 |
| Forfeited/expired | (85,957) | | 37.77 |
| Options outstanding at September 30, 2001 | 682,613 | $ | 26.43 |
| Granted | 13,008 | | 6.37 |
| Exercised | (6,489) | | 1.50 |
| Forfeited/expired | (101,014) | | 26.85 |
| Cancelled due to exchange offer | (213,246) | | 30.22 |
| Options outstanding at May 31, 2002 | 374,872 | $ | 23.96 |
| Options outstanding at June 1, 2002, after spinoff adjustments[b] | 363,603 | $ | 21.04 |
| Granted | 946 | | 2.09 |
| Exercised | (278) | | 0.41 |
| Forfeited/expired | (77,376) | | 36.85 |
| Options outstanding at September 30, 2002 | 286,895 | $ | 16.73 |

(a)   Includes options converted in acquisitions.

(b)   Effective with the spinoffs of Agere and Avaya on June 1, 2002 and September 30, 2000, respectively, Lucent stock options held by Agere employees were converted into Agere stock options and unvested Lucent stock options held by Avaya employees were converted into Avaya stock options. For the remaining unexercised Lucent stock options held by Avaya employees, the number of Lucent stock options and the exercise price were adjusted to preserve the intrinsic value of the stock options that existed prior to the spinoff.

41

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The following table summarizes the status of stock options outstanding and exercisable at September 30, 2002:

| | Stock options outstanding | | | Stock options exercisable | |
|---|---|---|---|---|---|
| Range of exercise prices per share | Shares (in thousands) | Weighted average remaining contractual life (years) | Weighted average exercise price per share | Shares (in thousands) | Weighted average exercise price per share |
| $0.00 to $6.00 | 6,301 | 5.1 | $ 3.71 | 2,563 | $ 3.15 |
| $6.01 to $6.26 | 77,537 | 3.5 | 6.23 | 32,820 | 6.23 |
| $6.27 to $9.99 | 40,692 | 4.1 | 9.41 | 37,698 | 9.57 |
| $10.00 to $16.03 | 99,184 | 4.0 | 12.24 | 89,549 | 12.22 |
| $16.04 to $89.70 | 63,181 | 6.2 | 42.68 | 56,639 | 41.78 |
| Total | 286,895 | | $ 16.73 | 219,269 | $ 18.40 |

Other stock unit awards are granted under certain award plans. The following table presents the total number of shares of common stock represented by awards granted to employees for the years ended September 30, 2002, 2001 and 2000:

| | Years ended September 30, | | |
|---|---|---|---|
| | 2002 | 2001 | 2000 |
| Other stock unit awards granted (in thousands) | 4,142 | 5,400 | 858 |
| Weighted average market value of shares granted during the period | $ 6.74 | $ 13.64 | $ 59.23 |

## 13. OPERATING SEGMENTS

Lucent designs and delivers networks for the world's largest communications service providers. Lucent changed its reporting segments beginning in fiscal 2002 to two customer-focused operating segments, Integrated Network Solutions ("INS") and Mobility Solutions ("Mobility"), from Products and Services. These reportable segments are managed separately. The INS segment sells to global wireline service providers, including long distance carriers, traditional local telephone companies and Internet service providers, and provides offerings comprised of a broad range of core switching and access and optical networking products. The Mobility segment focuses on global wireless service providers and offers products to support the needs of its customers for radio access and core networks. Both segments offer network management and application and service delivery products. In addition, Lucent supports its segments through its worldwide services organization.

Performance measurement and resource allocation for the reportable segments are based on many factors. The primary financial measure is operating income (loss), which includes the revenues, costs and expenses directly controlled by each reportable segment, as well as an allocation of costs and operating expenses, which are not managed at a segment level, but are related to the products or services sold to its customers. Operating income (loss) for reportable segments excludes the following:

- goodwill and other acquired intangibles amortization;

- business restructuring and asset impairments;

- acquisition/integration-related costs, including IPRD;

- the results of the optical fiber business;

- the results from billing and customer care software products, messaging products and other smaller units;

- certain personnel costs and benefits, including a portion of those related to pension and postretirement benefits and differences between the actual and standard allocated benefit rates;

- certain other costs related to shared services such as general corporate functions, which are managed on a common basis in order to realize economies of scale and efficient use of resources; and

- certain other general and miscellaneous costs and expenses not directly used in assessing the performance of the operating segments.

The accounting policies of the reportable segments are the same as those applied in the consolidated financial statements.

42

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The following tables present Lucent's revenues and operating income (loss) by reportable operating segment and a reconciliation of the totals reported for operating income (loss) of the segments to consolidated operating income (loss):

| | Years ended September 30, | | |
| | 2002 | 2001 | 2000 |
|---|---|---|---|
| **EXTERNAL REVENUES** | | | |
| INS | $ 6,415 | $ 12,263 | $ 18,654 |
| Mobility | 5,380 | 6,154 | 6,837 |
| Total reportable segments | 11,795 | 18,417 | 25,491 |
| Optical fiber business | 114 | 2,023 | 1,842 |
| Other | 412 | 854 | 1,571 |
| **Total external revenues** | $ 12,321 | $ 21,294 | $ 28,904 |
| | | | |
| **OPERATING INCOME (LOSS)** | | | |
| INS | $ (2,769) | $ (4,724) | $ 1,685 |
| Mobility | (655) | (1,517) | 939 |
| Total reportable segments | (3,424) | (6,241) | 2,624 |
| Goodwill and other acquired intangibles amortization | (250) | (921) | (362) |
| Business restructuring charges and asset impairments | (2,316) | (11,416) | — |
| Acquisition/integration–related costs | — | — | (620) |
| Optical fiber business | (68) | 543 | 439 |
| Unallocated personnel costs and benefits | 1,717 | 2,423 | 2,535 |
| Shared services such as general corporate functions | (1,603) | (2,497) | (2,347) |
| Other | (1,035) | (920) | 97 |
| **Total operating income (loss)** | $ (6,979) | $ (19,029) | $ 2,366 |

Supplemental Segment Information

| | Years ended September 30, | | |
| | 2002 | 2001 | 2000 |
|---|---|---|---|
| **ASSETS:** | | | |
| INS | $ 1,909 | $ 7,235 | $ 11,411 |
| Mobility | 760 | 2,305 | 3,641 |
| Total reportable segments(a) | 2,669 | 9,540 | 15,052 |
| Non–segment | 15,122 | 24,124 | 32,460 |
| **Total assets** | $ 17,791 | $ 33,664 | $ 47,512 |
| | | | |
| **DEPRECIATION AND AMORTIZATION:** | | | |
| INS | $ 458 | $ 725 | $ 671 |
| Mobility | 247 | 343 | 266 |
| Total reportable segments(b) | 705 | 1,068 | 937 |
| Non–segment | 765 | 1,468 | 730 |
| **Total depreciation and amortization** | $ 1,470 | $ 2,536 | $ 1,667 |

(a)   Assets included in reportable segments consist of receivables, inventory and contracts in process.

(b)   Depreciation and amortization for reportable segments excludes goodwill and other acquired intangibles amortization.

## Products and Services Revenues

The table below presents external revenues for groups of similar products and services:

|  | | Years ended September 30, | | | | |
|  | | 2002 | | 2001 | | 2000 |
|---|---|---|---|---|---|---|
| Switching and access | $ | 3,155 | $ | 5,598 | $ | 10,798 |
| Optical networking products | | 1,427 | | 3,206 | | 3,297 |
| Wireless products | | 4,492 | | 5,409 | | 6,430 |
| Optical fiber | | 114 | | 2,023 | | 1,842 |
| Services | | 2,689 | | 4,162 | | 4,926 |
| Other[a] | | 444 | | 896 | | 1,611 |
| Totals | $ | 12,321 | $ | 21,294 | $ | 28,904 |

(a)   Principally includes billing and customer care software products, messaging products and, in fiscal 2000, the consumer products business.

## Geographic Information

|  | | External Revenues[a] | | | | |
|  | | Years ended September 30, | | | | |
|  | | 2002 | | 2001 | | 2000 |
|---|---|---|---|---|---|---|
| U.S. | $ | 8,148 | $ | 13,776 | $ | 19,829 |
| Non–U.S. countries | | 4,173 | | 7,518 | | 9,075 |
| Totals | $ | 12,321 | $ | 21,294 | $ | 28,904 |

|  | | Long–Lived Assets[b] | | | | |
|  | | September 30, | | | | |
|  | | 2002 | | 2001 | | 2000 |
|---|---|---|---|---|---|---|
| U.S. | $ | 1,540 | $ | 4,755 | $ | 10,283 |
| Non–U.S. countries | | 661 | | 1,127 | | 1,226 |
| Totals | $ | 2,201 | $ | 5,882 | $ | 11,509 |

(a)   Revenues are attributed to geographic areas based on the location of customers.

(b)   Represents property, plant and equipment, net and goodwill and other acquired intangibles, net.

## Concentrations

Historically, Lucent has relied on a limited number of customers for a substantial portion of its total revenues. Revenues from Verizon, including Verizon Wireless, accounted for approximately 19%, 19% and 14% of consolidated revenues in the years ended September 30, 2002, 2001 and 2000, respectively. Revenues from AT&T, including AT&T Wireless, accounted for approximately 11% of consolidated revenues in the year ended September 30, 2000. Lucent expects a significant portion of its future revenues to continue to be generated by a limited number of customers. The loss of any of these customers or any substantial reduction in orders by any of these customers could materially and adversely affect Lucent's operating results. See note 17 for a discussion of contract manufacturing concentrations.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**14. FINANCIAL INSTRUMENTS**

Fair Values

The carrying values and estimated fair values, based on quoted market rates, of financial instruments were as follows:

| | Years ended September 30, | | | |
| | 2002 | | 2001 | |
| | Carrying value | Fair value | Carrying value | Fair value |
|---|---|---|---|---|
| Long–term debt | $ 3,236 | $ 1,281 | $ 3,274 | $ 2,324 |
| Company–obligated 7.75% mandatorily redeemable convertible preferred securities of subsidiary trust | 1,750 | 400 | — | — |
| 8% redeemable convertible preferred stock | 1,680 | 429 | 1,834 | 1,849 |

The carrying values of cash and cash equivalents, receivables, payables and debt maturing within one year contained in the consolidated balance sheets approximate fair value. The carrying values of foreign exchange forward and option contracts and interest rate swaps at September 30, 2002 and 2001 equals their fair value and are determined using quoted market rates.

The following tables summarize Lucent's investments in debt and equity securities:

| September 30, 2002 | Cost | Gross unrealized gains | Gross unrealized losses and impairments | Estimated fair value |
|---|---|---|---|---|
| **DEBT SECURITIES:** | | | | |
| U.S. treasury bills and government agency notes | $ 1,232 | $ 9 | $ — | $ 1,241 |
| Corporate commercial paper | 124 | — | — | 124 |
| Bank certificates of deposit | 160 | 1 | — | 161 |
| Total debt securities | 1,516 | 10 | | 1,526 |
| **EQUITY SECURITIES:** | | | | |
| Available–for–sale equity investments | 267 | — | (150) | 117 |
| Other equity investments | 275 | — | (138) | 137 |
| Total equity securities | 542 | — | (288) | 254 |
| Total debt and equity securities | $ 2,058 | $ 10 | $ (288) | $ 1,780 |

| September 30, 2001 | Cost | Gross unrealized gains | Gross unrealized losses and impairments | Estimated fair value |
|---|---|---|---|---|
| **EQUITY SECURITIES:** | | | | |
| Available–for–sale equity investments | $ 36 | $ 29 | $ (6) | $ 59 |
| Other equity investments | 251 | — | (49) | 202 |
| Total equity securities | $ 287 | $ 29 | $ (55) | $ 261 |

All of Lucent's debt security investments are classified as available–for–sale and mature within one year.

**Credit Risk and Market Risk**

By their nature, all financial instruments involve risk, including credit risk for non–performance by counterparties. The contract or notional amounts of these instruments reflect the extent of involvement Lucent has in particular classes of financial instruments. The maximum potential loss may exceed any amounts recognized in the consolidated balance sheets. However, Lucent's maximum exposure to credit loss in the event of nonperformance by the other party to the financial instruments for commitments to extend credit and financial guarantees is limited to the amount drawn and outstanding on those instruments.

Exposure to credit risk is controlled through credit approvals, credit limits and continuous monitoring procedures and reserves for losses are established when deemed necessary. Lucent seeks to limit its exposure to credit risks in any single country or region, although Lucent's customers are primarily in the telecommunications service provider industry.

All financial instruments inherently expose the holders to market risk, including changes in currency and interest rates. Lucent manages its exposure to these market risks through its regular operating and financing activities and when appropriate, through the use of derivative financial instruments.

**Derivative Financial Instruments**

**Foreign currency risk**

Lucent conducts its business on a multinational basis in a wide variety of foreign currencies. The objective of Lucent's foreign currency risk management policy is to preserve the economic value of cash flows in nonfunctional currencies. Lucent's policy is to hedge all significant booked and firmly committed cash flows identified as creating foreign currency exposure on a rolling 12–month basis. In addition, Lucent typically hedges a portion of its exposure resulting from identified anticipated cash flows, providing the flexibility to deal with the variability of longer–term forecasts as well as changing market conditions, in which the cost of hedging may be excessive relative to the level of risk involved.

To manage this risk, Lucent enters into various foreign exchange forward and option contracts. In some cases, Lucent may hedge foreign exchange risk in certain sales and purchase contracts by embedding terms in the contracts that affect the ultimate amount of cash flows under the contract. Principal currencies hedged as of September 30, 2002 include euros and Indian rupees having notional amounts of $208 and $81, respectively, with fair values that were not material. The notional amounts and fair values of embedded derivatives at September 30, 2002, were not material.

Lucent hedges all types of foreign currency risk to preserve the economic cash flows of the Company in accordance with corporate risk management policies but generally does not expect to designate related derivative instruments as hedges under SFAS 133 for cost/benefit reasons.

Accordingly, the changes in fair value of these undesignated freestanding foreign currency derivative instruments are recorded in other income

44

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

(expense), net in the period of change and have not been material to Lucent due to the short maturities of these instruments.

Lucent's foreign currency embedded derivatives consist of sales and purchase contracts with cash flows indexed to changes in or denominated in a currency that neither party to the contract uses as their functional currency. Changes in the fair value of these embedded derivatives were not significant during fiscal 2002.

### Interest rate risk

Lucent uses a combination of financial instruments, including medium–term and short–term financings, variable–rate debt instruments and interest rate swaps to manage its interest rate mix of the total debt portfolio and related overall cost of borrowing. At September 30, 2002, Lucent had interest rate swap agreements designated as fair value hedges with an aggregate notional amount of $500 and a fair value of $28 that hedge a portion of a long–term, fixed–rate debt obligation due in July 2006. Under these swaps, Lucent receives a fixed interest rate of 7.25% and pays a weighted average floating rate of LIBOR plus 2.91%. As of September 30, 2002, LIBOR was approximately 1.79%. The objective of maintaining the mix of fixed and floating rate debt is to mitigate the variability of cash flows resulting from interest rate fluctuations, as well as to reduce the cash flows attributable to debt instruments. There were no derivative transactions hedging cash equivalents and short–term investments since their relatively short maturities do not create significant risk. There were no interest rate swaps in effect at September 30, 2001.

### Other derivatives

From time to time, Lucent may obtain warrants to purchase equity securities in other companies to complement its investment portfolio. Warrants that provide for net share settlement are considered to be derivative instruments and are generally not eligible to be designated as hedging instruments as there is no corresponding underlying exposure. The fair value of these warrants was not material at September 30, 2002 and 2001.

### Non–Derivative Instruments and Customer Financing Commitments

Requests for providing commitments to extend credit and financial guarantees are reviewed and approved by senior management. Management regularly reviews all outstanding commitments, letters of credit and financial guarantees, and the results of these reviews are considered in assessing the adequacy of Lucent's reserve for possible credit and guarantee losses.

The following table presents Lucent's non–derivative instruments and customer financing commitments for amounts drawn, available but not drawn and not available to be drawn. These instruments may expire without being drawn upon. Therefore, the amounts available but not drawn and not available do not necessarily represent future cash flows. The amounts drawn on these instruments are generally collateralized by substantially all of the assets of the respective creditors.

| | September 30, 2002 | | |
| --- | --- | --- | --- |
| | Total Loans and Guarantees | Loans | Guarantees |
| Drawn commitments | $ 1,098 | $ 909 | $ 189 |
| Available but not drawn | 93 | 51 | 42 |
| Not available | 151 | 151 | —— |
| **Total** | $ 1,342 | $ 1,111 | $ 231 |

| | September 30, 2001 | | |
| --- | --- | --- | --- |
| | Total Loans and Guarantees | Loans | Guarantees |
| Drawn commitments | $ 2,956 | $ 2,528 | $ 428 |
| Available but not drawn | 1,447 | 1,411 | 36 |
| Not available | 911 | 655 | 256 |
| **Total** | $ 5,314 | $ 4,594 | $ 720 |

### Commitments to Extend Credit

Commitments to extend credit to third parties are conditional agreements generally having fixed expiration or termination dates and specific interest rates and purposes. In certain situations, credit may not be available for draw down until certain conditions precedent are met.

### Guarantees of Debt

From time to time, Lucent guarantees the financing for product purchases by customers. Requests for providing such guarantees are reviewed and approved by senior management. Certain financial guarantees are assigned to a third–party reinsurer.

**Letters of Credit**

Letters of credit are obtained to ensure Lucent's performance or payment to third parties in accordance with specified terms and conditions, which amounted to $668 and $900 as of September 30, 2002 and 2001, respectively. The estimated fair value of letters of credit are $17 and $12 as of September 30, 2002 and 2001, respectively, which are valued based on fees paid to obtain the obligations.

45

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## 15. SECURITIZATIONS AND TRANSFERS OF FINANCIAL INSTRUMENTS

In June 2001, Lucent established a $750 revolving accounts receivable securitization facility due to expire in June 2004. The facility limit was reduced to $500 in October 2001. Under the terms of the facility, Lucent could sell an undivided interest in collateralized accounts receivable from specified customers in exchange for cash and a subordinated retained interest in the remaining outstanding accounts receivable. At September 30, 2002 and 2001, unrelated third parties held an undivided interest of $0 and $286, respectively, in the collateralized accounts receivables. The balance of retained interests is included in receivables and varies based on changes in Lucent's credit ratings and the credit ratings of the customers included in the securitization facility, changes in the sufficiency of eligible accounts receivable and concentration of credit risk among obligors. Accordingly, unfavorable changes in these factors required Lucent to repurchase undivided interests in securitized accounts receivable and favorable changes in the factors allowed Lucent to sell additional undivided interests in accounts receivable. On October 17, 2002, this securitization facility, together with the credit facility, was terminated.

Lucent serviced these securitized receivables for a fee that approximated Lucent's cost of servicing and such fees were not significant. The investors in the securitized receivables had no recourse to Lucent's other assets as a result of debtors' defaults except for the retained interests in the collateralized accounts receivable.

The following table provides the cash flows related to this securitization facility:

| | Years ended September 30, | |
| --- | --- | --- |
| | 2002 | 2001 |
| Proceeds from receivables initially securitized | $     — | $    435 |
| Proceeds from collections reinvested in revolving securitization | 6,385 | 1,913 |
| Net repurchases of undivided interests | 286 | 149 |
| Average securitized balance | 753 | 1,188 |

At September 30, 2002, there were no retained interests in this facility. The following table provides the valuation of retained interests at September 30, 2001.

| | |
| --- | --- |
| Total securitized balance | $    1,277 |
| Fair value of retained interests in outstanding receivables | 939 |
| Discount for time value | 7 |
| Net reserve for credit losses | 13 |

Retained interests are valued based on the historical payment patterns and the discount rate implicit in the underlying invoices. The expected reserve for credit losses is 1.27%. A discount is imputed based on the expected number of days that receivables will remain outstanding and a discount rate commensurate with the risks involved. Assuming hypothetical simultaneous unfavorable variations of up to 20% in credit losses and the discount rate used, the pretax impact on the value of retained interests would not be significant.

In September 2000, Lucent and a third-party financial institution arranged for the creation of a non-consolidated Special Purpose Trust ("Trust") for the purpose of allowing Lucent from time to time to sell on a limited-recourse basis up to a maximum of $970 of customer finance loans and receivables ("Loans") at any given point in time through a wholly-owned bankruptcy-remote subsidiary, which in turn would sell the Loans to the Trust. Lucent had originally intended to periodically sell Loans to the Trust, however, due to Lucent's credit downgrade in February 2001, Lucent is unable to sell additional Loans to the Trust, as defined by agreements between Lucent and the Trust. Lucent will continue to service, administer and collect the Loans on behalf of the Trust and receive a fee for performance of these services until the Loans are either fully collected or sold by the Trust to an unrelated third party. At September 30, 2002, the Trust held $349 in loans relating to five obligors, all of which are in default. Lucent's wholly-owned captive insurance company assumed the credit risk of the loans that are held in the Trust. It also reinsured the exposure with an unaffiliated insurer for amounts in excess of an initial loss of $90. The self-insured loss reserve of $379 related to these loans (including accrued interest) and the corresponding receivable due from the unaffiliated insurer of $298 were included in other current liabilities and other current assets in the September 30, 2002 consolidated balance sheet. Cash flows received from (paid to) the Trust during 2002 and 2001 were as follows:

| | Years ended September 30, | | |
| --- | --- | --- | --- |
| | 2002 | 2001 | 2000 |
| Proceeds from sales of Loans | $     — | $    382 | $    575 |
| Repurchases of Loans | (90) | (355) | — |
| Losses on sales of Loans and other costs | — | (7) | (4) |
| Fees received | 4 | 6 | — |
| Servicing advances | — | (8) | — |
| Reimbursements of servicing advances | — | 8 | — |

In September 2002, a non–U.S. subsidiary of Lucent established a $120 revolving accounts receivable facility that allows this subsidiary to sell certain of its accounts receivable at a discount from face value, on a non–recourse basis. As of September 30, 2002, Lucent sold $15 of accounts receivable under this facility. Lucent's ability to further utilize this facility is dependent on the sufficiency of eligible receivables, generally a function of new sales generated by this non–U.S. subsidiary.

46

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## 16. ACCOUNTING CHANGES

### Staff Accounting Bulletin 101, "Revenue Recognition in Financial Statements" ("SAB 101")

In December 1999, the Securities and Exchange Commission issued SAB 101, which provides guidance on the recognition, presentation and disclosure of revenues in financial statements. During the fourth quarter of fiscal 2001, Lucent implemented SAB 101 retroactively to the beginning of fiscal 2001, resulting in a cumulative effect of a change in accounting principle of a $68 loss (net of a tax benefit of $45), or $0.02 loss per basic and diluted share, and a reduction in the 2001 loss from continuing operations of $11, or $0.00 per basic and diluted share. For the fiscal year ended September 30, 2001, Lucent recognized $116 in revenue that is included in the cumulative effect adjustment as of October 1, 2000. The cumulative effect adjustment results primarily from the change in revenue recognized on intellectual property license agreements that included settlements for which there was no objective evidence of the fair value of the settlement. Under SAB 101, in the absence of objective evidence of the fair value of the settlement, revenue is recognized prospectively over the remaining term of the intellectual property license agreement. In addition, revenue recognition was deferred for certain products for multiple element agreements where certain services, primarily installation and integration, were deemed to be essential to the functionality of delivered elements.

Following are pro forma amounts showing the effects if the accounting change were applied retroactively for fiscal 2000:

| | | |
|---|---|---|
| Income from continuing operations | $ | 1,419 |
| Basic earnings per share – continuing operations | $ | 0.44 |
| Diluted earnings per share – continuing operations | $ | 0.43 |
| Net income | $ | 1,151 |
| Basic earnings per share | $ | 0.36 |
| Diluted earnings per share | $ | 0.35 |

### SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities" ("SFAS 133")

Effective October 1, 2000, Lucent adopted SFAS 133, and its corresponding amendments under SFAS 138. SFAS 133 requires Lucent to measure all derivatives, including certain derivatives embedded in other contracts, at fair value and to recognize them in the consolidated balance sheet as an asset or a liability, depending on Lucent's rights or obligations under the applicable derivative contract. For derivatives designated as fair value hedges, the changes in the fair value of both the derivative instrument and the hedged item are recorded in other income (expense), net. For derivatives designated as cash flow hedges, the effective portions of changes in the fair value of the derivative are reported in other comprehensive income ("OCI") and are subsequently reclassified into other income (expense), net when the hedged item affects other income (expense). Changes in the fair value of derivative instruments not designated as hedging instruments and ineffective portions of hedges are recognized in other income (expense), net in the period incurred. The adoption of SFAS 133 as of October 1, 2000 resulted in a cumulative after–tax reduction in net loss of $30 (net of a $17 tax provision), or $0.01 per basic and diluted share, and an $11 credit to OCI. The reduction in net loss is primarily attributable to derivatives not designated as hedging instruments, including foreign currency embedded derivatives, equity warrants and other derivatives.

## 17. COMMITMENTS AND CONTINGENCIES

Lucent is subject to legal proceedings, lawsuits, and other claims, including proceedings by government authorities. In addition, Lucent may be subject to liabilities to some of its former affiliates under separation agreements with them. Legal proceedings are subject to uncertainties, and the outcomes are difficult to predict. Consequently, Lucent is unable to ascertain the ultimate aggregate amount of monetary liability or financial impact with respect to these matters at September 30, 2002. Lucent is subject to several purported class action lawsuits and other lawsuits for alleged violations of federal securities laws, ERISA and related claims described below, which could have a material financial impact. Other than those matters, Lucent believes that the remainder of the cases will not have a material financial impact after final disposition.

Lucent and certain of its former officers and current and former members of Lucent's Board of Directors are defendants in numerous purported shareholder class action lawsuits for alleged violations of federal securities laws. These cases have been consolidated into a single action pending in the United States District Court for the District of New Jersey, captioned *In re Lucent Technologies Inc. Securities Litigation*. The consolidated complaint alleges, among other things, that beginning in late October 1999, Lucent and certain of its officers misrepresented Lucent's financial condition and failed to disclose material facts that had an adverse impact on its future earnings and prospects for growth. The action seeks monetary damages, and costs and expenses associated with the litigation.

Lucent has been served with derivative complaints filed by individual shareowners in Delaware Chancery Court against certain current and former members of Lucent's Board of Directors and a former officer. These complaints have been consolidated in a single action. The consolidated complaint asserts that certain current and former directors and an officer allegedly breached their fiduciary duties to Lucent by acquiescing in or approving allegedly fraudulent conduct and seek damages against the defendants and in favor of Lucent, as well as costs and expenses associated with litigation. Lucent has also been served with derivative actions in Delaware Chancery Court and United States District Court for the District of New Jersey that have not been consolidated with the other derivative cases. These non–consolidated actions allege that certain of Lucent's current and former directors breached fiduciary duties to supervise Lucent and seeks an accounting of the damages sustained as a result of these alleged acts, as well as costs and expenses associated with litigation.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

An additional derivative complaint was filed in September 2001 by an individual shareholder in the Delaware Chancery Court against certain current and former members of Lucent's Board of Directors and a former officer asserting claims of corporate waste and breach of fiduciary duties arising out of the award of performance–based compensation to Lucent's directors and an officer and seeks the return of all such performance–based compensation, compensation to Lucent for resulting losses, the imposition of a constructive trust upon the proceeds of any sale of Lucent shares by the defendants, as well as costs and expenses associated with litigation.

In July 2001, a purported class action complaint was filed in United States District Court for the District of New Jersey under ERISA alleging, among other things, that Lucent and certain unnamed officers breached their fiduciary duties with respect to Lucent's employee savings plans. The case claims that the defendants were aware that Lucent's stock was inappropriate for retirement investment and continued to offer Lucent stock as a plan investment option. The complaint seeks damages, injunctive and equitable relief, interest and fees and expenses associated with the litigation.

In March 2002, Lucent was named as a defendant in a case captioned *In re Winstar Communications Securities Litigation*, pending in U.S. District Court for the Southern District of New York. The case is a putative class action on behalf of purchasers of common stock of Winstar Communications, Inc. ("Winstar"), which filed for bankruptcy in April 2001, against several former officers and directors of Winstar, Winstar's outside auditors, and Lucent. In addition, in April 2002, a case captioned *Preferred Life Insurance Co. of New York et al. v. Lucent Technologies Inc.* was filed in New Jersey state court against Lucent. The plaintiffs in the New Jersey case are institutional investors, many of which are affiliated with each other, that purchased the common stock of Winstar. In both actions, the plaintiffs claim that Lucent caused money to be lost by the plaintiffs in connection with their investments in Winstar stock or contributed to such loss. In the New York action, the plaintiffs claim that Lucent violated federal securities laws in connection with plaintiffs' purchases of Winstar stock. In the New Jersey action, the plaintiffs claim that Lucent committed common law fraud, negligent misrepresentation, conspiracy to commit fraud and aiding and abetting fraud in connection with plaintiffs' purchases of Winstar stock.

Lucent and certain of its current and former officers and directors are defendants in an action in Texas state court captioned *Obtek, et al. v. Lucent Technologies Inc., et al.* This case alleges violation of federal securities laws, the Texas Securities Act and in connection with Lucent's acquisition of a company called Agere Inc. in April 2000. The court has denied a motion to dismiss the claims against individual defendants and has set a trial date for February 2003.

In November 2001, a purported class action complaint was filed in the United States District Court for the District of New Jersey against Lucent and current and former officers captioned *Laufer v. Lucent Technologies Inc., et al.* The plaintiffs allege that Lucent and its officers concealed adverse material information about Agere's financial condition prior to Agere's IPO and about Lucent's vendor financing portfolio.

In October 2002, a purported class action lawsuit captioned *Balaban v. Schacht, et al.,* was filed on behalf of holders of the Company's notes, convertible preferred stock and trust preferred securities against Lucent, certain current and former directors and two former officers. The complaint asserts claims for breach of fiduciary duty by the defendants during the period of April 1999 to September 2002 and seeks compensatory damages and other damages and costs.

*Sparks, et al. v. AT&T and Lucent Technologies Inc. et al.,* is a class action lawsuit filed in 1996 in Illinois state court under the name of *Crain v. Lucent Technologies.* The plaintiffs requested damages on behalf of present and former customers based on a claim that the AT&T Consumer Products business (which became part of Lucent in 1996) and Lucent had defrauded and misled customers who leased telephones, resulting in payments in excess of the cost to purchase the telephones. Similar consumer class actions pending in various state courts were stayed pending the outcome of the Sparks case, and in July 2001, the Illinois court certified a nationwide class of plaintiffs.

A settlement was agreed to by the parties in August 2002, to settle the litigation for up to $300 in cash plus prepaid calling cards redeemable for minutes of long distance service. The court approved the settlement in November 2002. Lucent and AT&T deny they have defrauded or misled their customers, but have decided to settle this matter to avoid the uncertainty of litigation and the diversion of resources and personnel that pursuing this matter would require. The class claimants will apply for reimbursement from the settlement fund, and will be required to demonstrate their entitlement through a claims form to be provided to a claims administrator. Depending upon the number of claims submitted and accepted, the actual cost of the settlement to the defendants may be less than the stated amount, but it is not possible to estimate the amount at this time. Lucent deposited approximately $200 in escrow accounts as of September 30, 2002 to cover a portion of the settlement.

Lucent is a party to various separation and distribution agreements, which provide for contribution from third parties formerly affiliated with Lucent for a portion of any liability (including any settlement) in this case. However, Lucent is responsible for a majority of any such liability or settlement. As a result, Lucent recognized a $162 charge recorded in other income (expense), net in 2002, which is net of expected third–party contributions.

Lucent is a defendant in an adversary proceeding filed in U.S. Bankruptcy Court in Delaware by Winstar Communications, Inc. and Winstar Wireless, Inc. in connection with the bankruptcy of Winstar and various related entities. The complaint asserts claims for breach of contract and other claims against Lucent and seeks compensatory damages, as well as costs and expenses associated with litigation. The complaint also seeks recovery of a payment of approximately $190 to Lucent in December 2000.

48

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**Separation Agreements**

Lucent is party to various agreements with AT&T, Avaya, Agere Systems and NCR Corporation, former affiliates, that were entered into in connection with the separation of these former affiliates and Lucent. Pursuant to these agreements, Lucent and the former affiliates have agreed to allocate certain liabilities related to each other's business, and have agreed to share liabilities based upon certain allocations and thresholds. For example in the Sparks case discussed above, AT&T, Avaya and NCR each assumed a portion of the liability for the settlement.

**Other Commitments**

On July 17, 2002, Lucent and Agere amended the purchase agreement between them, dated as of February 1, 2001, pursuant to which, among other things, Lucent had agreed to purchase $2,800 in products from Agere over a three year period ending January 31, 2004. Under the amendment, Lucent's first–year purchases of $411 through January 31, 2002 are deemed to be in full satisfaction of its initial year's $800 obligation under the original agreement. In addition, Lucent has agreed, for an extended period that ends on September 30, 2006, provided Agere is competitive with other potential suppliers as to price, delivery interval and technological merit, to purchase 90% of its requirements for products it currently purchases from Agere and 60% of its requirements for other products that Agere can supply. Lucent has also agreed to proceed first with Agere on all joint product development projects where Agere meets Lucent's criteria. Lucent has also agreed to transfer certain patents, patent applications and patent license agreements to Agere.

Lucent is generally not committed to unconditional purchase obligations, except for a commitment that requires annual purchases of certain wireless components ranging from $350 to $425 over the next two years. Lucent is in negotiations with this supplier to completely restructure the arrangement. If this obligation is not satisfied, Lucent will be required to pay 25% of the unfulfilled annual commitment.

Lucent has exited certain of its manufacturing operations and has increased its use of contract manufacturers. Lucent is currently using a sole–source supplier for a majority of the switching and wireless product lines. In addition, Lucent is in the process of moving from a primarily sole–sourced supplier for its optical product line to a combination of multiple contract manufacturers, and continues to use a combination of multiple contract manufacturers for their data networking and other products. Lucent is generally not committed to unconditional purchase obligations in these contract manufacturing relationships. However, Lucent is exposed to short–term purchase commitments as they fall within the contract manufacturers' leadtime of specific products or raw material components. As a result, any sudden and significant changes in forecasted demand requirements within the leadtime of those products or raw materials could adversely affect Lucent's results of operations and cash flows.

**Environmental Matters**

Lucent's current and historical operations are subject to a wide range of environmental protection laws. In the United States, these laws often require parties to fund remedial action regardless of fault. Lucent has remedial and investigatory activities under way at numerous current and former facilities. In addition, Lucent was named a successor to AT&T as a potentially responsible party ("PRP") at numerous "Superfund" sites pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA") or comparable state statutes. Under the Separation and Distribution Agreement with AT&T, Lucent is responsible for all liabilities primarily resulting from or relating to the operation of Lucent's business as conducted at any time prior to or after the separation from AT&T, including related businesses discontinued or disposed of prior to the separation, and Lucent's assets including, without limitation, those associated with these sites. In addition, under such Separation and Distribution Agreement, Lucent is required to pay a portion of contingent liabilities paid out in excess of certain amounts by AT&T and NCR, including environmental liabilities.

It is often difficult to estimate the future impact of environmental matters, including potential liabilities. Lucent records an environmental reserve when it is probable that a liability has been incurred and the amount of the liability is reasonably estimable. This practice is followed whether the claims are asserted or unasserted. Management expects that the amounts reserved will be paid out over the periods of remediation for the applicable sites, which typically range from five to 30 years. Reserves for estimated losses from environmental remediation are, depending on the site, based primarily on internal or third–party environmental studies and estimates as to the number, participation level and financial viability of any other PRPs, the extent of the contamination and the nature of required remedial actions. Accruals are adjusted as further information develops or circumstances change. The amounts provided for in Lucent's consolidated financial statements for environmental reserves are the gross undiscounted amounts of such reserves without deductions for insurance or third–party indemnity claims. In those cases where insurance carriers or third–party indemnitors have agreed to pay any amounts and management believes that collectibility of such amounts is probable, the amounts are reflected as receivables in the consolidated financial statements. Although Lucent believes that its reserves are adequate, there can be no assurance that the amount of capital expenditures and other expenses which will be required relating to remedial actions and compliance with applicable environmental laws will not exceed the amounts reflected in Lucent's reserves or will not have a material adverse effect on Lucent's financial condition, results of operations or cash flows. Any possible loss or range of possible loss that may be incurred in excess of the amounts provided for at September 30, 2002 cannot be estimated.

49

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**Lease Commitments**

Lucent leases land, buildings and equipment under agreements that expire in various years through 2020. Rental expense, net of sublease rentals, under operating leases was $421, $476 and $420 for the years ended September 30, 2002, 2001 and 2000, respectively. Future minimum lease payments due under non-cancelable operating leases, including leases that are part of our restructuring actions, at September 30, 2002 for fiscal 2003 through fiscal 2007 and thereafter were $253, $208, $169, $129, $106 and $725, respectively.

**18. RECENT PRONOUNCEMENTS**

Lucent is currently evaluating the impacts of SFAS No. 142, "Goodwill and Other Intangible Assets" ("SFAS 142"), SFAS No. 143, "Accounting for Asset Retirement Obligations" ("SFAS 143"), SFAS No. 144," Accounting for the Impairment or Disposal of Long–Lived Assets" ("SFAS 144"), SFAS No. 146,"Accounting for Costs Associated with Exit or Disposal Activities" ("SFAS 146") and FASB Interpretation No. 45," Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness to Others" ("FIN 45") to determine the effect, if any, they may have on the consolidated financial position and results of operations. Lucent is required to adopt each of these standards effective with the first quarter of fiscal 2003, except SFAS 146 and FIN 45, which will be effective with the second quarter of fiscal 2003.

On October 1, 2002, the Company adopted SFAS 142, which requires goodwill to be tested for impairment on an annual basis and more frequently in certain circumstances, and written down when impaired, rather than amortized, as previously required. Identifiable intangible assets will continue to be amortized over their useful lives. The criteria for recognizing an intangible asset have also been revised. SFAS 142 also requires that goodwill be tested for impairment initially within one year of adoption and at least annually thereafter. If an impairment loss exists as a result of the transitional goodwill impairment test, the implementation of SFAS 142 could result in a one–time charge to earnings as a cumulative effect of accounting change. The goodwill impairment test is a two–step process that requires goodwill to be allocated to reporting units which are reviewed by the units' segment managers. In the first step, the fair value of the reporting unit is compared with the carrying value of the reporting unit. If the fair value of the reporting unit is less than the carrying value of the reporting unit, goodwill impairment may exist, and the second step of the test is performed. In the second step, the implied fair value of the goodwill is compared with the carrying value of the goodwill, and an impairment loss will be recognized to the extent that the carrying value of the goodwill exceeds the implied fair value of the goodwill. As of September 30, 2002, there was approximately $209 of net goodwill primarily within the INS segment that will be subject to this new pronouncement and will no longer be amortized but will be subject to the transitional and subsequent annual impairment test. The Company is assessing whether any charge will be required upon completion of the transitional impairment test and expects to complete step one of the transitional test during the first quarter of fiscal 2003.

In August 2001, the FASB issued SFAS 143, which establishes accounting standards for recognition and measurement of a liability for the costs of asset retirement obligations. Under SFAS 143, the future costs of retiring a tangible long–lived asset will be recorded as a liability at their present value when the retirement obligation arises and will be amortized to expense over the life of the asset. Lucent is in the process of identifying assets with retirement obligations, including leased properties that contractually obligate the Company to remove leasehold improvements and restore the properties to the original condition. The adoption of SFAS 143 is not expected to materially affect the consolidated financial statements.

In October 2001, the FASB issued SFAS 144, which addresses financial accounting and reporting for the impairment or disposal of long–lived assets and discontinued operations. SFAS 144 supersedes SFAS 121 and the accounting and reporting provisions of Accounting Principles Board Opinion No. 30 ("APB 30") for the disposal of a segment of a business. SFAS 144 retains the basic principles of SFAS 121 for long–lived assets to be disposed of by sale or held and used and modifies the accounting and disclosure rules for discontinued operations. The adoption of SFAS 144 is not expected to materially affect the consolidated financial statements.

In July 2002, the FASB issued SFAS 146, which addresses significant issues regarding the recognition, measurement, and reporting of costs that are associated with exit and disposal activities, including restructuring activities that are currently accounted for pursuant to the guidance that the Emerging Issues Task Force ("EITF") has set forth in EITF Issue No. 94–3," Liability Recognition for Certain Employee Termination Benefits and Other Costs to Exit an Activity (Including Certain Costs Incurred in a Restructuring)." SFAS 146 revises the accounting for certain lease termination costs and employee termination benefits, which are generally recognized in connection with restructuring activities.

In November 2002, the FASB issued FIN 45, which expands previously issued accounting guidance and disclosure requirements for certain guarantees. FIN 45 requires Lucent to recognize an initial liability for the fair value of an obligation assumed by issuing a guarantee. The provision for initial recognition and measurement of the liability will be applied on a prospective basis to guarantees issued or modified after December 31, 2002. The adoption of FIN 45 is not expected to materially affect the consolidated financial statements.

50

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**19. QUARTERLY INFORMATION (UNAUDITED)**

| | First | Second | Third | Fourth | Total |
|---|---|---|---|---|---|
| **YEAR ENDED SEPTEMBER 30, 2002** | | | | | |
| Revenues | $ 3,579 | $ 3,516 | $ 2,949 | $ 2,277 | $ 12,321 |
| Gross margin | $ 435 | $ 802 | $ 651 | $ (336) | $ 1,552 |
| Business restructuring charges (reversals) and asset impairments, net (including amounts affecting gross margin) | $ (68) | $ (60) | $ 1,645 | $ 799 | $ 2,316 |
| Provision (benefit) for income taxes | $ (486) | $ (61) | $ 5,329 | $ (25) | $ 4,757 |
| Loss from continuing operations | $ (423) | $ (595) | $ (7,999) | $ (2,809) | $ (11,826) |
| Loss from discontinued operations | — | 100 | (27) | — | 73 |
| Net loss | $ (423) | $ (495) | $ (8,026) | $ (2,809) | $ (11,753) |
| Loss per common share – basic and diluted[a]: | | | | | |
| Loss from continuing operations | $ (0.14) | $ (0.19) | $ (2.34) | $ (0.84) | $ (3.51) |
| Loss from discontinued operations | — | 0.03 | (0.01) | — | 0.02 |
| Net loss applicable to common shareowners | $ (0.14) | $ (0.16) | $ (2.35) | $ (0.84) | $ (3.49) |
| Dividends per share | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 |
| | | | | | |
| **YEAR ENDED SEPTEMBER 30, 2001** | | | | | |
| Revenues | $ 4,346 | $ 5,907 | $ 5,886 | $ 5,155 | $ 21,294 |
| Gross margin | $ 681 | $ 485 | $ 829 | $ 63 | $ 2,058 |
| Business restructuring charges and asset impairments, net (including amounts affecting gross margin) | — | $ 2,710 | $ 684 | $ 8,022 | 11,416 |
| Provision (benefit) for income taxes | $ (778) | $ (1,649) | $ (967) | $ (2,340) | $ (5,734) |
| Loss from continuing operations | $ (1,575) | $ (3,388) | $ (1,878) | $ (7,329) | $ (14,170) |
| Loss from discontinued operations | (5) | (308) | (1,360) | (1,499) | (3,172) |
| Loss before extraordinary item and cumulative effect of accounting changes | $ (1,580) | $ (3,696) | $ (3,238) | $ (8,828) | $ (17,342) |
| Extraordinary gain, net | 1,154 | — | — | 28 | 1,182 |
| Cumulative effect of accounting changes | (38) | — | — | — | (38) |
| Net loss | $ (464) | $ (3,696) | $ (3,238) | $ (8,800) | $ (16,198) |
| Loss per common share — basic and diluted[a]: | | | | | |
| Loss from continuing operations | $ (0.47) | $ (1.00) | $ (0.55) | $ (2.16) | $ (4.18) |
| Loss from discontinued operations | (0.00) | (0.09) | (0.40) | (0.44) | (0.93) |
| Loss before extraordinary item and cumulative effect of accounting changes | $ (0.47) | $ (1.09) | $ (0.95) | $ (2.60) | $ (5.11) |
| Net loss applicable to common shareowners | $ (0.14) | $ (1.09) | $ (0.95) | $ (2.59) | $ (4.77) |
| Dividends per share | $ 0.02 | $ 0.02 | $ 0.02 | $ 0.00 | $ 0.06 |

(a)   The loss per common share from continuing operations and the net loss per share for the fourth quarter of fiscal 2001 and each of the quarters of fiscal 2002, includes the effect of preferred dividends and accretion of $28, $42, $40, $42 and $43, respectively. In addition, the loss per common share for the fourth quarter of fiscal 2002 includes the effect of $29 conversion cost associated with the exchange of 8% redeemable convertible preferred stock.

· EXHIBIT 21

## LUCENT TECHNOLOGIES INC.'S SUBSIDIARIES

| | |
|---|---|
| Lucent Technologies Argentina S.A. (Lucent Technologies Sociedad Anonima Argentina) | Argentina |
| Lucent Technologies Australia Pty. Ltd. | Australia |
| Lucent Technologies Austria Gmbh | Austria |
| Lucent Technologies Foreign Sales Corporation | Barbados |
| Lucent Technologies Network Systems Belgium S.A./N.V. | Belgium |
| INS Network Services SPRL | Belgium |
| Ascend Communications (Bermuda) Holding Limited | Bermuda |
| Excel Switching Europe SA | Belgium |
| Lucent Technologies Network Systems do Brasil Ltda | Brazil |
| SID Telecomunicacoes E Controles, S.A. | Brazil |
| Lucent Technologies Comercio e Servicio Ltd. | Brazil |
| Lucent Technologies World Services, Inc. (Brunei branch) | Brunei |
| Lucent Technologies Canada Corp. | Canada |
| Stratus Computer Corporation | Canada |
| Lucent Technologies (Chile) Limitada | Chile |
| Ascend Communications Colombia Ltda. | Colombia |
| Lucent Technologies Colombia S.A. | Colombia |
| Lucent Technologies de Costa Rica S.A. | Costa Rica |
| Lucent Technologies Cyprus Limited | Cyprus |
| Lucent Technologies Czech Republic s.r.o. | Czech Republic |
| Lucent Technologies ApS | Denmark |
| Lucent Technologies Hispaniola C. por A. | Dominican Republic |
| Lucent Technologies International Inc. (Egypt Branch) | Egypt |
| Lucent Technologies El Salvador S.A. de C.V. | El Salvador |
| Lucent Technologies France S.A. | France |
| Lucent Technologies Network Systems GmbH | Germany |
| Lucent Technologies EMEA B.V. (Greece) | Greece |
| Lucent Technologies de Guatemala S.A. | Guatemala |
| Lucent Technologies de Honduras S.A. | Honduras |
| Lucent Technologies Asia/Pacific (H.K) Ltd. | Hong Kong |
| Lucent Technologies Korea Ltd. (Hong Kong branch) | Hong Kong |
| Lucent Technologies India Pvt. Ltd. | India |
| Lucent Technologies Hindustan Ltd. | India |
| P.T. Lucent Technologies Network Systems Indonesia | Indonesia |
| Lucent Technologies Europe | Ireland |
| Lucent Technologies Holding and Finance Company Limited | Ireland |
| Lucent Technologies International Sales Limited | Ireland |
| Lucent Technologies Optical Networks (Israel) Ltd. | Israel |
| Lucent Technologies Israel Ltd. | Israel |
| WaveAccess, Ltd. | Israel |
| Lucent Technologies Italia S.p.A. | Italy |
| Lucent Technologies Japan Ltd. | Japan |
| Lucent Technologies Korea Ltd. | Korea |
| Lucent Technologies (Malaysia) Sdn. Bhd. | Malaysia |
| Lucent Technologies de Mexico S.A. de C.V. | Mexico |
| Lucent Technologies Holdings de Mexico S.A. de C.V. | Mexico |
| Bedrijvencomplex Huizen/Hilversum C.V. | Netherlands |
| Lucent Technologies EMEA B.V. | Netherlands |
| Lucent Technologies EMEA Services B.V. | Netherlands |

| | |
|---|---|
| Lucent Technologies Nederland B.V. | Netherlands |
| INS Network Management B.V. | Netherlands |
| SRA Computers C.V. | Netherlands |
| Lucent Technologies (New Zealand) Limited | New Zealand |
| Lucent Technologies Nicaragua S.A. | Nicaragua |
| Lucent Technologies Norway A.S. | Norway |
| Guoxin Lucent Technologies Network Technology Co. Ltd. | P.R.C. |
| Lucent Technologies Optical Networks (China) Ltd. | P.R.C. |
| Lucent Technologies Qingdao Telecommunications Equipment Ltd. | P.R.C. |
| Lucent Technologies Qingdao Telecommunications Systems Ltd. | P.R.C. |
| Lucent Technologies (China) Co., Ltd. | P.R.C. |
| Lucent Technologies (Shanghai) International Enterprises, Ltd. | P.R.C. |
| Lucent Technologies Shanghai Information & Communications of Shanghai, Ltd. | P.R.C. |
| Shanghai Lucent Technologies Transmission Equipment Co., Ltd. | P.R.C. |
| Lucent Technologies (Shenzhen) Co., Ltd. | P.R.C. |
| Lucent Technologies del Peru S.A. | Peru |
| Lucent Technologies Philippines Inc. | Philippines |
| Lucent Technologies Poland S.A. | Poland |
| Lucent Technologies International Inc. —Secursal en Portugal | Portugal |
| Lucent Technologies Caribbean and Latin America Sales Ltd. | Puerto Rico |
| ZAO Lucent Technologies | Russian Federation |
| Lucent Technologies Sistema Switching Solutions | Russian Federation |
| Lucent Technologies International Inc. (Saudi Arabia branch) | Saudi Arabia |
| Lucent Technologies Consumer Products Pte. Ltd. | Singapore |
| Lucent Technologies Singapore Pte. Ltd. | Singapore |
| Lucent Technologies Slovenia d.o.o. | Slovenia |
| Lucent Technologies South Africa (Proprietary) Ltd. | South Africa |
| LT Parsipanis S.L. | Spain |
| Lucent Technologies Espana S.A. | Spain |
| Lucent Technologies Sweden AB. | Sweden |
| Lucent Technologies A.G. (also registered as 'Lucent Technologies S.A. Zurich') | Switzerland |
| Lucent Technologies Taiwan Inc. (Taiwan branch) | Taiwan |
| Lucent Technologies Taiwan Telecommunications Co. Ltd. | Taiwan |
| Lucent Technologies Network Technologies (Thailand) Co., Ltd. | Thailand |
| Lucent Technologies Thailand Inc. (Thailand branch) | Thailand |
| Lucent Technologies Telekomunikasyon Limited Sirketi | Turkey |
| Lucent Technologies International Inc. (U.A.E. branch) | UAE (United Arab Emirates) |
| Lucent Technologies M.E. Inc. Dubai | UAE (United Arab Emirates) |
| Lucent Technologies Network Systems UK Ltd. | UK |
| Lucent Technologies Holdings UK Limited | UK |
| Lucent Technologies UK Limited | UK |
| ZAO Lucent CheZaRa | Ukraine |
| Lucent Technologies Uruguay S.A. | Uruguay |
| Ascend Communications, Inc. | US |
| AG Communications Systems Corporation | US |
| Bell Laboratories, Inc. | US |
| Chromatis Networks Inc. | US |

| | |
|---|---|
| Day Investment Corp. | US |
| First Beacon Insurance Company | US |
| KED Funding LLC | US |
| LT01 LLC | US |
| LTI NJ Finance LLC | US |
| LTI Properties Finance LLC | US |
| LTI Properties Holdings LLC | US |
| Lucent Asset Management Corporation | US |
| Lucent Cable Communications Inc. | US |
| Lucent Technologies Americas Inc. | US |
| Lucent Technologies Asia/Pacific Inc. | US |
| Lucent Technologies Canada LLC | US |
| Lucent Technologies Construction Services, Inc. | US |
| Lucent Technologies Eastern Ventures Ltd. | US |
| Lucent Technologies Eurasia Ltd. | US |
| Lucent Technologies Fiber Guardian LLC | US |
| Lucent Technologies Guardian I LLC | US |
| Lucent Technologies GRL LLC | US |
| Lucent Technologies Holdings LLC | US |
| Lucent Technologies Optical Networking Guardian LLC | US |
| Lucent Technologies International Inc. | US |
| Lucent Technologies Management Services Inc. | US |
| Lucent Technologies Realty Inc. | US |
| Lucent Technologies Taiwan Inc. | US |
| Lucent Technologies Thailand Inc. | US |
| Lucent Technologies Ventures Inc. | US |
| Lucent Technologies Wireless Guardian Corp. | US |
| Lucent Technologies World Services Inc. | US |
| Lucent Venture Partners I LLC | US |
| Lucent Venture Partners II LLC | US |
| Lucent Venture Partners III LLC | US |
| Lucent Venture Partners Inc. | US |
| Nassau Metals Corporation | US |
| NCS OSP Development Corp. | US |
| Nexabit Networks Inc. | US |
| SpringTide Networks, Inc. | US |
| Stratus Computer, Inc. | US |
| Stratus Securities Corp. | US |
| Stratus World Trade Corp. | US |
| Western Electric Company, Incorporated | US |
| Western Electric International Incorporated | US |
| WM Funding LLC | US |
| Lucent Technologies Venezuela S.A. | Venezuela |

Certain subsidiaries, which considered in the aggregate as a single subsidiary, would not constitute a significant subsidiary as of September 30, 2002, have been omitted in accordance with Item 601(b)(21)(ii) of Regulation S–K.

**EXHIBIT 23**

### CONSENT OF INDEPENDENT ACCOUNTANTS

We hereby consent to the incorporation by reference in the registration statements on Form S–3 (File No.'s 333–89347, 333–85219, 333–85061, 333–42532, 333–72282 and 333–90628) and Form S–8 (File No.'s 333–45253, 333–64525, 333–46589, 333–52799, 333–72425, 333–79007, 333–52805, 333–56133, 333–08775, 333–37041, 333–33943, 333–18975, 333–18977, 333–08783, 333–81751, 333–87685, 333–88201, 333–87151, 333–84981, 333–80267, 333–08789, 333–08793, 333–08801, 333–23043, 333–42475, 333–31400, 333–31738, 333–40992, 333–43184 and 333–64188) of Lucent Technologies Inc. of our report dated October 23, 2002, except for the second paragraph of Note 4, the third paragraph of Note 10 and the first paragraph of Note 12, as to which the date is December 4, 2002 relating to the consolidated financial statements, which appears in the Annual Report to Shareowners, which is incorporated in this Annual Report on Form 10–K. We also consent to the incorporation by reference of our report dated October 23, 2002, except for the second paragraph of Note 4, the third paragraph of Note 10 and the first paragraph of Note 12, as to which the date is December 4, 2002 relating to the financial statement schedule, which appears in this Form 10–K.

**PRICEWATERHOUSECOOPERS LLP**
NEW YORK, NEW YORK
DECEMBER 12, 2002

**Exhibit 24**

POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS:

WHEREAS, Lucent Technologies Inc., a Delaware corporation (the "Company"), proposes to file with the Securities and Exchange Commission, under the provisions of the Securities Exchange Act of 1934, as amended, an Annual Report on Form 10-K for the fiscal year ended September 30, 2002; and

WHEREAS, the undersigned is a director of the Company;

NOW, THEREFORE, each of the undersigned hereby constitutes and appoints Frank A. D'Amelio, John A. Kritzmacher and Richard J. Rawson, and each of them, as attorneys-in-fact for and in the name, place and stead of the undersigned, and in the capacity of the undersigned as a director of the Company, to execute the above referenced Form 10-K and any amendments or supplements thereto, hereby giving and granting to said attorneys-in-fact, full power and authority to do and perform each and every act and thing required and necessary to be done in and about the premises, as fully to all intents and purposes as the undersigned might or could do in person, hereby ratifying and confirming all that each attorney-in-fact may or shall lawfully do or cause to be done by virtue of this Power of Attorney.

IN WITNESS WHEREOF, the undersigned has executed this Power of Attorney on December 12, 2002.


By:  /s/ Paul A. Allaire                    By:  /s/ Robert E. Denham

Name: Paul A. Allaire                       Name: Robert E. Denham



By:  /s/ Daniel S. Goldin                   By:  /s/ Carla A. Hills

Name: Daniel S. Goldin                      Name: Carla A. Hills


By:  /s/ Patricia F. Russo                  By:  /s/ Henry B. Schacht

Name: Patricia F. Russo                     Name: Henry B. Schacht


By:  /s/ Franklin A. Thomas                 By:  /s/ John A. Young

Name: Franklin A. Thomas                    Name: John A. Young

Exhibit 99.2

## CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES–OXLEY ACT OF 2002

I, Patricia F. Russo, Chief Executive Officer of Lucent Technologies Inc. (the "Company"), certify, pursuant to Section 906 of the Sarbanes–Oxley Act of 2002, 18 U.S.C. Section 1350, that:

(1) the Annual Report on Form 10–K of the Company for the fiscal year ended September 30, 2002 (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and

(2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: December 12, 2002

/s/ Patricia F. Russo
Patricia F. Russo
Chief Executive Officer

**Exhibit 99.3**

### CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES–OXLEY ACT OF 2002

I, Frank A. D'Amelio, Chief Financial Officer of Lucent Technologies Inc. (the "Company"), certify, pursuant to Section 906 of the Sarbanes–Oxley Act of 2002, 18 U.S.C. Section 1350, that:

(1) the Annual Report on Form 10–K of the Company for the fiscal year ended September 30, 2002 (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and

(2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: December 12, 2002

/s/ Frank A. D'Amelio
Frank A. D'Amelio
Chief Financial Officer

Created by 10KWizard Technology    www.10KWizard.com

05/02/03  15:00 FAX 202 942 5211       ARNOLD & PORTER                    ☑002

# 2002

# LexisNexis

# CORPORATE

# AFFILIATIONS



ARNOLD & PORTER
OCT 0 2 2002
LIBRARY



LexisNexis™

**LUBYS**                                                                                                      **U.S. PUBLIC**

Luby's Cafeterias, Inc.—(Continued)

Tel.: 210-654-9000                                      DE
Fax: 210-871-7856
Web Site: www.lubys.com

Year Founded: 1947 .
LUB—(NYSE)
Approx. Sis.: $493,384,000
Earnings: $9,125,000
Emp.: 14,000
Fiscal Year-end: 08/31/00

**Business Description:**
Owns & Operates Restaurants in AZ,
AK, FL, LA, MO, MS, NM, OK, TN
& TX
S.I.C.: 5812
# of Domestic Offices: 225
**Personnel:**
Robert T. Herres (Chrm. Bd.)
Christopher J. Pappas (Pres. & Chief
Exec. Officer)
Harris J. Pappas (Chief Oper. Officer)
Alan M. Davis (Sr. V.P.-Real Estate
Devel.)
Raymond C. Gabrysch (Sr. V.P.-
Opers.)
Clyde C. Hays, III (Sr. V.P.-Opers.)
Janet L. Duckham (V.P.-Pur. & Product
Devel.)
Gerald K. Ferris (V.P.-Risk Mngmt.)
Carolyn M. Pelitza (V.P.-Fin. Proj.)
Wayne R. Shirley (V.P.-Corp. H.R.)
Susan L. Beggs (Asst. V.P.-
Shareholder Rels. & Asst. Sec.)
Patricia F. Speck (Asst. V.P.-Profit
Sharing Admin.)
Paula Gold-Williams (Controller)
James R. Hala (Gen. Counsel & Sec.)
John Wamoka (Mgr.-D.P.)
Debra L. Wainscott (Asst. Sec.)
**Board of Directors:**
Robert T. Herres
Ronald K. Calgaard
Lauro F. Cavazos
Judith Craven
David B. Davies
Arthur Rojas Emerson
Roger R. Hemminghaus
John B. Lahourcade
Walter J. Salmon
George H. Wenglein
Joanne Winik

**Auditor:**
Ernst & Young
1000 Frost Bank Tower 100 W. Houston St.
San Antonio, TX 78205
Tel.: 210-226-0696
Fax: 210-554-0253

**Legal Counsel:**
Cauthorn Hale, Hornberger, Fuller,
Sheehan & Becker
700 N. St. Mary's St., Ste. 520
San Antonio, TX 78205
Tel.: 210-271-1700

**Registrar:**
American Stock Transfer & Trust
Company
40 Wall St.
New York, NY 10005
Tel.: 800-937-5449

**Transfer Agent:**
American Stock Transfer & Trust
Company
40 Wall St.
New York, NY 10005
Tel.: 800-937-5449

**LUCENT TECHNOLOGIES INC.**
600 Mountain Ave
New Providence, NJ 07974-2008

1556

Tel.: 908-582-8500; 908-582-5713 DE
Fax: 908-582-1209
Toll Free: 888-4LUCENT
Web Site: www.lucent.com

Year Founded: 1996
LU—(NYSE)
Approx. Rev.: $34,049,000,000
Emp.: 125,000
Fiscal Year-end: 09/30/00

**Business Description:**
Designs, Builds & Delivers Public &
Private Networks, Communications
Systems & Software, Consumer &
Business Telephone Systems &
Microelectronics Components
S.I.C.: 4813; 3663; 5065
**Personnel:**
Henry R. Schacht (Chrm & CEO)
Ben Verwaayen (Vice Chrm.)
Michael J. Butler (Pres.-Intl. Opers.)
James K. Brewington (Grp. Pres.-
Wireless Networks)
Janet Davidson (Grp. Pres.-Switching
Solutions & InterNetworking Systems
Grp.)
Arun Netravali (Pres.-Bell Labs)
Thomas M. Uhlman (Pres.-New
Ventures)
David Ford (Foundation Pres.)
Larry Kittelberger (Chief Info. Officer,
& Sr. V.P.)
Frank A. D'Amelio (Chief Fin. Officer
& Exec. V.P.)
Jose Mejia (Chief Supply Officer)
Robert C. Holder (Exec. V.P.-Corp.
Opers.)
William Y. O'Shea (Exec. V.P.-Corp.
Strategy & Bus. Devel. & Chief Tech.
Officer)
Curt Artis (Sr. V.P.-H.R.)
Kathleen M. Fitzgerald (Sr. V.P.-Pub.
Rels., Investor Rels. & Adv.)
Richard J. Rawson (Sr. V.P. & Gen.
Counsel)
Martine Hund-Mejean (V.P. & Treas.)
Jim Lusk (V.P. & Controller)
Kent Miller (Dir.-Corp. Adv. & Brand
Mngmt.)
**Board of Directors:**
Henry B. Schacht
Paul A. Allaire
Betsy S. Atkins
Carla A. Hills
Paul H. O'Neill
Franklin A. Thomas
Ben Verwaayen
John A. Young

**Auditor:**
PricewaterhouseCoopers LLP
1301 Ave of the Americas
New York, NY 10019-6013
Tel.: 212-259-1000

**Transfer Agent:**
The Bank of New York
101 Barclay St
New York, NY 10286
Tel.: 212-815-2321
Toll Free: 800-524-4458

**Divisions:**

Atlantic Lucent                          (1)
924 Grand Regency Blvd.
Brandon, FL 33510-3931
Tel.: 888-556-2255
Web Site: www.expansisouth.com
S.I.C.: 4813
Rick Schonbrun (V.P.)

Lucent InterNetworking Systems         (1)
One Ascend Plaza 1701 Harbor Bay Pkwy.
Alameda, CA 94502                       CA

Tel.: 510-769-6001
Fax: 510-814-2530
Toll Free: 800-621-9678
E-Mail: info@lucent.com
Web Site: www.lucent.com
Approx. Sis.: $1,476,682,000
Earnings: ($19,654,000)
Emp.: 721
Fiscal Year-end: 12/31/00
Develops, Manufactures, Markets, Sells &
Supports a Broad Range of High-Speed
Digital Remote Networking Products
Covering ISPS, WANS, Telecommunication
Carriers
S.I.C.: 5065; 3669
Janet Davidson (Grp. Pres.)
Michael Hendren (Sr. V.P.-N. American Sis.)
David Colicchio (V.P.-Customer Support/
Global Integration Svcs.)
William Kid (V.P.-Engrng.)
David Mauges (V.P.-Strategic Bus. Devel.)
Anthony Stagno (V.P.-Mktg. & Oper.)
Bea Maciel (V.P.-Mktg. Commun.)

Lucent Technologies                     (1)
2110 Washington Blvd
Arlington, VA 22204-5719
Tel.: 703-553-3000
S.I.C.: 7373

Lucent Technologies                     (1)
2501 4th Ave
Seattle, WA 98121-3208 .
Tel.: 206-615-5717 .
Fax: 206-615-6818
Marketing Office
S.I.C.: 3661
George Ullig (Mgr-Sis.)

Lucent Technologies                     (1)
2825 N 12th St
Reading, PA 19605-2749
Mailing Address:
PO Box 13386
Reading, PA 19612-3396
Tel.: 610-939-7011
Mfr. of Electronics
S.I.C.: 3661

Lucent Technologies, Business
Communications Systems Div.            (1)
38 Mt. Bethel Rd.
Basking Ridge, NJ 07920             (100%)
Toll Free: 800-247-7000 (Small Bus.)
Business Telephone Systems; Voice
Messaging & Telemarketing Systems;
Multimedia & Visual Communications;
Computer Telephone Integration
S.I.C.: 4813; 1731; 5065
Bill O'Shea (Pres.)

Lucent Technologies, Network
Systems Div.                           (1)
283 King George Rd
Warren, NJ 07059-6134               (100%)
Tel.: 908-559-3000
Data & Broadband Networking;
Asynchronous Transfer Mode Switches;
Wireless Systems; Network Cable Systems;
Switching Systems, ISDN, CATV
Transmission Systems; Interactive Video
Servers & Interactive Vehicular Highway
Systems
S.I.C.: 3663; 7374
Daniel C. Stanzione (Pres.)

Octel Lucent Tech.                      (1)
1001 Murphy Ranch Rd
Milpitas, CA 95035-7912
Tel.: 408-321-2000
Fax: 408-324-2702
Approx. Rev.: $277,700,000
Fiscal Year-end: 12/31/00
Telephones & Telephone Voicemail Services
S.I.C.: 3661
Henry Schacht (Pres.)

**Subsidiaries:**

AG Commun. Sys. Corp.                   (1)
2500 W Utopia Rd
Phoenix, AZ 85027-4129                  CA

**Mailing Address:**
PO Box 52179
Phoenix, AZ 85072-2179
Tel.: 602-582-7000
Fax: 623-581-4168
E-Mail: resumes@ages.com
Emp.: 1,200
Fiscal Year-end: 12/31/00
Switching Equipment Telephone
S.I.C.: 3661
Jeffrey W Seidel (Pres.)
Donald J Cole (Chief Financial Officer)
Lee Brandes (V.P.)
Linda Leonard (V.P.)

Agere Systems Inc.                      (1)
555 Union Blvd
Allentown, PA 18109-3229               DE
Tel.: 610-712-4323                     (83%)
Fax: 610-712-6451
Web Site: www.agere.com
Approx. Rev.: $4,080,000,000
Assets: $6,560,000,000
Liabilities: $4,101,000,000
Net Worth: $2,481,000,000
Earnings: ($4,616,000,000)
Emp.: 12,000
Fiscal Year-end: 09/30/01
Semiconductors And Related Devices
S.I.C.: 3674
John T. Dickson (Pres. & Chief Exec. Officer)
Mark Greenquist (Chief Fin. Officer & Exec.
V.P.)
Ronald D. Black (Exec. V.P.-Client Systems)
Sohail A Khan (Exec. V.P.-Infrastructure
Systems)
Harry Kelly (Exec. V.P.-Global Opers. Grp.)
Ahmed Nawaz (Exec. V.P.-Worldwide Sis.)
Vicki Gash (Sr. V.P.-Commun.)
Kevin Pennington (Sr. V.P.-H.R.)
Jean Rankin (Sr. V.P., Gen. Counsel & Sec.)
Gregory L Waters (Sr. V.P.-Strategy & Bus.
Devel.)

Branch:

Agere Systems                          (2)
9333 S John Young Pkwy
Orlando, FL 32819-8612
Tel.: 407-371-8000
Approx. Rev.: $123,200,000
Fiscal Year-end: 12/31/00
Semiconductors & Related Devices
S.I.C.: 3674
Peter Panousis (President)
Laura Webster (Chief Financial Officer)
Robert Koch (Vice-President)
David Williams (Vice-President)

Bell Labs                              (1)
600 Mountain Ave
New Providence, NJ 07974-2008
Tel.: 908-582-3000                      (100%)
Web Site: www.bell-labs.com
Research & Manufacturing
S.I.C.: 4813
William O'Shea (Pres.)

Subsidiary:

Lucent Technologies Engineering
Research Center                        (2)
PO Box 3030
Holmdel, NJ 07733-3030
Tel.: 609-639-1234
S.I.C.: 3661
David Lando (V.P.-Engrng. & Environ. Tech.)

Lucent Specialty Fiber
Technologies                           (1)
PO Box 1260
Avon, CT 06001-1260                     (100%)
Tel.: 860-673-0071
Fax: 860-674-8818
Web Site: www.fiber-wire.com
Mfr. of Specialty Fiber
S.I.C.: 4813
Michael Forth (Mgr.-Nat. Accts.)

## COMPANIES                                                                    LUCENT

**Lucent Technologies Americas Inc.**                    (1)
PO Box 636
New Providence, NJ 07974-0636   (100%)
Tel: 973-606-2000
S.I.C.: 4813

**Lucent Technologies Holdings Inc.**                    (1)
PO Box 636
New Providence, NJ 07974-0636   (75%)
Tel: 973-606-2000
S.I.C.: 4813

Subsidiaries:

**Lucent Technologies Opto Inc.**        (2)
2 Connell Dr
Berkeley Heights, NJ 07922-2747   (100%)
Tel: 908-771-2000
S.I.C.: 4813

**Lucent Technologies Western Investments Inc.**          (2)
PO Box 636
New Providence, NJ 07974-0636   (100%)
Tel: 973-606-2000
S.I.C.: 4813

**Telecommunications Technology Middle East Inc.**          (2)
600 Mountain Ave
New Providence, NJ 07974-2008   (100%)
Tel: 908-582-8500
S.I.C.: 4813

**Lucent Technologies International Inc.**          (1)
PO Box 636
New Providence, NJ 07974-0636   (100%)
Tel: 973-606-2000
S.I.C.: 4813

Subsidiaries:

**Lucent Technologies Asia/Pacific Inc.**          (2)
PO Box 636
New Providence, NJ 07974-0636   (102%)
Tel: 973-606-2000
S.I.C.: 4813

**Lucent Technologies Construction Services Inc.**          (2)
4725 River Green Pkwy
Duluth, GA 30096-2587   (100%)
S.I.C.: 4813

**Lucent Technologies de Honduras S.A.**          (2)
PO Box 636
New Providence, NJ 07974-0636
Tel: 973-606-2000
S.I.C.: 4813

**Lucent Technologies Eastern Ventures Inc.**          (2)
PO Box 636
New Providence, NJ 07974-0636   (100%)
Tel: 973-606-2000
S.I.C.: 4813

Non-U.S. Subsidiary:

**Lucent Technologies s.r.o.**          (3)
Navrlach 23/670
Prague, Czech Republic   (100%)
S.I.C.: 4813

**Lucent Technologies Engineering Inc.**          (2)
PO Box 636
New Providence, NJ 07974-0636
Tel: 973-606-2000

Web Site: www.lucent-eco.com
S.I.C.: 4812

**Lucent Technologies Eurasia Ltd.**          (2)
PO Box 636
New Providence, NJ 07974-0636   (100%)
Tel: 973-606-2000
S.I.C.: 4813

**Lucent Technologies Management Services Inc.**          (2)
PO Box 636
New Providence, NJ 07974-0636   (100%)
Tel: 973-606-2000
S.I.C.: 4813

**Lucent Technologies Nicaragua S.A.**          (2)
PO Box 636
New Providence, NJ 07974-0636
Tel: 973-606-2000
S.I.C.: 4813

**Lucent Technologies Puerto Rico Inc.**          (2)
950 Ave Ponce De Leon
Santurce, PR 00907-3628   (100%)
S.I.C.: 4813

**Lucent Technologies Thailand Inc.**          (2)
600 Mountain Ave
New Providence, NJ 07974-2008
Tel: 908-508-8030
Fax: 908-508-2576
Approx. Rev: $420,000
Fiscal Year-end: 03/31/00
Electronic Parts & Equipment Nec
S.I.C.: 5065
Florence Walsh (Treasurer)
Pamela Craven (Secretary)
Henery Ehacht (Manager)

**Lucent Technologies World Services Inc.**          (2)
PO Box 636
New Providence, NJ 07974-0636
Tel: 973-606-2000
Approx. Rev: $420,000
Fiscal Year-end: 03/31/00
Electronic Parts & Equipment Nec
S.I.C.: 5065
Greg H. Hughes (President)
Jim Lalein (Marketing Director)
Errol Harris (Manager)
Herbert C. Mack (Manager)

**Lucent Technologies World Services Inc.**          (2)
PO Box 636
New Providence, NJ 07974-0636   (100%)
Tel: 973-606-2000
S.I.C.: 4813

Non-U.S. Subsidiaries:

**Lucent Technologies Argentina S.A.**          (2)
Esmeralda 55 Capital Federal
1035 Buenos Aires, Argentina   (100%)
S.I.C.: 4813

**Lucent Technologies Asia/Pacific Ltd.**          (2)
30th Fl., Shed Tower Times Square, 1
Matheson St.
Causeway Bay, Hong Kong   (50%)
S.I.C.: 4813

**Lucent Technologies Australia Pty. Ltd.**          (2)
5-10 Talavera Rd.
North Ryde, Sydney, NSW, 2113, Australia   (100%)
S.I.C.: 4813

**Lucent Technologies Austria Ges.m.b.H.**          (2)
Brigittenauer Lände 50-54
A-1203 Vienna, Austria   (100%)
S.I.C.: 4813

**Lucent Technologies Belgium S.A./N.V.**          (2)
Waterloo Office Park Drève Richelle 161,
Bldg. M
1410 Waterloo, Belgium
S.I.C.: 4813

**Lucent Technologies Brasil Ltda.**          (2)
Torre do Rio Sul Rio Laura Muller 116
Gr. 3102
22290 Rio de Janeiro, Brazil   (94%)
S.I.C.: 4813

**Lucent Technologies (China) Co., Ltd.**          (2)
7th & 8th Flrs. CVIK Pl. No. 22, Jian Guo
Men
Wai Ave.
Beijing, 100004, China   (100%)
S.I.C.: 4813

Subsidiaries:

**AT&T Qingdao Power Systems Company Ltd.**          (3)
Huis Industrial City Hi-Tech Industrial Park
Qingdao, 266071, China
S.I.C.: 4813

**Lucent Technologies (Shanghai) International Enterprises, Ltd.**          (3)
Rm. 204, Xin Yi Bldg. No. 2005 Yang Gao
Rd Rd.
Shanghai, China
S.I.C.: 4813

Joint Ventures:

**AT&T Qingdao Telecommunications Equipment Ltd.**          (3)
Hui-Te Industrial City Hi-Tech Industrial Park
Qingdao, 266101, China
Joint Venture Among Lucent Technologies
(China) Co. Ltd. (51%), HiSense Electric
Corp. of Qed (29%), Shangdong Posts &
Telecommunications Industry Corp. (7.5%),
Qingdao Posts & Telecommunications
Administrative Bureau (7.5%) & China
International Trust & Investment Corp. (5%)
S.I.C.: 4813

**AT&T Qingdao Telecommunications Systems Ltd.**          (3)
Hui-Te Industrial City Hi-Tech Industrial Park
Qingdao, 266101, China
Joint Venture Among Lucent Technologies
(Shanghai) International Enterprises, Ltd.
(51%), HiSense Electric Corp. of Qed (29%),
Shangdong Posts & Telecommunications
Industry Corp. (7.5%), Qingdao Posts &
Telecommunications Administrative Bureau
(7.5%) & China International Trust &
Investment Corp. (5%)
S.I.C.: 4813

**Lucent Technologies of Shanghai, Ltd.**          (3)
704 Yi San Rd.
Shanghai, 200233, China
Joint Venture Between Lucent Technologies
(China) Co. Ltd. (50%) & Shanghai Optical
Communications Corp. (50%)
S.I.C.: 4813

**Lucent Technologies of Tianjin Cable Co. Ltd.**          (3)
Yi Bai Road Hebei District
Tianjin, China
Joint Venture Between Lucent Technologies
(China) Co. Ltd. (60%) & Tianjin Cable
Company, Ltd. (40%)

S.I.C.: 4813

**Shanghai Lucent Technologies Transmission Equipment Co., Ltd.**          (3)
1700 Yi Shan Rd.
Shanghai, 200233, China
Joint Venture Between Lucent Technologies
(China) Co. Ltd. (50%) & Shanghai
Telecommunications Equipment Factory
(50%)
S.I.C.: 4813

**Lucent Technologies Consumer Products Mexico, S.A. de C.V.**          (2)
Avenida Jardin No. 257 Col.
El Arenal
Mexico, C.P. 02970, Mexico   (100%)
S.I.C.: 4813

**Lucent Technologies Consumer Products Pty. Ltd.**          (2)
3014A Ubi Rd. 1 Kampong Ubi Industrial
Estate
Singapore, Singapore
S.I.C.: 4813

**Lucent Technologies de Costa Rica S.A.**          (2)
Edificio Centro Colon Piso Septimo, Paseo
Colon
Distho Segundo
Carton Primaro, San Jose, Costa Rica   (100%)
S.I.C.: 4813

**Lucent Technologies de Guatemala S.A.**          (2)
3a Ave. 14-30, Zona 10
Guatemala, Guatemala   (99%)
S.I.C.: 4813

**Lucent Technologies del Peru S.A.**          (2)
Paseo de la Republica 3245
P.O. Box 2445
San Isidro, Lima, 27, Peru   (100%)
S.I.C.: 4813

**Lucent Technologies El Salvador S.A. de C.V.**          (2)
Avenida Olympia 3742
San Salvador, El Salvador   (100%)
S.I.C.: 4813

**Lucent Technologies EMEA B.V.**   (2)
Larenseweg 50
P.O. Box 1166
1200 BD Hilversum, Netherlands   (100%)
S.I.C.: 4813

Non-U.S. Subsidiaries:

**Lucent Technologies Manufacturing of St. Petersburg**          (3)
17 Tchapaeva St.
Saint Petersburg, 197046, Russia   (100%)
S.I.C.: 4813

**Lucent Technologies Network Systems Belgium S.A./N.V.**          (3)
Rue des Deux 84
1070 Brussels, Belgium   (100%)
S.I.C.: 4813

**Lucent Technologies Network Systems Espana S.A.**          (3)
Ronda de Valdecarrizo. 14-H2
Tres Cantos, 28760 Madrid, Spain   (100%)
S.I.C.: 4813

**Lucent Technologies Network Systems GmbH**          (3)
Thurn-und-Taxis Strasse 10
90411 Nuremberg, Germany   (100%)
S.I.C.: 4813

1857

## CERTIFICATE OF SERVICE

I certify that today on May 6, 2003, a copy of the foregoing DELL COMPUTER

CORPORATION'S BRIEF IN SUPPORT OF ITS MOTION TO SEVER AND TRANSFER

was served upon counsel for defendants as follows:

**BY HAND**
Josy W. Ingersoll
Christian Douglas Wright
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Post Office Box 391
Wilmington, Delaware  19899-0391

**FEDERAL EXPRESS**
John M. Desmarais
Robert A. Appleby
Michael E. Stimson
Kirkland & Ellis
153 East 53rd Street
New York, New York 10022-4675

R. Eric Hutz

256468v1

COPY

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

LUCENT TECHNOLOGIES, INC., and )
LUCENT TECHNOLOGIES GUARDIAN I LLC,)
                 )      Case No. 03-CV-205-KAJ
        Plaintiffs, )
    v. )
                 )
DELL COMPUTER CORPORATION, )
                 )
        Defendant. )

# DELL COMPUTER CORPORATION'S
## BRIEF IN SUPPORT OF ITS
## <u>MOTION TO SEVER AND TRANSFER</u>

R. Eric Hutz (ID # 2702)
James D. Heisman (#2746)
**CONNOLLY BOVE LODGE & HUTZ, LLP**
1220 Market Street, Post Office Box 2207
Wilmington, DE 19899
(302) 658-9141
*Attorneys for Defendant*
*Dell Computer Corporation*

**OF COUNSEL**
Joel M. Freed
Joseph A. Micallef
**ARNOLD & PORTER**
555 12th Street NW
Washington, DC 20004
(202) 942-5000

**DATE:** May 6, 2003

## TABLE OF CONTENTS

**PAGE**

INTRODUCTION..................................................................................................1

NATURE AND STAGE OF PROCEEDINGS AND STATEMENT OF FACTS ...............1

ARGUMENT........................................................................................................3

    A.      Legal Standards ...................................................................................3

    B.      Efficient Administration Of Justice Supports Severance And
           Transfer Of Counts II-VI..................................................................4

CONCLUSION .....................................................................................................7

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES

*Air Products and Chemicals, Inc. v. MG Nitrogen Services, Inc.,*
    133 F.Supp.2d 354 (D. Del. 2001) ........................................................................ 4

*Chrysler Credit Corp. v. Country Chrysler, Inc.,*
    928 F.2d 1509 (10th Cir. 1991) ............................................................................. 4

*Codex Corp. v. Milgo Electronic Corp.,*
    553 F.2d 735 (1st Cir. 1977) ................................................................................. 3

*Corixa Corp. v. IDEC Pharmaceuticals Corp.,*
    2002 WL 265094 (D. Del. 2002) .......................................................................... 4

*Crosley Corp. v. Hazeltine Corp.,*
    122 F.2d 925 (3d Cir. 1941) ................................................................................. 4

*In re Innotron Diagnostics,*
    800 F.2d 1077 (Fed. Cir. 1986) ............................................................................ 4

*Kahn v. General Motors Corp.,*
    889 F.2d 1078 (Fed. Cir. 1989) ............................................................................ 4

*Kerotest Mfg. Co. v. C-O-Two Fire Equipment Co.,*
    342 U.S. 180 (S. Ct. 1952) ................................................................................... 3

*Miteq, Inc. v. Comtech Telecommunications Corp.,*
    2003 WL 179991 (D. Del. 2003) .......................................................................... 4

## STATUTES

*Fed. R. Civ. P. 21* ......................................................................................................... 4

*Fed. R. Civ. P. 42(b)* .................................................................................................... 4

## INTRODUCTION

This is a patent infringement case in which plaintiffs (collectively "Lucent") have alleged that Defendant Dell Computer Corporation ("Dell") has infringed six patents. Infringement allegations relating to five out of those six patents implicate software which Dell purchases from Microsoft Corporation ("Microsoft") and then installs in Dell's products. Dell played no role in the design and development of that software. Dell is a customer of Microsoft for that software and has sought indemnification from Microsoft.

Based on Lucent's patent assertions against Dell and other Microsoft customers, Microsoft has brought suit against Lucent in the United States District Court for the Southern District of California ("the Declaratory Judgment Microsoft case"). The Declaratory Judgment Microsoft case asks for declarations of noninfringement and invalidity of a number of patents that Lucent has threatened Microsoft's customers with -- including each of the five patents in this case that implicate software purchased by Dell from Microsoft.

It would be wasteful to litigate identical issues in two different courts. Accordingly, Dell hereby moves for an order severing the claims for infringement of those five patents set out in Counts II through VI of the complaint (along with Dell's counterclaim as it relates thereto) and transferring them to the Southern District of California where the Declaratory Judgment Microsoft case is pending.

## NATURE AND STAGE OF PROCEEDINGS AND STATEMENT OF FACTS

Dell sells computer systems, and for over fifteen years has pioneered outsourcing and manufacturing techniques for high quality computer systems which employ the latest technology at the lowest cost. (*See,* Declaration of Henry N. Garrana – "Garrana Decl." – filed concurrently herewith, at ¶2.) These computer systems are sold with Microsoft operating systems and

application software installed.  Dell's relationship with Microsoft is one of customer to manufacturer, *i.e.,* Dell plays no part in the design or development of Microsoft software. (Garrana Decl. ¶3.)

In 1998, representatives of Lucent contacted Dell concerning several Lucent patents. Thereafter, representatives of the two companies met and corresponded from time to time over a 5-year period to discuss the professed applicability of Lucent's patents to Dell products. (Garrana Decl. ¶4.)  Lucent's representatives contended that several of its patents apply to any device that practices certain MPEG standards, which contentions implicated the software from Microsoft that is installed in Dell's products.  (Garrana Decl. ¶5.)  With respect to another patent, they identified a functionality of Dell's website, provided by Microsoft's Commerce Server software products.  (*Id.*)  Finally, one patent asserted in the complaint but not mentioned in pre-suit correspondence appears to be directed to Microsoft's PocketPC software included in some of Dell's products.  (*Id.*)  Accordingly, Dell requested indemnification from Microsoft.  (Garrana Decl. ¶6.)

Based on Lucent's patent assertions against Dell and other Microsoft customers, Microsoft brought the Declaratory Judgment Microsoft case against Lucent in the United States District Court for the Southern District of California.  The complaint in that case is attached as Exhibit A.  It seeks declarations of noninfringement and invalidity of a number of patents with which Lucent has threatened Microsoft's customers -- including the five patents in this case that implicate the software purchased by Dell from Microsoft Corporation.  (*See* Counts V-IX of

2

Exhibit A.)[1]  The application of those five patents to Dell products is therefore at issue in that case.

Accordingly, in this case the Court is faced with a classic "customer infringement suit" where a suit involving the supplier with the real interest in the infringement allegations is in litigation elsewhere with the patentee over the same patents and the same products.

## ARGUMENT

### A.   Legal Standards

Where two cases directed to the same issues are pending the general rule is that the first filed should proceed. *Kerotest Mfg. Co. v. C-O-Two Fire Equipment Co.,* 342 U.S. 180, 185-186 (S. Ct. 1952).  But a long recognized exception to this rule is where a manufacturer files a second suit seeking a declaratory judgment concerning the allegations of infringement against the customer. *Id.*  In such a situation, the courts favor the manufacturer's suit as the one involving

---

[1]  The sole patent in this case which is not included in the Declaratory Judgment Microsoft case against Lucent in the United States District Court for the Southern District of California (namely, U.S. Patent No. 4,439,759) is also before that same California Court in a related case.  Lucent sued Gateway, Inc. ("Gateway"), another seller of computer systems, on June 6, 2002 in the United States District Court for the Eastern District of Virginia for infringement of that and six other patents ("the Gateway case").  A copy of the complaint in the Gateway case is attached as Exhibit B.  On motion by Gateway, the Gateway case was transferred to the United States District Court for the Southern District of California.  The transfer order is attached as Exhibit C.  Microsoft intervened in the Gateway case in California and counterclaimed against Lucent for a declaratory judgment that five of the seven patents at issue there were invalid and not infringed.  A copy of that pleading is attached as Exhibit D.

Dell does not specifically here move for transfer with regard to U.S. Patent No. 4,439,759.  In the future, however, should Lucent identify a Microsoft product as the basis for its allegations against Dell of infringement of that patent, Dell would move the Court for transfer with regard to that patent as well.  And given that the patent is already before the California Court in the Gateway case, this Court may determine that such a transfer is warranted even at this stage.

the real parties in interest. *Codex Corp. v. Milgo Electronic Corp.*, 553 F.2d 735 (1ˢᵗ Cir. 1977); *Kahn v. General Motors Corp.*, 889 F.2d 1078 (Fed. Cir. 1989). This rule has long been recognized in the Federal Circuit, the Third Circuit and has been applied in this District. *Kahn v. General Motors Corp.*, 889 F.2d 1078 (Fed. Cir. 1989); *Crosley Corp. v. Hazeltine Corp.*, 122 F.2d 925 (3d Cir. 1941); *Miteq, Inc. v. Comtech Telecommunications Corp.*, 2003 WL 179991, *1 (D. Del. 2003) (attached as Exhibit E).

A district court has ample discretion to apply this rule, *see, Air Products and Chemicals, Inc. v. MG Nitrogen Services, Inc.*, 133 F.Supp.2d 354, 356 (D. Del. 2001), even where the customer suit includes allegations beyond what is included in the manufacturer's suit, *Corixa Corp. v. IDEC Pharmaceuticals Corp.*, 2002 WL 265094, *3 (D. Del. 2002) (attached as Exhibit F). Furthermore, the court has ample authority to sever different causes of action where the issues warrant doing so. *Fed. R. Civ. P. 21*; *Corixa Corp,*, 2002 WL 265094, *3 (D. Del. 2002). And the court also may stay or transfer severed counts where the efficient administration of justice requires it. *Fed. R. Civ. P. 42(b)*; *In re Innotron Diagnostics*, 800 F.2d 1077, 1084 (Fed. Cir. 1986); *Chrysler Credit Corp. v. Country Chrysler, Inc.*, 928 F.2d 1509, 1518-19 (10ᵗʰ Cir. 1991).

**B.** **Efficient Administration Of Justice Supports Severance And Transfer Of Counts II-VI**

While the Declaratory Judgment Microsoft case was filed after the present action, the manufacturer's suit exception is applicable here. Counts II through VI of the complaint implicate software which Dell purchases from Microsoft Corporation. The same patents and the same products are at issue in the Microsoft case (and some of the same are at issue in the Gateway case) before the California court.

Microsoft and Lucent will take part in the same discovery in the California cases that will be required in this one. The same documents will be produced, the same inventors, individuals involved in patent procurement, developers, business people, and experts will be deposed. The same patents and file histories will be analyzed, the same interpretation arguments briefed and the same claims construed. The same prior art will be discovered, asserted and argued over. The same summary judgment motions made and the same evidence presented.

Moreover, in this case Microsoft is a third party. And while the Federal Rules provide for third party discovery, the interests of judicial administration are served best by proceeding in the California court where disputes over confidentiality, burden, scope and timing of discovery can all be addressed in context by the Judge before whom Microsoft also is appearing as a party.

Furthermore, the efficiencies that can be achieved by the severance and transfer here requested cannot be achieved in reverse. The Declaratory Judgment Microsoft case in California includes Lucent patents not at issue in this Court, including some that are at issue in the Gateway case but not here. Also, the Gateway case includes two Lucent patents asserted in the complaint here. Even if Microsoft's allegations relating to the patents at issue here were dismissed or transferred from California, Microsoft and Lucent would still be litigating in California. Indeed, they would still be litigating two of the patents asserted here. At this point, the only court that can efficiently resolve all of these disputes is the California court.

Permitting that Court to do so prejudices no party. Lucent is a national corporation, having sales last year of $12.3 billion dollars (Lucent SEC-10K, 12/12/02 attached as Exhibit G) and maintaining offices in eight states (2002 Corporate Affiliations Vol. III, attached as Exhibit H), including California. And, although based in New Jersey, Lucent is already litigating these issues in California, so it can hardly complain of being dragged into a distant forum.

In any event, according to Lucent's initial disclosures in this case, the individuals that it believes may have relevant information reside outside of this Judicial District, in Illinois, Pennsylvania, New Jersey, California, Connecticut and Sweden. (Garrana Decl. ¶ 7.) Dell's witnesses also reside outside of this District, in Texas, where Dell is based, or in California. (*Id.*) While Dell cannot speak for where Microsoft witnesses or documents may be, it should be noted that Microsoft is based in Redmond, Washington. The court in California is therefore a substantially more convenient forum for this dispute.

Given this balance of convenience, the fact that the real parties in interest are already litigating common issues in California and that the other California issues cannot practically be transferred here, Dell submits that the efficient administration of justice strongly supports the severance and transfer of those counts relating to the five patents in common with the Microsoft case (along with Dell's counterclaim relating thereto) to the United States District Court for the Southern District of California.[2]

---

[2] The Court may consider the interests of justice further served by also transferring Count I of the complaint (the count directed to U.S. Patent No. 4,439,759). *See* note 1, *supra.*

6

## CONCLUSION

Accordingly, Dell Computer Corporation moves the Court to sever Counts II through VI of the complaint and transfer those counts, along with the Counterclaim I (Declaratory Judgment) of the answer and counterclaim to the extent it relates to Counts II through VI, to the United States District Court for the Southern District of California.

Respectfully submitted,

**CONNOLLY BOVE LODGE & HUTZ, LLP**

By: _____

R. Eric Hutz (#2702)
James D. Heisman (#2746)
1220 Market Street
Post Office Box 2207
Wilmington, DE 19899
(302) 658-9141
*Attorneys for Plaintiff*
   *Dell Computer Corporation*

**OF COUNSEL**
Joel M. Freed
Joseph A. Micallef
**ARNOLD & PORTER**
555 12th Street NW
Washington, DC 20004
(202) 942-5000

**DATE:**   May 6, 2003

263736v1

7

1   John E. Gartman (SBN 152300)
    Christopher S. Marchese (SBN 170239)
2   Gary H. Savitt (SBN 220129)
    Fish & Richardson P.C.
3   4350 La Jolla Village Drive, Suite 500
    San Diego, California 92122
4   Telephone:  (858) 678-5070
    Facsimile:   (858) 678-5099
5
    Katherine Ford Horvath (SBN 213098)
6   Fish & Richardson P.C.
    500 Arguello Street, Suite 500
7   Redwood City, California 94063
    Telephone:  (650) 839-5070
8   Facsimile:   (650) 839-5071

9   *Additional counsel listed on last page*

10  Attorneys for Plaintiff
    MICROSOFT CORPORATION

11

                    UNITED STATES DISTRICT COURT
12
                   SOUTHERN DISTRICT OF CALIFORNIA
13
                        '03 CV   0699 K   LAB
14

15  MICROSOFT CORPORATION,              Case No._____

16              Plaintiff,              **DECLARATORY JUDGMENT**
                                        **COMPLAINT**
17          v.
                                        **JURY TRIAL DEMANDED**
18  LUCENT TECHNOLOGIES INC. and
    LUCENT TECHNOLOGIES GUARDIAN I
19  LLC,

20              Defendants

21                            **COMPLAINT**

22          Plaintiff, Microsoft Corporation ("Microsoft"), as and for its complaint against defendants,

23  Lucent Technologies Inc. and Lucent Technologies Guardian I LLC (collectively "Lucent"), alleges

24  as follows:

25          1.      This is an action for a declaratory judgment that Microsoft does not infringe any

26  claim of United States Patent Nos. 4,317,956; 4,383,272; 4,617,676; 4,763,356; 4,958,226;

27  4,910,781; 5,227,878; 5,347,295; 5,649,131; 4,701,954; 5,341,457; 5,627,938; and Re. 36,714 ("the

28  Patents-in-Suit"), attached hereto as Exhibits A-M, respectively.  This action is filed pursuant to 28

                                    1              Case No._____

FILED
APR - 8 2003
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                          DEPUTY

1   U.S.C. §§ 2201 and 2202 for the purpose of resolving an actual and justiciable controversy between

2   Microsoft and Lucent.

**Parties**

3

4   2.      Microsoft Corporation is a Washington corporation with its principal place of

5   business at One Microsoft Way, Redmond, WA 98052-6399.

6   3.      On information and belief, Lucent Technologies Inc. is a corporation organized

7   under the laws of the state of Delaware with its principal place of business at 600 Mountain

8   Avenue, Murray Hill, NJ 07974.

9   4.      On information and belief, Lucent Guardian I LLC is a limited liability company

10  organized under the laws of the state of Delaware with its principal place of business at 600

11  Mountain Avenue, Murray Hill, NJ 07974.

**Jurisdiction and Venue**

12

13  5.      Microsoft brings this action under the Declaratory Judgment Act, 28 U.S.C. §§ 2201

14  and 2202, to obtain a judicial declaration that the Patents-in-Suit, purportedly owned by Lucent, are

15  invalid, unenforceable, and have not been infringed by Microsoft or its customers.  This action

16  arises under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq.*, and is based upon an actual

17  and justiciable controversy between the parties with respect to the infringement, validity, and

18  enforceability of the Patents-in-Suit.  This Court has jurisdiction under 28 U.S.C. §§ 1331, 1338(a),

19  2201 and 2202.  Diversity of citizenship also exists under 28 U.S.C. § 1332, and the amount in

20  controversy exceeds $75,000, exclusive of costs and interest.

21  6.      Venue is proper before this court pursuant to 28 U.S.C. §§ 1391(b), (c), and 1400(b)

22  because the claims involve federal questions of patent law and Lucent is subject to personal

23  jurisdiction in this district.

**Lucent's Claims Against Users of Microsoft's Products**

24

25  7.      Lucent has asserted the Patents-in-Suit against Microsoft customers.  The Patents-in-

26  Suit are:

27

28

2                   Case No. _____

1           a.      United States Patent No. 4,317,956 ("the Torok '956 Patent"), which issued

2 on March 2, 1982, and is entitled "Remote Chalkboard Automatic Cursor." A copy of the Torok

3 '956 Patent is attached as Exhibit A.

4           b.      United States Patent No. 4,383,272 ("the Netravali '272 Patent"), which

5 issued on March 10, 1983, and is entitled "Video Signal Interpolation Using Motion Estimation." A

6 copy of the Netravali '272 Patent is attached as Exhibit B.

7           c.      United States Patent No. 4,617,676 ("the Jayant '676 Patent"), which issued

8 on October 14, 1986, and is entitled "Predictive Communication System Filtering Arrangement." A

9 copy of the Jayant '676 Patent is attached as Exhibit C.

10           d.      United States Patent No. 4,763,356 ("the Day '356 Patent"), which issued on

11 August 9, 1988, and is entitled "Touch Screen Form Entry System." A copy of the Day '356 Patent

12 is attached as Exhibit D.

13           e.      United States Patent No. 4,958,226 ("the Haskell '226 Patent"), which issued

14 on September 18, 1990, and is entitled "Conditional Motion Compensated Interpolation of Digital

15 Motion Video." A copy of the Haskell '226 Patent is attached as Exhibit E.

16           f.      United States Patent No. 4,910,781 ("the Ketchum '781 Patent"), which

17 issued on March 20, 1990, and is entitled "Code Excited Linear Predictive Vocoder Using Virtual

18 Searching." A copy of the Ketchum '781 Patent is attached as Exhibit F.

19           g.      United States Patent No. 5,227,878 ("the Puri '878 Patent"), which issued on

20 July 13, 1993, and is entitled "Adaptive Coding and Decoding of Frames and Fields of Video." A

21 copy of the Puri '878 Patent is attached as Exhibit G.

22           h.      United States Patent No. 5,347,295 ("the Agulnick '295 Patent"), which

23 issued on September 13, 1994, and is entitled "Control of a Computer Through a Position-Sensed

24 Stylus." A copy of the Agulnick '295 Patent is attached as Exhibit H.

25           i.      United States Patent No. 5,649,131 ("the Ackerman '131 Patent"), which

26 issued on July 15, 1997, and is entitled "Communications Protocol." A copy of the Ackerman '131

27 Patent is attached as Exhibit I.

28

        Case No. _____

1           j.      United States Patent No. 4,701,954 ("the Atal '954 Patent"), which issued on

2    October 20, 1987, and is entitled "Multipulse LPC Speech Processing Arrangement." A copy of the

3    Atal '954 Patent is attached as Exhibit J.

4           k.      United States Patent No. 5,341,457 ("the Hall '457 Patent"), which issued on

5    August 23, 1994, and is entitled "Perceptual Coding of Audio Signals."  A copy of the Hall '457

6    Patent is attached as Exhibit K.

7           l.      United States Patent No. 5,627,938 ("the Johnston '938 Patent"), which

8    issued on May 6, 1997, and is entitled "Rate Loop Processor for Perceptual Encoder/Decoder." A

9    copy of the Johnston '938 Patent is attached as Exhibit L.

10          m.      United States Patent No. Re. 36,714 ("the Brandenburg '714 Reissue

11   Patent"), which reissued on May 23, 2000, and is entitled "Perceptual Coding of Audio Signals." A

12   copy of the Brandenburg '714 Reissue Patent is attached as Exhibit M.

13         8.     Lucent has sued Microsoft's customers Gateway, Inc. and Gateway Country Stores

14   L.L.C. (collectively, "Gateway") in this Court, alleging, *inter alia*, that Gateway infringes the Torok

15   '956 Patent, the Netravali '272 Patent, the Jayant '676 Patent, the Day '356 Patent, and the Haskell

16   '226 Patent ("the Gateway Litigation Patents"), as well as two other patents not named in this

17   action.  A copy of the complaint is attached as Exhibit N.  Microsoft has intervened in the action

18   between Lucent and Gateway as to the Gateway Litigation Patents.  On information and belief,

19   Lucent's infringement allegations as to the Gateway Litigation Patents are based, at least in part, on

20   Gateway's use of Microsoft products and sale of Gateway computers containing Microsoft

21   products.  Accordingly, a legal action is ongoing in a court of competent jurisdiction concerning the

22   Gateway Litigation Patents, and there exists an actual and justiciable controversy between

23   Microsoft and Lucent concerning the Gateway Litigation Patents.

24         9.     Lucent has initiated suit against another of Microsoft's customers, Dell Computer

25   Corporation ("Dell"), in the United States District Court for the District of Delaware alleging, *inter*

26   *alia*, that Dell infringes the Haskell '226 Patent, the Ketchum '781 Patent, the Puri '878 Patent, the

27   Agulnick '295 Patent, and the Ackerman '131 Patent ("the Dell Litigation Patents").  A copy of the

28   complaint is attached as Exhibit O.  Accordingly, Lucent has sued both Dell and Gateway on one of

Case No. _____

1    the Patents-in-Suit in this action, namely, the Haskell '226 Patent.  On information and belief,

2    Lucent's infringement allegations as to the Dell Litigation Patents are based, at least in part, on

3    Dell's use of Microsoft products and sale of Dell computers containing Microsoft products.

4    Accordingly, a legal action is ongoing in a court of competent jurisdiction concerning the Dell

5    Litigation Patents, and there exists an actual and justiciable controversy between Microsoft and

6    Lucent concerning the Dell Litigation Patents.

7        10.    On information and belief, Lucent has threatened to commence an infringement

8    action against Dell for infringement of the Atal '954 Patent.  On information and belief, Lucent's

9    infringement allegations against Dell on the Atal '954 Patent are based, at least in part, on Dell's

10   use of Microsoft products and sale of Dell computers containing Microsoft products.  Accordingly,

11   there exists an actual and justiciable controversy between Microsoft and Lucent concerning the Atal

12   '954 Patent.

13       11.    On information and belief, Lucent has threatened at least one other Microsoft

14   customer claiming infringement of the Day '356 Patent, the Haskell '226 Patent, the Puri '878

15   Patent, the Hall '457 Patent, the Agulnick '295 Patent, the Johnston '938 Patent, and the

16   Brandenburg '714 Reissue Patent based, at least in part, on that customer's use of Microsoft

17   products and sale of computers made by that customer that contain Microsoft products.

18   Accordingly, there exists an actual and justiciable controversy between Microsoft and Lucent

19   concerning those additional accused patents.

20       12.    Gateway has demanded contractual defense and indemnification from Microsoft

21   against Lucent's infringement charges on the Gateway Litigation Patents under a contract between

22   Microsoft and Gateway.  By this paragraph, however, Microsoft does not admit that it must

23   indemnify Gateway on the Gateway Litigation Patents.

24       13.    Dell has demanded contractual defense and indemnification from Microsoft against

25   Lucent's infringement charges on the Dell Litigation Patents and the Atal '954 Patent under a

26   contract between Microsoft and Dell.  By this paragraph, however, Microsoft does not admit that it

27   must indemnify Dell on the Dell Litigation Patents or the Atal '954 Patent.

28

5                    Case No. _____

14.     Consequently, as a result of Lucent's actions, Microsoft has received defense and indemnification demands from Gateway and Dell against Lucent's infringement charges on the Torok '956 Patent, the Netravali '272 Patent, the Jayant '676 Patent, the Day '356 Patent, the Haskell '226 Patent, the Ketchum '781 Patent, the Puri '878 Patent, the Agulnick '295 Patent, the Ackerman '131 Patent, and the Atal '954 Patent.  In addition, at least one other Microsoft customer has been threatened with the the remaining Patents-in-Suit (the Hall '457 Patent, the Johnston '938 Patent, and the Brandenburg '714 Reissue Patent).

15.     On January 13, 2003, an entity known as "ThinkFire," which claims to represent Lucent as its licensing agent, sent a letter to Microsoft stating:  "We believe that specific Lucent Technologies patents are crucial to the current and planned product offerings of Microsoft."  A copy of the January 13 letter is attached as Exhibit P to this Complaint.  The January 13 ThinkFire letter included a list of 16 patents that ThinkFire alleged "includes patents that Microsoft already knows about through discussions that Lucent has had with various computer manufacturers who sell products incorporating Microsoft products."  Of the 16 listed patents, eight are involved in this Complaint:  the Jayant '676 Patent, the Haskell '226 Patent, the Puri '878 Patent, the Hall '457 Patent, the Brandenburg '714 Reissue Patent, the Ackerman '131 Patent, the Day '356 Patent, and the Agulnick '295 Patent.

16.     On March 12, 2003, representatives of Microsoft met in person with representatives of ThinkFire to discuss the allegations in the January 13 letter.  During that meeting, ThinkFire representatives discussed seven patents purportedly owned by Lucent, including the Day '356 Patent, the Ackerman '131 Patent, and the Agulnick '295 Patent.

17.     In sum, Lucent's conduct has caused Microsoft reasonably and legitimately to fear that Lucent will bring infringement actions under the Patents-in-Suit against Microsoft and/or against Microsoft's customers for use of Microsoft Products.

### Count I

### (Declaratory Judgment Regarding the Torok '956 Patent)

18.     Microsoft incorporates by reference and realleges Paragraphs 1 through 17 of this Complaint.

6

Case No. _____

19.     The manufacture, use, sale, offer to sell, and/or importation of Microsoft products do not infringe and have not infringed any claim of the Torok '956 Patent. In addition, the manufacture, use, sale, offer to sell, and/or importation of Microsoft products do not contribute to or induce the infringement of any claim of the Torok '956 Patent; nor has Microsoft ever contributed to or induced the infringement of any such claim. Microsoft, its customers, and all others have the right to manufacture, have made, use, sell, offer to sell, and import all of Microsoft's products accused of infringement, unhampered and unmolested by Lucent.

20.     The claims of the Torok '956 Patent are invalid for failure to comply with one or more provisions of the Patent Laws of the United States of America, Title 35, United States Code, Sections 101 *et seq.*, including without limitation Sections 102, 103 and/or 112.

21.     There is an actual and justiciable controversy between Microsoft Corporation and Lucent over the validity, enforceability and infringement of the Torok '956 Patent.

## Count II

### (Declaratory Judgment Regarding the Netravali '272 Patent)

22.     Microsoft incorporates by reference and realleges Paragraphs 1 through 17 of this Complaint.

23.     The manufacture, use, sale, offer to sell, and/or importation of Microsoft products do not infringe and have not infringed any claim of the Netravali '272 Patent. In addition, the manufacture, use, sale, offer to sell, and/or importation of Microsoft products do not contribute to or induce the infringement of any claim of the Netravali '272 Patent; nor has Microsoft ever contributed to or induced the infringement of any such claim. Microsoft, its customers, and all others have the right to manufacture, have made, use, sell, offer to sell, and import all of Microsoft's products accused of infringement, unhampered and unmolested by Lucent.

24.     The claims of the Netravali '272 Patent are invalid for failure to comply with one or more provisions of the Patent Laws of the United States of America, Title 35, United States Code, Sections 101 *et seq.*, including without limitation Sections 101, 102, 103 and/or 112.

25.     The Netravali '272 Patent is unenforceable by virtue of inequitable conduct. The claims of the Netravali '272 Patent are unenforceable as a result of the inequitable conduct of the

7                         Case No. _____

1  applicants, their attorneys and/or agents in the prosecution of the Netravali '272 Patent. Microsoft

2  alleges that said inequitable conduct comprised intentional misrepresentations and omissions

3  including, without limitation, the following:

4            a)     The sworn statement signed by the applicants on or about April 2 and April 3,

5  1981, stated in pertinent part that: "I am the original, first and sole inventor … or a joint inventor

6  … of the invention entitled Video Signal Interpolation Using Motion Estimation described and

7  claimed in the attached specification; I do not know and do not believe the same was ever known or

8  used in the United States of America before my or our invention thereof or more than one year prior

9  to this application; to the best of my knowledge and belief the same was not in public use or on sale

10  in the United States of America more than one year prior to this application; … I acknowledge my

11  duty to disclose information of which I am aware which is material to the examination of this

12  application …."

13            b)     On May 11, 1979, Arun N. Netravali, one of the named inventors on the

14  Netravali '272 Patent, submitted an article entitled "Picture Coding: A Review" for publication in

15  the PROCEEDINGS OF THE IEEE, Vol. 68, No. 3, p. 366. The article was published in March

16  1980. The article was highly material to the examination of the Netravali '272 Patent and thus was

17  required to be cited during the prosecution under 37 C.F.R. 1.56. Nonetheless, the article was not

18  cited during the prosecution of the Netravali '272 Patent, in spite of the fact that Netravali authored

19  the article.

20      26.     There is an actual and justiciable controversy between Microsoft and Lucent over the

21  validity, enforceability and infringement of the Netravali '272 Patent.

22  <div align="center">**Count III**</div>

23  <div align="center">**(Declaratory Judgment Regarding the Jayant '676 Patent)**</div>

24      27.     Microsoft incorporates by reference and realleges Paragraphs 1 through 17 of this

25  Complaint.

26      28.     The manufacture, use, sale, offer to sell, and/or importation of Microsoft products do

27  not infringe and have not infringed any claim of the Jayant '676 Patent. In addition, the

28  manufacture, sale, offer to sell, and/or importation of Microsoft products do not contribute to or

<div align="center">8</div>

Case No. _____

1  induce the infringement of any claim of the Jayant '676 Patent; nor has Microsoft ever contributed

2  to or induced the infringement of any such claim.  Microsoft, its customers, and all others have the

3  right to manufacture, have made, use, sell, offer to sell, and import all of Microsoft's products

4  accused of infringement, unhampered and unmolested by Lucent.

5     29.    The claims of the Jayant '676 Patent are invalid for failure to comply with one or

6  more provisions of the Patent Laws of the United States of America, Title 35, United States Code,

7  Sections 101 *et seq.*, including without limitation Sections 102, 103 and/or 112.

8     30.    The Jayant '676 Patent is unenforceable by virtue of inequitable conduct.

9  The claims of the Jayant '676 Patent are unenforceable as a result of the inequitable conduct of the

10  applicants, their attorneys, and/or agents in the prosecution of the Jayant '676 Patent.  Microsoft

11  alleges that said inequitable conduct comprised intentional misrepresentations and omissions

12  including, without limitation, the following:

13     a)    The sworn statement signed by the applicants on or about November 20,

14  1984 and January 11, 1995, stated in pertinent part:  "I believe I am an original, first and joint

15  inventor of the subject matter which is claimed and for which a patent is sought on the invention,

16  entitled Predictive Communication System Filtering Arrangement, the specification of which was

17  filed on September 4, 1984, as application Serial No. 646,971. ... I acknowledge the duty to

18  disclose information which is material to the examination of this application in accordance with

19  Title 37, Code of Federal Regulations, 1.56(a)."

20     b)    In March 1984, a textbook co-authored by N.S. Jayant, one of the named

21  inventors of the Jayant '676 Patent, entitled DIGITAL CODING OF WAVEFORMS was published

22  by Prentice Hall.  The textbook was highly material to the examination of the Jayant '676 Patent

23  and thus was required to be cited during the prosecution under 37 C.F.R. 1.56.  Nonetheless, the

24  textbook was not cited during the prosecution of the Jayant '676 Patent, despite that Jayant co-

25  authored the textbook.

26     c)    On March 26, 1986, prior to the issuance of the Jayant '676 Patent, inventor

27  Jayant filed a second patent application with the same title, "Predictive Communication System

28  Filtering Arrangement," having subject matter related to the Jayant '676 Patent.  On June 10, 1986,

9                    Case No. _____

1   prior to the issuance of the Jayant '676 Patent and during the prosecution of the second application,

2   Jayant cited a material prior art reference in an Information Disclosure Statement, the reference

3   being an article that he co-authored entitled, "Adaptive Quantization in Differential PCM Coding of

4   Speech," and published by The American Telephone and Telegraph Company in September, 1973.

5   As Jayant acknowledged in his second application, the article was highly material to the

6   examination of the Jayant '676 Patent and thus was required to be cited during the prosecution of

7   the Jayant Patent under 37 C.F.R. 1.56.  Nonetheless, the article was not cited during the

8   prosecution of the Jayant '676 Patent.

9        31.    There is an actual and justiciable controversy between Microsoft and Lucent over the

10  validity, enforceability and infringement of the Jayant '676 Patent.

11                          **Count IV**

12            **(Declaratory Judgment Regarding the Day '356 Patent)**

13       32.    Microsoft incorporates by reference and realleges Paragraphs 1 through 17 of this

14  Complaint.

15       33.    The manufacture, use, sale, offer to sell, and/or importation of Microsoft products do

16  not infringe and have not infringed any claim of the Day '356 Patent.  In addition, the manufacture,

17  sale, offer to sell, and/or importation of Microsoft products do not contribute to or induce the

18  infringement of any claim of the Day '356 Patent; nor has Microsoft ever contributed to or induced

19  the infringement of any such claim.  Microsoft, its customers, and all others have the right to

20  manufacture, have made, use, sell, offer to sell, and import all of Microsoft's products accused of

21  infringement, unhampered and unmolested by Lucent.

22       34.    The claims of the Day '356 Patent are invalid for failure to comply with one or more

23  provisions of the Patent Laws of the United States of America, Title 35, United States Code,

24  Sections 101 *et seq.*, including without limitation Sections 102, 103 and/or 112.

25       35.    There is an actual and justiciable controversy between Microsoft and Lucent over the

26  validity, enforceability and infringement of the Day '356 Patent.

27

28

                          10              Case No. _____

1

## Count V

2

### (Declaratory Judgment Regarding the Haskell '226 Patent)

3      36.    Microsoft incorporates by reference and realleges Paragraphs 1 through 17 of this

4 Complaint.

5      37.    The manufacture, use, sale, offer to sell, and/or importation of Microsoft products do

6 not infringe and have not infringed any claim of the Haskell '226 Patent.  In addition, the

7 manufacture, sale, offer to sell, and/or importation of Microsoft products do not contribute to or

8 induce the infringement of any claim of the Haskell '226 Patent; nor has Microsoft ever contributed

9 to or induced the infringement of any such claim.  Microsoft, its customers, and all others have the

10 right to manufacture, have made, use, sell, offer to sell, and import all of Microsoft's products

11 accused of infringement, unhampered and unmolested by Lucent.

12      38.    The claims of the Haskell '226 Patent are invalid for failure to comply with one or

13 more provisions of the Patent Laws of the United States of America, Title 35, United States Code,

14 Sections 101 *et seq.*, including without limitation Sections 101, 102, 103 and/or 112.

15      39.    The Haskell '226 Patent is unenforceable by virtue of inequitable conduct.  The

16 claims of the Haskell '226 Patent are unenforceable as a result of the inequitable conduct of the

17 applicants, their attorneys and/or agents in the prosecution of the Haskell '226 Patent. Microsoft

18 alleges that said inequitable conduct comprised intentional misrepresentations and omissions

19 including, without limitation, the following:

20      a)    The sworn statement signed by the applicants on or about September 25,

21 1989, stated in pertinent part:  "I believe I am an original, first and joint inventor of the subject

22 matter which is claimed and for which a patent is sought on the invention entitled Conditional

23 Motion Compensated Interpolation of Digital Motion Video the specification of which is attached

24 hereto .... I acknowledge the duty to disclose information which is material to the examination of

25 this application in accordance with Title 37, Code of Federal Regulations, 1.56(a)."

26      b)    Barry G. Haskell, one of the named inventors on the Haskell '226 Patent, and

27 Arun N. Netravali are the co-authors of a book entitled DIGITAL PICTURES:

28 REPRESENTATION AND COMPRESSION, which was published more than one year prior to the

1   date of the application for the Haskell '226 Patent.  DIGITAL PICTURES: REPRESENTATION

2   AND COMPRESSION was highly material to the prosecution of the Haskell '226 Patent.

3   Nevertheless, the inventors failed to cite this material reference during the examination of the

4   Haskell '226 Patent, as required under 37 C.F.R. 1.56.

5        40.    There is an actual and justiciable controversy between Microsoft and Lucent over the

6   validity, enforceability and infringement of the Haskell '226 Patent.

7                                    **Count VI**

8              **(Declaratory Judgment Regarding the Ketchum '781 Patent)**

9        41.    Microsoft incorporates by reference and realleges Paragraphs 1 through 17 of this

10  Complaint.

11       42.    The manufacture, use, sale, offer to sell, and/or importation of Microsoft products do

12  not infringe and have not infringed any claim of the Ketchum '781 Patent.  In addition, the

13  manufacture, use, sale, offer to sell, and/or importation of Microsoft products do not contribute to or

14  induce the infringement of any claim of the Ketchum '781 Patent; nor has Microsoft ever

15  contributed to or induced the infringement of any such claim.  Microsoft, its customers, and all

16  others have the right to manufacture, have made, use, sell, offer to sell, and import all of

17  Microsoft's products accused of infringement, unhampered and unmolested by Lucent.

18       43.    The claims of the Ketchum '781 Patent are invalid for failure to comply with one or

19  more provisions of the Patent Laws of the United States of America, 35 U.S.C. §§ 101 *et seq.*,

20  including without limitation Sections 102, 103, and/or 112.

21       44.    There is an actual and justiciable controversy between Microsoft and Lucent over the

22  validity and infringement of the Ketchum '781 Patent.

23                                    **Count VII**

24              **(Declaratory Judgment Regarding the Puri '878 Patent)**

25       45.    Microsoft incorporates by reference and realleges Paragraphs 1 through 17 of this

26  Complaint.

27       46.    The manufacture, use, sale, offer to sell, and/or importation of Microsoft products do

28  not infringe and have not infringed any claim of the Puri '878 Patent.  In addition, the manufacture,

1  use, sale, offer to sell, and/or importation of Microsoft products do not contribute to or induce the

2  infringement of any claim of the Puri '878 Patent; nor has Microsoft ever contributed to or induced

3  the infringement of any such claim.  Microsoft, its customers, and all others have the right to

4  manufacture, have made, use, sell, offer to sell, and import all of Microsoft's products accused of

5  infringement, unhampered and unmolested by Lucent.

6      47.    The claims of the Puri '878 Patent are invalid for failure to comply with one or more

7  provisions of the Patent Laws of the United States of America, 35 U.S.C. §§ 101 *et seq.*, including

8  without limitation Sections 102, 103, and/or 112.

9      48.    There is an actual and justiciable controversy between Microsoft and Lucent over the

10  validity and infringement of the Puri '878 Patent.

11                          <u>**Count VIII**</u>

12              **(Declaratory Judgment Regarding the Agulnick '295 Patent)**

13      49.    Microsoft incorporates by reference and realleges Paragraphs 1 through 17 of this

14  Complaint.

15      50.    The manufacture, use, sale, offer to sell, and/or importation of Microsoft products do

16  not infringe any claim of the Agulnick '295 Patent.  In addition, the manufacture, use, sale, offer to

17  sell, and/or importation of Microsoft products do not contribute to or induce the infringement of any

18  claim of the Agulnick '295 Patent; nor has Microsoft ever contributed to or induced the

19  infringement of any such claim.  Microsoft, its customers, and all others have the right to

20  manufacture, have made, use, sell, offer to sell, and import all of Microsoft's products accused of

21  infringement, unhampered and unmolested by Lucent.

22      51.    The claims of the Agulnick '295 Patent are invalid for failure to comply with one or

23  more provisions of the Patent Laws of the United States of America, 35 U.S.C. §§ 101 *et seq.*,

24  including without limitation Sections 102, 103, and/or 112.

25      52.    There is an actual and justiciable controversy between Microsoft and Lucent over the

26  validity and infringement of the Agulnick '295 Patent.

27

28

                          13                  Case No. _____

1

<u>Count IX</u>

2

**(Declaratory Judgment Regarding the Ackerman '131 Patent)**

3     53.    Microsoft incorporates by reference and realleges Paragraphs 1 through 17 of this

4 Complaint.

5     54.    The manufacture, use, sale, offer to sell, and/or importation of Microsoft products do

6 not infringe and have not infringed any claim of the Ackerman '131 Patent.  In addition, the

7 manufacture, use, sale, offer to sell, and/or importation of Microsoft products do not contribute to or

8 induce the infringement of any claim of the Ackerman '131 Patent; nor has Microsoft ever

9 contributed to or induced the infringement of any such claim.  Microsoft, its customers, and all

10 others have the right to manufacture, have made, use, sell, offer to sell, and import all of

11 Microsoft's products accused of infringement, unhampered and unmolested by Lucent.

12     55.    The claims of the Ackerman '131 Patent are invalid for failure to comply with one or

13 more provisions of the Patent Laws of the United States of America, 35 U.S.C. §§ 101 *et seq.*,

14 including without limitation Sections 102, 103, and/or 112.

15     56.    There is an actual and justiciable controversy between Microsoft and Lucent over the

16 validity and infringement of the Ackerman '131 Patent.

17

<u>Count X</u>

18

**(Declaratory Judgment Regarding the Atal '954 Patent)**

19     57.    Microsoft incorporates by reference and realleges Paragraphs 1 through 17 of this

20 Complaint.

21     58.    The manufacture, use, sale, offer to sell, and/or importation of Microsoft products do

22 not infringe and have not infringed any claim of the Atal '954 Patent.  In addition, the manufacture,

23 use, sale, offer to sell, and/or importation of Microsoft products do not contribute to or induce the

24 infringement of any claim of the Atal '954 Patent; nor has Microsoft ever contributed to or induced

25 the infringement of any such claim.  Microsoft, its customers, and all others have the right to

26 manufacture, have made, use, sell, offer to sell, and import all of Microsoft's products accused of

27 infringement, unhampered and unmolested by Lucent.

28

59.     The claims of the Atal '954 Patent are invalid for failure to comply with one or more provisions of the Patent Laws of the United States of America, 35 U.S.C. §§ 101 *et seq.*, including without limitation Sections 102, 103, and/or 112.

60.     There is an actual and justiciable controversy between Microsoft and Lucent over the validity and infringement of the Atal '954 Patent.

### Count XI

### (Declaratory Judgment Regarding the Hall '457 Patent)

61.     Microsoft incorporates by reference and realleges Paragraphs 1 through 17 of this Complaint.

62.     The manufacture, use, sale, offer to sell, and/or importation of Microsoft products do not infringe and have not infringed any claim of the Hall '457 Patent.  In addition, the manufacture, use, sale, offer to sell, and/or importation of Microsoft products do not contribute to or induce the infringement of any claim of the Hall '457 Patent; nor has Microsoft ever contributed to or induced the infringement of any such claim.  Microsoft, its customers, and all others have the right to manufacture, have made, use, sell, offer to sell, and import all of Microsoft's products accused of infringement, unhampered and unmolested by Lucent.

63.     The claims of the Hall '457 Patent are invalid for failure to comply with one or more provisions of the Patent Laws of the United States of America, 35 U.S.C. §§ 101 *et seq.*, including without limitation Sections 102, 103, and/or 112.

64.     There is an actual and justiciable controversy between Microsoft and Lucent over the validity and infringement of the Hall '457 Patent.

### Count XII

### (Declaratory Judgment Regarding the Johnston '938 Patent)

65.     Microsoft incorporates by reference and realleges Paragraphs 1 through 17 of this Complaint.

66.     The manufacture, use, sale, offer to sell, and/or importation of Microsoft products do not infringe and have not infringed any claim of the Johnston '938 Patent.  In addition, the manufacture, use, sale, offer to sell, and/or importation of Microsoft products do not contribute to or

15                    Case No. _____

1  induce the infringement of any claim of the Johnston '938 Patent; nor has Microsoft ever

2  contributed to or induced the infringement of any such claim. Microsoft, its customers, and all

3  others have the right to manufacture, have made, use, sell, offer to sell, and import all of

4  Microsoft's products accused of infringement, unhampered and unmolested by Lucent.

5       67.    The claims of the Johnston '938 Patent are invalid for failure to comply with one or

6  more provisions of the Patent Laws of the United States of America, 35 U.S.C. §§ 101 *et seq.*,

7  including without limitation Sections 102, 103, and/or 112.

8       68.    There is an actual and justiciable controversy between Microsoft and Lucent over the

9  validity and infringement of the Johnston '938 Patent.

10  <div align="center">**Count XIII**</div>

11  <div align="center">**(Declaratory Judgment Regarding the Brandenburg '714 Reissue Patent)**</div>

12       69.    Microsoft incorporates by reference and realleges Paragraphs 1 through 17 of this

13  Complaint.

14       70.    The manufacture, use, sale, offer to sell, and/or importation of Microsoft products do

15  not infringe and have not infringed any claim of the Brandenburg '714 Reissue Patent. In addition,

16  the manufacture, use, sale, offer to sell, and/or importation of Microsoft products do not contribute

17  to or induce the infringement of any claim of the Brandenburg '714 Reissue Patent; nor has

18  Microsoft ever contributed to or induced the infringement of any such claim. Microsoft, its

19  customers, and all others have the right to manufacture, have made, use, sell, offer to sell, and

20  import all of Microsoft's products accused of infringement, unhampered and unmolested by Lucent.

21       71.    The claims of the Brandenburg '714 Reissue Patent are invalid for failure to comply

22  with one or more provisions of the Patent Laws of the United States of America, 35 U.S.C. §§ 101

23  *et seq.*, including without limitation Sections 102, 103, and/or 112.

24       72.    The Brandenburg '714 Reissue Patent is unenforceable by virtue of inequitable

25  conduct. The claims of the Brandenburg Patent are unenforceable as a result of the inequitable

26  conduct of the applicants, their attorneys and/or agents in the prosecution of the Brandenburg

27  Patent. Microsoft alleges that said inequitable conduct comprised intentional misrepresentations

28  and omissions including, without limitation, the following:

<div align="center">16           Case No. _____</div>

1       a)      The sworn statement signed by the applicants on or about August 12, 1993

2 and during the earlier prosecution of U.S. Patent No. 5,040,217 (which became the RE 36,714

3 patent), stated in pertinent part: "We verily believe ourselves to be the original, first and joint

4 inventors of the invention described in and claimed in Letters Patent No. 5,040,217. … We

5 acknowledge the duty to disclose information which is material to the examination of this

6 application in accordance with Title 37, Code of Federal Regulations, 1.56(a)."

7       b)      In spring 1988, an article co-authored by K.H. Brandenburg, one of the

8 named inventors of the Brandenburg '714 Reissue Patent, which article was entitled "Fast Signal

9 Processor Encodes 48 kHz/16 Bit Audio Into 3 Bit In Real Time," was published by the IEEE. This

10 article was highly material to the examination of the Brandenburg '714 Reissue Patent and thus was

11 required to be cited during the prosecution under 37 C.F.R. 1.56. Nonetheless, the article was not

12 cited during the prosecution of the Brandenburg '714 Reissue Patent, despite that Brandenburg co-

13 authored the article.

14     73.     There is an actual and justiciable controversy between Microsoft and Lucent over the

15 validity and infringement of the Brandenburg '714 Reissue Patent.

16                  **PRAYER FOR RELIEF**

17 WHEREFORE, Microsoft asks this Court to enter judgment in Microsoft's favor against

18 Lucent granting the following relief:

19     A.     Declaration that neither Microsoft nor its products infringes or has infringed any of

20 the claims of the Patents-in-Suit under any subsection of 35 U.S.C. § 271;

21     B.     Declaration that the claims of the Patents-in-Suit are invalid under 35 U.S.C. §§ 102,

22 103, and/or 112;

23     C.     Declaration that some or all of the Patents-in-Suit are unenforceable;

24     D.     Order enjoining the Lucent entities and their respective officers, partners, employees,

25 agents, parents, subsidiaries, and affiliates from suing or threatening to sue for infringement of any

26 of the Patents-in-Suit on the basis of the making, using, selling, offering for sale or importing of any

27 Microsoft products;

28

1    E.    Any such other and further relief, including an award of Microsoft's costs of suit and

2 attorneys' fees to the extent permitted by law, that this Court deems just and proper.

3                    **JURY DEMAND**

4    Microsoft hereby demands a trial by jury for all issues so triable.

5 Dated:  April 8, 2003                    FISH & RICHARDSON P.C.

6

7                                   By: _____

8                                   Christopher S. Marchese (SBN 170239)
                                    Fish & Richardson P.C.
9                                   4350 La Jolla Village Drive, Suite 500
                                    San Diego, California 92122

10

11                                  Additional Counsel:
                                    Stephen P. McGrath (SBN 202696)
12                                  MICROSOFT CORPORATION
                                    One Microsoft Way
13                                  Redmond, WA 98052
                                    Telephone: (425) 882-8080
14                                  Facsimile: (425) 936-7329

15
                                    Attorneys for Plaintiff
16                                  MICROSOFT CORPORATION

17

18

19

20

21

22

23

24

25

26

27

28

                          18                Case No. _____

1

**PROOF OF SERVICE**

2      I am employed in the County of San Diego. My business address is Fish & Richardson P.C.,

3 4350 La Jolla Village Drive, Suite 500, San Diego, California 92122.  I am over the age of 18 and

4 not a party to the foregoing action.

5      I am readily familiar with the business practice at my place of business for collection and

6 processing of correspondence for personal delivery, for mailing with United States Postal Service,

7 for facsimile, and for overnight delivery by Federal Express, Express Mail, or other overnight

8 service.

9      On April 8, 2003, I caused a copy of the following document(s):

10

**DECLARATORY JUDGMENT COMPLAINT**

11

12 to be served on the interested parties in this action by placing a true and correct copy thereof, enclosed in a sealed envelope, and addressed as follows:

13   Jane Hahn                       Attorneys for Defendants,
  Hahn & Adema                LUCENT TECHNOLOGIES INC. and

14   501 West Broadway, Suite 1730      LUCENT TECHNOLOGIES
  San Diego, CA  92101             GUARDIAN I LLC

15   Telephone: (619) 235-2100
  Facsimile: (619) 235-2101

16

17 ☐ **MAIL:**            Such correspondence was deposited, postage fully paid, with the United States Postal Service on the same day in the ordinary course of business.

18

19 ☒ XX  **PERSONAL:**    Such envelope was delivered by hand to the offices of the addressee.

20

21 ☐ **FACSIMILE:**    Such document was faxed to the facsimile transmission machine with the facsimile machine number stated above.  Upon completion of the transmission, the transmitting machine issued a transmission report showing the transmission was complete and without error.

22

23 ☐ **FEDERAL EXPRESS:**   Such correspondence was deposited on the same day in the ordinary course of business with a facility regularly maintained by Federal Express.

24

25 ☐ **EXPRESS MAIL:**    Such correspondence was deposited on the same day in the ordinary course of business with a facility regularly maintained by the United States Postal Service.

26

27 ☐ **OVERNIGHT DELIVERY:**   Such correspondence was given on the same day in the ordinary course of business to an authorized courier or a driver authorized by that courier to receive documents.

28

1                Case No. _____

1          I declare that I am employed in the office of a member of the bar of this Court at whose
direction the service was made.

2          I declare under penalty of perjury that the above is true and correct.  Executed on April 8,
2003, at San Diego, California.

3

4
                                        Veronica Whalen

5    10267545.doc

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                          2           Case No. _____

1  John E. Gartman (SBN 152300)
   Christopher S. Marchese (SBN 170239)
2  Gary H. Savitt (SBN 220129)
   Fish & Richardson P.C.
3  4350 La Jolla Village Drive, Suite 500
   San Diego, California 92122
4  Telephone:  (858) 678-5070
   Facsimile:   (858) 678-5099
5
   Katherine Ford Horvath (SBN 213098)
6  Fish & Richardson P.C.
   500 Arguello Street, Suite 500
7  Redwood City, California 94063
   Telephone:  (650) 839-5070
8  Facsimile:   (650) 839-5071
9  Attorneys for Plaintiff
   MICROSOFT CORPORATION
10
11                    UNITED STATES DISTRICT COURT
12                   SOUTHERN DISTRICT OF CALIFORNIA
13
   MICROSOFT CORPORATION,            Case No. _____
14
            Plaintiff,               **Table of Contents For Exhibits**
15
            v.
16
   LUCENT TECHNOLOGIES INC. and LUCENT
17 TECHNOLOGIES GUARDIAN I LLC,
18          Defendants.
19
20                        **Table of Contents**
21                                                              **Page**

22 Exhibit A ................................................................................................. 1-12
23 Exhibit B ................................................................................................. 13-23
24 Exhibit C ................................................................................................. 24-36
25 Exhibit D ................................................................................................. 37-64
26 Exhibit E ................................................................................................. 65-70
27 Exhibit F ................................................................................................. 71-84
28 Exhibit G ................................................................................................. 85-151

                              · 1               Case No. _____

Exhibit H ............................................................................................................ 152-236

Exhibit I............................................................................................................. 237-260

Exhibit J ............................................................................................................ 261-280

Exhibit K ........................................................................................................... 281-297

Exhibit L ........................................................................................................... 298-320

Exhibit M ........................................................................................................... 321-333

Exhibit N ........................................................................................................... 334-344

Exhibit O ........................................................................................................... 345-358

Exhibit P............................................................................................................. 359-362

2                    Case No. _____

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

JUN - 6 2002

_Spencer_

LUCENT TECHNOLOGIES INC. and
LUCENT TECHNOLOGIES GUARDIAN I LLC,

           Plaintiffs,

           v.

GATEWAY, INC. and
GATEWAY COUNTRY STORES LLC,

           Defendants.

Civil Action No.: 3:02-389-R

DEMAND FOR JURY TRIAL

## COMPLAINT

Plaintiffs Lucent Technologies Inc. and Lucent Technologies Guardian I LLC

(collectively, "Lucent") for their Complaint against Gateway, Inc. and Gateway Country Stores

LLC (collectively, "Gateway") hereby demand a jury trial and allege as follows:

### Parties

    1.    Plaintiff Lucent Technologies Inc. is a corporation organized under the

laws of the state of Delaware with its principal place of business at 600 Mountain Avenue,

Murray Hill, NJ 07974.

    2.    Plaintiff Lucent Technologies Guardian I LLC is a limited liability

company organized under the laws of the state of Delaware with its principal place of business at

600 Mountain Avenue, Murray Hill, New Jersey 07974.

3. Lucent is a leading global supplier of computer and communications equipment, including data, software, voice, and wireless-networking technologies. Researchers at Lucent's Bell Laboratories have developed a wide variety of key innovations that have greatly enhanced the capabilities and utility of personal computers. Common features such as video display, audio encoding, telephony, networking, and user interfaces have all benefited from Lucent's research and development efforts.

4. On information and belief, Defendant Gateway, Inc. is a company organized under the laws of the state of Delaware with its principal place of business at 14303 Gateway Place, Poway, CA 92064.

5. On information and belief, Defendant Gateway Country Stores LLC is a company organized under the laws of the state of Delaware with its principal place of business at 610 Gateway Drive, North Sioux City, SD 57049.

6. Gateway makes, uses, sells, and offers for sale in the United States, and imports into the United States, computer systems, components, and accessories.

## Nature of the Action

7. This is a civil action for infringement of seven United States Patents. This action is based upon the Patent Laws of the United States, 35 U.S.C. § 1 *et seq.*

## Jurisdiction and Venue

8. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1338(a).

-2-

9.      Venue is proper in this district under 28 U.S.C. §§ 1391(b) and (c) and 1400(b) because Gateway has committed acts of infringement in this district and because Gateway is subject to personal jurisdiction in this district.  Venue is proper in this division under Rule 3 of the Local Rules of Practice because Gateway has committed acts of infringement in this division and because Gateway is subject to personal jurisdiction in this division.

## The Patents

10.      United States Patent No. 4,317,956 ("the Torok '956 Patent"), entitled "Remote Chalkboard Automatic Cursor," was duly and legally issued on March 2, 1982, to Torok et al.  A copy of the Torok '956 Patent is attached hereto as Exhibit A.

11.      United States Patent No. 4,383,272 ("the Netravali '272 Patent"), entitled "Video Signal Interpolation Using Motion Estimation," was duly and legally issued on May 10, 1983, to Netravali et al.  A copy of the Netravali '272 Patent is attached hereto as Exhibit B.

12.      United States Patent No. 4,439,759 ("the Fleming '759 Patent"), entitled "Terminal Independent Color Memory For A Digital Image Display System," was duly and legally issued on March 27, 1984, to Fleming et al.  A copy of the Fleming '759 Patent is attached hereto as Exhibit C.

13.      United States Patent No. B1 4,582,956 ("the Doughty '956 Patent"), entitled "Method And Apparatus For Displaying At A Selected Station Special Service Information During A Silent Interval Between Ringing," was duly and legally issued on April 15, 1986, to Carolyn A. Doughty.  A reexamination certificate confirming the patentability of the invention of the Doughty '956 Patent was duly and legally issued on September 20, 1994.  A copy of the Doughty '956 Patent is attached hereto as Exhibit D.

-3-

14.    United States Patent No. 4,617,676 ("the Jayant '676 Patent"), entitled "Predictive Communication System Filtering Arrangement," was duly and legally issued on October 14, 1986, to Jayant et al. A copy of the Jayant '676 Patent is attached hereto as Exhibit E.

15.    U.S. Patent No. 4,763,356 ("the Day '356 Patent"), entitled "Touch Screen Form Entry System," was duly and legally issued on August 9, 1988, to Day, Jr. et al. A copy of the Day '356 Patent is attached hereto as Exhibit F.

16.    United States Patent No. 4,958,226 ("the Haskell '226 Patent"), entitled "Conditional Motion Compensated Interpolation Of Digital Motion Video," was duly and legally issued on September 18, 1990, to Haskell et al. A copy of the Haskell '226 Patent is attached hereto as Exhibit G.

17.    The Torok '956, Netravali '272, Fleming '759, Doughty '956, Jayant '676, Day '356, and Haskell '226 patents are collectively referred to herein as the "Patents-in-Suit."

18.    Lucent owns each of the Patents-in-Suit, with the right to sue for past infringement.

### Count I
### (Patent Infringement of United States Patent No. 4,317,956)

19.    Paragraphs 1 through 18 are incorporated by reference as if stated fully herein.

20.    The Torok '956 Patent is valid and enforceable.

-4-

21.     Before the expiration of the Torok '956 Patent, Gateway made, used, sold, and offered to sell products that infringed at least one claim of the Torok '956 Patent.

22.     Before the expiration of the Torok '956 Patent, Gateway also contributed to and/or induced the infringement of at least one claim of the Torok '956 Patent.

23.     Although Lucent notified Gateway of its infringement of the Torok '956 Patent, Gateway continued its infringement after receiving this actual notice.

24.     Gateway's infringement of the Torok '956 Patent was willful.

25.     Lucent has been damaged by Gateway's infringement of the Torok '956 Patent.

<u>Count II</u>

**(Patent Infringement of United States Patent No. 4,383,272)**

26.     Paragraphs 1 through 18 are incorporated by reference as if stated fully herein.

27.     The Netravali '272 Patent is valid and enforceable.

28.     Before the expiration of the Netravali '272 Patent, Gateway made, used, sold, and offered to sell products that infringed at least one claim of the Netravali '272 Patent.

29.     Before the expiration of the Netravali '272 Patent, Gateway also contributed to and/or induced the infringement of at least one claim of the Netravali '272 Patent.

30.     Although Lucent notified Gateway of its infringement of the Netravali '272 Patent, Gateway continued its infringement after receiving this actual notice.

-5-

31.    Gateway's infringement of the Netravali '272 Patent was willful.

32.    Lucent has been damaged by Gateway's infringement of the Netravali '272 Patent.

### Count III
#### (Patent Infringement of United States Patent No. 4,439,759)

33.    Paragraphs 1 through 18 are incorporated by reference as if stated fully herein.

34.    The Fleming '759 Patent is valid and enforceable.

35.    Before the expiration of the Fleming '759 Patent, Gateway made, used, sold, and offered to sell products that infringed at least one claim of the Fleming '759 Patent.

36.    Before the expiration of the Fleming '759 Patent, Gateway also contributed to and/or induced the infringement of at least one claim of the Fleming '759 Patent.

37.    Although Lucent notified Gateway of its infringement of the Fleming '759 Patent, Gateway continued its infringement after receiving this actual notice.

38.    Gateway's infringement of the Fleming '759 Patent was willful.

39.    Lucent has been damaged by Gateway's infringement of the Fleming '759 Patent.

### Count IV
#### (Patent Infringement of United States Patent No. B1 4,582,956)

40.    Paragraphs 1 through 18 are incorporated by reference as if stated fully herein.

41.    The Doughty '956 Patent is valid and enforceable.

42.    Gateway makes, uses, sells, and offers to sell products that infringe at least one claim of the Doughty '956 Patent.

43.    Gateway also contributes to and/or induces the infringement of at least one claim of the Doughty '956 Patent.

44.    Although Lucent notified Gateway of its infringement of the Doughty '956 Patent, Gateway continued its infringement after receiving this actual notice.

45.    Gateway's infringement of the Doughty '956 Patent was, and continues to be, willful.

46.    Lucent has been damaged by Gateway's infringement of the Doughty '956 Patent and will suffer irreparable injury unless the infringement is enjoined by this Court.

<u>Count V</u>
**(Patent Infringement of United States Patent No. 4,617,676)**

47.    Paragraphs 1 through 18 are incorporated by reference as if stated fully herein.

48.    The Jayant '676 patent is valid and enforceable.

49.    Gateway makes, uses, sells, and offers to sell products that infringe at least one claim of the Jayant '676 Patent.

50.    Gateway also contributes to and/or induces the infringement of at least one claim of the Jayant '676 Patent.

-7-

51.    Although Lucent notified Gateway of its infringement of the Jayant '676 Patent, Gateway continued its infringement after receiving this actual notice.

52.    Gateway's infringement of the Jayant '676 Patent was, and continues to be, willful.

53.    Lucent has been damaged by Gateway's infringement of the Jayant '676 Patent and will suffer irreparable injury unless the infringement is enjoined by this Court.

<u>Count VI</u>
**(Patent Infringement of United States Patent No. 4,763,356)**

54.    Paragraphs 1 through 18 are incorporated by reference as if stated fully herein.

55.    The Day '356 Patent is valid and enforceable.

56.    Gateway makes, uses, sells, and offers to sell products that infringe at least one claim of the Day '356 Patent.

57.    Gateway also contributes to and/or induces the infringement of at least one claim of the Day '356 Patent.

58.    Although Lucent notified Gateway of its infringement of the Day '356 Patent, Gateway continued its infringement after receiving this actual notice.

59.    Gateway's infringement of the Day '356 Patent was, and continues to be, willful.

-8-

60. Lucent has been damaged by Gateway's infringement of the Day '356 Patent and will suffer irreparable injury unless the infringement is enjoined by this Court.

## Count VII

### (Patent Infringement of United States Patent No. 4,958,226)

61. Paragraphs 1 through 18 are incorporated by reference as if stated fully herein.

62. The Haskell '226 Patent is valid and enforceable.

63. Gateway makes, uses, sells, and offers to sell products that infringe at least one claim of the Haskell '226 Patent.

64. Gateway also contributes to and/or induces the infringement of at least one claim of the Haskell '226 Patent.

65. Although Lucent notified Gateway of its infringement of the Haskell '226 Patent, Gateway continued its infringement after receiving this actual notice.

66. Gateway's infringement of the Haskell '226 Patent was, and continues to be, willful.

67. · Lucent has been damaged by Gateway's infringement of the Haskell '226 Patent and will suffer irreparable injury unless the infringement is enjoined by this Court.

## Prayer for Relief

WHEREFORE, Lucent prays for judgment as follows:

A. That Gateway has willfully infringed the Patents-in-Suit;

-9-

B.   That Gateway, its officers, agents, servants and employees, and those persons in active concert or participation with any of them, and their successors and assigns be permanently enjoined from infringement, inducement of infringement, and contributory infringement of each of the Patents-in-Suit not yet expired, including but not limited to making, importing, using, offering for sale, or selling any devices or systems that infringe, or using processes that infringe, the Patents-in-Suit before the expiration dates of those patents;

C.   That Lucent be awarded all damages adequate to compensate it for Gateway's infringement of the Patents-in-Suit, such damages to be determined by a jury and, if necessary to adequately compensate Lucent for the infringement, an accounting, and that such damages be trebled and awarded to Lucent with prejudgment interest;

D.   That this case be declared an exceptional case within the meaning of 35 U.S.C. § 285 and that Lucent be awarded the attorney fees, costs, and expenses that it incurs prosecuting this action; and

E.   That Lucent be awarded such other and further relief as this Court deems just and proper.

## JURY DEMAND

Lucent demands a trial by jury on all issues triable of right by a jury.

LUCENT TECHNOLOGIES INC. and
LUCENT TECHNOLOGIES GUARDIAN I LLC

By Counsel

**RICHARDS McGETTIGAN REILLY**
**& WEST, P.C.**
225 Reinekers Lane, Suite 700
Alexandria, Virginia 22314-2822
(703) 549-5353

By:

John P. Anderson
Va. Bar No. 20710
Craig C. Reilly
Va. Bar No. 20942

OF COUNSEL:

John M. Desmarais
Robert A. Appleby
**KIRKLAND & ELLIS**
153 East 53rd Street
New York, New York 10022-4675
(212) 446-4800

-11-

**FILED**

OCT 1 7 2002

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

FILE
OCT - 4 2002
CLERK, U.S. DISTRICT COURT
RICHMOND, VA

LUCENT TECHNOLOGIES, INC., et al.,

                                    Plaintiffs.

        v.                                            Civil Action Number 3:02CV389

GATEWAY, INC., et al.,                                02cv 2060 BTM (JAH)

                                    Defendants.

## ORDER

THIS MATTER comes before the Court on Defendants Gateway, Inc., et al.'s Motion to Transfer Venue, filed on August 19, 2002. For the reasons discussed in the accompanying memorandum, the Defendant's Motion is GRANTED. This case is TRANSFERRED to the Southern District of California for all further proceedings.

The Clerk is DIRECTED to forward the entire case file to the Southern District of California.

Let the Clerk send a copy of this Order to all parties of record.

It is SO ORDERED.

_James R. Spencer_
UNITED STATES DISTRICT JUDGE

OCT - 4 2002

DATE

A TRUE COPY, TESTE:
CLERK, U.S. DISTRICT COURT

BY _____
DEPUTY CLERK



FILED
03 FEB 27 AM 7:55
CLERK US DISTRICT COURT
SOUTHERN DIST OF CALIFORNIA
DEPUTY

RECEIVED
FEB 2 6 2003
CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                          DEPUTY

1  John E. Gartman (SBN 152941)
   Christopher S. Marchese (SBN 170239)
2  Katherine Ford Horvath (SBN 213698)
   Gary H. Savitt (SBN 220129)
3  Fish & Richardson P.C.
   4350 La Jolla Village Drive, Suite 500
4  San Diego, California 92122
   Telephone: (858) 678-5070
5  Facsimile: (858) 678-5099

6  Attorneys for
   MICROSOFT CORPORATION

7

8              UNITED STATES DISTRICT COURT

9             SOUTHERN DISTRICT OF CALIFORNIA

10

11 LUCENT TECHNOLOGIES INC. and          Case No. 02-CV-2060 BTM (JAH)
   LUCENT TECHNOLOGIES GUARDIAN I
12 LLC,                                   STIPULATION AND [PROPOSED]
                                          ORDER FOR MICROSOFT
13        Plaintiffs and Counter-defendants   CORPORATION TO INTERVENE IN
                                          THIS ACTION AND FOR AN
14        v.                              EXTENSION OF TIME TO PRESENT
                                          CLAIM CONSTRUCTION POSITIONS
15 GATEWAY, INC. and GATEWAY
   COUNTRY STORES LLC,
16                                        Honorable Barry Ted Moskowitz
          Defendants and Counter-claimants,
17                                        Courtroom 15, 5th Floor
          and                                 FILE BY FAX
18
   MICROSOFT CORPORATION.
19
          Applicant for Intervention
20

21

22        WHEREAS, Plaintiffs Lucent Technologies Inc. and Lucent Technologies Guardian I LLC

23 (collectively, "Lucent") filed their Complaint on June 6, 2002 in the United States District Court for

24 the Eastern District of Virginia;

25        WHEREAS, in that Complaint, Lucent asserted seven patents (the "Lucent Patents"):

26 United States Patent No. B1 4,582,956 (the "Doughty Patent"); United States Patent No. 4,439,759

27

28                              STIP. & [PROPOSED] ORDER FOR MICROSOFT TO INTERVENE
                                IN THIS ACTION AND FOR AN EXT. OF TIME TO PRESENT
                                CLAIM CONSTRUCTION POSITIONS
                                Lucent et al. v Gateway et al.
                                Microsoft Corp.
                                Intervenor

1   (the "Fleming Patent"); United States Patent No. 4,958,226 (the "Haskell Patent"); United States

2   Patent No. 4,383,272 (the "Netravali Patent"); United States Patent No. 4,617,676 (the "Jayant

3   Patent");United States Patent No. 4,317,956 (the "Torok Patent"); and United States Patent No.

4   4,763,356 (the "Day Patent");

5         WHEREAS, on October 4, 2002, the United States District Court for the Eastern District of

6   Virginia ordered the instant case transferred to this Court;

7         WHEREAS, on November 19, 2002, this Court held a Case Management Conference where

8   it set various dates including a claim construction hearing on October 27, 2003;

9         WHEREAS, in an order dated November 22, 2002, this Court vacated these dates;

10        WHEREAS, on December 11, 2002, this Court held a Status Conference where it set a date

11   of February 28, 2003 for Lucent to file its claim construction positions and a date of April 4, 2003

12   for Gateway, Inc. and Gateway Country Stores LLC (collectively, "Gateway") to file their claim

13   construction positions;

14        WHEREAS, Applicant for Intervention Microsoft Corporation ("Microsoft") desires to

15   intervene in the instant action as a defendant and counterclaimant with respect to five of the seven

16   Lucent Patents, namely, the Haskell Patent, the Netravali Patent, the Jayant Patent, the Torok

17   Patent, and the Day Patent (collectively, the "Intervention Patents");

18        WHEREAS, given the proximity of the current claim construction dates, given that

19   Microsoft has not yet become a party to the instant action, and given the status and nature of this

20   action, Microsoft desires an extension of time to prepare its claim construction positions;

21        WHEREAS, in signing the instant stipulation, neither Microsoft nor Gateway waive the

22   right to seek an additional extension of time relating to presenting claim construction positions,

23   including on the bases that discovery relevant to claim construction has not been provided, or has

24   been provided at a time too late to permit responsive claim construction positions to be provided by

25   the time currently scheduled.  Lucent reserves the right to oppose such a request, including on the

26

27

28

STIP. & [PROPOSED] ORDER FOR MICROSOFT TO INTERVENE
IN THIS ACTION AND FOR AN EXT. OF TIME TO PRESENT
CLAIM CONSTRUCTION POSITIONS
Lucent et al. v Gateway et al.
Microsoft Corp.
Intervenor

2

1  bases that the discovery sought is not in fact relevant to claim construction or was not timely

2  sought.

3      WHEREAS, by intervening only as to the five Intervention Patents, Microsoft does not

4  waive any right to defend any charge of infringement by Lucent against Microsoft or any Microsoft

5  product relating to the Doughty Patent and/or Fleming Patent;

6      NOW, THEREFORE, Lucent, Gateway, and Microsoft, by and through their undersigned

7  counsel, stipulate to the following:

8      1.  Microsoft shall be permitted to intervene as a defendant and counterclaimant with

9         respect to the Intervention Patents.

10      2.  A complete statement of Lucent's proposed construction of all the asserted claims of

11         each of the seven patents at issue in this case that Lucent contends Gateway and/or

12         Microsoft infringed (and/or infringe) is no longer due on or before February 28,

13         2003, but is now due on or before April 11, 2003.

14      3.  Gateway's response to Lucent's statement of claim construction, which in turn sets

15         forth a complete statement of Gateway's proposed construction of the asserted

16         claims of each of the seven patents at issue in this case, is no longer due on or before

17         April 4, 2003, but is now due on or before May 16, 2003.

18      4.  Microsoft's response to Lucent's statement of claim construction, which in turn sets

19         forth a complete statement of Microsoft's proposed construction of the asserted

20         claims of each of the Intervention Patents at issue in this case, is due on or before

21         May 16, 2003.

22

23

24

25

26

27

28

STIP. & [PROPOSED] ORDER FOR MICROSOFT TO INTERVENE
IN THIS ACTION AND FOR AN EXT. OF TIME TO PRESENT
CLAIM CONSTRUCTION POSITIONS
Lucent et al. v Gateway et al.
Microsoft Corp.
(Intervenor)

1    IT IS SO STIPULATED.

2    Dated: 2/25/03                        FISH & RICHARDSON P.C.

3

4                                          By: _Cleell_____

5                                          Christopher S. Marchese

6                                          Attorneys for
                                           MICROSOFT CORPORATION
7

8    Dated: _____                     HAHN & ADEMA

9

10                                         By: _____

11                                         Alison Adema

12                                         Attorneys for
                                           LUCENT TECHNOLOGIES INC. and
13                                         LUCENT TECHNOLOGIES GUARDIAN I
                                           LLC
14

15

16   Dated: _____                     SELTZER, CAPLAN, MCMAHON & VITEK

17

18                                         By: _____

19                                         David J. Zubkoff

20                                         Attorneys for
                                           GATEWAY, INC. and GATEWAY
21                                         COUNTRY STORES LLC

22

23

24

25

26

27

28                                         STIP. & [PROPOSED] ORDER FOR MICROSOFT TO INTERVENE
                                           IN THIS ACTION AND FOR AN EXT. OF TIME TO PRESENT
                                           CLAIM CONSTRUCTION POSITIONS
                                           Lucent et al. v Gateway et al.
                               4           Microsoft Corp.
                                           Intervenor

1      IT IS SO STIPULATED.

2      Dated: _____          FISH & RICHARDSON P.C.

3

4

5                                        By: _____
                                              Christopher S. Marchese

6

7                                        Attorneys for
                                       MICROSOFT CORPORATION

8      Dated: **2/26/03**                          HAHN & ADEMA

9

10                                        By: *Alison Adema*

11                                               Alison Adema

12                                        Attorneys for

13                                        LUCENT TECHNOLOGIES INC. and
                                       LUCENT TECHNOLOGIES GUARDIAN I

14                                        LLC

15

16      Dated: _____          SELTZER, CAPLAN, MCMAHON & VITEK

17

18

19                                        By: _____
                                              David J. Zubkoff

20                                        Attorneys for

21                                        GATEWAY, INC. and GATEWAY
                                       COUNTRY STORES LLC

22

23

24

25

26

27

28                                  STIP. & [PROPOSED] ORDER FOR MICROSOFT TO INTERVENE
                                 IN THIS ACTION AND FOR AN EXT. OF TIME TO PRESENT
                                 CLAIM CONSTRUCTION POSITIONS
                                 Lucent et al. v Gateway et al.
                                 Microsoft Corp.
                                 Intervenor

                         4

1    IT IS SO STIPULATED.

2    Dated: _____                    FISH & RICHARDSON P.C.

3

4                                               By: _____

5                                                   Christopher S. Marchese

6                                               Attorneys for
                                                MICROSOFT CORPORATION
7

8    Dated: _____                    HAHN & ADEMA

9

10                                              By: _____

11                                                  Alison Adema

12                                              Attorneys for
                                                LUCENT TECHNOLOGIES INC. and
13                                              LUCENT TECHNOLOGIES GUARDIAN I
                                                LLC
14

15

16   Dated: _____                    SELTZER, CAPLAN, MCMAHON & VITEK

17

18                                              By: _____

19                                                  David J. Zubkoff

20                                              Attorneys for
                                                GATEWAY, INC. and GATEWAY
21                                              COUNTRY STORES LLC

22

23

24

25

26

27                                              STIP. & [PROPOSED] ORDER FOR MICROSOFT TO INTERVENE
                                                IN THIS ACTION AND FOR AN EXT. OF TIME TO PRESENT
28                                              CLAIM CONSTRUCTION POSITIONS
                                                Lucent et al. v Gateway et al.
                                                Microsoft Corp.
                                                Intervenor
                          4

## ORDER

1. Microsoft can intervene as a defendant and counterclaimant with respect to the Intervention Patents. *Microsoft shall file its counterclaim in intervention within 30 days.*

2. Microsoft shall file an answer (including any counterclaims) within *20* days of entry of this order.

3. A complete statement of Lucent's proposed construction of all the asserted claims of each of the seven patents at issue in this case that Lucent contends Gateway and/or Microsoft infringed (and/or infringe) is no longer due on or before February 28, 2003, but is now due on or before April 11, 2003.

4. Gateway's response to Lucent's statement of claim construction, which in turn sets forth a complete statement of Gateway's proposed construction of the asserted claims of each of the seven patents at issue in this case, is no longer due on or before April 4, 2003, but is now due on or before May 16, 2003.

5. Microsoft's response to Lucent's statement of claim construction, which in turn sets forth a complete statement of Microsoft's proposed construction of the asserted claims of each of the Intervention Patents at issue in this case, is due on or before May 16, 2003.

Dated: **2-26**, 2003

*Barry T. Moskowitz*

BARRY T. MOSKOWITZ
Judge of the District Court

18255176.doc

STIP. & [PROPOSED] ORDER FOR MICROSOFT TO INTERVENE
IN THIS ACTION AND FOR AN EXT. OF TIME TO PRESENT
CLAIM CONSTRUCTION POSITIONS
Lucent et al. v Gateway et al.
Microsoft Corp.
Intervenor

5

Only the Westlaw citation is currently available.


United States District Court,
D. Delaware.

MITEQ, INC., Plaintiff,
v.
COMTECH TELECOMMUNICATIONS CORP.,
Defendant.

**No. Civ.A. 02-1336-SLR.**

Jan. 23, 2003.


MEMORANDUM ORDER

ROBINSON, J.

I. INTRODUCTION

*1 On July 29, 2002, plaintiff Miteq, Inc. filed this action against defendant Comtech Telecommunications, Corp. seeking a declaratory judgment that it does not infringe U.S. Patent No. 5,666,646 ("the '646 patent") owned by a subsidiary of defendant, or that the '646 patent is invalid. (D.I.1) Presently before the court is defendant's motion to dismiss, stay, or transfer this action. (D.I.6) This court has jurisdiction pursuant to 28 U.S.C. § § 1331 and 1338. For the reasons that follow, the motion shall be granted.

II. BACKGROUND

Plaintiff is a Delaware corporation with its principal place of business in Hauppauge, New York. (D.I. 14 at 5) Plaintiff designs and manufactures satellite communications equipment, including the accused infringing products. (Id. at 7) Defendant is a Delaware corporation with its principal place of business in Melville, New York. (D.I.8) Comtech EF Data ("EF Data") is a wholly owned subsidiary of defendant with its principal place of business in Tempe, Arizona. (Id.) EF Data is the assignee of the '646 patent entitled "Radio Frequency (RF) Converter System with Distributed Protection Switching and Method Transfer." (Id.) Defendant and EF Data design and manufacture satellite communications equipment utilizing the technology of the '646 patent.

On April 10, 2002, defendant filed a complaint against plaintiff in the United States District Court for the District of Arizona alleging infringement of the '646 patent. (D.I. 7 at 3) However, defendant asserts that it did not serve plaintiff in the Arizona case until August 1, 2002, in order to "permit a dialogue between the parties." (Id.) Prior to being served in the Arizona case, plaintiff filed this action and served defendant on July 29, 2002, seeking declaratory judgment of non-infringement and invalidity of the '646 patent. (D.I.1) Defendant now seeks to either dismiss this action, stay this case until resolution of the Arizona litigation, or transfer this case to the District of Arizona. (D.I.7)

III. DISCUSSION

More than fifty years ago, the Third Circuit Court of Appeals adopted the "first-filed rule" where "in all cases of federal concurrent jurisdiction the court which first had possession of the subject must decide it." Crosley Corp. v. Hazeltine Corp., 122 F.2d 925, 929 (3d Cir.1941) (quoting Smith v. M'Iver, 22 U.S. (9 Wheat.) 532, 6 L.Ed. 152 (1824)). Consequently, the second filed action should be stayed or transferred to the court where the first filed action is pending. Peregrine Corp. v. Peregrine Indus., Inc., 769 F.Supp. 169, 171 (E.D.Pa.1991); Dippold-Harmon Enterprises, Inc. v. Lowe's Companies, Inc., 2001 U.S. Dist. LEXIS 18547, Civil Action No. 01-532-GMS, 2001 WL 1414868 (D.Del.2001). The rule "encourages sound judicial administration and promotes comity among federal courts of equal rank." E.E.O.C. v. University of Pennsylvania, 850 F.2d 969, 971 (3d Cir.1988). The decision to transfer or stay the second action is within the discretion of the trial court. Id. at 972, 977. However, invocation of the rule will usually be the norm, not the exception. Courts must be presented with exceptional circumstances before exercising their discretion to depart from the first-filed rule. Id. at 979.

*2 In this case, it is undisputed that the first-filed case in Arizona and the present case involve the same patent and the same issues. Therefore, the burden is on plaintiff to present some exceptional circumstances why the court should depart from the first-filed rule. In support of its argument opposing transfer, plaintiff states that all of its relevant witnesses reside in New York, all the documents and records related to the accused product are in New York, and the "center of gravity" of the case is New York. (D.I. 14 at 6-7) None of these arguments show that there are any exceptional circumstances requiring the court to depart from the first-filed rule.

Furthermore, defendant makes the same arguments in favor of transferring the case to Arizona. It argues that all of its relevant witness, documents, and

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

products are either in or near Arizona. Therefore, by not allowing a transfer, the court would simply be transferring the inconvenience of traveling from plaintiff to defendant. Mere inconvenience to one party does not rise to the level of exceptional circumstances that would require the court to depart from the well-established principles of the first-filed rule. Since the patent litigation action in Arizona was filed first, transfer of the subsequently filed Delaware action will promote judicial administration and consistency of results.

IV. CONCLUSION

For the reasons stated, at Wilmington, this 23rd day of January, 2003, IT IS ORDERED that:

1. Defendant's motion to transfer (D.I.6) is granted.

2. Defendant's motions to dismiss and stay (D.I.6) are denied as moot.

3. The above-captioned action shall be transferred to the United States District Court for the District of Arizona.

2003 WL 179991 (D.Del.)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

C

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.

CORIXA CORPORATION, a Delaware corporation,
et al., Plaintiffs,
v.
IDEC PHARMACEUTICALS CORPORATION, a
Delaware corporation, Defendant.

No. CIV.A.01-615-GMS.

Feb. 25, 2002.

MEMORANDUM AND ORDER

SLEET, District J.

I. INTRODUCTION

*1 On September 10, 2001, IDEC Pharmaceutical Corporation ("IDEC") filed a complaint in the Southern District of California against Coulter Pharmaceutical Inc. ("Coulter"), Corixa Corporation ("Corixa"), and the Regents of the University of Michigan ("Michigan"). In its complaint, IDEC seeks a declaratory judgment of non-infringement and/or invalidity of five patents. On September 11, 2001, the Oncologic Drugs Advisory Committee ("ODAC") indicated that it would recommend a limited FDA approval of IDEC's drug Zevalin. On September 12, 2001, at approximately 8:33 A.M. PST, IDEC filed a first amended complaint which included a sixth patent.

On September 12, 2001, at 12:07 P.M. EST, Corixa, Coulter, and GlaxoSmithKline (GSK) (collectively "Corixa") filed the above-captioned action against IDEC. [FN1] Corixa alleges that IDEC is infringing U.S. Patent Nos. 6,015,542, ("the '542 patent"), 6,090,365 ("the '365 patent"), and 5,595,721 ("the '721 patent"). These patents are three of the patents involved in the California declaratory judgment action.

FN1. On September 28, 2001, Michigan was added as a plaintiff in this action.

Presently before the court is IDEC's motion to stay the proceedings, or alternatively, to dismiss or transfer this action to the Southern District of California. [FN2] For the reasons that follow, the court will grant IDEC's motion to transfer.

FN2. IDEC sought to stay the proceedings pending a ruling from the California court on a motion to dismiss. On January 30, 2002, the California court denied the motion to dismiss. IDEC's current motion to stay is therefore moot.

II. BACKGROUND

IDEC is a Delaware corporation with its sole place of business in the San Diego area. Coulter is a Delaware corporation with its principle place of business in the San Francisco Bay area. Corixa is a Delaware corporation based in Seattle, Washington. GSK is a Pennsylvania corporation with its principle place of business in Philadelphia, Pennsylvania. The University of Michigan is a constitutional corporation of the State of Michigan, located in Ann Arbor, Michigan.

The patents at issue involve technology for the treatment of lymphoma using targeted radioimmunotherapy. Coulter and Corixa are co-owners of the '542, ' 365, and '721 patents. Corixa and GSK are the licensees of these patents. Both IDEC and Corixa are currently seeking FDA approval for a commercial embodiment of their respective inventions for the treatment of lymphoma using radioimmunotherapy.

With these facts in mind, the court will now turn to the motion presently before it.

III. DISCUSSION

A. The "First-Filed" Rule

Where two patent lawsuits involving the same claims are filed in different jurisdictions, the Federal Circuit requires that the first-filed action be given preference absent special circumstances. See Genentech v. Eli Lilly & Co., 998 F.2d 931, 937 (Fed.Cir.1993). The first-filed doctrine also serves to prevent a multiplicity of actions and to achieve resolution in a single lawsuit of all disputes arising from common matters. See id. at 937. This doctrine applies equally well where the first-filed action is one for a declaratory judgment. See id. at 938 (noting that, where the declaratory action can resolve the various issues, a first-filed declaratory action is

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

entitled to precedence as against a later-filed patent infringement action.)

*2 Applying the first-filed rule, IDEC argues that the present case should be transferred to the Southern District of California. Notwithstanding that the cases at issue are "mirror image" cases where the court is asked to construe the same patents, Corixa argues that the first-filed rule is inapplicable to the present situation.

Corixa first argues that GSK has not been joined in the California litigation. The record before the court indicates that GSK is Coulter's licensee. It is unclear whether GSK is an exclusive licensee. However, even were the court to accept Corixa's argument that GSK is an exclusive licensee, that alone does not indicate that GSK is a necessary party to this litigation. Corixa concedes that GSK is a licensee with fewer than all substantial rights. As such, GSK, while likely a proper party to the California lawsuit, is not a necessary party. See *Intellectual Property Development, Inc. v. TCI Cablevision of California, Inc.,* 248 F.3d 1333, 1348 (Fed.Cir.2001) (holding that an exclusive licensee possessing fewer than all substantial rights may not sue in its own name without joinder of the patent owner.) Finally, to the extent that the parties believe that GSK is a necessary party, GSK may request permission to join the California litigation. [FN3]

> FN3. Corixa expresses concern over whether the California court has subject-matter jurisdiction over an action between IDEC and GSK. As it is not the court's province to determine another court's subject matter jurisdiction, the court expresses no opinion on this.

Corixa next argues that the first-filed rule is inapplicable to the present situation because IDEC improperly "raced to the courthouse" in order to file its motion in California. In support of this contention, Corixa points out that its right to file an infringement suit against IDEC did not ripen until after ODAC recommended that the FDA approve Zevalin. However, before ODAC publicly recommended approval, but after IDEC had reason to believe they would do so, IDEC "raced" to file its declaratory judgment action.

The court acknowledges that IDEC's filing seems providential since ODAC's recommendation became public the day after IDEC filed its suit. In its

November 6, 2001 Order, however, the California court specifically found that IDEC possessed a reasonable apprehension of suit when it filed its declaratory judgment action. The California court continued by stating that, "an actual controversy existed when IDEC filed the complaint under consideration. Consequently the [c]ourt finds that IDEC's filing suit was not motivated by "forum shopping alone," but rather was a legitimate exercise of its opportunity under the Declaratory Judgment Act ...." This court sees no reason to disagree with the California court's findings.

Given the information presently before it, the court concludes that having two separate trials in mirror image cases would defeat the purposes of the first-filed rule, namely, sound judicial administration and comity among federal courts of equal rank. See *EEOC v. University of Pennsylvania,* 850 F.2d 969, 971 (3d Cir.1988). Accordingly, the court finds that the application of the rule weighs heavily in favor of transferring this case to the Southern District of California.

B. Section 1404(a)

*3 Transfer to the Southern District of California is also mandated under a section 1404(a) analysis. Section 1404(a) provides that "[f]or the convenience of [the] parties and [the] witnesses, in the interest of justice," the court may transfer this action to "any other district where it might have been brought." 28 U.S.C. § 1404(a). There is no dispute that this action could have been filed in the Southern District of California. The court will, therefore, move on with inquiry as directed by the Third Circuit. See *Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 879 (3d Cir.1995).

In *Jumara,* the Third Circuit provided a list of factors to assist the district courts in determining "whether, on balance, the litigation would more conveniently proceed and the interests of justice [would] be better served by a transfer to a different forum." *Id.* These factors include six private and five public interests which the court may consider. See *id.*

1. The Private Interests

The private interests most relevant to this case include: (1) the convenience of the parties as indicated by their relative physical and financial position; (2) the convenience of the witnesses, but only to the extent that they may be unavailable for trial in one of the fora; and (3) the location of records and other documents, again, only to the extent that

these files cannot be produced in the alternate forum. [FN4]

> FN4. For the reasons the court discussed in a previous opinion, it will not afford any weight to the first three *Jumara* factors, specifically, the plaintiff's initial choice of forum, the defendant's preferred venue, and whether the claim arose elsewhere. *See Affymetrix, Inc. v. Synteni, Inc.,* 28 F.Supp.2d 192, 197-201 (D.Del.1998). In not affording weight to these factors, the court avoids the risk of double- counting these interests and thereby throwing off the transfer analysis. *See id.* Instead, the court will consider whether the Southern District of California is a more convenient forum for the parties and the witnesses, while also serving the interests of justice. *See* 28 U.S.C. § 1404(a).

a. The Convenience of the Parties

 Geographically, California is not more inconvenient for the parties than Delaware. Michigan must travel whether the suit is in California or Delaware. GSK is one of the world's largest pharmaceutical companies, and cannot complain about location. The remainder of the parties are based on · the West Coast. Furthermore, transfer to California would reduce the overall inconvenience to all parties involved. The parties must already be prepared to litigate the related case currently pending in the Southern District of California. Bringing witnesses and relevant documents to only one location, here California, minimizes the level of disruption caused to all parties by the litigation. This is certainly a more economical and efficient result than having each party moving witnesses and documents between two states, depending on which of these related actions is being litigated at that time. Thus, this factor weighs in favor of transfer.

b. The Convenience of Witnesses

 Party witnesses or witnesses who are employed by a party carry no weight in the "balance of convenience" analysis since each party is able, indeed obligated, to procure the attendance of its own employees for trial. *See Affymevtrix,* 28 F.Supp.2d at 203. Expert witnesses or witnesses who are retained by a party to testify carry little weight in determining where the "balance of convenience" lies because they are "usually selected [on the basis] of their reputation and

special knowledge without regard to their residences and are presumably well compensated for their attendance, labor and inconvenience, if any." *See id.* (internalcitations omitted). Fact witnesses who possess first-hand knowledge of the events giving rise to the lawsuit, however, have traditionally weighed quite heavily in the "balance of convenience" analysis. *See id.*

*4 There is no evidence on the record that would indicate that Delaware would be an inconvenient forum for potential non-party witnesses. However, the court notes that all the material witnesses in this dispute, party or otherwise, will be in California already to litigate the related matter now pending in the Southern District of California. Requiring that they come to Delaware to litigate this action separately cannot be considered convenient and in the interest of justice. However, as there is no clear evidence that a non- party witness will be unable to attend trial in Delaware, this factor must weigh against transfer.

c. The Location of Records and Other Documents

 The technological advances of recent years have significantly reduced the weight of this factor in the "balance of convenience" analysis. *See id.* at 205. There is no indication that either party would be unable to produce the relevant records and documents in Delaware. Thus, because this factor is relevant only insofar as the documents would be unavailable in one forum, the court finds that this factor must weigh against transfer.

 From a practical standpoint, however, the court notes that any relevant documents will already be in California for the litigation of that case. The court sees no need to require that the parties move the same documents across the country. Rather, it would be much more efficient to litigate these related actions in one location. However, these considerations are more relevant to the first factor discussed *supra.*

2. The Public Factors

 As other courts have noted, depending on the circumstances of the case, some of the "public interest" factors listed in *Jumara* may play no role in the "balance of convenience." *See id.* at 205. The court thus elects to discuss only the factors most relevant to the pending case.

a. Practical Considerations Making Trial Easy, Expeditious or Inexpensive

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

This factor appears to substantially repeat the "first-filed" analysis advanced by IDEC, and accepted by the court, in Section III .A, *supra.* As such, the court declines to further address this issue here, since it has already taken this argument into consideration.

b. Delaware's Interest in this Controversy

Three of the parties in this action are Delaware corporations. However, while the court is mindful of Delaware's interest, that alone will not tip the "balance of convenience" in its favor. This is so because the court can hardly describe the patents as a local controversy unique to Delaware. See *Affymetrix, 28 F.Supp.2d at 207.* Instead, the patents deal with the treatment of lymphoma. This clearly has far-reaching implications. Accordingly, this factor does not weigh against transferring this case to California.

c. Collective Travel Time and Cost

A mirror image action is currently pending in California. Thus, to require the parties to simultaneously litigate virtually the same case on different coasts would certainly increase the collective travel time and cost. Thus, this factor weighs in favor of transfer.

IV. CONCLUSION

*5 The court concludes that the "balance of convenience" tips strongly in favor of transferring this action to the Southern District of California.

For these reasons, IT IS HEREBY ORDERED that:
   1. IDEC's alternative motion to transfer this action to the Southern District of California (D.I.8) is GRANTED.
   2. The above-captioned matter is hereby TRANSFERRED to the United States District Court for the Southern District of California.

2002 WL 265094 (D.Del.)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

WASHINGTON, D.C. 20549

# FORM 10-K

[X]  ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF
THE SECURITIES EXCHANGE ACT OF 1934

FOR THE FISCAL YEAR ENDED SEPTEMBER 30, 2002

OR

[ ]  TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF
THE SECURITIES EXCHANGE ACT OF 1934

FOR THE TRANSITION PERIOD FROM _____ TO _____

COMMISSION FILE NO.: 001-11639

# LUCENT TECHNOLOGIES INC.
(EXACT NAME OF REGISTRANT AS SPECIFIED IN ITS CHARTER)

| DELAWARE | 22-3408857 |
|---|---|
| (STATE OR OTHER JURISDICTION OF INCORPORATION OR ORGANIZATION) | (I.R.S. EMPLOYER IDENTIFICATION NO.) |

| 600 MOUNTAIN AVENUE, MURRAY HILL, NEW JERSEY | 07974 |
|---|---|
| (ADDRESS OF PRINCIPAL EXECUTIVE OFFICES) | (ZIP CODE) |

REGISTRANT'S TELEPHONE NUMBER, INCLUDING AREA CODE: (908) 582-8500

SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:
See attached Schedule A.

SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT:
None

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes [X] No [  ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in the definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [  ]

At November 30, 2002, the aggregate market value of the voting and non-voting common stock held by non-affiliates of the registrant was approximately $6,300,000,000.

At November 30, 2002, 3,607,381,493 shares of the registrant's common stock were outstanding.

## DOCUMENTS INCORPORATED BY REFERENCE

(1) Portions of the registrant's annual report to shareowners for the fiscal year ended September 30, 2002 (Part II).

(2) Portions of the registrant's definitive proxy statement for its 2003 annual meeting of shareowners (Part II and III).

## SCHEDULE A

Securities registered pursuant to Section 12(b) of the Securities Act of 1934:

| Title Of Each Class | Name Of Each Exchange On Which Registered |
|---|---|

| | |
|---|---|
| Common Stock (par value $.01 per share) | New York Stock Exchange |
| 7.25% Notes due July 15, 2006 | New York Stock Exchange |
| 6.50% Debentures due January 15, 2028 | New York Stock Exchange |
| 5.50% Notes due November 15, 2008 | New York Stock Exchange |
| 6.45% Debentures due March 15, 2029 | New York Stock Exchange |

---

TABLE OF CONTENTS

| Item | Description | Page |
|---|---|---|
| | PART I | |
| Item 1. | Business | 1 |
| Item 2. | Properties | 30 |
| Item 3. | Legal Proceedings | 31 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 36 |
| | PART II | |
| Item 5. | Market for Registrant's Common Equity and Related Stockholder Matters | 37 |
| Item 6. | Selected Financial Data | 38 |
| Item 7. | Management's Discussion and Analysis of Results of Operations and Financial Condition | 38 |
| Item 8. | Financial Statements and Supplementary Data | 38 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 38 |
| | PART III | |
| Item 10. | Directors and Executive Officers of the Registrant | 39 |
| Item 11. | Executive Compensation | 39 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management | 39 |
| Item 13. | Certain Relationships and Related Transactions | 39 |
| Item 14. | Controls and Procedures | 39 |
| Item 15. | Exhibits, Financial Statement Schedule, and Reports on Form 8–K | 39 |

This report contains trademarks, service marks and registered marks of us and our subsidiaries, and other companies, as indicated.

PART I

**Item 1.  Business**

**COMPANY OVERVIEW**

Lucent Technologies Inc. (referred to in this report as the "Company," "we," "us" or "Lucent") is a leading provider of communications networks for the world's largest communications service providers. We design our systems, services and software to help our customers quickly deploy and better manage their networks and create new, revenue–generating services that help businesses and consumers. We have a strategic focus on and strong relationships with the top 50 global service providers.

We were incorporated in Delaware in November 1995. We were formed from the systems and technology units that were formerly a part of AT&T Corp. ("AT&T"), including the research and development capabilities of Bell Laboratories ("Bell Labs"), and were spun off by AT&T on September 30, 1996. Our principal executive offices are located at 600 Mountain Avenue, Murray Hill, New Jersey 07974 (telephone number 908–582–8500). Our fiscal year begins October 1 and ends September 30.

**MARKET ENVIRONMENT**

The global telecommunications networking industry is experiencing a very difficult period, which began in calendar 2001 and intensified in 2002. Our service provider customers, especially in North America, are facing slowing revenue growth due to competitive and market pressures and a decline in near–term demand for their services. The following are the primary factors that have contributed to the lower revenue growth for service providers:

- Growth in demand for traditional telecommunications services in developed markets has been slowing. Subscriber penetration for various services has started to reach saturation levels and subscriber growth has started to taper off.

- Demand for corporate data services has weakened due to the economic slowdown in general and reductions in business spending for information technology.

- Prices for traditional telecommunications services have declined significantly due to increased competition across customer segments and technologies.

  – In many regions, established wireline players are entering each other's markets.

  – Some local service providers are providing long distance service, and long distance operators are offering local telephone service.

  – Cable operators are providing basic telephone services in addition to their traditional broadcast video operations.

  – Wireless service providers are competing with wireline service providers, as customers are canceling landline service and using only mobile service.

  – Wireless service providers continue to compete aggressively, leading to further price declines.

- Demand for new telecom services, especially "application services," remains subdued.

Many service providers also accumulated significant amounts of debt in recent years to expand their network capacity, enter new markets and acquire other businesses. Access to capital for long–term investment in telecommunications networks has become scarce and the industry is going through a period of rationalization after a period of heavy investment. The regulatory environment, especially in North America, has also discouraged local service providers from investing in network expansion and upgrades.

In response to these challenges, service providers have a renewed focus on reducing debt levels, cutting costs and conserving cash. They are significantly reducing capital expenditures and rethinking their plans to expand their networks. Capital spending by service providers declined by more than 25% from the end of 2001. Service providers are refocusing their capital investment on projects that can provide an immediate return either through profitable revenue growth or clear operating cost savings. In addition, many service providers are delaying their deployment of new technologies or scaling back these plans significantly. Many large service providers in the U.S., including SBC Communications and Verizon Communications, intend to reduce their capital spending in calendar year 2003 even further from 2002 levels. We expect that capital spending by service providers will continue to decline through 2003 and will begin to stabilize or possibly increase in 2004 or 2005.

## OUR STRATEGY

Our strategy continues to center upon meeting the needs of the world's top service providers. We estimate that the top 50 service providers will account for about 70% of the total capital spending in the industry in 2002 and that this will grow to almost 80% of service provider capital spending by 2005. In addition, the top 20 countries still account for over 90% of all capital spending by service providers. We are organized to address service providers' needs globally through two distinct operations: Mobility Solutions ("Mobility"), which is focused on wireless service providers, and Integrated Network Solutions ("INS"), which is focused on wireline service providers.

In the Mobility segment, we plan to lead the migration to next or third generation wireless networks, often referred to as 3G, across both CDMA2000 and UMTS industry standards. We intend to build upon our leadership position in CDMA spread spectrum technology – the underpinning of both global standards – and our detailed understanding of wireless operators' business challenges. We believe that the key to widespread deployment of 3G networks centers upon meeting the enterprise demand for high–speed mobile data services. These new service offerings offer the promise of profitable new revenue streams for service providers and provide financial justification for the significant investment in network upgrades to 3G systems.

In the INS segment, we remain committed to providing end–to–end solutions for wireline service providers. However, in response to this extended market downturn, we have taken action to further refocus our product portfolio. We are exiting or paring back investment in product lines that have been slow to develop and are unlikely to become profitable in the next 12 to 18 months. For example, we are reducing our investment in broadband access by focusing on revenue opportunities involving carriers' metropolitan area networks (which we refer to as our

2

metro optical products) and scaling back efforts in next generation voice segments, including Class 5 circuit switch replacement.

While refocusing our product portfolio in this manner, we are working on expanding the role of third party vendors with whom we have relationships. We will continue to offer end–to–end solutions to both wireline and wireless service providers, but will design these solutions to use both internally developed and externally sourced products. Consistent with this approach, we intend to increase our support of third party products by both our Network Operations Software and our Worldwide Services organization. We expect to integrate third party products under our iNavis network and service management platform and expand our capability to engineer, install, integrate and maintain third party networking products.

We believe that we have an opportunity to increase our participation in both the services and software portions of the market. We plan to expand our approach to selling services and software from the more traditional bundling of these with Lucent product sales to selling services and software to support third party vendors' products. We are also seeking opportunities to provide professional and managed services. Our professional services portfolio includes network design, integration and optimization. Managed services include outsourcing all or portions of network monitoring and maintenance.

We strive to be our customers' partner of choice for providing communications and networking products and services. We believe we have the following strengths that differentiate us from our competitors:

- The deepest experience building and supporting large service providers' wireline and wireless networks.

- Our service intelligence network architecture that provides a platform to drive new revenues, reduce costs and simplify operations for our service provider customers.

- One of the largest in-house research and development programs focused on service providers.

- The industry's most extensive services capability to design, build, integrate and manage networks.

- Network management and software tools to help our customers simplify operations and deliver services faster.

Our customer strategy is to focus our sales and marketing, product development, services and supply chain resources on the world's largest service providers in both the INS and Mobility segments. We have moved from a geographically organized sales force across INS and Mobility segments to two smaller sales forces, one primarily dedicated to the needs of wireline customers and the other primarily dedicated to the needs of wireless customers. We believe this alignment will improve our ability to address our customers' requirements. We follow the geographic footprints of the world's largest service providers around the world to the approximately 20 core countries in which they do business. We also pursue business with other service providers in these 20 countries when opportunities arise. We expect to serve customers selectively in countries that are within close proximity to these 20 core countries by drawing upon the infrastructure from the core countries. For countries that do not fit those criteria, we have or are

3

developing strategic relationships with third party agents, so that we can continue to service customers without utilizing our direct resources.

We began to implement this new business structure in the beginning of fiscal 2002. Our goals are to eliminate costs from our business, speed-up our decision making by reducing the number of people involved in the decisions and shift to the most profitable near-term opportunities.

## OUR RESTRUCTURING PROGRAM

Beginning in 2001, we embarked on a series of restructuring efforts because of the dramatic downturn in the telecommunications market and the significant reduction in our revenues. These programs were designed to eliminate duplication in functions and activities, centralize other functions and restructure the business to match our strategy. During 2002, we committed to additional steps in response to the continued downturn in the market.

Our restructuring included the following actions: (1) evaluating our manufacturing operations and eliminating some of our manufacturing facilities, (2) making greater use of contract manufacturers, (3) assessing virtually every aspect of our product portfolio and associated research and development ("R&D"), (4) streamlining the rest of our operations to support those reassessments, (5) eliminating some marginally profitable or non-strategic lines, (6) merging technology platforms, (7) consolidating development activities and (8) eliminating positions to reduce personnel costs where appropriate. In making these decisions, we have taken and continue to take into account the needs of our largest service provider customers. We have sold assets relating to product lines whose products did not support our large service provider customers or our strategy.

## DISPOSITIONS

During 2002 and 2001, we sold various assets and businesses as part of our strategy to focus our business on large service providers and to streamline our operations and reduce our costs. Some of the more significant actions we have taken are as follows:

*Power Systems*

On December 29, 2000, we sold our power systems business to Tyco International Ltd.

*Manufacturing*

We sold our manufacturing operations in Oklahoma City, Oklahoma and Columbus, Ohio to Celestica Corporation on August 31, 2001. Upon closing of the sale, we entered into a five-year supply agreement with Celestica to be the primary manufacturer of our switching and access and wireless networking products. In July 2002, we reacquired the Columbus, Ohio facility and we are currently planning to sell it.

We sold a substantial portion of our optical networking manufacturing operation to Solectron on May 31, 2002, and entered into a three-year supply contract with Solectron to be the primary

4

manufacturer of our optical networking products. Due to continuing market uncertainties, we have agreed with Solectron to unwind this relationship. We expect that the contract manufacturing work for our optical networking products will be transitioned to our other suppliers.

*Optical Fiber Solutions*

On November 16, 2001, we sold a significant portion of our optical fiber business to The Furukawa Electric Co., Ltd. and on September 30, 2002, we sold our interests in two Chinese joint ventures in the optical fiber business to Corning Incorporated.

*Customer Care*

On February 28, 2002, we sold our billing and customer care business to CSG Systems International, Inc.

*Agere*

On June 1, 2002, we completed our spin-off of Agere Systems Inc. by distributing to our common shareholders of record on May 3, 2002 all of the shares of Agere held by us.

## OUR ORGANIZATION

We are organized around two distinct customer segments: Integrated Network Solutions, focusing on the needs of wireline service providers, and Mobility Solutions, focusing on the needs of wireless service providers. We have consolidated sales, product development, product management and general profit and loss responsibilities within each of these two segment organizations. In fiscal 2002, we began to report the INS and Mobility segment financial performance separately. Financial information about each of these segments is set forth in Note 13 to our September 30, 2002 financial statements and our Management's Discussion and Analysis of Results of Operations and Financial Condition.

Our segments are supported by a number of central organizations, including Lucent Worldwide Services (or "LWS"), Supply Chain Networks ("SCN"), Bell Labs and the Corporate Centers (e.g. finance, human resources, information systems, etc.). LWS provides the services that are sold to customers through the two segment organizations. Manufacturing and supply chain functions have been consolidated into the SCN organization. SCN manages the materials and activities necessary to produce and deliver products and services to our customers. Our Corporate Centers provide administrative support to both segments.

## INTEGRATED NETWORK SOLUTIONS

INS focuses on global, wireline service providers and offers a broad range of circuit switching, packet switching, access and optical networking products, as well as network management software. Our offerings include services provided by LWS and may include products, software and services provided through original equipment manufacturers and our co-marketing and

5

strategic alliances with other businesses. Our switching, access and optical products are an integral part of our customer's networks that support voice, data and video applications.

INS's revenues during fiscal 2002 were approximately $6.4 billion, of which 54% were from customers in the U.S. Our revenues come primarily from large established service providers. Sales to our five largest customers accounted for approximately 40% of our total revenues during fiscal 2002. We sell most of our products and services through our direct sales force with individual teams that support all significant customers. We also sell our products and services through third party distributors, although to a much lesser extent. We are actively working to enhance our relationships with third party distributors and increase our indirect sales capabilities. As of September 30, 2002, INS had approximately 10,000 employees that are primarily engaged in product development and sales and marketing activities.

We believe that over time, voice traffic will migrate from existing circuit switched infrastructure to a packet infrastructure primarily driven by new packet based end-user devices. These devices, when connected to the packet switching infrastructure, will offer new kinds of multi-media and voice services. However, we do not believe that wireline service providers will undertake a massive replacement of circuit switches in the near term. As a result, our SoftSwitch product, a key component providing the switching intelligence in voice-over-packet applications, will be focused in the near term to support the 3G wireless market, where our customers see a near-term market opportunity for this technology.

*INS Strategy*

Our primary focus is addressing opportunities with our service provider customers who have massive investments in their existing networks. We believe that one of the key priorities for service providers is leveraging their investment in these networks.

In voice switching, we are working closely with our customers to help them evolve their 5ESS® circuit switch platforms to increase capacity, lower cost of operations and accelerate new feature introductions. We have launched an IP Centrex solution that adds interfaces on the 5ESS to connect packet based end-user devices for voice traffic. This allows service providers to serve new types of terminals and offer new services with a small additional investment, while significantly reducing operational expenses.

In the packet switched network core, we are committed to help our customers migrate to MPLS. MPLS is a protocol or procedure for regulating the transmission of data through a network using multiple types of traffic, such as frame relay, asynchronous transfer mode (or ATM) and Internet protocol. Given our customers' stated intent to focus on leveraging their embedded networks, we will enhance our GX550 Multi-Service Core Switch feature set with MPLS and other features, as requested by our customers. At the network edge, we will continue to invest in products such as CBX Multi-Service Switch and the PSAX Concentrator.

We believe we have an industry leading optical networking portfolio. Our primary focus and near term investment planning is on metro optical products which support local metropolitan area networks and for which there is a strong market demand. Our Metropolis optical products

6

are in more than 45 trials and deployments. The LambdaUnite™ MultiService Switch, introduced in January 2002, was successfully launched in over 50 customer trials and deployments.

In the core optical market, we have what we believe is an industry leading long-haul optical transport system, LambdaXtreme™ that was launched in March 2002, and is going through trials with half a dozen customers. The market for core optical long-haul equipment has slowed because of a significant overbuild in the past 3 years. With a continued rise in demand for telecommunication services, this market is expected to grow again, with Lucent positioned with a strong portfolio.

In our access line of products, such as Stinger, Anymedia Access Systems, and Universal Gateway products, we invest to meet customer commitments with a clear focus on continuous reduction of the manufacturing costs of these platforms.

One area where we will continue to make significant investments is network management software. Our new Navis iOperations software portfolio is focused on simplifying network management for our customers, reducing costs, improving reliability, and helping them accelerate the time to market for voice and data services. These areas are critical to the business success of our customers and we believe there will be an increasingly strong demand for these types of management solutions. Many service providers have deployed Lucent software products.

Our product offerings include:

### Circuit Switching Products

Primarily used for voice communications, circuit switching is a networking technology that uses switches to transmit or "switch" communications from one location to another within the network. Circuit switching has been used in telephone networks for decades. In a traditional "circuit–switched" telephone call, the telephone network creates dedicated connections so that the person placing the call can communicate with the person receiving the call. When the call is placed, the network determines a path for the call and all communications during that call are transmitted over that path. The telephone line and other network resources are then dedicated to that particular call and cannot be used for any other purpose or any other call.

### Packet Switching Products

Packet switching is a more recent technology that has historically been used for data communications. The Internet uses Internet Protocol (called "IP") switching, a specific type of packet switching, to connect the end–user to the servers where the web pages reside. In packet switched networks, information is divided up into small segments (called packets) of information. Packets are then sent independently, possibly over different paths, through the network from the originating end of the call to the destination. At each step along the way, the network can determine the 'next step' that a particular packet should take. As all the packets arrive at the destination, they are re–assembled into the original information.

7

Packet switching has an advantage over circuit switching in that it allows information streams to more efficiently share network resources because a "path" is not dedicated to each information stream as in circuit switching. However, packet switching can have lower transmission quality than circuit switching because some packets may get delayed or lost in transit. New protocols between packet switches allow the network to maintain quality transmission of information by tagging each information packet with a description of the type and importance of its content. Multi–Protocol Label Switching, or MPLS, is such a protocol (or procedure) for regulating the transmission of data through a packet network. MPLS allows multiple types of traffic (data, voice and video) to cross a packet switched network without loss of quality.

### Access Products

Access products provide a means of connecting the end user to the rest of the network. The INS access product line is focused on access through twisted copper wires, which is the wiring commonly used in local telephone networks. Traditionally, voice traffic has been, and continues to be, connected to circuit switches through circuit–switched access products. This allows one voice call per pair of copper wires. More recent access technologies, such as Digital Subscriber Line, or DSL, allow faster transmission of data, multiple voice connections and even video streams over one pair of copper wires to the end–user. INS has two families of products, one fully specialized at providing DSL service with the highest speeds at low cost, and the other aimed at providing a flexible mix between traditional voice access and DSL access. Other access technologies allow packet and circuit switched networks to communicate with each other. An example is our Universal Gateway products, which allow end–users to dial over a circuit switched connection (traditional phone call) and then interface with a packet switched network, such as the Internet.

### Optical Networking Products

Optical networking products include laser–based transmission systems that transport information between and among switches and other network components by release of light particles. Optical networking is made possible by photonics, a technology that uses light particles, or photons, to transport information over glass fibers in optical fiber cables. These systems include core backbone high capacity systems (the central portion of network equipment) as well as lower capacity metropolitan systems (local networks).

Core optical networking systems expand and speed optical signals over fiber cable for the "core" or central portion of the network of a service provider and allow these customers to increase the amount of traffic transmitted over their fiber optic networks. The core network equipment is responsible for moving voice, data and video traffic from origin to destination and connecting radio base stations to the public voice and data networks.

Metro optical networking systems, another group of optical networking products, are designed to aggregate and increase the use of fiber optic systems for both voice and data traffic for local carriers or networks located in metropolitan areas. This family of optical networking products provides service providers with fast, efficient information transport over fiber optic lines.

8

## MOBILITY SOLUTIONS

Mobility focuses on global, wireless service providers with end–to–end solutions and products that support their needs for radio access, core networks, network management and application and service delivery systems. We also tap strengths across INS's optical networking, switching and access product lines and LWS services and, to a lesser extent, products, software and services provided by third parties.

Mobility's revenues during fiscal 2002 were approximately $5.4 billion. Although products and services are provided to wireless service providers on a worldwide basis, approximately 80% of Mobility's fiscal 2002 revenues were related to U.S. customers, of which 84% were concentrated with four large U.S. service providers. We primarily sell to customers through our direct sales force. As of September 30, 2002, Mobility had approximately 7,000 full time employees that are engaged primarily in product development and sales and marketing activities.

Our products and services encompass all of the major wireless mobile network standards. Our primary focus is on two technologies – Code Division Multiple Access ("CDMA") and Universal Mobile Telecommunication System ("UMTS")*. We continue to meet ongoing customer commitments to the Advanced Mobile Phone Service ("AMPS"), an analog technology that uses FM radio channels, Time Division Multiple Access ("TDMA"), and Global Systems for Mobile Communications ("GSM"). We provide these mobile systems throughout the world and in a variety of frequency bands assigned to mobile communications. Our offerings are scalable (i.e., can be made larger or smaller without undue cost increases) and are therefore compatible with the established providers and start–ups. We believe our strength and track–record in spread spectrum technologies, have us uniquely positioned for the global migration to 3G and the support for high speed packet data communications.

Our emphasis is providing the equipment and services necessary for our customers to evolve from their current second generation ("2G") technology to 3G spread spectrum technologies of CDMA2000 and UMTS. Spread spectrum technologies will allow service providers to offer enhanced voice capacity and improved Internet/Intranet access. These spread spectrum technologies distribute radio signals over a wide range of frequencies and then collect them into their original frequencies at the receiver. Wireless service providers must be able to provide voice capacity in terms of numbers of subscribers and minutes of use at extremely low cost in a spectrum–efficient manner. At the same time they must be able to penetrate the high–speed wireless data market for enterprise customers.

The 2G technologies utilized by service providers currently include cdmaOne, GSM, and TDMA. CdmaOne is the 2G version of spread spectrum. GSM and TDMA are both time division multiplexed technologies. Systems based on these 2G technologies provide digital voice and transaction data communications, but generally cannot offer the high–speed services in a spectrum–efficient manner that 3G spread spectrum technology is expected to provide. We have significantly reduced our investments in 2G but are continuing support of our existing customers.

---

* UMTS is a trademark of the European Telecommunications Standards Institute.

9

The International Telecommunications Union, an international standards body that operates as part of the United Nations, has been instrumental in promulgating a vision of 3G that embraces a wide variety of spread spectrum technologies, a technology we have helped to develop. We are the global leader in CDMA spread–spectrum networks, with more than 70,000 base stations providing commercial service around the world, and more than 35,000 of those base stations are providing 3G services for our customers today. We have built more CDMA networks than anyone else, and we are leveraging that expertise to establish a strong position in the very early stages of UMTS deployment.

We have brought to market spread spectrum CDMA2000 networks in North America, South America, China, Asia, Eastern Europe, and Russia, and expect to supply UMTS networks in Europe in the future.

Based on the existent 3G migration plans from leading service providers around the world, it is expected that the great majority of future 3G mobile users will be accessing voice and high speed data services through a CDMA2000 or UMTS network. However, we cannot assure you that the spread spectrum technologies on which we have chosen to focus (CDMA2000 and UMTS) will become the dominant standards for 3G wireless networks in the future. Some of our competitors invested heavily in GSM and the future evolution of time division multiplex based technology to 2.5G (GPRS) and 3G (EDGE), a technology path in which we have decided not to invest. These competitors have developed products to help their GSM service provider customers migrate to 3G through technology upgrades, rather than deploy new 3G networks. Two of the major service providers in the U.S. have chosen this path. However, they are also continuing to evaluate and plan for UMTS. We believe spread spectrum will provide superior performance both technically and economically.

The planned customer investment in 3G networks has been reduced in the last two years. In early 2000, many service providers, particularly in Europe, had plans to aggressively upgrade their networks to 3G, or to enter new networks by building 3G networks. Auctions for UMTS 3G spectrum in Europe started off with staggering bids for the licenses, but since then, financial and market conditions have driven some service providers to delay their 3G deployments or abandon their plans to deploy 3G. We expect new high–speed data services will trigger increased capital expenditures, but this investment by service providers is being delayed.

### Mobility Strategy

One of our primary strategies is to capitalize on the evolving market need for wireless data services. Our existing and targeted customers' embedded base of network technology was primarily designed to support voice services. While this market continues to represent a large revenue opportunity, in many countries this is a mature market with limited growth potential for our customers. Furthermore, the average revenue per subscriber that our customers can realize for voice services has been steadily declining over the past several years, resulting in a negative impact on profit margins. Accordingly, we are committed to supporting our customers' objective to identify new high growth revenue opportunities. We believe that the availability of wireless high–speed data, driven by spread spectrum technologies, represents a significant

10

evolution of the wireless industry and can satisfy this customer objective. As a result, we expect to focus our investment on a portfolio of products that enables wireless high–speed data in both the CDMA and UMTS markets.

We have performed market research to identify the user segment most likely to adopt wireless high–speed data. This research has concluded that enterprises are planning (and have a need) to provide mobile communication capabilities for an increasing percentage of their workforce in the coming years. A mobile professional is defined as an employee that plans to spend at least 20% of their working time away from the office. The mobile professional, however, faces tremendous challenges in accessing critical business information while away from the office. We have worked closely with several information technology organizations across multiple industries to understand why enterprises have not utilized 2G or other wireless technology to address this need. In each case, the barriers to adoption are consistently focused on the lack of speed and security of access, limited availability of coverage, and high cost of service. Our research has included business case analysis that indicates significant gains in productivity and reductions in operating costs are realizable for enterprises if technology is made available that can overcome these barriers. Furthermore, the mobile professional is characterized by a strong willingness to pay for technology that can accomplish this.

Mobility and its product portfolio have been structured to meet this market need. We are actively working with our customers on 3G network deployments that are providing enterprises with the ability to mobilize their workforces. Our CDMA 2000 deployments have proven to provide the services that mobile professionals need to do their work. Similar results are expected with our UMTS networks. We are working with our customers to ensure optimal network performance in the secure environment that enterprises demand. This includes integrating VPN (Virtual Private Network) technology into our 3G offers, as well as providing tools that enable enterprises to quickly provision users for service. We are working on the development of leading edge technology that will enable subscribers to roam seamlessly from 3G networks to local area networks, or LANs, which service office complexes. We are also continuing to partner with our customers in educating their customers about the capabilities and benefits of wireless high–speed data.

Following acceptance and widespread use of high–speed wireless data by the mobile professional, we believe that the mobile consumer will quickly follow. This model has exhibited itself many times throughout the evolution of wireless technology as well as other high technology industries such as computing. We will therefore continue to work to create solutions that enable consumer based services as the second phase of our strategy.

Our product offerings include:

### Base Station Products

Base stations provide the radio link that transmits and receives wireless subscriber calls and manages handoffs as customers move from cell (the area in which calls are handled by a particular base station) to cell. Each radio base station covers a specific geographic area with a

11

capacity to handle a certain amount of subscriber traffic. Typically, base station equipment represents a significant portion of the capital equipment cost of a mobile operator.

The Flexent OneBTS Base Station is the newest member of our base station family, supporting CDMA and UMTS technologies, and will be the primary platform that we offer for UMTS network deployments. The Flexent OneBTS base station addresses the form, fit and function of future assemblies in a modular fashion so that current investment is not likely to be lost as the cell evolves to include expanded capacity in wireless voice and/or data transmissions. Our family of Flexent™ Base Station products supports virtually all major radio access technologies (AMPS, TDMA, CDMA, GSM and UMTS).

While we will continue to sell AMPS, TDMA and GSM radio equipment to existing customers, Mobility has made a strategic decision to focus on CDMA and UMTS 3G spread spectrum technologies in the future.

### Core Network Equipment

Core network equipment is responsible for connecting radio base stations to the public voice and data networks. The primary element of the core network for voice traffic is the mobile switching center ("MSC"). MSCs provide the transfer of calls within the wireless network and interface to the public switched telephone networks. The majority of these voice and packet data core network products are provided by the INS segment.

Our 5ESS–2000 switch has advanced switching, signaling and administrative capabilities to deliver cost–effectively the standard mobile switching center functionality. It is a multipurpose, flexible modular platform capable of supporting both wireline and wireless telecommunications applications. For our existing wireless customers, we expect to continue to support the 5ESS–based mobile switching center and provide a graceful transition to the new Softswitch based technology.

Our Softswitch based 3G MSC provides integrated voice and data services that use open application programming interfaces (applications for which the code is published), enabling providers to create new innovative services for the mobile Internet.

### Network Management Products

Operations and maintenance centers, which are essentially software systems, allow for the service provider's provisioning, diagnostics and administration of its wireless networks. Our Mobility segment will be utilizing our Navis™ network operations platforms to provide these products as well as third party systems depending on the customer environment.

### Applications And Service Delivery Products

The MiLife™ Applications Platforms allow a wireless service provider to easily introduce personalized mobile services. These platforms are used to support mobile applications and services developed by us and by third parties.

12

## LUCENT WORLDWIDE SERVICES (LWS)

Even with the telecommunications market as challenging as it is, services remain a clear opportunity for near–term revenue potential. We believe our customers spend $30 billion or more annually on services performed by third parties. LWS is looking to expand into new areas like network integration, multi–vendor networking and managed services such as outsourcing.

LWS's revenues during fiscal 2002 were approximately $2.7 billion, of which 71% was generated in support of INS customers and 29% in support of Mobility customers. LWS personnel are organized and deployed on a regional basis. Our U.S. service revenues represented about 63% of our total service revenues during fiscal 2002. At September 30, 2002, we had approximately 16,000 employees dedicated to professional services, deployment services and operational and maintenance services.

We believe services will differentiate us in the marketplace. We have one of the largest groups of skilled technicians, consultants, engineers, and installers serving all of Lucent's top customers. We offer multi–technology and multi–vendor services solutions in the following three areas:

–   Professional Services, which accounted for approximately 15% of fiscal 2002 revenues for LWS. These services help our customers identify network areas where they can capitalize on high–margin opportunities, apply proven tools and techniques to optimize performance and reduce expenses, and plan evolution to protect their network investment and increase profits. Our enhanced engineering services help our customers determine the best configuration for maximizing traffic capacity and other operational efficiencies. These services also provide our customers with "in service" upgrades to help them migrate to new technologies. Our enhanced technical services help carriers maintain a high performing network by identifying and correcting network performance issues, balancing traffic loads and integrating new equipment into a live system. We often help our customers improve their network quality by troubleshooting, reporting and resolving problems or by providing on–the–job training to their staff.

–   Deployment Services, which accounted for approximately 60% of fiscal 2002 revenues for LWS. These services help our customers bring their equipment online in an efficient manner and allow them to begin generating revenues more quickly. Our equipment and field engineering services provide analysis, identification and documentation of detailed hardware and software specifications for new networking equipment to help ensure smooth deployments. We build and expand wireline and wireless networks globally and provide on–site configuration, testing and network connectivity of the equipment following installation. We can also perform a complete inventory, inspection, assembly, configuration and testing of network equipment at one of our staging facilities prior to deployment in order to deliver a complete ready–for–installation system at a customer site.

13

–   Operations and Maintenance Services, which accounted for approximately 25% of fiscal 2002 revenues for LWS. These services help our customers maximize the performance of their networks and maintain network reliability and availability to ensure quality of service. We have the capabilities to provide technical support either remotely via phone or modem for rapid response, diagnosis and resolution or through on–site technical specialists supplementing the service provider's staff.

We are focused on the areas that customers tell us matter most to them in today's industry downturn, including revenue recovery, network performance, inventory management, network security, and technology migration. We also perform work for our customers on multi–vendor networks. A key to helping our customers in these areas is the expertise of our research and development arm, Bell Labs, which develops tools our engineers use to deliver our services.

## COMPETITION

The global communications networking industry is highly competitive. Our current principal competitors include Alcatel, Ciena Corporation, Cisco Systems, Inc., LM Ericsson Telephone Company, Fujitsu Limited, Huawei Technologies, Motorola Inc., NEC Corporation, Nokia Corporation, Nortel Networks Corporation, Samsung Networks Inc. and Siemens AG. Some of our competitors, such as Alcatel and Nortel, compete across many of our product lines, while others compete in a smaller subset of our products.

We expect that the level of competition will intensify for several reasons. First, most industry participants will seek to strengthen their relationships with large service providers, as they represent over 70% of global carrier spending. The collapse of competitive local exchange carriers and other competitors of incumbent carriers has resulted in fewer customers. In addition, the large service providers have been consolidating, thus giving the remaining service providers additional buying power. Furthermore, as service providers continue to reduce their capital spending, fewer sales opportunities will exist.

Many factors influence our ability to compete successfully in our industry, some of these being:

–   the quality, performance, reliability, price and market acceptance of our products;

–   market acceptance of our competitors' products;

–   efficiency and quality of the production and implementation of our products;

–   our ability to develop appropriate technologies and introduce new products and services and value added features on a timely basis;

–   our willingness and ability to provide or arrange customer financing in certain emerging U.S. and non–U.S. markets; and

–   our customer support and reputation.

14

We believe we are currently among the top suppliers of products and services to global wireline and wireless service providers. However, a number of our existing competitors are very large companies with substantial technical, engineering and financial resources, brand recognition and established relationships with global service providers. In addition, we may from time to time face new competitors, including entrants from the telecommunications, computer software, data networking and semiconductor industries. These competitors may be able to offer lower prices, additional products or services or other incentives that we cannot or will not match or do not offer. They may also be in a stronger position to respond quickly to new or emerging technologies and to undertake more extensive marketing campaigns, adopt more aggressive pricing policies and make more attractive offers to our potential customers, employees and third party agents.

## NON–U.S. OPERATIONS

We have operations in foreign countries, including manufacturing and system integration center facilities, sales personnel and customer support operations. For fiscal 2002, we derived approximately 34% of our revenues from sales outside the United States and are dependent on international suppliers for many of our components and subassemblies used worldwide and for the manufacturing of some of our products. We intend to continue to pursue focused opportunities in carefully delineated markets outside the United States. Therefore, we continue to be subject to the risks inherent in doing business in foreign countries. In many non–U.S. markets, long–standing relationships between our potential customers and our competitors and protective regulations, including local content requirements, create barriers to our entry and can adversely affect our ability to capitalize on the opportunities in these markets. Also, pursuit of non–U.S. opportunities may require us to make significant investments for an extended period before returns on such investments, if any, are realized. Our ability to compete and our investments in some countries can be adversely affected by difficulties in protecting intellectual property, exchange controls, currency fluctuations, investment policies, repatriation of cash, nationalization, social and political risks, taxation, and other factors, depending on the country in which such opportunity arises.

## BELL LABS

Our INS and Mobility segments are supported by the technological expertise provided by Bell Labs, one of the world's largest research and development organizations focused on the needs of large service providers. Bell Labs provides basic and applied research and development support for our business. Bell Labs' mission is to develop technically advanced products and services that will keep us at the forefront of communications, to conduct fundamental research in scientific fields important to communications and to create innovations that can be put to use in our new communications products and services. Bell Labs' R&D activities continue to focus on the technologies we view as central to our business strategy: software, network design and engineering, network services, photonics, data networking and wireless communications.

Bell Labs has become smaller as we reorganized or divested various businesses, such as Agere, Avaya, the optical fiber business and the power systems business. Bell Labs' researchers and developers associated with those businesses were relocated to work with the new companies. At

15

the same time, certain areas of R&D work grew. For example, Bell Labs has increased its work on technologies to further the development of our service intelligent architecture. We plan to continue to invest in the R&D efforts of Bell Labs because we believe it gives us a competitive advantage in developing innovative technologies. There are approximately 1,400 employees supporting R&D efforts within Bell Labs core research group.

## SUPPLY CHAIN NETWORKS

Supply Chain Networks, or SCN, manages our end–to–end global supply chain needed to produce and deliver our products and services to our worldwide customers. The organization designs, implements and optimizes the supply chain for our products, with the goal of establishing product cost, product cycle and interval, and quality that meets our objectives and those of our customers.

The key functions of SCN include: identifying the sources of raw materials, sub–assemblies, and finished goods that are needed to support our product lines; establishing and managing relationships with component vendors and our electronic manufacturing service providers to ensure continuity of supply at the required price and quality; managing the operational execution in our systems integration centers and the distribution network required to deliver product and services to our customers; and driving the engineering effort across the product life cycle by working closely with our product management and development teams to ensure lowest cost designs through low cost and standardized component selection, optimizing sourcing strategies, aiding new product introductions, and maximizing post–development cost reduction opportunities.

## SOURCES AND AVAILABILITY OF COMPONENTS AND MANUFACTURING

We make significant purchases of components and other materials from many U.S. and non–U.S. sources. While there have been some shortages in components and some other materials, we have generally been able to obtain sufficient materials and components from sources around the world to meet our needs, although there may be temporary delays. We also develop and maintain alternative sources for essential materials and components. We do not have a concentration of sources of supply of materials, labor or services that, if suddenly eliminated, could severely impact our operations.

We currently have contracts with contract manufacturers, who we also refer to as electronic manufacturing services providers (or EMS providers), around the world. These providers manufacture a significant amount of our product lines. These providers include Celestica, Solectron, Jabil, Sanmina, Flextronics and other local providers in various regions. SCN controls source selection on all components. On non–strategic components, our manufacturing providers use their leverage and global buying power to negotiate best price on components from vendors we approve.

## CORPORATE HEADQUARTERS

16

INS, Mobility, LWS, SCN and Bell Labs draw upon centrally managed but locally deployed corporate support groups that include cash management, legal, accounting, tax, public relations, insurance, advertising, human resources and data services.

## BACKLOG

Our backlog, calculated as the aggregate of the sales price of orders received from customers less revenue recognized, was approximately $1.9 billion and $4.3 billion on September 30, 2002 and 2001, respectively. Approximately $600 million of the September 30, 2001 backlog was attributable to Agere, which was reported as a discontinued operation. Approximately $1.8 billion of the orders included in the September 30, 2002 backlog are scheduled for delivery during fiscal 2003. However, all orders are subject to possible rescheduling by customers. Although we believe that the orders included in the backlog are firm, customers may be able to cancel some orders without penalty, and we may elect to permit cancellation of orders without penalty where management believes that it is in our best interest to do so. In addition, some customers may become unable to pay for or finance their purchases as a result of deterioration in their financial positions.

## SEASONALITY

Our revenues and earnings have not followed a consistent pattern and have not been seasonal.

## PATENTS, TRADEMARKS AND OTHER INTELLECTUAL PROPERTY RIGHTS

We have patents to protect some of our innovations and proprietary products and technology. We market our products and services primarily under our own names and marks. We consider our patents and trademarks to be valuable assets. Many of our trademarks are registered throughout the world. We currently own approximately 6,300 patents in the U.S. and 9,500 patents in foreign countries. The foreign patents are, for the most part, counterparts of our U.S. patents.

The number of current patents reflects the reduction of our patent portfolio for U.S. and foreign patents we assigned to Avaya or Agere in connection with our spin-offs of these two companies as well as patents that we transferred in connection with dispositions, such as the sale of the optical fiber business. Our intellectual property licensing division licenses, protects and maintains our intellectual property and enforces our intellectual property rights. This responsibility includes the licensing of our patents and technology to third parties and negotiating agreements regarding our licensing of intellectual property from others. Many of the patents owned by us are licensed to other companies with large patent portfolios, and we are licensed to use patents owned by these other companies. We also have cross-licensing arrangements with our former affiliates, Agere, AT&T, Avaya and NCR.

We rely on patent, trademark, trade secret and copyright laws both to protect our intellectual property, including our proprietary technology, and to protect us against claims from others. We believe that we have direct intellectual property rights or rights under cross-licensing arrangements covering substantially all of our material technologies. However, third parties may

17

assert infringement claims against us or against our customers in connection with their use of our systems and products. When infringement claims are made against us or our customers, the outcome of these claims are difficult to predict because of the technological complexity of our systems and products.

## FORWARD-LOOKING STATEMENTS

This annual report on Form 10-K and other documents we file with the Securities and Exchange Commission contain forward-looking statements that are based on current expectations, estimates, forecasts and projections about us, our future performance, the industries in which we operate, our beliefs and our management's assumptions. In addition, other written or oral statements that constitute forward-looking statements may be made by or on behalf of us. Words such as "expects," "anticipates," "targets," "goals," "projects," "intends," "plans," "believes," "seeks," "estimates," variations of such words and similar expressions are intended to identify such forward-looking statements. These statements are not guarantees of future performance and involve certain risks, uncertainties and assumptions that are difficult to predict. Therefore, actual outcomes and results may differ materially from what is expressed or forecasted in such forward-looking statements. Except as required under the federal securities laws and the rules and regulations of the SEC, we do not have any intention or obligation to update publicly any forward-looking statements after the distribution of this Form 10-K, whether as a result of new information, future events, changes in assumptions, or otherwise.

## RISKS RELATED TO OUR BUSINESS AND INVESTING IN OUR SECURITIES

Our business and our prospects are subject to many risks. The following items are representative of the risks, uncertainties and assumptions that could affect our business, our future performance and the outcome of the forward-looking statements we make. In addition, our business, our future performance and forward-looking statements could be affected by general industry and market conditions and growth rates, general U.S. and non-U.S. economic and political conditions, including the global economy, interest rate and currency exchange rate fluctuations and other future events.

*If The Telecommunications Market Does Not Improve, Or Improves At A Slower Pace Than The Company Anticipates, The Company's Results Of Operations Will Continue To Suffer.*

During fiscal 2002 and 2001, the global telecommunications market has significantly deteriorated, reflecting a significant decrease in the competitive local exchange carrier market, failures of many other start-up telecommunications service providers and a significant reduction in capital spending by established service providers. The Company's sales and results of operations have been adversely affected by this market deterioration.

If capital investment levels by service providers continue to decline, or if the telecommunications market does not improve or improves at a slower pace than we anticipate, our revenues and profitability will continue to be adversely affected. In addition, if our sales volume and product mix do not improve, our gross margin percentage may not improve as much as we expect, resulting in lower than expected results of operations.

18

The significant slowdown in capital spending in our target markets has created uncertainty as to the level of demand in those markets. In addition, the level of demand can change quickly and can vary over short periods of time, including from month to month. As a result of the uncertainty and variations in our markets, accurately forecasting revenues, results and cash flow is increasingly difficult.

*The Company Incurred Significant Net Losses In Fiscal 2002 And 2001 And The Company Expects To Incur A Net Loss In Fiscal 2003. If The Company Continues To Incur Net Losses, The Company's Ability To Satisfy Its Cash Requirements May Be More Difficult And The Company's Legally Available Surplus May Be Significantly Reduced Or Impaired.*

We incurred net losses of approximately $12 billion and $16 billion in fiscal 2002 and 2001, and in fiscal 2002 we recorded a $2.9 billion charge to equity on account of our employee benefit plans. We expect to have a net loss in fiscal 2003 as well. There can be no assurance that we can return to profitability in the future. If we fail to generate operating income and net income, we could have difficulty meeting our cash requirements.

Our losses and charges to equity have contributed to a significant reduction in our legally available surplus. Under Delaware law we generally can pay dividends on or acquire shares of our capital stock (including our 8.00% redeemable convertible preferred stock) only from our legally available surplus, as defined by Delaware law. The significant reductions of our surplus we have experienced, as well as potential future losses and charges to equity, could adversely affect our ability to pay dividends or to redeem or otherwise acquire our capital stock.

***The Company's Strategic Direction And Restructuring Programs May Not Yield The Benefits The Company Expects And Could Even Harm The Company's Financial Condition, Reputation And Prospects.***

In connection with our strategic direction and restructuring programs, we have or are in the process of exiting certain product lines, outsourcing the manufacturing of most of our products, selectively disposing of certain of our businesses and facilities, reducing the number of countries in which we operate, and significantly reducing our workforce. These activities may not yield the benefits we expect, and may raise product costs, delay product production and service delivery, result in or exacerbate labor disruptions and labor-related legal actions against us, and create inefficiencies in our business.

Our strategic direction and restructuring program also may give rise to unforeseen costs, which could wholly or partially offset any expense reductions or other financial benefits we attain as a result of the changes to our business. In addition, if the markets for our products do not improve, we may need to take additional restructuring actions to address these market conditions. Any such additional actions could result in additional restructuring charges.

Our restructuring programs and our current business plan are designed to get us back to profitability and positive cash flow, but we cannot be certain that this will occur or that we will return to profitability and positive cash flow within the time period we are targeting. Our current

<center>19</center>

plan to return to profitability is predicated upon achieving gross profit margins in the mid 30% range or higher. If we cannot achieve these levels, we may not be able to obtain the cash flow and profitability levels we expect.

***The Company Has Substantial Cash Requirements And May Require Additional Sources Of Funds. Additional Sources Of Funds May Not Be Available Or Available On Reasonable Terms.***

We have substantial cash requirements in connection with our operations, capital expenditures, restructuring programs, debt service obligations, pension and postretirement benefit plans and, if we elect and have sufficient surplus to pay such dividends or redemptions in cash, preferred stock dividend requirements and redemptions. In addition, new product development, which is key to the success of our business, is cash intensive. If the cash we generate from our operations or from our other sources is not available when needed or is insufficient to satisfy our requirements, we may require additional sources of funds.

We cancelled our credit facility in October 2002 to avoid an anticipated default under our financial covenants. While we intend to replace that credit facility with a smaller credit facility, we cannot assure you that we will be able to do so on acceptable terms or at all. We also cannot assure you that any other required additional sources of funds would be available or available on reasonable terms. If we do not generate sufficient amounts of capital to meet our cash requirements at the times and on the terms required by us, our business will be adversely affected.

In addition, any new credit facility could severely limit our ability to plan for or react to market conditions or meet capital needs or could otherwise restrict our intended activities or business plans and adversely affect our ability to finance operations, strategic acquisitions, investments or alliances or to engage in other business activities that would be in our interest. Any new credit facility may also include financial covenants similar in scope to the financial covenants in our prior credit facility.

***The Company's Credit Ratings May Be Reviewed For Downgrade, Put On Credit Watch Or Downgraded, Which Could Adversely Affect The Company's Results Of Operations.***

Declines in our credit ratings have resulted in increased costs on certain of our financing arrangements. In addition, we have experienced reduced access to credit markets and declines in the price of our common stock, convertible preferred stock, trust preferred securities and debt securities. There can be no assurance that our credit ratings will not be reduced in the future by Moody's, S&P, or any other ratings agency. In addition, our current credit ratings may cause some customers to be unwilling to do business with us on normal terms and conditions, or at all.

***The Company Operates In A Highly Competitive Industry. The Company's Failure To Compete Effectively Would Harm Its Business.***

The industry in which we operate is highly competitive and we expect that the level of competition on pricing and product offerings will continue to be intensive. Factors that could

<center>20</center>

affect our ability to compete successfully in the industry include: the quality, performance, price, reliability, mix and market acceptance of our products; market acceptance of our competitors' products; efficiency and quality of the production and implementation of our products; and our customer support and reputation.

We have a number of existing competitors, some of which are very large with substantial technological and financial resources, brand recognition and established relationships with global service providers. In addition, new competitors may enter the industry as a result of shifts in technology. These new competitors, as well as existing competitors, may include entrants from the telecommunications, computer software, computer services, data networking, and semiconductor industries. We cannot assure that we will be able to compete successfully against existing or future competitors. Competitors may be able to offer lower prices, additional or a more attractive mix of products or services, or services or other incentives that we cannot or will not match or do not offer. These competitors may be in a stronger position to respond quickly to new or emerging technologies and may be able to undertake more extensive marketing campaigns, adopt more aggressive pricing policies, and make more attractive offers to potential customers, employees, and strategic partners. Because we have a unionized workforce at some locations and many of our main competitors are not unionized to the same extent, or at all, unless our labor contracts are improved, our costs will be higher and our profitability may be lower than those competitors. Our collective agreements with the unions expire on May 31, 2003, and no assurance can be given that we will complete new agreements with the unions prior to that time, or that we will not be competitively disadvantaged if we are not able to reach agreement with the unions by May 31, 2003.

In addition, we may have less liquidity and a more limited access to the capital markets as a result of our credit ratings than some of our competitors. Therefore, these competitors may be better positioned to withstand a prolonged downturn in the industry or in the economy as a whole.

***A Small Number Of The Company's Customers Account For A Substantial Portion Of Its Revenues, And The Loss Of One Or More Key Customers Could Significantly Reduce The Company's Revenues, Profitability And Cash Flow.***

We rely on a few large customers to provide a substantial portion of our revenues. These customers include: AT&T, AT&T Wireless, BellSouth, Cingular, SBC, Sprint, Verizon and Verizon Wireless. Our strategy is to target our products and services to the world's largest service providers. In addition, the telecommunications industry has recently experienced a consolidation of both U.S. and non–U.S. companies. As a result of these factors, it is likely that in fiscal 2003 and subsequent years an even greater percentage of our revenues will be attributable to a limited number of large service providers than in years past.

Reductions, delays or cancellations of orders from one or more of our significant customers or the loss of one or more significant customers in any period could continue to have an adverse effect on our revenues, profitability and cash flow.

21

### The Company Is Exposed To The Credit Risk Of Its Customers As A Result Of The Company's Customer Financing Arrangements And Accounts Receivables.

Our customer financing arrangements and accounts receivable make us vulnerable to downturns in the economy and the industry in general, and to adverse changes in our customers' businesses in particular. Many of the customers to whom we provide financing or with whom we have contracts have been negatively affected by the continued softening in the telecommunications market, and some have filed for bankruptcy or been declared insolvent. As a result, we wrote off some of our accounts receivables and many of our customer financings and sold others at significant discounts. We also recorded reserves or write–offs in our financial statements and may have to record additional reserves or write–offs in the future. Deterioration in the credit quality of our customers may increase our capital needs if we are unable to sell the notes representing existing customer financings or to transfer future funding commitments to financial institutions and investors on acceptable terms and in the expected timeframes.

### The Company Relies On Third Parties To Manufacture Most Of Its Products And To Provide Substantially All Of Its Components. If These Third Parties Fail To Deliver Quality Products And Components At Reasonable Prices On A Timely Basis, The Company May Alienate Some Of Its Customers, And Its Revenues, Profitability And Cash Flow May Decline.

We are increasing our use of contract manufacturers as an alternative to our own manufacturing of products. If these contract manufacturers do not fulfill their obligations to us, or if we do not properly manage these relationships, our existing customer relationships may suffer. In addition, by undertaking these activities, we run the risk that the reputation and competitiveness of our products and services may deteriorate as a result of the reduction of our control over quality and delivery schedules. We also may experience supply interruptions, cost escalations and competitive disadvantages if our contract manufacturers fail to develop, implement or maintain manufacturing methods appropriate for our products and customers.

Our supply chain and manufacturing process relies on accurate forecasting to provide us with optimal margins and profitability. Because of market uncertainties, forecasting is becoming much more difficult. In addition, as we come to rely more heavily on contract manufacturers, we may have fewer personnel resources with expertise to manage these third–party arrangements.

### The Company Has Long–Term Sales Agreements With A Number Of Its Large Customers. Some Of These Agreements May Prove Unprofitable As The Company's Costs And Product Mix Shift Over The Lives Of The Agreements.

We have entered into long–term sales agreements with a number of our large customers. Some of these sales agreements require us to sell products and services at fixed prices over the lives of the agreements, and some require us to sell products and services that we would otherwise discontinue, thereby diverting our resources from developing more profitable or strategically important products. The costs we incur in fulfilling some of our sales agreements may vary substantially from our initial cost estimates. Any cost overruns that we cannot pass on to our customers could adversely affect our results of operations by reducing or eliminating our profit margins.

22

### If The Company Fails To Maintain A Product Portfolio That Is Attractive To Its Customers, Enhance Its Existing Products And Keep Pace With Technological Advances In Its Industry Or If The Company Pursues Technologies That Do Not Become Commercially Accepted, Customers May Not Buy Our Products, And The Company's Revenues, Profitability And Cash Flow May Be Adversely Affected.

The demand for our products can change quickly and in ways that we may not anticipate because markets for our principal products are characterized by: rapid, and sometimes disruptive, technological developments; evolving industry and certification standards; frequent new product introductions and enhancements; changes in customer requirements and a limited ability to accurately forecast future customer orders; evolving methods of building and operating communications systems for our customers; and short product life cycles with declining prices over the life cycle of a product. For example, some of our U.S.–based Mobility customers are pursuing alternatives to our Time Division Multiple Access technology, and we do not have products for all of the alternative technologies. If one or more of the customers select an alternative technology we do not provide, we would expect to have a significant reduction of business from those customers.

Our operating results depend, to a significant extent, on our ability to maintain a product portfolio that is attractive to our customers, enhance our existing products and continue to successfully introduce new products on a timely basis. New technological innovations generally require a substantial investment before any assurance is available as to their commercial viability, including, in some cases, certification by U.S. and non–U.S. standards–setting bodies.

If we fail to make sufficient investments or we focus on technologies that do not become widely adopted, other technologies could render our current and planned products obsolete, resulting in the need to change the focus of our research and development and our product strategies. This will disrupt our business significantly. Being one of the first to make products available is important to the success of a new product, and any delays in bringing a new product to market could have a negative effect on our results of operations. Accordingly, when we do develop appropriate technology, this technology may not be successful if we fail to bring it to market in a timely and commercially feasible manner.

### Many Of The Company's Current And Planned Products Are Highly Complex And May Contain Defects Or Errors That Are Detected Only After Deployment In Communications Networks. If That Occurs, The Company's Reputation May Be Harmed.

Our products are highly complex and some of them can only be fully tested when deployed in communications networks or with other equipment. From time to time, our products have contained undetected defects, errors or failures. The occurrence of any defects, errors or failures could result in cancellation of orders, product returns, diversion of our resources, legal actions by our customers or our customers' end–users and other losses to us or to our customers or end–users.

Any of these occurrences could also result in the loss of or delay in market acceptance of our products and loss of sales, which would harm our business and adversely affect our revenue and profitability.

### The Company's Success Depends On Its Ability To Retain And Recruit Key Personnel.

Our success depends in large part on our ability to recruit and retain highly skilled technical, managerial, sales and marketing personnel. In spite of the economic slowdown, competition for these personnel remains intense. In addition, our recent workforce reductions have increased our dependence on our remaining workforce, as we are relying on our current personnel to assume additional responsibilities. The loss of services of any of our key personnel or our failure to retain and attract qualified personnel in the future could make it difficult for us to meet our key objectives, such as timely product introductions.

### The Company Is A Party To Lawsuits, Which, If Determined Adversely To It, Could Result In The Imposition Of Damages Against It And Could Harm The Company's Business And Financial Condition.

We and certain of our former officers and current and former members of our board of directors are subject to various lawsuits brought by shareowners and classes of shareowners, customers and participants in some of our employee benefit plans, alleging, among other things, violations of federal and state securities laws, ERISA and breaches of various fiduciary obligations. The deterioration in the overall telecommunications market, the decline of our results of operations in fiscal 2002 and 2001, and the consequent impact on our common stock price, have increased the number and nature of the actions being brought and the damages claimed against us. In addition, our substantial workforce reductions appear to have been the catalyst for a number of employment related actions against us. The actions and allegations made against us may increase in the future as we continue to implement our restructuring efforts, which may involve asset dispositions and workforce reductions. There can be no assurance that actions that have been or will be brought against us will be resolved in our favor, or if a significant monetary judgment is rendered against us, we will have the ability to pay such a judgment. Any losses resulting from these claims could adversely affect our profitability and cash flow.

### If The Company Fails To Protect Its Intellectual Property Rights, The Company's Business And Prospects May Be Harmed.

Intellectual property, such as patents, are vital to our business and developing new products and technology that are unique to us is critical to our success. We have numerous United States and foreign patents and numerous pending patents, but we cannot predict whether any patents, issued or pending, will provide us with any competitive advantage, or will be challenged by third parties. Moreover, our competitors may already have applied for patents that, once issued, could prevail over our patent rights or otherwise limit our ability to sell our products. Our competitors also may attempt to design around our patents or copy or otherwise obtain and use our proprietary technology. In addition, patent applications that we have currently pending may not be granted. If we do not receive the patents we seek, or if other problems arise with our intellectual property, our competitiveness could be significantly impaired, which would limit our future revenues and harm our prospects.

24

### The Company Is Subject To Intellectual Property Litigation And Infringement Claims, Which Could Cause It To Incur Significant Expenses Or Prevent The Company From Selling Its Products.

From time to time, we receive notices from third parties of potential infringement and receive claims of potential infringement when we attempt to license our intellectual property to others. Intellectual property litigation can be costly and time consuming and divert the attention of management and key personnel from other business issues. The complexity of the technology involved and the uncertainty of intellectual property litigation increase these risks. A successful claim by a third party of patent or other intellectual property infringement by us could compel us to enter into costly royalty or license agreements or force us to pay significant damages and may even require us to stop the sale of certain of our products.

### The Company Is Subject To Environmental, Health And Safety Laws, Which Could Be Costly And Restrict The Company's Future Operations.

Our operations are subject to a wide range of environmental, health and safety laws, including laws relating to the use, disposal, clean up of, and human exposure to, hazardous substances. In the United States, these laws often require parties to fund remedial action regardless of fault. Although we believe our reserves are adequate to cover our environmental liabilities, factors such as the discovery of additional contaminants, the extent of remediation and compliance expenses, and the imposition of additional cleanup obligations at Superfund and other sites could cause our capital expenditures and other expenses relating to remediation activities to exceed the amount reflected in our environmental reserve and adversely affect our results of operations or cash flows. Compliance with existing or future environmental, health and safety laws could subject us to future liabilities, cause the suspension of production, restrict our ability to expand facilities, require us to acquire costly pollution control equipment or incur other significant expenses or modify manufacturing processes.

### Rapid Changes To Existing Regulations Or Technical Standards Or The Implementation Of New Regulations Or Technical Standards Upon Products And Services Not Previously Regulated Could Be Disruptive, Time Consuming And Costly To The Company.

Many of our products and services are developed in reliance upon existing regulations and technical standards, our interpretation of unfinished technical standards or the lack of such regulations and standards. Rapid changes to existing regulations and technical standards or the implementation of new regulations and technical standards upon products and services not previously regulated could adversely affect development, demand, sale and warranty of our products and services, thus increasing our costs and decreasing the demand for our products and services.

### The Company Conducts A Significant Amount Of Its Operations Outside The United States, Which Subjects It To Social, Political And Economic Risks Of Doing Business In Foreign Countries And May Cause The Company's Profitability To Decline Due To Increased Costs.

25

We have significant operations in foreign countries, including manufacturing facilities, sales personnel and customer support operations. For fiscal 2002, we derived approximately 34% of our revenues from sales outside the United States, with the foreign markets including China, Germany, India and Saudi Arabia.

We manufacture a portion of our products outside the United States. We are also dependent on international suppliers for many of our components and subassemblies and assembly of some of our products. We are concentrating sales and marketing, product development, services and supply chain resources to meet the global needs of the world's largest service providers and to follow the geographic footprint of our large service provider customers around the world to the approximately 20 core countries in which these customers do business. We are, therefore, subject to the risks inherent in doing business in foreign countries. These risks include: tariffs and duties, price controls, restrictions on foreign currencies and trade barriers imposed by foreign countries; exchange controls and fluctuations in currency exchange rates; difficulties in staffing and managing international operations; political or social unrest or economic instability; the risk of nationalization of private enterprises by foreign governments; and adverse tax consequences, including imposition of withholding or other taxes on payments by subsidiaries.

Difficulties in some foreign financial markets and economies could also inhibit demand from our customers in the affected countries. Any or all of these factors could have a material adverse impact on our global business operations. Although we attempt to manage our exposure to risks from fluctuations in foreign currency exchange rates, through our regular operating and financing activities and, when deemed appropriate, derivative financial instruments, our attempts may not always be successful. A significant change in the value of the United States dollar against the currency of one or more countries where we sell products to local customers or make purchases from local suppliers may materially adversely affect our operating results.

### The Company's Common Stock Has Traded At Prices Below $1.00, And Could Be Subject To Delisting By The New York Stock Exchange.

Our common stock currently trades on the New York Stock Exchange ("NYSE"). Under the NYSE requirements, a stock is required to maintain a minimum trading prices, and can be delisted and not allowed to trade on the NYSE if the average closing price of the stock over a 30 trading–day period is less than $1.00. At the close of trading on October 17, 2002, our common stock failed to meet this NYSE minimum trading price requirement because the average closing price for 30 trading days was below $1.00. The NYSE gave us notice of this fact and we have six months to cure this problem or our common stock could be delisted. We intend to ask our shareowners to authorize a reverse stock split at our next annual meeting in February 2003. This action is being taken because our Board of Directors believes a reverse stock split is in the best interest of shareholders as it may maintain our common stock price over the $1.00 threshold and prevent possible delisting by the NYSE. However, shareholders may not approve the reverse stock split; or if the reverse stock split is approved and completed, it may not result in a sustained trading price for our common stock sufficient to prevent delisting.

If our common stock is delisted, trading our stock may become more difficult and our stock price could decrease even further. If our common stock is not listed on a national securities exchange or NASDAQ, many potential investors will not purchase our common stock,

26

limiting the trading market for our stock even further. If delisting by the NYSE does occur, our common stock would likely be removed from the Standard & Poor's 500 index (S&P 500), which would also limit the trading market for our common stock.

### The Company Has Risks Related to Its Pension and Postretirement Benefit Plans

The Company currently maintains U.S. pension plans under the Employee Retirement Income Security Act of 1974, or ERISA, that cover various categories of employees and retirees. Liabilities related to 32,000 active employees and 127,000 retired employees make up approximately 95% of the total obligations under these pension plans. The remaining 5% of the liabilities are attributable to approximately 90,000 beneficiaries and former employees with deferred vested pension rights. Separate trusts are maintained for management participants and for represented participants to fund these pension obligations. The Company's obligations to make contributions to fund benefit obligations under the pension plans are based on the performance of the financial markets, particularly the equity markets, and interest rates. Funding obligations are determined under ERISA and are measured as of December 31 of each year utilizing the value of assets and liabilities on that date. If the financial markets do not provide the long–term returns that are expected under the ERISA funding calculation, the likelihood of Company contributions increases. The equity markets can be, and recently have been, very volatile, and therefore the Company's estimate of future contribution requirements can change dramatically in relatively short periods of time. Similarly, changes in interest rates can impact our contribution requirements. In a low interest rate environment, the likelihood of required contributions in the future increases.

With respect to the management pension plan, we do not expect to be required to make a contribution for fiscal 2003. However, because of the volatility of the financial markets and fluctuations in interest rates, the Company could be required to make contributions as early as fiscal 2004. With respect to the represented pension plan, the Company does not currently foresee a need to make any contributions, but this could change if the equity markets decline substantially.

Approximately 127,000 of the Company's current retirees are also covered by postretirement healthcare benefit plans. With respect to management retirees, the Company expects it will only need to make minimal, if any, cash payments in fiscal 2003 for these healthcare benefits. However, the Company does expect to make benefit payments from its operating cash flow in fiscal 2004 and beyond. Although it is difficult to estimate these expected future payments, the Company's current view of the funding requirement is approximately $350 million annually. With respect to represented retirees, the Company does not expect to have to make cash payments before fiscal 2006 or 2007 due to assets currently held in a separate trust to fund these payments.

The cost of providing postretirement healthcare benefits continues to rise. The Company expects to take steps designed to reduce the overall cost of providing postretirement healthcare benefits and to reduce the share of these costs borne by the Company, consistent with legal requirements and our collective bargaining obligations. There can be no assurance that the Company will be successful in reducing these costs.

27

If the Company is required to make significant contributions to fund the pension plans or make significant cash payments for retiree healthcare benefits, the Company's cash flow available for other uses may be significantly reduced. In addition, if the Company is unable at any time to meet any required funding obligations for the pension plans, or if the Pension Benefit Guaranty Corporation (PBGC) concludes that, as insurer of certain plan benefits, its risk may increase unreasonably if the plans continue, under ERISA the PBGC could terminate the plans and place liens on material amounts of the Company's assets.

## EMPLOYEE RELATIONS

On September 30, 2002, we had approximately 47,000 employees. Of these 47,000 employees, approximately 32,000, or 68%, were located in the United States. Of these U.S. employees, approximately 6,800, or 21%, were represented by unions, primarily the Communications Workers of America ("CWA") and the International Brotherhood of Electrical Workers ("IBEW"). Our current five–year collective agreements with the CWA and IBEW expire on May 31, 2003. We cannot give any assurance that new agreements with the unions will be reached by the time the current ones expire. If we do not enter into new agreements before

our current agreements expire, our operations could be disrupted, which could adversely impact our business.

## EXECUTIVE OFFICERS OF THE REGISTRANT

The following information about our executive officers is included herein in accordance with Part III, Item 10 and is as of November 30, 2002.

| Name | Age | Title | Date Became Executive Officer |
|------|-----|-------|-------------------------------|
| Henry B. Schacht | 68 | Chairman of the Board | 10/00 |
| Patricia F. Russo | 50 | President and Chief Executive Officer | 01/02 |
| Robert C. Holder | 56 | Chief Operating Officer | 11/00 |
| William T. O'Shea | 55 | President, Bell Labs and Executive Vice President, Strategy and Marketing | 10/99 |
| Frank A. D'Amelio | 44 | Executive Vice President and Chief Financial Officer | 05/01 |
| Richard J. Rawson | 50 | Senior Vice President, General Counsel and Secretary | 02/96 |
| John A. Kritzmacher | 42 | Senior Vice President and Controller | 09/01 |
| James K. Brewington | 59 | President, Mobility Solutions | 10/02 |

28

| | | | |
|------|-----|-------|-------|
| Janet G. Davidson | 46 | President, Integrated Network Solutions | 10/02 |

All of the executive officers have held high-level managerial positions and/or directorships with us for more than the past five years, except for Ms. Russo. Ms. Russo held executive officer positions with us from our formation in 1996 until August 2000. Prior to becoming our President and Chief Executive Officer in January 2002, Ms. Russo was Chairman of Avaya Inc. from December 2000 to January 2002 and President and Chief Operating Officer of Eastman Kodak Company from April 2001 to January 2002.

Officers are not elected for a fixed term of office but hold office until their successors have been elected.

## ENVIRONMENTAL MATTERS

Our current and historical operations are subject to a wide range of environmental protection laws. In the United States, these laws often require parties to fund remedial action regardless of fault. We have remedial and investigatory activities under way at numerous current and former facilities. In addition, we were named a successor to AT&T as a potentially responsible party at numerous "Superfund" sites pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA") or comparable state statutes. Under our Separation and Distribution Agreement with AT&T, we are responsible for all liabilities primarily resulting from or relating to our assets and the operation of our business as conducted at any time prior to or after the separation from AT&T, including related businesses discontinued or disposed of prior to our separation from AT&T. Furthermore, under the AT&T Separation and Distribution Agreement, we are required to pay a portion of contingent liabilities paid out in excess of certain amounts by AT&T and NCR, including environmental liabilities. In our separation agreements with Agere and Avaya, Agere and Avaya have agreed, subject to certain exceptions, to assume all environmental liabilities related to their respective businesses.

The future impact of environmental matters, including potential liabilities, is often difficult to estimate. We record an environmental reserve when it is probable that a liability has been incurred and the amount of the liability is reasonably estimable. This practice is followed whether the claims are asserted or unasserted. Management expects that the amounts reserved will be paid out over the periods of remediation for the applicable sites, which typically range from five to 30 years. Reserves for estimated losses from environmental remediation are, depending on the site, based primarily upon internal or third-party environmental studies and estimates as to the number, participation level and financial viability of any other potentially responsible parties, the extent of the contamination and the nature of required remedial actions. Accruals are adjusted as further information develops or as circumstances change. The amounts provided for in our consolidated financial statements for environmental reserves are the gross undiscounted amounts of such reserves, without deductions for insurance or third-party indemnity claims. In those cases where insurance carriers or third-party indemnitors have agreed to pay any amounts, and management believes that collectibility of such amounts is probable, the amounts are reflected as receivables in the consolidated financial statements. Although we believe that our reserves are adequate, we can not be certain that the amount of capital

29

expenditures and other expenses required for remedial actions and compliance with applicable environmental laws will not exceed the amounts reflected in our reserves or will not have a material adverse effect on our financial condition, results of operations or cash flows. Any possible loss or range of possible loss that may be incurred in excess of that provided for at September 30, 2002 cannot be determined.

## SEPARATION AGREEMENTS

In connection with our separation from AT&T in 1996, we, AT&T and NCR Corp. entered into a Separation and Distribution Agreement and related ancillary agreements, including an employee benefits agreement, technology−related agreements, a tax sharing agreement and other tax−related agreements. We entered into similar agreements with Avaya and Agere in connection with our spin−offs of each of these companies.

Pursuant to these various agreements, we and our former affiliates have separately agreed to assume all liabilities, including contingent liabilities, related to our and their respective businesses and operations. In some instances, these agreements also provide for the sharing of certain contingent liabilities, specifically: (1) any contingent liabilities that are not primarily our contingent liabilities or contingent liabilities associated with the businesses attributed to our former affiliate; (2) certain specifically identified liabilities, including liabilities relating to terminated, divested or discontinued businesses or operations; and (3) shared contingent liabilities and excess liabilities as specified in the agreements with AT&T and Avaya.

## Item 2.  Properties

As discussed in more detail below, we currently have approximately 470 owned and leased sites comprising 34.8 million square feet (including 5.7 million square feet which have been vacated under our restructuring actions). As part of our fiscal 2001 and 2002 restructuring actions, we have plans to reduce a significant number of our facilities, which will result in reducing our total owned and leased real estate by approximately 16.6 million square feet. As of September 30, 2002, we exited approximately 12.0 million square feet and expect to exit the remaining sites during fiscal 2003. Although we have not yet committed to any specific plans, we are currently considering strategies to exit the three largest manufacturing and systems integration sites we own, which are located in North Andover, Massachusetts, Columbus, Ohio and Oklahoma City, Oklahoma. These three sites comprise approximately 5.8 million square feet in total.

On September 30, 2002, we owned or leased 13 manufacturing and systems integration sites, consisting of approximately 7.6 million square feet. Four locations are in the United States, substantially all of which are owned. The remaining nine sites are located in seven other countries.

On September 30, 2002, we owned or leased 65 warehouse sites, consisting of approximately 2.4 million square feet. Fifty−six locations are in the United States, substantially all of which are leased. The remaining nine sites are located in seven other countries.

On September 30, 2002, we owned or leased 377 office sites (administration, sales, field service), consisting of approximately 15.4 million square feet of which 13.3 million square feet

30

are leased. Two hundred thirty of these office sites are located in the United States. The remaining 147 sites are located in 52 other countries.

On September 30, 2002, we owned or leased additional sites with significant research and development activities in four countries, including the U.S., consisting of approximately 9.3 million square feet, of which approximately 0.6 million square feet are leased.

On September 30, 2002, three New Jersey properties located in Whippany, Murray Hill and Holmdel were pledged to secure financing from GMAC Commercial Mortgage Corporation.

Most of the properties we are retaining listed above are used jointly by our reporting segments. We believe our facilities are suitable and adequate to meet our current needs.

## Item 3.  Legal Proceedings

We are subject to legal proceedings, lawsuits, and other claims, including proceedings by government authorities. In addition, we may be subject to liabilities to some of our former affiliates under separation agreements with them (see Item 1, "Business — Separation Agreements"). Legal proceedings are subject to uncertainties and the outcomes are difficult to predict. Consequently, we are unable to ascertain the ultimate aggregate amount of monetary liability or financial impact with respect to these matters at September 30, 2002. We are subject to several purported class action lawsuits and other lawsuits for alleged violations of federal securities laws, ERISA and related claims described below, which could have a material financial impact on us. Other than those matters, we believe that the remainder of the cases will not have a material financial impact on us after final disposition. However, because of the uncertainties of legal proceedings, one or more of these proceedings could ultimately result in material monetary payments by us. The damage claims in some of these proceedings, particularly the securities and related cases, are significant and if an adverse judgment were to be rendered against us in one or more of these proceedings for the amount of damages claimed, we may be unable to pay the amount of such judgments.

Legal proceedings involving the company include the following types of matters:

- Securities cases, including federal securities laws and related ERISA claims

- Consumer fraud and similar claims

- Commercial disputes involving breach of contract, products disputes or similar claims

- Intellectual property actions, usually involving patent infringement claims

  Employment matters

- Regulatory or government investigations

- Environmental, health and safety claims, including asbestos related claims

*Securities and Related Cases*

We and certain of our former officers are defendants in numerous purported shareholder class action lawsuits for alleged violations of federal securities laws. These cases have been consolidated into a single action pending in the United States District Court for the District of New Jersey, captioned *In re Lucent Technologies Inc. Securities Litigation.* The consolidated

31

complaint alleges, among other things, that beginning in late October 1999, we and certain of our officers misrepresented our financial condition and failed to disclose material facts that had an adverse impact on our future earnings and prospects for growth. The action seeks monetary damages and costs and expenses associated with the litigation. We have filed a motion to dismiss the complaint which was denied in June 2002. The case is in the discovery phase, however all proceedings are currently stayed pending court ordered mediation efforts. Should these efforts fail to result in a settlement of the action, Lucent intends to defend the action vigorously.

We have been served with derivative complaints filed by individual shareowners in Delaware Chancery Court against certain current and former members of our Board of Directors and a former officer. These complaints have been consolidated in a single action. The consolidated complaint asserts that certain current and former directors and officer allegedly breached their fiduciary duties to us by acquiescing in or approving allegedly fraudulent conduct and seek damages against the defendants and in favor of us, as well as costs and expenses associated with litigation. We have also been served with other derivative actions in Delaware Chancery Court and United States District Court for the District of New Jersey that have not been consolidated with the other derivative cases. These non–consolidated actions allege that certain of our current and former directors breached fiduciary duties to supervise our company and seeks an accounting of the damages sustained as a result of these alleged acts, as well as costs and expenses associated with litigation. The actions are in the early stages and we intend to defend the actions vigorously. The non–consolidated derivative action pending in Federal Court in New Jersey is currently stayed pending the same mediation efforts described in the preceding paragraph.

An additional derivative complaint was filed in September 2001 by an individual shareholder in the Delaware Court of Chancery against certain current and former members of our Board of Directors and a former officer asserting claims of corporate waste and breach of fiduciary duties arising out of the award of performance–based compensation to our directors and an officer and seeks the return of all such performance–based compensation, compensation to us for resulting losses, the imposition of a constructive trust upon the proceeds of any sale of our shares by the defendants, as well as costs and expenses associated with litigation. We are defending the action vigorously.

In July 2001, a purported class action complaint was filed in the United States District Court for the District of New Jersey alleging, among other things, that we and certain unnamed officers breached our and their fiduciary duties under ERISA with respect to Lucent's employee savings plans. The complaint alleges that the defendants were aware that our stock was inappropriate for retirement investment and continued to offer Lucent stock as a plan investment option. The complaint seeks damages, injunctive and equitable relief, interest and fees and expenses associated with the litigation. The action is in the discovery stage, however the action is currently stayed pending the mediation efforts described above. Should these efforts fail to result in a settlement of the case, we intend to defend the action vigorously. The case is captioned *Reinhart et al. v. Lucent Technologies.*

In March 2002, we were named as a defendant in a case captioned *In re Winstar*

32

*Communications Securities Litigation,* pending in U.S. District Court for the Southern District of New York. The case is a putative class action on behalf of purchasers of common stock of Winstar Communications, Inc. ("Winstar"), which filed for bankruptcy in April 2001, against several former officers and directors of Winstar, Winstar's outside auditors and us. In addition, in April 2002, a case captioned *Preferred Life Insurance Co. of New York, et al. v. Lucent Technologies Inc.* was filed in New Jersey state court against us. The plaintiffs in the New Jersey case are institutional investors, many of which are affiliated with each other, that purchased the common stock of Winstar. In both actions, the plaintiffs claim that we caused or contributed to money lost by the plaintiffs in connection with their investments in Winstar stock. In the New York action, the plaintiffs claim that we committed common law fraud, negligent misrepresentation, conspiracy to commit fraud and aiding and abetting fraud in connection with plaintiffs' purchases of Winstar stock. In the New Jersey action, the plaintiffs claim that we violated federal securities laws in connection with plaintiffs' purchases of Winstar stock. Lucent has filed a motion to dismiss the claims asserted against it in the New York action, and the New Jersey action is in the discovery stage. Lucent is defending both actions vigorously.

We and certain of our current and former officers and directors are defendants in an action in Texas state court captioned *Obtek, et al. v. Lucent Technologies Inc., et al.* This case was filed in April 2001 and alleges violation of federal securities laws, the Texas Securities Act and common law fraud in connection with Lucent's acquisition of a company called Agere Inc. in April 2000. The court has set a trial date for February 2003. We are defending this action vigorously.

In November 2001, a purported class action complaint was filed in the United States District Court for the District of New Jersey against us and current and former officers captioned *Laufer v. Lucent Technologies Inc., et al.* The plaintiffs allege that we and our officers concealed material adverse information about Agere's financial condition prior to Agere's IPO and about our vendor financing portfolio. The action is currently stayed pending the mediation efforts described above. If the mediation does not result in settlement of the case, we intend to defend the action vigorously.

In October 2002, a purported class action lawsuit captioned *Balaban v. Schacht, et al.,* was filed in United States District Court for the District of New Jersey against the Company, certain current and former members of the Board of Directors and two former officers. The action was brought on behalf of holders of the Company's notes, the Company's convertible preferred stock and trust convertible preferred stock and asserts claims for breach of fiduciary duty by the defendants during the period from April 1999 to September 2002. The action seeks compensatory and other damages and costs and expenses associated with the

litigation. The action is in the early stages.

### Consumer Products Cases

*Sparks, et al. v. AT&T and Lucent Technologies Inc. et al.*, is a class action lawsuit filed in 1996 in Illinois state court under the name of *Crain v. Lucent Technologies*. The plaintiffs requested damages on behalf of present and former customers based on a claim that the AT&T Consumer Products business (which became part of Lucent in 1996) and Lucent had defrauded and misled customers who leased telephones, resulting in payments in excess of the cost to purchase the

<div align="center">33</div>

telephones. Similar consumer class actions pending in various state courts were stayed pending the outcome of the Sparks case and, in July 2001, the Illinois court certified a nationwide class of plaintiffs.

A settlement was agreed to by the parties in August 2002, to settle the litigation for up to $300 million in cash plus pre-paid calling cards redeemable for minutes of long distance service. The court approved the settlement in November 2002. Lucent and AT&T deny they have defrauded or misled their customers, but have decided to settle this matter to avoid the uncertainty of litigation and the diversion of resources and personnel that the continuation of pursuing this matter would require. The class claimants will apply for reimbursement from the settlement fund, and will be required to demonstrate their entitlement through a claims form to be provided to a claims administrator. Depending upon the number of claims submitted and accepted, the actual cost of the settlement to the defendants may be less than the stated amount, but it is not possible to estimate the amount at this time. We have deposited approximately $200 million in escrow accounts in connection with the settlement.

Lucent is a party to various separation and distribution agreements, which provide for contribution from third parties formerly affiliated with Lucent for a portion of any liability (including any settlement) in this case. However, we are responsible for a majority of any such liability or settlement. As a result, we recognized a $162 million charge recorded in other income (expense), net in 2002, which is net of expected third party contributions.

### Commercial Matters

Lucent is the defendant in an adversary proceeding filed in April 2001 in United States Bankruptcy Court for the District of Delaware by Winstar Communications, Inc. and Winstar Wireless, Inc. (collectively "Winstar") in connection with the Chapter 11 bankruptcy petition of Winstar and various related entities. The Winstar bankruptcy was subsequently converted to Chapter 7 and the Winstar bankruptcy trustee replaced Winstar as plaintiff in the action. The complaint asserts claims for breach of contract and other claims against Lucent and seeks compensatory damages, as well as costs and expenses associated with litigation. The complaint also seeks recovery of a payment of approximately $190 million made by Winstar to Lucent in December 2000. Lucent has filed a motion to dismiss certain of the claims asserted by the plaintiff. Lucent intends to defend the case vigorously.

In the normal course of business, we are involved in commercial disputes with customers, suppliers, subcontractors and others. These matters generally involve claims for breach of contract, breach of warranty of similar claims. While many of these disputes are settled amicably without litigation, some of these matters will result in lawsuits being filed against us. The recent downturn in the telecommunications market and the insolvency and failures of numerous service providers has resulted in more claims and disputes resulting in litigation.

One such matter is *PF.Net Supply Corp. v. Lucent Technologies Inc.*, pending in U.S. Bankruptcy Court in New Jersey. The plaintiffs are claiming damages for breach of a purported $100 million purchase commitment of the Company. We are defending this action vigorously.

<div align="center">34</div>

### Intellectual Property

We are defendants in various cases in which third parties have claimed we are infringing their patents. In addition, we have assumed defenses of some cases where infringement claims have been made against our customers in connection with products we have provided to them. We also occasionally institute actions against third parties which we believe are infringing our intellectual property rights, and these actions sometimes lead to counterclaims by the opposing party.

### Employee Matters

One of our former sales executives filed a lawsuit against us in New Jersey Superior Court in December 2000, captioned *Aversano v. Lucent Technologies Inc.* The allegations relate to the former sales executive's departure from us in October 2000. The complaint asserts claims for violation of New Jersey's Conscientious Employee Protection Act, breach of contract and promissory estoppel. The complaint seeks compensatory and punitive damages, as well as attorneys' fees. This action is set for trial in January 2003 and we are defending the action vigorously.

We are also subject to various other employment related claims regarding employee dismissals, benefits, compensation and other matters. As a result of our recent restructuring actions and plans for the future, we have reduced our work force significantly, and may have further reductions in the future. These work force reductions have increased the number of employment claims, and this trend may continue in the future.

### Regulatory

On November 21, 2000, we announced that we had identified an issue impacting our revenue in the fourth fiscal quarter of 2000. We informed the SEC and initiated a review by our outside counsel and independent accountants. In late December 2000, we announced the results of the review, which resulted in certain adjustments to our fourth fiscal quarter of 2000 results from the preliminary, unaudited results that we had announced in an October 2000 press release. We are cooperating fully with the SEC's investigation of these matters.

In August 2002, the U.S. Attorney's Office in New Jersey informed us that the office was conducting an investigation into certain of the matters described in the previous paragraph. The U.S. Attorney's Office has informed us that we are not a target of this investigation. We are cooperating fully with the U.S. Attorney's investigation.

*Environmental, Health and Safety*

Information about environmental proceedings is included under "Environmental Matters" in Item 1.

The Company is a defendant in various lawsuits involving exposure to asbestos. These cases primarily involve exposure to asbestos in premises owned or operated by the Company or the

35

predecessors of its business, such as AT&T or Western Electric, and, to a lesser extent, exposure from handling products manufactured or sold by the Company or its predecessors that contained asbestos. Historically, the Company has not paid any material amounts related to asbestos claims, and currently does not expect these cases to have a significant impact on the Company in the future. However, asbestos claims are on the rise generally in the U.S. and an increasing number of claims are being made against owners or operators of premises where asbestos is or was located and companies that manufactured or sold products containing asbestos. Accordingly, the Company cannot give assurance that asbestos related claims will not have a material adverse impact on the Company in the future.

**Item 4.  Submission Of Matters To A Vote Of Security Holders.**

During the fourth quarter of fiscal year 2002, no matter was submitted to a vote of our security holders.

36

**PART II**

**Item 5.  Market For Registrant's Common Equity And Related Stockholder Matters.**

**(a)  Market Price And Dividend Information**

Our common stock is traded on the New York Stock Exchange ("NYSE") under the symbol LU. The following table presents the reported high and low sales prices of our common stock as reported on the NYSE:

|  | High | Low | Dividend Per Share |
|---|---|---|---|
| YEAR ENDED SEPTEMBER 30, 2002 |  |  |  |
| Quarter ended December 31, 2001 | $ 8.75 | $ 5.37 | $ 0.00 |
| Quarter ended March 31, 2002 | 7.50 | 4.10 | 0.00 |
| Quarter ended June 30, 2002 | 5.03 | 1.48 | 0.00 |
| Quarter ended September 30, 2002 | 2.94 | 0.71 | 0.00 |
| YEAR ENDED SEPTEMBER 30, 2001 |  |  |  |
| Quarter ended December 31, 2000 | $ 34.50 | $ 12.19 | $ 0.02 |
| Quarter ended March 31, 2001 | 21.13 | 9.15 | 0.02 |
| Quarter ended June 30, 2001 | 11.50 | 5.16 | 0.02 |
| Quarter ended September 30, 2001 | 7.90 | 5.25 | 0.00 |

**(b)  Approximate Number Of Holders Of Common Stock**

On November 30, 2002, there were approximately 1,476,691 shareowners of record of our common stock.

**(c)  Dividends**

On July 24, 2001, we announced that our Board of Directors had discontinued payments of cash dividends on our common stock. We currently have no plans to reinstate a dividend for our common stock.

**(d)  Sale of Unregistered Securities**

During the fiscal quarter ended September 30, 2002, we issued a total of 58,113,000 shares of our common stock that were not registered under the Securities Act of 1933 in reliance on an exemption pursuant to Section 3(a)(9) of that Act. These shares of common stock were issued in two privately negotiated transactions occurring on September 20 and 26, 2002, solely in exchange for 174,500 shares of our 8% redeemable convertible preferred stock with a liquidation value of $174.5 million. No underwriters were used for these transactions.

**(e)  Equity Compensation Plans**

37

Information about our equity compensation plans required by this item is set forth in our definitive proxy statement for our 2003 annual meeting of shareowners to be held on February 19, 2003 and is incorporated herein by reference.

### Item 6. Selected Financial Data.

The information required by this item is included in page 20 of our annual report to shareowners for the fiscal year ended September 30, 2002. This page of the annual report to shareowners is included in Exhibit 13 to this report.

### Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations.

The information required by this item is included in pages 6 to 19 of our annual report to shareowners for the fiscal year ended September 30, 2002. These pages of the annual report to shareowners are included in Exhibit 13 to this report.

### Item 7A. Qualitative and Quantitative Disclosures About Market Risk.

The information required by this item is included in pages 18 to 19 of our annual report to shareowners for the fiscal year ended September 30, 2002. These pages of the annual report to shareowners are included in Exhibit 13 to this report.

### Item 8. Financial Statements and Supplementary Data.

The information required by this item is included in pages 21 to 51 of our annual report to shareowners for the fiscal year ended September 30, 2002. These pages of the annual report to shareowners are included in Exhibit 13 to this report.

### Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure.

None.

38

# PART III

### Item 10. Directors And Executive Officers Of The Registrant.

Information required by Item 10 for executive officers is set forth under the caption "Executive Officers of the Registrant" in Part I, Item 1 of this report. The other information required by Item 10 is included in our definitive proxy statement for our 2003 annual meeting of shareowners to be held on February 19, 2003 and is incorporated herein by reference.

### Item 11. Executive Compensation.

The information required by this Item 11 is included in our definitive proxy statement for our 2003 annual meeting of shareowners to be held on February 19, 2003 and is incorporated herein by reference.

### Item 12. Security Ownership Of Certain Beneficial Owners And Management.

The information required by this Item 12 is included in our definitive proxy statement for our 2003 annual meeting of shareowners to be held on February 19, 2003 and is incorporated herein by reference.

### Item 13. Certain Relationships And Related Transactions.

The information required by this Item 13 is included in our definitive proxy statement for our 2003 annual meeting of shareowners to be held on February 19, 2003 and is incorporated herein by reference.

### Item 14. Controls And Procedures.

Within the 90-day period prior to the filing of this report, an evaluation was carried out under the supervision and with the participation of our management, including the Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), of the effectiveness of our disclosure controls and procedures. Based on that evaluation, the CEO and CFO have concluded that our disclosure controls and procedures are effective to ensure that information required to be disclosed by us in reports that we file or submit under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms. Subsequent to the date of our management's evaluation, there were no significant changes in our internal controls or in other factors that could significantly affect these controls, including any corrective actions with regard to significant deficiencies and material weaknesses.

### Item 15. Exhibits, Financial Statement Schedule, And Reports On Form 8-K.

(a) The following documents are filed as part of this Report:

39

Pages

(1) Management's Discussion and Analysis of Results of Operations and Financial Condition   •
(2) Five–Year Summary of Selected Financial Data   •
(3) Report of Independent Accountants   •
(4) Financial Statements:
    (i) Consolidated Statements of Operations   •
    (ii) Consolidated Balance Sheets   •
    (iii) Consolidated Statements of Changes in Shareowners' (Deficit) Equity   •
    (iv) Consolidated Statements of Cash Flows   •
    (v) Notes to Consolidated Financial Statements   •
(5) Financial Statement Schedule:
    (i) Report of Independent Accountants   42
    (ii) Schedule II —Valuation and Qualifying Accounts   43

Separate financial statements of subsidiaries not consolidated and 50 percent or less owned persons are omitted since no such entity constitutes a 'significant subsidiary' pursuant to the provisions of Regulation S–X, Article 3–09.

•    Incorporated by reference to the appropriate portions in pages 6 through 51 of the Company's annual report to shareowners for the fiscal year ended September 30, 2002 (see Part II and Exhibit 13)

    (6) Exhibits:

See Exhibit Index on page 49 for a description of the documents that are filed as Exhibits to this report on Form 10–K or incorporated by reference herein. Any document incorporated by reference is identified by a parenthetical referencing the SEC filing which included the document.

We will furnish, without charge, to a security holder upon request a copy of our definitive proxy statement for our 2003 annual meeting of shareowners, portions of which are incorporated herein by reference thereto. We will furnish any other exhibit at cost.

(b) Reports On Form 8–K During The Last Quarter Of The Fiscal Year Covered By This Report:

The company filed the following four reports on Form 8–K during the fiscal quarter ended September 30, 2002:

| Date Filed | Item Reported Upon |
|---|---|
| July 23, 2002 | The Company issued a press release containing the results of its third fiscal quarter ended June 30, 2002, and slides made available at a webcast for its quarterly results conference call held on July 23, 2002. |

| | |
|---|---|
| August 12, 2002 | The Company announced the settlement of a class action lawsuit in Illinois state court entitled *Sparks, et al. v. AT&T and Lucent Technologies Inc. et al.* |
| August 13, 2002 | The Company announced that its chief executive officer and chief financial officer had submitted to the Securities and Exchange Commission sworn statements pursuant to Securities and Exchange Commission Order No. 4–460. |
| September 13, 2002 | The Company issued a press release regarding its expectations for revenues and profits for the quarter ended September 30, 2002. |

## REPORT OF INDEPENDENT ACCOUNTANTS ON FINANCIAL STATEMENT SCHEDULE

**To the Board of Directors and Shareowners of Lucent Technologies Inc.:**

Our audits of the consolidated financial statements referred to in our report dated October 23, 2002, except for the second paragraph of Note 4, the third paragraph of Note 10 and the first paragraph of Note 12, as to which the date is December 4, 2002, appearing in the 2002 Annual Report to the Shareowners of Lucent Technologies Inc. (which report and consolidated financial statements are incorporated by reference in this Annual Report on Form 10–K) also included an audit of the consolidated financial statement schedule hereto included in this Form 10–K. In our opinion, this consolidated financial statement schedule presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements.

PricewaterhouseCoopers LLP
New York, New York
October 23, 2002,
except for the second paragraph of Note 4, the third paragraph of Note 10 and the first paragraph of Note 12, as to which the date is December 4, 2002

42

Lucent Technologies Inc.
Schedule II — Valuation and Qualifying Accounts
(Dollars in millions)

| Column A | Column B | Column C Additions | | Column D | Column E |
|---|---|---|---|---|---|
| Description | Balance at beginning of period | Charged to Costs & expenses | Charged to other accounts, net | Deductions | Balance at end of period |
| Year 2002 | | | | | |
| Allowance for doubtful accounts | $ 634 | $ 488 | $ — | $ 797(a) | $ 325 |
| Customer financing reserves | 2,109 | 765 | — | 1,923(a) | 951 |
| Deferred tax asset valuation allowance | 742 | 7,868 | 1,472(b) | 93(a) | 9,989 |
| Inventory valuation reserves | $ 1,814 | $ 621 | $ 334 | $ 1,279(d) | $ 1,490 |
| Year 2001 | | | | | |
| Allowance for doubtful accounts | $ 479 | $ 462 | $ — | $ 307(a) | $ 634 |
| Customer financing reserves | 604 | 1,787 | 257 | 539(a) | 2,109 |
| Deferred tax asset valuation allowance | 197 | 545 | — | — | 742 |
| Inventory valuation reserves | $ 805 | $ 2,400(c) | — | $ 1,391(d) | $ 1,814 |
| Year 2000 | | | | | |
| Allowance for doubtful accounts | $ 303 | $ 245 | $ — | $ 69(a) | $ 479 |
| Customer financing reserves | 34 | 260 | 432 | 122(a) | 604 |
| Deferred tax asset valuation allowance | 146 | 45 | 6 | — | 197 |
| Inventory valuation reserves | $ 624 | $ 360 | $ 8 | $ 187(d) | $ 805 |

(a)  Primarily represents amounts written off, net of recoveries.

(b)  Primarily charged to shareowners' (deficit) equity for minimum pension liability and other charges to other comprehensive income.

(c)  Charged to costs and expenses include $1,259 of inventory related to Lucent's business restructuring program, of which $570 was written off and included in deductions.

(d)  Primarily represents amounts of obsolete and scrapped inventory written off.

Amounts above reflect continuing operations. All amounts have been reclassified to exclude Avaya, Agere and the power systems business.

43

SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, hereunto duly authorized on December 12, 2002.

LUCENT TECHNOLOGIES INC.

By:   /s/ JOHN A. KRITZMACHER
        John A. Kritzmacher
        Principal Accounting Officer

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities indicated on December 12, 2002.


*/s/ PATRICIA F. RUSSO*
PRINCIPAL EXECUTIVE OFFICER
    Patricia F. Russo
        President and Chief Executive Officer




*/s/ FRANK A. D'AMELIO*
PRINCIPAL FINANCIAL OFFICER
    Frank A. D'Amelio
        Executive Vice President and
        Chief Financial Officer




*/s/ JOHN A. KRITZMACHER*
PRINCIPAL ACCOUNTING OFFICER
    John A. Kritzmacher
        Senior Vice President and
        Corporate Controller


DIRECTORS
Paul A. Allaire
Robert E. Denham
Daniel S. Goldin
Carla A. Hills
Patricia F. Russo
Henry B. Schacht
Franklin A. Thomas
John A. Young

By:    */s/ JOHN A. KRITZMACHER*
        Attorney-in-Fact


44


## CHIEF EXECUTIVE OFFICER CERTIFICATION

I, Patricia F. Russo, President and Chief Executive Officer of Lucent Technologies Inc., certify that:

1.    I have reviewed this annual report on Form 10–K of Lucent Technologies Inc. (the "registrant");

2.    Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3.    Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4.    The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–14 and 15d–14) for the registrant and have:

a)    designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

b)    evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

c)   presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5.   The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a)   all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

b)   any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6.   The registrant's other certifying officers and I have indicated in this annual report whether there were significant changes in internal controls or in other factors that could significantly

<center>45</center>

affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

Date: December 12, 2002

/s/ Patricia F. Russo
President and Chief Executive Officer
(Principal Executive Officer)

<center>46</center>

<center>**CHIEF FINANCIAL OFFICER CERTIFICATION**</center>

I, Frank A. D'Amelio, Executive Vice President and Chief Financial Officer of Lucent Technologies Inc., certify that:

1.   I have reviewed this annual report on Form 10-K of Lucent Technologies Inc. (the "registrant");

2.   Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3.   Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4.   The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and have:

a)   designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

b)   evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

c)   presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5.   The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a)   all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

b)   any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6.   The registrant's other certifying officers and I have indicated in this annual report whether there were significant changes in internal controls or in other factors that could significantly

affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

Date: December 12, 2002

/s/ Frank A. D'Amelio
Executive Vice President and
   Chief Financial Officer
(Principal Financial Officer)

48

## EXHIBIT INDEX

The following documents are filed as Exhibits to this report on Form 10–K or incorporated by reference herein. Any document incorporated by reference is identified by a parenthetical reference to the SEC filing which included such document.

| Exhibit Number | Description |
| --- | --- |
| 3(i) 1 | Certificate of Incorporation of the Registrant, as amended effective February 16, 2000 (Exhibit 3.1 to Registration Statement on Form S–4, No. 333–31400). |
| 3(i) 2 | Certificate of Designations of 8.00% Redeemable Convertible Preferred Stock Setting Forth the Powers, Preferences and Rights, and the Qualifications, Limitations and Restrictions thereof, of such Preferred Stock of Lucent Technologies Inc. (Exhibit 3 to Quarterly Report on Form 10–Q for the quarter ended June 30, 2001). |
| 3(ii) | By–Laws of the Registrant as amended through January 6, 2002 (Exhibit 3(ii) to the Quarterly Report on Form 10–Q for the quarter ended December 31, 2001). |
| 4(ii) 1 | Indenture dated as of April 1, 1996 between Lucent Technologies Inc. and The Bank of New York, as Trustee (Exhibit 4A to Registration Statement on Form S–3, No. 333–01223). |
| 4(ii) 2 | First Supplemental Indenture dated as of April 17, 2000 to Indenture dated April 1, 1996 (Exhibit 4 to Report on Form 8–K filed May 5, 2000). |
| 4(ii) 3 | Form of the Registrant's common stock certificate (Exhibit 4(iv) to Quarterly Report on Form 10–Q for the quarter ended December 31, 2001). |
| 4(ii) 4 | Amended and Restated Trust Agreement, dated as of March 19, 2002, among the registrant, as depositor, The Bank of New York, as property trustee, The Bank of New York (Delaware), as Delaware trustee, and the individuals named therein, as administrative trustees, relating to Lucent Technologies Capital Trust I. (Exhibit 4(v) 1 to Quarterly Report on Form 10–Q for the quarter ended March 31, 2002). |
| 4(ii) 5 | Form of certificate for preferred securities of Lucent Technologies Capital Trust I, designated as 7.75% Cumulative Convertible Trust Preferred Securities (liquidation preference $1,000 per preferred security) (Exhibit 4(v) 2 to Quarterly Report on Form 10–Q for the quarter ended March 31, 2002). |

49

| | |
| --- | --- |
| 4(ii) 6 | Indenture, dated as of March 19, 2002, between the registrant and The Bank of New York, as indenture trustee (Exhibit 4(v) 3 to Quarterly Report on Form 10–Q for the quarter ended March 31, 2002). |
| 4(ii) 7 | Form of the registrant's 7.75% convertible subordinated debentures due 2017 (Exhibit 4(v) 4 to Quarterly Report on Form 10–Q for the quarter ended March 31, 2002). |
| 4(ii) 8 | Guarantee Agreement, dated as of March 19, 2002, between the registrant, as guarantor, and The Bank of New York, as guarantee trustee (Exhibit 4(v) 5 to Quarterly Report on Form 10–Q for the quarter ended March 31, 2002). |
| 4(iii) | Other instruments in addition to Exhibits under 4(ii) which define the rights of holders of long–term debt of the Registrant and all of its consolidated subsidiaries are not filed herewith pursuant to Regulation S–K, Item 601(b)(4)(iii)(A). Pursuant to this regulation, the Registrant agrees to furnish a copy of any such instrument to the SEC upon request. |

| 10(i) 1 | Separation and Distribution Agreement by and among Lucent Technologies Inc., AT&T Corp. and NCR Corporation, dated as of February 1, 1996 and amended and restated as of March 29, 1996 (Exhibit 10.1 to Registration Statement on Form S–1 No. 333–00703). |
| 10(i) 2 | Tax Sharing Agreement by and among Lucent Technologies Inc., AT&T Corp. and NCR Corporation, dated as of February 1, 1996 and amended and restated as of March 29, 1996 (Exhibit 10.6 to Registration Statement on Form S–1 No. 333–00703). |
| 10(i) 3 | Employee Benefits Agreement by and between AT&T Corp. and Lucent Technologies Inc., dated as of February 1, 1996 and amended and restated as of March 29, 1996 (Exhibit 10.2 to Registration Statement on Form S–1 No. 333–00703). |
| 10(i) 4 | Rights Agreement between Lucent Technologies Inc. and The Bank of New York (successor to First Chicago Trust Company of New York), as Rights Agent, dated as of April 4, 1996 (Exhibit 4.2 to Registration Statement on Form S–1 No. 333–00703). |
| 10(i) 5 | Amendment to Rights Agreement between Lucent Technologies Inc. and The Bank of New York (successor to First Chicago Trust Company of New York), dated as of February 18, 1998 (Exhibit (10)(i) 5 to the Annual Report on Form 10–K for the year ended September 30, 1998). |

50

| 10(i) 6 | 364–Day Revolving Credit Facility Agreement, dated as of February 22, 2001 among Lucent Technologies Inc., several banks and other financial institutions or entities from time to time parties thereto, Salomon Smith Barney Inc., as Syndication Agent, and The Chase Manhattan Bank, as Administrative Agent (Exhibits 99.1 to the Current Report on Form 8–K filed February 27, 2001). |
| 10(i) 7 | 5–Year Amended and Restated Revolving Credit Facility Agreement, dated as of February 26, 1998, as Amended and Restated as of February 22, 2001 among Lucent Technologies Inc., the lenders party thereto, Salomon Smith Barney Inc., as Syndication Agent, and The Chase Manhattan Bank, as Administrative Agent (Exhibit 99.3 to the Current Report on Form 8–K filed February 27, 2001). |
| 10(i) 8 | Guarantee and Collateral Agreement made by Lucent Technologies Inc. and certain of its subsidiaries in favor of The Chase Manhattan Bank, as Collateral Agent, dated as of February 22, 2001 (Exhibit 99.4 to the Current Report on Form 8–K filed February 27, 2001). |
| 10(i) 9 | Collateral Sharing Agreement among Lucent Technologies Inc., various Grantors and The Chase Manhattan Bank, as Collateral Agent, dated as of February 22, 2001 (Exhibit 99.5 to the Current Report on Form 8–K filed February 27, 2001). |
| 10(i) 10 | First Amendment to 364–Day Revolving Credit Facility Agreement and First Amendment to Guarantee and Collateral Agreement, dated as of June 11, 2001 (Exhibit 99.1 to the Current Report on Form 8–K filed August 16, 2001). |
| 10(i) 11 | First Amendment to Five–Year Revolving Credit Facility Agreement and First Amendment to Guarantee and Collateral Agreement, dated as of June 11, 2001 (Exhibit 99.2 to the Current Report on Form 8–K filed August 16, 2001). |
| 10(i) 12 | Second Amendment to 364–Day Revolving Credit Facility, dated as of August 16, 2001 (Exhibit 99.3 to the Current Report on Form 8–K filed August 16, 2001). |
| 10(i) 13 | Second Amendment to Five–Year Amended and Restated Revolving Credit Facility Agreement, dated as of August 16, 2001 (Exhibit 99.4 to the Current Report on Form 8–K filed August 16, 2001). |
| 10(i) 14 | Third Amendment To Five–Year Revolving Credit Facility Agreement And Second Amendment To Guarantee And Collateral Agreement, dated as of June 7, 2002 (Exhibit 99.1 to Current Report on Form 8–K filed June 13, 2002). |

51

| 10(i) 15 | Letter Agreement, dated as of October 16, 2002, among Lucent Technologies Inc. and certain of its subsidiaries, and JPMorgan Chase Bank, as Collateral Agent (Exhibit 99.1 to Current Report on Form 8–K filed October 23, 2002). |
| 10(ii)(B) 1 | Brand License Agreement by and between Lucent Technologies Inc. and AT&T, dated as of February 1, 1996 (Exhibit 10.5 to Registration Statement on Form S–1 No. 333–00703). |
| 10(ii)(B) 2 | Patent License Agreement among AT&T Corp., NCR Corporation and Lucent Technologies Inc., effective as of March 29, 1996 (Exhibit 10.7 to Registration Statement on Form S–1 No. 333–00703). |
| 10(ii)(B) 3 | Amended and Restated Technology License Agreement among AT&T Corp., NCR Corporation and Lucent Technologies Inc., effective as of March 29, 1996 (Exhibit 10.8 to Registration Statement on Form S–1 No. 333–00703). |
| 10(iii)(A) 1 | Lucent Technologies Inc. Short Term Incentive Program (Exhibit (10)(iii)(A) 2 to the Quarterly Report on Form 10–Q for the quarter ended March 31, 1998).* |
| 10(iii)(A) 2 | Lucent Technologies Inc. 1996 Long Term Incentive Program, as amended through April 21, 2002 (Exhibit 10(iii)(A) to the Quarterly Report on Form 10–Q for the quarter ended March 31, 2002). * |

10(iii)(A) 3    Lucent Technologies Inc. 1996 Long Term Incentive Program (Plan) Restricted Stock Unit Award Agreement (Exhibit (10)(iii)(A) 3 to the Annual Report on Form 10–K for the year ended September 30, 2000).*

10(iii)(A) 4    Lucent Technologies Inc. 1996 Long Term Incentive Program (Plan) Nonstatutory Stock Option Agreement (Exhibit (10)(iii)(A) 4 to the Annual Report on Form 10–K for the year ended September 30, 2000).*

10(iii)(A) 5    Lucent Technologies Inc. Deferred Compensation Plan (Exhibit (10)(iii)(A) 5 to the Annual Report on Form 10–K for the year ended September 30, 2000).*

10(iii)(A) 6    Lucent Technologies Inc. Stock Retainer Plan for Non–Employee Directors (Exhibit (10)(iii)(A) 5 to the Annual Report on Form 10–K for the year ended September 30, 1998).*

10(iii)(A) 7    Lucent Technologies Inc. Officer Long–Term Disability and Survivor Protection Plan (Exhibit (10)(iii)(A) 8 to the Annual Report on Form 10–K for the Transition Period ended September 30, 1996).*

52

10(iii)(A) 8    Description of the Lucent Technologies Inc. Supplemental Pension Plan (Exhibit (10)(iii)(A) 13 to the Annual Report on Form 10–K for the year ended September 30, 1998).*

10(iii)(A) 9    Lucent Technologies Inc. 1999 Stock Compensation Plan for Non–Employee Directors (Exhibit (10)(iii)(A) 14 to the Annual Report on Form 10–K for the year ended September 30, 1998).*

10(iii)(A) 10    Lucent Technologies Inc. Voluntary Life Insurance Plan (Exhibit (10)(iii)(A) 15 to the Annual Report on Form 10–K for the year ended September 30, 1998).

10(iii)(A) 11    Employment Agreement dated January 6, 2002, between Patricia F. Russo and Lucent Technologies Inc. (Exhibit (10)(iii)(A)(1) to Quarterly Report on Form 10–Q for the quarter ended December 31, 2001).*

10(iii)(A) 12    Officer Severance Policy for Robert Holder, dated February 14, 2001 (Exhibit (10)(iii)(A) 15 to the Annual Report on Form 10–K for the year ended September 30, 2001).*

10(iii)(A) 13    Officer Severance Policy for William O'Shea, dated February 14, 2001 (Exhibit (10)(iii)(A) 16 to the Annual Report on Form 10–K for the year ended September 30, 2001).*

10(iii)(A) 14    Officer Severance Policy for Richard J. Rawson, dated February 14, 2001.*

10(iii)(A) 15    Henry Schacht letter to Robert Holder, dated December 3, 2001 (Exhibit (10)(iii)(A) 19 to the Annual Report on Form 10–K for the year ended September 30, 2001).*

10(iii)(A) 16    Henry Schacht letter to William O'Shea, dated December 3, 2001 (Exhibit (10)(iii)(A) 20 to the Annual Report on Form 10–K for the year ended September 30, 2001).*

10(iii)(A) 17    Henry Schacht letter to Richard J. Rawson, dated December 3, 2001.*

10(iii)(A) 18    Henry Schacht letter to Frank A. D'Amelio, dated March 13, 2001.*

10(iii)(A) 19    Pam Kimmet letter to Frank A. D'Amelio, dated September 12, 2001.*

10(iii)(B) 1    Lucent Technologies Inc. 1997 Long Term Incentive Plan, as amended through April 21, 2002 (Exhibit 10(iii)(B) to the Quarterly Report on Form 10–Q for the quarter ended March 31, 2002).

53

12    Computation of Deficiency of Earnings to Cover Combined Fixed Charges and Preferred Stock Dividend Requirements and Ratio of Earnings to Combined Fixed Charges and Preferred Stock Dividend Requirements.

13    Selected portions (pages 5 to 51) of the company's Annual Report to Shareowners for the year ended September 30, 2002.

21    List of subsidiaries of Lucent Technologies Inc.

23    Consent of PricewaterhouseCoopers LLP.

24    Powers of Attorney executed by directors who signed this report.

99.1    Description of capital stock (Exhibit 99(i) to Quarterly Report on Form 10–Q for the quarter ended December 31, 2001).

99.2          Certification of Patricia F. Russo, Chief Executive Officer, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes–Oxley Act of 2002.

99.3          Certification of Frank A. D'Amelio, Chief Financial Officer, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes–Oxley Act of 2002.

*  Management contract or compensatory plan or arrangement.

54

To:     Rich Rawson

From:   Henry Schacht

Date:   February 14, 2001

Re:     Officer Severance Policy

This is a challenging time for our company. While I am confident in our ability to successfully work through the issues we are facing, I am also aware that our current business climate creates an uncertainty and raises concerns that could distract you from the turnaround work at hand. To address such concerns, I'm pleased to inform you that the Board of Directors has approved your eligibility for enhanced severance coverage in the event;

1       your employment is terminated by Lucent for reasons other than 'cause'; or

2.      you choose to terminate your employment with Lucent within six months of the hire date of the next CEO; or

3.      you choose to terminate your employment with Lucent because your reporting relationship to me has changed; or

4.      you choose to terminate your employment with Lucent on or after April 22, 2002 for any reason.

If you choose to invoke the severance policy as described in items 2, 3, or 4, you must give at least three months notice. Upon such notice, the Company will reserve the right to request an additional three months of employment from you.

The severance coverage, that you would receive in the event your employment ends under any of the conditions noted above, is described in Attachment I. This benefit provides for continuation of salary and target bonus for 24 months. During this 24–month paid leave of absence, your stock options and restricted stock units will continue to vest. In addition, your coverage under many of Lucent's benefit plans, including the medical, dental, stock purchase and savings plans, will continue as normal.

The 24–month paid leave of absence can be used to accrue age and service towards achieving service pension eligibility. Given you current age and years of service, you would be service pension eligible at the end of a 24–month paid leave of absence. And, at the conclusion of a 24–month paid leave of absence, the retirement and termination provisions set forth in each grant's (stock option and restricted stock units) respective agreement will apply. The vesting and retirement provisions for all your outstanding grants are described in Attachment II.

Also, if you choose to invoke the severance policy as described in items 2, 3, or 4, then the stock options and restricted stock units granted on December 26, 2000 will accelerate, with full vesting occurring on the first day your severance coverage begins. Further communication on these grants and the agreements will be sent to you later this week.

The special severance provisions described in items 2, 3, and 4 do not apply to all officers, so I ask that you keep the terms of this arrangement confidential.

Challenging times can be the most satisfying and rewarding times of our professional lives. With your help we can take our company to new levels of success.


Attachments

**EXHIBIT 10(iii)(A) 17**

To: Rich Rawson

From: Henry Schacht

Date: December 3, 2001

Re: Special Compensation Actions

As we continue with our turnaround, it is critical for us to remain focused and committed to successfully meet our business challenges. I am confident that we can take our company to new levels of success, and I am counting on your continued commitment as a key player in making this happen. To reward you for your efforts and dedication, the Board has approved several compensation actions, which are contingent upon your waiving the enhanced severance coverage described in my February 14, 2001 letter to you:

1) You will be eligible for a special retention bonus; the amount and the payment terms are outlined on Attachment I.

2) All the unvested stock option and restricted stock unit grants you have received will become fully vested and exercisable on April 22, 2002, or earlier upon the appointment and commencement of employment of a new CEO, except for any future grants that you may be awarded.

3) In the event that any future payments you receive are deemed to be 'excess parachute payments' under Internal Revenue Code Section 280G, the company will provide a tax gross-up to indemnify you against the 20% federal excise tax. A summary of 280G considerations is shown on Attachment II.

Please note that due to these special compensation actions, the terms of the enhanced severance coverage described in my February 14, 2001 letter will be modified. Specifically, your acceptance of the special retention bonus will commit you to continuing your employment past April 22, 2002, or the appointment and commencement of employment of a new CEO if that should occur prior to April 22, 2002. Further, by accepting this award you acknowledge that you will no longer have the ability to invoke your severance coverage under the terms of items 2, 3, or 4 of the February 14, 2001 letter. You may, however, voluntarily resign prior to November 22, 2002 (the date at which you become retirement eligible) and be treated as retirement eligible for pension, medical insurance, and equity vesting. Instead, you will be eligible for ongoing severance coverage under the standard terms of the Officer Severance Policy. A summary of this policy is included on Attachment III.

I truly appreciate your efforts and look forward to working together through the challenges ahead.

Attachment I

**SPECIAL RETENTION BONUS**
**RICH RAWSON**

AMOUNT

You are eligible to receive a retention bonus equal to two times your base salary and target bonus in effect on the payment date (see below).

For illustrative purposes, if the bonus were based on your base salary and target bonus as of November 27, 2001, the amount of the retention bonus would be **$2,310,000**.

This award is subject to any applicable tax and is benefit bearing for purposes of Lucent's benefit plans. Please note that this award is in addition to any other incentive awards for which you may be eligible.

PAYMENT DATE

Assuming your continued employment, the payments will be made on April 22, 2002, or upon the appointment and commencement of employment of a new CEO, whichever comes first.

TERMINATION PROVISIONS

– In the event you voluntarily resign or retire or are terminated by Lucent for 'Cause' prior to the payout date this award will be canceled.

– In the event of your death or long–term disability prior to the payout date, this award will be paid to you or your estate.

– If you are placed on a Company approved leave of absence under the Officer Severance Policy and you are on this leave on the scheduled payout date, then this award will continue to be paid on the originally scheduled date. Please note that the Officer Severance Policy remains in effect in the event of a Change in Control (as defined by the 1996 Long Term Incentive Program).

– In the event of a Change in Control prior to the payout date (as defined by the 1996 Long Term Incentive Program), this award would continue to be paid on the originally scheduled date.

## GOLDEN PARACHUTE RULES

IRC Section 280G was enacted to discourage the practice of giving "disqualified individuals" large benefits (such as the accelerated vesting of options, severance payments, etc.) that are triggered upon a change in control of their employer company. The employer company is denied a tax deduction for the "excess golden parachute," and the individual recipient must pay a 20% excise tax on this same amount. A "gross–up" payment made by the company to make the recipient whole for this excise tax (generally three times the amount of the excise tax) is also an "excess golden parachute" payment.

- Disqualified individuals include officers, the highest paid 1% of the employees and holders of stock or options having a fair market value in excess of $1 million.

- A benefit received that is in excess of three times the recipient's average annual compensation is considered a "golden parachute."

- The amount by which the golden parachute exceeds the recipient's average annual compensation is the "excess golden parachute" and is therefore disallowed as a tax deduction for the company and the participant receiving the benefit is subject to the excise tax.

- The value of the accelerated vesting of options is determined as follows:

  - The aggregate value of the options is determined over their normal vesting period then discounted to the present under present value analysis. This amount is then compared to aggregate value of the options upon the acceleration date. The excess is the value of the acceleration.

  - In addition to the value of acceleration, a value reflecting the lapse of the recipient's obligation to continue to perform services throughout the vesting period must also be included. This is equal to 1% of the amount of the accelerated payment multiplied by the number of full months that the right is no longer subject to a substantial risk of forfeiture.

## EXAMPLE OF TAX GROSS–UP CALCULATION

### *Assumptions*

| | |
|---|---|
| Average Annual Compensation | $ 2,000,000 |
| 300% of Average Annual Compensation | $ 6,000,000 |
| Value of Change in Control Payments | $ 8,000,000 |

### *Rules*

Since the value of Change in Control payments is greater than 300% of the Average Annual Compensation, the $8,000,000 is considered a "parachute payment." The "excess parachute payment" is the total parachute payment, less the Average Annual Compensation ($8,000,000 – $2,000,000) = $6,000,000

### *Gross–Up Payments*

Cost of Excise Tax to Participant:          $1,200,000
($6,000,000 x 20%)

### *Gross–Up*

Additional payment from company needed to offset the effect of the excise tax on employee at 66% tax rate (46% regular tax rate + 20% excise tax):

   $ 3,500,000 gross
   $ 1,200,000 net after tax

Note that payments in excess of average annual compensation ($6,000,000) and gross–up payments ($3,500,000) are not deductible by the company.

## OFFICER SEVERANCE POLICY

| | |
|---|---|
| **Eligibility** | – Lucent or Agere Officer status |
| | – Participation for new officers is contingent upon Board/CEO approval |
| | – Company initiated termination, other than for 'Cause' as defined on page 2 |
| | – Contingent upon signing the standard, Lucent Release Agreement (including non–compete, non–solicitation provisions) |
| | – All payments and benefits listed below will be offset by any individually negotiated or legally required arrangement |
| **Leave of Absence Payment** | – 24 months of base salary and target bonus |
| | – Base salary will be paid monthly. Target bonus will be paid annually in December. Both payments are benefits bearing. |
| **Equity** | **STOCK OPTIONS** |
| | – Options continue vesting as scheduled during the 24 month period. |
| | – At end of the 24 month period, your employment will end and options will follow normal termination provisions: |
| | — Pension eligible — Keep vested remainder of term; unvested options cancel |
| | — Not Pension eligible — 90 days to exercise vested; unvested options cancel |
| | **RESTRICTED STOCK** |
| | – Restricted stock continues vesting as scheduled during the 24 month period. |
| | **ESPP** |
| | – Your participation will continue through payroll deductions. |
| **Retirement Benefits** | **SERVICE PENSION** |
| | Retirement eligible: Your severance pay will count towards your pension. Pension payments begin after termination of this arrangement. |
| | Not retirement eligible: Deferred vested employees can elect to begin payment at the termination of this arrangement. The severance period can be used to accrue service/age toward achieving pension eligibility. |
| | **CASH BALANCE PENSION** |
| | – Severance pay will count towards the cash balance plan. The cash balance is payable at the end of the 24 month period or later at employee election. |
| | **401(K)** |
| | – Payroll deductions continue |
| **Health and Welfare Benefits** | – Medical, Dental, Disability, Life Insurance, Car Allowance, Financial Counseling benefits continue the same as actively employed Officers. |
| | – Company credit cards, home office equipment, voice mail and e–mail will be cancelled at the beginning of the 24 month period. |

## OFFICER SEVERANCE POLICY

**Termination Provisions**
– In the event you need to terminate this arrangement during the 24 month leave period for any reason (including conflict with another employer), the Company may approve the payment of the remaining amount of base salary and target bonus in a lump sum. The normal 'voluntary' termination provisions for the stock and benefit plans will apply.

**Outplacement Services**
– At your request, outplacement services will be provided through a vendor selected by the Company, during the 24 month leave period or within six months following termination of employment, up to a limit of $50,000.

**Change in control Provisions**
– Upon or after a Change in Control (as defined in the 1996 Long Term Incentive Program or its successor plan as in effect immediately before the Change in Control) this policy will remain in effect.

– Upon or after a Change in Control (as defined in the 1996 Long Term Incentive Program or its successor plan as in effect immediately before the Change in Control), you will also be entitled to the benefits of this policy if you terminate your employment within three months of an event constituting Good Reason. Good Reason is defined as follows:

   (i) the assignment to you by the Board of Directors or another representative of the Company of duties which represent a material decrease in responsibility and are materially inconsistent with the duties associated with your position, any reduction in your job title, or a material negative change in the level of Officer to whom you report, or

   (ii) a material negative change in the terms and conditions of your employment, including a reduction by the Company of your annual base salary or a material decrease in your target opportunity for a Short Term Incentive Award, or

   (iii) the requirement to change your work location to one in a different country, even for a comparable or superior position.

'Cause' is defined as:

(i)     violation of Lucent's code of conduct, Business Guideposts;

(ii)   conviction of (including a plea of guilty or nolo contendere) a felony or any crime of theft, dishonesty or moral turpitude; or

(iii)  gross omission or gross dereliction of any statutory or common law duty of loyalty to Lucent.

**EXHIBIT 10(iii)(A) 18**

To:         Frank D'Amelio

From:       Henry Schacht

Date:       March 13, 2001

Re:         Special Retention Bonus

As we continue with our turnaround, it is critical for us to remain focused and committed to successfully meet our business challenges. I am confident that we can take our company to new levels of success, and I am counting on your continued commitment as a key player in making this happen. To reward you for your efforts and dedication, the Board has approved a special retention bonus for you. The amount of the bonus and the payment terms are outlined in the attachment.

This special retention bonus has only been offered to select Officers, so I ask that you keep the details of this award confidential.

I truly appreciate your efforts and look forward to working together through the challenges ahead.

Attachment

**Special Retention Bonus**
**Frank D'Amelio**

| | |
|---|---|
| **Amount** | You are eligible to receive a retention bonus in the amount of **$1,500,000**. |

This award is subject to any applicable tax and is non-benefit bearing for purposes of Lucent's benefits plans. Please note that this award is in addition to any other incentive awards for which you may be eligible.

**Payment Dates**    Assuming your continued employment, the following payments will be made:

- 50% is payable on **February 1, 2002**

- 50 % is payable on **December 1, 2002**

**Termination Provisions**

– In the event you voluntarily resign or are terminated by Lucent for "Cause" prior to the payout date(s), this award will be cancelled.

– In the event of your death or disability prior to the payout date(s), a prorated portion of this award will be paid to your or your estate.

– If you are placed on a Company approved leave of absence under the Officer Severance Policy and you are on this leave on the scheduled payout date(s), then this award will be paid. Please note that the Officer Severance Policy remains in effect in the event of a Change in Control (as defined by the 1996 Long Term Incentive Program).

– In the event of a Change in Control (as defined by the 1996 Long Term Incentive Program), this award would continue to be paid on the originally scheduled dates assuming your continued employment.

**EXHIBIT 10(iii)(A) 19**

To:     Frank D'Amelio

From:   Pam Kimmet

Date:   September 12, 2001

Re:     Enhanced Retention Bonus

This memo is to confirm the change to your special cash retention bonus approved earlier this year. In recognition of your new role as Chief Financial Officer, the Board has approved an increase in the amount of this award as of May 24, 2001. The scheduled payout dates and terms will remain the same. As formal confirmation of this increase, the new amount is shown on the attachment, which replaces the attachment your received in February.

Please let me know if you have any questions.

Attachment

**Special Retention Bonus**
**Frank D'Amelio**

| | |
|---|---|
| **Amount** | You are eligible to receive a retention bonus in the amount of **$3,000,000.** |
| | This award is subject to any applicable tax and is non–benefit bearing for purposes of Lucent's benefits plans. Please note that this award is in addition to any other incentive awards for which you may be eligible. |
| **Payment Dates** | Assuming your continued employment, the following payments will be made: |

- 50% is payable on **February 1, 2002**

- 50 % is payable on **December 1, 2002**

| | |
|---|---|
| **Termination Provisions** | – In the event you voluntarily resign or are terminated by Lucent for "Cause" prior to the payout date(s), this award will be cancelled. |
| | – In the event of your death or disability prior to the payout date(s), a prorated portion of this award will be paid to your or your estate. |
| | – If you are placed on a Company approved leave of absence under the Officer Severance Policy and you are on this leave on the scheduled payout date(s), then this award will be paid. Please note that the Officer Severance Policy remains in effect in the event of a Change in Control (as defined by the 1996 Long Term Incentive Program). |
| | – In the event of a Change in Control (as defined by the 1996 Long Term Incentive Program), this award would continue to be paid on the originally scheduled dates assuming your continued employment. |

**LUCENT TECHNOLOGIES INC. AND SUBSIDIARIES**
**COMPUTATION OF DEFICIENCY OF EARNINGS TO COVER COMBINED FIXED CHARGES**
**AND PREFERRED STOCK DIVIDEND REQUIREMENTS**
**AND RATIO OF EARNINGS TO COMBINED FIXED CHARGES**
**AND PREFERRED STOCK DIVIDEND REQUIREMENTS**
**(DOLLARS IN MILLIONS)**
**(UNAUDITED)**

| | FOR THE YEAR ENDED SEPTEMBER 30, | | | | |
|---|---|---|---|---|---|
| | **2002** | **2001** | **2000** | **1999** | **1998** |
| Income (loss) from continuing operations before income taxes and losses from equity investments | $ (7,083) | $ (19,844) | $ 2,388 | $ 3,828 | $ 1,466 |
| Less: interest capitalized during the period | 4 | 16 | 20 | 20 | 17 |
| Add: Fixed charges | 644 | 869 | 667 | 612 | 441 |
| Total earnings (loss) to cover fixed charges | $ (6,443) | $ (18,991) | $ 3,035 | $ 4,420 | $ 1,890 |
| Fixed charges: | | | | | |
| Total interest expense including capitalized interest | $ 469 | $ 659 | $ 434 | $ 428 | $ 298 |
| Interest portion of rental expenses | 175 | 210 | 233 | 184 | 143 |
| Total fixed charges | $ 644 | $ 869 | $ 667 | $ 612 | $ 441 |
| Preferred stock dividends and accretion | 167 | 28 | — | — | — |
| Ratio of earnings to combined fixed charges and preferred stock dividend requirements | — | — | 4.6 | 7.2 | 4.3 |
| Deficiency of earnings to cover combined fixed charges and preferred stock dividend requirements | $ 7,254 | $ 19,888 | — | — | — |

Fixed charges consist of interest expense on all indebtedness and that portion of operating lease rental expense that is representative of the interest factor.
Preferred stock dividend requirements consist of the amount of pre–tax earnings that is required to pay the dividends on outstanding preferred stock.

align=center>SELECTED PAGES OF
LUCENT TECHNOLOGIES
ANNUAL REPORT 2002

**LUCENT TECHNOLOGIES FINANCIAL REVIEW 2002**

**Management's Discussion and Analysis of Results of Operations and Financial Condition**

- Forward–Looking Statements — 6
- Overview — 6
- Application of Critical Accounting Policies — 7
- Results of Operations — 9
- Liquidity and Capital Resources — 15
- Risk Management — 18

**Five–Year Summary of Selected Financial Data** — 20

**Report of Management and Report of Independent Accountants** — 21

**Consolidated Financial Statements**

- Consolidated Statements of Operations — 22
- Consolidated Balance Sheets — 23
- Consolidated Statements of Changes in Shareowners' (Deficit) Equity — 24
- Consolidated Statements of Cash Flows — 25

**Notes to Consolidated Financial Statements**

- Summary of Significant Accounting Policies — 26
- Business Restructuring Charges and Asset Impairments, Net — 28
- Discontinued Operations — 30
- Business Dispositions and Combinations — 31
- Supplementary Financial Information — 33
- Earnings (Loss) Per Common Share — 34
- Comprehensive Income (Loss) — 34
- Income Taxes — 35
- Debt Obligations — 36
- Redeemable Convertible Preferred Stock — 37
- Employee Benefit Plans — 37
- Stock Compensation Plans — 40
- Operating Segments — 42
- Financial Instruments — 44
- Securitizations and Transfers of Financial Instruments — 46
- Accounting Changes — 47
- Commitments and Contingencies — 47
- Recent Pronouncements — 50
- Quarterly Information (Unaudited) — 51

**MANAGEMENT'S DISCUSSION AND ANALYSIS**
of Results of Operations and Financial Condition

## FORWARD-LOOKING STATEMENTS

This Management's Discussion and Analysis of Results of Operations and Financial Condition ("MD&A") contains forward-looking statements that are based on current expectations, estimates, forecasts and projections about us, our future performance, the industries in which we operate, our beliefs and our management's assumptions. In addition, other written or oral statements that constitute forward-looking statements may be made by or on behalf of us. Words such as "expects," "anticipates," "targets," "goals," "projects," "intends," "plans," "believes," "seeks," "estimates," variations of such words and similar expressions are intended to identify such forward-looking statements. These statements are not guarantees of future performance and involve certain risks, uncertainties and assumptions that are difficult to predict. Therefore, actual outcomes and results may differ materially from what is expressed or forecasted in such forward-looking statements. These risks and uncertainties include: the failure of the telecommunications market to improve or improve at the pace we anticipate; continued net losses may reduce or impair our legally available surplus; our ability to realize the benefits we expect from our strategic direction and restructuring program; our ability to secure additional sources of funds on reasonable terms; our credit ratings; our ability to compete effectively; our reliance on a limited number of key customers; our exposure to the credit risk of our customers as a result of our vendor financing arrangements and accounts receivable; our reliance on third parties to manufacture most of our products; the cost and other risks inherent in our long-term sales agreements; our product portfolio and ability to keep pace with technological advances in our industry; the complexity of our products; our ability to retain and recruit key personnel; existing and future litigation; our ability to protect our intellectual property rights and the expenses we may incur in defending such rights; changes in environmental health and safety law; changes to existing regulations or technical standards; the social, political and economic risks of our foreign operations; the impact if our common stock is de-listed from the New York Stock Exchange; and the costs and risks associated with our pension and postretirement benefit obligations. For a further list and description of such risks and uncertainties, see the reports filed by us with the Securities and Exchange Commission. Except as required under the federal securities laws and the rules and regulations of the SEC, we do not have any intention or obligation to update publicly any forward-looking statements after the distribution of this MD&A, whether as a result of new information, future events, changes in assumptions, or otherwise.

## OVERVIEW

We design and deliver networks for the world's largest communications service providers. Backed by Bell Labs research and development, we rely on our strengths in mobility, optical, data and voice networking technologies, as well as software and services, to develop next-generation networks. Our systems, services and software are designed to help customers quickly deploy and better manage their networks and create new, revenue-generating services that help businesses and consumers.

Beginning in fiscal 2001, the global telecommunications market deteriorated, reflecting a significant decrease in the competitive local exchange carrier market and a significant reduction in capital spending by established service providers. This trend intensified during fiscal 2002. We believe that large service providers, primarily in the wireline market, have reduced their capital spending by more than 25% since the end of 2001. The U.S. wireline service provider capital spending declined by about 40%. Additional capital spending reductions may occur during 2003. Reasons for this reduction include the general economic slowdown, network overcapacity, customer bankruptcies, network build-out delays and limited capital availability. As a result, our sales and results of operations have been and may continue to be adversely affected. The significant slowdown in capital spending has created uncertainty as to the level of demand in our target markets. In addition, the level of demand can change quickly and can vary over short periods of time, including from month to month. As a result of the uncertainty and variations in our markets, accurately forecasting future results, earnings and cash flow is increasingly difficult.

As discussed in more detail throughout our MD&A:

- our results of operations during the past two years were adversely affected by the rapid and sustained deterioration of the telecommunications market. After several years of significant growth, our revenues declined during fiscal 2002 and 2001 by 42% and 26%, respectively, as compared to the respective prior year. The significant reduction in capital spending by service providers, among other factors, contributed to this decline;

- our gross margin rates, which historically had been at least 40%, declined to 12.6% and 9.7% during fiscal 2002 and 2001, respectively. The significant and rapid decline in revenue from decreased market demand and product line discontinuances led to significant inventory charges and high-unabsorbed fixed costs, which, among other factors, adversely affected our gross margin rates;

- we were able to reduce our operating expenses as a result of cost reductions under our restructuring actions; however, these actions resulted in net business restructuring and asset impairment charges of $2.3 billion and $10.2 billion during fiscal 2002 and 2001, respectively;

- we recorded significant provisions for bad debts and customer financings of $1.3 billion and $2.2 billion during fiscal 2002 and 2001, respectively, as a result of the significant deterioration of the financial health of certain customers. Most of these provisions were related to commitments made and loans drawn under our customer-financing program during prior years; and

- we recorded a full valuation allowance on our net deferred tax assets during fiscal 2002, which resulted in a tax provision of $4.8 billion despite a pre-tax loss from continuing operations of $7.1 billion.

MANAGEMENT'S DISCUSSION AND ANALYSIS

All of these factors contributed significantly to our loss from continuing operations of $11.8 billion and $14.2 billion during fiscal 2002 and 2001, respectively. The fiscal 2001 results were also adversely affected by $3.2 billion of net losses from discontinued operations, which primarily related to our share of Agere's estimated losses through the June 1, 2002 spinoff date. We also completed several dispositions during the past two years, the most significant being the sale of our optical fiber business ( " OFS " ), resulting in a $664 million gain during fiscal 2002. Our dispositions did not have a significant effect on our results from continuing operations, except for the sale of OFS, which had revenues of $2.0 billion and pretax income of $541 million during fiscal 2001.

In fiscal 2002, we restructured our operations into distinct wireline and wireless units, and targeted the large service providers in each segment. We believe structuring our business along customer lines – wireline and wireless – enables us to better serve the needs of our large service provider customers.

Our wireline segment, Integrated Network Solutions ( " INS " ), focuses on global wireline service providers, including long distance carriers, traditional local telephone companies and Internet service providers. INS primarily sells and services core switching and access and optical networking products. Our wireless segment, Mobility Solutions ( " Mobility " ), offers products to support the needs of its customers for radio access and core networks and primarily sells and services wireless products to wireless service providers. Both segments offer network management and application and service delivery products. We support these two new segments through a number of central organizations, including our services organization and corporate headquarters. Manufacturing and supply chain functions are part of a single global supply chain network organization that manages the materials and activities necessary to produce and deliver products to our customers.

During this prolonged market downturn, we have worked closely with our customers to position the full breadth of our products and services, significantly reducing our cost structure and reducing our quarterly earnings per share ( " EPS " ) breakeven revenue figure. If capital investment levels continue to decline, or if the telecommunications market does not improve or improves at a slower pace than we anticipate, our revenues and profitability will continue to be adversely affected. We are financially planning for our revenues to decline by about 20% during fiscal 2003. However, our results are expected to improve by realizing higher gross margin rates and lower operating expenses resulting from improved product mix, cost reductions related to our restructuring actions, lower inventory–related charges, and lower provisions for bad debts and customer financings.

## APPLICATION OF CRITICAL ACCOUNTING POLICIES

Our consolidated financial statements are based on the selection and application of significant accounting policies, which require management to make significant estimates and assumptions. We believe that the following are some of the more critical judgment areas in the application of our accounting policies that affect our financial condition and results of operations.

The impact of changes in the estimates and judgments pertaining to revenue recognition, receivables and inventories is directly reflected in our segments' operating loss. Although any charges related to our net deferred tax assets and goodwill and other acquired intangibles are not reflected in the segment results, the long–term forecasts supporting the realization of those assets and changes in them are significantly affected by the actual and expected results of each segment. Generally, the changes in estimates related to pension and postretirement benefits, our restructuring program and litigation will not affect our segment results, although execution of the restructuring plans by each segment may cause related changes in the estimates.

We have discussed the application of these critical accounting policies with our board of directors and Audit and Finance Committee. There was no initial adoption of any accounting policies during fiscal 2002. See Note 18 to the consolidated financial statements for recent accounting pronouncements.

### Revenue recognition

Most of our sales are generated from complex contractual arrangements, which require significant revenue recognition judgments, particularly in the areas of multiple element arrangements and collectibility. Revenues from contracts with multiple element arrangements, such as those including installation and integration services, are recognized as each element is earned based on objective evidence of the relative fair value of each element and when there are no undelivered elements that are essential to the functionality of the delivered elements. We have determined that the customer or a third party can install most of our equipment, and as a result, revenue may be recognized upon delivery of the equipment, provided all other revenue recognition criteria are met. The assessment of collectibility is particularly critical in determining whether revenues should be recognized in the current market environment. As part of the revenue recognition process, we determine whether trade and notes receivable are reasonably assured of collection based on various factors, including our ability to sell those receivables and whether there has been deterioration in the credit quality of our customers that could result in our being unable to collect or sell the receivables. In situations where we have the ability to sell the receivable, revenue is recognized to the extent of the value we could reasonably expect to realize from the sale. We will defer revenue and related costs if we are uncertain as to whether we will be able to sell or collect the receivable. We will defer revenue but recognize costs when we determine that the collection or sale of the receivable is unlikely. For sales generated from long–term contracts, primarily those related to customized network solutions and network build–outs, we generally use the percentage of completion method of accounting. In doing so, we make important judgments in estimating revenue and cost and in measuring progress towards completion. These judgments underlie our determinations regarding overall contract value, contract profitability and timing of revenue recognition. Revenue and cost estimates are revised periodically based on changes in circumstances; any losses on contracts are recognized immediately. We also sell products through multiple distribution channels, including resellers and distributors. For products sold through these channels, revenue is generally recognized when the reseller or distributor sells the product to the end user. The total amount of deferred revenue, including deferrals relating to collectibility concerns, undelivered elements and multiple distribution channels was approximately $228 million and $550 million at September 30, 2002 and 2001, respectively.

7

MANAGEMENT'S DISCUSSION AND ANALYSIS

### Receivables and customer financing

We are required to estimate the collectibility of our trade receivables and notes receivable. A considerable amount of judgment is required in assessing the realization of these receivables, including the current creditworthiness of each customer and related aging of the past due balances. Our provisions for bad debts and customer financings during fiscal 2002, 2001, and 2000 amounted to approximately $1.3 billion, $2.2 billion, and $500 million, respectively. At September 30, 2002 and 2001, our receivables of $1.6 billion and $4.6 billion, respectively, included reserves of $325 million and $634 million, respectively. Under our customer financing program, there were approximately $950 million and $2.1 billion of reserves on the $1.1 billion and $3.0 billion of drawn commitments at September 30, 2002 and 2001, respectively. We evaluate specific accounts when we become aware of a situation where a customer may not be able to meet its financial obligations due to a deterioration of its financial condition, credit ratings or bankruptcy. The reserve requirements are based on the best facts available to us and re-evaluated and adjusted as additional information is received. Our reserves also are determined by using percentages applied to certain aged receivable categories. Significant increases in reserves have been recorded during fiscal 2002 and 2001, and may occur in the future due to the market environment. In addition, at September 30, 2002, we had approximately $500 million of net assets from long-term projects that have been winding down in Saudi Arabia (primarily long-term receivables included in other assets). We have concluded that these net assets are realizable based on our contractual rights and past collection history.

### Inventories

We are required to state our inventories at the lower of cost or market. In assessing the ultimate realization of inventories, we are required to make judgments as to future demand requirements and compare these with the current or committed inventory levels. Our reserve requirements generally increase as our projected demand requirements decrease due to market conditions, technological and product life cycle changes, and longer than previously expected usage periods. We have experienced significant changes in required reserves in recent periods due to changes in strategic direction, such as discontinuances of product lines, as well as declining market conditions. As a result, we incurred net inventory charges of approximately $620 million, $2.4 billion and $360 million during fiscal 2002, 2001 and 2000, respectively. At September 30, 2002 and 2001, inventories of $1.4 billion and $3.6 billion respectively, are net of reserves of approximately $1.4 billion and $1.1 billion, respectively. It is possible that significant changes in required inventory reserves may continue to occur in the future if there is a further decline in market conditions and if additional restructuring actions are taken.

### Income taxes

We currently have significant deferred tax assets resulting from tax credit carryforwards, net operating loss carryforwards and deductible temporary differences, which will reduce taxable income in future periods. At September 30, 2001 and continuing through March 31, 2002 we provided valuation allowances on future tax benefits with relatively short carryforward periods such as foreign tax credits, foreign net operating losses, capital losses and most state net operating losses. At that time, we believed it was more likely than not that the remaining net deferred tax assets of $5.2 billion at both September 30, 2001 and March 31, 2002 would be realized principally based upon forecasted taxable income, generally within the twenty-year research and development (" R&D ") credit and net operating loss carryforward periods, giving consideration to substantial benefits realized to date through our restructuring program. A valuation allowance is required when it is more likely than not that all or a portion of a deferred tax asset will not be realized. Forming a conclusion that a valuation allowance is not needed is difficult when there is negative evidence such as cumulative losses in recent years. Cumulative losses weigh heavily in the overall assessment. During the fiscal 2002 third quarter-end review, several significant developments were considered in determining the need for a full valuation allowance, including the continuing and recently more severe market decline, uncertainty and lack of visibility in the telecommunications market as a whole, a significant decrease in sequential quarterly revenue levels, a decrease in sequential earnings after several quarters of sequential improvement and the necessity for further restructuring and cost reduction actions to attain profitability. As a result of our assessment, we established a full valuation allowance for our remaining net deferred tax assets at June 30, 2002. During the fourth quarter of fiscal 2002, we maintained a full valuation allowance on our net deferred tax assets. Until we reach an appropriate level of profitability we do not expect to recognize any significant tax benefits in our future results of operations. Our income tax provision (benefit) included charges related to changes in valuation allowances of approximately $7.9 billion, $540 million and $40 million during fiscal 2002, 2001, and 2000, respectively. As of September 30, 2002 and 2001, our total valuation allowance on net deferred tax assets was approximately $10.0 billion and $740 million, respectively.

### Intangible assets

We currently have intangible assets, including goodwill and other acquired intangibles of $224 million and capitalized software development costs of $570 million. The determination of related estimated useful lives and whether these assets are impaired involves significant judgments based upon short and long-term projections of future performance. Certain of these forecasts reflect assumptions regarding our ability to successfully develop and ultimately commercialize acquired technology. Changes in strategy and/or market conditions may result in adjustments to recorded asset balances. For example, we had taken significant impairment charges, including $4.1 billion related to goodwill and other acquired intangibles and $362 million related to capitalized software under our restructuring program during fiscal 2001. During fiscal 2002, the continued and recently sharper decline in the telecommunications market prompted a re-assessment of all key assumptions underlying our goodwill valuation judgments, including those relating to short and longer-term growth rates. As a result of our analysis, during fiscal 2002 we determined that impairment charges of $975 million were required because the forecasted undiscounted cash flows were less than the book values of certain businesses. The charges were measured on the basis of comparison of estimated fair values with corresponding book values and relate primarily to goodwill recorded in connection with our September 2000 acquisition of Spring Tide Networks. Fair values were determined on the basis of discounted cash flows. In addition, in the fourth quarter of fiscal 2002, we recorded

8

**MANAGEMENT'S DISCUSSION AND ANALYSIS**

approximately $200 million of capitalized software impairments and $50 million in property, plant and equipment impairments, primarily as a result of delays and increasing uncertainties in the development of the universal mobile telecommunications systems ("UMTS") market. Goodwill and other acquired intangibles at September 30, 2002, is primarily related to our acquisition of Yurie Systems, Inc., which provides asynchronous transfer mode access equipment. We have concluded that this amount is realizable based upon projected undiscounted cash flows through 2006. Due to uncertain market conditions and potential changes in our strategy and product portfolio, it is possible that forecasts used to support our intangible assets may change in the future, which could result in additional non-cash charges that would adversely affect our results of operations and financial condition.

**Pension and postretirement benefits**

   We have significant pension and postretirement benefit costs and credits, which are developed from actuarial valuations. Inherent in these valuations are key assumptions, including discount rates and expected return on plan assets, which are usually updated on an annual basis at the beginning of each fiscal year. We are required to consider current market conditions, including changes in interest rates, in making these assumptions. Changes in the related pension and postretirement benefit costs or credits may occur in the future due to changes in the assumptions. The key assumptions used in developing our fiscal 2002 net pension and postretirement benefit credit were a 7% discount rate, a 9% expected return on plan assets and a 4.5% rate of compensation increase. These were consistent with the prior year assumptions except that the discount rate was reduced by one–half of a percent due to current market conditions. Compared with the prior year, our net pension and postretirement benefit credit in fiscal 2002 was reduced by $111 million to $972 million, excluding the impact of restructuring actions. Our net pension and postretirement benefit credit is expected to be reduced to approximately $500 million during fiscal 2003, primarily as a result of lower plan assets, a reduction in the discount rate from 7% to 6.5%, a reduction in the expected return on plan assets from 9% to 8.5% for pensions and from 9% to 7.93% for postretirement benefits. Holding all other assumptions constant, a one–half percent increase or decrease in the discount rate would have increased or decreased annual fiscal 2002 pre–tax loss by approximately $125 million. Likewise, a one–half percent increase or decrease in the expected return on plan assets would have increased or decreased annual fiscal 2002 pre–tax loss by $200 million.

   In addition, the estimated accumulated benefit obligation ("ABO") related to the U.S. management employees pension plan, as well as several other smaller pension plans, exceeded the fair value of the plan assets at September 30, 2002. This was due primarily to negative returns on the pension funds as a result of the overall decline in the equity markets and a decline in the discount rate used to estimate the pension liability as a result of declining interest rates in the U.S. Therefore, we were required to establish a minimum liability and record a $2.9 billion direct charge to equity for the difference to the extent the minimum liability exceeded the unrecognized prior service cost. Market conditions and interest rates significantly impact future assets and liabilities of our pension plans, and similar charges might be required in the future upon measurement of plan obligations which are usually completed by us at the end of a fiscal year.

   We expect to have minimal, if any, cash requirements related to our pension and postretirement benefit plans during fiscal 2003. However during fiscal 2004, it is likely that we will be required to fund some portion of retiree health benefits and, depending on market conditions, we may be required to make a contribution to the pension plan of our U.S. management employees. Although it is difficult to estimate these potential fiscal 2004 cash requirements due to uncertain market conditions, we currently expect that the cash requirements for the retiree health benefits would be approximately $350 million. For more information, see the detailed risk factor included in our Form 10–K for the year ended September 30, 2002.

**Business restructuring**

   During fiscal 2002 and 2001, we recorded significant charges in connection with our restructuring program. The related reserves reflect many estimates, including those pertaining to separation costs, inventory, settlements of contractual obligations and proceeds from asset sales. We reassess the reserve requirements to complete each individual plan under our restructuring program at the end of each reporting period. Actual experience has been and may continue to be different from these estimates. For example, we revised our estimates for certain fiscal 2001 restructuring plans during fiscal 2002 which resulted in a net credit of $333 million. As of September 30, 2002 and 2001, liabilities associated with our restructuring program were $1.1 billion and $1.6 billion, respectively. For more information, see Note 2 to the consolidated financial statements.

**Legal contingencies**

   We are subject to proceedings, lawsuits and other claims, including proceedings under laws and government regulations related to securities, environmental, labor, product and other matters. We are required to assess the likelihood of any adverse judgments or outcomes to these matters, as well as potential ranges of probable losses. A determination of the amount of reserves required, if any, for these contingencies is based on a careful analysis of each individual issue with the assistance of outside legal counsel. The required reserves may change in the future due to new developments in each matter or changes in approach such as a change in settlement strategy in dealing with these matters. For more information, see Note 17 to the consolidated financial statements.

**RESULTS OF OPERATIONS**

**Revenues**

   The following table presents our U.S. and non–U.S. revenues and the approximate percentage of total revenues (dollars in millions):

|  | *Years ended September 30,* | | |
|  | 2002 | 2001 | 2000 |
| U.S. revenues | $   8,148 | $   13,776 | $   19,829 |
| Non–U.S. revenues | 4,173 | 7,518 | 9,075 |
| Total revenues | $   12,321 | $   21,294 | $   28,904 |

|  | *As a percentage of total revenues* | | |
| U.S. revenues | 66.1% | 64.7% | 68.6% |

| | | | |
|---|---|---|---|
| Non–U.S. revenues | - | 33.9% | 35.3% | 31.4% |
| Total revenues | | 100.0% | 100.0% | 100.0% |

9

MANAGEMENT'S DISCUSSION AND ANALYSIS

*Fiscal 2002 vs. 2001*

Continued reductions in capital spending in fiscal 2002 by service providers, primarily affecting our INS segment, and business dispositions were the primary reasons for the lower revenues in fiscal 2002 than in fiscal 2001. The revenue decline resulting from business dispositions was $2.3 billion for fiscal 2002, of which approximately 84% was a result of the sale of the OFS business in the first quarter of fiscal 2002. The impact of product rationalizations and discontinuances under our restructuring program has not had a significant effect on our overall trend of revenues.

*Fiscal 2001 vs. 2000*

A significant decrease in the competitive local exchange carrier ("CLEC") market and a significant reduction in capital spending by service providers were the primary reasons for the decline in revenues. In addition, we implemented a more selective customer-financing program, which also had a negative impact on revenues. In December 1999, the Securities and Exchange Commission issued Staff Accounting Bulletin 101, "Revenue Recognition in Financial Statements" ("SAB 101"). SAB 101 provides guidance on the recognition, presentation and disclosure of revenues in financial statements. The adoption of SAB 101 in fiscal 2001 did not have a significant impact on revenues or the comparability of results of operations for the periods presented (see Note 16 to the consolidated financial statements).

**Gross Margin**

The following table presents our gross margin and the percentage to total revenues (dollars in millions):

|  | Years ended September 30, | | |
|  | 2002 | 2001 | 2000 |
|---|---|---|---|
| Gross margin | $ 1,552 | $ 2,058 | $ 11,714 |
| Gross margin rate | 12.6% | 9.7% | 40.5% |

Inventory and other charges negatively affected the gross margin rate in fiscal 2002 and 2001 by approximately 13 percentage points and 11 percentage points, respectively. The total dollar amount of charges was lower in fiscal 2002, primarily due to lower inventory levels resulting from our strategy of focusing on large service providers, our restructuring program and improved inventory management. However, due to the significant revenue decline in fiscal 2002, the charges had a greater impact on the gross margin rate. These charges were primarily related to items or events associated with customers experiencing financial difficulties and in some cases declaring bankruptcy or becoming insolvent, costs associated with supplier and customer contract settlements, higher provisions for slow-moving and obsolete inventory, adjustments to certain long-term projects and higher than expected costs due to certain customer obligations and product performance issues.

During fiscal 2002 and 2001, we recorded $64 million and $1.2 billion, respectively, of inventory charges associated with product line rationalizations and product line discontinuances under our restructuring program. These inventory charges negatively affected the gross margin rate for fiscal 2002 and 2001 by 1 percentage point and 6 percentage points, respectively. Our product mix in fiscal 2002 was adversely affected by the sale of OFS.

Also, significant reductions in capital spending by service providers reduced sales volumes across all product lines and services more quickly than the reduction in our fixed costs, which resulted in less absorption of fixed costs. The net change in unabsorbed fixed costs as well as all other factors affecting gross margin, including changes in geographic and product mix, negatively affected the gross margin rate for fiscal 2002 and 2001.

**Operating Expenses**

The following table presents our operating expenses (dollars in millions):

|  | Years ended September 30, | | |
|  | 2002 | 2001 | 2000 |
|---|---|---|---|
| Selling, general and administrative ("SG&A") expenses, excluding the following two items | $ 2,466 | $ 4,240 | $ 4,743 |
| Provision for bad debts and customer financings | 1,253 | 2,249 | 505 |
| Amortization of goodwill and other acquired intangibles | 250 | 921 | 362 |
| Total SG&A | 3,969 | 7,410 | 5,610 |
| Research and development ("R&D") | 2,310 | 3,520 | 3,179 |
| Purchased in-process research and development ("IPRD") | — | — | 559 |
| Business restructuring charges and asset impairments, net | 2,252 | 10,157 | — |
| **Operating expenses** | $ 8,531 | $ 21,087 | $ 9,348 |

*SG&A expenses*

Excluding provisions for bad debts and customer financings and amortization of goodwill and other acquired intangibles, SG&A expenses decreased by 41.8% during fiscal 2002 as compared with fiscal 2001 and decreased by 10.6% in fiscal 2001 as compared with fiscal 2000. The decreases in fiscal 2002 and 2001 were primarily a result of headcount reductions under our restructuring program and other cost savings initiatives that limited discretionary spending. Approximately 80% of the fiscal 2002 reductions were in the INS segment due to the greater degree of product rationalization efforts in INS as well as the required cost reductions due to the significant INS revenue decline.

*Provision for bad debts and customer financings*

Many of our customers have been negatively affected by the continued decline in telecommunications market conditions. As a result, the creditworthiness of certain customers has declined, resulting in some having to file for bankruptcy protection or having been declared insolvent. As a result, we have provided reserves for certain trade and notes receivable and sold others at significant discounts in the periods presented. We may have to record additional reserves or write-offs in the future.

*Fiscal 2002 vs. 2001*

During fiscal 2002, $765 million of provisions related to customer financings with the balance relating to trade receivables. Approximately one-third of the provision for customer financings was related to one customer that defaulted under the terms and conditions of its customer financing agreement. Approximately 55% of the total provisions

10

MANAGEMENT'S DISCUSSION AND ANALYSIS

were related to INS customers and 39% were related to Mobility customers. The remaining provisions were not related to reportable segments.

### *Fiscal 2001 vs. 2000*

The deterioration of the creditworthiness of certain customers resulted in higher provisions for bad debts and customer financings in fiscal 2001 as compared with fiscal 2000. Provisions for three customer financings, including provisions for amounts due from One.Tel and Winstar, accounted for approximately 60% of fiscal 2001 expense. On April 18, 2001, Winstar filed for Chapter 11 bankruptcy protection, and in late May 2001, One.Tel filed for voluntary administration (bankruptcy). Approximately 63% of the total provisions were related to INS customers and 34% were related to Mobility customers. The remaining provisions were not related to reportable segments.

### *Amortization of goodwill and other acquired intangibles*

### *Fiscal 2002 vs. 2001*

Amortization of goodwill and other acquired intangibles was significantly lower in fiscal 2002 as compared with fiscal 2001 as a result of restructuring actions committed to in fiscal 2001 that reduced total goodwill and other acquired intangibles by $4.1 billion, primarily related to the discontinuance of the Chromatis Networks, Inc. product portfolio. In addition, as a result of the continued downturn in the telecommunications market during fiscal 2002, impairment charges of $975 million were recognized in fiscal 2002, primarily related to goodwill associated with Spring Tide.

### *Fiscal 2001 vs. 2000*

The full-year effect of the acquisitions of Chromatis in June 2000 and Spring Tide in September 2000 were the primary reasons for the increase in the amortization of goodwill and other acquired intangibles in fiscal 2001 as compared with fiscal 2000.

### R&D

### *Fiscal 2002 vs. 2001*

The decrease in R&D expenses in fiscal 2002 as compared with fiscal 2001 was primarily due to headcount reductions and product rationalizations under our restructuring program. Approximately 75% of the fiscal 2002 reductions were in the INS segment due to the greater degree of product rationalizations in INS.

During fiscal 2002, 53% of our R&D was attributable to our INS segment, and most of the remaining amounts were attributable to our Mobility segment. The INS spending was primarily related to next-generation products, including optical products for both long haul and metro networks, multi-service switches that can handle both Internet protocol services and multiple network traffic protocols, network operations software solutions, and digital subscriber line products. The Mobility spending was primarily related to code division multiple access ("CDMA") and UMTS next-generation technologies.

### *Fiscal 2001 vs. 2000*

The increase in R&D expenses for fiscal 2001 as compared with fiscal 2000 was primarily due to acquisitions made late in fiscal 2000 and new product development, particularly in next-generation optical networking and wireless products, partially offset by headcount reductions and product rationalizations under our restructuring program.

During fiscal 2001, 60% of our R&D was attributable to our INS segment and most of the remaining amounts were attributable to our Mobility segment.

### IPRD

In connection with the acquisitions in fiscal 2000 of Chromatis and Spring Tide, we allocated non-tax impacting charges of $428 million and $131 million, respectively, of the total purchase price to IPRD. As part of the process of analyzing each of these acquisitions, we made a decision to buy technology that had not yet been commercialized rather than develop the technology internally. We based this decision on a number of factors, including the amount of time it would take to bring the technology to market. We also considered Bell Labs' resource allocation and its progress on comparable technology, if any. We expect to use the same decision process in the future.

On June 28, 2000, we completed the purchase of Chromatis. Chromatis was involved in the development of next-generation optical transport solutions that provide telecommunications carriers with improvements in the cost, efficiency, scale and management of multi-service metropolitan networks. At the acquisition date, costs to complete the research and development efforts related to the product were expected to be $7.8 million. A risk-adjusted discount rate of 25% was used to discount projected cash flows. As part of our restructuring program in fiscal 2001, the Chromatis product portfolio was discontinued and all of the remaining assets, primarily goodwill and other acquired intangibles, were written off (see Note 2 to the consolidated financial statements).

On September 19, 2000, we completed the purchase of Spring Tide. Spring Tide was involved in the development of carrier-class network equipment that enables service providers to offer new, value-added Internet protocol ("IP") services and virtual private networks with low cost and complexity. At the acquisition date, costs to complete the research and development efforts related to the product were expected to be $0.5 million and $4.3 million in fiscal 2000 and 2001, respectively. A risk-adjusted discount rate of 25% was used to discount projected cash flows. In fiscal 2002, our remaining goodwill from the acquisition of Spring Tide was written off.

We estimated the fair value of IPRD for each of the above acquisitions using an income approach. This involved estimating the fair value of the IPRD using the present value of the estimated after-tax cash flows expected to be generated by the IPRD, using risk-adjusted discount rates and revenue forecasts as appropriate. The selection of the discount rate was based on consideration of our weighted average cost of capital, as well as other factors, including the expected useful life of each technology, estimated profitability levels of each technology, the uncertainty of technology advances that were known at the time, and the stage of completion of each technology. We believe that the estimated IPRD amounts so determined represented fair value and did not exceed the amount a third party would pay for the projects.

MANAGEMENT'S DISCUSSION AND ANALYSIS

Where appropriate, we deducted an amount reflecting the contribution of the core technology from the anticipated cash flows from an IPRD project. At the date of acquisition, the IPRD projects had not yet reached technological feasibility and had no alternative future uses. Accordingly, the value allocated to these projects was capitalized and immediately expensed at acquisition.

*Business restructuring charges and asset impairments, net*

Since beginning our restructuring program during the second quarter of fiscal 2001, we have realigned our resources to focus on the opportunities that we currently believe to be the most profitable for us – the large service provider market. We evaluated our manufacturing operations and decided to sell or otherwise lease certain of our manufacturing facilities and make greater use of contract manufacturers. We assessed our product portfolio and associated R&D, made decisions based on the needs of our largest service provider customers, deployed our resources to meet those needs and then streamlined the rest of our operations to support those reassessments. We eliminated some marginally profitable or non–strategic product lines, merged certain technology platforms, consolidated development activities, eliminated management positions and eliminated many duplications in marketing functions and programs, and centralized our sales support functions, which resulted in reduced associated product development costs. We sold the assets relating to a number of product lines whose products did not support our large service provider customers or our strategy. We closed facilities and reduced the workforces in many of the countries that we operated in at the end of fiscal 2000. As a result we incurred net business restructuring charges and asset impairments in fiscal 2001 of $11.4 billion. Due to continuing market declines in fiscal 2002, we committed to additional restructuring actions that resulted in net business restructuring charges and asset impairments of $1.3 billion. These actions are designed to enable us to achieve a cost structure that will result in EPS breakeven at a quarterly revenue level in late fiscal 2003 of $2.5 billion with a targeted gross margin rate of 35%. We generally expect to complete each restructuring plan within 12 months of committing to it.

During fiscal 2002, we recorded in operating expenses net business restructuring charges and related asset impairments of $1.3 billion and other impairment charges of $975 million, primarily related to Spring Tide's goodwill. This compares to $10.2 billion of net business restructuring charges and asset impairments recorded during fiscal 2001. We believe the restructuring actions committed to in fiscal 2001 will yield annual cost savings of approximately $5.0 billion, $4.0 billion of which will be reflected in operating expenses. We began to realize the full effect of these cost savings during the second quarter of fiscal 2002. In fiscal 2002, we committed to additional restructuring actions, primarily in the third and fourth quarters. These actions are expected to yield additional cost savings of approximately $2.0 billion, $1.4 billion of which is expected from reduced operating expenses. See Note 2 to the consolidated financial statements for more information.

**Other Income (Expense), Net**

Other income (expense), net consisted of the following items (dollars in millions):

| | Years ended September 30, | | |
|---|---|---|---|
| | **2002** | **2001** | **2000** |
| Interest income | $   114 | $   255 | $   118 |
| Minority interests in earnings of consolidated subsidiaries | (12) | (81) | (50) |
| Net income (loss) from equity method investments | 14 | (60) | (31) |
| Other–than–temporary write–downs of investments | (209) | (266) | (14) |
| Loss on foreign currency transactions | (46) | (58) | (18) |
| Net gains on sales of businesses | 725 | 56 | 30 |
| Legal settlements | (212) | — | — |
| Net gains (losses) on sales and settlements of financial instruments | (22) | 18 | 347 |
| Write–off of embedded derivative assets | — | (42) | — |
| Miscellaneous, net | (60) | (179) | (49) |
| **Other income (expense), net** | $   292 | $   (357) | $   333 |

*Fiscal 2002*

Other income (expense), net included $725 million of gains from business dispositions, $664 million of which was from the sale of the OFS business and China joint ventures, and interest income of $114 million related to our cash and cash equivalents. This was partially offset by a legal settlement of $162 million related to our former consumer products telephone leasing business and a $50 million purchase price adjustment to settle a claim with VTech Holdings Limited and VTech Electronics Netherlands B.V., and other–than–temporary investment write–downs of $209 million, primarily related to our investment in Commscope.

*Fiscal 2001*

Other income (expense), net primarily included other–than–temporary write–downs on several of our investments due to adverse market conditions and net losses from minority interests and equity method investments, offset in part by interest income. The write–off of the embedded derivative assets was primarily related to One.Tel.

*Fiscal 2000*

In fiscal 2000, other income (expense), net primarily included interest income and net gains on sales and settlements of financial instruments, including equity investments.

**Interest Expense**

*Fiscal 2002 vs. 2001*

Interest expense for fiscal 2002 decreased to $382 million as compared with $518 million for fiscal 2001. The decrease resulted from a significant reduction in short-term debt, partially offset by interest expense related to our trust preferred securities, which were issued in March 2002.

12

MANAGEMENT'S DISCUSSION AND ANALYSIS

*Fiscal 2001 vs. 2000*

Despite lowering debt levels by approximately $2.1 billion in the latter half of fiscal 2001, interest expense increased to $518 million as compared with $342 million for fiscal 2000. The increase in interest expense was due to higher weighted average short–term debt levels, primarily related to borrowings under our credit facilities. In addition, interest expense in fiscal 2001 included the amortization of fees associated with entering into our credit facility arrangements.

**Provision (Benefit) for Income Taxes**

The following table presents our provision (benefit) for income taxes and the related effective tax (benefit) rates (dollars in millions):

|  | Years ended September 30, | | |
|  | 2002 | 2001 | 2000 |
|---|---|---|---|
| Provision (benefit) for income taxes | $ 4,757 | $ (5,734) | $ 924 |
| Effective tax (benefit) rate | 67.3% | (28.8)% | 39.2% |

As discussed in more detail under "APPLICATION OF CRITICAL ACCOUNTING POLICIES,", "the effective tax rate for fiscal 2002 was significantly more than the U.S. statutory rate primarily due to providing for a full valuation allowance on our net deferred tax assets and not reflecting any significant tax benefits for the current fiscal year's losses.

The effective tax benefit rate for fiscal 2001 was lower than the U.S. statutory rate, primarily from the impact of non–tax deductible goodwill amortization, certain non–tax deductible business restructuring charges and asset impairments, as well as an increase in our deferred tax valuation allowances, all of which decreased the effective tax benefit rate. Such decrease was offset in part by research and development tax credits, which increased the effective tax benefit rate on the pre–tax loss.

The effective tax rate exceeded the U.S. statutory rate for fiscal 2000, primarily due to the write–offs of IPRD costs that were not deductible for tax purposes.

**Income (Loss) from Continuing Operations**

As a result of the above, income (loss) from continuing operations and related per share amounts are as follows (amounts in millions, except per share amounts):

|  | Years ended September 30, | | |
|  | 2002 | 2001 | 2000 |
|---|---|---|---|
| Income (loss) from continuing operations | $ (11,826) | $ (14,170) | $ 1,433 |
| Basic earnings (loss) per share from continuing operations | $ (3.51) | $ (4.18) | $ 0.44 |
| Diluted earnings (loss) per share from continuing operations | $ (3.51) | $ (4.18) | $ 0.43 |
| Weighted average number of common shares outstanding – basic | 3,426.7 | 3,400.7 | 3,232.3 |
| Weighted average number of common shares outstanding – diluted | 3,426.7 | 3,400.7 | 3,325.9 |

**Income (Loss) from Discontinued Operations, Net**

Income (loss) from discontinued operations, net for fiscal 2002, 2001 and 2000 was $73 million or $0.02 per basic and diluted share, ($3.2) billion or ($0.93) per basic and diluted share and ($214) million or ($0.06) per basic and diluted share, respectively (see Note 3 to the consolidated financial statements).

**Extraordinary Gain, Net**

During fiscal 2001, we recorded a gain of $1.2 billion, net of a $780 million tax provision, or $0.35 per basic and diluted share, from the sale of our power systems business.

**Cumulative Effect of Accounting Changes, Net**

Effective October 1, 2000, we recorded a net $38 million charge for the cumulative effect of certain accounting changes. This was comprised of a $30 million earnings credit ($0.01 per basic and diluted share) from the adoption of Statement of Financial Accounting Standards No.133, "Accounting for Derivative Instruments and Hedging Activities," and a $68 million charge to earnings ($0.02 per basic and diluted share) from the adoption of SAB 101.

**Results of Operations by Segment**

*INS*

The following table presents external revenues, U.S. and non–U.S., and operating income (loss) (dollars in millions):

*Years ended September 30,*

|  | 2002 | 2001 | 2000 |
|---|---|---|---|
| U.S. revenues | $  3,490 | $  7,065 | $  12,548 |
| Non–U.S. revenues | 2,925 | 5,198 | 6,106 |
| Total revenues | $  6,415 | $  12,263 | $  18,654 |
| Operating income (loss) | $  (2,769) | $  (4,724) | $  1,685 |
| Return on sales | (43.2%) | (38.5%) | 9.0% |

### Fiscal 2002 vs. 2001

During fiscal 2002, INS revenues declined by 47.7% as a result of continuing reductions and delays in capital spending by service providers. The decline was reflected in all product lines and geographic regions, except for China. The deterioration of creditworthiness or financial condition of certain service providers also adversely affected revenues, although to a much lesser degree. Approximately, 60% of the decline was in the United States, and about 40% was non–U.S., primarily in EMEA (Europe, Middle East, and Africa). The five largest INS customers represented about 40% of INS revenues during fiscal 2002, and accounted for about 45% of the revenue decline as compared with fiscal 2001.

During fiscal 2002, the operating loss declined by $2.0 billion to an operating loss of approximately $2.8 billion. The $2.8 billion operating loss was driven by a 2.2% gross margin rate and $2.9 billion of operating expenses, which included $683 million of provisions for bad debts. The INS gross margin rate continues to be under significant pressure

13

MANAGEMENT'S DISCUSSION AND ANALYSIS

and declined from 10.3% in fiscal 2001 to 2.2% in fiscal 2002. The low gross margin rates were primarily a result of unabsorbed fixed costs as a result of significantly lower revenue levels, as well as significant inventory charges. The decline from fiscal 2001 was primarily due to the continued decrease in sales volume, partially offset by lower inventory charges and cost reductions. Operating expenses declined $3.1 billion, of which $2.3 billion resulted from headcount reductions and less discretionary spending. The remaining decrease was from a decrease in provisions for bad debts and customer financings of $742 million, primarily due to the significant charges incurred for amounts due from Winstar in the prior year.

### *Fiscal 2001 vs. 2000*

During fiscal 2001, INS revenues declined by 34%. The decline primarily resulted from reductions and delays in capital spending by large service providers and was reflected in all product lines. The most significant declines were in the U.S., especially associated with large service providers. Our five largest customers represented about 45% of INS revenues during fiscal 2001, and about 40% of the revenue decline as compared with revenues realized from those customers in fiscal 2000. The deterioration of creditworthiness or financial condition of certain service providers and CLECs also adversely affected revenues, although to a lesser degree. The decrease in non–U.S. revenues for fiscal 2001 was also attributable to the continued wind–down of a project with Saudi Telecommunications Company ("STC").

During fiscal 2001, the operating income (loss) declined by approximately $6.4 billion to a loss of $4.7 billion. Lower gross margin of $6.0 billion and higher operating expenses of $412 million drove this decline. The gross margin decrease resulted from a significant decline in the gross margin rate from 38.9% to 10.3%, primarily due to lower sales volume and significant inventory–related charges. The $412 million increase in operating expenses resulted from $993 million of higher provisions for bad debts and customer financings, partially offset by $581 million of lower expenses, primarily due to headcount reductions and less discretionary spending. The higher provisions for bad debts and customer financings primarily related to significant charges incurred for amounts due from Winstar.

### *Mobility*

The following table presents external revenues, U.S. and non–U.S., and operating income (loss) (dollars in millions):

| | Years ended September 30, | | |
| | 2002 | 2001 | 2000 |
| --- | --- | --- | --- |
| U.S. revenues | $ 4,315 | $ 4,929 | $ 4,913 |
| Non–U.S. revenues | 1,065 | 1,225 | 1,924 |
| Total revenues | $ 5,380 | $ 6,154 | $ 6,837 |
| Operating income (loss) | $ (655) | $ (1,517) | $ 939 |
| Return on sales | (12.2%) | (24.7%) | 13.7% |

### *Fiscal 2002 vs. 2001*

During fiscal 2002, Mobility revenues decreased by 12.6%. The decrease in the U.S. resulted primarily from reductions in capital spending by certain service providers. The decrease in non–U.S. revenues for fiscal 2002 resulted from reductions in revenues from One.Tel, which went into receivership during 2001, partially offset by higher revenues in the CALA (Caribbean and Latin America) and Asia Pacific regions primarily due to a loss of fiscal 2002 revenues from One.Tel, which went into receivership during 2001, partially offset by higher revenues in the China and EMEA regions. The five largest customers represented approximately 75% of Mobility revenues during fiscal 2002, and approximately 35% of the revenue decline compared with fiscal 2001. In addition, approximately 20% of the decline was related to lower revenues from a U.S. customer that defaulted on its customer financing commitment.

During fiscal 2002, the operating loss declined by $862 million to $655 million. Increases in gross margin of $188 million and decreases in operating expenses of $674 million drove the improvement. The gross margin rate increased from 21.0% to 27.5% due to lower inventory and warranty–related charges and cost reductions. However, the gross margin rate in fiscal 2002 was still affected by these charges. The reduction in operating expenses resulted from a reduction in provisions for bad debts and customer financings of $278 million, as well as a reduction in other operating expenses of $396 million, primarily related to headcount reductions and less discretionary spending. In fiscal 2002, approximately 50% of Mobility's provisions for bad debts and customer financings was due to the one customer that defaulted on its customer financing commitment. In fiscal 2001, Mobility incurred significant provisions for bad debts and customer financings for amounts due from One.Tel and another customer that experienced financial difficulties.

### *Fiscal 2001 vs. 2000*

During fiscal 2001, Mobility revenues decreased by 10%. The decrease primarily resulted from lower non–U.S. revenues due to the wind–down of various projects and certain customers that experienced financial difficulties, including a loss of revenues from One.Tel, which went into receivership during the third fiscal quarter of 2001. Revenues from our five largest customers represented about 70% of Mobility revenues during fiscal 2001 and were slightly higher as compared with the revenues realized from those customers in fiscal 2000.

During fiscal 2001, operating income (loss) declined by $2.5 billion to a loss of $1.5 billion. Lower gross margin of $1.5 billion and higher operating expenses of $960 million drove this decline. The gross margin rate decreased from 40.7% to 21.0% primarily due to lower sales volume and higher inventory and warranty–related charges. The $960 million increase in operating expenses primarily resulted from higher provisions for bad debts and customer financings of $696 million. Substantially all of the increase in provisions for bad debts and customer financings was related to One.Tel and one other customer with specific credit concerns for which financing was provided. Most of the remaining increases in operating expenses were primarily related to higher R&D expenses for next–generation CDMA and UMTS technology.

**MANAGEMENT'S DISCUSSION AND ANALYSIS**

## LIQUIDITY AND CAPITAL RESOURCES

### Cash Flow for the Years Ended September 30, 2002, 2001 and 2000

*Operating activities*

Net cash used in operating activities was $756 million for fiscal 2002. This primarily resulted from the loss from continuing operations of $2.9 billion (adjusted for non-cash items) and changes in other operating assets and liabilities of $2.4 billion, offset in part by a reduction in working capital requirements (accounts receivable, inventories and contracts in process and accounts payable) of $4.5 billion. The reduction in working capital primarily resulted from the significant decrease in sales volume during fiscal 2002 as compared with fiscal 2001. Consistent with the decrease in receivables of $2.5 billion, the average receivable days sales outstanding decreased from 80 days at September 30, 2001 to 77 days at September 30, 2002. In addition to reduced sales volume, the decline in inventory and contracts in process was also a result of our continued efforts to streamline inventory supply chain operations and higher billings for our long-term contracts. The changes in other operating assets and liabilities include cash outlays under our restructuring program of $1.0 billion and a reduction in other operating assets and liabilities due to the decrease in sales volume and lower headcount. Federal and state income tax refunds in fiscal 2002 amounted to approximately $1.0 billion including $616 million received in connection with changes to tax legislation.

Net cash used in operating activities was $3.4 billion for fiscal 2001. This primarily resulted from the loss from continuing operations (adjusted for non-cash items) of $6.6 billion, a decrease in accounts payable of $759 million and changes in other operating assets and liabilities of $602 million. Changes in other operating assets and liabilities primarily include a net increase in notes receivable and higher software development assets, offset in part by business restructuring liabilities. The increases in net cash used in operating activities were partially offset by decreases in receivables of $3.6 billion and in inventories and contracts in process of $881 million. Receivable improvement was largely due to improved collections and lower sales volumes in fiscal 2001 as compared with fiscal 2000. Average receivable days outstanding improved by 34 days from 114 days at September 30, 2000 to 80 days at September 30, 2001. Improvements in inventory and contracts in process resulted from streamlining inventory supply chain operations, as well as lower amounts in net contracts in process due to the wind-down of the STC project in Saudi Arabia.

Net cash used in operating activities was $703 million for fiscal 2000. This primarily resulted from increases in receivables of $1.6 billion and inventories and contracts in process of $2.2 billion and changes in other operating assets and liabilities of $1.8 billion. Changes in other operating assets and liabilities primarily include higher software development assets and decreases in accrued income tax and payroll- and benefit-related liabilities. Net cash used in operating activities was partially offset by income from continuing operations (adjusted for non-cash items) of $3.6 billion and tax benefits from stock options of $1.1 billion and an increase in accounts payable of $263 million. The receivable deterioration in fiscal 2000 resulted from slower collections, partially offset by smaller revenue growth in the fourth fiscal quarter of 2000 as compared with the same period in fiscal 1999. Average receivable days outstanding increased by 19 days to 114 days at September 30, 2000. The increase in inventories and contracts in process resulted from our increased production to meet current and anticipated sales commitments to customers and the start-up of several long-term projects.

*Investing activities*

The net cash provided by investing activities of $757 million for fiscal 2002 was primarily from the $2.6 billion of net cash proceeds received from the disposition of businesses and the sale of certain manufacturing operations, partially offset by $1.5 billion of purchases of short-term investments and capital expenditures of $449 million. Cash proceeds from dispositions primarily included the $2.1 billion received from the sale of our OFS businesses, $60 million from the sale of our voice enhancement and echo cancellation business, $93 million from the sale of New Venture Partners II LP, approximately $250 million from the sale of our billing and customer care business and $96 million from the sale of certain manufacturing operations to Solectron. The short-term investments primarily consisted of U.S. treasury bills and government agency notes, bank instruments and top tier corporate debt securities.

Net cash provided by investing activities was $2.0 billion for fiscal 2001 and was primarily from $2.5 billion in proceeds from the sale of the power systems business, $572 million from the sale of two of our manufacturing operations to Celestica and sales or disposals of property, plant and equipment of $177 million. These proceeds were partially offset by capital expenditures of $1.4 billion.

Net cash used in investing activities was $1.6 billion for fiscal 2000, primarily from capital expenditures of $1.9 billion and purchases of investments of $680 million, offset in part by proceeds from the sales or maturity of investments of $820 million and from the disposition of businesses of $250 million, largely related to the sale of the remaining consumer products business.

We currently expect about $400 million of capital expenditures during fiscal 2003, $100 million of which relates to the repurchase of certain real estate, under synthetic lease agreements we had in place as of September 30, 2002, which were designed to fund certain real estate construction costs. We expect to sell the property that we repurchased under the synthetic lease agreements during fiscal 2003, which may result in additional charges. We do not expect significant proceeds from business or asset dispositions.

*Financing activities*

Net cash provided by financing activities of $468 million for fiscal 2002 included $1.75 billion of proceeds from the sale of 7.75% convertible trust preferred securities in March 2002. Fees paid in connection with this transaction were approximately $46 million. Partially offsetting these proceeds were repayments under our credit facilities and other short-term borrowings of $1.1 billion and preferred stock dividend payments related to our 8% convertible redeemable preferred stock of $149 million.

15

MANAGEMENT'S DISCUSSION AND ANALYSIS

During September 2002, we repurchased approximately 175 thousand shares of 8% redeemable convertible preferred stock for approximately 58 million shares of our common stock. Since September 30, 2002, we have repurchased an additional 380 thousand shares of preferred stock for approximately 143 million shares of common stock. No gain or loss was recognized on these exchanges. The total carrying value of the preferred stock repurchased was approximately $555 million ($175 million was reflected as of September 30, 2002) and resulted in a corresponding increase to our common stock and additional paid–in capital. The fair value of the additional common shares issued to the preferred shareowners to prompt the exchange over the shares obligated for exchange pursuant to the original conversion terms amounted to $125 million ($29 million of which was recognized in fiscal 2002 and was included in the net loss applicable to the common shareowners). We may issue more common stock for similiar transactions in the future.

Net cash provided by financing activities for fiscal 2001 was $2.6 billion and was primarily due to net proceeds received from the issuance of 8% redeemable convertible preferred stock in August 2001 of $1.8 billion (a portion of the proceeds received were used to reduce borrowings under our credit facilities), net borrowings under our credit facilities of $3.5 billion ($2.5 billion of the debt associated with borrowings was assumed by Agere), and proceeds from a real estate debt financing of $302 million under which certain real estate was transferred to a separate, consolidated wholly–owned subsidiary. Borrowings under our credit facilities were used to fund our operations and to pay down $2.1 billion of short–term borrowings, which primarily represented commercial paper. We had no commercial paper outstanding as of September 30, 2001. In addition, we repaid the current portion of long–term debt that matured in July 2001 of $750 million. Dividends paid on our common stock in fiscal 2001 were $204 million.

Net cash provided by financing activities for fiscal 2000 of $2.2 billion resulted primarily from issuances of common stock related to the exercise of stock options of $1.4 billion and a net increase in short–term borrowings of $1.4 billion, partially offset by repayments of long–term debt of $387 million and common stock dividend payments of $255 million.

### Cash Requirements

Our cash requirements over the next 12 months are primarily to fund operations, including spending on R&D, our restructuring program, capital expenditures, capital requirements in connection with our existing customer financing commitments, and debt service and preferred stock dividend requirements. We expect to use cash to fund our operations in fiscal 2003. Although we believe we will realize additional cash savings upon completion of our restructuring actions, including a full year impact of those actions completed during fiscal 2002, these savings will be offset by less working capital reductions and income tax refunds that were realized in fiscal 2002. We expect to have minimal, if any, cash requirements related to our pension and postretirement benefit plans during fiscal 2003. For more information on these obligations, see the detailed risk factor included in our Form 10–K for the year ended September 30, 2002.

### *Restructuring*

Total cash requirements under the restructuring program since its inception are expected to be approximately $2.6 billion. Approximately $530 million was paid during fiscal 2001 and $1.0 billion was paid during fiscal 2002. The majority of the remaining $1.1 billion is expected to be paid in fiscal 2003, except for lease obligations of approximately $300 million, of which approximately $200 million would be paid in fiscal 2004 and 2005. Upon completion of the actions during fiscal 2003, we expect to realize annual cash savings of approximately $1.8 billion. These anticipated savings result primarily from reduced headcount. Our restructuring program may not achieve all of the cost and expense reductions and other benefits we anticipate and may not be completed on the timetable contemplated.

If we do not complete our restructuring program and achieve our anticipated expense reductions in the time frame we contemplate, our cash requirements to fund our operations are likely to be significantly higher than we currently anticipate. In addition, because market demand continues to be uncertain and because we are currently implementing our restructuring program and business strategy, it is difficult to estimate our ongoing cash requirements. Our restructuring program may also have other unanticipated adverse effects on our business.

### *Customer financing commitments*

The following table presents our customer financing commitments at September 30, 2002 and September 30, 2001 (dollars in billions):

|  | September 30, 2002 | | |
|  | Total loans and guarantees | Loans | Guarantees |
| --- | --- | --- | --- |
| Drawn commitments | $ 1.1 | $ 0.9 | $ 0.2 |
| Available but not drawn | 0.1 | 0.1 | — |
| Not available | 0.1 | 0.1 | — |
| Total commitments | $ 1.3 | $ 1.1 | $ 0.2 |
| Reserves | $ 1.0 | | |

|  | September 30, 2001 | | |
|  | Total loans and guarantees | Loans | Guarantees |
| --- | --- | --- | --- |
| Drawn commitments | $ 3.0 | $ 2.6 | $ 0.4 |
| Available but not drawn | 1.4 | 1.4 | — |

| | | | | | |
|---|---|---|---|---|---|
| Not available | | 0.9 | 0.6 | | 0.3 |
| Total commitments | $ | 5.3 | $ 4.6 | $ | 0.7 |
| Reserves | $ | 2.1 | | | |

We have provided substantial long−term financing to some of our customers worldwide as a condition of obtaining or bidding on infrastructure projects, in the form of both commitments to extend credit and providing third party financial guarantees. These commitments were extended to established companies as well as start up companies and ranged from modest amounts to more than a billion dollars. As a result, customer financing commitments increased to $8.1 billion at September 30, 2000. Our overall customer financing exposure, coupled with the rapid and sustained decline in telecommunications market conditions, negatively affected our results of operations and cash flows in fiscal 2001 and 2002. These market conditions led to the deteriora−

16

MANAGEMENT'S DISCUSSION AND ANALYSIS

tion of certain customer's creditworthiness or bankruptcy filings and corresponding defaults. We were also unable to sell or transfer significant amounts of the drawn and undrawn commitments to financial institutions or other investors on reasonable terms or at all. These adverse conditions resulted in significant charges for customer financings of approximately $1.8 billion and $765 million during fiscal 2001 and 2002, respectively, and additional charges may be required in the future.

We expect to continue to provide or commit to financing on a much more limited basis. We are focusing on the largest service providers who typically have less demand for such financing. We currently have the ability to offer limited customer financing due to our capital structure, credit rating, level of available credit and liquidity. As a result of significant customer defaults that led to significant charges and the cancellation or restructuring of several financing arrangements, our customer financing commitments were reduced to $1.3 billion at September 30, 2002. We expect that approximately $50 million of the undrawn commitments will be drawn during the next twelve months and the rest will likely expire undrawn.

Although on a very limited basis, we consider requests for customer financing on a case–by–case basis and may consider offering financing only after a careful review that considers the credit quality of the individual borrowers, their respective business plans and market conditions. We also consider the likelihood of our ability to sell or transfer the undrawn commitments and drawn borrowings to unrelated third parties. We continue to monitor the drawn borrowings and undrawn commitments by assessing, among other things, the customer's short–term and long–term liquidity position, current operating performance versus plan, execution challenges facing the company, changes in the competitive landscape, and management experience and depth. We undertake certain mitigating actions, including cancellation of commitments if corrective measures are not taken, depending upon the extent of any deterioration of a customer's credit profile or non–compliance with our loan conditions. Although these actions can limit the extent of our losses, substantial exposure remains to the extent of drawn amounts, which may not be recoverable.

*Debt service and preferred dividend requirements*

Debt service primarily represents interest payments on our short– and long–term debt and trust preferred securities. Preferred dividend requirements represent payments on our 8% redeemable convertible preferred stock. We expect debt service and preferred dividend requirements for fiscal 2003 to be approximately $500 million.

## Sources of Cash

We expect to fund our cash requirements during fiscal 2003 through a combination of cash and cash equivalents of $2.9 billion and short–term investments of $1.5 billion, both as of September 30, 2002.

*Credit facility and accounts receivable securitization facility*

On October 17, 2002, we cancelled our $1.5 billion credit facility and our $500 million accounts receivable securitization facility to avoid an anticipated default on the financial covenants contained in these agreements. We had no outstanding balance on the credit facility, which was scheduled to expire in February 2003, and nothing drawn against the accounts receivable securitization facility. We are currently in negotiations with our bankers concerning a new and smaller credit facility, however we can not provide assurance that one will be obtained.

Although the credit facility was cancelled, substantially all of our domestic U.S. assets remained collateralized as a result of extending through December 18, 2002, the Guarantee and Collateral Agreement with our banks. This agreement provides security for commercial bankers in extending, among other things, credit facilities to non–U.S. subsidiaries, letters of credit and foreign exchange hedging. If this agreement is not renewed or replaced with a similar agreement, we may be required to collateralize certain new or existing obligations or financial instruments, such as letters of credit with cash. Any cash collateral requirements would be expected to occur over time.

*Future capital requirements*

We believe our cash and cash equivalents and short–term investments are currently sufficient to meet our requirements in fiscal 2003. However, we cannot assure that these sources will be available when needed or that our actual cash requirements will not be greater than we currently expect. If our sources of liquidity are not available or if we cannot generate sufficient cash flow from operations, we might be required to obtain additional sources of funds through additional operating improvements, asset sales and financing from third parties, or a combination thereof. We cannot provide assurance that these additional sources of funds will be available, or if available, would have reasonable terms.

*Credit ratings*

Our credit ratings as of November 30, 2002, are as follows:

| Rating Agency | Long–term debt | Convertible preferred stock | Trust preferred securities | Last update |
|---|---|---|---|---|
| Standard & Poor's | B–(a) | CCC– | CCC– | October 11, 2002 |
| Moody's | Caa1(a) | Ca | Caa3 | November 1, 2002 |

(a)  Ratings outlook is negative.

Our credit ratings are below investment grade. As a result of past downgrades, we no longer have the ability to participate in the commercial paper market and are unable to sell trade and notes receivables to the Trust (see "Customer financing commitments"). In addition, a credit downgrade affects our ability to

enter into and maintain certain contracts on favorable terms, and increases our cost of borrowing.

**Special Purpose Entities**

We have used special purpose entities for the sales and securitizations of receivables and in real estate financing arrangements. The Financial Accounting Standards Board is currently proposing amendments to existing accounting standards that will require the consolidation of certain special purpose entities. If these proposed amendments are approved in their existing form, we may be required to consolidate the Trust described below, that we have used to sell certain customer financing loans and receivables to, and this will result in the addition

17

MANAGEMENT'S DISCUSSION AND ANALYSIS

of approximately $350 million of long–term notes receivable and debt obligations to our balance sheet. We are currently analyzing these proposed amendments to existing accounting standards; we believe that if they are adopted in their existing form, we will be required to consolidate the aforementioned special purpose entity beginning July 1, 2003.

In September 2000, we and a third party created a non–consolidated Special Purpose Trust ("Trust") for the purpose of allowing us from time to time to sell on a limited–recourse basis customer finance loans and receivables ("Loans") at any given point in time to the Trust. Due to our credit downgrade in February 2001, we are unable to sell additional Loans to the Trust. As of September 30, 2002, the Trust held approximately $350 million in Loans relating to five obligors, all of which are in default. Because we and the Trust collectively hold significant portions of the total outstanding debt of each of the five obligors, we and the Trust currently are reviewing alternatives related to recovery of defaulted Loans currently held in the Trust. Our wholly–owned captive insurance company assumed the credit risk of the loans that are held in the Trust. It also reinsured the exposure to an unaffiliated insurer for amounts in excess of an initial loss of $90 million. The self–insured loss reserve related to these loans (including accrued interest) was $379 million and the corresponding receivable due from the unaffiliated insurer was $298 million. We also indemnify the Trust for any actions that we may take that impairs the Trust's ability to obtain payment.

### Contractual Cash Obligations and Other Commercial Commitments and Contingencies

The following tables quantify our future contractual obligations and commercial commitments as of September 30, 2002 (dollars in millions):

*Contractual Obligations*

| | | Payments due in fiscal | | | | | | |
| | Total | 2003 | 2004 | 2005 | 2006 | 2007 | Thereafter |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Long–term debt (including company– obligated trust preferred securities) | $ 5,025 | $ 31 | $ 37 | $ 42 | $ 948 | $ 2 | $ 3,965 |
| 8% redeemable convertible preferred stock[a] | 1,680 | — | — | — | — | — | 1,680 |
| Operating leases [b] | 1,590 | 253 | 208 | 169 | 129 | 106 | 725 |
| Unconditional purchase obligations | 775 | 350 | 425 | — | — | — | — |
| Total | $ 9,070 | $ 634 | $ 670 | $ 211 | $ 1,077 | $ 108 | $ 6,370 |

(a) Subsequent to September 30, 2002, $380 of convertible preferred stock was exchanged for our common stock (see "Financing activities"). The convertible preferred stock is redeemable, at our option after August 15, 2006 and at the option of the holders on August 2 of 2004, 2007, 2010 and 2016.

(b) The contractual obligations under operating leases exclude approximately $250 of potential lease obligations that were assigned to Avaya, Agere and other dispositions for which Lucent remained secondarily liable.

*Other Commercial Commitments[a]*

| | | Amounts expiring in fiscal | | | | | | |
| | Total | 2003 | 2004 | 2005 | 2006 | 2007 | Thereafter |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Standby letters of credit | $ 668 | $ 374 | $ 98 | $ 22 | $ 130 | $ 4 | $ 40 |
| Undrawn customer commitments | 244 | 209 | 33 | — | — | 2 | — |
| Total | $ 912 | $ 583 | $ 131 | $ 22 | $ 130 | $ 6 | $ 40 |

(a) At September 30, 2002, we had $90 of surety bonds that remain outstanding until specific events or projects are completed and claims are settled.

### RISK MANAGEMENT

We are exposed to market risk from changes in foreign currency exchange rates, interest rates and equity prices. We manage our exposure to these market risks through the use of derivative financial instruments coupled with other strategies. Our risk management objective is to minimize the effects of volatility on our cash flows by identifying the assets, liabilities or forecasted transactions exposed to these risks and hedging them with either forward or option contracts or swap derivatives or by embedding terms into certain contracts that affect the ultimate amount of cash flows under the contract. Since there is a high correlation between the hedging instruments and the underlying exposures, the gains and losses on these exposures are generally offset by reciprocal changes in value of the hedging instruments when used. We use derivative financial instruments as risk management tools and not for trading or speculative purposes.

### Foreign Currency Risk

As a multinational company, we conduct our business in a wide variety of currencies and are therefore subject to market risk for changes in foreign exchange rates. We use foreign exchange forward and option contracts to minimize exposure to the risk to the eventual net cash inflows and outflows resulting from foreign currency denominated transactions with customers, suppliers and non–U.S. subsidiaries. Our objective is to hedge all types of foreign currency risk

to preserve our economic cash flows, but we generally do not expect to designate these derivative instruments as hedges under current accounting standards unless the benefits of doing so are material. Cash inflows and outflows denominated in the same foreign currency are netted on a legal entity basis, and the corresponding net cash flow exposure is appropriately hedged. To the extent that the forecasted cash flow exposures are overstated or understated or if there is a shift in the timing of the anticipated cash flows during periods of currency volatility, we may experience unanticipated currency gains or losses. We do not hedge our net investment in non–U.S. entities because we view those investments as long–term in nature.

Our primary net foreign currency exposures as of September 30, 2002 include the euro, the Chinese renminbi and the Indian rupee and at September 30, 2001, include the euro, Brazilian real, Australian dollar and Danish kroner. We use a sensitivity analysis to determine the effects that market risk exposures may have on the fair value of the foreign currency forwards and options and results of operations. To perform the sensitivity analysis, we assess the risk of loss in fair values from the effect of a hypothetical 10% change in the value of foreign

18

MANAGEMENT'S DISCUSSION AND ANALYSIS

currencies, assuming no change in interest rates. For contracts outstanding as of September 30, 2002 and 2001, a 10% adverse movement in the value of foreign currencies against the U.S. dollar from the prevailing market rates, including the primary foreign currency exposures noted above, would result in an incremental pretax net unrealized loss of $21 million and $63 million, respectively. Consistent with the nature of the economic hedge, any unrealized gains or losses on these forwards and options would be offset by corresponding decreases or increases, respectively, of the underlying instrument or transaction being hedged. The model to determine sensitivity assumes a parallel shift in all foreign currency exchange spot rates, although exchange rates rarely move in the same direction. We have not changed our foreign exchange risk management strategy from the prior year.

### Interest Rate Risk

The fair values of our fixed-rate long-term debt, interest rate swaps, company-obligated 7.75% mandatorily redeemable convertible preferred securities of subsidiary trust and short-term investments are sensitive to changes in interest rates. Our portfolio of customer finance notes receivable is predominantly comprised of variable-rate notes at LIBOR plus a stated percentage and subjects us to variability in cash flows and earnings due to the effect of changes in LIBOR. Prior to May 2002, our debt obligations primarily consisted of fixed-rate debt instruments while our interest rate sensitive assets were primarily variable-rate instruments. In the latter half of fiscal 2002, we began to mitigate this interest rate sensitivity by adding short-term fixed-rate assets to our investment portfolio and simultaneously entering into interest rate swaps on a portion of our debt obligations to make them variable-rate debt instruments. Under these swaps, we receive a fixed interest rate of 7.25% and pay an average floating rate of LIBOR plus 2.91% on the notional amounts of the swaps. As of September 30, 2002, LIBOR was approximately 1.79%. The objective of maintaining the mix of fixed and floating-rate debt and investments is to mitigate the variability of cash inflows and outflows resulting from interest rate fluctuations, as well as reduce the overall cost of borrowing. We do not enter into derivative transactions on our cash equivalents since their relatively short maturities do not create significant risk. We do not foresee any significant changes in our risk management strategy or in our exposure to interest rate fluctuations.

The impacts of a sensitivity analysis we performed under a model that assumes a hypothetical 150 basis point parallel shift in interest rates is as follows (dollars in millions):

| | Fair value as of September 30, 2002 | Hypothetical increase or decrease in fair value as of September 30, 2002 | Fair value as of September 30, 2001 | Hypothetical increase or decrease in fair value as of September 30, 2001 |
|---|---|---|---|---|
| **Assets:** | | | | |
| Short-term investments | $  1,515 | $  14 | $  — | $  — |
| Interest rate swaps | 28 | 27 | — | — |
| **Liabilities:** | | | | |
| Long-term debt obligations | 998 | 60 | 2,009 | 210 |
| Company-obligated 7.75% mandatorily redeemable convertible preferred securities of subsidiary trust | 400 | 19 | — | — |

The changes in fair values of our fixed-rate liabilities are not necessarily indicative of actual changes that may occur as a result of changes in interest rates alone when also considered with the result of potential future changes in our credit ratings. Our sensitivity analysis on debt obligations excludes variable-rate debt instruments, secured borrowings and bank loans because the changes in interest rates would not significantly affect the fair value of such instruments. In addition, our variable-rate customer finance notes have been excluded since a significant portion of the principle balances and related receivables for accrued interest are fully reserved.

### Equity Price Risk

Our investment portfolio includes equity investments in publicly held companies that are classified as available-for-sale and other strategic equity holdings in privately held companies. These securities are exposed to price fluctuations and are generally concentrated in the high-technology and telecommunications industries. At September 30, 2002, the fair value of two available-for-sale securities (Commscope and Corning) that were obtained in connection with the sale of our optical fiber businesses totaled $101 million out of a total available-for-sale portfolio valued at $117 million. The process of determining the fair values of our privately held equity investments inherently requires subjective judgments. These valuation assumptions and judgments include consideration of the investee's earnings and cash flow position, cash flow projections and rate of cash consumption, recent rounds of equity infusions by us and other investors, strength of investee's management and valuation data provided by the investee that may be compared with peers. Due to a sustained weakness in the economic environment in both public and private equity markets, we have and may continue to record impairment losses and write down the carrying value of certain equity investments when the declines in fair value are other-than-temporary. Impairment charges recorded in 2002 and 2001 were $209 million and $266 million, respectively.

We generally do not hedge our equity price risk due to hedging restrictions imposed by the issuers, illiquid capital markets or inability to hedge non-marketable equity securities in privately held companies. As of September 30, 2002 and 2001, a 20% adverse change in equity prices would result in an approximate $23 million and $12 million decrease, respectively, in the fair value of our available-for-sale equity securities. The model to determine sensitivity assumes a corresponding shift in all equity prices. This analysis excludes stock purchase warrants as we do not believe that the value of such warrants is significant. An adverse movement in the equity prices of our holdings in privately held companies can not be easily quantified as our ability to realize returns on investments depends on the investees' ability to raise additional capital or derive sales from continuing operations or through liquidity events such as initial public offerings, mergers or private sales. As of September 30, 2002 and 2001, we had no outstanding hedging instruments for our equity price risk. However, during December 2002, we entered into a prepaid forward sales agreement for 50% of the Corning stock we own, under which we received approximately $60 million and locked in approximately $35 million of unrealized appreciation.

19

**FIVE–YEAR SUMMARY OF SELECTED FINANCIAL DATA**

*(Amounts in Millions, Except Per Share Amounts)*

*Years ended September 30,*

| RESULTS OF OPERATIONS | | 2002 | | 2001 | | 2000 | | 1999 | | 1998 |
|---|---|---|---|---|---|---|---|---|---|---|
| Revenues | $ | 12,321 | $ | 21,294 | $ | 28,904 | $ | 26,993 | $ | 21,307 |
| Gross margin [a] | | 1,552 | | 2,058 | | 11,714 | | 12,969 | | 9,817 |
| Operating income (loss) [a] | | (6,979) | | (19,029) | | 2,366 | | 3,786 | | 1,384 |
| Income (loss) from continuing operations [a] | | (11,826)[b] | | (14,170) | | 1,433 | | 2,369 | | 360 |
| Earnings (loss) per common share from continuing operations [c] [d]: | | | | | | | | | | |
| Basic | | (3.51) | | (4.18) | | 0.44 | | 0.76 | | 0.12 |
| Diluted | | (3.51) | | (4.18) | | 0.43 | | 0.74 | | 0.12 |
| Dividends per common share [c] | | 0.00 | | 0.06 | | 0.08 | | 0.08 | | 0.0775 |

| FINANCIAL POSITION | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Cash, cash equivalents and short–term investments | $ | 4,420 | $ | 2,390 | $ | 1,467 | $ | 1,686 | $ | 1,144 |
| Total assets | | 17,791 | | 33,664 | | 47,512 | | 34,246 | | 24,289 |
| Total debt | | 5,106[e] | | 4,409 | | 6,498 | | 5,788 | | 2,861 |
| 8.00% redeemable convertible preferred stock | | 1,680 | | 1,834 | | — | | — | | — |
| Shareowners' (deficit) equity | | (4,734)[f] | | 11,023 | | 26,172 | | 13,936 | | 7,960 |

[a]  Operating income (loss) and Income (loss) from continuing operations includes net business restructuring charges and asset impairments of $2,316 and $11,416 in fiscal 2002 and 2001, respectively, of which $64 and $1,259 of inventory write–downs affected gross margin, in fiscal 2002 and 2001, respectively.

[b]  Includes a full valuation allowance on the net deferred tax assets as of September 30, 2002.

[c]  All per share data have been restated to reflect the two–for–one splits of our common stock that became effective on April 1, 1998 and April 1, 1999.

[d]  Includes the impact of preferred dividends and accretion of $167 and $28 in fiscal 2002 and 2001, respectively. In addition, fiscal 2002 includes the effect of conversion cost of $29 associated with the exchange of 8% redeemable convertible preferred stock for Lucent common stock.

[e]  Includes company–obligated 7.75% mandatorily redeemable convertible preferred securities of subsidiary trust of $1,750.

[f]  Includes a non–cash charge of $2,927 related to the minimum liability adjustment for the management pension plan.

20

# REPORT OF MANAGEMENT

Management is responsible for the preparation of Lucent Technologies Inc.'s consolidated financial statements and all related information appearing in this Annual Report. The consolidated financial statements and notes have been prepared in conformity with accounting principles generally accepted in the United States of America and include certain amounts that are estimates based upon currently available information and management's judgment of current conditions and circumstances.

To provide reasonable assurance that assets are safeguarded against loss from unauthorized use or disposition and that accounting records are reliable for preparing financial statements, management maintains a system of accounting and other controls, including an internal audit function. Even an effective internal control system, no matter how well designed, has inherent limitations – including the possibility of circumvention or overriding of controls – and therefore can provide only reasonable assurance with respect to financial statement presentation. The system of accounting and other controls is improved and modified in response to changes in business conditions and operations and recommendations made by the independent accountants and the internal auditors.

The Audit and Finance Committee of the board of directors, which is composed of independent directors, meets periodically with management, the internal auditors and the independent accountants to review the manner in which these groups are performing their responsibilities and to carry out the Audit and Finance Committee's oversight role with respect to auditing, internal controls and financial reporting matters. Both the internal auditors and the independent accountants periodically meet privately with the Audit and Finance Committee and have access to its individual members.

Lucent engaged PricewaterhouseCoopers LLP, independent accountants, to audit the consolidated financial statements in accordance with auditing standards generally accepted in the United States of America, which include consideration of the internal control structure.

**Patricia F. Russo**
President and
Chief Executive Officer

**Frank A. D'Amelio**
Chief Financial Officer

# REPORT OF INDEPENDENT ACCOUNTANTS

To the Board of Directors and
Shareowners of LUCENT TECHNOLOGIES INC.:

In our opinion, the accompanying consolidated balance sheets and the related consolidated statements of operations, changes in shareowners' (deficit) equity and cash flows present fairly, in all material respects, the financial position of Lucent Technologies Inc. and its subsidiaries at September 30, 2002 and 2001, and the results of their operations and their cash flows for each of the three years in the period ended September 30, 2002, in conformity with accounting principles generally accepted in the United States of America. These financial statements are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

As discussed in Note 16 to the consolidated financial statements, in 2001 the Company changed its accounting methods for revenue recognition and for derivative financial instruments.

**PRICEWATERHOUSECOOPERS LLP**
New York, New York
October 23, 2002,
except for the second paragraph of Note 4, the third paragraph of Note 10
and the first paragraph of Note 12, as to which the date is December 4, 2002

21

LUCENT TECHNOLOGIES INC. AND SUBSIDIARIES
**CONSOLIDATED STATEMENTS OF OPERATIONS**

*(Amounts in Millions, Except Per Share Amounts)*     *Years ended September 30,*

| | 2002 | 2001 | 2000 |
|---|---|---|---|
| Revenues: | | | |
| Products | $ 9,632 | $ 17,132 | $ 23,978 |
| Services | 2,689 | 4,162 | 4,926 |
| Total revenues | 12,321 | 21,294 | 28,904 |
| Costs: | | | |
| Products | 8,452 | 15,596 | 13,265 |
| Services | 2,317 | 3,640 | 3,925 |
| Total costs | 10,769 | 19,236 | 17,190 |
| Gross margin | 1,552 | 2,058 | 11,714 |
| Operating expenses: | | | |
| Selling, general and administrative | 3,969 | 7,410 | 5,610 |
| Research and development | 2,310 | 3,520 | 3,179 |
| Purchased in–process research and development | — | — | 559 |
| Business restructuring charges and asset impairments, net | 2,252 | 10,157 | — |
| Total operating expenses | 8,531 | 21,087 | 9,348 |
| Operating income (loss) | (6,979) | (19,029) | 2,366 |
| Other income (expense), net | 292 | (357) | 333 |
| Interest expense | 382 | 518 | 342 |
| Income (loss) from continuing operations before income taxes | (7,069) | (19,904) | 2,357 |
| Provision (benefit) for income taxes | 4,757 | (5,734) | 924 |
| **Income (loss) from continuing operations** | **(11,826)** | **(14,170)** | **1,433** |
| Income (loss) from discontinued operations, net | 73 | (3,172) | (214) |
| Income (loss) before extraordinary item and cumulative effect of accounting changes | (11,753) | (17,342) | 1,219 |
| Extraordinary gain, net | — | 1,182 | — |
| Cumulative effect of accounting changes, net | — | (38) | — |
| Net income (loss) | (11,753) | (16,198) | 1,219 |
| Conversion cost – 8% redeemable convertible preferred stock | (29) | — | — |
| Preferred stock dividends and accretion | (167) | (28) | — |
| **Net income (loss) applicable to common shareowners** | **$ (11,949)** | **$ (16,226)** | **$ 1,219** |
| **EARNINGS (LOSS) PER COMMON SHARE – BASIC** | | | |
| Income (loss) from continuing operations | $ (3.51) | $ (4.18) | $ 0.44 |
| Net income (loss) applicable to common shareowners | $ (3.49) | $ (4.77) | $ 0.38 |
| **EARNINGS (LOSS) PER COMMON SHARE – DILUTED** | | | |
| Income (loss) from continuing operations | $ (3.51) | $ (4.18) | $ 0.43 |
| Net income (loss) applicable to common shareowners | $ (3.49) | $ (4.77) | $ 0.37 |
| Weighted average number of common shares outstanding – basic | 3,426.7 | 3,400.7 | 3,232.3 |
| Weighted average number of common shares outstanding – diluted | 3,426.7 | 3,400.7 | 3,325.9 |

See Notes to Consolidated Financial Statements.

LUCENT TECHNOLOGIES INC. AND SUBSIDIARIES
## CONSOLIDATED BALANCE SHEETS

*(Dollars in Millions, Except Per Share Amounts)*

| | September 30, | |
|---|---|---|
| | **2002** | **2001** |
| **ASSETS** | | |
| Cash and cash equivalents | $ 2,894 | $ 2,390 |
| Short–term investments | 1,526 | — |
| Receivables, less allowance of $325 in 2002 and $634 in 2001 | 1,647 | 4,594 |
| Inventories | 1,363 | 3,646 |
| Contracts in process, net | 10 | 1,027 |
| Deferred income taxes, net | — | 2,658 |
| Other current assets | 1,715 | 1,788 |
| | | |
| **Total current assets** | 9,155 | 16,103 |
| Property, plant and equipment, net | 1,977 | 4,416 |
| Prepaid pension costs | 4,355 | 4,958 |
| Deferred income taxes, net | — | 2,695 |
| Goodwill and other acquired intangibles, net of accumulated amortization of $910 in 2002 and $832 in 2001 | 224 | 1,466 |
| Other assets | 2,080 | 2,724 |
| Net long–term assets of discontinued operations | — | 1,302 |
| | | |
| **Total assets** | $ 17,791 | $ 33,664 |
| | | |
| **LIABILITIES** | | |
| Accounts payable | $ 1,298 | $ 1,844 |
| Payroll and benefit–related liabilities | 1,094 | 1,500 |
| Debt maturing within one year | 120 | 1,135 |
| Other current liabilities | 3,814 | 5,285 |
| Net current liabilities of discontinued operations | — | 405 |
| | | |
| **Total current liabilities** | 6,326 | 10,169 |
| Postretirement and postemployment benefit liabilities | 5,230 | 5,481 |
| Pension liability | 2,752 | 80 |
| Long–term debt | 3,236 | 3,274 |
| Company–obligated 7.75% mandatorily redeemable convertible preferred securities of subsidiary trust | 1,750 | — |
| Deferred income taxes, net | — | 152 |
| Other liabilities | 1,551 | 1,651 |
| | | |
| **Total liabilities** | 20,845 | 20,807 |
| | | |
| **Commitments and contingencies** | | |
| | | |
| 8.00% redeemable convertible preferred stock | 1,680 | 1,834 |
| | | |
| **SHAREOWNERS' (DEFICIT) EQUITY** | | |
| Preferred Stock – par value $1.00 per share; authorized shares: 250,000,000; issued and outstanding none | — | — |
| Common stock – par value $.01 per share; Authorized shares: 10,000,000,000; 3,491,585,126 issued and 3,490,310,034 outstanding shares at September 30, 2002 and 3,414,815,908 issued and 3,414,167,155 outstanding shares at September 30, 2001 | 35 | 34 |
| Additional paid–in capital | 20,606 | 21,702 |
| Accumulated deficit | (22,025) | (10,272) |
| Accumulated other comprehensive loss | (3,350) | (441) |
| | | |
| **Total shareowners' (deficit) equity** | (4,734) | 11,023 |
| | | |
| **Total liabilities, redeemable convertible preferred stock and shareowners' (deficit) equity** | $ 17,791 | $ 33,664 |

See Notes to Consolidated Financial Statements.

LUCENT TECHNOLOGIES INC. AND SUBSIDIARIES

## CONSOLIDATED STATEMENTS OF CHANGES IN SHAREOWNERS' (DEFICIT) EQUITY

| (Dollars in Millions) | Common Stock | Additional Paid-In Capital | Retained Earnings (Accumulated Deficit) | Accumulated Other Comprehensive Loss | Total Shareowners' (Deficit) Equity | Total Comprehensive Income (Loss) |
|---|---|---|---|---|---|---|
| **Balance at September 30, 1999** | $ 31 | $ 7,961 | $ 6,188 | $ (244) | $ 13,936 | |
| Net income | | | 1,219 | | | $ 1,219 |
| Foreign currency translation adjustment | | | | (185) | | (185) |
| Reclassification of foreign currency translation losses realized upon spin-off of Avaya | | | | 64 | | 64 |
| Unrealized holding gains on certain investments (net of tax of $124) | | | | 190 | | 190 |
| Reclassification adjustment for realized holding gains on certain investments (net of tax benefit of $126) | | | | (194) | | (194) |
| Common stock dividends declared | | | (255) | | | |
| Issuance of common stock | | 1,397 | | | | |
| Tax benefit from employee stock options | | 1,064 | | | | |
| Issuance of common stock and conversion of stock options for acquisitions | 3 | 9,901 | | | | |
| Other | | 45 | (14) | 2 | | 2 |
| Spin off of Avaya | | 6 | (1,009) | 2 | | |
| **Total comprehensive income** | | | | | | $ 1,096 |
| **Balance at September 30, 2000** | 34 | 20,374 | 6,129 | (365) | 26,172 | |
| Net loss | | | (16,198) | | | $ (16,198) |
| Foreign currency translation adjustment (net of tax of $16) | | | | (30) | | (30) |
| Reclassification of foreign currency translation losses realized upon the sale of foreign entities (net of tax of $2) | | | | (3) | | (3) |
| Unrealized holding losses on certain investments (net of tax benefit of $72) | | | | (95) | | (95) |
| Reclassification adjustment for realized holding gains and impairment losses on certain investments (net of tax of $32) | | | | 50 | | 50 |
| Common stock dividends declared | | | (204) | | | |
| Issuance of common stock | | 234 | | | | |
| Tax benefit from employee stock options | | 18 | | | | |
| Preferred stock dividends and accretion | | (28) | | | | |
| Cumulative effect of accounting change (SFAS 133) | | | | 11 | | 11 |
| Agere initial public offering | | 922 | | | | |
| Compensation on equity-based awards | | 87 | | | | |
| Other | | 95 | 1 | (9) | | (9) |
| **Total comprehensive loss** | | | | | | $ (16,274) |
| **Balance at September 30, 2001** | 34 | 21,702 | (10,272) | (441) | 11,023 | |
| Net loss | | | (11,753) | | | $ (11,753) |
| Minimum pension liability adjustment | | | | (2,927) | | (2,927) |
| Foreign currency translation adjustment | | | | 40 | | 40 |
| Reclassification of foreign currency translation gain realized upon the sale of foreign entities | | | | 20 | | 20 |
| Unrealized holding losses on certain investments | | | | (27) | | (27) |
| Reclassification adjustment for realized holding losses and impairment losses on certain investments | | | | (8) | | (8) |
| Issuance of common stock in connection with exchange of 8% convertible redeemable preferred stock | 1 | 174 | | | | |
| Other issuance of common stock | | 55 | | | | |
| Preferred stock dividends and accretion | | (167) | | | | |
| Spin off of Agere | | (1,191) | | (6) | | (6) |
| Other | | 33 | | (1) | | (1) |
| **Total comprehensive loss** | | | | | | $ (14,662) |
| **Balance at September 30, 2002** | $ 35 | $ 20,606 | $ (22,025) | $ (3,350) | $ (4,734) | |

See Notes to Consolidated Financial Statements.

24

LUCENT TECHNOLOGIES INC. AND SUBSIDIARIES
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

*(Dollars in Millions)*

|  | *Years ended September 30,* | | |
| --- | --- | --- | --- |
|  | **2002** | **2001** | **2000** |
| **OPERATING ACTIVITIES** | | | |
| Net income (loss) | $    (11,753) | $    (16,198) | $    1,219 |
| Less: Income (loss) from discontinued operations | 73 | (3,172) | (214) |
| Extraordinary gain | — | 1,182 | — |
| Cumulative effect of accounting changes | — | (38) | — |
| Income (loss) from continuing operations | (11,826) | (14,170) | 1,433 |
| Adjustments to reconcile income (loss) from continuing operations to net cash used in operating activities, net of effects of acquisitions and dispositions of businesses and manufacturing operations: | | | |
| Non–cash portion of business restructuring charges, net | 827 | 9,322 | — |
| Asset impairment charges | 975 | — | — |
| Depreciation and amortization | 1,470 | 2,536 | 1,667 |
| Provision for bad debts and customer financings | 1,253 | 2,249 | 505 |
| Tax benefit from employee stock options | — | 18 | 1,064 |
| Deferred income taxes | 5,268 | (5,935) | 491 |
| Purchased in–process research and development | — | — | 559 |
| Net pension and postretirement benefit credit | (972) | (1,083) | (802) |
| Gains on sales of businesses | (725) | (56) | (30) |
| Other adjustments for non–cash items | 843 | 551 | (222) |
| Changes in operating assets and liabilities: | | | |
| Decrease (increase) in receivables | 2,493 | 3,627 | (1,626) |
| Decrease (increase) in inventories and contracts in process | 2,552 | 881 | (2,242) |
| (Decrease) increase in accounts payable | (539) | (759) | 263 |
| Changes in other operating assets and liabilities | (2,375) | (602) | (1,763) |
| **Net cash used in operating activities from continuing operations** | (756) | (3,421) | (703) |
| **INVESTING ACTIVITIES** | | | |
| Capital expenditures | (449) | (1,390) | (1,915) |
| Dispositions of businesses and manufacturing operations, net of cash disposed | 2,576 | 3,187 | 250 |
| Sales or maturity of investments | 31 | 57 | 820 |
| Purchases of non–consolidated investments | (30) | (101) | (680) |
| Purchases of short–term investments | (1,518) | — | — |
| Proceeds from the sale or disposal of property, plant and equipment | 194 | 177 | 26 |
| Other investing activities | (47) | 21 | (60) |
| **Net cash provided by (used in) investing activities from continuing operations** | 757 | 1,951 | (1,559) |
| **FINANCING ACTIVITIES** | | | |
| Issuance of company–obligated 7.75% mandatorily redeemable convertible preferred securities of subsidiary trust | 1,750 | — | — |
| (Repayments of) proceeds from credit facilities | (1,000) | 3,500 | — |
| Net (repayments of) proceeds from other short–term borrowings | (104) | (2,147) | 1,355 |
| Issuance of long–term debt | — | 302 | 72 |
| Repayments of long–term debt | (47) | (754) | (387) |
| Issuance of 8% redeemable convertible preferred stock | — | 1,831 | — |
| Issuance of common stock | 64 | 222 | 1,444 |
| Dividends paid on preferred and common stock | (149) | (204) | (255) |
| Other financing activities | (46) | (125) | — |
| **Net cash provided by financing activities from continuing operations** | 468 | 2,625 | 2,229 |
| Effect of exchange rate changes on cash and cash equivalents | 35 | 4 | 10 |
| Net cash provided by (used in) continuing operations | 504 | 1,159 | (23) |
| Net cash used in discontinued operations | — | (236) | (196) |

| | | | | |
|---|---|---|---|---|
| Net increase (decrease) in cash and cash equivalents | | 504 | 923 | (219) |
| Cash and cash equivalents at beginning of year | | 2,390 | 1,467 | 1,686 |
| Cash and cash equivalents at end of year | $ | 2,894 | $ 2,390 | $ 1,467 |

See Notes to Consolidated Financial Statements.

25

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
(Dollars in Millions, Except Per Share Amounts)

## 1. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Basis of Consolidation

The consolidated financial statements include all majority–owned subsidiaries in which Lucent Technologies Inc. ("Lucent" or "the Company") exercises control. Investments in which Lucent exercises significant influence, but which it does not control (generally a 20% to 50% ownership interest), are accounted for under the equity method of accounting. All material intercompany transactions and balances have been eliminated. Except as otherwise noted, all amounts and disclosures reflect only Lucent's continuing operations.

### Use of Estimates

The consolidated financial statements are prepared in conformity with generally accepted accounting principles. Management is required to make estimates and assumptions that affect the amounts reported in the consolidated financial statements and accompanying disclosures. Actual results could differ from those estimates. Among other things, estimates are used in accounting for long–term contracts, allowances for bad debts and customer financings, inventory obsolescence, restructuring reserves, product warranty, amortization and impairment of intangibles, goodwill, and capitalized software, depreciation and impairment of property, plant and equipment, employee benefits, income taxes, contingencies, and loss reserves for discontinued operations. Estimates and assumptions are periodically reviewed and the effects of any material revisions are reflected in the consolidated financial statements in the period that they are determined to be necessary.

### Foreign Currency Translation

For operations outside the U.S. that prepare financial statements in currencies other than the U.S. dollar, results of operations and cash flows are translated at average exchange rates during the period, and assets and liabilities are translated at end–of–period exchange rates. Translation adjustments are included as a separate component of accumulated other comprehensive loss in shareowners' (deficit) equity.

### Revenue Recognition

Revenue is recognized when persuasive evidence of an agreement exists, delivery has occurred, the fee is fixed and determinable, and collection of the resulting receivable, including receivables of customers to which Lucent has provided customer financing, is probable. For sales generated from long–term contracts, primarily those related to customized network solutions and network build–outs, Lucent generally uses the percentage of completion method of accounting. In doing so, Lucent makes important judgments in estimating revenue and costs and in measuring progress toward completion. These judgments underlie the determinations regarding overall contract value, contract profitability and timing of revenue recognition. Revenue and cost estimates are revised periodically based on changes in circumstances; any losses on contracts are recognized immediately. Lucent also sells products through multiple distribution channels, including resellers and distributors. For products sold through these channels, revenue is generally recognized when the reseller or distributor sells the product to the end user.

Most sales are generated from complex contractual arrangements that require significant revenue recognition judgments, particularly in the areas of multiple element arrangements and collectibility. Revenues from contracts with multiple element arrangements, such as those including installation and integration services, are recognized as each element is earned based on the relative fair value of each element and when there are no undelivered elements that are essential to the functionality of the delivered elements. Lucent has determined that most equipment is generally installed by Lucent within 90 days, but can be installed by the customer or a third party, and as a result, revenue is recognized when title passes to the customer, which usually is upon delivery of the equipment, provided all other revenue recognition criteria are met. Services revenues are generally recognized at time of performance. The assessment of collectibility is particularly critical in determining whether revenue should be recognized in the current market environment. As part of the revenue recognition process, Lucent determines whether trade and notes receivables are reasonably assured of collection based on various factors, including the ability to sell those receivables and whether there has been deterioration in the credit quality of customers that could result in the inability to collect or sell the receivables. In situations where Lucent has the ability to sell the receivables, revenue is recognized to the extent of the value Lucent could reasonably expect to realize from the sale. Lucent defers revenue and related costs when it is uncertain as to whether it will be able to collect or sell the receivable. Lucent defers revenue but recognizes costs when it determines that the collection or sale of the receivables is unlikely.

### Research and Development and Software Development Costs

Research and development costs are charged to expense as incurred. However, the costs incurred for the development of computer software that will be sold, leased or otherwise marketed are capitalized when technological feasibility has been established, generally when all of the planning, designing, coding and testing activities that are necessary in order to establish that the product can be produced to meet its design specifications including functions, features and technical performance requirements are completed. These capitalized costs are subject to an ongoing assessment of recoverability based on anticipated future revenues and changes in hardware and software technologies. Costs that are capitalized include direct labor and related overhead.

Amortization of capitalized software development costs begins when the product is available for general release. Amortization is provided on a product–by–product basis on the straight–line method over periods not exceeding 18 months. Unamortized capitalized software development costs determined to be in excess of the net realizable value of the product are expensed immediately.

26

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**Cash and Cash Equivalents**

All highly liquid investments with original maturities of three months or less are considered cash equivalents. These primarily consist of money market funds and to a lesser extent certificates of deposit and commercial paper.

At September 30, 2002 and 2001, approximately $324 and $138, respectively, of cash was held as collateral or escrowed for contingent liabilities and was classified in other current assets on the consolidated balance sheets.

**Short-Term Investments**

All investments with original maturities greater than three months and with maturities less than one year are considered short-term investments. They are of investment grade quality and are not subject to significant market risk. These investments are designated as available-for-sale, and are recorded at fair value, which approximates their cost. Any unrealized holding gains or losses are excluded from net loss and are reported as a component of accumulated other comprehensive loss.

**Inventories**

Inventories are stated at the lower of cost (determined principally on a first-in, first-out basis) or market.

**Contracts in Process**

Net contracts in process are stated at cost plus accrued profits less progress billings. Gross contracts in process, before progress billings were $10,324 and $8,868, at September 30, 2002 and 2001, respectively. Contract progress billings were $10,314 and $7,841 at September 30, 2002 and 2001, respectively. Net contracts in process also includes unbilled receivables of $286 and $1,128 at September 30, 2002 and 2001, respectively; unbilled receivables are generally billable and collectible within one year.

Long-term contract receivables include amounts billed but unpaid due to contractual retainage provisions of $356 and $464 at September 30, 2002 and 2001, respectively, and are included in other assets.

**Property, Plant and Equipment**

Property, plant and equipment are stated at cost less accumulated depreciation. Depreciation is determined using accelerated and straight-line methods over the estimated useful lives of the various asset classes. Useful lives for buildings and building improvements, furniture and fixtures and machinery and equipment principally range from five to 40 years, five to 10 years and two to 10 years, respectively.

**Financial Instruments**

Various financial instruments, including foreign exchange forward and option contracts and interest rate swap agreements are used to manage risk by generating cash flows that offset the cash flows of certain transactions in foreign currencies or underlying financial instruments in relation to their amount and timing. Lucent's derivative financial instruments are for purposes other than trading. Non-derivative financial instruments include letters of credit, commitments to extend credit and guarantees of debt.

Lucent's investment portfolio includes securities accounted for under the cost and equity methods as well as equity investments in publicly held companies that are generally concentrated in the high-technology and telecommunications industries. These investments are included in other assets. Marketable equity securities with readily determinable fair values are classified as available-for-sale securities and reported at fair value. Unrealized gains and losses on the changes in fair value of these securities are reported as a component of accumulated other comprehensive loss until sold or considered to be other than temporarily impaired. At the time of sale, any such gains or losses are recognized in other income (expense), net. All equity investments are periodically reviewed to determine if declines in fair value below cost basis are other-than-temporary. Significant and sustained decreases in quoted market prices, a series of historic and projected operating losses by the investee or other factors are considered as part of the review. If the decline in fair value has been determined to be other-than-temporary, an impairment loss is recorded in other income (expense), net and the individual security is written down to a new cost basis.

**Securitizations and Transfers of Financial Instruments**

Lucent may sell trade and notes receivables with or without recourse and/or discounts in the normal course of business. The receivables are removed from the consolidated balance sheet at the time they are sold. Sales and transfers that do not meet the criteria for surrender of control are accounted for as secured borrowings.

The value assigned to undivided interests retained in securitized trade receivables is based on the relative fair values of the interests retained and sold in the securitization. Fair values are measured by the present value of estimated future cash flows of the securitization facility. See Note 15 for further discussions on securitizations and transfers of financial instruments.

**Goodwill and Other Acquired Intangibles**

Goodwill and other acquired intangibles are amortized on a straight-line basis over the periods benefited, principally in the range of five to seven years. Goodwill is the excess of the purchase price over the fair value of identifiable net assets acquired in business combinations accounted for as purchases.

**Impairment of Goodwill and Other Long-Lived Assets**

Goodwill and other long-lived assets are reviewed for impairment whenever events such as product discontinuances, plant closures, product dispositions or other changes in circumstances indicate that the carrying amount may not be recoverable. When such events occur, Lucent compares the carrying amount of the assets with undiscounted expected future cash flows. If this comparison indicates that there is an impairment, the amount of the impairment is typically calculated using discounted expected future cash flows. The discount rate applied to these cash flows is based on Lucent's weighted average cost of capital, which represents the blended after-tax costs of debt and equity.

**Reclassifications**

Certain prior-year amounts have been reclassified to conform to the fiscal 2002 presentation.

27

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**2. BUSINESS RESTRUCTURING CHARGES AND ASSET IMPAIRMENTS, NET**

*Fiscal 2002*

In fiscal 2002, due to the continuing decline and uncertainty in the telecommunications market, Lucent committed to additional restructuring actions to align the business with market conditions that resulted in net business restructuring charges and asset impairments of $1,341. Since Lucent's restructuring program is an aggregation of many individual plans that are currently being executed, actual costs have differed from estimated amounts. The fiscal 2002 charges were primarily comprised of headcount reductions, facility consolidations and property, plant and equipment write-downs. Business restructuring charges and asset impairments, net for fiscal 2002 and 2001, are recorded as a separate line item in the consolidated statements of operations, except for inventory charges which are included in costs.

Lucent continues to evaluate the current restructuring reserve as plans are being executed. As a result, there may be additional charges or reversals. This table displays the activity of the restructuring reserve for fiscal 2002, the balance at September 30, 2002, and the components of the net charges for fiscal 2002:

| | Sept. 30, 2001 reserve | Fiscal 2002 charge | Revisions to fiscal 2001 plans | | Net charge/ (reversal) | Deductions | Sept. 30, 2002 reserve |
| | | | charge | reversal | | | |
|---|---|---|---|---|---|---|---|
| Employee separations | $ 588 | $ 944 | $ 5 | $ (150) | $ 799(a) | $ (1,020)(a) | $ 367 |
| Contract settlements | 610 | 90 | 18 | (201) | (93) | (367) | 150 |
| Facility closings | 296 | 210 | 123 | (32) | 301 | (114) | 483 |
| Other | 125 | 34 | 2 | (20) | 16 | (72) | 69 |
| Total restructuring costs | $ 1,619 | $ 1,278 | $ 148 | $ (403) | $ 1,023 | $ (1,573)(b) | $ 1,069 |
| | | | | | | | |
| Total asset write-downs | | $ 536 | $ 148 | $ (226) | $ 458(c) | | |
| Net gains on sales | | (140) | — | — | (140) | | |
| Total net charges on business restructuring | | $ 1,674 | $ 296 | $ (629) | $ 1,341 | | |
| Impairment of goodwill and other assets | | $ 975 | — | — | $ 975 | | |
| Total | | $ 2,649 | $ 296 | $ (629) | $ 2,316(d) | | |

(a) Includes charges for pension termination benefits of $241, of which $205 are non-cash charges for certain U.S. employees expected to be funded through Lucent's pension assets; pension and postretirement benefit curtailment charges of $337 and postemployment benefit curtailment credits of $34.

(b) Includes cash payments of $1,022 and other non-cash settlements.

(c) At September 30, 2002, the remaining restructuring reserve for inventory was $129.

(d) Net inventory charges of $64 was included in costs.

The components of the fiscal 2002 net charge included:

- employee separation charges were associated with approximately 15,100 employees. Revisions for fiscal 2001 employee separation reserves were due to higher than expected attrition rates that resulted in a reduction in expected terminations by 2,200 employees. Also, the actual severance cost per person was lower than the original estimates after execution of the various plans in many countries. Including the 15,100 headcount reductions, the total voluntary and involuntary employee separations associated with the employee separations net charges recorded in fiscal 2001 and 2002 were 54,300. As of September 30, 2002, approximately 42,200 separations were completed. The completed and future employee separations affect all business groups and geographic regions. Approximately 70% of these separations were related to management employees and were involuntary. The majority of the remaining separations are expected to be completed by the end of the second quarter of fiscal 2003. In addition, since December 31, 2000, 16,600 employee separations have occurred through attrition and divestitures of businesses;

- contract settlement charges were for settlements of purchase commitments with suppliers and contract renegotiations or cancellations of contracts with customers, all of which resulted from the discontinuance of various product lines. Revisions to fiscal 2001 plans were primarily for settling certain purchase commitments for amounts lower than originally planned;

fiscal 2002 charges for facility closings represented the expected remaining future cash outlays associated with trailing lease liabilities, lease termination payments and expected restoration costs, net of expected sublease income of $136. Revisions to fiscal 2001 plans were primarily due to additional space consolidation as well as changes in estimates for the amount and timing of expected sublease rental income of $63 as a result of changes in the current commercial real estate market. As part of the fiscal 2001 and 2002 restructuring actions, charges were recognized in connection with plans to reduce a significant number of owned and leased facilities, totaling approximately 16.6 million square feet. As of September 30, 2002, owned and leased sites aggregating 12.0 million square feet have been exited and the remaining sites are expected to be exited during fiscal 2003;

28

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

- net asset write–downs for fiscal 2002 included property, plant and equipment write–downs of $304 primarily related to facility closings and product rationalizations, capitalized software of $72, inventory charges of $129, that were associated with product exits in certain switching and access and optical networking products in the Integrated Network Solutions ("INS") segment, goodwill and other acquired intangibles write–down of $22 and other charges of $9. Net revisions to fiscal 2001 plans were primarily related to adjustments to estimated inventory charges. In establishing the initial charge for inventory, Lucent included an estimate of amounts relating to products rationalized or discontinued that were not required to fulfill existing customer obligations. To the extent the fulfillment of those customer obligations differed from amounts estimated, additional inventory charges or reserve reductions were required; and

- net gains on sales included $193 of gains primarily related to the sale of the billing and customer care business and losses of $53 which were primarily related to the sale of the enterprise professional services business. Net gains on sales are included in business restructuring if the disposition of these businesses was contemplated as part of Lucent's overall restructuring program.

**Impairment of goodwill and other assets**

The continued and recently sharper decline in the telecommunications market prompted an assessment of all key assumptions underlying goodwill valuation judgments, including those relating to short– and long–term growth rates. As a result of the analysis, Lucent determined that impairment charges of $975 were required because the forecasted undiscounted cash flows were less than the book values of the goodwill and other intangible assets of certain businesses. The charges were measured on the basis of comparison of estimated fair values with corresponding book values and related primarily to goodwill recorded in connection with the September 2000 acquisition of Spring Tide. Fair values were determined on the basis of discounted cash flows.

*Fiscal 2001*

In fiscal 2001, Lucent committed to various restructuring actions in which it exited certain non–strategic wireless, optical networking and switching and access product lines and streamlined its cost structure in various businesses and corporate operations. This resulted in a pre–tax charge to earnings totaling $11,416 for fiscal 2001.

This table displays the components of the fiscal 2001 charge, the activity of the restructuring reserve for fiscal 2001, and the balance at September 30, 2001:

| | Fiscal 2001 charge | | Deductions | | September 30, 2001 reserve |
|---|---|---|---|---|---|
| Employee separations | $ | 3,440 | $ | (2,852)(a) | $ | 588 |
| Contract settlements | | 944 | | (334) | | 610 |
| Facility closings | | 304 | | (8) | | 296 |
| Other | | 79 | | 46(b) | | 125 |
| Total restructuring costs | $ | 4,767 | $ | (3,148)(c) | $ | 1,619 |
| Total asset write–downs | $ | 6,649(d) | | | | |
| Total | $ | 11,416(e) | | | | |

(a) Includes non–cash charges of $2,113 for net pension and postretirement termination benefits to certain U.S.employees expected to be funded through Lucent's pension assets, $632 for pension and postretirement benefit curtailment charges and $72 for postemployment benefit curtailment credits.

    (b) Includes proceeds from the sale of a product line.

    (c) Includes cash payments of $531 at September 30, 2001.

    (d) At September 30, 2001, the remaining restructuring reserve for inventory was $689.

    (e) Net inventory charges of $1,259 was included in costs.

The components of the fiscal 2001 charge included:

- employee separation charges for approximately 39,200 employees, including 8,500 related to a voluntary early–retirement offer to qualified U.S. paid management employees. During fiscal 2001, approximately 23,700 separations were completed;

- contract settlement charges consisted of settlements of purchase commitments with suppliers of $508 and contract renegotiations or cancellations of contracts with customers of $436. Approximately 50% of total purchase commitments related to the rationalization of certain optical networking products, including charges relating to the discontinuance of the Chromatis product portfolio. Customer settlements included charges associated with switching and access product rationalizations and Lucent's strategic decision to limit its investment in research and development in certain wireless technologies;

- facility closings charges represented the expected remaining future cash outlays associated with trailing lease liabilities, lease termination payments and expected restoration costs, net of expected sublease income of $241; and

29

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

- asset write-downs primarily related to the write-down of goodwill and other acquired intangibles of $4,081 and inventory charges of $1,259. Impairment losses related to the write-down of goodwill and other acquired intangibles were estimated by discounting the expected future cash flows. These impairment charges largely relate to the write-off of $3,707 of goodwill relating to the discontinuance of the Chromatis product portfolio, the write-off of acquired intangibles related to the impairment of Lucent's TeraBeam investment and rationalizations of products associated with the DeltaKabel, Stratus and Ignitus acquisitions. Inventory write-downs resulted primarily from optical networking, switching, access and wireless product rationalizations and discontinuances. The remainder of the asset write-downs consisted of property, plant and equipment of $425, capitalized software of $362 and other assets of $522 associated with Lucent's product and system rationalizations resulting in sales of assets, closures and consolidation of offices, research and development facilities and factories.

## 3. DISCONTINUED OPERATIONS

On June 1, 2002, Lucent completed the spinoff of Agere Systems Inc. ("Agere"), Lucent's microelectronics business, by distributing its remaining 37.0 million shares of Agere Class A common stock and 908.1 million shares of Agere Class B common stock to Lucent common shareowners of record on May 3, 2002. Each Lucent shareowner received one share of Agere Class A common stock for every 92.768991 shares of Lucent's common stock held and one share of Agere Class B common stock for every 3.779818 shares of Lucent's common stock held. The historical carrying amount of the net assets transferred to Agere of $1,191 was recorded as a reduction to shareowners' (deficit) equity.

On April 2, 2001, Agere, completed an initial public offering ("IPO") of 600 million shares of Class A common stock, resulting in net proceeds of $3,440 to Agere. As a result of the IPO and the planned spinoff of Agere, Lucent recorded an increase to shareowners' equity of $922 in fiscal 2001. In addition, on April 2, 2001, Morgan Stanley exercised its overallotment option to purchase an additional 90 million shares of Agere Class A common stock from Lucent. Morgan Stanley exchanged $519 of Lucent commercial paper for the Agere common shares. This transaction resulted in a gain of $141, which was included in the loss on disposal of Agere in fiscal 2001. After the exercise of the overallotment option by Morgan Stanley and before the spinoff, Lucent owned 57.8% of Agere common stock.

On December 29, 2000, Lucent completed the sale of its power systems business (see Note 4).

On September 30, 2000, Lucent completed the spinoff of Avaya Inc., Lucent's former enterprise networks business, in a tax-free distribution to its shareowners. The historical carrying amount of the net assets transferred to Avaya was recorded as a reduction to shareowners' equity of $1,009. As a result of the final transfer of assets and liabilities to Avaya, the stock dividend was adjusted by $47 and reflected as a reduction to additional paid-in capital during fiscal 2001. Summarized results of operations for discontinued operations are as follows:

| | Years ended September 30, | | |
|---|---|---|---|
| | 2002 | 2001 | 2000 |
| **REVENUES** | | | |
| Agere and power systems | $    1,247 | $    3,838 | $    4,909 |
| Avaya | — | — | 7,607 |
| **Total revenues** | $    1,247 | $    3,838 | $    12,516 |
| **INCOME (LOSS) FROM DISCONTINUED OPERATIONS, NET OF TAXES** | | | |
| Agere and power systems | $    — | $    (151) | $    248 |
| Avaya | — | — | 303 |
| Income (loss) on disposal of Agere | 73 | (3,021) | — |
| Loss on disposal of Avaya | — | — | (765) |
| **Income (loss) from discontinued operations** | $    73 | $    (3,172) | $    (214) |

The income (loss) from discontinued operations for Agere and power systems includes the results of operations for Lucent's former power systems business through the date of sale of December 29, 2000, and Agere through the initial measurement date of March 31, 2001. Agere's and power systems' income (loss) from discontinued operations included income tax provisions of $107 and $398 for the years ended September 30, 2001 and 2000, respectively.

Avaya's income from discontinued operations for fiscal 2000 was net of applicable income taxes of $160. Income from discontinued operations includes an allocation of Lucent's interest expense totaling $64 for fiscal 2000 and was based upon the amount of debt assumed by Avaya. Approximately $780 of commercial paper borrowings was assumed by Avaya as part of the spinoff transaction.

The income (loss) on disposal of Agere for fiscal 2002, net of a tax provision of $34, includes Lucent's share of Agere's net losses from the initial measurement date through the spinoff date. Also included in the income (loss) on disposal for fiscal 2002 are subsequent adjustments to the related loss reserve, including pension termination benefit charges of $102, relating to business restructuring actions taken by Agere prior to the spinoff. The income (loss) on disposal of Agere for fiscal 2001, net of a tax provision of $39, was composed of Lucent's 57.8% share of the estimated net losses and separation costs of the microelectronics business from the measurement date through the spinoff date, partially offset by a gain of $141 associated with Lucent's debt exchange on April 2, 2001. The fiscal 2001 loss on disposal of Agere includes Lucent's share of a $2,762 impairment charge for goodwill and other acquired intangibles primarily associated with the product portfolios of the Ortel Corporation, Herrmann Technology, Inc., and Agere, Inc.; acquisitions and costs associated with Agere's restructuring initiatives; separation expenses related to the IPO; and expected spinoff and inventory provisions of $563, $99 and $409, respectively. Major components of the restructuring charge include $386 for the rationalization of

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

underutilized manufacturing facilities and other restructuring–related activities, and $177 for work force reductions. In addition, Agere recorded a $538 tax valuation allowance for its deferred tax assets.

The loss on disposal of Avaya, net of a tax benefit of $238, reflects the costs directly associated with the spinoff and the net loss of Avaya between the measurement date and the spinoff date of September 30, 2000. The loss includes those components of the Avaya reorganization plan, including a business restructuring charge and directly–related asset write–downs of $545, recorded during the year, along with transaction costs of $56 for the spinoff. Major components of this restructuring charge include $365 for employee separation and $101 for real estate consolidation.

Agere's net current liabilities at September 30, 2001 consisted of current assets of $4,022 and current liabilities of $4,427. Current liabilities included $2,500 of short–term debt assumed by Agere on April 2, 2001, of which $1,000 was repaid on October 4, 2001, and $565 of reserves for Lucent's share of Agere's estimated future losses through the spinoff date. Agere's net long–term assets at September 30, 2001 consisted of long–term assets of $2,625 and long–term liabilities of $1,323, including a minority interest in the net assets of Agere of $1,026.

The following table represents changes in Lucent's cash balance in support of discontinued operations. During fiscal 2001, Agere was funded through Lucent's consolidated cash balances until its IPO on April 2, 2001.

|  | Years ended September 30, | |
|  | 2001 | 2000 |
| --- | --- | --- |
| Net cash provided by operating activities of discontinued operations | $    517 | $    1,640 |
| Net cash used in investing activities of discontinued operations | (744) | (1,366) |
| Net cash used in financing activities of discontinued operations | (9) | (470) |
| Net cash used in discontinued operations | $    (236) | $    (196) |

After April 2, 2001, Agere's operations were no longer funded through Lucent's consolidated cash balances. The following table represents the changes in Agere's cash balance due to their operations during fiscal 2002 through the spinoff date:

| Net cash used by operating activities of Agere | $    (521) |
| --- | --- |
| Net cash provided by investing activities of Agere | $    279 |
| Net cash used by financing activities of Agere | $    (1,744) |

## 4. BUSINESS DISPOSITIONS AND COMBINATIONS

### Dispositions

On September 30, 2002, Lucent completed the sale of two China–based joint ventures to Corning Incorporated, which were part of the optical fiber solutions ("OFS") business. Under the agreement originally announced on July 24, 2001, the total purchase price was $225, which included a cash payment of $123, Corning common stock valued at $50, a note receivable of $27 and a future cash payment of $25 should the ventures achieve certain business milestones. The transaction resulted in a gain of $100, which was included in other income (expense), net for the year ended September 30, 2002.

On May 31, 2002, Lucent completed its agreement with Solectron Corporation to sell certain manufacturing equipment and inventory for $96, subject to post–closing adjustments, and commenced a three–year supply agreement with Solectron for certain optical networking products. Due to continuing market uncertainties, Lucent and Solectron agreed to unwind the agreements which resulted in Lucent purchasing certain assets back from Solectron and paying $50 to Solectron in November 2002. It is expected that the contract manufacturing work for the optical networking products will be transitioned to other suppliers during the first half of fiscal 2003. The impact of these events are not expected to significantly impact the results of operations.

On February 28, 2002, Lucent completed the sale of its billing and customer care business to CSG Systems International, Inc. for approximately $250, after settling certain post closing purchase price adjust–ments. All post closing purchase price adjustments were settled as of September 30, 2002 and the transaction resulted in a net gain of $188 that has been included in business restructuring charges and asset impairments, net in fiscal 2002.

On November 16, 2001, Lucent completed the sale of OFS to The Furukawa Electric Co., Ltd. for approximately $2,300, of which $173 was in CommScope, Inc. common stock. The transaction resulted in a gain of $564, which was included in other income (expense), net in fiscal 2002.

On August 31, 2001, Lucent received $572 from the closing of its transaction with Celestica Corporation to transition Lucent's manufacturing operations in Oklahoma City, Oklahoma and Columbus, Ohio. At closing, Lucent entered into a five–year supply agreement for Celestica to be the primary manufacturer of its switching and access and wireless networking systems products. As a result of expected workforce reductions and/or transfers to Celestica, Lucent recorded non–cash termination and curtailment charges of approximately $378, which were included as a component of Lucent's employee separation restructuring costs in fiscal 2001.

On December 29, 2000, Lucent completed the sale of its power systems business to Tyco International Ltd. for approximately $2,538 in cash. In connection with the sale, Lucent recorded an extraordinary gain of $1,182 (net of tax expense of $780).

31

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**Acquisitions**

The following table presents information about acquisitions by Lucent during fiscal 2000. All of these acquisitions were accounted for under the purchase method of accounting, and the acquired technology valuation included existing technology, purchased in−process research and development ("IPRD") and other intangibles. All IPRD charges were recorded in the quarter in which the transaction was completed. On a pro forma basis, if the fiscal 2000 acquisitions had occurred on October 1, 1999, the amortization of goodwill and other acquired intangibles would have increased by approximately $675.

| | | | | | | | Amortization Period (in years) | | |
| | Acquisition date | Purchase price | Goodwill | Existing technology | Other intangibles | (IPRD after−tax) | Goodwill | Existing technology | Other intangibles |
|---|---|---|---|---|---|---|---|---|---|
| Spring Tide | 9/00 | $ 1,315 Stock & options | $ 1,075 | $ 143 | $ 14 | $ 131 | 7 | 7 | 7 |
| Chromatis | 6/00 | 4,756 Stock & options | 4,223 | n/a | 186 | 428 | 7 | n/a | 2−7 |
| DeltaKabel | 4/00 | 52 Cash | 56 | n/a | n/a | n/a | 6 | n/a | n/a |

n/a    Not applicable.

Spring Tide Networks was a provider of network switching equipment, Chromatis Networks Inc. was a supplier of metropolitan optical networking systems and DeltaKabel Telecom cv was a developer of cable modem and Internet protocol (IP) telephony products and services for the European market. Due to declining telecommunications market conditions in fiscal 2002 and 2001, impairment charges for goodwill and other acquired technology were recorded for Spring Tide, Chromatis and DeltaKabel (see Note 2).

Included in the purchase price for the acquisitions was IPRD, which was a non−cash charge to earnings as this technology had not reached technological feasibility and had no future alternative use. The remaining purchase price was allocated to tangible assets and intangible assets, including goodwill and other acquired intangibles, less liabilities assumed.

The value allocated to IPRD was determined using an income approach that included an excess earnings analysis reflecting the appropriate cost of capital for the investment. Estimates of future cash flows related to the IPRD were made for each project based on estimates of revenue, operating expenses and income taxes from the project. These estimates were consistent with historical pricing, margins and expense levels for similar products.

Revenues were estimated based on relevant market size and growth factors, expected industry trends, individual product sales cycles and the estimated life of each product's underlying technology. Estimated operating expenses, income taxes and charges for the use of contributory assets were deducted from estimated revenues to determine estimated after−tax cash flows for each project. Estimated operating expenses include cost of goods sold; selling, general and administrative expenses; and research and development expenses. The research and development expenses include estimated costs to maintain the products once they have been introduced into the market and generate revenues and costs to complete the in−process research and development.

The discount rates utilized to discount the projected cash flows were based on consideration of Lucent's weighted average cost of capital, as well as other factors including the estimated useful life of each project, the anticipated profitability of each project, the uncertainty of technology advances that were known at the time and the stage of completion of each project.

**TeraBeam Corporation**

On April 9, 2000, Lucent and TeraBeam Corporation entered into an agreement to develop TeraBeam's fiberless optical networking system that provides high−speed data networking between local and wide area networks. Under the agreement, Lucent paid cash and contributed research and development assets, intellectual property and free−space optical products, valued at $450. On September 26, 2001, Lucent and TeraBeam agreed to terminate most of the existing arrangements between the parties. Pursuant to the agreement, the 30% interest held by Lucent in the venture that develops the fiberless optical networking system was exchanged for a 15% interest in TeraBeam Corporation in the second quarter of fiscal 2002. As a result of exiting the original arrangement and an evaluation of the restructured investment as of September 30, 2001, the remaining investment and goodwill and other acquired intangibles of $328 were written−off and included in the fiscal 2001 business restructuring charge. In the fourth quarter of fiscal 2002, the remaining 15% interest was sold for $5 and included as part of the fiscal 2002 business restructuring charge.

**Ignitus Communications LLC**

On April 4, 2000, Lucent acquired the remaining 44% of Ignitus Communications LLC, a start−up company that focuses on high−speed optical communications at the network edge, for approximately $33. Lucent previously owned 56% of the company. An impairment charge for goodwill and other acquired intangibles was recorded in fiscal 2001's business restructuring charge related to the product rationalization of the technology acquired from Ignitus.

32

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**Pooling–of–Interests Mergers**

On November 3, 1999, Lucent merged with Excel Switching Corporation ("Excel"), a developer of programmable switches, through the issuance of approximately 22 million shares of Lucent common stock in exchange for all the outstanding shares of Excel common stock. On October 15, 1999, Lucent merged with International Network Services, a provider of network consulting, design and integration services, through the issuance of approximately 49 million shares of Lucent common stock in exchange for all the outstanding shares of their common stock.

Lucent merged with Xedia in fiscal 2000. The historical operating results of this entity were not material to Lucent's consolidated results of operations, therefore prior periods were not restated for this merger.

## 5. SUPPLEMENTARY FINANCIAL INFORMATION

**Supplementary Statements of Operations Information:**

|  | | Years ended September 30, | | | | |
|---|---|---|---|---|---|---|
|  | | 2002 | | 2001 | | 2000 |
| **DEPRECIATION AND AMORTIZATION** | | | | | | |
| Depreciation of property, plant and equipment | $ | 718 | $ | 1,065 | $ | 908 |
| Amortization of goodwill | | 207 | | 790 | | 281 |
| Amortization of other acquired intangibles | | 43 | | 131 | | 81 |
| Amortization of software development costs | | 469 | | 501 | | 395 |
| Other amortization | | 33 | | 49 | | 2 |
| **Total depreciation and amortization** | $ | 1,470 | $ | 2,536 | $ | 1,667 |
| | | | | | | |
| **OTHER INCOME (EXPENSE), NET** | | | | | | |
| Interest income | $ | 114 | $ | 255 | $ | 118 |
| Minority interests in earnings of consolidated subsidiaries | | (12) | | (81) | | (50) |
| Net income (loss) from equity method investments | | 14 | | (60) | | (31) |
| Other–than–temporary write–downs of investments | | (209) | | (266) | | (14) |
| Loss on foreign currency transactions | | (46) | | (58) | | (18) |
| Net gains on sales of businesses | | 725 | | 56 | | 30 |
| Legal settlements | | (212) | | — | | — |
| Net gains (losses) on sales and settlements of financial instruments | | (22) | | 18 | | 347 |
| Write–off of embedded derivative assets | | — | | (42) | | — |
| Miscellaneous, net | | (60) | | (179) | | (49) |
| **Total other income (expense), net** | $ | 292 | $ | (357) | $ | 333 |

**Supplementary Balance Sheet Information:**

|  | | September 30, | | |
|---|---|---|---|---|
|  | | 2002 | | 2001 |
| **INVENTORIES** | | | | |
| Completed goods | $ | 711 | $ | 2,023 |
| Work in process | | 35 | | 432 |
| Raw materials | | 617 | | 1,191 |
| **Total inventories** | $ | 1,363 | $ | 3,646 |
| | | | | |
| **PROPERTY, PLANT AND EQUIPMENT, NET** | | | | |
| Land and improvements | $ | 175 | $ | 320 |
| Buildings and improvements | | 1,796 | | 3,088 |
| Machinery, electronic and other equipment | | 2,648 | | 5,636 |
| Total property, plant and equipment | | 4,619 | | 9,044 |
| Less: accumulated depreciation | | 2,642 | | 4,628 |
| **Total property, plant and equipment, net** | $ | 1,977 | $ | 4,416 |

**GOODWILL AND OTHER**
**ACQUIRED INTANGIBLES, NET**

| | | | | |
|---|---|---|---|---|
| Goodwill | $ | 209 | $ | 1,262 |
| Other acquired intangibles | | 15 | | 204 |
| **Total goodwill and other acquired intangibles, net** | **$** | **224** | **$** | **1,466** |

**INCLUDED IN OTHER ASSETS**

| | | | | |
|---|---|---|---|---|
| Capitalized software | $ | 366 | $ | 583 |
| Internal use software | $ | 204 | $ | 261 |

**INCLUDED IN OTHER CURRENT LIABILITIES**

| | | | | |
|---|---|---|---|---|
| Deferred revenue | $ | 210 | $ | 452 |
| Advance billings, progress payments and customer deposits | $ | 403 | $ | 998 |
| Warranty reserve | $ | 440 | $ | 456 |
| Consumer Products leasing legal settlement (Note 17) | $ | 312 | $ | — |
| Self–insured loss reserves (Note 15) | $ | 428 | $ | 62 |

**Supplementary Cash Flow Information:**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | *Years ended September 30,* | | | | | | |
| | | **2002** | | | **2001** | | | **2000** |
| Interest payments, net of amounts capitalized | $ | (349) | $ | | (490) | $ | | (356) |
| Income tax refunds (payments), net | $ | 804 | $ | | (161) | $ | | (34) |
| Acquisitions of businesses: | | | | | | | | |
| Fair value of assets acquired, net of cash acquired | $ | — | $ | | — | $ | | 59 |
| Less: Fair value of liabilities assumed | | — | | | — | | | 7 |
| **Acquisitions of businesses, net of cash acquired** | **$** | **—** | **$** | | **—** | **$** | | **52** |

33

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**6. EARNINGS (LOSS) PER COMMON SHARE**

Basic earnings (loss) per common share is calculated by dividing net income (loss) applicable to common shareowners by the weighted average number of common shares outstanding during the period. Net income (loss) applicable to common shareowners includes preferred stock dividends and accretion for fiscal 2002 and 2001 and the conversion cost related to the exchange of 8% redeemable convertible preferred stock for Lucent common stock in fiscal 2002 (see Note 10).

Diluted earnings (loss) per share is calculated by dividing net income (loss) applicable to common shareowners, adjusted for preferred stock dividends and accretion for fiscal 2002 and 2001, interest expense for the 7.75% mandatorily redeemable convertible preferred securities of subsidiary trust for fiscal 2002 and conversion cost related to the exchange of the 8% redeemable convertible preferred stock for fiscal 2002. Diluted earnings (loss) per common share further reflects all potential issuances of common stock. However, since Lucent recorded a loss from continuing operations for fiscal 2002 and 2001, the diluted earnings (loss) per share is the same as basic, as any potentially dilutive securities would reduce the loss per share from continuing operations.

| | | Years ended September 30, | | | | |
|---|---|---|---|---|---|---|
| | | 2002 | | 2001 | | 2000 |
| **EARNINGS (LOSS)** | | | | | | |
| **PER COMMON SHARE – BASIC** | | | | | | |
| Income (loss) from continuing operations | $ | (3.51) | $ | (4.18) | $ | 0.44 |
| Income (loss) from discontinued operations | | 0.02 | | (0.93) | | (0.06) |
| Extraordinary gain | | — | | 0.35 | | — |
| Cumulative effect of accounting changes | | — | | (0.01) | | — |
| Net income (loss) applicable to common shareowners | $ | (3.49) | $ | (4.77) | $ | 0.38 |
| | | | | | | |
| **EARNINGS (LOSS)** | | | | | | |
| **PER COMMON SHARE – DILUTED** | | | | | | |
| Income (loss) from continuing operations | $ | (3.51) | $ | (4.18) | $ | 0.43 |
| Income (loss) from discontinued operations | | 0.02 | | (0.93) | | (0.06) |
| Extraordinary gain | | — | | 0.35 | | — |
| Cumulative effect of accounting changes | | — | | (0.01) | | — |
| Net income (loss) applicable to common shareowners | $ | (3.49) | $ | (4.77) | $ | 0.37 |
| | | | | | | |
| **WEIGHTED AVERAGE NUMBER** | | | | | | |
| **OF COMMON SHARES (IN MILLIONS)** | | | | | | |
| Common shares – basic | | 3,426.7 | | 3,400.7 | | 3,232.3 |
| Effect of dilutive securities: | | | | | | |
| Stock options | | — | | — | | 88.5 |
| Other | | — | | — | | 5.1 |
| Weighted average number of common shares – diluted | | 3,426.7 | | 3,400.7 | | 3,325.9 |

Most stock options are excluded from the calculation because their exercise price was greater than the average market price of the common shares. Diluted earnings (loss) per share for fiscal 2002 and 2001 does not include the effect of the following potential shares:

| | Years ended September 30, | |
|---|---|---|
| | 2002 | 2001 |
| *Potential common shares excluded from the* | | |
| *calculation of diluted loss per share (in millions): (a)* | | |
| 8% redeemable convertible preferred stock | 519 | 47(b) |
| Company–obligated 7.75% mandatorily redeemable convertible preferred securities of subsidiary trust | 193(c) | — |
| Stock options | 4 | 24 |
| Other | 2 | 6 |
| Total | 718 | 77 |

(a)  Adjusted to reflect the spinoff of Agere.

(b)  Had these securities been outstanding for the entire fiscal year, the amount of shares excluded from the calculation would have been 309 million for the year ended September 30, 2001.

(c)  Had these securities been outstanding for the entire fiscal year, the amount of shares excluded from the calculation would have been 362 million for the year ended September 30, 2002.

In addition, stock options where the exercise price was greater than the average market price of the common shares of 471 million, 407 million and 41 million, calculated on a weighted average basis, for the years ended September 30, 2002, 2001 and 2000, respectively, were excluded from the computation of diluted earnings (loss) per share.

## 7. COMPREHENSIVE INCOME (LOSS)

Comprehensive income (loss) represents net income (loss) plus the results of certain shareowners' (deficit) equity changes not reflected in the consolidated statements of operations.

The components of accumulated other comprehensive loss are as follows:

| | Foreign currency translation adjustment | Net unrealized holding gains/(losses) on investments | Minimum pension liability adjustments | Net unrealized holding gains/(losses) on derivative instruments | Total accumulated other comprehensive loss |
|---|---|---|---|---|---|
| Beginning balance, October 1, 1999 | $  (313) | $   79 | $  (10) | $   — | $  (244) |
| Current–period change | (185) | (4) | 2 | — | (187) |
| Amounts transferred to Avaya | 64 | — | 2 | — | 66 |
| Ending balance, September 30, 2000 | (434) | 75 | (6) | — | (365) |
| Cumulative effect of accounting change – SFAS 133 | — | 9 | — | 2 | 11 |
| Current–period change | (33) | (45) | (8) | (1) | (87) |
| Ending balance, September 30, 2001 | (467) | 39 | (14) | 1 | (441) |
| Current–period change | 60 | (35) | (2,927) | (1) | (2,903) |
| Amounts transferred to Agere | (6) | — | — | — | (6) |
| Ending balance, September 30, 2002 | $  (413) | $    4 | $  (2,941) | $   — | $  (3,350) |

Foreign currency translation adjustments are not generally adjusted for income taxes as they relate to indefinite investments in non–U.S. subsidiaries.

34

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## 8. INCOME TAXES

The following table presents the U.S. and non–U.S. components of income (loss) from continuing operations before income taxes and the provision (benefit) for income taxes:

| | | Years ended September 30, | |
|---|---|---|---|
| | 2002 | 2001 | 2000 |
| **INCOME (LOSS) FROM CONTINUING OPERATIONS BEFORE INCOME TAXES:** | | | |
| U.S. | $ (7,076) | $ (19,089) | $ 2,055 |
| Non–U.S. | 7 | (815) | 302 |
| **Income (loss) from continuing operations before income taxes** | $ (7,069) | $ (19,904) | $ 2,357 |
| **PROVISION (BENEFIT) FOR INCOME TAXES:** | | | |
| Current: | | | |
| Federal | $ (611) | $ 21 | $ 159 |
| State and local | — | — | 9 |
| Non–U.S. | 100 | 180 | 265 |
| Subtotal | (511) | 201 | 433 |
| Deferred: | | | |
| Federal | 4,242 | (4,983) | 405 |
| State and local | 837 | (879) | 85 |
| Non–U.S. | 189 | (73) | 1 |
| Subtotal | 5,268 | (5,935) | 491 |
| **Provision (benefit) for income taxes** | $ 4,757 | $ (5,734) | $ 924 |

The following table presents the principal reasons for the difference between the effective tax (benefit) rate on continuing operations and the U.S. federal statutory income tax (benefit) rate:

| | Years ended September 30, | | |
|---|---|---|---|
| | 2002 | 2001 | 2000 |
| U.S. federal statutory income tax (benefit) rate | (35.0)% | (35.0)% | 35.0% |
| State and local income tax (benefit) rate, net of federal income tax effect | (3.3)% | (4.1)% | 1.2% |
| Foreign earnings and dividends taxed at different rates | 0.2% | 0.4% | (1.3)% |
| Research credits | (1.9)% | (0.8)% | (6.0)% |
| Acquisition–related costs (a) | 5.0% | 8.3% | 12.6% |
| Disposition of OFS business | (7.3)% | n/a | n/a |
| Other differences, net | (1.7)% | (0.3)% | (4.2)% |
| Change in valuation allowance | 111.3% | 2.7% | 1.9% |
| **Effective income tax (benefit) rate** | 67.3% | (28.8)% | 39.2% |

(a)  Includes non–tax deductible IPRD, goodwill amortization and impairments (including goodwill write–offs recognized under the restructuring program), and merger–related costs.

n/a   Not applicable

The components of deferred income tax assets and liabilities are as follows:

*Years ended September 30,*

| | 2002 | | 2001 |
|---|---|---|---|
| **DEFERRED INCOME TAX ASSETS:** | | | |
| Bad debt and customer financing reserves | $ 490 | $ | 1,004 |
| Inventory reserves | 585 | | 685 |
| Business restructuring reserves | 421 | | 632 |
| Other operating reserves | 843 | | 536 |
| Postretirement and other benefits | 2,207 | | 2,386 |
| Net operating loss/credit carryforwards | 5,826 | | 2,538 |
| Other | 364 | | 636 |
| Valuation allowance | (9,989) | | (742) |
| | | | |
| **Total deferred tax assets** | $ 747 | $ | 7,675 |
| | | | |
| **DEFERRED INCOME TAX LIABILITIES:** | | | |
| Pension | $ 632 | $ | 1,971 |
| Other | 115 | | 526 |
| | | | |
| **Total deferred tax liabilities** | $ 747 | $ | 2,497 |

Statement of Financial Accounting Standards ("SFAS") No.109, "Accounting for Income Taxes" ("SFAS 109") requires that a valuation allowance be established when it is more likely than not that all or a portion of a deferred tax asset will not be realized. A review of all available positive and negative evidence needs to be considered, including a company's current and past performance, the market environment in which the company operates, the utilization of past tax credits, length of carryback and carryforward periods, existing contracts or sales backlog that will result in future profits, etc.

Forming a conclusion that a valuation allowance is not needed is difficult when there is negative evidence such as cumulative losses in recent years. Cumulative losses weigh heavily in the overall assessment. During the first and second quarters of fiscal 2002 Lucent established valuation allowances for future tax benefits with relatively short carryforward periods related to foreign tax credits, state and foreign net operating losses and capital losses. As a result of the review undertaken at June 30, 2002, Lucent concluded that it was appropriate to establish a full valuation allowance for its net deferred tax assets. During the fourth quarter of fiscal 2002 Lucent continued to maintain a full valuation allowance on the tax benefits generated by operating losses and credit carryforwards. Lucent expects to continue to record a full valuation allowance on future tax benefits until an appropriate level of profitability is sustained. Until an appropriate level of profitability is reached, Lucent does not expect to recognize any significant tax benefits in future results of operations. Valuation allowances of $1,149 were also established for net deferred tax assets resulting from minimum pension liabilities and other direct charges to equity.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The following table presents carryforwards for losses (tax effected) and tax credits:

| *Description* | *Amount* | *Expiration* |
|---|---|---|
| Federal net operating losses | $ 3,008 | 2022 |
| State net operating losses | 627 | 2007 to 2022 |
| Capital losses | 296 | 2007 |
| Foreign net operating losses/credits | 192 | 2007 to indefinite |
| Foreign tax credits | 489 | 2003 to 2005 |
| Research credits | 969 | 2017 to 2022 |
| State credits (various) | 223 | 2007 to 2017 |
| Alternative minimum tax credits | 22 | Indefinite |
| **Total** | **$ 5,826** | |

As of September 30, 2002, Lucent had provided for $71 of U.S. deferred income taxes on $203 of undistributed earnings of a non–U.S. subsidiary. The Company has not provided for U.S. deferred income taxes or foreign withholding taxes on its remaining undistributed earnings of $3,374 of its non–U.S. subsidiaries since these earnings are intended to be reinvested indefinitely. It is not practical to estimate the amount of additional taxes that might be payable on such undistributed earnings.

The Internal Revenue Service is currently examining Lucent's federal tax returns for 1997 and 1998 and has proposed certain adjustments. In addition, Lucent is a party to a tax sharing agreement with AT&T and is liable for tax adjustments that are attributable to Lucent's lines of businesses as well as a portion of certain shared non–line of business tax adjustments during the years prior to separation from AT&T. Certain tax adjustments have been proposed or assessed subject to this tax sharing agreement. Lucent does not believe that the outcome of these matters will have a material adverse effect on the consolidated results of operations, consolidated financial position, or near–term liquidity.

## 9. DEBT OBLIGATIONS

| | September 30, | |
|---|---|---|
| | 2002 | 2001 |
| **DEBT MATURING WITHIN ONE YEAR** | | |
| Revolving credit facilities, 5.7% weighted average interest rate at September 30, 2001 | $ — | $ 1,000 |
| Other | 120 | 135 |
| **Total debt maturing within one year** | **$ 120** | **$ 1,135** |

Weighted average interest rate for revolving credit facilities was 5.2% and 6.0% for fiscal 2002 and 2001, respectively.

Although the credit facility was cancelled, substantially all of Lucent's domestic assets remained collateralized as a result of extending the Guarantee and Collateral Agreement with our banks through December 18, 2002. This agreement provides security for commercial bankers in extending, among other things, credit facilities to non–U.S. subsidiaries, letters of credit and foreign exchange hedging.

| | September 30, | |
|---|---|---|
| | 2002 | 2001 |
| **LONG–TERM DEBT** | | |
| 7.25% notes due July 15, 2006 | $ 750 | $ 750 |
| 11.755% notes due July 1, 2006 | 302 | 330 |
| 5.50% notes due November 15, 2008 | 500 | 500 |
| 6.50% debentures due January 15, 2028 | 300 | 300 |
| 6.45% debentures due March 15, 2029 | 1,360 | 1,360 |
| Other (7.0% and 8.0% weighted average interest rates, in 2002 and 2001, respectively) | 63 | 101 |
| Total long–term debt | 3,275 | 3,341 |
| Unamortized discount | (36) | (38) |
| Fair value basis adjustment attributable to hedged debt obligations | 28 | — |
| Amounts maturing within one year | (31) | (29) |
| Long–term debt | $ 3,236 | $ 3,274 |

| | | | |
|---|---|---|---|
| Company–obligated 7.75% mandatorily redeemable convertible preferred securities of subsidiary trust | $ | 1,750 | $ — |

Aggregate maturities of the $3,275 in total long–term debt obligations at September 30, 2002 for fiscal 2003 through fiscal 2007 and thereafter were $31, $37, $42, $948, $2 and $2,215, respectively.

On March 19, 2002, Lucent Technologies Capital Trust I ("the Trust") completed the sale of 7.75% cumulative convertible trust preferred securities for an initial price of $1,000 per share for an aggregate amount of $1,750. Lucent owns all of the common securities of the Trust. The Trust used the proceeds to purchase 7.75% convertible subordinated debentures issued by Lucent due March 15, 2017, which represent all of the Trust's assets. The terms of the trust preferred securities are substantially the same as the terms of the debentures. Lucent may redeem the debentures, in whole or in part, for cash at premiums ranging from 103.88% beginning March 20, 2007, to 100.00% on March 20, 2012, and thereafter. To the extent Lucent redeems debentures, the Trust is required to redeem a corresponding amount of trust preferred securities. Lucent has irrevocably and unconditionally guaranteed, on a subordinated basis, the payments due on the trust preferred securities to the extent Lucent makes payments on the debentures to the Trust. In connection with this transaction, Lucent incurred approximately $46 of expenses that are deferred and are being amortized over the life of the debentures.

Holders of trust preferred securities are entitled to receive quarterly cash distributions commencing June 15, 2002. The ability of the Trust to pay dividends depends on the receipt of interest payments on the debentures. Lucent has the right to defer payments of interest on the debentures for up to 20 consecutive quarters. If Lucent defers the payment of interest on the debentures, the Trust will defer the quarterly distributions on the trust preferred securities for a corresponding period. Deferred interest accrues at an annual rate of 9.25%. Each trust preferred security is convertible at the option of the holder into 206.6116 shares of Lucent common stock, subject to additional adjustment under certain circumstances.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## 10. REDEEMABLE CONVERTIBLE PREFERRED STOCK

Lucent has 250,000,000 shares of preferred stock authorized. On August 6, 2001, Lucent designated and sold 1,885,000 shares of non-cumulative 8% redeemable convertible preferred stock having an initial liquidation preference of $1,000 per share, subject to accretion as described below, in a private placement, resulting in net proceeds of $1,831. Annual dividends are payable semiannually in cash or common stock at Lucent's option, subject to Lucent's having a legally available surplus as defined by Delaware law. Any unpaid dividends will increase the liquidation preference at an accretion rate of 10% per year, calculated on a semiannual basis. At the holder's option, each share of convertible preferred stock is convertible into 168.3502 shares of Lucent common stock, subject to adjustment under certain circumstances. Lucent can, at its option, require all holders to exchange their shares of redeemable convertible preferred stock for convertible subordinated debentures having terms substantially similar to the preferred stock. The redeemable convertible preferred stock is redeemable, at Lucent's option after August 15, 2006 and at the option of the holders on August 2 of 2004, 2007, 2010 and 2016. Provided certain criteria are met, Lucent has the option to redeem the convertible preferred stock for cash or its common stock (the common stock to be valued at a 5% discount from the then current market price) or a combination of cash and shares of its common stock. Lucent is obligated to redeem all outstanding preferred shares on August 1, 2031. The ability to redeem the preferred stock is subject to having legally available surplus as defined by Delaware law. The initial carrying value is being accreted to liquidation value as a charge to shareowners' (deficit) equity over the earliest redemption period of three years. Holders of the preferred stock have no voting rights, except as required by law, and rank junior to Lucent's debt obligations. In addition, upon dissolution or liquidation of Lucent, holders are entitled to the liquidation preference plus any accrued and unpaid dividends prior to any distribution of net assets to common shareowners.

During September 2002, Lucent repurchased 174,500 shares of 8% redeemable convertible preferred stock for 58,113,000 shares of Lucent common stock. No gain or loss was recognized on the exchange. The carrying value of the preferred stock repurchased was $175, and the exchange resulted in a corresponding increase to common stock and additional paid-in capital. The fair value of the additional common shares issued to the preferred stockholders to prompt the exchange over the shares obligated to be exchanged pursuant to the original conversion terms amounted to $29 and has been included in the loss applicable to the common shareowners.

Since September 30, 2002 and through December 4, 2002, Lucent repurchased an additional 380,024 shares of 8% redeemable convertible preferred stock for 143,340,962 shares of Lucent common stock. No gain or loss was recognized on the exchange. The carrying value of the preferred stock repurchased was approximately $380 and the exchange resulted in a corresponding increase to common stock and additional paid-in capital. The fair value of the additional common shares issued to the preferred stockholders to prompt the exchange over the shares obligated for exchange pursuant to the original conversion terms amounted to $96.

## 11. EMPLOYEE BENEFIT PLANS

### Pension and Postretirement Benefits

Lucent maintains defined benefit pension plans covering the majority of its employees and retirees, and postretirement benefit plans for retirees that include health care, dental benefits and life insurance coverage. On June 1, 2002, certain pension and postretirement asset and obligation amounts were transferred to Agere and are subject to final adjustment. The final amounts to be transferred to Agere are not expected to be materially different from the estimated amounts. In fiscal 2001, Lucent recorded final adjustments to the pension and postretirement asset and obligation amounts that were transferred to Avaya on September 30, 2000.

37

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The following information summarizes activity in the pension and postretirement benefit plans:

| | Pension benefits September 30, | | Postretirement benefits September 30, | |
|---|---|---|---|---|
| | 2002 | 2001 | 2002 | 2001 |
| **CHANGE IN BENEFIT OBLIGATION** | | | | |
| Benefit obligation at October 1 | $ 30,515 | $ 26,677 | $ 9,399 | $ 8,242 |
| Service cost | 238 | 345 | 18 | 35 |
| Interest cost | 1,981 | 1,956 | 622 | 604 |
| Actuarial losses | 1,708 | 1,466 | 1,004 | 761 |
| Amendments | — | 9 | — | (58) |
| Benefits paid | (3,403) | (2,800) | (914) | (709) |
| Settlements | (3) | (3) | — | (10) |
| Plan participant contributions | 5 | 5 | — | — |
| Termination benefits – Lucent | 237 | 1,954 | (1) | 197 |
| Termination benefits – Agere | 102 | — | — | — |
| Impact of curtailments | (14) | 715 | (29) | 288 |
| Exchange rate changes | 54 | 17 | — | — |
| Benefit obligation assumed by OFS | (95) | — | (37) | — |
| Benefit obligation assumed by Agere | (1,013) | — | (217) | — |
| Benefit obligation assumed by Avaya | — | 174 | — | 48 |
| **Benefit obligation at September 30** | $ 30,312 | $ 30,515 | $ 9,845 | $ 9,398 |
| **CHANGE IN PLAN ASSETS** | | | | |
| Fair value of plan assets at October 1 | $ 36,010 | $ 45,719 | $ 3,441 | $ 4,557 |
| Actual loss on plan assets | (2,473) | (6,848) | (515) | (827) |
| Company contributions | 98 | 57 | 10 | 17 |
| Benefits paid | (3,403) | (2,800) | (914) | (709) |
| Assets transferred to OFS | (115) | — | — | — |
| Assets transferred to Agere | (1,253) | — | (79) | — |
| Assets transferred from Avaya | — | 259 | — | 36 |
| Exchange rate changes | 35 | 12 | — | — |
| Other (including transfer of assets from pension to postretirement plans) | (301) | (389) | 502 | 366 |
| **Fair value of plan assets at September 30** | $ 28,598 | $ 36,010 | $ 2,445 | $ 3,440 |
| (Unfunded) funded status of the plan | $ (1,714) | $ 5,495 | $ (7,401) | $ (5,958) |
| Unrecognized prior service cost (credit) | 699 | 1,250 | (173) | (135) |
| Unrecognized transition asset | (7) | (100) | — | — |
| Unrecognized net (gain) loss | 5,948 | (1,642) | 2,851 | 1,035 |
| **Net amount recognized** | $ 4,926 | $ 5,003 | $ (4,723) | $ (5,058) |
| Amounts recognized in the consolidated balance sheets consist of: | | | | |
| Prepaid pension costs | $ 4,355 | $ 4,958 | $ — | $ — |
| Prepaid pension costs allocated to discontinued operations | — | 122 | — | — |
| Accrued benefit liability | (2,760) | (99) | (4,723) | (4,972) |
| Accrued benefit liability allocated to discontinued operations | — | (2) | — | (86) |
| Intangible asset | 390 | 5 | — | — |
| Accumulated other comprehensive loss | 2,941 | 19 | — | — |
| **Net amount recognized** | $ 4,926 | $ 5,003 | $ (4,723) | $ (5,058) |
| Under–funded or non–funded plans: | | | | |
| Aggregate benefit obligation | $ 18,238 | $ 95 | $ 9,845 | $ 8,094 |
| Aggregate fair value of plan assets | 14,940 | — | 2,444 | 1,674 |
| Plans with under–funded or non–funded accumulated benefit obligations: | | | | |
| Aggregate accumulated benefit obligation | $ 17,275 | $ 89 | n/a | n/a |
| Aggregate fair value of plan assets | 14,507 | — | n/a | n/a |

n/a      Not applicable.

38

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

In fiscal 2002, global capital market developments resulted in negative returns on Lucent's pension funds and a decline in the discount rate used to estimate the pension liability. As a result, the accumulated benefit obligation exceeded the fair value of plan assets and Lucent was required to adjust the minimum pension liability recorded in the consolidated balance sheet. The effect of this adjustment was to decrease prepaid pension costs by $684, increase pension liabilities by $2,623, increase intangible assets by $385 and increase accumulated other comprehensive loss by $2,922. Because these adjustments were non-cash, their effect has been excluded from the accompanying consolidated statement of cash flows.

Pension plan assets include $2 and $17 of Lucent common stock at September 30, 2002 and 2001, respectively. Postretirement plan assets include $0 and $1 of Lucent common stock at September 30, 2002 and 2001, respectively.

**Components of Net Periodic Benefit Cost:**

|  | Years ended September 30, | | |
|---|---|---|---|
|  | 2002 | 2001 | 2000 |
| **PENSION COST (CREDIT):** | | | |
| Service cost | $ 238 | $ 345 | $ 497 |
| Interest cost on projected benefit obligation | 1,981 | 1,956 | 1,940 |
| Expected return on plan assets | (3,384) | (3,401) | (3,256) |
| Amortization of unrecognized prior service costs | 236 | 327 | 363 |
| Amortization of transition asset | (92) | (220) | (298) |
| Amortization of net (gain) loss | (189) | (387) | (197) |
| Subtotal | (1,210) | (1,380) | (951) |
| Termination benefits | 340 | 1,954 | — |
| Curtailments | 305 | 562 | — |
| Settlements | (10) | (12) | — |
| **Net pension cost (credit)** | $ (575) | $ 1,124 | $ (951) |
| **DISTRIBUTION OF NET PENSION COST (CREDIT):** | | | |
| Continuing operations: | | | |
| Business restructuring | $ 543 | $ 2,485 | $ — |
| Other costs and expenses | (1,220) | (1,387) | (1,093) |
| Subtotal | (677) | 1,098 | (1,093) |
| Discontinued operations | 102 | 26 | 142 |
| **Net pension cost (credit)** | $ (575) | $ 1,124 | $ (951) |
| **POSTRETIREMENT COST:** | | | |
| Service cost | $ 18 | $ 35 | $ 67 |
| Interest cost on accumulated benefit obligation | 622 | 604 | 601 |
| Expected return on plan assets | (361) | (352) | (338) |
| Amortization of unrecognized prior service costs | — | 22 | 37 |
| Amortization of net gain | (24) | (25) | (12) |
| Subtotal | 255 | 284 | 355 |
| Termination benefits | — | 197 | — |
| Curtailments | 35 | 98 | — |
| Settlements | — | (5) | — |
| **Net postretirement benefit cost** | $ 290 | $ 574 | $ 355 |

|  | Years ended September 30, | | |
|---|---|---|---|
|  | 2002 | 2001 | 2000 |
| **DISTRIBUTION OF NET POSTRETIREMENT BENEFIT COST:** | | | |
| Continuing operations: | | | |
| Business restructuring | $ 35 | $ 260 | $ — |
| Other costs and expenses | 248 | 304 | 291 |

| | | | |
|---|---|---|---|
| Subtotal | 283 | 564 | 291 |
| Discontinued operations | 7 | 10 | 64 |
| Net postretirement benefit cost | $ 290 | $ 574 | $ 355 |

### PENSION AND POSTRETIREMENT BENEFITS WEIGHTED AVERAGE ASSUMPTIONS:

| | | | |
|---|---|---|---|
| Discount rate | 6.5% | 7.0% | 7.5% |
| Expected return on plan assets | 9.0% | 9.0% | 9.0% |
| Rate of compensation increase | 3.5% | 4.5% | 4.5% |

The expected rate of return on plan assets that will be used to determine fiscal 2003 net periodic benefit cost is 8.75% for pensions and a weighted average of 7.93% for postretirement benefits.

Lucent has several non–pension postretirement benefit plans. For postretirement health care benefit plans, Lucent assumed a 9.8% weighted average annual health care cost trend rate for 2003, gradually declining to 4.9% (excluding postretirement dental benefits, the annual medical cost trend rate would be 10.2% in 2003 gradually declining to 5.0%). The assumed health care cost trend rate has a significant effect on the amounts reported. A one–percentage–point change in the assumed health care cost trend rate would have the following effects:

| | 1 Percentage Point | |
|---|---|---|
| | Increase | Decrease |
| Effect on total of service and interest cost components | $ 24 | $ 20 |
| Effect on postretirement benefit obligation | $ 339 | $ 294 |

### Savings Plans

Lucent's savings plans allow employees to contribute a portion of their compensation on a pre–tax and/or after–tax basis in accordance with specified guidelines. Lucent matches a percentage of the employee contributions up to certain limits, in cash, in accordance with participants' investment elections. Savings plan expense charged to continuing operations was $71, $125 and $161 for fiscal 2002, 2001 and 2000, respectively.

39

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## 12. STOCK COMPENSATION PLANS

On April 22, 2002, Lucent commenced a voluntary offer to eligible employees to exchange certain outstanding stock options to purchase shares of common stock, including all stock options issued during the six-month period ended April 22, 2002, for Lucent's promise to grant a new stock option on or about November 25, 2002. Employees who participated in the offer tendered stock options to purchase an aggregate of 213.2 million shares of Lucent common stock, which have been cancelled, in exchange for Lucent's promises to grant new stock options to purchase up to an aggregate of 123.3 million shares of Lucent common stock. On November 25, 2002, Lucent granted approximately 110.6 million new stock options in connection with the exchange having an exercise price of $1.78 per share, which was the fair market value of Lucent common stock on the date of the grant.

Lucent has stock-based compensation plans under which outside directors and certain employees receive stock options and other equity-based awards. The plans provide for the grant of stock options, stock appreciation rights, performance awards, restricted stock awards and other stock unit awards.

Stock options generally are granted with an exercise price equal to 100% of the market value of a share of common stock on the date of grant, have two-to-10-year terms and vest within four years from the date of grant. Subject to customary antidilution adjustments and certain exceptions, the total number of shares of common stock authorized for option grants under the plans was 729 million shares at September 30, 2002.

In connection with certain acquisitions, outstanding stock options held by employees of acquired companies became exercisable, according to their terms, for Lucent common stock effective at the acquisition date. These options did not reduce the shares available for grant under any of Lucent's other option plans. For acquisitions accounted for as purchases, the fair value of these options was generally included as part of the purchase price. As of July 1, 2000, Lucent began recording deferred compensation related to unvested options held by employees of companies acquired in a purchase acquisition. Unamortized deferred compensation expense was $0, $5 and $34 at September 30, 2002, 2001 and 2000, respectively. The deferred expense calculation and amortization are based on the graded vesting schedule of the awards.

Lucent established an Employee Stock Purchase Plan ("ESPP") effective October 1, 1996. Under the terms of this ESPP, eligible employees could have up to 10% of eligible compensation deducted from their pay to purchase common stock. The per share purchase price was 85% of the average high and low per share trading price of common stock on the New York Stock Exchange ("NYSE") on the last trading day of each month. In fiscal 2001 and 2000, 17.6 million and 7.8 million shares, respectively, were purchased under this ESPP and the employer stock purchase plans of acquired companies, at weighted average per share prices of $10.04 and $46.75, respectively. This ESPP expired on June 30, 2001.

Effective July 1, 2001, Lucent established the current ESPP ("2001 ESPP"). Under the terms of the 2001 ESPP, eligible employees may have up to 10% of eligible compensation deducted from their pay to purchase common stock during an offering period, consisting of four purchase periods, generally six months long. An employee may purchase up to 567 shares on the last trading date of each purchase period. The per share purchase price is 85% of the average high and low per share trading price of common stock on the NYSE on either the employee's entry date for the relevant offering period, or on the last trading day of the relevant purchase period, whichever is lower. The amount that may be offered pursuant to this new plan is 250 million shares. During fiscal 2002, 9.9 million shares of common stock were purchased.

Lucent has adopted the disclosure requirements of SFAS No.123, "Accounting for Stock-Based Compensation" ("SFAS 123"), and, as permitted under SFAS 123, applies Accounting Principles Board Opinion No.25 ("APB 25") and related interpretations in accounting for its plans. Compensation expense recorded under APB 25 was $37, $147 and $49 for the years ended September 30, 2002, 2001 and 2000, respectively. If Lucent had elected to adopt the optional recognition provisions of SFAS 123 for its stock option and purchase plans, net income (loss) and earnings (loss) per share applicable to common shareowners would have been changed to the pro forma amounts indicated below. The fiscal 2002 pro forma amounts include $1,395 related to an increase in valuation allowances for net deferred tax assets.

|  | | Years ended September 30, | | | | |
|---|---|---|---|---|---|---|
|  | | **2002** | | **2001** | | **2000** |
| **NET INCOME (LOSS)** | | | | | | |
| As reported | $ | (11,753) | $ | (16,198) | $ | 1,219 |
| Pro forma[(a)] | $ | (14,265) | $ | (17,172) | $ | 452 |
| | | | | | | |
| **EARNINGS (LOSS) PER SHARE – BASIC** | | | | | | |
| As reported | $ | (3.49) | $ | (4.77) | $ | 0.38 |
| Pro forma[(a)] | $ | (4.22) | $ | (5.05) | $ | 0.14 |
| | | | | | | |
| **EARNINGS (LOSS) PER SHARE – DILUTED** | | | | | | |
| As reported | $ | (3.49) | $ | (4.77) | $ | 0.37 |
| Pro forma[(a)] | $ | (4.22) | $ | (5.05) | $ | 0.13 |

(a)   Includes Lucent's pro rata share of Agere's SFAS 123 compensation expense.

The fair value of stock options used to compute pro forma net income (loss) and earnings (loss) per share disclosures is the estimated fair value at grant date using the Black-Scholes option-pricing model with the following assumptions:

| | Years ended September 30, | | |
| | 2002 | 2001 | 2000 |
|---|---|---|---|
| Dividend yield | 0.0% | 0.49% | 0.23% |
| Expected volatility – Lucent | 78.9% | 60.2% | 39.2% |
| – Acquisitions[a] | n/a | n/a | 55.3% |
| Risk–free interest rate | 3.6% | 4.9% | 6.5% |
| Expected holding period (in years) | 2.5 | 2.4 | 2.9 |

(a) Pre–merger assumptions for companies acquired in a pooling–of–interests.

n/a    Not applicable.

40

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The fair value of the employee's purchase rights under the 2001 ESPP is calculated using the Black–Scholes model, with the following weighted average assumptions for fiscal 2002: dividend yield of 0%; expected life of 12.6 months; expected volatility of 81.7%; and a risk–free interest rate of 2.1%. The weighted average fair value of those purchase rights granted in fiscal 2002 was $3.18 per share.

The fair value of the employee's purchase rights under the 2001 ESPP was calculated using the Black–Scholes model, with the following weighted average assumptions for fiscal 2001: dividend yield of 0%; expected life of 15.3 months; expected volatility of 97.4%; and a risk–free interest rate of 3.7%. The weighted average fair value of those purchase rights granted in fiscal 2001 was $3.53 per share.

The weighted average fair value of stock options, calculated using the Black–Scholes option–pricing model, granted during the years ended September 30, 2002, 2001 and 2000 is $2.11, $4.59 and $16.15 per share, respectively.

Presented below is a summary of the status of Lucent stock options and the related activity for the years ended September 30, 2002, 2001 and 2000:

| | Shares (in thousands) | | Weighted average exercise price per share |
|---|---|---|---|
| Options outstanding at October 1, 1999 | 286,292 | $ | 26.15 |
| Granted/assumed[a] | 285,798 | | 47.95 |
| Exercised | (74,963) | | 15.38 |
| Forfeited/expired | (38,815) | | 41.56 |
| Options outstanding at September 30, 2000 | 458,312 | $ | 40.20 |
| Options outstanding at September 30, 2000, after spinoff adjustments[b] | 431,509 | $ | 39.34 |
| Granted | 347,557 | | 12.56 |
| Exercised | (10,496) | | 4.73 |
| Forfeited/expired | (85,957) | | 37.77 |
| Options outstanding at September 30, 2001 | 682,613 | $ | 26.43 |
| Granted | 13,008 | | 6.37 |
| Exercised | (6,489) | | 1.50 |
| Forfeited/expired | (101,014) | | 26.85 |
| Cancelled due to exchange offer | (213,246) | | 30.22 |
| Options outstanding at May 31, 2002 | 374,872 | $ | 23.96 |
| Options outstanding at June 1, 2002, after spinoff adjustments[b] | 363,603 | $ | 21.04 |
| Granted | 946 | | 2.09 |
| Exercised | (278) | | 0.41 |
| Forfeited/expired | (77,376) | | 36.85 |
| Options outstanding at September 30, 2002 | 286,895 | $ | 16.73 |

(a)  Includes options converted in acquisitions.

(b)  Effective with the spinoffs of Agere and Avaya on June 1, 2002 and September 30, 2000, respectively, Lucent stock options held by Agere employees were converted into Agere stock options and unvested Lucent stock options held by Avaya employees were converted into Avaya stock options. For the remaining unexercised Lucent stock options held by Avaya employees, the number of Lucent stock options and the exercise price were adjusted to preserve the intrinsic value of the stock options that existed prior to the spinoff.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The following table summarizes the status of stock options outstanding and exercisable at September 30, 2002:

| | Stock options outstanding | | | Stock options exercisable | |
|---|---|---|---|---|---|
| Range of exercise prices per share | Shares (in thousands) | Weighted average remaining contractual life (years) | Weighted average exercise price per share | Shares (in thousands) | Weighted average exercise price per share |
| $0.00 to $6.00 | 6,301 | 5.1 | $ 3.71 | 2,563 | $ 3.15 |
| $6.01 to $6.26 | 77,537 | 3.5 | 6.23 | 32,820 | 6.23 |
| $6.27 to $9.99 | 40,692 | 4.1 | 9.41 | 37,698 | 9.57 |
| $10.00 to $16.03 | 99,184 | 4.0 | 12.24 | 89,549 | 12.22 |
| $16.04 to $89.70 | 63,181 | 6.2 | 42.68 | 56,639 | 41.78 |
| **Total** | **286,895** | | $ **16.73** | **219,269** | $ **18.40** |

Other stock unit awards are granted under certain award plans. The following table presents the total number of shares of common stock represented by awards granted to employees for the years ended September 30, 2002, 2001 and 2000:

| | Years ended September 30, | | |
|---|---|---|---|
| | 2002 | 2001 | 2000 |
| Other stock unit awards granted (in thousands) | 4,142 | 5,400 | 858 |
| Weighted average market value of shares granted during the period | $ 6.74 | $ 13.64 | $ 59.23 |

## 13. OPERATING SEGMENTS

Lucent designs and delivers networks for the world's largest communications service providers. Lucent changed its reporting segments beginning in fiscal 2002 to two customer–focused operating segments, Integrated Network Solutions ("INS") and Mobility Solutions ("Mobility"), from Products and Services. These reportable segments are managed separately. The INS segment sells to global wireline service providers, including long distance carriers, traditional local telephone companies and Internet service providers, and provides offerings comprised of a broad range of core switching and access and optical networking products. The Mobility segment focuses on global wireless service providers and offers products to support the needs of its customers for radio access and core networks. Both segments offer network management and application and service delivery products. In addition, Lucent supports its segments through its worldwide services organization.

Performance measurement and resource allocation for the reportable segments are based on many factors. The primary financial measure is operating income (loss), which includes the revenues, costs and expenses directly controlled by each reportable segment, as well as an allocation of costs and operating expenses, which are not managed at a segment level, but are related to the products or services sold to its customers. Operating income (loss) for reportable segments excludes the following:

- goodwill and other acquired intangibles amortization;

- business restructuring and asset impairments;

- acquisition/integration–related costs, including IPRD;

- the results of the optical fiber business;

- the results from billing and customer care software products, messaging products and other smaller units;

- certain personnel costs and benefits, including a portion of those related to pension and postretirement benefits and differences between the actual and standard allocated benefit rates;

- certain other costs related to shared services such as general corporate functions, which are managed on a common basis in order to realize economies of scale and efficient use of resources; and

- certain other general and miscellaneous costs and expenses not directly used in assessing the performance of the operating segments.

The accounting policies of the reportable segments are the same as those applied in the consolidated financial statements.

42

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The following tables present Lucent's revenues and operating income (loss) by reportable operating segment and a reconciliation of the totals reported for operating income (loss) of the segments to consolidated operating income (loss):

| | *Years ended September 30,* | | |
| | 2002 | 2001 | 2000 |
|---|---:|---:|---:|
| **EXTERNAL REVENUES** | | | |
| INS | $ 6,415 | $ 12,263 | $ 18,654 |
| Mobility | 5,380 | 6,154 | 6,837 |
| Total reportable segments | 11,795 | 18,417 | 25,491 |
| Optical fiber business | 114 | 2,023 | 1,842 |
| Other | 412 | 854 | 1,571 |
| **Total external revenues** | $ 12,321 | $ 21,294 | $ 28,904 |
| | | | |
| **OPERATING INCOME (LOSS)** | | | |
| INS | $ (2,769) | $ (4,724) | $ 1,685 |
| Mobility | (655) | (1,517) | 939 |
| Total reportable segments | (3,424) | (6,241) | 2,624 |
| Goodwill and other acquired intangibles amortization | (250) | (921) | (362) |
| Business restructuring charges and asset impairments | (2,316) | (11,416) | — |
| Acquisition/integration–related costs | — | — | (620) |
| Optical fiber business | (68) | 543 | 439 |
| Unallocated personnel costs and benefits | 1,717 | 2,423 | 2,535 |
| Shared services such as general corporate functions | (1,603) | (2,497) | (2,347) |
| Other | (1,035) | (920) | 97 |
| **Total operating income (loss)** | $ (6,979) | $ (19,029) | $ 2,366 |

Supplemental Segment Information

| | *Years ended September 30,* | | |
| | 2002 | 2001 | 2000 |
|---|---:|---:|---:|
| **ASSETS:** | | | |
| INS | $ 1,909 | $ 7,235 | $ 11,411 |
| Mobility | 760 | 2,305 | 3,641 |
| Total reportable segments(a) | 2,669 | 9,540 | 15,052 |
| Non–segment | 15,122 | 24,124 | 32,460 |
| **Total assets** | $ 17,791 | $ 33,664 | $ 47,512 |
| | | | |
| **DEPRECIATION AND AMORTIZATION:** | | | |
| INS | $ 458 | $ 725 | $ 671 |
| Mobility | 247 | 343 | 266 |
| Total reportable segments(b) | 705 | 1,068 | 937 |
| Non–segment | 765 | 1,468 | 730 |
| **Total depreciation and amortization** | $ 1,470 | $ 2,536 | $ 1,667 |

(a)   Assets included in reportable segments consist of receivables, inventory and contracts in process.

(b)   Depreciation and amortization for reportable segments excludes goodwill and other acquired intangibles amortization.

## Products and Services Revenues

The table below presents external revenues for groups of similar products and services:

| | Years ended September 30, | | |
| | 2002 | 2001 | 2000 |
|---|---|---|---|
| Switching and access | $   3,155 | $   5,598 | $  10,798 |
| Optical networking products | 1,427 | 3,206 | 3,297 |
| Wireless products | 4,492 | 5,409 | 6,430 |
| Optical fiber | 114 | 2,023 | 1,842 |
| Services | 2,689 | 4,162 | 4,926 |
| Other(a) | 444 | 896 | 1,611 |
| Totals | $  12,321 | $  21,294 | $  28,904 |

(a)   Principally includes billing and customer care software products, messaging products and, in fiscal 2000, the consumer products business.

## Geographic Information

| | External Revenues(a) | | |
| | Years ended September 30, | | |
| | 2002 | 2001 | 2000 |
|---|---|---|---|
| U.S. | $   8,148 | $  13,776 | $  19,829 |
| Non–U.S. countries | 4,173 | 7,518 | 9,075 |
| Totals | $  12,321 | $  21,294 | $  28,904 |

| | Long–Lived Assets(b) | | |
| | September 30, | | |
| | 2002 | 2001 | 2000 |
|---|---|---|---|
| U.S. | $   1,540 | $   4,755 | $  10,283 |
| Non–U.S. countries | 661 | 1,127 | 1,226 |
| Totals | $   2,201 | $   5,882 | $  11,509 |

(a)   Revenues are attributed to geographic areas based on the location of customers.

(b)   Represents property, plant and equipment, net and goodwill and other acquired intangibles, net.

## Concentrations

Historically, Lucent has relied on a limited number of customers for a substantial portion of its total revenues. Revenues from Verizon, including Verizon Wireless, accounted for approximately 19%, 19% and 14% of consolidated revenues in the years ended September 30, 2002, 2001 and 2000, respectively. Revenues from AT&T, including AT&T Wireless, accounted for approximately 11% of consolidated revenues in the year ended September 30, 2000. Lucent expects a significant portion of its future revenues to continue to be generated by a limited number of customers. The loss of any of these customers or any substantial reduction in orders by any of these customers could materially and adversely affect Lucent's operating results. See note 17 for a discussion of contract manufacturing concentrations.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## 14. FINANCIAL INSTRUMENTS

### Fair Values

The carrying values and estimated fair values, based on quoted market rates, of financial instruments were as follows:

| | Years ended September 30, | | | |
| | 2002 | | 2001 | |
| | Carrying value | Fair value | Carrying value | Fair value |
|---|---|---|---|---|
| Long–term debt | $ 3,236 | $ 1,281 | $ 3,274 | $ 2,324 |
| Company–obligated 7.75% mandatorily redeemable convertible preferred securities of subsidiary trust | 1,750 | 400 | — | — |
| 8% redeemable convertible preferred stock | 1,680 | 429 | 1,834 | 1,849 |

The carrying values of cash and cash equivalents, receivables, payables and debt maturing within one year contained in the consolidated balance sheets approximate fair value. The carrying values of foreign exchange forward and option contracts and interest rate swaps at September 30, 2002 and 2001 equals their fair value and are determined using quoted market rates.

The following tables summarize Lucent's investments in debt and equity securities:

| September 30, 2002 | Cost | Gross unrealized gains | Gross unrealized losses and impairments | Estimated fair value |
|---|---|---|---|---|
| **DEBT SECURITIES:** | | | | |
| U.S. treasury bills and government agency notes | $ 1,232 | $ 9 | $ — | $ 1,241 |
| Corporate commercial paper | 124 | — | — | 124 |
| Bank certificates of deposit | 160 | 1 | — | 161 |
| Total debt securities | 1,516 | 10 | | 1,526 |
| **EQUITY SECURITIES:** | | | | |
| Available–for–sale equity investments | 267 | — | (150) | 117 |
| Other equity investments | 275 | — | (138) | 137 |
| Total equity securities | 542 | — | (288) | 254 |
| **Total debt and equity securities** | $ 2,058 | $ 10 | $ (288) | $ 1,780 |

| September 30, 2001 | Cost | Gross unrealized gains | Gross unrealized losses and impairments | Estimated fair value |
|---|---|---|---|---|
| **EQUITY SECURITIES:** | | | | |
| Available–for–sale equity investments | $ 36 | $ 29 | $ (6) | $ 59 |
| Other equity investments | 251 | — | (49) | 202 |
| **Total equity securities** | $ 287 | $ 29 | $ (55) | $ 261 |

All of Lucent's debt security investments are classified as available–for–sale and mature within one year.

### Credit Risk and Market Risk

By their nature, all financial instruments involve risk, including credit risk for non–performance by counterparties. The contract or notional amounts of these instruments reflect the extent of involvement Lucent has in particular classes of financial instruments. The maximum potential loss may exceed any amounts recognized in the consolidated balance sheets. However, Lucent's maximum exposure to credit loss in the event of nonperformance by the other party to the financial instruments for commitments to extend credit and financial guarantees is limited to the amount drawn and outstanding on those instruments.

Exposure to credit risk is controlled through credit approvals, credit limits and continuous monitoring procedures and reserves for losses are established when deemed necessary. Lucent seeks to limit its exposure to credit risks in any single country or region, although Lucent's customers are primarily in the telecommunications service provider industry.

All financial instruments inherently expose the holders to market risk, including changes in currency and interest rates. Lucent manages its exposure to these market risks through its regular operating and financing activities and when appropriate, through the use of derivative financial instruments.

**Derivative Financial Instruments**

**Foreign currency risk**

Lucent conducts its business on a multinational basis in a wide variety of foreign currencies. The objective of Lucent's foreign currency risk management policy is to preserve the economic value of cash flows in nonfunctional currencies. Lucent's policy is to hedge all significant booked and firmly committed cash flows identified as creating foreign currency exposure on a rolling 12–month basis. In addition, Lucent typically hedges a portion of its exposure resulting from identified anticipated cash flows, providing the flexibility to deal with the variability of longer–term forecasts as well as changing market conditions, in which the cost of hedging may be excessive relative to the level of risk involved.

To manage this risk, Lucent enters into various foreign exchange forward and option contracts. In some cases, Lucent may hedge foreign exchange risk in certain sales and purchase contracts by embedding terms in the contracts that affect the ultimate amount of cash flows under the contract. Principal currencies hedged as of September 30, 2002 include euros and Indian rupees having notional amounts of $208 and $81, respectively, with fair values that were not material. The notional amounts and fair values of embedded derivatives at September 30, 2002, were not material.

Lucent hedges all types of foreign currency risk to preserve the economic cash flows of the Company in accordance with corporate risk management policies but generally does not expect to designate related derivative instruments as hedges under SFAS 133 for cost/benefit reasons.

Accordingly, the changes in fair value of these undesignated freestanding foreign currency derivative instruments are recorded in other income

44

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

(expense), net in the period of change and have not been material to Lucent due to the short maturities of these instruments.

Lucent's foreign currency embedded derivatives consist of sales and purchase contracts with cash flows indexed to changes in or denominated in a currency that neither party to the contract uses as their functional currency. Changes in the fair value of these embedded derivatives were not significant during fiscal 2002.

**Interest rate risk**

Lucent uses a combination of financial instruments, including medium-term and short-term financings, variable-rate debt instruments and interest rate swaps to manage its interest rate mix of the total debt portfolio and related overall cost of borrowing. At September 30, 2002, Lucent had interest rate swap agreements designated as fair value hedges with an aggregate notional amount of $500 and a fair value of $28 that hedge a portion of a long-term, fixed-rate debt obligation due in July 2006. Under these swaps, Lucent receives a fixed interest rate of 7.25% and pays a weighted average floating rate of LIBOR plus 2.91%. As of September 30, 2002, LIBOR was approximately 1.79%. The objective of maintaining the mix of fixed and floating rate debt is to mitigate the variability of cash flows resulting from interest rate fluctuations, as well as to reduce the cash flows attributable to debt instruments. There were no derivative transactions hedging cash equivalents and short-term investments since their relatively short maturities do not create significant risk. There were no interest rate swaps in effect at September 30, 2001.

**Other derivatives**

From time to time, Lucent may obtain warrants to purchase equity securities in other companies to complement its investment portfolio. Warrants that provide for net share settlement are considered to be derivative instruments and are generally not eligible to be designated as hedging instruments as there is no corresponding underlying exposure. The fair value of these warrants was not material at September 30, 2002 and 2001.

**Non-Derivative Instruments and Customer Financing Commitments**

Requests for providing commitments to extend credit and financial guarantees are reviewed and approved by senior management. Management regularly reviews all outstanding commitments, letters of credit and financial guarantees, and the results of these reviews are considered in assessing the adequacy of Lucent's reserve for possible credit and guarantee losses.

The following table presents Lucent's non-derivative instruments and customer financing commitments for amounts drawn, available but not drawn and not available to be drawn. These instruments may expire without being drawn upon. Therefore, the amounts available but not drawn and not available do not necessarily represent future cash flows. The amounts drawn on these instruments are generally collateralized by substantially all of the assets of the respective creditors.

| | September 30, 2002 | | |
| | Total Loans and Guarantees | Loans | Guarantees |
|---|---|---|---|
| Drawn commitments | $ 1,098 | $ 909 | $ 189 |
| Available but not drawn | 93 | 51 | 42 |
| Not available | 151 | 151 | — |
| **Total** | $ 1,342 | $ 1,111 | $ 231 |

| | September 30, 2001 | | |
| | Total Loans and Guarantees | Loans | Guarantees |
|---|---|---|---|
| Drawn commitments | $ 2,956 | $ 2,528 | $ 428 |
| Available but not drawn | 1,447 | 1,411 | 36 |
| Not available | 911 | 655 | 256 |
| **Total** | $ 5,314 | $ 4,594 | $ 720 |

**Commitments to Extend Credit**

Commitments to extend credit to third parties are conditional agreements generally having fixed expiration or termination dates and specific interest rates and purposes. In certain situations, credit may not be available for draw down until certain conditions precedent are met.

**Guarantees of Debt**

From time to time, Lucent guarantees the financing for product purchases by customers. Requests for providing such guarantees are reviewed and approved by senior management. Certain financial guarantees are assigned to a third–party reinsurer.

**Letters of Credit**

Letters of credit are obtained to ensure Lucent's performance or payment to third parties in accordance with specified terms and conditions, which amounted to $668 and $900 as of September 30, 2002 and 2001, respectively. The estimated fair value of letters of credit are $17 and $12 as of September 30, 2002 and 2001, respectively, which are valued based on fees paid to obtain the obligations.

45

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## 15. SECURITIZATIONS AND TRANSFERS OF FINANCIAL INSTRUMENTS

In June 2001, Lucent established a $750 revolving accounts receivable securitization facility due to expire in June 2004. The facility limit was reduced to $500 in October 2001. Under the terms of the facility, Lucent could sell an undivided interest in collateralized accounts receivable from specified customers in exchange for cash and a subordinated retained interest in the remaining outstanding accounts receivable. At September 30, 2002 and 2001, unrelated third parties held an undivided interest of $0 and $286, respectively, in the collateralized accounts receivables. The balance of retained interests is included in receivables and varies based on changes in Lucent's credit ratings and the credit ratings of the customers included in the securitization facility, changes in the sufficiency of eligible accounts receivable and concentration of credit risk among obligors. Accordingly, unfavorable changes in these factors required Lucent to repurchase undivided interests in securitized accounts receivable and favorable changes in the factors allowed Lucent to sell additional undivided interests in accounts receivable. On October 17, 2002, this securitization facility, together with the credit facility, was terminated.

Lucent serviced these securitized receivables for a fee that approximated Lucent's cost of servicing and such fees were not significant. The investors in the securitized receivables had no recourse to Lucent's other assets as a result of debtors' defaults except for the retained interests in the collateralized accounts receivable.

The following table provides the cash flows related to this securitization facility:

| | Years ended September 30, | |
| --- | --- | --- |
| | 2002 | 2001 |
| Proceeds from receivables initially securitized | $ — | $ 435 |
| Proceeds from collections reinvested in revolving securitization | 6,385 | 1,913 |
| Net repurchases of undivided interests | 286 | 149 |
| Average securitized balance | 753 | 1,188 |

At September 30, 2002, there were no retained interests in this facility. The following table provides the valuation of retained interests at September 30, 2001.

| | |
| --- | --- |
| Total securitized balance | $ 1,277 |
| Fair value of retained interests in outstanding receivables | 939 |
| Discount for time value | 7 |
| Net reserve for credit losses | 13 |

Retained interests are valued based on the historical payment patterns and the discount rate implicit in the underlying invoices. The expected reserve for credit losses is 1.27%. A discount is imputed based on the expected number of days that receivables will remain outstanding and a discount rate commensurate with the risks involved. Assuming hypothetical simultaneous unfavorable variations of up to 20% in credit losses and the discount rate used, the pretax impact on the value of retained interests would not be significant.

In September 2000, Lucent and a third–party financial institution arranged for the creation of a non–consolidated Special Purpose Trust ("Trust") for the purpose of allowing Lucent from time to time to sell on a limited–recourse basis up to a maximum of $970 of customer finance loans and receivables ("Loans") at any given point in time through a wholly–owned bankruptcy–remote subsidiary, which in turn would sell the Loans to the Trust. Lucent had originally intended to periodically sell Loans to the Trust, however, due to Lucent's credit downgrade in February 2001, Lucent is unable to sell additional Loans to the Trust, as defined by agreements between Lucent and the Trust. Lucent will continue to service, administer and collect the Loans on behalf of the Trust and receive a fee for performance of these services until the Loans are either fully collected or sold by the Trust to an unrelated third party. At September 30, 2002, the Trust held $349 in loans relating to five obligors, all of which are in default. Lucent's wholly–owned captive insurance company assumed the credit risk of the loans that are held in the Trust. It also reinsured the exposure with an unaffiliated insurer for amounts in excess of an initial loss of $90. The self–insured loss reserve of $379 related to these loans (including accrued interest) and the corresponding receivable due from the unaffiliated insurer of $298 were included in other current liabilities and other current assets in the September 30, 2002 consolidated balance sheet. Cash flows received from (paid to) the Trust during 2002 and 2001 were as follows:

| | Years ended September 30, | | |
| --- | --- | --- | --- |
| | 2002 | 2001 | 2000 |
| Proceeds from sales of Loans | $ — | $ 382 | $ 575 |
| Repurchases of Loans | (90) | (355) | — |
| Losses on sales of Loans and other costs | — | (7) | (4) |
| Fees received | 4 | 6 | — |
| Servicing advances | — | (8) | — |
| Reimbursements of servicing advances | — | 8 | — |

In September 2002, a non−U.S. subsidiary of Lucent established a $120 revolving accounts receivable facility that allows this subsidiary to sell certain of its accounts receivable at a discount from face value, on a non−recourse basis. As of September 30, 2002, Lucent sold $15 of accounts receivable under this facility. Lucent's ability to further utilize this facility is dependent on the sufficiency of eligible receivables, generally a function of new sales generated by this non−U.S. subsidiary.

46

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## 16. ACCOUNTING CHANGES

**Staff Accounting Bulletin 101, "Revenue Recognition in Financial Statements" ("SAB 101")**

In December 1999, the Securities and Exchange Commission issued SAB 101, which provides guidance on the recognition, presentation and disclosure of revenues in financial statements. During the fourth quarter of fiscal 2001, Lucent implemented SAB 101 retroactively to the beginning of fiscal 2001, resulting in a cumulative effect of a change in accounting principle of a $68 loss (net of a tax benefit of $45), or $0.02 loss per basic and diluted share, and a reduction in the 2001 loss from continuing operations of $11, or $0.00 per basic and diluted share. For the fiscal year ended September 30, 2001, Lucent recognized $116 in revenue that is included in the cumulative effect adjustment as of October 1, 2000. The cumulative effect adjustment results primarily from the change in revenue recognized on intellectual property license agreements that included settlements for which there was no objective evidence of the fair value of the settlement. Under SAB 101, in the absence of objective evidence of the fair value of the settlement, revenue is recognized prospectively over the remaining term of the intellectual property license agreement. In addition, revenue recognition was deferred for certain products for multiple element agreements where certain services, primarily installation and integration, were deemed to be essential to the functionality of delivered elements.

Following are pro forma amounts showing the effects if the accounting change were applied retroactively for fiscal 2000:

| | | |
|---|---|---|
| Income from continuing operations | $ | 1,419 |
| Basic earnings per share – continuing operations | $ | 0.44 |
| Diluted earnings per share – continuing operations | $ | 0.43 |
| Net income | $ | 1,151 |
| Basic earnings per share | $ | 0.36 |
| Diluted earnings per share | $ | 0.35 |

**SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities" ("SFAS 133")**

Effective October 1, 2000, Lucent adopted SFAS 133, and its corresponding amendments under SFAS 138. SFAS 133 requires Lucent to measure all derivatives, including certain derivatives embedded in other contracts, at fair value and to recognize them in the consolidated balance sheet as an asset or a liability, depending on Lucent's rights or obligations under the applicable derivative contract. For derivatives designated as fair value hedges, the changes in the fair value of both the derivative instrument and the hedged item are recorded in other income (expense), net. For derivatives designated as cash flow hedges, the effective portions of changes in the fair value of the derivative are reported in other comprehensive income ("OCI") and are subsequently reclassified into other income (expense), net when the hedged item affects other income (expense), net. Changes in the fair value of derivative instruments not designated as hedging instruments and ineffective portions of hedges are recognized in other income (expense), net in the period incurred. The adoption of SFAS 133 as of October 1, 2000 resulted in a cumulative after-tax reduction in net loss of $30 (net of a $17 tax provision), or $0.01 per basic and diluted share, and an $11 credit to OCI. The reduction in net loss is primarily attributable to derivatives not designated as hedging instruments, including foreign currency embedded derivatives, equity warrants and other derivatives.

## 17. COMMITMENTS AND CONTINGENCIES

Lucent is subject to legal proceedings, lawsuits, and other claims, including proceedings by government authorities. In addition, Lucent may be subject to liabilities to some of its former affiliates under separation agreements with them. Legal proceedings are subject to uncertainties, and the outcomes are difficult to predict. Consequently, Lucent is unable to ascertain the ultimate aggregate amount of monetary liability or financial impact with respect to these matters at September 30, 2002. Lucent is subject to several purported class action lawsuits and other lawsuits for alleged violations of federal securities laws, ERISA and related claims described below, which could have a material financial impact. Other than those matters, Lucent believes that the remainder of the cases will not have a material financial impact after final disposition.

Lucent and certain of its former officers and current and former members of Lucent's Board of Directors are defendants in numerous purported shareholder class action lawsuits for alleged violations of federal securities laws. These cases have been consolidated into a single action pending in the United States District Court for the District of New Jersey, captioned *In re Lucent Technologies Inc. Securities Litigation*. The consolidated complaint alleges, among other things, that beginning in late October 1999, Lucent and certain of its officers misrepresented Lucent's financial condition and failed to disclose material facts that had an adverse impact on its future earnings and prospects for growth. The action seeks monetary damages, and costs and expenses associated with the litigation.

Lucent has been served with derivative complaints filed by individual shareowners in Delaware Chancery Court against certain current and former members of Lucent's Board of Directors and a former officer. These complaints have been consolidated in a single action. The consolidated complaint asserts that certain current and former directors and an officer allegedly breached their fiduciary duties to Lucent by acquiescing in or approving allegedly fraudulent conduct and seek damages against the defendants and in favor of Lucent, as well as costs and expenses associated with litigation. Lucent has also been served with derivative actions in Delaware Chancery Court and United States District Court for the District of New Jersey that have not been consolidated with the other derivative cases. These non-consolidated actions allege that certain of Lucent's current and former directors breached fiduciary duties to supervise Lucent and seeks an accounting of the damages sustained as a result of these alleged acts, as well as costs and expenses associated with litigation.

47

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

An additional derivative complaint was filed in September 2001 by an individual shareholder in the Delaware Chancery Court against certain current and former members of Lucent's Board of Directors and a former officer asserting claims of corporate waste and breach of fiduciary duties arising out of the award of performance-based compensation to Lucent's directors and an officer and seeks the return of all such performance-based compensation, compensation to Lucent for resulting losses, the imposition of a constructive trust upon the proceeds of any sale of Lucent shares by the defendants, as well as costs and expenses associated with litigation.

In July 2001, a purported class action complaint was filed in United States District Court for the District of New Jersey under ERISA alleging, among other things, that Lucent and certain unnamed officers breached their fiduciary duties with respect to Lucent's employee savings plans. The case claims that the defendants were aware that Lucent's stock was inappropriate for retirement investment and continued to offer Lucent stock as a plan investment option. The complaint seeks damages, injunctive and equitable relief, interest and fees and expenses associated with the litigation.

In March 2002, Lucent was named as a defendant in a case captioned *In re Winstar Communications Securities Litigation*, pending in U.S. District Court for the Southern District of New York. The case is a putative class action on behalf of purchasers of common stock of Winstar Communications, Inc. ("Winstar"), which filed for bankruptcy in April 2001, against several former officers and directors of Winstar, Winstar's outside auditors, and Lucent. In addition, in April 2002, a case captioned *Preferred Life Insurance Co. of New York v. Lucent Technologies Inc.* was filed in New Jersey state court against Lucent. The plaintiffs in the New Jersey case are institutional investors, many of which are affiliated with each other, that purchased the common stock of Winstar. In both actions, the plaintiffs claim that Lucent caused money to be lost by the plaintiffs in connection with their investments in Winstar stock or contributed to such loss. In the New York action, the plaintiffs claim that Lucent violated federal securities laws in connection with plaintiffs' purchases of Winstar stock. In the New Jersey action, the plaintiffs claim that Lucent committed common law fraud, negligent misrepresentation, conspiracy to commit fraud and aiding and abetting fraud in connection with plaintiffs' purchases of Winstar stock.

Lucent and certain of its current and former officers and directors are defendants in an action in Texas state court captioned *Obtek, et al. v. Lucent Technologies Inc., et al.* This case alleges violation of federal securities laws, the Texas Securities Act and in connection with Lucent's acquisition of a company called Agere Inc. in April 2000. The court has denied a motion to dismiss the claims against individual defendants and has set a trial date for February 2003.

In November 2001, a purported class action complaint was filed in the United States District Court for the District of New Jersey against Lucent and current and former officers captioned *Laufer v. Lucent Technologies Inc., et al.* The plaintiffs allege that Lucent and its officers concealed adverse material information about Agere's financial condition prior to Agere's IPO and about Lucent's vendor financing portfolio.

In October 2002, a purported class action lawsuit captioned *Balaban v. Schacht, et al.*, was filed on behalf of holders of the Company's notes, convertible preferred stock and trust preferred securities against Lucent, certain current and former directors and two former officers. The complaint asserts claims for breach of fiduciary duty by the defendants during the period of April 1999 to September 2002 and seeks compensatory damages and other damages and costs.

*Sparks, et al. v. AT&T and Lucent Technologies Inc. et al.*, is a class action lawsuit filed in 1996 in Illinois state court under the name of *Crain v. Lucent Technologies*. The plaintiffs requested damages on behalf of present and former customers based on a claim that the AT&T Consumer Products business (which became part of Lucent in 1996) and Lucent had defrauded and misled customers who leased telephones, resulting in payments in excess of the cost to purchase the telephones. Similar consumer class actions pending in various state courts were stayed pending the outcome of the Sparks case, and in July 2001, the Illinois court certified a nationwide class of plaintiffs.

A settlement was agreed to by the parties in August 2002, to settle the litigation for up to $300 in cash plus prepaid calling cards redeemable for minutes of long distance service. The court approved the settlement in November 2002. Lucent and AT&T deny they have defrauded or misled their customers, but have decided to settle this matter to avoid the uncertainty of litigation and the diversion of resources and personnel that pursuing this matter would require. The class claimants will apply for reimbursement from the settlement fund, and will be required to demonstrate their entitlement through a claims form to be provided to a claims administrator. Depending upon the number of claims submitted and accepted, the actual cost of the settlement to the defendants may be less than the stated amount, but it is not possible to estimate the amount at this time. Lucent deposited approximately $200 in escrow accounts as of September 30, 2002 to cover a portion of the settlement.

Lucent is a party to various separation and distribution agreements, which provide for contribution from third parties formerly affiliated with Lucent for a portion of any liability (including any settlement) in this case. However, Lucent is responsible for a majority of any such liability or settlement. As a result, Lucent recognized a $162 charge recorded in other income (expense), net in 2002, which is net of expected third-party contributions.

Lucent is a defendant in an adversary proceeding filed in U.S. Bankruptcy Court in Delaware by Winstar Communications, Inc. and Winstar Wireless, Inc. in connection with the bankruptcy of Winstar and various related entities. The complaint asserts claims for breach of contract and other claims against Lucent and seeks compensatory damages, as well as costs and expenses associated with litigation. The complaint also seeks recovery of a payment of approximately $190 to Lucent in December 2000.

48

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**Separation Agreements**

Lucent is party to various agreements with AT&T, Avaya, Agere Systems and NCR Corporation, former affiliates, that were entered into in connection with the separation of these former affiliates and Lucent. Pursuant to these agreements, Lucent and the former affiliates have agreed to allocate certain liabilities related to each other's business, and have agreed to share liabilities based upon certain allocations and thresholds. For example in the Sparks case discussed above, AT&T, Avaya and NCR each assumed a portion of the liability for the settlement.

**Other Commitments**

On July 17, 2002, Lucent and Agere amended the purchase agreement between them, dated as of February 1, 2001, pursuant to which, among other things, Lucent had agreed to purchase $2,800 in products from Agere over a three year period ending January 31, 2004. Under the amendment, Lucent's first–year purchases of $411 through January 31, 2002 are deemed to be in full satisfaction of its initial year's $800 obligation under the original agreement. In addition, Lucent has agreed, for an extended period that ends on September 30, 2006, provided Agere is competitive with other potential suppliers as to price, delivery interval and technological merit, to purchase 90% of its requirements for products it currently purchases from Agere and 60% of its requirements for other products that Agere can supply. Lucent has also agreed to proceed first with Agere on all joint product development projects where Agere meets Lucent's criteria. Lucent has also agreed to transfer certain patents, patent applications and patent license agreements to Agere.

Lucent is generally not committed to unconditional purchase obligations, except for a commitment that requires annual purchases of certain wireless components ranging from $350 to $425 over the next two years. Lucent is in negotiations with this supplier to completely restructure the arrangement. If this obligation is not satisfied, Lucent will be required to pay 25% of the unfulfilled annual commitment.

Lucent has exited certain of its manufacturing operations and has increased its use of contract manufacturers. Lucent is currently using a sole–source supplier for a majority of the switching and wireless product lines. In addition, Lucent is in the process of moving from a primarily sole–sourced supplier for its optical product line to a combination of multiple contract manufacturers, and continues to use a combination of multiple contract manufacturers for their data networking and other products. Lucent is generally not committed to unconditional purchase obligations in these contract manufacturing relationships. However, Lucent is exposed to short–term purchase commitments as they fall within the contract manufacturers' leadtime of specific products or raw material components. As a result, any sudden and significant changes in forecasted demand requirements within the leadtime of those products or raw materials could adversely affect Lucent's results of operations and cash flows.

**Environmental Matters**

Lucent's current and historical operations are subject to a wide range of environmental protection laws. In the United States, these laws often require parties to fund remedial action regardless of fault. Lucent has remedial and investigatory activities under way at numerous current and former facilities. In addition, Lucent was named a successor to AT&T as a potentially responsible party ("PRP") at numerous "Superfund" sites pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA") or comparable state statutes. Under the Separation and Distribution Agreement with AT&T, Lucent is responsible for all liabilities primarily resulting from or relating to the operation of Lucent's business as conducted at any time prior to or after the separation from AT&T, including related businesses discontinued or disposed of prior to the separation, and Lucent's assets including, without limitation, those associated with these sites. In addition, under such Separation and Distribution Agreement, Lucent is required to pay a portion of contingent liabilities paid out in excess of certain amounts by AT&T and NCR, including environmental liabilities.

It is often difficult to estimate the future impact of environmental matters, including potential liabilities. Lucent records an environmental reserve when it is probable that a liability has been incurred and the amount of the liability is reasonably estimable. This practice is followed whether the claims are asserted or unasserted. Management expects that the amounts reserved will be paid out over the periods of remediation for the applicable sites, which typically range from five to 30 years. Reserves for estimated losses from environmental remediation are, depending on the site, based primarily on internal or third–party environmental studies and estimates as to the number, participation level and financial viability of any other PRPs, the extent of the contamination and the nature of required remedial actions. Accruals are adjusted as further information develops or circumstances change. The amounts provided for in Lucent's consolidated financial statements for environmental reserves are the gross undiscounted amounts of such reserves without deductions for insurance or third–party indemnity claims. In those cases where insurance carriers or third–party indemnitors have agreed to pay any amounts and management believes that collectibility of such amounts is probable, the amounts are reflected as receivables in the consolidated financial statements. Although Lucent believes that its reserves are adequate, there can be no assurance that the amount of capital expenditures and other expenses which will be required relating to remedial actions and compliance with applicable environmental laws will not exceed the amounts reflected in Lucent's reserves or will not have a material adverse effect on Lucent's financial condition, results of operations or cash flows. Any possible loss or range of possible loss that may be incurred in excess of the amounts provided for at September 30, 2002 cannot be estimated.

49

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**Lease Commitments**

Lucent leases land, buildings and equipment under agreements that expire in various years through 2020. Rental expense, net of sublease rentals, under operating leases was $421, $476 and $420 for the years ended September 30, 2002, 2001 and 2000, respectively. Future minimum lease payments due under non–cancelable operating leases, including leases that are part of our restructuring actions, at September 30, 2002 for fiscal 2003 through fiscal 2007 and thereafter were $253, $208, $169, $129, $106 and $725, respectively.

**18. RECENT PRONOUNCEMENTS**

Lucent is currently evaluating the impacts of SFAS No. 142, "Goodwill and Other Intangible Assets" ("SFAS 142"), SFAS No. 143, "Accounting for Asset Retirement Obligations" ("SFAS 143"), SFAS No. 144," Accounting for the Impairment or Disposal of Long–Lived Assets" ("SFAS 144"), SFAS No. 146,"Accounting for Costs Associated with Exit or Disposal Activities" ("SFAS 146") and FASB Interpretation No. 45," Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness to Others" ("FIN 45") to determine the effect, if any, they may have on the consolidated financial position and results of operations. Lucent is required to adopt each of these standards effective with the first quarter of fiscal 2003, except SFAS 146 and FIN 45, which will be effective with the second quarter of fiscal 2003.

On October 1, 2002, the Company adopted SFAS 142, which requires goodwill to be tested for impairment on an annual basis and more frequently in certain circumstances, and written down when impaired, rather than amortized, as previously required. Identifiable intangible assets will continue to be amortized over their useful lives. The criteria for recognizing an intangible asset have also been revised. SFAS 142 also requires that goodwill be tested for impairment initially within one year of adoption and at least annually thereafter. If an impairment loss exists as a result of the transitional goodwill impairment test, the implementation of SFAS 142 could result in a one–time charge to earnings as a cumulative effect of accounting change. The goodwill impairment test is a two–step process that requires goodwill to be allocated to reporting units which are reviewed by the units' segment managers. In the first step, the fair value of the reporting unit is compared with the carrying value of the reporting unit. If the fair value of the reporting unit is less than the carrying value of the reporting unit, goodwill impairment may exist, and the second step of the test is performed. In the second step, the implied fair value of the goodwill is compared with the carrying value of the goodwill, and an impairment loss will be recognized to the extent that the carrying value of the goodwill exceeds the implied fair value of the goodwill. As of September 30, 2002, there was approximately $209 of net goodwill primarily within the INS segment that will be subject to this new pronouncement and will no longer be amortized but will be subject to the transitional and subsequent annual impairment test. The Company is assessing whether any charge will be required upon completion of the transitional impairment test and expects to complete step one of the transitional test during the first quarter of fiscal 2003.

In August 2001, the FASB issued SFAS 143, which establishes accounting standards for recognition and measurement of a liability for the costs of asset retirement obligations. Under SFAS 143, the future costs of retiring a tangible long–lived asset will be recorded as a liability at their present value when the retirement obligation arises and will be amortized to expense over the life of the asset. Lucent is in the process of identifying assets with retirement obligations, including leased properties that contractually obligate the Company to remove leasehold improvements and restore the properties to the original condition. The adoption of SFAS 143 is not expected to materially affect the consolidated financial statements.

In October 2001, the FASB issued SFAS 144, which addresses financial accounting and reporting for the impairment or disposal of long–lived assets and discontinued operations. SFAS 144 supersedes SFAS 121 and the accounting and reporting provisions of Accounting Principles Board Opinion No. 30 ("APB 30") for the disposal of a segment of a business. SFAS 144 retains the basic principles of SFAS 121 for long–lived assets to be disposed of by sale or held and used and modifies the accounting and disclosure rules for discontinued operations. The adoption of SFAS 144 is not expected to materially affect the consolidated financial statements.

In July 2002, the FASB issued SFAS 146, which addresses significant issues regarding the recognition, measurement, and reporting of costs that are associated with exit and disposal activities, including restructuring activities that are currently accounted for pursuant to the guidance that the Emerging Issues Task Force ("EITF") has set forth in EITF Issue No. 94–3," Liability Recognition for Certain Employee Termination Benefits and Other Costs to Exit an Activity (Including Certain Costs Incurred in a Restructuring)." SFAS 146 revises the accounting for certain lease termination costs and employee termination benefits, which are generally recognized in connection with restructuring activities.

In November 2002, the FASB issued FIN 45, which expands previously issued accounting guidance and disclosure requirements for certain guarantees. FIN 45 requires Lucent to recognize an initial liability for the fair value of an obligation assumed by issuing a guarantee. The provision for initial recognition and measurement of the liability will be applied on a prospective basis to guarantees issued or modified after December 31, 2002. The adoption of FIN 45 is not expected to materially affect the consolidated financial statements.

50

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### 19. QUARTERLY INFORMATION (UNAUDITED)

| | First | Second | Third | Fourth | Total |
|---|---|---|---|---|---|
| **YEAR ENDED SEPTEMBER 30, 2002** | | | | | |
| Revenues | $ 3,579 | $ 3,516 | $ 2,949 | $ 2,277 | $ 12,321 |
| Gross margin | $ 435 | $ 802 | $ 651 | $ (336) | $ 1,552 |
| Business restructuring charges (reversals) and asset impairments, net (including amounts affecting gross margin) | $ (68) | $ (60) | $ 1,645 | $ 799 | $ 2,316 |
| Provision (benefit) for income taxes | $ (486) | $ (61) | $ 5,329 | $ (25) | $ 4,757 |
| Loss from continuing operations | $ (423) | $ (595) | $ (7,999) | $ (2,809) | $ (11,826) |
| Loss from discontinued operations | — | 100 | (27) | — | 73 |
| Net loss | $ (423) | $ (495) | $ (8,026) | $ (2,809) | $ (11,753) |
| Loss per common share – basic and diluted[a]: | | | | | |
| Loss from continuing operations | $ (0.14) | $ (0.19) | $ (2.34) | $ (0.84) | $ (3.51) |
| Loss from discontinued operations | — | 0.03 | (0.01) | — | 0.02 |
| Net loss applicable to common shareowners | $ (0.14) | $ (0.16) | $ (2.35) | $ (0.84) | $ (3.49) |
| Dividends per share | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 |
| | | | | | |
| **YEAR ENDED SEPTEMBER 30, 2001** | | | | | |
| Revenues | $ 4,346 | $ 5,907 | $ 5,886 | $ 5,155 | $ 21,294 |
| Gross margin | $ 681 | $ 485 | $ 829 | $ 63 | $ 2,058 |
| Business restructuring charges and asset impairments, net (including amounts affecting gross margin) | — | $ 2,710 | $ 684 | $ 8,022 | $ 11,416 |
| Provision (benefit) for income taxes | $ (778) | $ (1,649) | $ (967) | $ (2,340) | $ (5,734) |
| Loss from continuing operations | $ (1,575) | $ (3,388) | $ (1,878) | $ (7,329) | $ (14,170) |
| Loss from discontinued operations | (5) | (308) | (1,360) | (1,499) | (3,172) |
| Loss before extraordinary item and cumulative effect of accounting changes | $ (1,580) | $ (3,696) | $ (3,238) | $ (8,828) | $ (17,342) |
| Extraordinary gain, net | 1,154 | — | — | 28 | 1,182 |
| Cumulative effect of accounting changes | (38) | — | — | — | (38) |
| Net loss | $ (464) | $ (3,696) | $ (3,238) | $ (8,800) | $ (16,198) |
| Loss per common share — basic and diluted[a]: | | | | | |
| Loss from continuing operations | $ (0.47) | $ (1.00) | $ (0.55) | $ (2.16) | $ (4.18) |
| Loss from discontinued operations | (0.00) | (0.09) | (0.40) | (0.44) | (0.93) |
| Loss before extraordinary item and cumulative effect of accounting changes | $ (0.47) | $ (1.09) | $ (0.95) | $ (2.60) | $ (5.11) |
| Net loss applicable to common shareowners | $ (0.14) | $ (1.09) | $ (0.95) | $ (2.59) | $ (4.77) |
| Dividends per share | $ 0.02 | $ 0.02 | $ 0.02 | $ 0.00 | $ 0.06 |

(a)  The loss per common share from continuing operations and the net loss per share for the fourth quarter of fiscal 2001 and each of the quarters of fiscal 2002, includes the effect of preferred dividends and accretion of $28, $42, $40, $42 and $43, respectively. In addition, the loss per common share for the fourth quarter of fiscal 2002 includes the effect of $29 conversion cost associated with the exchange of 8% redeemable convertible preferred stock.

EXHIBIT 21

## LUCENT TECHNOLOGIES INC.'S SUBSIDIARIES

| | |
|---|---|
| Lucent Technologies Argentina S.A. (Lucent Technologies Sociedad Anonima Argentina) | Argentina |
| Lucent Technologies Australia Pty. Ltd. | Australia |
| Lucent Technologies Austria Gmbh | Austria |
| Lucent Technologies Foreign Sales Corporation | Barbados |
| Lucent Technologies Network Systems Belgium S.A./N.V. | Belgium |
| INS Network Services SPRL | Belgium |
| Ascend Communications (Bermuda) Holding Limited | Bermuda |
| Excel Switching Europe SA | Belgium |
| Lucent Technologies Network Systems do Brasil Ltda | Brazil |
| SID Telecomunicacoes E Controles, S.A. | Brazil |
| Lucent Technologies Comercio e Servicio Ltd. | Brazil |
| Lucent Technologies World Services, Inc. (Brunei branch) | Brunei |
| Lucent Technologies Canada Corp. | Canada |
| Stratus Computer Corporation | Canada |
| Lucent Technologies (Chile) Limitada | Chile |
| Ascend Communications Colombia Ltda. | Colombia |
| Lucent Technologies Colombia S.A. | Colombia |
| Lucent Technologies de Costa Rica S.A. | Costa Rica |
| Lucent Technologies Cyprus Limited | Cyprus |
| Lucent Technologies Czech Republic s.r.o. | Czech Republic |
| Lucent Technologies ApS | Denmark |
| Lucent Technologies Hispaniola C. por A. | Dominican Republic |
| Lucent Technologies International Inc. (Egypt Branch) | Egypt |
| Lucent Technologies El Salvador S.A. de C.V. | El Salvador |
| Lucent Technologies France S.A. | France |
| Lucent Technologies Network Systems GmbH | Germany |
| Lucent Technologies EMEA B.V. (Greece) | Greece |
| Lucent Technologies de Guatemala S.A. | Guatemala |
| Lucent Technologies de Honduras S.A. | Honduras |
| Lucent Technologies Asia/Pacific (H.K) Ltd. | Hong Kong |
| Lucent Technologies Korea Ltd. (Hong Kong branch) | Hong Kong |
| Lucent Technologies India Pvt. Ltd. | India |
| Lucent Technologies Hindustan Ltd. | India |
| P.T. Lucent Technologies Network Systems Indonesia | Indonesia |
| Lucent Technologies Europe | Ireland |
| Lucent Technologies Holding and Finance Company Limited | Ireland |
| Lucent Technologies International Sales Limited | Ireland |
| Lucent Technologies Optical Networks (Israel) Ltd. | Israel |
| Lucent Technologies Israel Ltd. | Israel |
| WaveAccess, Ltd. | Israel |
| Lucent Technologies Italia S.p.A. | Italy |
| Lucent Technologies Japan Ltd. | Japan |
| Lucent Technologies Korea Ltd. | Korea |
| Lucent Technologies (Malaysia) Sdn. Bhd. | Malaysia |
| Lucent Technologies de Mexico S.A. de C.V. | Mexico |
| Lucent Technologies Holdings de Mexico S.A. de C.V. | Mexico |
| Bedrijvencomplex Huizen/Hilversum C.V. | Netherlands |
| Lucent Technologies EMEA B.V. | Netherlands |
| Lucent Technologies EMEA Services B.V. | Netherlands |

| | |
|---|---|
| Lucent Technologies Nederland B.V. | Netherlands |
| INS Network Management B.V. | Netherlands |
| SRA Computers C.V. | Netherlands |
| Lucent Technologies (New Zealand) Limited | New Zealand |
| Lucent Technologies Nicaragua S.A. | Nicaragua |
| Lucent Technologies Norway A.S. | Norway |
| Guoxin Lucent Technologies Network Technology Co. Ltd. | P.R.C. |
| Lucent Technologies Optical Networks (China) Ltd. | P.R.C. |
| Lucent Technologies Qingdao Telecommunications Equipment Ltd. | P.R.C. |
| Lucent Technologies Qingdao Telecommunications Systems Ltd. | P.R.C. |
| Lucent Technologies (China) Co., Ltd. | P.R.C. |
| Lucent Technologies (Shanghai) International Enterprises, Ltd. | P.R.C. |
| Lucent Technologies Shanghai Information & Communications of Shanghai, Ltd. | P.R.C. |
| Shanghai Lucent Technologies Transmission Equipment Co., Ltd. | P.R.C. |
| Lucent Technologies (Shenzhen) Co., Ltd. | P.R.C. |
| Lucent Technologies del Peru S.A. | Peru |
| Lucent Technologies Philippines Inc. | Philippines |
| Lucent Technologies Poland S.A. | Poland |
| Lucent Technologies International Inc. —Secursal en Portugal | Portugal |
| Lucent Technologies Caribbean and Latin America Sales Ltd. | Puerto Rico |
| ZAO Lucent Technologies | Russian Federation |
| Lucent Technologies Sistema Switching Solutions | Russian Federation |
| Lucent Technologies International Inc. (Saudi Arabia branch) | Saudi Arabia |
| Lucent Technologies Consumer Products Pte. Ltd. | Singapore |
| Lucent Technologies Singapore Pte. Ltd. | Singapore |
| Lucent Technologies Slovenia d.o.o. | Slovenia |
| Lucent Technologies South Africa (Proprietary) Ltd. | South Africa |
| LT Parsipanis S.L. | Spain |
| Lucent Technologies Espana S.A. | Spain |
| Lucent Technologies Sweden AB. | Sweden |
| Lucent Technologies A.G. (also registered as 'Lucent Technologies S.A. Zurich') | Switzerland |
| Lucent Technologies Taiwan Inc. (Taiwan branch) | Taiwan |
| Lucent Technologies Taiwan Telecommunications Co. Ltd. | Taiwan |
| Lucent Technologies Network Technologies (Thailand) Co., Ltd. | Thailand |
| Lucent Technologies Thailand Inc. (Thailand branch) | Thailand |
| Lucent Technologies Telekomunikasyon Limited Sirketi | Turkey |
| Lucent Technologies International Inc. (U.A.E. branch) | UAE (United Arab Emirates) |
| Lucent Technologies M.E. Inc. Dubai | UAE (United Arab Emirates) |
| Lucent Technologies Network Systems UK Ltd. | UK |
| Lucent Technologies Holdings UK Limited | UK |
| Lucent Technologies UK Limited | UK |
| ZAO Lucent CheZaRa | Ukraine |
| Lucent Technologies Uruguay S.A. | Uruguay |
| Ascend Communications, Inc. | US |
| AG Communications Systems Corporation | US |
| Bell Laboratories, Inc. | US |
| Chromatis Networks Inc. | US |

| | |
|---|---|
| Day Investment Corp. | US |
| First Beacon Insurance Company | US |
| KED Funding LLC | US |
| LT01 LLC | US |
| LTI NJ Finance LLC | US |
| LTI Properties Finance LLC | US |
| LTI Properties Holdings LLC | US |
| Lucent Asset Management Corporation | US |
| Lucent Cable Communications Inc. | US |
| Lucent Technologies Americas Inc. | US |
| Lucent Technologies Asia/Pacific Inc. | US |
| Lucent Technologies Canada LLC | US |
| Lucent Technologies Construction Services, Inc. | US |
| Lucent Technologies Eastern Ventures Ltd. | US |
| Lucent Technologies Eurasia Ltd. | US |
| Lucent Technologies Fiber Guardian LLC | US |
| Lucent Technologies Guardian I LLC | US |
| Lucent Technologies GRL LLC | US |
| Lucent Technologies Holdings LLC | US |
| Lucent Technologies Optical Networking Guardian LLC | US |
| Lucent Technologies International Inc. | US |
| Lucent Technologies Management Services Inc. | US |
| Lucent Technologies Realty Inc. | US |
| Lucent Technologies Taiwan Inc. | US |
| Lucent Technologies Thailand Inc. | US |
| Lucent Technologies Ventures Inc. | US |
| Lucent Technologies Wireless Guardian Corp. | US |
| Lucent Technologies World Services Inc. | US |
| Lucent Venture Partners I LLC | US |
| Lucent Venture Partners II LLC | US |
| Lucent Venture Partners III LLC | US |
| Lucent Venture Partners Inc. | US |
| Nassau Metals Corporation | US |
| NCS OSP Development Corp. | US |
| Nexabit Networks Inc. | US |
| SpringTide Networks, Inc. | US |
| Stratus Computer, Inc. | US |
| Stratus Securities Corp. | US |
| Stratus World Trade Corp. | US |
| Western Electric Company, Incorporated | US |
| Western Electric International Incorporated | US |
| WM Funding LLC | US |
| Lucent Technologies Venezuela S.A. | Venezuela |

Certain subsidiaries, which considered in the aggregate as a single subsidiary, would not constitute a significant subsidiary as of September 30, 2002, have been omitted in accordance with Item 601(b)(21)(ii) of Regulation S-K.

**EXHIBIT 23**

## CONSENT OF INDEPENDENT ACCOUNTANTS

We hereby consent to the incorporation by reference in the registration statements on Form S−3 (File No.'s 333−89347, 333−85219, 333−85061, 333−42532, 333−72282 and 333−90628) and Form S−8 (File No.'s 333−45253, 333−64525, 333−46589, 333−52799, 333−72425, 333−79007, 333−52805, 333−56133, 333−08775, 333−37041, 333−33943, 333−18975, 333−18977, 333−08783, 333−81751, 333−87685, 333−88201, 333−87151, 333−84981, 333−80267, 333−08789, 333−08793, 333−08801, 333−23043, 333−42475, 333−31400, 333−31738, 333−40992, 333−43184 and 333−64188) of Lucent Technologies Inc. of our report dated October 23, 2002, except for the second paragraph of Note 4, the third paragraph of Note 10 and the first paragraph of Note 12, as to which the date is December 4, 2002 relating to the consolidated financial statements, which appears in the Annual Report to Shareowners, which is incorporated in this Annual Report on Form 10−K. We also consent to the incorporation by reference of our report dated October 23, 2002, except for the second paragraph of Note 4, the third paragraph of Note 10 and the first paragraph of Note 12, as to which the date is December 4, 2002 relating to the financial statement schedule, which appears in this Form 10−K.

**PRICEWATERHOUSECOOPERS LLP**
NEW YORK, NEW YORK
DECEMBER 12, 2002

**Exhibit 24**

POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS:

WHEREAS, Lucent Technologies Inc., a Delaware corporation (the "Company"), proposes to file with the Securities and Exchange Commission, under the provisions of the Securities Exchange Act of 1934, as amended, an Annual Report on Form 10–K for the fiscal year ended September 30, 2002; and

WHEREAS, the undersigned is a director of the Company;

NOW, THEREFORE, each of the undersigned hereby constitutes and appoints Frank A. D'Amelio, John A. Kritzmacher and Richard J. Rawson, and each of them, as attorneys–in–fact for and in the name, place and stead of the undersigned, and in the capacity of the undersigned as a director of the Company, to execute the above referenced Form 10–K and any amendments or supplements thereto, hereby giving and granting to said attorneys–in–fact, full power and authority to do and perform each and every act and thing required and necessary to be done in and about the premises, as fully to all intents and purposes as the undersigned might or could do in person, hereby ratifying and confirming all that each attorney–in–fact may or shall lawfully do or cause to be done by virtue of this Power of Attorney.

IN WITNESS WHEREOF, the undersigned has executed this Power of Attorney on December 12, 2002.

By:  /s/ Paul A. Allaire

Name: Paul A. Allaire

By:  /s/ Robert E. Denham

Name: Robert E. Denham

By:  /s/ Daniel S. Goldin

Name: Daniel S. Goldin

By:  /s/ Carla A. Hills

Name: Carla A. Hills

By:  /s/ Patricia F. Russo

Name: Patricia F. Russo

By:  /s/ Henry B. Schacht

Name: Henry B. Schacht

By:  /s/ Franklin A. Thomas

Name: Franklin A. Thomas

By:  /s/ John A. Young

Name: John A. Young

**Exhibit 99.2**

**CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES–OXLEY ACT OF 2002**

I, Patricia F. Russo, Chief Executive Officer of Lucent Technologies Inc. (the "Company"), certify, pursuant to Section 906 of the Sarbanes–Oxley Act of 2002, 18 U.S.C. Section 1350, that:

(1)  the Annual Report on Form 10–K of the Company for the fiscal year ended September 30, 2002 (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and

(2)  the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: December 12, 2002

                                                              /s/ Patricia F. Russo
                                                              Patricia F. Russo
                                                              Chief Executive Officer

Exhibit 99.3

**CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES–OXLEY ACT OF 2002**

I, Frank A. D'Amelio, Chief Financial Officer of Lucent Technologies Inc. (the "Company"), certify, pursuant to Section 906 of the Sarbanes–Oxley Act of 2002, 18 U.S.C. Section 1350, that:

(1) the Annual Report on Form 10–K of the Company for the fiscal year ended September 30, 2002 (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and

(2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: December 12, 2002

/s/ Frank A. D'Amelio
Frank A. D'Amelio
Chief Financial Officer

Created by 10KWizard Technology    www.10KWizard.com

05/02/03  15:00 FAX 202 942 5211        ARNOLD & PORTER                      @002

# 2002

# LexisNexis

# CORPORATE

# AFFILIATIONS


OCT 0 2 2002
ARNOLD & PORTER LIBRARY



LexisNexis™

05/02/03 15:00 FAX 202 942 5211 ARNOLD & PORTER ☒003

## LUBYS
<div style="text-align:right">U.S. PUBLIC</div>

**Luby's Cafeterias, Inc.—(Continued)**

Tel.: 210-654-9000    DE
Fax: 210-871-7866
Web Site: www.lubys.com

Year Founded: 1947 .
LUB—(NYSE)
Approx. Sls.: $493,384,000
Earnings: $9,125,000
Emp.: 14,000
Fiscal Year-end: 08/31/00

**Business Description:**
Owns & Operates Restaurants in AZ, AK, FL, LA, MO, MS, NM, OK, TN & TX
S.I.C.: 5812
# of Domestic Offices: 225
Personnel:
Robert T. Herres (Chrm. Bd.)
Christopher J. Pappas (Pres. & Chief Exec. Officer)
Harris J. Pappas (Chief Oper. Officer)
Alan M. Davis (Sr. V.P.-Real Estate Devel.)
Raymond C. Gabrysch (Sr. V.P.-Opers.)
Clyde C. Hays, III (Sr. V.P.-Opers.)
Janet L. Duckham (V.P.-Pur. & Product Devel.)
Gerald K. Ferris (V.P.-Risk Mngmt.)
Carolyn M. Pelizza (V.P.-Fin. Plng.)
Wayne R. Shirley (V.P.-Corp. H.R.)
Susan L. Beggs (Asst. V.P.-Shareholder Rels. & Asst. Sec.)
Patricia F. Speck (Asst. V.P.-Profit Sharing Admin.)
Paula Gold-Williams (Controller)
James R. Hale (Gen. Counsel & Sec.)
John Warnoke (Mgr.-D.P.)
Debra L. Walriscott (Asst. Sec.)
Board of Directors:
Robert T. Herres
Ronald K. Calgaard
Lauro F. Cavazos
Judith Craven
David B. Daviss
Arthur Rojas Emerson
Roger R. Hemminghaus
John B. Lahourcade
Walter J. Salmon
George H. Wenglein
Joanne Wink

**Auditor:**
Ernst & Young
1000 Frost Bank Tower 100 W. Houston St.
San Antonio, TX 78205
Tel.: 210-228-9696
Fax: 210-554-0253

**Legal Counsel:**
Cauthorn Hale, Hornberger, Fuller, Sheehan & Becker
700 N. St. Mary's St., Ste. 620
San Antonio, TX 78205
Tel.: 210-271-1700

**Registrar:**
American Stock Transfer & Trust Company
40 Wall St.
New York, NY 10005
Tel.: 800-837-5449

**Transfer Agent:**
American Stock Transfer & Trust Company
40 Wall St.
New York, NY 10005
Tel.: 800-937-5449

## LUCENT TECHNOLOGIES INC.
600 Mountain Ave
New Providence, NJ 07974-2008

---

Tel.: 908-582-8500; 908-582-5713 DE
Fax: 908-582-1209
Toll Free: 888-4LUCENT .
Web Site: www.lucent.com

Year Founded: 1996
LU—(NYSE)
Approx. Rev.: $34,049,000,000
Emp.: 125,000
Fiscal Year-end: 09/30/00

**Business Description:**
Designs, Builds & Delivers Public & Private Networks, Communications Systems & Software, Consumer & Business Telephone Systems & Microelectronics Components
S.I.C.: 4813; 3663; 5065
Personnel:
Henry B. Schacht (Chrm & CEO)
Ben Verwaayen (Vice Chrm.)
Michael J. Butler (Pres.-Intl. Opers.)
James K. Brewington (Grp. Pres.-Wireless Networks)
Janet Davidson (Grp. Pres.-Switching Solutions & InterNetworking Systems Grp.)
Arun Netravali (Pres.-Bell Labs)
Thomas M. Uhlman (Pres.-New Ventures)
David Reed (Foundation Pres.)
Larry Kittelberger (Chief Info. Officer, & Sr. V.P.)
Frank A. D'Amelio (Chief Fin. Officer & Exec. V.P.)
Jose Mejia (Chief Supply Officer)
Robert C. Holder (Exec. V.P.-Corp. Opers.)
William T. O'Shea (Exec. V.P.-Corp. Strategy & Bus. Devel. & Chief Tech. Officer)
Curt Artis (Sr. V.P.-H.R.)
Kathleen M. Fitzgerald (Sr. V.P.-Pub. Rels., Investor Rels. & Advc.)
Richard J. Rawson (Sr. V.P. & Gen. Counsel)
Martina Hund-Mejean (V.P. & Treas.)
Jim Lusk (V.P. & Controller)
Kent Miller (Dir.-Corp. Adv. & Brand Mngmt.)
Board of Directors:
Henry B. Schacht
Paul A. Allaire
Betsy S. Atkins
Carla A. Hills
Paul H. O'Neill
Franklin A. Thomas
Ben Verwaayen
John A. Young

**Auditor:**
PricewaterhouseCoopers LLP
1301 Ave of the Americas
New York, NY 10019-6013
Tel.: 213-939-1000

**Transfer Agent:**
The Bank of New York
101 Barclay St
New York, NY 10286
Tel.: 212-815-2321
Toll Free: 800-524-4458

**Divisions:**

Atlantic Lucent    (1)
524 Grand Regency Blvd,
Brandon, FL 33510-3931
Tel.: 888-550-2233
Web Site: www.expaxsbellsouth.com
S.I.C.: 4813
Rick Schonabon (V.P.)

Lucent InterNetworking Systems   (1)
One Ascend Plaza 1701 Harbor Bay Pkwy.
Alameda, CA 94502    CA

---

Tel.: 510-769-6001
Fax: 510-814-2203
Toll Free: 800-621-9578 '
E-Mail: info@lucent.com
Web Site: www.lucent.com
Approx. Sls.: $1,478,582,000
Earnings: ($19,654,000)
Emp.: 721
Fiscal Year-end: 12/31/00
Develops, Manufactures, Markets, Sells & Supports a Broad Range of High-Speed Digital Remote Networking Products Covering ISPs, WANS, Telecommunication Carriers
S.I.C.: 5065; 3669
Jane Denison (Grp. Pres.)
Michael Hendren (Sr. V.P.-N. American Sls.)
David Cokeohlo (V.P.-Customer Support/Global Integration Svcs.)
William Kind (V.P.-Engrng.)
David Maturo (V.P.-Strategic Bus. Operat.)
Anthony Stagno (V.P.-Mfg. & Opers.)
Bea Mackel (V.P.-Mktg. Commun.)

Lucent Technologies    (1)
2110 Washington Blvd
Arlington, VA 22204-5719
Tel.: 703-553-3000
S.I.C.: 7370

Lucent Technologies    (1)
2501 4th Ave
Seattle, WA 98121-3206 .
Tel.: 206-615-5717 .
Fax: 206-615-5818
Marketing Office
S.I.C.: 3661
George Lillg (Mgr-Sls.)

Lucent Technologies    (1)
2525 N 12th St
Reading, PA 19609-2749
Tel.: 610-939-7000
Fax: 610-939-7011
Mfr. of Electronics
S.I.C.: 3661

Lucent Technologies, Business Communications Systems Div.   (1)
38 Mt. Bethel Rd.
Basking Ridge, NJ 07920    (100%)
Toll Free: 800-247-7000 (Small Bus.)
Business Telephone Systems; Voice Messaging & Telemarketing Systems; Multimedia & Visual Communications; Computer Telephone Integration .
S.I.C.: 4813; 1731; 5065
Bill O'Shea (Pres.)

Lucent Technologies, Network Systems Div.    (1)
283 King George Rd
Warren, NJ 07059-6134
Tel.: 908-559-3000    (100%)
Data & Broadband Networking; Asynchronous Transfer Mode Switches; Wireless Systems; Network Cable Systems; Switching Systems, ISDN, CATV Transmission Systems; Interactive Video Servers & Interactive Vehicular Highway Systems
S.I.C.: 3663; 7374
Daniel C. Stanzione (Pres.)

Octel Lucent Tech.    (1)
1001 Murphy Ranch Rd
Milpitas, CA 95035-7912
Tel.: 408-321-2000
Fax: 408-324-2702
Approx. Rev.: $277,700,000
Fiscal Year-end: 12/31/00
Telephones & Telephone Voicemail Services
S.I.C.: 3661
Henry Schacht (Pres.)

**Subsidiaries:**

AG Commun. Sys. Corp.    (1)
2500 W Utopia Rd
Phoenix, AZ 85027-4129 '

---

Mailing Address:
PO Box 52179
Phoenix, AZ 85072-2179 .
Tel.: 623-582-7000
Fax: 623-581-4158
E-Mail: resumes@agcs.com
Web Site: www.agcs.com
Approx. Rev.: $413,786,000
Emp.: 1,200 '
Fiscal Year-end: 12/31/00
Switching Equipment Telephone,
S.I.C.: 3661
Jeffrey W Belgel (Pres.)
Donald J Cole (Chief Financial Officer)
Lee Brandes (V.P.)
Linda Leonard (V.P.)

Agere Systems Inc.    (1)
555 Union Blvd
Allentown, PA 18109-3229    DE
Tel.: 610-712-4323    (83%)
Fax: 610-712-6451
Web Site: www.agere.com
Approx. Rev.: $4,080,000,000
Assets: $6,582,000,000
Liabilities: $4,101,000,000
Net Worth: $2,481,000,000
Earnings: ($616,000,000)
Emp.: 12,000
Fiscal Year-end: 09/30/01
Semiconductors And Related Devices
S.I.C.: 3674
John T. Dickson (Pres. & Chief Exec. Officer)
Mark Greenquist (Chief Fin. Officer & Exec. V.P.)
Ronald D. Black (Exec. V.P.-Client Systems)
Sohail A Khan (Exec. V.P.-Infrastructure Systems)
Rajeev Kalb (Exec. V.P.-Global Opers. Grp.)
Ahmad Nazeri (Exec. V.P.-Worldwide Sls.)
Vicki Gash (Sr. V.P.-Commun.)
Kevin Pennington (Sr. V.P.-H.R.)
Jean Rankin (Sr. V.P., Gen. Counsel & Sec.)
Gregory L Waters (Sr. V.P.-Strategy & Bus. Devel.)

Branch:

Agere Systems    (2)
9333 S John Young Pkwy
Orlando, FL 32819-8612
Tel.: 407-371-6000
Fax: 407-371-6000
Approx. Rev.: $123,200,000
Fiscal Year-end: 12/31/00
Semiconductors & Related Devices
S.I.C.: 3674
Peter Panousis (President)
Laura Webster (Chief Financial Officer)
Roben Koch (Vice-President)
David Williams (Vice-President)

Bell Labs    (1)
600 Mountain Ave
New Providence, NJ 07974-2008   (100%)
Tel.: 908-582-3000
Web Site: www.bell-labs.com
Research & Manufacturing
S.I.C.: 4813
William O'Shea (Pres.)

Subsidiary:

Lucent Technologies Engineering Research Center    (2)
PO Box 3030
Holmdel, NJ 07733-3030
Tel.: 908-639-1234
S.I.C.: 3661
David Lando (V.P.-Engrng. & Environ. Tech.)

Lucent Specialty Fiber Technologies    (1)
PO Box 1260
Avon, CT 06001-1260    (100%)
Tel.: 860-678-0371
Fax: 860-674-8618
Web Site: www.fiber-wire.com
Mfr. of Specialty Fiber
S.I.C.: 3661
Michael Porto (Mgr.-Natl. Accts.)

1556

## COMPANIES                                                              LUCENT

**Lucent Technologies Americas Inc.** (1)
PO Box 636
New Providence, NJ 07974-0636    (100%)
Tel.: 973-509-2000
S.I.C.: 4813

**Lucent Technologies Holdings Inc.** (1)
PO Box 636
New Providence, NJ 07974-0636    (75%)
Tel.: 973-509-2000
S.I.C.: 4813

**Subsidiaries:**

**Lucent Technologies Opto Inc.** (2)
2 Connell Dr
Berkeley Heights, NJ 07922-2747    (100%)
Tel.: 908-771-2000
S.I.C.: 4813

**Lucent Technologies Western Investments Inc.** (2)
PO Box 636
New Providence, NJ 07974-0636    (100%)
Tel.: 973-509-2000
S.I.C.: 4813

**Telecommunications Technology Middle East Inc.** (2)
600 Mountain Ave
New Providence, NJ 07974-2008    (100%)
Tel.: 908-582-8600
S.I.C.: 4813

**Lucent Technologies International Inc.** (1)
PO Box 636
New Providence, NJ 07974-0636    (100%)
Tel.: 973-509-2000
S.I.C.: 4813

**Subsidiaries:**

**Lucent Technologies Asia/Pacific Inc.** (2)
PO Box 636
New Providence, NJ 07974-0636    (100%)
Tel.: 973-509-2000
S.I.C.: 4813

**Lucent Technologies Construction Services Inc.** (2)
4725 River Green Pkwy
Duluth, GA 30096-2567    (100%)
S.I.C.: 4813

**Lucent Technologies de Honduras S.A.** (2)
PO Box 636
New Providence, NJ 07974-0636
Tel.: 973-509-2000
S.I.C.: 4813

**Lucent Technologies Eastern Ventures Inc.** (2)
PO Box 636
New Providence, NJ 07974-0636    (100%)
Tel.: 973-509-2000
S.I.C.: 4813

**Non-U.S. Subsidiary:**

**Lucent Technologies s.r.o.** (3)
Navratilova 23/670
Prague, Czech Republic    (100%)
S.I.C.: 4813

**Lucent Technologies Engineering Inc.** (2)
PO Box 636
New Providence, NJ 07974-0636    (100%)
Tel.: 973-509-2000

Web Site: www.lucent-a-co.com
S.I.C.: 4813

**Lucent Technologies Eurasia Ltd.** (2)
PO Box 636
New Providence, NJ 07974-0636    (100%)
Tel.: 973-509-2000
S.I.C.: 4813

**Lucent Technologies Management Services Inc.** (2)
PO Box 636
New Providence, NJ 07974-0636    (100%)
Tel.: 973-509-2000
S.I.C.: 4813

**Lucent Technologies Nicaragua S.A.** (2)
PO Box 636
New Providence, NJ 07974-0636
Tel.: 973-509-2000
S.I.C.: 4813

**Lucent Technologies Puerto Rico** (2)
950 Ave Ponce De Leon
Santurce, PR 00907-3626    (100%)
S.I.C.: 4813

**Lucent Technologies Thailand** (2)
600 Mountain Ave
New Providence, NJ 07974-2008    (100%)
Tel.: 908-509-9090
Fax: 908-508-2576
Approx. Rev.: $420,000
Fiscal Year-end: 03/31/00
Electronic Parts & Equipment Nec
S.I.C.: 5065
Florence Walsh (Treasurer)
Pamela Craven (Secretary)
Henery Bhacht (Manager)

**Lucent Technologies World Services** (2)
PO Box 636
New Providence, NJ 07974-0636
Tel.: 973-509-2000
Approx. Rev.: $420,000
Fiscal Year-end: 03/31/00
Electronic Parts & Equipment Nec
S.I.C.: 5065
Greg N. Hughes (President)
Jim Laietta (Marketing Director)
Errol Harris (Manager)
Herbert C. Mack (Manager)

**Lucent Technologies World Services Inc.** (2)
PO Box 636
New Providence, NJ 07974-0636    (100%)
Tel.: 973-509-2000
S.I.C.: 4813

**Non-U.S. Subsidiaries:**

**Lucent Technologies Argentina S.A.** (2)
Esmeralda 55 Capital Federal
1035 Buenos Aires, Argentina    (90%)
S.I.C.: 4813

**Lucent Technologies Asia/Pacific Ltd.** (2)
30th Fl., Shell Tower Times Square, 1
Matheson St.
Causeway Bay, Hong Kong    (50%)
S.I.C.: 4813

**Lucent Technologies Australia Pty. Ltd.** (2)
5-19 Talavera Rd.
North Ryde, Sydney, NSW, 2113, Australia    (100%)
S.I.C.: 4813

**Lucent Technologies Austria Ges.m.b.H.** (2)
Brigittenauer Lande 50-54
A-1203 Vienna, Austria    (100%)
S.I.C.: 4813

**Lucent Technologies Belgium S.A./N.V.** (2)
Waterloo Office Park Drève Richelle 161,
Bldg. M
1410 Waterloo, Belgium
S.I.C.: 4813

**Lucent Technologies Brasil Ltda.** (2)
Torre do Rio Sul Rio Laura Muller 116
Gr. 3102
22290 Rio de Janeiro, Brazil    (94%)
S.I.C.: 4813

**Lucent Technologies (China) Co., Ltd.** (2)
7th & 9th Flrs. CVIK Pt. No. 22, Jian Goo
Men
Wai Ave.
Beijing, 100004, China    (100%)
S.I.C.: 4813

**Subsidiaries:**

**AT&T Qingdao Power Systems Company Ltd.** (3)
Hute Industrial City Hi-Tech Industrial Park
Qingdao, 266071, China
S.I.C.: 4813

**Lucent Technologies (Shanghai) International Enterprises, Ltd.** (3)
Rm. 204, Xin Yi Bldg. No. 2005 Yang Gao
Rd Rd.
Shanghai, China    (100%)
S.I.C.: 4813

**Joint Ventures:**

**AT&T Qingdao Telecommunications Equipment Ltd.** (3)
Hui-Te Industrial City Hi-Tech Industrial Park
Qingdao, China
Joint Venture Among Lucent Technologies
(China) Co., Ltd. (51%), HiSense Electric
Corp. of Qsit (29%), Shangdong Posts &
Telecommunications Industry Corp. (7.5%),
Qingdao Posts & Telecommunications
Administrative Bureau (7.5%) & China
International Trust & Investment Corp. (5%).
S.I.C.: 4813

**AT&T Qingdao Telecommunications Systems Ltd.** (3)
Hui-Te Industrial City Hi-Tech Industrial Park
Qingdao, 266001, China
Joint Venture Among Lucent Technologies
(Shanghai) International Enterprises, Ltd.
(51%), HiSense Electric Corp. of Qingdao (29%),
Shangdong Posts & Telecommunications
Industry Corp. (7.5%), Qingdao Posts &
Telecommunications Administrative Bureau
(7.5%) & China International Trust &
Investment Corp. (5%)
S.I.C.: 4813

**Lucent Technologies of Shanghai, Ltd.** (3)
704 Yi San Rd.
Shanghai, 200233, China
Joint Venture Between Lucent Technologies
(China) Co., Ltd. (50%) & Shanghai Optical
Communications Corp. (50%)
S.I.C.: 4813

**Lucent Technologies of Tianjin Cable Co. Ltd.** (3)
Yi Bai Road Hebei District
Tianjin, China
Joint Venture Between Lucent Technologies
(China) Co. Ltd. (60%) & Tianjin Cable
Company, Ltd. (40%)

S.I.C.: 4813

**Shanghai Lucent Technologies Transmission Equipment Co., Ltd.** (3)
1700 Yi Shan Rd.
Shanghai, 200233, China
Joint Venture Between Lucent Technologies
(China) Co. Ltd. (50%) & Shanghai
Telecommunications Equipment Factory
(50%)
S.I.C.: 4813

**Lucent Technologies Consumer Products Mexico, S.A. de C.V.** (2)
Avenida Jardin No. 257 Col.
El Arenal
Mexico, C.P. 02970, Mexico    (100%)
S.I.C.: 4813

**Lucent Technologies Consumer Products Pty. Ltd.** (2)
3014A Ubi Rd. 1 Kampong Ubi Industrial
Estate
Singapore, Singapore
S.I.C.: 4813

**Lucent Technologies de Costa Rica S.A.** (2)
Edificio Centro Colon Piso Septimo, Paseo
Colon
Distrito Segundo
Canton Primero, San Jose, Costa Rica    (100%)
S.I.C.: 4813

**Lucent Technologies de Guatemala S.A.** (2)
3a Ave. 14-30, Zona 10
Guatemala, Guatemala    (99%)
S.I.C.: 4813

**Lucent Technologies del Peru S.A.** (2)
Paseo de la Republica 3245
P.O. Box 2445
San Isidro, Lima, 27, Peru    (100%)
S.I.C.: 4813

**Lucent Technologies El Salvador S.A. de C.V.** (2)
Avenida Olympia 3742
San Salvador, El Salvador    (100%)
S.I.C.: 4813

**Lucent Technologies EMEA B.V.** (2)
Larenseweg 50
P.O. Box 1168
1200 BD Hilversum, Netherlands    (100%)
S.I.C.: 4813

**Non-U.S. Subsidiaries:**

**Lucent Technologies Manufacturing of St. Petersburg** (3)
17 Tchapaeva St.
Saint Petersburg, 197046, Russia    (100%)
S.I.C.: 4813

**Lucent Technologies Network Systems Belgium S.A./N.V.** (3)
Rue des Deux 84
1070 Brussels, Belgium    (100%)
S.I.C.: 4813

**Lucent Technologies Network Systems Espana S.A.** (3)
Ronda de Valdecarrizo, 14-N2
Tres Cantos, 28760 Madrid, Spain    (100%)
S.I.C.: 4813

**Lucent Technologies Network Systems GmbH** (3)
Thurn-und-Taxis Strasse 10
90411 Nuremberg, Germany    (100%)
S.I.C.: 4813

## CERTIFICATE OF SERVICE

I certify that today on May 6, 2003, a copy of the foregoing DELL COMPUTER

CORPORATION'S BRIEF IN SUPPORT OF ITS MOTION TO SEVER AND TRANSFER

was served upon counsel for defendants as follows:

**BY HAND**
Josy W. Ingersoll
Christian Douglas Wright
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Post Office Box 391
Wilmington, Delaware  19899-0391

**FEDERAL EXPRESS**
John M. Desmarais
Robert A. Appleby
Michael E. Stimson
Kirkland & Ellis
153 East 53rd Street
New York, New York 10022-4675

R. Eric Hutz

256468v1

**ORIGINAL**

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE**

| | |
|---|---|
| LUCENT TECHNOLOGIES, INC., and <br> LUCENT TECHNOLOGIES GUARDIAN I LLC, <br><br> Plaintiffs, <br> v. <br><br> DELL COMPUTER CORPORATION, <br><br> Defendant. | ) <br> ) <br> ) <br> )    **Case No. 03-CV-205-KAJ** <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## DELL COMPUTER CORPORATION'S
## <u>MOTION TO SEVER AND TRANSFER</u>

Defendant, Dell Computer Corporation ("Dell") hereby moves to sever Counts II through

VI of Plaintiffs Lucent Technologies Inc.'s and Lucent Technologies Guardian I LLC's

complaint in this action and transfer those Counts, along with Counterclaim I (Declaratory

Judgment) of Dell's the answer and counterclaim to the extent it relates to Counts II through VI,

to the United States District Court for the Southern District of California. Support and authority

for this motion can be found in the Brief in Support of Dell's Motion to Sever and Transfer,

which accompanies this motion.

Respectfully submitted,

**CONNOLLY BOVE LODGE & HUTZ, LLP**

By: _____

R. Eric Hutz (#2702)
James D. Heisman (#2746)
1220 Market Street
Post Office Box 2207
Wilmington, DE 19899
(302) 658-9141
*Attorneys for Plaintiff
   Dell Computer Corporation*

**OF COUNSEL**
Joel M. Freed
Joseph A. Micallef
**ARNOLD & PORTER**
555 12th Street NW
Washington, DC 20004
(202) 942-5000

**DATE:**  May 6, 2003

263767v1

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

LUCENT TECHNOLOGIES, INC., and )
LUCENT TECHNOLOGIES GUARDIAN I LLC, )
                                    )   **Case No. 03-CV-205-KAJ**
            Plaintiffs,             )
      v.                            )
                                    )
DELL COMPUTER CORPORATION,          )
                                    )
            Defendant.              )

## ORDER

Having considered Defendant Dell Computer Corporation's (hereinafter "Dell") Motion

to Sever and Transfer and Dell's supporting briefs and arguments, and Plaintiffs' answering

brief(s) and arguments submitted in response thereto, this Court hereby grants Defendant's

Motion.


So Ordered this ___ day of _____, 2003.



_____
Judge Kent A. Jordan



263854v1

## CERTIFICATE OF SERVICE

I certify that today on May 6, 2003, a copy of the foregoing DELL COMPUTER

CORPORATION'S MOTION TO SEVER AND TRANSFER and PROPOSED ORDER was

served upon counsel for defendants as follows:

### BY HAND
Josy W. Ingersoll
Christian Douglas Wright
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Post Office Box 391
Wilmington, Delaware  19899-0391

### FEDERAL EXPRESS
John M. Desmarais
Robert A. Appleby
Michael E. Stimson
Kirkland & Ellis
153 East 53rd Street
New York, New York 10022-4675

R. Eric Hutz

256468v1

COPY

32

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE**

LUCENT TECHNOLOGIES, INC., and )
LUCENT TECHNOLOGIES GUARDIAN I LLC, )
                                    )
            Plaintiffs,             )      **Case No. 03-CV-205-KAJ**
                                    )
      v.                            )
                                    )
DELL COMPUTER CORPORATION,          )
                                    )
            Defendant.              )

## DELL COMPUTER CORPORATION'S
## MOTION TO SEVER AND TRANSFER

Defendant, Dell Computer Corporation ("Dell") hereby moves to sever Counts II through

VI of Plaintiffs Lucent Technologies Inc.'s and Lucent Technologies Guardian I LLC's

complaint in this action and transfer those Counts, along with Counterclaim I (Declaratory

Judgment) of Dell's the answer and counterclaim to the extent it relates to Counts II through VI,

to the United States District Court for the Southern District of California.  Support and authority

for this motion can be found in the Brief in Support of Dell's Motion to Sever and Transfer,

which accompanies this motion.

Respectfully submitted,

**CONNOLLY BOVE LODGE & HUTZ, LLP**

By: _____

R. Eric Hutz (#2702)
James D. Heisman (#2746)
1220 Market Street
Post Office Box 2207
Wilmington, DE 19899
(302) 658-9141
*Attorneys for Plaintiff*
   *Dell Computer Corporation*

**OF COUNSEL**
Joel M. Freed
Joseph A. Micallef
**ARNOLD & PORTER**
555 12th Street NW
Washington, DC 20004
(202) 942-5000

**DATE:**  May 6, 2003

263767v1

2

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

|  |  |
|---|---|
| LUCENT TECHNOLOGIES, INC., and<br>LUCENT TECHNOLOGIES GUARDIAN I LLC, )<br><br>Plaintiffs,<br>v.<br><br>DELL COMPUTER CORPORATION,<br><br>Defendant. | )<br>)<br>)<br>)  Case No. 03-CV-205-KAJ<br>)<br>)<br>)<br>)<br>)<br>) |

## ORDER

Having considered Defendant Dell Computer Corporation's (hereinafter "Dell") Motion to Sever and Transfer and Dell's supporting briefs and arguments, and Plaintiffs' answering brief(s) and arguments submitted in response thereto, this Court hereby grants Defendant's Motion.

So Ordered this ___ day of _____, 2003.

_____
Judge Kent A. Jordan

263854v1

## CERTIFICATE OF SERVICE

I certify that today on May 6, 2003, a copy of the foregoing DELL COMPUTER

CORPORATION'S MOTION TO SEVER AND TRANSFER and PROPOSED ORDER was

served upon counsel for defendants as follows:

**BY HAND**
Josy W. Ingersoll
Christian Douglas Wright
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Post Office Box 391
Wilmington, Delaware  19899-0391

**FEDERAL EXPRESS**
John M. Desmarais
Robert A. Appleby
Michael E. Stimson
Kirkland & Ellis
153 East 53rd Street
New York, New York 10022-4675

R. Eric Hutz

256468v1

(31)

**ORIGINAL**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

LUCENT TECHNOLOGIES INC.          )
and LUCENT TECHNOLOGIES           )
GUARDIAN I LLC,                   )
                                  )
            Plaintiffs,           )
                                  )
     v.                           )     C.A. No. 03-205 (KAJ)
                                  )
DELL COMPUTER CORPORATION,        )
                                  )
            Defendant.            )

## MOTION AND ORDER FOR ADMISSIONS *PRO HAC VICE*

Pursuant to Local Rule 83.5 and the attached certifications, counsel moves the

admissions *pro hac vice* of Todd M. Friedman, Jon T. Hohenthaner, Steven J. Lever,

Michael E. Stimson, and Brian P. Verminski to represent plaintiffs Lucent Technologies,

Inc. and Lucent Technologies Guardian I LLC in this matter.

DATED:  May 6, 2003

Christian Douglas Wright (#3554)
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE  19899-0391
(302) 571-6600

## ORDER

IT IS HEREBY ORDERED that counsel's motion for admissions *pro hac vice* is

GRANTED.

DATED:  May 7, 2003

United States District Court Judge

57224.1002

## CERTIFICATION BY COUNSEL
## <u>TO BE ADMITTED PRO HAC VICE</u>

Pursuant to Local Rule 83.5, I certify that I am eligible for admission to this Court, am admitted, practicing and in good standing as a member of the Bar of New York, and pursuant to Local Rule 83.6, submit to the disciplinary jurisdiction of this Court for any misconduct which occurs in the preparation or course of this action. I also certify I am generally familiar with this Court's Local Rules.

Todd M. Friedman
Kirkland & Ellis
153 East 53rd Street
New York, New York  10022-4675

DATED:  April 25, 2003

## CERTIFICATION BY COUNSEL
## <u>TO BE ADMITTED PRO HAC VICE</u>

Pursuant to Local Rule 83.5, I certify that I am eligible for admission to this Court, am admitted, practicing and in good standing as a member of the Bar of New York, and pursuant to Local Rule 83.6, submit to the disciplinary jurisdiction of this Court for any misconduct which occurs in the preparation or course of this action. I also certify I am generally familiar with this Court's Local Rules.

Jon T. Hohenthaner
Kirkland & Ellis
153 East 53rd Street
New York, New York  10022-4675

DATED:  April 29, 2003

## CERTIFICATION BY COUNSEL
## <u>TO BE ADMITTED PRO HAC VICE</u>

Pursuant to Local Rule 83.5, I certify that I am eligible for admission to this Court, am admitted, practicing and in good standing as a member of the Bar of New York, and pursuant to Local Rule 83.6, submit to the disciplinary jurisdiction of this Court for any misconduct which occurs in the preparation or course of this action. I also certify I am generally familiar with this Court's Local Rules.

Steven J. Lever
Kirkland & Ellis
153 East 53rd Street
New York, New York  10022-4675

DATED:  April 28, 2003

## CERTIFICATION BY COUNSEL
## <u>TO BE ADMITTED PRO HAC VICE</u>

Pursuant to Local Rule 83.5, I certify that I am eligible for admission to this Court, am admitted, practicing and in good standing as a member of the Bar of New York, and pursuant to Local Rule 83.6, submit to the disciplinary jurisdiction of this Court for any misconduct which occurs in the preparation or course of this action. I also certify I am generally familiar with this Court's Local Rules.

Michael Edward Stimson
Kirkland & Ellis
153 East 53rd Street
New York, New York  10022-4675

DATED:  April 28, 2003

## CERTIFICATION BY COUNSEL
## <u>TO BE ADMITTED PRO HAC VICE</u>

Pursuant to Local Rule 83.5, I certify that I am eligible for admission to this Court, am admitted, practicing and in good standing as a member of the Bars of New York and California, and pursuant to Local Rule 83.6, submit to the disciplinary jurisdiction of this Court for any misconduct which occurs in the preparation or course of this action. I also certify I am generally familiar with this Court's Local Rules.

Brian P. Verminski
Kirkland & Ellis
153 East 53rd Street
New York, New York  10022-4675

DATED: April 20, 2003

## CERTIFICATE OF SERVICE

I, Christian Douglas Wright, certify that copies of the foregoing *Motion for Admissions* Pro Hac Vice were caused to be served on May 6, 2003 on the following counsel of record in the manner indicated:

### BY HAND DELIVERY

        R. Eric Hutz, Esquire
        Connolly Bove Lodge & Hutz LLP
        1220 Market St., 10th Floor
        P.O. Box 2207
        Wilmington, DE  19899-2207

### BY FEDERAL EXPRESS

        Joel M. Freed, Esquire
        Arnold & Porter
        555 12th Street NW
        Washington, DC  20004

Christian Douglas Wright

*(30)*

## IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | ) | |
| **LUCENT TECHNOLOGIES, INC., and** | ) | |
| **LUCENT TECHNOLOGIES GUARDIAN I LLC,** | ) | |
| | ) | **Case No. 03-CV-205-KAJ** |
| Plaintiffs, | ) | |
| v. | ) | **Demand For Jury Trial** |
| | ) | |
| **DELL COMPUTER CORPORATION,** | ) | |
| | ) | |
| Defendant. | ) | |

## NOTICE OF SERVICE

PLEASE TAKE NOTICE that one copy of **Dell Computer Corporation's Second Set of Document Requests To Lucent Technologies, Inc. And Lucent Technologies Guardian I LLC** was served on April 29, 2003 upon the following counsel in the manner indicated:

> **FEDERAL EXPRESS**
> Josy W. Ingersoll
> Young Conaway Stargatt & Taylor, LLP
> The Brandywine Building
> 1000 West Street, 17th Floor
> Post Office Box 391
> Wilmington, Delaware 19899-0391

> **FEDERAL EXPRESS**
> John M. Desmarais
> Robert A. Appleby
> Michael E. Stimson
> Kirkland & Ellis
> 153 East 53rd Street
> New York, New York 10022-4675

Respectfully submitted,

**CONNOLLY BOVE LODGE & HUTZ, LLP**

By: _____

R. Eric Hutz (#2702)
James D. Heisman (#2746)
1220 Market Street
Post Office Box 2207
Wilmington, DE 19899
(302) 658-9141
*Attorneys for Plaintiff
   Dell Computer Corporation*

**OF COUNSEL**
Joel M. Freed
Joseph A. Micallef
**ARNOLD & PORTER**
555 12th Street NW
Washington, DC 20004
(202) 942-5000

**DATE:** May 1, 2003

257896_1.DOC

2

## CERTIFICATE OF SERVICE

I certify that today on May 1, 2003, a copy of the foregoing NOTICE OF SERVICE was

served upon counsel for plaintiffs as follows:

**FEDERAL EXPRESS**
Josy W. Ingersoll
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Post Office Box 391
Wilmington, Delaware  19899-0391

**FEDERAL EXPRESS**
John M. Desmarais
Robert A. Appleby
Michael E. Stimson
Kirkland & Ellis
153 East 53rd Street
New York, New York 10022-4675

R. Eric Hutz (#2702)

257896_1.DOC

3

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

LUCENT TECHNOLOGIES INC.          )
and LUCENT TECHNOLOGIES           )
GUARDIAN I LLC,                   )
                                  )
            Plaintiffs,           )
                                  )
      v.                          )      C.A. No. 03-205 (KAJ)
                                  )
DELL COMPUTER CORPORATION,        )
                                  )
            Defendant.            )

## MOTION AND ORDER FOR ADMISSION *PRO HAC VICE*

Pursuant to Local Rule 83.5 and the attached certification, counsel moves the admission *pro hac vice* of John M. Desmarais to represent plaintiffs Lucent Technologies, Inc. and Lucent Technologies Guardian I LLC in this matter.

DATED:  April 28, 2003

Christian Douglas Wright (#3554)
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE  19899-0391
(302) 571-6600

## ORDER

IT IS HEREBY ORDERED that counsel's motion for admissions *pro hac vice* is GRANTED.

DATED: April 28, 2003

United States District Court Judge

WP3:882306.1

## CERTIFICATION BY COUNSEL
## TO BE ADMITTED PRO HAC VICE

Pursuant to Local Rule 83.5, I certify that I am eligible for admission to this Court, am admitted, practicing and in good standing as a member of the Bars of New York and the District of Columbia and, pursuant to Local Rule 83.6, submit to the disciplinary jurisdiction of this Court for any misconduct which occurs in the preparation or course of this action.  I also certify I am generally familiar with this Court's Local Rules.

John M. Desmarais
Kirkland & Ellis
153 East 53rd Street
New York, New York  10022-4675

DATED:  April 23, 2003

## CERTIFICATE OF SERVICE

I, Christian Douglas Wright, certify that copies of the foregoing *Motion for Admission* Pro Hac Vice were caused to be served on April 28, 2003 on the following counsel of record in the manner indicated:

### BY HAND DELIVERY

R. Eric Hutz, Esquire
Connolly Bove Lodge & Hutz LLP
1220 Market St., 10th Floor
P.O. Box 2207
Wilmington, DE  19899-2207


### BY FEDERAL EXPRESS

Joel M. Freed, Esquire
Arnold & Porter
555 12th Street NW
Washington, DC  20004


Christian Douglas Wright

28

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

|   |   |
|---|---|
| LUCENT TECHNOLOGIES, INC., and<br>LUCENT TECHNOLOGIES GUARDIAN I LLC,<br><br>       Plaintiffs,<br><br>    v.<br><br>DELL COMPUTER CORPORATION,<br><br>       Defendant. | Case No. 03-CV-205-KAJ<br><br>Demand For Jury Trial |

### NOTICE OF SERVICE

PLEASE TAKE NOTICE that one copy of the following document was served on

April 23, 2003 upon the following counsel in the manner indicated:

Dell Computer Corporation's Initial Disclosures
Pursuant To Federal Rule of Civil Procedure 26(a)(1)

Respectfully submitted,

**CONNOLLY BOVE LODGE & HUTZ, LLP**

By: _____
R. Eric Hutz (#2702)
James D. Heisman (#2746)
1220 Market Street
Post Office Box 2207
Wilmington, DE 19899
(302) 658-9141
*Attorneys for Plaintiff*
*Dell Computer Corporation*

**OF COUNSEL**
Joel M. Freed
Joseph A. Micallef
**ARNOLD & PORTER**
555 12th Street NW
Washington, DC 20004
(202) 942-5000

**DATE:** April 24, 2003

## CERTIFICATE OF SERVICE

I certify that today on April 24, 2003, a copy of the foregoing NOTICE OF

SERVICE was served upon counsel for plaintiffs as follows:

**BY HAND**
Josy W. Ingersoll
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Post Office Box 391
Wilmington, Delaware  19899-0391

**FEDERAL EXPRESS**
John M. Desmarais
Robert A. Appleby
Michael E. Stimson
Kirkland & Ellis
153 East 53rd Street
New York, New York 10022-4675

R. Eric Hutz (#2702)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE



LUCENT TECHNOLOGIES INC. and
LUCENT TECHNOLOGIES GUARDIAN I LLC,

      Plaintiffs,

      v.

DELL COMPUTER CORPORATION,

      Defendant.

Civil Action No.: 03-205-KAJ

## NOTICE OF SERVICE

The undersigned hereby certifies that copies of Lucent's Initial Disclosure

Statement, and this Notice of Service, were caused to be served on April 23, 2003 upon the

following counsel of record:

**BY HAND DELIVERY**

      R. Eric Hutz, Esquire
      Connolly, Bove, Lodge & Hutz, LLP
      1220 Market Street
      Wilmington, DE  19801

**BY FEDERAL EXPRESS**

      Joel M. Freed
      Arnold & Porter
      555 12th Street, NW
      Washington, DC  20004

57224.1002

YOUNG CONAWAY STARGATT & TAYLOR LLP

Josy W. Ingersoll (#1088)
John W. Shaw (#3362)
Christian Douglas Wright (#3554)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
(302) 571-6672
Attorneys for Lucent Technologies Inc. and Lucent
   Technologies Guardian 1 LLC

OF COUNSEL:

John M. Desmarais
Robert A. Appleby
Maxine Y. Graham
Michael E. Stimson
KIRKLAND & ELLIS
153 East 53rd Street
New York, NY 10022-4675
(212) 446-4800

Dated: April 23, 2003

2

ORIGINAL

(26)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LUCENT TECHNOLOGIES INC. and
LUCENT TECHNOLOGIES GUARDIAN I LLC,

        Plaintiffs,

        v.

DELL COMPUTER CORPORATION,

        Defendant.

:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No.  03-205-KAJ

## PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR MOTION TO STRIKE DELL'S AFFIRMATIVE DEFENSE OF UNENFORCEABILITY AND TO DISMISS DELL'S COUNTERCLAIM TO THE EXTENT IT IS BASED ON THAT AFFIRMATIVE DEFENSE

Josy W. Ingersoll (#1088)
John W. Shaw (#3362)
Christian Douglas Wright (#3554)
**YOUNG CONAWAY STARGATT**
    **& TAYLOR, LLP**
The Brandywine Building
1000 West Street, 17th Floor, P.O. Box 391
Wilmington, Delaware  18991
(302) 571-6600

OF COUNSEL:

John M. Desmarais
Robert A. Appleby
Maxine Y. Graham
**KIRKLAND & ELLIS**
153 East 53rd Street
New York, New York 10022-4675
(212) 446-4800

Attorneys for Lucent Technologies Inc. and
Lucent Technologies Guardian I LLC

Dated:  April 21, 2003

## I.   INTRODUCTION.

Dell Computer Corporation ("Dell") attempts to reform its inadequately pled unclean-hands defense and avoid the particularity requirement of Fed. R. Civ. P. 9(b) by disclaiming that its defense is based on fraud or inequitable conduct.  On its face, Dell's unclean-hands defense belies this assertion.  But even with its disclaimer, Dell's unclean-hands defense remains deficient under Fed. R. Civ. P. 8.  An unclean-hands defense requires notice of alleged misconduct and the nexus between the alleged misconduct and relief sought in the litigation.  Dell alleges *no* facts in its Answer and Counterclaim to support its unclean-hands defense, and then proceeds to contend that all of the asserted patents are unenforceable under two theories of unclean-hands it advances.  Indeed, Dell seeks a declaration that all *six* of the patents-in-suit are unenforceable, not just against Dell but against third parties as well.  Yet Dell cites no legal authority for its contention that, absent a showing of fraud on the United States Patent Office, any of the patents-in-suit could be held unenforceable against a third party.  Accordingly, Plaintiffs Lucent Technologies Inc. and Lucent Technologies Guardian I LLC ("Lucent") respectfully request that this Court strike Dell's unclean-hands defense and dismiss Dell's declaratory-judgment counterclaim to the extent it seeks to have the patents-in-suit declared unenforceable.

## II.   ARGUMENT.

### A.   Dell's Allegation Of "Procurement Of One Or More Of The Patents-In-Suit By Failure To Disclose Material Prior Art To The United States Patent Office" Fails To Provide The Notice Required By Rules 8 And 9(b).

Seeking to circumvent the particularity requirements of Rule 9(b) of the Federal Rules of Civil Procedure, Dell disclaims that its allegation of unclean-hands due to the "procurement of one or more of the patents in suit by failure to disclose material prior art to the United States

1

Patent Office" (Dell's "procurement" allegation) is an attempt to plead inequitable conduct, fraud or bad faith assertion of the patents-in-suit. (Dell Opp. at 7) But Dell fails to explain how a "failure to disclose" falling short of inequitable conduct, fraud or bad faith could constitute unclean-hands, let alone render the patents-in-suit unenforceable.

The Third Circuit has held that unclean-hands may be based on "fraud, unconscionable conduct, or bad faith directly related to the matter at issue that injures the other party and affects the balance of equities." *Paramount Aviation Corp. v. Agusta*, 178 F.3d 132, 147 n.12 (3d Cir. 1999). Indeed, "this nexus is 'the primary guiding application of the unclean-hands doctrine'" and requires "'an immediate and necessary relation' between the plaintiff's alleged misconduct and the equity sought by that party." *France Telecom S.A. v. Novell, Inc.*, No. 102-437-GMS, 2002 WL 31355255, at *3 (D. Del. Oct. 17, 2002) (citations omitted). Accordingly, an adequately pled unclean-hands defense must allege facts that demonstrate misconduct, as well as a nexus between that misconduct and the relief sought by the plaintiff. *Id.* Dell fails in its pleading to identify any alleged misconduct regarding any one of the *six* patents-in-suit, or to identify how that alleged misconduct is related to Lucent's claims in this case. Accordingly, Dell's "procurement" allegation is deficient on its face.

Lucent should not be left guessing what is the basis for Dell's "procurement" allegation. Nor should Dell be allowed to set forth its "procurement" allegation in such vague terms that it can change its theory of the defense without putting Lucent on notice. *See France Telecom*, 2002 WL 31355255, at *1 n.1 (noting potential problems caused by broad and undefined unclean-hands defense would be avoided by an amended answer). That Dell, in its opposition, points to a letter that refers to a reference it contends is relevant to only *one* of the *six* patents-in-suit cannot save its otherwise flawed allegation. *See EMC Corp. v. Storage Tech. Corp.*, 921 F.

2

Supp. 1261, 1263-64 (D. Del. 1996) (pleading should be sufficient on its face to meet to pleading requirements of the Federal Rules).

> **B.** **Dell Cannot Circumvent Rule 9(b) By Pleading Its Allegation Of "Procurement Of One Or More Of The Patents-In-Suit By Failure To Disclose Material Prior Art To The United States Patent Office" As Unclean-Hands.**

Dell raises illogical and inconsistent arguments in an attempt justify its contention that its "procurement" allegation is not subject to the particularity requirement of Fed. R. Civ. P. 9(b). Dell cannot, however, circumvent the particularity requirement of Fed. R. Civ. P. 9(b) by including this allegation as part of an unclean-hands defense. The Delaware District Court has required that allegations of misconduct before the Patent Office be pled with particularity even when raised as part of an unclean-hands defense. *See France Telecom*, 2002 WL 31355255, at *3. In *France Telecom*, the defendant's answer included an affirmative defense which read: "The Complaint and the relief requested therein are barred, in whole or in part, by the doctrine of unclean hands." *Id.* at *2. The plaintiffs moved to strike that affirmative defense on two grounds: 1) as insufficient because it failed to provide adequate notice of the nature of the unclean-hands defense and the relationship between the alleged misconduct and the plaintiff's claim and 2) as redundant of a separately asserted affirmative defense of inequitable conduct. *Id.*

The defendant moved for leave to file an amended answer that included "the title, author, and publication date of the references allegedly withheld by the plaintiffs from the Patent and Trademark Office." *Id.* at *2. In finding the *amended* defense sufficiently pled to state the basis for the unclean-hands defense, including the context of the alleged misconduct, the Delaware court applied Rule 9(b)'s particularity requirement:

> To the extent the defendant's fourth affirmative defense involves fraud and is subject to the particularity requirement of Rule 9(b), this requirement also is satisfied by [defendant's] amendment. As noted above, the amended Answer discloses the title, author, and

3

publication date of the relevant prior art allegedly withheld from
the PTO.

*Id.* at *3.

The Delaware District Court also imposed a similar requirement in addressing allegations
of misconduct before the Patent Office that were raised in the context of a patent-misuse defense.
*See Tristrata Tech., Inc. v. Neoteric Cosmetics, Inc.*, No. 96-227-JFF, slip opinion (D. Del. Sept.
30. 1997). In *Tristrata*, the defendant filed a counterclaim that alleged that "misuse has in part
been attempted . . . through the use of extensive and misleading representations to the Patent
Office." *Tristrata*, at 3. The plaintiff moved to dismiss that allegation as inadequately pled. *Id.*
at 4. The Delaware court held that to the extent that the claim alleged fraud on the Patent Office,
"it is deficient as a matter of law." *Id.* at 9.

To the extent that Dell disclaims that its unclean-hands defense is based on fraud, its
position is inconsistent with the relief Dell seeks in its counterclaim. Unclean-hands is an
affirmative defense that can bar a plaintiff from obtaining the relief that it seeks in a specific
litigation. *See Xilinx, Inc. v. Altera Corp.*, No. C 93-20709 RMW, 1994 WL 782236, at *3-4
(N.D. Cal. Feb. 8, 1994). Dell, however, seeks more than to limit Lucent's relief against Dell in
this litigation. Dell's declaratory-judgment counterclaim seeks to have all *six* of the patents-in-
suit declared *unenforceable* against Dell *and* third parties. Yet Dell cites no legal authority for
its contention that, in the absence of fraud on the Patent Office, any alleged misconduct by
Lucent could render the patents-in-suit unenforceable.

Without a cognizable legal theory to support the broad relief it seeks, Dell's
"procurement" allegation should be stricken. *See Cardiogenesis Corp. v. PLC Sys., Inc.*, Civ.
No. 96-20749 SW, 1997 WL 12129, at *1 (N.D. Cal. Jan. 8, 1997) (striking allegation of
unenforceability after denials in opposition to motion to dismiss made clear that plaintiff had not
attempted to assert a recognized basis for unenforceability).

4

**C.   Dell's Allegation Of "Assertion Of The Patents-In-Suit Without Proper Basis For Alleging Infringement" Fails To Provide The Notice Required By Rule 8.**

Dell contends that its allegation of "assertion of the patents-in-suit without proper basis for alleging infringement" (Dell's "assertion" allegation) is an assertion of bad-faith litigation. (Dell Opp. at 6). But Dell fails to identify which of the *six* patents-in-suit it contends was improperly asserted, let alone allege the misconduct or nexus elements of an unclean-hands defense. Namely, Dell fails to allege any misconduct by Lucent in connection with its assertion of any one of the six patents-in-suit or how that alleged misconduct relates to the relief Lucent seeks in this action.

The requirement of alleging nexus between the plaintiff's misconduct and the relief sought is not negated by the fact that Dell bases its claim on bad-faith assertion, and not on inequitable conduct. *See Xilinx, Inc,* 1994 WL 782236, at *3-*4 (nexus must be pled in allegation of unclean-hands based on bad-faith assertion). Indeed, an affirmative defense of unclean-hands is properly stricken as defective when a defendant "has not alleged in its answer nor explained in its papers how [the plaintiff's] alleged bad faith relates to [the plaintiff's] patent infringement claims against [the defendant]." *Id.* at *3. Moreover, the bad-faith assertion of one patent does not render the assertion of other patents in that litigation unenforceable unless an "immediate and necessary relation" to the other patents is alleged and proved. *Id.* at *4 (citations omitted). Accordingly, Dell must plead the requisite misconduct and nexus with respect to each of the patents-in-suit it contends is unenforceable on this ground.

Dell's failure to plead the requisite nexus renders its "assertion" allegation defective under Rule 8. If Dell has a basis for this allegation, it should state it now. Dell should not be allowed to use the broad and undefined nature of its "assertion" allegation as a basis for "'fishing expeditions' on matters that would otherwise not properly be subject to discovery." *See France*

5

*Telecom*, 2002 WL 31355255, at *1 n.1 (noting that amended answer that pled unclean-hands with specificity would avoided "fishing expeditions"); *see also EMC Corp.*, 921 F. Supp. at 1263 (insufficiently pled allegations cannot be used to justify discovery into such allegations). Dell's assertion constitutes a serious charge. If Dell has a basis for this assertion, it should inform Lucent of that basis.

Dell, again, seeks greater relief than it is entitled to under to doctrine of unclean-hands when it seeks to have all of the patents-in-suit declared unenforceable — against Dell and third parties — based on alleged bad-faith assertion of these patents against Dell. While a court might refuse to grant equitable relief under the doctrine of unclean-hands, there is no legal or equitable basis for a holding that the patents-in-suit could not be enforced against third parties. *See Aptix Corp. v. Quickturn Design Sys., Inc.*, 269 F.3d 1369, 1377-78 (Fed. Cir. 2001) (vacating holding of unenforceability based on unclean-hands, noting that "[n]o case law from the Supreme Court or this court provides a basis for nullifying property rights granted by the United States when such rights did not themselves accrue through inequitable conduct.")

### D.   Dell's Open-Ended Unclean-Hands Allegation Fails To Provide The Notice Required By Rule 8.

Finally, Dell attempts to evade the notice requirement of Rule 8 by drafting its unclean-hands allegation in open-ended terms. Dell's unclean-hands allegation purportedly "includes, *but is not limited to*" Dell's "procurement" allegation and "assertion" allegation. (Answer and Counterclaim ¶¶ 61 and 71) (emphasis added). As written, Dell purports to raise every cognizable theory of unclean-hands through this defense. As explained above, Dell has failed to provide sufficient notice of either its "procurement" allegation or its "assertion" allegation, let alone an (as yet) *unnamed* basis for its unclean-hands defense. Accordingly, the words "but is not limited to" should be stricken from Dell's unclean-hands allegation.

# TABLE OF CONTENTS

I.    INTRODUCTION. ...............................................................................................1

II.   ARGUMENT. .....................................................................................................1

      A.   Dell's Allegation Of "Procurement Of One Or More Of The Patents-In-
           Suit By Failure To Disclose Material Prior Art To The United States
           Patent Office" Fails To Provide The Notice Required By Rules 8 And
           9(b). ...........................................................................................................1

      B.   Dell Cannot Circumvent Rule 9(b) By Pleading Its Allegation Of
           "Procurement Of One Or More Of The Patents-In-Suit By Failure To
           Disclose Material Prior Art To The United States Patent Office" As
           Unclean-Hands. ...........................................................................................3

      C.   Dell's Allegation Of "Assertion Of The Patents-In-Suit Without Proper
           Basis For Alleging Infringement" Fails To Provide The Notice Required
           By Rule 8. ...................................................................................................5

      D.   Dell's Open-Ended Unclean-Hands Allegation Fails To Provide The
           Notice Required By Rule 8. .........................................................................6

III.  CONCLUSION. ..................................................................................................7

# TABLE OF AUTHORITIES

*Cases*

*Aptix Corp. v. Quickturn Design Sys., Inc.,*
269 F.3d 1369 (Fed. Cir. 2001)..................................................................................6

*Cardiogenesis Corp. v. PLC Sys., Inc.,*
Civ. No. 96-20749 SW, 1997 WL 12129 (N.D. Cal. Jan. 8, 1997).........................4

*EMC Corp. v. Storage Tech. Corp.,*
921 F. Supp. 1261 (D. Del. 1996).........................................................................2, 6

*France Telecom S.A. v. Novell, Inc.,*
No. 102-437-GMS, 2002 WL 31355255 (D. Del. Oct. 17, 2002)...................2, 3, 5

*Paramount Aviation Corp. v. Agusta,*
178 F.3d 132 (3d Cir. 1999).....................................................................................2

*Tristrata Tech., Inc. v. Neoteric Cosmetics, Inc.,*
No. 96-227-JFF, slip opinion (D. Del. Sept. 30. 1997)............................................4

*Xilinx, Inc. v. Altera Corp.,*
No. C 93-20709 RMW, 1994 WL 782236 (N.D. Cal. Feb. 8, 1994) ....................4, 5


*Statutes and Rules*

Fed. R. Civ. P. 8..........................................................................................1, 5, 6, 7

Fed. R. Civ. P. 9(b)......................................................................................1, 3, 4, 7

Fed. R. Civ. P. 12(b)(6)........................................................................................7

Fed. R. Civ. P. 12(f)..............................................................................................7

## III.    CONCLUSION.

For the foregoing reasons, Lucent respectfully requests that this Court:

(1)    strike Dell's unenforceability affirmative defense (Answer and Counterclaim ¶ 61)

in its entirety pursuant to Fed. R. Civ. P. 8, 9(b) and 12(f);

(2)    strike the words "but is not limited to" from Dell's unenforceability affirmative

defense (Answer and Counterclaim ¶ 61) pursuant to Fed. R. Civ. P. 8 and 12(f), if that defense

is not stricken in its entirety; and

(3)    dismiss Dell's counterclaim to the extent it seeks to have the patents-in-suit

declared unenforceable (Answer and Counterclaim ¶ 71) pursuant to Fed. R. Civ. P. 8, 9(b) and

12(b)(6).

Respectfully submitted,

Dated:  April 21, 2003

Josy W. Ingersoll (#1088)
John W. Shaw (#3362)
Christian Douglas Wright (#3554)
YOUNG CONAWAY STARGATT
          & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE  18991
(302) 571-6600

*Attorneys for Plaintiffs Lucent Technologies Inc.
and Lucent Technologies Guardian I LLC*

OF COUNSEL:
John M. Desmarais
Robert A. Appleby
Maxine Y. Graham
Michael E. Stimson
KIRKLAND & ELLIS
153 East 53rd Street
New York, New York 10022-4675
(212) 446-4800



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

TRISTRATA TECHNOLOGY, INC.,          :
                                     :
                                     :
                                     :
          Plaintiff,                 :
                                     :
     v.                              :     Civil Action No. 96-227-JJF
                                     :
NEOTERIC COSMETICS, INC., MURAD      :
SKIN RESEARCH LABORATORIES, INC.,    :
HOWARD MURDAD, M.D., ERNO LASZLO     :
DIVISION, CHANEL, INC. and           :
CLARINS USA, INC., COSMAIR, INC.     :
                                     :
          Defendants.                :

------------------------------------------------

Thomas J. Allingham, II, Esquire and Robert S. Saunders, Esquire of SKADDEN, ARPS, SLATE, MEAGHER & FLOM, Wilmington, Delaware.  Of Counsel: Constance S. Huttner, Esquire and John L. Gardiner, Esquire of SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, New York, New York; Kevin M. McGovern, Esquire and Brian T. Foley, Esquire of McGOVERN & ASSOCIATES, Greenwich, Connecticut. Attorneys for Plaintiff.

Allen M. Terrell, Jr., Esquire and Frederick L. Cottrell, III, Esquire of RICHARDS, LAYTON & FINGER, Wilmington, Delaware.  Of Counsel: David Wolf, Esquire, Stanley Sacks, Esquire and Robert E. Rigby, Jr., Esquire of WOLF, GREENFIELD & SACKS, P.C.  Attorneys for Defendant Neoteric Cosmetics, Inc.

Jack B. Blumenfeld, Esquire, Thomas C. Grimm, Esquire, Matthew B. Lehr, Esquire and Maryellen Noreika, Esquire of MORRIS, NICHOLS, ARSHT & TUNNELL, Wilmington, Delaware. Attorneys for Defendants Murad Skin Research Laboratories, Inc. and Howard Murad, M.D.

James F. Burnett, Esquire and Joanne Ceballos, Esquire of POTTER ANDERSON & CORROON, Wilmington, Delaware.  Of Counsel: Yosef J. Riemer, Esquire and Sarah Slover, Esquire of KIRKLAND & ELLIS, New York, New York;  Robert P. Oppenheim, Esquire of COBLENCE & WARNER, New York, New York;  Paul H. Heller, Esquire, Albert J. Breneisen, Esquire and Daniel F. Coughlin, Esquire of KENYON & KENYON, New York, New York.  Attorneys for Defendant Chanel, Inc. and·Clarins USA, Inc.

Kent A. Jordan, Esquire of MORRIS, JAMES, HITCHENS & WILLIAMS,
Wilmington, Delaware.  Of Counsel: Richard D. Kelly, Esquire and
Jean-Paul Lavalleye, Esquire of OBLON, SPIVAK, McCLELLAND, MAIER &
NEUSTADT, P.C., Arlington, Virginia. Attorneys for Defendant
Cosmair, Inc.

---------------------------------------------

MEMORANDUM OPINION

September 30, 1997

Wilmington, Delaware

Farnan, Chief Judge.

Presently before the Court is a Motion For Judgement Dismissing Neoteric's Counterclaim For Patent Misuse Pursuant To Fed. R. Civ. P. 12(c) (D.I. 77) filed by Plaintiff TriStrata Technology, Inc. ("TriStrata"). In its Answer to the Complaint, Neoteric sets forth a two count Counterclaim. Count I alleges that the patents in issue are invalid and/or unenforceable, and Count II alleges breach of contract against TriStrata. Pursuant to a stipulation (D.I. 76), Neoteric dismissed Count II of its Counterclaim without prejudice. Subsequently, TriStrata filed the instant motion seeking dismissal of the remainder of the Counterclaim. For the reasons set forth below, the Court will grant TriStrata's motion. However, the Court will also grant Neoteric leave to file an Amended Counterclaim.

### BACKGROUND

The instant motion arises in the context of a patent infringement action brought by TriStrata against Neoteric and others. The patents in issue (the "AHA Patents") describe and claim a method of using a composition containing an "alpha-hydroxy acid" ("AHA"), such as glycolic or lactic acid, to treat and/or reduce the appearance of wrinkles and/or fine lines on human skin. The AHA Patents were originally issued to Drs.

1

Eugene J. Van Scott and Ruey J. Yu, and subsequently were

assigned to TriStrata.  In its Complaint, TriStrata alleges that

Neoteric and others willfully and deliberately infringed the AHA

patents.

In addition to answering the Complaint, Neoteric filed a

two-count Counterclaim against TriStrata.  By stipulation,

Neoteric dismissed Count II of the Counterclaim.  The remaining

Count consists of three paragraphs numbered 59-61.  Paragraph 60

alleges that the AHA Patents "are invalid and unenforceable under

the Patent Laws of the United States, including 35 U.S.C. § 101,

102, 103 and 112; and by reason of obviousness-type double

patenting."  In the instant motion, TriStrata expressly states

that it does not seek dismissal of the allegations contained in

paragraph 60.  (D.I. 78 at 3, n.4).  However, TriStrata does seek

dismissal of the allegations contained in paragraph 61 of the

Counterclaim.  Paragraph 61 alleges that the AHA Patents are

> void and unenforceable because plaintiff has misused
> its patents by virtue of asserting claims against other
> including Neoteric and, on information and belief, by
> entering into agreements, which claims and agreements
> purport coverage of the [AHA patents], which plaintiff
> knows or should know are beyond the metes and bounds of
> the [AHA patents] as defined by the claims thereof.  As
> part of said misuse, plaintiff has embarked upon a
> calculated scheme knowingly intended to achieve a
> monopoly in the manufacture, sale and use of skin
> cosmetics containing alpha hydroxy acids and, in

particular, glycolic acid.  Such misuse has in part
been attempted through seeking and obtaining numerous
patents having overlapping claims and non-coextensive
termination dates, said patents being patentably
indistinct from one another by engaging in predatory
licensing and threats and through the use of extensive
and misleading representations to the Patent Office.

(D.I. 20 at 12).

### STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 12(c), "[a]fter

the pleadings are closed but within such time as not to delay the

trial, any party may move for judgment on the pleadings."  In

deciding a motion to dismiss on the pleadings, courts utilize the

same legal standard that applies to Rule 12(b)(6) motions.  See

Finch v. Hercules, Inc., 809 F. Supp. 309, 310 (D. Del. 1992)

(citations omitted).  As such, a court must accept as true all

factual allegations in the claim and must draw all reasonable

factual inferences in the light most favorable to the non-moving

party.  However, a court "need not accept any conclusory

allegations or statements of law."  In re General Motors Class E

Stock Buyout Sec. Litig., 694 F. Supp. 1119, 1125 (D. Del. 1988).

Dismissal of a claim is only appropriate when it appears beyond

doubt that the plaintiff can prove no set of facts entitling him

to relief.  Revis v. Slocomb, 765 F. Supp. 1212, 1213 (D. Del.

1991).  In applying this standard, the moving party bears the

burden of showing that dismissal is warranted.  See Finch, 809 F. Supp. at 310.

## DISCUSSION

In its motion, TriStrata seeks to dismiss the patent misuse allegation contained in paragraph 61 of the Counterclaim.  In particular, TriStrata contends that:  (1) its patent enforcement and licensing activities cannot constitute patent misuse under the "Safe Harbor" Provisions of 35 U.S.C. § 271(d); (2) Neoteric's allegation that TriStata committed fraud on the patent office is inadequately pled, (3) Neoteric's allegation that TriStrata "knowingly intended to achieve a monopoly in the manufacture, sale and use of skin cosmetics containing AHA, and in particular glycolic acid" fails to state a claim for relief, and (4) Neoteric's allegation that Tristrata entered into agreements which it knew or should have known extended beyond the metes and bounds of the patent fails to state a claim for relief.

In response, Neoteric asserts four arguments.  First, Neoteric contends that its allegations are sufficient to support its Counterclaim for patent misuse.  Second, Neoteric contends that TriStrata's motion cannot carry its burden on the motion.  Third, Neoteric contends that TriStrata's motion is premature. And, fourth, Neoteric contends that if the Court concludes that

4

its Counterclaim is not adequately pled, then the more

appropriate remedy is a more definite statement.

A.   Neoteric's Allegation That TriStrata Enforcement and
     Licensing Activities Amounted To Misuse

In seeking to dismiss Neoteric's Counterclaim for patent

misuse, TriStrata contends that several allegations contained in

paragraph 61 of the Counterclaim fall within the "safe harbor"

provision of 35 U.S.C. § 271(d).  Section 271(d) provides:

> No patent owner otherwise entitled to relief for
> infringement or contributory infringement of a patent
> shall be denied relief or deemed guilty of misuse or
> illegal extension of the patent right by reason of his
> having done one or more of the following: (1) derived
> revenue from acts which if performed by another without
> his consent would constitute contributory infringement
> of the patent, (2) licensed or authorized another to
> perform acts which if performed without his consent
> would constitute contributory infringement of the
> patent; (3) sought to enforce his patent rights against
> infringement or contributory infringement [or] (4)
> refused to license or use any rights to the patent, or
> (5) conditioned the license of any rights to the patent
> or the sale of the patented product on the acquisition
> of a license to rights in another patent or purchase of
> a separate product, unless in view of the
> circumstances, the patent owner has market power in the
> relevant market for the patent or patented product on
> which the license or sale is conditioned.

35 U.S.C. § 271(d).

In response to this argument, Neoteric contends that Section

271(d) is inapplicable to the instant case, because "even if

TriStrata's factual allegations as set forth in the Complaint

5

were true, and even if the patents were valid, Neoteric, at best,
would only be liable for inducing infringement" and inducing
infringement is not contemplated by the provisions of Section
271(d).  While Neoteric admits that TriStrata has charged it with
infringement, contributory infringement and inducing
infringement, Neoteric contends that "it should be apparent from
the pleadings" that it has neither infringed nor contributorily
infringed.  Further, Neoteric contends that pursuant to the
standard of review under Rule 12(c), the Court must accept, as
true, its allegation that it would only be liable for inducing
infringement.

The Court is not persuaded by Neoteric's argument.  First,
under the applicable standard of review, the Court must accept
the truth of Neoteric's factual allegations.  Neoteric's
assertion that it, at most, would be liable for inducing
infringement and that it has neither infringed nor contributorily
infringed are legal conclusions, the truth of which the Court is
not required to accept for purposes of a Rule 12(c) dismissal.
See e.g. In re General Motors, 694 F. Supp. at 1125.  Moreover,
at this stage of the proceedings, the Court is not prepared to
address the legal merits of TriStrata's infringement claims.
Therefore, the Court declines to accept Neoteric's contention

6

that it is apparent from the pleadings that it has neither infringed nor contributorily infringed.

Second, the Court declines to accept Neoteric's narrow interpretation of Section 271(d). Neoteric has not offered any authority to support its contention that Section 271(d) does not extend to protect claims of inducing infringement, and the Court has not been able to locate any support for that proposition. Indeed, the Supreme Court acknowledged in <u>Dawson Chemical Co. v. Rohm & Haas Co.</u>, that Section 271(d) "moved in the direction of expanding the statutory protection enjoyed by patentees." 448 U.S. 176, 213, <u>reh'd denied</u>, 448 U.S. 917 (1980). By its express terms, Section 271(d) includes patent owners who are entitled to relief for infringement, as well as contributory infringement. Given the language of Section 271(b), which states that "[w]hoever actively induces infringement of a patent shall be liable as an infringer," the Court cannot say that the term "infringement" as used in Section 271(d) excludes inducing infringement. Therefore, even if Neoteric is correct that it is not liable for direct or contributory infringement, the Court cannot conclude that Section 271 would be inapplicable. <u>See</u> <u>Dawson</u>, 448 U.S. at 176 (holding conduct of patent holder, who sought to enforce patents under theories of both contributory and

7

induced infringement, protected under provisions of § 271(d)).

In examining Neoteric's allegations of patent misuse in light of the provisions of Section 271(d), the Court concludes that a number of Neoteric's allegations of patent misuse are within the safe harbor provisions of that section.  Subsections (2) and (3) expressly encompass a patent owners license activities and enforcement activities.  Indeed, in discussing Section 271(d), the Supreme Court stated that "[t]his provision plainly means that the patentee may bring suit without fear that doing so will be regarded as an unlawful attempt to suppress competition."  See Dawson, 448 U.S. at 201.  Thus, Neoteric's allegations that TriStrata misused its patents by "asserting claims against others including Neoteric," (2) "entering into agreements," and (3) engaging in "predatory licensing and threats" are licensing and enforcement activities that do not constitute misuse under Section 271(d).  To the extent that Neoteric contends that certain licensing and enforcement activities were improper and thus, not within the protection of Section 271(d), the Court finds Neoteric's allegations to be insufficient and conclusory.  Indeed, Neoteric has not alleged any facts that would lead the Court to conclude that TriStrata's activities fall outside the safe harbor provisions.  Accordingly,

8

the Court will dismiss, with leave to amend, Neoterics's

Counterclaim of misue based upon TriStrata's enforcement and

licensing activities.  See e.g. Advanced Cardiovascular Sys.,

Inc. v. Medtronic, Inc., 1996 WL 467273 at *6 (N.D. Cal. July 24,

1996) (striking misuse allegation where no factual basis provided

for defendant's contention that patent owner knew patent was

invalid, and nonetheless willfully, deliberately and

intentionally asserted it against defendant).

B.   Neoteric's Allegation that TriStrata Committed Fraud On The
     Patent Office

     In its Counterclaim, Neoteric contends that TriStrata's

misuse "has in part been attempted through seeking and obtaining

numerous patents having overlapping claims and non-coextensive

termination dates, said patents being patentably indistinct from

one another . . . through the use of extensive and misleading

representations to the Patent Office."  To the extent that this

claim alleges that TriStrata committed fraud on the Patent

Office, the Court concludes that it is deficient as a matter of

law.

     Pursuant to Federal Rule of Civil Procedure 9(b) allegations

of fraud must be pled with particularity.  In its Counterclaim,

Neoteric has not pled any specific facts to support its assertion

9

that TriStrata made extensive and misleading representations to

the Patent Office.  Rather, Neoteric appears to base its claim of

fraud on its allegation that TriStrata has obtained patents with

overlapping claims and non-coextensive termination dates, that

are patentably indistinct from one another.  While Neoteric

provides facts relevant to this allegation in its brief, it does

not offer those or any other facts to support this allegation in

its pleadings.

Although Neoteric relies on Raychem Corp v. PSI for the

proposition that it has provided TriStrata reasonable notice of

the conduct which it alleges constitutes fraud, the Court

believes that Raychem lends greater support for the Court's

conclusion that Neoteric's misuse claim is inadequately pled.

1995 WL 108193 (N.D. Cal. 1995).  In Raychem, the defendant based

his defense of patent misuse on assertions of "inequitable

conduct," "mutually exclusive patents," and patents which "are

clearly not capable of being properly construed to cover the

accused infringing devices."  In striking the defense of patent

misuse and granting defendant leave to amend, the Raychem court

concluded that the defendant has not offered a sufficient factual

basis upon which to base its allegations.  In this case, the

Court finds Neoteric's conclusory allegation of "patents having

10

overlapping claims" to be similar to the conclusory allegations
that the Raychem court found insufficient.  Because the Court
concludes that Neoteric's claims of patent misuse based on fraud
on the Patent Office and overlapping patent claims are not
sufficiently pled, the Court will grant TriStrata's motion to
dismiss, but allow Neoteric the opportunity to amend its
Counterclaim.

C.   Neoteric's Allegation That TriStrata Knowingly Intended To
     Achieve A Monopoly

     As another basis for its allegation of misuse, Neoteric
contends that TriStrata "has embarked upon a calculated scheme
knowingly intended to achieve a monopoly in the manufacture, sale
and use of skin cosmetics containing alpha hydroxy acids, and in
particular, glycolic acid."  In its brief, Neoteric attempts to
support this contention with the additional allegation that
TriStrata "is targeting the entire AHA market, not just limited
uses of AHA."  As a factual basis for these assertions, Neoteric
offers TriStrata's statement in its opening brief that "the
market for AHA containing cosmetics products has exploded; it is
currently estimated to be in excess of $800 million per year, and
all indications are that it will continue to grow in the future."
(D.I. 78 at 2).

11

As with Neoteric's other allegations, the Court concludes that Neoteric's Counterclaim of misuse based on attempted monopolization is inadequately pled.  As a general principle, a patent holder is entitled to maintain a patent monopoly by excluding others from making using or selling the patented invention, as long as the patent owner's conduct is permissible under the patent laws.  See SCM Corp. v. Xerox Corp, 645 F.2d 1195, 1204 (2d Cir. 1981), cert. denied, 455 U.S. 1016 (1982).

To the extent that Neoteric relies on TriStrata's statement concerning the "market for AHA containing cosmetics" as factual support for its Counterclaim, the Court finds the statement to be inadequate.  Examined in context, TriStrata's statement is simply a background comment on the magnitude of the AHA market.  As such, the Court declines to accept this statement, taken out of context, as sufficient factual support for a claim of misuse based on attempted monopolization.  Therefore, the Court will grant TriStrata's motion to dismiss Neoteric's claim of patent misuse based on attempted monopolization, but will grant Neoteric the opportunity to amend.

D.   <u>Neoteric's Allegation That TriStrata Entered Into Agreements</u>
     <u>Which It Knew Or Should Have Known Extended Beyond The Metes</u>
     <u>And Bounds Of The Patent</u>

Regarding Neoteric's allegation that TriStrata has engaged

12

in misuse by attempting to enforce its patents beyond their

limits, the Court concludes that Neoteric has not offered

sufficient factual support for its contention.  Again, the Court

believes this allegation resembles the conclusory type of

allegation that the Raychem court found to be lacking factual

support.  In dismissing the defendant's allegation that the

patents "are not capable of being properly construed to cover the

accused infringing devices," the Raychem court stated that the

defendant failed to "include any facts demonstrating how or why

[the plaintiff] has attempted to overbroadly and impermissibly

construe its patents in an anticompetitive fashion."  1995 WL

108193 at *4.  Likewise, in this case, Neoteric has not offered

any facts or examples demonstrating how TriStrata's agreements

with others have extended beyond the scope of the patents.

Therefore, the Court will grant TriStrata's motion to dismiss,

but will grant Neoteric leave to amend its Counterclaim.

E.   Whether TriStrata's Rule 12(c) Motion Is Premature

     Neoteric contends that the Court should deny TriStrata's

motion because it is untimely.  According to Neoteric, the

pleadings are not closed within the meaning of Rule 12(c),

because TriStrata's Motion For Relief To File A Second Amended

Complaint is pending.

13

Subsequent to the instant motions, the Court granted TriStrata leave to file its Second Amended Complaint and the Second Amended Complaint was filed.  Thus, in the first instance, Neoteric's argument is moot.

However, even if it were not moot, the Court declines to accept Neoteric's argument that the pendency of an amended pleading prevents the pleadings from being considered closed.  In its own research, the Court has been unable to locate any authority either in the Federal Rules of Civil Procedure or in the relevant case law to support this proposition.  See e.g. Katz v. Aiwa Am. Inc., 818 F. Supp. 730, 735 n.3 (D.N.J. 1993) (concluding that pleadings were "closed" despite pending motion to amend counterclaims).

Moreover, according to Moore's Federal Practice, "[u]nless the court orders a reply to an answer or third-party answer, the pleadings close after the last of the following pleadings in the case has been filed:  answer, reply to a counterclaim, answer to a cross-claim, and third-party answer."  James Wm. Moore, et al. Moore's Federal Practice, ¶12.38 (3d ed. 1997).  The Court notes that Moore's makes no mention of the effect of amended pleadings on this general rule of determining when pleadings close.  Id.

In this case, TriStrata filed a Reply (D.I. 34) and Amended

14

Reply (D.I. 44) to Neoteric's Counterclaim before filing its Rule 12(c) motion.  As such, the Court concludes that the pleadings are properly considered closed and TriStrata's motion pursuant to Rule 12(c) is not untimely.

### CONCLUSION

For the reasons discussed, TriStrata's Motion For Judgement Dismissing Neoteric's Counterclaim For Patent Misuse Pursuant To Fed. R. Civ. P. 12(c) (D.I. 77) will be granted.  However, the Court will grant Neoteric leave to amend its Counterclaim.[1]

An appropriate Order will be entered.

---

[1]     Although TriStrata contends that no amount of additional pleading could salvage Neoteric's patent misuse Counterclaim, the Court believes that its decision to permit Neoteric leave to amend is consistent with the approach of other courts that have dismissed or stricken allegations based on insufficient pleading.  See e.g. Raychem, 1995 WL 108193 at *4-5.

15



## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

TRISTRATA TECHNOLOGY, INC.,      :
                                 :
                                 :
                                 :
        Plaintiffs,              :
                                 :
    v.                           :   Civil Action No. 96-227-JJF
                                 :
NEOTERIC COSMETICS, INC., MURAD  :
SKIN RESEARCH LABORATORIES, INC.,:
HOWARD MURDAD, M.D., ERNO LASZLO :
DIVISION, CHANEL, INC. and       :
CLARINS USA, INC.,               :
                                 :
        Defendants.              :

## O R D E R

At Wilmington this 30 day of September 1997, for the reasons set forth in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that:

1.   TriStrata's Motion For Judgment Dismissing Neoteric's Counterclaim For Patent Misuse Pursuant to Fed. R. Civ. P. 12(c) (D.I. 77) is GRANTED.

2.   Neoteric is granted leave to file an Amended Counterclaim within 20 days of the date of this Order.

_____
UNITED STATES DISTRICT JUDGE

Not Reported in F.Supp.                                        Page 1
33 U.S.P.Q.2d 1149
(Cite as: 1994 WL 782236 (N.D.Cal.))

**H**

United States District Court, N.D. California.

XILINX, INC., a Delaware Corporation, Plaintiff,
v.
ALTERA CORPORATION, a, California
Corporation, Defendant.

**No. C 93-20709 RMW (EAI).**

Feb. 8, 1994.

Richard Grossman, Vernon Norviel, Townsend and
Townsend Khourie and Crew, San Francisco, CA.

Herbert Schwartz, Robert Goldman, Fish & Neave,
New York City.

Alan MacPherson, Robert Morrill, Anthony de
Alcuaz, Joseph Greco, Kenneth Leeds, Scott
Brown, Peter Kang, Skjerven, Morrill, MacPherson,
Franklin & Friel, San Jose, CA.

Robert Hinckley, Xilinx Corp., San Jose, CA.

ORDER GRANTING PLAINTIFF'S MOTION TO
STRIKE

WHYTE, District Judge.

*1 The motion to strike of plaintiff XILINX, INC.
("Xilinx"), was heard on February 4, 1994. The
court has read the moving papers and the opposition
papers of defendant ALTERA CORPORATION
("Altera") and heard the oral argument of counsel.
GOOD CAUSE APPEARING therefor,

The court grants plaintiff's motion to strike
defendant's affirmative defense of inequitable
conduct in the United States Patent and Trademark
Office because defendant has not properly pleaded
the requisite intent for this affirmative defense.
The court also grants plaintiff's motion to strike
defendant's affirmative defense of unclean hands,
because that defense, as pleaded, is not a proper
affirmative defense.

I. Background

On June 7, 1993, Xilinx filed suit against Altera
alleging infringement of two patents: United States

Patent No. 4,870,302 ("the '302 patent" or
"Freeman patent") and United States Patent No.
4,642,487 ("the '487 patent" or "Carter patent").
Both these patents deal with integrated circuits
which perform logic functions.

In its answer filed on July 28, 1993, Altera asserted
a number of affirmative defenses. On October 25,
1994, this court granted the defendant's motion to
strike two of those affirmative defenses with leave
to amend. In that order, the court held that Rule
9(b)'s requirement of pleading fraud with
particularity applied to the affirmative defense of
inequitable conduct, and that Altera had not pleaded
that affirmative defense with the requisite
particularity. The court also held that while Rule
9(b) did not technically apply to pleading the
affirmative defense of unclean hands, Altera ought
to plead that defense so as to give notice of the
nature of the defense to Xilinx.

On November 15, 1993, Altera filed its amended
answer re-alleging the affirmative defenses of
inequitable conduct and unclean hands. Xilinx has
again moved to strike these two affirmative
defenses pursuant to Rules 9(b) and 12(f). The two
amended affirmative defenses which are the subject
of Xilinx's motion to strike are at paragraphs twenty
(20) and twenty (22) of Altera's Amended Answer
and are as follows:

20. Upon information and belief, the '302 and
'487 patents are unenforceable because they were
obtained by Xilinx through inequitable conduct in
the United States Patent and Trademark Office.
During the prosecution of these patents, at least
the following prior art references were neither
cited by the patent examiner nor called to the
patent examiner's attention by Xilinx: a 1967
article by Wahlstrom titled "Programmable logic
arrays--cheaper by the millions"; (2) Wahlstrom
United States Patent No. 3,473,160 issued on
October 14, 1969; (3) a 1970 doctoral thesis by
Shoup titled "Programmable Cellular Logic
Arrays"; and (4) a 1975 doctoral thesis by
Manning titled "Automatic Test, Configuration,
and Repair Cellular Arrays." In addition, the
materiality of other prior art, e.g. Manning United
States Patent No. 4,020,469 was not disclosed to
the patent examiner. Each of these five
references was material to the patentability of the
patents in suit. Upon information and belief,
those acts and omissions by or on behalf of Xilinx

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.
33 U.S.P.Q.2d 1149
(Cite as: 1994 WL 782236 (N.D.Cal.))

were either intentional or evidence an intentional disregard of Xilinx's duty of disclosure to the Patent and Trademark Office and had the effect of depriving the Patent and Trademark Office of an opportunity to consider fairly whether or not the '302 and '487 patents should have issued.
**\*2** 22. Upon information and belief, Xilinx's claims for equitable relief are barred by the doctrine of unclean hands. Xilinx has commenced and continues this lawsuit in a bad faith attempt to interfere improperly with Altera's relationships with its customers and prospective customers. Xilinx threatened Altera with infringement litigation months before it first obtained and tested Altera's FLEX products. Xilinx personnel have also made false or misleading statements to Altera's customers or potential customers concerning the continued availability of Altera's products.

## II. Legal Standards

Motions to strike are governed by Federal Rule of Civil Procedure 12(f) which provides:

> Upon motion made by a party before responding to a pleading or, if no responsive pleading is permitted by these rules, upon motion made by a party within 20 days after the service of the pleading upon the party or upon the court's own initiative at any time, the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.

As with a motion to dismiss, when ruling on a motion to strike a court must view the pleadings in the light most favorable to the non-moving party. *State of California v. United States,* 512 F.Supp. 36, 39 (N.D.Cal.1981). Motions to strike are generally disfavored. *Id.* at 38 (citing 5A Wright & Miller, *Federal Practice and Procedure* § 1381 (2d ed. 1990)). "However, where the motion may have the effect of making the trial of the action less complicated, or have the effect of otherwise streamlining the ultimate resolution of the action, the motion to strike will be well taken." *Fantasy, Inc. v. Fogerty,* 984 F.2d 1524, 1528 (9th Cir.1993) , *cert. granted,* 113 S.Ct. 2992 (June 21, 1993) (citing *State of California, supra,* 512 F.Supp. at 38)
.

Federal Rule of Civil Procedure 9(b) provides:

> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.

As such, "allegations of fraud must be pleaded with specificity as to time, place and content of any misrepresentations or else be stricken." *Intel Corp. v. Hyundai Electronics America, Inc.,* 692 F.Supp. 1113, 1116 (N.D.Cal.1987). Applying these standards, the court finds as follows:

## III. Analysis
### A. Inequitable Conduct Defense

"Inequitable conduct resides in failure to disclose material information, or submission of false material information, with an intent to deceive, and those two elements, materiality and intent, must be proven by clear and convincing evidence." *Kingsdown Medical Consultants v. Holister, Inc.,* 863 F.2d 867, 872 (Fed.Cir.1988), *cert. denied,* 490 U.S. 1067 (1989); *Labounty Mfg., Inc. v. U.S. Intern. Trade Comm'n,* 958 F.2d 1066, 1076 (Fed.Cir.1992). Therefore, "intent to deceive the PTO is a required element of inequitable conduct and, further, requires a high level of proof." *Paragon Podiatry Laboratory v. KLM Laboratories,* 984 F.2d 1182, 1189 (Fed.Cir.1993); *Kimberly-Clark v. Proctor & Gamble,* 973 F.2d 911, 918 (Fed.Cir.1992).

**\*3** Xilinx agues that the court should strike Altera's affirmative defense of inequitable conduct because Altera has failed to plead a required element of the affirmative defense, namely an intent to deceive. In response Altera apparently makes two arguments. First, Altera argues that intent can be inferred from the circumstances surrounding the patent prosecution and that Altera, therefore, need not provide direct evidence of Xilinx's culpable intent. Altera's argument is correct but misplaced and premature. Altera's eventual ability to prove Xilinx's intent to deceive and Altera's need to plead that intent in its answer, are two entirely different matters. Second, Altera argues that it has pleaded the requisite intent by pleading that Xilinx's acts or omissions (e.g. not citing prior art to the PTO) were either "intentional or evidence an intentional disregard of Xilinx's duty of disclosure to the Patent and Trademark Office." These allegations may allow the court to infer that Altera is alleging that Xilinx knew or should have known of the prior art and its materiality. However, intentionally failing to cite prior art to the PTO or intentionally

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.
33 U.S.P.Q.2d 1149
(Cite as: 1994 WL 782236 (N.D.Cal.))

disregarding one's duty of disclosure to the PTO is not necessarily tantamount to doing those same intentional acts with an intent to deceive the PTO. Altera's opposition brief clarifies why this is the case:

> The issue to be decided on this motion is whether, assuming that the allegations in Paragraph 20 of Altera's amended complaint are true, Altera will have established that the patents in suit are unenforceable for inequitable conduct during the prosecution of those patents in the Patent Office. (Opp.Brief at 8:5-10).

Under the Altera's amended answer as it now stands, the response to this question must be "no." Even if Altera proved every allegation in paragraph 20, it would not have proven that Xilinx intended to deceive the PTO, and, as noted, an intent to deceive the PTO is a necessary element of this defense. If Altera believes it can later prove that Xilinx intended to deceive the PTO-- whether through direct or circumstantial evidence--Altera's pleading should, at the very least, reflect that belief. [FN1] *See Energy Absorption Sys., Inc. v. Roadway Safety Serv., Inc.,* 28 U.S.P.Q.2d 1717 (N.D.Cal.1993) ( Rule 9(b) requires defendant to allege with specificity why or how plaintiffs misrepresentation constituted inequitable conduct in the PTO). Therefore, the defense of inequitable conduct is stricken with twenty days leave to amend.

### B. Unclean Hands

Altera's attempt to plead the affirmative defense of unclean hands suffers from a defect that is similar, although not identical, to the one discussed above. In its opposition, Altera states that "the unclean hands defense asserts that Xilinx first threatened suit and then brought suit in bad faith, *without a good faith belief that the patents were infringed,* to interfere improperly with Altera's business relationships." (Opp.Brief at 3:2-6, emphasis added). Notably, the sentence highlighted above is absent from paragraph 22 of the amended answer. Thus, it is not entirely clear whether Altera is alleging that Xilinx brought and is prosecuting this action without a good faith belief that Altera infringed or whether Altera is simply claiming that while Xilinx may have a good faith belief that Altera infringed, that was not its only motive for bringing suit. Regardless of which version Altera means to plead, the affirmative defense is defective. Altera has not alleged in its answer nor explained

in its papers how Xilinx's alleged bad faith relates to Xilinx's patent infringement claims against Altera. As the Ninth Circuit stated over thirty years ago,

> *4 Misconduct in the abstract, unrelated to the claim to which it is asserted as a defenses, does not constitute unclean hands ... What is material is not that the plaintiff's hands are dirty, but that he dirtied them in acquiring the right he now seeks to assert, or that the manner of dirtying renders inequitable the assertion of such rights against the defendant.

*Republic Molding Corp. v. B.W. Photo Utils.,* 319 F.2d 347, 349 (9th Cir.1963); *Keystone Driller Co. v. General Excavator Co.,* 290 U.S. 240, 245 (1933) (courts require clean hands only where unconscionable act has immediate and necessary relation to the equity he seeks in respect of the matter of litigation). The court went on to address patent cases specifically:

> Where unclean hands has been asserted to bar a claim of infringement, it has usually been because the patent was fraudulently obtained, or there has been concealment of evidence ... or perhaps, more remotely, the patent was being misused, as, for example, in violation of the Sherman Act.

*Id.* at 350; *see also, National Presto Indus. v. Black & Decker, Inc.,* 760 F.Supp. 699, 702 (N.D.Ill.1991) (threatening retailers and competitors not an affirmative defense of unclean hands where issues are infringement and priority); *Southwire Co. v. Essex Group, Inc.,* 220 U.S.P.Q. 1053, 1055 (N.D.Ill.1983) (burglary to investigate infringement bears no relation to validity or infringement). [FN2] Here, Altera has pleaded nothing to demonstrate how the alleged acts of Xilinx would bar Xilinx's claim of infringement. Finally, Altera argues that even if Xilinx proves the validity of one patent-in-suit, Xilinx's alleged bad faith regarding the other patent- in-suit might prevent this court from ordering an injunction on the valid patent. This argument suffers from the problem discussed directly above. Further, in *Consolidated Aluminum, supra,* 910 F.2d 804, cited by Altera, the court specifically found that the inequitable conduct by the plaintiff regarding one patent (fraud on the PTO) had "an immediate and necessary relation" to the other patents because it "permeated the prosecution of the other patents-in-suit...." *Id.* at 810. That is an entirely different situation from the one Altera claims to be present in this case. The unclean hands alleged by Altera does not involve an intent to deceive the

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.                                                    Page 4
33 U.S.P.Q.2d 1149
**(Cite as: 1994 WL 782236 (N.D.Cal.))**

PTO with respect to related patent applications. Accordingly, the court hereby strikes Altera's unclean hands defense, but grants Altera twenty days leave to amend.

### IV. Order

Given the above discussion and GOOD CAUSE APPEARING therefor, the court grants Xilinx's motion to strike Altera's affirmative defenses of "inequitable conduct" and "unclean hands" at paragraphs 20 and 22 of the Amended Answer. Pursuant to Federal Rule of Civil Procedure 15(a), Altera is granted leave to file an amended pleading in compliance with this order within twenty days of the date of this order.

> FN1. Altera's citation to *Consolidated Aluminum Corp. v. Foseco Intern. Ltd.,* 910 F.2d 804, 809 (Fed.Cir.1990), does not change this result. In that case, the district court's order reflected a finding of "intentional concealment." The Federal Circuit merely held that this finding was equal to a finding of intent to deceive even though the district court did not specifically use the words "intent to deceive." Here, the court is not asking for a particular phrase but rather requiring Altera to plead a requisite element of the defense alleged.

> FN2. The circumstances of *Gardiner v. Gendel,* 727 F.Supp. 799, 804 (E.D.N.Y.1989), *aff'd without published opinion,* 976 F.2d 746 (Fed.Cir.1992), as well as the other cases cited By Altera, are all distinguishable from the case at hand. For example, in *Gardiner,* the court specifically found that the plaintiffs sent cease and desist letters and threatened infringement suits at a time when the plaintiffs knew that they had no patent rights at all. Moreover, the court only commented on the plaintiffs "litigation conduct" in light of its decision to find the case was "exceptional" under 35 U.S.C. § 285, thus entitling the defendants to attorney fees.

1994 WL 782236 (N.D.Cal.), 33 U.S.P.Q.2d 1149

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

## CERTIFICATE OF SERVICE

I, John W. Shaw, Esquire, certify that copies of the foregoing document were caused

to be served on April 21, 2003 on the following counsel of record in the manner indicated:

### BY HAND DELIVERY

R. Eric Hutz, Esquire
Connolly Bove Lodge & Hutz LLP
1220 Market St., 10th Floor
P.O. Box 2207
Wilmington, DE  19899-2207

### BY FEDERAL EXPRESS

Joel M. Freed, Esquire
Arnold & Porter
555 12th Street NW
Washington, DC  20004

John W. Shaw

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

COPY

26

|  |  |  |
|---|---|---|
| LUCENT TECHNOLOGIES INC. and<br>LUCENT TECHNOLOGIES GUARDIAN I LLC, | : | |
| Plaintiffs, | : | |
| v. | : | Civil Action No.  03-205-KAJ |
| DELL COMPUTER CORPORATION, | : | |
| Defendant. | : | |

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF
THEIR MOTION TO STRIKE DELL'S AFFIRMATIVE DEFENSE OF
UNENFORCEABILITY AND TO DISMISS DELL'S COUNTERCLAIM
TO THE EXTENT IT IS BASED ON THAT AFFIRMATIVE DEFENSE**

Josy W. Ingersoll (#1088)
John W. Shaw (#3362)
Christian Douglas Wright (#3554)
**YOUNG CONAWAY STARGATT
& TAYLOR, LLP**
The Brandywine Building
1000 West Street, 17th Floor, P.O. Box 391
Wilmington, Delaware  18991
(302) 571-6600

OF COUNSEL:

John M. Desmarais
Robert A. Appleby
Maxine Y. Graham
**KIRKLAND & ELLIS**
153 East 53rd Street
New York, New York 10022-4675
(212) 446-4800

Attorneys for Lucent Technologies Inc. and
Lucent Technologies Guardian I LLC

Dated:  April 21, 2003

## I.    INTRODUCTION.

Dell Computer Corporation ("Dell") attempts to reform its inadequately pled unclean-hands defense and avoid the particularity requirement of Fed. R. Civ. P. 9(b) by disclaiming that its defense is based on fraud or inequitable conduct.  On its face, Dell's unclean-hands defense belies this assertion.  But even with its disclaimer, Dell's unclean-hands defense remains deficient under Fed. R. Civ. P. 8.  An unclean-hands defense requires notice of alleged misconduct and the nexus between the alleged misconduct and relief sought in the litigation.  Dell alleges *no* facts in its Answer and Counterclaim to support its unclean-hands defense, and then proceeds to contend that all of the asserted patents are unenforceable under two theories of unclean-hands it advances.  Indeed, Dell seeks a declaration that all *six* of the patents-in-suit are unenforceable, not just against Dell but against third parties as well.  Yet Dell cites no legal authority for its contention that, absent a showing of fraud on the United States Patent Office, any of the patents-in-suit could be held unenforceable against a third party.  Accordingly, Plaintiffs Lucent Technologies Inc. and Lucent Technologies Guardian I LLC ("Lucent") respectfully request that this Court strike Dell's unclean-hands defense and dismiss Dell's declaratory-judgment counterclaim to the extent it seeks to have the patents-in-suit declared unenforceable.

## II.    ARGUMENT.

### A.    Dell's Allegation Of "Procurement Of One Or More Of The Patents-In-Suit By Failure To Disclose Material Prior Art To The United States Patent Office" Fails To Provide The Notice Required By Rules 8 And 9(b).

Seeking to circumvent the particularity requirements of Rule 9(b) of the Federal Rules of Civil Procedure, Dell disclaims that its allegation of unclean-hands due to the "procurement of one or more of the patents in suit by failure to disclose material prior art to the United States

1

Patent Office" (Dell's "procurement" allegation) is an attempt to plead inequitable conduct, fraud or bad faith assertion of the patents-in-suit. (Dell Opp. at 7)  But Dell fails to explain how a "failure to disclose" falling short of inequitable conduct, fraud or bad faith could constitute unclean-hands, let alone render the patents-in-suit unenforceable.

The Third Circuit has held that unclean-hands may be based on "fraud, unconscionable conduct, or bad faith directly related to the matter at issue that injures the other party and affects the balance of equities." *Paramount Aviation Corp. v. Agusta*, 178 F.3d 132, 147 n.12 (3d Cir. 1999).  Indeed, "this nexus is 'the primary guiding application of the unclean-hands doctrine'" and requires "'an immediate and necessary relation' between the plaintiff's alleged misconduct and the equity sought by that party." *France Telecom S.A. v. Novell, Inc.*, No. 102-437-GMS, 2002 WL 31355255, at *3 (D. Del. Oct. 17, 2002) (citations omitted).  Accordingly, an adequately pled unclean-hands defense must allege facts that demonstrate misconduct, as well as a nexus between that misconduct and the relief sought by the plaintiff.  *Id.*  Dell fails in its pleading to identify any alleged misconduct regarding any one of the *six* patents-in-suit, or to identify how that alleged misconduct is related to Lucent's claims in this case.  Accordingly, Dell's "procurement" allegation is deficient on its face.

Lucent should not be left guessing what is the basis for Dell's "procurement" allegation. Nor should Dell be allowed to set forth its "procurement" allegation in such vague terms that it can change its theory of the defense without putting Lucent on notice.  *See France Telecom*, 2002 WL 31355255, at *1 n.1 (noting potential problems caused by broad and undefined unclean-hands defense would be avoided by an amended answer).  That Dell, in its opposition, points to a letter that refers to a reference it contends is relevant to only *one* of the *six* patents-in-suit cannot save its otherwise flawed allegation.  *See EMC Corp. v. Storage Tech. Corp.*, 921 F.

2

Supp. 1261, 1263-64 (D. Del. 1996) (pleading should be sufficient on its face to meet to pleading requirements of the Federal Rules).

**B.    Dell Cannot Circumvent Rule 9(b) By Pleading Its Allegation Of "Procurement Of One Or More Of The Patents-In-Suit By Failure To Disclose Material Prior Art To The United States Patent Office" As Unclean-Hands.**

Dell raises illogical and inconsistent arguments in an attempt justify its contention that its "procurement" allegation is not subject to the particularity requirement of Fed. R. Civ. P. 9(b). Dell cannot, however, circumvent the particularity requirement of Fed. R. Civ. P. 9(b) by including this allegation as part of an unclean-hands defense. The Delaware District Court has required that allegations of misconduct before the Patent Office be pled with particularity even when raised as part of an unclean-hands defense. *See France Telecom*, 2002 WL 31355255, at *3. In *France Telecom*, the defendant's answer included an affirmative defense which read: "The Complaint and the relief requested therein are barred, in whole or in part, by the doctrine of unclean hands." *Id.* at *2. The plaintiffs moved to strike that affirmative defense on two grounds:  1) as insufficient because it failed to provide adequate notice of the nature of the unclean-hands defense and the relationship between the alleged misconduct and the plaintiff's claim and 2) as redundant of a separately asserted affirmative defense of inequitable conduct. *Id.*

The defendant moved for leave to file an amended answer that included "the title, author, and publication date of the references allegedly withheld by the plaintiffs from the Patent and Trademark Office." *Id.* at *2. In finding the *amended* defense sufficiently pled to state the basis for the unclean-hands defense, including the context of the alleged misconduct, the Delaware court applied Rule 9(b)'s particularity requirement:

> To the extent the defendant's fourth affirmative defense involves fraud and is subject to the particularity requirement of Rule 9(b), this requirement also is satisfied by [defendant's] amendment. As noted above, the amended Answer discloses the title, author, and

3

publication date of the relevant prior art allegedly withheld from
the PTO.

*Id.* at *3.

The Delaware District Court also imposed a similar requirement in addressing allegations
of misconduct before the Patent Office that were raised in the context of a patent-misuse defense.
*See Tristrata Tech., Inc. v. Neoteric Cosmetics, Inc.*, No. 96-227-JFF, slip opinion (D. Del. Sept.
30. 1997). In *Tristrata*, the defendant filed a counterclaim that alleged that "misuse has in part
been attempted . . . through the use of extensive and misleading representations to the Patent
Office." *Tristrata*, at 3. The plaintiff moved to dismiss that allegation as inadequately pled. *Id.*
at 4. The Delaware court held that to the extent that the claim alleged fraud on the Patent Office,
"it is deficient as a matter of law." *Id.* at 9.

To the extent that Dell disclaims that its unclean-hands defense is based on fraud, its
position is inconsistent with the relief Dell seeks in its counterclaim. Unclean-hands is an
affirmative defense that can bar a plaintiff from obtaining the relief that it seeks in a specific
litigation. *See Xilinx, Inc. v. Altera Corp.*, No. C 93-20709 RMW, 1994 WL 782236, at *3-4
(N.D. Cal. Feb. 8, 1994). Dell, however, seeks more than to limit Lucent's relief against Dell in
this litigation. Dell's declaratory-judgment counterclaim seeks to have all ***six*** of the patents-in-
suit declared ***unenforceable*** against Dell ***and*** third parties. Yet Dell cites no legal authority for
its contention that, in the absence of fraud on the Patent Office, any alleged misconduct by
Lucent could render the patents-in-suit unenforceable.

Without a cognizable legal theory to support the broad relief it seeks, Dell's
"procurement" allegation should be stricken. *See Cardiogenesis Corp. v. PLC Sys., Inc.*, Civ.
No. 96-20749 SW, 1997 WL 12129, at *1 (N.D. Cal. Jan. 8, 1997) (striking allegation of
unenforceability after denials in opposition to motion to dismiss made clear that plaintiff had not
attempted to assert a recognized basis for unenforceability).

4

**C.      Dell's Allegation Of "Assertion Of The Patents-In-Suit Without Proper Basis For Alleging Infringement" Fails To Provide The Notice Required By Rule 8.**

Dell contends that its allegation of "assertion of the patents-in-suit without proper basis for alleging infringement" (Dell's "assertion" allegation) is an assertion of bad-faith litigation. (Dell Opp. at 6). But Dell fails to identify which of the *six* patents-in-suit it contends was improperly asserted, let alone allege the misconduct or nexus elements of an unclean-hands defense. Namely, Dell fails to allege any misconduct by Lucent in connection with its assertion of any one of the six patents-in-suit or how that alleged misconduct relates to the relief Lucent seeks in this action.

The requirement of alleging nexus between the plaintiff's misconduct and the relief sought is not negated by the fact that Dell bases its claim on bad-faith assertion, and not on inequitable conduct. *See Xilinx, Inc,* 1994 WL 782236, at *3-*4 (nexus must be pled in allegation of unclean-hands based on bad-faith assertion). Indeed, an affirmative defense of unclean-hands is properly stricken as defective when a defendant "has not alleged in its answer nor explained in its papers how [the plaintiff's] alleged bad faith relates to [the plaintiff's] patent infringement claims against [the defendant]." *Id*. at *3. Moreover, the bad-faith assertion of one patent does not render the assertion of other patents in that litigation unenforceable unless an "immediate and necessary relation" to the other patents is alleged and proved. *Id*. at *4 (citations omitted). Accordingly, Dell must plead the requisite misconduct and nexus with respect to each of the patents-in-suit it contends is unenforceable on this ground.

Dell's failure to plead the requisite nexus renders its "assertion" allegation defective under Rule 8. If Dell has a basis for this allegation, it should state it now. Dell should not be allowed to use the broad and undefined nature of its "assertion" allegation as a basis for "'fishing expeditions' on matters that would otherwise not properly be subject to discovery." *See France*

5

*Telecom*, 2002 WL 31355255, at \*1 n.1 (noting that amended answer that pled unclean-hands with specificity would avoided "fishing expeditions"); *see also EMC Corp.*, 921 F. Supp. at 1263 (insufficiently pled allegations cannot be used to justify discovery into such allegations). Dell's assertion constitutes a serious charge. If Dell has a basis for this assertion, it should inform Lucent of that basis.

Dell, again, seeks greater relief than it is entitled to under to doctrine of unclean-hands when it seeks to have all of the patents-in-suit declared unenforceable — against Dell and third parties — based on alleged bad-faith assertion of these patents against Dell. While a court might refuse to grant equitable relief under the doctrine of unclean-hands, there is no legal or equitable basis for a holding that the patents-in-suit could not be enforced against third parties. *See Aptix Corp. v. Quickturn Design Sys., Inc.*, 269 F.3d 1369, 1377-78 (Fed. Cir. 2001) (vacating holding of unenforceability based on unclean-hands, noting that "[n]o case law from the Supreme Court or this court provides a basis for nullifying property rights granted by the United States when such rights did not themselves accrue through inequitable conduct.")

### D. Dell's Open-Ended Unclean-Hands Allegation Fails To Provide The Notice Required By Rule 8.

Finally, Dell attempts to evade the notice requirement of Rule 8 by drafting its unclean-hands allegation in open-ended terms. Dell's unclean-hands allegation purportedly "includes, *but is not limited to*" Dell's "procurement" allegation and "assertion" allegation. (Answer and Counterclaim ¶¶ 61 and 71) (emphasis added). As written, Dell purports to raise every cognizable theory of unclean-hands through this defense. As explained above, Dell has failed to provide sufficient notice of either its "procurement" allegation or its "assertion" allegation, let alone an (as yet) *unnamed* basis for its unclean-hands defense. Accordingly, the words "but is not limited to" should be stricken from Dell's unclean-hands allegation.

6

## TABLE OF CONTENTS

I.  INTRODUCTION. .................................................................................................1

II.  ARGUMENT. ....................................................................................................1

    A.  Dell's Allegation Of "Procurement Of One Or More Of The Patents-In-Suit By Failure To Disclose Material Prior Art To The United States Patent Office" Fails To Provide The Notice Required By Rules 8 And 9(b). ......................................................................................................1

    B.  Dell Cannot Circumvent Rule 9(b) By Pleading Its Allegation Of "Procurement Of One Or More Of The Patents-In-Suit By Failure To Disclose Material Prior Art To The United States Patent Office" As Unclean-Hands. ....................................................................................3

    C.  Dell's Allegation Of "Assertion Of The Patents-In-Suit Without Proper Basis For Alleging Infringement" Fails To Provide The Notice Required By Rule 8. ..............................................................................5

    D.  Dell's Open-Ended Unclean-Hands Allegation Fails To Provide The Notice Required By Rule 8. ........................................................................6

III.  CONCLUSION. ................................................................................................7

# TABLE OF AUTHORITIES

*Cases*

*Aptix Corp. v. Quickturn Design Sys., Inc.,*
269 F.3d 1369 (Fed. Cir. 2001)...................................................................6

*Cardiogenesis Corp. v. PLC Sys., Inc.,*
Civ. No. 96-20749 SW, 1997 WL 12129 (N.D. Cal. Jan. 8, 1997).........................4

*EMC Corp. v. Storage Tech. Corp.,*
921 F. Supp. 1261 (D. Del. 1996)................................................................2, 6

*France Telecom S.A. v. Novell, Inc.,*
No. 102-437-GMS, 2002 WL 31355255 (D. Del. Oct. 17, 2002)...................2, 3, 5

*Paramount Aviation Corp. v. Agusta,*
178 F.3d 132 (3d Cir. 1999).........................................................................2

*Tristrata Tech., Inc. v. Neoteric Cosmetics, Inc.,*
No. 96-227-JFF, slip opinion (D. Del. Sept. 30. 1997)......................................4

*Xilinx, Inc. v. Altera Corp.,*
No. C 93-20709 RMW, 1994 WL 782236 (N.D. Cal. Feb. 8, 1994) ...................4, 5

*Statutes and Rules*

Fed. R. Civ. P. 8....................................................................................1, 5, 6, 7

Fed. R. Civ. P. 9(b) ...............................................................................1, 3, 4, 7

Fed. R. Civ. P. 12(b)(6)...................................................................................7

Fed. R. Civ. P. 12(f).......................................................................................7

## III.    CONCLUSION.

For the foregoing reasons, Lucent respectfully requests that this Court:

(1)    strike Dell's unenforceability affirmative defense (Answer and Counterclaim ¶ 61) in its entirety pursuant to Fed. R. Civ. P. 8, 9(b) and 12(f);

(2)    strike the words "but is not limited to" from Dell's unenforceability affirmative defense (Answer and Counterclaim ¶ 61) pursuant to Fed. R. Civ. P. 8 and 12(f), if that defense is not stricken in its entirety; and

(3)    dismiss Dell's counterclaim to the extent it seeks to have the patents-in-suit declared unenforceable (Answer and Counterclaim ¶ 71) pursuant to Fed. R. Civ. P. 8, 9(b) and 12(b)(6).

Respectfully submitted,

Dated:  April 21, 2003

Josy W. Ingersoll (#1088)
John W. Shaw (#3362)
Christian Douglas Wright (#3554)
YOUNG CONAWAY STARGATT
    & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE  18991
(302) 571-6600

*Attorneys for Plaintiffs Lucent Technologies Inc.
and Lucent Technologies Guardian I LLC*

OF COUNSEL:
John M. Desmarais
Robert A. Appleby
Maxine Y. Graham
Michael E. Stimson
KIRKLAND & ELLIS
153 East 53rd Street
New York, New York 10022-4675
(212) 446-4800

7



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

TRISTRATA TECHNOLOGY, INC.,          :
                                     :
                                     :
                                     :
        Plaintiff,                   :
                                     :
    v.                               :    Civil Action No. 96-227-JJF
                                     :
NEOTERIC COSMETICS, INC., MURAD      :
SKIN RESEARCH LABORATORIES, INC.,    :
HOWARD MURDAD, M.D., ERNO LASZLO     :
DIVISION, CHANEL, INC. and           :
CLARINS USA, INC., COSMAIR, INC.     :
                                     :
        Defendants.                  :
                                     :

------------------------------------------------

Thomas J. Allingham, II, Esquire and Robert S. Saunders, Esquire of
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, Wilmington, Delaware.  Of
Counsel: Constance S. Huttner, Esquire and John L. Gardiner,
Esquire of SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, New York, New
York; Kevin M. McGovern, Esquire and Brian T. Foley, Esquire of
McGOVERN & ASSOCIATES, Greenwich, Connecticut. Attorneys for
Plaintiff.

Allen M. Terrell, Jr., Esquire and Frederick L. Cottrell, III,
Esquire of RICHARDS, LAYTON & FINGER, Wilmington, Delaware.  Of
Counsel: David Wolf, Esquire, Stanley Sacks, Esquire and Robert E.
Rigby, Jr., Esquire of WOLF, GREENFIELD & SACKS, P.C.  Attorneys
for Defendant Neoteric Cosmetics, Inc.

Jack B. Blumenfeld, Esquire, Thomas C. Grimm, Esquire, Matthew B.
Lehr, Esquire and Maryellen Noreika, Esquire of MORRIS, NICHOLS,
ARSHT & TUNNELL, Wilmington, Delaware. Attorneys for Defendants
Murad Skin Research Laboratories, Inc. and Howard Murad, M.D.

James F. Burnett, Esquire and Joanne Ceballos, Esquire of POTTER
ANDERSON & CORROON, Wilmington, Delaware.  Of Counsel: Yosef J.
Riemer, Esquire and Sarah Slover, Esquire of KIRKLAND & ELLIS, New
York, New York; Robert P. Oppenheim, Esquire of COBLENCE & WARNER,
New York, New York;  Paul H. Heller, Esquire, Albert J. Breneisen,
Esquire and Daniel F. Coughlin, Esquire of KENYON & KENYON, New
York, New York.  Attorneys for Defendant Chanel, Inc. and Clarins
USA, Inc.

Kent A. Jordan, Esquire of MORRIS, JAMES, HITCHENS & WILLIAMS, Wilmington, Delaware.  Of Counsel: Richard D. Kelly, Esquire and Jean-Paul Lavalleye, Esquire of OBLON, SPIVAK, McCLELLAND, MAIER & NEUSTADT, P.C., Arlington, Virginia. Attorneys for Defendant Cosmair, Inc.

--------------------------------------------------

## MEMORANDUM OPINION

September 30, 1997

Wilmington, Delaware

Farnan, Chief Judge.

Presently before the Court is a Motion For Judgement Dismissing Neoteric's Counterclaim For Patent Misuse Pursuant To Fed. R. Civ. P. 12(c) (D.I. 77) filed by Plaintiff TriStrata Technology, Inc. ("TriStrata").  In its Answer to the Complaint, Neoteric sets forth a two count Counterclaim.  Count I alleges that the patents in issue are invalid and/or unenforceable, and Count II alleges breach of contract against TriStrata.  Pursuant to a stipulation (D.I. 76), Neoteric dismissed Count II of its Counterclaim without prejudice.  Subsequently, TriStrata filed the instant motion seeking dismissal of the remainder of the Counterclaim.  For the reasons set forth below, the Court will grant TriStrata's motion.  However, the Court will also grant Neoteric leave to file an Amended Counterclaim.

## BACKGROUND

The instant motion arises in the context of a patent infringement action brought by TriStrata against Neoteric and others.  The patents in issue (the "AHA Patents") describe and claim a method of using a composition containing an "alpha-hydroxy acid" ("AHA"), such as glycolic or lactic acid, to treat and/or reduce the appearance of wrinkles and/or fine lines on human skin.  The AHA Patents were originally issued to Drs.

1

Eugene J. Van Scott and Ruey J. Yu, and subsequently were
assigned to TriStrata. In its Complaint, TriStrata alleges that
Neoteric and others willfully and deliberately infringed the AHA
patents.

In addition to answering the Complaint, Neoteric filed a
two-count Counterclaim against TriStrata. By stipulation,
Neoteric dismissed Count II of the Counterclaim. The remaining
Count consists of three paragraphs numbered 59-61. Paragraph 60
alleges that the AHA Patents "are invalid and unenforceable under
the Patent Laws of the United States, including 35 U.S.C. § 101,
102, 103 and 112; and by reason of obviousness-type double
patenting." In the instant motion, TriStrata expressly states
that it does not seek dismissal of the allegations contained in
paragraph 60. (D.I. 78 at 3, n.4). However, TriStrata does seek
dismissal of the allegations contained in paragraph 61 of the
Counterclaim. Paragraph 61 alleges that the AHA Patents are

> void and unenforceable because plaintiff has misused
> its patents by virtue of asserting claims against other
> including Neoteric and, on information and belief, by
> entering into agreements, which claims and agreements
> purport coverage of the [AHA patents], which plaintiff
> knows or should know are beyond the metes and bounds of
> the [AHA patents] as defined by the claims thereof. As
> part of said misuse, plaintiff has embarked upon a
> calculated scheme knowingly intended to achieve a
> monopoly in the manufacture, sale and use of skin
> cosmetics containing alpha hydroxy acids and, in

2

> particular, glycolic acid.  Such misuse has in part
> been attempted through seeking and obtaining numerous
> patents having overlapping claims and non-coextensive
> termination dates, said patents being patentably
> indistinct from one another by engaging in predatory
> licensing and threats and through the use of extensive
> and misleading representations to the Patent Office.

(D.I. 20 at 12).

## STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 12(c), "[a]fter the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings."  In deciding a motion to dismiss on the pleadings, courts utilize the same legal standard that applies to Rule 12(b)(6) motions.  See Finch v. Hercules, Inc., 809 F. Supp. 309, 310 (D. Del. 1992) (citations omitted).  As such, a court must accept as true all factual allegations in the claim and must draw all reasonable factual inferences in the light most favorable to the non-moving party.  However, a court "need not accept any conclusory allegations or statements of law."  In re General Motors Class E Stock Buyout Sec. Litig., 694 F. Supp. 1119, 1125 (D. Del. 1988).  Dismissal of a claim is only appropriate when it appears beyond doubt that the plaintiff can prove no set of facts entitling him to relief.  Revis v. Slocomb, 765 F. Supp. 1212, 1213 (D. Del. 1991).  In applying this standard, the moving party bears the

3

burden of showing that dismissal is warranted.  <u>See</u> <u>Finch</u>, 809 F.
Supp. at 310.

<center>DISCUSSION</center>

In its motion, TriStrata seeks to dismiss the patent misuse
allegation contained in paragraph 61 of the Counterclaim.  In
particular, TriStrata contends that:  (1) its patent enforcement
and licensing activities cannot constitute patent misuse under
the "Safe Harbor" Provisions of 35 U.S.C. § 271(d); (2)
Neoteric's allegation that TriStata committed fraud on the patent
office is inadequately pled, (3) Neoteric's allegation that
TriStrata "knowingly intended to achieve a monopoly in the
manufacture, sale and use of skin cosmetics containing AHA, and
in particular glycolic acid" fails to state a claim for relief,
and (4) Neoteric's allegation that Tristrata entered into
agreements which it knew or should have known extended beyond the
metes and bounds of the patent fails to state a claim for relief.

In response, Neoteric asserts four arguments.  First,
Neoteric contends that its allegations are sufficient to support
its Counterclaim for patent misuse.  Second, Neoteric contends
that TriStrata's motion cannot carry its burden on the motion.
Third, Neoteric contends that TriStrata's motion is premature.
And, fourth, Neoteric contends that if the Court concludes that

<div align="right">4</div>

its Counterclaim is not adequately pled, then the more

appropriate remedy is a more definite statement.

A.   Neoteric's Allegation That TriStrata Enforcement and
     Licensing Activities Amounted To Misuse

In seeking to dismiss Neoteric's Counterclaim for patent

misuse, TriStrata contends that several allegations contained in

paragraph 61 of the Counterclaim fall within the "safe harbor"

provision of 35 U.S.C. § 271(d).  Section 271(d) provides:

> No patent owner otherwise entitled to relief for
> infringement or contributory infringement of a patent
> shall be denied relief or deemed guilty of misuse or
> illegal extension of the patent right by reason of his
> having done one or more of the following: (1) derived
> revenue from acts which if performed by another without
> his consent would constitute contributory infringement
> of the patent, (2) licensed or authorized another to
> perform acts which if performed without his consent
> would constitute contributory infringement of the
> patent; (3) sought to enforce his patent rights against
> infringement or contributory infringement [or] (4)
> refused to license or use any rights to the patent, or
> (5) conditioned the license of any rights to the patent
> or the sale of the patented product on the acquisition
> of a license to rights in another patent or purchase of
> a separate product, unless in view of the
> circumstances, the patent owner has market power in the
> relevant market for the patent or patented product on
> which the license or sale is conditioned.

35 U.S.C. § 271(d).

In response to this argument, Neoteric contends that Section

271(d) is inapplicable to the instant case, because "even if

TriStrata's factual allegations as set forth in the Complaint

5

were true, and even if the patents were valid, Neoteric, at best, would only be liable for inducing infringement" and inducing infringement is not contemplated by the provisions of Section 271(d). While Neoteric admits that TriStrata has charged it with infringement, contributory infringement and inducing infringement, Neoteric contends that "it should be apparent from the pleadings" that it has neither infringed nor contributorily infringed. Further, Neoteric contends that pursuant to the standard of review under Rule 12(c), the Court must accept, as true, its allegation that it would only be liable for inducing infringement.

The Court is not persuaded by Neoteric's argument. First, under the applicable standard of review, the Court must accept the truth of Neoteric's factual allegations. Neoteric's assertion that it, at most, would be liable for inducing infringement and that it has neither infringed nor contributorily infringed are legal conclusions, the truth of which the Court is not required to accept for purposes of a Rule 12(c) dismissal. See e.g. In re General Motors, 694 F. Supp. at 1125. Moreover, at this stage of the proceedings, the Court is not prepared to address the legal merits of TriStrata's infringement claims. Therefore, the Court declines to accept Neoteric's contention

that it is apparent from the pleadings that it has neither infringed nor contributorily infringed.

Second, the Court declines to accept Neoteric's narrow interpretation of Section 271(d). Neoteric has not offered any authority to support its contention that Section 271(d) does not extend to protect claims of inducing infringement, and the Court has not been able to locate any support for that proposition. Indeed, the Supreme Court acknowledged in <u>Dawson Chemical Co. v. Rohm & Haas Co.</u>, that Section 271(d) "moved in the direction of expanding the statutory protection enjoyed by patentees." 448 U.S. 176, 213, <u>reh'd denied</u>, 448 U.S. 917 (1980). By its express terms, Section 271(d) includes patent owners who are entitled to relief for infringement, as well as contributory infringement. Given the language of Section 271(b), which states that "[w]hoever actively induces infringement of a patent shall be liable as an infringer," the Court cannot say that the term "infringement" as used in Section 271(d) excludes inducing infringement. Therefore, even if Neoteric is correct that it is not liable for direct or contributory infringement, the Court cannot conclude that Section 271 would be inapplicable. <u>See</u> <u>Dawson</u>, 448 U.S. at 176 (holding conduct of patent holder, who sought to enforce patents under theories of both contributory and

induced infringement, protected under provisions of § 271(d)).

In examining Neoteric's allegations of patent misuse in light of the provisions of Section 271(d), the Court concludes that a number of Neoteric's allegations of patent misuse are within the safe harbor provisions of that section.  Subsections (2) and (3) expressly encompass a patent owners license activities and enforcement activities.  Indeed, in discussing Section 271(d), the Supreme Court stated that "[t]his provision plainly means that the patentee may bring suit without fear that doing so will be regarded as an unlawful attempt to suppress competition."  See Dawson, 448 U.S. at 201.  Thus, Neoteric's allegations that TriStrata misused its patents by "asserting claims against others including Neoteric," (2) "entering into agreements," and (3) engaging in "predatory licensing and threats" are licensing and enforcement activities that do not constitute misuse under Section 271(d).  To the extent that Neoteric contends that certain licensing and enforcement activities were improper and thus, not within the protection of Section 271(d), the Court finds Neoteric's allegations to be insufficient and conclusory.  Indeed, Neoteric has not alleged any facts that would lead the Court to conclude that TriStrata's activities fall outside the safe harbor provisions.  Accordingly,

8

the Court will dismiss, with leave to amend, Neoterics's

Counterclaim of misue based upon TriStrata's enforcement and

licensing activities.  See e.g. Advanced Cardiovascular Sys.,

Inc. v. Medtronic, Inc., 1996 WL 467273 at *6 (N.D. Cal. July 24,

1996) (striking misuse allegation where no factual basis provided

for defendant's contention that patent owner knew patent was

invalid, and nonetheless willfully, deliberately and

intentionally asserted it against defendant).

B.    Neoteric's Allegation that TriStrata Committed Fraud On The
      Patent Office

      In its Counterclaim, Neoteric contends that TriStrata's

misuse "has in part been attempted through seeking and obtaining

numerous patents having overlapping claims and non-coextensive

termination dates, said patents being patentably indistinct from

one another . . . through the use of extensive and misleading

representations to the Patent Office."  To the extent that this

claim alleges that TriStrata committed fraud on the Patent

Office, the Court concludes that it is deficient as a matter of

law.

      Pursuant to Federal Rule of Civil Procedure 9(b) allegations

of fraud must be pled with particularity.  In its Counterclaim,

Neoteric has not pled any specific facts to support its assertion

9

that TriStrata made extensive and misleading representations to

the Patent Office.  Rather, Neoteric appears to base its claim of

fraud on its allegation that TriStrata has obtained patents with

overlapping claims and non-coextensive termination dates, that

are patentably indistinct from one another.  While Neoteric

provides facts relevant to this allegation in its brief, it does

not offer those or any other facts to support this allegation in

its pleadings.

Although Neoteric relies on <u>Raychem Corp v. PSI</u> for the

proposition that it has provided TriStrata reasonable notice of

the conduct which it alleges constitutes fraud, the Court

believes that <u>Raychem</u> lends greater support for the Court's

conclusion that Neoteric's misuse claim is inadequately pled.

1995 WL 108193 (N.D. Cal. 1995).  In <u>Raychem</u>, the defendant based

his defense of patent misuse on assertions of "inequitable

conduct," "mutually exclusive patents," and patents which "are

clearly not capable of being properly construed to cover the

accused infringing devices."  In striking the defense of patent

misuse and granting defendant leave to amend, the <u>Raychem</u> court

concluded that the defendant has not offered a sufficient factual

basis upon which to base its allegations.  In this case, the

Court finds Neoteric's conclusory allegation of "patents having

10

overlapping claims" to be similar to the conclusory allegations that the Raychem court found insufficient.  Because the Court concludes that Neoteric's claims of patent misuse based on fraud on the Patent Office and overlapping patent claims are not sufficiently pled, the Court will grant TriStrata's motion to dismiss, but allow Neoteric the opportunity to amend its Counterclaim.

C.   Neoteric's Allegation That TriStrata Knowingly Intended To Achieve A Monopoly

As another basis for its allegation of misuse, Neoteric contends that TriStrata "has embarked upon a calculated scheme knowingly intended to achieve a monopoly in the manufacture, sale and use of skin cosmetics containing alpha hydroxy acids, and in particular, glycolic acid."  In its brief, Neoteric attempts to support this contention with the additional allegation that TriStrata "is targeting the entire AHA market, not just limited uses of AHA."  As a factual basis for these assertions, Neoteric offers TriStrata's statement in its opening brief that "the market for AHA containing cosmetics products has exploded; it is currently estimated to be in excess of $800 million per year, and all indications are that it will continue to grow in the future."  (D.I. 78 at 2).

11

As with Neoteric's other allegations, the Court concludes that Neoteric's Counterclaim of misuse based on attempted monopolization is inadequately pled.  As a general principle, a patent holder is entitled to maintain a patent monopoly by excluding others from making using or selling the patented invention, as long as the patent owner's conduct is permissible under the patent laws.  See SCM Corp. v. Xerox Corp, 645 F.2d 1195, 1204 (2d Cir. 1981), cert. denied, 455 U.S. 1016 (1982).

To the extent that Neoteric relies on TriStrata's statement concerning the "market for AHA containing cosmetics" as factual support for its Counterclaim, the Court finds the statement to be inadequate.  Examined in context, TriStrata's statement is simply a background comment on the magnitude of the AHA market.  As such, the Court declines to accept this statement, taken out of context, as sufficient factual support for a claim of misuse based on attempted monopolization.  Therefore, the Court will grant TriStrata's motion to dismiss Neoteric's claim of patent misuse based on attempted monopolization, but will grant Neoteric the opportunity to amend.

D.   <u>Neoteric's Allegation That TriStrata Entered Into Agreements</u>
     <u>Which It Knew Or Should Have Known Extended Beyond The Metes</u>
     <u>And Bounds Of The Patent</u>

Regarding Neoteric's allegation that TriStrata has engaged

in misuse by attempting to enforce its patents beyond their limits, the Court concludes that Neoteric has not offered sufficient factual support for its contention.  Again, the Court believes this allegation resembles the conclusory type of allegation that the Raychem court found to be lacking factual support.  In dismissing the defendant's allegation that the patents "are not capable of being properly construed to cover the accused infringing devices," the Raychem court stated that the defendant failed to "include any facts demonstrating how or why [the plaintiff] has attempted to overbroadly and impermissibly construe its patents in an anticompetitive fashion."  1995 WL 108193 at *4.  Likewise, in this case, Neoteric has not offered any facts or examples demonstrating how TriStrata's agreements with others have extended beyond the scope of the patents. Therefore, the Court will grant TriStrata's motion to dismiss, but will grant Neoteric leave to amend its Counterclaim.

E.   Whether TriStrata's Rule 12(c) Motion Is Premature

Neoteric contends that the Court should deny TriStrata's motion because it is untimely.  According to Neoteric, the pleadings are not closed within the meaning of Rule 12(c), because TriStrata's Motion For Relief To File A Second Amended Complaint is pending.

13

Subsequent to the instant motions, the Court granted TriStrata leave to file its Second Amended Complaint and the Second Amended Complaint was filed. Thus, in the first instance, Neoteric's argument is moot.

However, even if it were not moot, the Court declines to accept Neoteric's argument that the pendency of an amended pleading prevents the pleadings from being considered closed. In its own research, the Court has been unable to locate any authority either in the Federal Rules of Civil Procedure or in the relevant case law to support this proposition. See e.g. Katz v. Aiwa Am. Inc., 818 F. Supp. 730, 735 n.3 (D.N.J. 1993) (concluding that pleadings were "closed" despite pending motion to amend counterclaims).

Moreover, according to Moore's Federal Practice, "[u]nless the court orders a reply to an answer or third-party answer, the pleadings close after the last of the following pleadings in the case has been filed: answer, reply to a counterclaim, answer to a cross-claim, and third-party answer." James Wm. Moore, et al. Moore's Federal Practice, ¶12.38 (3d ed. 1997). The Court notes that Moore's makes no mention of the effect of amended pleadings on this general rule of determining when pleadings close. Id.

In this case, TriStrata filed a Reply (D.I. 34) and Amended

14

Reply (D.I. 44) to Neoteric's Counterclaim before filing its Rule 12(c) motion. As such, the Court concludes that the pleadings are properly considered closed and TriStrata's motion pursuant to Rule 12(c) is not untimely.

<div align="center">CONCLUSION</div>

For the reasons discussed, TriStrata's Motion For Judgement Dismissing Neoteric's Counterclaim For Patent Misuse Pursuant To Fed. R. Civ. P. 12(c) (D.I. 77) will be granted. However, the Court will grant Neoteric leave to amend its Counterclaim.[1]

An appropriate Order will be entered.

---

[1]    Although TriStrata contends that no amount of additional pleading could salvage Neoteric's patent misuse Counterclaim, the Court believes that its decision to permit Neoteric leave to amend is consistent with the approach of other courts that have dismissed or stricken allegations based on insufficient pleading. See e.g. Raychem, 1995 WL 108193 at *4-5.

15



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE


TRISTRATA TECHNOLOGY, INC.,          :
                                     :
                                     :
                                     :
          Plaintiffs,                :
                                     :
     v.                              :   Civil Action No. 96-227-JJF
                                     :
NEOTERIC COSMETICS, INC., MURAD      :
SKIN RESEARCH LABORATORIES, INC.,    :
HOWARD MURDAD, M.D., ERNO LASZLO     :
DIVISION, CHANEL, INC. and           :
CLARINS USA, INC.,                   :
                                     :
          Defendants.                :


## O R D E R

At Wilmington this 30 day of September 1997, for the
reasons set forth in the Memorandum Opinion issued this date;

     IT IS HEREBY ORDERED that:

     1.    TriStrata's Motion For Judgment Dismissing
Neoteric's Counterclaim For Patent Misuse Pursuant to Fed. R.
Civ. P. 12(c) (D.I. 77) is GRANTED.

     2.    Neoteric is granted leave to file an Amended
Counterclaim within 20 days of the date of this Order.


                              _____
                              UNITED STATES DISTRICT JUDGE

Not Reported in F.Supp.                                                       Page 1
33 U.S.P.Q.2d 1149
(Cite as: 1994 WL 782236 (N.D.Cal.))

**H**

United States District Court, N.D. California.

XILINX, INC., a Delaware Corporation, Plaintiff,
v.
ALTERA CORPORATION, a, California
Corporation, Defendant.

**No. C 93-20709 RMW (EAI).**

Feb. 8, 1994.

Richard Grossman, Vernon Norviel, Townsend and
Townsend Khourie and Crew, San Francisco, CA.

Herbert Schwartz, Robert Goldman, Fish & Neave,
New York City.

Alan MacPherson, Robert Morrill, Anthony de
Alcuaz, Joseph Greco, Kenneth Leeds, Scott
Brown, Peter Kang, Skjerven, Morrill, MacPherson,
Franklin & Friel, San Jose, CA.

Robert Hinckley, Xilinx Corp., San Jose, CA.

ORDER GRANTING PLAINTIFF'S MOTION TO
STRIKE

WHYTE, District Judge.

*1 The motion to strike of plaintiff XILINX, INC.
("Xilinx"), was heard on February 4, 1994. The
court has read the moving papers and the opposition
papers of defendant ALTERA CORPORATION
("Altera") and heard the oral argument of counsel.
GOOD CAUSE APPEARING therefor,

The court grants plaintiff's motion to strike
defendant's affirmative defense of inequitable
conduct in the United States Patent and Trademark
Office because defendant has not properly pleaded
the requisite intent for this affirmative defense.
The court also grants plaintiff's motion to strike
defendant's affirmative defense of unclean hands,
because that defense, as pleaded, is not a proper
affirmative defense.

I. Background

On June 7, 1993, Xilinx filed suit against Altera
alleging infringement of two patents: United States

Patent No. 4,870,302 ("the '302 patent" or
"Freeman patent") and United States Patent No.
4,642,487 ("the '487 patent" or "Carter patent").
Both these patents deal with integrated circuits
which perform logic functions.

In its answer filed on July 28, 1993, Altera asserted
a number of affirmative defenses. On October 25,
1994, this court granted the defendant's motion to
strike two of those affirmative defenses with leave
to amend. In that order, the court held that Rule
9(b)'s requirement of pleading fraud with
particularity applied to the affirmative defense of
inequitable conduct, and that Altera had not pleaded
that affirmative defense with the requisite
particularity. The court also held that while Rule
9(b) did not technically apply to pleading the
affirmative defense of unclean hands, Altera ought
to plead that defense so as to give notice of the
nature of the defense to Xilinx.

On November 15, 1993, Altera filed its amended
answer re-alleging the affirmative defenses of
inequitable conduct and unclean hands. Xilinx has
again moved to strike these two affirmative
defenses pursuant to Rules 9(b) and 12(f). The two
amended affirmative defenses which are the subject
of Xilinx's motion to strike are at paragraphs twenty
(20) and twenty (22) of Altera's Amended Answer
and are as follows:

20. Upon information and belief, the '302 and
'487 patents are unenforceable because they were
obtained by Xilinx through inequitable conduct in
the United States Patent and Trademark Office.
During the prosecution of these patents, at least
the following prior art references were neither
cited by the patent examiner nor called to the
patent examiner's attention by Xilinx: a 1967
article by Wahlstrom titled "Programmable logic
arrays--cheaper by the millions"; (2) Wahlstrom
United States Patent No. 3,473,160 issued on
October 14, 1969; (3) a 1970 doctoral thesis by
Shoup titled "Programmable Cellular Logic
Arrays"; and (4) a 1975 doctoral thesis by
Manning titled "Automatic Test, Configuration,
and Repair Cellular Arrays." In addition, the
materiality of other prior art, e.g. Manning United
States Patent No. 4,020,469 was not disclosed to
the patent examiner. Each of these five
references was material to the patentability of the
patents in suit. Upon information and belief,
those acts and omissions by or on behalf of Xilinx

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.
33 U.S.P.Q.2d 1149
(Cite as: 1994 WL 782236 (N.D.Cal.))

Page 2

were either intentional or evidence an intentional disregard of Xilinx's duty of disclosure to the Patent and Trademark Office and had the effect of depriving the Patent and Trademark Office of an opportunity to consider fairly whether or not the '302 and '487 patents should have issued.

*2 22. Upon information and belief, Xilinx's claims for equitable relief are barred by the doctrine of unclean hands. Xilinx has commenced and continues this lawsuit in a bad faith attempt to interfere improperly with Altera's relationships with its customers and prospective customers. Xilinx threatened Altera with infringement litigation months before it first obtained and tested Altera's FLEX products. Xilinx personnel have also made false or misleading statements to Altera's customers or potential customers concerning the continued availability of Altera's products.

## II. Legal Standards

Motions to strike are governed by Federal Rule of Civil Procedure 12(f) which provides:

Upon motion made by a party before responding to a pleading or, if no responsive pleading is permitted by these rules, upon motion made by a party within 20 days after the service of the pleading upon the party or upon the court's own initiative at any time, the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.

As with a motion to dismiss, when ruling on a motion to strike a court must view the pleadings in the light most favorable to the non-moving party. *State of California v. United States,* 512 F.Supp. 36, 39 (N.D.Cal.1981). Motions to strike are generally disfavored. *Id.* at 38 (citing 5A Wright & Miller, *Federal Practice and Procedure* § 1381 (2d ed. 1990)). "However, where the motion may have the effect of making the trial of the action less complicated, or have the effect of otherwise streamlining the ultimate resolution of the action, the motion to strike will be well taken." *Fantasy, Inc. v. Fogerty,* 984 F.2d 1524, 1528 (9th Cir.1993) , *cert. granted,* 113 S.Ct. 2992 (June 21, 1993) (citing *State of California, supra,* 512 F.Supp. at 38)

Federal Rule of Civil Procedure 9(b) provides:

In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.

As such, "allegations of fraud must be pleaded with specificity as to time, place and content of any misrepresentations or else be stricken." *Intel Corp. v. Hyundai Electronics America, Inc.,* 692 F.Supp. 1113, 1116 (N.D.Cal.1987). Applying these standards, the court finds as follows:

## III. Analysis
### A. Inequitable Conduct Defense

"Inequitable conduct resides in failure to disclose material information, or submission of false material information, with an intent to deceive, and those two elements, materiality and intent, must be proven by clear and convincing evidence." *Kingsdown Medical Consultants v. Holister, Inc.,* 863 F.2d 867, 872 (Fed.Cir.1988), *cert. denied,* 490 U.S. 1067 (1989); *Labounty Mfg., Inc. v. U.S. Intern. Trade Comm'n,* 958 F.2d 1066, 1076 (Fed.Cir.1992). Therefore, "intent to deceive the PTO is a required element of inequitable conduct and, further, requires a high level of proof." *Paragon Podiatry Laboratory v. KLM Laboratories,* 984 F.2d 1182, 1189 (Fed.Cir.1993); *Kimberly-Clark v. Proctor & Gamble,* 973 F.2d 911, 918 (Fed.Cir.1992).

*3 Xilinx agues that the court should strike Altera's affirmative defense of inequitable conduct because Altera has failed to plead a required element of the affirmative defense, namely an intent to deceive. In response Altera apparently makes two arguments. First, Altera argues that intent can be inferred from the circumstances surrounding the patent prosecution and that Altera, therefore, need not provide direct evidence of Xilinx's culpable intent. Altera's argument is correct but misplaced and premature. Altera's eventual ability to prove Xilinx's intent to deceive and Altera's need to plead that intent in its answer, are two entirely different matters. Second, Altera argues that it has pleaded the requisite intent by pleading that Xilinx's acts or omissions (e.g. not citing prior art to the PTO) were either "intentional or evidence an intentional disregard of Xilinx's duty of disclosure to the Patent and Trademark Office." These allegations may allow the court to infer that Altera is alleging that Xilinx knew or should have known of the prior art and its materiality. However, intentionally failing to cite prior art to the PTO or intentionally

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.                                                                    Page 3
33 U.S.P.Q.2d 1149
**(Cite as: 1994 WL 782236 (N.D.Cal.))**

disregarding one's duty of disclosure to the PTO is not necessarily tantamount to doing those same intentional acts with an intent to deceive the PTO. Altera's opposition brief clarifies why this is the case:

> The issue to be decided on this motion is whether, assuming that the allegations in Paragraph 20 of Altera's amended complaint are true, Altera will have established that the patents in suit are unenforceable for inequitable conduct during the prosecution of those patents in the Patent Office. (Opp.Brief at 8:5-10).

Under the Altera's amended answer as it now stands, the response to this question must be "no." Even if Altera proved every allegation in paragraph 20, it would not have proven that Xilinx intended to deceive the PTO, and, as noted, an intent to deceive the PTO is a necessary element of this defense. If Altera believes it can later prove that Xilinx intended to deceive the PTO-- whether through direct or circumstantial evidence--Altera's pleading should, at the very least, reflect that belief. [FN1] *See Energy Absorption Sys., Inc. v. Roadway Safety Serv., Inc.,* 28 U.S.P.Q.2d 1717 (N.D.Cal.1993) ( Rule 9(b) requires defendant to allege with specificity why or how plaintiffs misrepresentation constituted inequitable conduct in the PTO). Therefore, the defense of inequitable conduct is stricken with twenty days leave to amend.

### B. Unclean Hands

Altera's attempt to plead the affirmative defense of unclean hands suffers from a defect that is similar, although not identical, to the one discussed above. In its opposition, Altera states that "the unclean hands defense asserts that Xilinx first threatened suit and then brought suit in bad faith, *without a good faith belief that the patents were infringed,* to interfere improperly with Altera's business relationships." (Opp.Brief at 3:2-6, emphasis added). Notably, the sentence highlighted above is absent from paragraph 22 of the amended answer. Thus, it is not entirely clear whether Altera is alleging that Xilinx brought and is prosecuting this action without a good faith belief that Altera infringed or whether Altera is simply claiming that while Xilinx may have a good faith belief that Altera infringed, that was not its only motive for bringing suit. Regardless of which version Altera means to plead, the affirmative defense is defective. Altera has not alleged in its answer nor explained

in its papers how Xilinx's alleged bad faith relates to Xilinx's patent infringement claims against Altera. As the Ninth Circuit stated over thirty years ago,

> *4 Misconduct in the abstract, unrelated to the claim to which it is asserted as a defenses, does not constitute unclean hands ... What is material is not that the plaintiff's hands are dirty, but that he dirtied them in acquiring the right he now seeks to assert, or that the manner of dirtying renders inequitable the assertion of such rights against the defendant.

*Republic Molding Corp. v. B.W. Photo Utils.,* 319 F.2d 347, 349 (9th Cir.1963); *Keystone Driller Co. v. General Excavator Co.,* 290 U.S. 240, 245 (1933) (courts require clean hands only where unconscionable act has immediate and necessary relation to the equity he seeks in respect of the matter of litigation). The court went on to address patent cases specifically:

> Where unclean hands has been asserted to bar a claim of infringement, it has usually been because the patent was fraudulently obtained, or there has been concealment of evidence ... or perhaps, more remotely, the patent was being misused, as, for example, in violation of the Sherman Act.

*Id.* at 350; *see also, National Presto Indus. v. Black & Decker, Inc.,* 760 F.Supp. 699, 702 (N.D.Ill.1991) (threatening retailers and competitors not an affirmative defense of unclean hands where issues are infringement and priority); *Southwire Co. v. Essex Group, Inc.,* 220 U.S.P.Q. 1053, 1055 (N.D.Ill.1983) (burglary to investigate infringement bears no relation to validity or infringement). [FN2] Here, Altera has pleaded nothing to demonstrate how the alleged acts of Xilinx would bar Xilinx's claim of infringement. Finally, Altera argues that even if Xilinx proves the validity of one patent-in-suit, Xilinx's alleged bad faith regarding the other patent- in-suit might prevent this court from ordering an injunction on the valid patent. This argument suffers from the problem discussed directly above. Further, in *Consolidated Aluminum, supra,* 910 F.2d 804, cited by Altera, the court specifically found that the inequitable conduct by the plaintiff regarding one patent (fraud on the PTO) had "an immediate and necessary relation" to the other patents because it "permeated the prosecution of the other patents-in-suit...." *Id.* at 810. That is an entirely different situation from the one Altera claims to be present in this case. The unclean hands alleged by Altera does not involve an intent to deceive the

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.
33 U.S.P.Q.2d 1149
(Cite as: 1994 WL 782236 (N.D.Cal.))

PTO with respect to related patent applications. Accordingly, the court hereby strikes Altera's unclean hands defense, but grants Altera twenty days leave to amend.

### IV. Order

Given the above discussion and GOOD CAUSE APPEARING therefor, the court grants Xilinx's motion to strike Altera's affirmative defenses of "inequitable conduct" and "unclean hands" at paragraphs 20 and 22 of the Amended Answer. Pursuant to Federal Rule of Civil Procedure 15(a), Altera is granted leave to file an amended pleading in compliance with this order within twenty days of the date of this order.

FN1. Altera's citation to *Consolidated Aluminum Corp. v. Foseco Intern. Ltd.,* 910 F.2d 804, 809 (Fed.Cir.1990), does not change this result. In that case, the district court's order reflected a finding of "intentional concealment." The Federal Circuit merely held that this finding was equal to a finding of intent to deceive even though the district court did not specifically use the words "intent to deceive." Here, the court is not asking for a particular phrase but rather requiring Altera to plead a requisite element of the defense alleged.

FN2. The circumstances of *Gardiner v. Gendel,* 727 F.Supp. 799, 804 (E.D.N.Y.1989), *aff'd without published opinion,* 976 F.2d 746 (Fed.Cir.1992), as well as the other cases cited By Altera are all distinguishable from the case at hand. For example, in *Gardiner,* the court specifically found that the plaintiffs sent cease and desist letters and threatened infringement suits at a time when the plaintiffs knew that they had no patent rights at all. Moreover, the court only commented on the plaintiffs "litigation conduct" in light of its decision to find the case was "exceptional" under 35 U.S.C. § 285, thus entitling the defendants to attorney fees.

1994 WL 782236 (N.D.Cal.), 33 U.S.P.Q.2d 1149

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

## CERTIFICATE OF SERVICE

I, John W. Shaw, Esquire, certify that copies of the foregoing document were caused

to be served on April 21, 2003 on the following counsel of record in the manner indicated:

### BY HAND DELIVERY

> R. Eric Hutz, Esquire
> Connolly Bove Lodge & Hutz LLP
> 1220 Market St., 10th Floor
> P.O. Box 2207
> Wilmington, DE  19899-2207

### BY FEDERAL EXPRESS

> Joel M. Freed, Esquire
> Arnold & Porter
> 555 12th Street NW
> Washington, DC  20004

John W. Shaw

25

**ORIGINAL**
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LUCENT TECHNOLOGIES, INC., and            )
LUCENT TECHNOLOGIES GUARDIAN I            )
LLC,                                      )
                                          )
          Plaintiffs,                     )
                                          )
     v.                                   )    Civil Action No. 03-205-KAJ
                                          )
DELL COMPUTER CORPORATION,                )
                                          )
          Defendant.                      )

## TRIAL MANAGEMENT ORDER

Pursuant to Fed.R.Cv.P. 16 and unless otherwise ordered by the Court,

IT IS ORDERED as follows:

1. <u>Pretrial Conference and Pretrial Order</u>.  The Court's Scheduling Order and

Local Rule 16 set out the procedures for preparing, exchanging, and filing drafts of the

proposed pretrial order.  Counsel should expect the Court will look to that draft order

when ruling on objections during the trial, when ruling on objections to arguments, and

when ruling on objections to the relevance and admissibility of evidence.

     a. <u>Issues of Law</u>.  Local Rule 16.4(d)(5)  provides that each party shall

include in the draft order a statement of the issues of law which the party contends

remain to be litigated.  Counsel should expect the Court will preclude a party from

seeking relief based on claims not in the pleadings and not described in the draft order.

     b. <u>Issues of Fact and Expected Proof</u>.  Local Rules 16.4(d)(4), (8), (9),

and (10) provide that each party shall identify the facts in issue and set out a brief

statement of what it intends to prove in support of its claims or defenses.  Those

summaries should be sufficient to identify for the Court the essential facts in issue and

should fairly put the other party on notice as to what each party expects to prove at trial.

Each party should expect the Court to look at those sections in the pretrial order and

the proposed jury instructions when ruling on the relevance and admissibility of

evidence.  The Court encourages counsel to serve contention interrogatories early in

discovery.  Where a party has served contention interrogatories, the responding party

should not expect to be able to include in the pretrial order new issues or new facts not

fairly disclosed in the answers to those interrogatories.

c. Witnesses.  At the pretrial conference the Court will review with counsel

the trial schedule, any request to sequester witnesses, whether or not certain witnesses

may need to be subpoenaed, and the expected scope of direct and cross examination

for witnesses who may be called by more than one party.

d. Exhibits.  Local Rule 16.4(d)(6) provides that counsel should meet

before the pretrial conference and mark all exhibits to be admitted into evidence during

the trial.  On or before the day of trial, counsel should deliver to the Courtroom Deputy a

completed AO Form 187 exhibit list for each party.

e. Depositions.  Counsel should confer prior to the pretrial conference to

determine which testimony will be offered by deposition, to agree on the designations of

those portions of the depositions to be offered into evidence, and to identify objections

that will need to be ruled on before the deposition is read or admitted into evidence

during trial.  Where there are objections that will need to be resolved, counsel should

submit the transcript and a summary of the objections to the Court with the draft pretrial

order.

2

f. Opinion Testimony. Counsel should include in the draft pretrial order a brief summary of the opinions to be offered by any witness to be called to offer opinion testimony. To the extent not previously resolved, counsel should also include in the pretrial order any objections to the qualifications of a witness to offer an opinion.

g. Motions *in Limine*. Rather than file motions *in limine*, counsel should include in the draft pretrial order a brief summary of any evidentiary or other issue that would otherwise be the subject of a motion *in limine* and include in the summary any case law counsel wishes to call to the Court's attention in connection with the matter. Unless otherwise ordered by the Court, each party shall be limited to five (5) *in limine* requests. To the extent the *in limine* request relates to the admissibility of documents, counsel should bring copies of the documents to the pretrial conference.

h. Voir Dire. Local Rule 47.1 provides that counsel shall file any proposed voir dire questions at least three business days before the pretrial conference. The Court will not ask the panel voir dire questions that are not filed pursuant to this Rule. Counsel should assume the Court will ask questions seeking to determine whether the members of the panel are familiar with the case, with counsel, with any of the witnesses, or if any member of the panel has some physical disability or scheduling problem that will prevent him or her from attending the entire trial. In preparing and filing proposed voir dire, counsel for each party should prepare a maximum of ten questions that are intended to elicit a "yes" or "no" answer. Should any juror answer "yes" to a voir dire question, the Court and counsel will explore the basis for the answer at side bar.

3

i. <u>Jury Instructions</u>.  Local Rule 51.1 provides that the parties must confer and file proposed jury instructions at least three business days before the pretrial conference.  The Court has certain form instructions.  You can obtain copies from the Court's website at www.ded.uscourts.gov.  The Court will treat any failure to comply with this rule and those portions of the Scheduling Order relating to this rule as a waiver of a claim for relief.

j. <u>Verdict Form</u>.   Local Rule 51.1(c) provides that any party desiring a special verdict must file a suggested form three days before the pretrial conference.

2. <u>Trial Procedures</u>

a. <u>Trial Schedule</u>.  Unless otherwise ordered by the Court, counsel should assume the trial schedule will be from 9:00 a.m. to 4:30 p.m., with breaks at 10:30 a.m. and 3:00 p.m., and with a lunch break for one hour beginning at 12:30 p.m. The Courtroom Deputy will keep a running total of trial time used by counsel.  Opening statements and closing arguments shall be included in the total.  For depositions, counsel will jointly advise the Courtroom Deputy as to the allocation of time according to the lines of testimony designated by each party.

b. <u>Stand for the Jury</u>.  The clerk will announce the entrance of the jury and those present at the trial shall stand for the jury as they enter and leave the court room.

c. <u>Jury Note Taking and Notebooks</u>.  The Court will provide the jury with pads and pens.  Counsel may prepare notebooks of key exhibits for the jurors.  Unless otherwise agreed to by counsel or ordered to by the Court, no document should be

4

included in a notebook handed to a juror unless that document has previously been admitted into evidence.

      d. <u>Preliminary Instructions</u>. Expect the Court will give preliminary jury instructions prior to opening statements. In preparing for trial, consider whether liability and damage instructions should be given to the jury before opening statements.

      e. <u>Use of Lectern</u>. Except as otherwise permitted by the Court, counsel should present the opening statement, conduct examination of witnesses, and make the closing argument from the lectern.

      f. <u>Opening Statement</u>. The opening statement is not an argument. Counsel may object to an improper opening statement.

      g. <u>Order of Proof</u>. Counsel should assume that the presentation of evidence will follow the pleadings and burdens of proof. Typically, this means that the plaintiff will go first on those issues as to which it has the burden. The defendant will answer as to those issues and then open as to the issues as to which it has the burden. The plaintiff may then reply on its claims for relief and answer the defendant's claims. The defendant may then reply as to its claims. Each party should assume that the reply will be limited to matters it could not have anticipated at the time it opened.

      h. <u>Examination of Witnesses</u>. Counsel should expect examination of witnesses will be limited to direct, cross examination and re-direct. Cross examination will be limited to the matters covered in direct and impeachment. Re-direct will be limited to matters covered in cross examination.

      i. <u>Objections and Side Bar</u>. Counsel should expect that there will be no side bar conferences during the trial. To the extent counsel can anticipate an

5

evidentiary objection, you should bring it to the attention of the Court during a break

before the evidence is offered.   In arguing evidence is admissible, be prepared to

identify 1) the matter in issue, 2) the fact that is of consequence to the determination of

that issue, and 3) how it is this evidence makes that fact more or less probable.   During

the trial, counsel should object by standing, announcing an objection, and identifying

the rule of evidence relied upon for the objection.   Counsel is not to argue objections in

front of the jury.

j.  Transition Statements.   The Court encourages counsel to make brief

statements to the jury during the trial.   The statements should be in the nature of an

opening statement.

k. Opinion Testimony.   The parties shall not, in the presence of the jury,

call upon the Court to find a witness qualified to offer an opinion.

l.  Exhibits.   Counsel should consider providing the Court with an extra

copy of key exhibits that may be the subject of direct and cross examination.

m.  Publishing Exhibits to the Jury.   Counsel should ask the permission of

the Court to publish exhibits to the jury.   At no time may anyone but the jury and the

Courtroom Deputy enter the jury box.

n.  Demonstrative Exhibits.   Unless otherwise agreed to by the parties,

demonstrative exhibits are marked for identification but not admitted into evidence.

o.  Testimony by Deposition.   Unless otherwise agreed to by the parties,

designated portions of deposition transcripts are read in order from the beginning of the

transcript to the end.

6

p. <u>Instructions</u>.  The Court will read the final instructions to the jury before closing argument.

q. <u>Closing Arguments</u>.  During closing argument, counsel may prepare and submit to the jury examples of how the verdict form should be filled out.

UNITED STATES DISTRICT JUDGE

Dated:    April 16, 2003

7



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

FILED
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE

2003 APR 16  PM 3: 34

LUCENT TECHNOLOGIES, INC., and ) 
LUCENT TECHNOLOGIES GUARDIAN I ) 
LLC, )
 )
                Plaintiffs, )
 )
         v. )      Civil Action No. 03-205-KAJ
 )
DELL COMPUTER CORPORATION, )
 )
                Defendant. )

## TRIAL MANAGEMENT ORDER

Pursuant to Fed.R.Cv.P. 16 and unless otherwise ordered by the Court,

IT IS ORDERED as follows:

1. <u>Pretrial Conference and Pretrial Order</u>.  The Court's Scheduling Order and

Local Rule 16 set out the procedures for preparing, exchanging, and filing drafts of the

proposed pretrial order.  Counsel should expect the Court will look to that draft order

when ruling on objections during the trial, when ruling on objections to arguments, and

when ruling on objections to the relevance and admissibility of evidence.

a. <u>Issues of Law</u>.  Local Rule 16.4(d)(5)  provides that each party shall

include in the draft order a statement of the issues of law which the party contends

remain to be litigated.  Counsel should expect the Court will preclude a party from

seeking relief based on claims not in the pleadings and not described in the draft order.

b. <u>Issues of Fact and Expected Proof</u>.  Local Rules 16.4(d)(4), (8), (9),

and (10) provide that each party shall identify the facts in issue and set out a brief

statement of what it intends to prove in support of its claims or defenses.  Those

summaries should be sufficient to identify for the Court the essential facts in issue and should fairly put the other party on notice as to what each party expects to prove at trial. Each party should expect the Court to look at those sections in the pretrial order and the proposed jury instructions when ruling on the relevance and admissibility of evidence. The Court encourages counsel to serve contention interrogatories early in discovery. Where a party has served contention interrogatories, the responding party should not expect to be able to include in the pretrial order new issues or new facts not fairly disclosed in the answers to those interrogatories.

c. <u>Witnesses</u>. At the pretrial conference the Court will review with counsel the trial schedule, any request to sequester witnesses, whether or not certain witnesses may need to be subpoenaed, and the expected scope of direct and cross examination for witnesses who may be called by more than one party.

d. <u>Exhibits</u>. Local Rule 16.4(d)(6) provides that counsel should meet before the pretrial conference and mark all exhibits to be admitted into evidence during the trial. On or before the day of trial, counsel should deliver to the Courtroom Deputy a completed AO Form 187 exhibit list for each party.

e. <u>Depositions</u>. Counsel should confer prior to the pretrial conference to determine which testimony will be offered by deposition, to agree on the designations of those portions of the depositions to be offered into evidence, and to identify objections that will need to be ruled on before the deposition is read or admitted into evidence during trial. Where there are objections that will need to be resolved, counsel should submit the transcript and a summary of the objections to the Court with the draft pretrial order.

2

f. Opinion Testimony. Counsel should include in the draft pretrial order a brief summary of the opinions to be offered by any witness to be called to offer opinion testimony. To the extent not previously resolved, counsel should also include in the pretrial order any objections to the qualifications of a witness to offer an opinion.

g. Motions in Limine. Rather than file motions in limine, counsel should include in the draft pretrial order a brief summary of any evidentiary or other issue that would otherwise be the subject of a motion in limine and include in the summary any case law counsel wishes to call to the Court's attention in connection with the matter. Unless otherwise ordered by the Court, each party shall be limited to five (5) in limine requests. To the extent the in limine request relates to the admissibility of documents, counsel should bring copies of the documents to the pretrial conference.

h. Voir Dire. Local Rule 47.1 provides that counsel shall file any proposed voir dire questions at least three business days before the pretrial conference. The Court will not ask the panel voir dire questions that are not filed pursuant to this Rule. Counsel should assume the Court will ask questions seeking to determine whether the members of the panel are familiar with the case, with counsel, with any of the witnesses, or if any member of the panel has some physical disability or scheduling problem that will prevent him or her from attending the entire trial. In preparing and filing proposed voir dire, counsel for each party should prepare a maximum of ten questions that are intended to elicit a "yes" or "no" answer. Should any juror answer "yes" to a voir dire question, the Court and counsel will explore the basis for the answer at side bar.

3

i. <u>Jury Instructions</u>.  Local Rule 51.1 provides that the parties must confer and file proposed jury instructions at least three business days before the pretrial conference.  The Court has certain form instructions.  You can obtain copies from the Court's website at www.ded.uscourts.gov.  The Court will treat any failure to comply with this rule and those portions of the Scheduling Order relating to this rule as a waiver of a claim for relief.

j. <u>Verdict Form</u>.   Local Rule 51.1(c) provides that any party desiring a special verdict must file a suggested form three days before the pretrial conference.

2. <u>Trial Procedures</u>

a. <u>Trial Schedule</u>.  Unless otherwise ordered by the Court, counsel should assume the trial schedule will be from 9:00 a.m. to 4:30 p.m., with breaks at 10:30 a.m. and 3:00 p.m., and with a lunch break for one hour beginning at 12:30 p.m. The Courtroom Deputy will keep a running total of trial time used by counsel.  Opening statements and closing arguments shall be included in the total.  For depositions, counsel will jointly advise the Courtroom Deputy as to the allocation of time according to the lines of testimony designated by each party.

b. <u>Stand for the Jury</u>.  The clerk will announce the entrance of the jury and those present at the trial shall stand for the jury as they enter and leave the court room.

c. <u>Jury Note Taking and Notebooks</u>.  The Court will provide the jury with pads and pens.  Counsel may prepare notebooks of key exhibits for the jurors.  Unless otherwise agreed to by counsel or ordered to by the Court, no document should be

4

included in a notebook handed to a juror unless that document has previously been admitted into evidence.

      d. <u>Preliminary Instructions</u>.  Expect the Court will give preliminary jury instructions prior to opening statements.  In preparing for trial, consider whether liability and damage instructions should be given to the jury before opening statements.

      e. <u>Use of Lectern</u>.  Except as otherwise permitted by the Court, counsel should present the opening statement, conduct examination of witnesses, and make the closing argument from the lectern.

      f. <u>Opening Statement</u>.  The opening statement is not an argument.  Counsel may object to an improper opening statement.

      g. <u>Order of Proof</u>. Counsel should assume that the presentation of evidence will follow the pleadings and burdens of proof.  Typically, this means that the plaintiff will go first on those issues as to which it has the burden.  The defendant will answer as to those issues and then open as to the issues as to which it has the burden.  The plaintiff may then reply on its claims for relief and answer the defendant's claims.  The defendant may then reply as to its claims.  Each party should assume that the reply will be limited to matters it could not have anticipated at the time it opened.

      h. <u>Examination of Witnesses</u>.  Counsel should expect examination of witnesses will be limited to direct, cross examination and re-direct.  Cross examination will be limited to the matters covered in direct and impeachment.  Re-direct will be limited to matters covered in cross examination.

      i. <u>Objections and Side Bar</u>.  Counsel should expect that there will be no side bar conferences during the trial.  To the extent counsel can anticipate an

5

evidentiary objection, you should bring it to the attention of the Court during a break

before the evidence is offered.   In arguing evidence is admissible, be prepared to

identify 1) the matter in issue, 2) the fact that is of consequence to the determination of

that issue, and 3) how it is this evidence makes that fact more or less probable.   During

the trial, counsel should object by standing, announcing an objection, and identifying

the rule of evidence relied upon for the objection.  Counsel is not to argue objections in

front of the jury.

> j.  Transition Statements.  The Court encourages counsel to make brief

statements to the jury during the trial.  The statements should be in the nature of an

opening statement.

> k. Opinion Testimony.  The parties shall not, in the presence of the jury,

call upon the Court to find a witness qualified to offer an opinion.

> l. Exhibits.  Counsel should consider providing the Court with an extra

copy of key exhibits that may be the subject of direct and cross examination.

> m. Publishing Exhibits to the Jury.  Counsel should ask the permission of

the Court to publish exhibits to the jury.  At no time may anyone but the jury and the

Courtroom Deputy enter the jury box.

> n. Demonstrative Exhibits.  Unless otherwise agreed to by the parties,

demonstrative exhibits are marked for identification but not admitted into evidence.

> o. Testimony by Deposition.  Unless otherwise agreed to by the parties,

designated portions of deposition transcripts are read in order from the beginning of the

transcript to the end.

p.  <u>Instructions</u>.  The Court will read the final instructions to the jury before closing argument.

q.  <u>Closing Arguments</u>.  During closing argument, counsel may prepare and submit to the jury examples of how the verdict form should be filled out.

UNITED STATES DISTRICT JUDGE

Dated:   April 16, 2003

7

ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LUCENT TECHNOLOGIES INC., and
LUCENT TECHNOLOGIES GUARDIAN
I LLC,

        Plaintiffs,

v.

DELL COMPUTER CORPORATION,

        Defendant.

)
)
)
)
)
)
)
)  Civil Action No. 03-205-KAJ
)
)
)
)
)

## SCHEDULING ORDER

This _16th_ day of April, 2003, the Court having conducted an initial Rule 16 scheduling and planning conference pursuant to Local Rule 16.2(a) on April 3, 2003, and the parties having determined after discussion that the matter cannot be resolved at this juncture by settlement, voluntary mediation, or binding arbitration;

IT IS ORDERED that:

1.    Rule 26(a)(1) Initial Disclosures.  Unless otherwise agreed to by the parties, the parties shall make their initial disclosures pursuant to Federal Rule of Civil Procedure 26(a)(1) within five days of the date of this Order.

2.    Joinder of other Parties and Amendment of Pleadings.  All motions to join other parties, and to amend or supplement the pleadings shall be filed on or before **September 30, 2003**.

3.    Discovery

    a.    Limitation on Hours for Deposition Discovery.  Each side is limited to a total of 175 hours of taking testimony by deposition upon oral examination, excluding the depositions of expert witnesses.  With respect to the depositions of

1

technical expert witnesses, each side is limited to one (1) day of seven (7) hours for each patent in suit on which the expert is expected to testify, up to a maximum of three (3) days of seven (7) hours each.  With respect to the depositions of non-technical expert witnesses, each side is limited to one (1) day of seven (7) hours per expert. Either side may seek leave of Court for additional time for fact or expert depositions for good cause shown.

        b.    <u>Location of Depositions</u>.  Any party or representative (officer, director, or managing agent) of a party filing a civil action in this district court must ordinarily be required, upon request, to submit to a deposition at a place designated within this district.  Exceptions to this general rule may be made on order of the Court. A defendant who becomes a counterclaimant, cross-claimant, or third-party plaintiff shall be considered as having filed an action in this Court for the purpose of this provision.

        c.    <u>Discovery Cut Off</u>.  All discovery other than expert disclosures and depositions in this case shall be initiated so that it will be completed on or before **May 14, 2004**.  Expert depositions shall be completed on or before **August 13, 2004**.  The Court encourages the parties to serve and respond to contention interrogatories early in the case.  Unless otherwise ordered by the Court, the limitations on discovery set forth in Local Rule 26.1 shall be strictly observed.

        d.    <u>Disclosure of Expert Testimony</u>.  Unless otherwise agreed to by the parties, they shall file their initial Federal Rule of Civil Procedure 26(a)(2) disclosures of expert testimony on or before **June 11, 2004**, and file rebuttal expert reports on or

2

before **July 16, 2004**. To the extent any objection to expert testimony is made pursuant to the principles announced in <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579 (1993), it shall be made by motion and briefed according to the schedule for case dispositive motions set forth in paragraph 9, unless otherwise ordered by the Court.

       e.   <u>Discovery Disputes</u>. Should counsel find they are unable to resolve a discovery dispute, the party seeking the relief shall contact chambers at (302) 573-6001 to schedule a telephone conference. Not less than forty-eight hours prior to the conference, the party seeking relief shall file with the Court a letter agenda not to exceed two pages outlining the issues in dispute. Should the Court find further briefing necessary upon conclusion of the telephone conference, the Court shall order the party seeking relief to file with the Court a three page letter, exclusive of exhibits, describing the issues in contention. The responding party shall file within five days from the date of service of the opening letter an answering letter of no more than three pages. The party seeking relief may then file a reply letter of no more than two pages within three days from the date of service of the answering letter.

    4.   <u>Application to Court for Protective Order</u>. Should counsel find it will be necessary to apply to the Court for a protective order specifying terms and conditions for the disclosure of confidential information, counsel should confer and attempt to reach an agreement on a proposed form of order and submit it to the Court within ten days from the date of this Order.

Any proposed order should include the following paragraph:

      <u>Other Proceedings</u>. By entering this order and limiting the disclosure of information in this case, the Court does not intend to preclude another court from finding that information

<div align="center">3</div>

may be relevant and subject to disclosure in another case. Any person or party subject to this order who becomes subject to a motion to disclose another party's information designated "confidential" [the parties should list any other level of designation, such as "highly confidential," which may be provided for in the protective order] pursuant to this order shall promptly notify that party of the motion so that the party may have an opportunity to appear and be heard on whether that information should be disclosed.

5.     Papers Filed Under Seal.  When filing papers under seal, counsel should deliver to the Clerk an original and one copy of the papers.

6.     Settlement Conference.  Pursuant to 28 U.S.C. § 636, this matter is referred to the United States Magistrate for the purpose of exploring the possibility of a settlement.  The Magistrate Judge will schedule a settlement conference with counsel and their clients to be held within ninety days from the date of this Order.

7.     Interim Status Report.  On **October 31, 2003**, counsel shall submit a letter to the Court with an interim report on the nature of the matters in issue and the progress of discovery to date.

8.     Status Conference.  On **November 6, 2003**, the Court will hold a Rule 16(a), (b) and (c) conference by telephone with counsel beginning at 4:30 p.m. Plaintiff's counsel shall initiate the telephone call.

If all parties agree that there is nothing to report, nor anything to add to the interim status report or to this order, they may so notify the Court in writing before the conference is scheduled to occur, and the conference will be taken off of the Court's calendar.

9.     Case Dispositive Motions.  All case dispositive motions, an opening brief, and affidavits, if any, in support of the motion shall be served and filed on or before **September 2, 2004**.  Answering briefs, and affidavits, if any, in opposition shall be

served and filed on or before **September 30, 2004**, and the reply brief of the movant and affidavits, if any, shall be served and filed on or before **October 21, 2004**.

10.     <u>Claim Construction Issue Identification</u>.  If the Court does not find that a limited earlier claim construction would be helpful in resolving the case, on **June 18, 2004**, the parties shall exchange a list of those claim term(s)/phrase(s) that they believe need construction and their proposed claim construction of those term(s)/phrase(s). This document will not be filed with the Court.  Subsequent to exchanging that list, the parties will meet and confer to prepare a Joint Claim Construction Chart to be submitted pursuant to paragraph 11 below.  The parties' Joint Claim Construction Chart should identify for the Court the term(s)/phrase(s) of the claim(s) in issue, and should include each party's proposed construction of the disputed claim language with citation(s) only to the intrinsic evidence in support of their respective proposed constructions.  A copy of the patent(s) in issue as well as those portions of the intrinsic record relied upon are to be submitted with this Joint Claim Construction Chart.  In this joint submission, the parties shall not provide argument.

11.     <u>Claim Construction</u>.  The parties shall submit a Joint Claim Construction Chart to the Court on or before **July 23, 2004**, to be considered by the Court in conjunction with the parties' summary judgment motions.  The parties shall file their respective opening briefs on claim-construction issues on or before **August 26, 2004**, answering briefs on claim-construction issues on or before **September 23, 2004**.

12.     <u>Hearing on Claim Construction</u>.  Beginning at 9:30 a.m. on **November 15, 2004**, the Court will hear evidence and argument on claim construction and on case dispositive motions.

13.    Applications by Motion.  Except as otherwise specified herein, any application to the Court shall be by written motion filed with the Clerk.  Unless otherwise requested by the Court, counsel shall not deliver copies of papers or correspondence to Chambers.  Any non-dispositive motion should contain the statement required by Local Rule 7.1.1.

14.    Pretrial Conference.  On **February 28, 2005**, the Court will hold a Final Pretrial Conference in Chambers with counsel beginning at 4:30 p.m. Unless otherwise ordered by the Court, the parties should assume that filing the pretrial order satisfies the pretrial disclosure requirement of Federal Rule of Civil Procedure 26(a)(3). Thirty days before the joint proposed pretrial order is due, plaintiff's counsel shall forward to defendant's counsel a draft pretrial order containing the information plaintiff proposes to include in the draft.  Defendant's counsel shall, in turn, provide to plaintiffs counsel any comments on the plaintiff's draft as well as the information defendant proposes to include in the proposed pretrial order. Motions *in limine* shall not be separately filed. Any *in limine* requests shall be set forth in the proposed pretrial order.  Each party shall be limited to five *in limine* requests, unless otherwise permitted by the  Court.  Briefing shall not be submitted on *in limine* requests, unless otherwise permitted by the Court.  The parties shall file with the Court the joint proposed final pretrial order with the information required by the form of Final Pretrial Order which accompanies this Scheduling Order on or before **February 21, 2005**.

15.    Jury Instructions, Voir Dire, and Special Verdict Forms.  Where a case is to be tried to a jury, pursuant to Local Rules 47 and 51 the parties should file proposed

6

voir dire, instructions to the jury, and special verdicts and interrogatories three full
business days before the final pretrial conference.

16.   Trial. This matter is scheduled for a jury trial of approximately three weeks
beginning at 10:00 a.m. on **March 7, 2005**. For the purpose of completing pretrial
preparations, counsel should plan on each side being allocated a total of 35 hours to
present their case.

UNITED STATES DISTRICT JUDGE

7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LUCENT TECHNOLOGIES, INC., and )
LUCENT TECHNOLOGIES GUARDIAN I )
LLC, )
                               )
           Plaintiffs, )
                               )
       v.                      )     Civil Action No. 03-205-KAJ
                               )
DELL COMPUTER CORPORATION, )
                               )
           Defendant. )

**PROPOSED FINAL PRETRIAL ORDER**

This matter comes before the Court at a final pretrial conference held pursuant to

Rule 16, Federal Rules of Civil Procedure.

**Plaintiff(s) Counsel:**



**Defendant(s) Counsel**:



**I.     Nature of the Case**

The parties should prepare a brief statement of the nature of the case including the

claims of the parties (personal injury, federal tort claim, breach of contracts, etc.).  The

principal purpose of this statement is to assist the Court in explaining the case to

prospective jurors upon selection of a jury.

**II.    Jurisdiction**

A.     This is an action for:

(State the remedy sought, such as damages, injunctive or declaratory relief.)

B.    The jurisdiction of the Court is not disputed (or, if the issue has not previously been raised, the basis on which jurisdiction is contested).

1.    If not disputed, state the statutory, constitutional or other basis of jurisdiction.

## III.    Uncontroverted Facts

The following facts are not disputed or have been agreed to or stipulated to by the parties:

(This section should contain a comprehensive statement of the facts which will become a part of the evidentiary record in the case and which, in jury trials, may be read to the jury.)

## IV.    Agreed to Issues of Law

The parties agree that the following are the issues to be decided by the Court:

## V.    Witnesses (Please note those who will testify by deposition.)

A.    List of witnesses the plaintiff expects to call, including experts:

1.    Expert witnesses.

2.    Non-expert witnesses.

B.    List of witnesses defendant expects to call, including experts:

1.    Expert witnesses.

2.    Non-expert witnesses.

C.    If there are any third parties to the action, they should include an identical list of witnesses as that contained in Parts A and B above.

D.   **Rebuttal Witnesses**.  Each of the parties may call such rebuttal witnesses as may be necessary, without prior notice thereof to the other party.

## VI.   Exhibits

(Refer to Pretrial Exhibit Stipulation appended hereto.)

## VII.   Damages

An itemized statement of all damages, including special damages.

## VIII.   Bifurcated Trial

Indicate whether the parties desire a bifurcated trial, and, if so, why.

## IX.   Trial Briefs

Motions *in limine* shall not be separately filed.  Any *in limine* requests shall be set forth, with citation to authorities and brief argument,  in the proposed pretrial order.  Each party shall be limited to five *in limine* requests, unless otherwise permitted by the Court. Briefing shall not be submitted on *in limine* requests, unless otherwise permitted by the Court.

## X.   Limitations, Reservations and Other Matters

A.   **Length of Trial**.  The probable length of trial is _____ days.  The case will be listed on the trial calendar to be tried when reached.

Mark appropriate box:     Jury_____
                          Non-jury_____

B.   **Number of Jurors**.  There shall be six jurors and _____ alternate jurors.

C.   **Jury Voir Dire**.  The Court will conduct voir dire.  If voir dire questions are to be tendered, they should be submitted with the final pretrial order.

3

IT IS ORDERED that this Final Pretrial Order may be modified at the trial of the action, or prior thereto, to prevent manifest injustice or for good cause shown. Such modification may be made either on application of counsel for the parties or on motion of the Court.

DATED: _____

_____
UNITED STATES DISTRICT JUDGE

APPROVED AS TO FORM AND
SUBSTANCE:

_____
ATTORNEY FOR PLAINTIFF(S)

_____
ATTORNEY FOR DEFENDANT(S)

NOTE:      Where a third-party defendant is joined pursuant to Rule 14(a) of the Federal Rules of Civil Procedure, the pretrial order may be suitably modified. The initial page may be modified to reflect the joinder. List attorney's name, address, and telephone number.

Schedule (c)

Exhibits[1]

1.    The following exhibits were offered by plaintiff, received in evidence and marked as indicated:

[State identification number and brief description of each exhibit.]

2.    The following exhibits were offered by plaintiff and marked for identification.  Defendant(s) objected to their receipt in evidence on the grounds states[2]:

[State identification number and brief description of each exhibit.  Also state briefly the grounds of objection, such as competency, relevancy or materiality, and the Fed.R.Evid. relied upon.  Also state briefly plaintiff('s)(s') response to the objection, with reference to Fed.R.Evid. relied upon.]

3.    The following exhibits were offered by defendant(s), received in evidence and marked as indicated:

[State identification number and brief description of each exhibit.]

4.    The following exhibits were offered by defendant(s) and marked for identification.  Plaintiff(s) objected to their receipt in evidence on the grounds stated[3]:

[State identification number and brief description of each exhibit.  Also state briefly the ground of objection, such as competency, relevancy or materiality, and the

---

[1]As in the Final Pretrial Order form, references to "plaintiff" and "defendant" are intended to cover those instances where there are more than one of either.

[2]Copies of objected-to exhibits should be delivered to the Court with this Order, to permit rulings *in limine* where possible.

[3]See footnote 2 of this Schedule.

5

Fed.R.Evid. relied upon.  Also state briefly defendant's response to the objection, with reference to Fed.R.Evid. relied upon.]





IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

FILED
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE

2003 APR 16  PH 1: 44

LUCENT TECHNOLOGIES INC., and )
LUCENT TECHNOLOGIES GUARDIAN )
I LLC, )
                     )
         Plaintiffs, )
                     )
                     )    Civil Action No. 03-205-KAJ
v. )
                     )
DELL COMPUTER CORPORATION, )
                     )
         Defendant. )

## SCHEDULING ORDER

This 16th day of April, 2003, the Court having conducted an initial Rule 16

scheduling and planning conference pursuant to Local Rule 16.2(a) on April 3, 2003,

and the parties having determined after discussion that the matter cannot be resolved at

this juncture by settlement, voluntary mediation, or binding arbitration;

IT IS ORDERED that:

1.    Rule 26(a)(1) Initial Disclosures.  Unless otherwise agreed to by the

parties, the parties shall make their initial disclosures pursuant to Federal Rule of Civil

Procedure 26(a)(1) within five days of the date of this Order.

2.    Joinder of other Parties and Amendment of Pleadings.  All motions to join

other parties, and to amend or supplement the pleadings shall be filed on or before

**September 30, 2003**.

3.    Discovery

        a.    Limitation on Hours for Deposition Discovery.  Each side is limited

to a total of 175 hours of taking testimony by deposition upon oral examination,

excluding the depositions of expert witnesses.  With respect to the depositions of

technical expert witnesses, each side is limited to one (1) day of seven (7) hours for each patent in suit on which the expert is expected to testify, up to a maximum of three (3) days of seven (7) hours each.  With respect to the depositions of non-technical expert witnesses, each side is limited to one (1) day of seven (7) hours per expert. Either side may seek leave of Court for additional time for fact or expert depositions for good cause shown.

b.      Location of Depositions.  Any party or representative (officer, director, or managing agent) of a party filing a civil action in this district court must ordinarily be required, upon request, to submit to a deposition at a place designated within this district.  Exceptions to this general rule may be made on order of the Court. A defendant who becomes a counterclaimant, cross-claimant, or third-party plaintiff shall be considered as having filed an action in this Court for the purpose of this provision.

c.      Discovery Cut Off.  All discovery other than expert disclosures and depositions in this case shall be initiated so that it will be completed on or before **May 14, 2004**.  Expert depositions shall be completed on or before **August 13, 2004**.  The Court encourages the parties to serve and respond to contention interrogatories early in the case.  Unless otherwise ordered by the Court, the limitations on discovery set forth in Local Rule 26.1 shall be strictly observed.

d.      Disclosure of Expert Testimony.  Unless otherwise agreed to by the parties, they shall file their initial Federal Rule of Civil Procedure 26(a)(2) disclosures of expert testimony on or before **June 11, 2004**, and file rebuttal expert reports on or

2

before **July 16, 2004**. To the extent any objection to expert testimony is made pursuant to the principles announced in <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579 (1993), it shall be made by motion and briefed according to the schedule for case dispositive motions set forth in paragraph 9, unless otherwise ordered by the Court.

       e.    <u>Discovery Disputes</u>. Should counsel find they are unable to resolve a discovery dispute, the party seeking the relief shall contact chambers at (302) 573-6001 to schedule a telephone conference. Not less than forty-eight hours prior to the conference, the party seeking relief shall file with the Court a letter agenda not to exceed two pages outlining the issues in dispute. Should the Court find further briefing necessary upon conclusion of the telephone conference, the Court shall order the party seeking relief to file with the Court a three page letter, exclusive of exhibits, describing the issues in contention. The responding party shall file within five days from the date of service of the opening letter an answering letter of no more than three pages. The party seeking relief may then file a reply letter of no more than two pages within three days from the date of service of the answering letter.

       4.    <u>Application to Court for Protective Order</u>. Should counsel find it will be necessary to apply to the Court for a protective order specifying terms and conditions for the disclosure of confidential information, counsel should confer and attempt to reach an agreement on a proposed form of order and submit it to the Court within ten days from the date of this Order.

Any proposed order should include the following paragraph:

> <u>Other Proceedings</u>. By entering this order and limiting the disclosure of information in this case, the Court does not intend to preclude another court from finding that information

<center>3</center>

may be relevant and subject to disclosure in another case.
Any person or party subject to this order who becomes
subject to a motion to disclose another party's information
designated "confidential" [the parties should list any other
level of designation, such as "highly confidential," which may
be provided for in the protective order] pursuant to this order
shall promptly notify that party of the motion so that the party
may have an opportunity to appear and be heard on whether
that information should be disclosed.

5.     <u>Papers Filed Under Seal</u>.  When filing papers under seal, counsel should

deliver to the Clerk an original and one copy of the papers.

6.     <u>Settlement Conference</u>.  Pursuant to 28 U.S.C. § 636, this matter is

referred to the United States Magistrate for the purpose of exploring the possibility of a

settlement.  The Magistrate Judge will schedule a settlement conference with counsel

and their clients to be held within ninety days from the date of this Order.

7.     <u>Interim Status Report</u>.  On **October 31, 2003,** counsel shall submit a letter

to the Court with an interim report on the nature of the matters in issue and the progress

of discovery to date.

8.     <u>Status Conference</u>.  On **November 6, 2003,** the Court will hold a Rule

16(a), (b) and (c) conference by telephone with counsel beginning at 4:30 p.m.

Plaintiff's counsel shall initiate the telephone call.

If all parties agree that there is nothing to report, nor anything to add to the

interim status report or to this order, they may so notify the Court in writing before the

conference is scheduled to occur, and the conference will be taken off of the Court's

calendar.

9.     <u>Case Dispositive Motions</u>.  All case dispositive motions, an opening brief,

and affidavits, if any, in support of the motion shall be served and filed on or before

**September 2, 2004.**  Answering briefs, and affidavits, if any, in opposition shall be

4

served and filed on or before **September 30, 2004**, and the reply brief of the movant and affidavits, if any, shall be served and filed on or before **October 21, 2004**.

10.    Claim Construction Issue Identification.  If the Court does not find that a limited earlier claim construction would be helpful in resolving the case, on **June 18, 2004**, the parties shall exchange a list of those claim term(s)/phrase(s) that they believe need construction and their proposed claim construction of those term(s)/phrase(s). This document will not be filed with the Court.  Subsequent to exchanging that list, the parties will meet and confer to prepare a Joint Claim Construction Chart to be submitted pursuant to paragraph 11 below.  The parties' Joint Claim Construction Chart should identify for the Court the term(s)/phrase(s) of the claim(s) in issue, and should include each party's proposed construction of the disputed claim language with citation(s) only to the intrinsic evidence in support of their respective proposed constructions.  A copy of the patent(s) in issue as well as those portions of the intrinsic record relied upon are to be submitted with this Joint Claim Construction Chart.  In this joint submission, the parties shall not provide argument.

11.    Claim Construction.  The parties shall submit a Joint Claim Construction Chart to the Court on or before **July 23, 2004**, to be considered by the Court in conjunction with the parties' summary judgment motions.  The parties shall file their respective opening briefs on claim-construction issues on or before **August 26, 2004**, answering briefs on claim-construction issues on or before **September 23, 2004**.

12.    Hearing on Claim Construction.  Beginning at 9:30 a.m. on **November 15, 2004**, the Court will hear evidence and argument on claim construction and on case dispositive motions.

5

13.    **Applications by Motion.** Except as otherwise specified herein, any application to the Court shall be by written motion filed with the Clerk. Unless otherwise requested by the Court, counsel shall not deliver copies of papers or correspondence to Chambers. Any non-dispositive motion should contain the statement required by Local Rule 7.1.1.

14.    **Pretrial Conference.** On **February 28, 2005,** the Court will hold a Final Pretrial Conference in Chambers with counsel beginning at 4:30 p.m. Unless otherwise ordered by the Court, the parties should assume that filing the pretrial order satisfies the pretrial disclosure requirement of Federal Rule of Civil Procedure 26(a)(3). Thirty days before the joint proposed pretrial order is due, plaintiff's counsel shall forward to defendant's counsel a draft pretrial order containing the information plaintiff proposes to include in the draft. Defendant's counsel shall, in turn, provide to plaintiffs counsel any comments on the plaintiff's draft as well as the information defendant proposes to include in the proposed pretrial order. Motions *in limine* shall not be separately filed. Any *in limine* requests shall be set forth in the proposed pretrial order. Each party shall be limited to five *in limine* requests, unless otherwise permitted by the Court. Briefing shall not be submitted on *in limine* requests, unless otherwise permitted by the Court. The parties shall file with the Court the joint proposed final pretrial order with the information required by the form of Final Pretrial Order which accompanies this Scheduling Order on or before **February 21, 2005.**

15.    **Jury Instructions, Voir Dire, and Special Verdict Forms.** Where a case is to be tried to a jury, pursuant to Local Rules 47 and 51 the parties should file proposed

6

voir dire, instructions to the jury, and special verdicts and interrogatories three full

business days before the final pretrial conference.

16.  <u>Trial</u>.  This matter is scheduled for a jury trial of approximately three weeks

beginning at 10:00 a.m. on **March 7, 2005**.  For the purpose of completing pretrial

preparations, counsel should plan on each side being allocated a total of 35 hours to

present their case.

UNITED STATES DISTRICT JUDGE

7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LUCENT TECHNOLOGIES, INC., and )
LUCENT TECHNOLOGIES GUARDIAN I )
LLC, )
)
        Plaintiffs, )
)
    v. )    Civil Action No. 03-205-KAJ
)
DELL COMPUTER CORPORATION, )
)
        Defendant. )

## PROPOSED FINAL PRETRIAL ORDER

This matter comes before the Court at a final pretrial conference held pursuant to Rule 16, Federal Rules of Civil Procedure.

**Plaintiff(s) Counsel:**


**Defendant(s) Counsel:**


## I.    Nature of the Case

The parties should prepare a brief statement of the nature of the case including the claims of the parties (personal injury, federal tort claim, breach of contracts, etc.). The principal purpose of this statement is to assist the Court in explaining the case to prospective jurors upon selection of a jury.

## II.    Jurisdiction

A.    This is an action for:

(State the remedy sought, such as damages, injunctive or declaratory relief.)

B.    The jurisdiction of the Court is not disputed (or, if the issue has not previously been raised, the basis on which jurisdiction is contested).

     1.    If not disputed, state the statutory, constitutional or other basis of jurisdiction.

## III.    Uncontroverted Facts

The following facts are not disputed or have been agreed to or stipulated to by the parties:

(This section should contain a comprehensive statement of the facts which will become a part of the evidentiary record in the case and which, in jury trials, may be read to the jury.)

## IV.    Agreed to Issues of Law

The parties agree that the following are the issues to be decided by the Court:

## V.    Witnesses (Please note those who will testify by deposition.)

A.    List of witnesses the plaintiff expects to call, including experts:

     1.    Expert witnesses.

     2.    Non-expert witnesses.

B.    List of witnesses defendant expects to call, including experts:

     1.    Expert witnesses.

     2.    Non-expert witnesses.

C.    If there are any third parties to the action, they should include an identical list of witnesses as that contained in Parts A and B above.

2

D.   **Rebuttal Witnesses**. Each of the parties may call such rebuttal witnesses as may be necessary, without prior notice thereof to the other party.

## VI.   Exhibits

(Refer to Pretrial Exhibit Stipulation appended hereto.)

## VII.   Damages

An itemized statement of all damages, including special damages.

## VIII.   Bifurcated Trial

Indicate whether the parties desire a bifurcated trial, and, if so, why.

## IX.   Trial Briefs

Motions *in limine* shall not be separately filed.  Any *in limine* requests shall be set forth, with citation to authorities and brief argument,  in the proposed pretrial order.  Each party shall be limited to five *in limine* requests, unless otherwise permitted by the Court. Briefing shall not be submitted on *in limine* requests, unless otherwise permitted by the Court.

## X.   Limitations, Reservations and Other Matters

A.   **Length of Trial**.  The probable length of trial is _____ days.  The case will be listed on the trial calendar to be tried when reached.

Mark appropriate box:     Jury_____
                          Non-jury_____

B.   **Number of Jurors**.  There shall be six jurors and _____ alternate jurors.

C.   **Jury Voir Dire**.  The Court will conduct voir dire.  If voir dire questions are to be tendered, they should be submitted with the final pretrial order.

3

IT IS ORDERED that this Final Pretrial Order may be modified at the trial of the action, or prior thereto, to prevent manifest injustice or for good cause shown.  Such modification may be made either on application of counsel for the parties or on motion of the Court.

DATED: _____

_____
UNITED STATES DISTRICT JUDGE

APPROVED AS TO FORM AND
SUBSTANCE:

_____
ATTORNEY FOR PLAINTIFF(S)

_____
ATTORNEY FOR DEFENDANT(S)

NOTE:     Where a third-party defendant is joined pursuant to Rule 14(a) of the Federal Rules of Civil Procedure, the pretrial order may be suitably modified.  The initial page may be modified to reflect the joinder.  List attorney's name, address, and telephone number.

4

Schedule (c)

Exhibits[1]

1.      The following exhibits were offered by plaintiff, received in evidence and marked as indicated:

[State identification number and brief description of each exhibit.]

2.      The following exhibits were offered by plaintiff and marked for identification.  Defendant(s) objected to their receipt in evidence on the grounds states[2]:

[State identification number and brief description of each exhibit.  Also state briefly the grounds of objection, such as competency, relevancy or materiality, and the Fed.R.Evid. relied upon.  Also state briefly plaintiff('s)(s') response to the objection, with reference to Fed.R.Evid. relied upon.]

3.      The following exhibits were offered by defendant(s), received in evidence and marked as indicated:

[State identification number and brief description of each exhibit.]

4.      The following exhibits were offered by defendant(s) and marked for identification.  Plaintiff(s) objected to their receipt in evidence on the grounds stated[3]:

[State identification number and brief description of each exhibit.  Also state briefly the ground of objection, such as competency, relevancy or materiality, and the

---

[1]As in the Final Pretrial Order form, references to "plaintiff" and "defendant" are intended to cover those instances where there are more than one of either.

[2]Copies of objected-to exhibits should be delivered to the Court with this Order, to permit rulings *in limine* where possible.

[3]See footnote 2 of this Schedule.

5

Fed.R.Evid. relied upon.  Also state briefly defendant's response to the objection, with reference to Fed.R.Evid. relied upon.]

# YOUNG CONAWAY STARGATT & TAYLOR, LLP

BRUCE M. STARGATT
STUART B. YOUNG
BEN T. CASTLE
SHELDON N. SANDLER
RICHARD A. LEVINE
RICHARD A. ZAPPA
FREDERICK W. IOBST
RICHARD H. MORSE
DAVID C. MCBRIDE
JOSEPH M. NICHOLSON
CRAIG A. KARSNITZ
BARRY M. WILLOUGHBY
JOSY W. INGERSOLL
ANTHONY G. FLYNN
JEROME K. GROSSMAN
EUGENE A. DIPRINZIO
JAMES L. PATTON, JR.
ROBERT L. THOMAS
WILLIAM D. JOHNSTON
TIMOTHY J. SNYDER
BRUCE L. SILVERSTEIN
WILLIAM W. BOWSER
LARRY J. TARABICOS
RICHARD A. DILIBERTO, JR.
MELANIE K. SHARP
CASSANDRA FALINE KAMINSKI
RICHARD J.A. POPPER
TERESA A. CHEEK
NEILLI MULLEN WALSH
JANET Z. CHARLTON
ROBERT S. BRADY
JOEL A. WAITE
BRENT C. SHAFFER
DANIEL P. JOHNSON
CRAIG D. GREAR
TIMOTHY JAY HOUSEAL
BRENDAN LINEHAN SHANNON
MARTIN S. LESSNER
PAULINE K. MORGAN
C. BARR FLINN
NATALIE S. WOLF
LISA B. GOODMAN

JOHN W. SHAW
JAMES P. HUGHES, JR.
EDWIN J. HARRON
MICHAEL R. NESTOR
MAUREEN D. LUKE

JOSEPH M. BARRY
SEAN M. BEACH
TIMOTHY P. CAIRNS
M. BLAKE CLEARY
CURTIS J. CROWTHER
JESSICA S. DAVIS
DANIELLE GIBBS
SCOTT A. HOLT
DAWN M. JONES
EDWARD J. KOSMOWSKI
TIMOTHY E. LENGKEEK
MATTHEW B. LUNN
JOSEPH A. MALFITANO
ADRIA B. MARTINELLI
MATTHEW B. MCGUIRE (PA ONLY)
VIVIAN L. MEDINILLA
MARIBETH L. MINELLA
EDMON L. MORTON
JENNIFER M. NICHOLS
JENNIFER R. NOEL
JOHN J. PASCHETTO
ADAM W. POFF
SETH J. REIDENBERG
SARA BETH A. REYBURN
FRANCIS J. SCHANNE
SCOTT SALERNI
STEPHEN E. SMITH
JOANNE C. SPRINGER-MESSICK
JOHN E. TRACEY
ALFRED VILLOCH, III
CHRISTIAN DOUGLAS WRIGHT
SHARON M. ZIEG
VIRGINIA A. ZRAKE

THE BRANDYWINE BUILDING
1000 WEST STREET, 17TH FLOOR
WILMINGTON, DELAWARE 19801

P.O. BOX 391
WILMINGTON, DELAWARE 19899-0391

(302) 571-6600
(800) 253-2234 (DE ONLY)
FAX: (302) 571-1253

WRITER'S DIRECT DIAL NUMBERS
VOICE: (302) 571-6689
FAX: (302) 576-3334

E-MAIL: jshaw@ycst.com

H ALBERT YOUNG
1929-1982

H. JAMES CONAWAY, JR.
1947-1990

———————
WILLIAM F. TAYLOR
EDWARD B. MAXWELL, 2ND
SHELDON A. WEINSTEIN
OF COUNSEL

———————
JOHN D. MCLAUGHLIN, JR.
SPECIAL COUNSEL

———————
GEORGETOWN OFFICE
110 WEST PINE STREET
P.O. BOX 594
GEORGETOWN, DELAWARE 19947
(302) 856-3571
(800) 255-2234 (DE ONLY)
FAX: (302) 856-9338

April 15, 2003

## BY HAND DELIVERY

The Honorable Kent A. Jordan
United States District Court
844 King Street
Wilmington, DE  19801

Re:    Lucent Technologies Inc., et al. v. Dell
       Computer Corporation, C.A. No. 03-205-KAJ

Dear Judge Jordan:

On behalf of both parties, I have enclosed the form of Scheduling Order discussed at the Scheduling Conference.  The parties believe the order ready to be entered by the Court. We are available at the Court's convenience should Your Honor have any questions or concerns.

Respectfully,

John W. Shaw

JWS:bjp
Enclosure
cc:    Clerk of the Court
       R. Eric Hutz, Esquire (w/enc., by hand)
       John M. Desmarais, Esquire (w/enc., by facsimile)
       John M. Freed, Esquire (w/enc., by facsimile)

57224.1002

WP3:879017.1

COPY   (23)

# YOUNG CONAWAY STARGATT & TAYLOR, LLP

BRUCE M. STARGATT
STUART B. YOUNG
BEN T. CASTLE
SHELDON N. SANDLER
RICHARD A. LEVINE
RICHARD A. ZAPPA
FREDERICK W. IOBST
RICHARD H. MORSE
DAVID C. MCBRIDE
JOSEPH M. NICHOLSON
CRAIG A. KARSNITZ
BARRY M. WILLOUGHBY
JOSY W. INGERSOLL
ANTHONY G. FLYNN
JEROME K. GROSSMAN
EUGENE A. DIPRINZIO
JAMES L. PATTON, JR.
ROBERT L. THOMAS
WILLIAM D. JOHNSTON
TIMOTHY J. SNYDER
BRUCE L. SILVERSTEIN
WILLIAM W. BOWSER
LARRY J. TARABICOS
RICHARD A. DiLIBERTO, JR.
MELANIE K. SHARP
CASSANDRA FALNE KAMINSKI
RICHARD J.A. POPPER
TERESA A. CHEEK
NEILLI MULLEN WALSH
JANET Z. CHARLTON
ROBERT S. BRADY
JOEL A. WAITE
BRENT C. SHAFFER
DANIEL P. JOHNSON
CRAIG D. GREAR
TIMOTHY JAY HOUSEAL
BRENDAN LINEHAN SHANNON
MARTIN S. LESSNER
PAULINE K. MORGAN
C. BARR FLINN
NATALIE S. WOLF
LISA B. GOODMAN

JOHN W. SHAW
JAMES P. HUGHES, JR.
EDWIN J. HARRON
MICHAEL R. NESTOR
MAUREEN D. LUKE

———

JOSEPH M. BARRY
SEAN M. BEACH
TIMOTHY P. CAIRNS
M. BLAKE CLEARY
CURTIS J. CROWTHER
JESSICA S. DAVIS
DANIELLE GIBBS
SCOTT A. HOLT
DAWN M. JONES
EDWARD J. KOSMOWSKI
TIMOTHY E. LENGKEEK
MATTHEW B. LUNN
JOSEPH A. MALFITANO
ADRIA B. MARTINELLI
MATTHEW B. McGUIRE (PA ONLY)
VIVIAN L. MEDINILLA
MARIBETH L. MINELLA
EDMON L. MORTON
JENNIFER M. NICHOLS
JENNIFER R. NOEL
JOHN J. PASCHETTO
ADAM W. POFF
SETH J. REIDENBERG
SARA BETH A. REYBURN
FRANCIS J. SCHANNE
SCOTT SALERNI
STEPHEN E. SMITH
JOANNE C. SPRINGER-MESSICK
JOHN E. TRACEY
ALFRED VILLOCH, III
CHRISTIAN DOUGLAS WRIGHT
SHARON M. ZIEG
VIRGINIA A. ZRAKE

THE BRANDYWINE BUILDING
1000 WEST STREET, 17TH FLOOR
WILMINGTON, DELAWARE 19801

P.O. BOX 391
WILMINGTON, DELAWARE 19899-0391

(302) 571-6600
(800) 253-2234 (DE ONLY)
FAX: (302) 571-1253

WRITER'S DIRECT DIAL NUMBERS
VOICE: (302) 571-6689
FAX: (302) 576-3334

E-MAIL: jshaw@ycst.com

H. ALBERT YOUNG
1929-1982

H. JAMES CONAWAY, JR.
1947-1990

WILLIAM F. TAYLOR
EDWARD B. MAXWELL, 2ND
SHELDON A. WEINSTEIN
OF COUNSEL

JOHN D. MCLAUGHLIN, JR.
SPECIAL COUNSEL

GEORGETOWN OFFICE
110 WEST PINE STREET
P.O. BOX 594
GEORGETOWN, DELAWARE 19947
(302) 856-3571
(800) 255-2234 (DE ONLY)
FAX: (302) 856-9338

April 15, 2003

## BY HAND DELIVERY

The Honorable Kent A. Jordan
United States District Court
844 King Street
Wilmington, DE  19801

Re:   Lucent Technologies Inc., et al. v. Dell
      Computer Corporation, C.A. No. 03-205-KAJ

Dear Judge Jordan:

On behalf of both parties, I have enclosed the form of Scheduling Order discussed at the Scheduling Conference.  The parties believe the order ready to be entered by the Court. We are available at the Court's convenience should Your Honor have any questions or concerns.

Respectfully,

John W. Shaw

JWS:bjp
Enclosure
cc:   Clerk of the Court
      R. Eric Hutz, Esquire (w/enc., by hand)
      John M. Desmarais, Esquire (w/enc., by facsimile)
      John M. Freed, Esquire (w/enc., by facsimile)

57224.1002

WP3:879017.1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LUCENT TECHNOLOGIES INC., and )
LUCENT TECHNOLOGIES GUARDIAN )
I LLC, )
                        )
         Plaintiffs, )
                        )
                        )   Civil Action No. 03-205-KAJ
v. )
                        )
DELL COMPUTER CORPORATION, )
                        )
         Defendant. )

## SCHEDULING ORDER

This _____ day of April, 2003, the Court having conducted an initial Rule 16

scheduling and planning conference pursuant to Local Rule 16.2(a) on April 3, 2003,

and the parties having determined after discussion that the matter cannot be resolved at

this juncture by settlement, voluntary mediation, or binding arbitration;

IT IS ORDERED that:

1.    Rule 26(a)(1) Initial Disclosures.  Unless otherwise agreed to by the

parties, the parties shall make their initial disclosures pursuant to Federal Rule of Civil

Procedure 26(a)(1) within five days of the date of this Order.

2.    Joinder of other Parties and Amendment of Pleadings.  All motions to join

other parties, and to amend or supplement the pleadings shall be filed on or before

**September 30, 2003**.

3.    Discovery

        a.    Limitation on Hours for Deposition Discovery.  Each side is limited

to a total of 175 hours of taking testimony by deposition upon oral examination,

excluding the depositions of expert witnesses.  With respect to the depositions of

1

technical expert witnesses, each side is limited to one (1) day of seven (7) hours for each patent in suit on which the expert is expected to testify, up to a maximum of three (3) days of seven (7) hours each. With respect to the depositions of non-technical expert witnesses, each side is limited to one (1) day of seven (7) hours per expert. Either side may seek leave of Court for additional time for fact or expert depositions for good cause shown.

b. <u>Location of Depositions</u>. Any party or representative (officer, director, or managing agent) of a party filing a civil action in this district court must ordinarily be required, upon request, to submit to a deposition at a place designated within this district. Exceptions to this general rule may be made on order of the Court. A defendant who becomes a counterclaimant, cross-claimant, or third-party plaintiff shall be considered as having filed an action in this Court for the purpose of this provision.

c. <u>Discovery Cut Off</u>. All discovery other than expert disclosures and depositions in this case shall be initiated so that it will be completed on or before **May 14, 2004**. Expert depositions shall be completed on or before **August 13, 2004**. The Court encourages the parties to serve and respond to contention interrogatories early in the case. Unless otherwise ordered by the Court, the limitations on discovery set forth in Local Rule 26.1 shall be strictly observed.

d. <u>Disclosure of Expert Testimony</u>. Unless otherwise agreed to by the parties, they shall file their initial Federal Rule of Civil Procedure 26(a)(2) disclosures of expert testimony on or before **June 11, 2004,** and file rebuttal expert reports on or

before **July 16, 2004**. To the extent any objection to expert testimony is made pursuant to the principles announced in <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579 (1993), it shall be made by motion and briefed according to the schedule for case dispositive motions set forth in paragraph 9, unless otherwise ordered by the Court.

   e. <u>Discovery Disputes</u>. Should counsel find they are unable to resolve a discovery dispute, the party seeking the relief shall contact chambers at (302) 573-6001 to schedule a telephone conference. Not less than forty-eight hours prior to the conference, the party seeking relief shall file with the Court a letter agenda not to exceed two pages outlining the issues in dispute. Should the Court find further briefing necessary upon conclusion of the telephone conference, the Court shall order the party seeking relief to file with the Court a three page letter, exclusive of exhibits, describing the issues in contention. The responding party shall file within five days from the date of service of the opening letter an answering letter of no more than three pages. The party seeking relief may then file a reply letter of no more than two pages within three days from the date of service of the answering letter.

   4. <u>Application to Court for Protective Order</u>. Should counsel find it will be necessary to apply to the Court for a protective order specifying terms and conditions for the disclosure of confidential information, counsel should confer and attempt to reach an agreement on a proposed form of order and submit it to the Court within ten days from the date of this Order.

  Any proposed order should include the following paragraph:

> <u>Other Proceedings</u>. By entering this order and limiting the disclosure of information in this case, the Court does not intend to preclude another court from finding that information

<div align="center">3</div>

may be relevant and subject to disclosure in another case.
Any person or party subject to this order who becomes
subject to a motion to disclose another party's information
designated "confidential" [the parties should list any other
level of designation, such as "highly confidential," which may
be provided for in the protective order] pursuant to this order
shall promptly notify that party of the motion so that the party
may have an opportunity to appear and be heard on whether
that information should be disclosed.

5.    Papers Filed Under Seal.  When filing papers under seal, counsel should
deliver to the Clerk an original and one copy of the papers.

6.    Settlement Conference.  Pursuant to 28 U.S.C. § 636, this matter is
referred to the United States Magistrate for the purpose of exploring the possibility of a
settlement.  The Magistrate Judge will schedule a settlement conference with counsel
and their clients to be held within ninety days from the date of this Order.

7.    Interim Status Report.  On **October 31, 2003**, counsel shall submit a letter
to the Court with an interim report on the nature of the matters in issue and the progress
of discovery to date.

8.    Status Conference.  On **November 6, 2003**, the Court will hold a Rule
16(a), (b) and (c) conference by telephone with counsel beginning at 4:30 p.m.
Plaintiff's counsel shall initiate the telephone call.

If all parties agree that there is nothing to report, nor anything to add to the
interim status report or to this order, they may so notify the Court in writing before the
conference is scheduled to occur, and the conference will be taken off of the Court's
calendar.

9.    Case Dispositive Motions.  All case dispositive motions, an opening brief,
and affidavits, if any, in support of the motion shall be served and filed on or before
**September 2, 2004**.  Answering briefs, and affidavits, if any, in opposition shall be

4

served and filed on or before **September 30, 2004,** and the reply brief of the movant

and affidavits, if any, shall be served and filed on or before **October 21, 2004.**

10. Claim Construction Issue Identification. If the Court does not find that a

limited earlier claim construction would be helpful in resolving the case, on **June 18,**

**2004,** the parties shall exchange a list of those claim term(s)/phrase(s) that they believe

need construction and their proposed claim construction of those term(s)/phrase(s).

This document will not be filed with the Court. Subsequent to exchanging that list, the

parties will meet and confer to prepare a Joint Claim Construction Chart to be submitted

pursuant to paragraph 11 below. The parties' Joint Claim Construction Chart should

identify for the Court the term(s)/phrase(s) of the claim(s) in issue, and should include

each party's proposed construction of the disputed claim language with citation(s) only

to the intrinsic evidence in support of their respective proposed constructions. A copy of

the patent(s) in issue as well as those portions of the intrinsic record relied upon are to

be submitted with this Joint Claim Construction Chart. In this joint submission, the

parties shall not provide argument.

11. Claim Construction. The parties shall submit a Joint Claim Construction

Chart to the Court on or before **July 23, 2004,** to be considered by the Court in

conjunction with the parties' summary judgment motions. The parties shall file their

respective opening briefs on claim-construction issues on or before **August 26, 2004,**

answering briefs on claim-construction issues on or before **September 23, 2004.**

12. Hearing on Claim Construction. Beginning at 9:30 a.m. on **November 15,**

**2004,** the Court will hear evidence and argument on claim construction and on case

dispositive motions.

13.   <u>Applications by Motion</u>.  Except as otherwise specified herein, any application to the Court shall be by written motion filed with the Clerk.  Unless otherwise requested by the Court, counsel shall not deliver copies of papers or correspondence to Chambers.  Any non-dispositive motion should contain the statement required by Local Rule 7.1.1.

14.   <u>Pretrial Conference</u>.  On **February 28, 2005**, the Court will hold a Final Pretrial Conference in Chambers with counsel beginning at 4:30 p.m. Unless otherwise ordered by the Court, the parties should assume that filing the pretrial order satisfies the pretrial disclosure requirement of Federal Rule of Civil Procedure 26(a)(3). Thirty days before the joint proposed pretrial order is due, plaintiff's counsel shall forward to defendant's counsel a draft pretrial order containing the information plaintiff proposes to include in the draft.  Defendant's counsel shall, in turn, provide to plaintiffs counsel any comments on the plaintiff's draft as well as the information defendant proposes to include in the proposed pretrial order. Motions *in limine* shall not be separately filed. Any *in limine* requests shall be set forth in the proposed pretrial order.  Each party shall be limited to five *in limine* requests, unless otherwise permitted by the  Court.  Briefing shall not be submitted on *in limine* requests, unless otherwise permitted by the Court.  The parties shall file with the Court the joint proposed final pretrial order with the information required by the form of Final Pretrial Order which accompanies this Scheduling Order on or before **February 21, 2005**.

15.   <u>Jury Instructions, Voir Dire, and Special Verdict Forms.</u>  Where a case is to be tried to a jury, pursuant to Local Rules 47 and 51 the parties should file proposed

6

voir dire, instructions to the jury, and special verdicts and interrogatories three full business days before the final pretrial conference.

16.    Trial.  This matter is scheduled for a jury trial of approximately three weeks beginning at 10:00 a.m. on **March 7, 2005**.  For the purpose of completing pretrial preparations, counsel should plan on each side being allocated a total of 35 hours to present their case.

_____

UNITED STATES DISTRICT JUDGE

ORIGINAL**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE**

| | |
|---|---|
| LUCENT TECHNOLOGIES, INC., and LUCENT TECHNOLOGIES GUARDIAN I LLC, ) ) ) Plaintiffs, ) v. ) ) DELL COMPUTER CORPORATION, ) ) Defendant. ) | Case No. 03-CV-205-KAJ |

## DELL'S REPLY TO LUCENTS' MOTION TO STRIKE DELL'S AFFIRMATIVE DEFENSE OF UNENFORCEABILITY AND TO DISMISS DELL'S COUNTERCLAIM TO THE EXTENT IT IS BASED ON THAT AFFIRMATIVE DEFENSE

R. Eric Hutz (ID # 2702)
James D. Heisman (#2746)
**CONNOLLY BOVE LODGE & HUTZ, LLP**
1220 Market Street, Post Office Box 2207
Wilmington, DE 19899
(302) 658-9141
*Attorneys for Defendant*
*Dell Computer Corporation*

**OF COUNSEL**
Joel M. Freed
Joseph A. Micallef
**ARNOLD & PORTER**
555 12th Street NW
Washington, DC 20004
(202) 942-5000

**DATED:** April 14, 2003

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ...................................................................................1

II.  NATURE AND STAGE OF THE PROCEEDINGS AND STATEMENT OF
     FACTS .............................................................................................2

III. ARGUMENT .......................................................................................4

     A.   Legal Standards...........................................................................4

     B.   Dell's Unclean Hands Defense Is Sufficiently Bottomed On The
          Averment Of Lucent's *Assertion Of The Patents In Suit Without Proper
          Basis* For Alleging Infringement .....................................................5

     C.   Dell's Additional Allegation Of *"Procurement* Of One Or More Of The
          Patents In Suit *By Failure To Disclose Material Prior Art To The United
          States Patent Office"* Cannot Render Insufficient The Otherwise Sufficient
          Pleading.....................................................................................7

IV.  CONCLUSION.....................................................................................9

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Agere Systems Guardian Corp.*, 190 F.Supp.2d 726, (D. Del. 2002); *EMC Corporation*, 921
   F.Supp. at 1263 ........................................................................................................ 4, 5

*Antonious v. Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P.*,
   275 F.3d 1066 (Fed. Cir. 2002) ............................................................................. 1, 2, 6

*EMC Corporation v. Storage Technology Corp.*, 921 F.Supp. 1261 (D. Del. 1996) ................. 3, 5

*France Telecom S.A. v. Novell, Inc.*,
   No. 102-437-GMS, 2002 WL 31355255, at *3-4 (D. Del. Oct. 17, 2002) ..................... 1, 5, 7, 8

*Scheiber v. Dolby Laboratories, Inc.*, 293 F.3d 1014 (7th Cir. 2002) ........................................ 6, 7

*Xilinx, Inc. v. Altera Corporation*,
   No. C 93-20409 RMW (EAI), 1993 WL 782236, at *2 (N.D. Cal. Oct. 25, 1993) ........... 4, 5, 6

## STATUTES

Fed. R. Civ. P. 8 ................................................................................................................ 3, 4, 9

Fed. R. Civ. P. 9(b) ....................................................................................................... *passim*

Fed. R. Civ. P. 12(b) ............................................................................................................. 2

Fed. R. Civ. P. 12(f) .............................................................................................................. 2

## I.   INTRODUCTION

Through the present motion Lucent Technologies Inc. and Lucent Technologies Guardian I LLC ("Lucent") seek to avoid judicial scrutiny of a meritorious defense to an action that was brought against Dell Computer Corporation ("Dell") without proper basis for alleging infringement.

Patent infringement actions are not to be brought based on a subjective belief that someone might have infringed or might be infringing.   Rather, a proper pre-filing investigation is required, and the pre-filing actions in infringement cases "are evaluated using a standard of objective reasonableness".  *See Antonious v. Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P.*, 275 F.3d 1066, 1074 (Fed. Cir. 2002).

This standard is met only when one has obtained "actual evidence" in the pre-filing investigation sufficient to establish a belief that "each claim limitation" of the allegedly infringed claims "reads on the accused device either literally or under the doctrine of equivalents." *Id.* Dell avers that Lucent brought this suit without a proper basis for alleging infringement, and Dell has made that averment the subject of an unclean hands defense and counterclaim.

In further support of its unclean hands defense and counterclaim Dell has additionally averred that one or more of the patents in suit were procured by failure to disclose material prior art to the United States Patent Office.  This Court has held that the defense of unclean hands is not identical to that of inequitable conduct before the PTO even though they "may well rest on the same facts and may result in identical outcomes", *France Telecom S.A. v. Novell, Inc.*, No. 102-437-GMS, 2002 WL 31355255, at *3-4 (D. Del. Oct. 17, 2002) (attached hereto as Exhibit 1).  Ignoring that holding, Lucent rests its motion on the supposition that those defenses are identical, and then proceeds to improperly apply the more stringent pleading requirements of

Rule 9(b) to Dell's additional averment that one or more of the patents in suit were procured by failure to disclose material prior art.

To compound that error, Lucent also ignores that the 'prior art' averment is *in addition* to the independent averment that Lucent brought this suit without a proper basis for alleging infringement. Lucent then proceeds —without citation of any authority— to indiscriminately treat the independent 'no proper basis' averment as subject to the more stringent pleading requirements of Rule 9(b).

## II.     NATURE AND STAGE OF THE PROCEEDINGS AND STATEMENT OF FACTS

This is an action brought by Lucent asserting patent infringement by Dell. In its Answer and Counterclaim, Dell has pleaded (among other things) that:

> The patents in suit are unenforceable because of Lucent's <u>unclean hands</u>, including but not limited to *assertion of the patents in suit without proper basis* for alleging infringement[1], **and** *procurement* of one or more of the patents in suit *by failure to disclose material prior art to the United States Patent Office.*

(Answer and Counterclaim of Dell Computer Corporation at ¶¶61 and 71, emphasis added.) In it's motion, Lucent contends that Rule 9(b) of the Federal Rules of Civil Procedure mandates that Dell's defense of unclean hands be stricken under Rule 12(f)[2] and that Dell's counterclaim based on unclean hands be dismissed under Rule 12(b).

---

[1]    *See Antonious*, 275 F.3d at 1074. (Pre-filing actions in infringement cases "are evaluated using a standard of objective reasonableness". This standard is met only when one has obtained "actual evidence" in a pre-filing investigation sufficient to establishing a belief for the allegedly infringed claims that "each claim limitation reads on the accused device either literally or under the doctrine of equivalents.")

[2]    To the extent that the motion is based on Rule 12(f), it may not be timely. Rule 12(f) requires that such a motion be filed "before responding to a pleading." Lucent's motion was filed along with Lucent's responsive pleading.

Although Rule 8 requires only a "short and plain" statement of a claim or defense, Rule 9(b) requires that " [i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Dell's pleading of unenforceability based on unclean hands contains no such averments. Nevertheless, Lucent contends that the specificity requirements of Rule 9(b) apply and have not been met.

The apparent basis for that contention is that Dell has added to its averment of Lucent's *assertion of the patents in suit without proper basis* an averment of Lucent's *failure to disclose material prior art to the United States Patent Office.* Lucent treats the latter **part** of the pleading as an averment of inequitable conduct before the Patent Office, although again the pleading contains no such averment. *See* Lucent's Opening Brief at 3 ("Dell rests its unenforceability allegation *in part* upon alleged unclean hands due to inequitable conduct.")(emphasis added).

Having unilaterally transformed that part of Dell's pleading to one of inequitable conduct before the Patent Office, Dell then finds that part inadequate under *EMC Corporation v. Storage Technology Corp.*, 921 F.Supp. 1261 (D. Del. 1996), which has treated inequitable conduct before the Patent Office like a pleading of fraud on the Patent Office and therefore subject to the "particularity requirement of Rule 9(b)." *Id.* at 1263. However, Lucent completely ignores that Dell did not plead inequitable conduct before the Patent Office (yet)[3], and also ignores that

---

[3]   If and when Dell discovers evidence that supports a conclusion that material prior art was withheld from the Patent Office with intent to deceive, Dell may then plead inequitable conduct. For now, Dell has only pleaded "failure to disclose material prior art" and has done so not in support of an inequitable conduct (fraud on the Patent Office) defense, but as an additional aspect of an unclean hands defense. *See* Section III.C, *infra*.

3

applicability of the fraud pleading requirements of Rule 9(b) to inequitable conduct before the Patent Office may not be a completely settled issue[4].

More importantly, even if Dell's pleading of *failure to disclose material prior art to the United States Patent Office* is deemed transformed into a pleading of inequitable conduct before the Patent Office, and even if inequitable conduct before the Patent Office is deemed subject to the specificity requirements of Rule 9(b), that would not make Dell's averment of Lucent's *assertion of the patents in suit without proper basis* subject to those specificity requirements. Yet, Lucent inappropriately applies that specificity requirement to both parts of Dell's pleading. *See* Lucent's Opening Brief at 1 ("But Dell fails to plead unenforceability counterclaim and defense with the specificity that the Federal Rules of Civil procedure require of claims and defenses of this nature.")(emphasis added).   For that reason alone, Lucent's motion must be denied.

## III.     ARGUMENT

### A.     Legal Standards

"Motions to strike affirmative defenses are disfavored." *France Telecom S.A*, 2002 WL 31355255, at *1 (Ex. 1).  Moreover, when ruling on such a motion all facts must be construed in favor of the non-moving party.  *Id.*  That is likewise true when ruling on motions to dismiss.  *See Xilinx, Inc. v. Altera Corporation*, No. C 93-20409 RMW (EAI), 1993 WL 782236, at *2 (N.D. Cal. Oct. 25, 1993) (Ex. 2).

Although all pleadings are subject to the "liberal pleading rules of Rule 8,"[5] Rule 9(b) requires that pleadings of fraud or mistake be "stated with particularity."  *Id.* at *2.  However,

---

[4]    *See Agere Systems Guardian Corp.*, 190 F.Supp.2d 726, 733-734 (D. Del. 2002); *Xilinx, Inc. v. Altera Corporation*, No. C 93-20409 RMW (EAI), 1993 WL 767688, at *1 (N.D. Cal. Oct. 25, 1993) (attached hereto as Exhibit 2).

4

this Court applies a liberal notice pleading philosophy even to the particularity requirement of Rule 9(b). *France Telecom S.A.*, 2002 WL 31355255, at *1 (Ex.1).

The particularity requirement of Rule 9(b) has been applied by this Court to charges of inequitable conduct before the PTO, although this Court has also recognized that as a majority but not uniform or settled rule. *See Agere Systems Guardian Corp.*, 190 F.Supp.2d 726, 733-734 (D. Del. 2002); *EMC Corporation*, 921 F.Supp. at 1263. In any event, the defense of unclean hands is not identical to that of inequitable conduct before the PTO even though they "may well rest on the same facts and may result in identical outcomes." *France Telecom S.A.*, 2002 WL 31355255, at *3-4 (Ex. 1). Moreover, an unclean hands defense not founded on allegations of fraud is not subject to the technical requirements of Rule 9(b). *Xilinx, Inc.*, 1993 WL 767688, at *2 (Ex. 2).

### B.    Dell's Unclean Hands Defense Is Sufficiently Bottomed On The Averment Of Lucent's *Assertion Of The Patents In Suit Without Proper Basis* For Alleging Infringement

The defense of unclean hands remains "a broader defense [than inequitable conduct before the PTO that is] less amenable to a particular checklist of elements."[6] *France Telecom S.A.*, 2002 WL 31355255, at *3 (Ex. 1). It is a defense which "really means that [the]... plaintiff's fault" is relevant to whether a plaintiff is entitled to claim relief. *Scheiber v. Dolby*

---

[5]  Fed. R. Civ. P. 8 requires a "short and plain" statement of a claim or defense. *France Telecom S.A.*, at *2 (Ex. 2). With respect to an unclean hands defense, such a statement need only put the other party on notice as to the "nature of the alleged defense of unclean hands." *Xilinx, Inc.*, 1993 WL 767688 at *2 (Ex. 2).

[6]  *See France Telecom S.A.*, at *3-4 ("The doctrine of unclean hands ... is "not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion. Accordingly, one's misconduct need not necessarily have been of such a nature as to be punishable as a crime or as to justify legal proceedings of any character. Any willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the invocation of the maxim.) (Ex. 1).

*Laboratories, Inc.,* 293 F.3d 1014, 1021 (7th Cir. 2002).   According to that principle, it is appropriate to withhold a remedy when "that would encourage or reward" actions not in accordance with the requirements of law. *Id.*

In this regard, it is beyond question that bringing an infringement suit without proper basis is not in accordance with the requirements of law.[7]   As such, Dell's pleading that "[t]he patents in suit are unenforceable because of Lucent's <u>unclean hands,</u> including but not limited to *assertion of the patents in suit without proper basis* for alleging infringement" is itself a sufficient defense.

Lucent's complaint that "Dell fails to plead *any* facts to support" this defense (*see* Lucent's Opening Brief at 4) is wide of the mark.   It glosses over the pleaded fact that patents in suit were asserted without proper basis for alleging infringement, and is in reality an assertion that more specific facts are required.

The law is otherwise.   The defense bottomed on an averment of assertion of the patents without proper basis for alleging infringement is not bottomed on fraud, so Lucent's attempt to make it subject to the specific pleading requirements of Rule 9(b) is without any underpinning whatsoever in the Rule or in the case law. *See Xilinx, Inc.,* 1993 WL 767688, at *2. (holding particularity requirements of Rule 9(b) inapplicable to unclean hands defense based on bringing suit in bad faith) (Ex. 2).

---

[7]    Such an assertion without proper basis is clearly a bad faith assertion.  As already mentioned at the outset of this opposition to Lucent's Motion, a good faith assertion must be properly based on a pre-filing investigation which produces "actual evidence" (as measured under a standard of "objective reasonableness") sufficient to establish a belief for the allegedly infringed claims that "each claim limitation reads on the accused device either literally or under the doctrine of equivalents." *See Antonious,* 275 F.3d at 1074. Even Lucent acknowledges that an unclean hands defense can be based on  "<u>bad faith</u> directly related to the matter at issue". *See* Lucent's Opening Brief at 4.

6

C.   Dell's <u>Additional</u> Allegation Of *"Procurement* Of One Or More Of The Patents In Suit *By Failure To Disclose Material Prior Art To The United States Patent Office"* Cannot Render Insufficient The Otherwise Sufficient Pleading

Lucent illogically suggests that the otherwise sufficient pleading is somehow rendered insufficient by the <u>additional</u> averment of procurement of one or more of the patents in suit by failure to disclose material prior art.   Besides the lack of logic, Lucent's position is also otherwise flawed.

That is because Lucent is treating the additional averment as an averment of inequitable conduct before the Patent Office.   But inequitable conduct is not pleaded.

It is of no moment that if inequitable conduct *were* pleaded it would also involve an averment of failure to disclose material prior art.   This Court has already held that the unclean hands defense is not identical to the defense of inequitable conduct before the PTO even though they "may well rest on the same facts and may result in identical outcomes." *France Telecom S.A.,* 2002 WL 31355255, at *3-4 (Ex. 1).

Furthermore, the failure to cite material prior art is a proper part of the pleaded non fraud-based unclean hands defense without regard to whether that failure also rises to the level of inequitable conduct (fraud) before the Patent Office.   Unclean hands is a defense that makes plaintiff's fault relevant. *Scheiber,* 293 F.3d at 1021.   There is no absolute requirement that the fault rise to the level of fraud.

Lucent nevertheless complains that Dell's pleading does not mention with particularity any prior art that was not disclosed.   But since the averment is part of a non fraud-based unclean hands defense, there is no requirement for that specificity.   Under the liberal notice pleading

7

philosophy applied by this Court (*see France Telecom S.A.*, 2002 WL 31355255, at *1 (Ex. 1).), Lucent has been sufficiently placed on notice that Dell maintains its position that Lucent failed to disclose material prior art.

For Lucent to suggest otherwise is disingenuous. Indeed, Lucent is fully aware that Dell's counsel sent a letter to Lucent identifying a specific prior art reference to one of the asserted patents (U.S. Patent No. 4,958,226) which names as an inventor, Mr. Barin G. Haskell. *See* attached Exhibit 3, U.S. Patent No. 4,958,226, and Exhibit 4, Letter from Mr. Joel M. Freed to Mr. Stephen Samuels dated February 3, 2003 at pg. 2. The prior art reference was none other than a chapter taken from one of Mr. Haskell's own books, entitled "Digital Pictures: Representations and Compression." In the letter, Mr. Freed highlighted the materiality of the non-disclosed prior art reference by specifically requesting an explanation as to "what [in the '226 patent] is claimed that is not in Chapter 5" of the reference. *Id*.

8

IV.    **CONCLUSION**

Based on all the foregoing, Dell respectfully requests that the Court deny Lucent's Motion to Strike Dell's Affirmative Defense of Unenforceability and to Dismiss Dell's Counterclaim to the Extent it is Based on that Affirmative Defense.    In the alternative, Dell respectfully requests leave to amend the Answer and Counterclaim of Dell Computer Corporation with more particularity if Court determines that Rule 8 and/or Rule 9(b) requires such an amendment.

Respectfully Submitted,

**CONNOLLY BOVE LODGE & HUTZ, LLP**

By: _____
R. Eric Hutz (ID # 2702)
James D. Heisman (ID #2746)
1220 Market Street
Post Office Box 2207
Wilmington, DE 19899
(302) 658-9141
Attorneys for Plaintiff
*Dell Computer Corporation*

**OF COUNSEL**
Joel M. Freed
Joseph A. Micallef
**ARNOLD & PORTER**
555 12th Street NW
Washington, DC 20004
(202) 942-5000

**DATE:**   April 14, 2003

## CERTIFICATE OF SERVICE

I certify that today on April 14, 3002, a copy of the foregoing Dell's Reply to Lucents' Motion to Strike Dell's Affirmative Defense of Unenforceability and to Dismiss Dell's Counterclaim to the Extent it is Based on that Affirmative Defense was served upon counsel for plaintiffs as follows:

**BY HAND**
Josy W. Ingersoll
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Post Office Box 391
Wilmington, Delaware  19899-0391

**FEDERAL EXPRESS**
John M. Desmarais
Robert A. Appleby
Michael E. Stimson
Kirkland & Ellis
153 East 53rd Street
New York, New York 10022-4675

R. Eric Hutz

**H**
Only the Westlaw citation is currently available.


United States District Court,
D. Delaware.

FRANCE TELECOM S.A., Telediffusion de France
S.A., and U.S. Philips Corp.,
Plaintiffs,
v.
NOVELL, INC., Defendant.

**No. 102-437-GMS.**

Oct. 17, 2002.


MEMORANDUM AND ORDER

SLEET, District J.

**I. INTRODUCTION**

*1 On May 17, 2002, the plaintiffs, France Telecom S.A. ("France Telecom"), TéléDiffusion de France S.A. ("TDF"), and U.S. Philips Corp. ("Philips") (collectively "the plaintiffs") filed this action alleging patent infringement of a computer software system for accreditating message signatures. The defendant, Novell, Inc. ("Novell"), filed its Answer and Counterclaim on July 16, 2002 (D.I.7). In its Answer, the defendant asserts ten affirmative defenses, including the affirmative defense of "unclean hands." The plaintiffs move to strike this fourth affirmative defense (D.I.8), and the defendant subsequently moved for leave to file an amended Answer (D.I.12). For the following reasons, the court will deny the plaintiffs' motion and grant the defendant's motion.

**II. DISCUSSION**

**A. Defendant's Motion for Leave to Amend Its Answer**

The defendant moves to amend its Answer pursuant to Federal Rule of Civil Procedure 15(a). Rule 15(a) provides that a party may amend its complaint "by leave of court ... and leave shall be freely given when justice so requires." FED. R. CIV. P. 15(a). Leave should be freely granted unless there is an apparent or declared reason for denial, e.g., undue delay, bad faith, or dilatory motive on the part of the movant; undue prejudice to the opposing party; or futility of the amendment. See Foman v. Davis, 371 U.S. 178,

182 (1962); see also In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1434 (3d Cir.1997). Leave to amend is particularly warranted when pleadings lack the requisite factual specificity for a particular cause of action. See District Council 47 v. Bradley, 795 F.2d 310, 316 (3d Cir.1986). Indeed, "[t]he clearest cases for leave to amend are correction of an insufficient claim or defense and amplification of previously alleged claims or defenses." U.S. v. Teeven, 1992 WL 683682, at *7 (D.Del. Oct. 27, 1992).

The plaintiffs object to Novell's motion to amend its Answer because, they argue, it is futile, as the amended Answer would remain subject to a motion to strike due to redundancy. For the reasons set out in Part B below, the court finds the two defenses are not redundant, and therefore the amendment is not futile.

Nor would the amendment prejudice the plaintiffs by complicating discovery and confusing issues at trial, as they assert. Indeed, as the plaintiffs imply in their briefs, the more particularized amended Answer will benefit the parties by providing notice of the nature and grounds of the defense and by narrowing discovery and preparation efforts. [FN1] None of the other reasons for denial, such as undue delay, bad faith, or dilatory motive on Novell's part, has been alleged, and the court finds no evidence of such. The defendant's motion for leave to amend the Answer is, therefore, granted.

> FN1. Referring to the defendant's unamended Answer, the plaintiffs asserted: "The unclean hands defense will prejudice plaintiffs if it remains in its present form .... The undefined nature of defendant's current pleading could permit defendant to change the theory of its defense, without putting plaintiffs on notice that this has occurred .... Defendant could also utilize the broad and undefined nature of its 'unclean hands' defense to rationalize 'fishing expeditions' on matters that would otherwise not properly be subject to discovery." Plaintiffs' Opening Brief in Support of Plaintiffs' Motion to Strike Defendant's Fourth Affirmative Defense of Unclean Hands at 7-8. These potential problems will be avoided by the amended Answer.

**B. Plaintiffs' Motion to Strike Defendant's Fourth Affirmative Defense of Unclean Hands**

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

The plaintiffs move to strike the defendant's fourth affirmative defense of unclean hands pursuant to Federal Rule of Civil Procedure 12(f). Rule 12(f) provides that "the court may order stricken from any pleading any insufficient defense or any redundant ... matter." FED. R. CIV. P. 12(f). Motions to strike affirmative defenses are disfavored. *Proctor & Gamble Co. v. Nabisco Brands, Inc.,* 697 F.Supp. 1360, 1362 (D.Del.1988). When ruling on such a motion, "the [c]ourt must construe all facts in favor of the nonmoving party ... and deny the motion if the defense is sufficient under the law."

**\*2** In its unamended form, the defendant's fourth affirmative defense reads: "The Complaint and the relief requested therein are barred, in whole or in part, by the doctrine of unclean hands." The plaintiffs contend this articulation is insufficient and redundant. They allege it is insufficient because it provides no notice of the unclean hands defense and because it does not detail the relationship between the plaintiffs' alleged inequitable conduct and the plaintiffs' claim. [FN2] Even if amended, the plaintiffs object, the defense is redundant, because Novell also asserts the affirmative defense of inequitable conduct. The plaintiffs maintain that these two affirmative defenses share identical elements and standards of proof. If one fails, the plaintiffs contend, so must the other. The court will now address these objections in turn.

> FN2. Although the plaintiffs seem to have withdrawn the insufficiency objections following the defendant's motion for leave to amend the Answer, the court will address the insufficiency objection *vis-a-vis* the amended Answer.

1. Sufficiency per Rule 8

Rule 8 of the Federal Rules of Civil Procedure requires a "short and plain" statement of a claim or defense. FED. R. CIV. P. 8(a) and (b). It is well settled that the Federal Rules intend a liberal pleading standard. *See Leatherman v. Tarrant County Narcotic Intelligence & Coordination Unit,* 507 U.S. 163, 168 (1993) (holding that federal courts may not impose a more demanding standard of pleading beyond "the liberal system of 'notice pleading' set up by the Federal Rules"). Indeed, Rule 8 expressly mandates that "[e]ach avermentof a pleading shall be simple, concise, and direct." FED. R. CIV. P. 8(e).

The defendant's fourth affirmative defense, as amended, comprises six short paragraphs stating the basis for the unclean hands defense, including the context of the alleged misconduct. This context includes the title, author, and publication date of the reference allegedly withheld by the plaintiffs from the Patent and Trademark Office ("PTO"). The amended affirmative defense clearly meets the threshold sufficiency requirements of Rule 8.

2. Sufficiency Per Rule 9

Rule 9 of the Federal Rules of Civil Procedure requires that all pleadings of fraud or mistake "shall be stated with particularity." FED. R. CIV. P. 9(b). Such averments, however, remain subject to the liberal pleading requirements of Rule 8. *See In re Westinghouse Sec. Litig.,* 90 F.3d 696, 703 (3d Cir.1996); *see generally* 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1281, at 520-21 (1990) (pleading with particularity under Rule 9(b) should be done consistently with the general philosophy of Rule 8); 2A JAMES W. MOORE, MOORE'S FEDERAL PRACTICE P 8.13, at 8-58 (2d ed.1995) (the mandate of Rule 8 applies "even where the Rules command particularity, as in the pleading of fraud under Rule 9(b)") (footnote omitted). In the context of alleged inequitable conduct before the PTO during a patent prosecution, "pleadings that disclose the name of the [allegedly withheld] relevant prior art and disclose the acts of the alleged fraud fulfill the requirements of Rule 9(b)." *EMC Corp. v. Storage Tech. Corp.,* 921 F.Supp. 1261, 1263 (D.Del.1996).

**\*3** To the extent the defendant's fourth affirmative defense involves fraud and is subject to the particularity requirement of Rule 9(b), this requirement also is satisfied by Novell's amendment. As noted above, the amended Answer discloses the title, author, and publication date of the relevant prior art allegedly withheld from the PTO. Novell's amended fourth affirmative defense suffices "to apprise the other party of what is being alleged in a manner sufficient to permit responsive pleadings" as Rule 9 requires. 5 WRIGHT & MILLER § 1296 (1990).

3. Nexus between the Unclean Hands Defense and Plaintiffs' Claim

The defense of unclean hands requires "an immediate and necessary relation" between the plaintiff's alleged misconduct and the equity sought by that party. *See Keystone Driller Co. v. General Excavator Co.,* 290 U.S. 240 (1933) ( "[Courts] apply

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

the maxim requiring clean hands only where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation."). Indeed, in the Third Circuit, this nexus is "the primary principle guiding application of the unclean hands doctrine." *New Valley Corp. v. Corporate Prop. Assocs. 2 & 3*, 181 F.3d 517, 525 (3d Cir.1999).

The plaintiffs object to Novell's unamended fourth affirmative defense because, they argue, it fails to disclose any relationship between the alleged inequitable conduct constituting unclean hands, and the patent infringement claim at issue. The amended fourth affirmative defense, however, makes clear this relationship. Novell alleges the defendants knowingly, and with an intent to deceive, failed to disclose relevant and material prior art to the Patent and Trademark Office. If such conduct constitutes unclean hands, it would render the patent unenforceable, and the present infringement action necessarily would fail. *See generally Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240 (1933). The relationship between the alleged inequitable conduct on the part of the plaintiffs and the equity sought by them has been made sufficiently clear by Novell's amended Answer.

4. Redundancy

The plaintiffs object to Novell's fourth affirmative defense of unclean hands as redundant because it is indistinguishable from Novell's third affirmative defense of inequitable conduct. The elements and standards of proof for the two defenses are identical, the plaintiffs contend, in the context of non-disclosure of material prior art to the PTO during the procurement of a patent.

The court is unconvinced that the two defenses are "identical," even in the context of non-disclosure to the PTO. The Federal Circuit has defined inequitable conduct as the "failure to disclose material information, or submission of false material information, with an intent to deceive." *Kingsdown Medical Consultants, Ltd. v. Hollister, Inc.,* 863 F.2d 872 (Fed.Cir.1988). Unclean hands, however, remains a broader defense less amenable to a particular checklist of elements. The doctrine of unclean hands

*4 necessarily gives wide range to the equity court's use of discretion .... It is "not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion." Accordingly one's misconduct need not necessarily have been of such a nature as to be punishable as a

crime or as to justify legal proceedings of any character. Any willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the invocation of the maxim.

*Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co .,* 324 U.S. 806, 815 (1945) (citation omitted). Although the two affirmative defenses in the instant case may well rest on the same facts and may result in identical outcomes, the defenses themselves are not necessarily identical. Particularly at this early stage in the proceedings and given the disfavor with which motions to strike affirmative defenses are received, the court will allow the fourth affirmative defense to remain, to succeed or fail as it may in the remaining litigation.

III. CONCLUSION

For the aforementioned reasons, IT IS HEREBY ORDERED that:

1. The plaintiffs' motion to strike the defendant's fourth affirmative defense of unclean hands (D.I.8) is DENIED.

2. The defendant's motion for leave to amend its Answer (D.I.12) is GRANTED.

3. The defendant shall file its amended Answer within 10 days of the date of this order.

2002 WL 31355255 (D.Del.)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

**H**

United States District Court,
N.D. California.

XILINX, INC., a Delaware Corporation, Plaintiff,
v.
ALTERA CORPORATION, a, California
Corporation, Defendant.

**No. C 93-20409 RMW (EAI).**

Oct. 25, 1993.

ORDER GRANTING PLAINTIFF'S MOTION TO
STRIKE

WHYTE, District Judge.

*1 The motion to strike of plaintiff XILINX, INC. ("Xilinx"), was heard on October 22, 1993. The court has read the moving papers and the opposition papers of defendant ALTERA CORPORATION ("Altera") and heard the oral argument of counsel. GOOD CAUSE APPEARING therefor,

The court grants plaintiff's motion to strike defendant's affirmative defense of inequitable conduct in the United States Patent and Trademark Office because defendant has not pleaded fraud with particularity as required by Federal Rule of Civil Procedure 9(b). The court also grants plaintiff's motion to strike defendant's affirmative defense of unclean hands, because that defense is not pleaded sufficiently to give fair notice to plaintiff.

I. Background

On June 7, 1993, Xilinx filed suit against Altera alleging infringement of two patents: United State Patent No. 4,870,302 ("the '302 patent" or "Freeman patent") and United States Patent No. 4,642,487 ("the '487 patent" or "Carter patent"). Both these patents deal with integrated circuits which perform logic functions.

In its answer filed on July 28, 1993, Altera asserted a number of affirmative defenses. The two affirmative defenses which are at page five of Altera's Answer and are as follows: Upon information and belief, the '302 and '487 patents are unenforceable because they were obtained by Xilinx through inequitable conduct in the United States Patent and Trademark Office.
22. Upon information and belief, Xilinx's claims for equitable relief are barred by the doctrine of unclean hands.

Xilinx argues that both these affirmative defenses must be pleaded with particularity pursuant to Federal Rule of Civil Procedure 9(b).

II. Legal Standards

Motions to strike are governed by Federal Rule of Civil Procedure 12(f) which provides that "the court may order stricken from the pleading any insufficient defense ...."

Federal Rule of Civil Procedure 9(b) provides:
In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.

As such, "allegations of fraud must be pleaded with specificity as to time, place and content of any misrepresentations or else be stricken." Intel Corp. v. Hyundai Electronics America, Inc., 692 F.Supp. 1113, 1116 (N.D. Cal. 1987).

III. Analysis

Notably, the Federal Circuit has never ruled on the issue of whether or not Federal Rule 9(b) applies to the affirmative defense of inequitable conduct. Xilinx argues that the Federal Circuit implicitly adopted this rule when it affirmed the district court's decision in Solarex Corporation v. Arco Solar, Inc., 870 F.2d 642 (Fed. Cir. 1989), affirming, 121 F.R.D. 163 (E.D.N.Y. 1988). However, the issue of Rule 9(b)'s application to the affirmative defense of inequitable conduct was not on appeal and was not addressed by the Federal Circuit.

Despite the lack of Federal Circuit guidance, a growing number of district courts have held that Rule 9(b) is applicable to averments of inequitable conduct on the Patent Office. See e.g., Intel, supra, 692 F.Supp. at 1115 (Aguilar, J.); Micro Motion, Inc. v. Exac Corp., 112 F.R.D. 2, 3 (N.D.Cal. 1985) (Aguilar, J.); IPPV Enterprises v. Cable/Home Communications, 25 U.S.P.Q.2d 1895 (S.D. Cal. 1993); Energy Absorption Sys. v. Roadway Safety Servs., 28 U.S.P.Q.2d 1079 (N.D. Ill. 1992); Sun-Flex Co., Inc. v. Software Computer Products Corp.,

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

18 U.S.P.Q.2d 1171 (N.D.Ill. 1990); *Wolf v. Wagner Spray Tech. Corp.,* 10 U.S.P.Q.2d 1690 (S.D.N.Y. 1989); *Scripps Clinic & Research Foundation, Inc. v. Baxter Travenol Laboratories, Inc.,* 7 U.S.P.Q.2d 1562 (D. Del. 1988); *G & H Technology, Inc. v. United States,* 227 U.S.P.Q. 491 (Cl.Ct. 1985).

**\*2** As the above citations indicate, at least two of the district court cases holding that 9(b) applies are from this district. Notably, however, there is also a case from this district which on its face holds the opposite. In *Quantum Corp. v. Western Digital Corp.,* 10 U.S.P.Q.2d 1712 (N.D. Cal. 1988), Judge Aguilar refused to strike the following affirmative defense under Rule 9(b):

U.S. Patents 4,396,959; 4,639,863; and Re. 32,075, are invalid for failure to comply with the requirements of Title 35, U.S.Code and are unenforceable.

In so holding, the court stated, "plaintiff's reliance on Rule 9(b) is misplaced. Inequitable conduct before the Patent Office does not give rise to the level of common law fraud which is the subject of Rule 9(b)." *Quantum, supra,* 10 U.S.P.Q.2d at 1713. The court's opinion did not distinguish, discuss or even recognize its prior holdings to the contrary in *Micro Motion* and *Intel.* The court seemed to rely to some extent on the fact that the affirmative defense pleaded by the defendants was one of the defenses cited in 35 U.S.C. § 282. How or why this moved the court to hold differently than it had in the past is unclear, however,

Despite the holding in *Quantum,* the majority of district courts have held that Rule 9(b) does apply and this court agrees. One of the most recent district court decisions dealing with this issue noted that, "the Federal Circuit has expressed frustration with the large number of unsupported allegations of inequitable conduct in patent case." *IPPV, supra* 25 U.S.P.Q.2d at 1895 (citing *Burlington Industries, Inc. v. Dayco Corporation,* 849 F.2d 1814, 1818 (Fed. Cir. 1988) and *FMC Corporation v. Manitowoc Company,* 835 F.2d 1411, 1415 (Fed. Cir. 1987)).

Given the Federal Circuit's expressed frustration and the weight of authority in favor of applying Rule 9(b), the court holds that Rule 9(b)'s particularity requirements apply to the affirmative defense of inequitable conduct.

The affirmative defense of unclean hands presents a slightly different issue, however. In *Intel,* the court

held that the pleading requirements of Rule 9(b) applied to the defense of unclean hands if the allegation of unclean hands involved the elements of fraud. *Intel, supra,* 692 F.Supp. at 1117. In this case, Altera's opposition to the motion to strike makes clear that the defense of unclean hands is not based on allegations of fraud on the Patent Office as was the case in *Intel.* Rather, it appears from the opposition that Altera is claiming that Xilinx brought this suit in bad faith. Thus, Rule 9(b) does not technically apply. However, Xilinx should at least be notified of the nature of the alleged defense of unclean hands. As such, the court strikes this affirmative defense but will not hold Altera to the particularity requirement of Rule 9(b).

### IV. Order

Given the above discussion and GOOD CAUSE APPEARING therefor,

The court grants Xilinx's motion to strike Altera's affirmative defenses of "inequitable conduct" and "unclean hands" at paragraphs 20 and 22 of the Answer. Pursuant to Federal Rule of Civil Procedure 15 (a), Altera is granted leave to file an amended pleading in compliance with this order within twenty days of the date of this order.

1993 WL 767688, 1993 WL 767688 (N.D.Cal.), 33 U.S.P.Q.2d 1149

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

# United States Patent [19]

## Haskell et al.

[11] **Patent Number:** **4,958,226**

[45] **Date of Patent:** **Sep. 18, 1990**

[54] **CONDITIONAL MOTION COMPENSATED INTERPOLATION OF DIGITAL MOTION VIDEO**

[75] Inventors: **Barin G. Haskell,** Tinton Falls, N.J.; **Atul Puri,** Bronx, N.Y.

[73] Assignee: **AT&T Bell Laboratories,** Murray Hill, N.J.

[21] Appl. No.: **413,520**

[22] Filed: **Sep. 27, 1989**

[51] Int. Cl.⁵ ............................................. H04N 7/12
[52] U.S. Cl. ..................................... 358/136; 358/135
[58] Field of Search ..................... 358/135, 136, 133

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,218,703 | 8/1980 | Netravali et al. . | |
| 4,218,704 | 8/1980 | Netravali et al. . | |
| 4,383,272 | 5/1983 | Netravali et al. . | |
| 4,442,454 | 4/1984 | Powell ..................... | 358/167 |
| 4,460,923 | 7/1984 | Hirano et al. ................. | 358/136 |
| 4,665,436 | 5/1987 | Osborne et al. ............... | 358/135 X |
| 4,667,233 | 5/1987 | Furukawa ..................... | 358/136 |
| 4,727,422 | 2/1988 | Hinman ....................... | 358/135 X |
| 4,782,387 | 11/1988 | Sabri et al. ................. | 358/135 |

### OTHER PUBLICATIONS

"Movement-Compensated Frame-Frequency Conversion of Television Signals," H. Yamaguchi, T. Sugi and K. Kinuhata, IEEE Transactions on Communications, vol. COM-35, No. 10, Oct. 1987, pp. 1069-1082.

*Primary Examiner*—James J. Groody
*Assistant Examiner*—Victor R. Kostak
*Attorney, Agent, or Firm*—Henry T. Brendzel

[57] **ABSTRACT**

Motion digital video is encoded and decoded by a motion compensated interpolation method and apparatus. In accordance with the method, selected frames of the video are interpolated in the decoder with the aid of interpolation correction codes that are generated in the encoder and sent to the decoder. In an encoder embodiment that interpolates half of the frames, every other frame is encoded and decoded within the encoder. The decoded versions of adjacent frames are appropriately combined and compared to the interleaved camera frame that is to be interpolated in the decoder. The differences, which correspond to "pels correction" information, are encoded and quantized. Those that exceed a predetermined threshold value are added to the encoder's output buffer. The inverse operation is carried out in the decoder. That is every pair of decoded frames is averaged and combined with the decoded "pels correction" information to form the interpolated frames.

**12 Claims, 2 Drawing Sheets**



FIG. 1



FIG. 2



4,958,226

1

# CONDITIONAL MOTION COMPENSATED INTERPOLATION OF DIGITAL MOTION VIDEO

## BACKGROUND OF THE INVENTION

This invention relates to signal coding and, more particularly, to a method and apparatus for encoding and decoding video signals of moving images.

Video signals typically originate from video cameras. The bandwidth of video signals is quite substantial and consequently, practioners in the art have tried to reduce the bandwidth of these signals without unduly degrading the images. Typically to reduce bandwidth the video signals are encoded and redundancies in the encoded signals are extracted and deleted. Different techniques are used in the art and some are better suited for still images, while others are better suited for moving images. One of the techniques for reducing the bandwidth of moving images is generally referred to as motion compensated predictive coding.

In conventional motion compensated predictive coding, each video frame is first partitioned into square blocks of picture elements (pels); such as blocks fo 8 pels by 8 pels. Each block is coded, in turn, and the developed encoded sequence is transmitted over a communications channel to a decoder. The communications channel may be, or may include, a storage element. Next, a determination is made as to whether or not the pels of the block have changed significantly compared with the previous frame. If not, an indicator signal is sent which signifies to the decoder that it needs to merely repeat the pels of that block from the previous frame obtain the pels for the current block. This is known as "Conditional Replenishment". If the pels have changed since the previous frame, an attempt is made to determine the best estimate of motion that is occurring in the block. This is frequently done by a "Block Matching Motion Estimation" technique wherein the pels of the current block are successively compared with various small shifts of the corresponding block in the previous frame. The shift that gives the best match is deemed to be the "best estimate" of the displacement in the block's image between frames, and the amount of this shift, called the "Motion Vector", is selected and sent to the decoder.

The pels of the current block are then compared with those of the "best" shifted block from the previous frame to see if there is a significant difference. If not, an indicator signal is sent to the decoder, which merely causes the pels of the shifted block from the previous frame to be repeated for the pels for the current shifted block. Such blocks are said to have been successfully "Motion Compensated". However, if there is a significant difference between the two blocks, the difference is encoded and sent to the decoder so that the pels of the current block may be more accurately recovered. Coding of this difference is typically performed by means of the "Discrete Cosine Transform" (DCT).

The volume of code that is generated by the above procedure is variable. It can be appreciated, for example, that image changes that do not correspond to a uniform translation, or motion, of the image may require substantial encoding to describe the deviation of a block from its best translated replica. On the other hand, when the image does not change between successive frames, then there is a minimal amount of information that needs to be encoded. To accommodate these potentially wide variations in the amount of code that

2

needs to be transmitted, typical encoders include a FIFO memory at the output, to serve as a buffer.

The FIFO is not a panacea. For a given transmission rate, when an excessive volume data is generated, there is always a danger that the FIFO would overflow. When it does, coding must stop until the transmission channel can empty the FIFO sufficiently so that new data to be accepted into it. Since it is inconvenient to stop encoding in the middle of a frame, most systems discard an entire frame whenever the FIFO buffer is full, or nearly so. To compensate for the loss of a frame, such systems cause the decoder to repeat its most recently available frame. Frame repeating results in moving objects in the scene being reproduced in a jerky fashion, rather than in the smooth way that would occur if frame repeating were not invoked.

There have been some suggestions for improving the quality of the repeated frames in order to make them more faithfully resemble the original. One technique is called "Motion Compensated Interpolation". With this technique, instead of simply repeating the pels from the previous frame, the Motion Vectors are used to laterally displace the block by the appropriate amount prior to display. In other words, this method creates the missing block of pels by averaging over the immediately previous and following blocks of pels that are available to the decoder. While this might seem to be a good idea, experimental results show that when the images of successive blocks do not represent translational motion, the reproduced image may be worse than with frame repeating. Although it has been observed that this degradation is caused by a relatively few pels that do not conform to the assumption of translational motion, putting these pels in the wrong place creates highly visible artifacts.

## SUMMARY OF THE INVENTION

In accordance with the principles of this invention, pels that cause highly visible artifacts are detected, and corresponding correction information is transmitted to the decoder. The amount of correction information that must be sent is relatively small, and the improvement in picture quality is quite large.

Since the interpolation technique that employs the principles of this invention yields good results, it has been found acceptable to interpolate every other frame, or two out of three frames, on a regular basis. The benefit of such regular interpolation is a reduced transmission bit rate which results from the fact that the pel correction information comprises fewer bits than the actual frame coding information.

In an encoder embodiment that interpolates half of the frames, every other frame is encoded and thereafter decoded within the encoder. The decoded versions of adjacent frames are appropriately combined and compared to the interleaved camera frame that is to be interpolated in the decoder. The differences, which correspond to "pels correction" information, are encoded and quantized. Those that exceed a predetermined threshold value are added to the encoder's output buffer. The inverse operation is carried out in the decoder. That is every pair of decoded frames is averaged and combined with the decoded "pels correction" information to form the interpolated frames.

4,958,226

| 3 | 4 |

## BRIEF DESCRIPTION OF THE DRAWING

FIG. 1 presents a block diagram of an encoder in accordance with the principles of this invention; and

FIG. 2 depicts a block diagram of a decoder in accordance with the principles of this invention.

## DETAILED DESCRIPTION

Given a specified transmission rate in the communications channel, frame interpolation needs to be resorted to only when the FIFO is at, or near overflow. When that is the selected approach, the encoder of our invention encodes the blocks of every frame and concurrently develops the codes for interpolating the blocks from the information available to the encoder from previous and subsequent frames. At the input to the FIFO buffer, a switch is installed that is sensitive to the available memory in the buffer. When the available memory falls below a preselected threshold, the switch is set to accept the frame interpolation code. Otherwise, the switch is set to accept the frame encoding code. Other control techniques are also available, such as selecting some frames for encoding and some frames for interpolation, based on the occupancy level of the buffer. Both specific frames can thus be selected for interpolations as well as a proportion of frames to be interpolated.

The above insures that the encoder would not exceed the transmission capacity of the communications channel. In some applications, however, it is more important to achieve a low transmission rate. Knowing that the frame interpolation code is less voluminous than the frame encoding code, it makes sense to accept the frame interpolation code wherever possible. The zeal to chose interpolation code in preference to the frame encoding code is tempered, however, by the level of degradation that is acceptable to the user in the reconstituted picture. It is further tempered by the observation that the volume of the frame interpolation code increase with increased use of the frame interpolation code so one could quickly reach a point of "diminishing returns" in the use of interpolation code.

Experimentally, it has been found that interpolating every other frame is quite beneficial. Accordingly, for the illustrative purposes of this disclosure, the following describes the structure and operation of an encoder and a decoder that interpolates every other frame in accordance with the principles of this invention.

FIG. 1 describes an encoder of our invention. In FIG. 1, a video signal is applied to switch 10. The switch toggles at the video frame rate and thus feed alternate frames to outputs A and B. The control is such that switch 10 is in position A when frame $F_{i+1}$ is coming out of the video camera. The index i designates the frame number from some arbitrary starting point. During the previous video frame period, frame $F_i$ came out of the camera, passed through output B of switch 10 and to the input of frame memory 16. Now, frame $F_i$ is coming out of frame memory 16. It is frame $F_i$ that will be interpolated in the decoder.

The following segment describes the operation of the motion compensation coding portion of the coder, which is well known to those skilled in the art.

Frame $F_{i+1}$ passes to subtractor 20 and to motion estimator 11. Frame memory 12 contains the frame that was previously coded via motion compensation; and in this case it is frame $F_{i-1}$. The output of memory 12 forms the other input to motion estimator 11. For each

block of pels, motion estimator 11 compares the pels of frames $F_{i+1}$ and $F_{i-1}$ to determine the best estimate of motion. The best estimate is delivered as a motion vector signal on bus 100, and thus it passes to shift circuit 15. Circuit 15 also accepts the pels information about the previous frame, $F_{i-1}$, from frame memory 12, applies the appropriate translational shift according to the above-mentioned motion vector and outputs a block of "Prediction" pels to be used as a prediction of the incoming frame $F_{i+1}$ pels.

This prediction block of pels passes to the other input of substractor 20 whereupon it is subtracted from the incoming pels of frame $F_{i+1}$ to give a "Prediction Error" signal. The prediction error typically is transformed by DCT 30 and the output coefficients are quantized by quantizer 40. The quantized values are coded into bits coder 50 and passed to buffer 60 to await transmission to the decoder.

From the above, it is clear that the input to the quantizer depends on the nature of the moving image, and consequently and as indicated above, it has the possibility of emptying or overflowing. To avoid this, a feedback path is provided to quantizer 40, so that the quantizer coarseness can be increased if buffer overflow threatens, or decreased if buffer emptying is imminent.

Continuing with the description of motion compensated coding, the quantized output signals of quantizer 40 are inverse transformed by inverse DCT 41, and applied to adder 42. Adder 42 also receives the prediction pels of shift circuit 15 resulting in a coded version of frame $i+1$, $F_{i+1}$, which is passed into frame memory 12 for use with a subsequent frame as described above.

This completes the discussion of conventional motion compensation coding.

With the coded versions of frames $i-1$ and $i+1$, i.e., $F_{i-1}$ and $F_{i+1}$ being available, frame $F_i$ can be generated.

The $F_i$ generation starts with the motion vectors that are produced by motion estimator 11. These are used by shift circuit 13 to shift the incoming pels from frame $F_{i-1}$, perhaps by half the motion vector, to produce one estimate of the pels in frame $F_i$. Circuit 14 also uses the motion vectors of line 100 to shift the coded pels of $F_{i+1}$, perhaps by half and in the opposite direction from the motion vector. This produces another estimate of the pels of $F_i$.

The two estimates produced by shift circuits 13 and 14 are combined in averager 17 to produce the final prediction of frame $F_i$. This interpolated prediction is usually very good, but not always.

To improve the interpolated prediction in accordance with our invention, subtractor 43 calculates an error signal that corresponds to the difference between the actual frame data that exits frame memory 16 ($F_i$) and the predicted frame as it appears at the output of averager 17 ($\hat{F}_i$). The error signal is transformed by DCT 18, quantized by quantizer 19 and passed to coder 44, which detects large occurrences of interpolation error and codes them for transmission. The coded interpolation error is passed to buffer 60 in the same way as from coder 50. Similarly, a feedback path is provided to quantizer 19 to combat buffer overflow and underflow.

The decoder, depicted in FIG. 2, is very similar to the encoder. The components mirror corresponding components in the coder with a few deviations. In particular, the input is received in buffer 23 and is distributed therefrom based on the nautre of the signals. Frame encoding code (e.g. corresponding to $F_{i-1}$ and $F_{i+1}$) is

4,958,226

5

sent to decoder 22 and therefrom to DCT$^{-1}$ 24, adder 27, memory 28 and shift circuit 26. These elements correspond to elements 41, 42, 12, and 15, respectively, and operate in the same manner. That is completely expected, since the function of these elements in the encoder is to emulate the decoder. Thus, the contents of memory 28 correspond to the estimated frames. Similarly, elements 39, 31 and 32 in the decoder correspond to elements 13, 14 and 17, respectively in the encoder and operate in the same manner.

The pels correction code also exits buffer 23, is decoded in decoder 25 and inverse transformed in element 34. This correction information is added to the estimate of $F_i$ developed by circuit 35 and is applied to memory 33. Memory 33 delays the $F_i$ information to permit a proper interleaving of $F_i$ between $F_{i-1}$ and $F_{i+1}$. As can be observed from above, one of the deviations is that the interpolation error subtractor 43 of the encoder becomes adder 35 at the decoder. Also, another output of frame memory 28 is shown since frame $F_{i-1}$ pels for the video output display may need to be read out at a different rate for the video output at switch 21 than the frame $F_{i-1}$ pels are needed for shift circuits 26 and 39.

It may be noted that there is a tradeoff between the buffer size of buffer 23 and the necessity for frame memory 33. If the buffer is sufficiently large, frame memory 33 could be deleted. The frame $F_i$ output from adder 35 would then pass directly to the video output via switch 21, which would be in position B. Following this, switch 21 would toggle to its A input, and decoding would stop for a frame period while frame $F_{i+1}$ was displayed via the output of frame memory 28 and the A input of switch 21. During this time, decoder buffer 23 would fill with data from the channel.

Many alternative arrangements are possible for the basic conditional motion compensation interpolation approach. For example, more than one frame might be conditionally interpolated, in which case shifter circuits 13, 14, 30 and 31 need to be more versatile and frame memories 16 and 33 need to be larger. Also in computing the best estimate of motion, motion estimator 11 might take frame $F_i$ pels as additional input. This would enable simultaneous minimization of both motion compensation prediction error as well as interpolation error. Still other improvements may be introduced by skilled artisans practicing this invention without departing from the spirit and scope thereof.

We claim:

1. A circuit for encoding applied video signals that comprise successive frames, where each frame is divided into blocks, comprising:

first means for encoding the blocks of some of said frames by developing for each block of such frames (a) an approximated version of said block derived from an approximated version of said block developed for a previous frame, and (b) a code which represents the deviation of said block from said approximated version of said block;

second means for approximating the blocks of those of said frames that are to be interpolated by combining approximated versions of said blocks in selected ones of the frames that are encoded in said first means; and

third means responsive to said second means and to said frames to be interpolated for developing a code that corresponds to those pels in blocks approximated by said second means that differ from

6

corresponding pels in said frames to be interpolated by greater than a preselected threshold.

2. A circuit for encoding applied video signals that comprise successive frames, where each frame is divided into blocks, including means for encoding the blocks of some of said frames by developing for each block of such frames (a) an approximated version of said block derived from an approximated version of said block developed for a previous frame, and (b) a code which represents the deviation of said block from said approximated version of said block, the improvement comprising:

second means for approximating the blocks of those of said frames that are to be interpolated by combining approximated versions of said blocks in selected ones of the frames that are encoded in said means for encoding; and

third means responsive to said second means and to said frames to be interpolated for developing code that corresponds to those pels in blocks approximated by said second means that differ from corresponding pels in said frames to be interpolated by greater than a preselected threshold.

3. The circuit of claim 2 wherein said code developed for a pel by said third means represents the difference between the value of said pel and the value of said pel approximated by said second means.

4. The circuit of claim 2 wherein the frames selected for combining in said second means include a frame encoded in said first means that precedes the frame approximated in said second means and a frame encoded in said first means that succeeds the frame approximated in said means.

5. The circuit of claim 4 wherein said combining includes developing anticipated versions of said blocks.

6. The circuit of claim 2 wherein a set proportion of frames of said applied video signals are interpolated.

7. The circuit of claim 6 wherein said proportion is approximately one half.

8. The circuit of claim 2 fruther comprising buffer means for interposed between the codes developed by said means for encoding and said third means and an output port of said circuit.

9. The circuit of claim 8 for controlling the proportion of frames selected for interpolation by said second means and code generation by said third means based on the occupancy level of said buffer.

10. The circuit of claim 8 for selecting frames for interpolation by said second means and code generation by said third means when said buffer is occupied beyond a chosen proportion of its capacity.

11. The circuit of claim 7 wherein granularity of the codes generated by said first means and said third means is controlled by the occupancy level of said buffer.

12. A circuit responsive to coded video signals where the video signals comprise successive frames and each frame includes a plurality of blocks and where the coded video signals comprise codes that describe deviations from approximated blocks and codes that describe deviations from interpolated blocks, comprising:

means for developing block approximations from said codes that describe deviations from approximated blocks; and

means responsive to said block approximations and to said codes that describe deviations from interpolated blocks to develop said interpolated blocks.

*   *   *   *   *

# ARNOLD & PORTER

202.942.5000
202.942.5999 Fax

555 Twelfth Street, NW
Washington, DC 20004-1206

## Fax Transmittal

### April 1, 2003

| RECIPIENT NAME(S) | RECIPIENT FAX NUMBER(S) | RECIPIENT TELEPHONE NUMBER(S) | RECIPIENT ROOM(S) |
|---|---|---|---|
| Joel Freed | | | |

| SENDER | SENDER'S TELEPHONE NUMBER | SENDER'S ROOM NUMBER | |
|---|---|---|---|
| | | | |

| CLIENT/MATTER NUMBER | TIMEKEEPER NUMBER | NUMBER OF PAGE(S) | |
|---|---|---|---|
| | | We are transmitting 4 page(s) (including this cover sheet) | |

| TRANSMISSION DEADLINE (DATE & TIME) | ALTERNATE TELEPHONE NUMBER (OPTIONAL) |
|---|---|
| This document must be transmitted no later than: | Alternate telephone number at which the sender can be reached if there are difficulties with this fax: |

If you experience difficulty receiving this fax transmission, please contact the operator at 202.942.5837.

**MESSAGE**

PRIVILEGED AND CONFIDENTIAL

Information intended only for the use of the addressee named above. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, please note that any dissemination, distribution or copying of this communication is strictly prohibited. Anyone who receives this communication in error should notify us immediately by telephone and return the original message to us at the above address via the U.S. Mail.

# ARNOLD & PORTER

Joel M. Freed
Joel_Freed@aporter.com

202.942.8602
202.942.5999 Fax

555 Twelfth Street, NW
Washington, DC 20004-1206

February 3, 2003

Stephen Samuels
IP Licensing Director
Lucent Technologies
600 Mountain Ave Murray Hill, NJ 07974

Dear Mr. Samuels:

When I spoke with you and Mr. Brickman on Thursday the 23rd of January you asked when I 'needed' to hear back from you. I have since learned that I am already "overdue" on my initial report, which means I would like to hear from you as soon as possible on all the issues which I covered in our conversation, namely:

Re: '272 Netravali:

- explain the basis for contending that MPEG-2 decoders, which are basically "dumb" and do what they are told to do, can be said to be selecting related locations as a function of object displacement as called for in claim 13

- explain the basis for contending that MPEG implementations, which manage error over a 64 pel block (regardless of what is in the block), can be said to be selecting related locations as a function of object displacement as called for in claim 13

- explain the basis for contending that MPEG implementations, which are based on reconstruction of actual frames, are determining by interpolation as called for in claim 13

    (we have considered you brief telephone comment that a decoder which 'reverses' interpolation performed by an encoder performs interpolation, but even if that were so, we still ask that you to explain how implementations that are based on reconstruction of actual frames are engaged in "determining by interpolation" as called for in claim 13)

- explain the basis for contending that the Gabor-Hill reference does not disclose selecting related locations as a function of object displacement as called for in claim 13, inasmuch as the contour is displaced

Washington, DC      New York      Los Angeles      Century City      Denver      London      Northern Virginia

# ARNOLD & PORTER

Stephen Samuels
February 3, 2003
Page 2

Re: '226 Haskell:

- explain what is claimed that is not in Chapter 5 of Netravali & Haskell's book "Digital Pictures: Representation and Compression"

- explain what we have come to understand is your position that the reference "A Hybrid Scheme of Subsampled DPCM and Interpolative EPCM for the GDTV Coding" by Tanimoto and Mori does not disclose block-based coding (see its disclosure of block-based coding on 4x4 blocks with both subsampled DPCM and interpolative DPCM)

Re: '878 Puri:

- inform us whether your position is that claim 13 should be considered with the missing words, or without them

- in either case, explain the meaning of selectively and the meaning of adaptively in the claim

Re: '938 Johnston:

- please provide us with an up to date file of the reissue

- please provide your claim read position regarding Dolby

Re: '457 Hall:

- please provide your claim read positions regarding both AC-3 and MP-3

Re: '956 Doughty:

- please provide the names of licensees who have "marked"

- please also reconsider our request for the names of all licensees (which in our telephone conversation you indicated would not be provided)

Re: '759 Fleming:

- we cannot determine the basis of your claim read position in the context of the previous "demonstration", so please explain that position

- you also indicated you would provide, along with that explanation, any extant videotapes or other electronic materials reflecting that demonstration

# ARNOLD & PORTER

Stephen Samuels
February 3, 2003
Page 3

Re: '956 Torok:

- please explain your claim read positions on various implementations of a Net Meeting conference, or your claim read position applicable to all uses of Net Meeting

Re: '676 Jayant:

- please provide your claim read positions regarding G.723.1, including whether it is your position that the standard cannot be practiced outside the claims

- please explain your participation in the standard, and whether the patent was disclosed

Re: '356 Day:

- please provide your claim read positions, including the basis for applying them outside the context of touch screens notwithstanding the title of the patent

- please explain your position on and a list of what tools are covered

Re: '131 Ackerman:

- although you indicated that you are not taking the position that all HTML implementation is covered, please explain and provide claim read positions that reflect the extent to which HTML is or is not implicated

I look forward to hearing from you very soon.

Very truly yours,

*Joel M. Freed*

Joel M. Freed

cc:    Henry Garrana, Esq.
       Michael Davis, Esq.

1

1           IN THE UNITED STATES DISTRICT COURT

2           IN AND FOR THE DISTRICT OF DELAWARE

3                          - - -

4    LUCENT TECHNOLOGIES INC. and    :    CIVIL ACTION
     LUCENT TECHNOLOGIES GUARDIAN I  :
5    LLC,                            :
                    Plaintiffs       :
6                                    :
7           v.                       :
                                     :
     DELL COMPUTER CORPORATION,      :
8                                    :
              Defendant              :    NO. 03-205 (KAJ)
9                          - - -

10
                              Wilmington, Delaware
11                            Thursday, April 3, 2003
                              4:03 o'clock, p.m.
12                            ***Telephone conference

13                         - - -

14   BEFORE:  HONORABLE KENT A. JORDAN, U.S.D.C.J.

15                         - - -

16   APPEARANCES:

17        YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
          BY:  JOHN W. SHAW, ESQ.
18
               -and-
19
          KIRKLAND & ELLIS
20        BY:  ROBERT A. APPLEBY, ESQ. and
               MAXINE Y. GRAHAM, ESQ.
21             (New York, New York)

22             Counsel for Plaintiffs

23

24                              Valerie J. Gunning
                                Official Court Reporter
25



1    APPEARANCES (Continued):

2            CONNOLLY, BOVE, LODGE & HUTZ, LLP
             BY:  R. ERIC HUTZ, ESQ.

3
                    -and-

4
         ARNOLD & PORTER

5        BY:  JOEL M. FREED, ESQ., and
                  JOSEPH A. MICALLEF, ESQ.

6             (Washington, D.C.)

7             Counsel for Defendant

8                 - - -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2

3              THE COURT:  Hello, counsel.

4              MR. FREED:  Joe Freed and Joe Micallef from

5    Arnold & Porter for Dell.

6              MR. APPLEBY:  Harold Appleby and Maxine Graham

7    from Kirkland & Ellis on behalf of Lucent.

8              MR. SHAW:  John Shaw also.

9              MR. HUTZ:  Eric Hutz here as local counsel for

10   Dell.

11             THE COURT:  Counsel, I have the letter that Mr.

12   Shaw sent on March 31 with proposed dates in the scheduling

13   order, and I wanted to ask a couple things:  First, let's

14   just plan to go through the order page by page here.  I

15   assume people have it in front of them.

16             Looking at Paragraph 3(c), the discovery cutoff,

17   you have suggested that discovery run run for about a year

18   and a half, until it wraps up.

19             I will ask both parties to tell me why they

20   think it requires that much time to get this case put

21   together.

22             MR. FREED:  Your Honor, this is Joel Freed for

23   Dell.

24             I think one of the primary reasons is that not

25   only are a number of patents involved, but the patent

1   involved distinctive technologies and, in addition to that,

2   there are quite a few inventors involved and there are a

3   number, in addition to the fact that there are quite a few

4   inventors and quite a few patents and different technologies,

5   there are a number of different accused things that are

6   implicated, things that appear on the Dell Computers that are

7   sourced from other places.

8          So it's just diffuse and I think it's pretty

9   ambitious to get it done in this time frame.

10          I know it's rather long under usual

11   circumstances, but those are the reasons for it.

12          THE COURT:  Okay.  I apologize.  I should have

13   said up front that I have here as Court Reporter Valerie

14   Gunning and case manager, Neil Looby and one of my law

15   clerks.

16          Counsel for Lucent, do you want to speak to this

17   issue of the length?

18          MR. APPLEBY:   Yes, your Honor.  We are

19   agreeable to the schedule proposed in the order, but we

20   had initially proposed a shorter schedule where we had

21   proposed that both fact and expert discovery close I

22   think by April 30th.

23          THE COURT:  Okay.  You need to identify yourself

24   for the record, too.

25          MR. APPLEBY:  Ronald Appleby from Kirkland &

1    Ellis.

2         We are agreeable to the current schedule as

3    proposed in the order, but we had proposed a quicker schedule

4    that would complete both fact and expert discovery by April

5    30th.

6         Although the issues are, I do believe the issues

7    are somewhat complex in the case, I think that we could

8    finish it in a quicker period of time than is proposed in the

9    scheduling order.

10        And as I said, something from April -- April 30th

11   was our original proposal and anywhere between that and this

12   current date we'd certainly be amenable to.

13        THE COURT:  All right.  And let me ask the

14   purpose for why it's anticipated that it would take another

15   three-plus months to handle the expert discovery here.

16        Mr. Freed?

17        MR. FREED:  Your Honor, I think there are going

18   to be a number of experts involved on a number of different

19   technologies, on both both sides.

20        I think the conclusion would allow for the

21   exchange of the expert reports and the opposing expert

22   reports and the depositions in an orderly fashion, not a

23   rush fashion, but there's not a lot of slack in it when it's

24   considered that they will just be receiving the end of fact

25   discovery on May 14th and then are going to have to prepare

1    the reports, exchange rebuttal reports and the depositions

2    begun only after that.

3                 THE COURT:  Well, presumably, you're going to

4    have people working on this before the close of fact

5    discovery; right?

6                 MR. FREED:  I would hope so, your Honor.  I

7    think absolutely we will be working on it before then, but,

8    of course, they won't be able to complete their positions

9    until then.

10                And the expert depositions I believe are

11   coordinated with the other activity that's going on as well,

12   with regard to claim construction and claim construction

13   issues.  They they sort of overlap and are interleaved in

14   there.

15                You'll see some of the issues that come later.

16   The joint claim construction issue is due --

17                THE COURT:  Yes.  I'm aware of that and we're

18   going to get to that.

19                MR. FREED:  Okay.

20                THE COURT:  All right.  Well, this is not

21   typically the way I like to see these things timed out, but

22   the truth is, as I think counsel generally know, you have the

23   advantage of me.  You're living with this thing and I'm not

24   on a day-to-day basis.  And so when you say to me, it really

25   will take us two years to get this all put together, I guess

1   I have to say, Okay, but in saying that, I want all the

2   parties to understand this clearly.  I'm not going to be

3   favorably disposed to extensions in this time schedule

4   because I think there's a lot of time in here already, in

5   relation to how very complex cases in this court typically

6   get brought to trial.

7           So we'll give you those dates as they stand in

8   3-C, and that includes also the filing of reports.  The

9   interim status report on October 31st is fine.  We'll have a

10  status conference on November 6th at 4:30 p.m., and you can

11  expect that at that time we'll set another status report to

12  take place in some reasonable time frame after that so that

13  we're comfortable we're still moving the thing forward; all

14  right?

15          On the case-dispositive motions, again, this

16  is an extended briefing schedule.  I assume if I said why

17  I would get much the same description about the number

18  of patents and the complexity of the issues; is that

19  correct?

20          MR. FREED:  That's correct, your Honor.  This

21  is Joel Freed.  Yes.

22          THE COURT:  All right.  Well, the way it

23  is set up, it does appear that you will have the briefing

24  on claim construction and any case-dispositive issues

25  completed contemporaneously so that we can have any

1   argument on dispositive motions along with a hearing on

2   claim construction on November 15th, 2004.  That's at

3   9:30 a.m.

4            The pretrial conference we're going to set

5   for February 28th, 2005 at 4:30 p.m.

6            That means I'm going to need your form of

7   pretrial order submitted on February 21st.

8            And let me ask Mr. Appleby:  You're speaking for

9   Lucent on this call; right?

10           MR. APPLEBY:  Yes.

11           THE COURT:  How many days do you think it will

12  take to try this case?

13           MR. APPLEBY:  Well, we propose a ten-day trial,

14  and on the day -- I think it's less critical than the

15  hours per side.  32 hours per side.  And those numbers

16  were actually the same numbers that were used in a

17  five-patent case that we tried in this district a few

18  years ago and we found that that amount of time allowed

19  both parties to effectively try their case while

20  still disciplining them to present their case in a

21  streamlined fashion as possible.

22           I think this case is about similar complexity

23  and could be tried in the same amount of time.

24           THE COURT:  All right.  And I see, Mr. Freed,

25  that you think this will take 50 hours to present both

1  sides?

2          MR. FREED:  That's correct, your Honor.

3          THE COURT:  Well, here's what we're going to do.

4  I have been looking at the stats and the Court and, again,

5  the typical case is something on the order of 25 hours a

6  side.  Recognizing that this is a more complicated case, I

7  will go ahead and put this down for in excess of that, give

8  you 35 hours a side to do it.

9          We'll schedule it out for that.  That will put

10 us, I think, into about the three-week range.  But I think

11 all of the participants in this should be looking for ways to

12 try to save time and streamline.  But that's how we'll set it

13 down.  And that will begin on March 7th.

14         Is there anything else we ought to address while

15 we're altogether on the phone, counsel?

16         MR. FREED:  Yes, your Honor.  This is Joel Freed

17 again.

18         I think we have submitted, I hope, a stipulated

19 protective order.  That perhaps we can get that out of the

20 way at this point in time.

21         THE COURT:  That just came in today, so we can't

22 get that out of the way today.

23         MR. FREED:  Okay.                          '

24         THE COURT:  But I will certainly take a look at

25 that and assuming everything is in order there, we'll turn it

1    around for you all right away.

2              MR. FREED:  Thank you very much.

3              THE COURT:  Yes.

4              Now, Mr. Shaw, you're Delaware counsel for

5    Lucent; is that correct?

6              MR. SHAW:  That's correct, your Honor.

7              THE COURT:  Okay.  Would you please take the

8    laboring oar here and take the information we've discussed on

9    this call and get it into the form of order so that there's a

10   final form that you can run past opposing counsel and then

11   submit to the Court for signature?

12             MR. SHAW:  I will do so, your Honor.

13             THE COURT:  All right.  If there's nothing else,

14   I thank you for your time, counsel, and we will convene again

15   at a later date.  Thanks.

16             (Counsel respond "Thank you, your Honor.")

17             (Telephone conference concluded at 4:15 p.m.)

18                       - - -

19

20

21

22                          I hereby certify that the foregoing is a true
                             and accurate transcript from my stenographic
23                          notes in the proceeding.

24                          *Valerie J. Gurnin*

25                          Official Court Reporter
                             U. S. District Court

20

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LUCENT TECHNOLOGIES INC. and LUCENT TECHNOLOGIES GUARDIAN I LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 03-205 (KAJ) |
| DELL COMPUTER CORPORATION, | ) ) | |
| Defendant. | ) | |

## MOTION AND ORDER FOR ADMISSIONS *PRO HAC VICE*

Pursuant to Local Rule 83.5 and the attached certifications, counsel moves the admissions *pro hac vice* of Robert A. Appleby and Maxine Y. Graham to represent plaintiffs Lucent Technologies, Inc. and Lucent Technologies Guardian I LLC in this matter.

DATED:  April 8, 2003

Christian Douglas Wright (#3554)
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE  19899-0391
(302) 571-6600

## ORDER

IT IS HEREBY ORDERED that counsel's motion for admissions *pro hac vice* is GRANTED.

DATED:  April 8, 2003

United States District Court Judge

WP3:876285.1

## CERTIFICATION BY COUNSEL
## <u>TO BE ADMITTED PRO HAC VICE</u>

Pursuant to Local Rule 83.5, I certify that I am eligible for admission to this Court, am admitted, practicing and in good standing as a member of the Bar of New York, and pursuant to Local Rule 83.6, submit to the disciplinary jurisdiction of this Court for any misconduct which occurs in the preparation or course of this action. I also certify I am generally familiar with this Court's Local Rules.

Maxine Y. Graham
Kirkland & Ellis
153 East 53rd Street
New York, New York  10022-4675

DATED: April 2, 2003

# CERTIFICATION BY COUNSEL
## TO BE ADMITTED PRO HAC VICE

Pursuant to Local Rule 83.5, I certify that I am eligible for admission to this Court, am admitted, practicing and in good standing as a member of the Bar of New York and, pursuant to Local Rule 83.6, submit to the disciplinary jurisdiction of this Court for any misconduct which occurs in the preparation or course of this action. I also certify I am generally familiar with this Court's Local Rules.

Robert A. Appleby
Kirkland & Ellis
153 East 53rd Street
New York, New York  10022-4675

DATED:  April 2, 2003

## CERTIFICATE OF SERVICE

I, Christian Douglas Wright, certify that copies of the foregoing *Motion for Admissions* Pro Hac Vice were caused to be served on April 8, 2003 on the following counsel of record in the manner indicated:

### BY HAND DELIVERY

R. Eric Hutz, Esquire
Connolly Bove Lodge & Hutz LLP
1220 Market St., 10th Floor
P.O. Box 2207
Wilmington, DE  19899-2207

### BY FEDERAL EXPRESS

Joel M. Freed, Esquire
Arnold & Porter
555 12th Street NW
Washington, DC  20004

Christian Douglas Wright



# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

LUCENT TECHNOLOGIES, INC., and )
LUCENT TECHNOLOGIES GUARDIAN I LLC, )
                    )
          **Plaintiffs,** )
    v. )
                    )
**DELL COMPUTER CORPORATION,** )
                    )
          **Defendant.** )

**Case No. 03-CV-205-KAJ**

**Demand For Jury Trial**

## NOTICE OF SERVICE

PLEASE TAKE NOTICE that one copy of the following documents was served on April 3, 2003 upon the following counsel in the manner indicated:

Dell Computer Corporation's First Set of Interrogatories to
Lucent Technologies, Inc. and Lucent Technologies Guardian I LLC

and

Dell Computer Corporation's First Set of Document Requests to
Lucent Technologies, Inc. and Lucent Technologies Guardian I LLC

Respectfully submitted,

**CONNOLLY BOVE LODGE & HUTZ, LLP**

By: _____

R. Eric Hutz (#2702)
James D. Heisman (#2746)
1220 Market Street
Post Office Box 2207
Wilmington, DE 19899
(302) 658-9141
*Attorneys for Plaintiff*
*Dell Computer Corporation*

**OF COUNSEL**
Joel M. Freed
Joseph A. Micallef
**ARNOLD & PORTER**
555 12th Street NW
Washington, DC 20004
(202) 942-5000


**DATE:**  April 7, 2003

## CERTIFICATE OF SERVICE

I certify that today on April 7, 2003, a copy of the foregoing NOTICE OF

SERVICE was served upon counsel for plaintiffs as follows:

### BY HAND
Josy W. Ingersoll
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Post Office Box 391
Wilmington, Delaware  19899-0391

### FEDERAL EXPRESS
John M. Desmarais
Robert A. Appleby
Michael E. Stimson
Kirkland & Ellis
153 East 53rd Street
New York, New York 10022-4675

James D. Heisman (#2746)

257896_1.DOC

3



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LUCENT TECHNOLOGIES INC. and
LUCENT TECHNOLOGIES GUARDIAN I LLC,

        Plaintiffs,

        v.

DELL COMPUTER CORPORATION,

        Defendant.

        Civil Action No. 03-205-KAJ

## STIPULATED PROTECTIVE ORDER

WHEREAS, the parties in the above-captioned action believe that discovery may involve the disclosure of confidential, trade secret, proprietary, technical, scientific, business, or financial information of a party or of a non-party;

WHEREAS, the parties desire to establish a mechanism to protect the disclosure of such information in this action;

Pursuant to Rule 26(c) of the Federal Rules of Civil Procedure, **IT IS HEREBY ORDERED THAT**:

1.    For purposes of this Protective Order, the following definitions shall apply:

(a)    The term "document" shall have the full meaning ascribed to it by the Federal Rules of Civil Procedure and shall include without limitation any records, exhibits, reports, samples, transcripts, video or audio recordings, affidavits, briefs, summaries, notes, abstracts, drawings, company records and reports, answers to interrogatories, responses to requests for admissions, or motions, including copies or computer-stored versions of any of the foregoing.

(b)     The term "d isclosing party" is defined herein as any p arty or non-party w ho is requested to produce or produces documents or testimony containing confidential information.

(c)     The term "CONFIDENTIAL INFORMATION" is defined herein as information that has not been made public, the disclosure of which the disclosing party contends could cause harm to the business operations of the disclosing party or provide improper advantage to others, including, but not limited to, trade secrets within the meaning of the Uniform Trade Secrets Act.

(d)     The term "OUTSIDE COUNSEL ONLY INFORMATION" is defined herein as CONFIDENTIAL INFORMATION that is commercial, financial or marketing in nature and that the disclosing party reasonably and in good faith believes is so highly sensitive that its disclosure to an employee of a receiving party would reveal significant business or financial advantages of the disclosing party.  It includes information that the designating party reasonably and in good faith believes relates to (1) current business/strategic plans, (2) sales, cost and price information including future sales/financial projections, (3) non-public marketing information including future marketing plans, (4) detailed sales and financial data, (5) customer lists, or (6) other information of competitive, financial, or commercial significance comparable to the items listed in this paragraph.  The term "OUTSIDE COUNSEL ONLY INFORMATION" is also defined herein to include all video and audio copies themselves (without regard to the information content) of any deposition so designated as "OUTSIDE COUNSEL ONLY INFORMATION."

(e)     "Outside Service Organization" is defined herein as an individual or organization that provides photocopying, document processing, translation or graphics services to counsel as part of discovery or preparation and trial of this action.

(f)     "Support Staff" is defined herein as permanent employees of counsel for the parties, including paralegals, clerical personnel and secretarial personnel.

2

2.     If, in the course of this litigation, a party undertakes or is caused to disclose what the disclosing party contends is CONFIDENTIAL INFORMATION, including OUTSIDE COUNSEL ONLY INFORMATION, the procedures set forth herein shall be employed and the disclosure thereof shall be subject to this Protective Order.  CONFIDENTIAL INFORMATION shall be used solely in the preparation, prosecution or trial of this action.

3.     By entering this Order and limiting the disclosure of information in this case, the Court does not intend to preclude another court from finding that information may be relevant and subject to disclosure in another case.  Any person or party subject to this Order who becomes subject to a motion to disclose another party's information designated under one of the categories of confidentiality pursuant to this Order, shall promptly notify that party of the motion so that the party may have an opportunity to appear and be heard on whether that information should be disclosed.

4.     Any document which contains CONFIDENTIAL INFORMATION should be so designated by the disclosing party before or at the time of disclosure by placing the notation "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY" on every page of each document so designated.  In the case of CONFIDENTIAL INFORMATION disclosed in a non-paper medium, (*e.g.*, videotape, audiotape, computer disks, etc.), the notation "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY" should be placed on the medium, if possible, and its container, if any, so as to clearly give notice of the designation.  Such designation is deemed to apply to the document itself and to the CONFIDENTIAL INFORMATION contained therein.  If any items produced in a non-paper medium are printed out by the receiving party, the receiving party must mark each page of the printed version with the confidentiality designation.

3

5. The failure to designate CONFIDENTIAL INFORMATION as "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY" before or at the time of disclosure shall not operate as a waiver of a disclosing party's right to designate said information as "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY." In the event that CONFIDENTIAL INFORMATION is designated as "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY" after disclosure, a receiving party shall employ reasonable efforts to ensure that all such information is subsequently treated as "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY" pursuant to the terms of this Protective Order. Disclosure of such CONFIDENTIAL INFORMATION to persons not authorized to receive that information before receipt of the confidentiality designation shall not be deemed a violation of this Protective Order. However, in the event the document has been distributed in a manner inconsistent with the designation, a receiving party will take the steps necessary to conform distribution to the designation: i.e., returning all copies of the "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY" document, or notes or extracts thereof, to the persons authorized to possess such documents. In the event distribution has occurred to a person not under the control of a receiving party, a request for return of the document, and for an undertaking of confidentiality, shall be made in writing. In the event the request is not promptly agreed to in writing, or in the event there is no response, or in the event that the party deems the making of the request to be a futile act, the party shall promptly notify the disclosing party of the distribution and all pertinent facts concerning it, including the identity of the person or entity not under the control of the receiving party.

6. Access to CONFIDENTIAL INFORMATION, not including OUTSIDE COUNSEL ONLY INFORMATION, shall be limited to the following individuals: (a) counsel of record in this action (including counsel's Support Staff and Outside Service Organizations);

4

(b) court reporters taking testimony and their support personnel; (c) the court and any authorized court personnel; (d) independent consultants and experts retained by counsel for assistance with respect to this litigation who are designated by each party respectively pursuant to paragraph 10 below, including such consultant's or expert's necessary clerical and support staff; and (e) no more than five (5) officers or employees (including in-house counsel) designated by each party respectively pursuant to paragraph 16 below.

7.     In no event shall CONFIDENTIAL INFORMATION be stored at any business premises of the receiving party unless such information is stored in a secured area and accessible only to persons eligible to review such information.

8.     Access to OUTSIDE COUNSEL ONLY INFORMATION, other than papers or pleadings filed with the Court (but excluding exhibits attached to such papers and pleadings), shall be limited to the following individuals:  (a) counsel of record in this action (including counsel's Support Staff and Outside Service Organizations, but not in-house counsel) (b) court reporters taking testimony and their support personnel; (c) the court and any authorized court personnel; and (d) independent consultants and experts retained by counsel for assistance with respect to this litigation who are designated by each party respectively pursuant to paragraph 10 below, including such consultant's or expert's necessary clerical and support staff.

9.     Papers or pleadings, including briefs and declarations or affidavits, but excluding exhibits to such papers, filed with the Court, and drafts thereof, which contain or refer to OUTSIDE COUNSEL ONLY INFORMATION shall be treated as if designated CONFIDENTIAL INFORMATION, in order to permit litigation counsel to adequately communicate with their respective clients and keep their clients informed as to the status and progress of the litigation. OUTSIDE COUNSEL ONLY INFORMATION shall not be stored at

5

any business premises of any party, provided, however, that OUTSIDE COUNSEL ONLY INFORMATION treated hereunder as if designated CONFIDENTIAL INFORMATION may be kept by in-house counsel designated under paragraph 16 in a location exclusively within their control (*e.g.*, a locked file cabinet) or in a location that is controlled by outside counsel.

10.     Before disclosing any CONFIDENTIAL INFORMATION, including OUTSIDE COUNSEL ONLY INFORMATION, to outside experts or consultants, the party seeking to disclose such information shall provide the other party with:  (i) the name of the person; (ii) the present employer and title of the person; (iii) an up-to-date curriculum vitae of the person; and (iv) an identification of any work performed for or on behalf of the other party by that person within the six (6) year period before the filing of the above-captioned action.  Within five (5) business days of mailing (via overnight delivery) of this information, the other party may object to the proposed outside expert or consultant on a reasonable basis.

(a)     If objection to disclosure is made within the time required, the parties shall meet and confer within five (5) business days of such mailing; and, if not resolved, the party disclosing the information shall move for a protective order precluding the disclosure of the information to the designated expert or consultant within five (5) business days after the meet and confer;

(b)     Where objection is made, no such information shall be disclosed to the consultant or expert until the day after the last day to file a motion for a protective order (where no protective order is sought), or upon entry of the Court's order denying the disclosing party's motion for protection.

(c)     Failure to object to an outside expert or consultant shall not preclude the nonobjecting party from later objecting to continued access by that outside expert or consultant

6

for good cause. If an objection is made, the parties shall meet and confer within five (5) business days; and, i f the p arties c annot r esolve t he d ispute, t he p arty d isclosing t he i nformation s hall move for a protective order precluding the disclosure of the information to the designated expert or consultant within five (5) business days after the meet and confer. The designated expert or consultant may continue to have access to information that was provided such expert or consultant prior to the date of the objection, unless otherwise ordered by the Court. If a later objection is made, no further CONFIDENTIAL INFORMATION, including OUTSIDE COUNSEL ONLY INFORMATION, shall be disclosed to the outside expert or consultant until the matter is resolved by the Court or the producing party withdraws its objection. Notwithstanding the foregoing, if the producing party fails to move for a protective order within five (5) business days after the meet and confer, further CONFIDENTIAL INFORMATION, including OUTSIDE COUNSEL ONLY INFORMATION, may thereafter be provided to the outside expert or consultant.

11.    CONFIDENTIAL INFORMATION, including OUTSIDE COUNSEL ONLY INFORMATION, or the substance or context thereof, including any notes, memoranda or other similar d ocuments r elating t hereto, s hall n ot b e disclosed o r s ummarized, e ither i n w riting o r orally, to anyone other than persons permitted to have access to such information under this Order. Notwithstanding the foregoing, nothing in this Order shall bar or otherwise restrict any attorney from rendering advice to a party-client or, in the course thereof, relying upon his or her knowledge of CONFIDENTIAL INFORMATION, including OUTSIDE COUNSEL ONLY INFORMATION; provided however, that in rendering such advice the attorney shall not disclose any CONFIDENTIAL INFORMATION or OUTSIDE COUNSEL ONLY INFORMATION

received from another party or third party to anyone not authorized to receive such information pursuant to the terms of this Protective Order.

12.   Nothing herein is intended to prevent showing a document designated as "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY" to a person who the document indicates is an author or authorized recipient of the document. No copies of such documents shall be given to such individuals for them to retain. During deposition or trial testimony, counsel may disclose documents produced by a party to current employees and officers of the disclosing party.

13.   A disclosing party will use reasonable efforts to avoid designating, or to dedesignate in a reasonable time after request, any document or information as "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY" that is not entitled to such designation or that is generally available to the public.

14.   Any receiving party disagreeing with the designation of any document or information as "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY" shall notify the disclosing party in writing.  The disclosing party shall then have a reasonable period, not exceeding fourteen (14) days, from the date of receipt of such notice to:  (1) advise the receiving party whether or not the disclosing party persists in such designation; and (2) if the disclosing party persists in the designation, to explain the reasons for the particular designation.  The receiving party may then, after advising the disclosing party, move the Court for an order removing the particular designation and replacing it with a different designation or no designation.  The party asserting that the document or information is "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY" shall have the burden of proving that the designation is proper. Information designated "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY" by a disclosing

8

party shall be treated as such by a receiving party unless otherwise agreed to by the parties or otherwise ordered by the Court or by any appellate court, should appellate review be sought.

15.    The failure of a receiving party to expressly challenge a claim of confidentiality or the designation of any document or information as "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY" at the time of disclosure shall not constitute a waiver of the right to assert at any subsequent time that the same is not in fact confidential or not an appropriate designation for any reason.

16.    Plaintiffs and Defendant may each collectively designate up to five (5) employees (including in-house counsel) named herein, or, if not named herein who are not involved in product design or patent prosecution, and who have no current plans or intentions to become involved in product design or patent prosecution, who shall be allowed to examine documents produced by the opposing party that have been designated "CONFIDENTIAL." (Plaintiffs name three of those five employees as Bernard Zucker, Boaz Brickman and Christopher Godziela. Defendant names two of those five employees as Gracie Renbarger and Anthony Peterman.) Notice of the additional names, titles and job responsibilities at present and for the last three (3) years of additional employees named after entry of this Order shall be mailed via overnight delivery to the opposing party. No CONFIDENTIAL INFORMATION shall be disclosed to those employees additionally named unless, after five (5) business days from date of mailing of the notice of the employee's name, title and job responsibilities, the disclosing party has not objected to disclosure of the information to the designated employee.

(a)    If objection to disclosure is made within the time required, the parties shall meet and confer within five (5) business days of such mailing; and, if not resolved, the objecting party

9

shall move for a protective order precluding the disclosure of the information to the designated employee within five (5) business days after the meet and confer.

(b)   Where objection is made, no such information shall be disclosed to the employee until the day after the last day to file a motion for a protective order (where no protective order is sought), or upon entry of the Court's order denying movant's motion for a protective order (where a protective order is sought).

(c)   In the event that an employee designated pursuant to this paragraph is no longer employed by a party, the party may designate a replacement employee in accordance with the provisions of this paragraph.

(d)   Notwithstanding the foregoing, in the event that a party amends its pleading in this case to add a patent to this litigation after entry of this Order, the party against whom the new patent is asserted may challenge only whether any person designated to view CONFIDENTIAL INFORMATION pursuant to this paragraph may also view documents designated "CONFIDENTIAL" related to the newly asserted patent by mailing notice of such challenge to the other party (via overnight mail) within fourteen (14) days of service of the amended pleading. The parties shall meet and confer within five (5) business days of the mailing of such notice; and, if the parties cannot resolve the dispute, the party against whom the new patent is asserted may move for an order from the Court to resolve the dispute. If the party against whom the new patent is asserted fails to move for such an order within ten (10) business days after the meet and confer, the person subject to challenge may thereafter also view documents designated "CONFIDENTIAL" related to the newly asserted patent. Otherwise, the person subject to challenge may not view documents designated "CONFIDENTIAL" related to the newly asserted patent until the matter is resolved by the Court or the challenge is withdrawn.

17.     If an attorney for any receiving party desires to give, show, make available or communicate (a) any document or information designated "CONFIDENTIAL" to a person not authorized by paragraph 6 to receive such documents, or (b) any document or information designated "OUTSIDE COUNSEL ONLY" to a person not authorized by paragraph 8 to receive such documents, the attorney must first disclose that person's name, a statement of that person's responsibilities that require access to such information, a specific identification of the information to which access is required by document identification number or other specific reference, and a brief statement as to why such access is necessary.  The producing party shall have five (5) business days after mailing (via overnight delivery) the above-described information to object in writing to such disclosure.  Pending resolution of any informal or formal petition for disclosure, no disclosure shall be made to such person.  If the disclosing party who so designated the document refuses to give its consent, the disclosing and receiving parties shall confer to attempt to resolve the reasons for withholding consent.  If an agreement cannot be reached, the disclosing or receiving party desiring disclosure of the confidential document or information may petition the Court for an order granting or prohibiting disclosure.

18.     Each    person    to    whom    documents    or    information    designated    as "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY" is made available under the terms of this Protective Order (other than counsel for the parties, counsel's Support Staff and Outside Service Organizations), must sign an agreement in the form attached hereto as Exhibit A.  A copy of each executed agreement shall be delivered to opposing counsel at least five (5) days before any disclosure of such information.

19.     If during the course of any deposition, or not later than fourteen (14) days after the receipt of a written transcript of such deposition, counsel for any disclosing party asserts

11

(either on the record at the deposition or in writing after the deposition) that the deposition transcript, or any specific inquiry, or an answer to a specific inquiry is subject to the designation "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY" that transcript, inquiry, or answer shall be treated as provided by this Protective Order for documents designated "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY."

20.     Counsel for any disclosing party shall have the right to exclude from oral depositions, other than the deponent, deponent's counsel, the reporter, and videographer (if any), any person who is not authorized by this Protective Order to receive documents or information designated "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY."  Such right of exclusion shall be applicable only during periods of examination or testimony directed to or comprising "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY" information.

21.     Any court reporter or videographer who records testimony in this action at a deposition shall be provided with a copy of this Protective Order by the party noticing the deposition. That party shall advise the court reporter or videographer, before any testimony is taken, that all documents, information, or testimony designated "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY" is and shall remain confidential and shall not be disclosed except as provided in this Protective Order. The noticing party shall further advise the court reporter and videographer that copies of all transcripts, reporting notes and all other records of any such testimony must be treated in accordance with this Protective Order, delivered to attorneys of record, or filed under seal with the Court.

22.     In the event that any CONFIDENTIAL INFORMATION, including OUTSIDE COUNSEL ONLY INFORMATION, is included with, or the contents thereof are in any way disclosed in any pleading, motion, deposition, transcript or other paper filed with the Clerk of

this Court, such information shall be filed with the Clerk of the Court in sealed envelopes or containers marked with the caption of the case, a general description of the contents of the envelope or container and a legend substantially in the following form:

"CONTAINS CONFIDENTIAL INFORMATION SUBJECT TO
A PROTECTIVE ORDER – TO BE OPENED ONLY BY OR AS
DIRECTED BY THE COURT."

The document shall be filed and kept under seal by the Clerk until further order of this Court. The party filing the document may simultaneously (or soon thereafter) file a public version of the document with the CONFIDENTIAL INFORMATION, including any OUTSIDE COUNSEL ONLY INFORMATION, redacted, and the complete unredacted documents as well as the redacted documents shall be furnished to the attorneys for the parties.

23.     Nothing herein shall restrict a qualified recipient from making working copies, abstracts, digests and analyses of such information for use in connection with this litigation, and such working copies, abstracts, digests and analyses shall be deemed to have the same level of protection under the terms of this Order.  Further, nothing herein shall restrict a qualified recipient from converting or translating such information into machine-readable form for incorporation in a data retrieval system used in connection with this litigation, provided that access to such information, whatever form stored or reproduced, shall be limited to qualified recipients.

24.     Documents or information designated "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY" shall be maintained in the custody of counsel for the parties except that: (a) any court reporter who transcribes testimony given in this action may maintain any such designated documents for the purpose of rendering his or her normal transcribing services; and (b) partial or complete copies of these documents may be retained by persons entitled to access of such documents under the terms of this Order to the extent necessary for their study, analysis

13

and preparation of the case.   A person with custody of documents designated "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY" shall maintain them in a manner that limits access to those persons entitled under this Order to examine the documents so designated.

25.   Should any document or information designated as "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY" be disclosed, through inadvertence or otherwise, to any person or party not authorized under this Order, then the party responsible for the inadvertent disclosure shall use its best efforts to bind such person to the terms of this Order; and shall (a) promptly inform such person of all the provisions of this Order; (b) request such person to sign the agreement in the form attached hereto as Exhibit A; and (c) identify such person immediately to the disclosing party that designated the document as confidential.   The executed agreement shall promptly be served upon the party that designated the document as confidential.

26.   Where discovery is provided by allowing access to the documents or tangible things for inspection instead of delivering copies of them, all items being inspected shall be deemed OUTSIDE COUNSEL ONLY INFORMATION until the party allowing access to them indicates otherwise in writing or delivers copies of them to the party seeking discovery with no "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY" designation, in which case the provisions of paragraph 5 shall also apply.   If a party believes that inspection, measuring, testing, sampling, or photographing of that party's processes, products, equipment, premises, or other property pursuant to Fed. R. Civ. P. 34 will reveal or disclose information that is in good faith deemed CONFIDENTIAL INFORMATION or OUTSIDE COUNSEL ONLY INFORMATION that party shall advise in advance the party seeking such discovery that the inspection, measuring, testing, sampling, or photographing will be permitted only on a confidential basis, and that the information discovered, and any information derived from that information, shall be

14

treated as CONFIDENTIAL INFORMATION or OUTSIDE COUNSEL ONLY INFORMATION.

27.     The purpose of this Order is to facilitate discovery in this litigation, and in no manner shall it affect the application of any state or federal law regarding confidentiality of information.

28.     The terms of this Order shall in no way affect a disclosing party's right to (a) withhold information on grounds of immunity from discovery such as, for example, attorney/client privilege or the work-product doctrine, or (b) reveal or disclose to anyone any documents or information designated by that party as "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY" and containing no information designated by an opposing or third party as "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY" under this Order.

29.     The restrictions and obligations set forth herein relating to information designated "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY" shall not apply to any information which: (a) the parties agree, or the Court rules, is already public knowledge; (b) the parties agree, or the Court rules, has become public knowledge other than as a result of disclosure by a receiving party, its employees or agents in violation of this Protective Order; or (c) has come or shall come into a receiving party's legitimate possession independently of the producing party. Such restrictions and obligations shall not be deemed to prohibit discussions with any person of any information designated "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY" if that person already has or obtains legitimate possession thereof.

30.     Unless counsel agrees otherwise in writing, within sixty (60) days of the final disposition of this action including any appeals, the attorneys for the parties shall return promptly to the disclosing party from whom they were obtained, all documents, other than attorney work-

15

product, which have been designated "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY" (including video and audio copies of "OUTSIDE COUNSEL ONLY" designated depositions) or destroy same; and return or destroy all copies made thereof, including all documents, or copies provided by a receiving party to any other person.  Notwithstanding the foregoing, counsel for the parties shall be permitted to retain a file copy of materials (other than video and audio copies of "OUTSIDE COUNSEL ONLY" designated depositions) created during the course of the litigation, or made part of the record, or which have been filed under seal with the Clerk of the Court and a copy of all depositions, including exhibits, and deposition evaluations.  Such file copies must be maintained under the conditions of "OUTSIDE COUNSEL ONLY" documents as set out in paragraph 8.  At the conclusion of the 60-day period, an in-house counsel designated under paragraph 16 shall represent in writing under penalty of perjury that to his or her knowledge and belief the company has either returned or destroyed all confidential information in accordance with this order.

31.     In the event any person or receiving party having possession, custody or control of any document or information produced in this action and designated "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY" by a disclosing party receives a subpoena or other process or order to produce such information, such subpoenaed person or entity shall notify by mail (via overnight delivery) the attorneys of record of the disclosing party claiming such confidential treatment of the document sought by such subpoena or other process or order, shall furnish those attorneys with a copy of said subpoena or other process or order, and shall cooperate with respect to any procedure sought to be pursued by the party whose interest may be affected.  The disclosing party asserting the confidential treatment shall have the burden of defending against such subpoena, process or order.  Subject to any reasonable procedure sought to be pursued by

16

the party whose interest may be affected, the person or party receiving the subpoena or other process or order shall be entitled to comply with it except to the extent the disclosing party asserting the confidential treatment is successful in obtaining an order modifying or quashing it.

32.    The Court retains jurisdiction even after termination of this action to enforce this Order and to make such amendments, modifications, deletions and additions to this Protective Order as the Court may from time to time deem appropriate.  The disclosing parties reserve all rights to apply to the Court at any time, before or after termination of this action, for an order: (i) modifying this Protective Order, (ii) seeking further protection against discovery or use of CONFIDENTIAL INFORMATION, including OUTSIDE COUNSEL ONLY INFORMATION, or other documents or information, or (iii) seeking further production, discovery, disclosure, or use of claimed CONFIDENTIAL INFORMATION, including OUTSIDE COUNSEL ONLY INFORMATION, or other documents or information.

33.    If the discovery process calls for the production of information that a party does not wish to produce because the party believes its disclosure would breach an express or implied agreement with a non-party to maintain such information in confidence, the disclosing party shall give written notice to the non-party that its information is subject to discovery in this litigation, and shall provide the non-party with a copy of this Protective Order.  When such written notice is given to the non-party, the disclosing party will advise the potential receiving party that such notice has been given.  The parties shall cooperate with each other and the non-party in attempting to resolve any disputes over disclosure and with each other in bringing unresolved disputes before the Court for resolution.

17

**Stipulation**

**By Counsel**

YOUNG CONAWAY STARGATT
   & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor, P.O. Box 391
Wilmington, DE  18991
(302) 571-6600

By: _____
     Josy W. Ingersoll (#1088)
     Christian Douglas Wright (#3554)

CONNOLLY BOVE LODGE
   & HUTZ, LLP
1220 Market Street, P.O. Box 2207
Wilmington, DE  19899
(302) 658-9141

By: _____
     R. Eric Hutz (#2702)

OF COUNSEL:

John M. Desmarais
Robert A. Appleby
KIRKLAND & ELLIS
153 East 53rd Street
New York, New York 10022-4675
(212) 446-4800

OF COUNSEL:

Joel M. Freed
Joseph A. Micallef
ARNOLD & PORTER
555 12th Street NW
Washington, DC  20004

SO ORDERED, this 4th day of April, 20 03

_____
UNITED STATES DISTRICT JU

18

## EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| LUCENT TECHNOLOGIES INC. and<br>LUCENT TECHNOLOGIES GUARDIAN I LLC, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Civil Action No.  03-205-KAJ |
| | : | |
| DELL COMPUTER CORPORATION, | : | |
| | : | |
| Defendant. | : | |

## AGREEMENT CONCERNING INFORMATION COVERED BY PROTECTIVE ORDER ENTERED IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

The undersigned hereby acknowledges that he (she) has received and read the Protective Order entered in the United States District Court for the District of Delaware on _____, in connection with the above-captioned lawsuit, and understands its terms and agrees to be bound by each of those terms.  Specifically, and without limitation upon such terms, the undersigned agrees not to use or disclose any confidential information made available to him (her) other than in accordance with said Order.  The undersigned further submits to jurisdiction of this Court for purposes of the Protective Order in this action.

Dated: _____

By: _____
        (signature line)

_____
        (type or print name of individual)

Of: _____
        (name of employer)


IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LUCENT TECHNOLOGIES INC. and
LUCENT TECHNOLOGIES GUARDIAN I LLC,

    Plaintiffs,

    v.

DELL COMPUTER CORPORATION,

    Defendant.

Civil Action No. 03-205-KAJ

## STIPULATED PROTECTIVE ORDER

WHEREAS, the parties in the above-captioned action believe that discovery may involve the disclosure of confidential, trade secret, proprietary, technical, scientific, business, or financial information of a party or of a non-party;

WHEREAS, the parties desire to establish a mechanism to protect the disclosure of such information in this action;

Pursuant to Rule 26(c) of the Federal Rules of Civil Procedure, **IT IS HEREBY ORDERED THAT:**

1.  For purposes of this Protective Order, the following definitions shall apply:

(a)  The term "document" shall have the full meaning ascribed to it by the Federal Rules of Civil Procedure and shall include without limitation any records, exhibits, reports, samples, transcripts, video or audio recordings, affidavits, briefs, summaries, notes, abstracts, drawings, company records and reports, answers to interrogatories, responses to requests for admissions, or motions, including copies or computer-stored versions of any of the foregoing.

(b)    The term "disclosing party" is defined herein as any party or non-party who is requested to produce or produces documents or testimony containing confidential information.

(c)    The term "CONFIDENTIAL INFORMATION" is defined herein as information that has not been made public, the disclosure of which the disclosing party contends could cause harm to the business operations of the disclosing party or provide improper advantage to others, including, but not limited to, trade secrets within the meaning of the Uniform Trade Secrets Act.

(d)    The term "OUTSIDE COUNSEL ONLY INFORMATION" is defined herein as CONFIDENTIAL INFORMATION that is commercial, financial or marketing in nature and that the disclosing party reasonably and in good faith believes is so highly sensitive that its disclosure to an employee of a receiving party would reveal significant business or financial advantages of the disclosing party.  It includes information that the designating party reasonably and in good faith believes relates to (1) current business/strategic plans, (2) sales, cost and price information including future sales/financial projections, (3) non-public marketing information including future marketing plans, (4) detailed sales and financial data, (5) customer lists, or (6) other information of competitive, financial, or commercial significance comparable to the items listed in this paragraph.  The term "OUTSIDE COUNSEL ONLY INFORMATION" is also defined herein to include all video and audio copies themselves (without regard to the information content) of any deposition so designated as "OUTSIDE COUNSEL ONLY INFORMATION."

(e)    "Outside Service Organization" is defined herein as an individual or organization that provides photocopying, document processing, translation or graphics services to counsel as part of discovery or preparation and trial of this action.

(f)    "Support Staff" is defined herein as permanent employees of counsel for the parties, including paralegals, clerical personnel and secretarial personnel.

2

2.      If, in the course of this litigation, a party undertakes or is caused to disclose what the disclosing party contends is CONFIDENTIAL INFORMATION, including OUTSIDE COUNSEL ONLY INFORMATION, the procedures set forth herein shall be employed and the disclosure thereof shall be subject to this Protective Order. CONFIDENTIAL INFORMATION shall be used solely in the preparation, prosecution or trial of this action.

3.      By entering this Order and limiting the disclosure of information in this case, the Court does not intend to preclude another court from finding that information may be relevant and subject to disclosure in another case. Any person or party subject to this Order who becomes subject to a motion to disclose another party's information designated under one of the categories of confidentiality pursuant to this Order, shall promptly notify that party of the motion so that the party may have an opportunity to appear and be heard on whether that information should be disclosed.

4.      Any document which contains CONFIDENTIAL INFORMATION should be so designated by the disclosing party before or at the time of disclosure by placing the notation "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY" on every page of each document so designated. In the case of CONFIDENTIAL INFORMATION disclosed in a non-paper medium, (*e.g.*, videotape, audiotape, computer disks, etc.), the notation "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY" should be placed on the medium, if possible, and its container, if any, so as to clearly give notice of the designation. Such designation is deemed to apply to the document itself and to the CONFIDENTIAL INFORMATION contained therein. If any items produced in a non-paper medium are printed out by the receiving party, the receiving party must mark each page of the printed version with the confidentiality designation.

3

5. The failure to designate CONFIDENTIAL INFORMATION as "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY" before or at the time of disclosure shall not operate as a waiver of a disclosing party's right to designate said information as "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY."  In the event that CONFIDENTIAL INFORMATION is designated as "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY" after disclosure, a receiving party shall employ reasonable efforts to ensure that all such information is subsequently treated as "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY" pursuant to the terms of this Protective Order.  Disclosure of such CONFIDENTIAL INFORMATION to persons not authorized to receive that information before receipt of the confidentiality designation shall not be deemed a violation of this Protective Order.  However, in the event the document has been distributed in a manner inconsistent with the designation, a receiving party will take the steps necessary to conform distribution to the designation: i.e., returning all copies of the "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY" document, or notes or extracts thereof, to the persons authorized to possess such documents.  In the event distribution has occurred to a person not under the control of a receiving party, a request for return of the document, and for an undertaking of confidentiality, shall be made in writing.  In the event the request is not promptly agreed to in writing, or in the event there is no response, or in the event that the party deems the making of the request to be a futile act, the party shall promptly notify the disclosing party of the distribution and all pertinent facts concerning it, including the identity of the person or entity not under the control of the receiving party.

6. Access to CONFIDENTIAL INFORMATION, not including OUTSIDE COUNSEL ONLY INFORMATION, shall be limited to the following individuals:  (a) counsel of record in this action (including counsel's Support Staff and Outside Service Organizations);

4

(b) court reporters taking testimony and their support personnel; (c) the court and any authorized court personnel; (d) independent consultants and experts retained by counsel for assistance with respect to this litigation who are designated by each party respectively pursuant to paragraph 10 below, i ncluding s uch consultant's o r expert's n ecessary c lerical and s upport s taff; and ( e) n o more than five (5) officers or employees (including in-house counsel) designated by each party respectively pursuant to paragraph 16 below.

7.      In no event shall CONFIDENTIAL INFORMATION be stored at any business premises of the receiving party unless such information is stored in a secured area and accessible only to persons eligible to review such information.

8.      Access to OUTSIDE COUNSEL ONLY INFORMATION, other than papers or pleadings filed with the Court (but excluding exhibits attached to such papers and pleadings), shall be limited to the following individuals:  (a) counsel of record in this action (including counsel's Support Staff and Outside Service Organizations, but not in-house counsel) (b) court reporters taking testimony and their support personnel; (c) the court and any authorized court personnel; and (d) independent consultants and experts retained by counsel for assistance with respect to this litigation who are designated by each party respectively pursuant to paragraph 10 below, including such consultant's or expert's necessary clerical and support staff.

9.      Papers or pleadings, including briefs and declarations or affidavits, but excluding exhibits to such papers, filed with the Court, and drafts thereof, which contain or refer to OUTSIDE COUNSEL ONLY INFORMATION shall be treated as if designated CONFIDENTIAL INFORMATION, in order to permit litigation counsel to adequately communicate with their respective clients and keep their clients informed as to the status and progress of the litigation. OUTSIDE COUNSEL ONLY INFORMATION shall not be stored at

any business premises of any party, provided, however, that OUTSIDE COUNSEL ONLY INFORMATION treated hereunder as if designated CONFIDENTIAL INFORMATION may be kept by in-house counsel designated under paragraph 16 in a location exclusively within their control (*e.g.*, a locked file cabinet) or in a location that is controlled by outside counsel.

10.     Before disclosing any CONFIDENTIAL INFORMATION, including OUTSIDE COUNSEL ONLY INFORMATION, to outside experts or consultants, the party seeking to disclose such information shall provide the other party with:  (i) the name of the person; (ii) the present employer and title of the person; (iii) an up-to-date curriculum vitae of the person; and (iv) an identification of any work performed for or on behalf of the other party by that person within the six (6) year period before the filing of the above-captioned action.  Within five (5) business days of mailing (via overnight delivery) of this information, the other party may object to the proposed outside expert or consultant on a reasonable basis.

(a)     If objection to disclosure is made within the time required, the parties shall meet and confer within five (5) business days of such mailing; and, if not resolved, the party disclosing the information shall move for a protective order precluding the disclosure of the information to the designated expert or consultant within five (5) business days after the meet and confer;

(b)     Where objection is made, no such information shall be disclosed to the consultant or expert until the day after the last day to file a motion for a protective order (where no protective order is sought), or upon entry of the Court's order denying the disclosing party's motion for protection.

(c)     Failure to object to an outside expert or consultant shall not preclude the nonobjecting party from later objecting to continued access by that outside expert or consultant

6

for good cause. If an objection is made, the parties shall meet and confer within five (5) business days; and, if the parties cannot resolve the dispute, the party disclosing the information shall move for a protective order precluding the disclosure of the information to the designated expert or consultant within five (5) business days after the meet and confer. The designated expert or consultant may continue to have access to information that was provided such expert or consultant prior to the date of the objection, unless otherwise ordered by the Court. If a later objection is made, no further CONFIDENTIAL INFORMATION, including OUTSIDE COUNSEL ONLY INFORMATION, shall be disclosed to the outside expert or consultant until the matter is resolved by the Court or the producing party withdraws its objection. Notwithstanding the foregoing, if the producing party fails to move for a protective order within five (5) business days after the meet and confer, further CONFIDENTIAL INFORMATION, including OUTSIDE COUNSEL ONLY INFORMATION, may thereafter be provided to the outside expert or consultant.

11.    CONFIDENTIAL INFORMATION, including OUTSIDE COUNSEL ONLY INFORMATION, or the substance or context thereof, including any notes, memoranda or other similar documents relating thereto, shall not be disclosed or summarized, either in writing or orally, to anyone other than persons permitted to have access to such information under this Order. Notwithstanding the foregoing, nothing in this Order shall bar or otherwise restrict any attorney from rendering advice to a party-client or, in the course thereof, relying upon his or her knowledge of CONFIDENTIAL INFORMATION, including OUTSIDE COUNSEL ONLY INFORMATION; provided however, that in rendering such advice the attorney shall not disclose any CONFIDENTIAL INFORMATION or OUTSIDE COUNSEL ONLY INFORMATION

received from another party or third party to anyone not authorized to receive such information pursuant to the terms of this Protective Order.

12.     Nothing herein is intended to prevent showing a document designated as "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY" to a person who the document indicates is an author or authorized recipient of the document. No copies of such documents shall be given to such individuals for them to retain. During deposition or trial testimony, counsel may disclose documents produced by a party to current employees and officers of the disclosing party.

13.     A disclosing party will use reasonable efforts to avoid designating, or to dedesignate in a reasonable time after request, any document or information as "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY" that is not entitled to such designation or that is generally available to the public.

14.     Any receiving party disagreeing with the designation of any document or information as "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY" shall notify the disclosing party in writing.  The disclosing party shall then have a reasonable period, not exceeding fourteen (14) days, from the date of receipt of such notice to:  (1) advise the receiving party whether or not the disclosing party persists in such designation; and (2) if the disclosing party persists in the designation, to explain the reasons for the particular designation.  The receiving party may then, after advising the disclosing party, move the Court for an order removing the particular designation and replacing it with a different designation or no designation.  The party asserting that the document or information is "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY" shall have the burden of proving that the designation is proper. Information designated "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY" by a disclosing

8

party shall be treated as such by a receiving party unless otherwise agreed to by the parties or otherwise ordered by the Court or by any appellate court, should appellate review be sought.

15.     The failure of a receiving party to expressly challenge a claim of confidentiality or the designation of any document or information as "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY" at the time of disclosure shall not constitute a waiver of the right to assert at any subsequent time that the same is not in fact confidential or not an appropriate designation for any reason.

16.     Plaintiffs and Defendant may each collectively designate up to five (5) employees (including in-house counsel) named herein, or, if not named herein who are not involved in product design or patent prosecution, and who have no current plans or intentions to become involved in product design or patent prosecution, who shall be allowed to examine documents produced by the opposing party that have been designated "CONFIDENTIAL." (Plaintiffs name three of those five employees as Bernard Zucker, Boaz Brickman and Christopher Godziela. Defendant names two of those five employees as Gracie Renbarger and Anthony Peterman.) Notice of the additional names, titles and job responsibilities at present and for the last three (3) years of additional employees named after entry of this Order shall be mailed via overnight delivery to the opposing party.  No CONFIDENTIAL INFORMATION shall be disclosed to those employees additionally named unless, after five (5) business days from date of mailing of the notice of the employee's name, title and job responsibilities, the disclosing party has not objected to disclosure of the information to the designated employee.

(a)     If objection to disclosure is made within the time required, the parties shall meet and confer within five (5) business days of such mailing; and, if not resolved, the objecting party

shall move for a protective order precluding the disclosure of the information to the designated employee within five (5) business days after the meet and confer.

(b)     Where objection is made, no such information shall be disclosed to the employee until the day after the last day to file a motion for a protective order (where no protective order is sought), or upon entry of the Court's order denying movant's motion for a protective order (where a protective order is sought).

(c)     In the event that an employee designated pursuant to this paragraph is no longer employed by a party, the party may designate a replacement employee in accordance with the provisions of this paragraph.

(d)     Notwithstanding the foregoing, in the event that a party amends its pleading in this case to add a patent to this litigation after entry of this Order, the party against whom the new patent is asserted may challenge only whether any person designated to view CONFIDENTIAL INFORMATION pursuant to this paragraph may also view documents designated "CONFIDENTIAL" related to the newly asserted patent by mailing notice of such challenge to the other party (via overnight mail) within fourteen (14) days of service of the amended pleading. The parties shall meet and confer within five (5) business days of the mailing of such notice; and, if the parties cannot resolve the dispute, the party against whom the new patent is asserted may move for an order from the Court to resolve the dispute. If the party against whom the new patent is asserted fails to move for such an order within ten (10) business days after the meet and confer, the person subject to challenge may thereafter also view documents designated "CONFIDENTIAL" related to the newly asserted patent. Otherwise, the person subject to challenge may not view documents designated "CONFIDENTIAL" related to the newly asserted patent until the matter is resolved by the Court or the challenge is withdrawn.

17.   If an attorney for any receiving party desires to give, show, make available or communicate (a) any document or information designated "CONFIDENTIAL" to a person not authorized by paragraph 6 to receive such documents, or (b) any document or information designated "OUTSIDE COUNSEL ONLY" to a person not authorized by paragraph 8 to receive such documents, the attorney must first disclose that person's name, a statement of that person's responsibilities that require access to such information, a specific identification of the information to which access is required by document identification number or other specific reference, and a brief statement as to why such access is necessary.  The producing party shall have five (5) business days after mailing (via overnight delivery) the above-described information to object in writing to such disclosure.  Pending resolution of any informal or formal petition for disclosure, no disclosure shall be made to such person.  If the disclosing party who so designated the document refuses to give its consent, the disclosing and receiving parties shall confer to attempt to resolve the reasons for withholding consent.  If an agreement cannot be reached, the disclosing or receiving party desiring disclosure of the confidential document or information may petition the Court for an order granting or prohibiting disclosure.

18.   Each   person   to   whom   documents   or   information   designated   as "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY" is made available under the terms of this Protective Order (other than counsel for the parties, counsel's Support Staff and Outside Service Organizations), must sign an agreement in the form attached hereto as Exhibit A.  A copy of each executed agreement shall be delivered to opposing counsel at least five (5) days before any disclosure of such information.

19.   If during the course of any deposition, or not later than fourteen (14) days after the receipt of a written transcript of such deposition, counsel for any disclosing party asserts

11

(either on the record at the deposition or in writing after the deposition) that the deposition transcript, or any specific inquiry, or an answer to a specific inquiry is subject to the designation "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY" that transcript, inquiry, or answer shall be treated as provided by this Protective Order for documents designated "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY."

20.     Counsel for any disclosing party shall have the right to exclude from oral depositions, other than the deponent, deponent's counsel, the reporter, and videographer (if any), any person who is not authorized by this Protective Order to receive documents or information designated "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY."  Such right of exclusion shall be applicable only during periods of examination or testimony directed to or comprising "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY" information.

21.     Any court reporter or videographer who records testimony in this action at a deposition shall be provided with a copy of this Protective Order by the party noticing the deposition.  That party shall advise the court reporter or videographer, before any testimony is taken, that all documents, information, or testimony designated "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY" is and shall remain confidential and shall not be disclosed except as provided in this Protective Order.  The noticing party shall further advise the court reporter and videographer that copies of all transcripts, reporting notes and all other records of any such testimony must be treated in accordance with this Protective Order, delivered to attorneys of record, or filed under seal with the Court.

22.     In the event that any CONFIDENTIAL INFORMATION, including OUTSIDE COUNSEL ONLY INFORMATION, is included with, or the contents thereof are in any way disclosed in any pleading, motion, deposition, transcript or other paper filed with the Clerk of

12

this Court, such information shall be filed with the Clerk of the Court in sealed envelopes or containers marked with the caption of the case, a general description of the contents of the envelope or container and a legend substantially in the following form:

> "CONTAINS CONFIDENTIAL INFORMATION SUBJECT TO
> A PROTECTIVE ORDER – TO BE OPENED ONLY BY OR AS
> DIRECTED BY THE COURT."

The document shall be filed and kept under seal by the Clerk until further order of this Court. The party filing the document may simultaneously (or soon thereafter) file a public version of the document with the CONFIDENTIAL INFORMATION, including any OUTSIDE COUNSEL ONLY INFORMATION, redacted, and the complete unredacted documents as well as the redacted documents shall be furnished to the attorneys for the parties.

23.     Nothing herein shall restrict a qualified recipient from making working copies, abstracts, digests and analyses of such information for use in connection with this litigation, and such working copies, abstracts, digests and analyses shall be deemed to have the same level of protection under the terms of this Order.  Further, nothing herein shall restrict a qualified recipient from converting or translating such information into machine-readable form for incorporation in a data retrieval system used in connection with this litigation, provided that access to such information, whatever form stored or reproduced, shall be limited to qualified recipients.

24.     Documents or information designated "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY" shall be maintained in the custody of counsel for the parties except that:  (a) any court reporter who transcribes testimony given in this action may maintain any such designated documents for the purpose of rendering his or her normal transcribing services; and (b) partial or complete copies of these documents may be retained by persons entitled to access of such documents under the terms this Order to the extent necessary for their study, analysis

13

and preparation of the case.   A person with custody of documents designated "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY" shall maintain them in a manner that limits access to those persons entitled under this Order to examine the documents so designated.

25.    Should any document or information designated as "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY" be disclosed, through inadvertence or otherwise, to any person or party not authorized under this Order, then the party responsible for the inadvertent disclosure shall use its best efforts to bind such person to the terms of this Order; and shall (a) promptly inform such person of all the provisions of this Order; (b) request such person to sign the agreement in the form attached hereto as Exhibit A; and (c) identify such person immediately to the disclosing party that designated the document as confidential.  The executed agreement shall promptly be served upon the party that designated the document as confidential.

26.    Where discovery is provided by allowing access to the documents or tangible things for inspection instead of delivering copies of them, all items being inspected shall be deemed OUTSIDE COUNSEL ONLY INFORMATION until the party allowing access to them indicates otherwise in writing or delivers copies of them to the party seeking discovery with no "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY" designation, in which case the provisions of paragraph 5 shall also apply. If a party believes that inspection, measuring, testing, sampling, or photographing of that party's processes, products, equipment, premises, or other property pursuant to Fed. R. Civ. P. 34 will reveal or disclose information that is in good faith deemed CONFIDENTIAL INFORMATION or OUTSIDE COUNSEL ONLY INFORMATION that party shall advise in advance the party seeking such discovery that the inspection, measuring, testing, sampling, or photographing will be permitted only on a confidential basis, and that the information discovered, and any information derived from that information, shall be

14

treated as CONFIDENTIAL INFORMATION or OUTSIDE COUNSEL ONLY INFORMATION.

27.    The purpose of this Order is to facilitate discovery in this litigation, and in no manner shall it affect the application of any state or federal law regarding confidentiality of information.

28.    The terms of this Order shall in no way affect a disclosing party's right to (a) withhold information on grounds of immunity from discovery such as, for example, attorney/client privilege or the work-product doctrine, or (b) reveal or disclose to anyone any documents or information designated by that party as "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY" and containing no information designated by an opposing or third party as "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY" under this Order.

29.    The restrictions and obligations set forth herein relating to information designated "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY" shall not apply to any information which: (a) the parties agree, or the Court rules, is already public knowledge; (b) the parties agree, or the Court rules, has become public knowledge other than as a result of disclosure by a receiving party, its employees or agents in violation of this Protective Order; or (c) has come or shall come into a receiving party's legitimate possession independently of the producing party. Such restrictions and obligations shall not be deemed to prohibit discussions with any person of any information designated "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY" if that person already has or obtains legitimate possession thereof.

30.    Unless counsel agrees otherwise in writing, within sixty (60) days of the final disposition of this action including any appeals, the attorneys for the parties shall return promptly to the disclosing party from whom they were obtained, all documents, other than attorney work-

15

product, which have been designated "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY" (including video and audio copies of "OUTSIDE COUNSEL ONLY" designated depositions) or destroy same; and return or destroy all copies made thereof, including all documents, or copies provided by a receiving party to any other person. Notwithstanding the foregoing, counsel for the parties shall be permitted to retain a file copy of materials (other than video and audio copies of "OUTSIDE COUNSEL ONLY" designated depositions) created during the course of the litigation, or made part of the record, or which have been filed under seal with the Clerk of the Court and a copy of all depositions, including exhibits, and deposition evaluations. Such file copies must be maintained under the conditions of "OUTSIDE COUNSEL ONLY" documents as set out in paragraph 8. At the conclusion of the 60-day period, an in-house counsel designated under paragraph 16 shall represent in writing under penalty of perjury that to his or her knowledge and belief the company has either returned or destroyed all confidential information in accordance with this order.

31. In the event any person or receiving party having possession, custody or control of any document or information produced in this action and designated "CONFIDENTIAL" or "OUTSIDE COUNSEL ONLY" by a disclosing party receives a subpoena or other process or order to produce such information, such subpoenaed person or entity shall notify by mail (via overnight delivery) the attorneys of record of the disclosing party claiming such confidential treatment of the document sought by such subpoena or other process or order, shall furnish those attorneys with a copy of said subpoena or other process or order, and shall cooperate with respect to any procedure sought to be pursued by the party whose interest may be affected. The disclosing party asserting the confidential treatment shall have the burden of defending against such subpoena, process or order. Subject to any reasonable procedure sought to be pursued by

16

the party whose interest may be affected, the person or party receiving the subpoena or other process or order shall be entitled to comply with it except to the extent the disclosing party asserting the confidential treatment is successful in obtaining an order modifying or quashing it.

32.     The Court retains jurisdiction even after termination of this action to enforce this Order and to make such amendments, modifications, deletions and additions to this Protective Order as the Court may from time to time deem appropriate.  The disclosing parties reserve all rights to apply to the Court at any time, before or after termination of this action, for an order: (i) modifying this Protective Order, (ii) seeking further protection against discovery or use of CONFIDENTIAL INFORMATION, including OUTSIDE COUNSEL ONLY INFORMATION, or other documents or information, or (iii) seeking further production, discovery, disclosure, or use of claimed CONFIDENTIAL INFORMATION, including OUTSIDE COUNSEL ONLY INFORMATION, or other documents or information.

33.     If the discovery process calls for the production of information that a party does not wish to produce because the party believes its disclosure would breach an express or implied agreement with a non-party to maintain such information in confidence, the disclosing party shall give written notice to the non-party that its information is subject to discovery in this litigation, and shall provide the non-party with a copy of this Protective Order.  When such written notice is given to the non-party, the disclosing party will advise the potential receiving party that such notice has been given.  The parties shall cooperate with each other and the non-party in attempting to resolve any disputes over disclosure and with each other in bringing unresolved disputes before the Court for resolution.

**Stipulation**

**By Counsel**

YOUNG CONAWAY STARGATT
    & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor, P.O. Box 391
Wilmington, DE  18991
(302) 571-6600

By:     _____
       Josy W. Ingersoll (#1088)
       Christian Douglas Wright (#3554)


OF COUNSEL:

John M. Desmarais
Robert A. Appleby
KIRKLAND & ELLIS
153 East 53rd Street
New York, New York 10022-4675
(212) 446-4800

CONNOLLY BOVE LODGE
    & HUTZ, LLP
1220 Market Street, P.O. Box 2207
Wilmington, DE  19899
(302) 658-9141

By:     _____
       R. Eric Hutz (#2702)


OF COUNSEL:

Joel M. Freed
Joseph A. Micallef
ARNOLD & PORTER
555 12th Street NW
Washington, DC  20004

18

## EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| LUCENT TECHNOLOGIES INC. and<br>LUCENT TECHNOLOGIES GUARDIAN I LLC,<br><br>Plaintiffs,<br><br>v.<br><br>DELL COMPUTER CORPORATION,<br><br>Defendant. | :<br>:<br>:<br>:<br>:<br>:   Civil Action No.  03-205-KAJ<br>:<br>:<br>:<br>: |

## AGREEMENT CONCERNING INFORMATION COVERED BY PROTECTIVE ORDER ENTERED IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

The undersigned hereby acknowledges that he (she) has received and read the Protective Order entered in the United States District Court for the District of Delaware on _____, in connection with the above-captioned lawsuit, and understands its terms and agrees to be bound by each of those terms.  Specifically, and without limitation upon such terms, the undersigned agrees not to use or disclose any confidential information made available to him (her) other than in accordance with said Order.  The undersigned further submits to jurisdiction of this Court for purposes of the Protective Order in this action.

Dated: _____

By: _____
     (signature line)


     _____
     (type or print name of individual)

Of: _____
     (name of employer)

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

|                                                          |       |                        |
|----------------------------------------------------------|-------|------------------------|
| LUCENT TECHNOLOGIES, INC., and LUCENT TECHNOLOGIES GUARDIAN I LLC, | )     |                        |
|                                                          | )     | Case No. 03-CV-205-KAJ |
| Plaintiffs,                                              | )     |                        |
| v.                                                       | )     | Demand For Jury Trial  |
|                                                          | )     |                        |
| DELL COMPUTER CORPORATION,                               | )     |                        |
| Defendant.                                               | )     |                        |

## <u>MOTION AND ORDER FOR ADMISSION PRO HAC VICE</u>

Pursuant to Local Rule 83.5 and the attached certification, counsel moves the admission *pro hac vice* of Joseph A. Micallef, Esquire to represent Defendant Dell Computer Corporation in this matter.

Respectfully submitted,

**CONNOLLY BOVE LODGE & HUTZ, LLP**

By: _____
R. Eric Hutz (#2702)
James D. Heisman (#2746)
1220 Market Street
Post Office Box 2207
Wilmington, DE 19899
(302) 658-9141
*Attorneys for Plaintiff*
    *Dell Computer Corporation*

**DATED:** April 2, 2003

## ORDER GRANTING MOTION

IT IS HEREBY ORDERED counsel's motion for admission pro hac vice is granted.

Date: **4/2/03**

United States District Judge

## CERTIFICATION BY COUNSEL TO BE ADMITTED PRO HAC VICE

Pursuant to Local Rule 83.5, I certify that I am eligible for admission to this Court, am admitted, practicing and in good standing as a member of the District of Columbia Bar, the Virginia State Bar and the U.S. Patent and Trademark Office and pursuant to Local Rule 83.6 submit to the disciplinary jurisdiction of this Court for any alleged misconduct which occurs in the preparation or course of this action. I also certify I am generally familiar with this Court's Local Rules.

Signed:

Joseph A. Micallef
Arnold & Porter
555 12th Street, N.W.
Washington, D.C. 20004
(202) 942-5000

Date: 3-31-03

## CERTIFICATE OF SERVICE

I certify that today on April 2, 2003, a copy of the foregoing MOTION AND

ORDER FOR ADMISSION PRO HAC VICE for Joseph A. Micallef, Esquire was served

upon counsel for defendants as follows:

### BY HAND
Josy W. Ingersoll
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Post Office Box 391
Wilmington, Delaware  19899-0391

### FEDERAL EXPRESS
John M. Desmarais
Robert A. Appleby
Michael E. Stimson
Kirkland & Ellis
153 East 53rd Street
New York, New York 10022-4675

R. Eric Hutz

256468v1

COPY

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| LUCENT TECHNOLOGIES, INC., and <br> LUCENT TECHNOLOGIES GUARDIAN I LLC, ) <br><br> Plaintiffs, <br> v. <br><br> DELL COMPUTER CORPORATION, <br><br> Defendant. | ) <br> ) <br> ) <br> ) **Case No. 03-CV-205-KAJ** <br> ) <br> ) **Demand For Jury Trial** <br> ) <br> ) <br> ) <br> ) |

## MOTION AND ORDER FOR ADMISSION PRO HAC VICE

Pursuant to Local Rule 83.5 and the attached certification, counsel moves the admission *pro hac vice* of Joseph A. Micallef, Esquire to represent Defendant Dell Computer Corporation in this matter.

Respectfully submitted,

**CONNOLLY BOVE LODGE & HUTZ, LLP**

By: _____
R. Eric Hutz (#2702)
James D. Heisman (#2746)
1220 Market Street
Post Office Box 2207
Wilmington, DE 19899
(302) 658-9141
*Attorneys for Plaintiff*
*Dell Computer Corporation*

**DATED:** April 2, 2003

## ORDER GRANTING MOTION

IT IS HEREBY ORDERED counsel's motion for admission pro hac vice is granted.

Date: _____       _____
                                                   United States District Judge


## CERTIFICATION BY COUNSEL TO BE ADMITTED PRO HAC VICE

Pursuant to Local Rule 83.5, I certify that I am eligible for admission to this Court, am admitted, practicing and in good standing as a member of the District of Columbia Bar, the Virginia State Bar and the U.S. Patent and Trademark Office and pursuant to Local Rule 83.6 submit to the disciplinary jurisdiction of this Court for any alleged misconduct which occurs in the preparation or course of this action.  I also certify I am generally familiar with this Court's Local Rules.

Signed: _Joseph G. Micallef_
         Joseph A. Micallef
         Arnold & Porter
         555 12th Street, N.W.
         Washington, D.C.  20004
         (202) 942-5000

Date: 3-31-03 _____

## CERTIFICATE OF SERVICE

I certify that today on April 2, 2003, a copy of the foregoing MOTION AND

ORDER FOR ADMISSION PRO HAC VICE for Joseph A. Micallef, Esquire was served

upon counsel for defendants as follows:

**BY HAND**
Josy W. Ingersoll
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Post Office Box 391
Wilmington, Delaware  19899-0391

**FEDERAL EXPRESS**
John M. Desmarais
Robert A. Appleby
Michael E. Stimson
Kirkland & Ellis
153 East 53rd Street
New York, New York 10022-4675

R. Eric Hutz

256468v1

ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| LUCENT TECHNOLOGIES INC. and LUCENT TECHNOLOGIES GUARDIAN I LLC, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Civil Action No.  03-205-KAJ |
| | : | |
| DELL COMPUTER CORPORATION, | : | |
| | : | |
| Defendant. | : | |

**PLAINTIFFS' OPENING BRIEF IN SUPPORT OF
THEIR MOTION TO STRIKE DELL'S AFFIRMATIVE DEFENSE OF
UNENFORCEABILITY AND TO DISMISS DELL'S COUNTERCLAIM
TO THE EXTENT IT IS BASED ON THAT AFFIRMATIVE DEFENSE**

Josy W. Ingersoll (#1088)
John W. Shaw (#3362)
YOUNG CONAWAY STARGATT
   & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor, P.O. Box 391
Wilmington, Delaware  18991
(302) 571-6600

OF COUNSEL:

John M. Desmarais
Robert A. Appleby
KIRKLAND & ELLIS
153 East 53rd Street
New York, New York 10022-4675
(212) 446-4800

Attorneys for Lucent Technologies Inc. and
Lucent Technologies Guardian I LLC

Dated:  March 31, 2003

# TABLE OF CONTENTS

I.  INTRODUCTION. ..................................................................................................1

II.  NATURE AND STAGE OF THE PROCEEDING AND STATEMENT OF
FACTS. ..................................................................................................................1

III.  ARGUMENT. .......................................................................................................2

    A.  Legal Standards..........................................................................................2

    B.  Dell's Unenforceability Allegation Fails To Satisfy Rule 9(b)................3

IV.  CONCLUSION......................................................................................................6

# TABLE OF AUTHORITIES

*Cases*

*Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*,
   No. C-95-3577 DLJ, 1996 WL 467293 (N.D. Cal. July 24, 1996)........................................4

*Agere Sys. Guardian Corp. v. Proxim, Inc.*,
   190 F. Supp. 2d 726 (D. Del. 2002)........................................................................3, 5

*Cardiogenesis Corp. v. PLC Sys., Inc.*,
   Civ. No. 96-20749 SW, 1997 WL 12129 (N.D. Cal. Jan. 8, 1997) .................................3

*EMC Corp. v. Storage Tech. Corp.*,
   921 F. Supp. 1261 (D. Del. 1996) ...................................................................................3

*France Telecom S.A. v. Novell, Inc.*,
   No. 102-437-GMS, 2002 WL 31355255 (D. Del. Oct. 17, 2002) ..............................3, 5

*Harrison v. Westinghouse Savannah River Co.*,
   176 F.3d 776 (4th Cir. 1999) .........................................................................................2

*Paramount Aviation Corp. v. Agusta*,
   178 F.3d 132 (3rd Cir.), *cert. denied*, 528 U.S. 878 (1999).........................................4

*S & R Corp. v. Jiffy Lube Int'l, Inc.*,
   968 F.2d 371 (3rd Cir. 1992) ...........................................................................................4


**Statutes and Rules**

Fed. R. Civ. P. 8.............................................................................................................5

Fed. R. Civ. P. 9(b) ...............................................................................................*passim*

Fed. R. Civ. P. 12(b)(6)...............................................................................................2, 5

Fed. R. Civ. P. 12(f).....................................................................................................2, 5

## I.    INTRODUCTION.

Plaintiffs Lucent Technologies Inc. and Lucent Technologies Guardian I LLC (collectively, "Lucent") seek redress for the infringement of six United States Patents by Defendant Dell Computer Corporation ("Dell").  These patents reflect innovations — most developed at Lucent's world-renowned Bell Laboratories — that have enhanced the capabilities of personal computers in the areas of video display, audio encoding, networking, and user interfaces.  Dell has infringed these patents through the manufacture, use, sale, and offer for sale of personal computers, components, and accessory equipment throughout the United States.

Unwilling to compensate Lucent for this infringement, Dell has raised several affirmative defenses and a declaratory-judgment counterclaim incorporating those defenses.  Among these, Dell asserts that all the patents-in-suit are unenforceable.  But Dell fails to plead its unenforceability counterclaim and defense with the specificity that the Federal Rules of Civil Procedure require of claims and defenses of this nature.  Accordingly, Lucent respectfully requests that this Court strike Dell's unenforceability defense and dismiss Dell's declaratory-judgment counterclaim to the extent it seeks to have the patents-in-suit declared unenforceable.

## II.    NATURE AND STAGE OF THE PROCEEDING AND STATEMENT OF FACTS.

Lucent filed its Complaint in this action on February 20, 2003, alleging that Dell infringed six United States Patents by making, using, selling, and offering for sale personal computer systems, components, and accessories throughout the United States.  (Complaint, ¶¶ 5, 22, 29, 36, 43, 47, 55)  Dell filed its Answer and Counterclaim on March 11, 2003, asserting five affirmative defenses and a declaratory-judgment counterclaim incorporating four of those five affirmative defenses.  Among these, Dell alleges as both an affirmative defense and ground for its counterclaim that:

> The patents in suit are unenforceable because of Lucent's unclean hands, including but not limited to assertion of the patents in suit without proper basis for alleging infringement, and procurement of one or more of the patents in suit by failure to disclose material prior art to the United States Patent Office.

(Answer and Counterclaim ¶¶ 61 and 71).  As demonstrated below, however, this allegation fails to provide sufficient notice of a cognizable claim for unenforceability.  Accordingly, Dell's affirmative defense of unenforceability should be stricken, and its counterclaim should be dismissed to the extent that it seeks a declaration that the patents-in-suit are unenforceable.

## III.    ARGUMENT.

### A.    Legal Standards.

The Federal Rules of Civil Procedure provide that a claim may be dismissed for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  Failure to state a claim under Rule 12(b)(6) includes the failure to satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).  *See, e.g., Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 n.5 (4th Cir. 1999) ("lack of compliance with Rule 9(b)'s pleading requirements is treated as a failure to state a claim under Rule 12(b)(6)").  Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  Fed. R. Civ. P. 9(b).  The purposes of Rule 9(b) are to ensure that a party "has sufficient information to formulate a defense by putting it on notice of the conduct complained of," to "eliminate fraud actions in which all the facts are learned after discovery," and to protect parties from "frivolous suits" and from "harm to their goodwill and reputation."  *Id.* at 784.

The Federal Rules of Civil Procedure also authorize the Court to strike "from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  Under Rule 12(f), the Court may strike any defense that is

insufficient as a matter of law. *See, e.g., France Telecom S.A. v. Novell, Inc.*, No. 102-437-GMS, 2002 WL 31355255, at *1 (D. Del. Oct. 17, 2002) (motion to strike will be denied only "if the defense is sufficient under the law").

**B.      Dell's Unenforceability Allegation Fails To Satisfy Rule 9(b).**

Dell alleges as both an affirmative defense and ground for its counterclaim that:

> The patents in suit are unenforceable because of Lucent's unclean hands, including but not limited to assertion of the patents in suit without proper basis for alleging infringement, and procurement of one or more of the patents in suit by failure to disclose material prior art to the United States Patent Office.

(Answer and Counterclaim ¶¶ 61 and 71)  An unenforceability allegation is often asserted as an "umbrella for . . . defenses such as fraud, estoppel, unclean hands, and patent misuse." *Cardiogenesis Corp. v. PLC Sys., Inc.*, Civ. No. 96-20749 SW, 1997 WL 12129, at *1 (N.D. Cal. Jan. 8, 1997).  On its face, Dell rests its unenforceability allegation in part upon alleged unclean hands due to inequitable conduct:  the alleged "procurement of one or more of the patents in suit by failure to disclose material prior art to the United States Patent Office."  (Answer and Counterclaim ¶¶ 61 and 71)

But an inequitable conduct defense which charges the patentee with fraudulent behavior before the Patent Office is subject to the heightened pleading requirements of Rule 9(b) and must be pled with particularity. *See, e.g., Agere Sys. Guardian Corp. v. Proxim, Inc.*, 190 F. Supp. 2d 726, 733-34 (D. Del. 2002).  Therefore, "in pleading an inequitable conduct claim, a party cannot merely rely on vague allegations that broadly recite the elements of fraud, but instead must either specify the time, place, and content of any alleged misrepresentations made to the PTO or otherwise 'give the defendant[] notice of the precise misconduct alleged.'" *Id.* (citations omitted). This includes identifying any allegedly material prior art that the party contends was not disclosed to the PTO. *EMC Corp. v. Storage Tech. Corp.*, 921 F. Supp. 1261, 1263 (D. Del.

1996) (deeming inequitable conduct counterclaim that failed to disclose the relevant prior art insufficient under Rule 9(b)).

Here, however, Dell fails to plead *any* facts to support its allegation of inequitable conduct, even failing to identify the patents-in-suit to which this defense applies. Indeed, the patents-in-suit, which cover different technologies, and were issued to different inventors over a sixteen year period. Thus, any alleged inequitable conduct with respect to any one patent-in-suit has no bearing on the other patents-in-suit. Thus, Dell's unenforceability allegation fails to satisfy the requirements of Rule 9(b). Nor can Dell circumvent these requirements by pleading the allegation as an "unclean hands" defense. *See, e.g., Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*, No. C-95-3577 DLJ, 1996 WL 467293, at * 11 and *13 (N.D. Cal. July 24, 1996) (dismissing inequitable conduct counterclaim and striking affirmative defenses of inequitable conduct and unclean hands, based on the same allegations of fraudulent conduct, as inadequately pled). Therefore, Dell's unenforceability defense should be stricken, and dismissed. *Id.*

Dell also rests its unenforceability allegation on a theory of unclean hands resulting from purported "assertion of the patents-in-suit without proper basis for alleging infringement." (Answer and Counterclaim ¶ ¶ 61 and 71) Again, however, Dell fails to plead *any* facts to support this claim or even identify the patents-in-suit to which the claim is directed. To assert the equitable defense of unclean hands successfully, Dell must allege and prove that Lucent is "guilty of fraud, unconscionable conduct, or bad faith directly related to the matter at issue that injures the other party and affects the balance of equities." *Paramount Aviation Corp. v. Agusta*, 178 F.3d 132, 147 n.12 (3rd Cir.), *cert. denied*, 528 U.S. 878 (1999); *see also S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 377 n.7 (3rd Cir. 1992) (noting plaintiff's failure to allege elements of unclean hands). Dell fails to allege *any* facts to support any of these elements.

Moreover, allegations of fraud are subject to the heightened pleading requirements of Rule 9(b). *Agere Sys.*, 190 F. Supp. 2d at 733-34. Accordingly, this Court should strike Dell's unenforceability affirmative defense, and dismiss Dell's counterclaim to the extent that it seeks to a declaration that the patents-in-suit are unenforceable, for failure to meet the threshold requirements of Rule 9(b).[1]

---

[1] To the extent that Dell rests its unenforceability allegation on a theory of unclean hands other than those expressly set forth in its Answer and Counterclaim, Dell fails to provide Lucent with sufficient notice of those grounds and accordingly fails to meet the threshold sufficiency requirements of Rule 8. *See France Telecom S.A*, at *2-3 (finding unclean hands defense to meet the sufficiency requirements of Rule 8 after bare allegation of unclean hands was amended to state "the basis for the unclean hands defense, including the context of the alleged misconduct").

## IV.   CONCLUSION.

For the foregoing reasons, Lucent respectfully requests that this Court:

(1)     strike Dell's unenforceability affirmative defense (Answer and Counterclaim ¶ 61)

pursuant to Fed. R. Civ. P.  9(b) and 12(f); and

(2)     dismiss Dell's counterclaim to the extent it seeks to have the patents-in-suit

declared unenforceable (Answer and Counterclaim ¶ 71) pursuant to Fed. R. Civ. P. 9(b) and

12(b)(6).

Respectfully submitted,

Josy W. Ingersoll (#1088)
John W. Shaw (#3362)
YOUNG CONAWAY STARGATT
      & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE  18991
(302) 571-6600

*Attorneys for Plaintiffs Lucent Technologies Inc.
and Lucent Technologies Guardian I LLC*

OF COUNSEL:
John M. Desmarais
Robert A. Appleby
Maxine Y. Graham
Michael E. Stimson
KIRKLAND & ELLIS
153 East 53rd Street
New York, New York 10022-4675
(212) 446-4800

Dated:  March 31, 2003

6

## CERTIFICATE OF SERVICE

I, John W. Shaw, Esquire, hereby certify that copies of the foregoing document were caused to be served on March 31, 2003, upon the following counsel of record:

### BY HAND DELIVERY

R. Eric Hutz, Esquire
Connolly, Bove, Lodge & Hutz, LLP
1220 Market Building
Wilmington, Delaware 19801

### BY FEDERAL EXPRESS

John M. Freed
Arnold & Porter
555 12th Street NW
Washington, DC  20004

John W. Shaw

WP3:873800.1                                                                                  57224.1002



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LUCENT TECHNOLOGIES INC. and
LUCENT TECHNOLOGIES GUARDIAN I LLC,      :

Plaintiffs,      :

v.      :      Civil Action No.  03-205-KAJ

DELL COMPUTER CORPORATION,      :

Defendant.      :

**PLAINTIFFS' OPENING BRIEF IN SUPPORT OF
THEIR MOTION TO STRIKE DELL'S AFFIRMATIVE DEFENSE OF
UNENFORCEABILITY AND TO DISMISS DELL'S COUNTERCLAIM
TO THE EXTENT IT IS BASED ON THAT AFFIRMATIVE DEFENSE**

Josy W. Ingersoll (#1088)
John W. Shaw (#3362)
YOUNG CONAWAY STARGATT
    & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor, P.O. Box 391
Wilmington, Delaware  18991
(302) 571-6600

OF COUNSEL:

John M. Desmarais
Robert A. Appleby
KIRKLAND & ELLIS
153 East 53rd Street
New York, New York 10022-4675
(212) 446-4800

Attorneys for Lucent Technologies Inc. and
Lucent Technologies Guardian I LLC

Dated:  March 31, 2003

# TABLE OF CONTENTS

I.      INTRODUCTION. ..............................................................................................1

II.     NATURE AND STAGE OF THE PROCEEDING AND STATEMENT OF
        FACTS. ............................................................................................................1

III.    ARGUMENT. ...................................................................................................2

        A.      Legal Standards. ...................................................................................2

        B.      Dell's Unenforceability Allegation Fails To Satisfy Rule 9(b). ...............3

IV.     CONCLUSION. ................................................................................................6

# TABLE OF AUTHORITIES

*Cases*

*Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.,*
  No. C-95-3577 DLJ, 1996 WL 467293 (N.D. Cal. July 24, 1996)........................................4

*Agere Sys. Guardian Corp. v. Proxim, Inc.,*
  190 F. Supp. 2d 726 (D. Del. 2002)................................................................3, 5

*Cardiogenesis Corp. v. PLC Sys., Inc.,*
  Civ. No. 96-20749 SW, 1997 WL 12129 (N.D. Cal. Jan. 8, 1997)........................................3

*EMC Corp. v. Storage Tech. Corp.,*
  921 F. Supp. 1261 (D. Del. 1996)................................................................3

*France Telecom S.A. v. Novell, Inc.,*
  No. 102-437-GMS, 2002 WL 31355255 (D. Del. Oct. 17, 2002)........................................3, 5

*Harrison v. Westinghouse Savannah River Co.,*
  176 F.3d 776 (4th Cir. 1999) ................................................................2

*Paramount Aviation Corp. v. Agusta,*
  178 F.3d 132 (3rd Cir.), *cert. denied,* 528 U.S. 878 (1999)................................................4

*S & R Corp. v. Jiffy Lube Int'l, Inc.,*
  968 F.2d 371 (3rd Cir. 1992) ................................................................4


**Statutes and Rules**

Fed. R. Civ. P. 8................................................................5

Fed. R. Civ. P. 9(b) ................................................................*passim*

Fed. R. Civ. P. 12(b)(6)................................................................2, 5

Fed. R. Civ. P. 12(f)................................................................2, 5

## I.   INTRODUCTION.

Plaintiffs Lucent Technologies Inc. and Lucent Technologies Guardian I LLC (collectively, "Lucent") seek redress for the infringement of six United States Patents by Defendant Dell Computer Corporation ("Dell").  These patents reflect innovations — most developed at Lucent's world-renowned Bell Laboratories — that have enhanced the capabilities of personal computers in the areas of video display, audio encoding, networking, and user interfaces.  Dell has infringed these patents through the manufacture, use, sale, and offer for sale of personal computers, components, and accessory equipment throughout the United States.

Unwilling to compensate Lucent for this infringement, Dell has raised several affirmative defenses and a declaratory-judgment counterclaim incorporating those defenses.  Among these, Dell asserts that all the patents-in-suit are unenforceable.  But Dell fails to plead its unenforceability counterclaim and defense with the specificity that the Federal Rules of Civil Procedure require of claims and defenses of this nature.  Accordingly, Lucent respectfully requests that this Court strike Dell's unenforceability defense and dismiss Dell's declaratory-judgment counterclaim to the extent it seeks to have the patents-in-suit declared unenforceable.

## II.   NATURE AND STAGE OF THE PROCEEDING AND STATEMENT OF FACTS.

Lucent filed its Complaint in this action on February 20, 2003, alleging that Dell infringed six United States Patents by making, using, selling, and offering for sale personal computer systems, components, and accessories throughout the United States.  (Complaint, ¶¶ 5, 22, 29, 36, 43, 47, 55)  Dell filed its Answer and Counterclaim on March 11, 2003, asserting five affirmative defenses and a declaratory-judgment counterclaim incorporating four of those five affirmative defenses.  Among these, Dell alleges as both an affirmative defense and ground for its counterclaim that:

1

> The patents in suit are unenforceable because of Lucent's unclean hands, including but not limited to assertion of the patents in suit without proper basis for alleging infringement, and procurement of one or more of the patents in suit by failure to disclose material prior art to the United States Patent Office.

(Answer and Counterclaim ¶¶ 61 and 71).  As demonstrated below, however, this allegation fails to provide sufficient notice of a cognizable claim for unenforceability.  Accordingly, Dell's affirmative defense of unenforceability should be stricken, and its counterclaim should be dismissed to the extent that it seeks a declaration that the patents-in-suit are unenforceable.

## III.   ARGUMENT.

### A.   Legal Standards.

The Federal Rules of Civil Procedure provide that a claim may be dismissed for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  Failure to state a claim under Rule 12(b)(6) includes the failure to satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).  *See, e.g., Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 n.5 (4th Cir. 1999) ("lack of compliance with Rule 9(b)'s pleading requirements is treated as a failure to state a claim under Rule 12(b)(6)").  Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  Fed. R. Civ. P. 9(b).  The purposes of Rule 9(b) are to ensure that a party "has sufficient information to formulate a defense by putting it on notice of the conduct complained of," to "eliminate fraud actions in which all the facts are learned after discovery," and to protect parties from "frivolous suits" and from "harm to their goodwill and reputation." *Id.* at 784.

The Federal Rules of Civil Procedure also authorize the Court to strike "from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  Under Rule 12(f), the Court may strike any defense that is

2

insufficient as a matter of law.  *See, e.g., France Telecom S.A. v. Novell, Inc.*, No. 102-437-

GMS, 2002 WL 31355255, at *1 (D. Del. Oct. 17, 2002) (motion to strike will be denied only "if

the defense is sufficient under the law").

### B.   Dell's Unenforceability Allegation Fails To Satisfy Rule 9(b).

Dell alleges as both an affirmative defense and ground for its counterclaim that:

> The patents in suit are unenforceable because of Lucent's unclean
> hands, including but not limited to assertion of the patents in suit
> without proper basis for alleging infringement, and procurement of
> one or more of the patents in suit by failure to disclose material
> prior art to the United States Patent Office.

(Answer and Counterclaim ¶¶ 61 and 71)  An unenforceability allegation is often asserted as an

"umbrella for . . . defenses such as fraud, estoppel, unclean hands, and patent misuse."

*Cardiogenesis Corp. v. PLC Sys., Inc.*, Civ. No. 96-20749 SW, 1997 WL 12129, at *1 (N.D. Cal.

Jan. 8, 1997).  On its face, Dell rests its unenforceability allegation in part upon alleged unclean

hands due to inequitable conduct:  the alleged "procurement of one or more of the patents in suit

by failure to disclose material prior art to the United States Patent Office."  (Answer and

Counterclaim ¶¶ 61 and 71)

But an inequitable conduct defense which charges the patentee with fraudulent behavior

before the Patent Office is subject to the heightened pleading requirements of Rule 9(b) and must

be pled with particularity.  *See, e.g., Agere Sys. Guardian Corp. v. Proxim, Inc.*, 190 F. Supp. 2d

726, 733-34 (D. Del. 2002).  Therefore, "in pleading an inequitable conduct claim, a party cannot

merely rely on vague allegations that broadly recite the elements of fraud, but instead must either

specify the time, place, and content of any alleged misrepresentations made to the PTO or

otherwise 'give the defendant[] notice of the precise misconduct alleged.'"  *Id.* (citations omitted).

This includes identifying any allegedly material prior art that the party contends was not

disclosed to the PTO.  *EMC Corp. v. Storage Tech. Corp.*, 921 F. Supp. 1261, 1263 (D. Del.

3

1996) (deeming inequitable conduct counterclaim that failed to disclose the relevant prior art insufficient under Rule 9(b)).

Here, however, Dell fails to plead *any* facts to support its allegation of inequitable conduct, even failing to identify the patents-in-suit to which this defense applies. Indeed, the patents-in-suit, which cover different technologies, and were issued to different inventors over a sixteen year period. Thus, any alleged inequitable conduct with respect to any one patent-in-suit has no bearing on the other patents-in-suit. Thus, Dell's unenforceability allegation fails to satisfy the requirements of Rule 9(b). Nor can Dell circumvent these requirements by pleading the allegation as an "unclean hands" defense. *See, e.g., Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*, No. C-95-3577 DLJ, 1996 WL 467293, at * 11 and *13 (N.D. Cal. July 24, 1996) (dismissing inequitable conduct counterclaim and striking affirmative defenses of inequitable conduct and unclean hands, based on the same allegations of fraudulent conduct, as inadequately pled). Therefore, Dell's unenforceability defense should be stricken, and dismissed. *Id.*

Dell also rests its unenforceability allegation on a theory of unclean hands resulting from purported "assertion of the patents-in-suit without proper basis for alleging infringement." (Answer and Counterclaim ¶ ¶ 61 and 71)  Again, however, Dell fails to plead *any* facts to support this claim or even identify the patents-in-suit to which the claim is directed. To assert the equitable defense of unclean hands successfully, Dell must allege and prove that Lucent is "guilty of fraud, unconscionable conduct, or bad faith directly related to the matter at issue that injures the other party and affects the balance of equities." *Paramount Aviation Corp. v. Agusta*, 178 F.3d 132, 147 n.12 (3rd Cir.), *cert. denied*, 528 U.S. 878 (1999); *see also S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 377 n.7 (3rd Cir. 1992) (noting plaintiff's failure to allege elements of unclean hands). Dell fails to allege *any* facts to support any of these elements.

4

Moreover, allegations of fraud are subject to the heightened pleading requirements of Rule 9(b).

*Agere Sys.*, 190 F. Supp. 2d at 733-34.  Accordingly, this Court should strike Dell's

unenforceability affirmative defense, and dismiss Dell's counterclaim to the extent that it seeks to

a declaration that the patents-in-suit are unenforceable, for failure to meet the threshold

requirements of Rule 9(b).[1]

---

[1] To the extent that Dell rests its unenforceability allegation on a theory of unclean hands
other than those expressly set forth in its Answer and Counterclaim, Dell fails to provide Lucent
with sufficient notice of those grounds and accordingly fails to meet the threshold sufficiency
requirements of Rule 8.  *See France Telecom S.A*, at *2-3 (finding unclean hands defense to meet
the sufficiency requirements of Rule 8 after bare allegation of unclean hands was amended to
state "the basis for the unclean hands defense, including the context of the alleged misconduct").

IV.     **CONCLUSION.**

For the foregoing reasons, Lucent respectfully requests that this Court:

(1)     strike Dell's unenforceability affirmative defense (Answer and Counterclaim ¶ 61) pursuant to Fed. R. Civ. P. 9(b) and 12(f); and

(2)     dismiss Dell's counterclaim to the extent it seeks to have the patents-in-suit declared unenforceable (Answer and Counterclaim ¶ 71) pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6).

Respectfully submitted,

Josy W. Ingersoll (#1088)
John W. Shaw (#3362)
YOUNG CONAWAY STARGATT
    & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE  18991
(302) 571-6600

*Attorneys for Plaintiffs Lucent Technologies Inc.
and Lucent Technologies Guardian I LLC*

OF COUNSEL:
John M. Desmarais
Robert A. Appleby
Maxine Y. Graham
Michael E. Stimson
KIRKLAND & ELLIS
153 East 53rd Street
New York, New York 10022-4675
(212) 446-4800

Dated:  March 31, 2003

6

# CERTIFICATE OF SERVICE

I, John W. Shaw, Esquire, hereby certify that copies of the foregoing document were caused to be served on March 31, 2003, upon the following counsel of record:

### BY HAND DELIVERY

R. Eric Hutz, Esquire
Connolly, Bove, Lodge & Hutz, LLP
1220 Market Building
Wilmington, Delaware 19801

### BY FEDERAL EXPRESS

John M. Freed
Arnold & Porter
555 12th Street NW
Washington, DC  20004

_____
John W. Shaw

57224.1002

 

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| LUCENT TECHNOLOGIES INC.<br>and LUCENT TECHNOLOGIES<br>GUARDIAN I LLC,<br><br>        Plaintiffs,<br><br>    v.<br><br>DELL COMPUTER CORPORATION,<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)   C.A. No. 03-205 (KAJ)<br>)<br>)<br>)<br>) |

## MOTION TO STRIKE DELL'S AFFIRMATIVE DEFENSE OF UNENFORCEABILITY AND TO DISMISS DELL'S COUNTERCLAIM TO THE EXTENT IT IS BASED ON THAT AFFIRMATIVE DEFENSE

Plaintiffs Lucent Technologies Inc. and Lucent Technologies Guardian I LLC ("Plaintiffs") hereby move this Court for entry of an Order, pursuant to Federal Rule of Civil Procedure 9(b) and 12(f), striking defendant Dell Computer Corporation's affirmative defense of unenforceability, and, pursuant to Federal Rule of Civil Procedure 9(b) and 12(b)(6), dismissing defendant's counterclaim to the extent it is based on that affirmative defense. The grounds upon which Plaintiffs make this motion are set forth in Plaintiff's opening brief, filed of even date herewith.

A proposed form of Order is attached for the Court's convenience.

Respectfully submitted,

Josy W. Ingersoll (#1088)
John W. Shaw (#3362)
Christian Douglas Wright (#3554)
YOUNG CONAWAY STARGATT
   & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 189991
(302) 571-6600

OF COUNSEL:

John M. Desmarais
Robert A. Appleby
KIRKLAND & ELLIS
153 East 53rd Street
New York, NY  10022-4675
(212) 446-4800

DATED:  March 31, 2003

*Attorneys for Plaintiffs Lucent Technologies
Inc. and Lucent Technologies Guardian I
LLC*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LUCENT TECHNOLOGIES INC.<br>and LUCENT TECHNOLOGIES<br>GUARDIAN I LLC, | ) | |
| | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 03-205 (KAJ) |
| | ) | |
| DELL COMPUTER CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

WHEREAS, plaintiffs Lucent Technologies Inc. and Lucent Technologies Guardian I LLC ("Plaintiffs") have moved this Court for entry of an Order, pursuant to Federal Rule of Civil Procedure 9(b) and 12(f), striking defendant Dell Computer Corporation's affirmative defense of unenforceability, and, pursuant to Federal Rule of Civil Procedure 9(b) and 12(b)(6), dismissing defendant's counterclaim to the extent it is based on that affirmative defense; and

WHEREAS, the Court has considered the parties' positions and arguments with respect to the motion, and finds that Plaintiffs are entitled to the relief they seek;

NOW, THEREFORE, IT IS HEREBY ORDERED, this ___ day of _____,

2003, that Plaintiffs' motion is GRANTED.  Defendant Dell Computer Corporation's

affirmative defense of unenforceability is hereby STRICKEN (Answer and Counterclaim

¶ 71), and its counterclaim is, to the extent it is based on the affirmative defense of

unenforceability, is hereby DISMISSED (Answer and Counterclaim ¶ 61).


_____

United States District Judge

## CERTIFICATE OF SERVICE

I, John W. Shaw, Esquire, hereby certify that copies of the foregoing document were caused to be served on March 31, 2003, upon the following counsel of record:

### BY HAND DELIVERY

R. Eric Hutz, Esquire
Connolly, Bove, Lodge & Hutz, LLP
1220 Market Building
Wilmington, Delaware 19801

### BY FEDERAL EXPRESS

Joel M. Freed
Arnold & Porter
555 12th Street NW
Washington, DC 20004

_____
John W. Shaw



**ORIGINAL**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

LUCENT TECHNOLOGIES INC.  )
and LUCENT TECHNOLOGIES   )
GUARDIAN I LLC,           )
                          )
        Plaintiffs,       )
                          )
    v.                    )    C.A. No. 03-205 (KAJ)
                          )
DELL COMPUTER CORPORATION,  )
                          )
        Defendant.        )

## MOTION TO STRIKE DELL'S AFFIRMATIVE DEFENSE OF UNENFORCEABILITY AND TO DISMISS DELL'S COUNTERCLAIM TO THE EXTENT IT IS BASED ON THAT AFFIRMATIVE DEFENSE

Plaintiffs Lucent Technologies Inc. and Lucent Technologies Guardian I LLC ("Plaintiffs") hereby move this Court for entry of an Order, pursuant to Federal Rule of Civil Procedure 9(b) and 12(f), striking defendant Dell Computer Corporation's affirmative defense of unenforceability, and, pursuant to Federal Rule of Civil Procedure 9(b) and 12(b)(6), dismissing defendant's counterclaim to the extent it is based on that affirmative defense. The grounds upon which Plaintiffs make this motion are set forth in Plaintiff's opening brief, filed of even date herewith.

A proposed form of Order is attached for the Court's convenience.

Respectfully submitted,

Josy W. Ingersoll (#1088)
John W. Shaw (#3362)
Christian Douglas Wright (#3554)
YOUNG CONAWAY STARGATT
   & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 189991
(302) 571-6600

*Attorneys for Plaintiffs Lucent Technologies
Inc. and Lucent Technologies Guardian I
LLC*

OF COUNSEL:

John M. Desmarais
Robert A. Appleby
KIRKLAND & ELLIS
153 East 53rd Street
New York, NY  10022-4675
(212) 446-4800

DATED:  March 31, 2003

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LUCENT TECHNOLOGIES INC. and LUCENT TECHNOLOGIES GUARDIAN I LLC, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 03-205 (KAJ) |
| | ) | |
| DELL COMPUTER CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

WHEREAS, plaintiffs Lucent Technologies Inc. and Lucent Technologies Guardian I LLC ("Plaintiffs") have moved this Court for entry of an Order, pursuant to Federal Rule of Civil Procedure 9(b) and 12(f), striking defendant Dell Computer Corporation's affirmative defense of unenforceability, and, pursuant to Federal Rule of Civil Procedure 9(b) and 12(b)(6), dismissing defendant's counterclaim to the extent it is based on that affirmative defense; and

WHEREAS, the Court has considered the parties' positions and arguments with respect to the motion, and finds that Plaintiffs are entitled to the relief they seek;

NOW, THEREFORE, IT IS HEREBY ORDERED, this ___ day of _____,

2003, that Plaintiffs' motion is GRANTED.  Defendant Dell Computer Corporation's

affirmative defense of unenforceability is hereby STRICKEN (Answer and Counterclaim

¶ 71), and its counterclaim is, to the extent it is based on the affirmative defense of

unenforceability, is hereby DISMISSED (Answer and Counterclaim ¶ 61).

_____
United States District Judge

## CERTIFICATE OF SERVICE

I, John W. Shaw, Esquire, hereby certify that copies of the foregoing document were caused to be served on March 31, 2003, upon the following counsel of record:

### BY HAND DELIVERY

> R. Eric Hutz, Esquire
> Connolly, Bove, Lodge & Hutz, LLP
> 1220 Market Building
> Wilmington, Delaware 19801

### BY FEDERAL EXPRESS

> Joel M. Freed
> Arnold & Porter
> 555 12th Street NW
> Washington, DC 20004

John W. Shaw



**ORIGINAL**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LUCENT TECHNOLOGIES INC. and                    :
LUCENT TECHNOLOGIES GUARDIAN I LLC,             :
                                                :
                    Plaintiffs,                 :
                                                :
                    v.                          :    Civil Action No.  03-205-KAJ
                                                :
DELL COMPUTER CORPORATION,                      :
                                                :
                    Defendant.                  :
                                                :

## <u>REPLY TO COUNTERCLAIM</u>

Plaintiffs Lucent Technologies Inc. and Lucent Technologies Guardian I LLC (collectively, "Lucent"), hereby demand a trial by jury for the Counterclaim and for their Reply to the Counterclaim of Defendant Dell Computer Corporation ("Dell"), hereby state as follows:

62.    Lucent admits that Paragraph 62 and following Paragraphs purport to set forth a counterclaim.

63.    Lucent admits that Dell's Counterclaim purports to set forth an action for declaratory judgment under the Declaratory Judgment Act and the Patent Laws of the United States, but denies that any of the Patents-in-Suit are invalid, unenforceable, or not infringed.

64.    Admitted.

65.    Lucent admits that this Court has subject-matter jurisdiction over Dell's Counterclaim, but denies that jurisdiction arises under 28 U.S.C. § 1337(a) or 28 U.S.C § 1367. Lucent admits that venue is proper in this judicial district.

66.     Paragraphs 1, 2, and 4 of Dell's Answer do not contain allegations and therefore require no response.  To the extent Dell incorporates the allegations of Paragraphs 1, 2, and 4 of Lucent's Complaint, those allegations are admitted.

67.     Lucent restates its responses to Paragraphs 62-66 as if fully set forth herein.  To the extent that Dell intends to incorporate any additional allegations other than those set forth in Paragraphs 62-66, those allegations are denied.

68.     Denied.

69.     Denied.

70.     Denied.

71.     Subject to Lucent's Motion To Dismiss Counterclaim And To Strike Affirmative Defense, filed concurrently herewith, Lucent denies each and every allegation in Paragraph 71.

## REPLY TO DELL'S PRAYER FOR RELIEF

Lucent denies that Dell is entitled to any relief, either as requested in Dell's Counterclaim or otherwise.

## LUCENT'S PRAYER FOR RELIEF

WHEREFORE, Lucent prays for judgment:

A.     Dismissing Dell's Counterclaim with prejudice;

B.     Awarding Lucent the relief sought in its Complaint;

C.     Awarding Lucent its costs, attorneys' fees and expenses incurred in this action; and

D.    Awarding Lucent such further relief as the Court deems just and proper.

Respectfully submitted,

Josy W. Ingersoll (No. 1088)
John W. Shaw (No. 3362)
Christian Douglas Wright (No. 3554)
YOUNG CONAWAY STARGATT
       & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE  18991
(302) 571-6600

*Attorneys for Plaintiffs Lucent Technologies Inc.
and Lucent Technologies Guardian I LLC*

OF COUNSEL:
John M. Desmarais
Robert A. Appleby
Maxine Y. Graham
Michael E. Stimson
Brian P. Verminski
KIRKLAND & ELLIS
153 East 53rd Street
New York, New York 10022-4675
(212) 446-4800

Dated:  March 31, 2003

## CERTIFICATE OF SERVICE

I, John W. Shaw, Esquire, hereby certify that copies of the foregoing document were caused to be served on March 31, 2003, upon the following counsel of record:

### BY HAND DELIVERY

R. Eric Hutz, Esquire
Connolly, Bove, Lodge & Hutz, LLP
1220 Market Building
Wilmington, Delaware 19801

### BY FEDERAL EXPRESS

John M. Freed
Arnold & Porter
555 12th Street NW
Washington, DC  20004

_____
John W. Shaw





IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| LUCENT TECHNOLOGIES INC. and<br>LUCENT TECHNOLOGIES GUARDIAN I LLC,<br><br>Plaintiffs,<br><br>v.<br><br>DELL COMPUTER CORPORATION,<br><br>Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

Civil Action No. 03-205-KAJ

## REPLY TO COUNTERCLAIM

Plaintiffs Lucent Technologies Inc. and Lucent Technologies Guardian I LLC (collectively, "Lucent"), hereby demand a trial by jury for the Counterclaim and for their Reply to the Counterclaim of Defendant Dell Computer Corporation ("Dell"), hereby state as follows:

62.     Lucent admits that Paragraph 62 and following Paragraphs purport to set forth a counterclaim.

63.     Lucent admits that Dell's Counterclaim purports to set forth an action for declaratory judgment under the Declaratory Judgment Act and the Patent Laws of the United States, but denies that any of the Patents-in-Suit are invalid, unenforceable, or not infringed.

64.     Admitted.

65.     Lucent admits that this Court has subject-matter jurisdiction over Dell's Counterclaim, but denies that jurisdiction arises under 28 U.S.C. § 1337(a) or 28 U.S.C § 1367. Lucent admits that venue is proper in this judicial district.

66.     Paragraphs 1, 2, and 4 of Dell's Answer do not contain allegations and therefore require no response. To the extent Dell incorporates the allegations of Paragraphs 1, 2, and 4 of Lucent's Complaint, those allegations are admitted.

67.     Lucent restates its responses to Paragraphs 62-66 as if fully set forth herein. To the extent that Dell intends to incorporate any additional allegations other than those set forth in Paragraphs 62-66, those allegations are denied.

68.     Denied.

69.     Denied.

70.     Denied.

71.     Subject to Lucent's Motion To Dismiss Counterclaim And To Strike Affirmative Defense, filed concurrently herewith, Lucent denies each and every allegation in Paragraph 71.

## REPLY TO DELL'S PRAYER FOR RELIEF

Lucent denies that Dell is entitled to any relief, either as requested in Dell's Counterclaim or otherwise.

## LUCENT'S PRAYER FOR RELIEF

WHEREFORE, Lucent prays for judgment:

A.     Dismissing Dell's Counterclaim with prejudice;

B.     Awarding Lucent the relief sought in its Complaint;

C.     Awarding Lucent its costs, attorneys' fees and expenses incurred in this action; and

D.    Awarding Lucent such further relief as the Court deems just and proper.

Respectfully submitted,

Jose W. Ingersoll (No. 1088)
John W. Shaw (No. 3362)
Christian Douglas Wright (No. 3554)
YOUNG CONAWAY STARGATT
    & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 18991
(302) 571-6600

*Attorneys for Plaintiffs Lucent Technologies Inc.
and Lucent Technologies Guardian I LLC*

OF COUNSEL:
John M. Desmarais
Robert A. Appleby
Maxine Y. Graham
Michael E. Stimson
Brian P. Verminski
KIRKLAND & ELLIS
153 East 53rd Street
New York, New York 10022-4675
(212) 446-4800

Dated: March 31, 2003

- 3 -

## CERTIFICATE OF SERVICE

I, John W. Shaw, Esquire, hereby certify that copies of the foregoing document were caused to be served on March 31, 2003, upon the following counsel of record:

### BY HAND DELIVERY

R. Eric Hutz, Esquire
Connolly, Bove, Lodge & Hutz, LLP
1220 Market Building
Wilmington, Delaware 19801

### BY FEDERAL EXPRESS

John M. Freed
Arnold & Porter
555 12th Street NW
Washington, DC 20004


John W. Shaw

13

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

LUCENT TECHNOLOGIES, INC., and )
LUCENT TECHNOLOGIES GUARDIAN I LLC, )
)
        Plaintiffs, )
v. )
)
DELL COMPUTER CORPORATION, )
)
        Defendant. )

**Case No. 03-CV-205-KAJ**

**Demand For Jury Trial**

## MOTION AND ORDER FOR ADMISSION PRO HAC VICE

Pursuant to Local Rule 83.5 and the attached certification, counsel moves the admission

*pro hac vice* of Leslie L. Jacobs, Jr., Esquire to represent Defendant Dell Computer Corporation

in this matter.

        Respectfully submitted,

        **CONNOLLY BOVE LODGE & HUTZ, LLP**

By: _____
        R. Eric Hutz (#2702)
        James D. Heisman (#2746)
        1220 Market Street
        Post Office Box 2207
        Wilmington, DE 19899
        (302) 658-9141
        *Attorneys for Plaintiff*
                *Dell Computer Corporation*

**DATED:** March 31, 2003

## ORDER GRANTING MOTION

IT IS HEREBY ORDERED counsel's motion for admission pro hac vice is granted.

Date: _4/1/03_

_____
United States District Judge

## CERTIFICATION BY COUNSEL TO BE ADMITTED PRO HAC VICE

Pursuant to Local Rule 83.5, I certify that I am eligible for admission to this Court, am admitted, practicing and in good standing as a member of the District of Columbia Bar and the U.S. Patent and Trademark Office and pursuant to Local Rule 83.6 submit to the disciplinary jurisdiction of this Court for any alleged misconduct which occurs in the preparation or course of this action.  I also certify I am generally familiar with this Court's Local Rules.

Signed: _____
Leslie L. Jacobs, Jr.
Arnold & Porter
555 12th Street, N.W.
Washington, D.C.  20004
(202) 942-5000

Date: _3/27/03_

## CERTIFICATE OF SERVICE

I certify that today on March 31, 2003, a copy of the foregoing MOTION AND

ORDER FOR ADMISSION PRO HAC VICE for Leslie L. Jacobs, Jr., Esquire was

served upon counsel for defendants as follows:

### BY HAND
Josy W. Ingersoll
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Post Office Box 391
Wilmington, Delaware  19899-0391

### FEDERAL EXPRESS
John M. Desmarais
Robert A. Appleby
Michael E. Stimson
Kirkland & Ellis
153 East 53rd Street
New York, New York 10022-4675

R. Eric Hutz

256468v1

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

|  |  |
|---|---|
| LUCENT TECHNOLOGIES, INC., and<br>LUCENT TECHNOLOGIES GUARDIAN I LLC,<br><br>Plaintiffs,<br><br>v.<br><br>DELL COMPUTER CORPORATION,<br><br>Defendant. | )<br>)<br>)<br>)   Case No. 03-CV-205-KAJ<br>)<br>)   Demand For Jury Trial<br>)<br>)<br>)<br>) |

## MOTION AND ORDER FOR ADMISSION PRO HAC VICE

Pursuant to Local Rule 83.5 and the attached certification, counsel moves the admission *pro hac vice* of Robert Jones Worrall, Esquire to represent Defendant Dell Computer Corporation in this matter.

Respectfully submitted,

**CONNOLLY BOVE LODGE & HUTZ, LLP**

By: _____
R. Eric Hutz (#2702)
James D. Heisman (#2746)
1220 Market Street
Post Office Box 2207
Wilmington, DE 19899
(302) 658-9141
*Attorneys for Plaintiff*
        *Dell Computer Corporation*

**DATED:** March 31, 2003

## ORDER GRANTING MOTION

IT IS HEREBY ORDERED counsel's motion for admission pro hac vice is granted.

Date: ___4/1/03___                        _____
                                           United States District Judge

## CERTIFICATION BY COUNSEL TO BE ADMITTED PRO HAC VICE

Pursuant to Local Rule 83.5, I certify that I am eligible for admission to this Court, am admitted, practicing and in good standing as a member of the Bars of <u>the State of Virginia and the District of Columbia</u> and pursuant to Local Rule 83.6 submit to the disciplinary jurisdiction of this Court for any alleged misconduct which occurs in the preparation or course of this action. I also certify I am generally familiar with this Court's Local Rules.

Signed: _____
        Robert Jones Worrall
        Arnold & Porter
        555 12th Street, N.W.
        Washington, D.C.  20004
        (202) 942-5000

Date: ___3.21.03___

## CERTIFICATE OF SERVICE

I certify that today on March 31, 2003, a copy of the foregoing MOTION AND

ORDER FOR ADMISSION PRO HAC VICE for Robert Jones Worrall, Esquire was

served upon counsel for defendants as follows:

**BY HAND**
Josy W. Ingersoll
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Post Office Box 391
Wilmington, Delaware  19899-0391

**FEDERAL EXPRESS**
John M. Desmarais
Robert A. Appleby
Michael E. Stimson
Kirkland & Ellis
153 East 53rd Street
New York, New York 10022-4675

R. Eric Hutz

256468v1

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

|  |  |
|---|---|
| LUCENT TECHNOLOGIES, INC., and LUCENT TECHNOLOGIES GUARDIAN I LLC, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| DELL COMPUTER CORPORATION, | ) ) ) |
| Defendant. | ) ) |

Case No. 03-CV-205-KAJ

Demand For Jury Trial

## MOTION AND ORDER FOR ADMISSION PRO HAC VICE

Pursuant to Local Rule 83.5 and the attached certification, counsel moves the admission *pro hac vice* of Joel M. Freed, Esquire to represent Defendant Dell Computer Corporation in this matter.

Respectfully submitted,

**CONNOLLY BOVE LODGE & HUTZ, LLP**

By: _____
R. Eric Hutz (#2702)
James D. Heisman (#2746)
1220 Market Street
Post Office Box 2207
Wilmington, DE 19899
(302) 658-9141
*Attorneys for Plaintiff*
    *Dell Computer Corporation*

**DATED:** March 31, 2003

## ORDER GRANTING MOTION

IT IS HEREBY ORDERED counsel's motion for admission pro hac vice is granted.

Date: _4/1/03_

_____
United States District Judge

## CERTIFICATION BY COUNSEL TO BE ADMITTED PRO HAC VICE

Pursuant to Local Rule 83.5, I certify that I am eligible for admission to this Court, am admitted, practicing and in good standing as a member of the Bars of the District of Columbia and Virginia, and pursuant to Local Rule 83.6 submit to the disciplinary jurisdiction of this Court for any alleged misconduct which occurs in the preparation or course of this action.  I also certify I am generally familiar with this Court's Local Rules.

Signed: _____
Joel M. Freed
Arnold & Porter
555 12th Street, N.W.
Washington, D.C.  20004
(202) 942-5000

Date: _3/28/03_

## CERTIFICATE OF SERVICE

I certify that today on March 31, 2003, a copy of the foregoing MOTION AND

ORDER FOR ADMISSION PRO HAC VICE for Joel M. Freed, Esquire was served

upon counsel for defendants as follows:

### BY HAND
Josy W. Ingersoll
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Post Office Box 391
Wilmington, Delaware  19899-0391

### FEDERAL EXPRESS
John M. Desmarais
Robert A. Appleby
Michael E. Stimson
Kirkland & Ellis
153 East 53rd Street
New York, New York 10022-4675

R. Eric Hutz

256468v1

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| LUCENT TECHNOLOGIES, INC., and LUCENT TECHNOLOGIES GUARDIAN I LLC, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 03-CV-205-KAJ |
| v. | ) ) | Demand For Jury Trial |
| DELL COMPUTER CORPORATION, | ) ) | |
| Defendant. | ) ) | |

### MOTION AND ORDER FOR ADMISSION PRO HAC VICE

Pursuant to Local Rule 83.5 and the attached certification, counsel moves the admission *pro hac vice* of Ali R. Sharifahmadian, Esquire to represent Defendant Dell Computer Corporation in this matter.

Respectfully submitted,

**CONNOLLY BOVE LODGE & HUTZ, LLP**

By:

R. Eric Hutz (#2702)
James D. Heisman (#2746)
1220 Market Street
Post Office Box 2207
Wilmington, DE 19899
(302) 658-9141
*Attorneys for Plaintiff*
       *Dell Computer Corporation*

**DATED:** March 31, 2003

## ORDER GRANTING MOTION

IT IS HEREBY ORDERED counsel's motion for admission pro hac vice is granted.

Date: _4/1/03_

_____
United States District Judge

## CERTIFICATION BY COUNSEL TO BE ADMITTED PRO HAC VICE

Pursuant to Local Rule 83.5, I certify that I am eligible for admission to this Court, am admitted, practicing and in good standing as a member of the Bar of District of Columbia and of Illinois, and pursuant to Local Rule 83.6 submit to the disciplinary jurisdiction of this Court for any alleged misconduct which occurs in the preparation or course of this action. I also certify I am generally familiar with this Court's Local Rules.

Signed: _____
Ali R. Sharifahmadian
Arnold & Porter
555 12th Street, N.W.
Washington, D.C. 20004
(202) 942-5000

Date: _March 21, 2003_

## CERTIFICATE OF SERVICE

I certify that today on March 31, 2003, a copy of the foregoing MOTION AND

ORDER FOR ADMISSION PRO HAC VICE for Ali R. Sharifahmadian, Esquire was

served upon counsel for defendants as follows:

**BY HAND**
Josy W. Ingersoll
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Post Office Box 391
Wilmington, Delaware  19899-0391

**FEDERAL EXPRESS**
John M. Desmarais
Robert A. Appleby
Michael E. Stimson
Kirkland & Ellis
153 East 53rd Street
New York, New York 10022-4675

R. Eric Hutz

256468v1



# YOUNG CONAWAY STARGATT & TAYLOR, LLP

BRUCE M. STARGATT
STUART B. YOUNG
BEN T. CASTLE
SHELDON N. SANDLER
RICHARD A. LEVINE
RICHARD A. ZAPPA
FREDERICK W. IOBST
RICHARD H. MORSE
DAVID C. MCBRIDE
JOSEPH M. NICHOLSON
CRAIG A. KARSNITZ
BARRY M. WILLOUGHBY
JOSY W. INGERSOLL
ANTHONY G. FLYNN
JEROME K. GROSSMAN
EUGENE A. DiPRINZIO
JAMES L. PATTON, JR.
ROBERT L. THOMAS
WILLIAM D. JOHNSTON
TIMOTHY J. SNYDER
BRUCE L. SILVERSTEIN
WILLIAM W. BOWSER
LARRY J. TARABICOS
RICHARD A. DILIBERTO, JR.
MELANIE K. SHARP
CASSANDRA FALINE KAMINSKI
RICHARD J.A. POPPER
TERESA A. CHEEK
NEILLI MULLEN WALSH
JANET Z. CHARLTON
ROBERT S. BRADY
JOEL A. WAITE
BRENT C. SHAFFER
DANIEL P. JOHNSON
CRAIG D. GREAR
TIMOTHY JAY HOUSEAL
BRENDAN LINEHAN SHANNON
MARTIN S. LESSNER
PAULINE K. MORGAN
C. BARR FLINN
NATALIE S. WOLF
LISA B. GOODMAN

JOHN W. SHAW
JAMES P. HUGHES, JR.
EDWIN J. HARRON
MICHAEL R. NESTOR
MAUREEN D. LUKE

JOSEPH M. BARRY
SEAN M. BEACH
TIMOTHY P. CAIRNS
M. BLAKE CLEARY
CURTIS J. CROWTHER
JESSICA S. DAVIS
DANIELLE GIBBS
SCOTT A. HOLT
DAWN M. JONES
EDWARD J. KOSMOWSKI
TIMOTHY E. LENGKEEK
MATTHEW B. LUNN
JOSEPH A. MALFITANO
ADRIA B. MARTINELLI
MATTHEW B. McGUIRE (PA ONLY)
VIVIAN L. MEDINILLA
MARIBETH L. MINELLA
EDMON L. MORTON
JENNIFER M. NICHOLS
JENNIFER R. NOEL
JOHN J. PASCHETTO
ADAM W. POFF
SETH J. REIDENBERG
SARA BETH A. REYBURN
FRANCIS J. SCHANNE
SCOTT SALERNI
STEPHEN E. SMITH
JOANNE C. SPRINGER-MESSICK
JOHN E. TRACEY
ALFRED VILLOCH, III
CHRISTIAN DOUGLAS WRIGHT
SHARON M. ZIEG
VIRGINIA A. ZRAKE

THE BRANDYWINE BUILDING
1000 WEST STREET, 17TH FLOOR
WILMINGTON, DELAWARE 19801

P.O. BOX 391
WILMINGTON, DELAWARE 19899-0391

(302) 571-6600
(800) 253-2234 (DE ONLY)
FAX: (302) 571-1253

WRITER'S DIRECT DIAL NUMBERS
VOICE: (302) 571-6689
FAX: (302) 576-3334

E-MAIL: jshaw@ycst.com

H. ALBERT YOUNG
1929-1982

H. JAMES CONAWAY, JR.
1947-1990

WILLIAM F. TAYLOR
EDWARD B. MAXWELL, 2ND
SHELDON A. WEINSTEIN
OF COUNSEL

JOHN D. MCLAUGHLIN, JR.
SPECIAL COUNSEL

GEORGETOWN OFFICE
110 WEST PINE STREET
P.O. BOX 594
GEORGETOWN, DELAWARE 19947
(302) 856-3571
(800) 255-2234 (DE ONLY)
FAX: (302) 856-9338

March 31, 2003

**BY HAND DELIVERY**

The Honorable Kent A. Jordan
United States District Court
844 King Street
Wilmington, DE 19801

Re: Lucent Technologies Inc., et al. v. Dell
Computer Corporation, C.A. No. 03-205-KAJ

Dear Judge Jordan:

In anticipation of the telephonic scheduling conference in this matter set for April 3, 2003 at 4:00 p.m., I have enclosed the parties' joint discovery plan for Your Honor's consideration.

Respectfully,

John W. Shaw

JWS:bjp
Enclosure
cc: Clerk of the Court
R. Eric Hutz, Esquire (w/enc., by hand)
John M. Desmarais, Esquire (w/enc., by facsimile)
John M. Freed, Esquire (w/enc., by facsimile)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LUCENT TECHNOLOGIES INC., and )
LUCENT TECHNOLOGIES GUARDIAN )
I LLC, )
)
       Plaintiffs, )
)
)   Civil Action No. 03-205-KAJ
v. )
)
DELL COMPUTER CORPORATION, )
)
       Defendant. )

## SCHEDULING ORDER

This ____ day of _____, 200_, the Court having conducted an initial Rule 16 scheduling and planning conference pursuant to Local Rule 16.2(a) on _____, 200_, and the parties having determined after discussion that the matter cannot be resolved at this juncture by settlement, voluntary mediation, or binding arbitration;

IT IS ORDERED that:

1.     <u>Rule 26(a)(1) Initial Disclosures</u>.  Unless otherwise agreed to by the parties, the parties shall make their initial disclosures pursuant to Federal Rule of Civil Procedure 26(a)(1) within five days of the date of this Order.

2.     <u>Joinder of other Parties and Amendment of Pleadings</u>.  All motions to join other parties, and to amend or supplement the pleadings shall be filed on or before **September 30, 2003**.

3.     <u>Discovery</u>

     a.     <u>Limitation on Hours for Deposition Discovery</u>.  Each side is limited to a total of 175 hours of taking testimony by deposition upon oral examination,

1

excluding the depositions of expert witnesses.  With respect to the depositions of

technical expert witnesses, each side is limited to one (1) day of seven (7) hours for

each patent in suit on which the expert is expected to testify, up to a maximum of three

(3) days of seven (7) hours each.  With respect to the depositions of non-technical

expert witnesses, each side is limited to one (1) day of seven (7) hours per expert.

Either side may seek leave of Court for additional time for fact or expert depositions for

good cause shown.

   b. <u>Location of Depositions</u>.  Any party or representative (officer,

director, or managing agent) of a party filing a civil action in this district court must

ordinarily be required, upon request, to submit to a deposition at a place designated

within this district.  Exceptions to this general rule may be made on order of the Court.

A defendant who becomes a counterclaimant, cross-claimant, or third-party plaintiff

shall be considered as having filed an action in this Court for the purpose of this

provision.

   c. <u>Discovery Cut Off</u>.  All discovery other than expert disclosures and

depositions in this case shall be initiated so that it will be completed on or before **May**

**14, 2004**.  Expert depositions shall be completed on or before **August 13, 2004.**  The

Court encourages the parties to serve and respond to contention interrogatories early in

the case.  Unless otherwise ordered by the Court, the limitations on discovery set forth

in Local Rule 26.1 shall be strictly observed.

   d. <u>Disclosure of Expert Testimony</u>.  Unless otherwise agreed to by the

parties, they shall file their initial Federal Rule of Civil Procedure 26(a)(2) disclosures of

<div align="center">2</div>

expert testimony on or before **June 11, 2004**, and file rebuttal expert reports on or before **July 16, 2004**. To the extent any objection to expert testimony is made pursuant to the principles announced in <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579 (1993), it shall be made by motion and briefed according to the schedule for case dispositive motions set forth in paragraph 9, unless otherwise ordered by the Court.

    e. <u>Discovery Disputes</u>. Should counsel find they are unable to resolve a discovery dispute, the party seeking the relief shall contact chambers at (302) 573-6001 to schedule a telephone conference. Not less than forty-eight hours prior to the conference, the party seeking relief shall file with the Court a letter agenda not to exceed two pages outlining the issues in dispute. Should the Court find further briefing necessary upon conclusion of the telephone conference, the Court shall order the party seeking relief to file with the Court a three page letter, exclusive of exhibits, describing the issues in contention. The responding party shall file within five days from the date of service of the opening letter an answering letter of no more than three pages. The party seeking relief may then file a reply letter of no more than two pages within three days from the date of service of the answering letter.

    4. <u>Application to Court for Protective Order</u>. Should counsel find it will be necessary to apply to the Court for a protective order specifying terms and conditions for the disclosure of confidential information, counsel should confer and attempt to reach an agreement on a proposed form of order and submit it to the Court within ten days from the date of this Order.

Any proposed order should include the following paragraph:

> Other Proceedings. By entering this order and limiting the disclosure of information in this case, the Court does not intend to preclude another court from finding that information may be relevant and subject to disclosure in another case. Any person or party subject to this order who becomes subject to a motion to disclose another party's information designated "confidential" [the parties should list any other level of designation, such as "highly confidential," which may be provided for in the protective order] pursuant to this order shall promptly notify that party of the motion so that the party may have an opportunity to appear and be heard on whether that information should be disclosed.

5.   Papers Filed Under Seal.  When filing papers under seal, counsel should deliver to the Clerk an original and one copy of the papers.

6.   Settlement Conference.  Pursuant to 28 U.S.C. § 636, this matter is referred to the United States Magistrate for the purpose of exploring the possibility of a settlement. The Magistrate Judge will schedule a settlement conference with counsel and their clients to be held within ninety days from the date of this Order.

7.   Interim Status Report.  On **October 31, 2003**, counsel shall submit a letter to the Court with an interim report on the nature of the matters in issue and the progress of discovery to date.

8.   Status Conference.  On **November __, 2003**, the Court will hold a Rule 16(a), (b) and (c) conference by telephone with counsel beginning at ____.m.  Plaintiff's counsel shall initiate the telephone call.

If all parties agree that there is nothing to report, nor anything to add to the interim status report or to this order, they may so notify the Court in writing before the conference is scheduled to occur, and the conference will be taken off of the Court's calendar.

9.   Case Dispositive Motions.  All case dispositive motions, an opening brief, and affidavits, if any, in support of the motion shall be served and filed on or before **September 2, 2004**.  Answering briefs, and affidavits, if any, in opposition shall be served and filed on or before **September 30, 2004**, and the reply brief of the movant and affidavits, if any, shall be served and filed on or before **October 21, 2004**.

10.   Claim Construction Issue Identification.  If the Court does not find that a limited earlier claim construction would be helpful in resolving the case, on **June 18, 2004**, the parties shall exchange a list of those claim term(s)/phrase(s) that they believe need construction and their proposed claim construction of those term(s)/phrase(s). This document will not be filed with the Court.  Subsequent to exchanging that list, the parties will meet and confer to prepare a Joint Claim Construction Chart to be submitted pursuant to paragraph 11 below.  The parties' Joint Claim Construction Chart should identify for the Court the term(s)/phrase(s) of the claim(s) in issue, and should include each party's proposed construction of the disputed claim language with citation(s) only to the intrinsic evidence in support of their respective proposed constructions.  A copy of the patent(s) in issue as well as those portions of the intrinsic record relied upon are to be submitted with this Joint Claim Construction Chart.  In this joint submission, the parties shall not provide argument.

11.   Claim Construction.  The parties shall submit a Joint Claim Construction Chart to the Court on or before **July 23, 2004**, to be considered by the Court in conjunction with the parties' summary judgment motions.  The parties shall file their respective opening briefs on claim-construction issues on or before **August 26, 2004**, answering briefs on claim-construction issues on or before **September 23, 2004**.

5

12.   <u>Hearing on Claim Construction</u>.  Beginning at - _____ _.m. on

**November 15, 2004**, the Court will hear evidence and argument on claim construction

and on case dispositive motions.

13.   <u>Applications by Motion</u>.  Except as otherwise specified herein, any

application to the Court shall be by written motion filed with the Clerk.  Unless otherwise

requested by the Court, counsel shall not deliver copies of papers or correspondence to

Chambers.  Any non-dispositive motion should contain the statement required by Local

Rule 7.1.1.

14.   <u>Pretrial Conference</u>.  On **January 20, 2005**, the Court will hold a Final

Pretrial Conference in Chambers with counsel beginning at ___ _.m. Unless otherwise

ordered by the Court, the parties should assume that filing the pretrial order satisfies the

pretrial disclosure requirement of Federal Rule of Civil Procedure 26(a)(3). Thirty days

before the joint proposed pretrial order is due, plaintiff's counsel shall forward to

defendant's counsel a draft pretrial order containing the information plaintiff proposes to

include in the draft. Defendant's counsel shall, in turn, provide to plaintiffs counsel any

comments on the plaintiff's draft as well as the information defendant proposes to

include in the proposed pretrial order. Motions *in limine* shall not be separately filed. Any

*in limine* requests shall be set forth in the proposed pretrial order.  Each party shall be

limited to five *in limine* requests, unless otherwise permitted by the  Court.  Briefing shall

not be submitted on *in limine* requests, unless otherwise permitted by the Court.  The

parties shall file with the Court the joint proposed final pretrial order with the information

required by the form of Final Pretrial Order which accompanies this Scheduling Order

on or before **January 10, 2005**.

6

15.   <u>Jury Instructions, Voir Dire, and Special Verdict Forms.</u>  Where a case is

to be tried to a jury, pursuant to Local Rules 47 and 51 the parties should file proposed

voir dire, instructions to the jury, and special verdicts and interrogatories three full

business days before the final pretrial conference.

16.   <u>Trial.</u>  This matter is scheduled for a __ day jury trial beginning at 10:00

a.m. on **January 31, 2005**.  For the purpose of completing pretrial preparations, counsel

should plan on each side being allocated a total of __ hours to present their case.

[Plaintiffs believe that a 10-day trial, where each side is allocated 32 hours to present

their case, will be sufficient for trial in this action.  Defendant believes that a 20-day trial

will be required, with each side being allocated 50 hours to present their case.]


_____
UNITED STATES DISTRICT JUDGE


7

# YOUNG CONAWAY STARGATT & TAYLOR, LLP

BRUCE M. STARGATT
STUART B. YOUNG
BEN T. CASTLE
SHELDON N. SANDLER
RICHARD A. LEVINE
RICHARD A. ZAPPA
FREDERICK W. IOBST
RICHARD H. MORSE
DAVID C. MCBRIDE
JOSEPH M. NICHOLSON
CRAIG A. KARSNITZ
BARRY M. WILLOUGHBY
JOSY W. INGERSOLL
ANTHONY G. FLYNN
JEROME K. GROSSMAN
EUGENE A. DIPRINZIO
JAMES L. PATTON, JR.
ROBERT L. THOMAS
WILLIAM D. JOHNSTON
TIMOTHY J. SNYDER
BRUCE L. SILVERSTEIN
WILLIAM W. BOWSER
LARRY J. TARABICOS
RICHARD A. DILIBERTO, JR.
MELANIE K. SHARP
CASSANDRA FALINE KAMINSKI
RICHARD J.A. POPPER
TERESA A. CHEEK
NEILLI MULLEN WALSH
JANET Z. CHARLTON
ROBERT S. BRADY
JOEL A. WAITE
BRENT C. SHAFFER
DANIEL P. JOHNSON
CRAIG D. GREAR
TIMOTHY JAY HOUSEAL
BRENDAN LINEHAN SHANNON
MARTIN S. LESSNER
PAULINE K. MORGAN
C. BARR FLINN
NATALIE S. WOLF
LISA B. GOODMAN

JOHN W. SHAW
JAMES P. HUGHES, JR.
EDWIN J. HARRON
MICHAEL R. NESTOR
MAUREEN D. LUKE
————
JOSEPH M. BARRY
SEAN M. BEACH
TIMOTHY P. CAIRNS
M. BLAKE CLEARY
CURTIS J. CROWTHER
JESSICA S. DAVIS
DANIELLE GIBBS
SCOTT A. HOLT
DAWN M. JONES
EDWARD J. KOSMOWSKI
TIMOTHY E. LENGKEEK
MATTHEW B. LUNN
JOSEPH A. MALFITANO
ADRIA B. MARTINELLI
MATTHEW B. MCGUIRE (PA ONLY)
VIVIAN L. MEDINILLA
MARIBETH L. MINELLA
EDMON L. MORTON
JENNIFER M. NICHOLS
JENNIFER R. NOEL
JOHN J. PASCHETTO
ADAM W. POFF
SETH J. REIDENBERG
SARA BETH A. REYBURN
FRANCIS J. SCHANNE
SCOTT SALERNI
STEPHEN E. SMITH
JOANNE C. SPRINGER-MESSICK
JOHN E. TRACEY
ALFRED VILLOCH, III
CHRISTIAN DOUGLAS WRIGHT
SHARON M. ZIEG
VIRGINIA A. ZRAKE

THE BRANDYWINE BUILDING
1000 WEST STREET, 17TH FLOOR
WILMINGTON, DELAWARE 19801

P.O. BOX 391
WILMINGTON, DELAWARE 19899-0391

(302) 571-6600
(800) 253-2234 (DE ONLY)
FAX: (302) 571-1253

WRITER'S DIRECT DIAL NUMBERS
VOICE: (302) 571-6689
FAX: (302) 576-3334

E-MAIL: jshaw@ycst.com

H. ALBERT YOUNG
1929-1982

H. JAMES CONAWAY, JR.
1947-1990

WILLIAM F. TAYLOR
EDWARD B. MAXWELL, 2ND
SHELDON A. WEINSTEIN
OF COUNSEL

JOHN D. MCLAUGHLIN, JR.
SPECIAL COUNSEL

GEORGETOWN OFFICE
110 WEST PINE STREET
P.O. BOX 594
GEORGETOWN, DELAWARE 19947
(302) 856-3571
(800) 255-2234 (DE ONLY)
FAX: (302) 856-9338

March 31, 2003

**BY HAND DELIVERY**

The Honorable Kent A. Jordan
United States District Court
844 King Street
Wilmington, DE 19801

Re: Lucent Technologies Inc., et al. v. Dell
Computer Corporation, C.A. No. 03-205-KAJ

Dear Judge Jordan:

In anticipation of the telephonic scheduling conference in this matter set for April 3, 2003 at 4:00 p.m., I have enclosed the parties' joint discovery plan for Your Honor's consideration.

Respectfully,

John W. Shaw

JWS:bjp
Enclosure
cc: Clerk of the Court
R. Eric Hutz, Esquire (w/enc., by hand)
John M. Desmarais, Esquire (w/enc., by facsimile)
John M. Freed, Esquire (w/enc., by facsimile)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LUCENT TECHNOLOGIES INC., and    )
LUCENT TECHNOLOGIES GUARDIAN    )
I LLC,    )
                                 )
          Plaintiffs,            )
                                 )
                                 )    Civil Action No. 03-205-KAJ
v.                               )
                                 )
DELL COMPUTER CORPORATION,       )
                                 )
          Defendant.             )

## SCHEDULING ORDER

This _____ day of _____, 200_, the Court having conducted an initial Rule

16 scheduling and planning conference pursuant to Local Rule 16.2(a) on

_____, 200_, and the parties having determined after discussion that the

matter cannot be resolved at this juncture by settlement, voluntary mediation, or binding

arbitration;

IT IS ORDERED that:

1.    Rule 26(a)(1) Initial Disclosures.  Unless otherwise agreed to by the

parties, the parties shall make their initial disclosures pursuant to Federal Rule of Civil

Procedure 26(a)(1) within five days of the date of this Order.

2.    Joinder of other Parties and Amendment of Pleadings.  All motions to join

other parties, and to amend or supplement the pleadings shall be filed on or before

**September 30, 2003**.

3.    Discovery

      a.    Limitation on Hours for Deposition Discovery.  Each side is limited

to a total of 175 hours of taking testimony by deposition upon oral examination,

1

excluding the depositions of expert witnesses. With respect to the depositions of technical expert witnesses, each side is limited to one (1) day of seven (7) hours for each patent in suit on which the expert is expected to testify, up to a maximum of three (3) days of seven (7) hours each. With respect to the depositions of non-technical expert witnesses, each side is limited to one (1) day of seven (7) hours per expert. Either side may seek leave of Court for additional time for fact or expert depositions for good cause shown.

      b.    <u>Location of Depositions</u>. Any party or representative (officer, director, or managing agent) of a party filing a civil action in this district court must ordinarily be required, upon request, to submit to a deposition at a place designated within this district. Exceptions to this general rule may be made on order of the Court. A defendant who becomes a counterclaimant, cross-claimant, or third-party plaintiff shall be considered as having filed an action in this Court for the purpose of this provision.

      c.    <u>Discovery Cut Off</u>. All discovery other than expert disclosures and depositions in this case shall be initiated so that it will be completed on or before **May 14, 2004**. Expert depositions shall be completed on or before **August 13, 2004.** The Court encourages the parties to serve and respond to contention interrogatories early in the case. Unless otherwise ordered by the Court, the limitations on discovery set forth in Local Rule 26.1 shall be strictly observed.

      d.    <u>Disclosure of Expert Testimony</u>. Unless otherwise agreed to by the parties, they shall file their initial Federal Rule of Civil Procedure 26(a)(2) disclosures of

2

expert testimony on or before **June 11, 2004**, and file rebuttal expert reports on or before **July 16, 2004**. To the extent any objection to expert testimony is made pursuant to the principles announced in <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579 (1993), it shall be made by motion and briefed according to the schedule for case dispositive motions set forth in paragraph 9, unless otherwise ordered by the Court.

        e.    <u>Discovery Disputes</u>. Should counsel find they are unable to resolve a discovery dispute, the party seeking the relief shall contact chambers at (302) 573-6001 to schedule a telephone conference. Not less than forty-eight hours prior to the conference, the party seeking relief shall file with the Court a letter agenda not to exceed two pages outlining the issues in dispute. Should the Court find further briefing necessary upon conclusion of the telephone conference, the Court shall order the party seeking relief to file with the Court a three page letter, exclusive of exhibits, describing the issues in contention. The responding party shall file within five days from the date of service of the opening letter an answering letter of no more than three pages. The party seeking relief may then file a reply letter of no more than two pages within three days from the date of service of the answering letter.

        4.    <u>Application to Court for Protective Order</u>. Should counsel find it will be necessary to apply to the Court for a protective order specifying terms and conditions for the disclosure of confidential information, counsel should confer and attempt to reach an agreement on a proposed form of order and submit it to the Court within ten days from the date of this Order.

Any proposed order should include the following paragraph:

> Other Proceedings. By entering this order and limiting the disclosure of information in this case, the Court does not intend to preclude another court from finding that information may be relevant and subject to disclosure in another case. Any person or party subject to this order who becomes subject to a motion to disclose another party's information designated "confidential" [the parties should list any other level of designation, such as "highly confidential," which may be provided for in the protective order] pursuant to this order shall promptly notify that party of the motion so that the party may have an opportunity to appear and be heard on whether that information should be disclosed.

5.  Papers Filed Under Seal. When filing papers under seal, counsel should deliver to the Clerk an original and one copy of the papers.

6.  Settlement Conference. Pursuant to 28 U.S.C. § 636, this matter is referred to the United States Magistrate for the purpose of exploring the possibility of a settlement. The Magistrate Judge will schedule a settlement conference with counsel and their clients to be held within ninety days from the date of this Order.

7.  Interim Status Report. On **October 31, 2003**, counsel shall submit a letter to the Court with an interim report on the nature of the matters in issue and the progress of discovery to date.

8.  Status Conference. On **November __, 2003**, the Court will hold a Rule 16(a), (b) and (c) conference by telephone with counsel beginning at ____.m. Plaintiff's counsel shall initiate the telephone call.

If all parties agree that there is nothing to report, nor anything to add to the interim status report or to this order, they may so notify the Court in writing before the conference is scheduled to occur, and the conference will be taken off of the Court's calendar.

9.    <u>Case Dispositive Motions</u>.  All case dispositive motions, an opening brief, and affidavits, if any, in support of the motion shall be served and filed on or before **September 2, 2004**.  Answering briefs, and affidavits, if any, in opposition shall be served and filed on or before **September 30, 2004**, and the reply brief of the movant and affidavits, if any, shall be served and filed on or before **October 21, 2004**.

10.    <u>Claim Construction Issue Identification</u>.  If the Court does not find that a limited earlier claim construction would be helpful in resolving the case, on **June 18, 2004**, the parties shall exchange a list of those claim term(s)/phrase(s) that they believe need construction and their proposed claim construction of those term(s)/phrase(s). This document will not be filed with the Court.  Subsequent to exchanging that list, the parties will meet and confer to prepare a Joint Claim Construction Chart to be submitted pursuant to paragraph 11 below.  The parties' Joint Claim Construction Chart should identify for the Court the term(s)/phrase(s) of the claim(s) in issue, and should include each party's proposed construction of the disputed claim language with citation(s) only to the intrinsic evidence in support of their respective proposed constructions.  A copy of the patent(s) in issue as well as those portions of the intrinsic record relied upon are to be submitted with this Joint Claim Construction Chart.  In this joint submission, the parties shall not provide argument.

11.    <u>Claim Construction</u>.  The parties shall submit a Joint Claim Construction Chart to the Court on or before **July 23, 2004**, to be considered by the Court in conjunction with the parties' summary judgment motions.  The parties shall file their respective opening briefs on claim-construction issues on or before **August 26, 2004**, answering briefs on claim-construction issues on or before **September 23, 2004**.

5

12.     <u>Hearing on Claim Construction</u>.  Beginning at - _____ _.m. on **November 15, 2004**, the Court will hear evidence and argument on claim construction and on case dispositive motions.

13.     <u>Applications by Motion</u>.  Except as otherwise specified herein, any application to the Court shall be by written motion filed with the Clerk.  Unless otherwise requested by the Court, counsel shall not deliver copies of papers or correspondence to Chambers.  Any non-dispositive motion should contain the statement required by Local Rule 7.1.1.

14.     <u>Pretrial Conference</u>.  On **January 20, 2005**, the Court will hold a Final Pretrial Conference in Chambers with counsel beginning at ___ _.m. Unless otherwise ordered by the Court, the parties should assume that filing the pretrial order satisfies the pretrial disclosure requirement of Federal Rule of Civil Procedure 26(a)(3). Thirty days before the joint proposed pretrial order is due, plaintiff's counsel shall forward to defendant's counsel a draft pretrial order containing the information plaintiff proposes to include in the draft. Defendant's counsel shall, in turn, provide to plaintiffs counsel any comments on the plaintiff's draft as well as the information defendant proposes to include in the proposed pretrial order. Motions *in limine* shall not be separately filed. Any *in limine* requests shall be set forth in the proposed pretrial order. Each party shall be limited to five *in limine* requests, unless otherwise permitted by the  Court.  Briefing shall not be submitted on *in limine* requests, unless otherwise permitted by the Court.  The parties shall file with the Court the joint proposed final pretrial order with the information required by the form of Final Pretrial Order which accompanies this Scheduling Order on or before **January 10, 2005**.

6

15. <u>Jury Instructions, Voir Dire, and Special Verdict Forms.</u> Where a case is to be tried to a jury, pursuant to Local Rules 47 and 51 the parties should file proposed voir dire, instructions to the jury, and special verdicts and interrogatories three full business days before the final pretrial conference.

16. <u>Trial</u>. This matter is scheduled for a __ day jury trial beginning at 10:00 a.m. on **January 31, 2005**. For the purpose of completing pretrial preparations, counsel should plan on each side being allocated a total of __ hours to present their case. [Plaintiffs believe that a 10-day trial, where each side is allocated 32 hours to present their case, will be sufficient for trial in this action. Defendant believes that a 20-day trial will be required, with each side being allocated 50 hours to present their case.]

_____
UNITED STATES DISTRICT JUDGE

7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LUCENT TECHNOLOGIES, INC., and )
LUCENT TECHNOLOGIES GUARDIAN I )
LLC, )
                                  )
            Plaintiffs,           )
                                  )
      v.                          )   Civil Action No. 03-205-KAJ
                                  )
DELL COMPUTER CORPORATION,        )
                                  )
            Defendant.            )

## ORDER FOR SCHEDULING CONFERENCE

At Wilmington, this 25th day of March, 2003

IT IS ORDERED that:

1.      A telephonic scheduling conference to be initiated by defendant's counsel

shall be held on April 3, 2003 at 4:00 p.m.  *See* D. Del. LR 16.2.

2.      Prior to the telephone conference scheduled herein, counsel shall confer

pursuant to Fed.R.Civ.P. 26(f) and shall submit a joint discovery plan to the

undersigned not later than three (3) business days prior to the conference with the

Court.  The discovery plan shall conform to the form of scheduling order previously

issued. Initial disclosures pursuant to Fed.R.Civ.P. 26(a)(1) need not be made prior to

the teleconference with the Court.

3.      At the teleconference with the Court, all parties shall be represented by

counsel who shall have full authority to bind their clients in all pretrial matters.

4.      If any party enters an appearance after the date of this order and before

the teleconference set by this order, counsel for plaintiff shall notify said party of the

teleconference and forward to that party a copy of these materials.

5.    The parties shall advise the undersigned immediately if this matter has

been settled or terminated so that the scheduled teleconference may be canceled.

UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LUCENT TECHNOLOGIES, INC., and    )
LUCENT TECHNOLOGIES GUARDIAN I    )
LLC,                              )
                                  )
                 Plaintiffs,      )
                                  )
        v.                        )      Civil Action No. 03-205-KAJ
                                  )
DELL COMPUTER CORPORATION,        )
                                  )
                 Defendant.       )

## ORDER FOR SCHEDULING CONFERENCE

At Wilmington, this 25th day of March, 2003

IT IS ORDERED that:

1.       A telephonic scheduling conference to be initiated by defendant's counsel shall be held on April 3, 2003 at 4:00 p.m.  *See* D. Del. LR 16.2.

2.       Prior to the telephone conference scheduled herein, counsel shall confer pursuant to Fed.R.Civ.P. 26(f) and shall submit a joint discovery plan to the undersigned not later than three (3) business days prior to the conference with the Court.  The discovery plan shall conform to the form of scheduling order previously issued. Initial disclosures pursuant to Fed.R.Civ.P. 26(a)(1) need not be made prior to the teleconference with the Court.

3.       At the teleconference with the Court, all parties shall be represented by counsel who shall have full authority to bind their clients in all pretrial matters.

4.       If any party enters an appearance after the date of this order and before the teleconference set by this order, counsel for plaintiff shall notify said party of the teleconference and forward to that party a copy of these materials.

5.    The parties shall advise the undersigned immediately if this matter has been settled or terminated so that the scheduled teleconference may be canceled.

_____
UNITED STATES DISTRICT JUDGE



# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

CHAMBERS OF
KENT A. JORDAN
DISTRICT JUDGE

LOCKBOX 10
844 KING STREET
U.S. COURTHOUSE
WILMINGTON, DELAWARE 19801

March 12, 2003

Josy W. Ingersoll, Esq.
Young Conaway Stargatt & Taylor LLP
1000 West Street - #1700
Wilmington, DE   19801

R. Eric Hutz, Esq.
Connolly Bove Lodge & Hutz, LLP
1220 Market Street
Wilmington, DE   19801

Re:    Lucent Technologies, Inc., et al. v. Dell Computer Corporation
        C.A. No. 03-205-KAJ

Dear Counsel:

I have recently been assigned the captioned case and enclose for your consideration a form of Scheduling Order.  Please confer and jointly call my secretary within ten days of the date of this letter to schedule a telephone conference to discuss dates you recommend be adopted in the Order.

Very truly yours,

Kent A. Jordan

KAJ:cas
Enclosure
cc:    Clerk of the Court

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LUCENT TECHNOLOGIES, INC., and LUCENT TECHNOLOGIES GUARDIAN I LLC, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 03-205-KAJ |
| | ) | |
| DELL COMPUTER CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## SCHEDULING ORDER

This ___ day of _____, 200_, the Court having conducted an

initial Rule 16 scheduling and planning conference pursuant to Local Rule 16.2(a) on

_____, 200_, and the parties having determined after discussion that the

matter cannot be resolved at this juncture by settlement, voluntary mediation, or binding

arbitration;

IT IS ORDERED that:

1.      Rule 26(a)(1) Initial Disclosures.  Unless otherwise agreed to by the

parties, the parties shall make their initial disclosures pursuant to Federal Rule of Civil

Procedure 26(a)(1) within five days of the date of this Order.

2.      Joinder of other Parties and Amendment of Pleadings.  All motions to join

other parties, and to amend or supplement the pleadings shall be filed on or before

_____, 200_.

3.      Discovery.

        a.      Limitation on Hours for Deposition Discovery.  Each side is limited

to a total of ___ hours of taking testimony by deposition upon oral examination.

b.   <u>Location of Depositions</u>.  Any party or representative (officer, director, or managing agent) of a party filing a civil action in this district court must ordinarily be required, upon request, to submit to a deposition at a place designated within this district.  Exceptions to this general rule may be made on order of the Court. A defendant who becomes a counterclaimant, cross-claimant, or third-party plaintiff shall be considered as having filed an action in this Court for the purpose of this provision.

c.   <u>Discovery Cut Off</u>.  All discovery in this case shall be initiated so that it will be completed on or before _____, 200_.  The Court encourages the parties to serve and respond to contention interrogatories early in the case.  Unless otherwise ordered by the Court, the limitations on discovery set forth in Local Rule 26.1 shall be strictly observed.

d.   <u>Disclosure of Expert Testimony</u>.  Unless otherwise agreed to by the parties, they shall file their initial Federal Rule of Civil Procedure 26(a)(2) disclosures of expert testimony on or before ninety days before the date of the completion of discovery, and file a supplemental disclosure to contradict or rebut evidence on the same subject matter identified by another party sixty days before the date for the completion of discovery.  To the extent any objection to expert testimony is made pursuant to the principles announced in <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579 (1993), it shall be made by motion no later than the deadline for dispositive motions set forth herein, unless otherwise ordered by the Court.

e.   <u>Discovery Disputes</u>.  Should counsel find they are unable to resolve a discovery dispute, the party seeking the relief shall contact chambers at (302) 573-

6001 to schedule a telephone conference. Not less than forty-eight hours prior to the conference, the party seeking relief shall file with the Court a letter agenda not to exceed two pages outlining the issues in dispute. Should the Court find further briefing necessary upon conclusion of the telephone conference, the Court shall order the party seeking relief to file with the Court a three page letter, exclusive of exhibits, describing the issues in contention. The responding party shall file within five days from the date of service of the opening letter an answering letter of no more than three pages. The party seeking relief may then file a reply letter of no more than two pages within three days from the date of service of the answering letter.

    4.    <u>Application to Court for Protective Order</u>. Should counsel find it will be necessary to apply to the Court for a protective order specifying terms and conditions for the disclosure of confidential information, counsel should confer and attempt to reach an agreement on a proposed form of order and submit it to the Court within ten days from the date of this Order.

    Any proposed order should include the following paragraph:

> <u>Other Proceedings</u>. By entering this order and limiting the disclosure of information in this case, the Court does not intend to preclude another court from finding that information may be relevant and subject to disclosure in another case. Any person or party subject to this order who becomes subject to a motion to disclose another party's information designated "confidential" [the parties should list any other level of designation, such as "highly confidential," which may be provided for in the protective order] pursuant to this order shall promptly notify that party of the motion so that the party may have an opportunity to appear and be heard on whether that information should be disclosed.

3

5.    Papers Filed Under Seal.  When filing papers under seal, counsel should deliver to the Clerk an original and one copy of the papers.

6.    Settlement Conference.  Pursuant to 28 U.S.C. § 636, this matter is referred to the United States Magistrate for the purpose of exploring the possibility of a settlement.  The Magistrate Judge will schedule a settlement conference with counsel and their clients to be held within ninety days from the date of this Order.

7.    Interim Status Report.  On _____, 200_, counsel shall submit a letter to the Court with an interim report on the nature of the matters in issue and the progress of discovery to date.

8.    Status Conference.  On _____, 200_, the Court will hold a Rule 16(a), (b) and (c) conference by telephone with counsel beginning at _____ _.m.  Plaintiff's counsel shall initiate the telephone call.

If all parties agree that there is nothing to report, nor anything to add to the interim status report or to this order, they may so notify the Court in writing before the conference is scheduled to occur, and the conference will be taken off of the Court's calendar.

9.    Tutorial Describing the Technology and Matters in Issue.  [This paragraph in the scheduling order is not a requirement.  If the parties believe that it would be helpful to the Court to have a tutorial, it is not required that the tutorial be by video tape.  Should the parties determine that another format, such as, a tutorial conference or a computerized presentation, for example, would be more appropriate, or that the tutorial is unnecessary, they may make their suggestions regarding the tutorial during the initial Rule 16 Scheduling Conference.

4

Regardless of the format, the tutorial should include (1) a description of the technology in issue and (2) a summary of the party's primary factual and legal contentions. The tutorial should be filed under seal as part of the Court's file, subject to any protective order in effect. This paragraph may also include the opportunity to comment, in writing (with page limitations) within a reasonable time, on the opposing party's tutorial. The parties should confirm that the Court has the technical means to access information contained in any tutorial presented in a format other than an in-person hearing or a video tape.]

10.     Case Dispositive Motions. All case dispositive motions, an opening brief, and affidavits, if any, in support of the motion shall be served and filed on or before _____, 200_. Briefing will be presented pursuant to the Court's Local Rules.

11.     Claim Construction Issue Identification. If the Court does not find that a limited earlier claim construction would be helpful in resolving the case, on _____, 200_, the parties shall exchange a list of those claim term(s)/phrase(s) that they believe need construction and their proposed claim construction of those term(s)/phrase(s). This document will not be filed with the Court. Subsequent to exchanging that list, the parties will meet and confer to prepare a Joint Claim Construction Chart to be submitted pursuant to paragraph 12 below. The parties Joint Claim Construction Chart should identify for the Court the term(s)/phrase(s) of the claim(s) in issue, and should include each party's proposed construction of the disputed claim language with citation(s) only to the intrinsic evidence in support of their respective proposed constructions. A copy of the patent(s) in issue as well as those

5

portions of the intrinsic record relied upon are to be submitted with this Joint Claim Construction Chart.  In this joint submission, the parties shall not provide argument.

12.     Claim Construction.  Issues of claim construction shall be submitted to the Court no later than _____, 200_, to be considered by the Court in conjunction with the parties' summary judgment motions.

13.     Hearing on Claim Construction.  Beginning at _____ _.m. on _____, 200_, the Court will hear evidence and argument on claim construction.

14.     Applications by Motion.  Except as otherwise specified herein, any application to the Court shall be by written motion filed with the Clerk.  Unless otherwise requested by the Court, counsel shall not deliver copies of papers or correspondence to Chambers.  Any non-dispositive motion should contain the statement required by Local Rule 7.1.1.

15.     Pretrial Conference.  On _____, 200_, the Court will hold a Final Pretrial Conference in Chambers with counsel beginning at ___ _.m.  Unless otherwise ordered by the Court, the parties should assume that filing the pretrial order satisfies the pretrial disclosure requirement of Federal Rule of Civil Procedure 26(a)(3). Thirty days before the joint proposed pretrial order is due, plaintiff's counsel shall forward to defendant's counsel a draft pretrial order containing the information plaintiff proposes to include in the draft.  Defendant's counsel shall, in turn, provide to plaintiff's counsel any comments on the plaintiff's draft as well as the information defendant proposes to include in the proposed pretrial order.  Motions *in limine* shall not be separately filed.  Any *in limine* requests shall be set forth in the proposed pretrial order.

6

Each party shall be limited to five *in limine* requests, unless otherwise permitted by the Court.  Briefing shall not be submitted on *in limine* requests, unless otherwise permitted by the Court.   The parties shall file with the Court the joint proposed final pretrial order with the information required by the form of Final Pretrial Order which accompanies this Scheduling Order on or before _____, 200_.

16.    <u>Jury Instructions, Voir Dire, and Special Verdict Forms</u>.  Where a case is to be tried to a jury, pursuant to Local Rules 47 and 51 the parties should file proposed voir dire, instructions to the jury, and special verdicts and interrogatories three full business days before the final pretrial conference.

17.    <u>Trial</u>.  This matter is scheduled for a __ day ___ trial beginning at 10:00 a.m. on _____, 200_.  For the purpose of completing pretrial preparations, counsel should plan on each side being allocated a total of ___ hours to present their case.


_____

UNITED STATES DISTRICT JUDGE





# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

CHAMBERS OF
KENT A. JORDAN
DISTRICT JUDGE

LOCKBOX 10
844 KING STREET
U.S. COURTHOUSE
WILMINGTON, DELAWARE 19801

March 12, 2003

Josy W. Ingersoll, Esq.
Young Conaway Stargatt & Taylor LLP
1000 West Street - #1700
Wilmington, DE   19801

R. Eric Hutz, Esq.
Connolly Bove Lodge & Hutz, LLP
1220 Market Street
Wilmington, DE   19801

> Re:   Lucent Technologies, Inc., et al. v. Dell Computer Corporation
>       C.A. No. 03-205-KAJ

Dear Counsel:

I have recently been assigned the captioned case and enclose for your consideration a form of Scheduling Order. Please confer and jointly call my secretary within ten days of the date of this letter to schedule a telephone conference to discuss dates you recommend be adopted in the Order.

Very truly yours,

Kent A. Jordan

KAJ:cas
Enclosure
cc:    Clerk of the Court

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LUCENT TECHNOLOGIES, INC., and )
LUCENT TECHNOLOGIES GUARDIAN I )
LLC, )
                               )
         Plaintiffs, )
                               )
     v. )    Civil Action No. 03-205-KAJ
                               )
DELL COMPUTER CORPORATION, )
                               )
         Defendant. )

## SCHEDULING ORDER

This ___ day of _____, 200_, the Court having conducted an

initial Rule 16 scheduling and planning conference pursuant to Local Rule 16.2(a) on

_____, 200_, and the parties having determined after discussion that the

matter cannot be resolved at this juncture by settlement, voluntary mediation, or binding

arbitration;

IT IS ORDERED that:

1.    Rule 26(a)(1) Initial Disclosures.  Unless otherwise agreed to by the

parties, the parties shall make their initial disclosures pursuant to Federal Rule of Civil

Procedure 26(a)(1) within five days of the date of this Order.

2.    Joinder of other Parties and Amendment of Pleadings.  All motions to join

other parties, and to amend or supplement the pleadings shall be filed on or before

_____, 200_.

3.    Discovery.

    a.    Limitation on Hours for Deposition Discovery.  Each side is limited

to a total of ___ hours of taking testimony by deposition upon oral examination.

b.    <u>Location of Depositions</u>.  Any party or representative (officer, director, or managing agent) of a party filing a civil action in this district court must ordinarily be required, upon request, to submit to a deposition at a place designated within this district.  Exceptions to this general rule may be made on order of the Court.  A defendant who becomes a counterclaimant, cross-claimant, or third-party plaintiff shall be considered as having filed an action in this Court for the purpose of this provision.

c.    <u>Discovery Cut Off</u>.  All discovery in this case shall be initiated so that it will be completed on or before _____, 200_.  The Court encourages the parties to serve and respond to contention interrogatories early in the case.  Unless otherwise ordered by the Court, the limitations on discovery set forth in Local Rule 26.1 shall be strictly observed.

d.    <u>Disclosure of Expert Testimony</u>.  Unless otherwise agreed to by the parties, they shall file their initial Federal Rule of Civil Procedure 26(a)(2) disclosures of expert testimony on or before ninety days before the date of the completion of discovery, and file a supplemental disclosure to contradict or rebut evidence on the same subject matter identified by another party sixty days before the date for the completion of discovery.  To the extent any objection to expert testimony is made pursuant to the principles announced in <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579 (1993), it shall be made by motion no later than the deadline for dispositive motions set forth herein, unless otherwise ordered by the Court.

e.    <u>Discovery Disputes</u>.  Should counsel find they are unable to resolve a discovery dispute, the party seeking the relief shall contact chambers at (302) 573-

2

6001 to schedule a telephone conference.  Not less than forty-eight hours prior to the

conference, the party seeking relief shall file with the Court a letter agenda not to

exceed two pages outlining the issues in dispute.  Should the Court find further briefing

necessary upon conclusion of the telephone conference, the Court shall order the party

seeking relief to file with the Court a three page letter, exclusive of exhibits, describing

the issues in contention.  The responding party shall file within five days from the date

of service of the opening letter an answering letter of no more than three pages.  The

party seeking relief may then file a reply letter of no more than two pages within three

days from the date of service of the answering letter.

      4.      <u>Application to Court for Protective Order</u>.  Should counsel find it will be

necessary to apply to the Court for a protective order specifying terms and conditions

for the disclosure of confidential information, counsel should confer and attempt to

reach an agreement on a proposed form of order and submit it to the Court within ten

days from the date of this Order.

      Any proposed order should include the following paragraph:

> <u>Other Proceedings</u>.  By entering this order and limiting the
> disclosure of information in this case, the Court does not
> intend to preclude another court from finding that information
> may be relevant and subject to disclosure in another case.
> Any person or party subject to this order who becomes
> subject to a motion to disclose another party's information
> designated "confidential" [the parties should list any other
> level of designation, such as "highly confidential," which may
> be provided for in the protective order] pursuant to this order
> shall promptly notify that party of the motion so that the party
> may have an opportunity to appear and be heard on whether
> that information should be disclosed.

<div align="center">3</div>

5.     <u>Papers Filed Under Seal</u>.  When filing papers under seal, counsel should deliver to the Clerk an original and one copy of the papers.

6.     <u>Settlement Conference</u>.  Pursuant to 28 U.S.C. § 636, this matter is referred to the United States Magistrate for the purpose of exploring the possibility of a settlement.  The Magistrate Judge will schedule a settlement conference with counsel and their clients to be held within ninety days from the date of this Order.

7.     <u>Interim Status Report</u>.  On _____, 200_, counsel shall submit a letter to the Court with an interim report on the nature of the matters in issue and the progress of discovery to date.

8.     <u>Status Conference</u>.  On _____, 200_, the Court will hold a Rule 16(a), (b) and (c) conference by telephone with counsel beginning at _____ _.m.  Plaintiff's counsel shall initiate the telephone call.

If all parties agree that there is nothing to report, nor anything to add to the interim status report or to this order, they may so notify the Court in writing before the conference is scheduled to occur, and the conference will be taken off of the Court's calendar.

9.     <u>Tutorial Describing the Technology and Matters in Issue</u>. [This paragraph in the scheduling order is not a requirement.  If the parties believe that it would be helpful to the Court to have a tutorial, it is not required that the tutorial be by video tape.  Should the parties determine that another format, such as, a tutorial conference or a computerized presentation, for example, would be more appropriate, or that the tutorial is unnecessary, they may make their suggestions regarding the tutorial during the initial Rule 16 Scheduling Conference.

4

Regardless of the format, the tutorial should include (1) a description of the technology in issue and (2) a summary of the party's primary factual and legal contentions. The tutorial should be filed under seal as part of the Court's file, subject to any protective order in effect. This paragraph may also include the opportunity to comment, in writing (with page limitations) within a reasonable time, on the opposing party's tutorial. The parties should confirm that the Court has the technical means to access information contained in any tutorial presented in a format other than an in-person hearing or a video tape.]

10.    Case Dispositive Motions. All case dispositive motions, an opening brief, and affidavits, if any, in support of the motion shall be served and filed on or before _____, 200_. Briefing will be presented pursuant to the Court's Local Rules.

11.    Claim Construction Issue Identification. If the Court does not find that a limited earlier claim construction would be helpful in resolving the case, on _____, 200_, the parties shall exchange a list of those claim term(s)/phrase(s) that they believe need construction and their proposed claim construction of those term(s)/phrase(s). This document will not be filed with the Court. Subsequent to exchanging that list, the parties will meet and confer to prepare a Joint Claim Construction Chart to be submitted pursuant to paragraph 12 below. The parties Joint Claim Construction Chart should identify for the Court the term(s)/phrase(s) of the claim(s) in issue, and should include each party's proposed construction of the disputed claim language with citation(s) only to the intrinsic evidence in support of their respective proposed constructions. A copy of the patent(s) in issue as well as those

5

portions of the intrinsic record relied upon are to be submitted with this Joint Claim

Construction Chart. In this joint submission, the parties shall not provide argument.

      12.    Claim Construction. Issues of claim construction shall be submitted to the

Court no later than _____, 200_, to be considered by the Court in

conjunction with the parties' summary judgment motions.

      13.    Hearing on Claim Construction. Beginning at ____ _.m. on

_____, 200_, the Court will hear evidence and argument on claim

construction.

      14.    Applications by Motion. Except as otherwise specified herein, any

application to the Court shall be by written motion filed with the Clerk. Unless otherwise

requested by the Court, counsel shall not deliver copies of papers or correspondence to

Chambers. Any non-dispositive motion should contain the statement required by Local

Rule 7.1.1.

      15.    Pretrial Conference. On _____, 200_, the Court will hold a

Final Pretrial Conference in Chambers with counsel beginning at ___ _.m. Unless

otherwise ordered by the Court, the parties should assume that filing the pretrial order

satisfies the pretrial disclosure requirement of Federal Rule of Civil Procedure 26(a)(3).

Thirty days before the joint proposed pretrial order is due, plaintiff's counsel shall

forward to defendant's counsel a draft pretrial order containing the information plaintiff

proposes to include in the draft. Defendant's counsel shall, in turn, provide to plaintiff's

counsel any comments on the plaintiff's draft as well as the information defendant

proposes to include in the proposed pretrial order. Motions *in limine* shall not be

separately filed. Any *in limine* requests shall be set forth in the proposed pretrial order.

Each party shall be limited to five *in limine* requests, unless otherwise permitted by the Court.  Briefing shall not be submitted on *in limine* requests, unless otherwise permitted by the Court.   The parties shall file with the Court the joint proposed final pretrial order with the information required by the form of Final Pretrial Order which accompanies this Scheduling Order on or before _____, 200_.

16.    <u>Jury Instructions, Voir Dire, and Special Verdict Forms</u>.  Where a case is to be tried to a jury, pursuant to Local Rules 47 and 51 the parties should file proposed voir dire, instructions to the jury, and special verdicts and interrogatories three full business days before the final pretrial conference.

17.    <u>Trial</u>.  This matter is scheduled for a __ day ___ trial beginning at 10:00 a.m. on _____, 200_.  For the purpose of completing pretrial preparations, counsel should plan on each side being allocated a total of ___ hours to present their case.


_____
UNITED STATES DISTRICT JUDGE

# ORIGINAL

### IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| LUCENT TECHNOLOGIES, INC., and<br>LUCENT TECHNOLOGIES GUARDIAN I LLC, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 03-CV-205-KAJ |
| v. | ) ) | Demand For Jury Trial |
| DELL COMPUTER CORPORATION, | ) ) | |
| Defendant. | ) ) | |

## ANSWER AND COUNTERCLAIM OF DELL COMPUTER CORPORATION

Defendant Dell Computer Corporation ("Dell"), through counsel, answers the complaint of Plaintiffs Lucent Technologies, Inc., and Lucent Technologies Guardian I LLC (collectively "Lucent"), and sets forth affirmative and other defenses, and counterclaims, as follows:

### THE PARTIES

1.    Paragraph 1 of the complaint is admitted.

2.    Paragraph 2 of the complaint is admitted.

3.    Paragraph 3 of the complaint is denied.

4.    Paragraph 4 of the complaint is admitted.

5.    Paragraph 5 of the complaint is admitted.

### NATURE OF THE ACTION

6.    Paragraph 6 of the complaint is admitted.

### JURISDICTION AND VENUE

7.    Paragraph 7 of the complaint is admitted.

8.    Venue and personal jurisdiction are admitted, but Paragraph 8 of the complaint is otherwise denied.

## THE PARTIES

9.      Paragraph 9 of the complaint is denied, except it is admitted that Exhibit A to the complaint is a copy of the Fleming '759 patent issued on March 27,1984.

10.     Paragraph 10 of the complaint is denied, except it is admitted that Exhibit B to the complaint is a copy of the Ketchum '781 patent issued on March 20,1990.

11.     Paragraph 11 of the complaint is denied, except it is admitted that Exhibit C to the complaint is a copy of the Haskell '226 patent issued on September 18, 1990.

12.     Paragraph 12 of the complaint is denied, except it is admitted that Exhibit D to the complaint is a copy of the Puri '878 patent issued on July 13, 1993.

13.     Paragraph 13 of the complaint is denied, except it is admitted that Exhibit E to the complaint is a copy of the Agulnick '295 patent issued on September 13, 1994.

14.     Paragraph 14 of the complaint is denied, except it is admitted that Exhibit F to the complaint is a copy of the Ackerman '131 patent issued on July 15, 1997.

15.     Subject to the denials in paragraphs 9-14 above, paragraph 15 of the complaint is admitted.

16.     Dell has insufficient information about the assertions in paragraph 16 of the complaint and accordingly denies them.

## COUNT I

### (Patent Infringement of United States Patent No. 4,439,759)

17.     Paragraph 17 of the complaint incorporates other paragraphs of the complaint, and Dell incorporates its response to those other paragraphs.

18.     Paragraph 18 of the complaint is denied.

19.     Paragraph 19 of the complaint is denied.

2

20.     Paragraph 20 of the complaint is denied.

21.     Paragraph 21 of the complaint is denied.

22.     Paragraph 22 of the complaint is denied.

23.     Paragraph 23 of the complaint is denied.

## COUNT II

### (Patent Infringement of United States Patent No. 4,910,781)

24.     Paragraph 24 of the complaint incorporates other paragraphs of the complaint, and Dell incorporates its response to those other paragraphs.

25.     Paragraph 25 of the complaint is denied.

26.     Paragraph 26 of the complaint is denied.

27.     Paragraph 27 of the complaint is denied.

28.     Paragraph 28 of the complaint is denied.

29.     Paragraph 29 of the complaint is denied.

30.     Paragraph 30 of the complaint is denied.

## COUNT III

### (Patent Infringement of United States Patent No. 4,958,226)

31.     Paragraph 31 of the complaint incorporates other paragraphs of the complaint, and Dell incorporates its response to those other paragraphs.

32.     Paragraph 32 of the complaint is denied.

33.     Paragraph 33 of the complaint is denied.

34.     Paragraph 34 of the complaint is denied.

35.     Paragraph 35 of the complaint is denied.

36.    Paragraph 36 of the complaint is denied.

37.    Paragraph 37 of the complaint is denied.

## COUNT IV

### (Patent Infringement of United States Patent No. 5,227,878)

38.    Paragraph 38 of the complaint incorporates other paragraphs of the complaint, and Dell incorporates its response to those other paragraphs.

39.    Paragraph 39 of the complaint is denied.

40.    Paragraph 40 of the complaint is denied.

41.    Paragraph 41 of the complaint is denied.

42.    Paragraph 42 of the complaint is denied.

43.    Paragraph 43 of the complaint is denied.

44.    Paragraph 44 of the complaint is denied.

## COUNT V

### (Patent Infringement of United States Patent No. 5,347,295)

45.    Paragraph 45 of the complaint incorporates other paragraphs of the complaint, and Dell incorporates its response to those other paragraphs.

46.    Paragraph 46 of the complaint is denied.

47.    Paragraph 47 of the complaint is denied.

48.    Paragraph 48 of the complaint is denied.

49.    Paragraph 49 of the complaint is denied.

## COUNT VI

### (Patent Infringement of United States Patent No. 5,649,131)

50.    Paragraph 50 of the complaint incorporates other paragraphs of the complaint, and Dell incorporates its response to those other paragraphs.

51.    Paragraph 51 of the complaint is denied.

52.    Paragraph 52 of the complaint is denied.

53.    Paragraph 53 of the complaint is denied.

54.    Paragraph 54 of the complaint is denied.

55.    Paragraph 55 of the complaint is denied.

56.    Paragraph 56 of the complaint is denied.

## AFFIRMATIVE AND OTHER DEFENSES

57.    Each of the patents in suit are invalid for failure to meet one or more of the conditions for patentability specified in Title 35, United States Code, particularly Sections 102, 103, and 112.

58.    Dell has not infringed, contributed to, or induced infringement of any of the patents in suit.

59.    Lucent is estopped from maintaining claims of patent infringement of the patents in suit against Dell, and is estopped from claiming any construction of the patents in suit which would cover Dell's products or activity.

60.    Claims by Lucent for damages for past infringement are barred by laches and by 35 U.S.C. Section 287.

61.    The patents in suit are unenforceable because of Lucent's unclean hands, including but not limited to assertion of the patents in suit without proper basis for alleging

infringement, and procurement of one or more of the patents in suit by failure to disclose material prior art to the United States Patent Office.

## COUNTERCLAIMS

62.     Dell hereby counterclaims against Lucent as follows:

## JURISDICTION AND VENUE

63.     Counterclaim I is an action for a declaratory judgment of non-infringement, invalidity and unenforceability of the patents in suit, which arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and the patent laws of the United States, Title 35, United States Code.

64.     There is a justiciable controversy between Dell and Lucent over the infringement, validity, and enforceability of the patents in suit.

65.     This Court has jurisdiction over the subject matter of that controversy and jurisdiction over the parties under 28 U.S.C. §§ 1331, 1337(a), 1338(a), and 1367.  Venue lies in this judicial district under 28 U.S.C. § 1391(b) and (c).

## THE PARTIES

66.     Dell incorporates what is set out in the preceding paragraphs 1, 2, and 4 as if fully set forth here.

## COUNTERCLAIM I – DECLARATORY JUDGMENT

67.     Dell incorporates what is set out in the preceding paragraphs as if fully set forth herein.

68.     Each of the patents in suit is invalid for failure to meet one or more of the conditions for patentability specified in Title 35, United States Code, particularly Sections 102, 103, and 112.

69.     The patents in suit have not been directly or indirectly infringed by Dell.

70.     Lucent is estopped from maintaining claims of infringement of the patents in suit against Dell, and is estopped from claiming any construction of the patents in suit which would cover Dell's products or activity.

71.     The patents in suit are unenforceable because of Lucent's unclean hands, including but not limited to assertion of the patents in suit without proper basis for alleging infringement, and procurement of one or more of the patents in suit by failure to disclose to the United States Patent Office material prior art.

## PRAYER FOR RELIEF

WHEREFORE,  Dell prays:

A. That Lucent's complaint be dismissed in its entirety and that Lucent take nothing;

B. For a declaration of noninfringement, invalidity, and unenforceability with respect to each of the patents in suit; and

C. That Dell be awarded its attorney fees, costs, and expenses and such other relief as is just and proper.

Respectfully Submitted,

**CONNOLLY BOVE LODGE & HUTZ, LLP**

By: _____
R. Eric Hutz (ID # 2702)
1220 Market Street, P.O. Box 2207
Wilmington, DE 19899
(302) 658-9141
*Counsel for Dell Computer Corporation*

**OF COUNSEL**
Joel M. Freed
Joseph A. Micallef
**ARNOLD & PORTER**
555 12th Street NW
Washington, DC 20004
(202) 942-5000
**DATE:**  March 11, 2003

7

## <u>CERTIFICATE OF SERVICE</u>

I certify that today on March 11, 3002, a copy of the foregoing ANSWER AND

COUNTERCLAIM OF DELL COMPUTER CORPORATION was served upon counsel

for plaintiffs as follows:

### <u>BY HAND</u>
Josy W. Ingersoll
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Post Office Box 391
Wilmington, Delaware  19899-0391

### <u>FEDERAL EXPRESS</u>
John M. Desmarais
Robert A. Appleby
Michael E. Stimson
Kirkland & Ellis
153 East 53rd Street
New York, New York 10022-4675


R. Eric Hutz

252162v1





**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

|  |  |
|---|---|
| LUCENT TECHNOLOGIES, INC., and<br>LUCENT TECHNOLOGIES GUARDIAN I LLC, )<br><br>           **Plaintiffs,**<br><br>    v.<br><br>DELL COMPUTER CORPORATION,<br><br>           **Defendant.** | **Case No. 03-CV-205-KAJ**<br><br>**Demand For Jury Trial** |

## ANSWER AND COUNTERCLAIM OF DELL COMPUTER CORPORATION

Defendant Dell Computer Corporation ("Dell"), through counsel, answers the complaint

of Plaintiffs Lucent Technologies, Inc., and Lucent Technologies Guardian I LLC (collectively

"Lucent"), and sets forth affirmative and other defenses, and counterclaims, as follows:

### THE PARTIES

1.      Paragraph 1 of the complaint is admitted.

2.      Paragraph 2 of the complaint is admitted.

3.      Paragraph 3 of the complaint is denied.

4.      Paragraph 4 of the complaint is admitted.

5.      Paragraph 5 of the complaint is admitted.

### NATURE OF THE ACTION

6.      Paragraph 6 of the complaint is admitted.

### JURISDICTION AND VENUE

7.      Paragraph 7 of the complaint is admitted.

8.      Venue and personal jurisdiction are admitted, but Paragraph 8 of the complaint is

otherwise denied.

## THE PARTIES

9.      Paragraph 9 of the complaint is denied, except it is admitted that Exhibit A to the complaint is a copy of the Fleming '759 patent issued on March 27,1984.

10.     Paragraph 10 of the complaint is denied, except it is admitted that Exhibit B to the complaint is a copy of the Ketchum '781 patent issued on March 20,1990.

11.     Paragraph 11 of the complaint is denied, except it is admitted that Exhibit C to the complaint is a copy of the Haskell '226 patent issued on September 18, 1990.

12.     Paragraph 12 of the complaint is denied, except it is admitted that Exhibit D to the complaint is a copy of the Puri '878 patent issued on July 13, 1993.

13.     Paragraph 13 of the complaint is denied, except it is admitted that Exhibit E to the complaint is a copy of the Agulnick '295 patent issued on September 13, 1994.

14.     Paragraph 14 of the complaint is denied, except it is admitted that Exhibit F to the complaint is a copy of the Ackerman '131 patent issued on July 15, 1997.

15.     Subject to the denials in paragraphs 9-14 above, paragraph 15 of the complaint is admitted.

16.     Dell has insufficient information about the assertions in paragraph 16 of the complaint and accordingly denies them.

## COUNT I

### (Patent Infringement of United States Patent No. 4,439,759)

17.     Paragraph 17 of the complaint incorporates other paragraphs of the complaint, and Dell incorporates its response to those other paragraphs.

18.     Paragraph 18 of the complaint is denied.

19.     Paragraph 19 of the complaint is denied.

20.     Paragraph 20 of the complaint is denied.

21.     Paragraph 21 of the complaint is denied.

22.     Paragraph 22 of the complaint is denied.

23.     Paragraph 23 of the complaint is denied.

## COUNT II

### (Patent Infringement of United States Patent No. 4,910,781)

24.     Paragraph 24 of the complaint incorporates other paragraphs of the complaint, and Dell incorporates its response to those other paragraphs.

25.     Paragraph 25 of the complaint is denied.

26.     Paragraph 26 of the complaint is denied.

27.     Paragraph 27 of the complaint is denied.

28.     Paragraph 28 of the complaint is denied.

29.     Paragraph 29 of the complaint is denied.

30.     Paragraph 30 of the complaint is denied.

## COUNT III

### (Patent Infringement of United States Patent No. 4,958,226)

31.     Paragraph 31 of the complaint incorporates other paragraphs of the complaint, and Dell incorporates its response to those other paragraphs.

32.     Paragraph 32 of the complaint is denied.

33.     Paragraph 33 of the complaint is denied.

34.     Paragraph 34 of the complaint is denied.

35.     Paragraph 35 of the complaint is denied.

36.    Paragraph 36 of the complaint is denied.

37.    Paragraph 37 of the complaint is denied.

## COUNT IV

### (Patent Infringement of United States Patent No. 5,227,878)

38.    Paragraph 38 of the complaint incorporates other paragraphs of the complaint, and Dell incorporates its response to those other paragraphs.

39.    Paragraph 39 of the complaint is denied.

40.    Paragraph 40 of the complaint is denied.

41.    Paragraph 41 of the complaint is denied.

42.    Paragraph 42 of the complaint is denied.

43.    Paragraph 43 of the complaint is denied.

44.    Paragraph 44 of the complaint is denied.

## COUNT V

### (Patent Infringement of United States Patent No. 5,347,295)

45.    Paragraph 45 of the complaint incorporates other paragraphs of the complaint, and Dell incorporates its response to those other paragraphs.

46.    Paragraph 46 of the complaint is denied.

47.    Paragraph 47 of the complaint is denied.

48.    Paragraph 48 of the complaint is denied.

49.    Paragraph 49 of the complaint is denied.

## COUNT VI

### (Patent Infringement of United States Patent No. 5,649,131)

50.     Paragraph 50 of the complaint incorporates other paragraphs of the complaint, and Dell incorporates its response to those other paragraphs.

51.     Paragraph 51 of the complaint is denied.

52.     Paragraph 52 of the complaint is denied.

53.     Paragraph 53 of the complaint is denied.

54.     Paragraph 54 of the complaint is denied.

55.     Paragraph 55 of the complaint is denied.

56.     Paragraph 56 of the complaint is denied.

## AFFIRMATIVE AND OTHER DEFENSES

57.     Each of the patents in suit are invalid for failure to meet one or more of the conditions for patentability specified in Title 35, United States Code, particularly Sections 102, 103, and 112.

58.     Dell has not infringed, contributed to, or induced infringement of any of the patents in suit.

59.     Lucent is estopped from maintaining claims of patent infringement of the patents in suit against Dell, and is estopped from claiming any construction of the patents in suit which would cover Dell's products or activity.

60.     Claims by Lucent for damages for past infringement are barred by laches and by 35 U.S.C. Section 287.

61.     The patents in suit are unenforceable because of Lucent's unclean hands, including but not limited to assertion of the patents in suit without proper basis for alleging

5

infringement, and procurement of one or more of the patents in suit by failure to disclose

material prior art to the United States Patent Office.

## COUNTERCLAIMS

62.     Dell hereby counterclaims against Lucent as follows:

## JURISDICTION AND VENUE

63.     Counterclaim I is an action for a declaratory judgment of non-infringement,

invalidity and unenforceability of the patents in suit, which arises under the Declaratory

Judgment Act, 28 U.S.C. §§ 2201-2202, and the patent laws of the United States, Title 35, United

States Code.

64.     There is a justiciable controversy between Dell and Lucent over the infringement,

validity, and enforceability of the patents in suit.

65.     This Court has jurisdiction over the subject matter of that controversy and

jurisdiction over the parties under 28 U.S.C. §§ 1331, 1337(a), 1338(a), and 1367.  Venue lies in

this judicial district under 28 U.S.C. § 1391(b) and (c).

## THE PARTIES

66.     Dell incorporates what is set out in the preceding paragraphs 1, 2, and 4 as if fully

set forth here.

## COUNTERCLAIM I – DECLARATORY JUDGMENT

67.     Dell incorporates what is set out in the preceding paragraphs as if fully set forth

herein.

68.     Each of the patents in suit is invalid for failure to meet one or more of the

conditions for patentability specified in Title 35, United States Code, particularly Sections 102,

103, and 112.

69.    The patents in suit have not been directly or indirectly infringed by Dell.

70.    Lucent is estopped from maintaining claims of infringement of the patents in suit against Dell, and is estopped from claiming any construction of the patents in suit which would cover Dell's products or activity.

71.    The patents in suit are unenforceable because of Lucent's unclean hands, including but not limited to assertion of the patents in suit without proper basis for alleging infringement, and procurement of one or more of the patents in suit by failure to disclose to the United States Patent Office material prior art.

## PRAYER FOR RELIEF

WHEREFORE, Dell prays:

A. That Lucent's complaint be dismissed in its entirety and that Lucent take nothing;

B. For a declaration of noninfringement, invalidity, and unenforceability with respect to each of the patents in suit; and

C. That Dell be awarded its attorney fees, costs, and expenses and such other relief as is just and proper.

Respectfully Submitted,

**CONNOLLY BOVE LODGE & HUTZ, LLP**

By: _____
R. Eric Hutz (ID # 2702)
1220 Market Street, P.O. Box 2207
Wilmington, DE 19899
(302) 658-9141
*Counsel for Dell Computer Corporation*

**OF COUNSEL**
Joel M. Freed
Joseph A. Micallef
**ARNOLD & PORTER**
555 12th Street NW
Washington, DC 20004
(202) 942-5000
**DATE:**  March 11, 2003

7

## CERTIFICATE OF SERVICE

I certify that today on March 11, 3002, a copy of the foregoing ANSWER AND

COUNTERCLAIM OF DELL COMPUTER CORPORATION was served upon counsel

for plaintiffs as follows:

### BY HAND
Josy W. Ingersoll
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Post Office Box 391
Wilmington, Delaware  19899-0391

### FEDERAL EXPRESS
John M. Desmarais
Robert A. Appleby
Michael E. Stimson
Kirkland & Ellis
153 East 53rd Street
New York, New York 10022-4675


R. Eric Hutz

252162v1

AO 440 (Delaware Rev. 7/00) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
## District of Delaware



**SUMMONS IN A CIVIL CASE**

LUCENT TECHNOLOGIES INC. and LUCENT
TECHNOLOGIES GUARDIAN I LLC,

      Plaintiffs,

CASE NUMBER:    0 3 - 2 0 5

v.

DELL COMPUTER CORPORATION,

      Defendant.

TO: (Name and address of defendant)

> DELL COMPUTER CORPORATION
> The Corporation Service Company
> 2711 Centerville Road, Suite 400
> Wilmington, DE 19808

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

> Josy W. Ingersoll, Esquire
> Young Conaway Stargatt & Taylor, LLP
> The Brandywine Building
> 1000 West Street, 17th Floor
> P. O. Box 391
> Wilmington, DE 19899-0391

an answer to the complaint which is herewith served upon you, within _____20_____ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

PETER T. DALLEO

CLERK

DATE  2/20/03

(By) DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

```
Lucent Technologies     )      doc #   5
                        )
         et al.         )
                        )
         v.             )
                        )      CA  03-0205-KAJ
                        )
Dell Computer Corp      )
                        )
                        ) PLEASE DIRECT ALL INQUIRIES TO 573-6003
```

## NOTICE OF ASSIGNMENT OF JUDGE

Please note the above captioned case has been assigned to Judge Kent A. Jordan.  When filing papers, please include the initials of the Judge assigned to the case.


```
                        Peter T. Dalleo
                        CLERK
```


Date: 02/26/03


```
To: The Honorable Kent A. Jordan
    Josy W. Ingersoll, Esq.
```

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

LUCENT TECHNOLOGIES INC.                    )
and LUCENT TECHNOLOGIES                      )
GUARDIAN I LLC,                              )
                                             )
                    Plaintiffs,              )
                                             )
          v.                                 )    Civil Action No.   0 3 - 2 0 5
                                             )
DELL COMPUTER CORPORATION,                   )
                                             )
                    Defendant.               )

## LUCENT'S RULE 7.1(a) DISCLOSURE STATEMENT

Pursuant to Rule 7.1(a) of the Federal Rules of Civil Procedure, the undersigned counsel

for Plaintiffs in the above-captioned action certifies (1) that there is no parent corporation and no

publicly held corporation that owns 10% or more of the stock of Lucent Technologies Inc. and

(2) that the following is a parent corporation and a publicly held corporation that owns 10% or

more of the stock of Lucent Technologies Guardian I LLC:  Lucent Technologies Inc.


OF COUNSEL:

John M. Desmarais
Robert A. Appleby
Michael E. Stimson
KIRKLAND & ELLIS
153 East 53rd Street
New York, NY  10022-4675
(212) 446-4800

DATED:  February 20, 2003

Josy W. Ingersoll (#1088)
Christian Douglas Wright (#3554)
YOUNG CONAWAY STARGATT
    & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 189991
(302) 571-6600

*Attorneys for Plaintiffs Lucent Technologies Inc.*
*and Lucent Technologies Guardian I LLC*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| LUCENT TECHNOLOGIES INC. and LUCENT TECHNOLOGIES GUARDIAN I LLC,<br><br>        Plaintiffs,<br><br>    v.<br><br>DELL COMPUTER CORPORATION,<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 0 3 - 2 0 5 _____

**COPY**

### LUCENT'S RULE 7.1(a) DISCLOSURE STATEMENT

Pursuant to Rule 7.1(a) of the Federal Rules of Civil Procedure, the undersigned counsel for Plaintiffs in the above-captioned action certifies (1) that there is no parent corporation and no publicly held corporation that owns 10% or more of the stock of Lucent Technologies Inc. and (2) that the following is a parent corporation and a publicly held corporation that owns 10% or more of the stock of Lucent Technologies Guardian I LLC: Lucent Technologies Inc.

_____
Josy W. Ingersoll (#1088)
Christian Douglas Wright (#3554)
YOUNG CONAWAY STARGATT
   & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 189991
(302) 571-6600

OF COUNSEL:

John M. Desmarais
Robert A. Appleby
Michael E. Stimson
KIRKLAND & ELLIS
153 East 53rd Street
New York, NY 10022-4675
(212) 446-4800

DATED: February 20, 2003

*Attorneys for Plaintiffs Lucent Technologies Inc.*
*and Lucent Technologies Guardian I LLC*

WP3:860193.1

# REPORT ON THE FILING OR DETERMINATION OF AN
## ACTION REGARDING A PATENT OR TRADEMARK

②

TO: Commissioner of Patents and Trademarks
Washington, D.C. 20231

In compliance with 35:290 and/or 15 U.S.C. 1116 you are hereby advised that a court action
has been filed on the following patent(s)/trademarks in the U.S. District Court:

| DOCKET NO. | DATE FILED | U.S. DISTRICT COURT |
|---|---|---|
| CA 03-0205 | 02/20/03 | District of Delaware |

| PLAINTIFF | DEFENDANT |
|---|---|
| Lucent Technologies | Dell Computer Corp |

| | PATENT/TRADEMARK NO. | DATE OF PATENT/TRADEMARK | HOLDER OF PATENT OR TRADEMARK |
|---|---|---|---|
| 1 | 4,439,759 | 03/27/84 | Bell Telephone Laboratories In |
| 2 | 4,910,781 | 03/20/90 | AT&T Bell Laboratories |
| 3 | 4,958,226 | 09/18/90 | AT &T Bell Laboratories |
| 4 | 5,227,878 | 07/13/93 | AT&T Bell Laboratories |
| 5 | 5,347,295 | 09/13/94 | GO Corporation |
| 6 | 5,649,131 | 07/15/97 | Lucent Technologies Inc. |

In the above-entitled case, the following patent(s) have been included:

| DATE INCLUDED | INCLUDED BY |
|---|---|
| | [ ] Amendment [ ] Answer [ ] Cross Bill [ ] Other Pleading |

| | PATENT/TRADEMARK NO. | DATE OF PATENT/TRADEMARK | HOLDER OF PATENT OR TRADEMARK |
|---|---|---|---|
| 1 | | | |
| 2 | | | |
| 3 | | | |
| 4 | | | |
| 5 | | | |

In the above-entitled case, the following decision has been rendered or
judgment issued:

| DECISION/JUDGMENT |
|---|

| CLERK | (BY) DEPUTY CLERK | DATE |
|---|---|---|
| PETER T. DALLEO, CLERK | | 02/20/03 |

**REPORT ON THE FILING OR DETERMINATION OF AN
ACTION REGARDING A PATENT OR TRADEMARK**

TO: Commissioner of Patents and Trademarks
Washington, D.C. 20231

In compliance with 35:290 and/or 15 U.S.C. 1116 you are hereby advised that a court action
has been filed on the following patent(s)/trademarks in the U.S. District Court:

| DOCKET NO.<br>CA 03-0205 | DATE FILED<br>02/20/03 | U.S. DISTRICT COURT<br>District of Delaware |
|---|---|---|

| PLAINTIFF<br>Lucent Technologies | DEFENDANT<br>Dell Computer Corp |
|---|---|

| | PATENT/TRADEMARK NO. | DATE OF PATENT/TRADEMARK | HOLDER OF PATENT OR TRADEMARK |
|---|---|---|---|
| 1 | 4,439,759 | 03/27/84 | Bell Telephone Laboratories In |
| 2 | 4,910,781 | 03/20/90 | AT&T Bell Laboratories |
| 3 | 4,958,226 | 09/18/90 | AT &T Bell Laboratories |
| 4 | 5,227,878 | 07/13/93 | AT&T Bell Laboratories |
| 5 | 5,347,295 | 09/13/94 | GO Corporation |
| 6 | 5,649,131 | 07/15/97 | Lucent Technologies Inc. |

In the above-entitled case, the following patent(s) have been included:

| DATE INCLUDED | INCLUDED BY |
|---|---|
| | [ ] Amendment   [ ] Answer   [ ] Cross Bill   [ ] Other Pleading |

| | PATENT/TRADEMARK NO. | DATE OF PATENT/TRADEMARK | HOLDER OF PATENT OR TRADEMARK |
|---|---|---|---|
| 1 | | | |
| 2 | | | |
| 3 | | | |
| 4 | | | |
| 5 | | | |

In the above-entitled case, the following decision has been rendered or
judgment issued:

DECISION/JUDGMENT

| CLERK<br>PETER T. DALLEO, CLERK | (BY) DEPUTY CLERK | DATE<br>02/20/03 |
|---|---|---|

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE



| | |
|---|---|
| LUCENT TECHNOLOGIES INC. and<br>LUCENT TECHNOLOGIES GUARDIAN I LLC,<br><br>Plaintiffs,<br><br>v.<br><br>DELL COMPUTER CORPORATION,<br><br>Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:     **0 3 - 2 0 5**<br>:     Civil Action No.: _____<br>:<br>:     **DEMAND FOR JURY TRIAL**<br>:<br>:<br>: |

## COMPLAINT

Plaintiffs Lucent Technologies Inc. and Lucent Technologies Guardian I LLC

(collectively, "Lucent") for their Complaint against Dell Computer Corporation ("Dell") hereby

demand a jury trial and allege as follows:

### Parties

1.     Plaintiff Lucent Technologies Inc. is a corporation organized under the

laws of the state of Delaware with its principal place of business at 600 Mountain Avenue,

Murray Hill, NJ 07974.

2.     Plaintiff Lucent Technologies Guardian I LLC is a limited liability

company organized under the laws of the state of Delaware with its principal place of business at

600 Mountain Avenue, Murray Hill, New Jersey 07974.

3.     Lucent is a leading global supplier of computer and communications

equipment, including data, software, voice, and wireless-networking technologies.  Researchers

at Lucent's Bell Laboratories have developed a wide variety of key innovations that have greatly

**ORIGINAL**

enhanced the capabilities and utility of personal computers.  Common features such as video display, audio encoding, networking, and user interfaces have all benefited from Lucent's research and development efforts.

4.      On information and belief, Defendant Dell is a corporation organized under the laws of the state of Delaware with its principal place of business at One Dell Way, Round Rock, Texas  78682.

5.      Dell makes, uses, sells, and offers for sale in the United States, and imports into the United States, computer systems, components, and accessories.

## Nature of the Action

6.      This is a civil action for infringement of six United States Patents.  This action is based upon the Patent Laws of the United States, 35 U.S.C. § 1 *et seq.*

## Jurisdiction and Venue

7.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1338(a).

8.      Venue is proper in this district under 28 U.S.C. §§ 1391(b) and (c) and 1400(b) because Dell has committed acts of infringement in this district and because Dell is subject to personal jurisdiction in this district.

## The Patents

9.      United States Patent No. 4,439,759 ("the Fleming '759 Patent"), entitled "Terminal Independent Color Memory For A Digital Image Display System," was duly and legally issued on March 27, 1984, to Fleming et al.  A copy of the Fleming '759 Patent is attached hereto as Exhibit A.

10.     United States Patent No. 4,910,781 (the "Ketchum '781 Patent"), entitled "Code Excited Linear Predictive Vocoder Using Virtual Searching," was duly and legally issued

-2-

on March 20, 1990, to Ketchum et al.  A copy of the Ketchum '781 Patent is attached hereto as Exhibit B.

11.     United States Patent No. 4,958,226 ("the Haskell '226 Patent"), entitled "Conditional Motion Compensated Interpolation Of Digital Motion Video," was duly and legally issued on September 18, 1990, to Haskell et al.  A copy of the Haskell '226 Patent is attached hereto as Exhibit C.

12.     United States Patent No. 5,227,878 (the "Puri '878 Patent"), entitled "Adaptive Coding and Decoding of Frames and Fields of Video," was duly and legally issued on July 13, 1993, to Puri et al.  A copy of the Puri '878 Patent is attached hereto as Exhibit D.

13.     United States Patent No. 5,347,295 (the "Agulnick '295 Patent"), entitled "Control of a Computer Through a Position-Sensed Stylus," was duly and legally issued on September 13, 1994, to Agulnick et al.  A copy of the Agulnick '295 Patent is attached hereto as Exhibit E.

14.     United States Patent No. 5,649,131 (the "Ackerman '131 Patent"), entitled "Communications Protocol," was duly and legally issued on July 15, 1997, to Ackerman et al.  A copy of the Ackerman '131 Patent is attached hereto as Exhibit F.

15.     The Fleming '759, Ketchum '781, Haskell '226, Puri '878, Agulnick '295, and Ackerman '131 Patents are collectively referred to herein as the "Patents-in-Suit."

16.     Lucent owns each of the Patents-in-Suit, with the right to sue for past infringement.

## COUNT I

### (Patent Infringement of United States Patent No. 4,439,759)

17.     Paragraphs 1 through 16 are incorporated by reference as if stated fully herein.

-3-

18.    The Fleming '759 Patent is valid and enforceable.

19.    Before the expiration of the Fleming '759 Patent, Dell made, used, sold, and offered to sell products that infringed at least one claim of the Fleming '759 Patent.

20.    Before the expiration of the Fleming '759 Patent, Dell also contributed to and/or induced the infringement of at least one claim of the Fleming '759 Patent.

21.    Although Lucent notified Dell of its infringement of the Fleming '759 Patent, Dell continued its infringement after receiving this actual notice.

22.    Dell's infringement of the Fleming '759 Patent was willful.

23.    Lucent has been damaged by Dell's infringement of the Fleming '759 Patent.

## COUNT II

### (Patent Infringement of United States Patent No. 4,910,781)

24.    Paragraphs 1 through 16 are incorporated by reference as if stated fully herein.

25.    The Ketchum '781 Patent is valid and enforceable.

26.    Dell makes, uses, sells, and offers to sell products that infringe at least one claim of the Ketchum '781 Patent.

27.    Dell also contributes to and/or induces the infringement of at least one claim of the Ketchum '781 Patent.

28.    Although Lucent notified Dell of its infringement of the Ketchum '781 Patent, Dell continued its infringement after receiving this actual notice.

29.    Dell's infringement of the Ketchum '781 Patent was, and continues to be, willful.

WP3:860160.1

30.     Lucent has been damaged by Dell's infringement of the Ketchum '781 Patent and will suffer irreparable injury unless the infringement is enjoined by this Court.

## COUNT III

### (Patent Infringement of United States Patent No. 4,958,226)

31.     Paragraphs 1 through 16 are incorporated by reference as if stated fully herein.

32.     The Haskell '226 Patent is valid and enforceable.

33.     Dell makes, uses, sells, and offers to sell products that infringe at least one claim of the Haskell '226 Patent.

34.     Dell also contributes to and/or induces the infringement of at least one claim of the Haskell '226 Patent.

35.     Although Lucent notified Dell of its infringement of the Haskell '226 Patent, Dell continued its infringement after receiving this actual notice.

36.     Dell's infringement of the Haskell '226 Patent was, and continues to be, willful.

37.     Lucent has been damaged by Dell's infringement of the Haskell '226 Patent and will suffer irreparable injury unless the infringement is enjoined by this Court.

## COUNT IV

### (Patent Infringement of United States Patent No. 5,227,878)

38.     Paragraphs 1 through 16 are incorporated by reference as if stated fully herein.

39.     The Puri '878 Patent is valid and enforceable.

40.     Dell makes, uses, sells, and offers to sell products that infringe at least one claim of the Puri '878 Patent.

-5-

WP3:860160.1

41.     Dell also contributes to and/or induces the infringement of at least one claim of the Puri '878 Patent.

42.     Although Lucent notified Dell of its infringement of the Puri '878 Patent, Dell continued its infringement after receiving this actual notice.

43.     Dell's infringement of the Puri '878 Patent was, and continues to be, willful.

44.     Lucent has been damaged by Dell's infringement of the Puri '878 Patent and will suffer irreparable injury unless the infringement is enjoined by this Court.

## COUNT V

### (Patent Infringement of United States Patent No. 5,347,295)

45.     Paragraphs 1 through 16 are incorporated by reference as if stated fully herein.

46.     The Agulnick '295 Patent is valid and enforceable.

47.     Dell makes, uses, sells, and offers to sell products that infringe at least one claim of the Agulnick '295 Patent.

48.     Dell also contributes to and/or induces the infringement of at least one claim of the Agulnick '295 Patent.

49.     Lucent has been damaged by Dell's infringement of the Agulnick '295 Patent and will suffer irreparable injury unless the infringement is enjoined by this Court.

## COUNT VI

### (Patent Infringement of United States Patent No. 5,649,131)

50.     Paragraphs 1 through 16 are incorporated by reference as if stated fully herein.

51.     The Ackerman '131 patent is valid and enforceable.

-6-

WP3:860160.1

52.     Dell makes, uses, sells, and offers to sell products that infringe at least one claim of the Ackerman '131 Patent.

53.     Dell also contributes to and/or induces the infringement of at least one claim of the Ackerman '131 Patent.

54.     Although Lucent notified Dell of its infringement of the Ackerman '131 Patent, Dell continued its infringement after receiving this actual notice.

55.     Dell's infringement of the Ackerman '131 Patent was, and continues to be, willful.

56.     Lucent has been damaged by Dell's infringement of the Ackerman '131 Patent and will suffer irreparable injury unless the infringement is enjoined by this Court.

### Prayer for Relief

**WHEREFORE**, Lucent prays for judgment as follows:

A.     That Dell has willfully infringed the Patents-in-Suit;

B.     That Dell, its officers, agents, and employees, and those persons in active concert or participation with any of them, and their successors and assigns be permanently enjoined from infringement, inducement of infringement, and contributory infringement of each of the Patents-in-Suit not yet expired, including but not limited to making, importing, using, offering for sale, or selling any devices or systems that infringe, or using processes that infringe, the Patents-in-Suit before the expiration dates of those patents;

C.     That Lucent be awarded all damages adequate to compensate it for Dell's infringement of the Patents-in-Suit, such damages to be determined by a jury and, if necessary to adequately compensate Lucent for the infringement, an accounting,

-7-

and that such damages be trebled and awarded to Lucent with prejudgment interest;

D.   That this case be declared an exceptional case within the meaning of 35 U.S.C. § 285 and that Lucent be awarded the attorney fees, costs, and expenses that it incurs prosecuting this action; and

E.   That Lucent be awarded such other and further relief as this Court deems just and proper.

Respectfully Submitted,

Josy W. Ingersoll (# 1088)
**YOUNG CONAWAY
   STARGATT & TAYLOR, LLP**
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
(302) 571-6600

OF COUNSEL:

John M. Desmarais
Robert A. Appleby
Michael E. Stimson
**KIRKLAND & ELLIS**
153 East 53rd Street
New York, New York 10022-4675
(212) 446-4800

Attorneys for Lucent Technologies Inc. and
Lucent Technologies Guardian I LLC

-8-

# United States Patent [19]

## Fleming et al.

[11]  **4,439,759**

[45]  **Mar. 27, 1984**

[54]  **TERMINAL INDEPENDENT COLOR MEMORY FOR A DIGITAL IMAGE DISPLAY SYSTEM**

[75]  Inventors:  **James R. Fleming**, Indianapolis, Ind.; **William A. Frezza**, North Brunswick; **Gerald S. Soloway**, Holmdel, both of N.J.

[73]  Assignee:  **Bell Telephone Laboratories, Incorporated**, Murray Hill, N.J.

[21]  Appl. No.:  **265,195**

[22]  Filed:  **May 19, 1981**

[51]  Int. Cl.3 .............................................. G09G 1/16
[52]  U.S. Cl. .................................... 340/703; 340/723; 340/750
[58]  Field of Search ............... 340/703, 701, 717, 747, 340/750, 726, 709, 723

[56]  **References Cited**

**U.S. PATENT DOCUMENTS**

3,422,419  1/1969  Mathews et al. ................... 340/736
4,091,374  5/1978  Müller et al. ...................... 340/717
4,233,601  11/1980  Hankins et al. ..................... 340/703
4,342,029  7/1982  Hofmanis et al. .................. 340/703

*Primary Examiner*—Marshall M. Curtis
*Attorney, Agent, or Firm*—H. L. Newman

[57]  **ABSTRACT**

The present terminal independent color memory for a digital image display system provides for inter-system compatability, color display systems generally having varying modes of access to color memories, varying color memory capacities, and features such as blinking implemented in varying ways. The data processor (1) of the present system may access color memory (6a) of video controller (6) or color values stored in permanent memory (9) or random access memory (10), responsive to the same command language. The present data processor (1) is also capable of entering color data values comprising color hues and gray levels into color memory for use in a terminal independent manner. Multiple process chained blinking from a particular color to a particular color is also provided by the present processor, the several processes in time-delayed relationship to one another.

**10 Claims, 14 Drawing Figures**





FIG. 1

## FIG. 2



## FIG. 3



Case 3:03-cv-01108-B-CAB   Document 1   Filed 06/02/03   Page 762 of 976



## FIG. 4



U.S. Patent     Mar. 27, 1984     Sheet 4 of 11     4,439,759

### FIG. 5



Case 3:03-cv-01108-B-CAB   Document 1    Filed 06/02/03   Page 764 of 976



FIG. 7



FIG. 6

Case 3:03-cv-01108-B-CAB   Document 1   Filed 06/02/03   Page 765 of 976



FIG. 10



FIG. 8

Case 3:03-cv-01108-B-CAB   Document 1   Filed 06/02/03   Page 766 of 976

*FIG. 9*





## FIG. II



TICK (CALLED EVERY 1/10TH SECOND)

SET PTR TO FIRST PROCESS BLOCK IN LIST — 1101

WHILE PTR IS NOT NULL — 1102

SUBTRACT 1 FROM COUNT IN PROCESS BLOCK POINTED TO BY PTR — 1103 / 1104

IS COUNT ≤ 0 ? — 1109 / 1105
NO      YES — 1106

IS STATUS ON OR OFF ? — 1108 / 1107
ON      OFF

RESTORE COLOR FROM PROCESS BLOCK INTO COLOR MAP ENTRY INDEXED BY FROM COLOR IN PROCESS BLOCK — 1111

SAVE COLOR, IN COLOR MAP ENTRY FROM, IN SAVE COLOR OF PROCESS BLOCK — 1110

COPY COLOR IN COLOR MAP ENTRY TO TO COLOR MAP ENTRY FROM — 1113

SET COUNT TO OFF TIME — 1112

SET COUNT TO ON TIME — 1114

SET STATUS TO OFF — 1116

SET STATUS TO ON — 1115

SET PTR TO NEXT PROCESS BLOCK IN LIST — 1117

## FIG. 12



ADD BLINK PROCESS

* FPIAL – FIRST PROCESS IN ACTIVE LIST

Case 3:03-cv-01108-B-CAB    Document 1    Filed 06/02/03    Page 769 of 976



*FIG. 13*

Case 3:03-cv-01108-B-CAB    Document 1    Filed 06/02/03    Page 770 of 976



*FIG. 14*

4,439,759

1

## TERMINAL INDEPENDENT COLOR MEMORY FOR A DIGITAL IMAGE DISPLAY SYSTEM

### BACKGROUND OF THE INVETNION

1. Technical Field

This invention relates to digital image display systems and, more particularly, to a terminal independent color memory for such systems.

2. Description of the Prior Art

Methods and apparatus for providing color digital images on video display screens are well known. A problem, however, has arisen in that compatability among digital display systems has been made difficult by the great variety of methods and apparatus for providing the color images. For example, the Picture Description Instructions PDI for the Telidon Videotex System, CRC Technical Note No. 696-E, developed by the Canadian Department of Communications describes a specific color value selection method: a direct selection of data values for the primary colors—red, green and blue. The Prestel videotex customer terminal developed by the British Post Office and the Antiope terminal developed by the French CCETT employ a technique for specifying both a foreground and a background color by indexing a permanent read-only color memory.

In the art of color computer graphics, the terminal manufacturers generally employ a color look-up table called a color map indexed by a binary number. The application of a color map expands the repertory of available colors for display. In particular, the Tektronix 4027 terminal is capable of providing 8 colors for direct use from the 64 possible color values that may be loaded into its color map. Other features such as blinking may be provided by such terminals; however, the various methods and apparatus for providing such features are similarly incompatible.

With the advent of videotex, also known as viewdata, and teletext services wherein a customer is able to access a remote host computer and associated data base with a digital image display terminal, there has arisen a need to solve the above-described problems from employing incompatible terminals. There remains a requirement for a terminal-independent color memory for a digital image display system.

### SUMMARY OF THE INVENTION

The above-stated problems and related problems of incompatability among digital image display systems are solved by the principles of the present terminal independent color memory. Processing means are provided for accessing color data in a terminal independent manner, regardless of the size of color memory or its permanent or semi-permanent nature. In accordance with the present invention, the known modes of color access are incorporated into the present color algorithm for selecting a particular mode of color memory access, for setting a particular color in a color map memory table or for setting foreground or background in-use drawing color. These in-use drawing colors may be applied by subsequently received text and graphics drawing commands. In a system having a permanent color memory, the algorithm selects the closest color to the desired color hue from the permanent color selection table.

An algorithm for loading the present color map memory selects a gray scale equally spaced between black and white and hue data values equally spaced about a

2

hue circle wherein the primary colors are located in 120 degree relationship. In this manner, a host computer is able upon initialization of the present terminal independent color memory to predict the configuration of a particular color map memory table and the color composition of a digital image or frame of information for display.

An algorithm for providing color blinking by means of a linked list of multiple processes is provided. The on and off intervals of blink-from colors and blink-to colors may be specified. In addition, the delay between processes is selectable. Simple animation is possible with the present technique. For example, a ball may appear to bounce across an image, a river may appear to flow or stars may appear to twinkle.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a general block diagram of a digital image display system which may employ the principles of the present invention, the system being exemplary of arrangements for color processing;

FIG. 2 is an operational diagram of the process for selecting a color data value from a color map memory table for display of particular picture element data;

FIGS. 3, 4, and 5 are flow diagrams of a method for accessing color data values for display regardless of the mode of access employed by a particular digital image display system in accordance with the present invention;

FIG. 6 is a representation of a color hue circle wherein the primary colors—red, green and blue—are located at 120 degrees, 240 degrees and 360 degrees respectively;

FIG. 7 is an exemplary table of color data values selected in accordance with a method for initializing a color map memory table in a terminal independent manner in accordance with the present invention;

FIGS. 8 through 14 generally depict the present method for poviding multiple processes of color blinking in accordance with the present invention;

FIG. 8 is a depiction of the contents of a memory block associated with a particular blink process;

FIG. 9 comprises blink process tables indicating the logical connection of linked lists of active and free process blocks as depicted in FIG. 8;

FIG. 10 is an actual depiction of an active blink process table comprising a plurality of process blocks as depicted in FIG. 8;

FIG. 11 is a flowchart diagram of an algorithm for providing multiple process color blinking;

FIG. 12 is a flowchart diagram of an algorithm for adding a new process to the active blink process table of FIG. 10;

FIG. 13 is an exemplary timing diagram and color tables for a color blink comprising three processes; and

FIG. 14 is an exemplary blink process table similar to that depicted in FIG. 9 whose process memory block entry values are shown relative to a particular point in the timing diagram of FIG. 13.

### DETAILED DESCRIPTION

Referring more particularly to FIG. 1, there is shown a general block diagram of a digital image display system employing the principles of the present invention. The digital image display system comprises a data processor 1 having bidirectional access to a processor data bus 2. A separate timing generator 3 may provide the

4,439,759

3

clock signals required on the processor data bus 2; however, in some systems, the timing generator capability is provided by data processor 1. The timing generator 3 may also provide the timing signals on a video data bus 8 for use by video memory 4, and by a video controller 6. The video controller 6 operates video display 7 responsive to the picture element data received over the video data bus 8. The picture element comprises a binary index for selecting color data values from color map memory 6a. Complete digital images or frames 5 of picture element information are sequentially displayed in color by video display 7.

Data processor 1 may be a microprocessor comprising program or read-only memory 9 and scratch pad or random access memory 10. In a viewdata or teletext terminal which may be located in a residential home, it is desirable that data processor 1 be as small as possible; accordingly, a microprocessor may be assumed.

Data processor 1 responds to user input from a keyboard 18, keypad 19, joystick 20, floppy disc 21, light pen or other data input device known in the art through peripheral device interface 17. In accordance with known technology, data processor 1 may program the video memory 4, the timing generator 3 and the video controller 6 to the proper modes of operation which will allow maximum flexibility in remotely reconfiguring the terminal operating characteristics.

In its application with a viewdata or teletext terminal, the data processor 1 may also respond to input provided from a remote or centralized data base such as one located at a television broadcast station or a provider of viewdata services. Such inputs are provided through communications interface 12. In the case of teletext services, a TV broadcast signal 16 is received at receiver 14 and provided to interface 12. In the case of viewdata services, data is provided over a communications line 15 through a data modulator/demodulator 13 to interface 12. Input/output controller 11 under user control provides selectable access to the various data input and output arrangements.

Processor data bus 2 is a bi-directional conduit through which the data processor 1 controls the video memory 4, the timing generator 3 and the video controller 6. Several bus structures may be adapted for use in the present invention. One example is the INTEL Corp. Multibus. Whichever specific bus structure is chosen, the bus generally comprises address capability, a data path and control lines which may include interrupt, reset, clock (for synchronous use), wait (for asynchronous use), and bus request lines.

The timing generator 3 may comprise a chain of programmable logic circuits, digital dividers and counters for providing required timing signal outputs. For operation of the video data bus 8, a number of different timing signals are required. Horizontal and vertical drive signals are provided in accordance with horizontal and field rates respectively. A dot clock signal is provided at the dot frequency (picture element or pel rate) of the system. An odd/even field signal indicates if the odd or even field is to be displayed in an interlaced system. A composite blanking signal indicates if video is being displayed or if vertical or horizontal retrace is occurring. Also, a group clock signal or other signals may be provided. The group clock signal indicates when to access data for a new group of picture element data from memory. For example, picture element data in video memory having a slow access time may be serially provided in groups of 4, 8 or 16 picture elements.

4

On the other hand, a parallel data transmission scheme is possible, potentially increasing the requirements for leads of video data bus 8.

Video controller 6 accepts digital image information from the video data bus 8, pel-by-pel, and converts the digital information, if necessary, to analog form for presentation on video display 7. The video controller comprises three components: (1) color map memory 6a; (2) digital to analog conversion and sample and hold circuits (not shown), if required by video display 7; and (3) a standard composite video encoder (not shown), for example, for providing NTSC standard video or red, green, blue (RGB) outputs.

Color map memory 6a comprises a color map memory table in random access memory indexed by a binary number component of pel data entering the video controller 6 by way of video data bus 8. For example, if four bits of color data are compiled per picture element, 16 color choices are directly accessable from color map memory table 6a. Each color data value indexed may comprise, for example, 12 bits of RGB data, the domain of possible data values in this case being 4096 possible values. The color map memory 6a may be loaded and updated from the large repertory of possible choices by the data processor 1 under local or remote control.

The application of color map memory 6a provides flexibility and greater color capacity than other color memory means. However, other color memory means are known in the art. Permanent memory 9 of data processor 1 may contain a directly accessible color table. Selections of color data values from permanent memory 9 are transferred to color map memory 6a for subsequent use. Also, random access or semi-permanent memory 10 of data processor 1 may contain a color memory, color data similarly being transferrable to color map memory 6a. Various modes of access to color memory, wherever located, in a digital image display system, are employed by the providers of viewdata and teletext services. Means for providing terminal independent color memory will be subsequently discussed in connection with FIGS. 3–14.

The color memory RGB output may be provided to three separate digital to analog converters, one for each primary color. In accordance with techniques generally known in the art, the RGB output may enter a monitor video display 7 directly, may be converted to a composite video signal for input to a monitor video display 7 or modulated to a particular RF frequency for input through the antenna lead-in of a television set display 7.

Video display 7, as previously discussed, may either be a monitor or a television set. In deference to the previous discussion, it may additionally comprise other forms of video display known in the art including a video projection system, a liquid crystal display or an LED display. The list is not intended to be inclusive and, if another standard format of input video signal is required, the principles of the present invention assume the capability of video controller 6 for providing such a standard video signal.

The video memory 4 comprises random access memory for storage of video picture element information for display. In particular, video memory 4 generally accepts input from the data processor 1 in the form of an image comprising digitized picture element information. The video memory 4 stores the information until rearrangement of data occurs and periodically passes the pel information over video data bus 8 to the video controller 6 on command of data processor 1. As previ-

4,439,759

5                                                                        6

ously indicated, the pel data comprises binary data employed to index a particular color entry in color map memory 6a.

The video data bus 8 connects the timing generator 3 and the video memory 4 to the video controller 6. It comprises the following types of leads: data leads for picture element information which is used for indexing into the color map memory 6a of video controller 6, and timing leads for providing video timing and control. The six timing and control leads include the previously mentioned horizontal and vertical drive signals, the dot clock, the field signal, the composite blanking signal and the group clock signal.

Referring more particularly to FIG. 2, an operational diagram is shown which depicts how a binary number component of picture element data stored in a planar bit memory 4 indexes color map memory 6a so that primary color data values for a video signal are provided for video display. Similar reference characters have been employed in FIGS. 2 through 14 wherever possible and in the subsequent discussions wherever possible. In addition, the first numeral of reference characters employed in FIGS. 2 through 14 relates to the location where the referenced element first appears.

In the depicted example a color map memory table of 16 colors is shown. The capacity or domain of the color map memory table may comprise, for example, four bits each of red, green and blue data. The total twelve bit capacity then relates to 4096 possible colors. Accordingly, each of the 16 tabular values indexed may comprise 12 bits of RGB data.

In the depicted example, picture element data 201 comprises, in addition to coordinate data of the location in a particular image or frame 5 for display, the binary index value representing the color that picture element 201 is to be. Binary index value 1011 representing the twelfth entry in the color map memory table may, for example, represent color data value 0011 1111 0000; 0011 being red data; 1111 being green data, and 0000 being blue data. The RGB data value, as previously discussed, illuminates the particular coordinate location in the particular in-use color in frame 5 of display 7.

Upon command of a host computer remotely provided by a teletext or videotex service provider, the color map memory table of 16 colors may be specifically loaded in combination with video processor 1 and the subsequently described software algorithms locally stored in program memory 9. Under control of local keyboard input, the data processor 1 may also specifically load the color map memory table. In accordance with the present invention, either the host computer or the local user may directly load colors into color map memory 6a from permanent memory 9 or from a semipermanent memory 10 with color data values for use.

Referring to FIGS. 3, 4, and 5, flow diagrams are depicted of a method or algorithm for accessing color memory 6a in a terminal independent manner and for setting the foreground and background in-use color if possible. FIG. 3 particularly represents a command decoding process. If a first particular command is found, then the flow diagram of FIG. 4 is performed within data processor 1. If a second particular command is found, then the flow diagram of FIG. 5 is preformed. Other commands or operation codes (opcodes) are interpreted by the command decoder algorithm depicted in FIG. 3. These other commands may include commands to perform the subsequently described blinking

process or other text or graphic drawing processes. The commands will be hereinafter referred to as opcodes.

Referring particularly to FIG. 3, the data processor is instructed in box 301 of the opcode decoder algorithm to attempt to locate the next opcode. The opcode may be remotely received from a host computer or locally received through the peripheral device interface 17. At decision box 302, the data processor 1 determines if the opcode entered is one for selecting a mode of color memory access. At box 303, transfer is effected to the algorithm for the mode selection process shown in FIG. 4 if there is a match. If there is not a match, the data processor determines at decision box 304 whether the opcode entered is one for setting a color data value. At box 305, transfer is effected to the algorithm for the color setting process shown in FIG. 5 if there is a match. In a similar manner, the entered opcode may be compared with other valid opcodes 306 and the entire opcode decoding process repeated.

Referring to FIG. 4, an algorithm for selecting a mode from a plurality of modes of color memory access and for setting foreground and background in-use colors for two of these modes is shown in flowchart form. Having transferred control to box 401 of the algorithm of FIG. 4 in the operation of the flowchart of FIG. 3, the data processor 1 now interprets the operands or data following the opcode. In general, it is presumed that an opcode will always be followed by a sequence of operands or data entrys or a new opcode. Accordingly, in the process depicted in FIG. 4, the data operands are interpreted and, as a result, the mode of access and the background and foreground color set if possible.

In particular at box 402, the first data operand is recovered if possible. If a box 403 an operand is located, another attempt is made at box 404 to locate a second operand. If at box 407 a second operand is found, the color mode of access is set at box 411 to mode 2. In other words, the color mode is determined by the number of operands following the opcode for selecting the mode of access. Accordingly, when no operands are found, the color mode is set at box 405 to mode 0. If one operand is found, the color mode is set at box 408 to mode 1.

In color mode 0, besides setting the color mode, it may be necessary in systems employing random access color memory 10 to reinitialize color map memory 6a to a default set of color data values. Accordingly block 406 suggests this activity if it may be performed. Color mode 0 of the present terminal independent color memory is adapted for use in digital image display systems employing a direct color selection process either from permanent or semi-permanent color memory.

After setting the color modes to 1 or 2 at blocks 408 or 411 respectively, the foreground and background in-use drawing colors are set. If foreground and background colors may be set in color mode 0, the subsequently described algorithm of FIG. 5 performs this feature. In color mode 1, only picture element data of the actual character in video memory 4 is drawn in the current in-use foreground color without illuminating adjoining picture element data in a background color. In color mode 2, text characters will be drawn in the in-use foreground color over the in-use background color. In other words, a character may fill a rectangular field on display 7. The actual character is illuminated in foreground color as in color mode 1, and the rectangular field surrounding the actual character is filled with the current in-use background color.

4,439,759

7

Therefore, in color mode 1, the foreground color is set at box 409 to the value of the first operand. At box 410, the background color is set to a data value representing "invisible" or no color. In color mode 2 the data processor compares the first and second operands entered. If the two operands are equal, then it is assumed that it is desired to only change the background in-use color and not the foreground color. Otherwise, the foreground color is set at box 414 and the background color is set at box 413 to the first and second operands respectively. Control is returned at box 415 to the opcode decoder program upon the completion of the color access algorithm.

Referring to FIG. 5, an algorithm in flowchart form is depicted (1) in color modes 1 or 2, for setting the color data values in color map memory 6$a$ in a terminal independent manner or (2) in color mode 0, for setting foreground and background colors. At decision box 502, the data processor determines if color mode 0 has been previously entered. It is assumed that, when the opcode for setting a color data value is entered, the select color access mode opcode has been read and acted upon in accordance with the flowcharts of FIGS. 3 and 4.

If the color access mode at decision box 502 is 0, then the first operand is located if possible at box 503. If the operand is located at decision box 505 then a second operand is located if possible at box 507.

If a second operand was not successfully located at decision box 509, then the foreground color and the background color will be modified at boxes 512 and 514 respectively. At box 512, the foreground color is set to the index of the closest match of the first operand and a color value from the color map memory table 6$a$. At box 514, the background color is set to an "invisible" color. "Invisible" is intended to describe the process of depositing pel values in video memory 4 only at the character or graphics drawing command locations corresponding to the foreground of the resulting image and not over-writing those corresponding to the background.

If a second operand has been successfully located at decision box 509 then a check is made at decision box 511 to see if both operands are equal. If the first operand and second operand are equal, then by convention only the background color is set at box 515. If the two operands are not equal at decision box 511 then the foreground color is set at box 513 and the background color is subsequently set at box 515. As in the case of a single operand, the foreground color and the background color are set to the index of the closest matched color in the color map memory table 6$a$.

If the color mode was not 0 at decision box 502 then the color map memory table 6$a$ will be loaded with colors specified by subsequent operands. The current in use foreground color index will indicate the first potential color map memory table entry to be changed. INDEX is set to the current in-use foreground color index at box 501. An attempt is made to get an RGB operand at box 504 if possible. If the operand is found at decision box 506, then the RGB operand is loaded into the color map memory table 6$a$ at the location determined by INDEX. The INDEX is then incremented at box 510. The sequence of boxes 504, 506, 508, and 510 is repeated as long as operands are available.

Referring to FIG. 6, a color hue circle is shown wherein the primary colors—red, green, and blue—are located at 120 degrees, 240 degrees, and 360 degrees.

8

Upon the operation of the box 406 of FIG. 4 and on other occasions in the operation of a digital image display system, for example, an explicit resetting operation, it is appropriate to initialize or establish color map memory table 6$a$ regardless of the number of possible entries and in a predictable fashion. Accordingly, a method is provided whereby one half of the color map memory is filled with a gray scale whose values are equally spaced between black and white and the other half of color map memory 6$a$ is filled with a color hue scale whose values are spaced about a hue circle of 360 degrees.

In particular, if the number of bits of a binary number index into a particular color map 6$a$ is defined as N, then the number of entries in the color map is $2^N$. Then the quantity $2^N/2$ of entires comprise gray scale values and the quantity $2^N/2$ of entires comprise color hue values.

The capacity or domain of the color map memory table 6$a$ may be defined as comprising M bits of data. Then, the quantity M/3 bits of data may represent data for each primary color—red, green, and blue. In general, the relationship between M and N may be maintained that M be greater than or equal to three times the quantity N-1.

By way of example, if a particular color map memory is indexed by a 4 bit binary index value, then 8 gray scale levels and 8 hues are loaded upon request into color map memory table 6$a$. The quantity M then should be greater than or equal to 9:3 bits each of red, green, and blue data.

The gray scale is found particularly as a binary number in this example between 000 000 000 and 111 111 111 and generally is represented by the binary result of the equation: $P_1 = k/(I-1)$ where I represents the decimal number of gray scale levels, generally $2^N/2$, k, a quantity between 0 . . . I-1, is the particular entry in the map desired, and $P_1$ is the binary result for a primary color—red, green, and blue. It is most convenient if, in the operation of data processor 1, the result is normalized and rounded to the nearest M/3 bits. The value for all the primary colors is set equal to this last.

Referring briefly to FIG. 7, an exemplary color map memory table is shown. In accordance with the above method, the first eight values are shown initialized to gray scale levels in a gray scale 706 between 000 000 000 at address 704 with the binary index value 0000 and value 111 111 111 at address 704 with the binary index value 0111.

To provide the color hue values, data processor 1 must first calculate the angle of a desired color hue h. If n entries are required then the result of the calculation (j−1) times 360 degrees divided by n (wherein j is an integer between 1 and n) provides the angle of h. In FIG. 6, if eight hue data values are desired then by way of example, color data values are desired for 45 degrees, at location 611, 90 degrees at location 612, 135 degrees at location 613, and so on about the color hue circle.

In general, the data processor must particularly locate the location of the closest primary color angle to the desired angle, the next closest primary color and the furthest primary color from the desired angle. In particular, for the example of color value 611 at 45 degrees, then the primary color blue is the closest primary color at location 601 or 360 degrees. This result may be appropriately established in temporary memory as variable $P_1$. The next closest primary color to the exemplary desired color hue is red at location 603 or 120 degrees. This result may be appropriately established in

4,439,759

9

temporary memory as variable $P_2$. The furthest primary color from the exemplary desired color hue is green at location 605 or 240 degrees. This result may be established in temporary memory as variable $P_3$.

The results $P_1$, $P_2$, and $P_3$, of this calculation are then employed generally to establish the color data values for the primary colors—red, green and blue. As it is known that $P_1$ is blue in the particular example under discussion, the blue data value in binary form is set in color map memory as all 1 bits. As it is known that $P_3$ is green, the green data value is set in color map memory as all 0 bits.

In the case of $P_2$, data processor 1 is instructed to calculate the binary result of the equation:

$$P_2 = \left| \frac{\langle h - \langle P_1}{60^\circ} \right|$$

As it is known that $P_2$ is red, the red data value is set in color map memory to the binary result of the above calculation. As with the gray level calculation, it is generally appropriate that the result be rounded to the nearest M/3 data bits in length after normalizing the result.

Referring again to FIG. 7, the color hue data values are entered in address locations 1000 to 1111 in the depicted exemplary color map memory table. In particular, the above exemplary calculation for a hue at 45 degrees on the hue circle of FIG. 6 is located at address 1001. As previously indicated, the blue data value is all 1 bits or 111; the green value is all 0 bits or 000, and the red value is given by the binary result 101.

Referring to FIG. 8, there is shown a depiction of a memory block associated with a particular process identifying its parameters. When a time blink process is initiated, a blink process block must be established in memory which stores the relevant parameters associated with that particular blink process. The first entry 801 in the block stores the LINK value, which is a pointer to the starting address of another blink process block. If the process is actively blinking, then the LINK value will point to the next active process block. If the process is INACTIVE, then the LINK value will point to the next FREE process block.

The second entry 802 in the block stores the current STATUS of the blink process. The status can be either INACTIVE, ON, or OFF (the latter two of which are considered active states).

The third entry 803 is used to store the BLINK-FROM COLOR, which is a binary number index that acts as an index into the color map memory table. This index number is extracted from the operand following opcode representing the color blinking process and does not change throughout the life of the process.

The fourth entry 804 is used to store the SAVE COLOR, which is an RGB value and not a binary index that is periodically copied out of the color map memory table in a manner that will be described subsequently.

The fifth entry 805 is used to store the BLINK-TO COLOR which is a binary number that acts as an index into the color map memory table. This number is also extracted from the operand following the blink process opcode and does not change throughout the life of the process.

The sixth entry 806 stores the ON TIME and the seventh entry 807 stores the OFF TIME, both of which are most conveniently numbers between 1 and 64 that represent time intervals in fractions of a second. These

10

are also extracted from the operand following the blink process opcode and do not change throughout the life of the process.

The eighth entry 808 stores the CURRENT COUNT which is also a number that represents a time interval. This number is updated regularly as the process is executed.

FIG. 9 gives a logical view of how the linked blink process blocks are treated. There are two linked lists kept in memory. The first contains all of the active process blocks and the second contains all of the INACTIVE or free process blocks. The memory occupied by the INACTIVE process blocks is available for use by new blink processes, and hence this list is called the FREE list. The head 901 of the ACTIVE list is a single pointer that contains the address in memory of the beginning of the process block of the most recently received active blink process 902. The LINK entry in this block in turn points to the beginning of the next most recently received active blink process 903, and so on to the beginning of block 904, block 905 through the entire list of process blocks that contain active blink processes. The displaced appearance of the blink process blocks is intended to represent their random appearance in memory. The last process block on the list contains a LINK value NULL indicating the end of the list. The head of the FREE list 910 is a single pointer that contains the address in memory of the beginning of the process block of the first inactive blink process 911. The LINK entry in this block points to the beginning of the next inactive process block 912 and so on to the beginning of block 913, block 914 through the remainder of the inactive process blocks. When the system is initialized, as well as any time that there are no currently active blink processes, all of the available blocks of memory allocated to the blink feature are on the FREE list.

When a new blink process is initiated, more particularly described in the discussion of FIG. 12, the first block in FREE list 911 is made available for its use. When this happens, the head of the FREE list pointer 910 is changed to the address of the beginning of the next free block 912. Also, the head of the ACTIVE list pointer 901 is changed to the address of the beginning of the block 911 just allocated, and the LINK pointer within block 911 is changed to the address of the beginning of what was the most recently received active blink process block 902. The new active process block 911 is then loaded with the relevant parameters of the blink process being defined.

FIG. 10 shows the actual organization within memory of blink process blocks. The first entry 1001 and the second entry 1002 store the head of the ACTIVE list pointer and the head of the FREE list pointer, respectively. Process blocks are stored in sequential memory locations 1003 through 1010 or until the capacity allocated within memory 10 is reached. These locations do not necessarily correspond to the order in which the blocks appear on the linked lists.

FIG. 11 shows a flow diagram for TICK, the primary blink processing subroutine. TICK is periodically called from a main control program, typically every 1/10th second. This subroutine goes through, examines, and updates each process block (and the color map memory table if necessary) in the ACTIVE list starting with the most recently received blink process block and proceeding to the last.

11

Activity block 1101 with which the TICK subroutine begins sets the value of an internal status variable PTR to the address stored in the head of the ACTIVE list. (This, as described previously, points to the most recently received active process block.) Activity block 1102 initiates a loop, whose steps comprise blocks 1103 through 1117, that is exited only when it returns a PTR value of NULL. The first step in the loop, activity block 1103, subtracts one from the COUNT of the process block pointed to by PTR. Decision block 1104 then checks the value of COUNT to see if it is equal to or less than zero. If it is not, then control action proceeds through block 1109 (by passing blocks 1106 through 1116) to activity block 1117, which changes PTR to the address stored in the LINK entry of the process block pointed to by PTR or, in other words, the current process block. Control then loops back to activity block 1103 as long as PTR does not have the value NULL. If the COUNT is less than or equal to zero, then control proceeds through block 1105 to decision block 1106. Decision block 1106 checks the value of STATUS in the current process block. If STATUS is on, then control proceeds through block 1108 to activity block 1111. If STATUS off, then control proceeds through block 1107 to activity block 1110.

Activity block 1111 takes the RGB value stored in SAVE COLOR of the current process block and writes it into the color map memory table entry indicated by the index stored in the FROM COLOR entry in that process block. Control then passes to activity block 1112, which sets the COUNT entry of the current process block to the contents of the OFF TIME entry of that block.

Activity block 1116 then sets the STATUS of that process block to OFF before control passes to activity block 1117, whose action has been described previously.

Activity block 1110 copies the RGB value from the color map entry indicated by the index stored in the FROM COLOR entry of the current process block into the SAVE COLOR entry of that process block. Activity block 1113 then copies the RGB value from the color map entry indicated by the index stored in the TO COLOR entry of the current process block into the color map entry indicated by the index stored in the FROM COLOR entry of that process block. Activity block 1114 then sets the COUNT entry to the value stored in the ON entry. Finally Activity block 1115 sets the STATUS entry to ON before control is passed to Activity block 1117, whose action has been described previously.

When the loop is finally exited, that is, when PTR returns the value NULL, the subroutine TICK is complete and control returns to the main control program.

In the previous discussion, the assumption was made that an active process list already had been established.

FIG. 12 is a flow diagram illustrating how one active blink process is added to the active list. Since only one active process is allowed for the ordered pair of FROM COLOR (FC) and TO COLOR (TC), the current list of active process blocks must be searched to determine if a process is active for a given pair. This search is indicated in box 1201. If the ordered pair (FC, TC), is found in the currently active process blocks then that block is made INACTIVE and is removed from the linked list as indicated in box 1206. When box 1205 is encountered an attempt is made to obtain a free process block from the previously described FREE list. At decision box

12

1207 a check is made to see if a free block was successfully obtained. If no block was obtained then the entire set of possible blocks must have been already allocated to ACTIVE processes and therefore no addition can be made, so the entire process addition procedure is exited.

If a free process block is obtained then it must be initialized as illustrated in box 1210. The new process always begins with a STATUS of OFF which guarantees that the first transition will be OFF-to-ON as previously stated.

The FROM COLOR, TO COLOR and ON and OFF TIME'S are also initialized in box 1210 from data obtained from the operand entered following the blink process opcode.

The phase delay (PD) is an offset from the next OFF-to-ON transition of the most recently received active process (that is, the process of the head of the ACTIVE process list). The head of the ACTIVE list is checked at decision box 1211 in case the list is empty. If the list is empty, then the phase delay does not apply and the CURRENT COUNT in the new process block is set to the OFF TIME as indicated in box 1219.

If an active process exists then two situations arise, either the process is currently ON or OFF. The STATUS of the proces is checked in decision box 1214. If the process is ON then the next OFF-to-ON transition will occure when the CURRENT COUNT reaches the interval of time represented by OFF TIME expires. Therefore, the total time to the next OFF-to-ON transition will be the CURRENT COUNT plus the OFF TIME. In order to synchronize the new process to the most recently received active process, its CURRENT COUNT is set to the time until the next OFF-to-ON transition plus any phase delay as shown in box 1210.

If the last active process has a STATUS of OFF, then the next OFF-to-ON transition will occur at a total time equal to CURRENT COUNT. The new process is therefore synchronized to that transition simply by setting the new process CURRENT COUNT to the CURRENT COUNT of the most recently received process plus any indicated phase delay.

In all cases when the complete process block is initialized, it is added to the active process list as shown in BOX 1220. The ADD NEW PROCESS returns control to the main control program.

Referring to FIG. 13, exemplary color tables and a timing diagram are illustrated for three active blink processes. Successive representations of an eight entry color table are illustrated in table 1301. Time is indicated by time line 1312. A legend 1311 indicates the assumed color values of color table 1301. The information that was used to establish the three blink processes is as shown in Table 1.

TABLE 1

| PROCESS 1 | |
|---|---|
| Arrival Time | T = 0 |
| FROM COLOR | 6 |
| TO COLOR | 3 |
| ON TIME | 2 |
| OFF TIME | 2 |
| PHASE DELAY | 3 |
| PROCESS 2 | |
| Arrival Time | T = 5 |
| FROM COLOR | 7 |
| TO COLOR | 1 |
| ON TIME | 4 |
| OFF TIME | 2 |
| PHASE DELAY | 1 |
| PROCESS 3 | |

4,439,759

13

TABLE 1-continued

| Arrival Time | T = 10 |
|---|---|
| FROM COLOR | 3 |
| TO COLOR | 7 |
| ON TIME | 4 |
| OFF TIME | 5 |
| PHASE DELAY | 1 |

The color table 1301 at time T=0 contains the color value white in entry 1, the color value red in entry 3, the color value green in entry 6 and the color value blue in entry 7. The other entries may contain color values but are not important in this example.

Process 1 arrives at time T=0 and assuming no active processes already exist, process 1 is activated with a STATUS of OFF (1304). The phase delay that was specified for process 1 is not relevant because no active blink processes existed when the information for process 1 arrived at time T=0.

When process 1 is activated the CURRENT COUNT is set to the OFF TIME which is equal to 2 and therefore an OFF-to-ON transition will occur at time T=2 (1313).

When the OFF-to-ON transition occurs, the color value in the color table indexed by the FROM COLOR, which is equal to 7, is saved in the process block in the SAVE COLOR entry 1302. The color value saved is blue shown by the entry 1315. After the FROM COLOR is saved, the contents of the color table indexed by the TO COLOR is copied to the color table entry indexed by the FROM COLOR. This results in the color value red in entry 3 at 1316 to be copied to entry 7 at 1317.

As a result of this change, any picture elements which were previously displayed using the color value stored in color map entry 7 will immediately change from blue to red. The STATUS of process 1 will be set to ON and the CURRENT COUNT will be set to the ON TIME which is equal to 2. An ON-to-OFF transition will occur at time T=4 referenced by character 1314. At that transition the previously saved color 1315 is restored in the color table at the entry indexed by the FROM COLOR, which is equal to 7, and referenced by character 1318. The STATUS is again set to OFF and the CURRENT COUNT is set to the OFF TIME which is equal to 2. The above sequence is repeated as long as the process is active.

Process 2 arrives at time T=5 which is after process 1 has been activated. Process 2 is started with a STATUS of OFF and must be synchronized with the next OFF-to-ON transition of process 1. Since at time T=5 the STATUS of process 1 is OFF then the time to the next OFF-to-ON transition will be equal to 1, which is the CURRENT COUNT of process 1. A phase delay of 1 was specified with process 2 so the OFF TIME of process 2 is set to the sum of the CURRENT COUNT of process 1 plus the phase delay of process 2, which equals 2. This setting results in the first OFF-to-ON transition occurring at time T=7 referenced by character 1319. Process 2 then begins the color save, copy and restore sequence previously described for process 1.

Process 3 arrives at time T=14 and must be synchronized to process 2. The next OFF-to-ON transition of process 2 occurs at time T=13, and, because of the phase delay of 1, the first OFF-to-ON transition for process 3 will occur at time T=14, referenced by character 1321. As with process 1 and 2, the save, copy and restore sequence will continue for process 3 until

14

changed by either another specification for the same ordered pair of FROM COLOR and TO COLOR or a general resetting procedure.

It should be noted that when colors are copied from one entry in the color table to another that an interaction between processes can result. This is illustrated at time T=13 and T=14. At time T=13, process 2 makes an OFF-to-ON transition referenced by character 1320. The color white is copied to color table entry 7 as referenced by 1324. At time T=14, process 1 makes an OFF-to-ON transition as referenced by 1322. At that transition, the SAVE COLOR, referenced by 1325, is white because of the previous copy operation performed by process 2 at time T=13. This interaction of colors between processes is useful for simple animation and complex blinking sequences.

FIG. 14 illustrates the state of the three process blocks at time T=15.

What is claimed is:

1. In a digital image display system:
   a memory for storing color data values;
   processing means responsive to a predetermined command and data sequence comprising at least one command, the processing means decoding the predetermined command and data sequence, the predetermined command and data sequence selecting one of a plurality of modes of access to color data values, the modes comprising
   a first mode of access wherein an in-use foreground color is directly specified as a color data value;
   a second mode of access wherein the in-use foreground color is specified as an index into the color memory; and
   a third mode of access wherein the in-use foreground color and an in-use background color are specified as indexes into the color memory; and
   display means responsive to the processing means, the display means displaying the colors associated with the color data values accessed by the selected mode.

2. A digital image display system comprising:
   a color memory for storing color data values;
   processing means responsive to predetermined command and data sequences, the processing means, responsive to a first command, selecting a mode of access to the color memory; and responsive to a second command, setting a color data value in the color memory; and
   display means responsive to the processing means, the display means displaying a color associated with the color data value accessed by the selected mode.

3. A display system as recited in claim 2, wherein the processing means responsive to a second command sets plural color data values in color memory.

4. In a video image display system having a color memory, a method for displaying a color image in a terminal independent manner responsive to commands and data received from a command and data source, the method comprising the steps of:
   receiving commands and data from the command and data source;
   reading a first command for selecting a mode of access to the color memory, and responsive to data following the first command, selecting the mode of access to the color memory;
   reading a second command for setting color data values in the color memory and, responsive to data

4,439,759

15

following the second command, setting the color data values in the color memory,

reading a third command for accessing color data values in the color memory, and

displaying a color image associated with the color data values accessed by the third command on a video display terminal.

5. A digital image display system comprising:

a color map memory for storing color data values;

processing means for storing color data values in the color map memory and accessing color data values stored in the color map memory, the color data values comprising $2^N/2$ gray level data values equally spaced between black and white, where N is the number of bits in a color entry address of the color map memory and the processing means storing the gray level data values in one half of the color map memory, the color data values further comprising $2^N/2$ hue data values equally spaced about a 360 degree hue circle wherein primary colors red, green, and blue are located in 120 degree relationship to one another and the processing means storing the hue data values in another half of the color map memory, the processing means upon command accessing color data values stored in the color map memory; and

display means responsive to the processing means for displaying an image associated with accessed color data values.

6. A digital image display system comprising:

a color map memory for storing color data values;

processing means for storing hue color data values in the color map memory and accessing color data values stored in the color map memory, the hues being equally spaced about a 360 degree hue circle wherein primary colors red, green, and blue are located in 120 degree relationship to one another, and where h is a desired hue color data value, n is a desired number of hue color data values, angle of h is determined by $(j-1)\times360$ degrees divided by n, where j is an integer between 1 and n, $P_1$ is the closest primary color to the angle of h, $P_2$ is the next closest primary color to the angle of h, and $P_3$ is the furthest primary color from the angle of h, the identity of $P_1$, $P_2$, and $P_3$ being assigned among the primary colors, the processing means setting the binary value of $P_1$ in the color map memory as all 1 bits, setting the binary value of $P_3$ in the color map memory as all 0 bits, and setting in the color

16

map memory the normalized and rounded binary value of $P_2$ resulting from the equation:

$$P_2 = \frac{\sphericalangle h - \sphericalangle P_1}{60°}$$

and upon command accessing color data values stored in the color map memory; and

display means responsive to the processing means for displaying an image associated with accessed color data values.

7. A digital image display system comprising:

a color memory for storing color data values;

processing means responsive to a particular command and data sequence providing a blinking of certain picture element data from one particular color specified by the data sequence to another particular color specified by the data sequence by periodically changing color data values in the color memory, multiple color blinking processes being provided responsive to multiple commands, each process subsequent to a first process being in delay relationship to the next previous process; and

a display means for displaying the multiple color blinking responsive to the processing means.

8. A display system as recited in claim 7 wherein the processing means determines the time interval each particular color is displayed during a blinking cycle responsive to the command and data sequence.

9. In a digital image display system having a color memory, a method for providing a blinking of certain picture element data from one particular color to another particular color, the color blinking method initiated by the reception of a particular command and data sequence, the color blinking method characterized by the steps of:

specifying multiple color blinking processes, each color blinking process including providing a blinking of certain picture element data from one particular color specified by the data sequence to another particular color specified by the data sequence by periodically changing color data values in the color memory;

specifying a delay interval, if desired, between the processes; and

displaying the multiple color blinking.

10. A method for providing color blinking as recited in claim 9 further characterized by the steps of

specifying a particular time interval a particular color is displayed during a blinking cycle of a particular color blinking process.

* * * * *

# United States Patent [19]

## Ketchum et al.

[11] **Patent Number:** **4,910,781**

[45] **Date of Patent:** **Mar. 20, 1990**

[54] **CODE EXCITED LINEAR PREDICTIVE VOCODER USING VIRTUAL SEARCHING**

[75] Inventors: **Richard H. Ketchum**, Wheaton; **Willem B. Kleijn**, Batavia; **Daniel J. Krasinski**, Glendale Heights, all of Ill.

[73] Assignee: **AT&T Bell Laboratories**, Murray Hill, N.J.

[21] Appl. No.: **67,650**

[22] Filed: **Jun. 26, 1987**

[51] Int. Cl.⁴ ............................................ G10L 7/02
[52] U.S. Cl. .................................................... 381/36
[58] Field of Search ................................. 381/36–41, 381/29–32, 51; 364/513.5; 375/122

[56] **References Cited**

U.S. PATENT DOCUMENTS

4,720,861  1/1988  Bertrand ................................ 381/36

OTHER PUBLICATIONS

Adoul et al., "Fast Celp Coding Based on Algebraic Codes", IEEE ICASSP, 81, pp. 1957–1960.
Crossman et al., "Multipulse Excited Channel Vocoder", IEEE ICASSP, 87, pp. 1926–1930.
Troncoso et al., "Efficient Procedures for Finding the Optimum Innovation in Stochastic coders", IEEE ICASSP, 86, pp. 2375–2378.
Schroeder et al, "Code-Excited Linear Prediction (HELP): High Quality Speech at Very Low Bit Rates", IEEE ICASSP, 85, pp. 937–940.
Singhal, S. and B. S. Atal, "Improving Performance of Multi-Pulse LPC Coders at Low Bit Rates", Proc. Int. Conf. Acoust., Speech and Sign. Process., San Diego, 1.3.1–1.3.4, 1984.
Atal, B. S. and M. R. Schroeder, "Stochastic Coding of

Speech Signals at Very Low Bit Rates", Proc. of ICC, Amsterdam, 1610–1613, 1984.
Trancoso, I. M. and B. S. Atal, "Efficient Procedures for Finding the Optimum Innovation in Stochastic Coders", Proc. Int. Conf. Acoust., Speech and Sign. Process., Tokyo, 2379–2382, 1986.
Atal, B. S., "High-Quality Speech at Low Bit Rates: Multi-Pulse and Stochastical Excited Linear Predictive Coders", Proc. Int. Conf. Acoust., Speech and Sign. Process., Tokyo, 1681–1684, 1986.
Chen, J. H. and Gersho, A., "Real-Time Vector APC Speech Coding at 4800 bps with Adaptive Postfiltering", Proc. Int. Conf. Acoust., Speech and Sign. Process., Dallas, 2185–2188, 1987.

*Primary Examiner*—David L. Clark
*Assistant Examiner*—John A. Merecki
*Attorney, Agent, or Firm*—John C. Moran

[57] **ABSTRACT**

Apparatus for encoding speech using a code excited linear predictive (CELP) encoder using a virtual searching technique during speech transitions such as from unvoiced to voiced regions of speech. The encoder compares candidate excitation vectors stored in a codebook with a target excitation vector representing a frame of speech to determine the candidate vector that best matches the target vector by repeating a first portion of each candidate vector into a second portion of each candidate vector. For increased performance, a stochastically excited linear predictive (SELP) encoder is used in series with the adaptive CELP encoder. The SELP encoder is responsive to the difference between the target vector and the best matched candidate vector to search its own overlapping codebook in a recursive manner to determine a candidate vector that provides the best match. Both of the best matched candidate vectors are used in speech synthesis.

**18 Claims, 5 Drawing Sheets**





FIG. 1

Case 3:03-cv-01108-B-CAB    Document 1    Filed 06/02/03    Page 781 of 976



FIG. 2

$$r_1^T H^T H r_1 = \begin{bmatrix} x_0 & x_1 & x_2 & x_3 & x_4 \end{bmatrix} \begin{bmatrix} \Lambda_0 & \Lambda_1 & \Lambda_2 & \Lambda_3 & \Lambda_4 \\ \Lambda_1 & \Lambda_0 & \Lambda_1 & \Lambda_2 & \Lambda_3 \\ \Lambda_2 & \Lambda_1 & \Lambda_0 & \Lambda_1 & \Lambda_2 \\ \Lambda_3 & \Lambda_2 & \Lambda_1 & \Lambda_0 & \Lambda_1 \\ \Lambda_4 & \Lambda_3 & \Lambda_2 & \Lambda_1 & \Lambda_0 \end{bmatrix} \begin{bmatrix} x_0 \\ x_1 \\ x_2 \\ x_3 \\ x_4 \end{bmatrix}$$

FIG. 3

$$r_2^T H^T H r_2 = \begin{bmatrix} x_1 & x_2 & x_3 & x_4 & x_5 \end{bmatrix} \begin{bmatrix} \Lambda_0 & \Lambda_1 & \Lambda_2 & \Lambda_3 & \Lambda_4 \\ \Lambda_1 & \Lambda_0 & \Lambda_1 & \Lambda_2 & \Lambda_3 \\ \Lambda_2 & \Lambda_1 & \Lambda_0 & \Lambda_1 & \Lambda_2 \\ \Lambda_3 & \Lambda_2 & \Lambda_1 & \Lambda_0 & \Lambda_1 \\ \Lambda_4 & \Lambda_3 & \Lambda_2 & \Lambda_1 & \Lambda_0 \end{bmatrix} \begin{bmatrix} x_1 \\ x_2 \\ x_3 \\ x_4 \\ x_5 \end{bmatrix}$$

FIG. 4

$$r_1^T H^T H r_1 = \begin{bmatrix} x_0 & x_1 & x_2 & x_3 & x_4 \end{bmatrix} \begin{bmatrix} \Lambda_0 & \Lambda_1 & \Lambda_2 & \Lambda_3 & \Lambda_4 \\ \Lambda_1 & \Lambda_0 & \Lambda_1 & \Lambda_2 & \Lambda_3 \\ \Lambda_2 & \Lambda_1 & \Lambda_0 & \Lambda_1 & \Lambda_2 \\ \Lambda_3 & \Lambda_2 & \Lambda_1 & \Lambda_0 & \Lambda_1 \\ \Lambda_4 & \Lambda_3 & \Lambda_2 & \Lambda_1 & \Lambda_0 \end{bmatrix} \begin{bmatrix} x_0 \\ x_1 \\ x_2 \\ x_3 \\ x_4 \end{bmatrix}$$

501   502   503   504

FIG. 5

$$r_2^T H^T H r_2 = \begin{bmatrix} x_1 & x_2 & x_3 & x_4 & x_5 \end{bmatrix} \begin{bmatrix} \Lambda_0 & \Lambda_1 & \Lambda_2 & \Lambda_3 & \Lambda_4 \\ \Lambda_1 & \Lambda_0 & \Lambda_1 & \Lambda_2 & \Lambda_3 \\ \Lambda_2 & \Lambda_1 & \Lambda_0 & \Lambda_1 & \Lambda_2 \\ \Lambda_3 & \Lambda_2 & \Lambda_1 & \Lambda_0 & \Lambda_1 \\ \Lambda_4 & \Lambda_3 & \Lambda_2 & \Lambda_1 & \Lambda_0 \end{bmatrix} \begin{bmatrix} x_1 \\ x_2 \\ x_3 \\ x_4 \\ x_5 \end{bmatrix}$$

601   604   602   603

FIG. 6

Case 3:03-cv-01108-B-CAB    Document 1    Filed 06/02/03    Page 783 of 976



FIG. 7



FIG. 9

FIG. 8

4,910,781

1.

# CODE EXCITED LINEAR PREDICTIVE VOCODER USING VIRTUAL SEARCHING

## CROSS-REFERENCE TO RELATED APPLICATION

The following application was filed concurrently with this application and is assigned to the same assignees as this application:

R. H. Ketchum, et al, "Improved Code Excited Linear Predictive Vocoder", Ser. No. 067,649.

## MICROFICHE APPENDIX

Included in this application is Microfiche Appendix A. The total number of microfiche is 1 sheet and the total number of frames is 37.

## TECHNICAL FIELD

This invention relates to low bit rate coding and decoding of speech and in particular to an improved code excited linear predictive vocoder that provides high performance.

## BACKGROUND AND PROBLEM

Code excited linear predictive coding (CELP) is a well-known technique. This coding technique synthesizes speech by utilizing encoded excitation information to excite a linear predictive coding (LPC) filter. This excitation is found by searching through a table of excitation vectors on a frame-by-frame basis. The table, also referred to as codebook, is made up of vectors whose components are consecutive excitation sample. Each vector contains the same number of excitation samples as there are speech samples in a frame. The codebook is constructed as an overlapping table in which eht excitation vectors are defined by shifting a window along a linear array of excitation samples. The analysis is performed by first doing an LPC analysis on a speech frame to obtain a LPC filter that is then excited by the various candidate vectors in the codebook. The best candidate vector is chosen on how well its corresponding synthesis output matches a frame of speech. After the best match has been found, information specifying the best codebook entry and the filter are transmitted to the synthesizer. The synthesizer has a similar codebook and accesses the appropriate entry in that codebook and uses it to excite an identical LPC filter. In addition, it utilizes the best candidate excitation vector to update the codebook so that the codebook adapts to the speech.

The problem with this technique is that the codebook adapts very slowly during speech transitions such as from unvoiced regions to voiced regions of speech. Voiced regions of speech are characterized in that a fundamental frequency is present in the speech. This problem is particularly noticeable for women since the fundamental frequencies that can be generated by women are higher than those for men.

## SUMMARY OF THE INVENTION

The following problem is solved and a technical advance is achieved by a vocoder that utilizes virtual searching of the codebook containing the candidate excitation vectors to improve response during speech transitions such as from unvoiced to voiced regions of speech. A method in accordance with this invention comprises the steps of: grouping speech into frames, comparing candidate sets of excitation information stored in a table with the samples of the present frame to

2

determine the candidate set that best matches the present speech by repeating a first portion of each group of the candidate sets in a second portion of each of the group of candidate sets of information, determining the location of the best matched candidate set in the table, and communicating that location for reproduction of the speech by a decoder.

Advantageously, the step of comparing comprises the steps of: storing candidate sets of excitation information in the table, shifting a window equal to the number of samples in each candidate set through the array to form candidate sets of excitation information thereby creating candidate sets of the group towards the end of the linear array for which there are not enough samples to fill the second portion of the group's candidate sets, and repeating the first portion of each candidate set of the group in the second portion of each of the group to complete each of the group. Also, the other candidate sets obtained by shifting the window through the linear array other than those that are part of the group are filled entirely with sequential samples from the table.

Advantageously, the comparing step further comprises the steps of: forming a target set of excitation information in response to the present frame of speech, calculating a temporary set of excitation information from the target set and the best matched set of excitation information, searching another table for other candidate sets with the temporary set of excitation information to determine the candidate set from the other table that best matches the temporary excitation set, determining the other location of the best matched candidate set in the other table, and the communicating step further communicates the other location for speech reproduction.

In addition, the comparing step further comprises the steps of: determining filter coefficients in response to the present speech frame, calculating finite impulse response filter information from the set of filter coefficients, recursively calculating an error value for each of the candidate sets stored in the table in response to the finite impulse response filter information and the target set of excitation information, and selecting the best candidate set on the basis that it has the smallest error value. Also, the communicating step further communicates the filter coefficients for speech reproduction.

Advantageously, an apparatus in accordance with this invention has a searcher circuit that searches through a plurality of candidate sets of excitation information in a table to determine the candidate set that best matches samples for a present frame of speech by repeating a first portion of each candidate set of a group of candidate sets into a second portion of each candidate set of the group. Further, the apparatus has a encoder for communicating information identifying the best matched candidate set's location in the table for reproduction of the speech by a decoder.

## BRIEF DESCRIPTION OF THE DRAWING

FIG. 1 illustrates, in block diagram form, analyzer and synthesizer sections of a vocoder which is the subject of this invention;

FIG. 2 illustrates, in graphic form, the formation of excitation vectors from codebook 104 using the virtual search technique which is the subject of this invention;

4,910,781

3

FIGS. 3 through 6 illustrate, in graphic form, the vector and matrix operation used in selecting the best candidate vector;

FIG. 7 illustrates, in greater detail, adaptive searcher 106 of FIG. 1;

FIG. 8 illustrates, in greater detail, virtual search control 708 of FIG. 7; and

FIG. 9 illustrates, in greater detail, energy calculator 709 of FIG. 7.

DETAILED DESCRIPTION

FIG. 1 illustrates, in block diagram form, a vocoder which is the subject of this invention. Elements 101 through 112 represent the analyzer portion of the vocoder; whereas, elements 151 through 157 represent the synthesizer portion of the vocoder. The analyzer portion of FIG. 1 is responsive to incoming speech received on path 120 to digitally sample the analog speech into digital samples and to group those digital samples into frames using well-known techniques. For each frame, the analyzer portion calculates the LPC coefficients representing the formant characteristics of the vocal tract and searches for entries from both the stochastic codebook 105 and adaptive codebook 104 that best approximate the speech for that frame along with scaling factors. The latter entries and scaling information define excitation information as determined by the analyzer portion. This excitation and coefficient information is then transmitted by encoder 109 via path 145 to the synthesizer portion of the vocoder illustrated in FIG. 1. Stochastic generator 153 and adaptive generator 154 are responsive to the codebook entries and scaling factors to reproduce the excitation information calculated in the analyzer portion of the vocoder and to utilize this excitation information to excite the LPC filter that is determined by the LPC coefficients received from the analyzer portion to reproduce the speech.

Consider now in greater detail the functions of the analyzer portion of FIG. 1. LPC analyzer 101 is responsive to the incoming speech to determine LPC coefficients using well-known techniques. These LPC coefficients are transmitted to target excitation calculator 102, spectral weighting calculator 103, encoder 109, LPC filter 110, and zero-input response filter 111. Encoder 109 is responsive to the LPC coefficients to transmit the latter coefficients via path 145 to decoder 151. Spectral weighting calculator 103 is responsive to the coefficients to calculate spectral weighting information in the form of a matrix that emphasizes those portions of speech that are known to have important speech content. This spectral weighting information is based on a finite impulse response LPC filter. The utilization of a finite impulse response filter will be shown to greatly reduce the number of calculations necessary for performing the computations performed in searchers 106 and 107. This spectral weighting information is utilized by the searchers in order to determine the best candidate for the excitation information from the codebooks 104 and 105.

Target excitation calculator 102 calculates the target excitation which searchers 106 and 107 attempt to approximate. This target excitation is calculated by convolving a whitening filter based on the LPC coefficients calculated by analyzer 101 with the incoming speech minus the effects of the excitation and LPC filter for the previous frame. The latter effects for the previous frames are calculated by filters 110 and 111. The reason

that the excitation and LPC filter for the previous frame must be considered is that these factors produce a signal component in the present frame which is often referred to as the ringing of the LPC filter. As will be described later, filters 110 and 111 are responsive to the LPC coefficients and calculated excitation from the previous frame to determine this ringing signal and to transmit it via path 144 to subtracter 112. Subtracter 112 is responsive to the latter signal and the present speech to calculate a remainder signal representing the present speech minus the ringing signal. Calculator 102 is responsive to the remainder signal to calculate the target excitation information and to transmit the latter information via path 123 to searcher 106 and 107.

The latter searchers work sequentially to determine the calculated excitation also referred to as synthesis excitation which is transmitted in the form of codebook indices and scaling factors via encoder 109 and path 145 to the synthesizer portion of FIG. 1. Each searcher calculates a portion of the calculated excitation. First, adaptive searcher 106 calculates excitation information and transmits this via path 127 to stochastic searcher 107. Searcher 107 is responsive to the target excitation received via path 123 and the excitation information from adaptive searcher 106 to calculate the remaining portion of the calculated excitation that best approximates the target excitation calculated by calculator 102. Searcher 107 determines the remaining excitation to be calculated by subtracting the excitation determined by searcher 106 from the target excitation. The calculated or synthetic excitation determined by searchers 106 and 107 is transmitted via paths 127 and 126, respectively, to adder 108. Adder 108 adds the two excitation components together to arrive at the synthetic excitation for the present frame. The synthetic excitation is used by the synthesizer to produce the synthesized speech.

The output of adder 108 is also transmitted via path 128 to LPC filter 110 and adaptive codebook 104. The excitation information transmitted via path 128 is utilized to update adaptive codebook 104. The codebook indices and scaling factors are transmitted from searchers 106 and 107 to encoder 109 via paths 125 and 124, respectively.

Searcher 106 functions by accessing sets of excitation information stored in adaptive codebook 104 and utilizing each set of information to minimize an error criterion between the target excitation received via path 123 and the accessed set of excitation from codebook 104. A scaling factor is also calculated for each accessed set of information since the information stored in adaptive codebook 104 does not allow for the changes in dynamic range of human speech.

The error criterion used is the square of the difference between the original and synthetic speech. The synthetic speech is that which will be reproduced in the synthesizer portion of FIG. 1 on the output of LPC filter 117. The synthetic speech is calculated in terms of the synthetic excitation information obtained from codebook 104 and the ringing signal; and the speech signal is calculated from the target excitation and the ringing signal. The excitation information for synthetic speech is utilized by performing a convolution of the LPC filter as determined by analyzer 102 utilizing the weighting information from calculator 103 expressed as a matrix. The error criterion is evaluated for each set of information obtained from codebook 104, and the set of excitation information giving the lowest error value is the set of information utilized for the present frame.

5

After searcher 106 has determined the set of excitation information to be utilized along with the scaling factor, the index into the codebook and the scaling factor are transmitted to encoder 109 via path 125, and the excitation information is also transmitted via path 127 to stochastic searcher 107. Stochastic searcher 107 subtracts the excitation information from adaptive searcher 106 from the target excitation received via path 123. Stochastic searcher 107 then performs operations similar to those performed by adaptive searcher 106.

The excitation information in adaptive codebook 104 is excitation information from previous frames. For each frame, the excitation information consists of the same number of samples as the sampled original speech. Advantageously, the excitation information may consist of 55 samples for a 4.8 Kbps transmission rate. The codebook is organized as a push down list so that the new set of samples are simply pushed into the codebook replacing the earliest samples presently in the codebook. When utilizing sets of excitation information out of codebook 104, searcher 106 does not treat these sets of information as disjoint sets of samples but rather treats the samples in the codebook as a linear array of excitation samples. For example, searcher 106 will form the first candidate set of information by utilizing sample 1 through sample 55 from codebook 104, and the second set of candidate information by using sample 2 through sample 56 from the codebook. This type of searching a codebook is often referred to as an overlapping codebook.

As this linear searching technique approaches the end of the samples in the codebook there is no longer a full set of information to be utilized. A set of information is also referred to as an excitation vector. At that point, the searcher performs a virtual search. A virtual search involves repeating accessed information from the table into a later portion of the set for which there are no samples in the table. This virtual search technique allows the adaptive searcher 106 to more quickly react to speech transitions such as from an unvoiced region of speech to a voiced region of speech. The reason is that in unvoiced speech regions the excitation is similar to white noise whereas in the voiced regions there is a fundamental frequency. Once a portion of the fundamental frequency has been identified from the codebooks, it is repeated.

FIG. 2 illustrates a portion of excitation samples such as would be stored in codebook 104 but where it is assumed for the sake of illustration that there are only 10 samples per excitation set. Line 201 illustrates that the contents of the codebook and lines 202, 203 and 204 illustrate excitation sets which have been formed utilizing the virtual search technique. The excitation set illustrated in line 202 is formed by searching the codebook starting at sample 205 on line 201. Starting at sample 205, there are only 9 samples in the table, hence, sample 208 is repeated as sample 209 to form the tenth sample of the excitation set illustrated in line 202. Sample 208 of line 202 corresponds to sample 205 of line 201. Line 203 illustrates the excitation set following that illustrated in line 202 which is formed by starting at sample 206 on line 201. Starting at sample 206 there are only 8 samples in the code book, hence, the first 2 samples of line 203 which are grouped as samples 210 are repeated at the end of the excitation set illustrated in line 203 as samples 211. It can be observed by one skilled in the art that if the significant peak illustrated in line 203 was a pitch

6

peak then this pitch has been repeated in samples 210 and 211. Line 204 illustrates the third excitation set formed starting at sample 207 in the codebook. As can be seen, the 3 samples indicated as 212 are repeated at the end of the excitation set illustrated on line 204 as samples 213. It is important to realize that the initial pitch peak which is labeled as 207 in line 201 is a cumulation of the searches performed by searchers 106 and 107 from the previous frame since the contents of codebook 104 are updated at the end of each frame. The statistical searcher 107 would normally arrive first at a pitch peak such as 207 upon entering a voiced region from an unvoiced region.

Stochastic searcher 107 functions in a similar manner as adaptive searcher 106 with the exception that it uses as a target excitation the difference between the target excitation from target excitation calculator 102 and excitation representing the best match found by searcher 106. In addition, search 107 does not perform a virtual search.

A detailed explanation is now given of the analyzer portion of FIG. 1. This explanation is based on matrix and vector mathematics. Target excitation calculator 102 calculates a target excitation vector, t, in the following manner. A speech vector s can be expressed as

$$s = Ht + z.$$

The H matrix is the matrix representation of the all-pole LPC synthesis filter as defined by the LPC coefficients received from LPC analyzer 101 via path 121. The structure of the filter represented by H is described in greater detail later in this section and is part of the subject of this invention. The vector z represents the ringing of the all-pole filter from the excitation received during the previous frame. As was described earlier, vector z is derived from LPC filter 110 and zero-input response filter 111. Calculator 102 and subtracter 112 obtain the vector t representing the target excitation by subtracting vector z from vector s and processing the resulting signal vector through the all-zero LPC analysis filter also derived from the LPC coefficients generated by LPC analyzer 101 and transmitted via path 121. The target excitation vector t is obtained by performing a convolution operation of the all-zero LPC analysis filter, also referred to as a whitening filter, and the difference signal found by subtracting the ringing from the original speech. This convolution is performed using well-known signal processing techniques.

Adaptive searcher 106 searches adaptive codebook 104 to find a candidate excitation vector r that best matches the target excitation vector t. Vector r is also referred to as a set of excitation information. The error criterion used to determine the best match is the square of the difference between the original speech and the synthetic speech. The original speech is given by vector s and the synthetic speech is given by the vector y which is calculated by the following equation:

$$y = HL_i r_i + z.$$

where $L_i$ is a scaling factor.

The error criterion can be written in the following form:

$$e = (Ht + z - HL_i r_i - z)^T (Ht + z - HL_i r_i - z). \qquad (1)$$

4,910,781

7

In the error criterion, the H matrix is modified to emphasis those sections of the spectrum which are perceptually important. This is accomplished through well known pole-bandwidth widing technique. Equation 1 can be rewritten in the following form:

$$e = (t - L_i r_i)^T H^T H (t - L_i r_i). \qquad (2)$$

Equation 2 can be further reduced as illustrated in the following:

$$e = t^T H^T H t + L_i r_i^T H^T H L_i r_i - 2 L_i r_i^T H^T H t. \qquad (3)$$

The first term of equation 3 is a constant with respect to any given frame and is dropped from the calculation of the error in determining which $r_i$ vector is to be utilized from codebook 104. For each of the $r_i$ excitation vectors in codebook 104, equation 3 must be solved and the error criterion, e, must be determined so as to chose the $r_i$ vector which has the lowest value of e. Before equation 3 can be solved, the scaling factor, $L^i$ must be determined. This is performed in a straight forward manner by taking the partial derivative with respect to $L_i$ and setting it equal to zero, which yields the following equation:

$$L_i = \frac{r_i^T H^T H t}{r_i^T H^T H r_i}. \qquad (4)$$

The numerator of equation 4 is normally referred to as the cross-correlation term and the denominator is referred to as the energy term. The energy term requires more computation than the cross-correlation term. The reason is that in the cross-correlation term the product of the last three elements needs only to be calculated once per frame yielding a vector; and then for each new candidate vector, $r_i$, it is simply necessary to take the dot product between the candidate vector transposed and the constant vector resulting from the computation of the last three elements of the cross-correlation term.

The energy term involves first calculating $Hr_i$ then taking the transpose of this and then taking the inner product between the transpose of $Hr_i$ and $Hr_i$. This results in a large number of matrix and vector operations requiring a large number of calculations. The present invention is directed towards reducing the number of calculations and enhancing the resulting synthetic speech.

In part, the present invention realizes this goal by utilizing a finite impulse response LPC filter rather than an infinite impulse response LPC filter as utilized in the prior art. The utilization of a finite impulse response filter having a constant reponse length results in the H matrix having a different symmetry than in the prior art. The H matrix represents the operation of the finite impulse response filter in terms of matrix notation. Since the filter is a finite impulse response filter, the convolution of this filter and the excitation information represented by each candidate vector, $r_i$, results in each sample of the vector $r_i$ generating a finite number of response samples which are designated as R number of samples. When the matrix vector operation of calculating $Hr_i$ is performed which is a convolution operation, all of the R response points resulting from each sample in the candidate vector, $r_i$, are summed together to form a frame of synthetic speech.

The H matrix representing the finite impulse response filter is an $N + R$ by N matrix, where N is the frame

8

length in samples, and R is the length of the truncated impulse response in number of samples. Using this form of the H matrix, the response vector $Hr$ has a length of $N + R$. This form of H matrix is illustrated in the following equation 5:

$$H = \begin{bmatrix} h_0 & 0 & . & . & 0 \\ h_1 & h_0 & . & . & . \\ . & . & & & . \\ h_R & h_{R-1} & & & . \\ 0 & h_R & . & . & h_0 \\ . & 0 & . & . & h_1 \\ . & & & & . \\ . & . & & . & h_R & h_{R-1} \\ 0 & 0 & . & 0 & h_R \end{bmatrix} \qquad (5)$$

Consider the product of the transpose of the H matrix and the H matrix itself as in equation 6:

$$A = H^T H. \qquad (6)$$

Equation 6 results in matrix A which is N by N square, symmetric, and Toeplitz as illustrated in the following equation 7.

$$A = \begin{bmatrix} A_0 & A_1 & A_2 & A_3 & A_4 \\ A_1 & A_0 & A_1 & A_2 & A_3 \\ A_2 & A_1 & A_0 & A_1 & A_2 \\ A_3 & A_2 & A_1 & A_0 & A_1 \\ A_4 & A_3 & A_2 & A_1 & A_0 \end{bmatrix}. \qquad (7)$$

Equation 7 illustrates the A matrix which results from $H^T H$ operation when N is five. One skilled in the art would observe from equation 5 that depending on the value of R that certain of the elements in matrix A would be 0. For example, if $R = 2$ then elements $A_2$, $A_3$ and $A_4$ would be 0.

FIG. 3 illustrates what the energy term would be for the first candidate vector $r_1$ assuming that this vector contains 5 samples which means that N equals 5. The samples $X_0$ through $X_4$ are the first 5 samples stored in adaptive codebook 104. The calculation of the energy term of equation 4 for the second candidate vector $r_2$ is illustrated in FIG. 4. The latter figure illustrates that only the candidate vector has changed and that it has only changed by the deletion of the $X_0$ sample and the addition of the $X_5$ sample.

The calculation of the energy term illustrated in FIG. 3 results in a scalar value. This scalar value for $r_1$ differs from that for candidate vector $r_2$ as illustrated in FIG. 4 only by the addition of the $X_5$ sample and the deletion of the $X_0$ sample. Because of the symmetry and Toeplitz nature introduced into the A matrix due to the utilization of a finite impulse response filter, the scalar value for FIG. 4 can be easily calculated in the following manner. First, the contribution due to the $X_0$ sample is eliminated by realizing that its contribution is easily determinable as illustrated in FIG. 5. This contribution can be removed since it is simply based on the multiplication and summation operations involving term 501 with terms 502 and the operations involving terms 504

4,910,781

9                                                    10

with term 503. Similarly, FIG. 6 illustrates that the addition of term $X_s$ can be added into the scalar value by realizing that its contribution is due to the operations involving term 601 with terms 602 and the operations involving terms 604 with the terms 603. By subtracting the contribution of the terms indicated in FIG. 5 and adding the effect of the terms illustrated in FIG. 6, the energy term for FIG. 4 can be recursively calculated from the energy term of FIG 3. It would be obvious to one skilled in the art that this method of recursive calculation is independent of the size of the vector $r_i$ or the A matrix. These recursive calculations allow the candidate vectors contained within adaptive codebook 104 or codebook 105 to be compared with each other but only requiring the additional operations illustrated by FIGS. 5 and 6 as each new excitation vector is taken from the codebook.

In general terms, these recursive calculations can be mathematically expressed in the following manner. First, a set of masking matrices is defined as $I_k$ where the last one appears in the kth row.

$$I_k = \begin{bmatrix} 1 & 0 & . & . & . & . & 0 \\ 0 & 1 & . & . & . & . & . \\ . & . & . & 1 & 0 & . & . \\ . & . & . & . & 0 & 0 & . \\ . & . & . & . & . & . & . \\ 0 & . & . & . & . & . & 0 \end{bmatrix} . \tag{8}$$

In addition, the unity matrix is defined as I as follows:

$$I = \begin{bmatrix} 1 & 0 & . & . & . & . \\ 0 & 1 & 0 & . & . & . \\ . & 0 & 1 & 0 & . & . \\ . & . & 0 & 1 & 0 & . \\ . & . & . & 0 & 1 & 0 \\ 0 & . & . & . & 0 & 1 \end{bmatrix} . \tag{9}$$

Further, a shifting matrix is defined as follows:

$$S = \begin{bmatrix} 0 & 1 & 0 & . & . & . & 0 \\ 0 & 0 & 1 & . & . & . & . \\ . & . & . & . & . & . & . \\ . & . & . & . & . & 0 & 1 \\ 0 & . & . & . & . & 0 & 0 \end{bmatrix} . \tag{10}$$

For Toeplitz matrices, the following well known theorem holds:

$$S^T A S = (I - I_1) A (I - I_1). \tag{11}$$

Since A or $H^T H$ is Toeplitz, the recursive calculation for the energy term can be expressed using the following nomenclature. First, define the energy term associated with the $r_{j+1}$ vector as $E_{j+1}$ as follows:

$$E_{j+1} = r_{j+1}^T H^T H r_{j+1}. \tag{12}$$

In addition, vector $r_{j+1}$ can be expressed as a shifted version of $r_j$ combined with a vector containing the new sample of $r_{j+1}$ as follows:

$$r_{j+1} = S r_j + (I - I_{N-1}) r_{j+1}. \tag{13}$$

Utilizing the theorem of equation 11 to eliminate the shift matrix S allows equation 12 to be rewritten in the following form:

$$E_{j+1} = E_j + 2 [r_{j+1}^T (I - I_{N-1}) H^T H S \eta - \tag{14}$$
$$\eta^T (I - I_1) H^T H I_1 \eta] -$$
$$\eta^T I_1 H^T H I_1 \eta + r_{j+1}^T (I - I_{N-1}) H^T H (I - I_{N-1}) r_{j+1} .$$

It can be observed from equation 14, that since the I and S matrices contain predominantly zeros with a certain number of ones that the number of calculations necessary to evaluate equation 14 is greatly reduced from that necessary to evaluate equation 3. A detailed analysis by one skilled in the art would indicate that the calculation of equation 14 requires only 2Q+4 floating point operations, where Q is the smaller of the number R or the number N. This is a large reduction in the number of calculations from that required for equation 3. This reduction in calculation is accomplished by utilizing a finite impulse response filter rather than an infinite impulse response filter and by the Toeplitz nature of the $H^T H$ matrix.

Equation 14 properly computes the energy term during the normal search of codebook 104. However, once the virtual searching commences, equation 14 no longer would correctly calculate the energy term since the virtual samples as illustrated by samples 213 on line 204 of FIG. 2 are changing at twice the rate. In addition, the samples of the normal search illustrated by samples 214 of FIG. 2 are also changing in the middle of the excitation vector. This situation is resolved in a recursive manner by allowing the actual samples in the codebook, such as samples 214, to be designated by the vector $w_i$ and those of the virtual section, such as samples 213 of FIG. 2, to be denoted by the vector $v_i$. In addition, the virtual samples are restricted to less than half of the total excitation vector. The energy term can be rewritten from equation 14 utilizing these conditions as follows:

$$E_i = w_i^T H^T H w_i + 2 v_i^T H^T H w_i + v_i^T H^T H v_i . \tag{15}$$

The first and third terms of equation 15 can be computationally reduced in the following manner. The recursion for the first term of equation 15 can be written as:

$$w_{j+1}^T H^T H w_{j+1} = w_j^T H^T H w_j - 2 w_j^T (I - I_1) H^T H I_1 w_j. \tag{16}$$
$$= w_j^T I_1 H^T H I_1 w_j.$$

and the relationship between $v_j$ and $v_{j+1}$ can be written as follows:

$$v_{j+1} = S^2 (I - I_{p+1}) v_j + (I - I_{N-2}) v_{j+1}. \tag{17}$$

This allows the third term of equation 15 to be reduced by using the following:

$$H^T H v_{j+1} = S^2 H^T H v_j + H^T H S^2 (I_p - I_{p+1}) v_j \tag{18}$$
$$+ (I - I_{N-2}) H^T H S^2 (I - I_{p+1}) v_j + H^T$$
$$H (I - I_{N-2}) v_{j+1}.$$

The variable p is the number of samples that actually exists in the codebook 104 that are presently used in the existing excitation vector. An example of the number of samples is that given by samples 214 in FIG. 2. The second term of equation 15 can also be reduced by equation 18 since $v_i^T H^T H$ is simply the transpose of $H^T H v_i$ in matrix arithmetic. One skilled in the art can

4,910,781

11

immediately observe that the rate at which searching is done through the actual codebook samples and the virtual samples is different. In the above illustrated example, the virtual samples are searched at twice the rate of actual samples.

FIG. 7 illustrates adaptive searcher 106 of FIG. 1 in greater detail. As previously described, adaptive searcher 106 performs two types of search operations: virtual and sequential. During the sequential search operation, searcher 106 accesses a complete candidate excitation vector from adaptive codebook 104; whereas, during a virtual search, adaptive searcher 106 accesses a partial candidate excitation vector from codebook 104 and repeats the first portion of the candidate vector accessed from codebook 104 into the latter portion of the candidate excitation vector as illustrated in FIG. 2. The virtual search operations are performed by blocks 708 through 712, and the sequential search operations are performed by blocks 702 through 706. Search determinator 701 determines whether a virtual or a sequential search is to be performed. Candidate selector 714 determines whether the codebook has been competely searched; and if the codebook has not been completely searched, selector 714 returns control back to search determinator 701.

Search determinator 701 is responsive to the spectral weighting matrix received via path 122 and the target excitation vector received path 123 to control the complete search operation 104. The first group of candidate vectors are filled entirely from the codebook 104 and the necessary calculations are performed by blocks 702 through 706, and the second group of candidate excitation vectors are handled by blocks 708 through 712 with portions of vectors beings repeated.

If the first group of candidate excitation vectors is being accessed from codebook 104, search determinator communicates the target excitation vector, spectral weighting matrix, and index of the candidate excitation vector to be accessed to sequential search control 702 via path 727. The latter control is responsive to the candidate vector index to access codebook 104. The sequential search control 702 then transfers the target excitation vector, the spectral weighting matrix, index, and the candidate excitation vector to blocks 703 and 704 via path 728.

Block 704 is responsive to the first candidate excitation vector received via path 728 to calculate a temporary vector equal to the $H^T Ht$ term of equation 3 and transfers this temporary vector and information received via path 728 to cross-correlation calculator 705 via path 729. After the first candidate vector, block 704 just communicates information received on path 728 to path 729. Calculator 705 calculates the cross-correlation term of equation 3.

Energy calculator 703 is responsive to the information on path 728 to calculate the energy term of equation 3 by performing the operations indicated by equation 14. Calculator 703 transfers this value to error calculator 706 via path 733.

· Error calculator 706 is responsive to the information received via paths 730 and 733 to calculate the error value by adding the energy value and the cross-correlation value and to transfer that error value along with the candidate number, scaling factor, and candidate value to candidate selector 714 via path 730.

Candidate selector 714 is responsive to the information received via path 732 to retain the information of the candidate whose error value is the lowest and to

12

return control to search determinator 701 via path 731 when actuated via path 732.

When search determinator 701 determines that the second group of candidate vectors is to be accessed from codebook 104, it transfers the target excitation vector, spectral weighting matrix, and candidate excitation vector index to virtual search control 708 via path 720. The latter search control accesses codebook 104 and transfers the accessed code excitation vector and information received via path 720 to blocks 709 and 710 via path 721. Blocks 710, 711 and 712, via paths 722 and 723, perform the same type of operations as performed by blocks 704, 705 and 706. Block 709 performs the operation of evaluating the energy term of equation 3 as does block 703; however, block 709 utilizes equation 15 rather than equation 14 as utilized by energy calculator 703.

For each candidate vector index, scaling factor, candidate vector, and error value received via path 724, candidate selector 714 retains the candidate vector, scaling factor, and the index of the vector having the lowest error value. After all of the candidate vectors have been processed, candidate selector 714 then transfers the index and scaling factor of the selected candidate vector which has the lowest error value to encoder 109 via path 125 and the selected excitation vector via path 127 to adder 108 and stochastic searcher 107 via path 127.

FIG. 8 illustrates, in greater detail, virtual search control 708. Adaptive codebook accessor 801 is responsive to the candidate index received via path 720 to access codebook 104 and to transfer the accessed candidate excitation vector and information received via path 720 to sample repeater 802 via path 803. Sample repeater 802 is responsive to the candidate vector to repeat the first portion of the candidate vector into the last portion of the candidate vector in order to obtain a complete candidate excitation vector which is then transferred via path 721 to blocks 709 and 710 of FIG. 7.

FIG. 9 illustrates, in greater detail, the operation of energy calculator 709 in performing the operations indicated by equation 18. Actual energy component calculator 901 performs the operations required by the first term of equation 18 and transfers the results to adder 905 via path 911. Temporary virtual energy calculator 902 calculates the term $H^T H v_i$ in accordance with equation 18 and transfers the results along with the information received via path 721 to calculators 903 and 904 via path 910. In response to the information on path 910, mixed energy component calculator 903 performs the operations required by the second term of equation 15 and transfers the results to adder 905 via path 913. In response to the information on path 910, virtual energy component calculator 904 performs the operations required by the third term of equation 15. Adder 905 is responsive to information on paths 911, 912, and 913 to calculate the energy value and to communicate that value on path 726.

Stochastic searcher 107 comprises blocks similar to blocks 701 through 706 and 714 as illustrated in FIG. 7. However, the equivalent search determinator · 701 would form a second target excitation vector by subtracting the selected candidate excitation vector received via path 127 from the target excitation received via path 123. In addition, the determinator would always transfer control to the equivalent control 702.

4,910,781

13

Microfiche Appendix A comprises a C language source program that implements this invention. The program of Microfiche Appendix A is intended for execution of a Digital Equipment Corporation's VAX 11/780-5 computer system with appropriate peripheral equipment or a similar system.

It is to be understood that the afore-described embodiments are merely illustrative of the principles of the invention and that other arrangements may be devised by those skilled in the art without departing from the spirit and scope of the invention.

What is claimed is:

1. A method of encoding speech for communication to a decoder for reproduction and said speech comprises frames of speech each having a plurality of samples, comprising the steps of:

storing a plurality of candidate sets of excitation information each having samples in a table, a group of said sets of excitation information having fewer samples than each of said frames of speech and remaining sets of said sets of excitation information having the same number of samples as each of said frames of speech;

searching said plurality of candidate sets of excitation information with a present one of said frames to determine the candidate set of excitation information that best matches said present frame by repeating upon searching each of said group of said candidate sets a portion of each of said group of said candidate sets of excitation information so that each of said group of said candidate sets of excitation information has the same number of samples as said present frame; and

communicating information to identify the location of the determined candidate set of excitation information in said table for reproduction of said speech for said present frame by said decoder.

2. The method of claim 1 wherein said step of searching comprises the steps of:

storing excitation information in said table as a linear array of samples;

shifting a window through said array equal to the number of samples in said present frame to form each candidate set of excitation information; and

repeating a portion of each of said group of said candidate sets of excitation in information to complete each of said group of said candidate sets of excitation information.

3. The method of claim 2 wherein said remaining sets of said candidate sets of excitation information are filled entirely with samples from said array.

4. The method of claim 3 wherein said searching step further comprises the steps of:

forming a target set of excitation information in response to a present one of said frames of speech;

calculating a temporary set of excitation information from said target set of excitation information and the determined candidate set of excitation information;

searching a plurality of other candidate sets of excitation information stored in another table with said temporary set of excitation information to determine the other candidate set of excitation information that best matches said temporary set of excitation information from said other table;

determining another location of the other determined candidate set of excitation information in said other table; and

14

said step of communicating further communicates said other location for reproduction of said speech for said present frame by said decoder.

5. The method of claim 4 where said searching step further comprises the steps of determining a set of filter coefficients in response to said present one of said frames of speech;

calculating information representing a finite impulse response filter from said set of filter coefficients;

recursively calculating an error value for each of said plurality of candidate sets of excitation information stored in said table in response to the finite impulse response filter information in each of said candidate sets of excitation information and said target set of excitation information; and

selecting said determined candidate set of excitation information whose calculated error value is the smallest.

6. The method of claim 5 wherein said step of communicating further communicates said filter coefficients for reproduction of said speech for said present frame by said decoder.

7. The method of claim 6 further comprises the step of updating said table by replacing one of said candidates sets of excitation information with said determined one of said candidate sets of excitation information from said table.

8. A method for encoding speech for communication to a decoder for reproduction and said speech comprises frames with each frame represented by a speech vector having a plurality of samples, comprising the steps of:

calculating a target excitation vector in response to a present speech vector;

storing a plurality of candidate excitation vectors having samples in an overlapping manner, a group of said candidate excitation vectors having fewer samples than said target excitation vector and a remainder of said candidate excitation vectors having the same number of samples as said target excitation vector;

calculating an error value associated with each of said plurality of candidate excitation vectors, said error value being a function of its associated candidate excitation vector and said target excitation vector and calculating an error value by repeating for each of said group of candidate excitation vectors a portion of each of said group of said candidate speech vectors so that each of said group of candidate excitation vectors has the same number of samples as said target excitation vector thereby compensating for speech transitions such as between unvoiced and voiced regions of said speech;

selecting the candidate excitation vector whose calculated error value is the smallest; and

communicating information defining the location of the selected candidate excitation vector in said table.

9. The method of claim 8 wherein said step of calculating comprises the steps of:

storing an array of samples in said table;

shifting a window through said array equal to the number of samples in said present speech vector to form each of said candidate excitation vectors; and

repeating a portion of each of said group of said candidate excitation to complete each of said group of candidate excitation vectors.

4,910,781

15

10. The method of claim 9 wherein said remainder of candidate excitation vectors are filled entirely with samples accessed sequentially from said array.

11. The method of claim 10 wherein said calculating step further comprises the steps of:

calculating a temporary excitation vector from said target excitation vector and the selected excitation vector;

calculating a set of filter coefficients in response to a present one of said speech vectors;

calculating a response matrix to model a finite impulse response filter based on said filter coefficients for said present speech vector;

calculating a spectral weighting matrix of a Toeplitz form by matrix operations on said response matrix;

calculating a cross-correlation value in response to said temporary excitation vector and said spectral weighting matrix and each of a plurality of other candidate speech vectors stored in another overlapping table;

recursively calculating an energy value for each of said other candidate excitation vectors in response to said temporary excitation vector and said spectral weighting matrix and each of said other candidate excitation vectors;

calculating an error value for each of said other candidate excitation vectors in response to each of said cross-correlation and energy values for each of said other candidate excitation vectors;

selecting the other candidate excitation vector whose calculated error value is the smallest;

said communicating step further communicates the location of the selected other candidate excitation vector in said other table for reproduction of said speech for said present speech vector.

12. Apparatus for encoding speech to be communicated to a decoder for reproduction and said speech comprises frames each having a plurality of samples, comprising:

means for storing a plurality of candidate sets of excitation information each having samples in a table, a group of said sets of excitation information having fewer samples than each of said frames of speech and remaining sets of said sets of excitation information having the same number of samples as each of said frames of speech;

means for searching through said plurality of candidate sets of excitation information with a present one of said frames to determine the candidate set of excitation information that best matches said present frame by repeating upon searching each of said group of said candidate sets of excitation information a portion of each of said group of said candidate sets of excitation information so that each of said group of said candidate sets of excitation information has the same number of samples as said present frame thereby compensating the amount of matching during speech transitions such as between unvoiced and voiced regions of said speech; and

means for communicating information to identify the location of the determined candidate set of excita-

16

tion information in said table for reproduction of said speech for said present frame by said decoder.

13. The apparatus of claim 12 wherein said searching means comprises:

means for storing excitation information in said table as a linear array of samples;

means for shifting a window through said array equal to the number of samples in said present frame to form each candidate set of excitation information; and

means for repeating a portion of each of said group of said candidate sets of excitation information to complete each of said group of said candidate sets of excitation information.

14. The apparatus of claim 13 wherein said remainder candidate sets of excitation information are filled entirely with samples said array.

15. The apparatus of claim 14 wherein said searching means further comprises:

means for forming a target set of excitation information in response to a present one of said frames of speech;

means for calculating a temporary set of excitation information from said target set of excitation information and the determined candidate set of excitation information;

means for searching a plurality of other candidate sets of excitation information stored in another table with said temporary set of excitaton information to determine the other candidate set of excitation information that best matches said temporary set of excitation information from said other table;

means for determining a location of the other determined candidate set of excitation information in said other table; and

said step of communicating further communicates said other location for reproduction of said speech for said present frame by said decoder.

16. The apparatus of claim 15 wherein said searching step further comprises means for determining a set of filter coefficients in response to said present one of said frames of speech;

means for calculating information representing a finite impulse response filter from said set of filter coefficients;

means for recursively calculating an error value for each of said plurality of candidate sets of excitation information stored in said table in response to the finite impulse response filter information in each of said candidate sets of excitation information and said target set of excitation information; and

means for selecting said determined candidate set of excitation information whose calculated error value is the smallest.

17. The apparatus of claim 16 wherein communicating means further communicates said filter coefficients for reproduction of said speech for said present frame by said decoder.

18. The apparatus of claim 17 further comprises means for updating said table by replacing one of said candidate sets of excitation information with said determined one of said candidate sets of excitation information from said table.

* * * * *

# United States Patent [19]

## Haskell et al.

[11] **Patent Number:** **4,958,226**

[45] **Date of Patent:** **Sep. 18, 1990**

[54] **CONDITIONAL MOTION COMPENSATED INTERPOLATION OF DIGITAL MOTION VIDEO**

[75] Inventors: **Barin G. Haskell**, Tinton Falls, N.J.; **Atul Puri**, Bronx, N.Y.

[73] Assignee: **AT&T Bell Laboratories**, Murray Hill, N.J.

[21] Appl. No.: **413,520**

[22] Filed: **Sep. 27, 1989**

[51] Int. Cl.⁵ .............................................. H04N 7/12
[52] U.S. Cl. ...................................... **358/136**; 358/135
[58] Field of Search ........................ 358/135, 136, 133

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,218,703 | 8/1980 | Netravali et al. . |
| 4,218,704 | 8/1980 | Netravali et al. . |
| 4,383,272 | 5/1983 | Netravali et al. . |
| 4,442,454 | 4/1984 | Powell ................................ 358/167 |
| 4,460,923 | 7/1984 | Hirano et al. .................... 358/136 |
| 4,665,436 | 5/1987 | Osborne et al. ............... 358/135 X |
| 4,667,233 | 5/1987 | Furukawa ......................... 358/136 |
| 4,727,422 | 2/1988 | Hinman ......................... 358/135 X |
| 4,782,387 | 11/1988 | Sabri et al. ...................... 358/135 |

### OTHER PUBLICATIONS

"Movement–Compensated Frame–Frequency Conversion of Television Signals," H. Yamaguchi, T. Sugi and K. Kinuhata, IEEE Transactions on Communications, vol. COM–35, No. 10, Oct. 1987, pp. 1069–1082.

Primary Examiner—James J. Groody
Assistant Examiner—Victor R. Kostak
Attorney, Agent, or Firm—Henry T. Brendzel

[57] **ABSTRACT**

Motion digital video is encoded and decoded by a motion compensated interpolation method and apparatus. In accordance with the method, selected frames of the video are interpolated in the decoder with the aid of interpolation correction codes that are generated in the encoder and sent to the decoder. In an encoder embodiment that interpolates half of the frames, every other frame is encoded and decoded within the encoder. The decoded versions of adjacent frames are appropriately combined and compared to the interleaved camera frame that is to be interpolated in the decoder. The differences, which correspond to "pels correction" information, are encoded and quantized. Those that exceed a predetermined threshold value are added to the encoder's output buffer. The inverse operation is carried out in the decoder. That is every pair of decoded frames is averaged and combined with the decoded "pels correction" information to form the interpolated frames.

**12 Claims, 2 Drawing Sheets**



FIG. 1



FIG. 2



1

## CONDITIONAL MOTION COMPENSATED INTERPOLATION OF DIGITAL MOTION VIDEO

### BACKGROUND OF THE INVENTION

This invention relates to signal coding and, more particularly, to a method and apparatus for encoding and decoding video signals of moving images.

Video signals typically originate from video cameras. The bandwidth of video signals is quite substantial and consequently, practioners in the art have tried to reduce the bandwidth of these signals without unduly degrading the the images. Typically to reduce bandwidth the video signals are encoded and redundancies in the encoded signals are extracted and deleted. Different techniques are used in the art and some are better suited for still images, while others are better suited for moving images. One of the techniques for reducing the bandwidth of moving images is generally referred to as motion compensated predictive coding.

In conventional motion compensated predictive coding, each video frame is first partitioned into square blocks of picture elements (pels); such as blocks fo 8 pels by 8 pels. Each block is coded, in turn, and the developed encoded sequence is transmitted over a communications channel to a decoder. The communications channel may be, or may include, a storage element. Next, a determination is made as to whether or not the pels of the block have changed significantly compared with the previous frame. If not, an indicator signal is sent which signifies to the decoder that it needs to merely repeat the pels of that block from the previous frame obtain the pels for the current block. This is known as "Conditional Replenishment". If the pels have changed since the previous frame, an attempt is made to determine the best estimate of motion that is occurring in the block. This is frequently done by a "Block Matching Motion Estimation" technique wherein the pels of the current block are successively compared with various small shifts of the corresponding block in the previous frame. The shift that gives the best match is deemed to be the "best estimate" of the displacement in the block's image between frames, and the amount of this shift, called the "Motion Vector", is selected and sent to the decoder.

The pels of the current block are then compared with those of the "best" shifted block from the previous frame to see if there is a significant difference. If not, an indicator signal is sent to the decoder, which merely causes the pels of the shifted block from the previous frame to be repeated for the pels for the current shifted block. Such blocks are said to have been successfully "Motion Compensated". However, if there is a significant difference between the two blocks, the difference is encoded and sent to the decoder so that the pels of the current block may be more accurately recovered. Coding of this difference is typically performed by means of the "Discrete Cosine Transform" (DCT).

The volume of code that is generated by the above procedure is variable. It can be appreciated, for example, that image changes that do not correspond to a uniform translation, or motion, of the image may require substantial encoding to describe the deviation of a block from its best translated replica. On the other hand, when the image does not change between successive frames, then there is a minimal amount of information that needs to be encoded. To accommodate these potentially wide variations in the amount of code that

2

needs to be transmitted, typical encoders include a FIFO memory at the output, to serve as a buffer.

The FIFO is not a panacea. For a given transmission rate, when an excessive volume data is generated, there is always a danger that the FIFO would overflow. When it does, coding must stop until the transmission channel can empty the FIFO sufficiently so that new data to be accepted into it. Since it is inconvenient to stop encoding in the middle of a frame, most systems discard an entire frame whenever the FIFO buffer is full, or nearly so. To compensate for the loss of a frame, such systems cause the decoder to repeat its most recently available frame. Frame repeating results in moving objects in the scene being reproduced in a jerky fashion, rather than in the smooth way that would occur if frame repeating were not invoked.

There have been some suggestions for improving the quality of the repeated frames in order to make them more faithfully resemble the original. One technique is called "Motion Compensated Interpolation". With this technique, instead of simply repeating the pels from the previous frame, the Motion Vectors are used to laterally displace the block by the appropriate amount prior to display. In other words, this method creates the missing block of pels by averaging over the immediately previous and following blocks of pels that are available to the decoder. While this might seem to be a good idea, experimental results show that when the images of successive blocks do not represent translational motion, the reproduced image may be worse than with frame repeating. Although it has been observed that this degradation is caused by a relatively few pels that do not conform to the assumption of translational motion, putting these pels in the wrong place creates highly visible artifacts.

### SUMMARY OF THE INVENTION

In accordance with the principles of this invention, pels that cause highly visible artifacts are detected, and corresponding correction information is transmitted to the decoder. The amount of correction information that must be sent is relatively small, and the improvement in picture quality is quite large.

Since the interpolation technique that employs the principles of this invention yields good results, it has been found acceptable to interpolate every other frame, or two out of three frames, on a regular basis. The benefit of such regular interpolation is a reduced transmission bit rate which results from the fact that the pel correction information comprises fewer bits than the actual frame coding information.

In an encoder embodiment that interpolates half of the frames, every other frame is encoded and thereafter decoded within the encoder. The decoded versions of adjacent frames are appropriately combined and compared to the interleaved camera frame that is to be interpolated in the decoder. The differences, which correspond to "pels correction" information, are encoded and quantized. Those that exceed a predetermined threshold value are added to the encoder's output buffer. The inverse operation is carried out in the decoder. That is every pair of decoded frames is averaged and combined with the decoded "pels correction" information to form the interpolated frames.

4,958,226

3                                                      4

## BRIEF DESCRIPTION OF THE DRAWING

FIG. 1 presents a block diagram of an encoder in accordance with the principles of this invention; and

FIG. 2 depicts a block diagram of a decoder in accordance with the principles of this invention.

## DETAILED DESCRIPTION

Given a specified transmission rate in the communications channel, frame interpolation needs to be resorted to only when the FIFO is at, or near overflow. When that is the selected approach, the encoder of our invention encodes the blocks of every frame and concurrently develops the codes for interpolating the blocks from the information available to the encoder from previous and subsequent frames. At the input to the FIFO buffer, a switch is installed that is sensitive to the available memory in the buffer. When the available memory falls below a preselected threshold, the switch is set to accept the frame interpolation code. Otherwise, the switch is set to accept the frame encoding code. Other control techniques are also available, such as selecting some frames for encoding and some frames for interpolation, based on the occupancy level of the buffer. Both specific frames can thus be selected for interpolations as well as a proportion of frames to be interpolated.

The above insures that the encoder would not exceed the transmission capacity of the communications channel. In some applications, however, it is more important to achieve a low transmission rate. Knowing that the frame interpolation code is less voluminous than the frame encoding code, it makes sense to accept the frame interpolation code wherever possible. The zeal to chose interpolation code in preference to coding code is tempered, however, by the level of degradation that is acceptable to the user in the reconstituted picture. It is further tempered by the observation that the volume of the frame interpolation code increase with increased use of the frame interpolation code so one could quickly reach a point of "diminishing returns" in the use of interpolation code.

Experimentally, it has been found that interpolating every other frame is quite beneficial. Accordingly, for the illustrative purposes of this disclosure, the following describes the structure and operation of an encoder and a decoder that interpolates every frame in accordance with the principles of this invention.

FIG. 1 describes an encoder of our invention. In FIG. 1, a video signal is applied to switch 10. The switch toggles at the video frame rate and thus feed alternate frames to outputs A and B. The control is such that switch 10 is in position A when frame $F_{i+1}$ is coming out of the video camera. The index i designates the frame number from some arbitrary starting point. During the previous video frame period, frame $F_i$ came out of the camera, passed through output B of switch 10 and to the input of frame memory 16. Now, frame $F_i$ is coming out of frame memory 16. It is frame $F_i$ that will be interpolated in the decoder.

The following segment describes the operation of the motion compensation coding portion of the coder, which is well known to those skilled in the art.

Frame $F_{i+1}$ passes to subtractor 20 and to motion estimator 11. Frame memory 12 contains the frame that was previously coded via motion compensation; and in this case it is frame $F_{i-1}$. The output of memory 12 forms the other input to motion estimator 11. For each block of pels, motion estimator 11 compares the pels of frames $F_{i+1}$ and $F_{i-1}$ to determine the best estimate of motion. The best estimate is delivered as a motion vector signal on bus 100, and thus it passes to shift circuit 15. Circuit 15 also accepts the pels information about the previous frame, $F_{i-1}$, from frame memory 12, applies the appropriate translational shift according to the above-mentioned motion vector and outputs a block of "Prediction" pels to be used as a prediction of the incoming frame $F_{i+1}$ pels.

This prediction block of pels passes to the other input of subtractor 20 whereupon it is subtracted from the incoming pels of frame $F_{i+1}$ to give a "Prediction Error" signal. The prediction error typically is transformed by DCT 30 and the output coefficients are quantized by quantizer 40. The quantized values are coded into bits coder 50 and passed to buffer 60 to await transmission to the decoder.

From the above, it is clear that the input to the quantizer depends on the nature of the moving image, and consequently and as indicated above, it has the possibility of emptying or overflowing. To avoid this, a feedback path is provided to quantizer 40, so that the quantizer coarseness can be increased if buffer overflow threatens, or decreased if buffer emptying is imminent.

Continuing with the description of motion compensated coding, the quantized output signals of quantizer 40 are inverse transformed by inverse DCT 41, and applied to adder 42. Adder 42 also receives the prediction pels of shift circuit 15 resulting in a coded version of frame i+1, which is passed into frame memory 12 for use with a subsequent frame as described above. This completes the discussion of conventional motion compensation coding.

With the coded versions of frames i−1 and i+1, i.e., $F_{i-1}$ and $F_{i+1}$ being available, frame $F_i$ can be generated.

The $F_i$ generation starts with the motion vectors that are produced by motion estimator 11. These are used by shift circuit 13 to shift the incoming pels from frame $F_{i-1}$, perhaps by half the motion vector, to produce one estimate of the pels in frame $F_i$. Circuit 14 also uses the motion vectors of line 100 to shift the coded pels of $F_{i+1}$, perhaps by half and in the opposite direction from the motion vector. This produces another estimate of the pels of $F_i$.

The two estimates produced by shift circuits 13 and 14 are combined in averager 17 to produce the final prediction of frame $F_i$. This interpolated prediction is usually very good, but not always.

To improve the interpolated prediction in accordance with our invention, subtractor 43 calculates an error signal that corresponds to the difference between the actual frame data that exits frame memory 16 ($F_i$) and the predicted frame as it appears at the output of averager 17 ($\hat{F}_i$). The error signal is transformed by DCT 18, quantized by quantizer 19 and passed to coder 44, which detects large occurrences of interpolation error and codes them for transmission. The coded interpolation error is passed to buffer 60 in the same way as from coder 50. Similarly, a feedback path is provided to quantizer 19 to combat buffer overflow and underflow.

The decoder, depicted in FIG. 2, is very similar to the encoder. The components mirror corresponding components in the coder with a few deviations. In particular, the input is received in buffer 23 and is distributed therefrom based on the nautre of the signals. Frame encoding code (e.g. corresponding to $F_{i-1}$ and $F_{i+1}$) is

5

sent to decoder 22 and therefrom to DCT$^{-1}$ 24, adder 27, memory 28 and shift circuit 26. These elements correspond to elements 41, 42, 12, and 15, respectively, and operate in the same manner. That is completely expected, since the function of these elements in the encoder is to emulate the decoder. Thus, the contents of memory 28 correspond to the estimated frames. Similarly, elements 39, 31 and 32 in the decoder correspond to elements 13, 14 and 17, respectively in the encoder and operate in the same manner.

The pels correction code also exits buffer 23, is decoded in decoder 25 and inverse transformed in element 34. This correction information is added to the estimate of $F_l$ developed by circuit 35 and is applied to memory 33. Memory 33 delays the $F_l$ information to permit a proper interleaving of $F_l$ between $F_{i-1}$ and $F_{i+1}$. As can be observed from above, one of the deviations is that the interpolation error subtractor 43 of the encoder becomes adder 35 at the decoder. Also, another output of frame memory 28 is shown since frame $F_{i-1}$ pels for the video output display may need to be read out at a different rate for the video output at switch 21 than the frame $F_{i-1}$ pels are needed for shift circuits 26 and 39.

It may be noted that there is a tradeoff between the buffer size of buffer 23 and the necessity for frame memory 33. If the buffer is sufficiently large, frame memory 33 could be deleted. The frame $F_l$ output from adder 35 would then pass directly to the video output via switch 21, which would be in position B. Following this, switch 21 would toggle to its A input, and decoding would stop for a frame period while frame $F_{i+1}$ was displayed via the output of frame memory 28 and the A input of switch 21. During this time, decoder buffer 23 would fill with data from the channel.

Many alternative arrangements are possible for the basic conditional motion compensation interpolation approach. For example, more than one frame might be conditionally interpolated, in which case shifter circuits 13, 14, 30 and 31 need to be more versatile and frame memories 16 and 33 need to be larger. Also in computing the best estimate of motion, motion estimator 11 might take frame $F_l$ pels as additional input. This would enable simultaneous minimization of both motion compensation prediction error as well as interpolation error. Still other improvements may be introduced by skilled artisans practicing this invention without departing from the spirit and scope thereof.

We claim:

1. A circuit for encoding applied video signals that comprise successive frames, where each frame is divided into blocks, comprising:

first means for encoding the blocks of some of said frames by developing for each block of such frames (a) and approximated version of said block derived from an approximated version of said block developed for a previous frame, and (b) a code which represents the deviation of said block from said approximated version of said block;

second means for approximating the blocks of those of said frames that are to be interpolated by combining approximated versions of said blocks in selected ones of the frames that are encoded in said first means; and

third means responsive to said second means and to said frames to be interpolated for developing a code that corresponds to those pels in blocks approximated by said second means that differ from

6

corresponding pels in said frames to be interpolated by greater than a preselected threshold.

2. A circuit for encoding applied video signals that comprise successive frames, where each frame is divided into blocks, including means for encoding the blocks of some of said frames by developing for each block of such frames (a) an approximated version of said block derived from an approximated version of said block developed for a previous frame, and (b) a code which represents the deviation of said block from said approximated version of said block, the improvement comprising:

second means for approximating the blocks of those of said frames that are to be interpolated by combining approximated versions of said blocks in selected ones of the frames that are encoded in said means for encoding; and

third means responsive to said second means and to said frames to be interpolated for developing code that corresponds to those pels in blocks approximated by said second means that differ from corresponding pels in said frames to be interpolated by greater than a preselected threshold.

3. The circuit of claim 2 wherein said code developed for a pel by said third means represents the difference between the value of said pel and the value of said pel approximated by said second means.

4. The circuit of claim 2 wherein the frames selected for combining in said second means include a frame encoded in said first means that precedes the frame approximated in said second means and a frame encoded in said first means that succeeds the frame approximated in said means.

5. The circuit of claim 4 wherein said combining includes developing anticipated versions of said blocks.

6. The circuit of claim 2 wherein a set proportion of frames of said applied video signals are interpolated.

7. The circuit of claim 6 wherein said proportion is approximately one half.

8. The circuit of claim 2 fruther comprising buffer means for interposed between the codes developed by said means for encoding and said third means and an output port of said circuit.

9. The circuit of claim 8 for controlling the proportion of frames selected for interpolation by said second means and code generation by said third means based on the occupancy level of said buffer.

10. The circuit of claim 8 for selecting frames for interpolation by said second means and code generation by said third means when said buffer is occupied beyond a chosen proportion of its capacity.

11. The circuit of claim 7 wherein granularity of the codes generated by said first means and said third means is controlled by the occupancy level of said buffer.

12. A circuit responsive to coded video signals where the video signals comprise successive frames and each frame includes a plurality of blocks and where the coded video signals comprise codes that describe deviations from approximated blocks and codes that describe deviations from interpolated blocks, comprising:

means for developing block approximations from said codes that describe deviations from approximated blocks; and

means responsive to said block approximations and to said codes that describe deviations from interpolated blocks to develop said interpolated blocks.

*     *     *     *     *

# United States Patent [19]

## Puri et al.

[11] Patent Number: 5,227,878

[45] Date of Patent: Jul. 13, 1993

[54] ADAPTIVE CODING AND DECODING OF FRAMES AND FIELDS OF VIDEO

[75] Inventors: Atul Puri, New York, N.Y.; Rangarajan Aravind, Matawan, N.J.

[73] Assignee: AT&T Bell Laboratories, Murray Hill, N.J.

[21] Appl. No.: 793,063

[22] Filed: Nov. 15, 1991

[51] Int. Cl.⁵ ...................... H04N 3/133; H04N 3/137
[52] U.S. Cl. ...................................... 358/136; 358/105
[58] Field of Search ............... 358/133, 135, 136, 138, 358/105

[56] References Cited

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,437,087 | 3/1984 | Petr | 375/27 |
| 4,475,213 | 10/1984 | Medaugh | 375/27 |
| 4,958,226 | 9/1990 | Haskell et al. | 358/136 |
| 4,969,040 | 11/1990 | Charavi | 358/136 |
| 4,999,705 | 3/1991 | Puri | 358/136 |
| 5,001,561 | 3/1991 | Haskell et al. | 358/133 |
| 5,091,782 | 2/1992 | Krause | 358/136 |

### OTHER PUBLICATIONS

B. Astle, "A Proposal For MPEG Video Report, Rev. 1," Int'l Organization For Standardization, ISO–IEC/JTC1/SC2/WG11, Aug. 14, 1991, pp. 1–78.
"Coding Of Moving Pictures And Associated Audio—For Digital Storage Media At Up To About 1.5 Mbit/s—Part 2 Video," 1991, pp. 2–51.
A. N. Netraveli et al., "Digital Pictures Representation and Compression," (Plenum Press, New York 1988), pp. 301–504.

Primary Examiner—Howard W. Britton
Attorney, Agent, or Firm—E. S. Indyk

[57] ABSTRACT

Improved compression of digital signals relating to high resolution video images is accomplished by an adaptive and selective coding of digital signals relating to frames and fields of the video images. Digital video input signals are analyzed and a coding type signal is produced in response to this analysis. This coding type signal may be used to adaptively control the operation of one or more types of circuitry which are used to compress digital video signals so that less bits, and slower bit rates, may be used to transmit high resolution video images without undue loss of quality. For example, the coding type signal may be used to improve motion compensated estimation techniques, quantization of transform coefficients, scanning of video data, and variable word length encoding of the data. The improved compression of digital video signals is useful for video conferencing applications and high definition television, among other things.

33 Claims, 20 Drawing Sheets



FUNCTIONAL SPECIFICATION OF BLOCK ADAPTIVE MOTION COMPENSATED PREDICTOR



FIG. 1A

Case 1:01-cv-01108-B-CAB    Document 1    Filed 06/02/03    Page 20 of 976



# FIG. 1B

# FIG. 1C

| FIG. 1A |
|---------|
| FIG. 1B |

## FIG. 1D



|   |   |   |   |   |   |   |   |   |   |   |   |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| I | B | B | P | B | B | P | B | B | P | B | B |

## FIG. 1E

FRAME BLOCK SCAN

FRAME SCAN

## FIG. 1F

FIELD BLOCK SCAN

FIELD SCANS



# FIG. 1G

### LENGTHS OF INTRA VLC #1 (EOB = 2 BITS)

#### LEVEL (ABSOLUTE VALUE)

| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0 | 3 | 4 | 5 | 6 | 6 | 7 | 8 | 8 | 9 | 9 | 9 | 11 | 11 | 11 |
| | 1 | 5 | 7 | 9 | 11 | | | | | | | | | | |
| | 2 | 6 | 9 | | | | | | | | | | | | |
| | 3 | 7 | 11 | | | | | | | | | | | | |
| R | 4 | 7 | | | | | | | | | | | | | |
| U | 5 | 8 | | | | | | | | | | | | | |
| N | 6 | 8 | | | | | | | | | | | | | |
| | 7 | 9 | | | | | | | | | | | | | |
| | 8 | 9 | | | | | | | | | | | | | |
| | 9 | 9 | | | | | | | | | | | | | |
| | 10 | 11 | | | | | | | | | | | | | |
| | 11 | 11 | | | | | | | | | | | | | |
| | 12 | 13 | | | | | | | | | | | | | |

# FIG. 1H

### LENGTHS OF INTRA VLC #2 (EOB = 2 BITS)

#### LEVEL (ABSOLUTE VALUE)

| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0 | 3 | 5 | 6 | 7 | 9 | 9 | 11 | 11 | | | | | | |
| | 1 | 4 | 6 | 9 | 11 | | | | | | | | | | |
| | 2 | 5 | 8 | 11 | | | | | | | | | | | |
| | 3 | 6 | 9 | | | | | | | | | | | | |
| | 4 | 7 | 11 | | | | | | | | | | | | |
| | 5 | 7 | 11 | | | | | | | | | | | | |
| R | 6 | 7 | | | | | | | | | | | | | |
| U | 7 | 8 | | | | | | | | | | | | | |
| N | 8 | 8 | | | | | | | | | | | | | |
| | 9 | 8 | | | | | | | | | | | | | |
| | 10 | 9 | | | | | | | | | | | | | |
| | 11 | 9 | | | | | | | | | | | | | |
| | 12 | 9 | | | | | | | | | | | | | |
| | 13 | 9 | | | | | | | | | | | | | |
| | 14 | 11 | | | | | | | | | | | | | |
| | 15 | 11 | | | | | | | | | | | | | |

# FIG. 1I

### LENGTHS OF INTRA VLC #3 (EOB = 3 BITS)

#### LEVEL (ABSOLUTE VALUE)

| RUN | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 3 | 4 | 4 | 6 | 6 | 7 | 8 | 8 | 9 | 9 | 9 | 11 | 11 | 11 |
| 1 | 4 | 7 | 9 | 11 | | | | | | | | | | |
| 2 | 6 | 9 | | | | | | | | | | | | |
| 3 | 7 | 11 | | | | | | | | | | | | |
| 4 | 7 | | | | | | | | | | | | | |
| 5 | 8 | | | | | | | | | | | | | |
| 6 | 8 | | | | | | | | | | | | | |
| 7 | 9 | | | | | | | | | | | | | |
| 8 | 9 | | | | | | | | | | | | | |
| 9 | 9 | | | | | | | | | | | | | |
| 10 | 11 | | | | | | | | | | | | | |
| 11 | 11 | | | | | | | | | | | | | |
| 12 | 13 | | | | | | | | | | | | | |

# FIG. 1J

### LENGTHS OF INTRA VLC #4 (EOB = 4 BITS)

#### LEVEL (ABSOLUTE VALUE)

| RUN | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 3 | 3 | 5 | 6 | 6 | 7 | 8 | 8 | 9 | 9 | 9 | 11 | 11 | 11 |
| 1 | 4 | 7 | 9 | 11 | | | | | | | | | | |
| 2 | 6 | 9 | | | | | | | | | | | | |
| 3 | 7 | 11 | | | | | | | | | | | | |
| 4 | 7 | | | | | | | | | | | | | |
| 5 | 8 | | | | | | | | | | | | | |
| 6 | 8 | | | | | | | | | | | | | |
| 7 | 9 | | | | | | | | | | | | | |
| 8 | 9 | | | | | | | | | | | | | |
| 9 | 9 | | | | | | | | | | | | | |
| 10 | 11 | | | | | | | | | | | | | |
| 11 | 11 | | | | | | | | | | | | | |
| 12 | 13 | | | | | | | | | | | | | |

# FIG. 1K

### LENGTHS OF PRED. VLC #1 (EOB = 2 BITS)

LEVEL (ABSOLUTE VALUE)

| RUN | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 3 | 5 | 6 | 7 | 9 | 9 | 11 | 11 | | | | | | |
| 1 | 4 | 6 | 9 | 11 | | | | | | | | | | |
| 2 | 5 | 8 | 11 | | | | | | | | | | | |
| 3 | 6 | 9 | | | | | | | | | | | | |
| 4 | 7 | 11 | | | | | | | | | | | | |
| 5 | 7 | 11 | | | | | | | | | | | | |
| 6 | 7 | | | | | | | | | | | | | |
| 7 | 8 | | | | | | | | | | | | | |
| 8 | 8 | | | | | | | | | | | | | |
| 9 | 8 | | | | | | | | | | | | | |
| 10 | 9 | | | | | | | | | | | | | |
| 11 | 9 | | | | | | | | | | | | | |
| 12 | 9 | | | | | | | | | | | | | |
| 13 | 9 | | | | | | | | | | | | | |
| 14 | 11 | | | | | | | | | | | | | |
| 15 | 11 | | | | | | | | | | | | | |

# FIG. 1L

### LENGTHS OF PRED. VLC #2 (EOB = 2 BITS)

LEVEL (ABSOLUTE VALUE)

| RUN | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 3 | 4 | 5 | 6 | 6 | 7 | 8 | 8 | 9 | 9 | 9 | 11 | 11 | 11 |
| 1 | 5 | 7 | 9 | 11 | | | | | | | | | | |
| 2 | 6 | 9 | | | | | | | | | | | | |
| 3 | 7 | 11 | | | | | | | | | | | | |
| 4 | 7 | | | | | | | | | | | | | |
| 5 | 8 | | | | | | | | | | | | | |
| 6 | 8 | | | | | | | | | | | | | |
| 7 | 9 | | | | | | | | | | | | | |
| 8 | 9 | | | | | | | | | | | | | |
| 9 | 9 | | | | | | | | | | | | | |
| 10 | 11 | | | | | | | | | | | | | |
| 11 | 11 | | | | | | | | | | | | | |
| 12 | 13 | | | | | | | | | | | | | |

# FIG. 1M

### LENGTHS OF PRED. VLC #3 (EOB = 3 BITS)

#### LEVEL (ABSOLUTE VALUE)

|     | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
|-----|---|---|---|---|---|---|---|---|---|----|----|----|----|----|
| 0   | 3 | 4 | 6 | 7 | 9 | 9 | 11 | 11 |   |   |   |   |   |   |
| 1   | 4 | 6 | 9 | 11 |   |   |   |   |   |   |   |   |   |   |
| 2   | 4 | 8 | 11 |   |   |   |   |   |   |   |   |   |   |   |
| 3   | 6 | 9 |   |   |   |   |   |   |   |   |   |   |   |   |
| 4   | 7 | 11 |   |   |   |   |   |   |   |   |   |   |   |   |
| 5   | 7 | 11 |   |   |   |   |   |   |   |   |   |   |   |   |
| 6   | 7 |   |   |   |   |   |   |   |   |   |   |   |   |   |
| 7   | 8 |   |   |   |   |   |   |   |   |   |   |   |   |   |
| 8   | 8 |   |   |   |   |   |   |   |   |   |   |   |   |   |
| 9   | 8 |   |   |   |   |   |   |   |   |   |   |   |   |   |
| 10  | 9 |   |   |   |   |   |   |   |   |   |   |   |   |   |
| 11  | 9 |   |   |   |   |   |   |   |   |   |   |   |   |   |
| 12  | 9 |   |   |   |   |   |   |   |   |   |   |   |   |   |
| 13  | 9 |   |   |   |   |   |   |   |   |   |   |   |   |   |
| 14  | 11 |   |   |   |   |   |   |   |   |   |   |   |   |   |
| 15  | 11 |   |   |   |   |   |   |   |   |   |   |   |   |   |

(RUN labels the row index)

# FIG. 1N

### LENGTHS OF PRED. VLC #4 (EOB = 4 BITS)

#### LEVEL (ABSOLUTE VALUE)

|     | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
|-----|---|---|---|---|---|---|---|---|---|----|----|----|----|----|
| 0   | 3 | 4 | 6 | 7 | 9 | 9 | 11 | 11 |   |   |   |   |   |   |
| 1   | 3 | 6 | 9 | 11 |   |   |   |   |   |   |   |   |   |   |
| 2   | 5 | 8 | 11 |   |   |   |   |   |   |   |   |   |   |   |
| 3   | 6 | 9 |   |   |   |   |   |   |   |   |   |   |   |   |
| 4   | 7 | 11 |   |   |   |   |   |   |   |   |   |   |   |   |
| 5   | 7 | 11 |   |   |   |   |   |   |   |   |   |   |   |   |
| 6   | 7 |   |   |   |   |   |   |   |   |   |   |   |   |   |
| 7   | 8 |   |   |   |   |   |   |   |   |   |   |   |   |   |
| 8   | 8 |   |   |   |   |   |   |   |   |   |   |   |   |   |
| 9   | 8 |   |   |   |   |   |   |   |   |   |   |   |   |   |
| 10  | 9 |   |   |   |   |   |   |   |   |   |   |   |   |   |
| 11  | 9 |   |   |   |   |   |   |   |   |   |   |   |   |   |
| 12  | 9 |   |   |   |   |   |   |   |   |   |   |   |   |   |
| 13  | 9 |   |   |   |   |   |   |   |   |   |   |   |   |   |
| 14  | 11 |   |   |   |   |   |   |   |   |   |   |   |   |   |
| 15  | 11 |   |   |   |   |   |   |   |   |   |   |   |   |   |

(RUN labels the row index)

Case 3:03-cv-01108-B-CAB   Document 1   Filed 06/02/03   Page 207 of 976



FIG. 2

ADAPTIVE MOTION
COMPENSATED
UNI/BI-DIRECTIONAL
PREDICTIVE DECODER

# FIG. 3



FUNCTIONAL SPECIFICATION OF BLOCK ADAPTIVE MOTION COMPENSATED PREDICTOR

BLOCK ADAPTIVE FRAME/FIELD UNIDIRECTIONAL MOTION COMPENSATED PREDICTION SELECTOR



FIG. 4A

FUNCTIONAL SPECIFICATION OF BLOCK ADAPTIVE MOTION COMPENSATED BIDIRECTIONAL PREDICTOR

BLOCK ADAPTIVE FRAME/FIELD BIDIRECTIONAL MOTION COMPENSATED PREDICTION SELECTOR



FIG. 4B

FIG. 4C

FIG. 5



MACRO BLOCK IN

FIG. 6



FIG. 7





FIG. 8

FLOWCHART FOR INTRA DC PREDICTION

# FIG. 9

EXAMPLE: MACRO BLOCK ADAPTIVE FRAME/FIELD DC PREDICTION



START OF
MACRO BLOCK
SLICE

# FIG. 12

DECODING MSCALE FOR B-PICTURES





FIG. 10

Case 3:03-cv-01108-B-CAB    Document 1    Filed 06/02/03    Page 815 of 976

FIG. 11

ENCODING MSCALE FOR B-PICTURES



# FIG. 13



# FIG. 14



# FIG. 15



GET NEW MACRO BLOCK — 526

530

REG 16X16 FRM_P=0    ← YES    FIRST MACRO BLOCK
REG 16X8 FRM_P1=0              IN SLICE? — 528
REG 16X8 FRM_P2=0
REG 16X8 FLD_P1=0                      NO
REG 16X8 FLD_P2=0

              YES    INTER    NO    REG 16X16 FRM_P=0
                     MACRO BLOCK?          REG 16X8 FRM_P1=0
                                           REG 16X8 FRM_P2=0
536                          532          REG 16X8 FLD_P1=0
                                          REG 16X8 FLD_P2=0
IS MOTION COMP TYPE 1?    NO
                                                  534
         YES    542
                                  MOTION VECTOR PREDICTION FOR P-PICTURES
MV_PRED=REG 16X16_FRM_P

REG 16X16 FRM_P=
CURR_MV_P                              561

         544                    ERROR CONDITION

     538    540                          NO
IS MOTION COMP TYPE 2?    NO    IS MOTION COMP TYPE 3?

         YES                              YES

MV_PRED1=REG 16X8 FRM_P1 — 546    M1_PRE1=REG 16X8 FLD_P1
                                   554

REG 16X8 FRM_P1= — 548    REG 16X8 FLD_P1=
CURR_MV_PI                 CURR_MV_P1
                           556

MV_PRED2=REG16X8 FRM_P2 — 550    MV_PRED2=REG16X8 FLD_FD2
                                  558

REG 16X8 FRM_P2= — 552    REG 16X8 FLD_P2=
CURR_MV_P2                 CURR_MV_P2

                                          560

MOTION VECTOR PREDICTION



FIG. 16A

MOTION VECTOR PREDICTION FOR B-PICTURES



FIG. 16B

FIG. 16C

| FIG. 16A |
|----------|
| FIG. 16B |

FIG. 16A

MOTION VECTOR PREDICTION

## ADAPTIVE CODING AND DECODING OF FRAMES AND FIELDS OF VIDEO

### TECHNICAL FIELD

This invention relates to coding and decoding of video signals. More particularly, this invention relates to adaptive encoders and decoders involved in the transmission and reception of digital video signals.

### BACKGROUND OF THE INVENTION

Worldwide efforts are underway to improve the quality of video signal production, transmission, and reproduction because a great deal of commercial importance is being predicted for improved quality video systems. These efforts involve, at least in part, increasing the resolution with which signals are converted into representative electrical signals by increasing the spatial and temporal sampling rates that are used to convert video images into electrical signals. This increase in resolution consequently means that more data about images must be produced, processed, and transmitted in a given period of time.

Video images such as those images in the field of view of a television camera are scanned at a predetermined rate and converted into a series of electrical signals, each electrical signal representing a characteristic of a predetermined region of the image generally referred to as a picture element, pel, or pixel. A plurality of the picture elements taken together at a predetermined instant of time form what amounts to a still picture representing the nature of the image at the predetermined instant of time. Increasing the quality of video signals produced in this manner involves, at least in part, the use of larger number of smaller-size picture elements to represent a given image frame and the production of a large number of image frames per unit time. For example, the CCIR-601 recommendation specifies the number of picture elements in a frame to be 720 horizontal picture elements×486 vertical picture elements (U.S. and Japan) or 576 vertical picture elements (Europe). Thirty or 25 interlaced pictures are produced each second. In high definition television (HDTV) projects, it has been proposed to have about 700–1000 horizontal lines each having 1200–2000 picture elements. These HDTV efforts contemplate production of 25 or 30 interlaced pictures per second or 60 or 50 non-interlaced pictures per second.

As the number of picture elements for each video frame and the rate at which frames are produced increases, these is an increasing amount of video data which must be produced, transmitted, and received in a given period of time. It would be advantageous if video signals produced by these systems could be compressed so that a smaller amount of data could be generated which would still contain enough information so that higher quality video images could be reproduced.

A number of data compression schemes have been proposed which attempt to transmit higher quality video images using the same numbers of bits and the same bit rates used for lower quality images. One such scheme involves an encoder which receives digital video signals representing the characteristics of a sequence of picture elements. The encoder transforms blocks of such video signals into blocks of transform coefficients relating to the spatial frequency components in the areas of the image represented by the blocks of picture elements. The blocks of frequency coeffici-

ents are then quantized and scanned according to some predetermined sequence. The quantized frequency coefficients are then sent in the order defined by the scanning sequence to a variable word length coder then encodes the quantized frequency coefficients and then transmits the encoded quantized frequency coefficients. It has been found that less bits need to be sent when these encoded quantized frequency coefficients are sent instead of pixel data bits.

Another data compression scheme which has been proposed involves estimating the characteristics of a segment of video signal and subtracting the estimate from the actual segment of video signal to produce an estimate error signal which is then coded and transmitted instead of the actual segment of video signal. Again, it has been found that a lesser number of bits need to be transmitted when estimation error signals are transmitted in place of pixel data signals.

Yet another technique of compressing video data involves the production and transmission of data representing motion vectors calculated in light of a current segment of video signal and a prior segment of video signal instead of transmission of pixel data. These motion vectors may be used to provide motion compensation for producing more accurate estimates of a video signal and smaller estimate error signals, which thereby reduces the number of bits which must be used to transmit video signals.

Each of these techniques seeks to send data derived from an actual video signal which can be used by a decoder in a receiver of the video signals to reconstruct the actual video signal from a limited subset of the data defined the actual video signal. The actual number of bits which must be transmitted in these situations is less than the number of bits needed to define each picture element in the video signal and, thus, higher resolution video signals may be transmitted at the same bit rate. Although each of these techniques is to a certain degree successful in achieving suitable compression of video data without undue loss of information, there are significant areas whereby the encoding of video data may be improved so that the number of bits which must be transmitted is reduced and an accurate reconstruction may be made by a video decoder.

### SUMMARY OF THE INVENTION

Improved compression of video data is achieved by an adaptive video frame/field encoder and decoder. In one example of the invention, different size blocks of video data are processed to achieve different modes of coding and different modes of motion estimation. The behavior of an encoder in accordance with one example of the invention and the behavior of a corresponding decoder adapt to certain characteristics of the video image. This adaptive behavior involves changing between a process of coding and decoding information from a frame of video or coding and decoding information from a field of video. In a more specific example, this invention involves an adaptation between coding and decoding information from a frame of video data or coding and decoding information from each of a plurality of interlaced fields of video data. Depending upon the coding mode used, certain steps may be taken, either individually or in any combination, to improve the compression and decompression of video data. In specific examples, appropriate quantization is chosen, different scanning techniques are adopted, different techniques of

5,227,878

3

predicting certain components of the video signals are used, or different motion compensation modes are employed. The benefits of this invention are useful for all video systems involving digital video signals, including high definition television and video telecommunication systems.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram representing a video signal encoder in accordance with this invention.

FIG. 1a is an illustration of a group of pictures structure useful in one example of the invention.

FIGS. 1b and 1c illustrate examples of block scans useful in one example of the invention.

FIGS. 1d to 1k illustrate examples of tables identifying the lengths of variable length codes used in one example of the invention.

FIG. 2 is a block diagram representing a video signal decoder in accordance with this invention.

FIG. 3 is a block diagram representing the functional specification of a block adaptive motion compensated unidirectional predictor in accordance with this invention.

FIG. 4 is a block diagram representing the functional specification of a block adaptive motion compensated bidirectional predictor in accordance with this invention.

FIG. 5 is a detailed block diagram of the block adaptive frame/field coding analyzer shown in FIG. 1.

FIG. 6 is a block diagram of the block formatter of FIG. 1.

FIG. 7 is a block diagram of the block unformatter of FIGS. 1 and 2.

FIG. 8 is a flow chart illustrating intra DC coefficient prediction of FIGS. 1 and 2.

FIG. 9 is an example of adaptive frame/field DC coefficient prediction.

FIG. 10 is a block diagram of the variable word length choice analyzer of FIG. 1.

FIG. 11 is a flow chart illustrating the encoding of an mscale parameter for B-pictures in one example of the invention.

FIG. 12 is a flow chart illustrating the decoding of an mscale parameter for B-pictures in one example of the invention.

FIG. 13 is a block diagram of an example of a visibility matrix selector useful in one example of the invention.

FIG. 14 is a block diagram of a forward/inverse scan selector useful in one example of the invention.

FIG. 15 is a flow chart illustrating motion vector prediction for P-pictures in accordance with one example of the invention.

FIG. 16 is a flow chart illustrating motion vector prediction for B-pictures in accordance with one example of the invention.

## DETAILED DESCRIPTION

FIG. 1 shows an adaptive motion compensated predictive/interpolative encoder in accordance with one example of this invention. The encoder of FIG. 1 receives digital video input signals on an input line 10 and compresses those video input signals for transmission to a receiver which decompresses those signals to produce video images. The digital video input signals are spatial and temporal samples of a video image and may be produced by scanning an image field and producing an electrical signal relating to the characteristics of the

4

image field at predetermined points. The characteristics determined in the scanning operation are converted into electrical signals and digitized. The video input signals comprise a succession of digital words, each representing some information at a particular instant of time about a small region of the image field generally referred to as a picture element. A complete set of digital representations for the image at a particular instant of time is called a frame or a picture. Each frame may be considered to be composed of a number of smaller regions generally known as fields; for example, each frame may be composed of two interlaced fields representing odd- and even-numbered horizontal lines or rows of picture elements in the image. The frame may also be considered to represent a number of macroblocks, submacroblocks, and blocks of picture elements which are groups of contiguous picture elements, for example, $16 \times 16$ macroblocks of picture elements, $16 \times 8$ sublocks of picture elements, and $8 \times 8$ blocks of picture elements.

The digital input video signal may be a monochrome video signal or a color video signal. In the case of a monochrome video signal, each frame may comprise a set of digital representations of the brightness or intensity of a two-dimensional array of picture elements which make up a video image. In the case of a color video signal, each picture comprises not only a brightness component but also a color component. For example, in the CCIR 601 recommendation, a color video signal picture (i.e., a temporal sample of the image) may be composed of a luminance frame of 720 horizontal picture elements $\times$ 480 vertical picture elements and two chrominance frames Cb and Cr at $\frac{1}{2}$ resolution of 360 horizontal picture elements $\times$ 240 vertical picture elements each. A sequence of such pictures may be transmitted at a rate of 29.97 pictures per second. The luminance frame is formed as the interlaced union of the two constituent CCIR-601 luminance fields, while the chrominance frames are derived by filtering and sub-sampling the respective 4:2:2 CCIR-601 chrominance frames.

For the purpose of illustrating a specific example of the invention, the description below will assume that the video signal on input line 10 is a video signal in accordance with the CCIR 601 recommendation. Those skilled in the art will appreciate that the principles of the invention are applicable to other types of video signals, such as HDTV video signals. To assist in the description of the example of the invention shown in FIG. 1, some terminology should be defined. A block is an 8-horizontal-row by 8-vertical-column array of contiguous picture elements. Blocks may be groups of luminance data or groups of chrominance data. A macroblock is composed of four contiguous $8 \times 8$ luminance data blocks and the two $8 \times 8$ chrominance data blocks corresponding to the area of the image represented by the four luminance data blocks. A slice is one horizontal row of macroblocks starting at the left edge of the picture and ending at the right end of the picture. A luminance frame is formed as an interlaced union of two CCIR 601 luminance fields. One field comprises even-numbered horizontal rows of picture elements and the other field comprises odd-numbered horizontal rows of picture elements.

In the examples of the invention shown in FIGS. 1 and 2, a plurality of picture types are encoded and decoded. Specifically, I-pictures, P-pictures, and B-pictures are encoded and decoded. I-pictures or intra-

5

coded pictures are pictures which are coded and de-coded without reference to any other pictures. P-pic-tures, or predicted pictures are pictures which are coded in light of a previous picture. Motion compensa-tion may be used to produce P-pictures. B-pictures, or bidirectionally predicted pictures are pictures which are coded in light of characteristics of a previous I- or P-picture and future I- or P-picture. As in the case of P-pictures, B-pictures may also be coded by using mo-tion compensation. In appropriate circumstances, P-pic-tures and I-pictures may have some of their blocks coded in the same fashion that the blocks of the I-pic-tures are coded, i.e., without reference to other pictures ("intra coding"). A Group-of-Picture (GOP) structure is used in this example with N=12 and M=3 in Motion Picture Experts Group (MPEG) parlance. This GOP consists of one intra-coded I-picture, 3 predictively coded P-pictures, and 8 bidirectionally predictive code B-pictures. This GOP ensures that a complete I-picture occurs every 12/29.97 (approximately 0.4) seconds, which is hence the maximum delay for acquiring a pic-ture from a bit stream. See FIG. 1a.

A picture is divided into macroblocks where a mac-roblock is a 16×16 luminance block plus the co-sited 8×8 Cb- and Cr-blocks (one of each). This definition, however, is easily extended to full CCIR-601 vertical chrominance resolution, where a 16×16 luminance block is associated with two 8×8 Cb and two 8×8 Cr blocks. The macroblock is the unit for which motion-compensation and quantization modes are defined. A slice is defined to be one row of macroblocks, starting at the left edge of the picture and ending at the right edge.

The digital video input signal on input line 10 is en-coded into a compressed bit stream by the encoder shown in FIG. 1 which may be transmitted on output line 26 to another location having a receiver which may decode the bit stream and produce a video image. One important feature of the encoder of FIG. 1 is that a variety of coding techniques may be employed in ap-propriate circumstances to efficiently compress the video input signal on line 10 and to permit accurate reconstruction of the video image in the decoder with-out significant loss of information. Specifically, the encoder of FIG. 1 adaptively selects its coding opera-tion so that either coding of frames in the video signal or coding of the interlaced fields in the frames of the video input signal takes place. Once the type of coding to be used for the video input signal has been selected, a vari-ety of techniques used to compress video data may be improved in an adaptive fashion in light of the coding technique adopted to the encoder of FIG. 1. For exam-ple, techniques of estimating future video signals may be made more accurate. Techniques of using motion com-pensation with these estimation techniques are also im-proved. In addition, items such as quantization proce-dures, scanning techniques, DC coefficient prediction, and variable word length coding may also be improved.

Two basic quantization and coding modes are al-lowed for a macroblock: frame coding and field coding. These quantization and coding modes are completely independent of the motion-compensation modes. In frame coding, four 8×8 luminance subblocks are formed from a macroblock. In field coding, four 8×8 luminance subblocks are derived from a macroblock by separating the lines of the two fields, such that each 8×8 subblock contains only lines of one field. Frame coding is superior to field coding where there is not much motion between the two fields, and field coding is supe-

6

rior when there are detailed moving areas. The mode decision is made in the pixel domain once for the entire macroblock. An 8×8 DCT is then applied to each frame subblock or field subblock, depending on the mode selected.

The digital video input signal on input line 10 in FIG. 1 is directed to the noninverting input of a summing element 11. An inverting input of the scanning element 11 receives a signal on line 12 related to an estimate of the video input signal on line 10. The estimate for P-pic-tures is based upon a prediction made in light of past I- and P-pictures. The estimate for B-pictures is based upon a prediction made in light of past and future I- and P-pictures. No estimate is made for I-pictures and intra-coded portions of P- and B-pictures, so that the estimate signal on line 12 in these situations are zero, as indicated symbolically in FIG. 1 by the opening of an inter/intra type switching element 13b in series with line 12. The summing element 11 produces an output signal on line 13 which is related to the error between the digital video input signal on line 10 and the estimate signal on line 12. The estimate error signal on line 13 is directed to the input of a block adaptive frame/field coding analyzer 14. The coding analyzer 14 examines predeter-mined characteristics of the video input signals on line 10 or of the estimate error signal on line 13, depending on the state of a switching element 13a and makes a decision as to the type of coding to be used by the en-coder of FIG. 1. The analyzer 14 decides, when the switching element 13a connects line 13 to the input of the analyzer 14, whether or not it would be advanta-geous to either code the frames of the estimate error signal on line 13 or to code the interlaced field of that estimate error signal. When the switching element 13a connects the input signal on line 10 to the input of the analyzer 14, the analyzer decides whether or not it would be advantageous to either code the frames of the input signal on line 10 or to code the interlaced fields of that input signal on line 13. The nature of analyzer 14's decision is indicated by the production of a coding type signal on line 15. In a specific example of the invention using a video input signal produced by an interlace scanning technique, the selector 14 checks to see whether or not there are similarities in adjacent or alter-nating horizontal scan lines in the input signal or the estimate error signal. If the selector finds that the differ-ences between adjacent scan lines are less than the dif-ferences between alternate scan lines, then the selector 14 produces a coding type signal on line 15 which indi-cates that frames of video information in the estimate error signal or the input signal are to be coded by the encoder of FIG. 1. If the selector 14 finds that the dif-ferences between adjacent scan lines are greater than the differences between alternate odd and even scan lines, then the selector 14 produces a coding type signal on line 15 which indicates that each field of oddly num-bered scan lines and each field of evenly numbered scan lines are to be coded separately.

The input signal on line 10 or the estimate error signal on line 13 is selectively directed to the input of a block formatting circuit 15a, depending on the state of the switching element 13a. The formatting circuit 15a is also responsive to the coding type signal on line 15 to direct the signals on either line 10 or line 13 in proper order on a line 17 to the input of a discrete cosine trans-form circuit 16. When field coding has been selected by selector 14, the order in which the data comprising the input signal on line 10 or the estimate error signal on

5,227,878

7

8

line 13 is changed so that first oddly numbered scan lines are consecutively directed to the input of a discrete cosine transform circuit 16 on the input line 17 followed by consecutive evenly numbered scan lines, or vice versa. The discrete cosine transform circuit 16 then converts each submacroblock of either evenly numbered or oddly numbered scan lines to a matrix of transform coefficients representing, in this example of the invention, spatial frequency components in the portion of the image represented by each submacroblock.

When frame coding has been chosen by the selector 14, each macroblock is sent to the discrete cosine transform circuit 16 on line 17 in the order they were received at the input of selector 14 on line 13. The discrete cosine transform circuit 16 then converts each block in the macroblock into a similarly sized matrix of transform coefficients representing, in this example of the invention, spatial frequency components in the portion of the image represented by each macroblock.

In addition to frame coding of entire macroblocks and field coding of submacroblocks representing oddly numbered and evenly numbered scan lines, the selector 14 may also be configured so that it may direct the encoder of FIG. 1 to code other kinds of submacroblocks such as groups of contiguous blocks which are smaller than the size of a macroblock.

The transform coefficients produced by the discrete cosine transform circuit 16 are directed on output line 18 to the input of a visibility matrix selector and perceptual quantizer 19. The quantizer 19 divides each of the transformed coefficients from discrete transform circuit 16 by predetermined scaling factors in one of a plurality of visibility matrices and a quantization parameter determined in light of the characteristics of the digital input signal communicated to the quantizer 19 on line 20 and in light of the characteristics of the estimate error signal communicated on the quantizer 19 on line 21. The amount by which the transform coefficients are quantized is also determined by the coding type signal produced by the selector 14 on line 15. The coding type signal is used by the quantizer 19 to adjust the quantization levels applied to the transform coefficients from discrete cosine transform circuit to improve the compression of video signals produced by the operation of the quantizer 19.

For AC-coefficient quantization, a 5-bit quantization parameter and a set of quantizer matrices are employed. Quantization is performed with a dead-zone for non-intra coding and without one for intra coding. This example of the invention allows four different quantizer matrices: one for each of the combinations of intra-/nonintra- and frame/field-coded macroblocks. There are no default matrices specified; the ones used are loaded and transmitted at the sequence layer. The Cb-and Cr-subblocks use the same matrices as the luminance subblocks.

In I-pictures, all macroblocks are coded, and the 5-bit quantization parameter is transmitted for every macroblock. In P- and B-pictures, some macroblocks may contain no coded coefficient data. A one-bit flag is sent for each macroblock to signal whether the macroblock is coded or not. In P-pictures, the quantization parameter is then transmitted for every coded macroblock.

In B-pictures, a 5-bit quantization parameter is transmitted at the start of every slice. A two-bit index (denoted mscale addr) is transmitted for every coded macroblock in the slice that identifies one of four multipliers (all of which are transmitted at the sequence layer). The slice quantization parameter is multiplied by the selected multiplier (denoted mscale) and the product rounded to the nearest integer and limited to 5 bits. The resulting number becomes the quantization parameter for that macroblock.

A coded block pattern framework (for signalling which of the subblocks inside a macroblock contain coded data) is used only with B-pictures.

Once the AC coefficients are quantized, they are coded for transmission. A scanning matrix ("scan") defines the order in which they are processed for encoding. Two fixed scans are defined: one for use in the frame-coding mode and the other for use in the field-coding mode. These scans do not change with the picture type in this example of the invention. See FIG. 1b and 1c.

Run-length and level combination are VL-coded for non-zero quantized AC coefficients. For each macroblock in I- and P-pictures, the encoder is allowed to choose one codebook out of a small number of codebooks. In this example of the invention, four codebooks for I-pictures and four for P-pictures are used. These eight codebooks are derived basically by permuting a set of codewords. Among other things, they differ in the length of the end of block (EOB) codeword (2, 3 or 4 bits). The lengths of the codewords in the top left corner of each codebook are shown in FIGS. 1d–1k.

For a particular macroblock in an I- or P-picture, the codebook yielding the smallest bit-count is selected, and signalled to the decoder with a 2-bit identifier. In B-pictures, this overhead for codebook selection was found to be excessive; therefore, one fixed codebook is used for all macroblocks in B-pictures. This codebook is one of the four used with P-pictures, and is the one shown in FIG. 1b.

In FIG. 1, the quantized transform coefficients are scanned by a scan selector circuit 23 in a predetermined order and sent to an encoder and multiplexer 24 which may select between a fixed word length codings of the transform coefficients or one or more variable word length coding of the transform coefficients. The scan analyzer 23 is responsive to the coding type signal produced by the selector 14 on line 15. The scan selector 23 determines one of a plurality of possible scanning orders which may be used to direct the transform coefficients to the encoder and multiplier 24. The order which the scanning selector 23 choses is based on what order may most conveniently be used by the encoder and multiplexer 24 to most efficiently code the transform coefficients with the fewest number of bits. For example, when frame coding has been used, the scan selector 23 may be configured to perform a zig zag scanning of the transform coefficients in the quantizer 19. When field coding has been used, the scan selector 23 may perform vertical scanning of the quantized transform coefficient in the quantizer 19. One of the strategies which may be employed in scanning the quantized transform coefficients in a strategy which will group like valued coefficients together for sequential transmission to the encoder and multiplexer 24. Examples of scanning sequences for frame block scans and field block scans are illustrated in FIGS. 1a and 1b, respectively. When like-valued coefficients are grouped together, a more efficient coding, such as a variable word length coding may be employed by the encoder 24. Longer word lengths may be used to represent higher valued coefficients while shorter word lengths may be used to represent coefficients having a value of zero or close to zero. An end of block (EOB)

code may be used to transmit pluralities of like valued coefficients.

As described in more detail below, the circuit of FIG. 1 includes a variable word length choice analyzer 23a which is responsive to the DCT coefficients output by the scan selector 23 and the picture type signal from line 32. The analyzer 23a produces a variable word length table select signal which is input to the encoder and multiplexer 24 and which is used by the encoder and multiplexer 24 to select one of a plurality of code tables which may be used to perform different kinds of fixed word length and variable word length coding of the DCT coefficients.

In addition to transmitting encoded transform coefficients, the encoder and multiplexer 24 receives and transmits along with the encoded coefficients a number of control signals which are used by a decoder in a video signal receiver to create a video image from the coded signals produced by the encoder in FIG. 1. These control signals include a signal related to the quantization parameter produced on line 30 between the quantizer 19 and the encoder and multiplexer 24. These control signals also include a picture type signal on line 32, which may be produced by an independently running sequencer not shown in FIG. 1. FIG. 1a shows an example of a sequence of I-, P-, and B-pictures which may be used. The picture type signal on line 32 represents what kind of picture is being produced by the encoder of FIG. 1, namely, either an I-, P-, or B-picture in this example of the invention.

The words produced by the encoder 24 are sent to a buffer 25 which then directs those words in an output bit stream on an encoder output line 26 at appropriate times. A fullness signal is produced on line 27 which is directed to an input of the quantizer 19 which thereby controls its operation to prevent the buffer 25 from overflowing or underflowing.

The production of an estimate of the digital video input signal is now described. The transform coefficients on the output of the scan selector 23 are connected to the input of an inverse scan selector 28 which rearranges the transform coefficients into the order they had in the quantizer 19 prior to being scanned by the scan selector 23. As shown in FIG. 1, the inverse scan selector 28 is also responsive to the coding type signal on line 15 which notifies the inverse scan selector 28 of the predetermined order into which the quantized transform coefficients were ordered by the scan selector 23 and thereby is the mechanism by which the inverse scan selector 28 is able to use the correct inverse scanning sequence. The transform coefficients as reordered by the inverse scan selector 28 are directed to a visibility matrix selector and dequantizer 29 which performs an inverse quantization procedure on the transform coefficients which basically reverses the operation of the quantizer 19. As shown in FIG. 1 the dequantizer 29 is responsive to the coding type signal on line 15 and the quantization parameter produced by the quantizer 19 to determine the correct dequantization procedure.

The output of the dequantizer 29 is directed to the input of an inverse discrete cosine transform circuit 34 which produces an output signal corresponding to the estimate error signal produced on line 13. The output signal from the inverse discrete cosine transform circuit 34 is directed on the noninverting input of a summing element 36 which receives at its inverting input a signal on line 38 which is related to an estimate of the video input signal on line 10. The output of the summing

element 36 is directed to a next previous picture store 36a via a write next switching element 36b between the output of the summing element 36 and the input of the next picture store 36a. The output of the summing element 36 represents a frame of video data which has been coded by the encoder of FIG. 1. Writing a picture into the next picture store 36a causes a picture previously stored in the next picture store 36a to be written into a previous picture store 36c via closure of a write previous switching element 36d.

A motion estimation circuit 37 receives the digital video input signal from line 10, signals relating to the contents of the stores 36a and 36c, and the picture type signal from line 32. The motion estimation circuit 37 produces signals related to motion vectors which are used by an estimation circuit 38 which produces an estimate or prediction of the video input signal on line 10. An estimation circuit 38 is responsive to the contents of the stores 36a and 36c and the motion vectors produced by the motion estimation circuit 37 to produce a motion compensated estimate of the video input signal on line 10.

The motion compensated estimate produced by the estimation circuit 38 in this example of the invention, involving the previously described macroblock structure of video signals, takes into account the fact that a macroblock contains two interlaced fields of luminance pixels. Accordingly, two main categories of motion compensation are used by the estimation circuit 38, namely, a frame motion compensation mode and a field motion compensation mode. In the frame motion compensation mode, picture elements of an entire frame are predicted on a macroblock by macroblock basis from picture elements in reference frames. In the field compensation mode, the picture elements of one field are predicted only from pixels of reference fields corresponding to that one field. For example, pixels in a field of oddly numbered scan lines are predicted only from pixels in a reference field of oddly numbered scan lines.

In addition to having different motion compensation modes based on prediction of frames or fields of picture elements, there can be other modes of compensation based on the type of pictures being handled. In this example of the invention, the modes of compensation can also be based on whether P-pictures or B-pictures are being predicted. (No prediction is made for I-pictures). Examples of motion compensation types are summarized below.

A. Motion Compensation Modes for P-pictures

1. 16×16 frame motion compensation mode (type 1)
   In this mode, the 16×16 luminance block is compensated by another 16×16 block from a reference frame which is fetched using one forward motion vector. No distinction is made between the picture element scan lines of the interlaced fields. The prediction block contains picture elements of both fields of the reference frame.

2. 16×16 frame motion compensation mode (type 2)
   In this mode, the 16×16 luminance block is divided by a horizontal line of demarcation into a top 16×8 subblock and a bottom 16×8 subblock. Each subblock is independently compensated using a forward motion vector. Again, no distinction is made between the scan lines of the two interlaced fields making up the luminance subblocks. Two motion vectors are created and transmitted for each macroblock in this mode.

3. 16×8 field motion compensation mode (type 3)

In this mode, the 16×16 luminance block is separated by field polarity, namely, by oddly numbered and evenly numbered scan lines, into two 16×8 subblocks. Each of the 16×8 subblocks contains only picture elements lines of one of the interlaced fields in the original 16×16 luminance block. Each field subblock is compensated independently using a separate forward motion vector with a 16×8 subblock that is derived from picture element scan lines of a field of the same polarity in the reference frame. Two motion vectors are created and transmitted for each macroblock in this mode.

**B. Motion Compensation Modes For B-pictures**

1. 16×16 bidirectional (P and N) frame motion compensation mode (type 3)

A forward (from a previous [P] frame) motion vector fetches a 16×16 block from a past reference frame and a backward (from a new [N] frame) motion vector fetches a 16×16 block from a future reference frame. The 16×16 blocks are averaged to yield a final prediction block.

2. 16×16 forward (P) unidirectional frame motion compensation mode (type 1)

This is a forward unidirectional predictional mode in which only one forward motion vector is used for each macroblock.

3. 16×16 backward (N) unidirectional frame motion compensation mode (type 2)

This is a backward unidirectional predictional mode in which only one backward motion vector is used for each macroblock.

4. 16×8 frame motion compensation mode (type 4); top-forward (P1) with bottom-backward (N2)

In this mode the 16×16 luminance block is divided by a horizontal line of demarcation into a 16×8 top subblock and a 16×8 bottom subblock. The top subblock is compensated using a forward motion vector which fetches a 16×8 block from a past reference frame. The bottom subblock is compensated using a backward motion vector which fetches a 16×8 block from a future reference frame. Two motion vectors are produced and transmitted for each macroblock in this mode.

5. 16×8 frame motion compensation mode (type 5); top-backward (N1) with bottom-forward (N2)

This mode is similar to the mode B.4. described above. The top subblock is compensated using a backward motion vector and the bottom subblock is compensated using a forward motion vector.

6. 16×8 field motion compensation mode (type 6); odd-forward (P1) with even-backward (N2)

In this mode the 16×16 luminance block is separated by field polarity into two 16×8 field subblocks. One of the field subblocks contains the oddly numbered picture element scan lines and the other field subblock contains the evenly numbered picture element scan lines. The 16×8 field subblock containing the oddly numbered field lines is compensated using a forward motion vector and another 16×8 subblock derived from only the oddly numbered scan lines of a past reference frame. Similarly, the 16×8 field subblock containing the evenly numbered field lines is compensated using a backward motion vector and a 16×8 subblock derived from only the evenly numbered field lines of a future reference frame. Two motion vectors are produced and transmitted per macroblock in this mode.

7. 16×8 field motion compensated mode (type 7); odd-backward (N1) with even-forward (P2)

This mode is similar to mode B.6. described above with the 16×8 subblock containing the oddly numbered field lines being compensated by using a backward motion vector and a subblock from a future reference frame and the 16×8 block containing the evenly numbered field lines compensated using a forward motion vector and a subblock from a past reference frame. Two motion vectors are produced and transmitted per macroblock in this mode.

The motion estimation circuit 37 thus may produce motion vectors needed to effectuate a variety of motion compensation modes. These motion vectors are transmitted to the estimation circuit 38 via a line 39 and are used by the estimation circuit to perform in an adaptive motion compensated prediction of the video input signal on line 10.

The estimation circuit is composed of two main parts, a block adaptive frame/field uni/bidirectional motion compensated prediction analyzer 38a and a block adaptive frame/field uni/bidirectional motion compensated prediction selector 38b. The prediction analyzer 38a is responsive to the motion vectors produced by the motion estimation circuit 37, the picture type signal from line 32, and the contents of the next picture store 36a and the previous picture store 36c. The prediction analyzer 38a produces a motion compensation type signal on line 38c which identifies which one of the motion compensation odes, such as the compensation modes described here, is used to produce an estimation of the video input signal on line 10. The prediction selector 38b takes appropriate ones of the motion vectors computed by the motion estimation circuit 37 and the motion compensation type signal on line 38c and computes an estimation of the video input signal on line 10. The estimate is produced in light of appropriate ones of the frames stored in stores 36a and 36c.

Each motion vector component in encoded differently, with respect to a previously transmitted component. The motion vectors produced by the motion estimation circuit 37 are also transmitted on a line 40 to a motion vector prediction circuit 41 and to summing element 42. The motion vector prediction circuit 41 also receives the picture type signal on line 32 and the motion compensation type signal on line 38c, which identifies the motion compensation mode being used by the estimation circuit 38. The circuit 41 produces an output signal to the inverting input of the summing element 42 which is related to a predicted value of the motion vector produced by the motion estimation circuit 37. The summing element 42 subtracts the motion vector estimate from the motion vector signal on line 40 and produces a differential motion vector signal which is directed to the input of the encoder and multiplexer 24. The encoder and multiplexer 24 sends the differential motion vector signal to the buffer 25 for insertion into the output bit stream on line 26. The differential motion vector signal will be used by a decoder to reconstruct a video image in accordance with the video input signal on line 10.

The decoder and multiplexer 24 also receives a block classification signal on line 43 which is produce by a block type classification circuit 44 in response to the previously described picture type signal, coding type signal, and motion compensation type signal.

The block type classification circuit 44 also receives an inter/intra type signal on line 44a which identifies whether intercoding or intracoding is being used for the block of video being classified. The inter/intra type

13

14

signal is produced by an inter/intra analyzer circuit 44b which receives the video input signal on line 10 and the estimate error signal on line 13. The analyzer circuit 44a determines and compares the energies present in the input signal and the estimation signal and makes a decision as to whether inter or intra coding is to be used. Inter coding, namely, coding of the estimate error signal on line 13, is used for P- and B-pictures when the energy of the estimate error signal is less than the energy of input signal. Sometimes in P- and B-pictures, such as in the situation where there is a scene change, it would be advantageous to code in an intra fashion, namely, to code the input video signal on line 10 instead of the estimate error on line 17. This is the case when the energy in the video input signal on line 10 is less than the energy in the estimate error signal on line 13. When this condition is sensed by the analyzer circuit 44b, the inter/intra type signal indicates that intra coding is to be used. As shown in FIG. 1, the inter/intra type coding signal from analyzer 44b controls the states of switching element 13a and the inter/intra type switching element 13b. The inter/intra coding type signal from the analyzer 44b also is directed to the input of the quantizer 19 to control the quantizing operation in accordance with how the video data is being coded. The inter/intra coding type signal is also a part of the block classification signal sent to the encoder and multiplexer 24.

The block classification signal on line 43 is transmitted to the buffer 25 by the encoder and multiplexer for insertion into the output bit stream on line 26. The block classification signal is used by a decoder to create an image in accordance with the video input signal on line 10.

All macroblocks in I-pictures are intra coded; intra coding of macroblocks is also allowed in P- and B-pictures. In intra coded macroblocks (field or frame mode), the DC coefficient of each subblock is uniformly quantized to 255 levels. DC-prediction is then employed to reduce the number of bits needed to encode the DC coefficients. Two predictors are maintained for luminance DC-prediction to increase its efficiency in switching between the frame- and field-coding modes. For chroma DC-prediction, one predictor suffices for each color component. All DC predictors are reset to zero at the start of a slice and at a nonintra coded macroblocks.

A signal on line 47 related to the magnitudes of intra coded DC coefficients produced by the discrete cosine transform circuit 16 is directed to the input of an intra DC coefficient prediction circuit 45 and the non-inverting input of a summing element 46. The switch 48 in line 47 symbolically represents the direction of only the intra DC coefficients produced by the discrete cosine transform circuit 16 to the input of the intra DC coefficient prediction circuit 45 and the summing element 46. The prediction circuit 45 also receives the coding type signal produced by the coding analyzer 14. The prediction circuit 45 produces an output relating to a predicted value of the intra code DC coefficient and directs that output signal to the inverting input of the summing element 46. The noninverting input of the summing element 46 receives the actual intra DC coefficient. The summing element 46 subtracts the prediction from the DC coefficient to produce a differential DC coefficient prediction which is directed to the input of the encoder and multiplexer 24. The differential DC coefficient is directed by the encoder and multiplexer 24 to the buffer 25 for insertion into the bit stream on output line 26. A decoder uses the differential DC coefficient to construct an image in accordance with the video input signal 10.

FIG. 2 shows an adaptive motion compensated uni/-bi-directional predictive/interpolative decoder which may be used to decode the output bit stream produced by an encoder such as the one shown in FIG. 1. An input bit stream is received by the decoder of FIG. 2 on an input line 50. The input bit stream on line 50 is placed in a buffer 52 and then sent to a variable word length decoder and demultiplexer 54 which performs a decoding and demultiplexing operation which is the inverse of the encoding and multiplexing performed by the encoder and multiplexer 24 shown in FIG. 1. The decoder and demultiplexer 54 produces on an output line 56 the quantized discrete cosine transform coefficients of FIG. 1. An inverse scan selector 64 rearranges the order of the coefficients appearing on input line 56 into the same order that those coefficients had in the quantizer 19 of FIG. 1. The inverse scan selector 64 directs the coefficients it receives in inverse order to a visibility matrix selector and dequantizer 66. The dequantizer circuit 66 is responsive to a coding type signal on line 68, a picture type signal on line 70, and the quantization parameter on line 68a retrieved from the bit stream input to the decoder of FIG. 2 by the decoder and demultiplexer circuit 54 to perform a dequantization which is the inverse of the quantization performed by the quantizer 19 in FIG. 1.

The intra DC transform coefficients for I-pictures and intracoded portions of P- and B-pictures are produced at the output of a summing element 58 which receives the differential DC coefficient as decoded and demultiplexed by the decoder and demultiplexer 54. The summing element 58 also receives an intra DC coefficient prediction signal from a prediction circuit 60 which is also responsive to intra DC coefficient signals on line 57 and a coding type signal on line 68. The state of a switching element 66a is controlled to switch an input line of an inverse discrete cosine transform circuit 72 between the DCT coefficient signal on the output of the dequantizer 66 and the intra DC coefficient signal on line 57. The dequantized transform coefficients and the intra DC coefficients are directed through a switching element 66a to an inverse discrete cosine transfer circuit 72 which performs a transform operation which is the inverse of the transform operation produced by the discrete cosine transform circuit 16 in FIG. 1. The output of the inverse discrete cosine transform circuit 72 in FIG. 2 is a decoded version of either the video signal on input line 10 in the case of I-pictures and intra coded portions of P- and B-pictures or it is a decoded version of the estimate error signal on line 13 in FIG. 1. The output signal from the transform circuit 72 is directed to the input of a block formatting circuit 72a which performs an unformatting operation which is the inverse of the formatting operation performed by block 15a in FIG. 1. The output of the unformatting circuit 72a is directed to one input of a summing element 74. Another input of the summing element 74 receives an estimate signal on line 76. The output of the summing element 74 is related to the difference between the estimate error signal from the unformatter 72a and the estimate signal on line 76 and comprises a video output on line 78 which is analogous to the video input signal on line 10 in FIG. 1.

The decoder and demultiplexer 54 in FIG. 2 directs the block classification signal received from the encoder of FIG. 1 to a block type declassification circuit 80 via an input line 82. The block type declassification circuit 80 produces a coding type signal on line 68, a picture type signal on line 70, a motion compensation type signal on line 88, and an inter/intra type signal on line 88a which correspond to the coding type, picture type, motion compensation type, and the inter/intra type signals produced by the encoder of FIG. 1.

The decoder and demultiplexer 54 also retrieves the differential motion vector signal from the bit stream sent by the encoder of FIG. 1 and directs the differential motion vector signal on a line 90 to the input of a summing element 92. Another input to summing element 92 is received from a motion vector prediction circuit 94 along line 96. The motion vector prediction circuit 94 is responsive to a motion compensation type signal on line 88, a picture type signal on line 70, and selected motion vectors on line 98a to produce a prediction of the motion vectors which is directed to one of the inputs to the summing element 92.

The output of the summing element 92 is a motion vector signal on line 98 which corresponds to the motion vector signals produced by the motion estimator 37 and used in the encoding performed by the circuit of FIG. 1. The motion vector signals are directed to an estimation circuit 100 on an input line 102. A next picture store 100a in responsive to the video output signals on line 78 through selective opening and closing of a switching element 100b shown in FIG. 2 to store selected frames of the video output signal. Writing a new frame of information into store 100a causes a previous frame in store 100a to be written into previous picture store 100c via closure of a switching element 100d. The estimation circuit 100 is responsive to the contents of the stores 100a and 100c, the motion vectors on line 102, the motion compensation type signal on line 88, and a picture type signal on line 70 to produce an estimate on line 76 of the video output signal on line 78 in a manner analogous to the estimate produced by the estimation circuit 38 in FIG. 1. As in FIG. 1, switching element 100e in series with line 76 acts to disconnect the estimate signal from the input of summing element 74 when I-pictures are being decoded or when intra coded portions of P- and B-pictures are involved.

FIG. 3 shows a block diagram of a block adaptive motion compensated predictor 106 in accordance with this invention. A decoded picture is received on line 108. The circuit of FIG. 3 produces predictions of P-pictures in accordance with the motion compensation modes identified above for P-pictures. The decoded picture may be either received from the output of the summing element 36 in FIG. 1 or the output of the summing element 74 in FIG. 2. The decoded picture on line 108 is received in the previous picture store 36c or 100c. The decoded picture from the previous picture store is sent to the input of a switching element 110 which selectively directs the decoded picture to one of three output lines in accordance with the motion compensation type signal. If the motion compensation type is type A.1., the decoded picture is sent to a frame macroblock motion compensation predictor 112 which produces a motion compensated prediction signal on the output line 114 of the predictor 106. If the motion compensation type is type A.2., the decoded picture is sent to the input of a submacroblock switching element 116. The switching element 116 selectively directs appropri-

ate portions of the decoded picture to one of a pair of frame submacroblock motion compensated prediction circuits 118 and 120. The top half frame submacroblock is directed to the prediction circuits 118 and the bottom half frame submacroblock is directed to the prediction circuit 120. The predictions produced by circuits 118 and 120 are sent to two inputs 122 and 124 of a frame submacroblock to macroblock formatter 126 which then directs the resulting formatted prediction to the output line 114 of the prediction circuit 106.

If the motion compensation type is type A.3., the decoded picture is sent by the switching element 110 to the input of a submacroblock switching element 128 which selectively directs the top field submacroblock portion of the decoded picture to one of two field submacroblock motion compensated prediction circuits 130 and 132 and the bottom field submacroblock portion of the decoded picture to the other of the prediction circuits 130 and 132. The prediction signals produced by the prediction circuits 130 and 132 are directed on lines 134 and 136 to the inputs of a field submacroblocks to macroblock formatting circuit 138 which then outputs the formatted predictions on the output line 114 of the prediction circuit 106. The predictor circuits are responsive to either one or two motion vector signals (MV1 or MV1 and MV2) as described above and shown in FIG. 3.

FIG. 4 is a block diagram of a block adaptive motion compensated bidirectional predictor 140 in accordance with this invention. The circuit of FIG. 4 produces predictions of B-pictures in accordance with the motion compensation modes identified above for B-pictures. A decoded previous picture is received on line 142 from either one of the outputs of summing element 36 in FIG. 1 or summing element 74 in FIG. 2. The decoded previous picture is sent to the previous picture store 36c or 100c of FIGS. 1 and 2, respectively. A decoded next picture is received on an input line 146 from the output of either summing element 36 in FIG. 1 or summing element 74 in FIG. 2. The decoded next picture is directed to the next picture store 36a or 100a of FIGS. 1 and 2, respectively. The decoded previous picture in the previous picture store is selectively directed by a switching element 150 on input line 149 to one of six output lines depending upon the motion compensation type signal in FIGS. 1 and 2. The decoded next picture in the next picture store is selectively directed by the switching element 150 on input line 152 to one of a second set of six output lines, depending again on the value of the motion compensation type signal in FIGS. 1 and 2.

If the motion compensation type is type B.1., the decoded previous picture in the previous picture store is directed on an output line 154 to the input of a frame macroblock motion compensation prediction circuit 156 which then outputs a frame macroblock motion compensated prediction on a line 158 and on an output line 160 of the prediction circuit 140. Type B.1. motion compensation is undefined for the decoded next pictures in the next picture store 146 so that the decoded next pictures are not involved in the prediction operation and do not influence the prediction signal produced on output line 160 in type B.1. situations.

If the motion compensation type is type B.2., the decoded next picture in the next picture store is directed to an output line 156 of the switching element 150 toward the input of a frame macroblock motion compensated prediction circuit 162 which produces a frame

17

macroblock motion compensated prediction on an output line 164 and an output line 160 of the prediction circuit 140. Type B.2. motion compensation is undefined for the decoded previous pictures in the previous picture store so that the decoded previous pictures are not involved in the prediction operation and do not influence the prediction signal produced on output line 160 in type B.2. situations.

When the motion compensation type is type B.3., the decoded previous picture in the previous picture store is directed on output line 166 of the switching element 150 to one input of a frame macroblock bidirectional motion compensated prediction circuit 168. The decoded next picture in the next picture store is directed to an output line 170 of the switching element 150 to a second input of the prediction circuit 168. The prediction circuit 168 produces a prediction signal on line 172 which is directed to the output line 160 of the prediction circuit 140.

When the compensation type is type B.4., the decoded previous picture in the previous picture store is directed to an output line 174 of the switching element 150 and the decoded next picture in the next picture store 148 is directed to an output line 176 of the switching element 150. The pictures on line 174 and 176 are directed to the inputs of a switching element 178 which selectively directs the pictures to the inputs of a pair of frame submacroblock motion compensated prediction circuits 180 and 182. The outputs of the prediction circuits 180 and 182 are directed to the inputs of a frame submacroblocks to macroblock formatting circuit 184 on lines 186 and 188. The output of the formatting circuit 184 is directed to the output line 160 of the prediction circuit 140.

When the motion compensation type is type B.5., the decoded previous picture in the previous picture store is directed to an output line 190 of the switching element 150 and the decoded next picture in the next picture store is directed to an output line 192 of the switching element 150. The pictures on lines 190 and 192 are directed to the inputs of a switching element 194 which selectively directs the pictures to a pair of frame submacroblock motion compensated prediction circuits 196 and 198. Prediction signals on lines 200 and 202 from the prediction circuits 196 and 198 are input to a frame submacroblocks to macroblocks formatting circuit 204 which sends formatted prediction signals to the output line 160 of the prediction circuit 140.

When the motion compensation type is type B.6., the decoded previous picture in the previous picture store is directed to an output line 206 of the switching element 150 and the decoded next picture in the next picture store is sent to an output line 208 of the switching element 150. The pictures on lines 206 and 208 are sent to the inputs of a switching element 210 which selectively directs those pictures to the inputs of a pair of field submacroblock motion compensated prediction circuits 212 and 214. The prediction circuits 212 and 214 send prediction signals on lines 216 and 218 to the inputs of a field submacroblocks to macroblock formatting circuit 220. The formatting circuit 220 directs formatted prediction signals to the output line 160 of the prediction circuit 140.

When the motion compensation type is type B.7., the decoded previous picture in the previous picture store is sent to an output line 222 of the switching element 150 and the decoded next picture in the next picture store is sent to an output line 224 of the switching element 150.

18

The pictures on lines 222 and 224 are sent to inputs of a switching element 226 which selectively directs the picture signals to a pair of field submacroblock motion compensated prediction circuits 228 and 230. The prediction circuits send prediction signals to a field submacroblocks to macroblocks formatting circuit 232 which directs the prediction signals to the output line 160 of the prediction circuit 140. As shown in FIG. 3, the predictor circuits are responsive to one or two motion vector signals (MV1 or MV1 and MV2).

FIG. 5 shows a detailed block diagram of the block adaptive frame/field coding analyzer 14 shown in FIG. 1. Macroblocks are received by the coding analyzer on an input line 234. The macroblocks received on the input line 234 are directed to a macroblock vertical correlation computer 236 which determines the amount of correlation between successive horizontal lines of each macroblock and produces a frame correlation signal on line 238 which is sent to a thresholder and comparator circuit 240. The macroblocks received on the input line 234 are also sent to a macroblock to field submacroblocks formatting circuit 242. The formatter 242 separates each macroblock into two separate fields, one of which comprises the evenly numbered horizontal lines of picture elements in each macroblock and the other or which comprises the oddly numbered horizontal lines of picture elements in each macroblock. The evenly numbered horizontal lines are sent to a submacroblock vertical correlation computer 244 when a selector switch 246 connects the output of the formatting circuit 242 to the input of the correlation computer 244. The correlation computer 244 determines the level of correlation between the evenly numbered horizontal lines sent to the computer 244 and produces a signal to a submacroblock selector switch 248 relating to the level of correlation. When the switch 248 is in an appropriate position, the signal from the correlation computer 244 relating to correlation level is sent to the input of an accumulator 250. The oddly numbered horizontal lines are sent to a submacroblock vertical correlation computer 252 when the selector switch 246 connects the output of the formatting circuit 242 to the input of the correlation computer 252. The correlation computer 252 determines the level of correlation between the oddly numbered horizontal lines sent to the computer 252 and produces a signal sent to the submacroblock selector switch 248 relating to the level of correlation. When the switch 248 is connected appropriately, the signal from the correlation computer 252 relating to correlation level of the oddly numbered lines is sent to the accumulator 250. The accumulator 250 sums the correlation levels of the oddly numbered and evenly number fields in the macroblocks and produces a total correlation signal indicating the level of correlation in the fields. The total correlation signal is divided by two in a divider circuit 254 and sent to the threshold in comparator circuit 240. The comparator circuit 240 compares the correlation levels of the frame correlation signal from computer 236 and the field correlation signal from divider 254 and produces the coding type signal shown in FIGS. 1 and 2. The coding type signal indicates whether frames of video information are to be encoded and decoded or fields of video information are to be encoded and decoded. Specifically, frames are to be encoded and decoded when the frame correlation level is greater than the field correlation level. Fields are to be encoded and decoded when the field correlation level is greater than the frame correlation level.

FIG. 6 shows the block formatter 15a of FIG. 1. Macroblocks are received on an input line 256 and directed to the input of a switching element 258. The state of the switching element is determined by the characteristics of the coding type signal produced by the circuit of FIG. 5. When the coding type signal indicates that frame coding is to take place, the switching element 258 connects the line 256 to the input to a macroblock to frame blocks formatter 260, the output of which is directed to a switching element 262 which connects the output of the formatter 260 to a block output line 264 of the formatter of FIG. 6. When the coding type signal indicates that field coding is to take place, the switching element 258 connects the line 256 to the input of a macroblock to field blocks formatter 266, the output of which is directed to the switching element 262 which connects the output of the formatter 266 to the block output line 264 of the formatter of FIG. 6.

FIG. 7 is a diagram of a block unformatter shown both in FIGS. 1 and 2. Blocks are received by the unformatter of FIG. 7 on an input line 268 which directs those blocks to the input of a switching element 270. When the coding type signal indicates that frame coding is to take place, the switching element 270 connects the blocks received on the output line 268 to the input of 25 a frame blocks to macroblock formatter 272 which directs frame macroblocks to the input of a switching element 274 which is configured by the coding type signal in this situation to direct frame blocks from the formatter 272 to a macroblock output line 276. When 30 the coding type signal indicates that field coding is to take place, the switching element 270 connects the blocks received on the input line 268 to the input of a field blocks to macroblock formatter 278 which directs the field blocks to the input of a switching element 274 which is configured by the coding type signal to direct macroblocks from the formatter 278 to the macroblock output line 276.

FIG. 8 is a flow chart representing an intra DC coefficient prediction circuit as shown as in FIGS. 1 and 2. Actually computed intra DC coefficients are directed to the input of the circuit of FIG. 8 on line 47. A quantization index is computer in block 280 by dividing the DC coefficient present on line 47 by a DC step-size parameter which may be eight. A decision then is made at block 282 to determine whether or not this DC coefficient is the DC coefficient for the first macroblock in a slice or whether the previous macroblock was a nonintra macroblock. For purposes of this discussion, the block index identifies the location of a block in a macroblock as shown for a frame macroblock and a field macroblock in FIG. 9. If the decision of block 282 is yes, a decision then is made at block 284 as to whether the block index is zero. If the block index is zero, a DC top block predictor parameter is set equal to some arbitrary value in block 286, for example, the predictor is set to 128. The DC prediction which is made by the prediction circuit of FIG. 8 is set equal to this top block DC predictor in block 288. In block 290, the top block predictor is overwritten with the value of the quantization index computed in block 280. In block 292 a bottom block DC predictor parameter is set equal to the value of the top block DC predictor set in block 290. The DC prediction is output from the circuit of FIG. 8 on output line 294 which corresponds to the output of the intra DC coefficient predictor blocks in FIGS. 1 and 2.

If the block index is 1, 2, or 3, as determined in block 284 in FIG. 8, a check is made in block 296 to see if the

block index is one. If the block index is one, the DC prediction is set equal to the top block DC predictor in block 298. The top block DC predictor then is overwritten with the quantization index in block 300 and the DC prediction is output by the circuit of FIG. 8 on line 294. If the block index, as determined in block 296, is 2 or 3, the DC prediction is set to the bottom block DC predictor in block 302 and the bottom block DC predictor then is overwritten with the value of the quantization index in block 304. The DC prediction signal is output from the circuit of FIG. 8 on line 294.

If the macroblock is not the first macroblock in a slice or the previous macroblock is not a nonintra type macroblock as determined in block 282 in FIG. 8, a decision is made in block 306 as to whether or not the current macroblock type is the same as the previous macrolock type. If the current macroblock is a frame type macroblock, block 306 in FIG. 8 determines if the previous macroblock was also a frame type macroblock. If the current macroblock is a field type macroblock, block 306 in FIG. 8 determines if the previous macroblock was also a field-type macroblock. If either of the determinations is in the affirmative, a check is made at block 308 to see if the block index is zero or one. If the block index is zero or one, the DC prediction is set equal to the top block DC predictor in block 310 and then in block 312 the top block DC predictor is set equal to the quantization index computed in block 280. The DC prediction then is output by the circuit of FIG. 8 on line 294. If the block index is 2 or 3, as determined in block 308, then the DC prediction is set equal to the bottom block predictor in block 314. The bottom block DC predictor then is overwritten with the quantization index in block 316 and the DC prediction is sent to the circuit of FIG. 8 on line 294.

If the current macroblock type is not the same as the previous macroblock type, as determined in block 306, then a check is made in block 318 to see if the block index is zero. If the block index is zero, an average of the current values of the top block DC predictor and the bottom block DC predictor is made in block 320. The average computed in block 320 is rounded in block 322. The top block DC predictor is set equal to the rounded average in block 324. The DC prediction then is set equal to the top block DC predictor in block 326. The top block DC predictor then is overwritten with the value of the quantization index in block 328. The bottom block DC predictor is set equal to the top block DC predictor in block 330. The DC prediction is sent to the output line 294 of the circuit of FIG. 8.

If the block index is 1, 2, or 3, as determined in block 318, a determination is made in block 332 to see if the block index is 1. If the block index is 1, the DC prediction is set to be equal to the top block DC predictor in block 334. The top block DC predictor then is overwritten in block 336 with the quantization index and the DC prediction is directed to the output line 294 of the circuit of FIG. 8. If the block index is not 1, as determined in block 332, then the DC prediction is set equal to the value of the bottom block DC predictor in block 338 and the bottom block DC predictor then is overwritten in block 340 with the value of the quantization index computed in block 280. As in the other cases, the DC prediction is directed to the output line 294.

FIG. 9 illustrates a sequence of six macroblocks in a slice of video data. The arrows in FIG. 9 illustrate schematically the relationship between the predicted DC coefficients for each of the blocks of video data and the

5,227,878

21

actual values of DC coefficients computer for adjacent blocks. The origin of each of the arrows is placed in the block for which an actual DC coefficient has been determined. The head of the arrow indicates the location of the block for which the actual value of the DC coefficient is used as a prediction of the DC coefficient for the block containing the head of the arrow. The circles in some of the blocks indicate the situation where an average of actual values of DC coefficients is used to predict the DC coefficients for the block in which the circles reside. FIG. 9 shows a frame type macroblock numbered 0 at the start of the macroblock slice, followed by a frame type macroblock numbered 1, a field type macroblock numbered 2, a frame type macroblock numbered 3, a field type macroblock numbered 4, and a field type macroblock numbered 5. Each of the macroblocks contains four blocks, the upper left hand block of each macroblock being given a block index of 0. The upper right hand block of each macroblock is given a block index of 1, the lower left hand block of each macroblock is given a block index of 2, and the lower right hand block of each macroblock is given a block index of 3. By way of example, a frame macroblock 0 and a field macroblock 4 are labeled with the block indices in FIG. 9. The block in frame macroblock 0 with an index of 0 is predicted to have a value of DC coefficient equal to an arbitrary value such as 128. The predicted value of the DC coefficient for the block in the frame macroblock 0 having an index of 1 is predicted to be the DC coefficient computed for the block having an index of 0 as illustrated by the arrow from the block having an index of 0 to the block having an index of 1. The predicted value of the DC coefficient for the block with an index of 2 in frame macroblock 0 is predicted to be the same as the actual value of the DC coefficient computed for the block having an index of 0 in the frame macroblock 0 as illustrated by the vertically downwardly directed arrow from the block of index 0 to the block of index 2. The predicted value of the DC coefficient for the block with an index of 3 in macroblock 0 is the same as the actual value of the DC coefficient computed for the block with an index of 2 in macroblock 0. The value of the DC coefficient predicted for the blocks of index 0 in the field macroblock 2, the frame macroblock 3, and the field macroblock 4 are each predicted to be the average of the computed coefficients for blocks of index 1 and 3 in the prior macroblocks in each instance. The rest of the predictions are apparent in light of the content of FIGS. 8 and 9 and are not further discussed.

FIG. 10 is a block diagram of the variable word length choice analyzer shown in FIG. 1. The analyzer receives the picture type signal on line 32 as an input to a signal translator 342 which produces two signals, an intracoding indication 344 which identifies whether or not there is intra-type coding and a B-type predictive indicator 346 which indicates whether or not predictive coding of B-pictures is being undertaken.

The variable word length choice analyzer also receives the DCT coefficients from the scan selector 23 in a run length computer 348 which determines, for all nonzero coefficients received, the number of zeros immediately prior to the receipt of that nonzero DCT coefficient. In other words, the computer 348 determines the run length for each DCT coefficient and sends signals relating to the amplitude and run length of each received DCT coefficient to the input of an intra indication switching element 350. The switching element 350 directs the signals from the run length com-

22

puter 348, when it is in the number 1 state shown in FIG. 10, to the input of sequencing switching element 352, which may be a counting circuit. The switching element 350 is in the number 1 state when the choice analyzer of FIG. 10 is analyzing DCT coefficient for I-pictures. The switching element 352 sequentially directs the amplitude and run length of each coefficient to the inputs of each of a series of four variable word length code length tables 354, 356, 358, and 356. The tables 354, 356, 358, and 360 contain data which represents the expected code length which will be produced if the DCT coefficient having an amplitude and run length as represented by the signals from the run length computer 348 are coded in accordance with four different coding schemes, one for each of the tables 354, 356, 358, and 360. When the switching element 352 connects the output of the run length computer 348 to the input of one of the tables 354, 356, 358, and 360, that table produces a signal on a respective output line 362, 364, 366, and 368 relating to the expected code length which will result from coding the DCT coefficient in accordance with the coding scheme for which the data in the table has been produced. The expected code lengths on lines 362, 364, 366, and 368 are directed to the number 1 inputs of a switching element 370. When the DCT coefficients are for I-pictures, the state of the switching element 370 is such that the signals on lines 362, 364, 366, and 368 are directed to the inputs of accumulators 372, 374, 376, and 378, respectively. The contents of the accumulators 372, 374, 376, and 378 are directed to four inputs of a comparator and minimum evaluation circuit 380 which is responsive to a compare enable signal to determine which of the expected run lengths stored in the accumulators 372, 374, 376, and 378 is the smallest. The evaluation circuit 380 produces a variable word length table select signal on line 382 which is then sent to the encoder and multiplexer 24 in FIG. 1 which then uses the signal produced on line 382 to select an efficient fixed or variable word length coding scheme identified by the nature of the variable word length table select signal on line 382. The select signal on line 382 causes the encoder 24 to select one of a plurality of coding tables stored in the encoder 24 which each control the encoding of quantized DCT coefficients in accordance with a separate and distinct fixed word length or variable word length coding scheme.

When P- and B-pictures are being coded, the switching element 350 is placed in state 0 such that the DCT coefficient amplitudes and run lengths are directed to the input of a bidirectional prediction indication switching element 384. When P-pictures are being coded, the switching element 384 is in the state 0 which causes the coefficient amplitudes and run lengths to be connected to the input of a sequencing switching element 386, which may be a counting circuit. The switching element 386 sequentially connects the P-picture coefficient amplitude and run lengths to each of four variable word length code length tables 388, 390, 392, and 394. The tables 388, 390, 392, and 394 each contain information about expected code lengths which will be produced by coding the DCT coefficient having the computed amplitude and run lengths in accordance with separate and distinct codes represented by each table 388, 390, 392 and 394. The expected code lengths from the tables 388, 390, 392, and 394 are sent to the 0 inputs of the switching element 370. For P-pictures, the state of the switching elements 370 and 396 is such that the outputs of the tables 388, 390, 392, and 394 are directed on output lines

398, 400, 402, and 404 and to the inputs of the accumulators 372, 374, 376, and 378. As in the case of I-pictures described above, the accumulators 372, 374, 376, and 378 direct the expected code lengths to the evaluation circuit 380 which then produces a variable word length select signal on line 382 which is used by the encoder and multiplexer 24 to code the quantized DCT coefficients using a code which is most efficient in terms of the smallest number of bits which must be used to transmit the DCT coefficients.

When B-pictures are being analyzed by the circuit of FIG. 10, the DCT coefficient amplitudes and run lengths from the computer 348 are directed to the input of a switching element 384 which is in a state which will connect those amplitudes and run lengths only to the variable word length code length table 388 which produces an expected run length signal and sends it to the input of the accumulator 372 and is used to produce a variable word length table select signal on line 382. Note that in the case of B-pictures, the state of switching element 396 is such that the output of the tables 390, 392, and 394 are not connected the inputs of the accumulators 374, 376, and 378.

In the example of the invention described here, a parameter Mscale is produced. The M scale parameter is a multiplexer to be used in computing the quantization parameter for bidirectionally coded frames. One M scale parameter is produced for each macroblock by selection from predetermined tables which have been determined experimentally for a particular picture resolution and bit rate.

FIG. 11 is a flow chart illustrating the encoding of the M scale parameter for bidirectionally coded pictures. In block 406, a decision is made as to whether or not the current macroblock was coded in the previous P-picture or I-picture. If not, whether decision is made in Block 408 as to whether or not the average quantization parameter was nonzero for a corresponding slice in the previous P-picture or I-picture. If it was zero, the average quantization parameter is set equal to 16 in block 410. If the average quantization parameter was nonzero, as determined in block 408, or after the average quantization parameter has been set to 16 in block 410, the quantization parameter for the corresponding macroblock in the previous P-picture or I-picture is set equal to 16 in block 412, since there was no quantization parameter for that macroblock. If the macroblock was coded in the previous P-picture or I-picture, as determined in block 406, or after the operation of block 412, the quantization step size is set equal to 2 times the quantization parameter in block 414. The quantization step size for the slice is set equal to 2 times the average quantization parameter for the corresponding slice in the previous P-picture or I-picture in block 414. A decision is then made in block 416 as to whether or not the prediction for the macroblock is to be unidirectional or intra. If the prediction is to be bidirectional, in other words, if the no route is followed at the output of block 416, then a temporary scale factor is set equal to a scale factor tuned to the resolution and bit rate times the quantizer 60 step size for the macroblock in the previous P-picture or I-picture in block 418. In block 420 a ratio parameter is computed by dividing the temporary scale factor by the quantization step size for the slice. In block 422 a variable min_ind is set equal to 9, a variable min_valf is set equal to 1,000, and a variable zlimit is set equal to 4. A decision is then made at block 424 to see whether an index z is less than zlimit. If z is less than zlimit, a vari-

able absdiff is set equal to the absolute value of the difference between the ratio computed in block 420 and a mscale parameter in block 426. Then in block 428 a decision is made as to whether or not the value of absdiff is less than min_valf. If the yes route is followed from block 428, a variable min_ind is set equal to z and the variable min_valf is set equal to the variable absdiff in block 430. The routine of FIG. 11 then returns to the input of block 424. If the no route is followed on the output of block 428, the routine of FIG. 11 returns directly to the input of block 424. The loop just described is repeated until z is no longer less than zlimit and the no route is followed on the output of block 424, after which in block 432 the current quantization step size is set equal to a rounded product of an mscale variable shown in block 432 and the quantization stepsize for the slice. The current quantization parameter is set equal to one-half of the current quantization step size in block 434 and the value of min_ind is sent for insertion into the encoder output bit stream for use by the decoder to recreate images from the compressed bit stream. The current quantization parameter is clipped to a valve of 31 by the operation of blocks 436 and 438.

If it is determined in block 416 that there is unidirectional prediction, then a temporary scale factor is computed in block 440, a ratio of the temporary scale factor to the quantization step size for the slice is computed in block 442 and in block 444, the min_ind, min_valf, and the zlimit variables are set to the same values they were set to in block 422. A decision is then made in block 446 to see if an index z is less than zlimit. If that is the case, a variable absdiff is computed in block 448 as the absolute value of the difference between the ratio computed in block 442 and an mscale parameter identified in block 448. A check then is made in block 450 to see if absdiff is less than min_valf. If that is the case, min_ind is set equal to z and min_valf is set equal to absdiff in block 452. The routine of FIG. 11 then returns to the input of block 446. The loop continues until z is no longer less than zlimit and then the routine follows the no route as the output of block 446. When the no route is followed in block 454, the current quantization step parameter is set equal to a product similar to the product already described for block 432 and the routine of FIG. 11 performs the previously described steps identified in blocks 434, 436 and 438.

FIG. 12 illustrates the operation of a decoder in accordance with this invention with respect to the mscale parameter produced for B-pictures. The min_ind parameter is extracted from the bit stream sent to the decoder in block 456. The quantization parameter for the slice is extracted from that bit stream in block 458. Block 460 computes the quantization step size from the quantization parameter for the slice in block 460. A decision then is made in block 462 as to whether the prediction for the macroblock is unidirectional or intra. If the prediction is unidirectional or intra, the current quantization step is computed as specified in block 464. If the prediction is bidirectional, the current quantization step size is computed as specified in block 456.

FIG. 13 shows a detailed block diagram of a visibility matrix selector. DCT coefficients are input to the selector on line 468 which is directed to the input of a coefficient weighting circuit 470. As those skilled in the art will appreciate, weighting factors are retrieved from a selected one of four visibility matrices 472, 474, 476 and 478, depending on the states of switching elements 480, 482, 484, 486, 488, and 490, which states are determined

5,227,878

25                                                                26

by the condition of signals identified in FIG. 13 and discussed elsewhere. Depending on which visibility matrix is selected, predetermined weighting factors are directed on line 492 to an input of the coefficient waiting circuit 470 which then produces weighted DCT coefficients on an output line 494 in light of the DCT coefficients introduced on line 468 and the weighting factors introduced on line 492.

FIG. 14 is a block diagram of a forward/inverse scan selector in accordance with this invention. The scan selector of FIG. 14 comprises a forward/inverse scan formatting circuit 496 which receives a forward inverse/scan designation signal on line 498 and quantization indices on line 500. One of four predetermined scanning orders may be produced in accordance with information stored in four scanning blocks 502, 504, 506, and 508. Depending on the states of switching elements 510, 512, 514, 516, 518, and 520, which are determined by the nature of control signals identified in FIG. 14 and discussed elsewhere, the operation of the scan formatter 496 is controlled by signals on an input line 522 produced by a selected one of the scanning blocks 502, 504, 506, and 508. The scan formatter 496 produces scan quantization indices on line 524 in light of the inputs received on lines 498, 500 and 522.

FIG. 15 is a flow chart illustrating motion vector prediction for P-pictures. A new macroblock is obtained in block 526. Block 528 determines if this macroblock is the first macroblock of a slice. If it is the first macroblock, the variables stored in five registers identified in block 530 are initialized to zero and the routine of FIG. 15 proceeds to the input of a decision block 532. If it is determined in block 528 that this macroblock is not the first macroblock in a slice, the routine of FIG. 15 proceeds directly from the block 528 to the input of block 532. Block 532 determines whether or not this is an inter macroblock. If it is not a inter macroblock, the variables stored in five registers identified in block 534 are initialized to zero and the routine of FIG. 15 returns to the input of block 526.

If block 532 determines that the macroblock is an inter macroblock, then decisions are made as to which motion compensation type is involved. These decisions are made in blocks 536, 538, and 540. If the motion compensation type is type 1, then in block 542 a motion vector prediction variable is set equal to the value of the REG 16×16 FRM_P variable. In block 544 the REG 16×16 FRM_P variable is set equal to the value of a current motion vector variable and the motion prediction is output by the routine of FIG. 15.

If the motion compensation type is type 2, in block 546 a first motion vector prediction variable is set equal to the REG 16×16 FRM_P1 variable. The REG 16×16 FRM_P1 variable is changed to the value of a current motion vector variable (P1) in block 548. In block 550, a second motion vector prediction variable is set equal to the REG 16×16 FRM_P2 variable. In block 532, the REG 16×8 FRM_P2 variable is set equal to the value of a current motion vector variable (P2) and the motion prediction is output by the routine of FIG. 15.

If the motion compensation type is type 3, then as first motion vector prediction variable is set equal to the REG 16×8 FLD_P1 variable in block 554. In block 556, the REG 16×8 FLD_P1 variable then is set equal to a current motion vector (P1) variable. In block 558 a second motion vector prediction variable is set equal to the REG 16×8 FLD_P2 variable. The REG 16×8

FLD_P2 variable then is set equal to the value of a current motion vector (P2) variable in block 560 and the motion vector prediction is output by the routine of FIG. 15. An error condition is identified in block 561 in a situation where it is determined that the motion compensation type is not one of the three permitted types in FIG. 15.

FIG. 16 is a flow chart illustrating motion vector prediction for B-pictures. A new macroblock is obtained in block 562. A determination is made in block 564 as to whether this is the first macroblock in a slice. If it is the first macroblock in a slice, a list of variables stored in register identified in block 566 is initialized to zero. After the operation of block 566, the routine of FIG. 16 proceeds to the input of block 568. If the macroblock is not the first macroblock in a slice, as determined in block 564, then the output of block 564 is directly connected to the input of block 568.

Block 568 determines if this an inter macroblock. If it is no an inter macroblock, block 570 initializes a list of variables stored in registers identified in block 570 to zero and the routine of FIG. 16 returns to the input of block 562. If block 568 determines that this is an inter macroblock, then blocks 572, 574, 576, 578, 580, 582, and 584 determine whether the motion compensation type is one of seven possible types.

If the motion compensation type is type 1 for B-pictures, block 586 sets a motion vector prediction variable equal to the variable REG 16×16 FRM_P. Block 588 then sets the REG 16×16 FRM_P variable to be equal to a current motion vector variable (P) and the motion vector prediction is output by the routine of FIG. 16.

If the motion compensation type is type 2 for B-pictures, block 590 sets a motion vector prediction variable equal to the REG 16×16 FRM_N variable. Block 592 sets the REG 16×16 FRM_N variable to the value of a current motion vector variable (N) and the motion vector prediction is output by the routine of FIG. 16.

If the motion compensation type is type 3 for B-pictures, block 594 sets a first motion vector prediction variable to the value of the REG 16×16 FRM_P variable. Block 596 then sets a current motion vector (P) variable to the value of the REG 16×16 FRM_P variable.

Block 598 sets a second motion vector prediction variable equal to the REG 16×16 FRM_N variable. Block 600 then sets the value of the REG 16×16 FRM_N to the value of a current motion vector variable (N) and the motion vector predictions are output by the routine of FIG. 16.

If the motion compensation type is type 4 for B-pictures, block 602 sets a first motion vector prediction variable equal to the REG 16×8 FRM_P1 variable. Block 604 changes the value of the REG 16×8 FRM_P1 variable to the value of a current motion vector (P1) variable. Block 606 sets a second motion vector prediction variable to the value of the REG 16×8 FRM_N2 variable. Block 608 changes the value of the REG 16×8 FRM_N2 variable to the value of a current motion vector (N2) variable and the motion vector predictions are output by the routine of FIG. 16.

If the motion compensation type is type 5 for B-pictures, block 610 sets a first motion vector prediction variable to be equal to the REG 16×8 FRM_N1 variable. Block 612 changes the value of the REG 16×8 FRM_N1 variable to the value of a current motion vector (N1) variable. Block 614 sets the value of a second motion vector prediction variable to be equal to the

5,227,878

27

28

value of the REG 16×8 FRM_P2 variable. Block 616 then changes the value of the REG 16×8 FRM_P2 variable to the value of a current motion vector (P2) variable and the motion vector prediction are output by the routine of FIG. 16.

If the motion compensation type is type 6 for B-pictures, block 618 sets the value of a first motion vector prediction variable to the value of the REG 16×8 FLD_P1 variable. Block 620 changes the value of the RE 16×8 FLD_P1 variable to the value of a current motion vector (P1) variable. Block 622 sets the value of a second motion vector prediction variable to be equal to the value of the REG 16×8 FLD_N2 variable. Block 624 changes the value of the REG 16×8 FLD_N2 variable to the value of a current motion vector (N2) variable and the motion vector predictions are output by the routine of FIG. 16.

If the motion compensation type is type 7 for B-pictures, block 626 sets the value of a first motion vector prediction variable to the value of the REG 16×8 FLD_N1 variable. Block 628 changes the value of the REG 16×8 FLD-N1 variable to be equal to the value of a current motion vector (N1) variable. Block 630 sets the value of a second motion vector prediction variable to be equal to the value of the REG 16×8 FLD_P2 variable. Block 632 changes the value of the REG 16×8 FLD_P2 variable to be the same as the value of a current motion vector (P2) variable and the motion vector predictions are output by the routine of FIG. 16.

If the routine of FIG. 16 determines that the motion compensation type is not one of the seven permitted types, the routine of FIG. 16 identifies an error condition in block 634.

A summary of the syntactical details of this example of the invention are shown below:

### Sequence Header

sequence_header_code
horizontal_size
vertical_size
pel_aspect_ratio
picture_rate
bit_rate
intra_frame_quantizer_matrix [64]
intra_field_quantizer_matrix [64]
nonintra_frame_quantizer_matrix [64]
nonintra_field_quantizer_matrix [64]
mscale [64]

### Group-of-Pictures Layer

group_start-code
time_code
closed_gap
broken_link

### Picture Layer

picture_start_code
temporal_reference
picture_coding_type
full_pel_forward_vector (for P- and B-pictures)
forward_f (for P- and B-picture)
full_pel_backward_vector (for B-pictures)
backward_f (for B-pictures)

### Slice Layer

slice_start_code
quantization_parameter

### Macroblock Layer in Intra Coded MBs

macroblock_type
quantization_parameter (5 bits)
vlc_select (2 bits)

### Macroblock Layer in Predictive-Coded MBs

macroblock_type
motion_horizontal_forward
motion_vertical_forward
macroblock_code_nocode (1 bit)
quantization_parameter (5 bits, sent when macroblock-_code_nocode is "1")
vlc_select (2 bits, sent when macroblock-_code_nocode is "1")

### Macroblock Layer in Bidirectionally Predictive-Coded MBs

macroblock_type
motion_horizontal_forward
motion_vertical_forward
motion_horizontal_backward
motion_vertical_backward
macroblock_code_nocode (1 bit)
mscale_addr (2 bits, sent when macroblock-_code_nocode is "1")
coded_block_pattern (sent when macroblock-_code_nocode is "1")

### Block Layer in Intra-Coded MBs

dct_dc_size
dct_dc_differential
dct_coeff_next
end_of_block (codeword depends on the codebook used)

### Block Layer in Non Intra Coded MBs

dct_coeff_first
dct_coeff_next
end_of_block (in P-pictures, codeword depends on the codebook used)

The entire set of macroblock modes for all three picture types is listed in Table 1 below.

#### TABLE I

| VLC TABLES FOR MACROBLOCK TYPES | | | | |
|---|---|---|---|---|
| macroblock_type in I-pictures: | | | | |
| 1 | 1 | Intra | , | frame-code |
| 2 | 01 | Intra | , | field-code |
| macroblock_type in P-pictures: | | | | |
| 1 | 10 | 16×8 | frame-MC, | frame-code |
| 2 | 11 | 16×8 | field-MC, | frame-code |
| 3 | 01 | 16×16 | frame-MC, | frame-code |
| 4 | 0010 | 16×8 | frame-MC, | field-code |
| 5 | 0011 | 16×8 | field-MC, | field-code |
| 6 | 0001 | 16×16 | frame-MC, | field-code |
| 7 | 00001 | Intra | , | field-code |
| 8 | 000001 | Intra | , | frame-code |
| macroblock_type in B-pictures: | | | | |
| 1 | 10 | 16×16 | frame-MCbdr, | field-code |
| 2 | 11 | 16×16 | frame-MCbdr, | frame-code |
| 3 | 010 | 16×16 | frame-MCb, | frame-code |
| 4 | 011 | 16×16 | frame-MCb, | field-code |
| 5 | 0010 | 16×16 | frame-MCf, | field-code |
| 6 | 0011 | 16×16 | frame-MCf, | frame-code |
| 7 | 00010 | 16×8 | frame-MCbf, | frame-code |
| 8 | 00011 | 16×8 | field-MCfb, | frame-code |
| 9 | 000010 | 16×8 | frame-MCfb, | frame-code |
| 10 | 000011 | 16×8 | field-MCbf, | frame-code |
| 11 | 0000010 | 16×8 | field-MCfb, | field-code |
| 12 | 0000011 | 16×8 | frame-MCbf, | field-code |

29

TABLE I-continued

| | | VLC TABLES FOR MACROBLOCK TYPES | | |
|---|---|---|---|---|
| 13 | 00000010 | 16×8 | field-MCbf, | field-code |
| 14 | 00000011 | 16×8 | frame-MCfb, | field-code |
| 15 | 000000010 | Intra | , | frame-code |
| 16 | 000000011 | Intra | , | field-code |

In a fully automated one-pass encoder, the delay incurred by the encoding process is 2 to 3 picture periods. The delay at the decoder is 1 to 2 picture periods (not counting any postprocessing delays). However, the encoder and decoder buffers introduce a significantly greater delay of 0.5 seconds. The total code delay is thus 0.65 to 0.7 seconds.

30

I-pictures provide access points roughly every 0.4 seconds. Beginning with the I-picture, the other pictures in the GOP can be decoded as necessary to obtain the desired picture from the bit stream.

Fast forward and reverse enabled by having regularly spaced I-pictures.

The basic feature of our proposal have been presented, with all its syntactical details.

## APPENDIX

The following appendix is an example of computer code written in the C programming language which may be used to create a working example of this invention on a programmed digital computer.

```
/*
Atul Puri
Copyright ATxx... ...
Sept 1991

mecale.c

Example of a code segment used for MSCALE quantization of B-frames
*/

if (mean_hdr->step_mac[y_index][x_index] != 0)
{
    if ((*ptr_type_prb == 4) || (*ptr_type_prb == 5))
    {
        tmpscalof = gntpar->scaleb_mac*mean_hdr->step_mac[y_index][x_index];
        ratiof = tmpscalof/((float) dim_step); /* dim_step is default */
        min_ind = 9;
        min_vaif = 1000.0;
        for (x=0; x < 4; x++)
        {
            diff = ratiof - gntpar->macaleb[x];
            absdiff = fabs(diff);
            if (absdiff < min_vaif)
            {
                min_ind = x;
                min_vaif = absdiff;
            }
        }
        if (min_ind == 9)
        {
            fprintf(stderr, "in quant3..INTERP frame, error in MSCALE computation...quitting\n");
            exit(0);
        }
        round_even(gntpar->macaleb[min_ind]*dim_step, &gntpar->step_size);
    }
    else
    {
        tmpscalof = gntpar->scaleimg_mac*mean_hdr->step_mac[y_index][x_index];
        ratiof = tmpscalof/((float) dim_step); /* dim_step is default */
        min_ind = 9;
        min_vaif = 1000.0;
        for (x=0; x < 4; x++)
        {
            diff = ratiof - gntpar->macaleb[x];
            absdiff = fabs(diff);
            if (absdiff < min_vaif)
            {
                min_ind = x;
                min_vaif = absdiff;
            }
        }
        if (min_ind == 9)
        {
            fprintf(stderr, "in quant3..INTERP frame, error in MSCALE computation...quitting\n");
            exit(0);
```

```
            round_even(qntpar->mscalep[min_ind]*dis_step, &qntpar->qstep_size);
        }
        *mscale_ind = min_ind;
    else

        /* no coding stay with default */

        if (qntpar->qstep_size > 62)
            qntpar->qstep_size = 62;
    }
}
```

```
/*--------------------------------------------------------------------*/
/*  Atul Puri
    Copyright AT&T Bell Labs
    Sept 1991

    vlc_coeff_adap.c

    Adaptive VLC coding of coefficients and Intra DC prediction

*/
/*--------------------------------------------------------------------*/
#include <stdio.h>
#include <math.h>
#include "zzz.h"

/* VLTBL10 and VLTBL11: EOB 2-bits */

static int vltbl10[32][40] = {
```



5,727,976

35      36

```
,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20},
,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20},
,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20},
,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20},
,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20},
... [dense array data] ...
```

/*vltbl11~vltbl0 */
static int vltbl11[32][40] ={
```
{ 3, 5, 6, 7, 9, 9,11,11,13,13,13,14,14,16,17,17,20,20,...
{ 4, 6, 7, 9,11,13,14,16,16,17,20,...
...
{17,20,20,20,20,20,20,20,20,20,20,20,...
```

/* VLTBL12: EOB 3-bits */
static int vltbl2[32][40] ={
```
{ 3, 4, 4, 6, 6, 7, 8, 9, 9, 9,11,11,11,13,13,13,13,14,14,14,14,15,15,15,15,15,16,16,16,16,16,17,17},
```

```c
/* VLTBL13: EOB 4-bits */
static int vltbl13[32][40] = {
```

```
[15, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20],
[15, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20],
[15, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20],
[15, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20],
[16, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20],
[16, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20],
[17, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20],
[17, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20],
};

/* VITBLP0 and VITBLP1 EOB 2-bits */
static int vitblp[32][40] ={
{3, 5, 7, 9, 11, 13, 13, 13, 14, 14, 15, 20, 20, 20, 20, 20, 20, 20, 20, 20},
{4, 6, 11, 13, 14, 16, 16, 16, 17, 17, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20},
{6, 9, 13, 14, 16, 17, 17, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20},
{7, 11, 13, 14, 16, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20},
{7, 11, 13, 14, 17, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20},
{8, 14, 16, 17, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20},
{8, 14, 17, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20},
{9, 17, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20},
{9, 17, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20},
{13, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20},
{13, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20},
{13, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20},
{13, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20},
{15, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20},
{15, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20},
{16, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20},
{17, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20},
{17, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20},
};

/* vitblp1 - vltbl10 */
static int vitblp1[32][40] ={
{3, 4, 5, 6, 7, 8, 9, 9, 11, 11, 13, 13, 14, 14, 15, 15, 15, 16, 16, 16, 16, 16, 17, 17, 17},
{5, 7, 9, 11, 11, 13, 14, 16, 16, 16, 17, 17, 20, 20, 20, 20, 20, 20, 20, 20},
{6, 9, 11, 13, 14, 16, 17, 17, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20},
{7, 11, 13, 14, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20, 20},
```

```c
/* VLTBLP2: BOB 3-bits */
static int vltblp2[32][40]={
```

```c
{15,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20},
{15,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20},
{15,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20},
{16,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20},
{16,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20},
{17,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20},
{17,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20},
};

/* VLTBLP3: EOB 4-bits */

static int vltblp3[32][40]={
{ 3, 4, 6, 7, 9,11,13,14,16,17,20,20,20,20,20,20,20,20,20,20},
{ 5, 6, 9,11,13,14,16,17,20,20,20,20,20,20,20,20,20,20,20,20},
{ 6, 9,11,13,14,16,17,20,20,20,20,20,20,20,20,20,20,20,20,20},
{ 7,11,13,14,16,17,20,20,20,20,20,20,20,20,20,20,20,20,20,20},
{ 8,14,17,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20},
{ 9,17,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20},
{ 9,17,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20},
{11,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20},
{13,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20},
{13,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20},
{13,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20},
{15,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20},
{16,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20},
{17,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20},
{17,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20,20},
};

static int vlc_dcdif_lum[9] = {3, 2, 2, 3, 3, 4, 5, 6, 6};
static int vlc_dcdif_chr[9] = {2, 2, 2, 3, 4, 5, 6, 7, 7};
```

```
vlc_2d2_adap(source, step_size, n_points, n_bits, parameter, type_macro, type_pnb_macro, block_index, index, mean_hdr, qntpar, error)
short  *source;
int    *step_size;                  /* Pointer to source data to be VLC'd. INPUT */
int    *type_macro;                 /* Pointer to step size used by the quantizer routine. INPUT */
int    *type_pnb_macro;
int    n_bits[4];                   /* Number of bits used to code the coefficients. OUTPUT */
int    n_points;
int    block_index, index;          /* Number of coefficients to be coded in SOURCE. INPUT */
struct codec  *parameter;
struct q_stat  *qntpar;
struct mean_mac  *mean_hdr;
int    *error;
{

       int    qnt_index;
       int    f_co, jk, level, cnt, run, rr, newl;
       int    sign;
       int    weight;                /* Used to store the sign of the current source value if truncation is required */

float  P_ind;
int    max_coeff_blk;
int    stepfarr[64];
int    *ptr_type, *ptr_type_pnb;

int    dc_prediction;
int    do_dif, size;

int    itmp, jtmp;
FILE   *file_pointer;
int    first-1;
static int  hist_amprun[64][32];
static int  gof_id, seglen_id, frame_id;
int    search_id, range_id, intp_id, prevme_id, origmc_id, fracmc_id;
float  avg_pred;
float  avg_pred;
int    tmp_mac_index;
int    u_ulimit;
short  *ptr_source;

max_coeff_blk = 64;

for (u=0; u < 4; u++)
    {
    n_bits[u] = 0;
    }

cnt = 0;
ptr_type = type_macro + block_index;
ptr_type_pnb = type_pnb_macro + block_index;

tmp_mac_index = block_index/6;

for(i=0;i(n_points;i++)
    {
```

```
/*-------------RESET SIGN-------------*/
sign = 0;

/*-------------LOAD STEP SIZE-------------------------------------------------*/
if ((*ptr_type == 1) && (1 == 0))    /* DC COEF of INTRA */
    {
    steparr[1] = 8;
    }
else
    {
    steparr[1] = *step_size;
    }

/*-------------LOAD WEIGHT OF STEP-------------------------------------------*/
if ((parameter->JPEG_QUANT==2) || ((parameter->JPEG_QUANT==1) && (*ptr_type==1)))
    {
    if ((index >= 0) && (index < 4))
        {
        weight = parameter->weight_zig_lum[1];
        }
    else
        {
        weight = parameter->weight_zig_chr[1];
        }
    }
else   /* (JPEG_QUANT==0) || (JPEG_QUANT==1 && *ptr_type==0) */
    {
    if (parameter->ENABLE_MATRIX)
        {
        weight = parameter->weight_zig_alt[1];
        }
    else
        {
        weight = 16;
        }
    }

/*-------------PROCESS RECONST'S-------------------*/
if ((*ptr_type == 1) && (1 == 0))              /* If Intra Block DC coef */
    {
    qnt_index = *source/steparr[1];
    if ((qnt_index < 0) || (qnt_index > 255))
        exit(-1);
    }
else                                            /* Non DC coef INTRA, any coef INTER */
    {
    if (*source == 0)                           /* ZERO source */
        qnt_index = 0;
    else                                        /* NonZERO source */
```

```c
if (*source < 0)
{
    sign = 1;
    *source = - *source;
}

if (ptr_type == 1)
{
    if (parameter->JPEG_QUANT==1 || parameter->JPEG_QUANT==2)     /* Non DC coef INTRA */
        p_ind = 0.833;
    else                                                          /* CCITT */
        p_ind = 0.0;
}
else
{
    if (parameter->JPEG_QUANT==2)                                 /* Real JPEG */
        p_ind = 1.0;
    else                                                          /* Pseudo JPEG and CCITT */
        p_ind = 0.0;
}

quant_for(*source, &qnt_index, steparr[i]/2, weight, p_ind, parameter, error);

/* ENSURE LIMITS OF QUANT INDEX */
if(qnt_index < 0 )
{
    exit(-1);
}

if ((*ptr_type == 1) && (i == 0))
{
    if (parameter->JPEG_QUANT)
    {
        if ((index >= 0) && (index < 4))                          /* LUM BLOCK */
        {
            /* reset prediction at start of slice in quant3.c */
            if (((tmp_mac_index%45) == 0) || (*(ptr_type-6) != 1))  /* first macro of slice, prev macro non-intra*/
                if ((index==0) || (index==1))
                    dc_prediction = mean_hdr->dc_pred_ltop;
```



```
            mean_hdr->dc_pred_ltop = qnt_index;
            if (index == 0)
            {
                mean_hdr->dc_pred_lbot = mean_hdr->dc_pred_ltop;
            }
        }
        else
        {
            dc_prediction = mean_hdr->dc_pred_lbot;
            mean_hdr->dc_pred_lbot = qnt_index;
        }
    }
    if ( *ptr_type_pnb == *(ptr_type_pnb-6) )
    {
        if ((index == 0) || (index == 1))
        {
            dc_prediction = mean_hdr->dc_pred_ltop;
            mean_hdr->dc_pred_ltop = qnt_index;
        }
        else
        {
            dc_prediction = mean_hdr->dc_pred_lbot;
            mean_hdr->dc_pred_lbot = qnt_index;
        }
    }
    else
    {
        if ((index == 0) || (index == 1))
        {
            if (index == 0)
            {
                avg_pred = ((float)(mean_hdr->dc_pred_ltop + mean_hdr->dc_pred_lty))/2
                round(avg_pred,&avg_pred);
                mean_hdr->dc_pred_ltop = avg_pred1;
            }
            dc_prediction = mean_hdr->dc_pred_ltop;
            mean_hdr->dc_pred_ltop = qnt_index;
            if (index == 0)
            {
                mean_hdr->dc_pred_lbot = mean_hdr->dc_pred_ltop;
            }
        }
        else
        {
            dc_prediction = mean_hdr->dc_pred_lbot;
            mean_hdr->dc_pred_lbot = qnt_index;
        }
    }
}
else
{
```

```
          if (index == 4)
            {
              dc_prediction = mean_hdr->dc_pred_cb;         /* CHR BLOCK */
              mean_hdr->dc_pred_cb = qnt_index;
            }
          if (index == 5)
            {                                              /* CHR BLOCK */
              dc_prediction = mean_hdr->dc_pred_cr;
              mean_hdr->dc_pred_cr = qnt_index;
            }

          mean_hdr->dc_predictor[index] = dc_prediction;  /* Note....used in vlc_2d2adap_bits_()...only.... */
          dc_dif = qnt_index - dc_prediction;
          size_dc_dif(dc_dif, &size, parameter, error);

          if ((index >= 0) && (index < 4))                  /* LUM BLOCK */
            {
              n_bits[0] = n_bits[1] = n_bits[2] = n_bits[3] = (size + vlc_dcdif_lum[size]);
            }
          else                                              /* CHR BLOCK */
            {
              n_bits[0] = n_bits[1] = n_bits[2] = n_bits[3] = (size + vlc_dcdif_chr[size]);
            }
        }
    }
  else
    {
      /* COMPUTE RUN */
      level = qnt_index;
      if ((1 == 0) && (level != 0))
        {
          run = 0;
        }
      else
        {
          if (level == 0)
            cnt++;
          else
            {
              run = cnt;
              cnt = 0;
            }
        }

      /* 2D VLC CODE (RUN, LEVEL) using all 4 tables   */
      if (qntpar->intra_frm == 1)
        ulimit = 7;
      else if (qntpar->pred_frm == 1)
        ulimit = 4;
      else if (qntpar->intrp_frm == 1)
        ulimit = 1;

      for (u=0; u < ulimit; u++)
        if (level != 0)
```

```
if ((((level >= 1)&&(level <= 40)) && ((run >= 0)&&(run <= 31)))
{
  switch (u)
  {
    case 0:
    {
      if (qntpar->intra_frm == 1)
        n_bits[0] += vltbl0[run][level-1];
      else if (qntpar->pred_frm == 1)
        n_bits[0] += vltblp0[run][level-1];
      else if (qntpar->intp_frm == 1)
        n_bits[0] += vltblp0[run][level-1];
      break;
    }
    case 1:
      if (qntpar->intra_frm == 1)
        n_bits[1] += vltbl1[run][level-1];
      else if (qntpar->pred_frm == 1)
        n_bits[1] += vltblp1[run][level-1];
      break;
    case 2:
      if (qntpar->intra_frm == 1)
        n_bits[2] += vltbl2[run][level-1];
      else if (qntpar->pred_frm == 1)
        n_bits[2] += vltblp2[run][level-1];
      break;
    case 3:
      if (qntpar->intra_frm == 1)
        n_bits[3] += vltbl3[run][level-1];
      else if (qntpar->pred_frm == 1)
        n_bits[3] += vltblp3[run][level-1];
      break;
  }
}
else
{
  if (((level > 40)&&(level <=128)) || ((run > 31)&&(run <=63)))
  {
    switch (u)
    {
      case 0:
        n_bits[0] += 20;
        break;
      case 1:
        n_bits[1] += 20;
        break;
      case 2:
        n_bits[2] += 20;
        break;
      case 3:
        n_bits[3] += 20;
        break;
    }
}
```

```
/*------------------------------------------------------------------*/

    Atul Puri
    Copyright AT&T Bell Labs
    Sept 1991

    load_qntpar.c

    Loads Inter/Intra matrices and MSCALE parameters

/*------------------------------------------------------------------*/

#include <stdio.h>
#include "zzz.h"

load_qntpar(qntpar, error)
struct q_str *qntpar;
int     *error;
{
    register int    i;
    FILE *fp_qntpar;

    /* open qnt file to read quant. parameters */
    if ((fp_qntpar = fopen("qntpar_file", "r")) == NULL)
    {
        fprintf(stderr, "In LOAD_QNTPAR.....unable to open qntpar_file....quitting..!\n");
        exit(0);
    }

    /* Read jpeg_lum_frm[] and jpeg_lum_fld[], weighting matrix for INTRA, frame and field blocks */
    for (i=0; i < 64; i++)
    {
        fscanf(fp_qntpar, "%d", &qntpar->jpeg_lum_frm[i]);
    }
    for (i=0; i < 64; i++)
    {
        fscanf(fp_qntpar, "%d", &qntpar->jpeg_lum_fld[i]);
    }

    /* copy jpeg_lum_frm[] matrix to jpeg_chr_frm[] and jpeg_lum_fld[] matrix to jpeg_chr_fld[] */
    for (i=0; i < 64; i++)
    {
        qntpar->jpeg_chr_frm[i] = qntpar->jpeg_lum_frm[i];
        qntpar->jpeg_chr_fld[i] = qntpar->jpeg_lum_fld[i];
    }

    /* Read ccit_alt_frm[] and ccit_alt_fld[], weighting matrices for NON-INTRA, frame and field blocks */
    for (i=0; i < 64; i++)
    {
        fscanf(fp_qntpar, "%d", &qntpar->ccit_alt_frm[i]);
    }
    for (i=0; i < 64; i++)
    {
        fscanf(fp_qntpar, "%d", &qntpar->ccit_alt_fld[i]);
    }

    /* Read mscale[] and mscalep[], local scale factors for mquant of INTP frames */
    for (i=0; i < 4; i++)
    {
        fscanf(fp_qntpar, "%f", &qntpar->mscale[i]);
    }
    for (i=0; i < 4; i++)
```

```c
            fscanf(fp_qntpar, "%f", &qntpar->mscalsp[11]);
        }

/* Read scalsb_mac and scalsp_mac, global scale factors for mquant of INTP frames */
fscanf(fp_qntpar, "%f", &qntpar->scalsb_mac);
fscanf(fp_qntpar, "%f", &qntpar->scalsp_mac);

/* Read step_vari[] and var_inti[]. step sizes and variance thresholds corresponding to activity classes for INTRA frame */
for (i=0; i < 8; i++)
{
        fscanf(fp_qntpar, "%d", &qntpar->step_vari[i]);
}
for (i=0; i < 8; i++)
{
        fscanf(fp_qntpar, "%d", &qntpar->var_inti[i]);
}

/* Read step_varp[] and var_intp[]. step sizes and variance thresholds corresponding to activity classes for PRED frame */
for (i=0; i < 8; i++)
{
        fscanf(fp_qntpar, "%d", &qntpar->step_varp[i]);
}
for (i=0; i < 8; i++)
{
        fscanf(fp_qntpar, "%d", &qntpar->var_intp[i]);
}

/* close qntpar file */
fclose (fp_qntpar);


#include <stdio.h>
#include "zzz.h"

vlc_mvadap_pred (vel_map_adap, index, type_pmb, parameter, mv_bits)

int     *vel_map_adap;
int     index;
struct codec *parameter;
int     *type_pmb;
int     *mv_bits;
{
int     mod, quo;
int     low, high, range, tmp_diff;
int     i, n_points;
int     dist;
int     *ptr_vec;
int     *ptr_type;
int     curr_vec_pxl, curr_vec_pyl, curr_vec_px2, curr_vec_py2, diff_vec, macros_in_slice;

int     MV_INT;

static  int first = 1;
static  FILE *p_coutil;

static  int reg_16x16frm_px,   reg_16x16frm_py;
static  int reg_16x8frm_px1,   reg_16x8frm_py1,   reg_16x8frm_py2;
static  int reg_16x8fld_px1,   reg_16x8fld_py1,   reg_16x8fld_py2;
```

```
macros_in_slice = 45;
*mv_bits = 0;

ptr_vec = vol_map.mdse + 4*index;
ptr_type = type_mb + index;

curr_vec_px1 = *ptr_vec;
curr_vec_py1 = *(ptr_vec + 1);

curr_vec_px2 = *(ptr_vec + 3);
curr_vec_py2 = *(ptr_vec + 3);

/* "dist" is now indicated by "forward_2" .... */
dist = parameter->forward_2;
if (dist < 1)
{
    fprintf (stderr, "vlc_mv1_pred: dist %d too small. STOP\n", dist) ;
    exit (-1);
}

if( (index % macros_in_slice) == 0)
{
    reg_16x16frm_px = reg_16x16frm_py = 0;
    reg_16x8frm_px1 = reg_16x8frm_py1 = reg_16x8frm_px2 = reg_16x8frm_py2 = 0;
    reg_16x8fld_px1 = reg_16x8fld_py1 = reg_16x8fld_px2 = reg_16x8fld_py2 = 0;
}

/* Begin MV processing ... */
switch (ptr_type)
{
case 0:
case 1:
    diff_vec = curr_vec_px1 - reg_16x16frm_px;
    mv_send (diff_vec, dist, mv_bits, parameter->symbits_ind);
    diff_vec = curr_vec_py1 - reg_16x16frm_py;
    mv_send (diff_vec, dist, mv_bits, parameter->symbits_ind);
    reg_16x16frm_px = curr_vec_px1;
    reg_16x16frm_py = curr_vec_py1;
    break;

case 2:
case 3:
    diff_vec = curr_vec_px1 - reg_16x8frm_px1;
    mv_send (diff_vec, dist, mv_bits, parameter->symbits_ind);
    diff_vec = curr_vec_py1 - reg_16x8frm_py1;
    mv_send (diff_vec, dist, mv_bits, parameter->symbits_ind);
    diff_vec = curr_vec_px2 - reg_16x8frm_px2;
    mv_send (diff_vec, dist, mv_bits, parameter->symbits_ind);
    diff_vec = curr_vec_py2 - reg_16x8frm_py2;
    mv_send (diff_vec, dist, mv_bits, parameter->symbits_ind);
    reg_16x8frm_px1 = curr_vec_px1;
    reg_16x8frm_py1 = curr_vec_py1;
    reg_16x8frm_px2 = curr_vec_px2;
    reg_16x8frm_py2 = curr_vec_py2;
    break;

case 4:
case 5:
    diff_vec = curr_vec_px1 - reg_16x8fld_px1;
    mv_send (diff_vec, dist, mv_bits, parameter->symbits_ind);
    diff_vec = curr_vec_py1 - reg_16x8fld_py1;
    mv_send (diff_vec, dist, mv_bits, parameter->symbits_ind);
    diff_vec = curr_vec_px2 - reg_16x8fld_px2;
```

65                    5,227,878                    66

```
    mv_amed (diff_vec, dist, mv_bits, parameter->symbits_ind);
    diff_vec = curr_vec_px2 - reg_16x8fld_px2;
    mv_amed (diff_vec, dist, mv_bits, parameter->symbits_ind);
    reg_16x8fld_px1 = curr_vec_px1;
    reg_16x8fld_py1 = curr_vec_py1;
    reg_16x8fld_px2 = curr_vec_px2;
    reg_16x8fld_py2 = curr_vec_py2;
    break;

case 6:
case 7:   reg_16x16frm_px = reg_16x16frm_py = 0;
          reg_16x8fld_px1 = reg_16x8frm_py1 = reg_16x8frm_px2 = reg_16x8frm_py2 = 0;
          reg_16x8fld_px1 = reg_16x8fld_py1 = reg_16x8fld_px2 = reg_16x8fld_py2 = 0;
          mv_bits += 0;
          break;

default: fprintf(stderr, "in VLC_MVADAP...illegal ptr_type=%d...quitting.\n", ptr_type);
         exit(0);
         }

    terminate:;
}

#include <math.h>
#include <stdio.h>
#include "xzz.h"
#include "mgalloc.h"

mot_pred_adap(prev_frm, curr_frm, pred_frm, vel_map, prev_map, vel_map_frmsub, vel_map_fldsub, type_mvadap, parameter)
short    *prev_frm;
short    *curr_frm;
short    *pred_frm;
int      *vel_map;
int      *vel_map_frmsub;
int      *vel_map_fldsub;
int      type_mvadap;
struct codec *parameter;

{
register  int i,j,k,m,n;
int       x_blocks, y_blocks, blocks_in_frm;
int       mot_bl_size;

int       prev_frm_x, prev_frm_y;
int       curr_frm_x, curr_frm_y;

int       *ptr_x_vec;
int       *ptr_y_vec;

short     *curr_array, **prev_fld0, *prev_fld1;

short     **prev_blint, **prev_blint_fld0, **prev_blint_fld1;

int       lum_ind;

short     framsbik[16][16], fldsbik[8][16], fldbik[8][16];

float     newflt;

int       l, temp_diff, min_ind, sum_sqdif;
int       count_frmsac_mac, count_frmsub_mac, count_fldsub_mac;
```

```c
float    avg_mqdif[3], ref0, ref2, T0, T2;

short    predblk[3][16][16];

count_frmmac_mac = count_fldsub_mac = 0;

for (i=0;i<y_blocks;i++)                    /* do for all y blocks */
    {for (j=0;j<x_blocks;j++)               /* do for all x blocks */
    {
/*---------------- STEP 1.         PREDICT 16x16 FRAME BLOCK ----------------*/
/*--------------------------------------------------------------------------*/

         ptr_x_vec = vel_map;
         ptr_y_vec = vel_map + 1;

    curr_frm_x = {*mot_bl_size;
    curr_frm_y = {*mot_bl_size;

    if (parameter->MOT_EST_FRAC)
        {
        prev_frm_x = 2*curr_frm_x + {*ptr_x_vec);
        prev_frm_y = 2*curr_frm_y + {*ptr_y_vec);

    for (s = 0; s < 2*mot_bl_size; s += 2)
        {for (p = 0; p < 2*mot_bl_size; p += 2)
            {
            predblk[0][s/2][p/2] = prev_blint[s + prev_frm_y][p + prev_frm_x];
            }
        }
    }

    else
        {
        /* INTEGER PEL MOT COMP */
        {
        prev_frm_x = curr_frm_x + {*ptr_x_vec);
        prev_frm_y = curr_frm_y + {*ptr_y_vec);

    for (s = 0; s < mot_bl_size; s++)
        {for (p = 0; p < mot_bl_size; p++)
            {
            predblk[0][s][p] = prev_blint[s + prev_frm_y][p + prev_frm_x];
            }
        }
    }

    vel_map++;
    vel_map++;

    for (k=0; k < 2; k++)
        {
/*---------------- STEP 2.         PREDICT 16x8 FRAME BLOCK ----------------*/
/*--------------------------------------------------------------------------*/

         ptr_x_vec = vel_map_frmsub;
         ptr_y_vec = vel_map_frmsub + 1;

    curr_frm_x = {*mot_bl_size;
    curr_frm_y = {*mot_bl_size + k*mot_bl_size/2;
```

```
if (parameter->MOT_EST_FRAC)
   {
   prev_frm_x = 2*curr_frm_x + (*ptr_x_vec);
   prev_frm_y = 2*curr_frm_y + (*ptr_y_vec);

   for (s = 0; s < 2*mot_bl_size/2; s += 2)
      {
      for (p = 0; p < 2*mot_bl_size; p += 2)
         {
         predblk[1][s/2, k*mot_bl_size/2][p/2] = prev_blint[s + prev_frm_y][p + prev_frm_x];
         }/* end for p */
      }/* end for s */
   }

else
   {
   prev_frm_x = curr_frm_x + (*ptr_x_vec);
   prev_frm_y = curr_frm_y + (*ptr_y_vec);

   for (s = 0; s < mot_bl_size/2; ++s)
      {
      for (p = 0; p < mot_bl_size; ++p)
         {
         predblk[1][s + k*mot_bl_size/2][p] = prev_array[s + prev_frm_y][p + prev_frm_x];
         }/* end for p */
      }/* end for s */
   }

vel_map_frmsub++;
vel_map_frmsub++;

//============================================
//                STEP 3.           PREDICT 16x8 FIELD BLOCK
//============================================

ptr_x_vec = vel_map_fldsub;
ptr_y_vec = vel_map_fldsub + 1;

curr_frm_x = {*mot_bl_size;
curr_frm_y = {*mot_bl_size/2;

if (parameter->MOT_EST_FRAC)
   {
   prev_frm_x = 2*curr_frm_x + (*ptr_x_vec);
   prev_frm_y = 4*curr_frm_y + (*ptr_y_vec);

   for (p = 0; p < 2*mot_bl_size; p += 2)
      {
      if (k == 0)
         {
         fldoblk[s/4][p/2] = prev_blint_fld0[s + prev_frm_y][p + prev_frm_x];
         }
      else
         {
         fldiblk[s/4][p/2] = prev_blint_fld1[s + prev_frm_y][p + prev_frm_x];
         }
      }
   }
```

```
        else
        {
            prev_frm_x = curr_frm_x + (*ptr_x_vec);
            prev_frm_y = 2*curr_frm_y + (*ptr_y_vec);

            for (s = 0; s < mot_bl_size; s += 2)
            {
                for (p = 0; p < mot_bl_size; ++p)
                {
                    if (k == 0)
                    {
                        fld0blk[s/2][p] = prev_fld0[s + prev_frm_y][p + prev_frm_x];
                    }
                    else
                    {
                        fld1blk[s/2][p] = prev_fld1[s + prev_frm_y][p + prev_frm_x];
                    }
                }
            }
        }
    }

    vel_map_fldnub++;
    vel_map_fldnub++;
    /*                                                                          */

}/* end for k, two field/frame split*/

for (s=0; s < mot_bl_size; s++)
{
    for (p=0; p < mot_bl_size; p++)
    {
        if (s%2 == 0)
        {
            predblk[2][s][p] = fld0blk[s/2][p];
        }
        else
        {
            predblk[2][s][p] = fld1blk[s/2][p];
        }
    }
}

/*::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::
  ::    STEP 4.       ADAPT BETWEEN THREE PREDICTIONS            ::
  ::                                                              ::
  ::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::*/

/* Step 4(a) compute all three differences */
curr_frm_x = {*mot_bl_size};
curr_frm_y = {*mot_bl_size};

for (i=0; i < 3; i++)
{
    sum_sqdif[i] = 0.0;
    sum_sqdif = temp_dif = 0;
    for (s=0; s < mot_bl_size; s++)
    {
        for (p=0; p < mot_bl_size; p++)
        {
            temp_dif = curr_array[s+curr_frm_y][p+curr_frm_x] - predblk[i][s][p];
            sum_sqdif += abs(temp_dif);
        }
    }
}
```

```c
        avg_sqdif[I] = sum_sqdif;
      }

/* Step 4(b) compare differences determine min_ind */
T0 = 1.0;
ref0 = ((float)avg_sqdif[0])/T0;

T2 = 1.0;
ref2 = ((float)avg_sqdif[2])/T2;

if ((avg_sqdif[1] < ref0) || (avg_sqdif[2] < ref0))
  {
  if (avg_sqdif[1] < ref2)
    {
    min_ind = 1;
    count_frmsub_mac++;
    }
  else
    {
    min_ind = 2;
    count_fldsub_mac++;
    }
  }

else
  {
  min_ind = 0;
  count_frmnc_mac++;
  }

/* Step 4(c) Transfers to prediction frame */
for (p=0; p < mot_bl_size; p++)
  {
  for (q=0; q < mot_bl_size; q++)
    {
    pred_frm = preablk[min_ind][q][p];
    pred_frm++;
    }
  }

/* Step 4(d) save mc adaptation info */
type_scanap = min_ind;
type_scanap++;
}/* end for i */
}/* end for j */

}

#include <math.h>
#include <stdio.h>
#include "zzz.h"

find_scanmode(type_pnb, mac_index, scanmode, parameter, qntpar, error)
int  *type_pnb;
int  mac_index;
int  *scanmode;
```

```
struct codec *parameter;
struct q_stat *qntpar;
{
    register int i,j,k,s,p,itmp;
    int       x_blocks, y_blocks, blocks_in_frm;
    int       mot_bl_size;
    int       *ptr_type;

    ptr_type = type_pnb + mac_index;

    if (qntpar->intra_frm == 1)
    {
        if ((*ptr_type >=0) && (*ptr_type < 2))
        {
            if ((*ptr_type % 2) == 0)           /* frame */
            {
                *scanmode = 2;
            }
            else                                /* field */
            {
                *scanmode = 3;
            }
        }
        else
        {
            fprintf(stderr,"In find_scanmode...illegal..type_pnb=%d for...intra picture..quitting\n", *ptr_type));
            exit(0);
        }
    }
    else if (qntpar->pred_frm == 1)
    {
        if ((*ptr_type >=0) && (*ptr_type < 8))
        {
            if ((*ptr_type % 2) == 0)           /* frame */
            {
                *scanmode = 2;
            }
            else                                /* field */
            {
                *scanmode = 3;
            }
        }
        else
        {
            fprintf(stderr,"In find_scanmode...illegal..type_pnb=%d for...Pred picture..quitting\n", *ptr_type));
            exit(0);
        }
    }
    else if (qntpar->intp_frm == 1)
```

```
        if ((*ptr_type >=0) && (*ptr_type < 16))
          if ((*ptr_type % 2) == 0)                /* frame */
            {
              *scanmode = 2;
            }
          else                                      /* field */
            {
              *scanmode = 3;
            }
        else
          {
            fprintf(stderr,"in find_scanmode...illegal..type_pnb=%d for...interp picture..quitting\n", *ptr_type);
            exit(0);
          }
}/* end find_scanmode */


#include <stdio.h>
#include "zzz.h"

vlc_mvadap_intp(vel_map_adap, index, type_pnb, parameter, mv_bits)
int     *vel_map_adap;
int     index;
struct codec *parameter;
int     *type_pnb;
int     *mv_bits;
{
  int   mod, quo;
  int   low, high, range, tmp_diff;
  int   i, n_points;
  int   dist ;
  int   *ptr_vec;
  int   *ptr_type;
  int   curr_vec_x1, curr_vec_y1, curr_vec_x2, curr_vec_y2, diff_vec, macron_in_slice;

  int   MV_LNT;

  static  int first = 1;
  static  FILE *p_coutil;

  static  int reg_16x16frm_px, reg_16x16frm_py;
  static  int reg_16x16frm_px1, reg_16x16frm_py1;
  static  int reg_16x8frm_px1, reg_16x8frm_py1, reg_16x8frm_px2, reg_16x8frm_py2;
  static  int reg_16x8fld_px1, reg_16x8fld_py1;
  static  int reg_16x8fld_px1, reg_16x8fld_py1, reg_16x8fld_px2, reg_16x8fld_py2;

  macron_in_slice = 45;
  *mv_bits = 0;
```

```c
ptr_vec = vel_map_adap * 4*index;
ptr_type = type_pnb + index;

curr_vec_x1 = *ptr_vec;
curr_vec_y1 = *(ptr_vec + 1);

curr_vec_x2 = *(ptr_vec + 2);
curr_vec_y2 = *(ptr_vec + 3);

/* Some checking ... */
dist = parameter->forward_f;
if( (dist < 1) || (dist > 6))
{
    fprintf (stderr, "vlc_mvadap_intp forward_f %d out of range. STOP\n", dist);
    exit (-1);
}

dist = parameter->backward_f;
if( (dist < 1) || (dist > 6))
{
    fprintf (stderr, "vlc_mvadap_intp: backward_f %d out of range. STOP\n", dist);
    exit (-1);
}

if( (index % macros_in_slice) == 0)
{
    reg_16x16frm_px = reg_16x16frm_py = 0;
    reg_16x16frm_nx = reg_16x16frm_ny = 0;
    reg_16x8frm_px1 = reg_16x8frm_py1 = reg_16x8frm_px2 = reg_16x8frm_py2 = 0;
    reg_16x8frm_nx1 = reg_16x8frm_ny1 = reg_16x8frm_nx2 = reg_16x8frm_ny2 = 0;
    reg_16x8fld_px1 = reg_16x8fld_py1 = reg_16x8fld_px2 = reg_16x8fld_py2 = 0;
    reg_16x8fld_nx1 = reg_16x8fld_ny1 = reg_16x8fld_nx2 = reg_16x8fld_ny2 = 0;
}

/* Begin MV processing ... */
switch (*ptr_type)
{

case 0:
case 1:   /* 16x16 frm p */
    dist = parameter->forward_f;
    diff_vec = curr_vec_x1 - reg_16x16frm_px;
    mv_send (diff_vec, dist, mv_bits, parameter->symbits_ind);
    diff_vec = curr_vec_y1 - reg_16x16frm_py;
    mv_send (diff_vec, dist, mv_bits, parameter->symbits_ind);
    reg_16x16frm_px = curr_vec_x1;
    reg_16x16frm_py = curr_vec_y1;
    break;

case 2:
case 3:   /* 16x16 frm n */
    dist = parameter->backward_f;
    diff_vec = curr_vec_x1 - reg_16x16frm_nx;
    mv_send (diff_vec, dist, mv_bits, parameter->symbits_ind);
    diff_vec = curr_vec_y1 - reg_16x16frm_ny;
    mv_send (diff_vec, dist, mv_bits, parameter->symbits_ind);
    reg_16x16frm_nx = curr_vec_x1;
    reg_16x16frm_ny = curr_vec_y1;
    break;

case 4:
case 5:   /* 16x16 frm b */
    dist = parameter->forward_f;
    diff_vec = curr_vec_x1 - reg_16x16frm_px;
```

```
            mv_send (diff_vec, dist, mv_bits_parameter->symbits_ind);
            diff_vec = curr_vec_y1 - reg_16x16frm_py;
            mv_send (diff_vec, dist, mv_bits_parameter->symbits_ind);
            dist = parameter->backward_f;
            diff_vec = curr_vec_x2 - reg_16x16frm_nx;
            mv_send (diff_vec, dist, mv_bits_parameter->symbits_ind);
            diff_vec = curr_vec_y2 - reg_16x16frm_ny;
            mv_send (diff_vec, dist, mv_bits_parameter->symbits_ind);
            reg_16x16frm_px = curr_vec_x1;
            reg_16x16frm_py = curr_vec_y1;
            reg_16x16frm_nx = curr_vec_x2;
            reg_16x16frm_ny = curr_vec_y2;
            break;

case 5:   /* 16x8 frm pn */
case 7:   dist = parameter->forward_f;
            diff_vec = curr_vec_x1 - reg_16x8frm_px1;
            mv_send (diff_vec, dist, mv_bits_parameter->symbits_ind);
            diff_vec = curr_vec_y1 - reg_16x8frm_py1;
            mv_send (diff_vec, dist, mv_bits_parameter->symbits_ind);
            reg_16x8frm_px1 = reg_16x8frm_py1 = reg_16x8frm_nx2 = reg_16x8frm_ny2 = 0;
            reg_16x8fid_px1 = reg_16x8fid_py1 = reg_16x8fid_nx2 = reg_16x8fid_ny2 = 0;
            reg_16x8fid_nx1 = reg_16x8fid_py1 = reg_16x8fid_px2 = reg_16x8fid_ny2 = 0;
            break;

default:  fprintf(stderr, "in vlc_mvadap_intp...illegal ptr_type=%d...quitting..\n", *ptr_type);
            exit(0);
}

}


#include <math.h>
#include <stdio.h>
#include "zzz.h"

frame_field(curr_frm,adap_frm,type_coadap,type_mcadap,type_ifdadap,parameter)
short   *curr_frm;
short   *adap_frm;
int     *type_coadap;
int     *type_mcadap;
int     *type_ifdadap;
struct codec *parameter;

{

register int i,j,k,s,p;
int     blocks, n_blocks, blocks_in_frm;
int     not_bl_size;

int     prev_frm_x, prev_frm_y;
int     curr_frm_x, curr_frm_y;

short   **curr_array;
int     lum_ind;

double  sum, sumsq, sumhoreq, sumvereq;
float   npels_frmmac, npels_fldmac;
double  var, varhor, varver, avg, avgeq;
double  phor, prevfrm, prevfld;
```

```
double   pwer_fld_slice[90];
int      count_frmmc, count_fldmmc;
int      cnt_16x16frmmc_frmcod, cnt_16x16frmmc_fldcod, cnt_16x8frmmc_frmcod, cnt_16x8frmmc_fldcod;
int      cnt_16x16fldmc_frmcod, cnt_16x16fldmc_fldcod, cnt_16x8fldmc_frmcod, cnt_intra_frmcod, cnt_intra_fldcod;
static   int      first = 1;

FILE     *file_pointer;
int      gof_id, segimm_id, frame_id;
int      search_id, range_id, intp_id, prevmc_id, origmc_id, fracmc_id;

cnt_16x16frmmc_frmcod = cnt_16x16frmmc_fldcod = cnt_16x8frmmc_frmcod = cnt_16x8frmmc_fldcod = 0;
cnt_16x16fldmc_frmcod = cnt_16x16fldmc_fldcod = cnt_intra_frmcod = cnt_intra_fldcod = 0;

count_frmmc = count_fldmmc = 0;
npals_frmmc = 256.0; npals_fldmmc = 128.0;          /* do for all y blocks */
for(j=0;j<y_blocks;j++)                             /* do for all x blocks */
     {for(i=0;i<x_blocks;i++)

          curr_frm_x = [mot_bl_size;
          curr_frm_y = [mot_bl_size;

/*=================================================================*/
/*;                                                               */
/*;                    STEP 1.                  FIND horiz and vertical frame correlation  */
/*;                                                               */
/*=================================================================*/

sumsq = sum = 0.0;
avg = avgsq = var = 0.0;
for(s = 0; s < mot_bl_size; s++)

     {for(p = 0; p < mot_bl_size; p++)

          sum += curr_array[s+curr_frm_y][p+curr_frm_x];
          sumsq += (curr_array[s+curr_frm_y][p+curr_frm_x]*curr_array[s+curr_frm_y][p+curr_frm_x]);
     }

avg = sum / npals_frmmc;
avgsq = sumsq / npals_frmmc;
var = avgsq - (avg*avg);

sumhorsq = sumhorsq = 0.0;
varhor = 0.0; prevfrm = 0.0;
for(s = 0; s < mot_bl_size; s++)

     {for(p = 0; p < mot_bl_size; p++)

          if (p+curr_frm_x+1) >= (x_blocks*mot_bl_size))
               sumhorsq += ((curr_array[s+curr_frm_y][p+curr_frm_x] - avg)*
                            (curr_array[s+curr_frm_y][p+curr_frm_x] - avg));

          else
               sumhorsq += ((curr_array[s+curr_frm_y][p+curr_frm_x+1] - avg)*
                            (curr_array[s+curr_frm_y][p+curr_frm_x] - avg));

          if ((s+curr_frm_y+1) >= (y_blocks*mot_bl_size))
```

```
        sumavereg += ((curr_array[s+curr_frm_y][p+curr_frm_x]-1 - avg) *
                      (curr_array[s+curr_frm_y][p+curr_frm_x] - avg));
        }
   else
        {
        sumavereg += ((curr_array[s+curr_frm_y][p+curr_frm_x] - avg) *
                      (curr_array[s+curr_frm_y][p+curr_frm_x] - avg));
        }

varhor = sumavereg/rpels_frmac;
phor = varhor/var;

varver = sumvereg/rpels_frmac;
pverfrm = varver/var;

fprintf(file_pointer, "%3.2f%3.2f ", phor, pverfrm);

/*=================================================
   STEP 2.        FIND vertical field correlation
=================================================*/

avg = sum / rpels_fldmac;
sumaq = sumaq /rpels_fldmac;
var = sumaq - (avg*avg);

for(s = 0; s < mot_bl_size; s += 2)
     {
     for(p = 0; p < mot_bl_size; p++)
          {
          sum += curr_array[s+curr_frm_y][p+curr_frm_x];
          sumaq += (curr_array[s+curr_frm_y][p+curr_frm_x]*curr_array[s+curr_frm_y][p+curr_frm_x]);
          }
     }

avg = sum / rpels_fldmac;
sumavg = sumaq /rpels_fldmac;
var = sumavg - (avg*avg);

sumavereg = 0.0;
varver = pverfld = 0.0;
for(s = 0; s < mot_bl_size; s += 2)
     {
     if ((s+curr_frm_y+2) >= (y_blocks*mot_bl_size))
          {
          for(p = 0; p < mot_bl_size; p++)
               {
               sumavereg += ((curr_array[s+curr_frm_y][p+curr_frm_x] - avg) *
                             (curr_array[s+curr_frm_y][p+curr_frm_x] - avg));
               }
          }
     else
          {
          sumavereg += ((curr_array[s+curr_frm_y][p+curr_frm_x] - avg) *
                        (curr_array[s+curr_frm_y+2][p+curr_frm_x] - avg));
          }
     }

varver = sumavereg/rpels_fldmac;
pverfld = varver/var;

pverfld_slice[j] = pverfld;

/*=================================================
   STEP 3    Compare vertical trans and field correlation
=================================================*/
```

```
        if (pvar_frm >= pvar_fld)
            {
            count_frmmac++;
            *type_codadap = 0;
            }
        else
            {
            count_fldmac++;
            *type_codadap = 1;
            }
/*--------------------------------------------------------------------*/
/*    STEP  4    Copy 16x16 frame mac or field macs depending on correlation   */
/*--------------------------------------------------------------------*/

    if (*type_codadap == 1)     /* Field Mode */
        {
        for (k=0; k < 2; k++)     /* field0 followed by field 1 */
            {
            for(s = 0; s < mot_bl_size; s += 2)
                {
                for(p = 0; p < mot_bl_size; p++)
                    {
                    *adap_frm = curr_array[s+k*curr_frm_y] [p+curr_frm_x];
                    adap_frm++;
                    }
                }
            }
        }

    else                        /* Frame Mode */
        {
        for(s = 0; s < mot_bl_size; s++)
            {
            for(p = 0; p < mot_bl_size; p++)
                {
                *adap_frm = curr_array[s+curr_frm_y] [p+curr_frm_x];
                adap_frm++;
                }
            }
        }

        type_codadap++;
        type_mcadap++;
        type_1fldadap++;
        }/* end for j */

    }/* end for i */

}/* end frame_field */
```

89

90

We claim:

1. An apparatus for encoding digital video signals, comprising:

a means for receiving a digital video input signal comprising a succession of digital representations related to picture elements making up at least one frame of a video image, the frame comprising a plurality of interlaced fields;

a means for coding groups of digital representations related to frames of picture elements;

a means for coding groups of digital representations related to interlaced fields in the frames; and

a means responsive to the digital video input signal for producing a field frame coding type signal which directs a selected one, but not both, of the frame coding means or the field coding means to code the digital video input signal.

2. The encoding apparatus of claim 1, in which the fields comprise alternating horizontal scan lines of the frames.

3. An apparatus for compressing digital video signals, comprising:

a means for receiving a digital video input signal comprising a succession of digital signals representing picture elements which make up at least one frame of a video image, the frame comprising a plurality of interlaced fields;

a means for producing a signal relating to an estimate of the digital video input signal;

a means responsive to the digital video input signal and the estimate of the digital video input signal for producing an error signal;

a circuit means responsive to the error signal for determining frequency coefficients of the error signal;

a means for quantizing the frequency coefficients;

a means for scanning the quantized frequency coefficients in predetermined order for producing a succession of frequency coefficient signals in the predetermined order;

a variable word length encoder responsive to the succession of the frequency coefficient signals for producing a compressed video signal bit stream; and

a means responsive to the digital video input signal prior to compression for producing a coding type signal for controlling compression of the digital video input signals by causing a selected one, but not both, of frame encoding and field encoding to be applied to the digital video input signal.

4. The apparatus of claim 3, in which the means for producing a coding type signal controls the predetermined order of scanning produced by the scanning means.

5. The apparatus of claim 3, in which the means for producing a coding type signal controls the means for producing a signal relating to an estimate of the digital video input signal.

6. The apparatus of claim 3, in which the means for producing a coding type signal controls the quantizing means.

7. The apparatus of claim 6, in which the estimate of the digital input video signal is produced in response to motion vectors determined by a motion estimating means responsive to the digital video input signal and at least one representation of another video input signal.

8. The apparatus of claim 3, in which the estimate of the digital input video signal is a motion compensated estimate of the digital input video signal.

9. The apparatus of claim 8, in which there are at least two modes of performing motion compensation.

10. The apparatus of claim 9, in which there is a frame motion compensation mode.

11. The apparatus of claim 9, in which there is a field motion compensation mode.

12. An apparatus for encoding digital video signals, comprising:

a means for receiving digital video input signals representing frames of picture elements, the frames comprising fields of non-contiguous picture elements;

a means for producing motion compensated estimates of the digital video input signals;

a means for producing motion vectors in response to signals representing frames of picture elements; and

a means for producing motion vectors in response to signals representing fields of picture elements;

a means for selecting one of the motion vectors produced in response to signals representing frames of picture elements and the motion vectors produced in response to signals representing field of picture elements for input to the estimate producing means;

the estimate producing means producing estimates based upon the selection produced by the selection means.

13. An apparatus for decoding a compressed digital video signal, comprising:

a means for receiving a compressed digital video bit stream; and

a means responsive to a motion compensation type signal for selectively and adaptively performing motion compensated decoding of frames of the compressed video bit stream.

14. The apparatus of claim 13, in which the decoding means comprises:

an adaptive inverse scanning means responsive to a coding type signal.

15. The apparatus of claim 13, in which the decoding means comprises:

a means responsive to a motion compensation type signal and selectively responsive to frame motion vectors and field motion vectors for producing an adaptive motion compensated estimate of a decoded video signal;

a means responsive to the compressed digital video bit stream for producing a decoded estimate error signal; and

a means responsive to the adaptive motion compensated estimate and the estimate error signal for producing a decoded video signal.

16. The apparatus of claim 13, in which the decoding means comprises:

a means responsive to a coding type signal for adaptively dequantizing the compressed digital video bit stream.

17. The apparatus of claim 13, in which the decoding means comprises:

a means for receiving a compressed digital video signal comprising at least one DC coefficient representation related to the video signal;

a means for producing an estimated DC coefficient in response to a coding type signal; and

a means for producing a decoded DC coefficient

signal in response to the DC coefficient representation and the estimated DC coefficient.

18. An apparatus for encoding digital video signals, comprising:

a means responsive to digital input video signals comprising a succession of digital representations of picture elements making up at least one video picture frame having a plurality of fields;

a means for producing a compressed code relating to the input video signals; and

an adaptive frame/field coding selector responsive to the digital input video signal prior to compression for producing a coding type signal which controls the production of compressed code by causing a selected one, but not both, of frame encoding and field encoding to be applied to the digital video input signals.

19. The apparatus of claim 18, in which the coding selector comprises:

a means for adaptively quantizing the digital input video signals in response to the coding type signal.

20. The apparatus of claim 18, further comprising:

a means selectively responsive to frame motion vectors and field motion vectors for producing an adaptive motion compensated estimate of the digital input video signal; and

a means for coding a signal related to the difference between the digital input video signal and the adaptive motion compensated estimate.

21. The apparatus of claim 18, further comprising:

a means for adaptively scanning stored values related to the representations in response to the coding type signal.

22. The apparatus of claim 18, further comprising:

a means for converting a plurality of the digital representations into a DC coefficient and a plurality of AC coefficients;

a means for adaptively producing a predicted DC coefficient in response to the coding type signal; and

a means responsive to the DC coefficient produced by the converting means and to the predicted DC coefficient for encoding the DC coefficient.

23. An apparatus for encoding digital video signals, comprising:

a means for receiving a digital video input signal comprising a succession of digital representations of picture elements making up at least one video frame, the frame comprising a plurality of fields;

a means for selectively encoding groups of digital representations in the input signal relating to one of frames and fields; and

a means responsive to the video input signal prior to encoding to ascertain a predetermined characteristic present in the input signal prior to encoding for producing a field/frame encoding type signal which directs the encoding means to encode a selected one, but not both, of the groups of digital representations relating to frames and fields in the input signal.

24. The apparatus of claim 23, in which the means for encoding comprises a means for selectively transforming first groups of digital representations relating to one of frames of picture elements and fields of picture elements into second groups of digital representations relating to one of frames of picture elements and fields of picture elements.

25. The apparatus of claim 24, in which the means for selectively transforming comprises a means for transforming groups of digital representations in the input video signal into groups of frequency coefficients related to the input video signal.

26. The apparatus of claim 24, in which the means for selectively transforming comprises a means for adaptively performing a discrete cosine transform of the input video signal in response to the frame/field encoding type signal.

27. The apparatus of claim 24, in which the predetermined characteristic comprises a correlation between predetermined portions of the digital video input signal.

28. The apparatus of claim 24, in which the encoding means comprises a means for performing motion compensation.

29. The apparatus of claim 24, in which the encoding means comprises a means for quantizing the digital video input signal.

30. The apparatus of claim 24, in which the encoding means comprises a means for performing variable word length encoding.

31. An apparatus for encoding digital video signals, comprising:

a means for receiving a digital video input signal comprising a succession of digital representations of picture elements making up at least one video frame, the frame comprising a plurality of fields;

a means for performing adaptive motion compensated encoding of groups of digital representations in the input signal relating to one of frames and fields in the input signal; and

a means responsive to the video input signal prior to encoding for producing a motion compensation type signal for controlling the adaptive motion compensated encoding means.

32. An apparatus for encoding digital video signals, comprising:

a means for receiving digital video input signals; and

a means for performing variable word length encoding adaptively in response to the video input signals.

33. The apparatus of claim 32, further comprising:

a means of transforming the digital video input signals into transform coefficients;

the encoding means being responsive to the transform coefficients for performing adaptive variable word length encoding.

* * * * *

65

US005347295A

# United States Patent [19]

## Agulnick et al.

[11] Patent Number: **5,347,295**

[45] Date of Patent: **Sep. 13, 1994**

[54] **CONTROL OF A COMPUTER THROUGH A POSITION-SENSED STYLUS**

[75] Inventors: **Todd Agulnick**, Newton Centre, Mass.; **Robert Carr**, San Francisco, Calif.; **Tony Hoeber**, Woodside, Calif.; **S. Jerrold Kaplan**, San Francisco, Calif.; **David R. Low**, Oakland, Calif.; **Michael Ouye**, Palo Alto, Calif.

[73] Assignee: **GO Corporation**, Foster City, Calif.

[21] Appl. No.: **610,231**

[22] Filed: **Oct. 31, 1990**

[51] Int. Cl.⁵ ............................................... G09G 5/00

[52] U.S. Cl. ...................................... 345/156; 345/179

[58] Field of Search ........................ 382/13, 14, 57, 59, 382/40; 178/18, 19; 340/706, 707, 709; 345/156, 179

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,699,439 | 10/1972 | Turner | 324/71.1 |
| 3,832,693 | 8/1974 | Ishizaki et al. | 364/900 |
| 4,016,542 | 4/1977 | Azure | 364/900 |
| 4,055,726 | 10/1977 | Turner et al. | 178/19 |
| 4,071,691 | 1/1978 | Pepper, Jr. | 178/19 |
| 4,112,415 | 9/1978 | Hilbrink | 382/13 |
| 4,129,747 | 12/1978 | Pepper, Jr. | 178/18 |
| 4,177,354 | 12/1979 | Mathews | 178/19 |
| 4,184,147 | 1/1980 | Seelbach | 382/13 |
| 4,198,539 | 4/1980 | Pepper, Jr. | 178/18 |
| 4,262,281 | 4/1981 | Buckle et al. | 382/13 |
| 4,293,734 | 10/1981 | Pepper, Jr. | 178/18 |
| 4,302,011 | 11/1981 | Pepper, Jr. | 178/19 |
| 4,318,096 | 3/1982 | Thornburg et al. | 360/706 |
| 4,353,552 | 10/1982 | Pepper, Jr. | 382/13 |
| 4,365,235 | 12/1982 | Greanias et al. | 382/13 |
| 4,371,746 | 2/1983 | Pepper, Jr. | 178/18 |
| 4,456,787 | 6/1984 | Schlosser et al. | 178/19 |
| 4,475,239 | 10/1984 | van Raamsdonk | 382/52 |
| 4,520,357 | 5/1985 | Castleberry et al. | 340/703 |
| 4,641,354 | 2/1987 | Fukunaga et al. | 382/13 |
| 4,672,677 | 6/1987 | Yamakawa | 382/13 |
| 4,679,241 | 7/1987 | Lukis | 382/13 |
| 4,680,430 | 7/1987 | Yoshikawa et al. | 178/19 |
| 4,680,804 | 7/1987 | Kuzunuki et al. | 382/13 |
| 4,764,885 | 8/1988 | Greanias et al. | 364/571 |
| 4,786,765 | 11/1988 | Yamanami et al. | 178/19 |
| 4,831,556 | 5/1989 | Oono | 364/521 |
| 4,839,634 | 6/1989 | More et al. | . |
| 4,972,496 | 11/1990 | Sklarew | 382/13 |
| 5,050,105 | 9/1991 | Peters | 340/734 |
| 5,053,758 | 10/1991 | Cornett et al. | 340/712 |
| 5,151,950 | 9/1992 | Hullender | . |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 0203324 | 3/1986 | European Pat. Off. . |
| 0242598 | 10/1987 | European Pat. Off. . |
| 0254561 | 1/1988 | European Pat. Off. . |
| 2117154 | 10/1983 | United Kingdom . |
| 2193023 | 1/1988 | United Kingdom ................. 382/13 |

### OTHER PUBLICATIONS

IBM Technical Disclosure Bulletin, "Object-Picking Method by Hierarchical Hand-Marking," vol. 30, No. 9, pp. 348–350, Feb. 1988 (New York).
GRiD Systems Corporation, "GRiDPAD Computer Owner's Guide" (1989–1990, California).
Wacom Co., Ltd., "User Manual for SD-510 A5 Type Digitizer" (Jul. 1988; place of publication unknown).
Linus Technologies, Inc., LINUS Write-Top User's Guide (1987 Virginia).
PC Magazine, "Digitizing Tablets/Pointing the Way to Easier Input" by Winn L. Rosch (1989 U.S.A.).

*Primary Examiner*—Jeffery Brier
*Attorney, Agent, or Firm*—Matthew C. Rainey; Amir H. Raubvogel

[57] **ABSTRACT**

A notebook computer which is controlled by a stylus executing gestures on the computer screen. The stylus and the computer include complementary electronic circuitry by which the proximity of the stylus tip to the computer is sensed. The proximity sensing is used to detect to approach of the stylus tip to the computer screen, and gestural commands are then entered on the screen by moving the stylus. The entry of a command is terminated by removing the stylus tip from proximity with the screen, which is detected by the computer, which then implements the command. Alternative methods of implementing the commands include time-outs and command termination buttons.

**46 Claims, 73 Drawing Sheets**





**Fig. 1**

**U.S. Patent**          Sep. 13, 1994          Sheet 2 of 73          **5,347,295**



Fig. 2



Fig. 3

Case 3:03-cv-01108-B-CAB   Document 1   Filed 06/02/03   Page 869 of 976



Fig. 4

Fig. 5

Fig. 6

Sample Notebook: Contents    ← 1 →

Document  Edit  Create  View  Show  Sort

| Name | | Page |
|---|---|---|
| 📄 First Experience · · · · · · · · · · · · · · · ▷ | | 2 |
| 📄 Samples · · · · · · · · · · · · · · · · · · · · · ▷ | | 3 |
| 📄 Application · · · · · · · · · · · · · · · · · · · ▷ | | 6 |
| 📄 Reports · · · · · · · · · · · · · · · · · · · · · · ▷ | | 7 |

440

390

Application                    6

Document  Edit  Insert  Case  Format

The present invention describes methods and apparatus for a stylus-driven computer. Said computer presents the behavior of a multi-page notebook including visible pages, page-turn effects, tabbed bookmarks along one or more edge, "floating" pages temporarily removed from their notebook location, a table-of-contents, and contents of sub-sections. Each page in the notebook contains one document which may contain many physical pages when printed. These pages are analogous to data files in other computers and may contain different types of documents such as text, drawings, FAX images, or specialized forms. Some information (such as the "Help Information") is contained in separate

380

410    400

Contents │ First Experience │ Samples

proximity

First Experience

**Fig. 7**

390                                              440

| | **Application** | 6 |

Document  Edit  Insert  Case  Format

380

    The present invention describes methods and apparatus for a stylus-driven computer. Said computer presents the behavior of a multi-page notebook including visible pages, page-turn effects, tabbed bookmarks along one or more edge, "floating" pages temporarily removed from their notebook location, a table-of-contents, and contents of sub-sections. Each page in the notebook contains one document which may contain many physical pages when printed. These pages are analogous to data files in other computers and may contain different types of documents such as text, drawings, FAX images, or specialized forms. Some information (such as the "Help Information") is contained in separate notebooks with all of the features listed above. The primary means of control of the computer is a rich set of gestures with the stylus over almost any object visible on the display. Gestures with a stylus offer a more concise vocabulary than tradition pointing devices because they combine both selection (by their location) and meaning (the specific gesture) in one movement. A common set of gestures can delete, move, copy, or edit diverse objects such as text fragments, buttons, documents, or entire notebooks. Gestures can initiate the insertion of hand-written text, the editing of existing text, page-turning, scrolling within a window, zooming or shrinking of entire pages, selection, summoning of windows containing operator guidance, or the creation of links ("goto" buttons) to other pages.

    The proximity of the stylus to the display's front surface is used to anticipate and terminate stylus input events. By sensing both the proximity of the stylus tip to, and contact with, the display surface the user-interface software can more accurately discern the vertical movement of the stylus, provide a richer vocabulary of stylus movements for control of the computer, and offer better feedback to the user.

    When using the stylus for selection, movements into proximity can trigger display events which give the user a preview of what display objects are understood to be targeted by the computer. For example the computer can

Fig. 8                    410                    400

Fig. 9

Fig. 10

| Sample Notebook: Contents | ← 1 → |
|---|---|

Document  Edit  Create  View  Show  Sort

| Name | Page |
|---|---|
| 📄 First Experience  · · · · · · · · · · · · · ▷ | 2 |
| 📄 Samples · · · · · · · · · · · · · · · · · · ▷ | 3 |
| 📄 Application · · · · · · · · · · · · · · · · ▷ | 6 |
| 📄 Reports · · · · · · · · · · · · · · · · · · ▷ | 7 |

⌐ 440          ⌐ 380

⌐ 445          Application          6

Document  Edit  Insert  Case  Format

The present invention describes methods and apparatus for a stylus-driven computer. Said computer presents the behavior of a multi-page notebook including visible pages, page-turn effects, tabbed bookmarks along one or more edge, "floating" pages temporarily removed from their notebook location, a table-of-contents, and contents of sub-sections. Each page in the notebook contains one document which may contain many physical pages when printed. These pages are analogous to data files in other computers and may contain different types of documents such as text, drawings, FAX images, or specialized forms. Some information (such as the "Help Information") is contained in separate

← 445

Contents  First Experience  Samples

proximity

First Experience

? ✓

Fig. 11

**Sample Notebook: Contents** — 1 —

Document  Edit  Create  View  Show  Sort

| Name | Page |
|------|------|
| 📄 First Experience · · · · · · · · · · · · · · · · ▷ | 2 |
| 📄 Samples · · · · · · · · · · · · · · · · · · · · ▷ | 3 |
| 📄 Application · · · · · · · · · · · · · · · · · · ▷ | 6 |
| 📄 Reports · · · · · · · · · · · · · · · · · · · · ▷ | 7 |

440   380   445

**Application** 6

Document  Edit  Insert  Case  Format

    The present invention describes methods and apparatus for a stylus-driven computer. Said computer presents the behavior of a multi-page notebook including visible pages, page-turn effects, tabbed bookmarks along one or more edge, "floating" pages temporarily removed from their notebook location, a table-of-contents, and contents of sub-sections. Each page in the notebook contains one document which may contain many physical pages when printed. These pages are analogous to data files in other computers and may contain different types of documents such as text, drawings, FAX images, or specialized forms. Some information (such as the "Help Information") is contained in separate

proximity

Contents | First Experience | Samples

First Experience

**Fig. 12**

Fig. 13

Case 3:03-cv-01108-B-CAB    Document 1    Filed 06/02/03    Page 879 of 976



Fig. 14



Fig. 15

| Application | ← 6 → |
|---|---|

Document Edit Insert Case Format

object visible on the display. Gestures with a stylus offer a more concise vocabulary than tradition pointing devices because they combine both selection (by their location) and meaning (the specific gesture) in one movement. A common set of gestures can delete, move, copy, or edit diverse objects such as text fragments, buttons, documents, or entire notebooks. Gestures can initiate the insertion of hand-written text, the editing of existing text, page-turning, scrolling within a window, zooming or shrinking of entire pages, selection, summoning of windows containing operator guidance, or the creation of links ("goto" buttons) to other pages.

The proximity of the stylus to the display's front surface is used to anticipate and terminate stylus input events. By sensing both the proximity of the stylus tip to, and contact with, the display surface the user-interface software can more accurately discern the vertical movement of the stylus, provide a richer vocabulary of stylus movements for control of the computer, and offer better feedback to the user.

When using the stylus for selection, movements into proximity can trigger display events which give the user a preview of what display objects are understood to be targeted by the computer. For example the computer can expand or alter the appearance of a button in anticipation of its selection. This solution overcomes the problems of selecting displayed objects due to tight spacing and parallax effects in prior art.

In the entry of multi-stroke graphical objects the sensing of the departure of the stylus tip from the vicinity of the display surface allows the computer to discern the

520

Contents First Experience Samples

470



First Experience

Fig. 16

---

## Application                                    ← 6 →

Document  Edit  Insert  Case  Format

The present invention describes methods and apparatus for a stylus-driven computer. Said computer presents the behavior of a multi-page notebook including visible pages, page-turn effects, tabbed bookmarks along one or more edge, "floating" pages temporarily removed from their notebook location, a table-of-contents, and contents of sub-sections. Each page in the notebook contains one document which may contain many physical pages when printed. These pages are analogous to data files in other computers and may contain different types of documents such as text, drawings, FAX images, or specialized forms. Some information (such as the "Help Information") is contained in separate notebooks with all of the features listed above. The primary means of control of the computer is a rich set of gestures with the stylus over almost any object visible on the display. Gestures with a stylus offer a more concise vocabulary than tradition pointing devices because they combine both selection (by their location) and meaning (the specific gesture) in one movement. A common set of gestures can delete, move, copy, or edit diverse objects such as text fragments, buttons, documents, or entire notebooks. Gestures can initiate the insertion of hand-written text, the editing of existing text, page-turning, scrolling within a window, zooming or shrinking of entire pages, selection, summoning of windows containing operator guidance, or the creation of links ("goto" buttons) to other pages.

The proximity of the stylus to the display's front surface is used to anticipate and terminate stylus input events. By sensing both the proximity of the stylus tip to, and contact with, the display surface the user-interface software can more accurately discern the vertical

— 510
— 530

Contents  First Experience  Samples

First Experience

Fig. 17

| Application | ← 6 → |

**Document  Edit  Insert  Case  Format**

The present invention describes methods and apparatus for a stylus-driven computer. Said computer presents the behavior of a multi-page notebook including visible pages, page-turn effects, tabbed bookmarks along one or more edge, "floating" pages temporarily removed from their notebook location, a table-of-contents, and contents of sub-sections. Each page in the notebook contains one document which may contain many physical pages when printed. These pages are analogous to data files in other computers and may contain different types of documents such as text, drawings, FAX images, or specialized forms. Some information (such as the "Help Information") is contained in separate notebooks with all of the features listed above. The primary means of control of the computer is a rich set of gestures with the stylus over almost any object visible on the display. Gestures with a stylus offer a more concise vocabulary than tradition pointing devices because they combine both selection (by their location) and meaning (the specific gesture) in one movement. A common set of gestures can delete, move, copy, or edit diverse objects such as text fragments, buttons, documents, or entire notebooks. Gestures can initiate the insertion of hand-written text, the editing of existing text, page-turning, scrolling within a window, zooming or shrinking of entire pages, selection, summoning of windows containing operator guidance, or the creation of links ("goto" buttons) to other pages.

The proximity of the stylus to the display's front surface is used to anticipate and terminate stylus input events. By sensing both the proximity of the stylus tip to, and contact with, the display surface the user-interface software can more accurately discern the vertical

Contents  First  Experience  Samples

─ 540

First Experience

**Fig. 18**



Fig. 19



Fig. 20

Case 3:03-cv-01108-B-CAB   Document 1    Filed 06/02/03   Page 886 of 976

---

### Application                                    ← 6 →

#### Document  Edit  Insert  Case  Format

> The present invention describes methods and apparatus for a stylus-driven computer.  Said computer presents the behavior of a multi-page notebook including visible pages, page-turn effects, tabbed bookmarks along one or more edge, "floating" pages (temporarily removed from their notebook location, a table-of-contents, and contents of sub-sections.  Each page in the notebook contains one document which may contain many physical pages when printed.  These pages are analogous to data files in other computers and may contain different types of documents such as text, drawings, FAX images, or specialized forms.  Some information (such as the "Help Information") is contained in separate notebooks with all of the features listed above.  The primary means of control of the computer is a rich set of gestures with the stylus over almost any object visible on the display.  Gestures with a stylus offer a more concise vocabulary than tradition pointing devices because they combine both selection (by their location) and meaning (the specific gesture) in one movement.  A common set of gestures can delete, move, copy, or edit diverse objects such as text fragments, buttons, documents, or entire notebooks.  Gestures can initiate the insertion of hand-written text, the editing of existing text, page-turning, scrolling within a window, zooming or shrinking of entire pages, selection, summoning of windows containing operator guidance, or the creation of links ("goto" buttons) to other pages.

> The proximity of the stylus to the display's front surface is used to anticipate and terminate stylus input events.  By sensing both the proximity of the stylus tip to, and contact with, the display surface the user-interface software can more accurately discern the vertical

← 610

*Contents  First Experience  Samples*

*First Experience*

**Fig. 21**



Fig. 22



Fig. 23

U.S. Patent          Sep. 13, 1994          Sheet 24 of 73          5,347,295



Fig. 24



Fig. 25



670 →

Fig. 26

Case 3:03-cv-01108-B-CAB   Document 1   Filed 06/02/03   Page 892 of 976



680

Fig. 27



Fig. 28

Application          ← 6 →

Document  Edit  Insert  Case  Format

740 —

The present invention describes methods and apparatus for a stylus-driven computer. Said computer presents the behavior of a multi-page notebook including visible pages (page-turn effects) tabbed bookmarks along one or more edge, "floating" pages temporarily removed from their notebook location, a table-of-contents, and contents of sub-sections. Each page in the notebook contains one document which may contain many physical pages when printed. These pages are analogous to data files in other computers and may contain different types of documents such as text, drawings, FAX images, or specialized forms. Some information (such as the "Help Information") is contained in separate notebooks with all of the features listed above. The primary means of control of the computer is a rich set of gestures with the stylus over almost any object visible on the display. Gestures with a stylus offer a more concise vocabulary than tradition pointing devices because they combine both selection (by their location) and meaning (the specific gesture) in one movement. A common set of gestures can delete, move, copy, or edit diverse objects such as text fragments, buttons, documents, or entire notebooks. Gestures can initiate the insertion of hand-written text, the editing of existing text, page-turning, scrolling within a window, zooming or shrinking of entire pages, selection, summoning of windows containing operator guidance, or the creation of links ("goto" buttons) to other pages.

The proximity of the stylus to the display's front surface is used to anticipate and terminate stylus input events. By sensing both the proximity of the stylus tip to, and contact with, the display surface the user-interface software can more accurately discern the vertical

Contents  First Experience  Samples



First Experience

Fig. 29

Case 3:03-cv-01108-B-CAB   Document 1   Filed 06/02/03   Page 895 of 976

Application        ← 6 →

Document  Edit  Insert  Case  Format

740

750

The present invention describes methods and apparatus for a stylus-driven computer. Said computer presents the behavior of a multi-page notebook including visible pages, page-turn effects, tabbed bookmarks along one or more edge, "floating" pages temporarily removed from their notebook location, a table-of-contents, and contents of sub-sections. Each page in the notebook contains one document which may contain many physical pages when printed. These pages are analogous to data files in other computers and may contain different types of documents such as text, drawings, FAX images, or specialized forms. Some information (such as the "Help Information") is contained in separate notebooks with all of the features listed above. The primary means of control of the computer is a rich set of gestures with the stylus over almost any object visible on the display. Gestures with a stylus offer a more concise vocabulary than tradition pointing devices because they combine both selection (by their location) and meaning (the specific gesture) in one movement. A common set of gestures can delete, move, copy, or edit diverse objects such as text fragments, buttons, documents, or entire notebooks. Gestures can initiate the insertion of hand-written text, the editing of existing text, page-turning, scrolling within a window, zooming or shrinking of entire pages, selection, summoning of windows containing operator guidance, or the creation of links ("goto" buttons) to other pages.

The proximity of the stylus to the display's front surface is used to anticipate and terminate stylus input events. By sensing both the proximity of the stylus tip to, and contact with, the display surface the user-interface software can more accurately discern the vertical

Contents | First Experience | Samples



First Experience

Fig. 30

Application        ← 6 →

Document  Edit  Insert  Case  Format

760

The present invention describes methods and apparatus for a stylus-driven computer.  Said computer presents the behavior of a multi-page notebook including page-turn effects, visible pages, tabbed bookmarks along one or more edge, "floating" pages temporarily removed from their notebook location, a table-of-contents, and contents of sub-sections.  Each page in the notebook contains one document which may contain many physical pages when printed.  These pages are analogous to data files in other computers and may contain different types of documents such as text, drawings, FAX images, or specialized forms.  Some information (such as the "Help Information") is contained in separate notebooks with all of the features listed above.  The primary means of control of the computer is a rich set of gestures with the stylus over almost any object visible on the display.  Gestures with a stylus offer a more concise vocabulary than tradition pointing devices because they combine both selection (by their location) and meaning (the specific gesture) in one movement.  A common set of gestures can delete, move, copy, or edit diverse objects such as text fragments, buttons, documents, or entire notebooks.  Gestures can initiate the insertion of hand-written text, the editing of existing text, page-turning, scrolling within a window, zooming or shrinking of entire pages, selection, summoning of windows containing operator guidance, or the creation of links ("goto" buttons) to other pages.

The proximity of the stylus to the display's front surface is used to anticipate and terminate stylus input events.  By sensing both the proximity of the stylus tip to, and contact with, the display surface the user-interface software can more accurately discern the vertical

Contents First Experience Samples



First Experience

Fig. 31



The present invention describes methods and apparatus for a stylus-driven computer. Said computer presents the behavior of a multi-page notebook including page-turn effects, visible pages, tabbed bookmarks along one or more edge, "floating" pages temporarily removed from their notebook location, a table-of-contents, and contents of sub-sections. Each page in the notebook contains one document which may contain many physical pages when printed. These pages are analogous to data files in other computers and may contain different types of documents such as text, drawings, FAX images, or specialized forms. Some information (such as the "Help Information") is contained in separate notebooks with all of the features listed above. The primary means of control of the computer is a rich set of gestures with the stylus over almost any object visible on the display. Gestures with a stylus offer a more concise vocabulary than tradition pointing devices because they combine both selection (by their location) and meaning (the specific gesture) in one movement. A common set of gestures can delete, move, copy, or edit diverse objects such as text fragments, buttons, documents, or entire notebooks. Gestures can initiate the insertion of hand-written text, the editing of existing text, page-turning, scrolling within a window, zooming or shrinking of entire pages, selection, summoning of windows containing operator guidance, or the creation of links ("goto" buttons) to other pages.

The proximity of the stylus to the display's front surface is used to anticipate and terminate stylus input events. By sensing both the proximity of the stylus tip to, and contact with, the display surface the user-interface software can more accurately discern the vertical

Fig. 32

Application ← 6 →

Document Edit Insert Case Format

The present wonderful invention describes methods and apparatus for a stylus-driven computer. Said computer presents the behavior of a multi-page notebook including page-turn effects, visible pages, tabbed bookmarks along one or more edge, "floating" pages temporarily removed from their notebook location, a table-of-contents, and contents of sub-sections. Each page in the notebook contains one document which may contain many physical pages when printed. These pages are analogous to data files in other computers and may contain different types of documents such as text, drawings, FAX images, or specialized forms. Some information (such as the "Help Information") is contained in separate notebooks with all of the features listed above. The primary means of control of the computer is a rich set of gestures with the stylus over almost any object visible on the display. Gestures with a stylus offer a more concise vocabulary than tradition pointing devices because they combine both selection (by their location) and meaning (the specific gesture) in one movement. A common set of gestures can delete, move, copy, or edit diverse objects such as text fragments, buttons, documents, or entire notebooks. Gestures can initiate the insertion of hand-written text, the editing of existing text, page-turning, scrolling within a window, zooming or shrinking of entire pages, selection, summoning of windows containing operator guidance, or the creation of links ("goto" buttons) to other pages.

The proximity of the stylus to the display's front surface is used to anticipate and terminate stylus input events. By sensing both the proximity of the stylus tip to, and contact with, the display surface the user-interface software can more accurately discern the vertical

*Contents  First Experience  Samples*



Fig. 33

Fig. 34

Sample Notebook: Contents          ◀— 1 —▶

Document  Edit  Create  View  Show  Sort

No┌──────────┐                                Page
  │ TextEdit │ence  · · · · · · · · · · ▷  2
☐ │ Snapshot │       · · · · · · · · · · ▷  3
☐ │ Section  │       · · · · · · · · · · ▷  6
☐ └──────────┘
☐ Reports  · · · · · · · · · · · · · · ▷  7

                    ┌— 810

Contents

First Experience

Samples

proximity

First Experience

Fig. 35



Fig. 36



Fig. 37

Case 3:03-cv-01108-B-CAB    Document 1    Filed 06/02/03    Page 903 of 976



**Fig. 38**



Fig. 39

Case 3:03-cv-01108-B-CAB    Document 1    Filed 06/02/03    Page 905 of 976



**Fig. 40**



Fig. 41



**Fig. 42**



Fig. 43

Case 3:03-cv-01108-B-CAB   Document 1   Filed 06/02/03   Page 909 of 976

Fig. 44



| Core | |
|---|---|
| 621 Tap | Select/Invoke |
| 627 | |
| 628 Press-hold | Initiate Drag (Move, Wipe-Thru) |
| Tap-Hold | Initiate Drag (Copy) |
| 623 Flick (4 directions) | Scroll to Edge |
| 629 Cross-Out ✕ | Delete |
| 610 Circle O | Edit |
| 652 Check ✓ | Options |
| 800 Caret ∧ | Insert |
| 530 Bracket [ ] (Left & Right) | Select Object, Adjust Selection |
| 535 Pigtail ～ | Delete Character |
| 632 Down-Right L | Insert Space |

631

| Other 622 | |
|---|---|
| Double-Tap •• | Select Word, Open Icon, Float Page |
| Triple-Tap ••• | Select Sentence  512 |
| Quad-Tap •••• | Select Paragraph  514 |
| Plus + | Toggle Selection, Sum |
| Square ☐ | Select Region  658 |
| Scratch-Out | Delete  657  656 |
| Circle-Line ⊖ | Replace Word(s)  651 |
| Caret-Tap ∧ | Create Input Pad  661  655 |
| Double-Caret | Create Embedded Doc |
| Circle-Tap ⊙ | Create Link Button  659 |
| Arrows (Up & Down) ↑↓ | Bigger/Smaller  653  654 |
| Double-Flick (4 directions) | Scroll Farther  624 |
| Triple-Flick (4 directions) | Scroll Farther Still  625 |
| Quad-Flick (4 directions) | Scroll Farthest  626 |

| Capital Letters | |
|---|---|
| Capital Letters A-Z | Context-Specific Accelerators |

| | |
|---|---|
| Up-Right ⌐ | Insert Character  634  638 |
| Down-Left ⌐ | Insert Para. Break  636 |
| Down-Left Flick | Insert Line Break  640 |
| Down-Right Flick L | Insert Tab |
| Right-Up ⌐ | Initial Caps  642  646 |
| Right-Up Flick | Upper Case |
| Right-Down ⌐ | Lower Case  644 |
| Check-Tap ✓• | Options for Container  732 |
| Questionmark ? | Quick Help  820 |

FIG. 45

— 632

**Eggplant dip**
(We'll need a catchy name for this.) This is a variation
on babaganoush that I think will stand up well to
long-term shelf storage. It involves roasting the eggplants
(which we can do in bulk) and then smashing them with
garlic, lemon, olive oil and spices. We currently have
some problems with the oil separating out to the top of
the jar, which is very unappetizing, but I'm sure we can
find a binding agent to solve this.

— 633

**Eggplant dip**
(We'll need a catch name for this.) This is a variation on

**Eggplant dip**
(We'll need a catch name for this.) This is a variation on

— 631

**Eggplant dip**
(We'll need a catch name for this.) T  his is a variation on

631A

— 634

**Eggplant dip**
(We'll need a catch name for this.) This is a variation on

Y — 635

**Eggplant dip**
(We'll need a catch name for this.) This is a variation on

**Eggplant dip**
(We'll need a catchy name for this.) This is a variation

**Fig. 46**                    635A

**Eggplant dip**
(We'll need a catchy name for this.) This is a variation

636

**Eggplant dip**
(We'll need a catchy name

637

for this.) This is a variation on babaganoush that I think

**Eggplant dip**
(We'll need a catchy name for this.) This is a variation
on babaganoush that I think will stand up well to
long-term shelf storage. It involves roasting the eggplants
(which we can do in bulk) and then smashing them with
garlic, lemon, olive oil and spices. We currently have
some problems with the oil separating out to the top of
the jar, which is very unappetizing, but I'm sure we can
find a binding agent to solve this.

638

**Eggplant dip**
(We'll need a catchy name for this.) This is a variation
on babaganoush that I think will stand up well to
long-term shelf storage. It involves roasting the eggplants
(which we can do in bulk) and then smashing them with
garlic, lemon, olive oil and spices. }

639

We currently have some problems with the oil separating
out to the top of the jar, which is very unappetizing, but
I'm sure we can find a binding agent to solve this.

**Eggplant dip**

640

(We'll need a catchy name for this.) This is a variation

641

**Eggplant dip**

(We'll need a catchy name for this.) This is a variation

Fig. 47



Fig. 48



**Fig. 49**



Fig. 50



```
┌────────────────────────────────────────────────┬──┐
│          Package Design Letter      ◄─ 4 ─►     │C │
├────────────────────────────────────────────────┤o │
│ Document  Edit  Insert  Case  Format           │n │
├────────────────────────────────────────────────┤t │
│ FastPak Design                                  │S │
│ 3535 Mission St.                                │a │
│ Houston TX 45321                                │m │
│                                                 │p │
│ RE: New package design                          │l │
│                                                 │S │
│ Dear Ms. Huerta:                                │t │
│                                                 │a │
│ We need a new design for the plastic bottles for│ff│
│ our condiments.                                 │W │
│                                                 │i │
│ Recently, an executive of a supermarket chain   │d │
│ took a box of our samples home in order to try  │g │
│ them before ordering our line. He briefly left  │e │
│ the box on the kitchen floor where his son ran  │t │
│ into it with a tricycle.                        │C │
│                                                 │u │
│ Our bottles should be able to withstand the     │r │
│ impact from a tricycle powered by a three year  │r │
│ old. But four bottles of our new salsa broke,   │e │
│ spilling their contents all over the floor.     │n │
│                                                 │P │
│ The executive never got a chance to try our     │e │
│ product.                                        │r │
│                                                 │s │
│ Can you design a lightweight, recyclable, 8 oz. │o │
│ plastic bottle that won't break under moderate  │T │
│ impact? I'll be travelling next week, but you   │o │
│ can fax me suggested proposals at 415/ 345-9833.│D │
│                                                 │o │
│                                                 │C │
│ Sincerely,                                      │P │
└────────────────────────────────────────────────┴──┘
```

629

Fig. 51

**Package Design Letter**          ← 4 →

Document   Edit   Insert   Case   Format

Contents | Samples | Staff | Widget Inc. | Current | Personal | To Do | Done | Calendar | Phone

FastPak Design
3535 Mission St.
Houston TX 45321

RE: New package design


Dear Ms. Huerta:

We need a new design for the plastic bottles for our
condiments.

Recently, an executive of a supermarket chain took a
box of our samples home in order to try them before
ordering. He briefly left the box on the kitchen floor
where his son ran into it with a tricycle.

Our bottles should be able to withstand the impact from a
tricycle powered by a three year old. But four bottles of
our new salsa broke, spilling their contents all over the
floor.

The executive never got a chance to try our product.

Can you design a lightweight, recyclable, 8 oz. plastic
bottle that won't break under moderate impact? I'll be
travelling next week, but you can fax me suggested
proposals at 415/ 345-9833.


Sincerely,





**Fig. 52**

Fig. 53

Fig. 54

Dear Ms. Huerta:

We need a quick new design for the plastic bottles for
our condiments.


Dear Ms. Huerta:                              ⌐653

We need a quick new design for the plastic bottles for
our condiments.


Dear Ms. Huerta:

We need a quick new **design** for the plastic bottles for
our condiments.

**Fig. 55**

Package Design Letter        ◄— 4 —►

Document  Edit  Insert  Case  Format

New World Foods
19271 Palm Blvd.
Los Angeles, CA 90036

February 17, 1991

Ms. Elena Huerta
FastPak Design
3535 Mission St.
Houston TX 45321

RE: New package design


Dear Ms. Huerta:

We need a quick new design for the plastic bottles for
our condiments.

655

Recently, an executive of a supermarket chain took a
box of our samples home in order to try them before
ordering. He briefly left the box on the kitchen floor
where his son ran into it with a tricycle.

Our bottles should be able to withstand the impact from a
tricycle powered by a three year old. But four bottles of
our new salsa broke, spilling their contents all over the
floor.

The executive never got a chance to try our product.

Can you design a lightweight, recyclable, 8 oz. plastic
bottle that won't break under moderate impact? I'll be
travelling next week, but you can fax me suggested

Contents | Samples | Staff | Widget Inc. | Current | Personal | To Do | Done | Phone | Index



**Fig. 56**



**Fig. 57**

Package Design Letter          ◄ 4 ►

Document  Edit  Insert  Case  Format

New World Foods
19271 Palm Blvd.
Los Angeles, CA 90036

February 17, 1991

Ms. Elena Huerta
FastPak Design
3535 Mission St
Houston TX 45321

RE: New package design

Dear Ms. Huerta:

We need a quick new design for the plastic bottles for our condiments.

Drawing Paper ◄———— 655 B

Recently, an executive of a supermarket chain took a box of our samples home in order to try them before ordering. He briefly left the box on the kitchen floor where his son ran into it with a tricycle.

Our bottles should be able to withstand the impact from a tricycle powered by a three year old. But four bottles of our new salsa broke, spilling their contents all over the floor.

The executive never got a chance to try our product.

Can you design a lightweight, recyclable, 8 oz. plastic bottle that won't break under moderate impact? I'll be

Contents  Samples  Staff  Widget Inc.  Current  Personal  To Do  Done  Phone  Index



Fig. 57A

| Package Design Letter | ◄— 4 —► |
|---|---|

**Document   Edit   Insert   Case   Format**

FastPak Design
3535 Mission St.
Houston TX 45321

RE: New package design

Dear Ms. Huerta:

We need a new design for the plastic bottles for our condiments.

Recently, an executive of a supermarket chain took a box of our samples home in order to try them before ordering our line. He briefly left the box on the kitchen floor where his son ran into it with a tricycle.

Our bottles should be able to withstand the impact from a tricycle powered by a three year old. But four bottles of our new salsa broke, spilling their contents all over the floor.

The executive never got a chance to try our product.

Can you design a lightweight, recyclable , 8 oz. plastic bottle that won't break under moderate impact? I'll be travelling next week, but you can fax me suggested proposals at 415/ 345-9833.

Sincerely,

*Side tabs:* Contents | Samples | Staff | Widget Inc. | Current | Personal | To Do | Done | Calendar | Phone

120 {



Fig. 58

659



---

**Package Design Letter** ◄— 4 —►

Document  Edit  Insert  Case  Format

FastPak Design
3535 Mission St.
Houston TX 45321

RE: New package design

Dear Ms. Huerta:

We need a new design for the plastic bottles for our
condiments.

Recently, an executive of a supermarket chain took a
box of our samples home in order to try them before
ordering our line. He briefly left the box on the kitchen
floor where his son ran into it with a tricycle.

Our bottles should be able to withstand the impact from a
tricycle powered by a three year old. But four bottles of
our new salsa broke, spilling their contents all over the
floor.

The executive never got a chance to try our product.

Can you design a lightweight, recyclable, 8 oz. plastic
bottle that won't break under moderate impact? I'll be
travelling next week, but you can fax me suggested
proposals at 415/ 345-9833.

Sincerely,

---

Contents | Samples | Staff | Widget Inc. | Current | Personal | To Do | Done | Calendar | Phone

Fig. 59

recyclable

659A

Package Design Letter          ◄─ 4 ─►

Document   Edit   Insert   Case   Format

FastPak Design
3535 Mission St.
Houston TX 45321

RE: New package design

Dear Ms. Huerta:

We need a new design for the plastic bottles for our condiments.

Recently, an executive of a supermarket chain took a box of our samples home in order to try them before ordering our line. He briefly left the box on the kitchen floor where his son ran into it with a tricycle.

Our bottles should be able to withstand the impact from a tricycle powered by a three year old. But four bottles of our new salsa broke, spilling their contents all over the floor.

The executive never got a chance to try our product.

Can you design a lightweight, recyclable , 8 oz. plastic bottle that won't break under moderate impact? I'll be travelling next week, but you can fax me suggested proposals at 415/ 345-9833.

Sincerely,



Fig. 60

| Package Design Letter | ← 4 → |
| --- | --- |

Document  Edit  Insert  Case  Format

FastPak Design
3535 Mission St.
Houston TX 45321

RE: New package design

Dear Ms. Huerta:

We need a new design for the plastic bottles for our condiments.

661  Recently, an executive of a supermarket chain took a box of our samples home in order to try them before ordering. He briefly left the box on the kitchen floor where his son ran into it with a tricycle.

Our bottles should be able to withstand the impact from a tricycle powered by a three year old. But four bottles of our new salsa broke, spilling their contents all over the floor.

The executive never got a chance to try our product.

Can you design a lightweight, recyclable, 8 oz. plastic bottle that won't break under moderate impact? I'll be travelling next week, but you can fax me suggested proposals at 415/ 345-9833.

Sincerely,

Contents  Samples  Staff  Widget Inc.  Current  Personal  To Do  Done  Calendar  Phone



Fig. 61



Fig. 62

---

**Package Design Letter**     ◄— 4 —►

Document  Edit  Insert  Case  Format

New World Foods
19271 Palm Blvd.
Los Angeles, CA 90036

February 17, 1991

Ms. Elena Huerta
FastPak Design
3535 Mission St.
Houston TX 45321

RE: New package design

Dear Ms. Huerta:

We need a new design for the plastic bottles for our
condiments.

800 —►

Recently, an executive of a supermarket chain took a
box of our samples home in order to try them before
ordering. He briefly left the box on the kitchen floor
where his son ran into it with a tricycle.

Our bottles should be able to withstand the impact from a
tricycle powered by a three year old. But four bottles of
our new salsa broke, spilling their contents all over the
floor.

The executive never got a chance to try our product.

Can you design a lightweight, recyclable, 8 oz. plastic
bottle that won't break under moderate impact? I'll be
travelling next week, but you can fax me suggested

Contents  Samples  Staff  Widget Inc.  Current  Personal  To Do  Done  Phone  Index



Fig. 63

---

**Package Design Letter**    ← 4 →

Document  Edit  Insert  Case  Format

New World Foods
19271 Palm Blvd.
Los Angeles, CA 90036

February 17, 1991

Ms. Elena Huerta
FastPak Design
3535 Mission St.
Houston TX 45321

RE: New package design

Dear Ms. H ⌐802        ⌐804

 q  u  i  c  k

We need a new design for the plastic bottles for our
condiments.

Recently, an executive of a supermarket chain took a
box of our samples home in order to try them before
ordering. He briefly left the box on the kitchen floor
where his son ran into it with a tricycle.

Our bottles should be able to withstand the impact from a
tricycle powered by a three year old. But four bottles of
our new salsa broke, spilling their contents all over the
floor.

The executive never got a chance to try our product.

Can you design a lightweight, recyclable, 8 oz. plastic
bottle that won't break under moderate impact? I'll be
travelling next week, but you can fax me suggested

*Sidebar tabs: Contents | Samples | Staff | Widget Inc. | Current | Personal | To Do | Done | Phone | Index*

Fig. 64

| Package Design Letter | ◄─ 4 ─► |
|---|---|

Document  Edit  Insert  Case  Format

> New World Foods
> 19271 Palm Blvd.
> Los Angeles, CA 90036
>
> February 17, 1991

Ms. Elena Huerta
FastPak Design
3535 Mission St.
Houston TX 45321

RE: New package design

Dear Ms. Huerta:

We need a quick new design for the plastic bottles for our condiments.

Recently, an executive of a supermarket chain took a box of our samples home in order to try them before ordering. He briefly left the box on the kitchen floor where his son ran into it with a tricycle.

Our bottles should be able to withstand the impact from a tricycle powered by a three year old. But four bottles of our new salsa broke, spilling their contents all over the floor.

The executive never got a chance to try our product.

Can you design a lightweight, recyclable, 8 oz. plastic bottle that won't break under moderate impact? I'll be travelling next week, but you can fax me suggested

*Right sidebar tabs:* Contents | Samples | Staff | Widget Inc. | Current | Personal | To Do | Done | Phone | Index



**Fig. 65**

**Package Design Letter** ← 4 →

Document  Edit  Insert  Case  Format

New World Foods
19271 Palm Blvd.
Los Angeles, CA 90036

February 17, 1991

Ms. Elena Huerta
FastPak Design
3535 Mission St.
Houston TX 45321

RE: New package design

Dear Ms. Huerta:

─ 652

We need a quick new design for the plastic bottles for our condiments.

Recently, an executive of a supermarket chain took a box of our samples home in order to try them before ordering. He briefly left the box on the kitchen floor where his son ran into it with a tricycle.

Our bottles should be able to withstand the impact from a tricycle powered by a three year old. But four bottles of our new salsa broke, spilling their contents all over the floor.

The executive never got a chance to try our product.

Can you design a lightweight, recyclable, 8 oz. plastic bottle that won't break under moderate impact? I'll be travelling next week, but you can fax me suggested

        

Contents | Samples | Staff | Widget Inc. | Current | Personal | To Do | Done | Phone | Index

Fig. 66



Fig. 67

Package Design Letter    ◀━ 4 ━▶

Document  Edit  Insert  Case  Format

New World Foods
19271 Palm Blvd.
Los Angeles, CA 90036

February 17, 1991

Ms. Elena Huerta
FastPak Design
3535 Mission St.
Houston TX 45321

RE: New package design

Dear Ms. Huerta:

We need a **quick** new design for the plastic bottles for
our condiments.

Recently, an executive of a supermarket chain took a
box of our samples home in order to try them before
ordering. He briefly left the box on the kitchen floor
where his son ran into it with a tricycle.

Our bottles should be able to withstand the impact from a
tricycle powered by a three year old. But four bottles of
our new salsa broke, spilling their contents all over the
floor.

The executive never got a chance to try our product.

Can you design a lightweight, recyclable, 8 oz. plastic
bottle that won't break under moderate impact? I'll be
travelling next week, but you can fax me suggested

Contents | Samples | Staff | Widget Inc. | Current | Personal | To Do | Done | Phone | Index



**Fig. 68**

Package Design Letter          ◄— 4 —►

Document  Edit  Insert  Case  Format

New World Foods
19271 Palm Blvd.
Los Angeles, CA 90036

February 17, 1991

Ms. Elena Huerta
FastPak Design
3535 Mission St.
Houston TX 45321

RE: New package design

Dear Ms. Huerta:

— 663

We need a quick new design for the plastic bottles for our condiments.

Recently, an executive of a supermarket chain took a box of our samples home in order to try them before ordering. He briefly left the box on the kitchen floor where his son ran into it with a tricycle.

Our bottles should be able to withstand the impact from a tricycle powered by a three year old. But four bottles of our new salsa broke, spilling their contents all over the floor.

The executive never got a chance to try our product.

Can you design a lightweight, recyclable, 8 oz. plastic bottle that won't break under moderate impact? I'll be travelling next week, but you can fax me suggested

*Side tabs: Contents, Samples, Staff, Widget Inc., Current, Personal, To Do, Done, Phone, Index*



Fig. 69



Fig. 70



Fig. 71

Case 3:03-cv-01108-B-CAB   Document 1   Filed 06/02/03   Page 938 of 976



Fig. 72

5,347,295

1

## CONTROL OF A COMPUTER THROUGH A POSITION-SENSED STYLUS

### BACKGROUND OF THE INVENTION

Recently a new class of computer has begun to emerge. This type of computer uses an electronically-sensed pen or stylus and handwriting recognition in place of a keyboard as the primary input device. Typically in such a pen-driven computer the movement of the stylus is tracked over a flat-screen bit-mapped display. As the computer tracks the stylus it displays images which mimic various real-world objects. In this way the interaction between the stylus and the screen simulates "paper," "ink," "push buttons," and other visual metaphors.

The present invention addresses the problem of controlling such a computer through a stylus. In this application the word stylus is used to mean a pen-like object whose position and contact with a surface can be continuously detected electronically. In the prior art it has been found that a computer can be made easier to use if it displays symbols that mimic the behavior of actual objects. For example, the Macintosh computer from Apple Computer uses simplified pictures or icons to represent documents, folders, and trash cans to present a metaphor for a desk top. The icons are manipulated by using a mouse to move a pointer on the screen to select and possibly drag these icons to new positions.

In the prior art the use of a mouse offers only a limited control vocabulary, basically pointing, dragging, clicking, and double clicking. More complex operations require the user to resort to the keyboard or choices from a menu. For example in a word processor program text is moved in a four step operation. First the desired phrase is selected by dragging the text cursor with the mouse, second the "cut" command is selected, third the text cursor is moved with the mouse, and fourth the "paste" command is selected. A copy operation requires a similar four-step process.

Certain systems substitute a stylus for a mouse, as described, for instance, in "Digitizing Tablets" PC Magazine, Nov. 28, 1989. Other systems have implemented stylus-controlled notepad computers, as described in "Linus Write-Top User's Guide" (1987) from Linus Technologies, Inc. of Reston, Va. and "Gridpad Computer Owner's Guide" (1990) from Grid Systems Corporation of Fremont, Calif. Each of the foregoing references is incorporated herein by reference.

In earlier systems, when a stylus has been used as a substitute for a mouse, the stylus emulates the limited behavior of a mouse with little or no change in the controlling software. The existing notepad computers also use the stylus in a limited way but add the recognition of handwritten input and one or two editing gestures which operate only within text.

There are problems in the initiation and termination of "input events" in these existing stylus-driven computers. For the purposes of this application, the term "input event" refers to one or more strokes which comprise one complete expression, such as a tap, caret, letter, word, or phrase. A "button" is a region of the display demarcated by shading or outline and sensitive to some small set of simple gestures such as tapping.

In certain systems (such as the Grid and Linus designs the mentioned above), an event begins when the stylus touches the front surface of the display. Input is then terminated in one of three ways: (a) by lifting the stylus

2

from the surface; (b) by a series of strokes followed by a final lift of the stylus and lack of contact for a specific time interval, or "timeout"; or (c) by a series of strokes after which a specific region of the display (such as a button) is touched.

Typically, technique (a) is used when the input event is a simple gesture, such as tapping a button. Technique (a) can also be used to terminate the input of a single-stroke editing symbol such as a strike-through, circle, or caret.

Technique (b) would typically be used to signal the end of entry of a single character or multi-stroke editing gesture. To terminate the entry of many symbols reliably (where the operator can be expected to pause during input), option (c) must be used to explicitly indicate completion.

Each of these stylus (as opposed to mouse) techniques has its problems. In technique (a), the input event is typically begun by placing the stylus tip on a desired button or other feature. However, selection of an individual button is difficult when there are many small buttons close to one another. An example of this is in a "sketching" program, where objects are manipulated by tapping or dragging small buttons or "handles" at their extremities. In such a program, a rectangle would have handles at each corner while a curve would have handles at each inflection point. For a screen with many small objects or curves with many bends, the selection of a desired handle can be difficult, because there is no way to preview which handle is targeted.

An additional problem in accurate pointing with the stylus is the parallax caused by the separation of the surface that the stylus tip contacts and the active layer of the display. This problem is not found in mouse-based systems, because a cursor or arrow is drawn on the display to represent the position of the mouse.

Technique (a) cannot be used to recognize the end of a multi-stroke gesture or character. This forces the designer into the use of timeouts, i.e. technique (b). However, the use of timeouts does not provide as smooth an interaction with the user, because the interval is commonly either too long or too short for a given individual or circumstance. The user must be conscious of the timeout interval, and alternately feels that he must race through the input task or delay excessively at the completion of the task.

Given the limitations of these two techniques, designers using prior art were often forced into using technique (c): explicit termination by selecting a button. But using this technique yields a host of problems. Finding room on the display to locate such a button is often difficult. In one area where notepad computers will be applied—hand entry of data into electronic forms—it is desirable for these computer-simulated forms to look and act much like a paper form. Using prior art, a termination button must be provided to trigger recognition and validation of the user's input for each field. Thus, for a typical form containing many fields an unnecessary amount of space on the display is given over to these termination buttons.

In addition, a form requiring the triggering of a button upon completing entry in a given field does not act like a paper form; a paper form is different in that it is "mode-less," i.e. the user may skip from field to field at will. Thus, the use of technique (c) impairs the user interface by making it less intuitive.

5,347,295

3

The above summary shows that present computers do not fully exploit the possibilities of user interaction with a computer using a stylus.

## SUMMARY OF THE INVENTION

The present invention describes methods and apparatus for a stylus-driven computer in a notebook metaphor. Thus, the computer presents the behavior of a metaphorical multi-page notebook including visible pages, page-turn effects, tabbed bookmarks along one or more edge, "floating" pages temporarily removed from their notebook location, a table of contents, and contents of subsections.

Each page in the notebook contains one document which may contain many physical pages when printed. These pages are analogous to data files in other computers and may contain different types of documents such as text, drawings, facsimile images, or specialized forms. Some information (such as the "Help Information") is contained in separate notebooks with all of the features listed above.

The primary means of control of the computer is a set of numerous gestures drawn with the stylus over almost any object visible on the display. Gestures with a stylus offer a more concise vocabulary than traditional pointing devices because they combine, into one movement, both: (1) selection of text or other portion of a document, as controlled by the location of the gesture on the screen or display; and (2) the meaning of the gesture or the specific command to be executed, which is determined by the particular gesture which is made.

A single set of gestures is used in the present invention to delete, move, copy, or edit diverse objects such as text fragments, buttons, documents, or entire notebooks. Gestures are used to initiate the insertion of hand-written text, the editing of existing text, page-turning, scrolling within a window, zooming or shrinking of entire pages, selection, summoning of windows containing operator guidance, or the creation of links ("goto" buttons) to other pages.

The proximity of the stylus to the display's front surface is used to anticipate and terminate stylus input events. By sensing both the proximity of the stylus tip to the display surface and the contact with the display surface, the user-interface software can more accurately discern the vertical movement of the stylus, provide a richer vocabulary of stylus movements for control of the computer, and offer better feedback to the user.

When using the stylus for selection, movement of the stylus into proximity can trigger display events which give the user a preview of what display objects are understood by the computer to be targeted. For example, the computer can expand or alter the appearance of a button in anticipation of its selection. This technique overcomes the problems of selecting displayed objects due to tight spacing and parallax effects in prior art.

In the entry of multi-stroke graphical objects the sensing of the departure of the stylus tip from the vicinity of the display surface allows the computer to discern the natural movement of the operator's hand at the end of drawing and initiate processing or recognition. Such drawn objects may include editing gestures, geometric figures, or handwriting. This use of proximity transitions for the termination of input events eliminates the problems found in prior art caused by the use of loss-of-contact, timeouts, or buttons.

The operating software of the computer presents a Graphical User Interface (GUI) for the control of the computer. In a GUI the computer displays small pictures or icons representing various familiar, real-world objects such as file folders, trash cans, buttons, slide controls, paint brushes, erasers, and pencils.

In prior art (Xerox Star, Apple Macintosh, Microsoft Windows and Presentation Manager), the icons have been chosen to simulate a desktop which uses the manipulation of files and folders as a metaphor for control of computer programs and files. In the present invention, a "notebook" metaphor is chosen as being more intuitive in controlling a portable, hand-held, stylus driven computer. This metaphor provides a coherent, familiar means of organizing and accessing data. Features such as numbered and titled pages, tables of contents, section dividers, and tabs mimic the operation of their real counterparts and allow a user to peruse the data held in the computer with little or no training.

The notebook metaphor allows a more structured arrangement of documents than the somewhat free-format desktop metaphor. Related documents can be place in a section on adjacent pages, and a simple gesture used to turn from one page to another. The ability of the user to place a tab on any document allows the user to turn to that page instantly.

Another advantage of the notebook metaphor is the matching in scale of the icons to their physical counterparts. For example, in the present invention a simulated page tab is roughly the size of an actual page tab. This is important because the stylus must interact with these icons and is the size of, and is manipulated with the accuracy of, an actual pen or pencil.

The implementation of the actual "notebook" GUI software can be based on any one of many prior inventions. Information in this area can be found in *Inside Macintosh, Fundamentals of Interactive Computer Graphics, SmallTalk-80, The Language and Its Implementation* (all from Addison-Wesley Publishing Co.), "The X Window System" (*ACM Transactions on Graphics,* Vol. 5, No. 2, April 1986, pages 79–109) or "Andrew: A Distributed Personal Computing Environment" (*Communications of the ACM,* March 1986). The actual techniques used to recognize both gestures and handwritten input will not be discussed in detail here, but may be found in "Automatic Recognition of Handprinted Characters—The State of the Art" *Proceedings of the IEEE,* pages 469–487, Vol. 68, No. 4, April 1980. The foregoing references are incorporated herein by reference.

Attached hereto as Appendices I-V are detailed documentation of an actual implementation applicant's system. These appendices are all from GO Corporation of Foster City, Calif., and are entitled:

I. Architecture—Parts 0 to 5
II. Architecture—Parts 6 to End
III. Application Developer's Guide
IV. API Reference.

The Appendices are supplied to demonstrate one actual working example of a system utilizing applicant's invention, and there may be many other, different realizations of the invention which still incorporate the features discussed above and described in detail below.

Another patent application which includes disclosure which may be used in conjunction with the present invention is the United States patent application of Carr et al., entitled "Computer Documents as Compound Documents in a Notebook Metaphor," Ser. No. 07/607,139, filed Oct. 31, 1990. That application is incorporated herein by reference.

5,347,295

5

Another copending application which complements the disclosure herein is the United States patent application of Hullender entitled "Method For Pattern Recognition," Ser. No. 07/607,125, filed on Oct. 31, 1990 now U.S. Pat. No. 5,151,950. That application is also incorporated herein by reference.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is an overall view of a notebook computer.

FIG. 2 is a cross-section of a notebook computer according to the present invention.

FIG. 3 is a block diagram of the computer's components.

FIG. 4 shows the table of contents document.

FIG. 5 shows a floating notebook.

FIG. 6 shows an expanded table of contents.

FIG. 7 shows a floating page above the table of contents.

FIG. 8 shows a floating page with the resize handle visible.

FIG. 9 shows the resizing of a floating page.

FIG. 10 shows the resulting resized floating page.

FIG. 11 shows the dragging of a floating page.

FIG. 12 show the result of dragging a floated page.

FIG. 13 shows a menu augmented with gesture symbols.

FIG. 14 shows quick gesture help.

FIG. 15 shows a text document with a word selected.

FIG. 16 shows the scrolling of a document with a scroll margin.

FIG. 17 shows the "extend selection" gesture.

FIG. 18 shows the extended selection.

FIG. 19 shows the "Document" menu.

FIG. 20 shows the "Edit" menu.

FIG. 21 shows the 'edit' gesture drawn over a word.

FIG. 22 shows a pop-up edit pad.

FIG. 23 shows a pop-up proofing pad.

FIG. 24 shows a text formatting option sheet.

FIG. 25 shows the available text option cards.

FIG. 26 shows a document information option card.

FIG. 27 shows a document access option card.

FIG. 28 shows an icon option card.

FIG. 29 shows text selected for movement in a document.

FIG. 30 shows a dragged text outline.

FIG. 31 shows the result of moving text.

FIG. 32 shows handprinting in an edit pad.

FIG. 33 shows the result of text edit.

FIG. 34 shows an insertion gesture in the table of contents.

FIG. 35 shows a sample stationery palette.

FIG. 36 shows a 'quick help' gesture and the quick help notebook.

FIG. 37 shows a "Drawing Paper" document with a selected object.

FIG. 38 shows a targeted handle on an object.

FIG. 39 shows an object being dragged.

FIG. 40 shows an object being resized.

FIG. 41 shows two selected objects.

FIG. 42 shows a targeted handle on one of two closely-spaced objects.

FIG. 43 shows a targeted handle on an adjacent object.

FIG. 44 shows a computerized form.

FIG. 45 is a table of gesture commands of the present invention.

6

FIGS. 46–48 are partial screen shots from the notebook 2, showing various gestures and the results of using them on text.

FIGS. 49 and 50 are screen shots showing the use of a check-tap gesture to call up an options sheet.

FIGS. 51–72 illustrate the use of numerous gestures of the invention as computer commands.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

FIG. 1 shows the initial embodiment of the invention. This implementation is a portable, battery-operated notebook computer 2 with, preferably, the height and width of a standard legal notepad. (The invention may also be implemented in other, non-portable computers.) As shown in FIG. 2, a stylus 4 having a tip 6 is utilized with the notebook computer 2, in a manner to be described below.

FIG. 2 shows the internal mechanical layout of the computer 2. Liquid crystal display 10 is mounted as the front surface of the unit. Mounted behind the display is the pen position digitizer 20. A rechargeable battery pack 30 snaps into a slot on the lower bottom of the computer and the main printed circuit board 40 mounts on the inside of the rear case 8 of the computer 2.

The pen or stylus 4 contains a radio frequency inductor/capacitor circuit 42 and a switch 44 which closes on pen-down and changes the resonant frequency. This may be in accordance with the disclosure in the U.S. Pat. No. 4,786,765 to Yamanami et al., which is incorporated herein by reference.

FIG. 3 is a block diagram of the internal architecture of the notebook computer 2. An Intel 80286 microprocessor 50 connects to the following subsystems: 1–2 megabytes of flash EPROM 60; 1–4 megabytes of static RAM 70; an LCD display controller 80; a pen position digitizer co-processor 90; a Small Computer Systems Interface (SCSI) expansion port 100; a custom Application Specific Integrated Circuit (ASIC) 104 (containing direct memory access and interrupt logic); and a dual-channel serial input-output integrated circuit 108. The expansion slot 112 is designed to accept modules containing additional I/O devices, such as a modem 114 or expansion memory (not shown). The base station port 116 is intended for connecting to a base station 118, which may comprise external disk drives, power supplies, a keyboard, and a local area network (LAN).

The display 10 can be any one of many commercially available units which contain an array of 400 by 640 picture elements (pixels), each of which can display four shades of gray. Such displays are available from Toshiba, Hitachi, and Sharp.

Although in certain designs (such as those that have been available from Grid Systems Corporation and Linus Technologies, Inc.), resistive, transparent digitizers have been mounted in front of the display, it is desirable to use a digitizer which does not require contact with the stylus. A digitizer based on non-contacting technology can be mounted behind the display, and thus eliminates one transparent layer above the display.

The present invention senses when the stylus is in proximity to or in contact with the front surface of the computer. Digitizers capable of this are available from Summagraphics, CalComp and Wacom. The Wacom unit is especially desirable because it provides a cordless, lightweight stylus which does not require an internal power source, as described in the above-mentioned '765 patent to Yamanami et al.

5,347,295

7

Gestures as Commands for the Notebook Metaphor
Computer

The notebook computer is completely controllable through gestures and printed characters drawn on the display with the electronic stylus. Unlike the click of a mouse button, a gesture can express a command and indicate its target. Thus a "hot point" or focus must be defined for each gesture that the computer can recognize. This hot point should bear some logical relationship to the gesture being made. For example, a caret gesture is used to insert new text or documents, and its hot point is the tip of the caret. Some gestures are actually letters. An example of this is in text editing: printing a capital "U" over a word causes that word to be underlined.

FIG. 4 shows a typical initial display of the notebook computer 2. Almost every visible object on the display is responsive to some gesture. The upper portion of the display shows the "table of contents" display 105 of the main notebook 110. The lower portion 120 of the display 10 is a "bookshelf" of icons which represent other notebooks 130, various accessories 140, or "goto" buttons 150 linked to locations within documents in any notebook. Tapping a notebook or accessory icon 130 or 140 on the bookshelf will open its window, while tapping a link button 150 will cause the linked page to be turned to.

Features such as the page title bar 160, page number 170, page turn buttons 180, and visible page tabs or bookmarks 190 are common features of all pages presented in the notebook metaphor of the present invention. The menu bar 200 occurs on many pages in the notebook and includes one or more buttons. Typically, the activation of these buttons displays submenus of related commands.

The "Document" menu 210 and "Edit" menu 220 are available in all documents, and an optional "cork margin" 230 may appear at the bottom of the page. The cork margin 230 is essentially a private bookshelf for each document and may contain embedded documents, accessories or link buttons 240.

The lower edge 245 of the main notebook 110 can be dragged up or down to reveal more or less of the bookshelf 120. The resizing is done by holding the stylus tip 6 down on the center handle 250 of the lower edge 245, and dragging the bottom edge vertically.

Some specialized documents such as "Help Information" are best presented as notebooks separated from the main notebook. For example, a format allows the "Help" notebook 340 (shown in FIG. 5) to be referenced as it floats above a user's document. Such independent notebooks support all of the features of the main notebook described above. A user might also organize different sets of documents into separate notebooks.

As shown for the notebook 110 in FIG. 4, the table of contents 105 on the "Contents" page of a notebook contains entries 260 for all top-level documents contained within that notebook. Each entry includes an icon 270, a title 280, a page number 290 and a page access button 300. The contents page (here, page 1) is itself the topmost instance of a document of type "Section". The entries (such as entries 310 and 320) of the table of contents 105 whose titles are bolded (Samples, Reports, etc.) are also "Section" documents which list the contents of subsections of the notebook 110. The entries whose titles are in a font of normal weight (such

8

as entries 330 and 340) represent documents of other types.

An option for an expanded view can be selected from the "View" menu 350, as shown in FIG. 6. In this format, the nested contents 360 and 370 of each section (entries 310 and 320, respectively) will be displayed. Double-tapping on a section name (such as 310 or 320) will expand or close that section, depending on its state at the time of tapping.

As a typical page, the table of contents 105 demonstrates the pervasive use of gestures in control of the computer. FIG. 45 illustrates a wide variety of the gestures which are used in conjunction with the present invention. For example, a gesture 165 comprising a horizontal stroke or flick of the stylus in the title bar 160 (see FIG. 4) turns to another page. Flicking from right to left will turn to the next page, while a left-to-right flick will turn to the previous page.

The gestures shown in FIG. 45 represent idealized shapes for the gestures used in conjunction with the present invention. The user of the computer 2 should make gestures which approximate the idealized gestures as closely as possible, but of course exact duplication is not required. A user's actual gestures are more likely to look like those shown in FIGS. 46–48.

When the user actually makes one of the gestures on the screen, an image of the actual strokes made by the tip of the stylus appears on screen. The computer then recognizes the gesture by comparing it with a set of predefined gesture shapes. Then, the computer takes an action in response to the recognized gesture. In a preferred embodiment, after the actual strokes appear on screen and either before or while the computer takes the consequent action, a stylized or idealized form of the gesture, such as the forms which are shown in FIG. 45, appears on the screen in place of the user's actual gesture. This accomplishes two things: it gives the user feedback that assures him that the computer has recognized the gesture which was intended (or, alternatively, lets the user know that an incorrect gesture was recognized); and it consequently trains the user to make gestures which will more consistently be correctly recognized by the computer. If an unrecognizable gesture is made, the computer responds with an appropriate symbol, such as a question mark in a circle.

It may also be that a gesture is made which is out of context. For instance, a context may be created for a gesture to be made over a word. If that gesture is made over a word, then the location of the gesture is considered to be the word underlying the gesture. If the gesture is made but not over a word, an error is returned.

The proximity sensing for the termination of gestures in the present invention allows for very smooth and natural computer control. In general, the user will bring the tip 6 of the stylus 4 towards the screen 10 (which may be covered by a protective glass or plastic layer 12, as shown in FIGS. 1 and 2), and upon contact with the layer 12, a gesture may be drawn.

When the user is finished drawing the gesture, the stylus tip 6 is simply removed from the layer 12, and the system automatically detects this motion. At that point, the computer 2 immediately begins to process the command represented by the gesture. Thus, the user is not required to take any action other than actually drawing the command gesture (such as tapping an "execute command" button), and also is not required to wait any additional time (such as due to a time-out) for execution of the command, once the gesture is completed.

5,347,295

9

The distance at which proximity is sensed may be preset in software by setting a strength level for the signal when the tip 6 is nearby. Generally, this will not be adjusted once it is set. The calibration is for a given strength of signal, which occurs at, e.g., ¼ inch or other appropriate distance.

Many of the actions of gestural commands can also be triggered by tapping on buttons or menu items. Page turns are an example of this. The page can be turned by flicking within the title bar, as discussed above, or by pressing one of the page turn buttons 180. The two approaches are complementary: the gestural commands are quick and convenient, but provide no visual clues as to the availability and meaning of gestures in a particular region of the screen. Visible controls invite the user to explore the behavior of the computer but require extra operations to actuate an operation.

The user can learn what gestures are acceptable for different procedures in two ways. First, menu entries that have gestural equivalents can be marked with a symbol that indicates the correct gesture, as in the gesture menu 450 shown in FIG. 13. In addition, explanations 460 summoned by the question-mark gesture 820 (see FIG. 36) contain the symbols and names of applicable gestures. Examples of instances where the computer supports a dual path to a given command are discussed below.

By way of example, FIG. 15 shows a text document 462 with a scroll margin 464. Scroll margins and scrolling are used throughout the notebook when the information to be displayed cannot be shown in the space available. In the case shown in FIG. 15, the text of the document is too long to display in the area available. With scrolling, the display can be thought of as a window which is movable into some larger space. Documents can contain vertical and horizontal scroll margins in any combination.

In general, scroll margins such as scroll margin 464 include four elements: a slider 470, selection area 480, and the direction arrows 490 & 500. The slider 470 shows the position of the visible portion relative to the entire virtual portion of the document 462 (much or most of which may be off screen).

This visible region can be moved by various stylus gestures or by the direction arrows over the selection area, and thus accommodates more than one command approach. A tap on a direction button moves the view of the window into the document one line in that direction. Tapping within the selection area causes the region of the document which corresponds to the location of the tap to be displayed in the window. The slider 470 may be dragged up or down to cause the display of a region 520 of text corresponding to the position of the slider 470 in the selection area 480, as shown in FIG. 16.

As discussed below, there are many commands which may be entered either by the gestures or by other command means on the screen. Numerous gestures are detailed in the following discussion, most of which, in the preferred embodiment of the invention, are implemented using the departure-from-proximity detection to signal the completion of the respective commands.

### The Use of the Gesture Commands

As mentioned above, a list of many available gestures for the present invention appears in FIG. 45. These gestures are described in detail in the course of the following discussion, with examples of how to use each being shown in the drawings.

10

Gestures have a strong advantage over visible controls. There may be, for a given computer action or command, both a gesture which can be drawn in a gesture area and a button or other command symbol which may be tapped to carry out the command. However, in the present invention, the gesture area which is sensitive to the command gesture is preferably much larger than the corresponding button or the like which may be tapped to accomplish the same command. This is due to the fact that a given region of the display can distinguish between many gestures and can display changeable information, while a button must be labeled in some static way and can only accept a tap.

Thus, in the case of scrolling, it is much easier to flick within a large window than to tap a relatively small button. This is also true of page turning, by flicking in the title bar vis-a-vis tapping on the page-turn buttons. Such ease of targeting is very important when using a notepad computer while standing, a common mode of use for such a portable computer.

A standardized, uniform procedure and set of gestures are used throughout the computer's user interface (i.e. across a plurality of applications) for selecting, moving, copying, deleting, editing, or setting the attributes of objects. Typical objects that can be manipulated are characters, words, spreadsheet cells, paragraphs, drawn geometric figures, icons, documents or entire subsections. To operate on an object, the object must first be selected and a gestural command issued. For example, a paragraph could be selected and then moved to another location.

In cases where the selection can be inferred from the target of the gesture, the selection step can be bypassed. Thus, the selection within a document may be a letter, word, sentence, or paragraph, while in the table of contents the selection is a document. If a selection has already been made and the gesture is made over the entire selection or a substantial portion of it, then the command applies to the entire selection. Otherwise, the selection is ignored, and the target is only what lies under the gesture's hot point. The current selection is marked by a grey background, such as with the selected word 510 shown in FIG. 15.

Within a block of text, the typical default selection for a gesture is the underlying word. For the selection of other units of text, a number of gestures are supported. A double-tap 622 on text explicitly selects a word, a triple-tap 512 selects a sentence, and a quadruple-tap 514 selects a paragraph. In addition, a square 657 drawn around a block of text or a region within a document selects that block or region. (See FIG. 45 for illustrations of these gestures.)

Any portion of text can be selected by holding the stylus tip down at either end of the desired region, pausing for a moment (during which time the letter preferably highlights), and then wiping or dragging the tip to the other end of the portion to be selected.

A selection can be extended or reduced in either direction to any arbitrary position by drawing a left or right bracket before, after, or within the current selection, respectively. Thus, insertion of right bracket 530 in FIG. 17 (see also FIG. 45) extends the selected word 510 to a selected portion 540, as shown in FIG. 18.

A right bracket 530 could also be placed in the selected portion 540 shown in FIG. 18, directly to the right of the word "Gestures", in which case the selected portion 540 would be re-sized to include only the word "Gestures", as originally shown in FIG. 17. Similarly, a

5,347,295

11                                                12

left bracket 535 (shown in FIG. 45) may be used to extend the selected words or portion of a document to the left.

A basic gesture is the single tap 621 which, when made on tab 190 shown in FIG. 4, will turn to the page whose number appears on the tab.

Two taps in quick succession, i.e. a double-tap 622 on a tab (or on a page number 290 or page access button 300) will cause the corresponding page (such as page 380) to appear floating above the current page 10, as shown in FIG. 7 (i.e. in several applications within the notebook. Multiple pages may be floated atop one another. The turn-to and bring-to meanings for tapping and double-tapping, respectively, are used in many places throughout the notebook. The document buttons in a section document, the tabs, the page numbers in the index document and the "goto" link buttons all support this behavior.

A floating page can be sent back to its home location by tapping the triangular button 390 located at its upper left corner. Floating pages can be expanded to the full size of the display as in FIG. 8 by an upward flick of the stylus tip 6 on the title bar 440, and can be reduced to their original floating size by a downward flick on the title bar of the full-size page.

In addition, floating pages can be resized through the "handles" 400 and 410 at the lower right and bottom of their frames. To aid in targeting, these resize handles are previewed or highlighted when the stylus is brought into proximity with the position of the handle 400 or 410 on the display 10, resulting, for example, in highlighted handle 430 (see FIG. 10) when the stylus tip 6 is nearby.

Once the highlighted handle 430 appears, the boundary of the floating page can then be shrunk or stretched by touching the stylus tip to the highlighted handle 430, and dragging the stylus tip 6 to the desired position, such as position 420 shown in FIGS. 9 and 10. In a similar fashion, the position of floating pages can be changed by holding the stylus tip down on the title bar 440 and dragging the pen tip to a new location 445, as shown in FIGS. 11 and 12. Floating objects maintain their positions as the underlying page (such as page 1) is turned.

An upward flick 623 (see FIG. 45) "pushes up" the visible portion of the document while a downward flick "pulls down." Left and right flicks within a horizontal scroll margin have an analogous effect, as shown in FIGS. 37 and 44. These gestural commands may be used as alternatives to the use of the scroll margin discussed above.

Two flicks in the same direction in quick succession may be referred to as a double flick, which make up gesture 624 shown in FIG. 45. A double flick moves the document to its extreme in that direction. Triple flick 625 and quadruple flick 626 provide extensions of this action for documents structured in a more hierarchical fashion. For example, in a numerical spreadsheet, a single flick could move the distance of one line, two flicks may move to the next window, three flicks can move to the next page, and four flicks may move to the extremes (e.g., top, bottom, and sides) of the spreadsheet. These positioning flicks can be drawn in the body of the document in cases where flicking does not conflict with other stylus actions recognized within the document body.

The deletion gesture 629 (shown in FIGS. 45 and 51) is a cross or 'x' drawn over the object the user wishes to delete. A word or a selected portion in a document is deleted by simply drawing an 'x' over it. Thus, in FIG.

51, the selected phrase "our line" is deleted simply by x-ing it out, with the result shown in FIG. 52.

Within a section document, an entire listed document may be similarly deleted, simply by drawing the x gesture 629 over its name. This is shown in FIGS. 53 and 54, where the document "Calendar" is deleted by the use of this gesture.

Any visible tab can likewise be removed by drawing an 'x' over it, and a document can be deleted by an 'x' gesture in the document's title bar. The hot point of the 'x' gesture is center of the cross. The current selection may also be deleted by choosing the "Delete" entry 520 under the "Edit" menu 545 shown in FIG. 20.

Within a body of text, a "scratch-out" gesture 656 (see FIG. 45) can be used to delete many letters at once. The gesture is drawn as connected strokes, resembling a squashed or vertically compressed "z". The top stroke is drawn left to right, then the middle stroke is drawn from right to left, and the bottom stroke is drawn from left to right. The targeted letters are those which are bracketed by the extreme ends of the strokes and hence, the size and location of the gesture (in this case, the bracketing gesture) are both attributes affecting the target of the gesture.

Any user-defined text can be edited by drawing a circle gesture 610 over it, as shown in FIGS. 21 and 45. This gestural command is effective on words within a document, the text in title bars of documents, the contents of tabs, the entries in a section document, the labels of link buttons, and other portions of documents or notebooks. In response to the gesture 610, a small window or editing pad 620 containing the selected text is displayed nearby, as shown in FIG. 22.

Corrections, deletions and additions can be made using the common editing gestures. The hot point of the circle gesture is its center. Within a text document, the current selection may also be edited by choosing the "Edit Pad" 590 from the "Edit" menu 547.

A given word can be replaced by a gesture similar to the circle gesture. A gesture 651 comprising a circle drawn with a horizontal stroke through it, shown in FIG. 45, will cause an empty editing pad to be displayed. After the user fills in the edit pad and closes it, the selected word will be replaced with the new word.

A special case of text editing is the "proof" gesture: a capital letter "P". When drawn over a word, this gesture summons an editing window 630 which lists similarly spelled words, as in FIG. 23. The existing word can be edited or replaced in its entirety by single-tapping on one of the listed alternatives. Within a text document, the current selection may also be proofed by choosing the "Proof" entry 600 from the "Edit" menu 547 shown in FIG. 20.

In general, as indicated in FIG. 45, the letters A–Z may all be used as command gestures, with the meaning of a particular letter depending upon the particular context or setting in which it is used.

A number of special gestures are used to allow common text editing operations. FIGS. 46–48 illustrate various such gestures in the context in which they are used, and also illustrate the actions taken by the computer as a result of these gestures. These figures complement the table of gestures shown in FIG. 45.

For example, in FIG. 46 a vertical "pigtail" 632 is shown, and is used to delete one character, such as the letter "y" in the word "catchy". The result 633 is shown on the next line of FIG. 46.

5,347,295

13                                                    14

A down-and-right gesture 631 inserts a space be-
tween two characters, with the result being shown as
631A. An up-and-right gesture 634 is used to insert a
single character between two existing characters. When
this gesture is made, a floating, one-character edit pad
635 appears. After a single character is written into the
pad 635 and the pen leaves proximity, the pad 635
closes, the computer proceeds with the recognition
routine on the inserted character, and the recognized
character is inserted into the body of text at the place
where the gesture 635 was made, as shown at 635A.

A line-break in inserted by a down-and-left stroke
followed by a left flick, as shown at 636 in FIG. 47. The
result is shown at 637.

A paragraph break gesture 638 is made by a down-
and-left stroke. The result is shown at 639 in FIG. 47.

A tab may be inserted by a gesture 640 including a
down-and-right stroke combined with a horizontal
flick, with the result being shown at 641 in FIG. 47.

Letters may be set to upper and lower case by using
three gestures shown in FIG. 48. An up-and-right ges-
ture 642 capitalizes the first letter of the target word and
changes the rest of the word to lower case, as shown at
643. A right-and-down gesture 644 sets all the letters to
lower case, as shown at 645. Finally, a gesture 646 in-
cluding a right-and-up stroke followed by an upward
flick capitalizes the whole word, as at 647 in FIG. 48.

A check-mark gesture 652 (see FIGS. 24 and 45) is
use to view and set the attributes of an object. In re-
sponse to the gesture 652, a clipboard 648 of option
sheets is displayed, as shown in FIG. 24. (For the sake
of illustration, in FIG. 24 the highlighted text, the ges-
ture, and the action—in this case, the display of the
option sheet clipboard 648—are all shown together.
However, in the preferred embodiment, the representa-
tion of the gesture, such as the check-mark 652, disap-
pears when the action is taken, and therefore would not,
in this case, continue to be displayed when the clip-
board 648 comes up.)

Another illustration of the use of the check mark
gesture 652 is shown in FIGS. 66–68. In FIG. 66, the
check mark gesture 652 is drawn over the word
"quick", causing the Text Options sheet 652A to ap-
pear. The user may then choose from the available text
options, such as by tapping next to the word "Bold". 45
Then, when "Apply & Close" is chosen, the selected
word appears in bold type style, as shown in FIG. 68.

In FIG. 69, an "N" gesture 663 is shown over the
bold-face word "quick". This is a shorthand alphabetic
command to return the type style to "normal", as it 50
originally appeared in FIG. 66.

If an object has more than one option sheet, then the
other sheets are selected by tapping on the title of the
current sheet (such as "Character sheet" 650) at the top
of the clipboard and choosing the desired sheet from the
resulting pop-up list 660 (shown in FIG. 25). For text,
the option sheets control and display various visual
attributes, such as font size and style, bolding, slant, and
underlining.

As a quick alternative to calling up the options sheet 60
648, the appearance of text may be changed by specific
gestures drawn directly over a selection or word. Text
may be bolded, italicized, underlined or returned to an
unadorned ("normal") state by the gestures "B", "I",
"U", and "N", respectively. In addition, the font size 65
can be increased by the up-arrow gesture 653, or de-
creased by the down-arrow gesture 654, both shown in
FIG. 45. This is illustrated in FIG. 55, where the font

size for the word "design", originally in normal size, is
increased by the use of the up-arrow gesture 653.

The option sheets for objects within the body of a
document can also be accessed by selecting the "Option
. . ." entry 580 from the "Edit" menu 547 shown in FIG.
20.

The option sheet of documents may be accessed by
drawing a check-mark 652 (see FIG. 45) in the title bar.
The "Document" sheet 670 shown in FIG. 26 displays
such attributes as title, author, comments, size and ac-
cess dates. The "Access" sheet 680, shown in FIG. 27,
enables or disables the various controls that surround
the body of a document.

Many of these controls can be toggled off or on by
drawing a gesture in the title bar of the document. The
"M", "C" and "B" gestures toggle (i.e., turn on and off)
the menu, cork margin, and borders, respectively.

These options are generally used when embedding
one document into another, to cause the embedded
document to blend in with the surrounding main docu-
ment. The option sheets for an entire document can also
be accessed by selecting the "About . . ." entry 545 from
the "Document" menu, as shown in FIG. 19.

A check-mark 652 drawn over an icon displays an
option sheet 690, shown in FIG. 28, which controls the
appearance and labeling of all icons. Large icons 700
and small icons 710 are available with or without labels
such as labels 720 and 730.

In some cases, an object offers no convenient place
where a check gesture can be used to access its options
sheet. An example of this occurs when one document is
embedded within another. The borders of an embedded
document can be turned off by using the "Access" op-
tion sheet or by drawing a "B" gesture in the title bar.

In such a case, there may be nowhere to draw the
check gesture 652, which is needed to access the options
sheet for the document as a whole. This is because a
check 652 drawn in the body of a document applies to
the contents (words, figures, etc.) of the document, and
not to whole document.

The solution to this in the present invention is to use
a check-tap gesture 732 (shown in FIGS. 45 and 49),
which accesses the options sheet of the container in
which it is drawn-in this case, the drawing paper docu-
ment which is embedded in the document "Org. Chart".
FIG. 50 shows the result 734 of using the check-tap
gesture 732 on the document shown in FIG. 49.

An object is moved by touching the stylus to it and
holding the tip down. After a short delay (less than
some predetermined minimum period of time, such as,
preferably, a second), an animated "marquee" 740 will
appear around the selection, as shown in FIG. 29. (This
operation is represented by entries 627 and 628 shown in
FIG. 45.) The selection can now be dragged to its new
location, such as location 750 shown in FIG. 30.

Alternatively, the pen can be lifted after the marquee
appears, which will cause the selection to "float" above
the current page. Then the document can be scrolled, or
one or more pages turned, and the selection can be
dragged to its final destination. Tapping the selection or
making another selection cancels the move.

Objects can also be moved different notebooks or
onto or off of the bookshelf. The target of the move is
the location of the stylus tip when it is lifted at the end
of the drag.

Final location 760 shown in FIG. 31 depicts the result
of the text move. The current selection can also be

5,347,295

15

placed into "move" mode by selecting the "Move" entry 550 from the "Edit" menu 547, shown in FIG. 20.

The copying of an object is done in the same fashion as a move, except that the initial gesture is to tap on the object and then hold the tip down until the marquee 740 appears. The current selection can also be placed into "copy" mode by selecting the "Copy" entry 560 from the "Edit" menu 547. An object that is being copied is distinguishable by fact that the surrounding marquee is made up of a double row of dashes, vis-a-vis the single row of dashes which make up the marquee surrounding an object being moved.

In previous, mouse-based systems, an object is often moved by dragging it. That is, the cursor or pointing device is placed over a target, the button is pressed, and the button is held down while the cursor is moved to the new location desired for the object. In the present invention, the corresponding move may be considered a slow flick. By using the press-hold gesture 627 for a move, and the tap-press-hold gesture for a copy (see FIG. 45), the present invention can support the dragging function in all contexts, and can still distinguish gestures which are analogous to drags in more conventional systems.

The caret gesture 800 ("∧" shown in FIGS. 32 and 45) is used to insert new objects. Within a body of text, the caret gesture 800 causes a floating, empty input window or edit pad 770 to appear, as in FIG. 32. The text 775 to be added is handwritten into this edit pad 770, and is inserted into the main body 790 of the document 785 when the edit pad's close button 780 is pressed. The insertion point is at the hot-point of the caret 800, which is at its apex, and the result of the insertion procedure is shown in the top line of FIG. 33.

FIGS. 63–65 illustrate the use of the caret gesture 800, which creates an edit pad 802 between at the hot point of the caret gesture 800, i.e. between the words "a" and "new". Thus, in FIG. 64, the user may write in by hand the word "quick", which is then converted to standard text type by the handwriting recognition software utilized in conjunction with the invention. When the button 804 of the edit pad 802 is tapped, the new word is inserted in the proper place in the text, as shown in FIG. 65.

In a section document, within a cork margin, or over the bookshelf, the caret gesture 800 invokes a list of stationery 810 from which the new document is chosen.

New documents can also be added to a section by choosing a document type from the "Create" menu. Because a caret drawn in a text document creates an input pad, in order to avoid ambiguity another gesture must be used to create an embedded document. Thus, for this purpose a double-caret gesture 655 is used (see FIG. 45). This will lead to the same result that the single caret 800 does within a section document, namely a pop-up list of known stationery types. By way of example, in FIG. 56 the double-caret gesture 655 is used to call up the stationery pop-up list 655A, shown in FIG. 57. Then, the user may select on of the types of available stationery, such as the drawing paper, at which point 60 the drawing paper icon 655B and title appear embedded in the document, as shown in FIG. 57A. To access and work with the drawing paper at this point, the user need only tap on the icon 655B.

Within the notebook 110, a question-mark gesture 820 (see FIGS. 36 and 45) is recognized over almost any displayed object. This gesture triggers the display of a floating notebook 830 containing a short summary of

16

the characteristics of the targeted object and the gestures it responds to.

The user can easily create buttons linked to any selectable object in the computer. When such a button is tapped, the linked paged will be turned to. As with other buttons, a double-tap will float the linked page above the current page.

Link buttons are created by selecting the object to link to, and drawing the circle-tap gesture 659 shown in FIGS. 45 at the desired location of the button. The default label of a button 240 will be the name or contents of the target as appropriate, as shown in FIG. 4. This label can be edited using the circle gesture in the same fashion as any other user-definable text.

FIGS. 58–61 provide an illustration of the creation and deletion of use of a link button. In FIG. 58, the word "recyclable" has been highlighted, and the user has then drawn the circle-tap gesture 659 on the bookshelf 120. This creates a link button 659A, which is automatically labeled "recyclable".

If the user desires, the link button 659A may also be deleted, by utilizing the x gesture 629, as shown in FIG. 60. The result, i.e. deletion of the link button 659A, is shown in FIG. 61.

Linked buttons can be placed on the bookshelf, in the cork margins of a document, or within the body of a document. They can be used to create a simple "hypertext" system or place bookmarks in the "Help" notebook.

The caret-tap gesture 661, shown in FIGS. 45 and 61, is used to create an in-line insertion pad, i.e. a writing pad which is embedded into the document. Thus, use of the caret-tap gesture 661 in FIG. 61 results in the insertion pad 662 (shown in FIG. 62) appearing in the document, and it remains there until affirmatively removed by the user.

Many objects (such as icons) are activated or opened by tapping on them. Thus, a separate gesture is required to select such objects. For this purpose, the plus gesture 658, shown in FIG. 45, is used. The plus gesture 658 may be used either: (1) to select an object for a variety of purposes, such as selecting as a target of a goto button, or to delete it, or any other operation which may affect an icon; or (2) to add other objects to the current selection. For example, an icon on the bookshelf can be selected by drawing a plus 658 over it. (Selection of the icon is confirmed by the appearance of a box surrounding the icon.) In addition, the plus gesture may be used to select a number of non-adjacent documents in section document. Some applications for the present invention, such as drawing programs, support a drawn box to select the objects within the box. (This is like the square 657 shown in FIG. 45 and discussed above.)

The usefulness of the plus gesture 658 is also shown in FIGS. 69–72. For instance, the user may call up the Accessories sheet 664 shown in FIG. 70 by tapping on the briefcase icon 657A, which then becomes greyed to indicate that it has been accessed. The Personal Dictionary icon (or any other icon) is then selected by using the plus gesture 658, after which it is surrounded by a box as in FIG. 71. Then, for instance, the user may draw a circle-tap gesture 659 (as in FIG. 58) on the bookshelf 120, which creates an appropriately-named link button 665, as in FIG. 72. Thus, the plus gesture 658 serves as an accessing or selecting command.

5,347,295

17                                          18

### Use of Proximity in a Notebook Computer

The sensing of the proximity of the stylus tip to the display surface of the computer is an important part of the gesture command termination for the gestures discussed above, and is accomplished in two different ways. Proximity before contact triggers indication on the display as to which objects are targeted, while movement out of proximity after contact with the display surface signals the completion of a series of stylus strokes. Thus, in each of the commands discussed above, the recognition and implementation of the computer commands begin immediately upon the departure from proximity of the stylus tip 6 from the screen 10.

An example of the use of proximity to anticipate object targeting is shown in FIG. 37 through FIG. 43. The document 835 supports the drawing of geometric figures such as lines, curves, rectangles, and ellipses. In the exemplary document 835, the objects have been used to lay out the floor plan of a hypothetical office.

An existing object 847 can be selected for manipulation by tapping on the desired object. The selection of such an object is indicated by the display of one or more small squares or "x's" 840 and 850 at the center and edges, respectively, of the object 847. These are used as "handles" (or "virtual handles") to move or resize the associated object. Which handle is targeted is indicated by its being enclosed by a small targeting square 860, shown in FIG. 38, as the stylus moves into proximity over that handle (here, handle 840).

An object may be moved by touching the stylus tip to the x-shaped handle 840 at the object's center and dragging the stylus tip 6 to the desired new location 870, as shown in FIG. 39. Resizing is accomplished by touching and dragging one of the outlying box-shaped handles, resulting in resized object 880 shown in FIG. 40.

The previewing of the targeted handle is particularly useful when there are many handles close to one another, as shown in FIG. 41 with respect to objects 885 and 890. Because a hand-held stylus is a relatively coarse pointing device when compared to a display's resolution, accurate selection is enhanced by providing the highlighted-handle feedback to the user. FIG. 42 and FIG. 43 show the alternate targeting of two adjacent handles 900 and 910 of the objects 885 and 890, respectively.

An example of the use of the departure of the stylus from proximity to the display's surface is shown with respect to the computerized form shown in FIG. 44. Each of the underlined sections 920 supports the entry and recognition of handwriting. The recognition process is triggered by the user's natural movement of the stylus's tip from the vicinity of the display surface upon completion of one or more entries. As shown in FIG. 44, the user writes in one or more fields and lifts the stylus. This activates the matching process which culminates in the display of the recognized text. Any number of fields can be filled in, and in any order, before departing proximity.

From the foregoing, it will be understood that the used of proximity sensing in the notebook computer of the invention leads to a smoothly operating system where the user's actions are virtually as natural as if he or she were actually writing in a notebook. Other applications of this system may be found without departing from the spirit and scope of the invention.

We claim:

1. An apparatus for controlling a computer system, the computer system comprising a screen for displaying information and a stylus having a tip for inputting information into the computer, including:

first detecting means coupled to said computer for detecting a stroke of the stylus tip in contact with the screen;

second detecting means coupled to said computer for detecting a departure of the stylus tip from the screen;

means coupled to said computer for defining termination of a gesture comprising at least one stroke in response to said departure of the stylus tip;

means coupled to said computer for recognizing a plurality of said gestures, said recognizing means including means for comparing each said gesture to at least one predefined shape;

means coupled to said computer for implementing each said recognized gesture, said implementing means including means for performing a predetermined action associated with each said predefined shape, said predetermined action being determined by the context in which said gesture was used, including a first context in which said action is executed upon an operating system level object and a second context in which said action is executed upon an application level object.

2. The apparatus of claim 1, wherein said gesture comprises a plurality of strokes.

3. The apparatus of claim 1, wherein:

said second detecting means includes means for detecting proximity of the stylus tip to the screen; and said apparatus further includes means coupled to said computer for displaying an indicator of the proximity of the stylus tip to the screen.

4. The apparatus of claim 1, further including third detecting means for detecting a direction of motion of said gesture.

5. The apparatus of claim 1, further including means coupled to said computer for displaying on said screen a predefined shape representing the recognized gesture.

6. The apparatus of claim 1, further including means coupled to said computer for displaying on said screen a shape representing the actual gesture made by a user of the computer.

7. The apparatus of claim 1, wherein said gesture implementation includes input of said recognized gesture as data to be processed by said computer system.

8. The apparatus of claim 7, wherein said recognized gesture comprises a character.

9. The apparatus of claim 7, wherein said recognized gesture comprises a graphics object.

10. The apparatus of claim 1, wherein said implementing means includes means for implementing said second command for performing an operation which is common across a plurality of applications.

11. The apparatus of claim 2, wherein the plurality of strokes are separated by departure of the stylus tip from contact with the screen while the stylus tip is still proximate to the screen.

12. The apparatus of claim 3, further including means for terminating display of said indicator when the stylus tip departs from proximity to the screen.

13. The apparatus of claim 3, wherein said indicator comprises a virtual handle for manipulating an object displayed on the screen.

5,347,295

19

14. The apparatus of claim 3, wherein said indicator comprises highlighting of information displayed on the screen in proximity to said stylus tip.

15. The apparatus of claim 3, wherein said indicator indicates proximity of said stylus tip to an object displayed on the screen.

16. The apparatus of claim 15, wherein said object comprises at least one character.

17. The apparatus of claim 15, wherein said object comprises at least one graphics object.

18. The apparatus of claim 1, wherein said predetermined action is performed on a target object, said target object being determined by at least one attribute of said gestu.

19. The apparatus of claim 18, wherein said attribute comprises the location of the gesture on the screen.

20. The apparatus of claim 19, wherein said location comprises the location on the screen of the hot point portion of said gesture.

21. The apparatus of claim 18, wherein said attribute comprises the size of the gesture on the screen.

22. The apparatus of claim 1, wherein said predetermined action is performed on a target object, said target object being determined by the context in which said gesture was used.

23. The apparatus of claim 22, wherein said context comprises the application in which said gesture was used.

24. The apparatus of claim 18, further including means coupled to said computer for displaying on said screen a predefined shape representing the recognized gesture.

25. The apparatus of claim 18, further including means coupled to said computer for displaying on said screen a shape representing the actual gesture made by a user of the computer.

26. The apparatus of claim 18, further including means coupled to said computer for displaying on said screen a symbol indicating that the gesture has not been recognized.

27. The apparatus of claim 18, further including means coupled to said computer for displaying on said screen a symbol indicating that the input gesture is not appropriate to the context in which it was used.

28. The apparatus of claim 1,
   further including means coupled to said computer for displaying on said screen a predefined shape representing the recognized gesture.

29. The apparatus of claim 1,
   further including means coupled to said computer for displaying on said screen a symbol indicating that the gesture has not been recognized.

30. The apparatus of claim 1, wherein said recognizing means is also for comparing each said gesture to at least one predefined shape, for recognizing a first gesture corresponding to a first said predefined shape and a second gesture corresponding to a second said predefined shape, the apparatus further including:
   means coupled to said computer for displaying on said screen said predefined shapes;
   wherein said first and second predefined shapes are substantially identical but differ in their orientation on the screen when displayed by said displaying means.

31. The apparatus of claim 30, wherein said differences in orientation comprise a rotation on the screen of said substantially identical shapes.

20

32. The apparatus of claim 30, wherein said differences in orientation comprise an inversion on the screen of said substantially identical shapes.

33. The apparatus of claim 1,
   wherein said predetermined action is performed on a target substantially enclosed by its associated said gesture, and wherein said target is selected as a result of the performance of said predetermined action.

34. The apparatus of claim 33, wherein said target comprises a graphics object.

35. The apparatus of claim 33, wherein said target comprises at least one character.

36. The apparatus of claim 35, wherein said character is selected to be edited as a result of the performance of said predetermined action.

37. The apparatus of claim 35, wherein said at least one character is selected to be replaced by at least one other character to be inputted into said computer as a result of the performance of said predetermined action.

38. The apparatus of claim 33, wherein the predetermined shape of said recognized gesture comprises a circle.

39. An apparatus for controlling a computer system, the computer system comprising a screen for displaying information and a stylus having a tip for inputting information into the computer, including:
   detecting means coupled to said computer for detecting a stroke of the stylus tip in contact with the screen;
   means coupled to said computer for recognizing a gesture comprising at least one stroke and an event indicating termination of the gesture, said recognizing means including means for comparing said gesture to at least one predefined shape and being for recognizing at least a first gesture, a second gesture, and a third gesture comprising said first and second gestures; and
   implementing means coupled to said computer for implementing each recognized gesture, said implementing means including means for performing a first predetermined action associated with said first gesture, a second predetermined action associated with said second gesture, and a third predetermined action associated with said third gesture.

40. The apparatus of claim 39, wherein the shapes of said first and second gestures are substantially identical.

41. An apparatus for controlling a computer system, the computer system comprising a screen for displaying information and a stylus having a tip for inputting information into the computer, including:
   first detecting means coupled to said computer for detecting a stroke of the stylus tip in contact with the screen;
   means coupled to said computer for recognizing a gesture comprising at least one stroke and an event indicating termination of the gesture, said recognizing means including means for comparing said gesture to at least one predefined shape, each stroke of said gesture being located in substantially the same area of the screen:
   second detecting means for detecting a direction of motion of the creation of said gesture, wherein the predefined shape of said recognized gesture also represents said direction of motion; and
   implementing means coupled to said computer for implementing said recognized gesture, said implementing means including means for performing a

5,347,295

21

predetermined action associated with said predefined shape.

42. The apparatus of claim 41, further including means coupled to said computer for displaying on said screen a predefined shape representing the recognized gesture.

43. The apparatus of claim 41, further including means coupled to said computer for displaying on said screen a shape representing the actual gesture made by a user of the computer.

22

44. The apparatus of claim 41, further including means coupled to said computer for displaying on said screen a symbol indicating that the gesture has not been recognized.

45. The apparatus of claim 41, further including means coupled to said computer for displaying on said screen a symbol indicating that the input gesture is not appropriate to the context in which it was used.

46. The apparatus of claim 41, wherein said direction of motion of said gesture is associated with said predetermined action.

* * * * *

*FIG. 1*



*FIG. 2*

| COMMAND MESSAGE FORMAT | |
|---|---|
| COMMAND | FORMAT |
| CREATE | id:CREATE:gid:type:properties |
| CHANGE | id:CHANGE:gid:type:properties |
| MOVE | id:MOVE:gid |
| ACTIVATE | gid:ACTIVATE |
| DESTROY | gid:DESTROY |
| DATAREQ | id:DATAREQ |
| VOICE | 0:VOICE |
| SESSION | <special format;restart msg framing> |
| FRAME | frid:FRAME |
| HOLDACK | 0:HOLDACK |

Case 3:03-cv-01108-B-CAB    Document ... of 976
US005649131A

# United States Patent [19]

**Ackerman et al.**

[11] **Patent Number:** 5,649,131

[45] **Date of Patent:** Jul. 15, 1997

[54] **COMMUNICATIONS PROTOCOL**

[75] Inventors: **Chaim M. Ackerman**, Lakewood; **Alan L. Glasser**, Manalapan; **Reuben Klein**, East Brunswick, all of N.J.

[73] Assignee: **Lucent Technologies Inc.**, Murray Hill, N.J.

[21] Appl. No.: **257,215**

[22] Filed: **Dec. 30, 1992**

[51] Int. Cl.$^6$ ................................................ G06F 13/00

[52] U.S. Cl. ...................... 395/335; 395/285; 395/242; 395/788

[58] Field of Search .............................. 395/325, 650, 395/200, 275, 700, 200.01, 200.05, 200.02, 280, 290, 285, 221, 242, 326, 329, 335, 339, 615, 788; 364/408, 407; 379/27, 28, 29, 93, 96, 122, 136

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,853,952 | 8/1989 | Jachmann et al. | 379/88 |
| 5,107,419 | 4/1992 | MacPhail | 395/600 |
| 5,173,854 | 12/1992 | Kaufman et al. | 364/419 |
| 5,181,162 | 1/1993 | Smith et al. | 364/419 |
| 5,201,049 | 4/1993 | Shorter | 395/650 |
| 5,303,042 | 4/1994 | Lewis et al. | 348/14 |
| 5,303,379 | 4/1994 | Khoyi et al. | 395/700 |
| 5,345,553 | 9/1994 | Busboom et al. | 395/161 |
| 5,347,632 | 9/1994 | Filepp et al. | 395/200 |
| 5,361,350 | 11/1994 | Conner et al. | 395/600 |

### OTHER PUBLICATIONS

Electrical Communication Laboratories Technical Journal, "Screen Control Program for an Advanced Data Terminal System", (original and English Translation) vol. 34, No. 1, 1985, Y. Ieyoshi et al, pp. 165–179.

*Primary Examiner*—Glenn A. Auve
*Attorney, Agent, or Firm*—Frederick B. Luludis

[57] **ABSTRACT**

The invention is directed to a communications protocol which facilitates the exchange of interface information between a host processor and a terminal, such as a workstation, smart phone, portable computer, etc., by associating an object that is to be displayed on the terminal display with a particular identifier, and by associating input information entered in response to a user manipulating a displayed object with the associated object identifier, rather than the location of the displayed object. Accordingly, a host processor may specify relative rather than specific attributes for an object that is to be displayed on a terminal display, thereby leaving it up to the terminal to display an object in accord with its own capabilities.

**10 Claims, 13 Drawing Sheets**



## FIG. 3

PROPERTIES

| |
|---|
| id:CREATE:gid:CHOICE:<attrib>:<label>:<datum> |
| id:CREATE:gid:ENTRY:<attrib>:<label>:<prompt>:<len>:<datum> |
| id:CREATE:gid:TEXT:<attrib>:<startbyte>:<datum> |
| id:CREATE:gid:BITMAP:<attrib>:<bit/row>:<datum>:<bitstream> |
| id:CREATE:gid:SCRIPT:<attrib>:<label>:<datum>:<script> |
| id:CREATE:gid:REGION:<attrib>:<datum> |

## FIG. 4

| OBJECT ATTRIBUTES | |
|---|---|
| TYPE | ATTRIBUTES |
| <any object> | HIDE |
| <any group> | RADIO |
| CHOICE | DEFAULT,NOTOUCH,COMMAND,POPUP |
| ENTRY | STRING,ALPHA,NUMBER,TELNO,MONEY,DATE,TIME,RAW,SECURE,NOTOUCH |
| TEXT | WORDWRAP,MORE,PROMPT |
| BITMAP | GROWABLE,SHRINKABLE,PROPORTIONAL,RUNLENGTH |
| REGION | HORIZONTAL,OUTER,UP |
| SCRIPT | ACTIVE |

*FIG. 6*



*FIG. 7*

| REPERTORY DIAL CONTROLS | |
|---|---|
| PARAMETER | FUNCTION |
| W | WAIT FOR 30 SECONDS |
| P | PAUSE FOR TWO SECONDS |
| H | HANG—UP |
| + | WAIT FOR DIAL TONE(UP TO 15 SECONDS) |
| , | WAIT FOR ANSWER(REMOTE OFF—HOOK)(UP TO 15 SECONDS) |
| F | FLASH |
| <DIGIT,*,#> | DIAL DIGIT,'*',OR '#' |
| A,B,C,D | DIAL DTMF TONE A,B,C,OR D |
| S | WAIT FOR CARRIER,AND TRY TO ESTABLISH SESSION |
| — | NO—OP(PLACE HOLDER) |
| [n:INPUT:s] | SEND INPUT EVENT WITH id 'n' AND INFO 's' |

*FIG. 5*

| EVENT MESSAGE FORMAT |
|---|
| id:INPUT:frid:info |
| id:ERROR:info |
| id:REPLY:info |
| id:CONNECTED:info |
| id:HANGUP:info |
| 0:HOLD |

*FIG. 8*



**FIG. 18**

| FORMULA FUNCTIONS | |
|---|---|
| FUNCTION | RETURN |
| HANGUP(sec) | TERMINATE THE SESSION IN sec SECONDS |
| BEEP(tone) | tone=0 - CONFIRMATION TONE; tone=1 - ACKNOWLEDGEMENT TONE; tone=2 - ERROR TONE |
| FIND(label) | RETURN ID OF OBJECT WITH LABEL lable |
| EVAL(id) | EVALUATE DATUM FORMULA OF OBJECT id |

FIG. 9



*FIG. 10*



## FIG. 11



*FIG. 12*





FIG. 13

*FIG. 14*



*FIG. 15*



FROM FIG.14

B

1108

COMMAND=FRAME ? — YES → RESET FRAME ID (INITIALLY 0)
1151

NO

1109
COMMAND=DATAREQ ? — YES → OBJECT EXISTS ?
1152

NO

OBJECT EXISTS ? — YES → FIND OBJECT; READ OBJECT'S DATUM AND EVALUATE ANY ASSOCIATED FORMULAS; FORMAT REPLY EVENT WITH DATUM OR FORMULA RESULTS
1155

NO

UNKNOWN ID ERROR
1153

ERROR
1154

1156 — SEND REPLY

1110
COMMAND=VOICE ? — YES → DROP CARRIER, BUT DO NOT HANG UP
1155

NO

1111
COMMAND=HOLDACK ? — YES

NO

DISCARD MESSAGE
1112



*FIG. 16*



*FIG. 17*

5,649,131

| 1 | 2 |

# COMMUNICATIONS PROTOCOL

### FIELD OF THE INVENTION

The invention relates to communications protocols and more particularly relates to a protocol for exchanging messages between a transaction processor and a computer terminal.

### BACKGROUND OF THE INVENTION

A host computer (processor) that communicates with different types of computer terminals usually customizes a command so that the command is in a form expected by the terminal that is currently communicating with the host. If a command is not so customized, then the terminal might possibly execute a process in a way not intended by the host. For example, if the command pertains to displaying a particular pattern, then the terminal might possibly display some variation of that pattern.

To deal with that possibility, the host initially requests the identity (model) of a computer terminal as a way of identifying the characteristics defining the display associated with the computer terminal. Such characteristics include, e.g., the size, shape, aspect ratio and resolution of the terminal display. Once it knows such characteristics, the host may then properly format a display command so that it suits the computer terminal. One such command includes the location at which a pattern, or symbol, is to be displayed on the terminal display. The host specifies such a location so that it may maintain in its internal memory a map of the locations at which symbols are to be displayed on the terminal display.

For example, one display pattern that a host computer typically transmits to a terminal is a so-called menu defining a list of selectable items (e.g., services). A user operating the terminal may select one of the displayed menu items using any one of a number of different input devices. One such input device is a conventional computer keyboard associated with a displayed screen cursor. To select a desired menu item, the user moves the screen cursor in a conventional manner to the displayed item and then operates an appropriate keyboard button, e.g., the Enter key. However, the movement of the displayed cursor is typically under the control of the host computer. That is, if the user moves the screen cursor in a particular direction (up, down, left or right), then the associated computer terminal sends a message indicative of that fact to the host computer. The host computer, in response thereto, returns a message directing the terminal to move the screen cursor a number of units in the identified direction. The host computer also tracks the new display location of the screen cursor in its associated memory map.

Once the screen cursor is positioned on the desired menu item, the user may then operate the Enter key. The user's terminal in response thereto notifies the host computer that the user operated the Enter key. The host computer, in turn, correlates the operation of the Enter key with the position of the screen cursor using its stored map of the display, and therefore determines that the screen cursor is positioned on a menu item. Accordingly, the host computer interprets the message as a request to invoke the selected menu item. A terminal device and host computer may reduce the level of communications that they exchange during a transaction session by using what is commonly referred to as a "block mode". In the block mode, the terminal accumulates the user's input until the user operates a transmit key. At that point, the terminal device transmits the user's accumulated

input to the host processor. However, in either case, the host needs to maintain precise knowledge of the terminal display, especially the size of the display, in order to properly format the presentation of information to a user.

### SUMMARY OF THE INVENTION

Based on the foregoing, we have recognized that there is a need for a communications protocol that is independent of the host transaction processor as well as the operating characteristics of different types of terminals, workstations and/or so-called smart phones that the host might communicate with. Thus, an advancement in the an is achieved by providing a communications protocol for exchanging application interface information between a host computer and user terminal, workstation or smart phone, in which the host, in accord with an aspect of the invention, associates different types of objects with respective identifiers and then transmits an object type and its associated identifier to the terminal device. The terminal device, in turn and in accord with an aspect of the invention, displays the object in a form determined solely by the terminal device but in accordance with respective predefined policies. If a user manipulates a displayed object type then, in accord with an aspect of the invention, data representative of such manipulation is generated and transmitted with the associated object identifier to the host processor.

### BRIEF DESCRIPTION OF THE DRAWING

In the FIGS:

FIG. 1 is a broad block diagram of a system in which the principles of the invention may be practiced;

FIG. 2 illustrates the format of various commands that may be exchanged between the transaction processor and one of the terminals of FIG. 1;

FIG. 3 shows the format of the Create command of FIG. 2 in more detail;

FIG. 4 lists in table form the attributes associated with the Create command of FIG. 3;

FIG. 5 illustrates the formats of a number of different types of event, or input, messages that a terminal may transmit to the transaction processor of FIG. 1;

FIG. 6 is an illustrative example of one way in which the display of a terminal may be partitioned into hierarchical regions, in accord with the principles of the invention;

FIG. 7 illustrates so-called repertory telephone functions that are included in the inventive communications protocol;

FIG. 8 is an example of the way in which a particular pattern of objects, or symbols, may be partitioned in accord with FIG. 5;

FIGS. 9–12 illustrate in flow chart form the program which implements the principles of the invention in the transaction processor of FIG. 1;

FIGS. 13–17 illustrate in flow chart form the program which implements the principles of the invention in a computer type terminal or similar device, such as one of the terminals of FIG. 1; and

FIG. 18 illustrates the format of so-called formula functions that may be included in the inventive protocol.

### DETAILED DESCRIPTION

The following discussion of an illustrative embodiment of the invention is given in the context of a so-called smart phone, two of which are shown in FIG. 1, namely station sets 10 and 20. As is well-known, a smart phone may be used as

5,649,131

3

a conventional telephone station set or as a data terminal. As illustrated specifically for station set 10, the smart phone includes telephone handset 11, a display 12 integrated with a touch-sensitive screen and telephone circuitry. It also includes a conventional data modem (not shown). The display and touch screen, more particularly, provide a mechanism for a user to input instructions to the smart phone. Such instructions may relate to establishing a simple telephone call. They may also relate to a complex data transaction involving transaction processor 200, during the course of which a smart phone, e.g., station set 10, and processor 200 communicate with one another in accord with the inventive communications protocol.

More particularly, processor 200 is a multiuser computer that is programmed to implement the principles of the invention and to implement a particular transaction service, for example, a banking service associated with host database 300. Users operating respective data terminals that have been programmed in accord with the invention may also "dial up" processor 200 and communicate therewith in order to invoke and interface with the particular transaction service. Assume that one such user is the user associated with station set 10 who places a call to processor 200 in a conventional manner. The user dials such a number by first touching display 12, which causes a processor (not shown) within station set 10 to display on display 12 a representation of a telephone keypad 13 and a plurality of command buttons 14. The user may then enter the processor 200 telephone number by touching the appropriate digits of displayed keypad 13. Station set 10, in response to such touching, transmits over line 50 a conventional dual-frequency (Touch-Tone) signal representing the telephone number thus entered.

Telephone network 100, in response thereto, establishes a communications connection to an idle line, e.g., line 150-1, connecting to processor 200. A modem contained in the processor 200 input port connected to line 150-1 responds to the incoming call in a conventional manner, i.e., by exchanging messages with the modem contained in station set 10 in order to negotiate a mutually acceptable operating mode including the transmission rate that they will use for the transmission of data (messages).

Once the operating mode is established, station set 10 transmits what we call a "Connected" message identifying station set 10, in which the identifying information may include, for example, a unique serial number assigned to station set 10. Such identifying information may include information relating other aspects of station set 10, such as, for example, terminal type and/or model number. Processor 200, in turn, acknowledges receipt of the connected message by returning a "Session" message containing the identifying information that it received from station set 10. Processor 200 then begins transmitting ("downloading") a series of objects. These objects are interpreted by station set 10 in accordance with a set of predefined specifications, or policies, relating to the way different types of objects (or symbols) should be presented to a user, i.e., displayed on display 12. It is noted that another terminal, e.g., station set 20, may utilize another somewhat different set of policies in presenting the objects to a user. In accord with an aspect of the invention, each object type has a unique identity (or name). Station set 10, in turn, stores each such object and its associated identity in memory (not shown) internal to station set 10.

At any point in time during the transaction session, processor 200 may direct station set 10 to activate a set, or group, of one or more objects. Such activation causes station

4

set 10 to define an object type in accord with the associated policy and to display the defined object on display 12. Certain ones of the displayed objects may generate particular inputs when touched by the user, as will be explained below in detail. Station set 10, in response to such touching, forms an event, or input, message containing the particular input, and, in accord with an aspect of the invention, the identity of the active object touched by the user. Station set 10 then transmits the message to processor 200.

In accord with an aspect of the invention, a particular object type may be associated with a respective group of objects, the group being identified by a respective group identifier. An object type is thus identified, in accord with the invention, by its unique identity for the purpose of generating an input when the object is active and by an associated group identity for the purpose of activating the group. Accordingly, processor 200 may activate a group of objects by merely transmitting to station set 10 a single activation message containing the group identity of the particular group. Station set 10, in response to the message, activates (e.g., displays) each object associated with the particular group identity.

The format of a processor 200 command that specifies an object type, as well as other commands, is shown in FIG. 2. Each command has at least two fields, the second of which is an action field which specifies the command itself. Two of those commands, ACTIVATE and DESTROY, each have one other field, which is an identity field. Specifically, the ACTIVATE command activates those object types whose group identifier (gid) is contained in the identity field (gid) of that command. The DESTROY command causes station 10 to erase from its internal memory those objects whose group identifier is contained in the associated identity field. (It is noted that, due to memory limitations, a station set, e.g., station set 10, may, on its own initiative, erase a group of objects from its internal memory in order "free up" memory space for the creation of a new group of objects. Thereafter, if station set 10 receives a processor 200 command identifying the erased group of objects, then station set 10, in response to that command, may request a retransmission of the processor 200 commands that created the erased group of objects.)

In certain applications, a station set 10 user who is communicating with the processor 200 application program may require the assistance of a live attendant associated with the service that the application program implements. For example, if the application implements a banking service, then the application program may transmit a command indicative of a symbol labeled "Attendant" or "Teller" to station set 10. If the user touches that symbol when it is displayed, then station set 10 sends a message indicative of that action to processor 200. The processor 200 application program, in response to receipt of the message, sends a VOICE command to station set 10. In accord with an aspect of the invention, the VOICE command directs station set 10 to drop its carrier signal as a means of changing the data connection between station set 10 and processor 200 to a voice connection. When station set 10 terminates its carrier signal, the application program, in a conventional manner, bridges an attendant onto the connection. Thereafter, when the attendant and station set 10 user end their communications, processor 200 may cause the voice connection to be changed back to a data connection by transmitting a carrier signal. Upon receipt of the carrier signal, station set 10 transmits a session command message to processor 200.

In certain situations, transaction processor 200 may have a need to obtain certain information associated with a

5,649,131

5

particular object from a station set that is communicating with processor 200. Processor 200 may obtain such information by inserting the identity of that object in the id field of a DATAREQ command and sending the command to the station set. Transaction processor 200 may also move a particular object from one group to another group of objects. To do so, transaction processor 200 respectively inserts the identities of the particular object and other group in the id and gid fields of a MOVE command and sends the command to the station set. (It is noted that the FRAME and HOLD-ACK commands are discussed below in connection with FIGS. 15 and 9, respectively.)

It is seen from FIG. 2, that the CREATE and CHANGE commands include additional fields relating to the type as well as the properties of an object that is created or changed. An expanded version of the format of the CREATE command is shown in FIG. 3. It is noted that the following discussion relating to the type and property fields of the CREATE command pertains to the CHANGE command.

Specifically, a CREATE command may refer to one of a number of different types of objects, e.g., six objects each associated with a particular function. Such types of objects include: CHOICE, which may be selected by a user when displayed; ENTRY, which solicits input from a user when displayed; TEXT, which provides information to a user when displayed; BITMAP, which requests the display of a particular bit-map pattern, for example, a logo; REGION, which associates the display of objects with a particular display region and SCRIPT, which is software that processor 200 may download to a station set, e.g., station 10. Of the various types of objects, REGION and SCRIPT are not displayed.

It is seen from FIG. 3 that each such object type is associated with a set of properties that is used to determine how the associated object type is to be displayed. As such, a terminal device interprets a set of properties, as well as associated attributes (discussed below), in accord with its own capabilities to create an object, or graphical symbol, characterizing the type of object specified in the associated CREATE command, as discussed above. It is also seen from the FIG. that a set of properties includes at least an attributes field and one or more other fields respectively pertaining to, for example, a label, data, prompt, etc.

More specifically, the attributes field associated with an object is a set of boolean values arranged in a bit-map field that control the presentation characteristics of an associated object. The attribute HIDE shown in FIG. 4, in particular, may be used to control the display of an object (i.e., its visibility on the display). The attribute RADIO may be used to provide a user with the option of changing a selection in the instance where the user may select only one object of a group of displayed objects. The remaining attributes shown in FIG. 4 are associated with respective object types.

Referring now to FIGS. 3 and 4, the properties segment of a command specifying a CHOICE object also includes label and datum fields. The label field may include either text or a so-called formula. The datum field of a CHOICE object typically includes a value which is inserted in a so-called Event message (discussed below) that is generated and sent to transaction processor 200 (FIG. 1) if the associated displayed CHOICE object is selected by a user.

The attributes field of a CHOICE object may specify one of four different attributes, namely, DEFAULT, NOTOUCH, COMMAND or POPUP. A DEFAULT attribute causes the associated displayed CHOICE object, to be redisplayed in a distinctive manner, e.g., highlighted, in the event that a user

6

selects that object. If the selected DEFAULT object is a member of a RADIO group, and if the user selects another CHOICE object of the same group, then the previously selected CHOICE object is redisplayed without such distinction, e.g., without being highlighted. The NOTOUCH attribute may be used to indicate that the associated CHOICE object when displayed is not selectable by the user. The COMMAND attribute may be used to cause the associated CHOICE object to exhibit a momentary action when the object is displayed and selected by a user. For example, the displayed object should function as a pushbutton. The POPUP attribute may be used to distinguish a displayed object from other such objects. For example, a so-called "drop shadow" may be added to a displayed object to provide such distinction.

The ENTRY object and fields comprising its associated properties is one mechanism which transaction processor 200 (FIG. 1) may use to solicit information from a user. For example, a user prompt, such as, for example, "Enter your account number", may be inserted in the prompt field. The user's response (input) to the prompt is then inserted in the datum field of the displayed ENTRY object and is also inserted in a so-called input (Event) message identified by the id associated with that object. The input message is then forwarded to transaction processor 200.

If a station set, e.g., station set 10 (FIG. 1), that is communicating with processor 200 does not have a keyboard and/or a display of sufficient size to accommodate a number of displayed entry prompts, then each associated ENTRY object may be displayed as a button with an abbreviated "label" identifying its functionality. For example, the label may specify "a/c No.". If the user selects that button, then the terminal displays the full prompt, e.g., "Enter your account number" and/or a qwerty type of keyboard for the entering of the called for information. The acceptable length of such an entry may be controlled by inserting a particular value in the "len" (length) property field of the associated ENTRY object. If the "len" field contains a zero, then the acceptable input may be of an arbitrary length.

As seen from FIG. 4, the display attributes of an ENTRY object include (a) "String", which defines a string of alpha-numeric characters including spaces, punctuations and symbols; (b) "alpha", which defines a string of alpha-numeric characters including apostrophes, commas, and dashes but not spaces; (c) "Number", which defines a simple calculator that is "operable" by a user to generate input; (d) "TelNo", which defines a telephone keypad that is operable by a user to enter a telephone number (the TelNo attribute may also include information for displaying telephone control buttons, such as, for example, "Flash", "Wait", etc.; (e) "Money", "Date", and "Time", which respectively define a money, date and time keyboard which is displayed when the associated object is selected by the user; and (f) "Raw", which indicates that input entered by a user in response to the associated displayed Entry prompt is to be forwarded immediately via an input event message to transaction processor 200.

A station set, such as station set 10 (FIG. 1) may have one or more limitations, namely, the size of its associated display and internal memory. In accord with the principles of the invention, a terminal that is communicating with transaction processor 200 manages its associated display itself, and manages its internal memory with the assistance of processor 200. In particular, during the exchange of session and connected messages, station set 10 sends a value defining a "chunksize" to processor 200, in which the "chunksize"

5,649,131

7

value is indicative of the number of characters that can be displayed at one time on the station set **10** display. Thereafter, if processor **200** sends text via a TEXT command to station set **10** then the number of bytes forming such text is at most equal to the station set **10** chunksize, in which such text is contained in the datum field of the associated TEXT command. Processor **200** identifies the start of such text using a startbyte whose value is defined in the "startbyte" field of the associated TEXT command. For example, a startbyte associated with a first chunk of text has a value of zero. If the chunk size happens to be 1024, then the next startbyte is 1024, and so on.

Accordingly, a station set need only store one chunk size of displayed text in its internal memory. If a user happens to enter a request to scroll to either a previous page or next page of displayed text, then the station set may send an event message identifying the startbyte of the desired page (chunksize) to processor **200**. Upon receiving the desired text in an associated TEXT command, the station set displays the text and stores it in its internal memory, thereby overwriting the chunksize of text that had been previously stored therein.

Processor **200** may exercise some control over the way that a station set displays text contained in a TEXT command. In particular, the MORE attribute of the TEXT command may be used to indicate that an associated chunk of text that is to be displayed is not the last chunk and that the terminal may request additional chunks of text as the user requests them. The WORDWRAP attribute, on the other hand, may be used to indicate that a displayed line should end on a full word and not a broken word and the PROMPT attribute may be used to indicate that text may be truncated and not to be scrolled.

The BITMAP object of a CREATE command, more particularly, may be used by processor **200** to display an image, e.g., a logo, on station **10** in which the image is defined in the associated "bitstream field". If the associated attributes are not "turned on" then the station set may display the image without adjusting the display size of the image, but centering it within an associated predefined region on the display. In displaying a bitmap image, the terminal may use the contents of the associated "bits/row" field to interpret the contents of the "bitstream" field as a two-dimensional array of picture elements ("pixels") that begins at the upper left-hand corner of an associated display region and proceeds in a conventional manner, i.e., from left to right and top to bottom.

The BITMAP object includes a number of attributes as defined in FIG. 4. In particular, the Growable attribute is used to indicate that if the associated display region contains extra space, then the associated image should be scaled up accordingly. The Shrinkable attribute is used to specify the opposite case. That is if the entire image defined in the associated bitstream field cannot be displayed in the associated display region, then the image should be scaled down, rather then clipped. The Runlength attribute is used to indicate that the information contained in the associated bitstream field has been compressed using a particular data compression scheme, for example, the well-known run-length encoding scheme.

The SCRIPT object, in particular, may be used by an application program to download a software program contained in the associated script field to a terminal, e.g., station **10**, in which the program is identified in the associated label field. The associated datum field may contain a so-called formula (discussed below), which may or may not be used

8

by the program. It is seen from FIG. 4 that the SCRIPT object is associated with one attribute, Active, which may be used to indicate that script is to be displayed at the time it is downloaded to the station set, or device.

An application program running on transaction processor **200** may use the REGION object to organize its access to the display and memory associated with the computer terminal that is communicating with processor **200**. That is, the REGION object is the means by which the application program partitions a display into regions for the displaying of particular information or images pertinent to the particular application that is running on processor **200**. For example, a plurality of user selectable buttons may be displayed in one such region, and one or more control buttons may be displayed in another region, and so on. It is to be understood, however, that the way in which a display is actually partitioned into such regions is under the control of the station set or computer terminal, e.g., station **10**.

In particular, a group region may contain either a number of subordinate regions, e.g., two regions or a number of nonregion objects (e.g., CHOICE object), but not both. In addition, a group region is associated with what we call a "primary direction". The primary direction specifies the layout of the members of a group region and the direction may be horizontal or vertical, with vertical being the default direction. For example, for horizontal direction, the first and second subordinate regions (or first and second nonregion objects) are respectively displayed at the left-hand and right-hand sides of the group region. For vertical direction, the first and second subordinate regions (or first and second nonregion objects) are respectively displayed at the top and bottom of the group region.

As shown in FIG. 4, the REGION object is associated with a number of attributes, namely, Horizontal, Outer and Up. The Horizontal attribute may be used to override the Vertical default direction. If the number of nonregion objects that are linked to a group region is more than the number that can be displayed in the primary direction, then the station set, e.g., station **10**, may resort to using a secondary direction to display the additional nonregion objects. A default secondary direction may be used to display the nonregion objects in a new row for Horizontal direction or a new column for Vertical direction. We call the secondary default direction Inner. The attribute Outer may be used to override the default secondary direction and specifies an opposite direction. For example, the secondary direction for two such regions, namely, a command and application region, is typically Inner, the default direction. When nonregion objects are added to the application region, then they are displayed as a new column of objects at the right-hand side of that region. Whereas, when nonregion objects are added to the command region, then they are displayed as a new column of objects on the left-side of that region.

Further, when a new column is created, then in accord with a default mode nonregion objects are displayed starting at the top of the column. The attribute Up is used to reverse the latter direction such that nonregion objects are displayed starting at the bottom of a column.

Turning now to FIG. 5, there is shown the format of the various Event messages that a terminal device, such as station set **10**, may use to transmit input information (message) to the transaction processor. Typically, an Event message, such as INPUT, is generated responsive to the user manipulating a displayed object. It is seen from the FIG. that the INPUT message contains the id of the manipulated displayed object as well as the id (frid) of the associated

5,649,131

| 9 | 10 |
|---|---|

display frame (discussed below). An input message may also be an ERROR message (discussed below) or a REPLY message, in which the particular error or reply is contained in the associated "info" field. An input message may also be a Connected message (mentioned above), HANGUP message (relating to the user "hanging up" the associated terminal device), or HOLD message (relating to the user placing the associated terminal device in a "hold" state, as is done with a conventional telephone station set). (It is noted that the term "manipulating" and variants of that term as used herein is meant to include other terms that are understood by the art and which define similar functions. For example, it includes "touching" a displayed object as one would touch screen 12 of station set 10 to select a displayed object, moving a screen cursor to the location of a displayed object or text and operating, for example, an enter key, or even as identifying a particular displayed object or text or a menu of entries using terminal buttons, for example, computer keyboard buttons.)

FIG. 6 is an illustrative example of one way in which a display, for example, the display of either a station set, e.g., station set 10, or a computer terminal, may be partitioned, in accord with an aspect of the invention, into a hierarchy of regions. More particularly, at the top of the hierarchy is a predefined Root region, which has an id of zero and which is associated with the total area of the display. The Root region, which cannot be destroyed, branches out into a treelike structure to two other regions, System and Session, which may be addressed as a group region object as a way of globally addressing objects associated with regions that descend from the Root region. For example, the "0:Destroy" command (FIG. 2) erases all regions that descend from the right-hand branch of the Root region. In essence, transaction processor 200 may clear the display of a station set that it is communicating with by transmitting the above command. As another example, transaction processor 200 may solicit information describing the capabilities of a station set by transmitting a "0:Datareq" command to the station set. The station set, in turn, responds to that command by transmitting a "0:Reply:text" message, in which the text field of the message contains the station set capabilities.

As seen from the FIG., the System region, or left-hand branch of the root region, relates to the memory of a station set, rather than the station set display. That is, a station set reserves a protected region and a repertory region in its internal memory. The session region, or right-hand branch of the root region, on the other hand, relates to the station set display, as will be discussed below.

The Protected region, in particular, is used for storing information and data, such as, for example, credit card numbers, social security numbers, addresses, etc., that is personal to the user and, therefore, is not displayed on the station set display. A transaction running on processor 200 may access the protected region only with the approval of the terminal user. The Protected region may also be used for the storage of predefined objects and/or objects specified by the user if the terminal provides that capability. A processor 200 application program may indirectly reference such protected information using a formula contained in a CHOICE or ENTRY object that is created during a current transaction session and that is stored in either the Application or Command region. When the application program activates such an object, the protected data is displayed on the station set display before it is transmitted to processor 200. In this way, the station set user may cancel or change the data before it is sent to the transaction program that is running on processor 200. A typical example of the foregoing command may be formatted as follows:

50:Create:30:Entry:Enter your full name:20:@Eval(Find ("User_Name)) where "@" indicates that the command includes a formula, namely Eval and Find. An expanded, self-explanatory Table of formula functions is shown in FIG. 18. When the transaction program activates object 50, the station set, in response thereto, displays the prompt "Enter your full name". In addition, the station set application program responds to the formula "Find" by searching its protected memory to see if the user's full name has been stored therein. If it has, then the station set displays that information in response to the prompt. At that point, the user may prevent such information from being transmitted to the processor 200 application program by causing the displayed information to be erased from the display. Alternatively, the user may change the information and then cause it to be transmitted to the processor 200 application program.

As a further aspect of the protected region (or memory), the processor 200 application program may use a CHANGE command during a current transaction to change data stored in the Protected region or store data therein. Such a command, or object, is treated similar to so-called repertory "telephone dial" buttons (discussed below) except that such buttons cannot be accessed by the terminal user.

The terminal Repertory region, in particular, has a region id of "R: and is used for storing symbols representing repertory telephone buttons for invoking respective telephone functions. For example, such buttons may represent respective telephone numbers, and/or sequences of commands inputted by the terminal user. However, an application program running on processor 200 may not access the repertory region since that region is considered to be personal to the terminal user. Nevertheless, a capability is provided to allow an application program running on transaction processor 200 to add an object to the Repertory region. Specifically, during a transaction session the application program may send a CREATE command defining a repertory button and referencing the Repertory region in the associated group id field to station set 10. Station set 10, in response to receipt of the command, stores it in the repertory region of its associated internal memory. However, the application program cannot address that button or any other object stored in the terminal's Repertory region, as mentioned above.

Objects stored in the Repertory region are typically created by the user and accessed when the user's terminal is off-line, i.e., is not communicating with an application program running on transaction processor 200. One such object may be, for example, a repertory button whose associated datum field contains a particular telephone number. If the user selects that button, then the station set causes its associated telephone station set, e.g., station set 10 (FIG. 1), to go off-hook. The station set then outpulses (dials) the telephone number that is associated with the selected button.

The datum field of an object stored in the Repertory region may contain two subfields, namely, an off-line subfield, which is always present, and an on-line subfield, which may or may not be present. The on-line datum subfield is present when its associated object defines a repertory dial button that is used to establish a data communications connection, for example, a connection to transaction processor 200. More specifically, if an on-line datum subfield is present, then that subfield is preceded by a special control character (e.g., S) which directs the associated station set to wait for carrier tone. Thereafter, when the data connection is established then the associated object may cause the station set to transmit that object as an event message to processor 200. At that point, the station set goes

5,649,131

| 11 | 12 |

on line, sends a Connected message (discussed above) to processor 200, erases the Repertory region from its associated display and activates its associated Application region. (An expanded, self-explanatory table of repertory dial control characters, including the above-mentioned S character is shown in FIG. 7.)

The Application and Command regions, which are respectively identified by identifiers (id) 1 and 2, may be used to partition the display of a station set communicating with a processor 200 transaction program. The Command region, in particular, contains a predefined suite of objects defining respective command buttons. Such command buttons, when displayed in accord with their respective policies, provide conventional functionalities across different types of transactions (applications) that may communicate with the associated station set.

For example, the application region may be first partitioned into a Message region and a region identified as A1. The A1 region is then further partitioned into a number of smaller regions, A2, A3, A4, P3, CNTRL1, etc., defining the layout of a particular screen pattern that is to be displayed. In the present illustrative example, regions A1, A2, A3 and A5 are used to specify a hierarchy of group identifiers and, in a sense, are dummy regions. Regions CNTRL1, P1, P2, USER and CNTRL2, on the other hand, define the way in which a screen, or display, is to be partitioned for the display of objects, or symbols, in those regions. An illustrative example of such an application layout is shown FIG. 8.

It is noted that the dotted lines shown in FIG. 8 are not displayed and are used for the purpose of illustrating the way in which a particular station set has elected to partition its display into the latter regions in response to receiving instructions to do so from the transaction processor. It is seen from FIG. 8, which illustrates a particular banking application, that the station set has displayed different objects in the specified regions, in which the objects are defined by respective CREATE commands issued by the transaction processor. (The various instructions for directing a terminal to display the screen of FIG. 8 are shown in appendix A.)

We turn now to a discussion of the programs which implement the invention in a transaction program, e.g., processor 200, and a computer type terminal, e.g., station set 10.

Specifically, FIGS. 9–11, show in flow chart form the program which implements the invention in transaction processor 200 (FIG. 1). The program may run under any one of a number of different types of user provided transaction programs that operates independent of the processor 200 program. Accordingly, the particular transaction program itself is not shown in the FIG.

The processor 200 program (hereinafter "program"), more particularly, is entered at block 900 in response to receipt of a message, presumably from a station set that is in communications with the processor. The program then proceeds to block 901 where it starts a series of determinations to identify the received message. If the received message is not a connected message, then the program proceeds to block 902. Otherwise, the program proceeds to block 908 where it checks to see if the station set's serial number contained in the message is associated with the communications port circuit that received the message. If that is not the case, then the program proceeds to block 912 where it discards the message and then proceeds to block 913 where it transmits a session message to the station set as a way of attempting to establish communications with the station set.

If the program finds that there is an association between the station set serial number and port, then it proceeds to block 909 where it compares the serial number in the message with a serial number that it stored in memory for the current session and that is associated with the aforementioned port circuit. If the serial numbers compare, indicating that the message is a retransmission of the connected message, then the program proceeds via block 910 to block 911 where it transmits a session message to the station set as a way of acknowledging receipt of a received connected message. If the serial numbers do not compare, then the program proceeds via block 910 to block 914 where it terminates the call.

At block 902, the program checks to see if a transaction session is in progress and proceeds to block 903 if that is the case. Otherwise, the program proceeds to block 915 where it discards the message. At block 903, the program determines if the newly received message is an event message indicative of input from the station set and proceeds to block 916 if that is case. Otherwise, the program proceeds to block 904.

At block 916, the program determines if the message contains a valid frame identity (id) (discussed below), and proceeds to block block 917 if that is the case. Otherwise, the program proceeds to block 920 where it discards the message. At block 917, the program proceeds to block 918 if the message contains a valid object id. Otherwise, it proceeds to block 920. At block 918, the program proceeds to block 919 to process a request for a chunk of text or block 921 if the message contains text or data, respectively. At block 919, the program forms a Create command, in which the text field contains a chunk of text the size of which conforms with the chunksize associated with the device communicating with the transaction processor and in which the beginning of the chunk of text corresponds with the value of the startbyte contained in the received message. The program (block 922) then transmits the Create command containing the requested text. At block 921, the program processes the data contained in the message and then determines the next action it should take based on the type of application (transaction) that is communicating with the sending station set.

At block 904, the program proceeds to block 923 if the message is a reply to a query generated by the application program. Otherwise, the program proceeds to block 905. At block 923, the program processes the reply data contained in the message and then determines the next action it should take based on that data and the particular application that is communicating with the sending station set. At block 905, the program proceeds to block 924 if the received message is a "Hold" command requesting that the current session be placed on hold as is done with a conventional telephone call. Otherwise, the program proceeds to block 906.

At block 924, the program places the session on hold and then proceeds to block 925 where it transmits an acknowledgment (HOLDACK) that has been placed on hold. At block 926, the program starts a software timer geared to time for a predetermined period of time, e.g., 10 minutes, at the end of which the program (blocks 927 and 930) terminates the call if it does not receive a carrier signal and a connected message from the station set. This action is invoked to prevent an indefinite hold time which would occur if the user does not re-establish the session. More particularly, at the end of the aforementioned period of time, as represented by the dashed line leaving block 926, the program is re-entered at block 927 where it proceeds to block 928 to determine if a carrier signal is indeed being received, or block 930-1 if that is not the case. At block 929, the program terminates the

13

session and associated telephone call. Whereas, at block 930-2, the program waits for the receipt of a connected message to re-establish the particular application session with the user's station set.

At block 906, the program proceeds to block 930-3 where it terminates the session as a result of determining that the received message is a "hangup" command. If that is not the case, then the program proceeds to block 907 to determine if the message is an error message. If it is not, then the program (block 930-4) discards the received message. Otherwise, the program proceeds to identify the type of error that is represented by the contents of the received message. Blocks 931 through 936, more particularly, perform that function and associated blocks 938 through 943 invoke the appropriate action based of the type of error identified in the received message. If the error cannot be identified then, at block 937, the program discards the received message.

FIG. 12 illustrates in flow chart form the actions that the communications protocol program invokes with respect to receipt of a particular type of command received from an associated application program represented by block 1001. When the instant program receives a particular one of the commands identified at blocks 1002 through 1010, the program associates the command with an identifier (id) and group identifier (gid) and then transmits the command, as represented by blocks 1011 through 1018, respectively.

FIGS. 13–15 show in flow chart form the program which implements the inventive communications protocol in a data terminal, such as a smart phone, e.g., station set 10 (FIG. 1). In particular, the program is entered at block 1100 upon receipt of a message containing a command and proceeds to block 1101 to begin the processing thereof. More particularly, at block 1101, the program checks its associated memory to determine if a transaction session is in progress and proceeds to block 1102 if it finds that to be the case. Otherwise, it proceeds to block 1113 to determine if the received message is a session message. If it is not, then the program proceeds to block 1114 where it discards the message and then exits. If it is, then the program proceeds to block 1115 where it compares the serial number contained in the message with the serial number of its associated device, i.e., station set 10. If the serial numbers match (block 1116) then the program proceeds to block 1118 where it notes in its associated memory that a session has been established. If those numbers do not match, then the program proceeds to block 1117 where it discards the message and then exits to await receipt of the next message.

If the received message happens to be a session message then the program proceeds from block 1102 to block 1119. Otherwise, it proceeds to block 1103. It is seen from the FIG. that the actions taken at blocks 1119 through 122 are similar to those taken at blocks 1113 through 1118, respectively, except for the fact that if the aforementioned serial numbers (IDs) match then the program discards the received message since it is representative of information already known by the program.

At block 1103, the program proceeds to either block 1104 or block 1123 based on whether or not the received message is a Create command. At block 1123, the program proceeds to block 1125 if it finds that the latter command is one of the create commands discussed above and proceeds to block 1124 if finds that is not the case. Block 1124 represents an error condition and marks an error flag to identify the error and then proceeds to block 1127 to process the error. That is, the program formats the error into a message and then sends the message to transaction processor 200.

14

At block 1125, the program proceeds to block 1128 if it finds that the received command is associated with a previously defined group. Otherwise, it proceeds to block 1126 to mark the aforementioned error flag as being an unknown group error and then proceeds to block 1127 to process the error. At block 1128, the program proceeds to block 1129 or 1130 based on whether the object defined in the received message has been previously defined. If it has, then the program (block 1129) replaces the priorly stored object with the object command contained in the received message. If it has not, then the program (block 1130) stores the received command in memory in relation to its associated group.

At block 1104, the program proceeds to block 1131 or 1105 based on whether the received message contains a Move command. At block 1131, the program checks to see if the associated group is stored in memory and proceeds to block 1133 if it finds that to be the case. Otherwise, the program proceeds to block 1132 where it sets the aforementioned error flag to indicate an unknown group error and then proceeds to block 1135 to process the error in the manner done at block 1127. At block 1133, the program checks to see if the object identified in the received message exists in memory and proceeds to block 1136 if it finds that to be the case. Otherwise, it proceeds to block 1134 where it sets the aforementioned error flag to indicate an unknown identification (ID) error and then proceeds to block 1135 to process the error, in the manner discussed above. At block 1136, the program associates (moves) the object identified in the received message with the group that is also identified in that message and then exits to await receipt of the next message.

At block 1105, the program proceeds to block 1106 or 1137 based on the received message containing a Change command. At block 1137, the program checks to see if the object is identified in memory and proceeds to block 1140 if that is the case. Otherwise, it proceeds to block 1138 to note the particular error condition and proceeds to block 1139 to process the error. At block 1140, the program locates the specification of the object in memory and then changes the specification in accord with the directions contained in the received message.

At block 1106, the program proceeds to block 1141 if the message happens to contain a Destroy command. Otherwise, it proceeds to block 1107. At block 1141, the program performs the same function as block 1137 and then proceeds to block 1143 if the result is true. If the result is not true, then it proceeds to block 1142 where it discards the message and waits for receipt of the next message. At block 1143, the program erases from its memory the object identified in the received message as well as other objects associated with that object, i.e., are associated with the same group

At block 1107, the program proceeds to block 1108 or 1144 based on whether the received message contains an Activate command. Block 1144, like blocks 1137 and 1141, checks to see if the object id contained in the received message is valid, i.e., is contained in memory. If it is, then the program proceeds to block 1146. Otherwise, it proceeds to block 1145 which, in conjunction with block 1149, performs an action similar to the action performed at blocks 1138 and 1139. At block 1146, the program locates the identified object and then proceeds to block 1147 where it checks to see if all of the objects associated with same group id are still specified in memory (intact) and therefore had not been priorly overwritten by an action taken in conjunction with a priorly received message. If the program finds that the group is not intact, then it proceeds to block 1148 where it notes the particular error condition in the aforementioned error flag and then proceeds to block 1149 to process the

5,649,131

15

error in the manner discussed above. If the program finds the group is intact then it proceeds to block **1150** where it activates the associated object as specified by block **1150**.

At block **1108**, the program checks to see if the received message contains a Frame command and proceeds to block **1151** if it finds that to be the case. Otherwise, it proceeds to block **1109**. (It is noted that a frame is the collection of objects and/or groups of objects that are displayed concurrently on a display or screen. For example, FIG. 8 represents such a frame, or screen, of displayed objects. Such a frame may also include objects (text) that can be displayed by scrolling. As an aspect of the invention, a frame is associated with a frame id, which the transaction processor transmits to a device, e.g., station set **10**, via a FRAME or SCREEN command. A SCREEN command is a macro which defines a series of ACTIVATE commands and is followed by a FRAME command. In practice, a SCREEN command is used as an encoding optimization facility to reduce the chance of a race condition occurring in the instance where a user touches or enters a displayed button following receipt of the ACTIVATE commands but before receipt of an associated FRAME command. Accordingly, each input event message that a device transmits to a transaction processor includes the associated frame id so that the transaction processor may correlate the event message with the appropriate frame. In this way, the transaction processor may ignore receipt of a duplicate of an already received event message. For example, if the transaction processor receives a DONE event message associated with a frame id of 123 and then begins to process that message and a short time later receives the same message bearing the same FRAME id, then the transaction processor may ignore the second, or duplicate message.)

At block **1151**, the program updates the Frame id to a value contained in the received message. The program then waits for receipt of the next message. At block **1109**, the program determines if the received message contains a data request (Datareq) and proceeds to block **1152** if that is the case. Otherwise, the program proceeds to block **1110**. At block **1152** the program checks the validity of the object noted in the received message and proceeds to block **1153** if it finds that the object does not exit, i.e., had not been previously defined. Otherwise, the program proceeds to block **1155**. The program at blocks **1153** and **1154** performs the same function that is performed by blocks **1145** and **1149**. At block **1155**, the program locates the specification for the object in memory, unloads all data and formula data and then formats a reply message. The program then proceeds via block **1156** to send the reply to transaction processor **200**, as will be discussed below.

At blocks **1110** and **1111**, the program causes its associated station set to drop (terminate) the modem carrier signal, but not the call. This action is typically done prior to establishing a voice call, such as a call to an agent associated with the transaction that is in communication with the associated station set. If the program finds that the received message does not contain a Voice or Holdack (Hold acknowledgement) command, then the program discards the received message and then waits for receipt of the next message.

16

FIG. 16 illustrates the program module which formats and then transmits a message to transaction processor **200**. In particular, the program module is entered at block **1200** when a user either selects a displayed Choice object or enters information in response to a displayed request for the entry of information (Entry object). At block **1200**, the program module proceeds to block **1201** where it formats a user selection or user entered information into a message and then proceeds to block **1202** where it transmits the message. The program then exits to await the transmission of the next user selection or entered information. Alternatively, the program is entered at block **1300** whenever the user requests the display of text, i.e., is scrolling through displayed text and requests additional text or text that had been previously displayed. When entered at block **1300**, the program proceeds to block **1301** to determine the startbyte of the next chunk size of text that is to be displayed on the user's station set. The program then proceeds to block **1201**, where, as mentioned above, the program formats the request into an input message and then transmits the message at block **1202**.

FIG. 17 illustrates another program module which formats and then transmits differents messages to transaction processor **200** and which has two entry points, namely blocks **1400** and **1500**. In particular, the program is entered at block **1500** when the user enters a request to terminate the current session (i.e., hangs up) or places the current session on hold. When the program is entered at block **1500** it proceeds to block **1501** where it format the user's request into a message and then transmits the message. The program then proceeds to either block **1503** or block **1504** based on the type of message that is being transmitted, as indicated in the FIG. At block **1503**, the program waits for a predetermined period of time, e.g., 10 seconds, and then terminates the session. At block **1504**, the program waits for receipt of a processor **200** message acknowledging a hold request (i.e., Holdack command). The program module is entered at block **1400** when receipt of a carrier signal is detected via an associated telephone line. Such detection occurs at the end of a Hold state or when a telephone connection is first established between the associated station set and processor **200**. Upon being so entered, the program proceeds to block **1401** where it unloads from its associated memory the manufacturing code and serial number assigned to its associated device, e.g., station set **10**. The program then proceeds to block **1501** where it formats a connected message using the unloaded information and then transmits the message to processor **200**. The program then proceeds to block **1502** where it continues to send the connected message to processor **200** every three seconds until a session command is received from processor **200**.

The foregoing is merely illustrative of the principles of the invention. Those skilled in the art will be able to devise numerous arrangements, which, although not explicitly shown or described herein, nevertheless embody those principles and are within the spirit and scope of the invention.

APPENDIX A

O:SESSION:ABCDEF01
O:DATAREQ
O:DESTROY
7:CHANGE:GENATTR:HIDE
1:CHANGE:GENATTR:HIDE

5,649,131

17    18

APPENDIX A-continued

```
64:CREATE:1:REGION:::
65:CREATE:1:REGION:::
66:CREATE:64:REGION:::
71:CREATE:64:REGION:::
69:CREATE:66:REGION:::
70:CREATE:66:REGION:::
72:CREATE:65:REGION:::
67:CREATE:65:REGION:::
68:CREATE:67:REGION:::
73:CREATE:68:REGION:::
74:CREATE:68:REGION:::
75:CREATE:67:*REGION:::
268435457:CREATE:69:CHOICE::::
268435458:CREATE:70:CHOICE::::
268435459:CREATE:71:CHOICE::::
268435460:CREATE:72:CHOICE::::
268435461:CREATE:75:CHOICE::::
112:CREATE:73:CHOICE::::
113:CREATE:112:ENTRY::NUMBER:ID:Enter ID:8:
268435463:C*REATE:74:CHOICE::::
101:SCREEN:268435457:268435458:268435459:268435460:268435461:112:268435463
4:CHANGE:GENATTR:HIDE
5:CHANGE:GENATTR:HIDE
6:CHANGE:GENATTR:HIDE
1:CHANGE:GENATTR:
114:CREATE:73:CHOICE::::
115:CREATE:114:ENTRY::NUMBER SECURE:Password:Enter secret code:8:
102:SCREEN:114
100:CREATE:69:CHOICE::::
101:CREATE:100:TEXT::PROMPT:O:HOME
152:CREATE:70:CHOICE::::
153:CREATE:152:TEXT::PROMPT:0:07/13/92
FOR DESIRED ITEM:
102:CREATE:72:CHOICE::::
103:CREATE:102:CHOICE::COMMAND:NEW: TOUCH HERE TO SEE CURRENT CD AND
LOAN RATES:
104:CREATE:75:CHOICE::::
105:CREATE:104:CHOICE::COMMAND:TOUCH HERE TO TALK TO YOUR HOME
BANKER:
116:CREATE:73:CHOICE::::
117:CREATE:116:CHOICE::COMMAND NOTOUCH::
118:CREATE:116:CHOICE::COMMAND:BANK AT HOME:
119:CREATE:116:CHOICE::COMMAND:PAY A BILL:
120:CREATE:116:CHOICE::COMMAND:STOCK/BONDS:
121:CREATE:116:CHOICE::COMMAND:STOP ORDER:
122:CREATE:116:CHOICE::COMMAND:TRAVEL CHECKS:
123:CREATE:116:CHOICE::COMMAND:SERVICES:
103:SCREEN:100:152:102:104:116
```

'IBANKING

10:12 AM 'JTouch BUTTON

We claim:

1. A method of operating a host processor communicating with a terminal device, said method comprising the steps of

assigning an identifier to a respective one of a plurality of input object types, and

transmitting said identifier and its respective input object type to said device, wherein said plurality of object types includes at least two of the object types choice, entry, text, and image.

2. A method of operating a host processor communicating with a terminal device, said method comprising the steps of

assigning an identifier to a respective one of a plurality of input object types,

transmitting said identifier and its respective input object type to said device, and

responding to a manipulation of the object at said terminal by transmitting to said processor a) said identifier and b) data representative of said manipulation, wherein said manipulation includes at least selection of said object; entry of data; or retrieval of display data.

3. A method of operating a host processor communicating with a terminal device, said method comprising the steps of

assigning an identifier to a respective one of a plurality of predefined presentation data types, said host being the originator of said identifier and said presentation data types,

transmitting said identifier and its respective presentation data type to said device, and

responsive to a manipulation of said respective presentation data type at said terminal device, transmitting to said processor said identifier and data representative of said manipulation, and further comprising the step of further transmitting to said device at least a first datum, and

wherein said data representative of said manipulation includes said first datum.

4. A method of operating a host processor communicating with a terminal device, said method comprising the steps of

assigning an identifier to a respective one of a plurality of predefined presentation data types, said host being the originator of said identifier and said presentation data types,

transmitting said identifier and its respective presentation data type to said device, and

responsive to a manipulation of said respective presentation data type at said terminal device, transmitting to

5,649,131

19

said processor said identifier and data representative of said manipulation,

further transmitting to said device at least a first datum,

wherein said data representative of said manipulation includes said first datum and wherein said respective presentation data type is representative of one of a plurality of different object types, and

presenting said first datum as a default data entry value for said one object type.

5. A method of operating a host processor communicating with a terminal device, said method comprising the steps of

assigning an identifier to a respective one of a plurality of predefined presentation data types, said host being the originator of said identifier and said presentation data types,

transmitting said identifier and its respective presentation data type to said device, and

further transmitting to said device at least a first datum, and

providing at said device a second datum that is a function of said first datum.

20

6. The invention of claim 5 wherein said second datum comprises data available at said device but not available at said host processor.

7. The invention of claim 6 wherein said first datum is a function call.

8. The invention of claim 5 wherein said respective presentation data type is representative of one of a plurality of different object types and wherein said method further comprises the step of presenting said second datum at said device as a label for said one object type.

9. The invention of claim 5 wherein said respective presentation data type is representative of one of a plurality of different object types and wherein said method further comprises the step of presenting said second datum at said device as a default data entry value for said one object type.

10. The invention of claim 5 further comprising the step of responsive to a manipulation of said respective presentation data type at said terminal device, transmitting to said processor said identifier and data representative of said manipulation, wherein said data representative of said manipulation includes said second datum.

* * * * *

# UNITED STATES DISTRICT COURT
Southern District Of California
Office Of The Clerk
880 Front Street, Room 4290
San Diego, California 92101-8900
Phone: (619) 557-5600
Fax: (619) 702-9900

W. Samuel Hamrick, Jr.
Clerk of Court

Matt Dykman
Chief Deputy

June 4, 2003

Josy W. Ingersoll
Young Conaway Stargatt & Taylor
PO Box 391
Wilmington, DE 19899-0391

R. Eric Hutz
Connolly Bove Lodge & Hutz
PO Box 2207
Wilmington, DE 19899

USDC Delaware (Wilmington)
Bin #18
844 North King Street
Wilmington, DE 19801-9956

RE: Lucent Technologies v. Dell Computer Corp

You are hereby notified that the above entitled case was on 06/02/2003 transferred
from the USDC Delaware (Wilmington) to the U.S. District Court, Southern District
of California.   The case will now contain the case number of the Southern District,
and  the initial of the assigned Judge.  The case has been assigned to the Honorable
Barry Ted Moskowitz, and on all future filings please show the case number as
**03cv1108-BTM(LAB)**.

W. Samuel Hamrick, Jr.
Clerk of Court

## M. AGUILAR

By: _____
M. Aguilar, Deputy Clerk

AO 120 (3/85)

| TO:<br><br>**Commissioner of Patents and Trademarks**<br>**Washington, D.C. 20231** | **REPORT ON THE**<br>**FILING OR DETERMINATION OF AN**<br>**ACTION REGARDING A PATENT** |
|---|---|

In compliance with the Act of July 19, 1952 (66 Stat. 814; 35 U.S.C. 290) you are hereby advised
that a court action has been filed on the following patent(s) in the U.S. District Court:

| DOCKET NO.<br>03cv1108-BTM(LAB) | DATE FILED<br>06/02/2003 | U.S. DISTRICT COURT<br>Transferred: United States District Court, Southern District of California |
|---|---|---|
| PLAINTIFF<br><br>Lucent Technologies Inc.; Lucent Technologies Guardian I LLC | | DEFENDANT<br><br>Dell Computer Corporation |

| PATENT NO. | DATE OF PATENT | PATENTEE |
|---|---|---|
| 1 4,439,759 | 03/27/1984 | James R. Fleming |
| 2 4,910,781 | 03/20/1990 | Richard H. Ketchum |
| 3 4,958,226 | 09/18/1990 | Barin G., Haskell |
| 4 5,227,878 | 07/13/1993 | Atul Puri |
| 5 5,347,295 | 09/13/1994 | Todd Agulnick |

In the above-entitled case, the following patent(s) have been included:

| DATE INCLUDED | INCLUDED BY<br>☐ Amendment   ☐ Answer   ☐ Cross Bill   ☐ Other Pleading | | |
|---|---|---|---|
| PATENT NO. | DATE OF PATENT | PATENTEE | |
| 1 5,649,131 | | | |
| 2 | | | |
| 3 | | | |
| 4 | | | |
| 5 | | | |

In the above-entitled case, the following decision has been rendered or judgment issued:

| DECISION/JUDGMENT |
|---|
|  |

| CLERK | (BY) DEPUTY CLERK | DATE |
|---|---|---|
|  |  |  |

Copy 1 - Upon initiation of action, mail this copy to Commissioner   Copy 3 - Upon termination of action, mail this copy to Commissioner

JS44
(Rev. 07/89)

## CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

**I (a) PLAINTIFFS**

Lucent Technologies, Inc.; Lucent Technologies Guardian I

**DEFENDANTS**

'03 CV 1108 BTM LAB

Dell Computer Corp

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF**
(EXCEPT IN U.S. PLAINTIFF CASES)

**COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT**
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

Josy W Ingersoll
1000 West Street, 17th Floor
Wilmington, DE  19899-0391
(302) 571-6600

**ATTORNEYS (IF KNOWN)**

FILED

JUN - 2 2003

CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY_____ DEPUTY

**II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)**

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III

**III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF**
(For Diversity Cases Only) AND ONE BOX FOR DEFENDANT)

| | PT | DEF | | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY).**

### 35:271 Patent Infringement

**V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)**

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reappointment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury-Medical Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | ☐ 630 Liquor Laws | ☐ 820 Copyrights | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment &Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 RR & Truck | ☒ 830 Patent | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veterans Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | ☐ 861 HIA (13958) | ☐ 850 Securities/Commodities Exchange |
| ☐ 160 Stockholders Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 530 General | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Tort to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 950 Constitutionality of State |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prisoner Conditions | | | |

**VI. ORIGIN (PLACE AN X IN ONE BOX ONLY)**  *DISTRICT OF DELAWARE*

☐ 1 Original Proceeding   ☐ 2 Removal from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☒ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

**VII. REQUESTED IN COMPLAINT:** ☐ CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p. 23   **DEMAND $**   Check YES only if demanded in complaint:   **JURY DEMAND:** ☒ YES ☐ NO

**VIII. RELATED CASE(S) IF ANY (See Instructions):**   JUDGE   Docket Number

DATE 6/2/03   SIGNATURE OF ATTORNEY OF RECORD